USDC SCAN INDEX SHEET

















MEG   6/26/00   9:37

3:96-CV-01023   BRADLEY V. HOFFENBERG

*349*

*AMDCMP.*

1 | Timothy C. Karen, Esq., SBN 117071
LAW OFFICES OF TIMOTHY C. KAREN
2 | 12702 Via Cortina, Suite 100
Del Mar, California 92014
3 | (619) 259-7790

4 | Attorneys for Plaintiffs

5

6

7

8

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| PAUL E. MEIER, Trustee of the EXCEL | ) Case No. 96-1023-L (JFS) |
| 10 BOTTLING CO. PENSION PLAN, Trustee of | ) |
| the PAUL E. MEIER TRUST, Trustee of the | ) THIRD AMENDED COMPLAINT FOR |
| 11 EDWARD & CATHERINE MEIER | ) DAMAGES AND FOR OTHER RELIEF |
| IRREVOCABLE INSURANCE TRUST of | ) |
| 12 which PAUL E. MEIER, and Trustee of the | ) |
| EDWARD J. MEIER REVOCABLE LIVING | ) |
| 13 TRUST, and STEVEN JOHNSON, | ) |
| | ) |
| 14 Plaintiffs, | ) |
| | ) |
| 15 v. | ) |
| | ) |
| 16 M.E. METZLER ORGANIZATION, INC., a | ) |
| duly Missouri corporation, MILTON E. | ) |
| 17 METZLER, JINCO LEASING CORP., dba | ) |
| JINCO FINANCIAL CORP., a Colorado | ) |
| 18 corporation and WAYNE MORRISON, | ) |
| | ) |
| 19 Defendant. | ) |
| | ) |

20

For their third amended complaint, Plaintiffs demand a jury trial under Federal Rules of Civil

21

Procedure, Rule 38(b) and allege as follows:

22

1.    This Court also has jurisdiction over the federal claims alleged herein under section 22(a)

23

of the Securities Act, 15 U.S.C. § 77v(a); section 27 of the Exchange Act, 15 U.S.C. § 78aa. This Court

24

has supplemental jurisdiction over the pendent State law claims herein under 28 U.S.C. § 1367. Venue

25

is proper in this matter because some of the original Defendants did business in this District and there

26

are related actions currently pending in this District and the time for the existing defendants to challenge

27

venue or jurisdiction has long past.

28

2.    This lawsuit is filed on behalf of investors in Towers Financial Corporation Promissory

ORIGINAL

349

1    Notes ["Towers Notes"]. Towers was a criminal Ponzi scheme, the chief promoter of which was sentenced
2    to 20 years in prison for his role in the fraud.    In the instant action, Plaintiffs have sued the brokerage
3    houses that recommended and sold the Towers Notes, alleging the breach of a variety of legal duties,
4    all as set forth more particularly below.

5       3.     Defendant JINCO LEASING CORP. ["JINCO"], dba JINCO FINANCIAL CORP., is
6    a duly organized Colorado corporation and is a securities broker-dealer and member of the National
7    Association of Securities Dealers which is based in Denver, Colorado who in the improper manner alleged
8    herein offered and sold, inter alia, Towers Notes. Defendant WAYNE MORRISON ["MORRISON"]
9    was a stockbroker employed by JINCO who, in the improper manner alleged herein, recommended and
10    sold $50,000.00 worth of note(s) on or about June 23, 1992 to STEVEN H. JOHNSON. The acts and
11    omissions of MORRISON were within the course and scope of his agency for Defendant JINCO and
12    at all times relevant herein, MORRISON was acting under the supervision, direction and control of and
13    with the express and implied authorization of the shareholders, officers, compliance officers, directors,
14    registered principals and other management level officials of JINCO.

15       4.     Default judgments have been entered against Defendants JINCO and MORRISON and
16    these defendants have filed an appeal of the default judgments, which appeal is currently pending. The
17    default judgments obtained against these defendants are based upon the allegations of the second amended
18    complaint in this case, which are referred to and incorporated by reference herein as to these Defendants
19    only. Plaintiffs have filed this third amended complaint for the purpose of amending the complaint to
20    reflect the dismissal of all parties Defendant other than JINCO, MORRISON, M.E. METZLER
21    ORGANIZATION, INC. and MILTON E. METZLER, and to add new allegations and legal theories
22    directed solely at M.E. METZLER ORGANIZATION, INC. and MILTON E. METZLER. It is not the
23    intention of Plaintiffs to change any of the allegations in this case which are made in the second amended
24    complaint as they pertain to Defendants JINCO and MORRISON or to seek any additional relief herein
25    against these Defendants, since judgment has already been entered as to these Defendants under the second
26    amended complaint, which is hereby realleged in its entirety by reference against JINCO and MORRISON
27    only.   Accordingly, the changes made in this third amended complaint pertain only to M.E. METZLER
28    ORGANIZATION, INC. and MILTON E. METZLER, who are still active litigants in the matter.

1        5.      Defendant M.E. METZLER ORGANIZATION, INC. ["METZLER, INC."] is a duly organized

2  Missouri corporation and is a securities broker-dealer and member of the National Association of Securities

3  Dealers which is based in St. Louis, Missouri who in the improper manner alleged herein offered and

4  sold, inter alia, Towers Notes. Defendant MICHAEL COURTE ["COURTE"] was a stockbroker employed

5  by METZLER, INC. who, along with Defendant MILTON E. METZLER, recommended Towers Notes.

6  COURTE recommended and sold $100,000.00 worth of note(s) on or about September 30, 1991 to PAUL

7  E. MEIER, Trustee of the EXCEL BOTTLING CO. PENSION PLAN; $100,000.00 worth of note(s)

8  on or about March 26, 1992 to PAUL E. MEIER, Trustee of the PAUL E. MEIER TRUST, which has

9  been transferred to the EDWARD & CATHERINE MEIER IRREVOCABLE INSURANCE TRUST

10  of which PAUL E. MEIER is Trustee; and $100,000.00 worth of note(s) on or about September 21, 1990

11  to PAUL E. MEIER, Trustee of the EDWARD J. MEIER REVOCABLE LIVING TRUST.  The acts

12  and omissions of COURTE and MILTON E. METZLER ["METZLER"] were within the course and scope

13  of their agency for Defendant METZLER, INC. and at all times relevant herein, COURTE and METZLER

14  were acting under the supervision, direction and control of and with the express and implied authorization

15  of the shareholders, officers, compliance officers, directors, registered principals and other management

16  level officials of METZLER, INC.

17        6.      Plaintiffs are informed and believe that Defendant METZLER was, at all times relevant

18  herein, the sole shareholder, sole director, and President of METZLER, INC., and was the person who

19  was responsible for conducting due diligence into the Towers Notes and for supervision of COURTE

20  in his sales activities with Plaintiff and all of COURTE's activities as alleged herein were done under

21  METZLER's direct supervision and control.  As such, he had the duty to supervise and exercise control

22  over COURTE, and the power to do so, so as to render him liable as a control person under the securities

23  laws and common law.

24        7.      Additionally, Plaintiffs are further informed and believe, and thereon allege that METZLER

25  has governed all of the corporate affairs, has assumed personal liability on corporate obligations, owns

26  a majority of corporate stock, has furnished corporate assets, treated the corporate assets as his own,

27  commingled corporate funds with his own, used the corporation as a conduit for his individual business,

28  used the corporation to procure goods or services for himself, that the corporations lack paid-in capital

1  or are inadequately capitalized, and METZLER took excessive and unjustified dividends from the corporations

2  at a time when such funds were needed to pay corporate liabilities. Plaintiffs are further informed and

3  believe that METZLER has exercised unfettered and total dominion and control over the corporation

4  and has caused the corporations to take action which, considered independently, was against its interest.

5  It would result in a fraud or injustice to maintain the corporate veil between Defendant METZLER and

6  the corporations, and for that reason, METZLER is merely an alter ego of METZLER, INC., so as to

7  render said individual and corporate defendant legally identical and jointly and severally liable for any

8  and all liability arising hereunder.

9       8.     The circumstances of MEIER's investment in the Towers Notes are set forth below:

10      9.     MEIER is a 59 year old retired insurance claims administrator and supervisor who lives

11  with his wife and mother in Chesterfield, Missouri. MEIER is an unsophisticated investor who mainly

12  invested in Certificates of Deposit prior to 1989. In or about 1989, while still working as an insurance

13  claims supervisor, MEIER became interested in investing some of his savings based on the referral of

14  a co-worker to invest with METZLER, INC. MEIER's co-worker informed him that METZLER, INC.'s

15  offices were in the same business complex as their company, Edna Life & Casualty, and that he found

16  METZLER, INC. to be a very reputable company. A short time later, MEIER visited the offices of

17  METZLER, INC. to find out more.

18      10.    During his visit, the staff at METZLER, INC. referred MEIER to one of their brokers,

19  COURTE, and also to the President of METZLER, INC., METZLER. MEIER recalls meeting with

20  COURTE or METZLER a short time later to discuss the possibilities of investing with METZLER, INC.

21  MEIER believes he met with METZLER first. During that first meeting and each of the following meetings

22  MEIER had with COURTE and METZLER, MEIER reiterated that his investment objectives were safety

23  of principal and a good return on his investment without sacrificing any safety. METZLER and COURTE

24  both assured MEIER that they would only make investment recommendations to MEIER with these

25  objectives in mind. Based on the advice and recommendation of METZLER and COURTE, MEIER

26  purchased several bonds and mutual funds over the following year.

27      11.    In or about 1990, MEIER's father, EDWARD MEIER, told MEIER that he was interested

28  in having MEIER invest the inheritance money he had saved and planned to give to MEIER upon his

1    death, which had placed in the Excel Bottling Co. Pension Plan, the Paul E. Meier Trust, which has since

2    been transferred to the Edward & Catherine Meier Irrevocable Insurance Trust, and the Edward J. Meier

3    Revocable Living Trust for MEIER.  EDWARD MEIER gave MEIER Power of Attorney over each of

4    these accounts and told him that he wanted MEIER to invest the money in safe investments which could

5    produce some income to make the inheritance money grow..

6          12.    With these objectives in mind, MEIER called METZLER, INC. a short time later and

7    told METZLER or COURTE that he was interested in investing some of the money EDWARD MEIER

8    had set aside as MEIER's inheritance. MEIER told METZLER and COURTE that his investment objectives

9    were the same as before, protection of principal and income without sacrificing safety. MEIER informed

10   METZLER and COURTE that it was very important to him to protect the principal he would invest because

11   the money was his inheritance. METZLER and COURTE both told MEIER that they would only recommend

12   investments which they believed met MEIER's investment objectives.  METZLER then told MEIER

13   that he had an excellent investment deal in mind. METZLER told MEIER about the promissory notes

14   being offered by Towers Financial Corporation.

15         13.    METZLER told MEIER that Towers was a very strong company that worked in the debt

16   collection business factoring account receivables for a substantial profit. METZLER told MEIER that

17   the money invested was secured and that they were collateralized by the accounts receivable at Towers.

18   METZLER told MEIER that Towers had been given a 'AA' rating by Duff & Phelps and that the accounts

19   receivable were insured.  In addition, METZLER told MEIER that he had visited Towers at their New

20   York offices and found them to be a "first class operation." METZLER said that with the excellent safety

21   and return on the investment, MEIER "could not lose."  METZLER also told MEIER that very large,

22   reputable organizations like the Detroit, Michigan Police Department had invested money from their

23   pension plan in Towers. METZLER told MEIER that Towers would be an excellent investment for him

24   to purchase to meet his investment objectives.

25         14.    Based on the advice and recommendations of METZLER, PAUL E. MEIER, Trustee of

26   the EDWARD J. MEIER REVOCABLE LIVING TRUST, purchased $100,000.00 worth of Towers note(s)

27   on or about September 21, 1990. A short time later, MEIER began receiving the interest payments from

28   Towers and felt confident that METZLER had provided MEIER with excellent investment advice.

1      15.    Approximately one year later, MEIER was again interested in investing more of the money

2    EDWARD MEIER had set aside for MEIER's inheritance. MEIER phoned METZLER, INC. and talked

3    to METZLER and COURTE about investing this money. METZLER and COURTE again recommended

4    that MEIER consider Towers. METZLER and COURTE emphasized the same representations which

5    were made to MEIER when he made his initial purchase in Towers. METZLER and COURTE also promised

6    the same excellent return while also maintaining the same safety of principal that Towers offered, stating

7    that Towers would continue to meet his investment objectives.

8      16.    Based on the same advice and recommendations of METZLER and COURTE, PAUL

9    E. MEIER, Trustee of the EXCEL BOTTLING CO. PENSION PLAN purchased $100,000.00 worth

10    of Towers note(s) on or about September 30, 1991. Towers began paying interest on the notes a short

11    time later and MEIER was once again satisfied with the advice that METZLER and COURTE had provided.

12      17.    In or about March 1992, MEIER became interested in investing more of the money set

13    aside for his inheritance. MEIER phoned METZLER, INC. and spoke to COURTE about the possibilities.

14    COURTE told MEIER that he still believed that Towers was the best option for meeting MEIER's goals,

15    reiterating all of the same representations that had been made to MEIER when he initially purchased Towers.

16    MEIER asked to speak to METZLER to also review the idea with him. METZLER reiterated COURTE's

17    representations about Towers and also told MEIER that his best investment option was to purchase Towers,

18    as Towers best fit with MEIER's investment objectives.

19      18.    Based on the same advice and recommendations of METZLER and COURTE, PAUL

20    E. MEIER, Trustee of the PAUL E. MEIER TRUST, purchased $100,000.00 worth of Towers note(s)

21    on or about March 26, 1992. A short time after this purchase was made the ownership of this investment

22    was transferred to PAUL E. MEIER, Trustee of the EDWARD & CATHERINE MEIER IRREVOCABLE

23    INSURANCE TRUST. MEIER began receiving interest payments from Towers a short time later and

24    once again believed that his money was secure and that METZLER and COURTE had provided him

25    with excellent investment advice.

26      19.    In or about September 1992, COURTE phoned MEIER and informed him that his first

27    Towers purchase was about to mature. COURTE asked MEIER if he was interested in reinvesting the

28    money in Towers. MEIER told COURTE that he was interested in reinvesting in Towers and asked if

1 COURTE thought that Towers would continue to meet his same investment objectives of safety of principal

2 and income without sacrificing safety. COURTE said that Towers was an excellent idea and that the

3 company was performing better than ever and was stronger than ever. COURTE told MEIER that because

4 Towers was doing so well, the opportunity to buy Towers notes at a great interest rate while maintaining

5 safety would soon pass, as Towers would be going public and selling stock instead. MEIER told COURTE

6 that the idea of reinvesting sounded great and that he also wanted to review the idea with METZLER.

7 METZLER made the same representations to MEIER that COURTE had made and told MEIER that

8 he believed MEIER should reinvest in Towers.

9      20.    Based on the same representations of METZLER and COURTE, PAUL E. MEIER, Trustee

10 of the EDWARD J. MEIER REVOCABLE LIVING TRUST purchased $100,000.00 worth of Towers

11 note(s) on or about September 21, 1992. Towers began paying interest on this investment a short time

12 later and MEIER was pleased that METZLER and COURTE had advised him to purchase Towers once

13 again.

14      21.    In or about February 1993, MEIER did not receive the interest payments he was due from

15 Towers. MEIER also received a letter from Steve Hoffenberg and Towers Financial Corporation dated

16 February 23, 1993, which stated that due to an SEC investigation, Towers had frozen its interest payments

17 to investors. MEIER called METZLER to find out what had happened. METZLER told MEIER that

18 he was not sure why the interest payments had been frozen, but in any event his money was secure and

19 that he should not worry. METZLER told MEIER that he would look into it and let him know what

20 he found out. MEIER called METZLER, INC. approximately once per week after this to find out that

21 METZLER had learned anything new. Each time, METZLER told MEIER that his money was secure

22 and that he should not worry. METZLER promised that he would let him know if anything newsworthy

23 happened.

24      22.    In or about April 1993, METZLER phoned MEIER and informed him that Towers had

25 declared bankruptcy. MEIER asked METZLER what that meant for him as a Towers investor. METZLER

26 assured MEIER that his investments were secured and that Towers was probably just reorganizing the

27 company, which he emphasized was a "first class organization." METZLER told MEIER that even if

28 Towers did not resume paying interest to investors, the principal that MEIER had invested was secure

1    based on the collateral of the accounts receivable. METZLER reminded MEIER that he believed that

2    MEIER was in a better position than Towers, stating that even if Towers were to close its doors, MEIER

3    would still get all of his money back because he was a secured Towers investor. MEIER was satisfied

4    with METZLER's explanation and believed that he would eventually recover all of his Towers principal,

5    even if Towers closed its doors.

6        23.      In or about June 1993, MEIER received claim forms related to the Towers bankruptcy

7    proceeding with instructions on filing them. MEIER promptly completed the forms and attached the

8    supplementary documentation to verify that he was a secured investor. MEIER mailed in his proof of

9    claim forms and felt that it would only be a matter of time before he recovered all of his principal Towers

10    investments. MEIER continued to phone METZLER or COURTE on a weekly basis to discuss the progress

11    of the Towers situation. During each conversation, METZLER and COURTE continued to reassure MEIER

12    that his money was secure and that he only needed to wait out the bankruptcy proceeding to get it back.

13        24.      In or about January or February 1994, MEIER received a report from the Trustee for the

14    Towers bankruptcy proceeding which indicated that Towers was a Ponzi scheme and that the principal

15    officials of Towers had stolen the money invested by Towers investors, so that there was very little left

16    to repay investors. MEIER once again called METZLER and asked what that meant. METZLER explained

17    to MEIER that he was most likely not a secured Towers investor based on this report and that he might

18    not recover any of the money he invested. MEIER asked METZLER how that could be since the Towers

19    notes he purchased were collateralized and secured. METZLER apologized to MEIER and told him that

20    evidently, Towers had not been using the money as promised. MEIER told METZLER that he was very

21    disappointed about the loss and was shocked that METZLER would so strongly recommend an investment

22    such as Towers for him when METZLER was fully aware that the money MEIER used to purchase Towers

23    came from his inheritance money which he only wanted to use to purchase very safe investments. METZLER

24    told MEIER that there was nothing he could do about it and that he should stick it out through the bankruptcy

25    process to see if he would get his money back. MEIER was very disappointed by this news and believed

26    that he might not recover any of the money he had invested.

27        25.      MEIER did not immediately learn of facts sufficient to put them on notice of any breach

28    of duty by Defendants at the time of the Towers Bankruptcy or of the objective need to initiate legal

1   action against Defendants. At the time that Towers filed bankruptcy, Plaintiff was still involved in a

2   fiduciary stockbroker- client relationship with Defendants and Defendants did not repudiate this role

3   at the time of the bankruptcy filing. The letter from Hoffenberg, the cessation of distributions, and the

4   bankruptcy did not trigger the statute of limitations in this case on Plaintiffs' claims, because these things

5   did not disclose that 1) the investment was not secured by accounts receivable of an equal or great *actual*

6   value than the face amount of the promissory note, 2) the investment was part of a criminal Ponzi scheme

7   *in which nearly all of the factual statements made in the written materials distributed with the investment*

8   were fraudulent, 3) the Defendant had failed to conduct adequate due diligence into the investment, 4)

9   the investment had never been suitable or in the best interests of Plaintiffs, 5) the investment was sold

10  in violation of state and federal registration requirements, 6)at the time that Defendant recommended

11  the Towers investments to Plaintiffs, Defendants were under a "best efforts" contract with Towers to

12  sell the investments while at the same time, concealing material information about the investment from

13  Plaintiffs, 7) a wealth of negative historical information existed about Steven Hoffenberg and Towers

14  prior to the time that Plaintiffs made their investments, 8) the financial statements issued by Towers were

15  utterly fraudulent and did not accurately reflect the income or net worth of Towers, 9) the money invested

16  had in all likelihood had not actually been used to purchase accounts receivable, and 10) virtually everything

17  which Plaintiffs had been told about the investment was a lie. These facts were not known or discoverable

18  by Plaintiffs for at least one year after the date of the bankruptcy filing, as more and more information

19  regarding the true facts of the Towers investment were gradually published and learned by Plaintiffs.

20  Moreover, Plaintiff had continuing communications with Defendants as his financial advisor after the

21  date that Towers went bankrupt, and in these communications, Defendants did not disclose any of the

22  above true facts to Plaintiff. In their communications with Defendants, who indicated that they too were

23  baffled by what was happening with Towers, and they could give no explanation for what went wrong

24  with the investment. Each representative did reassure each Plaintiff that their money should be safe, despite

25  the bankruptcy, because the Towers Notes were secured by high quality collateral.

26      26.    MEIER also reasonably believed that a Chapter 11 Bankruptcy Reorganization may occur

27  for reasons other than actual insolvency and certainly, the fact that a corporation chooses to file bankruptcy

28  does not necessarily infer fraud. After they learned of the bankruptcy, Plaintiff discussed the meaning

of the bankruptcy with the Defendants, and were told that the investment was secured, so that even if Towers was in bankruptcy, the security would cover the investment and Plaintiffs would receive their money back. Each Plaintiff filed a proof of claim form with the bankruptcy trustee asserting a secured claim against the estate.

27.     Since he suffered the loss of his Towers investments, MEIER has undergone a great deal of anxiety and distress. He felt that he could not face his father because he had purchased such horrible investments with money his father had intended him to receive as his inheritance. MEIER has suffered many sleepless nights since the loss, wondering why he trusted METZLER and COURTE with his inheritance. MEIER continues to wonder if he will ever recover any substantial portion of the investment again.

28.     MEIER, METZLER, and METZLER, INC. all resided in the State of Missouri at all times relevant herein, and none of the misconduct complained of on the part of METZLER and METZLER, INC. took place outside of Missouri. No state other than Missouri has any interest in having its law applied to this case, and for that reason, Missouri law should be applied to the state law claims and to the state law statutes of limitations as far as the claims of MEIER are concerned in this case.

29.     Unbeknownst to Plaintiff, the source of the interest they received on the Notes was not generated by profits from the factoring of high quality accounts receivable. The money used to make distributions to Plaintiffs came from funds raised from the Towers Note offerings and Towers was nothing more than a huge criminal Ponzi scheme, the history of which is set forth below.

30.     Steven Hoffenberg a/k/a Barry Cohen was Chief Executive Officer, President, and Chairman of the Board of Directors of Towers and exercised actual control over all of its subsidiaries. Hoffenberg was convicted of fraud and received a 20-year prison sentence for his role in the Towers debacle. Prior to the time that the Plaintiffs purchased their Towers Notes, Hoffenberg had racked up a lengthy history of legal violations, failed business ventures, regulatory violations, questionable business transactions and unethical behavior.

31.     Defendants led Plaintiffs to believe that Defendants were Plaintiffs' financial advisors and that in this capacity, the recommendations of Defendants were based solely on the question of what was best for Plaintiffs. Defendants concealed from Plaintiffs the fact that Defendants were under contract with Towers Financial Corporation to use Defendants' best efforts to sell the Towers Notes as a non-exclusive

1    sales agent and was also required to conceal material information from investors such as Plaintiffs.

2        32.    Defendants acted in concert with Towers Financial Corporation pursuant to a written

3    Broker-Dealer Agreement. In accordance with the Agreement, Defendants became the sales agent for

4    Towers Financial Corporation for the sale of the Towers Notes, entitling them to receive sales commissions

5    of between 5% and 10%, plus an additional commission payable automatically if the proceeds from the

6    Towers Notes were reinvested. A true and correct copy of an exemplar of the Broker-Dealer Agreement

7    between Towers and Defendants is attached as Exhibit "52" and is incorporated by reference herein.

8    On page 2 of the Broker-Dealer Agreement the following language is set forth:

9            *The Broker-Dealer will aid in the placement of the Promissory Notes on a "best efforts"*
        *nonexclusive basis through the distribution*, subject to applicable securities laws and

10           regulations, of the Offering Document and subscription documents relating to the offering
        to potential Accredited Investors and their purchaser representatives (as such terms are

11           defined in Regulation D) and through the processing of such Accredited Investors and
        their purchaser representatives. *The Broker-Dealer agrees to utilize only the Offering*

12           *Document and such offering materials which are provided by the Company or which*
        *have been previously approved by the Company in writing in connection with the offering*

13           *and sale of the Promissory Notes.* Specifically, *the Broker- Dealer acknowledges that*
        *from time to time the Company may, in its sole discretion, provide the Broker-Dealer*

14           *or its representatives with certain information not contained in the Offering Document*
        *in connection with the Broker-Dealer's "due diligence" examination. The Broker-Dealer*

15           *agrees that no reference to any such material, which is not described or contained in*
        *the Offering Document or any amendment thereto, will be disclosed to any potential*

16           *Investor or appear in any analysis, report or literature prepared by the Broker-Dealer*
        *or its representative, except with the prior written consent of the Company. Neither*

17           *the Broker-Dealer nor its representatives are authorized to circulate any such information*
        *or to make any representations other than those contained in the Offering Document,*

18           *and any such information will be furnished to the Broker-Dealer or its representatives*
        *only upon the condition that the same is for their information only*; and such persons

19           will upon request of the Company execute all such agreements and documents as the
        Company may reasonably request in connection with the matters contained in this Section,

20           which agreements and documents may be filed by the Company with the Securities and
        Exchange Commission or any state securities agency. [Emphasis added].

21       33.    Plaintiffs would not have agreed to purchase the Towers Notes if they had been informed

22   that Defendants were was acting as sales agent for Towers, rather than an impartial financial advisors,

23   or that they had agreed to conceal from Plaintiffs material information about the investment received

24   by them from Towers.

25       34.    At all times relevant herein, Defendants provided financial advice for compensation to

26   Plaintiffs. In providing this financial investment advice, Defendants and Defendants' registered

27   representatives:

28

-11-

1        a.     expressly and impliedly held themselves out as experts in financial matters who stood

2 ready to provide expertise financial advice on suitable investments,

3        b.     caused Plaintiffs to reasonably place their complete trust and reliance upon the skill, advice

4 and expertise of the stockbroker/brokerage house/financial advisor so as to create a confidential, fiduciary

5 and trustee relationship.

6        c.     solicited the purchase of investments in the context of a brokerage house/investor or financial

7 advisor/advisee relationship.

8        d.     impliedly represented that they had conducted thorough due diligence into the recommended

9 investments and had concluded that the investments were bona fide and not part of a criminal fraud, and

10 that the written materials provided to Plaintiffs accurately depicted the features and risks of the investment

11 and were not fraudulent or part of a fraudulent Ponzi scheme.

12        e.     impliedly represented that recommended investments were legitimate business enterprises

13 and that the securities were bona fide securities which were legally being sold under the applicable State

14 and Federal registration and qualification laws.

15        f.     Expressly and impliedly represented that it was in Plaintiffs' best financial interest to purchase

16 the investments.

17        g.     Expressly and impliedly represented that the investments were offered by a legitimate,

18 successful, growing business enterprise engaged in lawful commerce.

19        h.     Stated that the investments were fully secured by accounts receivable.

20        I.     Expressly and impliedly represented that the other positive features of the investment set

21 forth in the written materials provided to Plaintiffs were existent and that the written materials accurately

22 described the investment.

23        j.     Expressly and impliedly represented that the investments were exempted from state and

24 federal registration requirements.

25        k.     Caused Plaintiffs to reasonably place their complete trust and reliance upon the skill, advice

26 and expertise of the stockbroker/brokerage house/financial advisor so as to create a confidential, fiduciary

27 and trustee relationship.

28        35.     In making their decision to purchase the Towers investments, Plaintiffs relied upon the

-12-

1  skill and integrity of Defendants and their registered representatives as their financial advisors and upon

2  the truth of the above express and implied representations.

3      36.    A fiduciary and confidential relationship existed between them and Defendants at all times

4  material herein. In the context of such a confidential and fiduciary relationship, the basis of liability in

5  this case is that Defendants had a duty to:

6      a.    conduct reasonable due diligence investigation into the background of the Towers enterprise

7  and its principals and the safety of the Towers Notes and reveal the results of such due diligence to Plaintiffs.

8      b.    discover and disclose reasonably obtainable adverse information regarding the Towers

9  Notes or the Towers enterprise and its principals.

10     c.    to undertake reasonable action to ascertain the truth or falsity of the highly positive

11  representations made by the Towers promoters.

12     d.    to ascertain and disclose whether or not the sale of the Towers Notes violated the registration

13  requirements of the State and Federal governments.

14     e.    to ascertain whether or not the Towers Notes were suitable for Plaintiffs and refrain from

15  recommending and selling the same to Plaintiffs.

16     f.    to refrain from selling the Towers Notes in violation of State and Federal registration

17  requirements.

18     g.    act in accordance with the standards of care regularly employed by similarly situated

19  professionals in the financial advisory industry.

20     h.    to abide by the rules and regulations of the Self-Regulatory Agencies in which Defendants

21  held memberships, including but not limited to the "suitability," "know your customer," and "reasonable

22  basis for recommendation" rules of the National Association of Securities Dealers, the New York Stock

23  Exchange, the Pacific Stock Exchange, and the American Stock Exchange.

24     I.    To conduct itself in all respects as a fiduciary towards Plaintiffs honestly and within the

25  highest standards of good faith.

26     37.    Plaintiffs contend that for the many reasons set forth in greater detail below, Defendants

27  breached these duties by recommending, offering, selling and delivering, or permitting or causing the

28  recommendation, offer, sale and delivery of Towers Notes to Plaintiffs, and that this breach of duty

-13-

1  proximately caused injury to Plaintiffs, giving rise to the right to relief under the various legal theories

2  alleged herein.

3  **TOWERS FINANCIAL WAS A CRIMINAL PONZI SCHEME**

4  38.  Unbeknownst to Plaintiffs, the source of the interest they received on the Notes was not

5  generated by profits from the factoring of high quality accounts receivable. The money used to make

6  distributions to Plaintiffs came from funds raised from the Towers Note offerings and Towers was nothing

7  more than a huge criminal Ponzi scheme, the history of which is set forth below.

8  39.  Steven Hoffenberg a/k/a Barry Cohen was Chief Executive Officer, President, and Chairman

9  of the Board of Directors of Towers and exercised actual control over all of its subsidiaries. Hoffenberg

10  was convicted of fraud and received a 20-year prison sentence for his role in the Towers debacle.  Prior

11  to the time that the Plaintiffs purchased their Towers Notes, Hoffenberg had racked up a lengthy history

12  of legal violations, failed business ventures, regulatory violations, questionable business transactions

13  and unethical behavior.

14  **The Offer And Sale Of Unregistered, Nonexempt Securities**

15  40.  Towers began offering Notes to the public in or about 1986.  Through six offering memoranda,

16  dated from January 1988 through March 1992, resulted in the sale of approximately $272 million in Notes

17  to 2,800 investors nationwide.

18  41.  Initially, Towers Notes were solely distributed by Eton Securities, a brokerage house wholly

19  owned by Mitchell Brater, a Towers officer who was later criminally convicted due to his Towers misconduct.

20  These sales were not registered as required under federal and state law. Moreover, the offering materials

21  employed to effect the sales were grossly misleading.  These initial Note sales attracted the attention and

22  prompted serious concerns on the part of the Securities and Exchange Commission ("SEC") and various

23  State securities officials.

24  42.  On August 4, 1988, the United States Securities and Exchange Commission ["SEC"] filed

25  an injunctive action against Towers Financial and several of its officers, styled <u>SEC v. Towers Credit</u>

26  <u>Corporation, Towers Financial Corporation, Steven Hoffenberg, Eton Securities Corp. and Mitchell Brater,</u>

27  88 Civ.5421 (SWK).  The action alleged that the sale of the Towers Notes violations of Section 5 of the

28  Securities Act, which prohibits the offering or sale of unregistered securities, among other things.  The

-14-

1  SEC charged that Towers had sold $ 34 million in unregistered securities—18 percent promissory notes—to

2  more than 400 investors in 26 states.  The SEC said the notes should have been registered.  A federal

3  judge in New York in late 1988 ordered Towers to halt sale of the unregistered notes, to offer to pay back

4  investors, to post $ 3.5 million as security, to not destroy records and to provide records to the SEC.

5  The SEC also filed a complaint against Eton Securities, a registered broker-dealer (stock brokerage) that

6  sold the notes, and which is owned by Towers Vice Chairman Mitchell Brater.  Hoffenberg, Towers,

7  Towers Credit, Brater, and Eton entered into a consent decree entitled "Final Consent Judgment of Permanent

8  Injunction and Order" (the "SEC Injunction") on November 16, 1988 and on May 12, 1989 (the "SEC

9  Injunction").  The SEC Injunction prohibited the sale of the Towers Notes without the filing of a registration

10  statement.  True and correct copies of the 1988 SEC complaint and the SEC Injunctions are attached

11  as Exhibits "25" and "26" and are incorporated by reference herein.

12      43.    Beginning no later than February 1989, Towers again started to sell unregistered promissory

13  notes in flagrant violation of the SEC Injunction.  Towers sold over $245 million in Towers Notes of

14  the type purchased by Plaintiffs in violation of the SEC 1988 injunction.

15      44.    The large scale sale by Towers of unregistered promissory notes caught the attention of

16  State regulators.  Towers was barred from selling the unregistered Notes in Alabama in 1990 [Exhibit

17  29"], Louisiana in 1991, and Nebraska in 1990 [Exhibit "32"].  On January 8, 1991 Towers consented

18  to an order with the state of Louisiana involving the failure to make adequate disclosure and the sale of

19  unregistered securities.  On October 17, 1989, the state of New Jersey issued an order of denial of an

20  exemption to Towers for sale of promissory notes.  Towers was told by the states of Texas, North Carolina,

21  Maryland and New Mexico that it could not sell securities without registering them. In the case of Alabama,

22  the state found that Towers had sold promissory notes in violation of state securities' laws, a finding echoed

23  by Louisiana and Nebraska. The latter state also fined Towers Financial $5,000.  All of the State actions

24  against Towers were of public record and could have been reviewed by anyone who desired to look.

25      45.    Notwithstanding the fact that it had been placed on notice that its sale of the unregistered

26  Towers Notes was illegal, Towers continued to sell the notes and heavily promoted them to thousands

27  of brokerage  houses across the country.

28      46.    The Towers Notes sold after the SEC Injunction had been entered were offered and sold

-15-

1    to United States residents pursuant to five offering memoranda dated February 15, 1989, February 20,

2    1990, October 1, 1990, October 15, 1991, and March 23, 1992, respectively (the "Domestic Memoranda")

3    and to non-United States residents pursuant to a so-called Explanatory Memorandum (collectively, the

4    "Offering Memoranda").  With few exceptions, these offering memoranda were essentially identical.

5         47.    Towers sold approximately $51 million in notes pursuant to an offering document dated

6    February 15, 1989; approximately $49 million in notes pursuant to an offering document dated February

7    20, 1990; approximately $76 million in notes pursuant to an offering document dated October 1, 1990;

8    and approximately $39 million in notes pursuant to an offering document dated-October 15, 1991; and

9    an uncertain amount of notes pursuant to an offering document dated March 23, 1992.

10         48.    The Notes offered to United States residents had maturity terms of one to three years and

11    paid interest at annual rates ranging from 12 to 14 percent for one-year Notes and from 14 to 16 percent

12    for two-year Notes.  Although these Notes were purportedly for sale in units of $50,000 or $100,000,

13    Towers routinely sold them in fractions of such units.

14         49.    The Notes offered to non-United States residents had maturity terms ranging from one

15    to seven years and paid interest at annual rates ranging from 14 to 16 ½ percent.  Although these Notes

16    were purportedly for sale in units of $100,000, Towers routinely sold them in fractions of such units.

17         50.    The Notes were offered and sold to residents of at least 40 States.  Many of these investors

18    are unsophisticated and live on fixed incomes.  The offer and sale of the Notes was effected through a

19    general solicitation, including cold call telephone solicitations.  Towers sold the Notes in violation of

20    blue sky registration and federal registration requirements.  Although Towers sold the Notes pursuant

21    to the private placement Regulation D limited offering exemption to the Federal Securities Act of 1933,

22    in reality the offering constituted an integrated public offering which did not meet the Regulation D exemption

23    requirements.  This integrated offering began in 1987 and continued until March of 1993, when the last

24    Towers Notes were sold.

25         51.    In or about 1989, the Securities & Exchange Commission ("SEC") began an new investigation

26    of Towers Financial.  This investigation culminated on February 8, 1993, when the SEC sued Towers,

27    Hoffenberg, Brater, and others charging the sale of unregistered securities and fraud. On or about March

28    29, 1993, Towers and its subsidiaries, including Towers Credit, Towers Collection, and the Healthcare

1    Subsidiaries, filed for bankruptcy under the protection of Chapter I I of the Bankruptcy Code.

2        52.    In connection with the SEC's case against Towers, Hoffenberg and others, Senior SEC

3    Attorney Dorothy Heyl prepared a declaration describing the Towers Ponzi scheme. A true and correct

4    copy of this declaration is attached hereto as Exhibit "28" and is incorporated by reference herein as if

5    made as factual allegations in the complaint. Set forth below is a description of the details of the Towers

6    fraud.

7        **Towers' Fraudulent Business Activities.**

8        53.    Towers' business, the collection and financing of accounts receivable, was secondary in

9    importance in importance to Towers' primary objective which was to provide a vehicle for the personal

10    enrichment of Hoffenberg and other participants in the fraud, at any cost. To sustain a steady flow of

11    new cash, Towers contrived to create, through various means, an image of Towers and its investments

12    which was entirely false. Throughout the period of its existence, Towers lost substantial sums through

13    the diversion of funds to the personal benefit of Hoffenberg and others, and the generally unprofitable

14    character of Towers' real business activity which was entirely different from the activities described in

15    the written materials disseminated by Defendant and Towers.

16        54.    Towers made payments to investors which were denominated "interest" payments, when

17    in fact those payments merely represented the return to investors of a portion of their principal or improperly

18    diverted proceeds of offerings of later sold Towers Notes and "Bonds" sold by Towers.

19        55.    Hoffenberg was Chief Executive Officer, President, and Chairman of the Board of Directors

20    of Towers and President of Towers Collection and TFC Funding Corporation. Hoffenberg directly owned

21    1 0 percent of Towers' common stock and additionally owned or controls 61.4 percent of the stock through

22    Professional Business Brokers, Inc., a corporation owned by the Hoffenberg Family Trust of which he

23    was the trustee. Through Professional Business Brokers, Inc., the Hoffenberg Family Trust received

24    a percentage of Towers' gross revenues ostensibly pursuant to an agreement stemming from the 1986

25    sale of TFC Funding Corporation and Towers Credit to Towers.

26        **THE OFFERING MEMORANDA WERE RIDDLED WITH FRAUD**

27        56.    The Offering Memoranda incorporated by reference the Towers Financial Corporation

28    Annual Reports and contained copies of the Subscription Agreement, Promissory Note, and Security

-17-

1  Agreement. The Offering Memoranda and these documents contained numerous fraudulent misrepresentations
2  and omissions of material fact concerning the Towers Notes purchased by Plaintiffs.  True and correct
3  copies of the Offering Memoranda are  attached as Exhibits "45," "47" and "49" and are incorporated
4  by reference herein.

5      57.    The Offering Memoranda represented that Towers would use the funds it raised from Note
6  investors to buy certain types of current accounts receivable or loan portfolios for collection by Towers
7  for its own account. The Offering Memoranda Stated that Towers typically would acquire accounts receivable
8  at a price of up to 95 percent of their face value, earn a minimum 5 percent "factoring fee" for each receivable
9  collected, and reinvest the proceeds of collection in additional receivables.  The Offering Memoranda
10  further Stated that Towers expected to compound its "factoring fee" up to six times per year through this
11  purchase and collection of receivables and reinvestment of the collection proceeds in more receivables.

12      58.    In fact, Towers bought few, if any, current accounts receivables with the Note proceeds,
13  buying instead past due, largely uncollectible accounts receivable or loan portfolios at prices substantially
14  lower than 95 percent of the face value of the receivables or portfolios.

15      59.    Instead of using Note investors' funds to purchase accounts receivable, Towers used the
16  money to pay, among other things, interest on the Notes and Towers' operating expenses and to enrich
17  the perpetrators of the Towers Fraud, including Defendant.  Because the accounts receivable which Towers
18  owned or had contracted to collect on behalf of others were of such poor quality, Towers' cash flow was
19  insufficient to meet its needs and obligations.  Thus, Towers resorted to such measures as spending the
20  collection proceeds instead of remitting them to its clients and diverting millions of dollars from the
21  Healthcare Subsidiaries to itself.

22      60.    The Offering Memoranda Stated that the Notes would be fully collateralized by accounts
23  receivable purchased with the Note proceeds and having a total face value substantially in excess of the
24  value of the Notes sold.  In reality, the Notes were severely under collateralized, if collateralized at all,
25  because of the low quality of accounts receivable purchased by Towers at huge discounts.  In addition,
26  the accounts receivable reflected in the financial statements consisted of a substantial amount of collection
27  receivables which Towers did not own, but only collected as agent and took a fee, and of certain healthcare
28  receivables purchased by funds obtained through a bond offering by a Towers subsidiary, Towers Health

1  Care Receivables Corporation, which Towers also did not own. Receivables owned by a third party

2  could not serve as legal collateral for the Notes.

3      61.     The Offering Memoranda stated that the security interests held by investors accounts receivable

4  that served as collateral would be perfected by filing under the Uniform Commercial Code or by pledge.

5  It is legally impossible to pledge an account receivable. Although UCC filings were done, as of June

6  30, 1991, Towers owned virtually no current accounts receivable, so these filings had no beneficial effect

7  for investors such as Plaintiffs. Whatever accounts receivable that Towers did purchase were of an extremely

8  low grade of debt, already written off by the seller and sold at a huge discount to Towers. These accounts

9  could not provide any security for the Towers Notes.

10     62.     The Offering Memoranda stated that Note proceeds would be deposited in special interest

11  bearing accounts - called "Funding Accounts" - at Chase Manhattan Bank and would remain in such

12  accounts to the extent the funds were not used to purchase accounts receivable or pay certain specified

13  expenses. Towers was prohibited from withdrawing these funds unless they constituted "excess profits,"

14  which were defined as "an amount equal to the amount by which (a)(I) the face value of the Accounts

15  Receivable plus (ii) the Funds on deposit in the [special interest-bearing] Account exceeds (b)(I) the face

16  amount of all issued Promissory Notes plus (ii) all accrued and unpaid interest due on such Promissory

17  Notes."

18     63.     Although Towers had purchased few accounts receivable with the $124 million it had

19  raised from selling Notes, as of June 30, 1991, Towers' bank accounts at Chase Manhattan Bank contained

20  at most $5 million. As of June 30, 1992, when Towers was reporting Notes outstanding in the total amount

21  of $198 million, its reported cash and cash equivalents amounted to only $32 million. Towers never

22  paid any heed to the "Funding Account" concept touted in the Offering Memoranda. Instead, it routinely

23  withdrew funds deposited into the generic checking accounts it maintained at Chase without regard to

24  the definition of "excess profits" and as a consequence, the accounts typically had a zero or negative

25  balance. Despite being designated a "Funding Account" in the Offering Memoranda, the accounts maintained

26  by Towers with Chase Manhattan Bank were simple checking accounts over which Towers exercised

27  unfettered control.

28     64.     The Offering Memoranda stated that the Towers Notes were exempted from registration

-19-

1  under Regulation D. This was false. The fact that the Regulation D exemption did not apply to the Towers

2  Notes because they constituted an integrated public offering was not disclosed. The fact that none of

3  the prior offerings had complied with the exemption was also not disclosed, nor was this fact accounted

4  for in Towers 1991 Audited Financial Statements which were included in the 1991 Annual Report that

5  was incorporated by reference into the Offering Memoranda.

6        65.    The fact that the sale of the Towers Notes violated the SEC Injunction was not disclosed.

7        66.    The Offering Memoranda's discussion of prior SEC litigation does not disclose that Towers

8  was ordered to offer $34 million in recission to its investors who had purchased prior to the date of the

9  1988 SEC complaint and Injunction.

10        67.    The Offering Memoranda stated that Towers Financial Corporation is a publically traded

11  company and that Steven Hoffenberg owned 10% of its outstanding stock and Mitchell Brater owned

12  10% of its outstanding stock. It did not disclosed that Hoffenberg also owned Professional Business Brokers,

13  which owned 70% of Towers outstanding stock, so that between them, Hoffenberg and Brater actually

14  owned 90% of Towers outstanding stock.

15      **The Towers Annual Reports Incorporated into the Offering Memoranda**
16      **were Riddled with Fraud, including Fraudulent Audited Financial Statements**

17        68.    The Offering Memoranda expressly refer to and incorporate by reference the Towers' Annual

18  Report. Rather than being a balanced picture of the activities and financial health of the company and

19  a disclosure of adverse information, the annual report provides an exceedingly favorable picture of

20  Towers. The annual report purports to present a detailed description of the Towers business activities

21  and operations. This entire description is an elaborate fantasy which bears no relationship to the actual

22  activities of Hoffenberg and Towers, which was a criminal Ponzi scheme. For instance, in the 1991

23  *Annual Report, in the opening message* "TO OUR SHAREHOLDERS," *the report states:* "Towers Financial

24  Corporation enters the 1992 fiscal year in a position of unprecedented financial strength and industry

25  leadership." At the time this statement was made, Towers was actually insolvent and using the funds

26  raised from investors purportedly for the purchase of health care accounts receivable for its operating

27  expenses. The Towers 1991 Annual Report goes into the huge success of Towers Health Care Receivables

28  factoring program, discussing how this program was highly profitable to both Towers and advantageous

-20-

1    to hospitals, nursing homes, clinics and related facilities across the country.  In realty, Towers engaged

2    in virtually no health care receivable factoring.  To the extent that Tower purchased accounts receivable

3    at all, the receivables were not health care related.

4         69.    The 1991 Annual Report states that Towers had unprecedented success in the collection

5    of past due accounts and that this success reflected the high caliber of Towers personnel and the quality

6    of its systems.  This statement was utterly false, as Towers was rapidly losing money over the course

7    of its existence, and depended upon cash from the sale of debt securities such as the Towers Notes and

8    Bonds to pay for operating expenses.

9         70.    The 1991 Annual Report contained false and misleading audited financial statements which

10   falsely reported that Towers was a financially successful and growing company, when, in fact, each year

11   it was incurring very substantial and increasing losses.  The financial statements contained in the 1991

12   Annual Report are signed by Marvin E. Basson, C.P.A., P.C., a solo practitioner, who served as the

13   Independent Auditor for Towers Financial and its subsidiaries from mid-1987 through June 30, 1992.

14   Notably, despite the fact that during the course of its existence Towers issued securities valued at hundreds

15   of millions of dollars, Towers did not use the services of a large or well-established accounting firm to

16   perform the auditing function.  Rather, it used an apparent one man operation to perform this function

17   for the 1991 Annual Report.  The financial statements created by Basson were entirely fraudulent.  During

18   the course of the criminal proceedings against Hoffenberg and others, including Basson, Hoffenberg stated:

19        At Towers Financial, there were three outside accounting firms that issue financial statements
          that I was aware of, that I was part of. These financial statements were prepared by an
20        accounting firm named Marvin Basson, Richard Eisner & Company, a New York firm,
          and Price Waterhouse, not of the United States but Price Waterhouse of Barbados, which
21        is separated from Price Waterhouse in the United States, it is a separate firm. These particular
          firms issued false financial statements where they inflated, with the cooperation of the
22        Towers people and myself, my involvement, the assets of Towers Financial Corporation.
          They were inaccurate and were used in order to sell bonds and notes and debentures.
23

     United States v. Hoffenberg (S.D.N.Y. 1996) 169 F.R.D. 267, 271.
24

25        71.    For fiscal year 1988, Towers reported net income of $1.4 million when it had actually

26   incurred a loss of approximately $29 million; total assets of $76 million when it actually had assets of

     no greater than $48 million; and shareholders' equity of $6.5 million (restated in 1990 as approximately
27
     $5.7 million) when it actually had a deficit of approximately $24.9 million.
28

                                              -21-

72.     For fiscal year 1989, Towers reported net income of $3.5 million when it actually had incurred a loss of over $28 million; total assets of $122 million when it actually had assets of no greater than $21 million; and shareholders' equity of $10.3 million (restated in 1990 as approximately $9.4 million) when it actually had a deficit of approximately $53 million.

73.     For fiscal year 1990, Towers reported net income of $3.9 million when it had actually incurred a loss of approximately $49 million; total assets of $195 million when it actually had assets of no greater than $29 million or less; and shareholders' equity of $13.4 million when it actually had a deficit of over $101 million.

74.     For fiscal year 1991, Towers reported net income of $4.3 million when it actually had incurred a loss of over $47 million; total assets of $513 million when it actually had assets of no greater than $250 million; and shareholders' equity of $20.1 million when it actually had a deficit of over $130 million.

75.     For fiscal year 1992, Towers reported net income of $5.4 million when it actually had incurred a loss of over $95 million; and shareholders' equity of $25.5 million when it had a deficit of over $242 million.  Thus, by fiscal year 1992, Towers was overstating its shareholders' equity by over $267 million, but the actual inaccuracy was even greater because this figure does not include an allowance for doubtful accounts.

76.     The financial statements in the 1991 Annual Report fail to take into account the $34 million in recission offers ordered by the SEC.

77.     The 1991 Annual Report improperly records Towers' investment in United Diversified Corporation ("UDC") at cost, $2,805,500, when as early as 1989 Towers had lost taken a total loss on UDC, which was being liquidated by order of the Illinois Insurance Director, as is discussed more fully below.

### Towers' Accounting Practices Were Not in Accordance with Generally Accepted Accounting Principals and in Fact, Were a Total Fraud

78.     Among the bases for these false and misleading financial Statements contained in the Annual Reports were figures generated by improper accounting procedures such as the following:

**1.     Southwestern Bell Portfolio**

1      79.    On or around June 30, 1988, the Towers subsidiary Towers Collection paid less than $300,000

2    for a portfolio of past-due accounts receivable from Southwestern Bell Yellow Pages, Inc. ("Southwestern

3    Bell") having a face value of approximately $28 million (the "Southwestern Bell portfolio"). Before selling

4    the portfolio to Towers Collection, Southwestern Bell had charged off all of the balances as worthless

5    after private collection agencies, including Towers, had failed to collect on them. Towers Collection

6    has collected less than $1 million on the Southwestern Bell portfolio.

7      80.    For fiscal year 1988, Towers improperly recorded income of $19 million from collecting

8    on the Southwestern Bell portfolio, resulting in the overstatement of Towers' income for fiscal year 1988

9    by that amount. Towers also improperly recorded the Southwestern Bell portfolio as valued at $28 million

10    instead of valuing the portfolio at its acquisition cost, causing an overstatement of Towers' fiscal year

11    1988 accounts receivable by $28 million (less the cost of the portfolio).

12    **2.  Federal Deposit Insurance Company**

13      81.    Towers also inflated the value of its accounts receivable and its income from collecting

14    such receivables by recording loan portfolios originated from banks liquidated by the Federal Deposit

15    Insurance Company ("FDIC loan portfolios") at values far above their acquisition costs and improperly

16    recognizing income from collecting on the FDIC loan portfolios, when no such collections existed.

17      82.    In fiscal year 1990, Towers paid less than $500,000 for various FDIC loan portfolios having

18    a face value of over $50 million. These portfolios contained nonperforming, distressed loans. For fiscal

19    year 1990, Towers improperly recorded the portfolios as accounts receivable having a value of $24 million

20    and recorded income of $24 million from the portfolios. In fiscal year 1990, however, Towers had received

21    virtually no cash proceeds from these FDIC loan portfolios.

22      83.    In fiscal year 1991, Towers paid approximately $30,000 for additional distressed FDIC

23    loan portfolios having a face value of $6 million. Towers improperly recorded the portfolios as accounts

24    receivable having a value of $6 million and recorded income of $6 million from the portfolios.

25      84.    As a result of Towers' improper recording of FDIC loan portfolios in fiscal years 1990

26    and 1991, accounts receivable for fiscal year 1991 were overstated by $13 million. In fiscal year 1991,

27    Towers had collected less than $1 million on the FDIC loan portfolios.

28      85.    Towers falsely Stated in its 1991 Annual Report: "Income on RTC/FDIC loans is recognized

1   as they are collected." In fact, Towers recorded income in much larger amounts than Towers ever collected

2   in fiscal year 1990 or 1991.

3   **3.   Bank Of America Portfolio**

4   86.   In or around January 1991, Towers paid less than $200,000 for a portfolio of credit-card

5   balances from Bank of America having a face value of approximately $16 million (the "Bank of America

6   portfolio"). Before selling the portfolio to Towers, Bank of America had charged off all of the balances

7   as worthless after other collection agencies had failed to collect on them. In fiscal year 1992, Towers

8   collected little or no amounts on the Bank of America portfolio.

9   87.   For fiscal year 1991, Towers improperly recorded income of $4 million from the Bank

10  of America portfolio, causing Towers' reported income for fiscal year 1991 to be overstated by that amount.

11  Towers also improperly recorded the Bank of America portfolio as accounts receivable valued at $4 million

12  instead of valuing the portfolio at its acquisition cost, causing an overstatement of Towers' fiscal year

13  1991 accounts receivable by $4 million (less the cost of the portfolio).

14  **4.   Investment In United Diversified**

15  88.   In its financial Statements for fiscal year 1989 through fiscal year 1991, Towers further

16  inflated its assets by improperly recording Towers' investment in United Diversified Corporation ("UDC"),

17  which conducted business through its subsidiaries, Associated Life Insurance Company ("Associated

18  Life") and United Fire Insurance Company ("United Fire"). Towers acquired a controlling interest in

19  UDC in 1987 for $2,805,500, and Hoffenberg became Chairman of the Boards of Directors of UDC,

20  United Fire, and Associated Life. Towers improperly recorded the purchase cost of UDC as an investment

21  on its financial Statements from fiscal year 1989 through fiscal year 1991. By fiscal year 1989, however,

22  the UDC investment had become seriously impaired and by no later than fiscal year 1991 posed a threat

23  of liability exceeding the purchase cost.

24  89.   In July 1988, the Illinois Director of Insurance (the "Insurance Director") obtained an order

25  placing UDC, United Fire, and Associated Life in conservation. On February 14, 1989, Hoffenberg agreed

26  in a signed stipulation to the entry of an order liquidating Associated Life and United Fire. The liquidation

27  order was based on Hoffenberg's agreement that both companies were insolvent. On March 1, 1989,

28  when the liquidation order was entered, Hoffenberg lost all control of the companies, and Towers lost

-24-

1   any expectation of a return on the investment.

2        90.    On or about June 27, 1991, Hoffenberg and others were charged by the Insurance Director

3   with having used the insurance companies as an instrumentality of Towers and, among other things, with

4   having transferred investments and cash of the companies into various Hoffenberg-controlled brokerage

5   accounts. These transfers began in November 1987 and continued through July 1988. In the civil action

6   Schacht v. Hoffenberg, No. 91-C-4024 (N.D. Ill.), the Insurance Director alleged that Defendants had

7   caused UDC, Associated Life, and United Fire to suffer damages in excess of $4 million, become insolvent,

8   and be placed in conservation and/or liquidation. The complaint sought, among other things, treble damages

9   under RICO. Towers settled this and related actions in 1992 upon Towers' agreement to pay $3.5 million

10  as part of the settlement.  True and correct copies of the Schacht complaint and the Final Judgment and

11  Order entered on the settlement are attached as Exhibits "30" and "31" and  incorporated by reference

12  herein.

13       91.    It was materially false and misleading for Towers to continue to record its investment

14  in the insurance companies at cost in its financial Statements for fiscal years 1989, 1990 and 1991 without

15  any reserve to reflect both the impairment of the investment and the contingency of Towers' potential

16  liability. Towers' assets were overstated by at least $3 million in each of those years as a result of Towers'

17  failure to record an appropriate allowance for uncollectible accounts.

18       92.    Furthermore, Towers did not disclose to potential or actual Note investors the liquidation

19  and conservation proceedings against UDC, Associated Life, and United Fire or the filing of the action

20  Schacht v. Hoffenberg against Hoffenberg.

21     **5.  Collection Receivables**

22       93.    The Towers subsidiary Towers Collection collected past-due accounts receivable for third

23  parties ("collection receivables") for a fee contingent on collection. Towers Collection paid no money

24  for collection receivables and was obligated to remit all collection proceeds to its clients, except for a

25  certain percentage of the proceeds which Towers Collection retained as its fee.

26       94.    Towers Collection improperly recorded fee income from collection receivables upon their

27  assignment to Towers and before performing any significant collection activities and collecting any proceeds.

28  Because of this improper recognition of fee income, Towers' reported fee income for fiscal year 1989,

1  $36 million, was overstated by at least $10 million. For fiscal year 1990, Towers reported total fee income

2  of $56 million, of which $22 million was fee income improperly recognized by Towers Collection in

3  the above manner. For fiscal year 1991, Towers reported total fee income of $97 million, of which $56

4  million was fee income improperly recognized by Towers Collection.

5       95.    Towers' Annual Reports for fiscal years 1988, 1989, and 1990 State that Towers recognized

6  *its fees as 30 percent of the amount expected to be collected and that it expected to collect 30 percent*

7  *of all collection receivables. This was the basis for Towers' accounting rule known as the "30/30 Rule."*

8       96.    In no year, however, had Towers collected even close to 30 percent of all of its collection

9  receivables. As of June 30, 1993, for example, Towers had collected only 22 percent of the accounts

10  receivable assigned to Towers for collection in 1988; only 18 percent of the accounts receivable assigned

11  in 1989; 13 percent of the receivables assigned in 1990; 14 percent of the receivables assigned in 1991;

12  and 11 percent of the receivables assigned in 1992.

13       97.    Towers also improperly recorded the collection receivables as Towers' own assets. The

14  collection receivables were *not owned by Towers Collection*, however, but by *Towers Collection's clients*,

15  who had assigned them to Towers Collection for collection on their behalf. Not only could Towers Collection

16  not properly record the receivables as assets, but also Towers Collection recorded them at amounts

17  substantially in excess of their value, resulting in an overstatement of Towers' assets of over $200 million

18  by the end of fiscal year 1992.

19       98.    For fiscal year 1989, Towers reported accounts receivable of $112 million, of which

20  approximately $101 million consisted of collection receivables improperly recorded as owned by Towers.

21  For fiscal year 1990, Towers reported accounts receivable of $177 million of which approximately $142

22  million consisted of improperly recorded collection receivables. For fiscal year 1991, Towers reported

23  accounts receivable of $437 million, of which $246 million consisted of improperly recorded collection

24  receivables.

25  ### DEFENDANT BEACHED THE DUTY TO CONDUCT DUE DILIGENCE INTO THE TOWERS NOTES BEFORE SELLING THEM TO PLAINTIFFS

26

27       99.    In Hanly v. SEC (2d Cir. 1969) 415 F.2d 589, the Court held that a brokers' failure to

28  conduct due diligence violated Rule 10b-5 and stated:

1     [The broker] cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which

2     are reasonably ascertainable. By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based

3     on that investigation. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information.

4

    Hanly, 415 F.2d at 597.

5

6     100.    A broker/dealer owes investors an independent and non-delegable duty to discover and

disclose those facts that are reasonably ascertainable. Sanders v. John Nuveen & Co. (7th Cir. 1980)

7

    619 F.2d 1222, 1227, cert. denied, 450 U.S. 1005 (1981). In Keenan v. D.H. Blair & Company Inc.

8

    (S.D. N.Y. 1993) 838 F. Supp. 82, the Court described this rule as follows:

9

    By virtue of his position, a dealer 'implicitly represents he has an adequate basis for the

10     opinions he renders.' Thus, a securities dealer must have an adequate and reasonable basis in order to recommend a security, and must disclose facts of which he has knowledge or

11     that are easily ascertainable. In addition, a dealer implies that his conclusions are the result of a reasonable investigation. If essential information about a security is not available

12     to the dealer, he must disclose this and identify the risks associated with the absence of this information. The investigation undertaken by the dealer will vary with the type of

13     security involved. These duties have been described as implicit warranties of the soundness of the stock, in terms of value, earning capacity, and the like. **_Failure to disclose_**

14     **_information in contravention of the warranty is tantamount to an omission of a material fact._** Dealers are under a special duty due to their expertise, as well as their advisory

15     activities. [Citations and footnotes omitted, emphasis added].

16     838 F. Supp. 82 at 89.

17     101.    Notwithstanding the due diligence rule set forth above, the recommendations, offers and

18   sales of the Towers Notes to Plaintiffs thus took place at a time when Defendants had not conducted any

19   type of reasonable due diligence investigation into the Towers Notes.

20     **THE TOWERS WRITTEN MATERIALS THAT THE DEFENDANT HAD IN ITS POSSESSION PUT IT ON NOTICE THAT TOWERS**

21     **WAS MOST LIKELY A FRAUD**

22     102.    At the time that Plaintiffs were sold the Towers Notes, Defendants had possession of copies

23   of the following documents:

24     a.    The Confidential Private Offering Documents dated October 1, 1990, October 15, 1991

25   and/or March 23, 1992 [the "Offering Memoranda"], which included copies of the Security Agreement

26   and Promissory Notes. True and correct copies of these documents are attached as Exhibits "45," "47'

27   and "49"and are incorporated by reference herein.

28     b.    The Towers Financial Corporation Annual Reports for the years of 1990, 1991 and 1992.

1   True and correct copies of these documents are attached as Exhibits "46," "48," and "50" and are incorporated

2   by reference herein.

3        c.    The Subscription Documents, which included the Subscription Agreement and Investor

4   Questionnaire.   A true and correct copy of an example of the Subscription Documents are included

5   in Exhibit "51," which is incorporated by reference herein. Exhibit "51" also includes the promissory

6   notes issued to Plaintiffs by Towers.

7        d.    A one page memorandum purporting to describe the benefits of the Towers Notes. A

8   copy of this document was filed with the original complaint in this case as Exhibit "55" and is incorporated

9   by reference herein. The information contained on Exhibit "55" was distributed as a standard form by

10   Towers to all of the brokerage houses that sold Towers Notes, including Defendants. The standard form

11   received by Defendants stated:

12                          **BENEFITS**

13   **TOWERS FINANCIAL:** Is an eighteen year old national public company. Towers is
      the second largest commercial recovery firm in the United States. Towers is the dominant

14   and largest health care factoring firm in the United States.

15       * **SHORT TERM**: *One, two and two and a half year maturities.*

16     * **HIGH YIELD:**

17           Option 1:     12% for a one year note.
          Option 2:     14% for either a two or two and a half year note.

18           Option 3:     Floating Rate Note

19                     The current interest rate is 9 1/2% Floats 3.50% over Chase
                        Manhattan Banks prime rate. The investor has the option to put

20                     back the note any time upon 90 day written notice to Towers.

21     * **INTEREST PAYMENTS**: Interest is paid monthly beginning thirty-four days from
    date of subscription.

22

23     * **NO LOAD**: There are absolutely no fees to the investor. Towers pays for all costs
    of the offering.

24     * **MARKET RISK**: None - This security is not traded, therefore there is no market risk
    or fluctuation of interest or principal.

25

26     * **COLLATERAL**: Towers secures all notes by a specific UCC-1 full recourse collateralized
    lien against the debtor's assets.

27     * **DEBTORS**: The underlying debtors who guarantee payment on the invoices are A+
    insurance companies (health care), Federal and State agencies (Medicare and Medicaid)

28     or Dunn & Bradstreet rated 1 and 2 (commercial).

* **INSURANCE**: The note offering is insured against the underlying debtor being unable to perform due to either bankruptcy, insolvency, or default.

* **PAST PERFORMANCE**: Towers has never failed to make an interest payment or principal redemption on over $400 million of note liabilities during a six year period.

e.    A brochure entitled "TOWERS HEALTHCARE FUNDING AND AUTOMATED CLAIMS MANAGEMENT SYSTEMS." A true and correct copy of this document is attached hereto as Exhibit "58" and is incorporated by reference herein.

f.    An article on Towers excerpted from a magazine entitled "ASSET FINANCE & LEASING DIGEST." A true and correct copy of this document is attached hereto as Exhibit "59" and is incorporated by reference herein.

g.    A brochure entitled "ACCOUNTS RECEIVABLE COLLECTION SERVICES." A true and correct copy of this document is attached hereto as Exhibit "56" and is incorporated by reference herein.

h.    A brochure entitled "THE RECEIVABLES FUNDING PROGRAM." A true and correct copy of this document is attached hereto as Exhibit "57" and is incorporated by reference herein.

i.    An article concerning Albany Medical Center, a Towers client. A true and correct copy of this document is attached hereto as Exhibit "61" and is incorporated by reference herein.

j.    An article from "Global Finance" dated September of 1992 entitled "HEALTH CARE COMPANIES REDISCOVER SECURITIZATION." A true and correct copy of this document is attached hereto as Exhibit "62" and is incorporated by reference herein.

k.    Plaintiffs are informed and believe that prior to the time that Plaintiffs made their Towers investments, Towers sent Defendants a form letter ["Towers' Marketing Letter"] which stated the following:

Enclosed please find information on the Towers Financial Corporation Promissory Note investment program.

The Towers program has been used by many investors to increase yield on their fixed income portfolio with a securitized, low risk, high yield investment. This program offers investors the choice of a twelve (12), twenty-four (24) month or thirty-six (36) month note paying interest monthly or quarterly at the investor's discretion.

Towers uses the investor dollars to purchase third party health care receivables from hospitals

and other health care institutions. A third party receivable is one due from insurance companies, governmental agencies, or major corporations. The investment monies are placed in a special Towers account at Chase Manhattan Bank and can only be used to purchase receivables due from insurance companies, commercial accounts and governmental agencies.

Towers purchases these receivables at approximately 95% of face value. Upon purchase, Towers pays the health care institution 50% of the value. The 45% balance is held in reserve until the monies due from the insurance company are paid to Towers. Towers retains the excess 5% as a factoring fee. Towers then purchases more receivables to compound the return. This compounding process is what allows Towers to pay the high rate of return.

The health care provider guarantees that the purchased receivables are both valid and non-disputed. If the receivables are not paid, then the health care provider must repay Towers the money advanced on the receivable or make it good with receivables.

Towers has the ability, (as mentioned in the memorandum), to purchase other types of receivables. These receivables are purchased and assigned in a manner similar to the health care transaction. These factoring transactions produce similar support documentation.

Towers has been involved in the factoring/servicing of receivables for over 15 years and is one of the largest companies of its kind in the United States. In the years Towers has been working with investors, there has never been a penny lost by any investor in a Towers investment. Moreover, there has never been a single interest payment missed to any investor.

To summarize the safety factors of the Towers Program:

1, The investment is, at all times, fully securitized in the special account at Chase Manhattan Bank. These funds are in no way commingled with other corporate monies.

2. The accounts receivable purchased with investors monies are assigned to the investors by the security agreement. (Exhibit III)

3. Towers analyzes the reimbursable rate of the receivables before purchasing.

4. Towers secures liens against the organizations from which receivables are purchased to insure recourse to those organizations if there is a problem with payment.

5. Towers assigns to the investor, a security interest in all receivables, contracts for purchase of receivables, the special account, etc. This assignment secures the investment by giving the investor an interest in financial assets.

6. Towers, as a corporation, guarantees the payment to investors of interest and principal.

7. Towers makes interest payments monthly or quarterly as determined by the investor. If Towers should ever default on a payment to the investor, the investor has direct access to his collateral in form of cash and receivables in the Towers special account at Chase Manhattan. Towers has never missed an interest payment to an investor,

8. Towers pays all costs of the offering. The investor is paid interest on the total investment amount. At the end of the investment term, the monies may be reinvested or the entire initial investment amount will be returned to the investor.

I am sure that, after reviewing the information, you will find the Towers Financial Corporation Promissory Note program one of the safest, high yield investments being offered today.

1      l.    A standard form Purchase Agreement purportedly used by Towers to acquire accounts

2  receivables with investor money.

3      m.   A copy of the credit insurance policy purportedly covering the 1992 Towers Note offering

4  issued by American Credit Indemnity Company.

**EVEN A MINIMAL DUE DILIGENCE INVESTIGATION WOULD HAVE
PLACED DEFENDANT ON NOTICE OF THE TOWERS' FRAUD
AND TO THE FACT THAT THE NOTES WERE BEING SOLD ILLEGALLY**

7      103.   As has been shown above, the written materials that Towers provided to the Defendant

8  contained sufficient red flags to signal the presence of potential fraud to any reasonable brokerage firm

9  due diligence officer who took the time to read the same. Plaintiffs, for their part, did not have all of the

10  same materials, and even if they had possession of the same written materials and read them carefully,

11  Plaintiffs would not have been placed on notice of a fraud because Plaintiffs, unlike the Defendants, utterly

12  lacked the knowledge, skill, training and experience to comprehend the significance of the information

13  noted above that would have placed a reasonable due diligence officer on notice of fraud.

14      104.   As a brokerage house that was recommending a particular security to its clients, Defendant

15  owed a duty of due diligence. Further, since the Towers Notes were issued without an underwriting firm,

16  Defendants, as Towers' selling agent, was required to exercise even greater care in performing its due

17  diligence. It is well established that the responsibilities and duties of an underwriter arise solely from

18  the parties' relationship to a particular offering. L. Loss, Fundamentals of Securities Regulation at 225-28

19  (2d ed.). Therefore, a licensed broker, may through his actions, be found to be an underwriter of a particular

20  security. SEC v. Glenn W. Turner Enterprises. Inc. 474 F.2d 476, 480 (9th Cir.), cert. denied, 414 U.S.

21  821 (1973); SEC v. Chinese Consol. Benevolent Ass'n. 120 F.2d 738,740 (2d Cir.) cert denied, 314 U.S.

22  618 (1941). U.S. v.Wolfsc 405 F.2d 779 (2d Cir. 1968), cert denied, 394 U.S. 946 (1969).

23      105.   Tacit reliar: on the management of the issuer for information about the security, which

24  is all Defendant did, is unacce able due diligence. The underwriters or those in the position of underwriter,

25  must play devil's advocate. See, Feit v. Leasco Data Processing Equip. Corp., 332 F. Supp. 544, 582 (E.D.N.Y.

26  1971).

27      106.   Given the fact that it was in the financial services industry, and presumptively had expertise

28  on such matters and is imputed to have read the Towers Offering Materials and the other materials noted

1 above, Defendant was placed on notice of potential fraud merely by reading the written materials provided

2 by Towers. Further, Defendants' duty of due diligence was not satisfied by a mere examination of the

3 written representations of the issuer. Due diligence includes a reasonable attempt to look at the background

4 of the investment sponsors, and look beyond or behind the written representations of the issuer. In this

5 case, the Defendant did not make any such attempt. If Defendant had conducted even a minimal investigation

6 beyond what Towers provided it would have discovered clear indications that Towers was a fraud, as

7 discussed further below.

8          107.    The documents received by, or readily available to, Defendants contained information

9 which put Defendants on notice that Towers was making conflicting statements about its own product

10 and operations and that Towers was most likely a fraud. For instance,

11          a.       Towers was described in these materials as a publicly traded company. In fact, it filed

12 a series of SEC Form 10's and amendments thereto in the years of 1990 and 1991 for its common stock.

13 However, the stock was not listed on any exchange, but rather, traded very thinly on pink sheets and no

14 analysts followed the stock. The Form 10 revealed that nearly all of the outstanding stock of the company

15 was owned by Steven Hoffenberg or entities controlled by him and that there was no active trading of

16 the stock. Consequently, there were no legitimate directors or shareholders meetings in which objective

17 oversight was exercised over Towers' activities and Towers was, in reality, a privately held company.

18          b.       Despite its allegedly large size and purported status of being a public company, Towers'

19 audited financial statements were prepared by Marvin Basson, a one man CPA firm operating out of his

20 home who had n o prior experience auditing public companies. Basson later admitted that the financial

21 statements were totally fraudulent. It is virtually impossible to imagine that a large, reputable accounting

22 firm of the type that normally audits public companies would have been willing to participate in the Towers

23 fraud at Basson's level of complicity.

24          c.       Although Towers was the guarantor of the Note offerings, its financial statements showed

25 that it was heavily in debt and did not have sufficient financial strength to cover the guarantees at face

26 value. In fact, Towers was insolvent.

27          d.       Although the sales literature touted the fact that Towers intended to purchase high quality

28 health care receivables due from major insurance companies with investor funds, the Offering Memoranda

1   contained language permitting Towers to purchase any other type of business receivables from third parties

2   or affiliates.  Towers was permitted to advance up to 95% of the face value of the receivable to an affiliate

3   under common ownership with Towers.  Towers was also permitted to purchase non-performing loans

4   from RTC and FDIC either directly or from other sources.  Towers was also permitted to purchase health

5   care receivables in which the patient debtor was the only obligor.  Most significantly, when using investor

6   funds, Towers was not required to purchase any particular amount of any particular type of receivable

7   or maintain any proportional balance between high quality health care accounts receivables and non-

8   performing RTC or FDIC debt.  As it turn out, the few accounts receivables that Towers did acquire with

9   investor funds were primarily non-performing RTC and FDIC debt and bad credit card or bank debts,

10   none of which was collected.  This is one of the reasons why Towers was unable to generate any real income

11   during its existence.  The very fact that Towers was granted unfettered discretion to purchase RTC or

12   FDIC debt with investor funds in any quantity that it deemed appropriate should have raised very serious

13   concerns on the part of any due diligence officer who bothered to actually consider the structure of the

14   investment.

15        e.       The form Purchase Agreement Towers used to acquire receivables gave Towers no recourse

16   against the seller if the receivables were not in fact collectable, so that Towers assumed the entire risk

17   of non-collection.  As it turned out, Towers was not able to collect most of the receivables it acquired

18   with investor funds and made no attempt to hold the seller accountable for this fact.

19        f.       Although the written materials issued by Towers touted the fact that it was primarily in

20   the health care receivables business, and that the purpose of the promissory notes was primarily to fund

21   the purchase of health care receivables, in fact most of the medical account receivable business of Towers

22   was conducted through five subsidiaries that issued their own debentures (the "Debentures") totaling over

23   $200 million that were secured by the medical accounts receivables acquired with creditor funds.  These

24   Debentures actually did receive a high credit rating with Duff & Phelps and this fact was touted to investors

25   such as Plaintiffs as a reason to buy the Towers Notes, which received no such rating and which were

26   structured totally differently.  Unlike the situation with the Towers Notes purchased by Plaintiffs, the

27   Towers subsidiaries established proper procedures for securing the Debentures with the health care accounts

28   receivables that they held.  The purchasers of the Debentures had the benefit of trust indenture and a trustee

-33-

1   which was a bank which held the offering proceeds until invested by the Towers subsidiary and monitored

2   the required collateral levels and controlled a "lock-box" account into which collections were deposit.

3   None of these protections were provided for the Notes purchased by Plaintiffs. Thus, these health care

4   AR were not available as collateral for Plaintiffs Notes or to satisfy, on an unsecured basis, the amounts

5   owed Plaintiffs. In addition, a Towers subsidiary borrowed $20 million from a bank in the Republic of

6   Cape Verde and pledged health care account receivables for that loan so that these health care accounts

7   receivables were not available to pay the amounts due on the Notes.

8        f.        Towers touted the fact that the proceedings of the Offering would be used to purchase

9   high quality health care accounts receivable, that the Offering proceeds would be deposited in a "Special

10  Account" at Chase Manhattan Bank, and that the promissory notes were to be secured by the accounts

11  receivable purchased with the offering proceeds on a two to one ratio [Towers paying only 50% of the

12  purchase price up front]. However, pursuant to the Offering Memorandum, Towers was also entitled

13  to take from the Special Account and use for any purpose it saw fit any "excess profits." Excess profits

14  were defined as the amount by which (a)(I) the face amount of the Accounts Receivable acquired, plus

15  (ii) the funds on deposit in the Special Account exceeded (b) (I) the face amount of all issued Promissory

16  Notes, plus (ii) all accrued and unpaid interest due on such promissory notes. Translated into layman's

17  terms, this clause meant that Towers could increase the amount that it received "free and clear" from the

18  offering as excess profits by using a portion of the proceeds to buy large quantities of low quality, heavily

19  discounted receivables, such as non-performing loans from the RTC and the FDIC, for which Towers

20  received the benefit of the face value of the debt for the purpose of calculating excess profits. Any due

21  diligence officer would have recognized that the structure of the offering provided an incentive for Towers

22  to acquire low quality receivables, rather than the high quality receivables that Towers claimed were the

23  subject of the Offering.  Indeed, given the fact that Towers had the contractual right to purchase non-

24  performing RTC or FDIC receivables, which would generate much greater profits for Towers from each

25  offering than high quality health care receivables, the only objective view that could be held was that

26  this is exactly what Towers intended to do all along.

27       g.        In its 1989 and 1990 offerings, Towers touted the fact that the note offering was insured

28  against the underlying debtor being unable to perform due to either bankruptcy, insolvency, or default.

-34-

1  In fact, the insurance policy that Towers purchased for this purpose from American Credit Indemnity

2  did not cover health care receivables, which were supposed to be the primary focus of the offering. Moreover,

3  the business receivables coverage did not cover non-performing loans or receivables acquired from the

4  FDIC or the RTC. Additionally, coverage for such loses amounted to only a small fraction of the offering

5  amount. Accordingly, the coverage provided virtually no actual protection for investors.

6       h.    The letter quoted above states that "The investment monies are placed in a special Towers

7  account at Chase Manhattan Bank and can only be used to purchase receivables due from insurance companies,

8  commercial accounts and governmental agencies." Yet, the letter also states that Towers can purchase

9  receivables from other sources, and the Offering Memorandum states that Towers could acquire non-

10  performing debt from the RTC, the FDIC, banks and other sources, including affiliates. The Offering

11  Memorandum does not specify what portion of the investor funds would be used to acquire this type of

12  bad debt, as opposed to high quality receivables of the type referred to in the letter.

13       108.    Investors in the Towers Notes described in the Towers Financial Corporation Private Offering

14  Document 10/15/91 [the "Offering Memorandum"] did not have an effective security interest in accounts

15  receivable, and this should have been apparent on any reasonable due diligence review, for the reasons

16  set forth below:

17       109.    Under the Security Agreement which is attached to the Offering Memorandum, there was

18  no third party entity appointed as an agent of the investor to police the collateral that served as security.

19  In a typical transaction involving multiple secured parties, a third party (usually a financial institution)

20  is appointed as the agent for the secured parties to do collectively what would be difficult or impossible

21  for them to do individually. In the normal situation, this agent would:

22       a.    Monitor the collateral to be sure that there was always an adequate amount of accounts

23  receivable to secure all outstanding notes;

24       b.    Control the cash proceeds so that they were used in accordance with the agreements;

25       c.    Audit Towers' books and records to insure compliance with the agreements; and

26       d.    Enforce the agreements in the event of default.

27       110.    It would be impossible for any individual investor, acting alone, to do any of the foregoing.

28  An investor in Towers Notes would never be able to ascertain whether or not the collateral had been diverted.

1    An investor could not monitor compliance with the security agreements or enforce his rights after default.

2    In the event of a default, the prospect of hundreds of note holders bringing separate lawsuits, each seeking

3    to grab a portion of the pool of collateral is entirely unfeasible as there would be no mechanism to sort

4    out the respective rights of note holders to the collateral. Because of these incongruities, it would be obvious

5    to anyone with even a modest understanding of how such transactions work that the Towers transaction

6    was designed to deny any note holder all of the security benefits that were touted by the Defendant and

7    Towers.

8         111.    In addition, the Offering Memoranda states that if UCC filings were not performed for

9    Healthcare Accounts Receivable, the security interest would be perfected by a pledge of the receivables.

10   This is impossible as a matter of law, because the only way that a security interest can be perfected in

11   an intangible such as an account receivable is by the filing of a UCC-1 form. There can be no pledge

12   of intangible assets such as accounts receivable.

13        112.    Further, Section 5.1 of the Security Agreement appoints Towers' counsel as agent of the

14   secured party (i.e., the note holders). This appointment makes a sham of the secured nature of the transaction.

15   Towers' counsel has divided loyalty or fiduciary duty to the secured parties and therefore cannot be expected

16   to act on their behalf. Indeed, this may place Towers' counsel in a conflict of interest, since as the named

17   representative of the note holders, he must owe them some duty, which would be directly adverse to the

18   duty owed to Towers.

19        113.    The Security Agreement is utterly unworkable from a practical standpoint. Under Section

20   3 of the Security Agreement attached to the Offering Memoranda, investors are granted a security interest

21   in "the Accounts Receivable", which is defined in the Offering Memoranda as accounts which are acquired

22   by Towers with the offering proceeds. However, it would be practically impossible for any particular

23   note holder to trace the funds invested or to see if any accounts receivable owned by Towers at the time

24   of default were in fact purchased with funds provided by that Towers Investor, since tracing would be

25   impossible for all practical purposes. The reference to the fact that the investor funds would be on deposit

26   in segregated accounts at Chase Manhattan Bank as the funding account depository is misleading in that

27   Chase performed no supervisory function over the funds and its involvement adds no protection for investors

28   to the transaction.

1    114.   For all of these reasons, the Towers Notes were not secured or collateralized for the actual

2  benefit of investors, and this fact could have been ascertained simply from an informed reading of the

3  Offering Memoranda and its attachments.

4    115.   Towers touted its business operations as primarily being the factoring of health care accounts

5  receivable, primarily payable by the government or by insurance companies. However, under UCC §9104,

6  it is not possible to obtain a security interest by filing a UCC-1 as to a receivable payable by an insurance

7  company, as such receivables are expressly excluded from the coverage of Article 9 of the UCC. Accordingly,

8  it was legally impossible for investors to have a security interest in any health care accounts receivable

9  payable by an insurance company, which are a large part of the collateral pool.

10    116.   In addition to the above problems, Towers claimed that it filed Financing Statements, UCC

11  Form 1, to perfect security interests on behalf of investors so that the investors would have a security

12  interest in collateral constituted by the accounts receivables purchased with their money. However, the

13  examples of the UCC Form 1 actually filed by Towers are utterly inadequate in that regard. For example,

14  the Form 1 filed for the October 15, 1991 Towers offering described the secured parties as "All investors

15  in the Debtor's October 15, 1991 Private Placement c/o Michael Rosoff, 417 Fifth Avenue, New York

16  10016. As shown by the Offering Memorandum at page 14, Michael Rosoff was "Director, Senior Vice

17  President, Chief Legal Officer and Assistant Secretary for Towers at the time. Any person with knowledge

18  of the mechanics of secured transactions work would immediately conclude that this arrangement was

19  fatally flawed because Rosoff was not in fact an agent for the investors, but an officer and employee hired

20  and paid by Towers and therefore, an agent only of Towers, owing no duty to investors. The UCC-1 filing

21  describes the collateral as "all accounts receivable and loans purchased by the debtor utilizing the proceeds

22  received by the debtor from its October 15, 1991 Private Placement of Promissory Notes, all replacements

23  thereof and their proceeds." Clearly this is patently ineffective for any note holder since there is just no

24  way they could trace the proceeds of their note purchase to a particular account or group of accounts,

25  nor could any note holder trace the proceeds, unless Towers carefully segregated all funds. Thus, the

26  secured creditor is wholly dependent on Towers to self-police, rendering the alleged collateral virtually

27  worthless.

28    117.   Another problem with the security interest arises from the structure in which Towers Financial

1   Corporation did business through two consolidated subsidiaries, Towers Credit Corporation and Towers

2   Collection Services, Inc. The Offering Materials and the Annual Report contain information suggesting

3   that Towers Financial Corporation was actually a holding company for these two subsidiaries, which appear

4   to be the entities that actually acquired accounts receivable. Yet, it appears that Towers Financial Corporation

5   was both the issuer of the promissory notes and the holder of the collateral per the UCC-1 forms. If this

6   was the case, then the entire security interest issue was a sham, since Towers did not actually own the

7   collateral, and therefore, could not create a security interest in the collateral for its creditors.

8         118.    In addition to problems with the security interest promised investors in the October 15,

9   1991 Promissory Note offering, the information contained in the above documents revealed several critical

10   flaws in the Towers business plan, which should have been apparent to anyone with an under standing

11   of health care factoring. These problems are peculiar to health care factoring, which is distinguishable

12   from other types of business factoring for several important reasons set forth below:

13         a.    Medical accounts receivable are primarily paid by insurance companies and by the government

14   through Medicaid and Medicare. When a medical provider submits a bill to an insurance company, the

15   insurance company does not simply pay the full amount of the bill. Rather, the insurance company applies

16   a rate schedule to the charges listed on the bill and pays only as much as the scheduled items provide.

17   When a provider submits a receivable to Medicaid or Medicare, the government applies statutory rate

18   schedule to the receivable. In both instances, the provider may receive significantly less than the full

19   face amount of the receivable. In its offering memorandum, Towers indicated that it intended to purchase

20   health care accounts receivables at 95% of face value. If this was actually done by Towers, it is difficult

21   to see how Towers could expect to make a profit in the transaction, since it is highly likely that any receivable

22   paid by an insurance company or the government would be discounted by at least the 5% margin, if not

23   significantly more.

24         b.    Additionally, health care receivable payments by the government are not only based upon

25   the scheduled charges listed in a given medical receivable, but are also tied to per capita overhead charges

26   and estimated costs, which are reported periodically by the health provider to HCFA and are subject to

27   review, audit and adjustment by the government. This aspect creates uncertainty as to the ultimate value

28   to the provider of any given medical receivable [and hence to Towers as the assignee of the receivable],

1  since under certain circumstances the government can reallocate payments based upon reporting errors

2  or overcharges by the provider. This situation is analogous to an IRS audit whereby a taxpayer has claimed

3  a specific deduction on a 1040 filing and three years later the IRS disallows the deduction, resulting in

4  an additional tax penalty. Because of this variable, which cannot be ascertained in advance, it is very

5  difficult to put an exact value on a health care receivable that is being paid by the government and by

6  paying 95% of face for receivables due from the government Towers was assuming a very high degree

7  of risk that payment would be withheld based upon factors totally beyond Towers' comprehension or control.

8  For these reasons, the program described by Towers had very little, if any, chance for success in the health

9  care factoring field.

10      **INFORMATION READILY AVAILABLE TO THE DEFENDANTS, WHICH**
        **A REASONABLE DUE DILIGENCE INVESTIGATION WOULD HAVE REVEALED,**
11      **SHOWED THAT TOWERS WAS MOST LIKELY A FRAUD**

12      119.    In 1971, Hoffenberg pleaded guilty to attempted grand larceny in New York County Supreme

13  Court (Indictment No. 202-70) and was sentenced to five years probation and restitution. He was diagnosed

14  at that time as manic depressive. The fact that the Chief Executive Officer, and high profit spokes person,

15  for Towers, had a criminal record involving a crime of moral turpitude which was of public record should

16  have raised a very high red flag for any due diligence officer.

17      120.    In 1976 Hoffenberg, then president of Union Electric Products Corp., declared the manufacturer

18  of electrical products bankrupt. The bankruptcy trustee in the case alleged that Hoffenberg fraudulently

19  removed assets from the bankrupt company.

20      121.    During the 1980s, Hoffenberg operated Westwood Paper and Hardware, which also went

21  bankrupt while under his management.

22      122.    In 1987, Hoffenberg as the CEO of Towers Financial Corporation acquired a controlling

23  interest in United Diversified Corporation ("UDC"), which conducted business through its subsidiaries,

24  Associated Life Insurance Co. ("Associated") and United Fire Insurance Co. ("United Fire"). Hoffenberg

25  later became chairman of the boards of UDC, Associated and United Fire. In July 1988, the Illinois Director

26  of Insurance obtained an order placing UDC, Associated and United Fire in conservation. On February

27  14, 1989, Hoffenberg agreed, in a signed stipulation, to an entry of an order liquidating Associated and

28  United Fire, based on Hoffenberg's agreement that both companies were insolvent. Hoffenberg lost control

1 | of these companies on March 1, 1989, when the liquidation order was entered.   On or about June 27,

2 | 1991, Hoffenberg and others were charged by the Insurance Director with having used the insurance companies

3 | as an instrumentality of Towers, and, among other things, with having transferred investments and cash

4 | of the companies into various Hoffenberg-controlled brokerage accounts.  These transfers began in November

5 | 1987 and continued through July 1988.  In the civil action Schacht v. Hoffenberg, No. 91-C-4024 (N.D.

6 | Ill.), the Insurance Director alleged that Towers and Hoffenberg had misappropriated for his own personal

7 | use and for the benefit of Towers over $4 million in assets of UDC, Associated Life, and United Fire,

8 | causing them to become insolvent, and be placed in conservation and/or liquidation.  With specificity,

9 | it is alleged that Hoffenberg stole corporate funds and used them to pay his own personal expenses, including

10 | his American Express card; and for payment of tuition to Wellesley College for one of his children.  See

11 | Exhibit 20 at pages 11 through 13.   The complaint alleged that "[o]n June 1, 1988, Hoffenberg, as the

12 | sole signator, fraudulently issued a Diversified check in the amount of $1,000,000 to 'Towers.' Said check

13 | cleared through the bank account of Diversified.  None of the officers of the Companies are aware of

14 | the purpose for the check.  Hoffenberg failed to provide a voucher or other documentation for the check.

15 | " [Exhibit "30, " paragraph 61 on page 19].  The complaint sought, among other things, treble damages

16 | under RICO.  Towers settled this and related actions in 1992 upon Towers' agreement to pay $3.5 million

17 | as part of the settlement.   True and correct copies of the Schacht complaint and the Final Judgment and

18 | Order entered on the settlement are attached as Exhibits "30" and "31" and are incorporated by reference

19 | herein.    The pendency of the Schacht complaint is not disclosed in the October 15, 1991 Offering

20 | Memorandum but is summarily disclosed in the March 23, 1992 Offering Memorandum at page 18.

21 |         123.    Although the pendency of the Schacht complaint is not disclosed in the October 15, 1991

22 | Offering Memoranda, on page 18 of the Memoranda reference is made to the pendency of litigation with

23 | the Illinois Insurance Director involving liquidation proceedings in which the Director placed UDC into

24 | conservatorship.  The Form 10's filed by Towers between 1990 and July of 1991 revealed that the Illinois

25 | insurance director [in connection with the UDC matter] had filed a petition to compel Hoffenberg to turn

26 | over $2.9 million  in assets allegedly belonging to UDC and its subsidiary insurance companies, which

27 | had been placed in receivership and had initiated liquidation proceedings. Defendant knew or should have

28 | known of this litigation, and it would have been a simple matter for Defendant to call the Illinois Insurance

1  Director directly and find out what was happening in this case.

2       124.    In 1988, F.H. Prince & Co. settled a lawsuit and bankruptcy claim against United Fire
3  Insurance Company, a UDC subsidiary controlled by Hoffenberg, for $1.2 million to be paid in installments
4  plus interest. Towers guaranteed all payments owed by United Fire to Prince in accordance with the terms
5  of the settlement agreement, promissory note and guaranty. No payments were ever made in accordance
6  with the terms of the promissory note, and Prince filed a lawsuit against Towers in Cook County Circuit
7  Court, Illinois styled F.H. Prince & Co. , v. Towers Financial Corporation, Case No. 89 L 15714, ["Prince
8  lawsuit"] on the promissory note. After trial, the jury awarded judgment in favor of Prince against Towers
9  for $767,986.86 (principal and interest) and $60,967.39.  Towers filed an appeal of the judgment, which
10  was dismissed.  On page 18 of the October 15, 1991 Offering Memoranda, reference is made to the judgment
11  against Towers.  Defendants knew, or should have known of the pendency and outcome of the Prince
12  lawsuit, which revealed that Towers was capable of failing, without any apparent justification,  to pay
13  large debts that appeared to be valid.

14       125.    Defendants could readily conducted a national lawsuit search through any number of private
15  database providers to see what, if any, litigation Towers was involved in that had not been disclosed in
16  its Offering Memoranda. Such a search would have revealed that Towers was involved in legal proceedings
17  showing potentially serious misconduct, and that it failed to properly disclose the same.

18       126.    Hoffenberg, through a family trust and a wholly owned corporation, as well as contractual
19  agreements with other shareholders, owned or controlled between 70 and 80 percent of Towers stock.
20  This fact is not revealed in the Towers Offering Memorandum or Annual Reports, but was revealed in
21  Towers Form 10 filings for 1990 and 1991.  The fact that Towers chose to omit information about such
22  ownership and control in its formal offering documents for the notes should have suggested a potential
23  problem. Moreover, the concentration of such ownership and control in one man suggested that Towers
24  might not be a public company in substance.

25       127.    Defendants knew or should have known of the 1988-89 SEC Injunction, which was mentioned
26  without elaboration on page 16 of the October 15, 1991 Offering Memorandum.  Although the Offering
27  Memorandum disclosure regarding this injunction does not expressly state that the SEC action pertained
28  to the Towers Notes, Defendant could have readily learned whether or  not the injunction pertained to

1   the Towers Notes by obtaining a copy of the complaint and injunction. The Offering Memoranda also

2   disclosed that on June 11, 1990 the State of Nebraska entered a consent order finding that the 1988 SEC

3   order prohibited Towers from selling "certain promissory notes" in that state under the registration

4   requirements of Nebraska law. The Offering Memoranda also discloses that on February 20, 1990, Towers

5   consented to an order finding a violation of the Alabama registration requirements and prohibiting Towers

6   from selling securities in that state. The Offering Memoranda also discloses that on January 8, 1991 Towers

7   consented to an order with the state of Louisiana involving the sale of unregistered securities. The Offering

8   Memoranda discloses that on October 17, 1989, the state of New Jersey issued an order of denial of an

9   exemption to Towers for sale of promissory notes.   All of these disclosures are imputed to Defendants,

10   which knew or should have known that the sale of the Towers Notes violated the 1988-89 SEC Injunction

11   and State and Federal registration laws. Plaintiffs on the other hand did not read these disclosures and

12   would not have understood their significance if they had read them.

13        128.   In or about 1989, the Securities & Exchange Commission ("SEC") began a renewed

14   investigation of the fraudulent sale of Towers' securities by Hoffenberg and his co-conspirators. As part

15   of this investigation, in the fall of 1991 the SEC sent letters to brokerage houses known to have sold the

16   Towers Notes informing them of its investigation.   The fact that Towers was under investigation was

17   circulated between brokerage houses, so that even brokerage houses that had not received the letter were

18   put on notice of the fact of the investigation. Plaintiffs are informed and believe that Defendant received

19   such a letter and/or heard of the SEC investigation, but this was never revealed to Plaintiffs.

20        129.   Towers was also barred from selling the unregistered Notes in Alabama in 1990, Louisiana

21   in 1991, and Nebraska in 1990.   Towers was told by the states of Texas, North Carolina, Maryland and

22   New Mexico that it could not sell securities without registering them. In the case of Alabama, the state

23   found that Towers had sold promissory notes in violation of state securities' laws, a finding echoed by

24   Louisiana and Nebraska. Nebraska also fined Towers Financial $ 5,000. Defendant could readily have

25   obtained the public records pertaining to these actions.

26        130.   According to the Form D filed by Towers with the SEC in support of its Regulation D

27   exemption, in addition to the selling commissions of from 4% to 10% which were being deducted from

28   the offering proceeds, an additional estimated amount of 10% of the offering proceeds would be paid

1  directly to Towers off the top of the investment. The 10% figure is not a ceiling. The Form D expressly

2  states that for a $100,000,000 note offering, only an estimated $85,000,000 would remain to purchase

3  accounts receivable. Yet, Towers sales literature bragged about the fact that the Note investments were

4  no load, and that Towers paid all of the sales commissions. However, given the fact that only 85% of

5  investor money was "going into the ground," this claim was highly misleading and for purposes of any

6  collateral, in reality, the load on the investment was for all practical purposes at least 15%. As it turned

7  out, Towers did not use anything close to $85,000,000 to purchase accounts receivable.

8       131.    Towers claimed that it filed Financing Statements, UCC Form 1, to perfect security interests

9  on behalf of investors so that the investors would have a security interest in collateral constituted by the

10  accounts receivables purchased with their money. However, the UCC Form 1 actually field by Towers

11  was utterly inadequate in that regard. For example, the Form 1 filed for the October 1, 1990 Towers offer

12  described the secured parties as "All investors in the Debtor's October 1, 1990 Private Placement c/o Michael

13  Rosoff, 417 Fifth Avenue, New York 10016. Michael Rosoff was general counsel for Towers at the

14  time. Rosoff was later convicted of making false statements to the SEC and obstruction of justice. Any

15  person with knowledge of the mechanics of secured transactions work would immediately conclude that

16  this arrangement was fatally flawed because Rosoff was not in fact an agent for the investors, but an attorney

17  hired and paid by Towers and therefore, an agent only of Towers, owing no duty to investors. The UCC-1

18  filing listed as the collateral property "All accounts receivable and loans purchased by the debtor utilizing

19  the proceeds received by the debtor from the [date of offering] placement of Promissory Notes, all

20  replacements and their proceeds." Any person with knowledge of the mechanics of secured transactions

21  would recognize that it would be impossible for any individual Towers investor to determine whether

22  or not any specific accounts receivable had been purchased with his or her funds, and therefore, impossible

23  to enforce the security agreement. Defendants either knew of these flaws or recklessly failed to consider

24  the adequacy of the UCC-1 filings.

25       132.    According to the Offering Materials provided by Towers to the Defendants, all proceeds

26  of the Towers Note Offerings were to be deposited into special Funding Accounts at Chase Manhattan

27  Bank. Withdrawal and use of the funds was to be governed by the terms of the Offering Memorandum.

28  Specifically, Towers was to use the funds only to purchase accounts receivable or other debt instruments

-43-

1  for collection, subject to the right of Towers to withdraw as a profit any excess profits, as that term was

2  defined in the Offering Memorandum. The proceeds from the collection of accounts receivables acquired

3  with investor funds were also to be deposited into Funding Accounts, pursuant to a "lock-box" system.

4  All books and records relating to the Funding Accounts would be available for inspection and audit at

5  the office of Towers. The letter which Towers sent Defendants, quoted above, also stated that the funds

6  in the Funding Accounts would not be commingled with Towers corporate funds. It would have been

7  a relatively simple matter for any due diligence officer to obtain Towers's permission to examine the deposit

8  and withdrawal register for the Funding Accounts, sampling withdrawals to see if the funds were actually

9  maintained and used in the fashion claimed. Since Towers claimed that the vast majority of the funds

10  were being used to purchase high quality health care receivables, such a sampling would have either supported

11  or refuted that claim with ease. In fact, Towers did not use the funds as it claimed it would, but instead,

12  used the so called Funding Account as a general checking account. Any inspection of the records of this

13  account would have revealed this immediately. It would have also revealed that the accounts balance

14  was repeatedly low, depleted, or negative.

15       133.  Further, a reasonable review of Towers' books and records and accounting systems and

16  procedures would have disclosed that they were a shambles and that they did not support Towers claims.

17  Towers' accountants were months behind in posting the general ledger and Towers' accounting systems

18  were inadequate and improperly maintained. Towers did not have any officer or employee who was held

19  out to be or took responsibility for being a chief financial officer.

20       134.  During 1990 and 1991, as part of its registration of its common stock for public trading,

21  Towers filed a series of SEC Form 10's, and amendments thereto. These public documents were readily

22  obtainable by anyone who desired to examine Towers Financial Corporation with a critical eye. These

23  documents contained the following information:

24       a.  For the fiscal year ended June 30, 1990, Towers purchased FDIC loans with a face value

25  of $111,654,000 for a total cost of $5,635,000. Pursuant to the Offering Memorandum in effect at the

26  time, Towers was entitled use the full face value of this debt for the purpose of calculating excess profits,

27  and for the purpose of collateralization of promissory notes, again at face value. Due to the very high

28  face value and very low actual cost of this debt, Towers was technically entitled to classify nearly all of

1   the money raised from note investors as excess profits, and use the money as it wished.

2       b.     For the purposes of its consolidated balance sheet, Towers recorded the full face value

3   of accounts receivables it purchased, or was assigned for collection purposes, as of the date of purchase

4   or assignment. Towers deducted from the gross face value amount a quantity it called "recoverable reserves."

5   Recoverable reserves were defined as amounts held in reserve against assigned and/or purchased accounts

6   receivable and amounts written down from accounts accepted for collection. Although purportedly based

7   upon historical experience, the amount of recoverable reserves deducted to arrive at the net value to be

8   placed on the balance sheet appeared to be entirely discretionary. For example, for the year of 1990, Towers

9   listed gross receivables of $354,995,882, less recoverable reserve accounts of $177,840,436, resulting

10   in net receivables of $177,155,446. No explanation of how the recoverable reserve account amount of

11   $177,840,436 was calculated, or who did this calculation, is given. The $177,155,446 figure shows up

12   in Towers consolidated balance sheet for 1990 under the title "accounts receivable" and formed the basis

13   of Towers' claim to a net worth of $13.4 million.

14       c.     Towers had never paid a dividend to its shareholders. Its stock was sold on the pink sheets.

15   *There was no active trading in the stock. This information strongly suggested that the company was not*

16   *as highly regarded, recognized, large, strong and as vital economically as it proclaimed.*

17       d.     78% of Towers' outstanding common stock was owned or controlled by Steven Hoffenberg

18   or Professional Business Brokers, an entity that he owned. Hoffenberg was the trustee of The Hoffenberg

19   Family Trust, which owned all of the outstanding stock of Professional Business Brokers, the entity that

20   owned 70% of the outstanding stock of Towers.

21       e.     Towers typically purchased FDIC debt for a cash payment of between 1% and 2% of the

22   face value of the debt, with an agreement to pay an additional 5% to 10% upon collection.

23       f.     Although Towers did not purchase collection accounts receivable, but instead, entered

24   into a contract to receive a fee of between 10% and 50% of the amounts collected, Towers listed collection

25   accounts receivables as assets on its financial statements.

26       g.     The Illinois insurance director [in connection with the UDC matter] had filed a petition

27   to compel Hoffenberg to turn over $2.9 million in assets allegedly belonging to UDC and its subsidiary

28   insurance companies, which had been placed in receivership and had initiated liquidation proceedings.

h.      The California Department of Consumer Affairs was expected to issue an accusation of serious misconduct against a Towers subsidiary - failing to remit collected funds to collection clients.

g.      The Form 10 describes the 1988 SEC action against Towers, et al., states that it was based upon the alleged sale of unregistered securities, and reveals that Towers was enjoined from further violations of the registration laws. Actions by the states of Nebraska, Alabama, Louisiana, and Jew Jersey involving prohibitions on the sale of unregistered securities are also disclosed.

h.      Towers listed no health care accounts receivable in the years of 1988 and 1989. In 1990, Towers posted collection and commercial accounts receivable totaling $163,769,335, and health care accounts receivable of $13,386,111.

I.      On July 17, 1990, Towers Healthcare Receivables Funding Corporation, a wholly owned subsidiary of Towers, issued $56.5 million in debt to institutional investors secured by healthcare accounts receivable sold by Towers, the purchase price was paid with the proceeds of the debt issue. Although these receivables are listed as assets on Towers' consolidated financial statements, these receivables were not available to creditors of Towers or other subsidiaries of the Towers and could not serve as security for the promissory note offerings.

j.      Although the consolidated financial statements issued by Towers in its 1991 annual report indicated that at least part of the collateral securing the promissory notes constituted health care receivables, the Form 10's revealed that the vast majority of the health care accounts receivables and cash of Towers resided in the debenture funds controlled by the debenture trustee and were not available to collateralize the private placement notes purchased by Plaintiffs. Additionally, the vast majority of Towers' cash holdings similarly resided in the same debenture and were unavailable for any purpose other than receivables acquisition for the designated funds.

k.      According to page 26 of the Form 10 filed by Towers with the SEC dated May 7, 1991 stated that the company had $291.6 million in outstanding accounts receivable at face value for its fiscal year ended June 30, 1990. The Form 10 stated that of this amount, $151.3 million was owned by Towers, and the remaining $140.3 million was in accounts being collected on a percentage basis. These accounts were broken down into three categories: $13.4 million in healthcare receivables [page 50]; $111.7 million, portfolio purchased from the FDIC or third parties that purchased FDIC receivables; $26.3 million,

1  commercial accounts receivable purchased from businesses. Towers placed a real value of $177.2 million

2  on its total of $291.6 of receivables. The $177.2 million represented the vast majority of Towers assets.

3  However, if Towers collected 100 percent of the collection agent accounts and earned the maximum 50

4  percent fee and if it collected 100 percent of the healthcare and commercial accounts, it would receive

5  $109.8 million. The remaining $67.4 million is the value of the loan portfolio obtained from the FDIC

6  and others. Although Towers claimed that this portfolio had a face value of $111.7 million, it reported

7  on page 8 of the Form 10 that the portfolio was purchased for only $5.6 million.

8        l.     The Form 10 stated that Towers borrowed 92.2 million to purchase accounts receivable

9  with $151.3 million in face value. If the accounts paid 85 percent of face value for all commercial receivables,

10  50 percent at time of purchase on healthcare receivables, and $5.6 million for the FDIC portfolio, the

11  cost of the $151.3 million in receivables was only $34.6 million. The left unaccounted for $56.6 million -

12  the different between the money borrowed as of June 30, 19990, $92.2 million, and the maximum cost

13  of the receivables according to Towers, $34.6. Towers' consolidated balance sheet showed $177.2 million

14  in accounts receivable in $18.3 million in other assets including cash and equivalents, prepaid interest,

15  office furnishings, leasehold improvements, etc. But these did not up to anything close to the missing

16  $56.6 million which was unaccounted for. Thus, to any keen observer with an understanding of accounting,

17  it should have been clear that net worth Towers claim, as well as its basic math, did not add up.

18       135.    Towers form 10 filing dated July 17, 1991 [attached as Exhibit "63"] contained the following

19  information:

20             a.     Included in Towers calculation of income taxes for the year ended June 30, 1990

21                  was an add back of approximately $5.4 million in interest and penalties determined

22                  to be due for prior years [see page 20];

23             b.     Steven Hoffenberg exercised ownership or control over 78.21 % of towers

24                  outstanding voting common stock [see pages 23-25 and 55 at paragraph 12]and

25                  in 1988, the state of Illinois sued Hoffenberg seeking recovery of $2.9 million in

26                  connection with liquidation proceedings involving several insurance companies

27                  [see pages 34 and 35];

28             c.     On August 4, 1988, the SEC sued towers and Hoffenberg for selling unregistered

1    securities and towers and Hoffenberg consented to entry of a judgment of permanent

2    injunction on November 16, 1988 enjoining them from violating sections 5(a) and

3    5(b) of the securities act of 1933 [see pages 27-28];

4    d.    Towers entered into a consent order on June 11, 1990 with the state of Nebraska

5        because Nebraska found that towers had violated the securities registration

6        requirements of Nebraska law [see page 28];

7    e.    Towers entered into a consent order dated February 20, 1990 with the state of

8        Alabama because Alabama found that the sale of towers promissory notes were

9        not made within the exemption from registration under Alabama law [see pages

10       28-29];

11   f.    On January 8, 1991, Towers entered into a consent order with the state of Louisiana

12       because Nebraska found that towers had violated the securities registration

13       requirements of Louisiana law [see page 29];

14   g.    On October 17, 1989, the state of New Jersey denied towers an exemption relating

15       to its 1988 offering of promissory notes [see page 29];

16   h.    Towers expected the California department of consumer affairs to issue an accusation

17       of misconduct against towers collection services of California, Inc. ["TCSC"]as

18       a result of its collection activities within the state and that TCSC would be required

19       to pay a $31,200 fine and be placed on three years probation as a result thereof

20       [see pages 35 and 36];

21   I.    As of October 8, 1990, Towers common stock was held by 73 persons see pages

22       37];

23   j.    Towers had paid no dividends to shareholders since its inception [see page 37];

24   k.    Towers' subsidiary Towers Healthcare Receivables Funding Corporation ["THRFC"]

25       sold $56.2 million of debt instruments to institutional investors and this debt was

26       secured by health care accounts receivable purchased by THRFC from towers with

27       the proceeds of the offering;

28   l.    The THRFC health care accounts receivable securing the $56.2 million in debt

1    were not available to the creditors of towers, but towers issued a consolidated balance

2    sheet which included all of its subsidiaries without excluding the asset value of

3    the THRFC health care accounts receivable [see pages 55-60];

4    I.    The financial information disclosed in the form 10 and the 1991 annual report

5    contradicted the collection turnover projections referenced in the offering

6    memorandum covering plaintiffs' investments and showed that towers was not

7    making enough money to pay its bills [see discussion below].

8    136.    The July 17, 1991 Form 10 contained the highly negative information set forth above.

9    Of critical importance, the financial information contained in the Form 10, when considered in light of

10    the information contained in the income statements to the Towers 1991 Annual Report, showed that the

11    collection turnover projections contained in the 1991 Offering Memorandum could not be met, and as

12    a consequence, Towers was not generating enough income to pay its bills. This fact is explained in detail

13    below.

14    137.    The July 1991 Form 10 reports $92 million in borrowed funds at page 43. The same filing

15    reports Towers was engaged to collect $291 million of receivables of which 48 percent was collection

16    services. See pages 9 and 10. The remaining $151 million or 52 percent would therefore have to be purchased

17    receivables. This is well below the expected  six times per year turnover rate proposed in the October

18    15, 1991 Offering Memorandum on $92 million in borrowed funds. See pages 2 and 9.  In the income

19    statements to the Towers 1991 Annual Report, Towers reported $27 million in interest expense and $65

20    million in other expenses including salaries and benefits, selling and general and administrative. See page

21    24. Very little of these expenses are depreciation, so these most of these expenses must be paid in cash.

22    Earning a 5% -10% factoring commission on $291 million in receivables would hardly cover interest

23    on Towers' debt, and could not  also cover Towers' expenses for salary, general and administrative, and

24    selling commissions. To cover $92 million in total expenses with 10 percent commission would require

25    $920 million in receivables. Therefore, the Form 10  information showed that Towers' official turnover

26    projections contained in the 1991 Offering Memorandum had not been met and Towers could not be making

27    enough money to pay its bills. And this of course is one of the main reasons that Towers ultimately collapsed.

28    138.    As of 1990, Towers claimed to have a net worth of $13.4 million, based largely upon the

1  valuation it placed on its receivables.  In order to support its valuation of its receivables as assets, Towers

2  would have to collect 12 times its cost in order to recover the minimum book value of its FDIC paper.

3  It would have to collect more than nine times its cost in order to keep from wiping out the company's

4  net worth of $13.4 million.

5          139.    Although in 1990 Towers used the "recoverable reserve" factor to discount the face value

6  of accounts receivable for the purpose of asset valuation, Towers dispensed with this discount per its 1991

7  annual report, instead valuing accounts receivable at face value.    No explanation is given for why the

8  system of reporting was changed.

9          140.    In addition to the promissory note offerings, which were issued by Towers, three subsidiaries

10 of Towers also issued debt offerings:  Towers Healthcare Receivables Funding Corp. - $56.5 million,

11 Towers Healthcare Receivables Funding Corp. II - $41.5 million, and Towers Healthcare Receivables

12 Funding Corp. III - $40.5 million.  These private placement bond offerings were sold to institutional investors.

13 The proceeds of the offerings were to purchase only healthcare accounts receivables, either from Towers

14 or from third parties.  Although the healthcare receivables purchased by these offerings were shown as

15 part of Towers consolidated assets, these receivables were not subject to Towers' creditors, including

16 Plaintiffs.  And although Towers touted the highly profitable nature of its healthcare collection business,

17 according to the audited financial statements for these subsidiaries, they suffered a collective net loss

18 of $1.6 million for the period from June 30, 1990 to June 20, 1991.

19         141.    The Towers Notes paid more than twice the then current money market rates, by claiming

20 that Towers was backed by healthcare receivables, commercial receivables, and receivables obtained directly

21 or indirectly from the Federal Deposit Insurance Corp. and Resolution Trust Corp.  By all indications

22 contained in Towers Offering Memoranda and its sales literature, the healthcare receivables constituted

23 the primary collateral for the Promissory Notes.  Towers had several types of debt instruments.  The single

24 largest was the "Private placement" Note purchased by Plaintiffs, which appeared to constitute about $148

25 million as of June 30, 1991.  But since starting to sell the Towers Notes in 1987, Towers had also created

26 new debt offerings issued by its subsidiary corporations: Towers Healthcare Receivables Funding Corp.

27 ($56.5 million), Towers Healthcare Receivables Funding Corp. II ($41.5 million), and Towers Healthcare

28 Receivables Funding Corp. III ($40.5 million), according to the 1991 Annual Report.  The three subsidiaries

1  held in the aggregate $161.4 million of the reported $169.1 million gross value of the healthcare receivables

2  reported on page 29 of the 1991 annual report. Thus, if Defendant had simply reviewed the written materials

3  generated by Towers and available to the public concerning its own operations and the operations of its

4  subsidiaries, it would have been apparent that only $7.3 million of the healthcare receivables that passed

5  through Towers Financial from the time they were acquired by Towers until the time that they were transferred

6  to one of the three subsidiaries were available to provide collateral for the private placement notes. This

7  amount of receivables could hardly provide adequate security for the Towers Note investments.

8         142.    That Marvin E. Basson, a one man C.P.A. firm, purported to undertake the task of performing

9  an independent audit of Towers and its subsidiaries and to prepare the financial statements contained

10  in the Annual Reports should have raised red flags at Defendant. To any astute due diligence investigator,

11  the fact that a publically traded company such as Towers, which had issued hundreds of millions in debt

12  securities, would use a one man operation to perform crucial audits, should have seemed highly unusual

13  at best. This fact alone should have caused Defendant to be concerned about the accuracy of the financial

14  information that Towers was providing to investors.

15         143.    The Towers Financial Corporation financial statements contained in the 1990 and 1991

16  annual report presented numerous obvious misapplications of generally accepted accounting principles

17  (GAAP). Additionally, glaring inconsistencies existed in the basic math employed in the statements.

18  These problems are discussed below:

19         144.    Revenue Recognition Practices. In its 1990 annual report, Towers indicated that gross

20  revenue was recognized on factored receivables when receivables were assigned. Towers recorded revenue

21  on receivables accepted for collection based on anticipated amounts it expected to collect. (Page 29 notes

22  to financial statements). The industry guide for finance companies indicates that finance companies should

23  recognize factoring commissions over the periods in which services are rendered. Those periods begin

24  when companies approve customer credit and end when customer accounts are settled. (Accounting and

25  Auditing Guide (AAG)-Fin 2.24 -53026). The receivables accepted for collection by Towers appear to

26  consist of more troubled receivables and require significant collection efforts. The 1991 Form 10 indicated

27  10-50% collection fees, suggesting significant efforts were involved (page 9). This also strongly suggested

28  that for receivables accepted for collection that grounds existed for delaying revenue recognition until

1  evidence of successful collection efforts. Some companies recognize factoring commissions when receivables

2  are bought, but not over a longer period of providing services, because the effects of such allocations

3  and the effects of immediate recognition are immaterial. Considering the riskiness and the significant

4  collection efforts for the factored receivables being acquired or assigned to Towers Financial Corporation,

5  immediate recognition is not justifiable.

6       145.    In the 1990 annual report, Towers reported  revenue as the face amount of receivables

7  (assigned for collection or bought). In arriving at net income, Towers deducted amounts paid for such

8  receivables and an allowance for uncollectibles. By reporting as revenues the face amount of receivables

9  accepted for collection or bought, Towers was reporting as gross revenues amounts far exceeding its share

10  of those receivables and the potential fees on collecting past due amounts. Towers presentation of revenue

11  distorts what was being earned by acquiring such receivables and suggested a level of revenue reported

12  each year from the business/ and growth in revenue far exceeding what was happening for the company.

13  In the 1991 annual report, Towers restated the reported revenues from earlier years. On page 28 of the

14  1991 annual report, Towers stated that gross income would from that time forward reflect only the portion

15  of the receivables that the Company expected to retain.  Revenue reported for the years 1990 and 1989

16  in the 1990 annual report were $291 million and $183 million respectively. Restated revenues for 1990

17  and 1989 as presented in the 1991 annual report were $74 million and $53 million.  The growth/change

18  in revenues from 1989 to 1990 as reported in the 1990 annual report was 60 percent. Using the restated

19  information for the years 1989 and 1990 as presented in the 1991 annual report, the growth in revenue

20  was reduced to only 40 percent.  For these changes, it is clear that the face amounts of receivables accepted

21  for collection or purchase should never have been recorded and presented on the income statement as

22  gross revenue. A review of Towers 1989 through 1991 annual reports fails to reveal the existence of any

23  legitimate justification for Towers' practice during the 1989-1990 period of posting revenues based upon

24  the face value of receivables accepted for collection or purchased as part of Towers' factoring activities.

25  Accordingly, this treatment was patently inappropriate from a GAAP standpoint.

26       146.    Riskiness of Receivables and Adequacy of Reserves. Per the 1989 through 1991 financial

27  statements, the amounts being reserved each year were quite high for a company that was acquiring secure

28  health-care and business accounts receivables. On pages 8 and 9 of the Private Offering Document 2/15/89,

1  Towers used the term insured health-care and business accounts receivable. The health-care receivables

2  and commercial receivables balances would have had no where near the allowances for uncollectible amounts

3  being reported in the 1990 annual report if these were insured or creditable business accounts receivable.

4  Towers had reserves for uncollectible amounts of $178 million on accounts receivable balances of $354

5  million for the year 1990, reserves for uncollectible amounts of $77 million on accounts receivable balances

6  of $189 million for the year 1989, and $47 million on accounts receivable balances of $108 million for

7  the year 1988 (page 30). The reserves as a percentage of accounts receivable was 50 percent for 1990,

8  41 percent for 1989, and 44 percent for 1988. This hardly suggested an acquisition of high turnover and

9  largely riskless receivables. On Page 8 of the Form 10 dated July 19, 1991, Towers reported that loan

10  portfolios from the FDIC and third parties for $112 million were acquired for $5.6 million. Such a deep

11  discount of $105 million strongly suggests the poor prospects for collection on these portfolios.

12      147.   Income Taxes Paid and Red Flags. The financial statements to the 1990 annual report

13  disclosed no income taxes were paid in 1989. See page 29. The financial statements to the 1991 annual

14  report refers to nondeductible tax penalties in the income tax note. See footnote 8 on page 31. The 1990

15  annual report omitted 1990 income taxes paid, a required disclosure under both FASB Statements 96

16  and 109, "Accounting for Income Taxes." A review of the information provided by Towers concerning

17  taxes actually paid versus tax expense suggests that revenue was being recognized far in advance of receipt

18  of cash and no justification is given for Towers' non-payment on income taxes when it was supposed

19  to be generating sufficient profits per its financial statements to pay its bills. In the 1991 annual report,

20  it was reported that no income taxes were paid in 1990. See page 28. But this raises serious concerns

21  as to Towers' revenue recognition practices, i.e., revenues recognized in advance of receipt of cash and

22  as to the quality of the financial information being reported. Towers reported income taxes payable of

23  $13 million in 1990, yet none were paid (page 25 of the 1990 annual report.) The 1991 annual report

24  shows for the year 1991 income tax expense of $1.1 million and cash payments in 1991 for income taxes

25  of $11 million. This information suggests a highly unusual approach to the payment of taxes.

26      148.   Reporting Issues in Presenting Cash Flows and Analytical Analysis of Cash Flow Information.

27  The cash flow statement in the financial statements contained in the 1990 annual report lists financial

28  receivables of $64.8 million on a net basis as part of cash flow from operations. See, page 28. The receivables

-53-

1   should have been reported under SFAS No. 95, "Statement of Cash Flows," on a gross basis showing

2   separately cash expended on purchase of receivables and cash collected on receivables. This would be

3   shown as an investing activity as required under SFAS No. 95. In the financial statements contained in

4   the 1991 annual report, the cash flow statements for the year ended June 30, 1990 are recast to show that

5   in 1990 $151 million in receivables were acquired and $86 million collected. See page 26. For the year

6   1989, the 1991 Statement of Cash Flows reports only $29 million were collected and $81 million acquired.

7       149.    The financial statements in the 1991 annual report show liabilities of $92 million on June

8   30, 1990 and $49 million on June 30, 1989. See page 23. The 1991 Statement of Cash Flows reports $45

9   million in proceeds from notes for the year 1991 and $19 million in proceeds for 1989. See page 26. The

10  cash proceeds from turnover of finance receivables expected on such levels of borrowings reported in

11  the financial statements is nowhere near the turnover of up to six times per year that was being suggested

12  in the private placement offering dated October 15, 1991. See page 9.

13      150.    The cash flow statements in 1990 and 1991 net the monies being collected from the debt

14  issuances. In the 1990 annual report, the statement of cash flows reports a $4.2 million increase in short

15  term borrowings and $42 million increase in long-term (page 28). For the comparative year 1989, the

16  same statement of cash flows shows $20 million increase in short term borrowings and a decrease of $1

17  million in long term. The required presentation under SFAS No. 95, "Statement of Cash Flows," is to

18  report separately inflows from borrowings and outflows from repaying debt. The 1991 annual report continues

19  to use a net presentation for such borrowings (page 26). This raises serious questions regarding repayments

20  and borrowings by Towers Financial during this period.

21      151.    Inadequate Disclosure and Reporting of Amounts Borrowed. The note disclosures on

22  borrowings are incomplete making it impossible to determine borrowings and when monies come due

23  (page 30 on both the 1991 and 1990 annual reports). This is also apparent on page 14 of the Form 10

24  dated 7/19/91. In reporting long-term liabilities on the balance sheet, information is required to be provided

25  on the nature of the liabilities, maturity dates, interest rates, methods of liquidation, collateralized property,

26  covenant restrictions, and other significant matters. Disclosure is also required for each of the five years

27  following the balance sheet date of the combined aggregate and maturity and sinking fund requirements

28  for all long-term borrowings.   The absence of this information cannot be reconciled with GAAP.

152.    <u>Inadequate Disclosure of Restrictions of Assets</u>. In the financial statements accompanying the 1991 annual report, the basis of presentation is incomplete, particularly restrictions on use of assets borrowed at the subsidiary level. Also, restrictions as to withdrawal or usage of cash were not disclosed

153.    <u>Improper Reporting of Receivable Balances</u>. The 1991 annual report (page 27) provides the mix of collection and commercial accounts and health care receivables. As of 6/30/1990, the receivables balance for health-care receivables was $13 million. In the preceding year, the balance for healthcare receivables was zero. This is inconsistent with the 1989 private placement offering talking about borrowings backed and secured by a first lien on health care receivables. Also, there does not appear to be any reason why collection receivables were included in accounts receivable, when collection receivables are not owned by Towers Financial Corporation and cannot properly be reported as receivables.

154.    <u>Ambiguous Description of Revenue Recognition Practices</u>. The information on page 9 of the Towers Form 10 dated July 19, 1991 is inconsistent with the information set forth on page 29 of the 1990 annual report concerning the description of revenue recognition for commercial receivables. The 1990 annual report indicates "the company anticipates collecting 30 percent of receivables collected and then records its fee of 30 percent. Page 9 of the Form 10 indicates "the Company's collection services are undertaken pursuant to a written agreement with the client that provides for a collection fee of 10% to 50% of the amount recovered on each receivable. Obviously, the revenues earned by Towers would vary depending upon which of these two descriptions applied. The mere fact that facially inconsistent descriptions of this critical feature of the Towers' program exists in official company documents raises serious concerns about the accuracy of the financial statements.

155.    <u>Concerns and Red Flags on Cash Generated From Operations</u>. The cash generated from operations appears to be low and unable to cover due to clients( i.e. amounts owed to corporations on receivables collected). As of June 30,1991, $191 million is reported on the balance sheet due to clients and $287 million is notes payable (page 23 1991 annual report). Net cash provided by operating activities was $118 million with most of that amount attributable to an adjustment for payable due to clients of $126 million (i.e. delay in payment). Had these amounts been paid, there would have been a cash deficit of $8 million. A serious question arises under these circumstances as to whether collections would be timely enough to cover these obligations. The same cash flow statement shows in 1991 a payment of $13

1    million in income taxes and deferred taxes. It appears there would have been a cash crunch had the payments

2    been more timely in earlier periods. This suggests that the company was undergoing serious financial

3    difficulties.

4        156.    <u>Prepaid Interest and Expenses</u>. In the 1991 statement of cash flows, adjustments for prepaid

5    interest and expenses are reported as $6.2 million in 1990 and $3.3 million in 1989 (page 23, 1991 annual

6    report). These are cash payments in advance of expensing the related item against the income statement.

7    Such amounts would ordinarily reconcile with amounts reported on the balance sheet. There are only

8    $421 thousand of prepaid interest and expenses in 1989 and $797 thousand in 1990 reported on the balance

9    sheet (page 22 1991 annual report). This difference again creates a concern regarding the quality of the

10    financial information being provided by Towers.

11        157.    <u>Adequacy of Factoring Commissions and Recovery Fees to Cover Interest and Other Expenses</u>.

12    The July 1991 Form 10 reports $92 million in borrowed funds (page 43). The same filing reports Towers

13    was engaged to collect $291 million of receivables of which 48 percent was collection services (pages

14    9 and 10). The remaining $151 million or 52 percent would therefore have to be purchased receivables.

15    This is well below the expected turnover rate proposed in the October 15, 1991 Offering Memorandum

16    on $92 million in borrowed funds. Towers on its 1991 income statement reports $27 million in interest

17    expense and $65 million in other expenses including salaries and benefits, selling and general and

18    administrative. Very little of these expenses are depreciation, so these most of these expenses must be

19    paid in cash. Earning 5% -10% factor commission on $291 million in receivables would hardly cover

20    interest, and was not sufficient to cover salary, general and administrative, and selling. To cover $92

21    million in total expenses with 10 percent commission would require $920 million in receivables. This

22    information strongly suggests that Towers was not able to generate sufficient cash from its operations

23    to pay its bills.

24        158.    <u>Conflicting Information On Treatment of FDIC portfolio</u>. The July 19, 1991 Form 10

25    indicates that $111 million of portfolios were purchased from FDIC for $5.6 million and that the company

26    would recognize income on these loans portfolios when collections are received based upon the difference

27    between the company's purchase price, including payments contingent on the amounts collected, and the

28    amount recovered on such portfolios. (See page 8). The financial statements accompanying the 1991

1   Annual Report state that income on RTC/FDIC loans is recognized as they are collected. (See page 28).

2   The financial statements are silent as to how these portfolios would be treated on Towers' balance sheet.

3   However, the October 15, 1991 Offering Memorandum states: "It should be noted that FDIC and RTC

4   portfolios are taken into account at face amount for purposes of the offering even though they may be

5   purchased for substantially less than face amount." (See page 13) Normally, these types of portfolios would

6   be recorded on financial statements at $5.6 million, which was their present value, rather than at their

7   face value.   Indeed, Towers' acknowledgment that it would not  recognize income on these portfolios

8   until collections had been received supports the view that the asset value of these portfolios for accounting

9   purposes was not their face value at time of acquisition, considering the fact that these portfolios were

10   likely not to be collectible. The deferral of recognition of income cannot be reconciled with the immediate

11   recognition of a face value asset as to these portfolios in the offering memorandum and particularly the

12   right to realize cash at that value.

13          159.    Defendant made no attempt to measure the risks of the Towers investments against the

14   risk tolerance of Plaintiffs.  Defendant was motivated to defraud Plaintiffs into purchasing the Towers

15   Notes as a result of the inordinately high sales and renewal commissions of from between 5% and 10%,

16   which were higher than could be obtained with virtually any other investment product available for sale

17   at that time. Defendant was driven by its own greed and self-interest to engage in the breach of fiduciary

18   duty and fraudulent acts and omissions alleged herein.  As a result of the sale of Towers Notes, Defendant

19   was paid commissions of not less than $416,125 in commissions from selling the Towers Notes.

20          160.    In or about the later part of the 1980's or during 1990, Dun & Bradstreet prepared a business

21   report on Towers as part of its regular reporting service. This report contained a very negative evaluation

22   of Towers' financial status.   In the later part of 1991 or early 1992, Towers sued Dun & Bradstreet in

23   the New York Supreme Court, charging defamation and seeking an injunction against further publication

24   of the report.   The report, and the litigation arising from the report, could readily have been discovered

25   by Defendant if it had conducted a Dun & Bradstreet review, or a litigation review,  of Towers.

26          161.    A huge amount of adverse information concerning Hoffenberg and Towers had been reported

27   in various newspapers prior to the date that Plaintiffs purchased their Towers Notes. Attached as Exhibits

28   "1" through "20" and incorporated by reference herein, are copies of articles concerning Towers and

1   Hoffenberg published prior to the date when Plaintiffs purchased their Towers Notes which contained

2   adverse information which should have raised red flags for Defendant. Plaintiffs, for their part, had not

3   seen any of these articles and were entirely ignorant of the information contained therein. Plaintiffs would

4   not have purchased their investments if that had been informed of the negative information contained

5   in these articles.

6       162.    Defendants, as part of its due diligence review of Towers, should have, inter alia, reviewed

7   online databases of public records and news publications concerning Towers and Hoffenberg, which would

8   have disclosed most, if not all, of the above adverse information and would have provided additional

9   information regarding the true facts of the Towers fraud.

10      163.    In a Wall Street Journal article published on November 11, 1987, it was disclosed that

11  "[i]n 1986, Towers became publicly held through a merger with O.G. Consulting Co., a Nevada company

12  Mr. Hoffenberg describes as a "shell corporation." O.G. Consulting had gone public in 1983 through an

13  offering of five million shares at two cents a share." Thus, at its inception, Towers went public by merging

14  with a shell company, a method that minimizes public scrutiny. The fact that Towers might have desired

15  to avoid public scrutiny would have been a piece of the puzzle that was the truth about Towers for a reasonable

16  due diligence investigator.

17      164.    It was reported in an article published in the Wall Street Journal on December 7, 1987

18  [Exhibit "1"], that:

19          Despite Towers's reported earnings -- $4.3 million, or $1.04 a share, for fiscal 1987 -- its
            annual report shows no taxable income for fiscal 1987. That and other aspects of the report
20          raise questions in the mind of Thornton L. O'glove, an Englewood Cliffs, N.J., securities
            analyst who publishes the "Quality of Earnings Report" for institutional investors. "There's
21          not enough disclosure," he says.

22          Moreover, the Denver accountant who was consulted by potential investors in the Towers
            Credit notes contends that Towers Financial's "true revenue" for fiscal 1987 was probably
23          about $10 million, rather than the reported $95.2 million.

24          Towers, he says, apparently records the full amount of bad debts it undertakes to collect
            as revenue, even though the company is paid only 30% or so of the amount it actually collects.
25
            165.    If Defendant had bothered reading the December 7, 1987 Wall Street Journal article, they
26
    would have learned one of the accounting practices which was used by Towers to falsely inflate its audited
27
    financial statements. This information would have cast serious doubts as to the validity of the financial
28

-58-

1  statements and the integrity of the accounting firm preparing those statements.  In the same article it was

2  also reported that:

3        Court records show that Union Electric was declared bankrupt in 1976, when Mr. Hoffenberg
       was 31. Unsecured creditors with $1.3 million in verified claims wound up with nothing.
4        The bankruptcy trustee sued Mr. Hoffenberg, alleging that he had fraudulently removed
       assets from Union Electric. The case was settled for $10,000 in 1979. But it wasn't until
5        1983, after protracted litigation, that the trustee collected the money.

6        166.    Again, if Defendant had run a search on news articles published regarding Towers and

7  Hoffenberg, they could have learned that the CEO of the supposedly very successful firm had already

8  had a company go bankrupt, causing creditors to lose $1.3 million.

9        167.    In an article published in the Wall Street Journal on August 5, 1988 [Exhibit "2"], it was

10  reported that:

11        The Securities and Exchange Commission charged Towers Financial Corp., a New York-based
       debt-collection agency that promoted itself in a bid to take over Pan Am Corp., with selling
12        more than $20 million in unregistered notes.

13        The SEC said Towers and its credit unit sold the notes mainly to "unsophisticated" investors.
       It seeks a court order requiring a refund to investors.
14
        The notes, promising a yield of 18%, were part of a planned $50 million offering. The
15        SEC said the notes were sold through a broker network organized by New York-based
       Eton Securities Corp. Eton also was named in the complaint, which seeks an injunction
16        against the companies as well as a restriction on the use of proceeds from the sale.

17        An attorney for Towers said the company and its chairman "recognize there may be a technical
       violation of the registration provisions of the securities laws." He said the company will
18        "make every effort to comply with the federal securities laws and will attempt to seek a
       resolution with the staff of the SEC."
19
        Despite considerable publicity last year over its interest in Pan Am, Towers never got a
20        formal takeover bid off the ground. Towers and its chairman, Steven Hoffenberg, next
       expressed interest in Emery Air Freight Corp. and launched an offering of $50 million
21        in notes to finance its plans.

22        The SEC complaint said the $20 million in notes was sold to enable the Towers Credit
       Corp. unit to purchase accounts receivable for its factoring business. Towers's attorney
23        declined to comment on the $50 million note offering to raise takeover funds except to
       say "there's no mention of (that) in the complaint."
24
        The SEC said the $20 million in notes, issued by the credit unit and backed by Towers
25        Financial, were purchased by more than 400 investors.

26        168.    If Defendant had read the above article, it would have learned that Towers had already

27  been found in violation of the federal securities registration laws.  This information would have placed

28  them on notice of the likelihood that Towers was willing to violate the securities laws, and that the Towers

1  Notes sold to Plaintiffs might not comply with the registration laws.

2      169.    In a Wall Street Journal article published on November 25, 1988 [Exhibit "3"] it was disclosed

3  that:

4      Towers Financial Corp. settled a Securities and Exchange Commission suit, which charged
        it sold $20 million in unregistered notes in a bid to take over Pan Am Corp., by agreeing
5      to make refunds to investors....

6      Towers Financial, a New York-based debt-collection agency, its Towers Credit Corp.
        subsidiary, and Steven Hoffenberg, chairman and chief executive officer of both companies,
7      ... are permanently enjoined from further violations of registration provisions of securities
        law.  Federal Judge Shirley Wohl Kram also restrained them from using the notes' proceeds,
8      other than for paying refunds, and has required them to turn over documents pertaining
        to the sale.

9      170.    A person conducting due diligence who read this article would have been placed on notice

10  of the fact that Hoffenberg and Towers had essentially admitted to the securities law violations, had been

11  ordered to make restitution of $20 million, and had  been  permanently barred from further violations

12  of the securities laws, all of these facts tending to raise serious doubts as to the reliability and honesty

13  of Towers and its founder, Hoffenberg.

14      171.    In a Wall Street Journal article dated May 16, 1989 [Exhibit "4"], it was reported that:

15      The Securities and Exchange Commission said the small New York brokerage firm of
        Eton Securities Corp. settled the agency's administrative proceeding against it by agreeing
16      not to act as an underwriter for 60 days.

17      The SEC said Eton's president, Mitchell Brater, similarly settled by agreeing to a 60-day
        suspension from the brokerage business.
18

19      The proceedings against Eton and Mr. Brater follow a suit filed last year by the SEC charging
        that Towers Financial Corp. sold $34 million in unregistered notes that should have been
20      registered with the SEC. The SEC said Eton and Mr. Brater "willfully violated" securities
        laws by distributing the unregistered notes. Eton and Mr. Brater neither admitted nor denied
21      the SEC's allegations.

22      Mr. Brater didn't have any comment on the settlement. He declined to discuss his relationship
        with Towers, saying, "that isn't germane to this case."
23

24      Steven Hoffenberg, chairman of Towers, said Mr. Brater is the company's vice chairman.
        He also said that "Eton no longer functions as an underwriter for Towers Financial." Towers
        settled the SEC's suit against it last November by neither admitting nor denying the charges
25      but agreeing to make refunds to investors.

26      172.    If Defendant had read this article as part of its due diligence, it would have known that

27  the SEC had concluded that the Towers Notes had been sold in violation of the federal securities registration

28  laws and that the Chief Operating Officer and Vice Chairman of the Board of Directors of Towers had

1  been found to have wilfully violated the securities laws. This information could only serve to reinforce

2  the notion that the Towers Notes sold to Plaintiffs were sold in violation of the registration rules, and

3  that Towers and its management were not honest.

4          173.    In an article published in the Los Angeles Business Journal on February 12, 1990 [Exhibit

5  "5"], it was reported that:

> Towers Financial Corp., a collections, factoring and insurance conglomerate with a checkered
> legal and financial history, is under state investigation for allegedly bilking Southland
> businesses that hired the company for collections work. According to business credit
> managers and the California State Department of Consumer Affairs, the Santa Monica
> branch of Towers has collected on, but not delivered, overdue accounts to clients.
> The chairman of the $ 183 million (reported revenues) Towers, Steven Hoffenberg, 45,
> denied the charges, and said last week whatever problems have arisen here stem from
> "confusion." He also said complaints are spread by competitors who are upset at New York-
> based Towers' entry into the California collections market.
>
> Towers earned fleeting nationwide headlines in late 1987, when it made a highly publicized
> bid for Pan Am Corp., the parent company of one of the nation's largest airlines. Locally,
> Towers attracts clients by offering to collect past-due accounts for between 15 percent
> and 30 percent on the dollar, roughly half what established collection agencies charge,
> said Al Hall, chief of the Bureau of Collections and Investigative Services for the state
> Department of Consumer Affairs.
>
> The state's investigation into Towers is a big one, said Hall. "We started our investigation
> based upon 30 to 39 sworn complaints—that was before we even began to investigate,"
> said Hall, who declined to estimate the full extent of alleged losses to local businesses.
> But Hall said, "(The alleged losses are) a significant amount. We are surprised at the number
> of clients they had, over and above the complaints." Hall said the Towers' case was the
> largest alleged collections fraud case the state is working on. When asked if Towers has
> collected but not delivered on receivable to clients, Hall responded, "I will say that is pretty
> much true."
>
> Last week Towers' Hoffenberg said Hall was confused, and had not yet seen Towers' side
> of the story. Hoffenberg said his company operates differently than other collections agencies,
> and directs deadbeats to send money directly to clients, rather than to Towers. "The Bureau
> (the state Bureau of Collections) does not understand that we direct payments to the client,
> not to Towers," said Hoffenberg. With so many delinquent accounts claiming to have
> paid both Towers and clients, confusion arises, said Hoffenberg. "Let's say an account
> is overdue to the phone company. They'll tell us, We paid the phone company.' They'll
> tell the phone company, We paid Towers.' This causes confusion." Hoffenberg said that
> Towers charges between 10 percent and 25 percent of receivables collected.
>
> The Towers case has been referred to the state Attorney General's office, said Hall, a
> gubernatorial appointee and a 22-year veteran of law enforcement agencies, including the
> California Highway Patrol. Antonio Merino, deputy state attorney general, confirmed
> last week that the case had been referred to him, but he said he could not discuss the
> particulars of the case.
> In addition to the collections problem, Towers had been operating without a license until
> it recently purchased a San Diego-based company that already had a collections license,
> said Hall of the Collections Bureau. "That was a major license problem," he said. Hall
> said he did not know how long Towers had operated in California prior to getting a license,

1    but "some of the (Towers' office) leases extend back to the mid-1980s."

2    Several local business credit managers, reached last week for comment, complained about
     Towers' lack of performance. I can't get a straight answer out of them," said Frances Carreon,
3    office manager for Tub Harris, a Los Angeles-based distributor of plastic bags and coin
     boxes. "We turned over $ 6,000 to $ 7,000 to them. They turned over two accounts real
4    fast, but I can't get answers on the rest. I always get referred to somebody when I call,
     I have even been referred to New York." Said Barbara Feeder, credit manager at Leo's
5    Stereo: "We did have a bad experience with them, but I am not allowed (on advice of counsel)
     to discuss details.'' Feeder said the problem involved collections that were not delivered.

6
     At Beverly Hills Office Supplies, Michelle Royah, office manager said, "We sent to them
7    $ 10,000 in accounts receivable. Nobody there (at Towers) seemed to know where they
     were. You get the run-around when you try to find out about your accounts. When we
8    cancelled, they said 'There will be a flat fee, if we turn them back over to you,' although
     they eventually waived that fee."
9    Hoffenberg of Towers said that with thousands of accounts, there are bound to be a few
     confused Towers' customers. He said Towers has never improperly withheld collected
10   receivables from clients.

11   Towers, its subsidiaries, and Hoffenberg have had previous run-ins with regulatory agencies:

12   In 1987, the Securities and Exchange Commission brought civil charges against Towers
     Financial for the sale of $ 34 million of unregistered securities -- 18 percent promissory
13   notes—to more than 400 investors in 26 states.
     A federal judge in New York on Nov. 16, 1988 ordered Towers Financial to halt sale of
14   the notes, to offer to pay back investors, to post $ 3.5 million as security, to not destroy
     records and to provide records to the SEC. The SEC also filed a complaint against Eton
15   Securities, a registered broker-dealer that sold the promissory notes, and which is owned
     by Towers Vice Chairman Mitchell Brater, 47. Hoffenberg told the Wall Street Journal
16   in 1987 that he had planned to raise $ 50 million through the securities, and wanted to
     buy a Big Board company. Last week Hoffenberg said the SEC matter was settled, and
17   is an old story.

18   The State of Illinois seized United Fire and Associated Life, two insurers that are subsidiaries
     of Towers Diversified, a Towers Financial subsidiary, on March 1 of last year.
19
     There is an ongoing investigation into the two insurance companies, according to Richard
20   Darling, chief operating officer of the Office of the Special Deputy Receiver, an agency
     that operates under Illinois state aegis. The liabilities of Associated Life and United Fire
21   exceed assets by $ 30 million, said Darling.
     The Director (of the Illinois Department of Insurance) is doing his due diligence as to the
22   cause of the insolvency, and what that investigation reveals will set the cause for action,
     which may or may not include Towers or the former ownership (of Associated Life and
23   United Fire)," said Darling.
     Hoffenberg said last week the problems were caused by the two insurers' previous owners,
24   and that 90 days after he bought the two companies he had the deal rescinded. "Towers
     Financial is not the legal owner, and never was the legal owner (of United Fire and Associated
25   Life)'' said Hoffenberg.
     Darling of the Illinois Special Deputy Receiver's office said that he considers Towers the
26   legal owner. Darling also said that Towers has yet to produce certain documents in the
     case, and is under order to show cause to an Illinois state judge as to why Towers should
27   not be held in contempt of court for not producing the documents. Darling said Hoffenberg
     had waged a spirited legal battle against the state seizure of the two insurers, in which Mark
28   White, former governor of Texas, served as Towers' attorney.

1  Towers Collection Service, a Towers subsidiary, was ordered in November 1987 by the Appellate Division of the Superior Court of New Jersey to pay $19,346, plus interest and
2  attorney fees, to LCP Chemical and Plastics. Towers had improperly withheld collections, and refused to return documents to LCP Chemicals, the court ruled. LCP Chemicals sued
3  Towers in June 1986.
   In 1976 Hoffenberg, then president of Union Electric Products Corp., declared the
4  manufacturer of electrical products bankrupt. The bankruptcy trustee in the case alleged that Hoffenberg fraudulently removed assets from the bankrupt company. The case was
5  settled in 1983 after protracted litigation, with Hoffenberg paying $10,000 to settle the case. "That was a nuisance suit," Hoffenberg declared last week. "They wouldn't have
6  settled for so little unless it was a nuisance suit. I just settled to avoid additional legal fees.''

7  Hoffenberg said last week he was blameless in the matter.
   Locally, Towers operates out of offices at 1821 Wilshire Boulevard in Santa Monica. At
8  the same address, Towers also operates a telemarketing staff that offers to investors promissory notes, yielding 14 percent to 16 percent annually, backed by hospital receivables.
9  According to a Towers prospectus, Towers plans to raises $100 million through issuance of the promissory notes. According to a former Towers employee, telemarketers cold-call
10  potential investors.

11  At the time Hoffenberg and Towers made the Pan Am bid some analysts did not give much credence to it, but work done by a six-member public relations staff hired by Hoffenberg
12  resulted in headlines coast-to-coast and a report in the Wall Street Journal. Last week Hoffenberg said that he did not hire the public relations staff, and that publicity surrounding
13  the buyout bid resulted from a union's endorsement of his group's efforts.

14  Although Towers reported annual revenues of $183.0 million for the fiscal year ended June 30, 1989, much of that is actually receivables that Towers has collected and passed
15  on to clients. The company reported operating expenses of $29.4 million and a net of $3.5 million in 1989.
16
   Towers has a high-profile Board of Advisors, including Ben Barnes, former Lt. Governor
17  of Texas and associate of banker Herman Beebe, and Thomas Evans, former U.S Congressman and former partner in the Washington offices of Manatt, Phelps, Rothenberg
18  & Phillips, a leading Los Angeles law firm. Locally, Towers is represented by Mickey Kantor, a Manatt Phelps partner who is well-known in Democratic Party circles. Kantor
19  said last week that if a state officer had revealed confidential information to the press, that would be a violation of state law, and would be a "grave matter." Kantor said a state officer,
20  divulging information part way through a case without the benefit of clarifying information, could make it appear there had been a problem with Towers, when in fact that may not
21  be the case.

22      174.    Anyone reading this article would have seen a wealth of red flags about the integrity of

23  Steven Hoffenberg and Towers and learned that Hoffenberg had been involved in several failed business

24  and Towers had run afoul of state and federal regulators on several occasions for allegedly unethical practices,

25  including the sale of unregistered securities. Just as significantly, he would have learned that in just *one*

26  *state* in which Towers had engaged in its vaunted, hugely successful collection activities, in a very short

27  time Towers had racked up 30 to 39 sworn complaints of fraudulent practices to the Department of Consumer

28  Affairs. The fact that Towers might have engaged in a large scale fraud in its collection activities in California

1  strongly inferred that it was capable of illegal or dishonest conduct in connection with the promissory

2  notes. He would also have learned that Towers was apparently selling private placement investments

3  with boiler room tactics, a clear violation of the federal securities laws.

4      175.    In an article published in the Los Angeles Business Journal on August 26, 1991 [Exhibit

5  "16"], it was stated:

6      Towers Financial Corp., a New York-based financial and collections company with a major
       operation in Santa Monica, is the target of a multi-state investigation for securities law
7      violations, state officials confirmed last week....According to Bill McDonald, assistant
       commissioner at corporations, the multistate task force is investigating improper disclosure
8      and the sale of unregistered notes by Towers—that is, IOUs which are sold to investors,
       in the form of securities, but are not registered with the state, as required by law. "We
9      are looking at whether they are misrepresenting securities they are selling," said McDonald.

10

11     Towers markets high-yield notes backed by receivables, usually hospital accounts, nationwide.
       Other states participating in the investigation include Illinois, Kansas, Missouri, New Mexico,
       Tennessee, Texas and Wisconsin. The investigation is a special project, funded in part
12     by the North American Securities Administrators Association, a body of state securities
       industry regulators, said McDonald. The federal Securities and Exchange Commission,
13     which sanctioned Towers in 1988 in a similar matter, is being kept abreast of the investigation.

14                                              *   *   *
       According to a Towers filing with the SEC, the state will soon issue an "accusation" against
15     the company, requiring proper record-keeping and licensure. The accusation will be dismissed
       with prejudice against Towers, with the company remaining in business under administrative
16     probation. According to Towers' SEC filing, Towers has had tangles with other regulatory
       agencies:
17
       In 1987 the Securities and Exchange Commission brought civil charges against Towers
18     for the sale of $34 million in unregistered securities. A federal judge in 1988 ordered Towers
       to pay back investors, and not to destroy records, and to not sell improperly unregistered
19     securities again.

20     On June 27, Towers, Chairman Hoffenberg and other company officers became the target
       of a Racketeering Influenced, Corrupt Organizations Act (RICO) suit filed in federal court
21     by the State of Illinois.

22     The Illinois Director of Insurance alleged that Towers purchased two insurance companies
       in that state in 1987, then stripped the insurers of their assets, causing insolvency, according
23     to Richard Darling, official with the Illinois Office of the Special Deputy Receiver.
       Hoffenberg said last week of the Illinois matter. "That's an old case, started in 1987. The
24     court has agreed that we could try our position, and rescind our purchase (of the insurance
       companies) and allow the return of our purchase money."
25
       On June 11, the State of Nebraska found that Towers had broken state securities registration
26     laws, * On Feb. 20. Alabama found Towers had violated state securities laws, and ordered
       Towers to cease and desist from illegal sales of securities.
27
       On Jan. 8. Louisiana ordered Towers to cease and desist from the illegal sales of securities.
28     Hoffenberg last week described Towers as a '1 billion (in collections and factoring revenues)

1      company that does business in 50 states. It is not unusual that we are regulated in 50 states."

2          176.    If Defendant had read this article, it would have learned that Towers was subject to a multi-state

3  investigation - a red flag if ever one existed, which should have raised serious questions about the risks

4  of the investment.

5          177.    In an article published in the Los Angeles Business Journal on December 9, 1991 [Exhibit

6  "18"], it was stated:

7      The State of California had settled its long-running charges against Santa Monica-based
       Towers Collection Service of California Inc., the business collection outfit accused of
8      misappropriating client funds.

9      Under the settlement, Towers admits no guilt and disputes it ever kept client money, but
       Towers is placed on administrative probation for three years and will pay state costs of
10     $31,138.

11     According to the state "accusation" filed with the settlement, Towers violated the following
       state laws:
12
       *       It did not hold a valid license as a collection agency.
13     *       It did not render to clients a statement of account within 60 days.
       *       It did not remit money to clients within 60 days.
14     *       It did not properly maintain records of client accounts.

15     Towers, a unit of New York-based Towers Financial Corp., retained heavyweight lawyers
       Mickey Kantor and Lisa Specht, of the Westside-based law firm Manatt, Phelps & Phillips,
16     to represent it in dealings with the state.

17     Both lawyers are well-connected to state political parties.

18     The state in early 1990 launched an investigation into Towers Collection, after sworn
       affidavits from more than 30 Southland businesses registered complaints about Towers.
19
       The thrust of the affidavits was that the businesses had hired Towers to collect on overdue
20     receivables, and that Towers did so, but did not properly remit the collected money to its
       rightful owners.
21
       At the time the affidavits became public, Towers Chairman Steven Hoffenberg, 47, denied
22     the charges and said competitors were spreading lies about Towers.

23     Separately, Towers' parent, Towers Financial, is undergoing a multi-state investigation
       for possible violations of securities laws, as the Business Journal reported in August. The
24     state Department of Corporations is participating in the investigation.

25     Towers markets high-yield notes backed by receivables, usually hospital accounts, nationwide.
       Those notes are the focus of the investigation, according to state officials.
26
       Too, Towers and Hoffenberg are the target of a federal Racketeer Influenced, Corrupt
27     Organizations Act suit fled in federal court by the State of Illinois.

28     The Illinois director of insurance alleged in June that Towers purchased two insurance

1    companies in that state in 1987, then stripped the insurers of their assets, causing insolvency.

2    Towers has denied the charges, and company officials have said problems with the two
     insurance companies stem from actions of previous owners. Towers has moved to have
3    its purchase of the insurance companies rescinded.

4    178.    If Defendant had read this article, it would have been aware of numerous red flags suggesting

5    that Towers and Hoffenberg were running fast and loose, and that it was very likely that the Notes were

6    not legitimate investments.  In particular, this article would have alerted Defendant to the pendency of

7    the Schacht case, which was not disclosed in the October 15, 1991 Offering Memoranda.  It would have

8    been a relatively simple matter for Defendant to order a copy of the complaint in Schacht.  Even a cursory

9    reading of the Schacht complaint should have put Defendant on notice that Hoffenberg was most likely

10   a criminal.  Read in conjunction with the other publically available information on Towers, this article

11   could only serve to confirm that it would be inappropriate for Defendant to recommend the Towers Notes

12   to any of its customers.  Additionally, this article would have revealed that serious charges of misconduct

13   by a Towers affiliate had been made by the State of California.  It would have been a relatively simple

14   matter for Defendant to look further into the accusations regarding fraudulent business practices made

15   against Towers by the State of California.  Defendant could have obtained copies of the "Accusation"

16   filed by California and the " Stipulated Settlement and Order."  The article would also have notified

17   the Defendant that Towers was the subject of a multi-state investigation and this should have signaled

18   the presence of potential serious misconduct..

19   179.    For their part, Plaintiffs had not read any of the above articles, nor did they have any reason

20   to be interested in these articles, prior to the time that they made their Towers investments.  Plaintiffs

21   would not have made their investments if they had known the negative information contained in the above

22   articles.

23   ## DEFENDANT BEACHED DUTIES OWED TO PLAINTIFFS BY
     ## RECOMMENDING UNSUITABLE INVESTMENTS FOR PLAINTIFFS

24   180.    Brokerage houses also have an obligation to take reasonable steps to ensure that investment

25   recommendations are suitable for a customer.  The intentional or reckless sale of an unsuitable investment

26   can constitute fraud, a breach of fiduciary duty, breach of contract, and a violation of the federal securities

27   laws.  In O'Connor v. R.F. Lafferty & Company, Inc. (10th Cir. 1992) 965 F. 2d 893, the Court explained

28

-66-

1 | this rule as follows:

2 | > O'Connor claims Defendants bought securities which were unsuitable for her investment
3 | > needs. Federal courts recognize such a claim as a violation of § 10(b) and Rule 10b-5. The unsuitability doctrine is premised on New York Stock Exchange Rule 405-- Know Your Customer Rule [FN3] and the National Association of Securities Dealers Rules of
4 | > Fair Practice. Unsuitability claims can be analyzed as omission cases or fraudulent practices cases. This rule provides: "Every member organization is required ... to (1) Use due diligence
5 | > to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization."

6 |
7 | > Some courts examining a § 10(b), Rule 10b-5 unsuitability claim have analyzed it simply as a misrepresentation or failure to disclose a material fact. In such a case, the broker has omitted telling the investor the recommendation is unsuitable for the investor's interests.
8 | > The court may then use traditional laws concerning omission to examine the claim.

9 | > Under a misrepresentation or omission theory, a plaintiff can establish § 10(b), Rule 10b-5
10 | > liability by showing that in connection with the purchase or sale of a security--the broker made an untrue statement of a material fact, or failed to state a material fact, that in so doing, the broker acted knowingly with intent to deceive or defraud, and that plaintiff relied
11 | > on the misrepresentations, and sustained damages as a proximate result of the misrepresentations. [Citations omitted].

12 |
 | 965 F. 2d at 897.

13 |
14 | > 181.    In <u>City of San Jose v. Paine, Webber, Jackson & Curtis Inc.</u> (N. D. Cal. June 6, 1991)

15 | 1991 WL 352485, 1, 1991 U. S. Dist. LEXIS 8318, at 1, the Court stated:

16 | > The City's unsuitability claim can arguably be viewed as falling under either of two theories that derive from Rule 10b-5. Under the first theory, it could be said that the knowing
17 | > recommendation of unsuitable trading is actionable because the dealer-defendants failed to disclose that the trading was unsuited to the City's objectives. 17 C.F.R. § 240.10b-5(b). For convenience, we shall refer to this as the "omission" theory. Under the second theory,
18 | > the knowing recommendation of unsuitable trading could be said to be actionable because it constitutes fraud by conduct. 17 C.F.R. § 240.10b-5(a),(c). For convenience, we shall
19 | > refer to this as the "fraudulent practice" theory.

20 | > 182.    At a bare minimum, Plaintiffs desired to invest in bona fide, legitimate investments sponsored

21 | by legitimate business enterprises and not investments that were riddled with fraud. Defendant was fully

22 | aware of this minimum suitability standard as a matter of law.   Defendant knew or should have known

23 | that the Towers investment did not meet this minimum suitability standard, and the acts and omissions

24 | of Defendant in recommending the Towers investments as alleged herein constituted the intentional or

25 | reckless recommendation of unsuitable investments, in that the Towers Notes were not bona fide, legitimate

26 | investments offered by a legitimate business enterprise but were part of a criminal fraud.

27 | ## DEFENDANTS COMMITTED FRAUD IN CONNECTION WITH THE SALE OF UNREGISTERED SECURITIES

28 |

183.    In connection with the purchase of the Towers Notes as alleged above, Plaintiffs were provided with packets of written materials entitled "Subscription Documents," which included sections entitled "Investor Questionnaire" and "Subscription Agreement." True and correct *exemplar* copies of these documents are included in Exhibit "51" attached hereto and are incorporated by reference herein. Plaintiffs read these Investor Questionnaire and Subscription Agreement documents prior to purchasing their investments.

184.    The "Confidential Investor Questionnaire" stated that the Towers Notes were being sold "pursuant to Regulation D promulgated under the Securities Act of 1933, as amended (the "1933 Act")." The Subscription Agreement stated that the offering was being made "in reliance upon the exemption for private offerings contained in Section 4(2) of the 1933 Act, Regulation D promulgated thereunder...."

185.    Plaintiffs reasonably interpreted the statements to indicate that the Towers Notes were being sold in conformity with applicable federal and state laws and reasonably relied upon these statements in making their decision to invest in Towers. In fact, the sale of the Towers Notes violated the state and federal registration laws. Had Plaintiffs known that the sale of the Towers Notes violated State and Federal registration laws, Plaintiffs would not have purchased the notes.

186.    A four factor flexible test applies in analyzing the validity of an asserted private offering exemption. The calculus consists of the following four considerations:

1)    The number of offerees;
2)    The sophistication of the offerees;
3)    The size and manner of the offering; and
4)    The relationship of the offerees to the issuer.

Securities & Exch. Com'n v. Murphy (9th Cir. 1980) 626 F.2d 633, 644.

187.    The principle announced by the Supreme Court in SEC v. Ralston Purina Co. (1953) 346 U.S. 119, 126 remains the central feature in analysis of the private offering exemption. Focusing upon the nature of the offeree, the Supreme Court held that: "(T)he applicability of s 4(2) should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown able to fend for themselves is a transaction 'not involving any public offering'." 346 U.S. at 125, 73 S.Ct. at 984.

188.    Plaintiffs have alleged facts showing that the Towers Notes did not meet the criteria for

-68-

1  a private offering and were in substance, if not form, sold in a public offering. The party claiming the

2  protection of the private offering exemption must demonstrate that the conditions are met with respect

3  to each offeree, not merely each purchaser. Securities & Exch. Com'n v. Murphy, supra, 626 F.2d at 645.

4  In the Towers case, the question of whether or not the Towers Notes should have been registered has already

5  been decided in a final judgment. On August 2, 1997, the Federal District Court in SEC v. Towers Financial

6  Corporation, et al. (S.D.N.Y.) Case No. 93-07744(WK) held that the sale of the Towers Notes violated

7  both the 1988 SEC injunction against the sale of unregistered securities [See Exhibits "25" and "26"]

8  and violated the registration requirements of Section 5 of the Securities Act. The Judgment constitutes

9  a collateral estoppel on the issues concluded therein.

10      189.    Defendants, for its part, knew or should have known that the Towers Notes did not qualify

11  as a private placement. The Towers Notes were sold as part of an offering of $215,000,000 of Notes sold

12  by Towers in a massive public offering throughout the United States. This huge public solicitation was

13  being offered to scores of thousands of investors and was sold to by at least 161 brokerage houses to over

14  2,800 investors throughout the country. To any person with knowledge of the requirements for a private

15  placement, this type of public offering of these securities would have clearly required registration with

16  the Securities and Exchange commission pursuant to the Securities Act of 1933 and qualification with

17  the state securities administrators. In light of the fact that the SEC had already sued Towers to enjoin

18  it from selling unregistered securities, and this fact was well known to Defendants, Defendant knew, or

19  should have known, that Towers was again engaged in wholesale noncompliance with the requirements

20  of the private offering exemptions, depriving Plaintiffs and other investors of the protections provided

21  by the registration and review process with the Securities and Exchange Commission, the National Association

22  of Securities Dealers, Inc. and various state securities administrators. Defendant did not disclose to Plaintiffs

23  that this huge public offering was sold illegally.

24      190.    Plaintiffs remained innocently ignorant of the fact that the Towers Notes were sold in

25  violation of state and federal registration requirements until they retained their current attorney years after

26  Towers filed bankruptcy. The question of whether the Towers Notes met the requirements of Regulation

27  D was not a matter of public record [as in the case of a securities registration statement], and the rules

28  governing a federal exemption to the securities registration laws presents a technical question outside

of the understanding of Plaintiffs who are not attorneys or stockbrokers and who have no special knowledge

of securities transactions. Plaintiffs exercised reasonable diligence in connection with the registration

issue by thoroughly reviewing all of the written materials provided to them by Defendant and Towers,

none of which gave any clue to Plaintiffs that the sale of the Towers Notes was in violation of state and

federal registration laws. Further, the official filing by Towers for the Towers Notes with the SEC was

"NOTICE OF SALE OF SECURITIES PURSUANT TO REGULATION D, SECTION 4(6), AND/OR

UNIFORM LIMITED OFFERING EXEMPTION."

### DEFENDANT BREACHED THE DUTIES THEY OWED TO PLAINTIFFS AS A BROKERAGE HOUSE, FINANCIAL ADVISOR, AND UNDERWRITER

191.    Because the offering of the Notes was a public offering and because Defendant received

substantial commissions from Towers based on the sale of the Notes and because there was no independent

third party involved performing an underwriter function for the Towers Notes, as a matter of law Defendant

had the obligations of an underwriter in connection with the offering of the Notes.    Considering its

presumptive sophistication as a broker-dealer and heightened ability to comprehend such matters, even

a minimal due diligence investigation by Defendant would have disclosed fraud in the Towers Notes.

The utter failure by Defendant to conduct any due diligence breached its duties of due diligence as a matter

of law.

192.    The offering of the Notes failed to comply with federal registration and state blue sky laws

because it was not a limited offering and was sold to more than 35 non-accredited investors (investors

with net assets of less than $1 million at the time of their purchase or annual income of less than $200,000

in each of the two years prior to their purchase or combined income with their spouse of less than $300,000

in each of the two years prior to their purchase or not-for-profit organizations, defined benefit plans and

trust with assets of less than $5 million at the time of their investment), and because it was sold through

a mass solicitation  involving cold calls and mass mailings of form letters.

193.    Defendant was under a duty, at all relevant times, to investigate the propriety of the foregoing

claimed exemptions from registration. Because of, inter alia, the massive Towers Notes solicitation, the

size of the offering, the large number of brokerage houses involved and Defendant's presumed knowledge

of the securities laws, Defendant knew, or was reckless in not knowing, that the offering did not comply

1  with the claimed exemptions or was not likely to be in compliance therewith.

2      194.    Defendant's registered representatives recommended the Towers Notes to Plaintiffs as

3  suitable. Defendant should not have recommended the Towers Notes to Plaintiffs as suitable investments

4  in light of the wealth of information available to anyone who had the skill, expertise and duty to look

5  into such matters - the very tasks for which a brokerage house and financial advisor is hired in the first

6  place.

7      195.    As set forth above, because the offering of the Notes was in reality a public offering, the

8  Respondents were statutory underwriters and had all of the legal duties and responsibilities of underwriters

9  with respect to an offering of securities. Prior to offering the Notes for sale and soliciting their customers

10  to purchase the Notes, the Respondents had a duty to conduct a due diligence investigation with respect

11  to the Notes and the offering. Adequate investigation by any Broker-Dealer would have revealed that

12  the offering memoranda and Towers' financial Statements contained the misrepresentations and omissions

13  of material fact alleged herein.

14      196.    Defendant solicited sales of the Notes by means of false and misleading sales materials

15  and oral Statements to Plaintiffs.  These written and oral sales representations contained the same

16  misrepresentations and omissions as the offering memoranda, and these written and oral representations

17  were in all material respects consistent with the offering memoranda, except that any disclaimer or warning

18  language contained in  the offering memoranda was omitted.

19      197.    Towers paid far higher commissions on the sale of the Towers Notes than what could be

20  obtained by the Defendant on other, similar investments. Towers paid a commission of 4% or 5% on one

21  year promissory notes, and 8% or 10% on two year promissory notes. Additionally, if an investor reinvested

22  the proceeds of an earlier note investment, the original selling broker received a reinvestment commission

23  of an equal amount. Defendants, in soliciting purchases of the Notes, was motivated by a desire to serve

24  its own financial interests.  Defendant was promised substantial commissions on sales of the Notes and

25  therefore, had every incentive to maximize the sales volume.

26      198.    As a result all of the foregoing, Defendant breached duties to Plaintiffs, inducing Plaintiffs

27  to purchase the Notes, and Plaintiffs relied upon the acts and omissions of Defendant to their detriment

28  and were damaged as a proximate result thereof.

1      199.    As a direct and proximate result of the aforementioned conduct of Defendants, Plaintiffs

2  have suffered the loss of the amount they invested in the Towers Notes, plus interest at the legal rate according

3  to proof.

4      200.    As a further direct and proximate result of the aforementioned conduct of Defendants,

5  Plaintiffs have suffered anxiety, worry, mental and emotional distress, and other incidental damages and

6  out-of-pocket expenses, including attorneys' fees, all to Plaintiffs' general damage in a sum to be determined

7  at the time of trial, but in any event, a sum in excess of the jurisdictional requirements of the above-entitled

8  court.

9      201.    Defendant's conduct as described herein was done with a conscious disregard for Plaintiffs'

10  rights and with the intent to vex, injure or annoy Plaintiffs, such as to constitute oppression, fraud or malice,

11  entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendant.

12      202.    Furthermore, Defendant's conduct described herein was done with a conscious disregard

13  for Plaintiffs' rights and with the intent to vex, injure or annoy Plaintiffs, thereby entitling Plaintiffs to

14  prejudgment interest on all sums awarded at the time of trial.

15                      **TOLLING OF STATUTE OF LIMITATIONS**

16     **Tolling By Class Pending Class Action**

17      203.    On February 9 or 10, 1993, representative Plaintiffs who had purchased Towers Notes

18  filed Gold, et al. v. Towers Financial Corporation, Inc. et al., which was later consolidated for all purposes

19  with other similar class action lawsuits in the case of In Re Towers Financial Corporation Note holders

20  Litigation, United States District Court, Southern District of New York, Master File No. 93 Civ. 0810

21  (WK) ["class action"]. Plaintiffs were members of the class but did not hear about it until substantially

22  later. On March 1, 1993, another class action lawsuit filed in the United States District Court for the Central

23  District of California, Dinsmore v. Towers Financial Corporation, et al.,Civ. No. 93-1164 SBW, [the

24  Dinsmore complaint"].[1] The Dinsmore complaint purported to represent the interests of Towers investors

25

26        [1] On March 4, 1993, a class action styled Thom v. Towers Financial Corporation Civ. No. 93

27  -1303 was filed in the United States District Court for the Southern District of New York. Like the Dinsmore
complaint, the Thom complaint made representative claims against a Defendant class of brokerage houses,

28  naming ROSE SECURITIES as the representative Defendant. The Thom case, like the Dinsmore case,

1    against all of the brokerage houses that sold the Towers investment. The <u>Dinsmore</u> complaint named

2    MONTEREY BAY SECURITIES as the representative of the Defendant class of brokerage houses. A

3    true and correct copy of the complaint in the <u>Dinsmore</u> class action was filed with the original complaint

4    in this case as Exhibit "33" and is incorporated by reference herein. The <u>Dinsmore</u> case alleged claims

5    against a class of broker-dealers who sold the Towers Notes at paragraphs 27 through 31:

6       Certain of the claims for relief are brought against a defendant class of broker-dealers pursuant
        to Federal Rule of Civil Procedure 23(a), 23(b)(1) and 23(b)(3). As to such claims, Monterey
7       Bay Securities is sued both individually and as the representative of a defendant class
        consisting of all broker-dealers who, pursuant to the private placement memoranda,
8       participated in the offer and sale of Towers' Promissory Notes from February 15, 1989
        to the present (the "Defendant Broker-Dealer Class").

9
        The members of the Defendant Broker-Dealer Class are so numerous that joinder of all
10      such class members is impracticable. Plaintiff is informed and believes that there are more
        than sixty members of the Defendant Broker-Dealer Class geographically dispersed across
11      the nation.

12      There are questions of law and fact common to the Defendant Broker-Dealer Class which
        predominate over any questions affecting only individual members of such class, including,
13      inter alia whether the Notes were offered and sold without the required registration under
        the securities laws, and whether the offering materials disseminated with respect to the
14      offer and sale of the Notes failed to disclose material facts or misrepresented material facts
        as alleged in this complaint.

15
        The defenses of the representative of the Defendant Broker-Dealer Class, on those claims
16      asserted against such class, are typical of the defenses of all members of such class and
        the named representatives of the Defendant Broker-Dealer Class will fairly and adequately
17      protect the interests of the members of such class as a whole.

18      The prosecution of separate actions by or against individual members of the Defendant
        Broker-Dealer Class would create a risk of:
19
            a.    Inconsistent or varying adjudications with respect to individual members
20      of the Defendant Broker-Dealer Class which would establish incompatible standards of
        conduct for plaintiffs; or
21
            b.    Adjudications with respect to individual members of the Defendant Broker-
22      Dealer Class which would, as a practical matter, be dispositive of the interests of the other
        members not parties to the adjudications or substantially impair or impede their ability
23      to protect their interests.

24          c.    A defendant class action is superior to the other available methods for the
        fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty which
25      will be encountered in the management of this litigation which would preclude its maintenance
        as a defendant class action.

26

27      _____

        was consolidated with the other federal class actions. A true and correct copy of the <u>Thom</u> complaint
28      is attached hereto as Exhibit "35" and is incorporated by reference herein.

-73-

1    204.    The filing of the Dinsmore action was reported in one or more newspapers in Los Angeles

2    County. For instance, on March 15, 1993, the Los Angeles Business Journal ran an article referring to

3    the Dinsmore case as a class action in which a brokerage house that sold the Towers Notes was named

4    as a Defendant. A true and correct copy of this article is attached hereto as Exhibit "23" and is incorporated

5    by reference herein. Plaintiffs are informed and believe that this article, and others like it referring to

6    the Towers class action, were read by management level officials at Defendant and that through news

7    reports and other sources, management level officials of Defendant had actual notice that Defendant was

8    the target of class action litigation on the part of Towers investors within several months of the filing

9    of the Dinsmore action.   Moreover, the brokerage house that was named in the Dinsmore complaint,

10   MONTEREY BAY SECURITIES, was served with the complaint [See, Exhibit "34," Proof of Service]

11   and had an identity of interest with Defendant in defending the Towers class action. Plaintiffs are further

12   informed and believe that within a short time after the filing of Dinsmore, it was well known among the

13   brokerage houses that sold the Towers Notes, including  at Defendants, that the class action had been

14   filed in an attempt to hold all of the brokerage houses that sold the Towers Notes liable for investor losses.

15   Moreover, all of the brokerage houses that had sold the Towers Notes would have been named as Defendants

16   in the Dinsmore case in the original complaint but for the fact that this information was known only to

17   Towers Financial at the time that Dinsmore was filed.  The filing of Dinsmore served to toll statute as

18   to Defendant under well established class action principals even through they were not expressly named

19   in the class action complaint. In re: Activision Securities Litigation, 1986 WL 15339 (N.D.Cal.); Appleton

20   Electric Company v. Graves Truck Line, 635 F.2d 603 (1980);  In re: Bestline Products Securities and

21   Antitrust Litigation, 1975 WL 386 (S.D.Fla.).

22    205.    On April 8, 1993, pursuant to a pretrial order of the Federal District Court in the Southern

23   District of New York, the Dinsmore case was transferred to the Southern District and became the operative

24   complaint as to the brokerage house Defendants in all of the class actions that had been filed in the Towers

25   case until a consolidated class action complaint was filed.   A true and correct copy of the pretrial order

26   is attached hereto as Exhibit "36" and is incorporated by reference herein.

27    206.    A "CONSOLIDATED AMENDED CLASS ACTION COMPLAINT" ["CACAC"] in

28   the class action which was filed **and served** on or about June 7, 1993.   True and correct copies of the

-74-

1  CACAC and the proof of service therefore are attached as Exhibits "37" and "38" and are incorporated

2  by reference herein  The CACAC incorporated all of the substantive allegations contained in the Dinsmore

3  case and included as a class plaintiff Robert Dinsmore.  The CACAC added First Affiliated Securities

4  as a second representative brokerage house Defendants, carrying forward the allegations from the Dinsmore

5  case. [CACAC page 23, para. 65 through page 25, para. 69(c);  page 69, para. 170 through pages 72-73,

6  para. 182].  The CACAC alleged at paragraphs 51, 65 and 66:

> Defendant Monterey Bay Securities is a registered Broker-Dealer with the National
> Association of Securities Dealers ("NASD"), and a citizen of California. Defendant First
> Affiliated Securities Inc. is a registered Broker-Dealer with the NASD and a citizen of
> California. Defendants Monterey Bay Securities and First Affiliated Securities are sued
> individually and also as representatives of a defendant class pursuant to Rule 23(a), (b)(1)
> and (b)(3) of the Federal Rules of Civil Procedure, consisting of all persons and entities
> who participated as sellers of various issues of Towers' Notes during the class period who
> thereby are alleged to have violated Sections 12(1) and 12(2) of the Securities Act, Section
> 10(b) of the Exchange Act, and applicable state Blue Sky statutes ("Defendant Class,"
> "Defendant Broker-Dealer Class" or the "Broker-Dealers").

> * * *

> Certain of the claims for relief are brought against a Defendant Class of Broker-Dealers
> pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1) and 23(b)(3).  As to such
> claims, Monterey Bay Securities and First Affiliated Securities are sued both individually
> and as the representatives of a defendant class consisting of all Broker-Dealers who, pursuant
> to the offering memoranda, participated in the offer and sale of Towers' Notes from February
> 15, 1989 to the present.

> The members of the Defendant Broker-Dealer Class are so numerous that joinder of all
> such class members is impracticable.  Plaintiffs are informed and believe that there are
> more than seventy-five members of the Defendant Class geographically dispersed across
> the nation.

19      207.    On or about June 10, 1994, the class Plaintiffs filed the "SECOND CONSOLIDATED

20  AMENDED CLASS ACTION COMPLAINT" ["SCACAC"].  Defendant was specifically named as

21  a Defendant in the SCACAC in paragraph 154.  Defendant was served a copy of the SCACAC by mail

22  on June 10, 1994. True and correct copies of the SCACAC and the proof of service therefor are attached

23  as Exhibits "39" and "40" and are incorporated by reference herein.

24      208.    The federal class action was certified for settlement purposes August of 1995. A true and

25  correct copy of the notice of certification is attached as Exhibit "41" and is incorporated by reference herein.

26  Plaintiffs did not opt out at that time, but remained class members. The case was again certified for settlement

27  purposes in August of 1996. A true and correct copy of the notice of certification is attached as Exhibit

28  "42" and is incorporated by reference herein.  This notice also notified the class that the broker-dealers,

-75-

1   including Defendant were going to be dismissed without prejudice. See page 11, paragraph 43. The notice

2   stated that class members would be free to pursue claims against the brokerage houses. The notice expressly

3   stated counsel's opinion that the statute of limitations was not a bar to the case. Plaintiffs did not opt out

4   of this second certification. Plaintiffs could not have opted out as to Defendants, this was not an option.

5          209.    The federal class action served to toll the statute of limitations even though it was dismissed

6   as to those Respondents prior to any ruling on certification as to them. Diaz, et al. v. Trust Territory of

7   the Pacific Islands, et al., 876 F.2d 1401, 1408 (1989). Tosti v. City of Los Angeles, 754 F.2d 1485 (1985).

8          210.    The SCACAC was voluntarily dismissed without prejudice as to the brokerage house

9   Respondents, including Defendants, with the presiding Federal District Court Judge specifically making

10  reference to the tolling of the statute of limitations as to absent class members' claims against brokerage

11  houses. [See Exhibit "43," Court Transcript at page 93, lines 4 through 16]. This dismissal was confirmed

12  by an order of the District Court on December 11, 1996. [See Exhibit "44."] Under laws governing finality

13  of Judgments, the dismissal became final 30 days later on or about January 10, 1997. Thus, Plaintiffs

14  have the benefit of tolling from the inception of the Defendant class in Dinsmore on March 1, 1993 through

15  the time when the dismissal order became final 30 days later as a result of the Towers class action under

16  In re: Activision Securities Litigation, 1986 WL 15339 (N.D.Cal.); Appleton Electric Company v. Graves

17  Truck Line, 635 F.2d 603 (1980); In re: Bestline Products Securities and Antitrust Litigation, 1975 WL

18  386 (S.D.Fla.); Diaz, et al. v. Trust Territory of the Pacific Islands, et al., 876 F.2d 1401, 1408 (1989);

19  Tosti v. City of Los Angeles, 754 F.2d 1485 (1985).

20                      **FIRST CLAIM FOR RELIEF**
                        (For Violations of Section 10(b) of
21                  the Exchange Act and Rule 10b-5(a), (b) and (c))

22         211.    Plaintiffs refer to and incorporate by reference herein each and every allegation set forth

23  above.

24         212.    The Towers Notes were securities within the meaning of, and regulated by, the Securities

25  Exchange Act of 1934, 15 U.S.C. Sec. 78c.

26         213.    As has been alleged in detail above, Defendants, directly and indirectly, participated the

27  offer and sale of unregistered securities in violation of Section 10(b) of the exchange Act [15 U.S.C. Sec

28  78(j)] and in contravention of rule 10b-5 promulgated thereunder, by use of the mails and other means

1 and instruments of transportation and communication and interstate commerce and in so doing:

2       a.      Employed manipulative and deceptive devices, contrivances, schemes, and artifices to

3             defraud Plaintiffs;

4       b.      Made untrue statements of material fact and omitted to state material facts necessary in

5             order to make the statements made, in light of the circumstances under which they were

6             made, not misleading; and

7       c.      Employed acts, practices, and a course of business that operated or would operate as a

8             fraud and deceit upon Plaintiffs.

9      50.    Plaintiffs' purchase of such securities was made in reliance upon the manipulative and

10 deceptive devices, contrivances, schemes and artifices employed by Defendants, and in reliance upon

11 the untrue statements and omissions of material facts made by Defendants in connection with the offer

12 and sale of said securities to Plaintiffs. Defendants knew that the devices, contrivances, schemes and

13 artifices were fraudulent at the time it employed them or employed them in reckless disregard thereof,

14 and employed them for the purpose and with the intent to deceive and defraud and oppress Plaintiffs,

15 or in reckless disregard of Plaintiffs' interests and the truth. Defendants fraudulently promoted, as legitimate,

16 sham investments that were not entitled to be placed on the market. Defendants also knew that the untrue

17 statements and omissions of material fact that they made were false and misleading at the time they were

18 made, or were made in reckless disregard thereof, and made for the purpose of, and with the intent to,

19 deceive, defraud and oppress Plaintiffs or in reckless disregard of Plaintiffs' interests and of the truth,

20 all in the context of a fiduciary relationship. Plaintiffs reasonably relied upon the misrepresentations and

21 omissions alleged above in deciding to purchase the Towers Notes.

22      214.    At all relevant times, the true nature of the Towers Notes were fraudulently concealed

23 from and/or misrepresented to Plaintiffs by Defendants all as alleged above. As alleged in detail above,

24 Defendant fraudulently concealed the facts which would have placed Plaintiffs on notice of this fraud.

25      **PLAINTIFFS ARE SEEKING RELIEF FOR SEVERAL DISTINCT**
**ASPECTS OF DEFENDANTS' FRAUD AND BREACH OF DUTY**

26

27      215.    Plaintiffs are seeking relief in this case for several distinct aspects of Defendants fraud

28 and breach of duty, including acts, omissions, misrepresentations or concealments involving 1) the fact

that investment was not secured at face value by accounts receivable of actual value equal to or greater than the amount of the notes, 2) the fact that the investment was part of a criminal Ponzi scheme in which nearly all of the factual statements made in the written materials distributed with the investment were fraudulent, 3) the fact that the Defendant had failed to conduct adequate due diligence into the investment, 4)the fact that the investment had never been suitable or in the best interests of Plaintiffs, 5) the fact that the investment was sold in violation of state and federal registration requirements, 6) the fact that at the time that Defendant recommended the Towers investments to Plaintiffs, Defendants were parties to a non-exclusive sales agent contract with Towers whereby it was required to use its "best efforts" to sell the investments while at the same time, concealing material information about the investment from Plaintiffs, 7) the fact that a wealth of negative historical information as alleged in detail herein existed about Steven Hoffenberg and Towers prior to the time that Plaintiffs made their investments, 8) the fact that the financial statements issued by Towers were utterly fraudulent, 9) the fact that the money invested by Plaintiffs had in all likelihood not actually been used to purchase accounts receivable, 10) the fact that virtually everything which Plaintiffs had been told about the investment was a lie, and so on, all as alleged in detail, above

216.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) promulgated thereunder and Plaintiffs are entitled to damages in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF
(Violation of Section 20 of the Exchange Act
Controlling Person Liability)

217.    Plaintiffs refer to and incorporate by reference herein each and every allegation set forth above.

218.    Defendants are liable to Plaintiffs as a controlling person under Section 20 of the Exchange Act for all the unlawful acts set forth herein which constituted violations of Section 10(b) of the Exchange Act because each such Defendant possessed, directly or indirectly, the power to influence and exercised the same, to direct the activities conducted by or attributable to the entities which they control in connection with the fraudulent plan and scheme alleged throughout this Complaint. By reason of the foregoing, Plaintiffs are entitled to damages from Defendants in an amount to be proven at trial and such other and further relief as the Court deems proper.

**THIRD CLAIM FOR RELIEF**
(For Violation of Sections 12(1) Of The Securities Act)

219. Plaintiffs refer to and incorporate by reference herein each and every allegation set forth above.

220. The Securities and Exchange Commission has made findings to the effect that the Towers Notes constituted a nonexempt integrated public offering which should have been registered but was not. Accordingly, the three-year outside limitation of Section 13 did not begin to run until March of 1993, when Towers finally stopped selling promissory notes to the public. Doran v. Petroleum Management Corp. (5th Cir. 1978) 576 F.2d 91, 93.

221. Defendants were offerors and sellers of securities within the meaning of section 12(1) of the Securities Act, 15 U.S.C. § 77l(l). Defendants, directly, or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, sold and offered to sell securities when no registration statement was filed or was in effect as to such securities when no exemption from registration was available. Plaintiffs purchased the notes in the offering and at such time were innocent of all comparative negligence.

222. The existence of a cause of action under Section 12(1) was fraudulently concealed from Plaintiffs by Defendants in the manner alleged above and Plaintiffs are entitled to the benefit of equitable tolling of the one-year statute of limitations set forth in Section 13.

223. Plaintiffs seek to recover the full amount of consideration paid for said securities, with interest thereon, upon tender of such securities, which tenders are hereby made, or in the alternative, seek damages sustained as a result of the sale of such securities.

**FOURTH CLAIM FOR RELIEF**
(For Violation Of Sections 12(2) Of The Securities Act)

224. Plaintiffs refer to and incorporate by reference herein each and every allegation set forth above.

225. Defendants, directly and indirectly participated in a continuous course of conduct, by the use of the mails, wires, and other means and instrumentalities of communication and transportation and interstate commerce, and offered for sale, sold and were the proximate cause and substantial and necessary factors in the sale of the Notes to the Plaintiffs, by means of written materials and oral communications

-79-

1 that contained material misrepresentations and omissions, in violation of Section 12(2) of the Securities

2 Act, all as alleged in detail above.

3      226.    Plaintiffs are entitled to recission based upon the misrepresentations and material omissions

4 contained in the Offering Memoranda, which contained many false statements of material facts, and omitted

5 to state many material facts necessary to make the statements contained therein not misleading, in light

6 of the circumstances under which they were made, as set forth in detail above.

7      227.    *Moreover, the Towers' Annual Reports are referred to and incorporated by reference in*

8 *the Offering Memoranda and the Annual Reports contain many false statements of material facts, and*

9 omitted to state many material facts necessary to make the statements contained therein not misleading,

10 in light of the circumstances under which they were made, as set forth in detail above.

11      228.    Plaintiffs exercised reasonable diligence in connection with their purchase of the Towers

12 Notes.  However, as alleged in detail above, Defendants fraudulently concealed the facts which would

13 have placed Plaintiffs on notice of this fraud and Plaintiffs reasonably did not discover the fraud as alleged

14 above, and accordingly, Plaintiffs are entitled to the benefit of the equitable tolling doctrine as to the one

15 year statute of limitations set forth in Section 13.

16      229.    *Plaintiffs accordingly seek to recover the full amount of the consideration paid for those*

17 securities, together with interest thereon upon tender of such securities, which tender is hereby made,

18 or in the alternative, seek damages sustained as a result of the sale of such securities.

19 **FIFTH CLAIM FOR RELIEF**<br>(Violations of Section 15 of the Securities Act)

20 Controlling Person Liability)

21      230.    Plaintiffs refer to and incorporate by reference herein each and every allegation set forth

22 above.

23      231.    Defendants are liable to Plaintiffs as controlling persons under Section 15 of the Securities

24 Act for all the unlawful acts set forth herein which constituted violations of Sections 12(1) and (2) of the

25 Securities Act because Defendant possessed, directly or indirectly, the power to influence and exercised

26 the same to direct the activities conducted by or attributable to the entities which they control.  By reason

27 of the foregoing, Plaintiffs are entitled to damages from these Defendant in an amount to be proven at

28 trial and such other and further relief as the Court deems proper.

-80-

1

**SIXTH CLAIM FOR RELIEF**
(Breach of Fiduciary Duty
And Breach of Trust Relationship)

2

3        232.    Plaintiffs refer to and incorporate by reference herein each and every allegation contained

4    above.

5        233.    Under the facts alleged herein, a confidential, fiduciary and trustee-beneficiary relationship

6    existed between Plaintiffs and Defendants.  The acts, omissions, misrepresentations and concealments

7    as alleged above in connection with the recommendation and sale of the Towers Notes constituted a breach

8    of fiduciary duty and a breach of the duties owed by a trustee to a beneficiary, all proximately causing

9    the injuries and damages alleged herein.

10

**SEVENTH CLAIM FOR RELIEF**
(Sale of Unregistered Securities Under Blue Sky Laws
V.A.M.S. §§ 409.301)

11

12        234.    Plaintiffs refer to and incorporate by reference herein each and every allegation contained

13    above.

14        235.    The securities sold to Plaintiffs were required to be registered, qualified or exempted under

15    state Blue Sky laws, but were not so qualified, registered or exempted, and thus, the sale of the securities

16    violated the state blue sky laws.

17        236.    Defendants are liable directly as sellers or as control persons under V.A.M.S. § 409.411(b).

18        237.    That as a result of the above described acts, Defendant is liable to Plaintiffs, and Plaintiffs

19    are entitled to, and hereby do, rescind the above securities purchases and seek restitution and damages

20    and an award of reasonable attorneys fees under Section 409.411(a).

21

**EIGHTH CLAIM FOR RELIEF**
(Fraud in the Sale of Securities Under Blue Sky Laws
Uniform Securities Act Sections 409.102, 409.201, 409.411 RSMo 1986)

22

23        238.    Plaintiffs refer to and incorporate by reference herein each and every allegation contained

24    above.

25        239.    The transactions alleged above constituted the offer and sale to Plaintiffs of securities through

26    the making of oral or written untrue Statements of material fact or the omission of material facts necessary

27    in order to make Statements, in light of the circumstances under which they were made, not misleading,

28    all in violation of state Blue Sky Laws.  Defendants are liable for such fraud either as direct perpetrators

1 | or as controlling persons or aiders and abettors and Defendants are liable to Plaintiffs, who are entitled

2 | to, and hereby do, rescind the above described investments and seek restitution of the funds and damages

3 | and an award of reasonable attorneys fees under Section 409.411(a).

### NINTH CLAIM FOR RELIEF
(Actual and Constructive Fraud and Deceit)

240.    Plaintiffs refer to and incorporate by reference herein each and every allegation contained above.

241.    Plaintiffs, having reasonably placed their trust and confidence in Defendant so as to create a confidential, fiduciary and trustee-beneficiary relationship, reasonably relied upon the misrepresentations, omissions and recommendations of Defendants, as alleged above, to their damage. Defendants intentionally or recklessly misrepresented the nature and quality of the recommended investments and knowingly placed Plaintiffs into unsuitable investments, failed to conduct adequate due diligence into the investments, failed to disclose the fact that no due diligence was conducted, impliedly and expressly represented that the securities were exempted from state and federal registration, when in fact the investments were sold illegally and in violation of the such state and federal registration requirements, and engaged in the other wrongful acts and omissions alleged herein, all with a conscious disregard for Plaintiffs' rights, and with full knowledge of the harm that would befall Plaintiffs as a result of their fraudulent advice, omissions and assurances

242.    The acts and omissions alleged above constituted actual and constructive fraud and deceit, entitling Plaintiffs to either rescission or damages, or both, according to proof.

### TENTH CLAIM FOR RELIEF
(Professional and Ordinary Negligence)

243.    Plaintiffs refer to and incorporate by reference herein each and every allegation contained above.

244.    Plaintiffs, having reasonably placed their trust and confidence in Defendants so as to create a confidential, fiduciary and trustee-beneficiary relationship, reasonably relied upon the misrepresentations, omissions and recommendations of Defendants, as alleged above, to their damage. Defendants misrepresented the nature and quality of the recommended investments and knowingly placed Plaintiffs into unsuitable investments, failed to conduct adequate due diligence into the investments, failed to disclose the fact that no due diligence was conducted, impliedly and expressly represented that the securities were exempted

1  from state and federal registration, when in fact the investments were sold illegally and in violation of

2  the such state and federal registration requirements, and engaged in the other wrongful acts and omissions

3  alleged herein, all with a conscious disregard for Plaintiffs' rights, and with full knowledge of the harm

4  that would befall Plaintiffs as a result of their fraudulent advice, omissions and assurances.

5    245.    Additionally, Defendants negligently and carelessly hired, trained and supervised the registered

6  representatives.

7    246.    The conduct of Defendants violated numerous state and federal statutes, rules and regulations

8  governing the conduct of brokerage houses and stockbrokers, as well as the rules and regulations of the

9  NASD, the NYSE, and the AMEX , and such violations constituted negligence per se.

10    247.    The representations, acts and omissions of Defendants were performed negligently and

11  carelessly, all so as to proximately cause the injuries and damages alleged above.

## ELEVENTH CLAIM FOR RELIEF
(Violations of Consumer Protection Laws
407.025 RSMo 1986)

14    248.    Plaintiffs refer to and incorporate by reference herein each and every allegation set forth

15  above.

16    249.    The above acts and omissions constituted a violation of applicable state consumer protection

17  laws, entitling Plaintiff to an award of damages and attorneys fees, all according to proof.

## TWELFTH CLAIM FOR RELIEF
(Breach of Warranty)

19    250.    Plaintiffs refer to and incorporate by reference herein each and every allegation contained

20  above.

21    251.    In Mary Pickford Co. v. Bayly Bros., Inc. (1939) 12 Cal.2d 501, the California Supreme

22  Court stated:

24  Upon a full consideration of the applicable principles of law, it is clear that a person who
sells a security impliedly represents that a permit therefor has been secured when one is
required by the Corporate Securities Act for such a sale. If this implied representation
25  is false, then it is a negligent misrepresentation which is an actionable fraud, and the buyer's
right of action does not accrue until he discovers its falsity unless the seller acted upon
26  information sufficient to justify a reasonable man in concluding that no permit was required.
In that event there has been a breach of warranty, but no fraud, and the buyer's cause of
27  action accrues at the date of the sale.

28  12 Cal.2d at 525.

-83-

1    252.    At the time of the recommendation and sale of the Towers Notes to Plaintiffs, Defendants

2   impliedly and expressly warranted that the security is being sold in compliance with registration laws.

3   However, in truth Defendants sold the Towers Notes in violation of state and federal registration laws,

4   thereby either committing fraud or breach of warranty, and in either case, Plaintiffs are entitled to a refund

5   of their money and or recission, plus interest at the legal rate.

6                               **THIRTEENTH CLAIM FOR RELIEF**
                        (Wrongful Interference with Prospective Economic Advantage)
7
        253.    Plaintiffs refer to and incorporate by reference herein each and every allegation contained
8
    above.
9
        254.    Plaintiffs had a prospective economic advantage, to wit, the investment of their funds in
10
    then available suitable investments.  Plaintiffs intend to offer expert testimony at the trial of this case
11
    on suitable investment options available to Plaintiffs at the time of the Towers investments.  By wrongfully
12
    recommending and selling Plaintiffs the Towers Notes in violation of state and federal law, the written
13
    contract between the parties, and the fiduciary duties existing at the time, Defendants wrongfully interfered
14
    with by the acts and omissions alleged above, all  so as to proximately cause Plaintiffs damages to be
15
    shown according to proof.
16
                               **FOURTEENTH CAUSE OF ACTION**
17                           (Tort of Another Claim for Attorneys Fees)

18      255.    Plaintiffs refer to and incorporate by reference each and every allegation contained above.

19      256.    In <u>Washington, v. Baenziger</u> (N.D. Cal. 1987) 673 F. Supp. 1478, the Court  stated:

20      Plaintiff has also stated a claim for attorney's fees under the "third party tort" exception
        to California Code of Civil Procedure § 1021 (which requires each party to pay his own
21      attorney's fees in the absence of contrary statute or contract). Under this exception, "a
        person who through the tort of another has been required to act in the protection of his
22      interests by bringing or defending an action against a third person" is entitled to recover
        attorney's fees from those parties who caused the suit to be brought. *Prentice v. North*
23      *American Title Guar. Corp., 59 Cal. 2d 618, 620, 30 Cal. Rptr. 821, 381 P. 2d 645 (1963).*
        Plaintiff pleads that, because of the fraudulent misrepresentations and omissions of certain
24      defendants, he has been required to bring this action to rescind the tortiously-induced
        purchase of investment units against other defendants.  Second Amended Complaint at
25      paras. 69, 120, 167, and 216. These allegations state a claim for relief under   [**12]
        the third party tort exception. It is irrelevant that the third person and the parties whose
26      breach of duty made it necessary to sue the third person are both sued in the same action.
        *Prentice, 59 Cal. 2d at 621.* Defendants' motion to dismiss the claims for attorney's fees
27      is denied.

28      257.    For the purposes of the tort of another rule, fact in the instant case are identical to the facts

                                        -84-

1  to the facts in <u>Washington</u>. Accordingly, Plaintiffs are entitled to recover their attorneys

2  fees in this case under the tort of another

3        WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

4        1.    Economic damages, plus interest at the legal rate, together with general, special, compensatory,

5  incidental, and/or consequential damages as applicable to each particular cause of action as has been alleged

6  according to proof;

7        2.    For alternative judgments of rescission or restitution together with an award of general,

8  special, compensatory, incidental and/or economic damages, and interest in a sum to be determined at

9  the time of trial;

10        3.    Punitive and exemplary damages in an amount appropriate to punish or set an example

11  of Defendant;

12        4.    Prejudgment interest on all damages awarded to Plaintiffs in an amount to be determined.

13        5.    Costs of suit, including an award of attorneys fees; and

14        6.    For such other and further damages as the court deems proper.

15  Dated: _____6/23/00_____    By: _____

16                                  Timothy C. Karen, Attorney for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28



Timothy C. Karen, Esq. SBN 117071
LAW OFFICES OF TIMOTHY C. KAREN
12702 Via Cortina, Suite 100
Del Mar, California 92014
(858) 259-7790

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

PAUL E. MEIER, Trustee of the EXCEL
BOTTLING CO. PENSION PLAN, Trustee of
the PAUL E. MEIER TRUST, Trustee of the
EDWARD & CATHERINE MEIER
IRREVOCABLE INSURANCE TRUST of
which PAUL E. MEIER, and Trustee of the
EDWARD J. MEIER REVOCABLE LIVING
TRUST, and STEVEN JOHNSON,

        Plaintiffs,

        v.

M.E. METZLER ORGANIZATION, INC., a
duly Missouri corporation, MILTON E.
METZLER, JINCO LEASING CORP., dba
JINCO FINANCIAL CORP., a Colorado
corporation and WAYNE MORRISON,

        Defendants.

Case No. 96-1023-L (JFS)

PROOF OF SERVICE BY MAIL RE
THIRD AMENDED COMPLAINT

I, the undersigned, certify:

That I am employed in the County of San Diego, State of California, in which county the within-mentioned mailing occurred. My business address is Law Offices of Timothy C. Karen, 12702 Via Cortina, Suite 100, Del Mar, California 92014; That I am and at all times hereinafter mentioned was, more than 18 years of age, and not a party to the within action; That I am readily familiar with the firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. Such correspondence is deposited with the United States Postal Service the same day

ORIGINAL

1  in the ordinary course of business;      That on the date set forth below, I served a true and correct copy

2  of the following paper(s), to wit:

3  1.      THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

4  2.      EXHIBITS TO THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF

5  by placing a copy thereof in a separate envelope to each addressee, respectively, as follows:

6  William R. Rapson, Esq.                          Attorney for Defendants MILTON E.
   WELBORN SULLIVAN MECK                            METZLER and M.E. METZLER
7      & TOOLEY, P.C.                                ORGANIZATION, INC.
   1775 Sherman Street, Suite 1800
8  Denver, CO 80203
   Tel.: (303) 830-2500  Fax: (303) 832-2366

9

10      I then sealed each envelope and placed each envelope for collection and mailing on the date set

11  forth below, at the Law Offices of Timothy C. Karen, following ordinary business practices.

12  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date

13  or postage meter date is more than one day after the date of deposit for mailing in affidavit.

14      I certify under penalty of perjury under the laws of the State of California that the foregoing is

15  true and correct.

16  Dated: _____ 23/00              By: _Carla Ott_____
                                           Carla Ott

17

18

19

20

21

22

23

24

25

26

27

28