USDC SCAN INDEX SHEET













PART

1 OF 2





MEG    6/26/00    9:56

3:96-CV-01023   BRADLEY V. HOFFENBERG

*350*

*EXH.*



1 | Timothy C. Karen, Esq., SBN 117071
LAW OFFICES OF TIMOTHY C. KAREN
2 | 12702 Via Cortina, Suite 100
Del Mar, California 92014
3 | (858) 259-7790

4 | Attorneys for Plaintiffs

**FILED**

**JUN 2 3 2000**

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

PAUL E. MEIER, Trustee of the EXCEL
BOTTLING CO. PENSION PLAN, Trustee of
the PAUL E. MEIER TRUST, Trustee of the
EDWARD & CATHERINE MEIER
IRREVOCABLE INSURANCE TRUST of
which PAUL E. MEIER, and Trustee of the
EDWARD J. MEIER REVOCABLE LIVING
TRUST, and STEVEN JOHNSON,

        Plaintiffs,

        v.

M.E. METZLER ORGANIZATION, INC., a
duly Missouri corporation, MILTON E.
METZLER, JINCO LEASING CORP., dba
JINCO FINANCIAL CORP., a Colorado
corporation and WAYNE MORRISON,

        Defendants.

Case No. 96-1023-L(JFS)

EXHIBITS TO THIRD AMENDED
COMPLAINT FOR DAMAGES AND FOR
OTHER RELIEF

PART

1 OF 2

Plaintiffs submit the following documents as exhibits to the third amended complaint in this case:

**Newspaper Articles Concerning Towers Financial Corporation and Steven Hoffenberg**

1.    Wall Street Journal Article dated December 7, 1987

2.    Wall Street Journal Article dated August 5, 1988

3.    Wall Street Journal Article dated November 25, 1988

4.    Wall Street Journal Article dated May 16, 1989

5.    The Los Angeles Business Journal Article dated February 12, 1990

ORIGINAL

350

1 | COMPANIES REDISCOVER SECURITIZATION."

2 |     63.   Form 10, dated July 17, 1991, filed with the SEC by Towers Financial Corporation.

3

4 | Dated: _____6/23/00_____              By:_____

                                   Timothy G. Karen, Attorney for Plaintiffs

The Wall Street Journal
Copyright (c) 1987, Dow Jones & Co., Inc.

Monday, December 7, 1987

Towers's Pan Am Plan Has Stalled,
But Sale of Notes Fattens War Chest
By Jeffrey A. Tannenbaum
Staff Reporter of The Wall Street Journal

NEW YORK -- Steven Hoffenberg's highly publicized effort to take over Pan Am Corp. has stalled. But his heretofore unpublicized effort to sell $50 million in notes to wealthy investors attracted by promises of an 18% yield has picked up steam.

Each $10,000 note sold will help his little Towers Financial Corp. grow, Mr. Hoffenberg says. And if the Pan Am takeover flops, as seems likely, he may choose another target. He says he has two in mind: Emery Air Freight Corp. and a company he declines to identify.

"My real hope is to buy a Big Board company by the end of 1988," he says.

From bankruptcy court to the Big Board is a long way to come in just five years. In early 1983, Mr. Hoffenberg finally toppled the last legal obstacle in a lawsuit arising from the bankruptcy of his former business. The bankruptcy trustee had accused him of fraudulently removing assets from the firm.

Now, at age 42, he has yet to become another Carl Icahn or T. Boone Pickens. But it hasn't been for lack of trying. In October, he emerged from obscurity with his astonishing assertion that Towers, a debt-collection and factoring concern that he controls, was seeking control of Pan Am and its Pan American World Airways unit.

To promote its Pan Am takeover, Towers hired six public relations assistants. Their news releases and telephone calls to reporters resulted in newspaper headlines from coast to coast. The effort reached a climax when Towers hired a Schedule 13-D with the Securities and Exchange Commission serving notice that it intended to acquire a majority interest in Pan Am at a cost of $250 million or more.

Never mind that Pan Am's annual revenue is $3 billion, while Towers says it had reported $95.1 million, and an accountant and analyst who have examined the company now talk about that figure. Towers invoked some big names in connection with its plan to take over and restructure Pan Am. First there was former Navy Secretary John Lehman. Then came former President Richard M. Nixon's brother, Edward Nixon, who like Mr. Lehman was hired as a consultant.

Finally, Towers intimated, none other than former Federal Reserve Chairman Paul Volcker was poised to join in.

However, Mr. Lehman jumped ship, and Mr. Volcker, it turned out, had never been aboard.

Meanwhile, Towers's news releases have kept quiet about what is by far the biggest deal it has actually launched: its private offering of $50 million in 18%-a-year promissory notes, to pay interest of 18% a year in monthly installments.

The notes, in $10,000 units, have been sold for more than a year through Eton Securities Corp., a small New York-based securities firm whose owner is vice chairman of Towers. According to one high-ranking Towers partner in whom investors to one high-ranking Towers partner, Eton has peddled some copies of the recent newspaper articles about Towers along with the offering circular -- a kind of prospectus for unregistered securities.

"has probably helped Eton sell notes," says Kenneth Koock, managing director of Maye, Koock & Co., a New Jersey City, N.J.-based securities firm that makes the market in Towers stock.

The publicity Mr. Hoffenberg and the Pan Am bid attracted.

A short-tempered man who alternately compliments and dresses down a reporter interviewing him, Mr. Hoffenberg describes himself as an entrepreneur who demands long hours and total dedication. Towers occupies five Fifth Avenue headquarters in Manhattan so that executives can eat dinner there. Expensive cars and other benefits inspire loyalty.

"We went from Oldsmobiles to Mercedeses," says Richard R. Allen, treasurer of United Fire Insurance Co., Des Plaines, Ill., in which Towers recently acquired an 85% interest. "I was very elated and very proud.

A New Yorker who started his career selling household and automotive products to retailers, Mr. Hoffenberg took Towers public only last year by merging it with a penny-stock shell corporation, O.G. Consulting Corp. of Nevada, which then became Towers Financial Corp.

A Hoffenberg family trust controls 70% of the shares. Although Mr. Hoffenberg's salary is only $80,000 a year, a company owned by the trust is entitled, until mid-1994, to 5% of Towers's gross profit before expenses and taxes. The 5% amounted to about $630,000 in the year ended June 30.

Towers itself Corp., a subsidiary, began its sale of the $50 million of notes in October 1986. Despite the 10% fees paid to brokers who place the notes, the company had sold only $4.6 million of them by June 30, according to the parent company's

annual report. Since then, says Mr. Hoffenberg, the total has risen to between $22 million and $23 million.

"If we wanted to do $50 million this week, we could," Mr. Hoffenberg says. "But we wouldn't have a use for the money. I'm not pushing it heavily."

How can Towers afford to borrow money at 18%, for an effective cost even higher if the broker fees are considered? By earning 60% or so on it, Mr. Hoffenberg says.

Towers' most important business, he says, is actually factoring. Money lenders of a sort, factors lend cash to businesses so needy that they can't wait to collect the short-term receivables they are owed (usually within 60 days). The factor typically lends as much as 70% of the value of the receivables that secure the loan and earns a fee of one or two percentage points.

Towers is smarter, Mr. Hoffenberg says, buying receivables outright at a discount of 10% or so. Thus, he says Towers can make about 10% on the money every 60 days -- equivalent to about 60% a year.

Despite Towers's reported earnings -- $4.3 million, or $1.04 a share, for fiscal 1987 That and other aspects, the Englewood Cliffs, N.J., securities analyst who publishes the "Quality of Earnings Report" for institutional investors. "There's not enough disclosure," he says.

Moreover, the Denver accountant who was consulted by potential investors in the Towers Credit notes contends that Towers Financial's "true revenue" for fiscal 1987 was probably about $10 million, rather than the reported $95.2 million.

Towers, he says, apparently records the full amount of bad debts it undertakes to collect as revenue, even though the company is paid only 30% or so of the amount it actually collects.

Mr. Hoffenberg defends his accounting. "We've taken a very conservative approach to revenues," he says. The company's outside auditor, Martin E. Basson, has deemed Towers's report to be "in conformity with generally accepted accounting principles." Mr. Basson couldn't be reached for elaboration.

Meanwhile, Mr. Hoffenberg's bid for Pan Am appears to have failed. Pan Am is now entertaining only one offer, from Jay Pritzker, chairman of Braniff Corp. Pan Am said Friday its board will meet again today to try to reach a decision on that offer.

Moreover, there is the matter of the $250 million that Mr.

Hoffenberg would need to buy a majority of Pan Am's common. That's more than 70 times the cash and cash equivalents on Towers's June 30 balance sheet. Towers has said it would pay Pan Am holders in new Towers preferred shares, but neither the holders nor Wall Street generally has demonstrated a burning interest in such a proposal.

"It's a long road to hoe," Mr. Hoffenberg concedes, "and I'm fighting major opposition. There's no cooperation from the company. There's no cooperation from the outside."

Pan Am isn't Mr. Hoffenberg's first setback. He was president of Electro Electric Products Corp., a New York-based maker of electrical batteries that was liquidated after bankruptcy-law proceedings.

"It was when I was in my early 20s," he says. "Now I'm more experienced." In any case, he says, he was blameless in the matter.

Court records show that Union Electric was declared bankrupt in 1976, when Mr. Hoffenberg was 31. Unsecured creditors with $1.3 million in verified claims wound up with nothing. The bankruptcy trustee sued Mr. Hoffenberg, alleging that he had fraudulently removed assets from Union Electric. The case was settled for $10,000 in 1979. But it wasn't until 1983, after protracted litigation, that the trustee collected the money.

Lacking credit, Mr. Hoffenberg says, "I had to go into a service industry that didn't require a huge infusion of capital." He started Towers with $2,000 of his own.

Citing how far Mr. Hoffenberg has come, some people aren't counting him out on Pan Am yet. Thomas G. Evans Jr., a former congressman from Delaware who now is Towers's Washington attorney, says Mr. Hoffenberg "has tremendous persistence -- he doesn't get discouraged easily."

Mr. Evans says: "That's a plus when you are acquiring corporations. And when you hang around long enough, others might drop out." And Mr. Koch, the stock market broker, says: "The man has tremendous energy. He works 16, 18 hours a day. He may pull something off yet."

EXHIBIT  2


# Towers Financial Charged by SEC Over Note Sale —

### By Pamela Sebastian
#### Staff Reporter of The Wall Street Journal

NEW YORK—The Securities and Exchange Commission charged Towers Financial Corp., a New York-based debt-collection agency that promoted itself in a bid to take over Pan Am Corp., with selling more than $20 million in unregistered notes.

The SEC said Towers and its credit unit sold the notes mainly to "unsophisticated" investors. It seeks a court order requiring a refund to investors.

The notes, promising a yield of 18%, were part of a planned $50 million offering. The SEC said the notes were sold through a broker network organized by New York-based Plan Securities Corp. Plan also was named in the complaint, which seeks an injunction against the companies as well as a restriction on the use of proceeds from the sale.

An attorney for Towers said the company and its chairman "recognize there may be a technical violation of the registration provisions of the securities laws." He said the company will "make every effort to comply with the federal securities laws and will attempt to seek a resolution with the staff of the SEC."

Despite considerable publicity last year over its interest in Pan Am, Towers never got a formal takeover bid off the ground. Towers and its chairman, Steven Hoffenberg, next expressed interest in Emery Air Freight Corp. and launched an offering of $50 million in notes to finance its plans.

The SEC complaint said the $20 million in notes was sold to enable the Towers Credit Corp. unit to purchase accounts receivable for its factoring business. Towers's attorney declined to comment on the $50 million note offering to raise takeover funds except to say "there's no mention of [that] in the complaint."

The SEC said the $20 million in notes, issued by the credit unit and backed by Towers Financial, were purchased by more than 400 investors.

**EXHIBIT 3**



The Wall Street Journal
Copyright (c) 1988, Dow Jones & Co., Inc.

Friday, November 25, 1988

Towers Financial Will Make Refund To Settle SEC Case

NEW YORK -- Towers Financial Corp. settled a Securities and Exchange Commission suit, which charged it sold $20 million in unregistered notes in a bid to take over Pan Am Corp., by agreeing to make refunds to investors.

Towers Financial, a New York-based debt-collection agency; its Towers Credit Corp. subsidiary, and Steven Hoffenberg, chairman and chief executive officer of both companies, settled the case without admitting or denying the allegations. Mr. Hoffenberg said, "Our attorney has effectively settled the matter."

The three defendants are permanently enjoined from further violations of registration provisions of securities law. Federal Judge Shirley Wohl Kram also restrained them from using the notes' proceeds, other than for paying refunds, and has required them to turn over documents pertaining to the sale.

Despite considerable publicity last year over its interest in Pan Am, Towers Financial never got a formal takeover bid off the ground. It then expressed interest in Emery Air Freight Corp., of Wilton, Conn.

The SEC complaint said the $20 million in notes was sold to enable the credit unit to purchase accounts receivable for its factoring business.

The notes were sold through a broker network organized by Eton Securities Corp. -- which was also named in the complaint. Litigation is pending against that New York firm. Eton, which has the same phone directory listing as both Towers firms, couldn't be reached for comment.

Last August, the SEC charged that Towers Credit, which issued the notes, and Towers Financial, which backed them, targeted "unsophisticated" investors. The unregistered notes, sold to more than 400 people, promised a yield of 18% and were part of a planned $50 million offering.

EXHIBIT 1

The Wall Street Journal
Copyright (c) 1989, Dow Jones & Co., Inc.

Tuesday, May 16, 1989

Eton Securities Settles SEC Case by Agreeing To 60 Day Suspension

WASHINGTON -- The Securities and Exchange Commission said
the small New York brokerage firm of Eton Securities Corp.
settled the agency's administrative proceeding against it by
agreeing not to act as an underwriter for 60 days.

The SEC said Eton's president, Mitchell Brater, similarly
settled by agreeing to a 60-day suspension from the brokerage
business.

The proceedings against Eton and Mr. Brater follow a suit
filed last year by the SEC charging that Towers Financial Corp.
sold $34 million in unregistered notes that should have been
registered with the SEC. The SEC said Eton and Mr. Brater
"willfully violated" securities laws by distributing the
unregistered notes. Eton and Mr. Brater neither admitted nor
denied the SEC's allegations.

Mr. Brater didn't have any comment on the settlement. He
declined to discuss his relationship with Towers, saying, "that
isn't germane to this case."

Steven Hoffenberg, chairman of Towers, said Mr. Brater is
the company's vice chairman. He also said that "Eton no longer
functions as an underwriter for Towers Financial." Towers settled
the SEC's suit against it last November by neither admitting nor
denying the charges but agreeing to make refunds to investors.

The Los Angeles Business Journal

February 12, 1990
Section: Vol 12, No 7, Sec 1; pg 1

## State Looks Into Collection Agency Suspected of Billing Customers

By: Benjamin Mark Cole

Towers Financial Corp., a collections, factoring and insurance conglomerate with a checkered legal and financial history, is under state investigation for allegedly bilking Southland businesses that hired the company for collections work. According to business credit managers and the California State Department of Consumer Affairs, the Santa Monica branch of Towers has collected on, but not delivered, overdue accounts to clients.

The chairman of the $ 183 million (reported revenues) Towers, Steven Hoffenberg, 45, denied the charges, and said last week whatever problems have arisen here stem from "confusion." He also said complaints are spread by competitors who are upset at New York-based Towers' entry into the California collections market.

Towers earned fleeting nationwide headlines in late 1987, when it made a highly publicized bid for Pan Am Corp., the parent company of one of the nation's largest airlines. Locally, Towers attracts clients by offering to collect past-due accounts for between 15 percent and 30 percent on the dollar, roughly half what established collection agencies charge, said Al Hall, chief of the Bureau of Collections and Investigative Services for the state Department of Consumer Affairs.

The state's investigation into Towers is a big one, said Hall. "We started our investigation based upon 30 to 39 sworn complaints—that was before we even began to investigate," said Hall, who declined to estimate the full extent of alleged losses to local businesses. But Hall said, "(The alleged losses are) a significant amount. We are surprised at the number of clients they had, over and above the complaints." Hall said the Towers' case was the largest alleged collections fraud case the state is working on. When asked if Towers has collected but not delivered on receivable to clients, Hall responded, "I will say that is pretty much true."

Last week Towers' Hoffenberg said Hall was confused, and had not yet seen Towers' side of the story. Hoffenberg said his company operates differently than other collections agencies, and directs deadbeats to send money directly to clients, rather than to Towers. "The Bureau (the state Bureau of Collections) does not understand that we direct payments to the client, not to Towers," said Hoffenberg. "With so many delinquent accounts claiming to have paid both Towers and clients, confusion arises, said Hoffenberg. "Let's

say an account is overdue to the phone company. They'll tell us. We paid the phone company. They'll tell the phone company. We paid Towers. This causes confusion." Hoffenberg said that Towers charges between 10 percent and 25 percent of receivables collected.

The Towers case has been referred to the state Attorney General's office, said Hall, a gubernatorial appointee and a 22-year veteran of law enforcement agencies, including the California Highway Patrol. Antonio Merino, deputy state attorney general, confirmed last week that the case had been referred to him, but he said he could not discuss the particulars of the case.

In addition to the collections problem, Towers had been operating without a license until it recently purchased a San Diego-based company that already had a collections license, said Hall of the Collections Bureau. "That was a major license problem," he said. Hall said he did not know how long Towers had operated in California prior to getting a license, but "some of the (Towers' office) leases extend back to the mid-1980s."

Several local business credit managers, reached last week for comment, complained about Towers' lack of performance. I can't get a straight answer out of them," said Frances Carreon, office manager for Tub Harris, a Los Angeles-based distributor of plastic bags and coinboxes. "We turned over $ 6,000 to $ 7,000 to them. They turned over two accounts real fast, but I can't get answers on the rest. I always get referred to somebody when I call, I have even been referred to New York." Said Barbara Feeder, credit manager at Leo's Stereo. "We did have a bad experience with them, but I am not allowed (on advice of counsel) to discuss details." Feeder said the problem involved collections that were not delivered.

At Beverly Hills Office Supplies, Michelle Royah, office manager said, "We sent to them $ 10,000 in accounts receivable. Nobody there (at Towers) seemed to know where they were. You get the run-around when you try to find out about your accounts. When we cancelled, they said There will be a flat fee, if we turn them back over to you,' although they eventually waived that fee."

Hoffenberg of Towers said that with thousands of accounts, there are bound to be a few confused Towers customers. He said Towers has never improperly withheld collected receivables from clients.

Towers, its subsidiaries, and Hoffenberg have had previous run-ins with regulatory agencies:

- In 1987, the Securities and Exchange Commission brought civil charges against Towers Financial for the sale of $ 34 million of unregistered securities -- 18 percent promissory notes—to more than 400 investors in 26 states.

A federal judge in New York on Nov. 16, 1988 ordered Towers Financial to halt sale of the notes, to offer to pay back investors, to post $ 3.5 million as security, to not destroy records and to provide records to the SEC. The SEC also filed a complaint against Eton Securities, a registered broker-dealer that sold the promissory notes, and which is owned by Towers Vice Chairman Mitchell Brater, 47. Hoffenberg told the Wall Street Journal in 1987 that he had planned to raise $ 50 million through the securities, and wanted to buy a Big Board company. Last week Hoffenberg said the SEC matter was settled, and is an old story.

- The State of Illinois seized United Fire and Associated Life, two insurers that are subsidiaries of Towers Diversified, a Towers Financial subsidiary, on March 3 of last year.

There is an ongoing investigation into the two insurance companies, according to Richard Darling, chief operating officer of the Office of the Special Deputy Receiver, an agency that operates under Illinois state aegis. The liabilities of Associated Life and United Fire exceed assets by $ 30 million, said Darling.

"The Director (of the Illinois Department of Insurance) is doing his due diligence as to the cause of the insolvency, and what that investigation reveals will set the cause for action, which may or may not include Towers or the former ownership (of Associated Life and United Fire)," said Darling.

Hoffenberg said last week the problems were caused by the two insurers' previous owners, and that 90 days after he bought the two companies he had the deal rescinded. "Towers Financial is not the legal owner, and never was the legal owner (of United Fire and Associated Life)" said Hoffenberg.

Darling of the Illinois Special Deputy Receiver's office said that he considers Towers the legal owner. Darling also said that Towers has yet to produce certain documents in the case, and is under order to show cause to an Illinois state judge as to why Towers should not be held in contempt of court for not producing the documents. Darling said Hoffenberg had waged a spirited legal battle against the state seizure of the two insurers, in which Mark White, former governor of Texas, served as Towers' attorney.

- Towers Collection Service, a Towers subsidiary, was ordered in November 1987 by the Appellate Division of the Superior Court of New Jersey to pay $ 19,346, plus interest and attorney fees, to LCP Chemical and Plastics. Towers had improperly withheld collections, and refused to return documents to LCP Chemicals, the court ruled. LCP Chemicals sued Towers in June 1986.

- In 1976 Hoffenberg, then president of Union Electric Products Corp., declared the manufacturer of electrical products bankrupt. The bankruptcy trustee in the case alleged that Hoffenberg fraudulently removed assets from the bankrupt company. The case was settled in 1983 after protracted litigation, with Hoffenberg paying $ 10,000 to settle the case. "That was a nuisance suit," Hoffenberg declared last week. "They wouldn't have settled for so little unless it was a nuisance suit. I just settled to avoid additional legal fees."

Hoffenberg said last week he was blameless in the matter.

Locally, Towers operates out of offices at 1821 Wilshire Boulevard in Santa Monica. At the same address, Towers also operates a telemarketing staff that offers to investors promissory notes, yielding 14 percent to 16 percent annually, backed by hospital receivables. According to a Towers prospectus,

Towers plans to raise $ 100 million through issuance of the promissory notes. According to a former Towers employee, telemarketers cold-call potential investors.

At the time Hoffenberg and Towers made the Pan Am bid some analysts did not give much credence to it, but work done by a six-member public relations staff hired by Hoffenberg resulted in headlines coast-to-coast and a report in the Wall Street Journal. Last week Hoffenberg said that he did not hire the public relations staff, and that publicity surrounding the buyout bid resulted from a union's endorsement of his group's efforts.

Although Towers reported annual revenues of $ 183.0 million for the fiscal year ended June 30, 1989, much of that is actually receivables that Towers has collected and passed on to clients. The company reported operating expenses of $29.4 million and a net of $ 3.5 million in 1989.

Towers has a high-profile Board of Advisors, including Ben Barnes, former Lt. Governor of Texas and associate of banker Herman Beebe, and Thomas Evans, former U.S Congressman and former partner in the Washington offices of Manatt, Phelps, Rothenberg & Phillips, a leading Los Angeles law firm. Locally, Towers is represented by Mickey Kantor, a Manatt Phelps partner who is well-known in Democratic Party circles. Kantor said last week that if a state officer had revealed confidential information to the press, that would be a violation of state law, and would be a "grave matter." Kantor said a state officer, divulging information part way through a case without the benefit of clarifying information, could make it appear there had been a problem with Towers, when in fact that may not be the case.

Page 1 - Morning Paper: November 1, 1990
Headline: Towers forgets its troubles

Louisiana investors who purchased the notes of Towers Financial Corp. through a Monroe-owned, Shreveport-based brokerage firm may count themselves lucky.

Not that their investment in the Towers notes proffered by Bledenharn Investment Group, BIG Inc., isn't just as risky as the investment by the investors who have had more than a month's warning that something might be amiss with Towers.

Offering documents are supposed to accurately reflect the condition and financial status of the company. An offering document might show a high degree of risk, but if it does not accurately reveal the financial condition of the company, the investor might not see the red flags that could cause him to keep his money.

The financial statement included with the offering document seems to omit a number of problems Towers faces across the country.

Towers touts itself as a $200 million company. Its chairman and chief executive officer has made some highly publicized, though unsuccessful, runs at acquiring such companies as Emory Air Freight and Pan American Airlines.

Yet, Steven Hoffenberg actually controls a company with a net worth of just over $13.4 million, according to the company's latest financial statement.

The most interesting complication not mentioned in the offering documents and financial statements is $4.5 million being sought by the state of Michigan through the receiver for Cadillac Insurance Co. Receiver Jackie Reese's suit alleges that Hoffenberg and Towers Financial or clients Hoffenberg et al. didn't own Cadillac, but somehow controlled it through vague contractual arrangements with United Diversified, an insurance holding company operating in Illinois.

Reese has already collected one judgment of $440,000 from Towers and Hoffenberg regarding the purchase of a yacht and has received another $159,000 judgment for expenses incurred in collecting the first judgment.

The Illinois special receiver, Richard Darling, is liquidating United Diversified and two subsidiary insurance companies, Associated Life and United Fire. Hoffenberg has been fighting the liquidation about two years. Until the presiding judge died, Hoffenberg had an outstanding contempt warrant in Il-

securities law by selling unregistered securities. Yet the Los Angeles Business Review reported that Hoffenberg/Towers operated a telemarketing office in Santa Monica selling the same kind of notes that have been sold through Bledenharn in North Louisiana.

Some Towers notes purportedly pay as much as 18 percent annual interest. The notes are supposed to be of one- or two-year duration, according to the offering documents. But there are reports in at least two states that notes are marketed with the promise that buyers could roll the notes over into succeeding offerings at the rate of interest currently being paid or the rate being paid when the customer became a Towers investor, whichever was higher.

There is no mention in the offering documents of one group of investors being paid a higher rate than others or any commitment to roll over the investment beyond the duration of the approved offering.

At year end June 30, 1990, the Towers consolidated statement acknowledged $6.2 million of the one- and two-year notes outstanding. Public records indicate that Bledenharn placed approximately $7 million of the notes in Louisiana.

Footnote:

Last week we mentioned that former Texas Speaker of the House and Lt. Gov. Ben Barnes was a Towers director. Another Towers director is William D. Fugazy of New York. Fugazy is featured in the Oct. 22 issue of Forbes magazine, page 60. The Lorelei Regine" starts with a report of the recent $47 million judgment against Fugazy by his former friend and partner John Kluge and goes on to recount other ventures in which Fugazy's partners took him of up to $100 million.

EXHIBIT 5

Page 1 Morning Paper 4 October 90
Headline- Checking on high rollers

A Shreveport brokerage firm whose stockholders are mostly Monroe residents received notification this week from state Deputy Commissioner of Securities Harry Stansbury that it is under investigation.

Regulators will look at the sale by Biedenharn Investment Group Inc. of notes issued by a New York firm, Towers Financial Group Inc. Towers has also been notified of the investigation, and the Office of Securities has requested information on Louisiana sales. Biedenharn also advertises under the name BIG Inc.

Since 1987 Towers appears to have issued more than $70 million in one- and two-year notes paying 13 percent interest. The notes have been offered to private individuals to "accredited investors" in units of $100,000 each. A public indication that at least 10 percent of the Towers offerings have been sold in Biedenharn's North Louisiana trade area.

Towers claims exemption from registration with the Securities and Exchange Commission because of the purported limited number of accredited investors to which the notes are offered. The notes are secured by accounts receivable purchased from hospitals and other medical providers after Tower receives proceeds of the notes, according to the offering documents.

The focus of the investigation reportedly will center on whether the notes have been offered in a private manner strictly to qualified investors or have been sold personally or by phone without providing the offering documents. Also to be investigated is whether principals (stockholders) of Biedenharn have promoted the Towers notes without being properly licensed to sell securities or without clearly informing potential investors that they have a financial interest in the brokerage firm.

A paragraph in the offering document titled "Severely Limited Liquidity of Units. Absence of Public Market" describes the Towers notes as for investment purposes only to be held until maturity.

Towers is liable for the notes to the extent that the collateral, the medical accounts receivable, is good, and, to the extent of its consolidated assets should the collateral be insufficient. An investor could lose his or her investment in whole or in part.

To be an "accredited investor" under Section 501 of Regulation D promulgated under the Securities Act of 1933, an individual being offered the Towers notes would have to demonstrate a net worth of $1 million, income of at least $200,000 a year for the past two years, and a reasonable expectation of the same or greater income the current year.

The Towers notes may not be offered by general solicitation such as newspaper advertising, telephone solicitation, direct mail, or other method normally used to sell investments or securities because of the claim of exemption from registration.

Towers entered into a consent agreement with the SEC and the state of Alabama in 1988 over its sale of unregistered securities. While Towers did not admit that it sold unregistered securities as alleged in the SEC suit, it did agree not to do so in the future.

---

Not till the legislation passed, the bank failed, and as one of Barnes' legislative committees said this week, "We were all elected to politics. Politics. In 1972. And I never even got any stock." Barnes was never charged with any criminal wrongdoing, though Mutscher was indicted and served a jail term.

Barnes fell back on Big John, by then associated with a major Houston law firm as well as his Washington sidelines. The Connally/Barnes duo became one of the big wheeler-dealers in real estate and development during the boom.

They were among the first to hit bottom, with losses in the hundreds of millions. Connally was forced to auction his most cherished personal assets to satisfy at least some of his creditors, a preview of which made "60 Minutes."

Now it appears that Barnes is back in the saddle, this time at least part with Towers Financial.

We didn't have the foggiest notion where Towers was investing the money it was collecting from the sale of its notes, but the obvious clue came from Barnes, Texas. And it the deal was so great for rural hospitals, what better place than ... you guessed it! we called Comanche Community Hospital, a struggling 19-bed facility.

Administrator Steve Taylor has been on the job less than a year fighting all the battles rural hospitals face. Asked if he had ever heard of Towers Financial, Taylor recalled receiving a mailer from the company last spring. "We felt there were things we should do in house before we considered taking the kind of discount on our receivables," he said.

Told that a director had called Towers the savior of small Texas hospitals, Taylor said, "I find it humorous they would make that claim." He thought it even funnier when I told him the claim was made by Comanche's most famous son.

Taylor said he and his counterparts stay in touch to keep abreast of ways to control hospital costs and find new sources of revenue. He did not know of a single hospital that uses Towers financing.

Until Monday nobody at the Texas Hospital Association in Austin had heard of Towers. Curiously, that day the association received a call from Steve Silver of Towers Health Care, who asked about hospitals his company could service in Texas.

A cynic might suspect the call was the result of Barnes' claims to Stansbury before a roomful of lawyers. This story is beginning to get interesting.
Thistlethwar

You thought I had forgotten about my weekly note on Glen McCart. Well, th defense this week is that he is still dodging deputies trying to arrest him for in "The trial on the Securities and Exchange Commission suit against him an other. ALIC officers scheduled to start Nov. 5 in Shreveport's federal court ha been postponed. Another case that was supposed to settle out of court did not leaving a conflict that puts the McCart case on the docket probably in Janu There will be an auction of ALIC assets Nov. 8 in Monroe. I though about bidding on McCart's desk ... until I heard it was expected to bring t more than $10,000.

**EXHIBIT 8**

Morning Paper, October 18, 1990, Page 1
Headline: A hold on investments

Notes issued by Towers Financial Corp. of New York probably won't be sold in Louisiana pending completion of an investigation by the Louisiana Securities Department.

According to offering documents, proceeds from the Towers notes were used to purchase accounts receivable from hospitals and other medical providers. Towers has issued the notes in Louisiana for at least three years as private offering investments, with Shreveport-based, Monroe-owned Biedenharn Investment Group acting as broker-dealer.

In 1987-88 Towers sold the notes in $10,000 denominations, paying as much as 18 percent interest. Sale of the notes drew the wrath of the New York regional office of the Securities and Exchange Commission, which obtained a consent order in November 1988.

Not only did the Towers notes pay an unusually high rate of interest to purchasers, but they paid a substantial commission to the broker dealers. Eaton Securities Corp., whose office address was the same as Towers Financial, had an exclusive marketing contract with Towers paying 14 percent commission for placements. Eaton in turn would in effect subcontract sale of the notes through other broker dealers, paying them a 10 percent sales commission.

Because the notes were not registered as securities with the SEC or the various state securities regulators, they were to be offered only to "accredited investors." accredited investors are generally defined as individuals, with a net worth of $1 million and $200,000 annual income for the past two years and anticipated in the current year.

Even before the New York SEC action, the Alabama Securities Commission put Towers and Eaton under an administrative order May 4, 1988. The Alabama order revoked the exempt status of the Towers notes because sales had been made to at least one Alabama resident who did not meet the financial requirements of an accredited investor.

The Nebraska Department of Banking and Finance took similar action against Towers this year. It cited three sales in which investors did not meet the requirements for accredited status. The state prohibited further sales of the unregistered securities and assessed Towers a $5,000 penalty and fine. Towers' 1989 offering of $50 million in 15 percent two-year and 13 percent one-year notes that were being sold by Biedenharn in $100,000 denominations expired Sept. 30. There are indications that Biedenharn sold at least $7 million of the notes before 1990. Figures are not available for 1990 sales in Louisiana.

The company had submitted documents on a 1990-91 offering to the Louisiana Securities Department. Rather than Biedenharn, Towers named Multi-Financial Services of Inglewood, Colo., as the broker that would distribute the notes in Louisiana.

Louisiana Deputy Commissioner of Securities Harry Stansbury's investigation into Towers and Biedenharn, also known as BIG Inc., will focus on whether the Towers notes were sold only to accredited investors, whether they were truly private and whether Biedenharn principals touted the notes without being licensed as securities brokers and without divulging their interest in the brokerage firm.

A private placement is an offering made without the usual advertising or direct contact between the broker and potential purchaser and with the broker first determining the purchaser's accredited status.

Biedenharn president James McCurry blamed Stansbury's investigation on articles written here. In an interview last week with Shreveport Journal managing editor Steve Norder, McCurry said inquiries to Stansbury by MP publisher John Hays precipitated the investigation.

The report quotes Stansbury, who described the notes as "speculative at best" and reminded potential buyers "you are dealing with highly leveraged paper." McCurry agreed that the notes are not risk free and said any private placement of securities carries a high risk.

Public records show that principals of Biedenharn Investment Group are Monrovans Fredrick Speed Bancroft, Joseph Augustus Biedenharn, Richard Hazter, Irving Gainor Kennedy Jr., and Warren J. Stassi (previously reported as Stahl). Other principals are McCurry and Uwe Schmidt.

Stansbury, in last week's interview, said he would like to talk to anyone who has been offered or has purchased the Towers notes in Louisiana. His telephone number in New Orleans is (504) 568-5515.

Despite Swearingen's close ties to Roemer... as in the know at Louisiana
Tech are delighte... For their money, only Thompson would be a better ma
for the job. *PAGE 2 MONROE PAPER — (STATE REPRESENTATIVE FRANCIS*
History lesson *OCT 25, 1996 — Rumor mill*

It was a routine call to Harry Stansbury, state deputy commissioner c
securities, to check on progress of his investigation into New York's Tower
Financial Corp. and the sale of Towers' notes by Shreveport's Biedenharn In
vestment Group Inc.

Stansbury didn't divulge any of the details, but he did say he met with som
Towers people last week. Participants were company chairman Steven Hoffen
berg, chief legal officer Michael Rosoff, New York attorney Bruce Bronson
attorney and former state Senate president Michael O'Keefe, his son attorne
Michael Jr., and a Towers director from Texas named Ben Barnes.

Although irrelevant to the investigation, Barnes volunteered praise fo
Towers' important service to small, rural hospitals in Texas and across th
Southeast. Stansbury said he got the impression that Barnes thought h
should know who he was, that Barnes' presence should impress him. In fac
the commissioner didn't recognize the name; he knew only that Barnes' bus
ness card said he was with the Austin, Texas, firm Entre Corp.

Having an interest in Texas politics as well as Louisiana politics, I couldn
help but grieve a bit at how soon the memory fades and how far the might
fall.

Barnes, you see, was the Wunderkind of Texas politics in the '60s. At th
tender age of 22, he took a seat in the 57th Legislature on Jan. 10, 1961, a
the representative from Comanche County. Only four years later, he becam
the youngest House speaker in Texas history.

His meteoric rise to the speaker's chair was probably directly tied to his rela
tionship with Gov. John Connally, who took office in 1963. Connally was i
turn the protege of Lyndon Johnson, then vice president.

Barnes succeeded Byron Tunnell as speaker, Tunnell having moved to th
Texas Railroad Commission, which was more powerful than OPEC in control
ing worldwide oil prices for nearly 50 years. The number of days a Texas we
could produce was nationwide business news for that half century, endin
only when we became dependent on foreign oil in the 1970s.

Barnes, with Connally's blessing, ran for lieutenant governor in the fall o
1968 and took office Jan. 14, 1969. His successor was Washington Count
Rep. Gus Mutscher.

Connally left the governor's office after his two allowable terms in 1970 an
served later as Richard Nixon's Treasury secretary.

It was about this time that one of the first big banking scandals since th
Great Depression hit Texas. A developer named Frank Sharp was discovere
to have spread stock in his Houston bank and other enterprises related to h
west Houston Sharpstown semicity among legislators. The largess was appa
ently to ensure approval of legislation that would keep his otherwise in
solvent bank afloat.

Not all the legislation passed, the bank failed, and as one of Barnes' legisl
tive classmates said this week, "We were all elected to political oblivion i
1972. And I never even got any stock." Barnes was never charged with an
criminal wrongdoing, though Mutscher was indicted and served a jail term.

Page 1 Morning Paper November 15, 1990

Headline: A new twist in the wind?

Towers Financial Corp. of New York, which has issued $7 million to $10 million of company notes at very high interest rates in North Louisiana and $92 million nationwide, is attempting to go public with its heretofore private offerings.

The Towers notes were supposedly offered only to accredited investors (those with the income and net worth to absorb a total loss on their investment), but an investigation by the Louisiana Securities Department for failure to disclose relevant information in offering documents and possible sale to non-accredited investors prompted Towers to begin the registration process.

Deputy Commissioner of Securities Harry Stansbury has effectively put Towers out of business in Louisiana by withdrawing the exemption on past offerings and denying registration on present offerings. He has also notified a number of other state securities regulators, the Securities and Exchange Commission and the National Association of Securities Dealers of his decision. He has asked Towers to refund the money of any Louisiana investor who bought Towers notes after Aug. 20, when he withdrew the exempt status.

According to the offering documents, Towers was paying 13 percent on one-year notes and 15 percent on two-year notes. But indications are that the company had at least agreements with investors that a matured note could be rolled over into a follow-up offering at the same terms and conditions as the original investment or the current one, whichever was higher.

The financial statement submitted with the offering documents indicates that Towers paid $12.3 million interest the first six months of 1990 on a total $48 million in notes outstanding June 30, 1989. Presumably, the interest is paid on an annual basis per the offering documents. That would indicate the company is paying more than 25 percent interest on its borrowed money.

The June 30, 1990, statement shows $92 million in outstanding notes. Towers Financial is more than 70 percent owned by Professional Business Brokers Inc. and is committed to pay 5 percent of its gross operating profit to PBB through 1995. That would amount to $2.25 million for year end June 30, 1990. The company reported profits of $3.9 million during the same period.

According to documents in a lawsuit filed against Towers and its chairman/chief executive officer/president Steven Hoffenberg filed in federal district court in Illinois and not mentioned in the offering documents, Professional Business Brokers is owned by the Hoffenberg Family Trust, which is controlled by Steven Hoffenberg. Hoffenberg's relationship to PBB is not made clear in the notes to the financial statement prepared by New York CPA Martin E. Basson.

Nor are lawsuits by receivers for insurance companies in Illinois and Michigan against Towers and Hoffenberg mentioned in the notes. Claims filed in federal and Illinois courts by receivers total well in excess of the $13.4 million net worth of the company.

Stansbury's letter to Towers alludes to these and other problems the company have come to light, including the financial dealings of certain Towers principals including Ben Burns, former Texas speaker of the House and lieutenant governor, and William Fugazy, a New York promoter with millions of dollars in outstanding court judgments against them.

The move to register the notes in Louisiana appears to be an effort to keep investors in the fold. Should Towers be forced to pay the notes as they come due, it would appear from the current financial statement that Towers' $9.2 million cash on hand would be effectively depleted. The notes sold in Louisiana from 1987 through September of this year were offered through Biedenharn Investment Group (BIG Inc.), based in Shreveport but reporting mostly Monroe ownership.

It appears that Biedenharn is being pushed out of the picture. The current agent in Louisiana is Multi-Financial Securities Inc. of Englewood, Colo., a Denver subunit.

An individual identifying himself as "Dana Woodbury, a financial analyst with Multi-Financial called the Morning Paper Oct. 24 inquiring about past newspaper articles that appeared about Towers. He revealed that his article is still offering the securities Tuesday.

Towers also operates a number of offices nationwide where the notes are reportedly offered for sale. In some cases the offices also function as collection agencies for Towers Credit Corp., a subsidiary operation.

Page 1, Morning Paper, January 10, 1994. Headline: BIG, Inc./Towers hit with C & D

A Shreveport brokerage firm and a New York company offering high-interest notes were hit with cease and desist orders by the Louisiana securities department Tuesday.

Biedenharn Investment Group Inc. (aka BIG Inc.) of Shreveport was cited for sales of unregistered notes issued by Towers Financial Corp. for sales of Towers notes to unaccredited investors, for sales of notes with offering documents that did not fully disclose pertinent information about Towers, and for sales of Towers notes at terms differing from the offering documents.

The Louisiana order requires Towers to register its note offerings, previously marketed as private placement offerings. All Louisiana investors must receive the rate of interest and note terms as outlined in the offering documents. There can be no rollover of maturing notes into current offerings at interest rates higher than the 13 percent for 12 month notes and 15 percent for 24 month notes.

And the notes can only be sold to accredited investors in $100,000 units.

Towers has had to disclose more information about the background of officers and directors. Ben Barnes, the former speaker of the House and lieutenant governor of Texas, disclosed the bankruptcy of his partnership with former Texas Gov. John Connally.

Towers chairman Steven Hoffenberg disclosed to Louisiana investors that he controls Towers through ownership of 70 percent of the Towers stock by Professional Business Brokers, which in turn is 100 percent owned by Hoffenberg Family Trust, which finally is controlled 100 percent by Hoffenberg.

From Towers documents it appears that Hoffenberg had about $92 million of the notes outstanding June 30, 1990, with $8 million to $10 million placed in Louisiana by Biedenharn.

The offering documents say the notes are secured by accounts receivable purchased by Towers from insurance companies, health care providers and government agencies. However, Towers has declined to identify any of its customers through one of its several Louisiana attorneys, state Sen. Michael O'Keefe.

Amended-offering documents of Towers conditionally accepted by Louisiana regulators acknowledge problems not previously disclosed by Towers in California, Illinois and Michigan. Insurance regulators claim that Hoffenberg acquired control of two insurance companies and drained their assets into his New York company, leaving them completely insolvent. Receivers for both states have sued Towers and Hoffenberg for return of the assets. Towers has countersued, contending he was defrauded by the companies' previous owner. Both sides are seeking treble damages.

In California Towers has been the subject of an action by the Department of Consumer Affairs for operating a bill-collecting agency without proper licensing, for failing to maintain money it collected in California trust accounts, and for failing to remit money it collected to Towers clients. The Towers documents say Towers "offered a compromise to the California Department of Consumer Affairs to resolve outstanding items. It is expected that this offer will be finalized shortly."

Biedenharn is apparently out of the Towers note business. The only registered broker dealer now is Multifinancial Securities Corp. of Inglewood, Colo.

Page 1 Morning Paper, February 26, 1991

Headline- Looks like they forgot to mention another small problem

Towers Financial Corp. of New York, whose notes were sold in North Louisiana by Monroe-owned, Shreveport-based Biedenharn Investment Group Inc., appears headed for more regulatory challenges.

The Chicago Daily Law Bulletin reported Feb. 15 that a Cook County circuit court jury returned a $767,000 verdict against Towers less than 10 minutes after beginning deliberations.

Chicago's F.H. Prince & Co. filed suit for payment of a $600,000 promissory note guaranteed by Towers and issued by United Fire Insurance Co. March 30, 1988. The note was in partial payment of a $1.2 million settlement between Prince and UFIC. When the settlement was consummated, Towers had control of the insurance company.

In two other suits in Illinois federal district court, receivers appointed by Illinois and Michigan insurance regulators claim Towers and its chairman, Stephen Hoffenberg, drained liquid assets from United Fire Insurance and Michigan-based Cadillac Insurance, leaving them insolvent. The suits seek more than $13 million from Towers/Hoffenberg.

Offering documents filed and amended by Towers in Louisiana mention the Illinois and Michigan regulatory action and the suits, but in words that could suggest Towers is the offended party. Significantly, there is no mention of the Prince suit, even though the suit was filed Oct. 31, 1989.

The settlement agreement, guaranty by Towers and the note are all signed by Hoffenberg. The signature, though illegible, appears to be the same as the signature on the Towers Financial annual report. No mention of the settlement, guaranty or note appears in the annual report, although the judgment along with the yet-to-be-determined collection costs, per the guaranty, could represent 10 percent or more of Towers' cash position.

Stock in Towers is more than 70 percent owned by Professional Business Brokers Inc. PBB is owned by the Hoffenberg Family Trust, which in turn is controlled 100 percent by the Towers chairman. Towers pays PBB "five (5%) percent of its gross profits before expenses and before provisions for taxes" until 1995. That payment to PBB/Hoffenberg would amount to more than $2.7 million for the year at year end June 30, 1990.

The PBB/Hoffenberg control and payments are disclosed only in a special offering document supplement to "Louisiana Investors Only" required by the state securities commission and dated Nov. 16, 1990.

Towers says it has issued $92 million in one- and two-year notes nationwide,

with a current rate of 13 percent on one-year notes and 15 percent on two-year notes paid annually. However, the annual report shows interest payments of $10.5 million during the fiscal year ending June 30, 1990, on $48.6 million of notes outstanding at June 30, 1989, which appears to be an average interest rate of more than 20 percent.

Towers say the notes are secured by accounts receivable purchased from hospitals, clinics, insurance companies and related medical care providers. The company has refused to identify any of its customers through one of its Louisiana attorneys, former state Senate president Mike O'Keefe, and we have been unable to locate any client, described as "rural hospitals in Texas and across the South" by Towers director Ben Barnes.

Followers of the Texas financial bust might remember Barnes as the state's youngest speaker of the House and lieutenant governor and as partner with former Texas Gov. John Connally in the now defunct Barnes-Connally Partnership. Barnes-Connally and Barnes-Connally went belly up in 1987, precipitating more than a few bank and savings and loan failures in the state.

Biedenharn aka BIG Inc., has been prohibited from offering or renewing Towers notes in Louisiana since August, when the deputy commissioner of securities, Harry Stansbury, began an investigation. Stansbury issued a cease and desist order Jan. 8 making the prohibition against Biedenharn permanent. Records indicate that before the order Biedenharn sold $6 million to $10 million of the high risk securities across North Louisiana, and some sales were to investors not qualified under state and federal laws. Biedenharn earned commissions of 10 percent per year on notes sold for Towers.

In Louisiana Towers notes are legally offered and sold now only in $100,000 denominations to investors with $1 million net worth. The broker of record in Louisiana is Multi-Financial Securities Corp. of Inglewood, Colo. Interest must be at the rates specified in the offering documents on file with the commissioner of securities.

**EXHIBIT 13**

Rumor Mill Column Mar '91

**Back in the saddle**

Biddenharn Investment Group, the Shreveport brokerage house, is back in the Towers note business. But with restrictions, according to rumors.

Towers note buyers, no new customers, sales only in blocks of $100,000 or more. Interest limited to 13 percent on one-year and 15 percent on full disclosure to buyers.

Towers notes have been sold in 34 states, the District of Columbia, and at least three foreign countries. The New York-based company acknowledges sales of more than $265 million in notes as of June 30, 1990.

The company claims to buy hospital and other health-care provider accounts receivable with the proceeds, but it has been reluctant to disclose the identity of any clients. We have located six small hospitals in three states that do business with the company, each for less than a year.

Towers contends that it is exempt from registering with the Securities and Exchange Commission. Some state regulatory agencies, however, require Towers to file offering documents with the position. Those states had relatively few investors and less than $1 million in sales.

Pulling out of Louisiana, where investments range from $15,000 to $870,000, could prove a threat to Towers' sale position. Three of the top investors, including one of the largest in the state, are also principals in Biddenharn, the Shreveport principal investment house.

All states, however, require full disclosure in a prospectus or in an offering document used in the sale of a private placement. The company was supposed to make full disclosure of any financial liability in a Louisiana consumer document, yet it failed to mention significant contingent liabilities since 1986 on the notes, among investors in Mississippi, where Towers has no filings.

**Curious**

Rumor is that ONB/Premier Bank attorneys are more than a little concerned about tape recordings related to the work of the legislative auditors and the Office of Financial Institutions proceeding. If that possibility exists—

An unconfirmed rumor in the twin cities is that the bank's attorneys are attempting to get copies of any tapes from the Gulf States side and are un-listing staff witnesses who have given depositions for their side as proposed.

Regulators in some states that require offering documents do not show their states side and are witnesses say the same thing in deposition. If the big guns represent ing ONB/Premier fear that their side has some strange testimony, why should the little guys have to disclose any refutation until it gets before the jury?

It might be more equitable for those who now remember what they earlier forgot or now realize they may have accidentally left the wrong impression to amend their previously sworn testimony. That way there would be no reason for the Gulf States/Fairway/Mike Hart crew to take up the jury's time laboring to tape.

**Coincidence**

There have been two auditors having a hard time extracting records from the OSU Research Foundation and OSU Alumni Foundation.

The university claims those are private entities and auditors are not entitled to any of its records. Auditors claim the university houses, staffs and controls the entities, hence they are subject to examination. Ultimately the auditors will win. Short of the school burning some strange testimony down, the records will come to light.

Page 2 Morning Paper May 16, 1991.....Rumor Mill Column

**Bent rule**

Academia now rates itself according to accreditation standards rather than the old rule of thumb—graduating students who get jobs and perform in the work place.

Tech is no different from other institutions, except for the journalism department. Journalism may never be accredited after one of its graduates, former Shreveport Journal editor Stan Tiner, threatened to speak to the chairman of the Regents' evaluation team by hand.

Faculty and staff members facing an accreditation team naturally put the best light on their operations. It is no secret that on occasion accreditation teams are subject to wining and dining before, during and after their visits. It is just a rumor, you understand, that Tech business school folks found themselves in a quandary at a party the night before their accreditation team made a formal inspection.

According to the story told to us, the chairman of the team was a smoker. It is also reported that the chairman made plain his feelings, during this social occasion, about the no-smoking trend across the country. Considering a campuswide no-smoking policy, the chairman's views put the powers that be on edge. The chairman of such an esteemed committee couldn't be expected to go outside to fire up. After the pre-inspection social, the matter reached the highest authority at the university.

The verdict: hide the no-smoking signs, roll out the ashtrays, call off the smoke police. The reprieve was much to the delight of smokers on the faculty, who could close their office doors and open their windows a couple of days without getting the dreaded telephone inquiry. Are you smoking in there?

Just goes to show that rules are rules unless ...

**Getting a look?**

Towers Financial Corp., of New York has sold $8 million to $10 million worth of its high-yield one- and two-year notes in Louisiana. Most of the sales have gone through Biedenharn Investment Group Inc., a Shreveport broker/dealer.

In Louisiana the notes are registered and information about the offerings are public record. In 33 other states, the notes are sold as private placement offerings, with Towers claiming they are not subject to registration.

Most states have what is called a "bad boy" provision to their securities laws. In a nutshell, the laws say you can't sell unregistered securities if you have been in trouble with securities regulators. The unregistered securities waive the requirement for companies that have had problems in the past but cleaned up their act.

We have located eight states where Towers would have been subject to "bad boy" and failed to seek waivers in 1980-91. Towers was found in violation of Securities and Exchange Commission regulations and Nebraska and Alabama laws in 1988.

In even more states, Towers filed for and had waivers granted, but did not fully disclose company litigation, state investigations, or payments from gross profits to Towers chairman Steven Hoffenberg's family trust.

Towers says it uses proceeds from the sale of the notes to purchase receivables from hospitals and other medical-care providers. In direct mailings and industry publications, the company actively solicits such business. But Towers has been reluctant to disclose any significant long-term customer, not only to reporters but also to potential customers. A California base potential customer spent several weeks extracting the names of four Towers clients, none of which had been doing business with Towers even a year.

Hospitals, including the charity system in Louisiana, that have analyze Towers' proposals have concluded that they can collect their own accoun receivable cheaper than Towers can do it for them. Former Towers employe have been told that the company made sporadic attempts to sell in Louisiana, but was never able to sign any significant accounts.

In an apparent attempt to boost services, the company has cooked up new subsidiary Towers Franchise Corp. For a mere $350,000 franchise fee you can have a territory to sell the Towers system to hospitals and medica care providers. Presumably anyone with fifty grand invested will sell harder than a salesman working for salary or commission.

More than a few people across North Louisiana have bought Towers note and think they are the greatest thing going around. As long as the interest keep coming—about double the normal rates—no one will complain.

This is to say that perfectly sound investments don't turn bad for un foreseen reasons. But twofold threat common to money losers is conceal ment or distortion of pertinent information about the investment ar blatant disregard for the rules involving sales of investments. Both of thos are present with Towers.

In the Pine Tree Caper, there were no real timber contracts. Glen McCa really didn't own the big building in Salt Lake City that was making 18 pe cent return. Pico was being drained by the new owners. NALL was sellin overpriced insurance policies, not investments in "the fastest growing surance company in the country."

With Towers the unanswered question is why Hoffenberg leaves the n tion's financial center to peddle notes and pay 20 percent interest when is such a sure thing. he could go down the street and pick up the money half that rate. Maybe the Biedenharn folks could answer that question.

Page 1. Morning Paper - July 4, 1991. Headline: Folks with Towers notes better read this

Copyright Morning Paper 1991

Reports filed by a New York based finance company that has sold at least $10 million in notes to more than 75 North Louisiana investors have raised questions about what happened to its assets.

The Towers Financial Corp. notes were sold by Shreveport-based, Monroe-owned broker/dealer Biedenharn Investment Group.

The high interest rate Towers paid on its notes--13 percent to 18 percent--contributed to its appeal to investors. Until this year they could roll over one- or two-year notes into a subsequent offering at 18 percent, even though the current rate is somewhat lower.

Nationwide through Dec. 31, 1990, Towers has sold some $100 million in private notes and $98 million in short-term bonds that, according to offering documents, are "collateralized, secured, and backed by healthcare accounts receivable due from major insurance companies, commercial accounts receivable, and loans and accounts receivable purchased from governmental agencies."

But documents filed May 7 with the Securities and Exchange Commission show that Towers was somewhat short of providing the indicated collateral as of its last audited financial statement, June 30, 1990.

Sorting out Towers' assets admittedly takes a merry chase through filings. According to the documents, the assets are primarily accounts receivable, either those it is earning as a collection agent (earning 10 percent to 50 percent when collected) or receivable it purchases. Towers is supposed to use the proceeds from note and bond sales to purchase receivables.

According to page 26 of Towers' annual report and page 9 of its May 7, 1991, SEC Form 10, the company had $291.8 million outstanding accounts receivable at face value at its fiscal year end June 30, 1990. Form 10 says $151.3 million is owned by Towers, and the remaining $140.3 million is in accounts being collected on a percentage basis.

The owned accounts break down into three categories: $13.4 million, healthcare receivables (page 50, Form 10); $111.7 million, portfolio purchased from the FDIC or third parties that purchased FDIC receivables; $26.3 million, commercial accounts receivable purchased from businesses.

Towers places a real value of $177.2 million on its total $291.8 receivables. The $177.2 million represents the vast majority of the company's assets.

If Towers collected 100 percent of the collection agent accounts and earned the maximum 50 percent fee and if it collected 100 percent of the healthcare and commercial accounts, it would receive $109.8 million. The remaining $67.4 mil-

lion is the value of the loan portfolio obtained from the FDIC and others (although Towers says the portfolio has a face value of $111.7 million, it reports [page 8, Form 10] paying only $5.6 million to purchase the FDIC loans. A packet of notes that can be bought for less than a nickel on the dollar is considered as less than prime paper.

Towers would have to collect 12 times its cost to recover the minimum book value of the FDIC paper. It would have to collect more than nine times cost of the investment to keep from wiping out the company's net worth of $13.4 million.

Other numbers are equally interesting. Towers borrowed $92.2 million to purchase accounts receivable with $151.3 million face value. If the accounts paid 85 percent of face value for all commercial receivables, 50 percent of face value for all healthcare receivables, and $5.6 million for the FDIC portfolio (all figures coming from Form 10), the cost of that $151.3 million is only $34.6 million. What happened to $56.6 million--the difference between the money borrowed on Louisiana and others as of June 30, 1990, $92.2 million, and the maximum cost of the receivables, $34.6 million?

Towers' consolidated balance sheet shows $177.2 million in accounts receivable, $18.3 million in other assets including cash and equivalents, prepaid interest, office furnishings, leasehold improvements, etc. Nothing there is even close to $56.6 million. On the liability side, its notes payable are close, with $92.6 million owed.

We called Towers and were referred to Mitchell Brater, board vice chairman and chief operating officer. Unfortunately, Brater was on vacation. His secretary said she would return the call.

# Towers Financial under multi-state investigation

## Company is suspected of selling unregistered notes

BY BENJAMIN MARK COLE
*Senior Reporter*

Towers Financial Corp., a New York-based financial and collections company with a major operation in Santa Monica, is the target of a multi-state investigation for securities law violations, state officials confirmed last week.

"We are taking a look at them, but we are not at liberty to discuss the matter much beyond that," said Irwin "Wes" Fisk, chief investigator in the Los Angeles office of the Department of Corporations, the state agency which regulates the securities industry.

According to Bill McDonald, assistant commissioner at corporations, the multi-state task force is investigating improper disclosure and the sale of unregistered notes, by Towers — that is, IOUs which are sold to investors, in the form of securities, but are not registered with the state, as required by law.

"We are looking at whether they are misrepresenting securities they are selling," said McDonald.

Towers markets high-yield notes backed by receivables, usually hospital accounts, nationwide.

Other states participating in the investigation include Illinois, Kansas, Missouri, New Mexico, Tennessee, Texas and Wisconsin. The investigation is a special project, funded in part by the North American Securities Administrators Association, a body of state securities industry regulators, said McDonald.

The federal Securities and Exchange Commission, which sanctioned Towers in 1988 in a similar matter, is being kept abreast of the investigation.

Towers Chairman and Chief Executive Officer Steven Hoffenberg, 46, last week said the multi-state investigation is just an

---

remember."

Hoffenberg said the matter would be resolved in the near future.

According to a Towers filing with the SEC, the state will soon issue an "accusation" against the company, requiring proper record-keeping and licensure. The accusation will be dismissed with prejudice against Towers, with the company remaining in business under administrative probation, according to Towers' SEC filing.

In 1987 the Securities and Exchange Commission brought civil charges against Towers for the sale of $34 million in unregistered securities. A federal judge in 1988 ordered Towers to pay back investors, and

---

not to destroy records, and to not sell improperly unregistered securities again.

On June 27, Towers, Chairman Hoffenberg and other company officers became the target of a Racketeering Influenced, Corrupt Organizations Act (RICO) suit filed in federal court by the State of Illinois.

The Illinois Director of Insurance alleged that Towers purchased two insurance companies in that state in 1987, then stripped the insurers of their assets, causing insolvency, according to Richard Darling, official with the Illinois Office of the Special Deputy Receiver.

Hoffenberg said last week of the Illinois matter. "That's an old case. started in 1987. The court has agreed that we could try our position, and rescind our purchase (of the insurance companies) and allow the

---

return of our purchase money."

On June 11, the State of Nebraska found that Towers had broken state securities registration laws, entered a consent order against Towers and fined the company $5,000.

On Feb. 20, Alabama found Towers had violated state securities laws, and ordered Towers to cease and desist from illegal sales of securities.

On Jan. 8, Louisiana ordered Towers to cease and desist from the illegal sales securities.

Hoffenberg last week described Towers as a "$1 billion-(in collections and factoring revenues) company that does business in 50 states. It is not unusual that we are regulated in 50 states."

Towers, the stock of which is traded in the "pink sheets," reported net income of $3.9 million on gross revenues of $291 million in the fiscal year ended June 30, 1990.

---

consin, New Mexico, Kansas, Missouri, consin. The investigation is a special project, funded in part by the North American Securities Administrators Association, a body of state securities industry regulators, said McDonald.

The federal Securities and Exchange Commission, which sanctioned Towers in 1988 in a similar matter, is being kept abreast of the investigation.

Towers Chairman and Chief Executive Officer Steven Hoffenberg, 46, last week said the multi-state investigation is just an ordinary regulatory oversight of his company, which does business across the country. "This really has nothing to do with us," he said. "We could be one of more than 1,500 companies they regularly look at, and I don't even know if they are looking at us."

Towers has been selling notes in California for several years. In 1989 and 1990, Towers sold $11.9 million worth of notes to Southland investors in chunks as large as $500,000 — according to documents obtained by the Los Angeles Business Journal.

Among the investors are the National Council of Jewish Women on Fairfax Avenue in Los Angeles, the Agatha Temple of Wisdom on Central Avenue in Los Angeles and the Profit Sharing Plan of Monte Cristo in Pasadena.

Towers is already in a bit of hot water with the state and is currently settling an out-of-court settlement with the state Attorney General's office, where it has remained for more than 18 months.

In 1990, the state Department of Consumer Affairs investigated Cal-Collection Services of California Inc., a wholly owned Towers' subsidiary, for allegedly bilking businesses in collections work. The consumer agency passed the case along to the state Attorney General.

Last year, Towers hired lawyers Mickey Kantor and Lisa Specht, both of the Westside law firm Manatt, Phelps, to dicker with Attorney General. Merino said last week a settlement is pending, but that he cannot discuss details. Merino added. "I have met with

Rumor Mill column, Page 2, Morning Paper, November 21, 1991

**Book it**

The question in newspapers accounts this week is, Where did we go wrong in the election? Generally, the polls showed a close race for governor.

Pollster Verne Kennedy of Jackson, Miss., isn't one of those trying to figure out what went wrong with his projections. He's right on the money.

Dave Norris of West Monroe fame held a gathering of cronies to assemble predictions on the election. George Luffey brought a copy of the latest Kennedy poll that included the results of the night before.

The numbers from 200 calls a night beginning with the primary showed a steady deterioration in David Duke's support. Duke started out ahead, but within a few days Edwards pulled even. The pattern was a steady decline for Duke and an equivalent increase for Edwards as the election got closer and Roemer voters decided to vote for Edwards rather than skip the election or vote for Duke.

(An informal poll Thursday at the Huddle House showed only three solid Duke votes, where there had been 11 three weeks before when Wiley Hilburn took the pulse.)

Kennedy called a worst-case scenario 55-45 Edwards and a best-case 68-32 Edwards. He predicted the probable Edwards vote at 60 percent to 63 percent. Edwards, who got a projected 60 percent, right down the middle.

Political pollsters and consultants generally stick with one party or the other. It might behoove Democrats facing a big race to find a Republican friend to hire Kennedy.

**A call**

The phone rang Thursday morning at 10. May I speak to John, the caller asked. It was Edwin Edwards. Someone had already sent him a copy of that morning's editorial, and he wanted to thank us for the support. It's a little salty coming from North Louisiana, the candidate said.

I usually have a hard time getting one like that past Susan's editing, I explained. But she was still mad because Duke supporters thought last week's editorial was great. "I told you they wouldn't understand it," she said endlessly.

Close enough for government work.

Duke took it to them? Edwards asked.

His announcement Monday that he will consider a run for the presidency on the Republican ticket and a shot at millions in matching campaign funds may prompt a closer look at past campaign spending.

The goodies candidates usually sell for a nominal charge or pass out free were sold for cumulative big bucks in the Duke campaign. There is talk that the campaign bought certain items from companies owned or controlled by Duke. In-

self favors would do some serious tracking of money if, for instance, a $10 T-shirt that normally costs a campaign $3 cost the Duke treasury $8.

**Towers tumble**

There is no convincing some folks that their money is in jeopardy.

Towers Financial Corp. of New York is seeking approval for a $100 million issue of private placement notes. Louisiana and a few other states require registration because Towers has a history of flouting securities laws and regulations.

Because investors like the 12 percent to 18 percent interest on their money and brokers like the 4 percent per year commission, they sometimes fail to look at the fine print in the offering documents and check out the public filings.

Towers is stringing together subsidiary companies faster than its accountants can put together reports. And it becomes clearer every day that the $10 million worth of Bledenharn Investment Group is backed by nothing more than trash-paper picked up indirectly from FDIC and RTC.

Towers claims the notes are "collateralized, secured and backed by accounts receivable due from major insurance companies, commercial accounts receivables and loans and accounts receivables purchased from governmental agencies."

But page 13 of the Oct. 13, 1991, offering document says: "Towers will be entitled to transfer or use for its own account an amount equal to the amount by which the face amount of Accounts Receivable plus the Funds on deposit in the funding account exceeds the face amount of all issued Promissory Notes plus all accrued and unpaid interest due on such Promissory Notes (the 'Excess Profit' amount). Towers profits are the assets of Towers and may be used for any corporate purpose as determined by the sole and absolute discretion of Towers."

According to July 17, 1991, Form 10 filings with the Securities and Exchange Commission, Towers reveals the composition of the "accounts receivables purchased from governmental agencies." Those accounts receivable total a face amount of $111 million. Towers paid $5.64 million for the assets. The face amount represents more than 20 percent of Towers claimed total assets of $511 million as of June 30, 1991.

In prior years Towers put a gross amount on accounts receivable held and discounted them by the amount they did not expect to collect. This year's annual report deletes the discount factor.

The face value of the highly questionable assets can and probably is used to collateralize the entire $100 million note issue. All other assets bought with the remaining $94.37 million can be transferred to other Towers subsidiaries as "shopping." Investors will not have the opportunity to evaluate the investment of the proceeds of the Offering or the merit or creditworthiness of any particular debtor with respect to the Accounts Receivable, but must rely on the ability o

From MORRISON/DUKE et al NOVEMBER, 11-21 Mill, page 2, November 21, 1991

**EXHIBIT 18**

The Los Angeles Business Journal
Copyright Los Angeles Business Journal 1991
Monday,
December 9, 1991
v13, n49, Section 1

State Ends Dispute Over Towers Collection Practices
By Benjamin Mark Cole

Los Angeles, CA, US --

The State of California had settled its long-running charges against Santa Monica-based Towers Collection Service of California Inc., the business collection outfit accused of misappropriating client funds.

Under the settlement, Towers admits no guilt and disputes it ever kept client money, but Towers is placed on administrative probation for three years and will pay state costs of $31,138.

According to the state "accusation" filed with the settlement, Towers violated the following state laws:

* It did not hold a valid license as a collection agency.
* It did not render to clients a statement of account within 60 days.
* It did not remit money to clients within 60 days.
* It did not properly maintain records of client accounts.

Both lawyers are well-connected to state political parties.

Towers, a unit of New York-based Towers Financial Corp., retained heavyweight lawyers Mickey Kantor and Lisa Specht, of the West Los Angeles law firm Manatt, Phelps & Phillips, to represent it in dealings with the state.

The state in early 1990 launched an investigation into Towers Collection, after sworn affidavits from more than 30 Southland businesses registered complaints about Towers.

Towers to collect on overdue receivables, and that Towers did so, but did not properly remit the collected money to its rightful owners.

The thrust of the affidavits was that the businesses had hired

At the time the affidavits became public, Towers Chairman Steven Hoffenberg, 47, denied the charges and said competitors were spreading lies about Towers.

Separately, Towers' parent, Towers Financial, is undergoing a multi-state investigation for possible violations of securities laws, as the business journal reported in August. The State Department of Corporations is participating in the investigation.

Towers markets high-yield notes backed by receivables, usually hospital accounts, nationwide. Those notes are the focus of the investigation, according to state officials.

Too, Towers and Hoffenberg are the target of a federal Racketeer Influenced, Corrupt Organizations Act suit filed in federal court by the State of Illinois.

The Illinois director of insurance alleged in June that Towers purchased two insurance companies in that state in 1987, then stripped the insurers of their assets, causing insolvency.

Towers has denied the charges, and company officials have said problems with the two insurance companies stem from actions of previous owners. Towers has moved to have its purchase of the insurance companies rescinded.

Page 1, Morning Paper, February 20, 1992, Headline: New questions from each answer

Louisianans who have invested in Towers Financial Corp. "private placement" notes may want to take a close look at the 1991 annual report of the New York company.

Towers sells the paper, which yields more than twice current money market rates by claiming that it is backed by healthcare receivables, commercial receivables, and receivables obtained directly or indirectly from the Federal Deposit Insurance Corp. and Resolution Trust Corp. Indications are clear that healthcare receivables constitute the primary collateral for the instruments.

Towers has several types of debt instruments. The single largest is the "private placement" note, which appears to constitute about $148 million as of June 30, 1991. But since starting to sell those notes five years ago, Towers has created new debt offerings issued by subsidiary corporations: now Healthcare Receivables Funding Corp. ($56.5 million), Towers Healthcare Receivables Funding Corp. II ($41.5 million), and Towers Healthcare Receivables Funding Corp. III ($40.5 million).

The figures come from Richard Eisner, who audited the three subsidiaries for Towers. The breakdown does not appear in the annual report.

The three subsidiaries hold in the aggregate $161.4 million of the reported $181.1 million gross value of healthcare receivables reported on page 29 of the annual report. Only $7.3 million of the healthcare receivables that pass through Towers Financial from the time they are acquired by Towers until transfer to one of the three subsidiaries are available to back the private placement notes.

And although Towers claims to make money hand over fist with healthcare receivables funding, Eisner's audits say the companies lost $16 million from June 30, 1990, to June 30, 1991.

Towers' New York attorney, Bruce Bronson, told securities regulators in December that he had reviewed Towers financial data with the company. Using that data and their responses and explanations he said that Towers listed the $111 million of FDIC/RTC receivables purchased for $5.8 million at cost rather than close to face value, as we have indicated Towers appeared to be doing. He also said Towers' $437 million of receivables carried as assets by the company have a cost basis of approximately $350 million.

Bronson's explanation leaves open the question of the company's cash position. Carrying the FDIC/RTC penny paper at cost and holding all other assets in strict-condition subsidiaries throws off the reported cash position and payables to clients widely out of kilter.

Then there is the question of the $350 million cost for the receivables. Towers has only had two sources of money: its borrowings, $288.6 million, and its paid-in capital and retained earnings, $20.1 million. Where did Towers and its principal owner, Steven Hoffenberg, come up with the additional $44 million to make the purchases?

While Towers continues to service existing customers, renewing notes when they come due, independent broker/dealers handle sales to all new customers. The brokers too are told that healthcare receivables are a big part of the paper collateralizing the notes, such as sold by Biedermann Investment Group of

Shreveport. The switch to all outside sales insulates the company at least one degree from the distortions of its true financial condition.

The New York company depends on what is called a "waiver of Bad Boy" to wheel and deal the paper freely. Most states prohibit companies from selling unregistered securities if they have ever been in trouble with securities regulators. Towers has been in a peck of trouble, regularly failing to disclose challenges by state regulators, to disclose lawsuits whose liability would be a significant portion of the company's net worth, and to make adequate disclosure of assets and liabilities in financial filings.

Sales are now on hold in several states where they sold large numbers of notes in Louisiana, Texas and New Mexico, to name a few. And they have been denied waivers in others: Maryland, North Carolina and South Carolina.

But there have been no investor complaints. People getting 12 percent to 18 percent interest don't complain until the money stops coming. Few complained about investments in Glenn McCarr's ALIC Corp. until they got McCarr's "pray for us" letter the day the well ran dry.

The Wall Street Journal
Copyright (c) 1992, Dow Jones & Co., Inc.

Friday, September 18, 1992

Judge Blocks D&B From Distributing A Credit Report
By Jonathan M. Moses
Staff Reporter of The Wall Street Journal

NEW YORK -- A federal judge blocked Dun & Bradstreet Corp. from distributing a credit report about an alleged competitor that says D&B is trying to lure away customers.

The order prevents D&B from distributing the updated report about Towers Financial Corp. until a hearing is held next week on the accuracy of the report and on the allegations of its anti-competitive use.

U.S. District Judge Louis J. Freeh issued the temporary restraining order prohibiting distribution of the report after Towers argued that publication would do irreparable harm to its business reputation.

Because of free speech concerns, it is unusual for courts to issue orders restricting distribution before the initial publication of a report. But Judge Freeh reasoned that since D&B has already been reporting on the report for 18 months while negotiating with Towers, another week wouldn't be a great burden. He also said it is likely that the D&B report would be found to be "commercial speech," such as advertising, which is afforded less protection than publications concerned with the expression of ideas, such as newspapers.

An attorney for D&B said the company would have no comment on the dispute until after the hearing. The company has said in court papers that it has "hundreds" of orders for new or updated reports on Towers.

Towers maintains that it competes with a D&B subsidiary in the debt-collection business and that the report, generated by D&B's credit-reporting unit, is specifically designed to damage its reputation. A Towers spokesman said it does about $500 million of commercial debt collecting business annually. D&B says its debt collection business is different from Towers's.

"They've been advertising against us for years by use of the credit reports," said Steven Hoffenberg, Towers chairman, and president. He added that the publicly traded concern, which other principal business is factoring accounts-receivables for medical firms, has limited credit demands and the only people ordering the reports would be potential customers.

The lawsuit concerns sensitive issues for both companies. D&B, which dominates the company credit report market, has come under fire from time to time, with both clients and reviewed companies questioning the accuracy of its reports. In 1985, the U.S. Supreme Court upheld a $650,000 judgment against D&B in a libel suit brought by a Vermont company that said its credit report was inaccurate. D&B has attempted to avoid such judgments by arguing that its credit reports are protected free speech, not commercial speech.

Towers also has faced scrutiny. In 1988, it settled a lawsuit brought by the Securities and Exchange Commission alleging that it sold $20 million in unregistered securities to help finance an aborted takeover of Pan Am Corp. Under the settlement, Tower neither admitted nor denied the allegations.

# Towers Financial Investors File Suit Over Firm's Notes

*By a WALL STREET JOURNAL Staff Reporter*

NEW YORK — Towers Financial Corp., already facing a broad civil action by the Securities and Exchange Commission, is now facing a lawsuit filed on behalf of investors holding its notes.

The lawsuit seeking class-action status was filed by the law firm of Stamell, Tabacco & Schager on behalf of Martin Gold, a New York attorney who during the past two years bought $80,000 of Towers notes that paid as much as 15% annual interest. Towers has sold more than $215 million of notes to about 2,800 investors.

The firm's financial condition has become of public interest because Towers Chairman Steven Hoffenberg recently offered to buy the troubled New York Post tabloid newspaper.

Towers, a huge debt-collection firm, sells the notes using its accounts receivable as backing. But the lawsuit, which closely follows the SEC cases filed this week, alleges that Towers fraudulently overstated its assets and income in order to get investors to buy the notes.

Ira Lee Sorkin, who represents Mr. Hoffenberg at Towers, could not be reached to comment yesterday. But in response to the SEC cases, Mr. Sorkin has pointed out that Towers has paid all interest and principal on its notes.

WALL STREET JOURNAL
02/11/93
AL


Printed on Recycled Paper
20% Post Consumer Waste

100TH STORY of Level 1 printed in FULL format.

Copyright 1993 Newsday, Inc.
Newsday

February 11, 1993, Thursday, CITY EDITION

SECTION: NEWS; Pg. 26

PAGE 37

Other Edition: Nassau Pg. 48, Suffolk Pg. 46

LENGTH: 444 words

HEADLINE: SEC Appeals to Freeze Hoffenberg's Assets

BYLINE: By David Henry. STAFF WRITER. Allan Sloan contributed to this story, which was supplemented by news service reports.

KEYWORD: SECURITIES AND EXCHANGE COMMISSION; STOCKS; INVESTMENT; FRAUD; STEVEN HOFFENBERG; NEW YORK POST; SALE; TOWERS FINANCIAL; LAWSUIT

BODY:
Securities and Exchange Commission lawyers yesterday stepped up their efforts to stop debt collector Steven Hoffenberg from buying the New York Post and spending money they believe should be saved for investors he allegedly cheated.

The SEC asked the Second Circuit Court of Appeals to freeze the assets of Hoffenberg and his Towers Financial Corp. immediately. The agency was appealing a decision by U.S. District Judge Whitman Knapp, who on Monday turned down the SEC's bid to freeze those assets. Knapp has scheduled a hearing on the request for Feb. 24, but Hoffenberg has said he intends to buy the Post by Feb. 19.

Part of the SEC's filing consists of a letter from Knapp dated yesterday saying that because the Post sale is scheduled to be completed before the freeze hearing, "it seems to me to have been a mistake to adjourn [the hearing] until after," according to current press reports, the deal will have become a fait accompli.

The SEC filed its appeal around 5 p.m. yesterday, too late in the day for the appeals court to take action. A hearing could be held as early as today.

Hoffenberg's lawyer, Ira Sorkin, couldn't be reached for comment.

A freeze would destroy Hoffenberg's chances of buying the struggling paper. Hoffenberg, whose questionable financial dealings have been widely reported, proposes to buy the Post by taking responsibility for some of its debts and agreeing to cover its losses, which are estimated to be as high as $1 million a month. He won't be able to meet those obligations if his assets are frozen.

The SEC's appeal follows the agency's filing on Monday of a civil lawsuit alleging that Hoffenberg's company fraudulently said it was profitable when it was actually losing huge sums of money. The SEC charges that Towers used the phony financial statements to mislead investors into buying more than $215 million in high-yielding debt securities.

Towers has sold an additional $200 million of securities that aren't covered by the SEC's suit, but which would be affected by any freeze.

---

Newsday, February 11, 1993

PAGE 38

In addition to the asset freeze, the SEC wants the courts to stop Towers from selling any more of its high-yield notes, some of which carry interest rates as high as 14 percent. The SEC charges that Towers, which says it uses the note proceeds to buy accounts receivable, actually uses the proceeds to cover its operating expenses, including paying interest on its existing notes.

In an unrelated action, attorney Martin Gold, trustee of a pension plan for his business, filed a class-action suit against Hoffenberg and Towers yesterday, claiming that Towers sold securities based on false information.

**EXHIBIT 23**

The Los Angeles Business Journal
Copyright Los Angeles Business Journal 1993
Monday, March 15, 1993
v15, n11, Section 1

## Class-action suit alleges Towers fraud in notes sale

By Benjamin Mark Cole

Los Angeles, CA, US --

A class-action suit has been filed in federal court in downtown Los Angeles against New York-based Towers Financial Corp. alleging fraud in the sale of $215 million of high-yield notes to more than 2,800 investors nationwide. Towers Financial, a collections and factoring agency, has splashed into national headlines of late, due to the bid of its owner, Steven Hoffenberg, to buy the New York Post, and due to a Securities and Exchange Commission lawsuit filed Feb. 18 against the company. The SEC alleged fraud and sought to freeze Towers Financial's assets. The SEC alleged that Towers has been losing money and doesn't have the money to honor the $215 million in notes, in part due to faulty accounting practices. For example, the SEC charged that Towers Financial purchased $10 million of our credit card debt from Bank of America for $200,000, and then booked a $4 million profit-despite never collecting a dime on the debts. According to the SEC, Towers Financial operated a massive Ponzi scheme (a fraudulent investor scheme in which earlier investors are paid artificially returns, financed from the proceeds garnered from later investors). Towers liabilities, at roughly $500 million, exceed its assets by $250 million. Towers Financial has hired New York lawyer Ira Sorkin, former regional SEC chief in New York, to defend against the SEC action. Hoffenberg was not available for comment last week, and no one else at the company would speak to the press, according to a receptionist at Towers Financial. The local suit, filed on March 1 on behalf of Southland investor Robert Dinsmore and all others similarly situated, is being brought by San Francisco-based law firm Lieff, Cabraser & Heimann. The Dinsmore suit alleges that Towers Financial has frozen all payments of principal and interest to the noteholders, in accordance with a court injunction won by the SEC, and Towers Financial has informed noteholders that the company is up for sale, according to the suit. "Plaintiff and the members of the class are thus not receiving interest under the notes, and may never recover the principal amounts they have invested," said the suit.

The suit alleges violations of the federal Racketeer Influenced and Corrupt Organizations Act, and thus seeks treble damages. The Dinsmore suit also names Monterey Bay Securities, a local brokerage house as a defendant.

Towers' Hoffenberg has been the topic of intense scrutiny in New York newspapers, due to his checkered history with regulatory agencies and his bid for the daily newspaper, the foundering New York Post. Insurance commissioners or regulatory agencies in two states have tangled with Hoffenberg regarding insurance companies he bought, and the SEC in 1987 sanctioned Towers Financial and Hoffenberg for selling unregistered securities that should have been registered. In California, Towers Financial was the subject of a state Department of Corporations investigation for two years, in connection with the sale of the $215 million in high-yield notes, which were unregistered, either with the state or the SEC. The notes did not have to be registered, if investors were limited to those exceeding certain net worth standards, and if the investors can be considered "sophisticated." The state investigation has been folded into the SEC action, according to Bill McDonald, chief of enforcement for state agency. Prior to the SEC action, several states, including Louisiana, barred Towers Financial from selling unregistered notes. But California allowed the sale of the notes, and as a result the state was probably Towers' largest market. In California, a Towers Financial subsidiary, Towers Collections, was in 1990 accused by the state of improperly keeping receivables it had obstensibly collected on behalf of clients, after a two-year-long state investigation. Mickey Kantor, of the prestigious Westside law firm Manatt, Phelps & Kantor, argued the case before a state administrative judge, on behalf of Towers. Deputy State Attorney General Antonio Merino handled the case for the state. Lisa Specht, onetime aspirant for the City of Los Angeles Attorney's Office, also represented Towers. In a nutshell, Towers promised to make good on money owed clients, to keep proper records, and to not break the law again, in a settlement with the state. The company kept its license, under a three-year-long probation. Kantor, a longtime bigwig in state Democratic party circles, has since been appointed the U.S. Trade Representative by President Clinton.

Corporate Detroit Magazine
Copyright Business Journal Publishing Co. 1993

Tuesday, June 1, 1993

v10, n7, Section 1

Shattered promises: How Towers Financial Corp. dazzled local investors and handed the Detroit pension fund a $50 million hit
By Lynn Waldsmith

Detroit, MI, US --

It was a classic "Ponzi" scheme that dazzled everyone from little old ladies to a prominent Detroit area millionaire. One woman from Bloomfield Township invested $15,000. A family from Bay City invested $1.8 million. Doctors, attorneys and other professionals from metro Detroit and outstate Michigan plunked down amounts of $50,000, $100,000, $200,000 and more. But the biggest loser of all is the Detroit General Retirement System pension fund--which invested a cool $50 million.

The investment should have sounded too good to be true. It promised double-digit returns at a time when interest rates on bank accounts and certificates of deposit had hit their lowest point in nearly 20 years. Nearly 3,000 people and institutions throughout the country jumped at the chance. The most notable metro Detroiter was Art Van Elslander, who invested $1.2 million.

The Detroit pension fund, still smarting from its $66 million investment in the Grand Traverse Resort, now under new management, invested $50 million in a New York firm that, according to the Securities and Exchange Commission (SEC), has perpetrated a massive fraud on investors. The company, Towers Financial Corp., recently filed for Chapter 11 bankruptcy protection.

Towers Financial is a giant debt collection agency based in New York City. A few years ago, Towers created Towers Health Care Receivables Funding Corp., a group of subsidiaries that targeted the hospital bill collection business.

Towers purchased health care receivables from hospitals and health care facilities, then repackaged the unpaid bills and sold them as notes to investors. Here's how it worked:

• Hospitals would sell their receivables to Towers for cash. In theory, Towers would buy low, collect high, and pocket the difference.

Copr. (C) West 1995 No claim to orig. U.S. govt. works

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

   - against -

TOWERS CREDIT CORPORATION
TOWERS FINANCIAL CORPORATION
STEVEN HOFFENBERG
ETON SECURITIES CORPORATION
MITCHELL BRATER,

        Defendants.

88 civ. 541 (SWK)

filed 8/4/88

COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") for its Complaint for injunctive and other equitable relief, alleges:

1.   Defendants Towers Credit Corporation ("Credit"), Towers Financial Corporation ("Financial"), Steven Hoffenberg ("Hoffenberg"), Eton Securities Corporation ("Eton"), and Mitchell Brater ("Brater") (collectively "Defendants") have engaged, and unless enjoined, are about to engage in acts and practices constituting violations of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c), (the Registration Provisions).

JURISDICTION AND VENUE

2.   The Commission brings this action to enjoin the aforementioned acts and practices pursuant to Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and for other equitable relief.

1

3.  This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. §77v(a).

4.  Certain of the alleged transactions, acts, practices, and courses of business, constituting violations of the Securities Act, have occurred within the Southern District of New York.

### DEFENDANTS

5.  **Credit**, with its principal offices located at 417 Fifth Avenue, New York, New York, was incorporated in New York in October 1962. Defendant Credit is engaged in the business of purchasing and servicing accounts receivable. Credit is a wholly owned subsidiary of Defendant Financial.

6.  **Financial**, with its principal offices located at 417 Fifth Avenue, New York, New York, was incorporated as O. G. Consulting Corporation in Nevada in June 1983. In June 1986 its name was changed to Financial. Defendant Financial, through its subsidiaries, is in the businesses of insurance and financial services, including collection services and accounts receivable financing.

7.  Defendant Financial is, and at all relevant times has been, a control person of defendant Credit, a wholly owned subsidiary of Financial, in that it has directed and has caused the direction of

2

Credit's business, and most or all of Credit's officers and directors are officers or directors of Financial.

8.  **Roffenberg**, age 41, has an office located at 417 Fifth Avenue, New York, New York. Defendant Roffenberg is, and at all relevant times has been, Chief Executive Officer and Chairman of the Board of Directors of both Defendant Financial and Defendant Credit.

9.  Defendant Roffenberg is, and at all relevant times has been, a control person of Financial and Credit in that he has directed and has caused the direction of Financial's and Credit's businesses, and controls approximately 80 per cent of Financial's common stock through a company wholly-owned by a trust of which he is a trustee.

10. **From**, with its principal offices located at 417 Fifth Avenue, New York, New York, was incorporated in New York in September 1985. Defendant Eton is a broker-dealer registered with the Commission and a member of the National Association of Securities Dealers.

11. Defendant Eton is, and at all relevant times has been, the exclusive distributor of the Notes described below.

12. **Braker**, age 46, has an office located at 417 Fifth Avenue,

3

New York, New York.  Defendant Brater is, and at all relevant times has been, the sole owner of Defendant Econ.

11.  Brater is, and since November 1987 has been, Vice-Chairman of the Board of Directors of both Financial and Credit.  Brater is, and at all relevant times has been, a control person of Econ, in that he has directed, and has caused the direction of, Econ's businesses; and, since November 1987 has been a control person of Financial and Credit.

## THE NOTE OFFERINGS

14.  In two offerings intended to raise $50 million each, Credit, as the issuer, and the other defendants have sold over $20 million in unregistered promissory notes (the "Notes") through Econ and a nation-wide network of approximately 80 brokers, to over 450 purchasers located in 30 states.  The Notes were sold to enable Credit to purchase accounts receivable for a factoring business.

15.  Pursuant to an offering memorandum dated October 17, 1986 (the "First Memorandum"), Defendants began to offer the Notes, through their sales representatives, in direct personal solicitation, through investment seminars, and through cold calls to potential investors.  Upon information and belief, between on or about October 17, 1986 and on or about March 8, 1988, these Notes were offered to over 300 persons.

16.  By March 8, 1988 over $15 million of these Notes had been sold to approximately 300 investors.  Many of the investors were financially unsophisticated and poorly situated to obtain or evaluate information about the investment quality of the Notes.

17.  The Notes sold in the first offering were all $10,000 in face amount, were to pay interest of 18% annually, payable monthly, and were to mature in two years.

18.  In February, 1988 Defendants began a second $50 million offering, pursuant to an offering memorandum dated January 26, 1988 ("the Second Memorandum"); and, upon information and belief, this offering continued until on or about July 22.

19.  By the end of April, 1988 the Defendants had offered to sell and sold over $5 million of notes pursuant to the Second Memorandum to over 150 investors.  Between April 28 and July 22, upon information and belief, Defendants offered to sell and sold an unknown additional amount of notes to an unknown number of investors.

20.  The Notes sold in the second offering were available in the $10,000, 14%, two-year form as well as in fractional amounts or at shorter maturities at lower interest rates.

4

5

21.  Initially, the proceeds received from the first offering were to be deposited into an Interim account (as defined in the First Memorandum), which together with accounts receivable purchased with these funds provided the sole source of funds for repayments of the Notes.  On September 1, 1987, Financial guaranteed payment of the Notes purchased thereafter, and in January, 1988, Financial guaranteed payment of the Notes purchased prior to September 1, 1987.

22.  Payment of the Notes offered pursuant to the Second Memorandum, according to its terms, were to be guaranteed by Financial, backed by Credit, and collateralized by accounts receivable purchased with the proceeds from the sale of the Notes.  A Special Account was to be used to receive the proceeds, purchase accounts receivable, and retire these Notes at maturity.

23.  According to both offering memoranda, the accounts receivable to be purchased with all Note proceeds were to be insured against non-collection by an insurance policy subject to a $150,000 deductible and to be paid for by Financial.

24.  According to the offering memoranda, Eton would earn 14% commissions if it sold the notes directly and the retailers would earn for their sales 10% commission, with Eton retaining 4%. These sales commissions were to be paid by Financial or Credit, not out of the Note proceeds.

25.  The Notes offered and sold pursuant to both the First and Second Memoranda were sold for the same consideration and were sold as part of a single plan of financing, namely the financing of Credit's accounts receivable factoring program.

CAUSE OF ACTION

VIOLATIONS OF SECTIONS 5(a) AND 5(c) OF
THE SECURITIES ACT, 15 U.S.C. §§ 77e(a)
AND 77e(c), OFFER, SALE, AND DELIVERY
AFTER SALE OF UNREGISTERED SECURITIES

26.  Plaintiff Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 25 above as fully set forth herein.

27.  During the period from on or about October 17, 1986 on in or about July 22, 1988, Defendants, singly and in concert, directly and indirectly, made use of the means and instruments of transportation or communication in interstate commerce, or of the mails, to offer for sale, sell, and deliver after sale to the public, the Notes in violation of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

28.  No registration statement under the Securities Act has ever been filed with, or declared effective by, Plaintiff Commission with respect to the offering of the Notes.

29. By reason of the foregoing, Defendants have violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), and unless enjoined will continue to engage in such acts and practices, or acts and practices of similar object and purpose.

WHEREFORE, Plaintiff Commission demands that this Court issue:

A.   A Preliminary Injunction and a Final Judgment of Permanent Injunction enjoining and restraining Defendants, their officers, agents, servants, employees, and attorneys-in-fact, and all persons in active concert or participation with them, directly or indirectly, singly or in concert, in the absence of any applicable statutory exemption, from:

(1)   making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell Credit securities, or any other securities, through the use or medium of any prospectus or otherwise unless and until a registration statement is in effect with the Commission as to such securities;

(2)   carrying or causing to be carried through the mails or in interstate commerce for the purpose of sale or delivery after sale Credit securities, or any other securities, unless and until a registration statement is in effect with the Commission as to such securities; or

(3)   making use of any means or instruments of transportation or communication in interstate commerce or of the mails to

offer to sell Credit securities, or any other securities, through the use or medium of any prospectus or otherwise, unless a registration statement has been filed with the Commission as to such securities, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act, 15 U.S.C. § 77(h);

in violation of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

B.   An Order directing Defendants Financial and Credit to make an offer of rescission to the purchasers of the Notes, within a period of time to be prescribed by the Court, and to report the results of such offer to the Commission's New York Regional Office.

C.   An Order directing Defendants Credit, Financial, Eton and Hoffenberg to account by affidavit to this Court and to Plaintiff Commission concerning the identity and address of each and every purchaser of the Notes and the amount of Notes purchased.

D.   An Order directing Defendants Financial and Credit to send to each purchaser of the Notes a copy of any Preliminary Injunction or Final Judgment of Permanent Injunction issued by the Court;

E. An Order, pending the Court's determination in the foregoing demand for a court-ordered offer of rescission and, pending final implementation of any such ordered relief, restraining Defendants Hoffenberg, Financial, and Credit, and their officers, agents, employees, servants, attorneys-in-fact, and those persons in active concert or participation with them, and each of them, from directly or indirectly:

(1) withdrawing, transferring, pledging, encumbering, assigning, dissipating, concealing, or otherwise dealing with or disposing of any funds in Credit's Interin or Special accounts, or any other proceeds of the sale of the Notes, in any manner:

(i) other than to pay interest on the Notes; and

(ii) which would make any preliminary or final order of this Court as to rescission ineffectual; or

(2) failing to deposit into Credit's Interin or the Special Accounts any funds collected, earned, or raised, directly or indirectly, from the purchase, servicing, or financing of any and all accounts receivable purchased, serviced, or financed with funds raised in the sale of Notes; or

(3) destroying, mutilating, concealing, altering, or disposing of any items, including but not limited to any books, records, documents, contracts, agreements, assignments, obligations, or other property of Financial or Credit, or relating to Financial or Credit, their subsidiaries or affiliates or any records maintained for such entities.

G. Such further relief as the Court deems appropriate under the circumstances.

Respectfully submitted,

_[signature]_

LAWRENCE IASON
Regional Administrator

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
7 World Trade Center
New York, New York 10278
Telephone Number: (212) 264-1636

Of Counsel:
Carmen J. Lawrence
Jason R. Gettinger
Dorothy Heyl
Andrew J. Geist

Dated:   New York, New York
         August 4, 1988

EXHIBIT 26

MICROFILM

NOV 21 1988    3:22 PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                                    Plaintiff,

        - against -

TOWERS CREDIT CORPORATION,
TOWERS FINANCIAL CORPORATION,
STEVEN HOFFENBERG,
ETON SECURITIES CORPORATION, and
MITCHELL BRATER,

                                    Defendants.

88 Civ. 5421 (SWK)

FINAL CONSENT
JUDGMENT OF
PERMANENT INJUNCTION
AND ORDER AS TO
DEFENDANTS CREDIT,
FINANCIAL, AND
HOFFENBERG

Plaintiff Securities and Exchange Commission ("Commission"),
having commenced this action by filing its Complaint on August 4,
1988, charging, among others, Towers Credit Corporation
("Credit"), Towers Financial Corporation ("Financial"), and Steven
Hoffenberg ("Hoffenberg"), with violations of Sections 5(a) and
5(c) of the Securities Act, 15 U.S.C. §§ 77e(c) and 77e(c) (the
Registration Provisions), and there having been no trial with
respect thereto, defendants Credit, Financial, and Hoffenberg
having admitted the jurisdiction of this Court over them and over
the subject matter of this action, and having waived the entry of
findings of fact and conclusions of law pursuant to Rule 52 of the
Federal Rules of Civil Procedure, and having consented solely for
the purposes of this action, without admitting or denying the
allegations contained in the plaintiff Commission's Complaint,
which consents are annexed hereto and incorporated herein, to the
entry without further notice, of this Final Consent Judgment of
Permanent Injunction and Order, and there being no just reason for

delay in the entry of this Final Consent Judgment of Permanent
Injunction and Order,

        IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendants
Credit, Financial, and Hoffenberg, and each of them, their
officers, agents, servants, employees, and attorney-in-fact while
these officers, agents, servants, employees, and attorney-in-fact
are acting in that capacity, and those persons in active concert
or participation with them, who receive actual notice of the order
by personal service or otherwise, and each of them, be and hereby
are permanently enjoined from, directly or indirectly, singly or
in concert, in the absence of any applicable statutory exemption:

        (1)  making use of any means or instruments of transportation
or communication in interstate commerce or of the mails to
sell credit securities, or any other securities, through
the use or medium of any prospectus or otherwise unless and
until a registration statement is in effect with the
Commission as to such securities;

        (2)  carrying or causing to be carried through the mails or
in interstate commerce for the purpose of sale or delivery
after sale Credit securities, or any other securities,
unless and until a registration statement is in effect with
the Commission as to such securities; or

        (3)  making use of any means or instruments of transportation
or communication in interstate commerce or of the mails to

                                    2

offer to sell Credit securities, or any other securities, through the use or medium of any prospectus or otherwise, unless a registration statement has been filed with the Commission as to such securities, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act, 15 U.S.C. § 77(h):

in violation of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

II

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that defendants Credit and Financial make an offer of rescission ("offer") to each purchaser of unregistered promissory notes offered and sold by Credit under a private placement memorandum dated October 17, 1986, and under a private placement memorandum dated January 20, 1988 ("Notes"). The offer shall be implemented in a manner to be determined by further order of this Court. Pending such further order:

1.   Not more than 30 calendar days from the entry of this Order, defendants Credit and Financial shall mail the offer to each and every purchaser of the notes;

2.   The offer shall be in a form acceptable to the Commission's staff and the settling parties and shall refer

3

to and describe this Final Consent Judgment and Permanent Injunction and Order;

3.   The offer shall be mailed by certified mail, return receipt requested with a return coupon and postpaid return envelope;

4.   The offer shall provide that it must be accepted or rejected by a particular note purchaser in writing post-marked within 15 calendar days of its receipt, or, there-after, expire;

5.   Not more than 30 calendar days from the expiration of the offer, the parties shall jointly submit to the Court a plan ("the plan") specifying the manner by which the rescission will be implemented, including the dates upon which Credit and Financial shall make the first, subsequent and final payments to participating note purchasers. The plan shall provide for final payment to all participating note purchasers rateably no later than one year from adoption of the plan by this Court; provided, however, that this order shall not preclude Credit and Financial from seeking to modify this Order, upon good cause shown, to extend the length of time to make payment. For purposes of this sub-paragraph the expiration date shall mean 15 calendar days from the date upon which owners of 80% of all outstanding face amount of notes received the offer, as indicated by the certified mail return receipt;

6.   Credit shall immediately advise the Commission of the expiration date, as defined above, and shall furnish to it

4

copies of all rescission acceptances, proof of mailing of all offers, and copies of all responses and return receipts;

7. The offer shall provide that participating note purchaser shall receive, in exchange for their notes and a release to Credit and Financial, the face or principal amount of the note, plus simple interest, less any income in the form of monthly interest payments received by the purchaser. Interest shall be provided for by the plan and shall be based upon money market rates to be determined by the Court and shall be measured against principal outstanding from the date of purchase to the date or dates of payment to the purchaser under the plan to be adopted by the Court.

8. Note purchasers accepting the offer of rescission shall, at the defendants' request, execute and return a general release of the defendants, their officers, directors, employees, representatives and agents. Each release shall be held in escrow by Ira Lee Sorkin, Esq. and only released from escrow upon the filing with the Court of a verification by Credit and Financial that the note holder who executed the release has been paid in full according to the plan of rescission.

9. Nothing herein shall be construed to limit the remedies at law or equity of any note purchaser electing not to participate in the rescission, nor to limit any defense that may be asserted by the parties.

III

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that defendant Credit shall, within 15 calendar days of the entry of this order, provide a report verified by an officer of Credit to this Court and to the plaintiff Commission's New York Regional Office concerning the identity, date of purchase, address of each purchaser, face amount of Notes purchased and rate of interest, for each and every sale of Notes.

IV

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, pending the entry of this Court's further order regarding the plan of rescission, defendants Credit, Financial, and Kottenburg, and each of them, and their officers, agents, employees, servants, attorneys-in-fact, and those persons in active concert or participation with them, and each of them, be and hereby are restrained from, singly or in concert, directly or indirectly:

(1) withdrawing, transferring, pledging, encumbering, assigning, dissipating, concealing, or otherwise dealing with or disposing of any funds in the Towers Credit Corporation Special Account, maintained at the Chase Manhattan Bank, N. A., account number 020-1-133982, the Towers Credit Corporation Special Account (money market with checks), maintained at the Chase Manhattan Bank, N. A., account number 020-1-133323 (together the "Special Accounts"), or any other accounts into which proceeds of the sale of Notes have been deposited, to the extent of such proceeds, or other proceeds

of the sale of Notes, or any account receivable purchased or financed with such Note proceeds in any manner other than:

(i) to pay interest on the Notes; or

(ii) to pay principal on matured Notes; or

(iii) to purchase or finance accounts receivable;

(2) failing to deposit into either of the Special Accounts any funds collected, earned, or raised, directly or indirectly, from the purchase, servicing, or financing of any and all accounts receivable purchased, serviced, or financed with Note proceeds, which funds, after being so deposited, may be expended consistently with sub-paragraph (1)(i), (ii), and (iii), above provided, however, that the excess profits, as defined in the Note offering memorandum, may be used for working capital; or

(3) destroying, mutilating, concealing, altering or disposing of any item, including but not limited to any books, records, documents, contracts, agreements, assignments, obligations, or other property of financial or credit, or relating to financial or credit, their subsidiaries or affiliates or any records maintained for such entities;

provided, however, that Credit and Financial shall file evidence with the court within 48 hours that they have established and funded an escrow account in the amount of $2.5 million, to further secure the offering proceeds, or have purchased a surety bond or

7

obtained a letter of credit, from an entity unaffiliated with Financial, or any combination of escrowed funds, surety bond, or letter of credit in such amount, pending the further direction of the Court upon adoption of the plan of rescission.

V

IT IS FURTHER ORDERED that pending full implementation of the plan of rescission and the completion of the rescission, Credit shall comply with its undertaking to provide the Commission's staff with verified monthly documentation of its inventory of accounts receivable purchased or financed with Note proceeds. Such documentation shall contain the following: the account name and opening balance (which will reflect separately) submitted accounts, collateral accounts or collection accounts), the collection date, discount rate, fee rate, profit and/or expected profit. Credit shall further provide monthly bank statements of the Special Accounts. The first such monthly documentation and bank statement production shall be on or before November 15, 1988. Credit shall also permit the Commission's staff to inspect and copy the documents underlying the verified monthly documentation, including underlying factoring or financing contracts, and all credit books and records pertaining to the utilization of all Note proceeds since the inception of Credit's Note program, upon reasonable notice to Credit's counsel. All documents produced by Credit to the staff shall be deemed confidential trade information and shall not be made available to third parties except upon further order of the Court after notice to the parties and oppor-

8

tunity for a hearing; provided, however, that plaintiff Commission is not precluded from taking or instituting any other action or proceeding or referring such matter and documents to any appropriate person or entity which plaintiff Commission is authorized to do at law or any statutes, rules, or regulation it administers, without notice or opportunity for a hearing.

VI

IT IS FURTHER ORDERED that this Court shall retain jurisdiction over this matter for all purposes, including jurisdiction over any additional claims for relief any party may wish to plead in the future, as well as carrying out, modifying, clarifying, and enforcing this Judgment and Order and the plan.

VII

IT IS FURTHER ORDERED that there being no just reason for delay, the Clerk of the Court is hereby directed to enter this Final Consent Judgment of Permanent Injunction and Order pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

Dated:    New York, New York
, 1998

_____
UNITED STATES DISTRICT JUDGE

A TRUE COPY
RAYMOND F. BURGHARDT, Clerk

THIS DOCUMENT WAS ENTERED

---

CONSENT BY DEFENDANT
TOWERS CREDIT CORPORATION

I

Defendant Towers Credit Corporation ("Credit"), having read and understood the terms of the annexed Final Consent Judgment of Permanent Injunction and Order ("Final Judgment"), appears and admits to the in personam jurisdiction of this Court and to the jurisdiction of the Court over the subject matter of this action, waives the filing of Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure ("F.R.C.P.") and consents, without admitting or denying the allegations contained in the Complaint of plaintiff Securities and Exchange Commission ("Commission"), to the entry, without further notice, of the annexed Final Judgment.

II

Defendant Credit agrees that this Consent shall be incorporated by reference in and made part of the Final Judgment to be entered against it and filed simultaneously herewith.

III

Defendant Credit waives any right it may have to appeal from the annexed Final Judgment.

1

IV

Defendant Credit enters into this Consent voluntarily and acknowledges that no tender, offer, promise or threat of any kind has been made by plaintiff Commission or any member, officer, agent, or representative thereof to induce its entering into this Consent.

V

Defendant Credit acknowledges that it has been informed that settlement of this action does not preclude plaintiff Commission at its sole or exclusive discretion from taking or instituting any other action or proceeding which plaintiff Commission is authorized to do at or law or under any statute, rules, or regulations it administers.

VI

Notwithstanding entry of this Final Judgment against it in this matter, defendant Credit consents to continue being treated as a party to this action solely for the purpose of enabling plaintiff Commission to seek discovery from it in connection with this case without court order or the necessity of a subpoena, subject to any privileges or rights recognized by law or the Federal Rules of Civil Procedure.

2

VII

Defendant Credit acknowledges that a willful violation of any of the terms or provisions of the Final Judgment may place it in contempt of this Court and subject Credit to civil or criminal sanctions.

VIII

Defendant Credit further consents that this Court shall retain jurisdiction in this matter for all purposes, including jurisdiction over any additional claims for relief any party may wish to plead in future, as well as carrying out, modifying, clarifying, or enforcing the Judgment and Order and plan of reacission.

IX

Defendant Credit hereby represents that as of October 14, 1988 it held in excess of $ 40 million in receivables, according to the business plan as set forth in its offering memorandum, for which Credit paid or advanced in excess of $ 30 million, acquired in bona fide, arms length factoring or financing transactions with the proceeds of the sales of its 1988 and 1988 Notes, and excluding any accounts for which Credit has only the right to seek collection for a fee. Credit hereby undertakes to provide the Commission's staff with verified monthly documentation of its inventory, or accounts receivable purchased or financed with Note proceeds. Such documentation shall contain the following: the

3

account name and opening balances (which will reflect separately submitted accounts, collateral accounts or collection accounts), the collection date, discount rate, fee rate, profit and/or expected profit. Credit shall further provide monthly bank statements of the Special accounts. The first such monthly documentation and bank statement production shall be on or before November 15, 1988. Credit shall also permit the Commission's staff to inspect and copy the documents underlying the verified monthly documentation, including underlying factoring or financing contracts, and all Credit books and records pertaining to the utilization of all Note proceeds since the inception of Credit's Note program, upon reasonable notice to Credit's counsel. All documents produced by Credit to the staff shall be deemed confidential trade information and shall not be made available to third parties except upon further order of the Court after notice to the parties and opportunity for a hearing; provided, however, that the plaintiff Commission is not precluded from taking or instituting any other action or proceeding or referring such matter and documents to any appropriate person or entity which plaintiff Commission is authorized to do at law or any statutes, rules, or regulations it administers, without notice or opportunity for a hearing.

X

Defendant Credit further acknowledges that this consent, and a letter to noteholders which the parties will submit to the Court, embody the entire understanding of the parties.

XI

Defendant Credit hereby consents and agrees that the annexed Final Judgment may be presented by the Commission to the Court for signature and entry without further notice or delay.

TOWERS CREDIT CORPORATION

By: _____
STEVEN ROFFENBERG
Chairman and Chief Executive
Officer

STATE OF NEW YORK   )
                    )   ss:
COUNTY OF NEW YORK   )

On this 17th day of October, 1988, before me personally appeared Steven Roffenberg to me known to be the person who executed the foregoing Consent on behalf of Towers Credit Corporation.

_____
NOTARY PUBLIC

Dated:   New York, New York
         October 17, 1988

ACKNOWLEDGED BY:
_____
Counsel to Defendant

## CORPORATE RESOLUTION

I, Michael Ricci, Asst. Secretary of TOWERS CREDIT CORPORATION hereby certify that the following Resolution was duly adopted by the Board of Directors of TOWERS CREDIT CORPORATION on October 17, 1988.

RESOLVED, that Steven Hoffenberg, Chairman and Chief Executive Officer of Towers Credit Corporation be and is hereby authorized on behalf of said corporation in the action captioned SEC v. TOWERS CREDIT CORPORATION, et al., United States District Court, Southern District of New York [81] civil action, to admit the jurisdiction of the Court, waive findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, and consent to the entry, without further notice, of a final consent form Judgment of Permanent Injunction and Order in the form annexed hereto against said corporation, without admitting or denying the allegations contained in the complaint by the Securities and Exchange Commission.

Dated:
New York, New York
October 17, 1988

(CORPORATE SEAL)

_____
Asst. Secretary

---

## CONSENT BY DEFENDANT
## TOWERS FINANCIAL CORPORATION

Defendant Towers Financial Corporation ("Financial"), having read and understood the terms of the annexed Final Consent Judgment of Permanent Injunction and Order ("Final Judgment"),

### I

appears and admits to the jurisdiction of the Court over the subject matter of this action, waives the filing of Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure (Fr.R.C.P.) and consents, without admitting or denying the allegations contained in the complaint of plaintiff Securities and Exchange Commission ("Commission"), to the entry, without further notice, of the annexed Final Judgment.

### II

Defendant Financial agree that this Consent shall be incorporated by reference in and made part of the Final Judgment to be entered against it and filed simultaneously herewith.

### III

Defendant Financial waives any right it may have to appeal from the annexed Final Judgment.

### IV

Defendant Financial enters into this Consent voluntarily and acknowledges that no tender, offer, promise or threat of any kind has been made by plaintiff Commission or any member, officer, agent, or representative thereof to induce its entering into this Consent.

Defendant Financial acknowledges that it has been informed that settlement of this action does not preclude plaintiff commission at its sole or exclusive discretion from taking or instituting any other action or proceeding which plaintiff commission is authorized to do at law or under any statutes, rules, or regulations it administers.

VI

Notwithstanding entry of this Final Judgment against it in this matter, defendant Financial consents to continue being treated as a party to this action solely for the purpose of enabling plaintiff Commission to seek discovery from it in connection with this case without Court order or the necessity of a subpoena, subject to any privileges or rights recognized by law or the Federal Rules of Civil Procedure.

VII

Defendant Financial acknowledges that a willful violation of any of the terms or provisions of the Final Judgment may place it in contempt of this Court and subject Financial to civil or criminal sanctions.

VIII

Defendant Financial further consents that this Court shall retain jurisdiction in this matter for all purposes, including jurisdiction over any additional claims for relief any party may wish to plead in future, as well as carrying out, modifying, clarifying, or enforcing the Judgment an Order and plan of rescission.

2

IX

Defendant Financial further acknowledges that this Consent embodies the entire understanding of the parties.

X

Defendant Financial hereby consents and agrees that the annexed Final Judgment may be presented by the commission to the Court for signature and entry without further notice or delay.

TOWERS FINANCIAL CORPORATION

By: _____

STATE OF NEW YORK )
COUNTY OF NEW YORK ) ss:

On this 17th day of October, 1988, before me personally appeared _____ to me known to be the person who executed the foregoing Consent on behalf of Towers Financial Corporation.

_____
NOTARY PUBLIC

Dated: New York, New York
October 17, 1988

ACKNOWLEDGED BY:

_____
Counsel to Defendant

3

## CONSENT BY DEFENDANT STEVEN HOFFENBERG

### I

Defendant Steven Hoffenberg ("Hoffenberg"), having read and understood the terms of the annexed Final Consent Judgment of Permanent Injunction and Order ("Final Judgment"), appears and admits to the in personam jurisdiction of this Court and to the jurisdiction of the Court over the subject matter of this action, waives the filing of Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure ("F.R.C.P.") and consents, without admitting or denying the allegations contained in the complaint of plaintiff Securities and Exchange Commission ("Commission"), to the entry, without further notice, of the annexed Final Judgment.

### II

Defendant Hoffenberg agrees that this Consent shall be incorporated by reference in and made part of the Final Judgment to be entered against him and filed simultaneously herewith.

### III

Defendant Hoffenberg waives any right he may have to appeal from the annexed Final Judgment.

### IV

Defendant Hoffenberg enters into this Consent voluntarily and acknowledges that no tender, offer, promise or threat of any kind has been made by plaintiff Commission or any member, officer, agent, or representative thereof to induce his entering into this Consent.

---

## CORPORATE RESOLUTION

I, Michael Knott, Assistant Secretary of TOWERS FINANCIAL CORPORATION hereby certify that the following Resolution was duly adopted by the Board of Directors of TOWERS FINANCIAL CORPORATION on _____, 1988.

RESOLVED, that _____ Chairman of Towers Financial Corporation be and is hereby authorized on behalf of said corporation in the action captioned SEC v. Towers Financial Corporation, et al., United States District Court, Southern District of New York (88 Civil ____), to admit the jurisdiction of the Court, waive findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure and consent to the entry, without further notice, of a Final Consent Judgment of Permanent Injunction and Order in the form annexed hereto against said corporation without admitting or denying the allegations contained in the Complaint by the Securities and Exchange Commission.

Dated:   New York, New York
October 7, 1988

(CORPORATE SEAL)

Assistant Secretary

V.

Defendant Hoffenberg acknowledges that he has been informed that settlement of this action does not preclude plaintiff Commission at its sole or exclusive discretion from taking or instituting any other action or proceeding which plaintiff Commission is authorized to do at law or under any statutes, rules, or regulations it administers.

VI.

Notwithstanding entry of this Final Judgment against him in this matter, defendant Hoffenberg consents to continue being treated as a party to this action solely for the purpose of enabling plaintiff Commission to seek discovery from him in connection with this case without Court order or the necessity of a subpoena, subject to any privileges or rights recognized by law or the Federal Rules of Civil Procedure.

VII.

Defendant Hoffenberg acknowledges that a willful violation of any of the terms or provisions of the final Judgment may place him in contempt of this Court and subject his to civil or criminal sanctions.

VIII.

Defendant Hoffenberg further consents that this Court shall retain jurisdiction in this matter for all purposes, including jurisdiction over any additional claims for relief any party may wish to plead in future, as well as carrying out, modifying, clarifying, or enforcing the Judgment and Order and plan of reascission.

2

IX.

Defendant Hoffenberg further acknowledges that this Consent embodies the entire understanding of the parties.

X.

Defendant Hoffenberg hereby consents and agrees that the annexed Final Judgment may be presented by the Commission to the Court for signature and entry without further notice or delay.

_____
STEVEN HOFFENBERG

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF NEW YORK   )

On this 17th day of October, 1996, before me personally appeared Steven Hoffenberg to me known to be the person who executed the foregoing Consent.

Dated:   New York, New York
         October 17, 1996

_____
NOTARY PUBLIC

ACKNOWLEDGED BY:
STROOCK & STROOCK & LAVAN

by _____
Counsel to Defendant

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

    - against -

TOWERS CREDIT CORPORATION,
TOWERS FINANCIAL CORPORATION,
STEVEN HOFFENBERG,
ETON SECURITIES CORPORATION, and
MITCHELL BRATER,

    Defendants.

88 Civ. 5469 (CES)

FILED

FINAL CONSENT
JUDGMENT OF, D OF N
PERMANENT INJUNCTION
AS TO DEFENDANTS
ETON SECURITIES CORP.
AND MITCHELL BRATER

Plaintiff Securities and Exchange Commission ("Commission") having commenced this action by filing its complaint on August 4, 1988, charging, among others, Eton Securities Corporation ("Eton") and Mitchell Brater ("Brater"), with violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c) (the Registration Provisions), and there having been no trial with respect thereto; defendants Eton and Brater having admitted the jurisdiction of this Court over them and over the subject matter of this action, and having waived the entry of Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, and having consented, without admitting or denying the allegations contained in the plaintiff Commission's complaint, which consents are annexed hereto and incorporated herein, to the entry without further notice, of this Final Consent Judgment of Permanent Injunction and Order, and there being no just reason for delay in the entry of this Final Consent Judgment of Permanent Injunction and Order,

any public proceeding or examination under Section 8(e) of the Securities Act, 15 U.S.C. § 77(h);

in violation of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

II

IT IS FURTHER ORDERED that this Court shall retain jurisdiction over this matter for all purposes.

III

IT IS FURTHER ORDERED that there being no just reason for delay, the Clerk of the Court is hereby directed to enter this Final Consent Judgment of Permanent Injunction and Order pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

Dated:   New York, New York
      April 27, 1989

UNITED STATES DISTRICT JUDGE

CONSENT BY DEFENDANT
MITCHELL BRATER

I

Defendant Mitchell Brater ("Brater"), having read and understood the terms of the annexed Final Consent Judgment of Permanent Injunction ("Final Judgment"), appears and admits to the in personam jurisdiction of this Court and to the jurisdiction of the court over the subject matter of this action, waives the filing of Findings of Fact and Conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure ("F.R.C.P.") and consents, without admitting or denying the allegations contained in the Complaint of plaintiff Securities and Exchange Commission ("Commission"), to the entry, without further notice, of the annexed Final Judgment.

II

Defendant Brater agrees that this Consent shall be incorporated by reference in and made a part of the Final Judgment to be entered against his and filed simultaneously herewith.

III

Defendant Brater waived any right he may have to appeal from the annexed Final Judgment.

IV

Defendant Brater enters into this Consent voluntarily and acknowledges that no tender, offer, promise or threat of any kind has been made by plaintiff Commission or any member, officer, agent or representative thereof to induce his entering into this Consent.

V

Defendant Brater acknowledges that he has been informed that settlement of this action does not preclude plaintiff Commission, at its sole or exclusive discretion, from taking or instituting any other action or proceeding which plaintiff Commission is authorized to do at law or under any statutes, rules, or regulations it administers.

VI

Defendant Brater acknowledges that a willful violation of any of the terms or provisions of the Final Judgment may place his in contempt of this Court and subject his to civil or criminal sanctions.

VII

Defendant Brater further consents that this Court shall retain jurisdiction in this matter for all purposes.

VIII

Defendant Brater further acknowledges that this Consent embodies the entire understanding of the parties, except that Brater has proffered to the Commission an Offer of Settlement of anticipated Administrative Proceedings and the Commission's counsel has undertaken not to submit this Consent to the Court unless and until the Commission accepts such Offer of Settlement.

MITCHELL BRATER

STATE OF NEW YORK )
                  ) ss:
COUNTY OF NEW YORK )

On this 10th day of January, 1989, before me person-ally appeared Mitchell Brater to me known to be the person who executed the foregoing Consent.

NOTARY PUBLIC

Dated:  New York, New York
        January 10, 1989

ACKNOWLEDGED BY:

Counsel to Defendant

- 3 -

---

CONSENT BY DEFENDANT
ETON SECURITIES CORPORATION

1

Defendant Eton Securities Corporation ("Eton"), having read and understood the terms of the annexed Final Consent Judgment of Permanent Injunction ("Final Judgment"), appears and admits to the _in personam_ jurisdiction of this Court and to the jurisdiction of the court over the subject matter of this action, waives the filing of Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure ("F.R.C.P.") and consents, without admitting or denying the allegations contained in the Complaint of plaintiff Securities and Exchange Commission ("Commission"), to the entry, without further notice, of the annexed Final Judgment.

II

Defendant Eton agrees that this Consent shall be incorporated by reference in and made a part of the Final Judgment to be entered against it and filed simultaneously herewith.

III

Defendant Eton waived any right it may have to appeal from the annexed Final Judgment.

IV

Defendant Eton enters into this Consent voluntarily and acknowledges that no tender, offer, promise or threat of any kind has been made by plaintiff Commission or any member, officer, agent or representative thereof to induce its entering into this Consent.

V

Defendant Eton acknowledges that it has been informed that settlement of this action does not preclude plaintiff Commission, at its sole or exclusive discretion, from taking or instituting any other action or proceeding which plaintiff Commission is authorized to do at law or under any statutes, rules, or regulations it administers.

VI

Defendant Eton acknowledges that a willful violation of any of the terms or provisions of the Final Judgment may place it in contempt of this Court and subject Eton to civil or criminal sanctions.

VII

Defendant Eton further consents that this Court shall retain jurisdiction in this matter for all purposes.

- 2 -

VIII

Defendant Eton further acknowledges that this Consent embodies the entire understanding of the parties, except that Eton has proffered to the Commission an Offer of Settlement of anticipated Administrative Proceedings and the Commission's counsel has undertaken not to submit this Consent to the Court unless and until the Commission accepts such Offer of Settlement.

ETON SECURITIES CORPORATION

By: _____
MITCHELL BRATER

A TRUE COPY
ATTEST: LOUIS J. MANDRIANO

By: _____
Deputy Clerk

STATE OF NEW YORK )
                  ) ss:
COUNTY OF NEW YORK )

On this 10th day of January 1989, before me personally appeared Mitchell Brater, to me known to be the person who executed the foregoing Consent on behalf of Eton Securities CORPORATION.

[NOTARY PUBLIC]

ACKNOWLEDGED BY:
_____
Counsel to Defendant

- 3 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

TOWERS FINANCIAL CORPORATION,
STEVEN HOFFENBERG,
MITCHELL BRATER and
ARTHUR J. FERRO,

Defendants.

93 Civ.   (744)WK

COMPLAINT

## PRELIMINARY STATEMENT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint,
alleges that:

1.      This case involves the ongoing and fraudulent sale of unregistered debt
securities to more than 2,800 investors in amounts totalling more than $215 million. The
sales were made in violation of a prior injunction issued by this Court in 1988, and
facilitated through the means of egregiously false and misleading statements concerning (a)
defendant Towers Financial Corporation's ("Towers") financial condition and results of
operations, (b) the risk of buying the securities and (c) Towers' use of the proceeds from the
sale of the securities. Many of the investors to whom the securities were sold are widowed,
retired or disabled -- investors whom the registration process is intended to protect. These
and other investors were induced to purchase the securities through, among other means,
fraudulent prepared financial statements which overstated Towers' assets, shareholders'
equity, and net income by staggering amounts.  Thousands of millions of dollars of innocent
investor funds have been raised in this manner and much of it remains unaccounted for to
this day.

2.      Defendants Towers, Steven Hoffenberg ("Hoffenberg"), and Mitchell Brater

("Brater"), directly and indirectly, have engaged, are continuing to engage in, transactions, acts, practices and courses of business that constitute violations of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c)].

3.   Towers, Hoffenberg, Brater, and Arthur Ferro ("Ferro") (collectively "the Defendants"), directly and indirectly, have engaged, are continuing to engage, and are about to engage in, transactions, acts, practices and courses of business that constitute violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), [15 U.S.C. § 78(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

4.   Unless the Defendants are restrained and enjoined, they will continue to engage in the transactions, acts, practices, and courses of business set forth in this Complaint and in transactions, acts, practices, and courses of business of similar type and object.

## JURISDICTION AND VENUE

5.   The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], permanently to enjoin the Defendants from engaging in the transactions, acts, practices, and courses of business as are more fully described herein, and to have the court ordered appointment of a special master, an asset freeze, an accounting, expedited discovery, an order prohibiting the destruction of documents, and disgorgement. With respect to illegal conduct occurring after October 15, 1990, the Commission also seeks penalties and prohibitions pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

6.   This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15

2

U.S.C. §§ 77u(e), 78aa].

7.   The Commission, pursuant to authority conferred upon it by Section 19(b) and 23(a) of the Exchange Act [15 U.S.C. §§ 78(b), 78w(a)] has promulgated Rule 10b-5 [17 C.F.R. § 240.10b-5]. Rule 10b-5 was in effect at the time of the transactions alleged in this Complaint and is now in effect.

8.   The Defendants, directly and indirectly, made use of the means or instruments of transportation and communication in interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein and certain of the transactions, acts, practices and courses of business have occurred and are now occurring within the jurisdiction of the United States District Court for the Southern District of New York, including the offer and sale of unregistered securities by means of materially false and misleading statements and omissions.

## THE DEFENDANTS

9.   Towers Financial Corporation is a Delaware corporation with its principal place of business in New York, New York. Towers has two operating subsidiaries: Towers Credit, which is engaged in the purchase of commercial accounts receivable, and Towers Collection Services, Inc. ("TCS"), which is engaged in the collection of past-due receivable for third parties on a contingency basis. Towers also conducts business operations, such as the purchase of certain receivables. In addition, Towers has five subsidiaries, incorporated in Delaware, that specialize in factoring healthcare receivables, Towers Healthcare Receivables Funding Corporation and Towers Healthcare Receivables Funding Corporations II, III IV, and V (collectively the "THRFC Bond Funds"). By June 30, 1992, the THRFC Bond Funds had raised approximately $196 million through offerings of debt securities for the purpose of buying healthcare accounts receivable. Investors in the THRFC Bond Funds either owned outright, or had a perfected security in, all of such healthcare receivables.

10.   Towers' common stock trades over the counter and is not listed on the

3

National Association of Securities Dealers Automatic Quotation System or any exchange. Towers does not file periodic reports with the Commission under the provisions of the Exchange Act.

11. On August 4, 1988, the Commission filed an injunctive action alleging violation of Section 5 of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)], captioned SEC v. Towers Credit Corporation, Towers Financial Corporation, Steven Hoffenberg, Elton Securities Corp., and Mitchell Brater, 88 Civ. [?]21 (SWK). A Final Consent Judgment of Permanent Injunction and Order as to Towers Credit Corporation ("Towers Credit"), Towers, and Hoffenberg was entered on November 16, 1988 and, as to Brater, on May 12, 1989 (the "Injunction"). Towers, Hoffenberg, and Brater are bound by the Injunction from violating Section 5 of the Securities Act.

12. Steven Hoffenberg a/k/a Barry Cohen, age forty-eight, is the chief executive officer, president and chairman of the board of Towers. Through the Hoffenberg Family Trust, of which Hoffenberg is the sole trustee, and Professional Business Brokers ("PBBI"), which is a corporation owned by the Hoffenberg Family Trust, Hoffenberg is the controlling shareholder of Towers. Hoffenberg lives in New York, New York.

13. Mitchell Brater, age fifty-one, is the vice chairman of the board of Towers and has responsibility for marketing the Towers promissory notes (the "Notes") through a nationwide network of registered broker-dealers. Brater lives in New York, New York.

14. Arthur J. Ferro, age fifty-one, heads Towers' accounting department, and prepares, directly or indirectly, Towers' books and records and financial statements. An independent contractor, Ferro provides services through his one-man accounting firm, Ferro & Broderick, which has no offices other than at Towers' headquarters, and in Ferro's residence in Valley Stream, New York. Ferro was once licensed as a CPA by the State of New York, but his registration statement is no longer active.

15. Hoffenberg, as chief executive officer, president and chairman of the board of

Towers, directed and controlled the actions and practices of Towers, Brater, and Ferro.

### THE UNREGISTERED OFFERING AND SALE OF SECURITIES

16. Beginning in at least February 1989, and continuing through the present, Towers, Hoffenberg, and Brater, in violation of the Injunction, have been engaged in an unregistered offering and sale of securities, namely, over $215 million in Notes. No registration statement was or is in effect as to such securities and no exemption from registration was or is available.

17. Towers sold the Notes pursuant to five separate offering memoranda, which are part of a single integrated offering. Towers sold approximately $35 million in Notes pursuant to an offering memorandum dated February 15, 1989 (the "February 1989 offering memorandum"); approximately $49 million in Notes pursuant to an offering memorandum dated February 20, 1990 (the "February 1990 offering memorandum"); approximately $76 million in Notes pursuant to an offering memorandum dated October 1, 1990 (the "October 1990 offering memorandum"); approximately $39 million in Notes pursuant to an offering memorandum dated October 15, 1991; and an uncertain amount pursuant to an offering memorandum dated March 23, 1992 (collectively, hereinafter referred to as the "offering memoranda"). The Notes were the same class of securities, sold for the same consideration and part of a single plan of financing.

18. Towers' sold the Notes pursuant to a purported exemption from registration under Section 4(2) of the Securities Act (transactions by an issuer not involving a public offering) and of Regulation D (exemption for limited offers and sales).. The Notes are for terms of one or two years, with interest rates ranging from 12% to 14%, per annum, and 14% to 16%, per annum, respectively.

19. Brater, and other employees of Towers acting at Brater's direction, have solicited registered broker-dealers to market the Notes. Brater, or others acting at his direction, has mailed over 25,000 offering memoranda to over 2,000 broker-dealers for the

purpose of having the broker-dealers offer the Notes to potential investors. At least sixty broker-dealers, in at least sixteen states, have sold the Notes to their customers. Some of these broker-dealers have purchased Notes for themselves or family members.

20. The Notes have been offered and sold to thousands of persons and entities, who reside in at least 40 states. Many of the investors are unsophisticated, and are living on fixed incomes. More than 35 of the investors are individual investors with net assets of less than $1 million at the time they purchased the Notes and annual income of less than $200,000 in each of the two years prior to their purchase, or not-for-profit organizations, defined benefit plans and trusts with assets of under $5 million at the time of their investment.

21. As set forth in paragraphs 23 through 66 below, Towers has not distributed to the Note investors certain accurate registration-type information material to an understanding of Towers', its business, and the Notes, as required by Securities Act Rule 502 [17 C.F.R. § 230.502] and Regulation S-K.

22. As of June 30, 1992, Towers had $198 million in Notes outstanding.

MISREPRESENTATIONS BY TOWERS OF ITS FINANCIAL CONDITION

23. Towers' Annual Reports for fiscal years 1988, 1989, 1990, 1991, distributed to investors and potential investors, contained false and misleading financial statements which portrayed Towers as a financially successful and secure company when, in fact, each year it was incurring greater losses. Through these false and misleading financial statements, Towers deceived investors into investing in the Notes and in rolling over their investments into new Notes as Notes matured.

24. In the financial statements for fiscal years ended on June 30, 1988 ("FY 1988"), June 30, 1989 ("FY 1989"), June 30, 1990 ("FY 1990"), and June 30, 1991 ("FY 1991"), Towers grossly overstated its total assets (due to inflated accounts receivable, net income (due to inflated fee income) and shareholders' equity, in violation of generally

accepted accounting principals ("GAAP"), as follows:

a. In FY 1988, Towers reported net income of $1.4 million when, in fact, Towers had incurred a loss of approximately $16 million; total assets of $76 million when, in fact, Towers had assets of $48 million or less; and shareholder's equity of $6.5 million when, in fact, Towers had a deficit of approximately $11 million;

b. In FY 1989, Towers reported net income of $3.5 million when, in fact, Towers had incurred a loss of approximately $24 million; total assets of $122 million when, in fact, Towers had assets of $21 million or less, and shareholder's equity of $10.3 million when, in fact, Towers had a deficit of approximately $35 million;

c. In FY 1990 Towers reported income of $3.9 million when, in fact, Towers had incurred a loss of approximately $36 million; total assets of $195 million when, in fact, Towers had assets of $29 million or less; and shareholder's equity of $13.4 million when, in fact, Towers had a deficit of approximately $71 million; and

d. In FY 1991, Towers reported net income of $4.3 million when, in fact, Towers had incurred a loss of approximately $61 million; total assets of $513 million when, in fact, Towers had assets of approximately $250 million; and shareholder's equity of $20.1 million when, in fact, Towers had a deficit of approximately $130 million.

25. Hoffenberg, knew or was reckless in not knowing, that Towers' financial statements were materially false and misleading, because, among other things, he had knowledge of and daily responsibility for Towers' operations and participated, directly or indirectly in the preparation and review of Towers' financial statements.

26. Ferro, knew or was reckless in not knowing, that Towers' financial statements were materially false and misleading, because, among other things, Ferro prepared or oversaw the preparation of Towers' books and records and its financial statements.

27. Brater, knew or was reckless in not knowing, that Towers' financial statements were materially false and misleading, because, among other things, Brater had

knowledge of Towers' true financial condition.

## COLLECTION RECEIVABLES

28. TCS collects past-due accounts receivable (the "collection receivables") for third-party clients on a contingency-fee basis. TCS pays no monies for these receivables and is obligated to return all collection receipts to its client, except for a percentage which constitutes TCS's fee, as agent. TCS improperly recorded fee income for its services at year end, before performing significant collection activities and prior to cash collections. As a result of this improper recognition of fee income, Towers' fee income of $36 million was overstated by at least $10 million in FY 1989. For FY 1990, TCS improperly recognized $22 million in fee income, out of Towers' total reported fee income of $56 million. For FY 1991, TCS improperly recorded $36 million in fee income, out of Towers' total reported fee income of $97 million.

29. Towers also improperly recorded these collection receivables as Towers' own assets. These collection receivables did not belong to TCS, but rather to TCS's clients, which had entrusted them to TCS as their agent. TCS, therefore, could not properly record these collection receivables at any amount on its books and records. Moreover, TCS recorded these past-due accounts receivable at amounts grossly in excess of their value.

30. For FY 1989, Towers reported accounts receivable of $112 million, of which approximately $101 million were collection receivables. For FY 1990, Towers reported $177 million in accounts receivable of which approximately $142 million were collection receivables. For FY 1991, Towers reported $457 million in accounts receivable of which $246 million were collection receivables.

## PURCHASE RECEIVABLES

31. Towers engaged in the business of purchasing severely delinquent receivables for a price which constituted a deep discount to face value. Instead of properly recording these receivables at cost, Towers improperly recorded them at substantially above cost.

Towers also improperly recorded significantly all income at the time the receivables were acquired, instead of properly recording no fee income until such time as the cost of the receivable was recaptured by cash collections.

## Federal Deposit Ins. Co. Loan Portfolio

32. Towers has also inflated its accounts receivable and fee income by improperly recognizing income from loan portfolios originating from banks liquidated by the Federal Deposit Insurance Co. (the "FDIC loan portfolios"), and recording these FDIC loan portfolios at amounts grossly in excess of their cost.

33. In FY 1990, Towers bought various FDIC loan portfolios, with a face value of over $50 million, for less than $500,000. These FDIC loan portfolios contained nonperforming, distressed loans. In FY 1990, Towers improperly recorded fee income of $24 million from the FDIC loan portfolio, and also improperly recorded the portfolios as accounts receivable valued at $24 million. Towers had virtually no cash receipt from these FDIC loan portfolios in FY 1990.

34. In FY 1991, Towers purchased additional FDIC loan portfolios with a face value of $6 million for approximately $30,000. Towers improperly recognized $6 million in fee income and recorded these distressed FDIC loan portfolios as accounts receivable valued at $6 million. As a result of the improper recording of the FDIC loan portfolios in FY 1990 and FY 1991, accounts receivable in FY 1991 were overstated by $13 million. In FY 1991, less than $1 million in cash receipt was collected on these receivables.

35. Towers falsely stated in its 1991 Annual Report that "Income on RTC/FDIC loans is recognized as they are collected." In fact, Towers recorded fee income in much larger amounts than Towers ever collected in FY 1990 or FY 1991, as described in paragraph 31 through 34.

## Bank Of America Portfolio

36. In or around January 1991, Towers purchased a portfolio of credit-card

balances from the Bank of America, with a face value of approximately $10 million for less than $200,000 (the "Bank of America portfolio"). Before selling the portfolio to Towers, Bank of America had charged off all of the balances as worthless after other private collection agencies had failed to collect on them. In FY 1991, Towers collected little or no amount on the Bank of America portfolio.

37. Towers improperly recorded fee income of $4 million for the Bank of America portfolio in FY 1991, causing Towers' reported fee income in FY 1991 to be overstated by this amount. Towers also improperly recorded the Bank of America portfolio at $4 million, causing an overstatement by $4 million (less the cost of the portfolio) of Towers' FY 1991 accounts receivable.

Southwestern Bell Portfolio

38. In or around June 30, 1988, Towers Credit purchased a portfolio of past-due accounts receivable from Southwestern Bell Yellow Pages, Inc. (the "Southwestern Bell") with a face value of approximately $28 million, for less than $300,000 ("Southwestern Bell portfolio"). Before selling the portfolio to Towers, Southwestern Bell had charged off all of the balances as worthless after private collection agencies, including Towers, had failed to collect on them. To date, Towers Credit has collected less than $1 million on the Southwestern Bell portfolio.

39. Towers improperly recorded fee income of $19 million for the Southwestern Bell portfolio in FY 1988, resulting in the overstatement of Towers' fee income in FY 1988 ($21 million) by that amount. Towers also improperly recorded the Southwestern Bell portfolio at $28 million, which resulted in an overstatement by $28 million (less the cost of the portfolio) of Towers' FY 1988 accounts receivable.

40. The improperly recorded fee income and accounts receivable, as set forth in paragraphs 31 through 39, resulted in material misstatements in Towers' financial statements for FY 1988 through FY 1991.

10

INVESTMENT IN UNITED DIVERSIFIED

41. In its financial statements for FY 1989 through FY 1991, Towers has inflated further its assets by improperly recording Towers' investment in United Diversified Corporation ("UDC"), which conducted business through its subsidiaries, Associated Life Insurance Co. ("Associated") and United Fire Insurance Co. ("United Fire").

42. Towers acquired a controlling interest in UDC in 1987 for $3 million, and Hoffenberg became chairman of the board of UDC, United Fire, and Associated.

43. Towers improperly recorded the purchase cost of $3 million as an investment on its financial statements from FY 1989 through FY 1991. As set forth in paragraph 44 through 46, below, the UDC investment had become seriously impaired by FY 1989 and by at least FY 1991, posed a threat of liability beyond the cost of the original investment.

44. In July 1988, the Illinois Director of Insurance (the "Insurance Director") obtained an order placing UDC, Associated, and United Fire in conservation; on February 14, 1989, Hoffenberg agreed in a signed stipulation to the entry of an order liquidating Associated Life and United Fire. The liquidation order was based on Hoffenberg's agreement that both companies were insolvent. On March 3, 1989, when the liquidation order was entered, Hoffenberg lost all control of the companies, and any expectation of any return on the investment.

45. On or about June 27, 1991, Hoffenberg and others were charged by the Insurance Director with having used the insurance companies as an instrumentality of Towers, and, among other things, having transferred investments and cash belonging to the companies into various Hoffenberg controlled brokerage accounts. These transfers of funds, began in November 1987, and continued through July 1988. The civil action, captioned Schacht v. Hoffenberg et al., No. 91 C 4024 (N.D. Ill.), alleged that the Defendants had caused UDC, Associated, and United Fire to suffer damages in excess of $4 million, become insolvent, and be placed in conservation and/or liquidation. The complaint sought,

11

among other things, treble damages under RICO. Towers settled this and related actions in 1992, upon Towers' agreement to pay $3.5 million, among other things.

46.    It was materially false and misleading for Towers to continue to record its investment in the insurance companies at cost in FY 1989, FY 1990, and FY 1991 financial statements without any reserve to reflect both the impairment of the investment or the contingency of Towers' potential liability. Towers' assets were overstated by at least $3 million in each of those years as a result of Towers' failure to record an appropriate reserve.

47.    Further, Towers did not accurately disclose to investors the liquidation and conservation proceedings against UDC, Associated, and United Fire, nor the filing of *Schacht v. Hoffenberg* against Towers.

## MISREPRESENTATIONS AND OMISSIONS IN TOWERS' OFFERING MEMORANDA

### USE OF PROCEEDS

48.    Towers represented in its offering memoranda that Towers planned to use the funds it raised by investors to buy accounts receivable, defined as "Health Care Accounts Receivable purchased from hospitals, doctors, medical groups and other health care providers and Business Accounts Receivable purchased from manufacturers, wholesalers and service companies." Beginning with the October 1990 offering memorandum, the proposed activities were expanded to include FDIC loan portfolios.

49.    The offering memoranda falsely state that Towers typically will acquire accounts receivable for up to 95% of their face value, will earn a minimum 5% "factoring fee" for each such account receivable collected and will reinvest the proceeds of collection in additional accounts receivable. The offering memoranda further state that Towers expects to compound its "factoring fee" up to six times per year from purchasing accounts receivable, collecting them and reinvesting the proceeds.

50.    In fact, Towers bought few, if any, current accounts receivable with offering proceeds, buying instead accounts receivable (or loan portfolio) at substantially less than 95% of face value that were largely uncollectible, such as those described in paragraphs 31 through 40.

51.    As of June 30, 1991, when Towers had $124 million in outstanding Notes, Towers owned virtually no accounts receivable. Accounts receivable reflected in Towers' consolidated financial statement for FY 1991, consisted mainly of the collection receivables described in paragraphs 31 through 40 above, which Towers did not own, and certain receivables purchased and owned by three of the THRPC Bond Funds. Any and all healthcare accounts receivable reflected on Towers' balance sheet dated June 30, 1991, were purchased with proceeds from these three THRPC Bond Funds, and not the Notes.

52.    Instead of using investors' funds to purchase accounts receivable, as represented in the offering memoranda, Towers, at the direction and control of Hoffenberg, used investors' funds to pay, *inter alia*, interest on the Notes, to pay Towers' expenses, such as salaries (including exorbitant salaries to Hoffenberg, Brauer, and Ferro) and attorneys' fees. In addition, because the collection and purchase receivables were of such poor quality, there was insufficient cash flow generated from collection on such receivables to meet Towers' financial needs and obligation. Thus, Towers resorted to such measures as failing to remit collection receipts due to its clients and diverting millions of dollars from the THRPC Bond Funds to Towers, in violation of bond fund indenture covenants.

53.    The offering memoranda falsely state that the Notes are fully collateralized by accounts receivable purchased with the offering proceeds, and with a face value substantially in excess of the Notes. In fact, the Notes are severely under-collateralized because of the small face amount and low quality of accounts receivable purchased by Towers in the relevant years, as reflected by their cost and Towers' minimal collections on them such as the FDIC loan portfolios, Southwestern Bell receivables, and the Bank of America portfolio,

set forth in paragraphs 32 and 40.

SPECIAL BANK ACCOUNTS FOR OFFERING PROCEEDS

54. Towers falsely stated in offering memoranda that it would keep offering proceeds in escrow bank accounts, to the extent that the funds were not used to purchase accounts receivable or pay certain specified expenses. As of June 30, 1991, although Towers had purchased few accounts receivable with the $124 million in offering proceedings, Towers' bank accounts contained at most $5 million. As of June 30, 1992, when Towers was reporting outstanding promissory notes of $198 million (and additional debt issued by the special-purpose subsidiaries of $196 million), reported cash and cash equivalents was only $32 million.

55. The offering memoranda falsely and misleadingly describe amounts that Towers could withdraw from escrow bank accounts to use for any corporate purpose. According to the offering memoranda, "excess profits amounts" could be withdrawn and used for any corporate purpose only if the face value of accounts receivable purchased with investors' funds (and proceeds from collections on these receivables) exceeded the amount of Notes. The face value of accounts receivable purchased with investors' funds (and proceeds from collection on these receivables) never exceeded the amount of Notes, yet Hoffenberg, or others at his direction and control, routinely emptied the escrow bank accounts.

INSURANCE POLICY COVERING RECEIVABLES

56. The February 1989 offering memorandum misleadingly characterizes the accounts receivable securing and backing the Notes offered therein as "insured." Towers represented that it had obtained an insurance policy "to insure the collectability of most of the Accounts Receivable which are either D & B listed or separately listed by the insurance company as additional insured companies" (emphasis added).

57. Towers' insurance in effect at that time allowed Towers to recover only its purchase price on accounts receivable that were current at the time Towers purchased them

14

(subject to other conditions being met). Therefore, the collectability of collection receivables and other past-due receivables was not covered at all.

58. Other significant limitations not disclosed in the offering document are that: the policy has a ceiling of $5 million; it protects only against insolvency of the debtor, and not disputed accounts (unless reduced to a judgment); and there is a dollar limitation per debtor.

BENEFICIAL OWNERSHIP OF TOWERS

59. The offering memoranda and annual reports distributed to investors fail to disclose Hoffenberg's ownership, either direct or indirectly, of a majority of Towers' common stock and the compensation paid to Towers' executive officers.

60. Hoffenberg, knew or was reckless in not knowing, that Towers' offering memoranda were materially false and misleading, because, among other things, he had knowledge of and daily responsibility for Towers' operations, and had knowledge of Towers' true financial condition and, directly or indirectly, developed the Note offering program.

61. Brauer, knew or was reckless in not knowing, that Towers' offering memoranda were materially false and misleading, because, among other things, he had knowledge of Towers' true financial condition and the nature of its business.

62. Perro, knew or was reckless in not knowing, that Towers' offering memoranda were materially false and misleading, because, among other things, he had knowledge of Towers' true financial condition.

TRADING BY HOFFENBERG

63. Between January 1990 and April 1992, Hoffenberg's company, FBB, sold 208,960 shares of Towers common stock for $1,596,841, in nine transactions.

64. From January 2, 1990, through January 30, 1992, Towers common stock generally traded in a range between $7.50 and $9.50 per share, reaching a high of $11 per

15

share (on January 10, 1990), and a low of $5.75 (on October 1, 1991).

65.   At the time of his sales, Hoffenberg knew, or was reckless in not knowing, that he possessed material, nonpublic information about Towers' poor financial condition and misuse of investor proceeds.

66.   Hoffenberg, while in possession of the material, nonpublic information described in paragraphs 23 through 62, sold at least 208,960 shares of Towers common stock in breach of his fiduciary duty to Towers' shareholders, and realized profits of at least $1,596,841.

### FIRST CLAIM FOR RELIEF
*Violations of Section 5(a) and (c)*
*of the Securities Act*

67.   The Commission repeats and realleges the allegations contained in paragraphs 1 through 66 of the Complaint as if set forth herein at length.

68.   As described in paragraphs 17 through 22, Towers, Hoffenberg, and Enter, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell and offer to sell securities through the use or medium of a prospectus or otherwise when no registration statement has been filed or was in effect as to such securities and when no exemption from registration was available.

69.   By reason of these offers and sales of the Notes, Towers, Hoffenberg, and Enter have violated, are violating, or are about to violate Section 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

### SECOND CLAIM FOR RELIEF
*Violations of Section 17(a)(1) of the Securities*
*Act and Section 10(b) of the Exchange Act and*
*Rule 10b-5 Promulgated Thereunder*

70.   The Commission repeats and realleges the allegations contained in paragraphs 1 through 69 of the Complaint as if set forth herein at length.

16

71.   As described in paragraphs 23 through 66, the Defendants, directly and indirectly, singly and in concert, knowingly or recklessly, by the use of the means or instruments of transportation or communication in interstate commerce or of or by the use of the mails, or the facilities of a national securities exchange, in connection with the offer, purchase or sale of securities: (a) have employed, are employing, and are about to employ devices, schemes or artifices to defraud; (b) have made, are making, and are about to make untrue statements of material fact, or have omitted, are omitting and are about to omit to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading; or (c) have engaged in transactions, acts, practices and courses of business which have operated, are operating and will operate as a fraud or deceit upon any person.

72.   The Defendants, knowingly or recklessly, made false and misleading statements and omission, as set forth in paragraph 23 through 66.

73.   The false statements and omissions made by the Defendants, fully described in paragraphs 23 through 66, were material.

74.   By reason of the acts, omission, practices, and courses of business set forth in this Complaint, the Defendants have violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)] Section 10(b) of the Exchange Act [15 U.S.C. § 78(b)], and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
*Violations of Sections 17(a)(2) and (3)*
*of the Securities Act*

75.   The Commission repeats and realleges the allegations contained in paragraphs 1 through 74 of the Complaint as if set forth herein at length.

76.   As described in paragraphs 23 through 66, the Defendants, directly and indirectly, singly and in concert, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the

17

of untrue statements of a material fact or are obtaining or are about to obtain money or property in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) have engaged, are engaged, or are about to engage in transactions, practices, or course of business which operated or would operate as a fraud or deceit upon purchasers of securities.

77. The Defendants made false and misleading statements and omissions, as set forth in paragraph 23 through 66.

78. The false statements and omissions made by the Defendants, fully described in paragraph 23 through 66, were material.

79. By reason of the untrue statements, omissions, transactions, practices or courses of business set forth herein, Defendants have violated, and are violating, and are about to violate Section 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2), (a)(3)].

WHEREFORE, Plaintiff respectfully requests that this Court:

**PRAYER FOR RELIEF**

**I.**

Grant an Order temporarily, preliminarily, and permanently restraining and enjoining Towers, Hoffenberg, and Baxter, and their officers, agents, servants, employees, and attorneys-in-fact, and all persons in active concert or participation with them, who receive actual notice of such Order by personal service or otherwise, each of them, directly or indirectly, from:

(1) making use of any means or instrument of transportation or communication in interstate commerce or of the mails to sell any securities through the use or medium of any prospectus or otherwise unless a registration statement is in effect as to such securities;

or

18

(2) carrying such securities or causing them to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or for delivery after sale, unless a registration statement is in effect as to such securities; or

(3) making use of any means or instrument of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any securities, unless a registration statement has been filed as to such securities, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h], in violation of Section 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)].

**II.**

Grant an Order temporarily, preliminarily, and permanently restraining and enjoining the Defendants and their officers, agents, servants, employees, and attorneys-in-fact, and all persons in active concert or participation with them, who receive actual notice of such Order by personal service or otherwise, and each of them, directly or indirectly, in the offer or sale, or in connection with the purchase or sale, of any securities, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of a national securities exchange, from employing any device, scheme, or artifice to defraud; obtaining money or property by means of, or otherwise making, any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engaging in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser, act, practice, or course of business which they were made, not misleading; or of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act [15 U.S.C. § 78(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

19

III.

Grant an Order directing Hoffenberg and Towers, their officers, agents, servants, employees, attorneys-in-fact, and all controlled, related or affiliated persons or entities, including, but not limited to, PBB, and all persons in active concert or participation with them who receive actual notice of such Order by personal service or otherwise, and each of them, directly or indirectly, to hold and retain within their control, and otherwise prevent any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal of any assets, funds, or other properties (including but not limited to money, real or personal property, securities, receivables, rights, claims, choses in action or property of any kind whatsoever) of the defendants (except transactions by Towers in the ordinary course of business and individually not exceeding $10,000, unless approved in advance by the Trustee, and not exceeding $50,000, unless stipulated to in advance in writing by the Commission, ordinary living and business expenses of Hoffenberg not exceeding $1,000 per week, unless stipulated to by the Commission and reasonable attorney's fees incurred in connection with this action or as ordered by the Court), pending determination of the Commission's Application for a Preliminary Injunction.

IV.

Grant an order appointing a special master for Towers, pending determination of the Commission's Application for a Preliminary Injunction and a final judgment on the merits of the Complaint.

V.

Grant an Order directing that Hoffenberg and Towers file with this Court and serve upon the Commission, within ten (10) business days, a verified written accounting, signed by Hoffenberg and Towers, under penalty of perjury, of:

(a)   all assets, liabilities, monies, funds, securities, and real or personal property currently held directly or indirectly by or for the benefit of Hoffenberg, Towers, and PBB,

20

including by not limited to bank accounts, brokerage accounts, investments, business interests, and real and personal property, wherever situated, describing each asset and liability, its current location and amount;

(b)   all monies, assets, funds, securities, and real or personal property received by Towers or for Towers' direct or indirect benefit, in or at any time from January 1, 1989, to the date of the accounting, describing the source, amount, disposition and current location of each of the items listed;

(c)   all funds or personal property received by Towers from investors through the date of the accounting, and the disposition of investors' funds by the Defendants;

(d)   the names, last known addresses, and account-identifying information of all financial institutions, bullion, creditors, and other persons and entities that are currently holding any monies, assets, funds, securities or real or personal property of Towers, Hoffenberg, and PBB; and

(e)   the names, last known addresses and telephone numbers of all investors, as well as the amount and date of each investment and the amount(s) and date(s) of payment(s) of principal and/or interest to each investor by the Defendants.

VI.

Grant an Order for expedited discovery.

VII.

Grant an Order, pending determination of the Commission's request for a preliminary injunction, temporarily restraining the Defendants, their officers, agents, servants, employees, and attorneys-in-fact, and all persons in active concert or participation with them who receive actual notice of such Order by personal service or otherwise, and each of them, directly and indirectly, from destroying, mutilating, concealing, altering or disposing of any and all documents referring to the offer or sale of Notes, the source and uses of Towers' funds and the financial condition of Towers, its subsidiaries and affiliates.

21

VIII.

Grant an Order directing the Defendants to serve and file any papers in opposition to the Commission's request for a preliminary injunction so as to be received no later than three business days prior to the time of the hearing on the Application for a Preliminary Injunction.

IX.

Grant a Final Order directing Tower, Hoffenberg, Brauer, and Ferro, jointly and severally, to disgorge all proceeds from the sale of the Notes as alleged herein (net of any principal payments to investors), plus prejudgment interest.

X.

Grant a Final Order directing the Defendants to disgorge all profits, gains, income, and benefits directly or indirectly derived from their illegal activities alleged herein, plus prejudgment interest.

XI.

Grant a Final Order imposing penalties on Defendants for violations described herein occurring after October 15, 1990, under Section 20(d) of the Securities Act (15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act (15 U.S.C. § 78u(d)(3)].

XII.

Grant a final order under Section 21(d)(2) of the Exchange Act (15 U.S.C. § 78u(d)(2)) prohibiting Hoffenberg, Brauer, and Ferro from serving as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78l) or who is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act (15 U.S.C. § 78o(d)].

XIII.

Grant such other and further relief as this Court shall deem just and proper.

Date:    February 8, 1993
         New York, New York

RICHARD H. WALKER (RW - 0581)
Regional Administrator

Edwin H. Nordlinger
Carmen J. Lawrence
Robert B. Blackburn
Amy C. Reich
Dorothy Heyl
Wendy J. Lane
Joe E. Gautier
Christine M. Sanzaro

Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
Seven World Trade Center - 13th Floor
New York, New York 10048-1102
Telephone No.: (212) 748-8035

22

23

**EXHIBIT 28**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

TOWERS FINANCIAL CORPORATION,
STEVEN HOFFENBERG,
MITCHELL BRATER and
.ARTHUR J. FERRO,

Defendants.

93 Civ. (     )

DOROTHY HEYL, pursuant to 28 U.S.C. § 1746, declares as follows:

1.    I am over 21 years of age and I am employed by the United States Securities and Exchange Commission (the "Commission") as a Senior Attorney in the Commission's New York Regional Office.

2.    I make this Declaration on information and belief. The sources of my information and the bases for my belief are documents obtained and testimony taken in the course of the Commission's investigation of Towers Financial Corporation ("Towers").

**THE DEFENDANTS**

3.    Towers, a Delaware corporation with headquarters in New York, New York, is engaged primarily in the business of collections and purchasing of accounts receivable.

4.    Professional Business Brokers ("PBB"), which is owned by the Hoffenberg Family Trust, owns 61.4% of the common stock of Towers.

5.    Towers Collection Services, Inc. ("TCS"), Towers' subsidiary, collects receivables on a contingency basis. Towers Credit Corporation ("Towers Credit") is another subsidiary of Towers which purchased commercial accounts receivable.

6.    Other Towers subsidiaries include Towers Healthcare Receivables Funding

Corp. and Towers Healthcare Receivables Funding Corp II, III, IV, and V (the "THRFC Bond Funds"). The THRFC Bond Funds were formed for the sole purpose of raising funds for the purchase of accounts receivables.

7.    Towers does not file periodic reports with the Commission.   Towers common stock trades in the over-the-counter market. As of February 4, 1993, Towers had at least 66 shareholders of record with 4,964,720 shares outstanding.

8.    Steven Hoffenberg ("Hoffenberg") is forty-eight years old and lives in New York, New York.  He is the chairman and chief executive officer ("CEO") of Towers and president of Towers Credit.  Hoffenberg directly owns 10% of Towers common stock, in addition to the 61.4% he owns or controls through PBB and the Hoffenberg Family Trust, of which he is trustee.  Hoffenberg has full knowledge and control of all of Towers' operations.  Hoffenberg has knowledge and control of the flow of funds among the numerous checking accounts, including the escrow accounts established for the proceeds of the promissory notes.  He has sole signatory power on all the escrow accounts.

9.    Mitchel Brater ("Brater") is fifty-one years old and lives in New York, New York.  He is the vice chairman of Towers and is responsible for marketing Towers promissory notes and coordinating the extensive broker-dealer network that sells the notes. Brater has also served as Towers' chief operating officer.  His responsibilities included "the broker dealer investor relationships, marketing of the collection services and any area where I could be helpful."  (See, e.g., Testimony of Mitchell Brater at pp. 42-45, Exhibit LL to the York/Heyl App.)   Brater is also the president and a director of each of the THRFC Bond Funds. Brater, who started working for Towers in October 1986, owns 10% of Towers common stock.  Brater has a B.S. degree in accounting from Long Island University.  In a recent lawsuit brought by Towers against Dun & Bradstreet, captioned *Tower Financial Corporation v. Dun & Bradstreet, Inc.*, 92 Civ. 629 (KTD), Brater testified that he was intimately familiar with the nature of Towers' business and with its financial

condition.

10. Arthur J. Ferro ("Ferro") aged fifty-one, prepares, directly or indirectly, Towers' books of original entry, such as the general ledgers, the working trial balances for all Towers' subsidiaries, and the consolidating trial balance. Purportedly the head of Towers' accounting department, Ferro is an independent contractor, providing services through his one-man accounting firm, Ferro & Broderick, with offices at Towers' headquarters, and in Ferro's house in Valley Stream, New York. Ferro served as Towers' chief financial officer ("CFO") from September 1989 to May 1990. His New York State registration as a Certified Public Accountant ("CPA") lapsed in 1990 for failure to pay dues. Ferro was paid at least $171,000 by Towers in Towers' fiscal year ended June 30, 1991.

**BACKGROUND**

11. On August 4, 1988, the Commission filed a complaint in the district court for the Southern District of New York against Towers, Towers Credit, Hoffenberg, Brater, and Eton Securities Corporation ("Eton"), charging violations of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)], in connection with the offer and sale of unregistered promissory notes by Towers Credit from 1986 through 1988 (the "Pre-injunction Notes"). (*See Complaint in SEC v. Towers Credit, et al.*, Exhibit CC to the Appendix to Declarations of Dorothy Heyl and Scott B. York (the "York/Heyl App.").)

12. On November 22, 1988, Towers and Hoffenberg consented to a final judgment of permanent injunction against future violations of Section 5 of the Securities Act (the "Injunction"). Brater signed the Injunction on May 12, 1989. (*See* Final Judgment, Exhibit DD to the York/Heyl App.)

13. Brater's licensed broker-dealer, Eton, was the exclusive distributor of the Pre-injunction Notes. Eton has since been liquidated and its registration withdrawn. Brater also owns and is president of Eton Capital Corp. ("Eton Capital"), to which Towers pays fees in

connection with the promissory notes sold subsequent to the Injunction. These fees include Brater's annual salary of $750,000.

14. Pursuant to the Injunction, Towers Credit was ordered to offer rescission to all of its investors.

15. Marvin E. Basson ("Basson"), aged 61, is a solo practitioner CPA registered in New York, with offices in Upper Brookville, New York. Basson has certified Towers' financial statements from mid-1987 through June 30, 1992.

**THE TOWERS PROMISSORY NOTES**

16. After the Injunction against Towers, Hoffenberg, and Brater, Towers continued to market promissory notes through a series of public offerings (the "Towers Promissory Notes") and relied over the investments of pre-injunction investors into the new Promissory Notes. Towers claimed that the Towers Promissory Notes were exempt from registration with the Commission pursuant to Section 4(2) of the Securities Act of 1933 [15 U.S.C. § 77d(2)] and Regulation D [17 C.F.R. § 230.506]. (*See* Exhibit 9 to the Appendix to Declaration of Christine M. Sommero (the "Sommero App.")

17. Towers sold the notes pursuant to five separate offering documents. Towers sold approximately $51 million in notes pursuant to an offering document dated February 15, 1989; approximately $76 million in notes pursuant to an offering document dated February 20, 1990; approximately $49 million in notes pursuant to an offering document dated October 1, 1990; and approximately $39 million in notes pursuant to an offering document dated October 15, 1991; and an uncertain amount of notes pursuant to an offering document dated March 23, 1992. (*See* Offering Documents, Exhibits EE-II to the York/Heyl App.)

18. Hoffenberg took full responsibility for the statements in the offering documents, claiming to have written the language in the offering documents. (*See* Testimony of Steven Hoffenberg at pp. 342, 362, Exhibits JJ-KK, York/Heyl App.)

3

4

## MISREPRESENTATIONS IN THE OFFERING DOCUMENTS

### Use of Proceeds

19. The stated purpose of all five offering documents for the Towers Promissory Notes was to raise funds for the acquisition of accounts receivable to collateralize the promissory notes sold in the offerings. According to the offering documents, Towers is a factor, specializing in healthcare receivables and requiring large amounts of capital to finance the receivables. (*See* Offering Documents, Exhibits EE-II, York/Heyl App.)

20. The February 1989 and February 1990 offering documents state that the proceeds of the notes will be used to purchase healthcare and business accounts receivable. Beginning with the October 1990 offering document, the proposed activities were expanded to include the purchase of Federal Deposit Insurance Corporation ("FDIC") and Resolution Trust Co. ("RTC") loan packages directly from the FDIC and RTC or from secondary sources. These FDIC and RTC receivables were to serve as additional collateral for the notes. (*See e.g.*, October 1990 Offering Document, Exhibit GG, York/Heyl App.)

21. All of the offering memoranda represent (with slight differences in language), that Towers will typically acquire accounts receivable for up to 95% of their face value, will earn a minimum 5% "factoring fee" for each such account receivable collected and will reinvest the proceeds of collection in additional accounts receivable. The offering memoranda further state that Towers expects to compound its "factoring fee" up to 6 times per year from purchasing accounts receivable, collecting them and reinvesting the proceeds.

22. In fact, Towers is primarily a collection agency, acquiring past-due receivables at no cost, or buying portfolios of past-due receivables at deep discounts. As of June 30, 1991, Towers owned virtually no accounts receivable. Accounts receivable reflected in Towers' consolidated financial statements for fiscal year 1991, consisted mainly of collection receivables, which Towers did not own, and certain healthcare accounts receivables purchased and owned by the THRFC Bond Funds. Any and all healthcare

receivables reflected on Towers balance sheet dated June 30, 1991, were purchased with proceeds from the THRFC Bond Funds, and note the notes. (*See* York/Heyl App. Exhibit Z.)

23. Hoffenberg testified that the offering documents did not require him to purchase new healthcare or other receivable with the proceeds of the Towers Promissory Notes because Towers already had a large portfolio of collection receivables which could serve as collateral for the promissory notes. (*See* Hoffenberg testimony, Exhibit KK-JJ, York/Heyl App.) However, Towers had merely accepted these receivables for collection and did not own them. (*See also*, Declaration of Scott B. York.)

24. None of the Towers' receivables were rolling over six times a year, or even once a year. Most purchased receivables could not be collected at all. (*See* Declaration of Scott B. York.)

### Lack of Collateral for the Notes

25. As described in ¶¶ 19-20 above, the Towers Promissory Notes were to have been collateralized by the acquired accounts receivable.

26. Towers did file UCC forms relating to the collateral for each of the five offerings. Each financing statement defines the property securing the debt simply as accounts receivable "purchased" with proceeds from the offering. (*See e.g.*, Towers UCC filing, Exhibit MM, York/Heyl App.)

27. The only accounts receivable in which the investors have a perfected security interest are those purchased with promissory note proceeds. Thus, investors have a perfected security interest only in various portfolios of distressed loans which Towers acquired at very low cost. These notes are, therefore, not fully collateralized. (*See* Declaration of Scott B. York.)

### Escrow Accounts for Offering Proceeds

28. Each offering memorandum stated that the proceeds from each offering would

be deposited in a separate escrow account and that proceeds from accounts receivable purchased with offering proceeds would also be deposited into the accounts. According to each offering memorandum, Towers could withdraw, from these escrow accounts, funds described as "Excess Profits Amount" to use "for any corporate purpose as determined in the sole and absolute discretion of Towers." (See Offering Documents, Exhibits EE-II.)

29. The definition of "Excess Profits Amount" in all of the five offering documents is "an amount equal to the amount by which (a)(i) the Funds on deposit in the (special interest-bearing) Account exceeds (b)(i) the face amount of all issued Promissory Notes plus (ii) all accrued and unpaid interest due on such Promissory Notes."

30. Hoffenberg testified that he was free to start withdrawing excess profits before any accounts receivable were purchased because Towers pledged its pre-existing portfolio of accounts receivable to the investors. That is, according to Hoffenberg's testimony, if Towers had a portfolio of receivables under contract with a face value of $100 million (and these receivables could be collection receivables for which Towers acted as agent and paid no funds), and Towers began one of the offerings, taking in $10,000 to the escrow account, the full $10,000 could immediately be withdrawn and used as excess profits, without any accounts receivable having been purchased with the $10,000. (See testimony of Steven Hoffenberg, p. 496, York/Heyl App. Exhibit JJ.)

31. Hoffenberg stated, "we had a portfolio of receivables unencumbered way before the offering and then we used that portfolio with the offering." See Hoffenberg testimony, Exhibits JJ-KK, York/Heyl App.)

32. The face value of accounts receivable purchased with investor's funds, however, (and proceeds from collections on those receivables) never exceeded the amount of the Towers Promissory Notes. Yet, Towers routinely emptied the escrow bank accounts. Bank records produced by Towers relating to certain of these accounts reflect that the

7

balance in these accounts was reduced to zero each month. At least as of June 30, 1991, when Towers had $124 million in outstanding Towers promissory notes, Towers owned virtually no receivables and its bank accounts contained at most $5 million.

33. Moreover, Towers' income from operations appears to be insufficient to pay for its operating expenses of interest and commissions relating to the Towers promissory notes. For example, with respect to Towers' fiscal year 1991, Towers incurred operating expenses of approximately $92 million, including salary expenses of $22 million, including salaries for Hoffenberg, Brater and Hoffenberg's step-daughter, who does not work for Towers. Towers also had interest expenses of $8 million on the debt issued by the THRFC Bond Funds, and interest on other debt, for a total interest expense of $27 million. In addition, in 1991, Towers paid $4 million to outside counsel and maintained, at Towers expense, private jets used by Hoffenberg.

34. Because Towers used very little of the funds to purchase accounts receivable, most of the funds must have been used as "excess profits" to pay Towers' considerable expenses, including interest to investors. Given the fact that the escrow accounts were empty a year end, (and, in fact, were emptied each month) it appears that the escrow accounts served merely as a conduit to funnel investor funds to other Towers bank accounts. Hoffenberg kept no records of his calculations of excess profits or the amounts withdrawn as excess profits.

35. In March 1992, Towers represented to the Texas Securities Board that the following amounts had been used as excess profits:

1989 Fiscal Year:    $14,732,090
1990 Fiscal Year:    $28,675,355
1991 Fiscal Year:    $20,417,750

No significant amounts of cash are segregated in bank accounts, representing proceeds not yet expended on accounts receivable; as of June 30, 1991, Towers had zero balances in most of its accounts at Chase, negative balances in others, and only $5 million in the only account

8

with a positive balance. This dissipation of the offering proceeds is not disclosed in the description of "excess profits" in the offering documents.

Insurance Policy Covering Receivables

36. The February 1989 Offering Document, falsely characterizes the accounts receivable securing and backing the notes as "Insured." According to the February 1989 Offering Document, which contains headings such as "Description of Insured Health Care Accounts Receivable" and "Description of Insured Business Accounts Receivable," Towers had obtained an insurance policy "to insure the collectibility of most of the Accounts Receivable which are either D & B listed or separately listed by the insurance company as additional insured companies" (emphasis added). (See February 1989 offering document, Exhibit EE; Hoffenberg testimony, Exhibits JJ-KK, York/Heyl App.).

37. The description of the insurance policy in the offering document mentions a $150,000 deductible and certain other "unspecified limitations". (See Offering Documents, Exhibits EE-II, York/Heyl App.)

38. The policy, which was issued by American Credit Indemnity Co. ("American Indemnity"), covers the period from January 1, 1989 through December 31, 1989. Pursuant to the policy, Towers could recover its purchase price on accounts receivable that were current at the time Towers purchased them.

39. The insurance policy did not cover accounts accepted for collection by TCS, because Towers never purchased these accounts. The policy covers only the funds expended for accounts purchased at a deep discount, and does not cover any past due account, whether purchased or accepted for collection. Other significant, but undisclosed, limitations on the policy include the fact that the policy has a ceiling of $5 million, protects only against insolvency of the debtor, and not disputed accounts (unless reduced to a judgment); and that there is a dollar limitation per debtor. (See Affidavit of Gary Shapiro, Exhibit NN, York/Heyl App.)

9

Investment in United Diversified

40. In 1987, Towers acquired a controlling interest in United Diversified Corporation ("UDC"), which conducted business through its subsidiaries, Associated Life Insurance Co. ("Associated") and United Fire Insurance Co. ("United Fire"), Hoffenberg became chairman of the boards of UDC, United Fire and Associated.

41. Towers recorded the purchase cost of $2.8 million on its June 30, 1988 year ended balance sheet as an investment. This $2.8 million "investment" has remained unchanged through the June 30, 1991 year ended financial statements. Ferro testified that the investment "has always been carried at original cost. An investment where you don't have any reason to change the value is carried at cost. That's in accordance with GAAP." (See Ferro Testimony, Exhibit QQ, York/Heyl App.)

42. In July 1988, the Illinois Director of Insurance ("Insurance Director") obtained an order placing UDC, Associated and United Fire in conservation. On February 14, 1989, Hoffenberg agreed in a signed stipulation, to the entry of an order liquidating Associated Life and United Fire. At that time, Hoffenberg could have had no expectation that Towers' investment could ever be recouped since the liquidation order was based on his agreement that both companies were insolvent.

43. Hoffenberg lost all control of the companies, and any expectation of any return on the investment on March 3, 1989, when the liquidation order was entered.

44. On June 27, 1991, three days before the end of Towers' 1991 fiscal year, the Insurance Director charged Hoffenberg with using the insurance companies as an instrumentality of Towers, and, among other things, from November 1987 through July 1988 transferring investments and cash belonging to the insurance companies into various Hoffenberg-controlled brokerage accounts. The civil action, captioned James W. Schacht, Acting Director of Insurance of the State of Illinois, in his capacity as Conservator of United Diversified Corporation, as Liquidator of Associated Life Insurance Co., and as Liquidator

10

*of United Fire Insurance Co. v. Steven Hoffenberg, Mitchell Brater, Charles H. Chugerman, Michael Rosoff, Towers Financial Corporation, and Towers Diversified Co.*, No. 91 C 4024 (N.D. Ill.), alleged that the defendants had caused UDC, Associated and United Fire to suffer damages in excess of $4 million, become insolvent, and be placed in conservation and/or liquidation. The complaint sought, among other things, treble damages under RICO. (See Schacht v. Hoffenberg complaint, Exhibit OO, York/Heyl App.)

45.    In a sealed settlement agreement dated May 4, 1992, the Insurance Director and the defendants agreed to settle the RICO action, with Towers paying $3.5 million. Towers also agreed to sell its interest in Towers Diversified to the Insurance Director for $1, and to withdraw objections to the liquidation of Towers Diversified.

46.    No reserve was set up for this investment by March 1989, when the order liquidating the companies was entered. Towers continued to carry the investment at its full cost, without any reserve, notwithstanding the filing of *Schacht v. Hoffenberg*, which later resulted in a liability of $3.5 million. Towers never disclosed the liquidation of the companies or the filing of *Schacht v. Hoffenberg* in the annual reports distributed to its investors.

47.    In the 1989 Annual Report (completed after Hoffenberg agreed that the companies were insolvent and could be liquidated), a note to the financial statements (the only reference to the UDC case) suggests that Towers never completed its agreement to purchase the insurance companies and that the "[c]onclusion of this transaction is being held in abeyance pending the finalization of certain regulatory matters." (See 1989 Annual Report, Exhibit BB, York/Heyl App.)

48.    The 1989 Annual Report also states that, other than the Commission's injunctive action, "there is no other material litigation in which the Company is currently involved." (See 1989 Annual Report, Exhibit BB, York/Heyl App.)

49.    The 1990 Annual Report discloses litigation between Towers and the previous

11

owners of UDC, but makes no mention of the "certain regulatory matters" referred to in the prior year's report. Again, there is a representation that the company is not involved in any other material litigation. (See 1990 Annual Report, Exhibit AA, York/Heyl App.)

50.    The 1991 Annual Report discloses that Towers purchased UDC in 1987 and that "UDC was placed in receivership within six months of the acquisition." This note states, however, that the Insurance Director has "instituted a legal action to take possession of all assets of UDC." By the date of this statement, UDC had a negative net worth, and both of its operating subsidiaries were in the process of being liquidated. The 1991 financial statements also state that "Management believes that the Illinois Insurance Director will not prevail and that the Company will ultimately be determined to be entitled to all the assets of UDC, in which case the Company would experience no loss on this investment." When this statement was made, the Insurance Director had already prevailed in the liquidation order and Towers had already experienced a total loss on the investment.

**Beneficial Ownership of Towers and Executive Compensation**

51.    Materials distributed to investors, in the form of offering documents and annual reports, do not disclose that Hoffenberg is the beneficial owner of a majority of Towers' stock. The offering documents describe Towers simply as a "publicly traded" corporation. They do not disclose that over 70% of Towers' common stock is owned by Hoffenberg, through his ownership and control of PBB. The first three of the five offering documents do not mention PBB at all. The last two refer to PBB in the description of Hoffenberg.

52.    For example, the March 1992 Offering Document states that Hoffenberg is the chairman, CEO and president of PBB, "the prior owner of TCC [Towers Credit] and TCS." It is not disclosed in the offering document that PBB is still the owner, through its ownership of Towers.

53.    Towers' Annual Reports disclose that PBB owns over 70% of Towers' stock,

12

but do not disclose that Hoffenberg owns PBB. The offering documents also do not disclose that pursuant to an agreement between PBB and Towers, PBB is paid a percentage of Towers' gross profits. (See Offering Documents Exhibits EE-II, York/Heyl App.)

54.    There is also no disclosure in the Annual Reports or offering documents of the enormous salaries paid to Hoffenberg and Brater. Hoffenberg's salary in 1991, was $900,000 plus bonus, and Brater's salary was $750,000 plus bonus.

HOFFENBERG'S SALES OF TOWERS COMMON STOCK

55.    Between January 1990 and April 1992, Hoffenberg's company, PBB, sold at least 208,960 shares of Towers common stock for at least $1,596,841.

56.    Although Towers does not file the periodic reports with the Commission, there is a market in its common stock. During the period January 2, 1990, through January 30, 1992, Towers common stock generally traded in a range between $9.50 and $7.50, reaching a high of $11 per share (on January 10, 1990), and a low of $5.75 (on October 1, 1991).

OTHER RELEVANT FACTS

57.    Towers' books and records indicate that Hoffenberg has a relationship with foreign bank accounts, in Cape Verde, Bermuda, and Barbados.

58.    According to the Stock Purchase Agreement, dated February 6, 1993, between Peter S. Kalikow and New York Post Publishing, Inc., a Hoffenberg controlled entity, section 2.4(e) provides in relevant part as follows:

All obligations of the Company (the New York Post Co., Inc.) under the Existing Credit Agreement (as hereinafter defined), from and after the date hereof and continuing to and including the Closing Date, Buyer will make available, or cause to be made available, to the Company a secured working capital line of credit in the total amount of $5,600,000.00, it being understood and agreed that such line of credit may be made available by (a) keeping in place the existing revolving credit agreement dated as of December 20, 1991 by and between the Company and Bankers Trust Company ("BTC") (the "Existing Credit Agreement") or (b) through other financial sources acceptable to Buyer . . . (rider)

RIDER 9-A

including, but not limited to, the standard accounts receivable financing or

factoring agreements customarily utilized by Towers Financial Corporation. Towers Financial Corporation's accounts receivable financing interest rate is 2% per month on outstanding cash balances, payable monthly in arrears. It is understood that neither Seller nor Peter S. Kalikow, individually, shall have any liability or obligation of any kind whatsoever with respect thereto.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:
February 8, 1993
New York, New York

Dorothy Heyl

STATE OF ALABAMA
ALABAMA SECURITIES COMMISSION

IN THE MATTER OF:

TOWERS CREDIT CORPORATION
4117 Fifth Avenue
New York, New York 10016

Respondent.

ORDER NO. CED-88-17

ORDER GRANTING EXEMPTION (CONFIDENTIAL)
AND DENYING EXEMPTION (CED-88-17)

On April 1, 1987, Mr. Louis Barstow of Kutt & Amoret, P.C., filed an application for exemption from registration of securities pursuant to Alabama Securities Commission Rule 830-X-6.11 on behalf of the above referenced issuer. The offering material specified terms of the offering and investor suitability as an offering to only Accredited Investors as defined by Rule 501 of Regulation D promulgated under the Securities Act of 1933. Accordingly, Exemption from Registration of Securities 87-131-(c) was granted on April 1, 1987, in the State of Alabama conditioned upon the offering being offered or sold only to accredited investors in this State, as that term is defined and used in S.E.C. Regulation D.

On January 14, 1988, Mr. Alan P. Friede of Mintz, Fraade & Leiner, P.C., filed an application for exemption from registration of securities pursuant to Alabama Securities Commission Rule 830-X-6-.11 on behalf of the above referenced issuer. The offering material specified terms of the offering and investor suitability as an offering to only Accredited Investors as defined by Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended. Accordingly, Exemption from Registration of Securities (CONFIDENTIAL) was granted on February 4, 1988, in the State of Alabama conditioned upon the offering being offered or sold only to accredited investors in this State, as that term is defined and used in S.E.C. Regulation D.

4.  Exemption From Registration of Securities LCA880101(1) was granted on February 4, 1988, in the State of Alabama conditioned upon the offering being offered or sold only to accredited investors in this State, as that term is defined and used in Regulation D.

5.  On April 26, 1988, Respondent filed a post sale report for Exemption 87-158-CO pursuant to Commission Rule 830-2-4-.11(1)(4)(3)(1) reflecting sales to non-accredited investors, including one Alabama resident.

6.  The sales to non-accredited investors were in violation of the terms of the offering.

7.  On May 4, 1988, the Commission by order revoked the Exemption From Registration No. 87-158-CO dated April 3, 1987.

8.  On May 4, 1988, the Commission by order suspended the Exemption From Registration No. LCA880101(1) dated April 4, 1988.

WHEREAS, Respondent admits the above factual allegations are true and correct but neither admits nor denies that such facts constitute violation of the Act; and

WHEREAS, Respondent has voluntarily agreed to entry of this Order; and

WHEREAS, the Commission finds this Order necessary, appropriate, in the public interest, for the protection of investors, and consistent with the purposes and provisions of the Act; and

WHEREAS, the Commission and Respondent are desirous of settling this matter, and agree to the entry of this Order.

IT IS HEREBY ORDERED:

1.  Respondent, whether acting individually or through directors, officers, agents, or employees, shall cease and desist from any offer or sale of any security or from any short securities activities into, within, or from the State of Alabama in violation of the Alabama Securities Act.

2.  This Order supersedes and concludes the Order No. CAL-88-27 Suspending Exemption LCA880101 and Revoking Exemption 87-158-CO issued by the Commission on May 4, 1988, as to Respondent.

AGREED AND CONSENTED TO this the 20th day of January 1992.

Texaco Card Corporation
(Respondent)

BY: _____
[signature]
Scott F. Rex
Director

APPROVED AND ORDERED this the 2nd day of January, 1992.

ALABAMA SECURITIES COMMISSION
166 Commerce Street, 2nd Floor
Montgomery, AL  36130
(205)  242-2984

BY: _____
[signature]
Robert L. Rex
Director

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

JAMES W. SCHACHT, Acting Director )
of Insurance of the State of )
Illinois, in his capacity )
as Conservator of UNITED )
DIVERSIFIED CORPORATION, )
as Liquidator of ASSOCIATED )
LIFE INSURANCE COMPANY, )
and as Liquidator of UNITED )
FIRE INSURANCE COMPANY, )
                                    )
                      Plaintiff,    )
                                    )
            vs.                     )
                                    )
STEPHEN HOFFENBERG,                 )
MITCHELL BRATER, CHARLES H.         )
CHUGERMAN, MICHAEL ROSOFF,          )
TOWERS FINANCIAL CORPORATION,       )
and TOWERS DIVERSIFIED              )
COMPANY,                            )
                                    )
                      Defendants.   )

FILED
JUN 28 1991

No. _ _
91 C 4024

MAGISTRATE JUDGE LEFKOW JURY DEMANDED

U.S. District Court

COMPLAINT

Plaintiff, JAMES W. SCHACHT, Acting Director of Insurance of the State of Illinois, in his capacity as Conservator of United Diversified Corporation, and as Liquidator of Associated Life Insurance Company and United Fire Insurance Company, by his attorneys, complains of Defendants, Stephen Hoffenberg ("Hoffenberg"), Mitchell Brater ("Brater"), Charles Chugerman ("Chugerman"), Michael Rosoff ("Rosoff"), Towers Financial Cor- poration ("Towers Financial") and Towers Diversified Company ("Towers Diversified"), as follows:

Parties, Jurisdiction and Venue

1. James W. Schacht, Acting Director of Insurance of the State of Illinois ("Director"), is the successor of the duly appointed Conservator of United Diversified Corporation ("Diversified") and Liquidator of Associated Life Insurance Company ("Associated") and United Fire Insurance Company ("United Fire"), pursuant to the Orders of Conservation and Liquidation entered by the Circuit Court of Cook County, Illinois on July 29, 1988 ("Conservation Order"), and March 3, 1989 ("Liquidation Orders"), and by virtue of the laws of the State of Illinois.

2. At all relevant times Diversified was an Illinois corporation with its principal place of business in Des Plaines, Illinois. United Diversified acted as a holding company whose principal business activities were conducted through and for its insurance subsidiaries, namely: Associated and United Fire.

3. At all relevant times Associated was a domestic stock legal reserve insurance company organized under the laws of the State of Illinois with its principal place of business in Des Plaines, Illinois. Associated is a wholly-owned subsidiary of Diversified and was in the business of writing life, accident and health insurance for individuals and groups.

4. At all relevant times United Fire was a domestic stock property, casualty and fire insurance corporation organized under the laws of the State of Illinois with its principal place of business in Des Plaines Illinois. United Fire is a wholly-owned

subsidiary of Associated and was in the business of writing health insurance for individuals and groups as well as various lines of property and casualty coverages.

5. Hoffenberg is a resident of the State of New York, and at all relevant times, was Chairman of the Board of Directors of United Fire, Associated, Diversified, Towers Diversified and Towers Financial. On information and belief, Hoffenberg, through an entity known as the "Hoffenberg Family Trust", at all relevant times owned 100% of Professional Business Broker's Inc., a New York corporation which owned 82.5% of Towers Financial.

6. Brater is a resident of the State of New York, and at all relevant times, was the Vice Chairman of the Board and Chief Operating Officer of Towers Financial and a member of the Board of Directors of United Fire, Associated, and Diversified.

7. Chugerman is a resident of the State of New York, and at all relevant times, was Vice President and Secretary of Towers Financial and a member of the Board of Directors of United Fire, Associated, and Diversified.

8. Rosoff is a resident of the State of New York, and at all relevant times, was Senior Vice President, Chief Legal Officer and Assistant Secretary of Towers Financial and acted as counsel for United Fire, Associated, and United Diversified.

9. Towers Financial is a publicly held Nevada corporation with its principal place of business in New York, New York. Towers Financial is in the business of providing financial services.

-3-

10. Towers Diversified is a Delaware corporation with its principal place of business in New York, New York, and a wholly-owned subsidiary of Towers Financial. Towers Diversified was established to acquire certain capital stock of Diversified, representing approximately 82% of its outstanding shares.

11. This Court has jurisdiction over Count IX pursuant to 18 U.S.C. §§ 1964(a) and 1964(c). Additionally, the sum or value of the claims in this case, exclusive of interest and costs, exceeds $50,000.00, and there is diversity of citizenship between the parties. This Court, therefore, has jurisdiction over the remaining Counts pursuant to 28 U.S.C. § 1332(a).

12. Plaintiff resides in this District. In addition, the claims arose in this District. Venue in the Northern District of Illinois is, therefore, proper under 28 U.S.C. § 1391(a).

Factual Background

13. This is an action for money damages against several former members of the Boards of Directors of Diversified, Associated and United Fire (collectively "the Companies") and an attorney for the Companies and their parent companies, Towers Diversified and Towers Financial (collectively "the Controlling Companies"). The defendants initiated, caused and/or permitted on a continuing basis certain transactions, some of which are more fully described below, which caused the Companies to suffer damages in excess of $4 million, become insolvent and be placed in conservation and/or liquidation.

-4-

14. In 1987, Diversified and its insurance company subsidiaries, Associated and United Fire, experienced significant financial difficulties in maintaining the minimum capital and surplus requirements of the Illinois Insurance Code in accordance with statutory accounting practices. On May 21, 1987, the Companies were placed in conservation by an order of the Circuit Court of Cook County, Illinois at the request of the Director and Attorney General of the State of Illinois.

15. In July, 1987 Diversified retained Towers Financial to assist it in obtaining additional capital financing to infuse the Companies as part of a rehabilitation plan in lieu of liquidation.

16. Thereafter Hoffenberg and Rosoff, on behalf of Towers Financial, began negotiations to acquire approximately 82% of the outstanding capital stock of Diversified.

17. On October 6, 1987, Towers Financial, through Towers Diversified, purchased approximately 82% of the outstanding capital stock of Diversified.

18. Immediately following the closing of the purchase, Hoffenberg and the Controlling Companies assumed full and complete control and operation of Diversified and its insurance company subsidiaries.

19. On October 21, 1987, the Illinois Department of Insurance approved Tower Financial's acquisition of control of Diversified and its insurance company subsidiaries. In granting Tower Financial's approval, the Director relied upon Towers Financial's

representation to the Director that it would contribute $3 million to the surplus of United Fire. On information and belief, Towers Financial never intended to contribute the $3 million.

20. Following the closing of the acquisition, Hoffenberg, on behalf of Towers Financial, controlled and dominated the Companies as a mere instrumentality of Towers Financial, as further described herein. Hoffenberg, without corporate formalities, appointed Brater and Chugerman to the Boards of Directors of each of the Companies. Similarly, absent corporate formalities, the Boards of Directors of the Companies named Hoffenberg, Brater and Chugerman to Executive Committees and, upon information and belief, Hoffenberg, Brater, Rosoff and Chugerman to Investment Committees which controlled all of the investments for the Companies.

21. Pursuant to Ill. Rev. Stat. Ch. 73, § 622(2) (1987), the corporate powers of Associated and United Fire were to be exercised by, and their business affairs were under the control of, their Boards of Directors.

22. The individual defendants owed the Companies fiduciary duties of loyalty and care of the highest order consistent with the Illinois Insurance Code, the regulations issued thereunder, common law, their oral employment contracts and sound insurance practices. The individual defendants acting on behalf of the Controlling Companies, breached their duties of loyalty and care causing the Companies to lose in excess of $4 million by engaging in the wrongful conduct described herein.

23. The individual defendants breached the terms of their oral employment agreements with the Companies by engaging in the wrongful conduct described herein.

24. The individual defendants negligently managed the affairs of the Companies as hereinafter alleged.

25. The individual defendants also engaged in secret and fraudulent business transactions which were hidden from the Companies, their officers, policyholders, shareholders and the Director as hereafter alleged.

26. Upon assuming control of the Companies, Hoffenberg took certain of their checks with him to New York, then signed and issued a series of checks drawn on a United Fire account, as the sole signator, contrary to Illinois law. Upon being advised that Illinois law required at least two signatures on checks over $5,000 disbursing insurance company funds, Hoffenberg attempted to circumvent the law by writing checks drawn on Diversified bank accounts holding Associated and United Fire funds. Many of the checks were issued for the benefit of Hoffenberg and the Controlling Companies.

27. In violation of Illinois law, Hoffenberg failed to provide vouchers supporting the disbursements by check. When repeatedly asked by the officers of the Companies and representatives of the Director to provide vouchers and/or supporting documentation for the checks, Hoffenberg refused and still refuses to provide this information.

28. In violation of Illinois law, Hoffenberg, on behalf of the Controlling Companies, began a transfer of the investments and cash of the Companies, including all of their bonds, into various brokerage accounts in the State of New York. The funds were used to purchase additional securities which were held in various names, concealed and moved from one brokerage firm to another within the State of New York.

29. Even though representatives of the Director and Daniel Peyton, the Chief Financial Officer of the Companies, asked Hoffenberg to return the securities to Illinois, Hoffenberg refused to do so until ordered to return the securities by the Circuit Court of Cook County, Illinois.

30. The investments in the securities were imprudent and contrary to sound insurance business practices. The Companies lost approximately $2 million as a result of these investments.

31. In violation of Illinois law, Hoffenberg signed and issued at least two checks totaling $1,100,000 to the Controlling Companies or their affiliates. These checks were either illegal dividends or constituted waste of the Companies funds.

32. Hoffenberg caused Associated and United Fire to issue or deliver insurance policies at a time when he knew that Associated and United Fire were insolvent or impaired in violation of Section 144.1 of the Illinois Insurance Code. (Ill. Rev. Stat. Ch. 73 ¶ 756.1 (1987).

33. Hoffenberg knowingly caused Associated and United Fire to file false and misleading annual statements for 1987 and quarterly statements for the first quarter of 1988 with the Illinois Department of Insurance in violation of Section 139(2) of the Illinois Insurance Code. (Ill. Rev. Stat. Ch. 73, ¶ 751(2) (1987).

34. Through the defendants' failure to provide the Illinois Department of Insurance with complete and accurate information, defendants artificially prolonged the operation of the Companies by the Controlling Companies beyond the point of insolvency.

35. Each of the above described transactions constituted waste of the Companies' assets and lacked any legitimate business purpose. Brater, Chugerman and Rosoff, acting on behalf of the Controlling Companies, failed to properly supervise the activities of Hoffenberg. Moreover, they negligently, and in breach of their fiduciary duties, approved (or failed to review) the above described transactions which were contrary to law, fraudulent, blatantly unsafe, unsound and dangerous to the economic well-being of the Companies. Brater, Chugerman and Rosoff failed to take corrective action to cure the violations of law and overall mismanagement.

36. As a consequence of the above described conduct, the Director filed a petition for the conservation of the assets of the Companies on July 29, 1988. The petition alleged, inter alia, that Associated and United Fire were insolvent; they failed to establish and maintain books and records which were sufficient

for the determination of their financial condition; and that they violated the laws of the State of Illinois by: failure to meet the minimum capital and surplus requirements; failure to maintain adequate policyholder Security Deposit Accounts; failure to comply with the laws relating to the proper registration and location of securities; failure to obtain the requisite approval for transfer or sale of securities and failure to obtain the appropriate signatures, authorizing the transfer or sale of securities. The Director also alleged that Diversified was insolvent and that its books and records were in such a condition that its financial condition could not be ascertained with a reasonable degree of certainty. On September 1, 1988, the Director filed a verified complaint for liquidation against Associated and United Fire, alleging, inter alia, similar misconduct.

Improper Disbursements

37. To protect policyholders and shareholders, the Illinois Insurance Code requires that certain procedures be followed in dealing with the funds of insurance companies. Specifically:

(a) Ill. Rev. Stat. Ch. 73, ¶ 745 (1987) requires that books, records, Accounts and vouchers must be prepared so that the Company's financial condition and financial statements may be readily verified;

(b) Ill. Rev. Stat. Ch. 73 ¶ 752 (1987) requires that vouchers must be maintained for disbursements in excess of $100;

(c) Ill. Admin. Code tit. 50, § 904.30 (1987) requires at least two authorized signatures on checks in excess of $5,000.

38. In violation of these laws and regulations issued thereunder, Hoffenberg issued a series of checks, for which he was the only signator and provided no supporting documentation. These checks were drawn from United Fire and Diversified accounts as follows:

COMPANY: United Fire Insurance Company

| Check # | Date | Amount | Payee |
|---|---|---|---|
| 100111 | 11/06/87 | $50,000.00 | United Air Fleet |
| 100110 | 11/13/87 | 25,000.00 | Jeff Epstein |
| 100108 | 11/20/87 | 25,000.00 | Corporate Risk |
| 100107 | 11/30/87 | 8,000.00 | Mintz, Fraade & Zieger PC |
| 100064 | 12/01/87 | 50,000.00 | United Air Fleet |
| 100066 | 12/01/87 | 25,000.00 | Jeff Epstein |
| 100527 | 12/03/87 | 17,000.00 | GAB Services, Inc. |
| 100516 | 12/11/87 | 75,000.00 | United Air Fleet |
| 100105 | 12/24/87 | 6,266.75 | Sonnenschein Carlin Nath & Rosenthal |
| 100068 | 01/05/88 | 25,000.00 | Jeff Epstein |
| 100104 | 01/06/88 | 50,000.00 | United Air Fleet |
| 100070 | 01/06/88 | 1,196.21 | American Express |
| 100071 | 01/06/88 | 3,479.80 | American Express |
| 100072 | 01/08/88 | 4,019.78 | American Express |
| 100077 | 01/14/88 | 1,625.22 | Ford Motor Credit |
| 100102 | 01/21/88 | 1,800,000.00 | Merrill Lynch, Pierce, Fenner & Smith, Inc. |
| 101378 | 01/29/88 | 24,595.01 | WTH Consulting |
| 101103 | 02/01/88 | 25,000.00 | Jeff Epstein |
| 101073 | 02/04/88 | 25,000.00 | United Air Fleet |
| 100078 | 02/08/88 | 87,527.65 | EAF |
| 100075 | 02/17/88 | 36,000.00 | United Air Fleet |
| 100077 | 02/17/88 | 36,000.00 | Bear Stearns |
| 100076 | 02/18/88 | 20,837.84 | American Express |

COMPANY: United Diversified Corporation

| Check # | Date | Amount | Payee |
|---|---|---|---|
| 7266 | 01/04/88 | 6,009.00 | Wellesley |
| 7062 | 02/23/88 | 29,695.54 | United Air Fleet |
| 7063 | 03/01/88 | 25,000.00 | Jeff Epstein |
| 7064 | 03/01/88 | 25,800.00 | United Air Fleet |
| 7065 | 03/02/88 | 20,000.00 | Jeff Epstein |
| 7452 | 03/04/88 | 25,000.00 | Jeffrey Epstein |
| 7453 | 03/04/88 | 5,000.00 | Robert Biegen |
| 7066 | 03/07/88 | 31,210.00 | Sonnenschein Carlin Nath & Rosenthal |
| 7072 | 03/07/88 | 11,380.13 | American Express |
| 7450 | 03/10/88 | 20,000.00 | United Air Fleet |
| 7450 | 03/10/88 | 629.50 | Stephen Juncker |
| 7451 | 03/10/88 | 90,819.00 | EAF |
| 7067 | 03/15/88 | 11,690.97 | American Express |
| 7070 | 03/15/88 | 100,000.00 | TPC Management Inc. |
| 7068 | 03/16/88 | 3,401.98 | American Express |
| 7069 | 03/16/88 | 1,854.27 | United Air Fleet |
| 7451 | 04/01/88 | 5,000.00 | Mintz, Fraade & Zieger |
| 7454 | 04/06/88 | 15,000.00 | Parker, Chaplin, Flattau & Klipl |
| 7455 | 04/06/88 | 20,000.00 | Jeff Epstein |
| 7457 | 04/13/88 | 19,060.00 | GAB Business Services, Inc. |
| 7458 | 04/21/88 | 10,000.00 | Certilman, Haft, etc. |
| 7459 | 04/21/88 | 1,000.00 | Certilman, Haft, Balin, etc. |
| 7468 | 05/03/88 | 25,000.00 | Jeff Epstein |
| 7469 | 05/02/88 | 5,590.00 | Robert Biegen |
| 7460 | 05/07/88 | 15,000.00 | Gerry Gilbert Advertising |
| 7467 | 05/11/88 | 10,000.00 | Gerry Gilbert Company |
| 7707 | 05/31/88 | 10,000.00 | Shea & Gould |
| 7466 | 06/02/88 | 50,000.00 | Ben Barnes, Esq. |
| 7465 | 06/24/88 | 10,000.00 | Towers |
| 7726 | 06/24/88 | 1,000,000.00 | Parker, Chaplin, Flattau & Klipl |
| 7719 | 04/13/88 | 932.00 | Mid-State Financial Corp. |
| 7720 | 07/01/88 | 58,732.60 | Rodman & Renshaw |
| 7708 | 07/20/88 | 26,296.65 | Manett Phelps Rothenberg & Evans |

39. As a result of the lack of documentation the financial statements of the Companies could not be verified.

40. The checks were issued primarily for the benefit of Hoffenberg or the Controlling Companies and not for the benefit of the Companies.

41. Among the checks benefiting Hoffenberg individually are checks payable to American Express for personal expenses and to Wellesley College for, upon information and belief, tuition for a Hoffenberg relative.

42. Among the checks that benefited the Controlling Companies were checks payable to United Air Fleet and EAF for an amount in excess of $522,000. To conceal the nature of these transactions, Hoffenberg directed that these checks be recorded on the books of the Companies as "travel expenses, airline miscellaneous or broker deposits." Subsequently Hoffenberg directed that these checks be recorded as management fees. In fact, the checks were issued to pay for the rental of a private airplane and its maintenance costs which were the obligations of the Towers Organization and Towers World Airways Inc., affiliates of the Controlling Companies. On information and belief, Towers Financial guaranteed the rental obligations on a lease between Towers World Airways Inc. and EAF Aircraft Sales, Inc.

43. Other disbursements included a series of checks payable to Jeff Epstein or Jeff Epstein & Co. totaling $215,000. At different times Hoffenberg claimed that the expenditures were for broker's fees on investment advice associated with an investment in the capital stock of Emery Air Freight ("Emery"). Within a period of shortly over six months the Companies lost

-13-

approximately $2 million on the Emery investment.

44. Although often requested to provide the vouchers supporting the issuance of the above described checks, Hoffenberg refused and continues to refuse to provide same.

## Improper Investments

45. The Illinois Insurance Code and regulations issued thereunder set forth the requirements for purchasing and selling securities and the manner of and location for holding same. The procedure for the making of loans is also set forth therein. Specifically:

(a) Ill. Rev. Stat. Ch. 73, ¶ 127.12a(c), precludes an insurance company from investing an amount in excess of 10% of its capital and surplus in the common stock of any one corporation.

(b) Ill. Rev. Stat. Ch. 73, ¶ 736.1 (1987), requires that directors must authorize or ratify investments or loans;

(c) Ill. Rev. Stat. Ch. 73, ¶ 745 (1987), requires that books, records, accounts and vouchers must be prepared so that the company's financial condition and financial statements may be readily verified. Further, securities must be kept within the state;

(d) Ill. Rev. Stat. Ch. 73, ¶ 752 (1987), requires that vouchers be maintained for disbursements in excess of $100;

(e) Ill. Admin. Code tit. 50, § 904.10 (1987), requires that securities be registered, issued to, and carried in the name of the insurance company'

(f) Ill. Admin. Code tit. 50, § 904.20 (1987), requires that the transfer or sale of securities be approved by the Board of Directors and have at least two authorized signatures;

-14-

(9) Ill. Admin. Code tit. 50, § 904.30 (1987)/, requires at least two authorized signatures on checks in excess of $5,000.

46. In violation of these laws, Hoffenberg, for the benefit of the Controlling Companies, transferred all of the bonds of Associated and United Fire, valued in excess of $2.5 million, to brokerage accounts in the State of New York. These transfers were completed by Hoffenberg alone, without the requisite documentation and approvals. While the bonds remained under Hoffenberg's control in the brokerage accounts, the interest earned on the bonds was used for the benefit of Hoffenberg and the Controlling Companies and the Companies were deprived of the interest.

47. The individual defendants permitted the above described bonds to be placed in margin accounts, permitting those acting on behalf of Associated and United Fire to borrow from the brokerage firms in violation of Illinois law.

48. On January 21, 1988, Towers Financial contributed $1.8 million to the capital of United Fire in satisfaction of the requirement imposed by the Director when he approved the acquisition of the Diversified capital stock by Towers Financial. On the same date, Hoffenberg, as the sole signatory, wrote a check from a United Fire account in the identical amount to Merrill, Lynch, Pierce, Fenner and Smith, Inc. The funds were then transferred to an account in the name of United Fire Insurance Company with the brokerage firm of Guinan and Company, Inc. in the State of New York, contrary to law. Within the

-15-

following five days, 531,300 shares of Emery were acquired in the account at a cost in excess of $4,000,000. Contrary to law, the individual defendants failed to prepare any documentation authorizing the purchase. To acquire the shares of Emery Air Freight, an amount in excess of $2,000,000 was borrowed from Guinan and Company, Inc.

49. The $4 million investment in Emery stock, contrary to law, exceeded 10% of the capital and surplus of United Fire which at the time of the purchase was negative according to regulatory accounting practices.

50. The individual defendants used the bonds owned by Associated and United Fire as collateral for additional purchases of Emery stock on margin. The individual defendants failed to prepare the requisite documentation authorizing the transactions.

51. To conceal the wrongful acquisitions of Emery stock and the resulting loans, the individual defendants, without approval of the Companies' Boards of Directors and contrary to law, caused the stock to be transferred between accounts in the following brokerage houses in the State of New York: Rodman and Renshaw, Inc.; Kuhns Brothers and Laidlaw, Inc.; McKinley Allsopp Inc.; Guinan and Company, Inc.; Ernst & Company; Bear Stearns and Company, Inc.; Edward A. Viner and Company, Inc. and Fahnestock and Company, Inc. The securities were held in the name of United Fire, Associated, Tower Financial-Associated Life Insurance Company and/or Tower Financial-United Fire Insurance Company.

-16-

52. Only $1.8 million of the investment was recorded on the books of United Fire. The margin loan was never recorded. In a further effort to conceal the improper use of the $1.8 million invested in Emery Stock, Hoffenberg advised the Chief Financial Officer of United Fire that the $1.8 million was invested in a money market account.

53. On information and belief, the purchase of the Emery stock was part of a plan by Hoffenberg and the Controlling Companies to acquire control of Emery.

54. Within approximately six months of the initial purchase, the individual defendants authorized the sale of all of the Emery stock at a loss. Hoffenberg and Brater have advised the Companies that substantially all of the $1.8 million used for the Emery investment was lost together with the interest earned on the Associated and United Fire bonds.

55. Contrary to law, the purchase and sales of Emery stock were not authorized by the Boards of Directors of the Companies or any duly authorized committee of the Boards of Directors.

56. Contrary to law, the loans utilized to acquire Emery stock were not authorized by the Boards of Directors of the Companies. Similarly, the Emery stock was neither registered in the name of the Companies nor located within the state.

57. The investment in Emery stock is departure from traditional insurance company investment practices. The investment was made by the individual defendants with reckless disregard for the risk factors associated with the investment and

without regard to the need for investment earnings required by an insurance company to pay underwriting losses.

58. After the Conservation Order was entered, approximately $95,000 remained in a brokerage account with Ernst & Company ("Ernst") in the name of Associated. Rosoff fraudulently notified Ernst that the funds in the account were the property of Towers Diversified and directed Ernst not to deliver the funds to the Director, the duly appointed Conservator of Associated. Ernst, following Rosoff's direction, has refused to turnover to the Director the balance of the account.

59. In October 1988, $56,830.53 was in an account maintained in the name of Associated with McKinley Allsopp, Inc. A check in the aforesaid amount was made payable to Associated by Broadcourt Capital Corp., the firm through which McKinley Allsopp, Inc. cleared its transactions. The check was mailed to Associated to the attention of Hoffenberg at the offices of the Controlling Companies. The funds were never delivered to the Conservator for Associated and, on information and belief, the check was fraudulently converted to the use of one of the Controlling Companies.

## Funds Transferred to Affiliates

60. The Illinois Insurance Code provides standards for transactions between insurance companies, their affiliates and entities employed to provide management services. Specifically:

(a) Ill. Rev. Stat. Ch. 73, ¶ 639 (1987), prohibits payment of dividends and other

distributions without sufficient surplus;

(b) Ill. Rev. Stat. Ch. 73, ¶ 736.2 (1987), prohibits investments or loans to entities in which any officer or director has a financial interest;

(c) Ill. Rev. Stat. Ch. 73, ¶ 743.20 (1987), provides that material transactions with affiliated companies be fair and reasonable, the books and accounts of the affiliate be maintained to clearly and accurately disclose the nature of the transactions, and transactions with affiliates must be reasonable in relation to surplus;

(d) Ill. Rev. Stat. Ch. 73, ¶ 743.20(a) (1987), requires that the Director be notified prior to distribution which dividends or any other transaction which might render the company's surplus unreasonable;

(e) Ill. Rev. Stat. Ch. 73, ¶ 753.1 (1987), requires all management contracts and service agreements be filed with the Department of Insurance;

(f) Ill. Admin. Code tit. 50, § 904.30 (1987) requires at least two authorized signatures on checks in excess of $5,000.

61. On June 1, 1988, Hoffenberg, as the sole signator, fraudulently issued a Diversified check in the amount of $1,000,000 to "Towers." Said check cleared through the bank account of Diversified. None of the officers of the Companies are aware of the purpose for the check. Hoffenberg failed to provide a voucher or other documentation for the check. Hoffenberg has refused and continues to refuse to provide and information regarding the purpose of the check and refused and

-19-

continues to refuse to identify the entity that cashed the check. There is no legitimate business purpose for said check.

62. On March 15, 1988, Hoffenberg, as the sole signator, fraudulently issued a Diversified check in the amount of $100,000 on an account in the name of Diversified to TFC Management, an affiliate of Towers Financial. The check cleared Diversified's bank. Hoffenberg refused and continues to refuse to provide a voucher or other documentation for the check. Hoffenberg refused and continues to refuse to provide an explanation for the transfer of $100,000.

63. Payments to "Towers" and TFC Management are not proper dividends because (a) they were not approved by the Directors of the Companies; (b) they were not approved by the Director; and (c) the Companies lacked sufficient surplus to pay dividends.

64. The payments to "Towers" and TFC Management were not proper payments of management fees since contracts for management services between the Companies and "Towers" and TFC Management were not approved by the Director.

65. The nature of the transactions involving the payments to "Towers" and TFC Management cannot be determined. The payments were neither fair and reasonable nor reasonable in relationship to surplus.

-20-

## COUNT I
### Claim For Fraud Against Hoffenberg And The Controlling Companies

66. The Director realleges and incorporates by reference Paragraphs 1 through 65 inclusive as though fully set forth herein.

67. With the intent to derive the use, enjoyment and profits from the Companies and with the intent to injure the Companies, Hoffenberg devised a fraudulent scheme wherein he could, under the guise of acting for the Companies, acquire the assets of the Companies for his own personal gain or use, or the gain or use of Towers Financial or Towers Diversified.

68. In order to accomplish this fraudulent scheme, while acting in his capacity as Chairman of Towers Financial, Towers Diversified, Diversified, Associated and United Fire, Hoffenberg caused Towers Financial and Towers Diversified to gain control of the Companies. At the time of gaining control over the Companies, Hoffenberg represented to the Department of Insurance and the Companies that the Controlling Companies would infuse surplus into United Fire, thereby rehabilitating the ailing Companies.

69. Hoffenberg concealed his actual intentions of not infusing surplus into United Fire but converting the assets of the Companies to himself for his own personal gain or use or to Towers Financial or Towers Diversified for their gain or use.

70. The Department of Insurance reasonably relied on Hoffenberg's representation that he would infuse capital into

-21-

### United Fire.

71. In order to accomplish this scheme, Hoffenberg transferred securities and cash valued in excess of $6 million from the Companies, resulting in their insolvency and causing them to be placed in conservation and/or liquidation. These transfers were accomplished by improperly removing the Companies' bonds from the State of Illinois and either transferring funds to the Controlling Companies or their affiliates or using the funds for the benefit of Hoffenberg or the Controlling Companies.

72. Hoffenberg made these transfers and issued checks knowing that the funds were not being used on behalf of the Companies, intending to transfer the funds to himself for his own personal gain or use, or to Towers Financial or Towers Diversified for their gain or use.

73. The Companies reasonably relied on the assurance of Hoffenberg that he was acting in the best interests of the Companies.

74. In an effort to conceal the fraud, Hoffenberg hid and refused to identify where securities and funds were transferred and concealed the purposes of the transfers of funds and securities.

75. By concealing their intent not to infuse the necessary surplus into United Fire, Hoffenberg and the Controlling Companies fraudulently obtained the approval of the Director for the acquisition of the Diversified stock and the continued operation of the Companies and the depletion of their assets.

-22-

76. By mailing fraudulent financial statements which Hoffenberg and the Controlling Companies knew did not disclose the Companies insolvency or the effect of the illegal transfers of funds, investments and loans, the Companies suffered from the defrauding of the Illinois Department of Insurance which permitted the Controlling Companies to operate the Companies beyond their insolvency and to be further drained of their assets.

77. As a direct and proximate result of each of these fraudulent acts, the Companies have been damaged.

78. Malice is the gist of this action.

79. The fraudulent actions of Hoffenberg and the Controlling Companies merit the imposition of punitive damages.

WHEREFORE, the Director prays that this Court enter judgment against Hoffenberg, Towers Financial, and Towers Diversified and award Diversified, Associated and United Fire compensatory and punitive damages in an amount to be determined at trial, plus interest, costs and such other and further relief as this Court deems appropriate.

COUNT II
Claim For Conversion Against Hoffenberg
And The Controlling Companies

80. The Director realleges and incorporates by reference Paragraphs 1 through 79 inclusive as though fully set forth herein.

81. During the period of October, 1987 through July, 1988

-23-

Hoffenberg, while acting in his capacity as Chairman of Towers Financial, Towers Diversified, Diversified, Associated and United Fire, caused the transfer of securities and cash in excess of $6 million from assets or accounts properly belonging to the Companies.

82. Through these transfers, Hoffenberg and the Controlling Companies intentionally converted and disposed of the cash and interest earned on the securities for the benefit or use of Hoffenberg and/or the Controlling Companies.

83. As a direct and proximate result of these improper acts by Hoffenberg and the Controlling Companies, the Companies have been damaged in excess of $4 million.

WHEREFORE, the Director prays that this Court enter judgment against Hoffenberg, Towers Financial, and Towers Diversified and award Diversified, Associated and United Fire compensatory and punitive damages in an amount to be determined at trial, plus interest, costs and such other and further relief as this Court deems appropriate.

COUNT III
Claim For Breach Of Fiduciary Duty Against Hoffenberg

84. The Director realleges and incorporates by reference Paragraphs 1 through 83 inclusive as though fully set forth herein.

85. As a Director of the Companies, Hoffenberg was a fiduciary and owed certain statutory duties to the Companies as well as a duty to the Companies to exercise the highest degree of

-24-

honesty, care, good faith and loyalty in handling the business and affairs of the Companies.

86. Beginning in October, 1987 through the present, Hoffenberg, in breach of his fiduciary duties and in violation of Illinois law:

(a) Issued a series of checks drawn on accounts of Diversified and United Fire for his personal use or the use of Towers Financial or Towers Diversified;

(b) Caused the Companies to transfer bonds out of Illinois, make a series of imprudent investments and loans resulting in a loss of considerable sums of money;

(c) Transferred $1.1 million from United Fire and Diversified to affiliates of the Controlling Companies;

(d) Caused the Companies to violate the Illinois Insurance Code and Regulations issued thereunder as hereinabove alleged.

(e) Concealed the true financial condition of the Companies from the Directors and allowed the Companies to operate while they were insolvent.

87. These breaches of fiduciary duty were fraudulent, in conflict with the interest of the Companies and constituted waste and mismanagement of the Companies' assets.

88. As a direct and proximate result of Hoffenberg's breaches of fiduciary duties, the Companies were damaged.

89. The actions of Hoffenberg in breaching his fiduciary duties were done willfully, wantonly and with malice, entitling the Companies to punitive damages.

WHEREFORE, the Director prays that this Court enter judgment against Hoffenberg and award Diversified, Associated and United Fire compensatory and punitive damages in an amount to be determined at trial, plus interest, costs and such other and further relief as this Court deems appropriate.

COUNT IV
Claim For Breach Of Fiduciary Duty Against Brater, Chugerman and Rosoff

90. The Director realleges and incorporates by reference Paragraphs 1 through 89 inclusive as though fully set forth herein.

91. As directors, counsel and members of the investment and executive committees of the Companies, Brater, Chugerman, and Rosoff, were fiduciaries and owed certain statutory duties to the Companies as well as a duty to the Companies to exercise the highest degree of honesty, care, good faith and loyalty in handling the business and affairs of the Companies.

92. Beginning in October 1987 through the present, Brater, Chugerman and Rosoff, breached the fiduciary duties each owed to the Companies in the conduct, direction, supervision and control of the business and affairs of the Companies in that each knew or should have known:

(a) Hoffenberg issued a series of checks drawn on accounts of Diversified and United Fire for his personal use or the use of Towers Financial or Towers Diversified;

(b) They allowed the transfer of bonds out of Illinois and a series of imprudent

investments and loans to be made with the Companies' funds, resulting in a loss of considerable sums of money;

(c) Hoffenberg transferred $1.1 million from United Fire and Diversified to affiliates of the Controlling Companies;

(d) Hoffenberg caused the Companies to violate the Illinois Insurance Code and Regulations issued thereunder as hereinabove alleged;

(e) The true financial condition of the Companies was being concealed from the Companies and the Director; and

(f) The Companies continued to operate while they were insolvent.

93. In breach of their fiduciary duties, Brater, Chugerman and Rosoff failed to prevent the Companies from participating in the above described transactions, ratified the transactions and violated the Illinois Insurance Code and Regulations issued thereunder.

94. Brater, Chugerman and Rosoff breached their fiduciary duties by failure to disclose the acts leading to the Companies' financial impairment including the fraudulent and preferential transfers.

95. These breaches of fiduciary duties were fraudulent, in conflict with the interests of the Companies and constituted waste and mismanagement of the assets of the Companies.

96. As a direct and proximate result of the defendants' breach of fiduciary duties, the Companies were damaged.

97. The actions of the defendants in breaching their fiduciary duties were done willfully, wantonly and with malice,

-27-

entitling the Companies to punitive damages.

WHEREFORE, the Director prays that this Court enter judgment against Brater, Chugerman and Rosoff, and award Diversified, Associated and United Fire compensatory and punitive damages in an amount to be determined at trial, plus interest, costs and such other and further relief as this Court deems appropriate.

COUNT V
Claim For Breach Of Fiduciary Duty Against
Towers Financial And Towers Diversified

98. The Director realleges and incorporates by reference Paragraphs 1 through 97 inclusive as though fully set forth herein.

99. As the corporate parents of the Companies, exercising control and domination over the Companies such that they were mere instrumentalities, the Controlling Companies had a statutory duty to deal fairly and reasonably with their subsidiaries and as fiduciaries owed a duty to the Companies to exercise the highest degree of honesty, care, good faith and loyalty in handling the business affairs of the Companies.

100. Beginning in October, 1987 and through the present, the Controlling Companies breached the fiduciary duties each owed to the Companies in the conduct, direction, supervision and control of the business and affairs of the Companies in that each knew or should have known:

(a) Hoffenberg issued a series of checks drawn on accounts of Diversified and United Fire for his personal use or the

-28-

use of Towers Financial or Towers Diversified;

(b) They allowed the transfer of bonds out of Illinois and a series of imprudent investments and loans to be made with the Companies' funds, resulting in the loss of considerable sums of money;

(c) Hoffenberg transferred $1.1 million from United Fire and United Diversified to affiliates of the Controlling Companies;

(d) Hoffenberg caused the Companies to violate the Illinois Insurance Code and Regulations issued thereunder as hereinabove alleged;

(e) The true financial condition of the Companies was being concealed from the Companies and the Director; and

(f) The Companies continued to operate while they were insolvent.

101. In breach of their fiduciary duties, the Controlling Companies failed to prevent the Companies from participating in the above described activities, violating the Illinois Insurance Code and Regulations issued thereunder.

102. These breaches of fiduciary duties were fraudulent, in conflict with the interests of the Companies and constituted waste and mismanagement of the assets of the Companies.

103. As a direct and proximate result of the Controlling Companies' breach of fiduciary duties, the Companies were damaged.

104. The actions of the Controlling Companies in breaching their fiduciary duties were done willfully, wantonly and with malice, entitling the Companies to punitive damages.

WHEREFORE, the Director prays that this Court enter judgment against Towers Financial and Towers Diversified and award Diversified, Associated and United Fire compensatory and punitive damages in an amount to be determined at trial, plus interest, costs and such other and further relief as this Court deems appropriate.

## COUNT VI
### Claim For Negligence Against Brater And Chugerman

105. The Director realleges and incorporates by reference Paragraphs 1 through 104 inclusive as though fully set forth herein.

106. As directors of the Companies, Brater and Chugerman owed a duty to the Companies to exercise reasonable business judgment in the handling of the business and affairs of the Companies.

107. Beginning in November, 1987 through July, 1988, Brater and Chugerman, in breach of their duties, negligently allowed Hoffenberg to issue a series of checks drawn on accounts of Diversified and United Fire for his personal use or the use of Towers Financial and Towers Diversified.

108. These acts constitute negligent management of the Companies.

109. As a direct and proximate consequence of the Defendant's negligence, the Companies have been injured.

WHEREFORE, the Director prays for a judgment against Brater and Chugerman, awarding Diversified, Associated and United Fire

compensatory damages, interest, costs and such other and further relief as this Court deems appropriate.

COUNT VII
Claim For Negligence Against Hoffenberg, Brater, Chugerman And Rosoff

110. The Director realleges and incorporates by reference Paragraphs 1 through 109 inclusive as though fully set forth herein.

111. As members of an executive or investment committees formed to make decisions regarding the investments of the Companies, the individual defendants owed a duty to the Companies to comply with the Illinois Insurance Code and to exercise reasonable business judgment in making investment decisions.

112. Beginning in October 1987 through July, 1988, the individual defendants, in breach of their duties, negligently invested the funds of the Companies in securities that were inappropriate investments for the Companies. The investment in these securities was imprudent and caused the Companies to lose approximately $2,000,000.

113. As a direct and proximate result of these breaches, the Companies have been damaged.

WHEREFORE, the Director prays for a judgment against Hoffenberg, Brater, Chugerman and Rosoff awarding Diversified, Associated and United Fire compensatory damages, interests, costs and such other and further relief as this Court deems appropriate.

COUNT VIII
Claim For Breach Of Contract Against Hoffenberg, Brater, Chugerman And Rosoff

114. The Director realleges and incorporates by reference Paragraphs 1 through 113 inclusive as though fully set forth herein.

115. As employees or agents of the Companies, the individual defendants formed oral contracts with the Companies whereby the individual defendants agreed not to convert the Companies' funds to their own use or the use of the Controlling Companies. Under such oral contracts, the individual defendants were to perform their duties for the benefit of the Companies and were required to exercise a high degree of care in the performance of their duties.

116. At all times when such oral contracts were in effect, the Companies performed all the conditions, covenants and promises required of them in accordance with the terms of the contracts.

117. In breach of these contracts the individual defendants either took, or allowed the taking, of funds from the Companies for the personal gain or use of Hoffenberg or the Controlling Companies.

118. As a result of these breaches of contract, the Companies have been damaged.

WHEREFORE, the Director prays for a judgment against the Hoffenberg, Brater, Chugerman and Rosoff awarding Diversified, Associated and United Fire compensatory damages, interest, costs

and such other and further relief as this Court deems appropriate.

## COUNT IX
### Claim For Violation Of RICO Against Hoffenberg

119. The Director realleges and incorporates by reference Paragraphs 1 through 118 inclusive as though fully set forth herein.

120. This Count is brought against Hoffenberg pursuant to the provisions of 18 U.S.C. §§ 1962(a) and 1962(c).

121. Hoffenberg is a "person" within the meaning of 18 U.S.C § 1961(3).

122. Towers Financial and Towers Diversified are "enterprises" within the meaning of 18 U.S.C § 1961(4). In addition, the combination of Towers Financial and Towers Diversified constitute an enterprise within the meaning of 18 U.S.C § 1961(4). At all relevant times, these enterprises were engaged in, and the activities of such enterprises affected, interstate and foreign commerce.

123. At all times relevant hereto, Hoffenberg was associated with these enterprises within the meaning of 18 U.S.C § 1962(c).

124. Beginning in October of 1987, Hoffenberg conducted, and participated in the conduct of the above enterprises' affairs through a pattern of racketeering activity. Hoffenberg embarked on a series of schemes with the common purpose of acquiring the assets of the Companies for himself or for the Controlling

-33-

Companies in which he had an interest.

125. These schemes to defraud the Companies, their policyholders, creditors and the minority shareholders of Diversified through the operation, establishment and conduct of the business affairs of the Companies by the Controlling Companies was an ongoing course of regular business conduct beginning in or about October of 1987 and continuing until the Director took control of the Companies in July of 1988. The refusal to turnover assets and records of the Companies continues to this date. These schemes to defraud the Companies, their policyholders, creditors and Diversified's minority shareholders were accomplished through five types of schemes, each involving numerous acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343 on at least the following occasions:

(a) From November of 1987 through July of 1988, Hoffenberg wrote a series of checks transferring the funds of United Fire and Diversified through the U.S. mail to various entities for his own benefit as for the benefit of the Controlling Companies as herein alleged;

(b) In a series of stock transactions, Hoffenberg transferred the bonds and/or cash from the Companies through the U.S. mail and telephone wires which he used to purchase Emery stock for his own benefit or for the benefit of the Controlling Companies as herein alleged;

(c) In two separate transactions, Hoffenberg fraudulently transferred $1,100,000 of the Companies' funds through the U.S. mail to further the D.H. Blair scheme to purchase the Companies as herein alleged;

(d) Hoffenberg caused Associated and United Fire to send through the U.S. Mail

-34-

fraudulent annual statements for 1987 and quarterly statements for the first quarter of 1988; and

(e) Hoffenberg fraudulently represented to the Director through the U.S. mail that Towers Financial would infuse $3 million of surplus into United Fire.

126. The conduct described above constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(1) and (5).

127. Hoffenberg committed at least two acts of wire and mail fraud in connection with the transactions described above.

128. Hoffenberg ceased making the above described improper disbursements and transfers of funds only when the Director took control of management for the Companies. Hoffenberg continues to retain certain funds properly belonging to the Companies and refuses to turn over those funds to the Director.

129. As a result of the foregoing, the Companies, their policyholders, creditors and the minority shareholders of Diversified were injured in their business and property in an amount to be determined.

WHEREFORE, the Director prays for a judgment against Hoffenberg and award Diversified, Associated and United Fire compensatory damages under 18 U.S.C. § 1964, in an amount to be determined at trial, trebled, plus interest, costs and attorneys fees and such other relief as this Court deems appropriate.

COUNT X
Claim For Prohibited And Voidable Transfers Against
Hoffenberg, Brater, Chugerman And The Controlling Companies

130. The Director realleges and incorporates by reference Paragraphs 1 through 129 inclusive as though fully set forth herein.

131. Section 204(1) of the Insurance Code provides that "no company shall make any transfer of or create a lien upon any of its property with the intent of giving to or enabling any creditor or policy holder to obtain a greater percentage of his debt than any other creditor of the same class". Ill. Rev. Stat. Ch. 73 ¶ 816(1) (1987)

132. Section 204(3) of the Insurance Code (Ill. Rev. Stat. Ch. 73, ¶ 816(3) (1987)) provides in relevant part, that "Every director, officer, employee, stockholder, member, or any other person, acting on behalf of such company who, within two years prior to the filing of a complaint against such company under this Article, shall knowingly participate in the making of any transfer or the creation of any lien prohibited by Subsection (1) and every person receiving any property of, or cash surrender from such company . . . shall be jointly and severally liable therefore and shall be bound to account to the director as rehabilitator, liquidator, or conservator as the case may be."

133. In violation of Section 204(3) of the Insurance Code, Hoffenberg, Brater and Chugerman, with knowledge that the assets of the Companies were insufficient to pay their creditors in full, knowingly participated in the making of such voidable

transfers when they allowed Hoffenberg to transfer the funds and securities of Diversified, Associated and United Fire enabling the Controlling Companies and other creditors to obtain a greater percentage of the debt of Diversified, Associated and United Fire.

134. In violation of Section 204(3) of the Illinois Insurance Code, the Controlling Companies received the property of Diversified, Associated and United Fire. The receipt of such property was the result of a transfer prohibited by Section 204(1) of the Illinois Insurance Code.

135. Pursuant to Section 204(3) of the Illinois Insurance Code the transfer of cash and securities as hereinabove alleged is prohibited and voidable and, Hoffenberg, Brater, Chugerman and the Controlling Companies having participated in the transfer are jointly and severally liable to the Companies for the value of the assets transferred.

WHEREFORE, the Director prays that this Court enter judgment against Hoffenberg, Brater, Chugerman, Towers Financial and Towers Diversified, jointly and severally, and award Diversified, Associated and United Fire compensatory damages in an amount to be determined at trial, plus interest, costs and such other and further relief as this Court deems appropriate.

COUNT XI
Claim For Breach Of Contract Against Towers Financial

136. In October 1987, the Companies entered into an oral contract with Towers Financial whereby the Towers Financial would

e space in the premises usually occupied by the Companies in s Plaines, Illinois as Towers Financial's branch office.

137. Towers Financial agreed to pay the Companies its apportionate share of the expenses for use of the premises in dition to any expenses advanced by the Companies on behalf of wers Financial.

138. Towers Financial occupied the premises through July, 88.

139. At all times when the oral contract was in effect, the ompanies performed all the conditions, covenants and promises quired of them in accordance with the terms of the oral ntract.

140. Although a bill has been submitted to Towers Financial the amount of $190,729.96 for use and occupancy of the mises, Towers Financial refused and continues to refuse to pay bill.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES W. SCHACHT, Acting Director
of Insurance of the State of
Illinois, as Conservator for
United Diversified Corporation
and Liquidator for United Fire
Insurance Company,

           Plaintiff,

v.

STEVEN HOFFENBERG, MITCHELL BRATER,
CHARLES H. CHUGERMAN, MICHAEL ROSOFF,
TOWERS FINANCIAL CORPORATION, and
TOWERS DIVERSIFIED COMPANY,

           Defendants.

Case No. 91 C 4024

Honorable Charles R. Norgle

**FINAL JUDGMENT ORDER**

THIS CAUSE coming on to be heard pursuant to Agreement
between Plaintiff, STEPHEN F. SELCKE, Director of Insurance of
the State of Illinois as Conservator of UNITED DIVERSIFIED
CORPORATION and as Liquidator of UNITED FIRE INSURANCE COMPANY
and ASSOCIATED LIFE INSURANCE COMPANY and Defendants, STEVEN
HOFFENBERG, MITCHELL BRATER, CHARLES H. CHUGERMAN, MICHAEL
ROSOFF, TOWERS FINANCIAL CORPORATION, and TOWERS DIVERSIFIED
COMPANY, the parties having determined to settle and compromise
all matters raised in this cause and having entered into a
Settlement Agreement and the Court being fully advised in the
premises finds as follows:

1.    It has jurisdiction over the parties to this action and the subject matter hereof.

2.    The parties hereto have agreed to settle this litigation in accordance with the provisions of a certain Settlement Agreement dated May 4, 1992, incorporated herein by reference.

IT IS HEREBY ORDERED AS FOLLOWS:

1.    All parties shall comply with their respective undertakings set forth in the Settlement Agreement.

2.    All proceedings in this cause, including without limitation, the complaint and counterclaim shall be, and they are hereby dismissed with prejudice, each party to bear the expenses of its attorneys' fees and other costs incident to the litigation; provided, however, that this Court shall retain continuing jurisdiction over all parties to this action for the purpose of implementing and enforcing the Settlement Agreement.

AGREED:

By: _____
Barry B. Gross, One of His Attorneys

STEPHEN F. SELCKE, as Director of Insurance of the State of Illinois, as Conservator of United Diversified Corporation, and as Liquidator of United Fire Insurance Company and Associated Life Insurance Company

-2-

STEVEN HOFFENBERG, MITCHELL BRATER, CHARLES H. CHUGERMAN, MICHAEL ROSOFF, TOWERS FINANCIAL CORPORATION and TOWERS DIVERSIFIED COMPANY

By: _____
Richard L. Fenton, One of the Attorneys for Defendants

66511(2)

ENTER: _____  5-11-92

CHARLES R. NORGLE, Judge
United States District Court

-3-

STATE OF NEBRASKA
DEPARTMENT OF BANKING AND FINANCE

| | | |
|---|---|---|
| In the Matter of Towers Financial Corporation and Towers Credit Corporation, 417 Fifth Avenue, New York, New York 10016 | ) ) ) ) ) ) ) ) | FINDINGS OF FACT CONCLUSIONS OF LAW AND CONSENT ORDER |

COMES NOW the Nebraska Department of Banking and Finance, Bureau of Securities ("Department"), by and through its Director ("DIRECTOR"), pursuant to Neb. Rev. Stat. section 8-1115 (Reissue 1987) of the Securities Act of Nebraska ("Act"), having investigated the acts, practices, and transactions engaged in by Towers Financial Corporation (TFC) and its wholly-owned subsidiary, Towers Credit Corporation (TCC). As a result of the Department's investigation, and being duly advised and informed in the matter, the DIRECTOR, TFC, and TCC enter into the following Findings of Fact, Conclusions of Law, and Consent Order ("Agreement").

FINDINGS OF FACT

1.  TFC is a Nevada corporation which filed an application for a waiver of disqualification from use of the private offering exemption contained in Neb. Rev. Stat. section 8-1111(16) (Supp. 1989, as amended by LB 956, 1990) on March 5, 1990.

2.  A previous application by TFC for a waiver of disqualification from use of the private offering exemption contained in Neb. Rev. Stat. section 8-1111(16) was filed on March 1, 1989.  In connection with the March 1, 1989

1

application, TFC submitted an uncertified copy of a complaint filed in the United States District Court for the Southern District of New York. This complaint is captioned "Securities and Exchange Commission, Plaintiff - against - Towers Credit Corporation, Towers Financial Corporation, Eton Securities Corporation, Mitchell Brater, Defendants." The complaint alleges that the parties listed as defendants "have engaged, and unless enjoined, are about to engage in acts and practices constituting violations" of the Securities Act of 1933. The complaint alleges sales of over $20 million in unregistered promissory notes to over 450 persons in 30 states, and sales to investors who were financially unsophisticated and poorly situated to obtain or evaluate information about the investment quality of the notes.

3. In connection with the March 1, 1989 application, TFC submitted a copy of a document entitled "Final Consent Judgment of Permanent Injunction and Order As to Defendants Credit, Financial, and Hoffenberg" ("Final Consent") issued by the United States District Court for the Southern District of New York.

4. By correspondence dated April 4, 1989, the Department denied TFC's March 1, 1989 request for waiver of disqualification from the use of the exemption contained in Neb. Rev. Stat. section 8-1111(16) of the Act (Supp. 1989, as amended by LB 956, 1990), 48 N.A.C. 15.

5. TCC, a wholly-owned subsidiary of TFC, is a New York corporation which filed application for exemption pursuant to Neb. Rev. Stat. section 8-1111(16) on July 31, 1989. In

correspondence dated August 9, 1989, relating to this claim of exemption, TCC states that the first sale made to a Nebraska resident pursuant to this offering of promissory notes was made on July 18, 1988.

6. By correspondence dated August 24, 1989, the Department denied TCC's July 31, 1989 request for exemption. The Department determined that the "bad boy" disqualifiers from the use of the requested exemption applied, notwithstanding the fact that TCC failed to disclose the disqualifier in its original exemption notice. The Department denied a waiver of the disqualification. The Department further required TCC to rescind the offer in Nebraska and refund the money of any Nebraska purchasers.

7. The Department reviewed the March 1, 1989 TFC filing, and the July 31, 1989 TCC filing, pursuant to TFC's March 5, 1990 application for a waiver.

8. Information provided to the Department pursuant to its investigation revealed that TCC may have made three sales in Nebraska prior to the July, 1989 filing. Further information indicated TCC's first sale in Nebraska under the offering occurred on May 27, 1988, and not July 18, 1988. This information was verified by correspondence from TFC dated March 21, 1990.

9. Correspondence from TFC dated March 21, 1990 further establishes TFC did not pursue a rescission offer to the three Nebraska investors.

10. No registration statement was in effect for either TFC or TCC during the period of time covering the sales.

11. Department records reveal no record of an applicable, available, exemption claim to cover the sales.

12. Correspondence from TFC, dated March 21, 1990, states the following as the status of the three Nebraska investors:

a) State Bank of Table Rock, P.O. Box D, Table Rock, NE 68447, purchased two 12-month units for an aggregate $20,000 on July 12, 1988. Its Promissory Notes matured on July 12, 1989, at which time its principal was returned. (interest payments having been made monthly) . . . .

b) Bob and Phoniel Oppperman, 1901 2nd Avenue, South Sioux City, NE 68776, purchased a 12-month unit for an aggregate of $10,000 on July 12, 1988, at the Oppermans' Promissory Note matured on July 12, 1989, at which time their principal was returned (interest payments having been made monthly) . . . .

c) Willard and Doris Menzel, RFD 2, Pawnee City, NE 68420. The Menzels purchased a 24-month Promissory Note on May 27, 1988. The Menzels remain investors in TCC's 1988 Offering Program; however, such Promissory Note is to be paid in full on May 27, 1990.

(letter from H. Bruce Bronson, Jr., Esq.).

13. By correspondence dated March 28, 1990, the Department denied TFC's March 5, 1990 request for waiver of disqualification from the use of the exemption contained in Neb. Rev. Stat. section 8-1111(16) of the Act (Supp. 1989, as amended by LB 956, 1990), 48 N.A.C. 15.

CONCLUSIONS OF LAW

1. The Final Consent issued by the United States District Court for the Southern District of New York is an order within 48 N.A.C. 15 001.01B5.

2. An order within the description of 48 N.A.C. 15 001.01B5 disqualifies an issuer from using the Nebraska Uniform

Limited Offering Exemption found in 48 NAC 15, adopted pursuant to the authority granted in Neb. Rev. Stat. section 8-1111(16).

3. The promissory notes which TCC sold in Nebraska during 1988 are securities within the meaning of Neb. Rev. Stat. section 8-1101(12) (Supp. 1989).

4. TCC's sale of securities in Nebraska during 1988, without registration or exemption, was a violation of Neb. Rev. Stat. section 8-1104 (Reissue 1987). Section 8-1104 provides it shall be unlawful for any person to offer or sell any securities in this state unless such securities are either registered or exempt pursuant to the Act.

5. Neb. Rev. Stat. section 8-1108.01 (Reissue 1987, as amended by L.B. 956, 1990) authorizes the DIRECTOR, after giving reasonable notice and an opportunity for a hearing, to impose a fine not exceeding twenty-five thousand dollars per violation upon a person found to have engaged in any act or practice which would constitute a violation of the Act or any rule, regulation, or order issued under the Act.

6. Under the Act's statutory framework, the DIRECTOR has legal and equitable authority to fashion significant protective remedies.

7. It is in the best interests of TFC and TCC, and it is in the public's best interest, for TFC, TCC and the DIRECTOR to resolve the issues included herein.

# CONSENT ORDER

NOW, THEREFORE, the parties to this Agreement agree as follows:

Stipulations: In connection with this Agreement, TFC, TCC and the DIRECTOR stipulate to the following:

a. The Department has jurisdiction as to all matters herein.

b. An Order should be entered in this matter, which shall be in lieu of other proceedings by the Department.

TFC and TCC further represent as follows:

1. TFC and TCC are aware of their right to a hearing at which they may be represented by counsel, present evidence, and cross-examine witnesses. The right to such hearing and any related appeal is irrevocably waived.

2. TFC and TCC are acting free from any duress or coercion of any kind or nature.

3. This Findings of Fact, Conclusions of Law and Consent Order is executed to avoid further proceedings and constitutes an admission of violations of the Act solely for purposes of the Agreement and for no other purpose.

FURTHER, TFC and TCC agree to take whatever action is necessary to ensure compliance with all provisions of the Act in the future. If, at any time, the Department determines TFC or TCC have committed any other violations of the Act, the Department may take any action available to it under the Act.

IT IS HEREBY ORDERED that TFC and TCC are assessed a penalty and fine of $5,000.00, jointly and severally, to be paid in full no later than thirty (30) days from the date of

6

the entry of this ORDER. Such payment shall be made to the Nebraska Department of Banking and Finance.

IT IS FURTHER ORDERED that TFC and TCC maintain a current registration of, or in the alternative, claim an appropriate, applicable exemption with the Department at all times that offers and sales of their securities are made within Nebraska.

In the event TFC and TCC fail to comply with provisions of this ORDER, the Department may commence such action as it deems necessary and appropriate in the public interest.

It is not intended that this Agreement operate as a disqualifying order to prevent future availability of the exemption contained in Neb. Rev. Stat. section 8-1111(16) of the Act to TFC and TCC. The DIRECTOR hereby determines that it is not necessary under the circumstances that the exemption be denied by reason of this Agreement.

DATED June 11, 1990.

Towers Financial Corporation

By: [signature]
Title: Vice Chairman

DATED June 11, 1990.

State of Nebraska
Department of Banking and Finance

By: Cynthia H. Milligan
Title: Director

7

**EXHIBIT 33**

ORIGINAL

1  Richard M. Heimann
2  Daniel C. Girard
   Karen E. Karpen
3  LIEFF, CABRASER & HEIMANN
   Embarcadero Center West
4  275 Battery Street, 30th Floor
   San Francisco, California 94111
5  Telephone: (415) 956-1000
6
   Attorneys for Individual and
7  Representative Plaintiff

8        IN THE UNITED STATES DISTRICT COURT

9        FOR THE CENTRAL DISTRICT OF CALIFORNIA

10 ROBERT W. DINSMORE, TRUSTEE, on        Case No. 93  1 1 6 4 SVW
   behalf of himself and all others
11 similarly situated,                     CLASS ACTION COMPLAINT FOR
                                           INJUNCTIVE RELIEF AND
12                 Plaintiffs,             DAMAGES FOR VIOLATIONS OF
                                           THE FEDERAL SECURITIES LAWS;
13                                          RACKETEER INFLUENCED AND
                 v.                         CORRUPT ORGANIZATIONS ACT
14                                          (CIVIL RICO); FRAUD; NEGLIGENT
   TOWERS FINANCIAL CORPORATION, a         MISREPRESENTATION;
15 Delaware Corporation, STEVEN            CONVERSION; NEGLIGENCE;
   HOFFENBERG, individually and as Trustee FALSE ADVERTISING AND UNFAIR
16 of the Hoffenberg Family Trust, THE     BUSINESS PRACTICES
   HOFFENBERG FAMILY TRUST, THE
17 PROFESSIONAL BUSINESS BROKERS,         DEMAND FOR JURY TRIAL
   INC., MITCHELL BRATER, CHARLES H.
18 CHUGERMAN, ARTHUR J. FERRO,
   MICHAEL ROSOFF, THOMAS B.
19 EVANS, JR., BEN BARNES, H. BRUCE
   BRONSON, JR., THE LAW OFFICES OF
20 H. BRUCE BRONSON, JR., GIBNEY,
   ANTHONY & FLAHERTY, BRONSON &
21 MIGLIACCIO, MARVIN E. BASSON, and,
   individually and on behalf of all others
22 similarly situated, MONTEREY BAY
   SECURITIES, a California corporation,
23
                Defendants.
24
25
26
27
28

Law

-1-

Class Action Complaint

---

1        Individual and representative plaintiff, Robert Dinsmore, Trustee, on behalf of
2  himself and all others similarly situated, complains against defendants as follows:

3                      JURISDICTION AND VENUE

4        1.   This Court has jurisdiction of the first through third claims under
5  28 U.S.C. § 1331 (federal question).

6        2.   This Court has jurisdiction of the first through third claims under
7  28 U.S.C. § 1337 (regulation of commerce).

8        3.   This Court has jurisdiction of the first and second claims for relief for
9  violation sections 12(1) and 12(2) of the Securities Act of 1933, as amended, under 15 U.S.C.
10 § 77v.

11       4.   This Court has jurisdiction of the third claim for violation of
12 section 10(b) and Rule 10b-5 thereunder of the Securities Exchange Act of 1934, as amended
13 [15 U.S.C. § 78(b)], under 15 U.S.C. § 78aa.

14       5.   This Court has jurisdiction of the fourth through sixth claims under
15 18 U.S.C. § 1964(c) ("Civil RICO").

16       6.   This Court has supplemental jurisdiction of the seventh through twelfth
17 claims under 28 U.S.C. § 1367.

18       7.   The amount in controversy exceeds the sum of $50,000, exclusive of
19 interest and costs.

20       8.   Individual and representative plaintiff Robert Dinsmore resides within
21 the Central District of California.  His and numerous other Tower Financial plaintiffs'
22 investments were solicited within the Central District and defendants maintain regional sales
23 offices in Los Angeles and utilize numerous broker-dealers in the Central District of California.
24
25
26
27
28

Law

-2-

Class Action Complaint

9. In connection with the acts and conduct alleged in this Class Action Complaint, the defendants, and each of them, directly or indirectly, utilized the mails, the wires, and the instrumentalities of interstate commerce in carrying out the scheme which is the subject of this action.

**PARTIES**

10. Plaintiff Robert Dinsmore, Trustee of the Dinsmore Architects PPSP ("Dinsmore"), a resident of Santa Monica, California, invested approximately $30,000 in Towers' promissory notes, during the class period.

11. Defendant Towers Financial Corporation ("Towers") is a Delaware corporation headquartered in New York, New York. Towers conducts its business through two subsidiaries: Towers Credit Corporation ("TCC") and Towers Collection Services, Inc. ("TCS").

12. Defendant Steven Hoffenberg ("Hoffenberg") is the Chief Executive Officer, President and Chairman of the Board of Directors of Towers.

13. Defendant Professional Business Brokers, Inc. ("PBB") and the Hoffenberg Family Trust are entities through which Hoffenberg exercises control of the majority of Towers' common stock. Hoffenberg is the president of PBB, which is owned by the Hoffenberg Family Trust, of which Hoffenberg is the trustee. PBB owns in excess of 70% of Towers' outstanding stock.

14. Defendant Mitchell Brater ("Brater") is the Vice Chairman of the Board of Directors and has been Chief Operating Officer of Towers during the class period.

15. Defendant Charles H. Chugerman ("Chugerman") is the Executive Vice President and Secretary and a Member of the Board of Directors of Towers, and President of

-3-
Class Action Complaint

Towers Leasing Corporation.

16. Defendant Arthur J. Ferro ("Ferro") is the head of Towers' accounting department and prepares Towers' records and financial statements.

17. Defendant Michael Rosoff ("Rosoff") is a Member of the Board of Directors and Vice President, Chief Legal Officer and Assistant Secretary of Towers.

18. Defendant Thomas B. Evans, Jr. ("Evans"), has served on the Advisory Board of Towers, and since 1990, was a Member of the Board of Directors of Towers. Evans has provided consulting services to Towers throughout the class period.

19. Defendant Ben Barnes ("Barnes") has served on the Advisory Board of Towers and since 1990, has been a Member of the Board of Directors of Towers. Barnes has provided consulting services to Towers throughout the class period.

20. Defendant H. Bruce Bronson, Jr. ("Bronson"), is an attorney who, through defendants The Law Offices of H. Bruce Bronson, Jr., and the law firms of Gibney, Anthony & Flaherty and Bronson & Migliaccio, has provided legal services and advice to Towers in connection with the offering of the securities which are the subject of this action. Bronson actively participated in the preparation and drafting of the offering materials, and provided other advice and services in connection with the offer and sale of the securities. (Bronson, The Law Offices of H. Bruce Bronson, Jr., Gibney, Anthony & Flaherty and ...... Bronson & Migliaccio are collectively hereinafter the "Lawyer Defendants.")

21. Marvin E. Basson ("Basson") is a certified public accountant who was retained by Towers to provide accounting and auditing services, including the preparation of audited financial statements for the years 1986 through 1992. Defendant Basson performed such services with the knowledge and intent that the financial statements he prepared would

-4-
Class Action Complaint

1 be included in Towers' Annual Reports and Towers' offering materials and knew and intended

2 that the above financial statements would be sent to members of the plaintiff class, and would

3 therefore be reviewed and relied upon by class members in making their investment decisions.

4 By virtue of his relationship with defendant Towers at all relevant times, defendant Basson

5 had access to and knowledge of all information relating to the financial condition of Towers.

6 Defendant Basson had actual knowledge of, or recklessly disregarded, the material

7 misrepresentations and omissions alleged below, but nonetheless knowingly concealed, or

8 recklessly failed to disclose, such misrepresentations and omissions to the plaintiff and the

9 other members of the class.

10

11     22.    Defendant Monterey Bay Securities is a California broker-dealer which

12 has sold Towers Notes during the class period. As set forth below, Monterey Bay Securities

13 is being sued both individually and on behalf of a defendant class of broker-dealers as

14 hereinafter defined.

15

16     23.    The Towers Securities which are the subject of this Class Action were

17 offered and sold through a network of broker-dealers, who are sued herein on a representative

18 basis as members of the broker-dealer defendant class defined in paragraph 27 below.

19

20     24.    Hoffenberg, the Hoffenberg Family Trust, PBB, Brater, Rosoff,

21 Chugerman, Evans, and Barnes, by reason of their ownership, managerial and/or directorship

22 positions in Towers were at all times controlling persons of Towers within the meaning of

23 15 U.S.C. Sections 77o and 78t and had the power and influence (and exercised the same) to

24 cause Towers to engage in the unlawful acts and conduct alleged herein. By virtue of their

25 positions in Towers each of these defendants had access to adverse non-public information

26 about the business and future prospects of Towers as alleged herein and acted to conceal that

1 information from plaintiff and the members of the class defined herein.

2     PLAINTIFF CLASS ACTION ALLEGATIONS

3     25.    Individual and representative plaintiff Dinsmore brings this class action

4 on behalf of himself, and of all others similarly situated, as members of the plaintiff class.

5 Plaintiff requests that this Court certify the plaintiff class, and any appropriate subclasses

6 thereof. The proposed class is initially defined as all persons who invested in Towers

7 Financial Corporation Promissory Notes, from February 15, 1989 to the present (the "Class

8 Period"). Named Defendants, members of the Broker-Dealer Defendant Class, any entity in

9 which any of them have a controlling interest, and their legal representatives, heirs, and

10 successors are expressly excluded from membership in the plaintiff class, and any subclasses

11 thereof, to avoid conflicts of interest.

12

13     26.    This action has been brought and may properly be maintained, pursuant

14 to the provisions of Federal Rules of Civil Procedure 23(A)(1)-(4), 23(B)(1), 23(B)(2) and/or

15 23(B)(3); and satisfies the numerosity, commonality, typicality, adequacy, impairment, and

16 superiority requirements thereof, because:

17

18     a.    The members of the class are so numerous that their individual

19 joinder herein is impractical. Millions of dollars in Towers investments have been offered

20 and sold to nationally to over 2,800 members of the investing public during the Class Period.

21 The class is believed to number over 5,000 members. Individual and representative plaintiff

22 invested approximately $30,000, virtually all of which has been lost. The aggregate out-of-

23 pocket loss of the class is estimated to exceed $215 million. Class members may be

24 identified from Towers' records. If the Court determines notice to be necessary or

25 appropriate, class members may be notified of the pendency of this action by mail,

1 supplemented or substituted by published notice.

2      b. Common questions of law and fact exist as to all members of

3 the class with respect to each defendant's participation in the common course of conduct (the

4 Towers scheme) described in the Factual Allegations section of the Complaint, and the

5 conduct of the scheme itself. These questions predominate over any questions which affect

6 only the individual members of the class. These common legal and factual questions include:

7      (1) Whether defendants violated the Securities Act of 1933,

8 the Securities Exchange Act of 1934, RICO, and/or California statutory and common law as

9 alleged herein;

10      (2) Whether defendants participated in and pursued the

11 conspiracy and common course of conduct herein complained of;

12      (3) Whether defendants actually participated in, substantially

13 assisted, aided and abetted, and/or controlled the Towers scheme;

14      (4) Whether the written promotional, offering, organizational

15 and contractual documents and materials, prepared and disseminated by defendants to the

16 investing public and class members misrepresented or omitted material facts about the

17 benefits, prospects, interrelationships, financial condition, activities of, and the safety,

18 security, and economic benefits of the investments offered by Towers;

19      (5) Whether said written documents and materials

20 misrepresented the material facts relative to the true value of Towers investments;

21      (6) Whether the defendants were aware of and

22 misrepresented or omitted material facts relative to the true value of Towers investments;

23      (7) Whether the defendants acted willfully, recklessly or with

-7-

Class Action Complaint

---

1 gross negligence in omitting to state and/or misrepresenting material facts with respect to the

2 foregoing, in aiding and abetting, or in controlling such misstatements;

3      (8) Whether the market price, terms or value of the Towers

4 investments which are the subject of this action were artificially inflated, maintained, or set

5 due to the manipulative actions, misrepresentations, and/or omissions of defendants;

6      (9) Whether the defendants operated Towers as a deceptive

7 business practice;

8      (10) Whether defendants perpetrated a fraud on the

9 undeveloped market in the offer and sale of the Towers investments;

10      (11) Whether the Towers scheme constituted a fraud on the

11 regulatory process;

12      (12) Whether the Towers investments were vehicles of a

13 "Ponzi scheme;" and

14      (13) Whether the members of the class have sustained

15 damages as a result of defendants' wrongdoings; and, if so, what is the proper measure and

16 appropriate formula of damages.

17      c. Individual and representative plaintiffs claims are typical of

18 those of the proposed plaintiff class, since plaintiff made investments similar to those of the

19 class, and the proposed plaintiff class is defined to include all persons and entities (except

20 defendants and insiders as set forth in paragraph 29) who made such investments.

21 Furthermore, plaintiff and all members of the plaintiff class have sustained monetary damages

22 arising out of defendants' identical course of wrongful conduct in violation of federal and

23 state securities laws, RICO and state law as alleged herein.

-8-

Class Action Complaint

d. Individual and named plaintiff will fairly and adequately protect

the interests of the members of the class. The named plaintiff has no interests which are

adverse to the interests of the class members. Plaintiff Dinsmore invested and lost

approximately $30,000 in defendants' securities. This provides Dinsmore with a sufficient

stake in this action and the incentive to prosecute it for himself and for the class. The named

plaintiff has retained counsel competent and experienced in class actions and securities

litigation, and intends to pursue this action vigorously.

c. A class action is superior to other available methods for the fair

and efficient adjudication of the Towers litigation since individual joinder of all damaged

investors is impracticable. Although the damages suffered by each individual class member

may total many thousands of dollars, damages of such magnitude are nonetheless relatively

small given the expense and burden of individual prosecution of the complex and extensive

litigation necessitated by the fraudulent promotion of the Towers securities. Thus, it would

be virtually impossible for the class members to effectively individually redress the wrongs

done to them. Even if some or all of the class members themselves could afford such

individual litigation, the court system could not. Individualized litigation presents the

potential for inconsistent or contradictory judgments, and repetitive individualized litigation

imposes an unnecessary burden on the civil justice system. Individualized litigation magnifies

the delay and expense, to all parties, and to the court system, presented by the complex legal

and factual issues of the Towers scheme. By contrast, the class action device presents far

fewer management difficulties, and provides the benefits of unitary adjudication, economy of

scale, and comprehensive supervision by a single court.

f. The foregoing allegations demonstrate the satisfaction of the

basic certification criteria of Federal Rules of Civil Procedure 23(a)(1)-(4) and the

requirements for voluntary, or opt-out certification under Federal Rules of Civil

Procedure 23(b)(3). However, the circumstances of this litigation may likewise justify the

certification of the proposed plaintiff class on a mandatory (non-opt-out) basis under Federal

Rules of Civil Procedure 23(b)(1)(a) and/or (b), because the prosecution of separate actions by

the members of the proposed plaintiff class in the federal and/or state courts would create a

risk of (a) inconsistent or varying adjudication with respect to individual members of the class

which would establish incompatible standards of conduct for the party opposing the class, or

(b) adjudication with respect to individual members of the class which would as a practical

matter be dispositive of the interests of the other members not a party to the adjudications or

substantially impair or impede their ability to protect their interests. Mandatory certification

may be particularly appropriate should the assets or insurance of one or more defendants be

found to constitute a "limited fund," or preliminary injunctive action become necessary to

freeze or preserve assets, or to effectuate their equitable disposition.

g. In conducting the Towers scheme and by omitting and

concealing material facts regarding the scheme from investors, defendants have acted or

refused to act on grounds generally applicable to the class, thereby making appropriate final

injunctive relief or corresponding declaratory relief with respect to the class as a whole, and

making appropriate class certification under Federal Rules of Civil Procedure 23(b)(2).

## DEFENDANT BROKER-DEALER CLASS ALLEGATIONS

27. Certain of the claims for relief are brought against a defendant class of

broker-dealers pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1) and 23(b)(3). As

to such claims, Monterey Bay Securities is sued both individually and as the representative of

1 a defendant class consisting of all broker-dealers who, pursuant to the private placement

2 memoranda, participated in the offer and sale of Towers' Promissory Notes from February 15,

3 1989 to the present (the "Defendant Broker-Dealer Class").

4

5 28. The members of the Defendant Broker-Dealer Class are so numerous

6 that joinder of all such class members is impracticable. Plaintiff is informed and believes that

7 there are more than sixty members of the Defendant Broker-Dealer Class geographically

8 dispersed across the nation.

9

10 29. There are questions of law and fact common to the Defendant Broker-

11 Dealer Class which predominate over any questions affecting only individual members of

12 such class, including, inter alia, whether the Notes were offered and sold without the required

13 registration under the securities laws, and whether the offering materials disseminated with

14 respect to the offer and sale of the Notes failed to disclose material facts or misrepresented

15 material facts as alleged in this complaint.

16 30. The defenses of the representative of the Defendant Broker-Dealer

17 Class, on those claims asserted against such class, are typical of the defenses of all members

18 of such class and the named representatives of the Defendant Broker-Dealer Class will fairly

19 and adequately protect the interests of the members of such class as a whole.

20

21 31. The prosecution of separate actions by or against individual members of

22 the Defendant Broker-Dealer Class would create a risk of:

23 a. Inconsistent or varying adjudications with respect to individual

24 members of the Defendant Broker-Dealer Class which would establish incompatible standards

25 of conduct for plaintiffs; or

26 b. Adjudications with respect to individual members of the

27

28

1 Defendant Broker-Dealer Class which would, as a practical matter, be dispositive of the

2 interest of the other members not parties to the adjudications or substantially impair or

3 impede their ability to protect their interests.

4

5 c. A defendant class action is superior to the other available

6 methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no

7 difficulty which will be encountered in the management of this litigation which would

8 preclude its maintenance as a defendant class action.

9

10 FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

11 32. Individual and representative plaintiff, on behalf of himself and all

12 others similarly situated, realleges as if fully set forth each and every allegation contained in

13 paragraphs 1 through 31, and further alleges, as follows, against all defendants:

14 33. Towers financial corporation is a Delaware corporation headquartered in

15 New York, with sales offices throughout the United States, including a large sales office in

16 Los Angeles. Towers operates through two subsidiaries: Towers Credit Corporation, which

17 purchases accounts receivable and Towers Collection Services, Inc., which collects past due

18 receivables for other parties in exchange for a fee. Additionally, Towers has five Delaware

19 subsidiaries which factor health care receivables: Towers Health Care Receivables Funding

20 Corporation and Towers Health Care Receivables Funding Corporations II, III, IV and V

21 (hereinafter the "Towers Bond Funds"). The Towers Bond Funds raised approximately $196

22 million through offerings of debt securities for the purpose of buying health care accounts

23 receivables.

24 34. Defendant Towers holds itself out as a successful diversified financial

25 services company and claims to be a recognized leader in the collection, factoring and

26

27

28

management of accounts receivable. Towers 1991 Annual Report describes "factoring" of accounts receivable as a "time-tested, dependable technique for managing cash flow and assuring financial stability." Towers maintains that its core business is "assisting our customers in collecting past due accounts receivable." Towers claims that corporate factoring is a $75 billion industry serving large and middle-market companies in a wide variety of industries. Towers explains:

> Factoring enables companies that are not highly capitalized to regain control over their cash flow. Many firms can no longer afford to wait a full sixty, ninety or 120 days -- or even longer -- their customers routinely delay payment of invoices. By factoring their receivables, these companies benefit from affordable financing to meet their ongoing overhead expenses of payroll, rent, inventory, taxes and other regular business costs.

Towers claims it was the first to extend this "big company" concept to health care organizations by creating the first nationwide medical factoring resource for hospitals, nursing homes, clinics and related facilities in this $660 billion industry. Towers also purports to provide factoring services to all types of manufacturing, transportation, communications, finance, insurance and wholesale and distribution companies. In its 1991 Annual Report, Towers claims to be a national leader in this field with a "proven track record in providing these services to more than 20,000 businesses and health care organizations throughout the United States, including many of the Fortune 1000 corporations." Towers goes on to represent that it is operating at more than one billion dollars annually, covering all of its business lines. In this same report, Towers claims to have established a leadership position in

several important and growing sectors of the financial services industry, including accounts receivable collection, factoring medical accounts receivable and business office management systems for the health care industry, acquiring RTC/FDIC and banking industry accounts receivable loan portfolios, and the underwriting and policy issuance of primary insurance and re-insurance.

## THE OFFERING OF TOWERS PROMISSORY NOTES

35. Pursuant to five virtually identical private placement offering memoranda dated February 15, 1989, February 20, 1990, October 1, 1990, October 15, 1991 and March 23, 1992, which are part of a single integrated offering, Towers has sold in excess of $215 million in promissory note securities (the "Notes") to more than 2,800 investors residing in at least 40 states. The Notes were the same class of securities, sold for the same consideration and part of a single plan of financing. Plaintiffs are informed and believe that California residents are among the largest groups of investors in the Notes. The Notes bear interest at rates ranging from 12% to 16% per annum, and have terms of one or two years. The Notes have been commonly reinvested or "rolled over" on similar terms at their maturity dates. The Notes were purportedly "secured and backed by insured fully collateralized health care accounts receivables due from major insurance companies and governmental agencies." The Notes were sold under a purported exemption from registration pursuant to Section 4(2) of the Securities Act (transactions by an issuer not involving a public offering) and Regulation D (exemption for limited offers and sales) and were purportedly offered and sold to accredited investors only. Although the Notes were purportedly sold in units of $50,000 or $100,000, Towers routinely sold the Notes in fractions of such units. No registration statement was in effect during the offerings and no exemption was available with respect to

1  such securities, despite the fact that defendants Towers, Hoffenberg, and Brater are bound by

2  a Final Consent Judgment of Permanent Injunction and Order entered on November 16, 1988

3  and May 12, 1989 in an action entitled SEC v. Towers Credit Corporation, Towers Financial

4  Corporation, Steven Hoffenberg, Eton Securities Corporation, and Mitchell Brater, 88 CIV

5  5421 (SWK) (S.D.N.Y.) from violating Section 5 of the Securities Act.

6  36.    Each of the five offering memoranda purports to raise funds for the

7  purchase of accounts receivable. The first two memoranda state the proceeds will be used "to

8  purchase health care and business receivables," and in addition, the last three state that the

9  proceeds may also be used to buy loan packages purchased from the Federal Deposit

10 Insurance Corporation ("FDIC") and the Resolution Trust Company ("RTC"). The offering

11 materials state that receivables purchased with offering proceeds will collateralize the Notes.

12 For example, the February 15, 1989 memorandum states that the proceeds of the offering will

13 be used "to purchase the Accounts Receivable which will collateralize the Promissory Notes"

14 and to pay certain commissions. The same memorandum describes the Notes as

15 "collateralized by Health Care Accounts Receivables purchased from hospitals, doctors,

16 medical groups and other health care providers and Business Accounts Receivables purchased

17 from manufacturers, wholesalers and service companies, that are insured by a major insurance

18 company . . . ." Moreover, each of the offering memoranda states that the offering proceeds

19 will be deposited in special escrow accounts at Chase Manhattan Bank, N.A.

20 37.    The Notes are marketed by Towers salesmen coordinated by defendant

21 Brater and have been sold by at least 60 broker-dealers (the "Defendant Broker Dealer

22 Class") in at least sixteen states. Plaintiff is informed and believes that despite the purported

23 reliance on the private offering exemption and its safe harbor, Regulation D, defendants sold

---

1  Notes to more than 35 unaccredited investors with no reasonable basis for believing these

2  investors to be accredited.

**MISREPRESENTATIONS AND OMISSIONS OF MATERIAL FACTS IN TOWERS' OFFERING MATERIALS AND FINANCIAL STATEMENTS**

38.    Despite the glowing portrayal of the Towers companies in the offering

materials as a thriving and growing financial services business, in reality, behind the facade of

a profitable going concern, created by defendants in a scheme to deceive and defraud

investors, was a failing collection agency which was operated at a substantial loss each year

and was kept afloat by note offerings and bond offerings. As described in detail below,

Towers' financial statements were false and misleading and disguised the losses through

improper recognition of fees and revenues to the tune of millions of dollars per year. In fact,

the Towers "factoring" and collection operations did not generate sufficient profit or revenues

to pay its expenses, including the interest on investors' Notes, and in fact such expenses were

dependent upon the continuing influx of new investor funds, and Towers was in effect a

massive Ponzi scheme. As set forth in detail below, defendants entered into an agreement to

participate in the unlawful conspiracy described herein, and caused injury to plaintiff and the

class members through unlawful acts in furtherance of the conspiracy.

39.    In connection with the offer and sale of the securities which are the

subject of this action, pursuant to a scheme to defraud defendants systematically made or

caused to be made, in their written promotional materials and financial statements and annual

reports appended thereto, numerous statements of material fact which were untrue, inaccurate

and misleading, and made material omissions, including, but not limited to the following:

a.    Towers Annual Reports for fiscal years 1988 through 1991,

appended to the offering materials and/or distributed to investors, falsely portray Towers as a

financially successful and secure company when, in fact, it was incurring losses in each year.

For example, the 1989 Annual Report, represents:

(1) That the results in Fiscal 1988 established a new record of solid growth and achievement;

(2) That Towers' record of expansion across the nation brought additional profitable business and thus strengthened Towers Financial Corporation's position as a major company in the financial services industry;

(3) That a $12 million increase in expenses posted in Fiscal 1988 was a result of Towers' intensive efforts to build an infrastructure that would enable it to attract and service additional business on a nationwide basis;

(4) That the strength of Towers Financial Corporation and its subsidiaries is its ability to recover assets;

(5) That on this solid foundation, Towers is recognized as a leading participant in the accounts receivable industry including accounts receivable factoring and financing, and accounts receivable management, as well as in asset-based lending, machinery and equipment lending, inventory financing and as a provider of funds in the field of corporate buyouts;

(6) That the short term reduction of profits caused by Towers' commitment to expansion will be more than offset by future growth, built on a well-planned and solid foundation;

(7) That Towers Financial Corporation is poised to capitalize on its dynamic growth experience over the past several years as it positioned itself as a truly nationwide financial services organization;

(8) That a major factor contributing to Towers' financial strength is its ability to offer institutional investors mortgage-backed asset full recourse Bonds and Promissory Notes which are over-collateralized with accounts receivable, inventories, machinery and equipment;

(9) That Towers Collection Service, Inc., founded 14 years ago, has established itself among the leaders in servicing and managing current and past due accounts receivable;

(10) That Towers has developed a unique ability to recover assets;

(11) That an insurance policy which has been issued to a wholly-owned subsidiary of the Company will insure the accounts receivable which are acquired and financed by Towers in accordance with the policy terms and conditions.

Moreover, the 1991 Towers Financial Corporation Annual Report falsely represents:

(12) That Towers Financial Corporation enters the 1992 fiscal year in a position of unprecedented financial strength and industry leadership;

(13) That during the past year, Towers continued its impressive record of business growth, innovation and financial performance, transacting more than $800 million of accounts receivables;

(14) That Towers is currently operating at a level of more than $1 billion annually;

(15) That by focusing on four market segments where Towers holds distinct business, technological and marketing advantages, TFC has established a

1  leadership position in several important and growing sectors of the financial services industry,

2  including accounts receivable collection, factoring of medical accounts receivable and

3  business office management systems for the health care industry, acquiring RTC/FDIC and

4  banking industry account receivable loan portfolios, and the underwriting and policy issuance

5

6  of primary insurance and reinsurance;

7          (16)    That Towers is continuing to follow its long-term plan of

8  identifying under-served market niches, applying its unique expertise and resources, and

9  building momentum to obtain a meaningful market share in selected businesses;

10          (17)    That TFC's track record of more than 15 years in

11  accounts receivable management and related businesses provides clear evidence of Towers'

12  seriousness of purpose, determination to compete aggressively and ability to succeed;

13          (18)    That for more than 15 years, TFC has emerged as an

14  industry leader in its core businesses and has pioneered new businesses which extend and

15  redefine the traditional boundaries of the accounts receivable industry;

16          (19)    That Towers' expertise and unmatched resources enable it

17  to process accounts receivable on a scale and with a professionalism unequalled in this

18  business;

19          (20)    That TFC's unprecedented success in the collection of

20  past due accounts reflects the high caliber of its personnel and quality of its systems;

21          (21)    That Towers has developed a unique business system

22  which places it at the forefront of this growing field;

23          (22)    That over the past 15 years, TFC has unceasingly worked

24  to raise the standards of professionalism, effectiveness and profitability in the industry;

25

26

27

28

---

1          (23)    That the best measure of Towers' success is found on its

2  bottom line, which mirrors the consistent growth to TFC's current level of more than $1

3  billion of accounts receivables annually;

4          (24)    That over the past two decades, Towers has clearly

5  demonstrated that by enhancing its services and improving its operational efficiencies for TFC

6  customers, Towers also fulfills its financial responsibilities to shareholders;

7          (25)    That Towers continues to build on its core strengths and

8  asset based financing and health care factoring to develop new approaches and serve new

9  segments of this vitally important industry of more than $660 billion;

10          (26)    That TFC has purchased selective packages of past due

11  accounts receivable loans which show a close fit with its distinctive expertise and geographic

12  coverage.

13          b.      Towers' financial statements from fiscal years 1988 through

14  fiscal year 1991 materially overstate net income and accounts receivable in violation of

15  Generally Accepted Accounting Principles ("GAAP"), in that, inter alia:

16          (1)     Towers recognized significant amounts of fee income

17  before cash was collected, by way of a journal entry at year end, in transactions where

18  Towers acted either as an agent to collect past due accounts receivables for clients, or as a

19  principal, having purchased portfolios of receivables at a deep discount.  Moreover, Towers

20  recorded the receivables at face value, less an allowance for doubtful accounts.  Under

21  GAAP, fee income for all of these receivables should have been recognized when the

22  receivables were actually collected, and receivables should properly have been recorded as

23  assets at cost in the cases where Towers was a principal, or not recorded at all where Towers

24

25

26

27

28

1 was serving merely as a collection agent;

2     (2)    As a result of improperly recording TSCs fee income and

3 receivables in situations in which accounts were accepted on a contingency fee basis and not

4 purchased outright, fee income in Tower's financial statements was grossly overstated in

5 approximate amounts of $10 million for fiscal year 1989, $22 million for fiscal year 1990, and $56

6 million for fiscal year 1991. Moreover, Towers improperly recorded accounts receivable of

7 $101 million in fiscal year 1989, $142 million in fiscal year 1990, and $246 million in fiscal

8 year 1991, when in fact such receivables should not have been recorded. The accounts

9 receivable balances recorded in this fashion represented over half of Towers' reported assets

10 in fiscal years 1989, 1990, and 1991.

11     (3)    In the situation where Towers purchased receivables at

12 deep discounts, Towers recorded significant amounts of fee income on accrual basis at the

13 time the receivables were acquired, and simultaneously recorded the receivables at a value

14 greatly in excess of their cost to Towers, in violation of GAAP. The purchased receivables

15 should properly have been recorded at Towers' cost, with no fee income recorded until the

16 accounts receivable had actually been collected. Towers was aware at the time of purchasing

17 such receivables that most of the receivables would never be collected due to the fact that the

18 receivables were generally of poor or chargeoff quality. Towers' fee income was overstated

19 by millions of dollars in fiscal years 1990 and 1992. If the financial statements had been

20 prepared according to GAAP, they would have reflected that Towers operated at a loss.

21     c.    Other material misrepresentations and omissions contained in the

22 offering memoranda include, but are not limited to, the following:

23     (1)    That Towers planned to use the funds it raised from the

---

1 sale of the Notes to buy health care accounts receivable purchased from hospitals, doctors,

2 medical groups and other health care providers, and business accounts receivable purchased

3 from manufacturers, wholesalers and service companies and, in addition, beginning with the

4 October 1990 memorandum, to purchase FDIC loan portfolios. In fact, the only healthcare

5 accounts receivables reflected on Towers' balance sheet as of June 30, 1991 were accounts

6 purchased with the proceeds of the Towers Bond Funds, and not with the proceeds of the

7 Notes. Rather than using funds raised by the sales of Notes to purchase receivables as

8 represented, the funds were diverted to pay interest on the Notes, to pay Towers' expenses,

9 including exorbitant compensation paid to defendants Hoffenberg, Brater, Chugerman, Rosoff,

10 and Ferro which were not disclosed in the offering materials, and other fees, expenses and

11 commissions;

12     (2)    That Towers will acquire accounts receivable for up to

13 95% of their face value, will earn a minimum 5% "factoring fee" for each account receivable

14 collected and will reinvest the proceeds of collection in additional accounts receivable. In

15 fact, Towers bought few current accounts receivable with offering proceeds, but rather,

16 purchased accounts receivable or loan portfolios at a discount far in excess of 90% of the face

17 value;

18     (3)    That the Notes are collateralized by accounts receivable

19 purchased with the offering proceeds, and/or secured and backed by accounts receivable,

20 when in fact the Notes are severely under-collateralized because of the small face amount

21 and low quality of accounts receivable purchased by Towers;

22     (4)    That the offering proceeds would be kept in special

23 escrow bank accounts, to the extent the funds were not used to purchase accounts receivable

or pay certain specified expenses, and that "excess profit amounts" could be withdrawn and used for any corporate purpose only if the face value of the accounts receivable purchased with investors' funds (and proceeds from collections on these receivables) exceeded the amount of the Notes. In fact the escrow bank accounts were routinely emptied in spite of the fact that the face value of the accounts receivable purchased with investors' funds and proceeds from collections thereof never exceeded the amount of the Notes;

(5)  That the accounts receivable securing and backing the Notes were "insured", when in fact the insurance policy referred to had extensive limitations, including the fact that it covered only the purchase price paid on accounts receivable that were current at the time Towers purchased them (most accounts purchased by TCS were not covered at all because they were not actually purchased by TCS), and the facts that the policy had a ceiling of $5 million, protected only against insolvency of the debtor and not disputed accounts unless reduced to a judgment, and contained a dollar limitation per debtor;

(6)  That the offering is exempt from registration with the Securities and Exchange Commission, when in fact the exemptions claimed were not applicable;

(7)  Failure to disclose that defendant Hoffenberg was the beneficial owner of a majority of Towers' stock. Towers is described as a "publicly traded" corporation, without disclosing that over 70% of Towers is controlled by Hoffenberg through his ownership and control of Professional Business Brokers ("PBB"), a corporation owned by the Hoffenberg Family Trust, of which Hoffenberg is the trustee;

(8)  Failure to disclose that pursuant to an agreement between PBB and Towers, PBB was paid a percentage of Towers' gross profits, which amounted to

approximately $824,000 in fiscal year 1990;

(9)  Failure to disclose the exorbitant salaries paid to Hoffenberg and Brater ($900,000 plus bonus to Hoffenberg in 1991, and $750,000 plus bonus to Brater in 1991);

(10)  Failure to accurately disclose or describe prior litigation and regulatory investigations, including the litigation arising out of Towers' acquisition in 1987 of a controlling interest in United Diversified Corporation ("UDC"), which conducted business through its subsidiaries Associated Life Insurance Company and United Fire Insurance Company. Despite the fact that in a civil action captioned James W. Schacht, Acting Director of Insurance of the State of Illinois, in his capacity as Conservator of United Diversified Corporation, as Liquidator of Associated Life Insurance Company, and as Liquidator of United Fire Insurance Company v. Steven Hoffenberg, Mitchell Brater, Charles H. Chugerman, Michael Rosoff, Towers Financial Corporation and Towers Diversified Company, No. 91 C 4024 (N.D. Ill.), the defendants were alleged to have caused UDC, Associated and United Fire to suffer damages in excess of $4 million, become insolvent, and be placed in conservation and/or liquidation, and despite the fact that those defendants agreed to settle the Schacht civil RICO action (with Towers paying $3.5 million), Towers continued to account for its investment in UDC at its full cost, without establishing any reserve, even after the filing of the lawsuit. Moreover, Towers never disclosed the liquidation of the companies or the filing of Schacht v. Hoffenberg in the annual reports distributed to investors; and

(11)  Failure to disclose that Towers was in fact operating at a loss, and that the offering proceeds would be used to keep the venture afloat rather than to

purchase healthcare and other receivables as represented.

40.    As a result of and in reliance upon the standardized representations and omissions of defendants, plaintiff and the members of the class have invested in Towers Notes. At all times mentioned herein, each defendant was the authorized agent of the other defendants and has knowingly or recklessly engaged in the activities and misrepresentations alleged herein. Plaintiff and the members of the class, without knowledge of the true facts, in reliance on the representations made by defendants, and/or based on the integrity of the market place, invested in Towers Notes and have been damaged thereby.

41.    Following a lengthy investigation of Towers, the Securities and Exchange Commission (the "SEC") has concluded that Towers has insufficient operating profits to pay even the interest or commission payments relating to the Towers promissory Notes.  The SEC maintains that Towers' actual fee income is insufficient to pay its salaries, which were $22 million in fiscal year 1991.  On February 8, 1993, the SEC commenced an action against Towers Financial Corporation, Steven Hoffenberg, Mitchell Brater, and Arthur J. Ferro in the United States District Court for the Southern District of New York (No. 93 CIV 0744 (WK)), alleging that those defendants have engaged in violations of Section 5(a) and 5(c), and 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 in marketing the Notes.  On February 17, 1993, the SEC and the defendants in that action entered into a consent preliminary injunction, and United States District Judge Whitman Knapp entered an order pursuant to the consent preliminary injunction, directing an accounting, ordering a limited restraint on Towers' assets, and appointing a trustee to take custody and control of the books and records of Towers and to report to the court on Towers' finances, including overseeing the preparation of an audit of

Towers' balance sheet and those of its subsidiaries.  Pursuant to the order, pending determination of the SEC's action on the merits and further order of the court, Towers is preliminarily enjoined from making payments of principal or interest on any promissory note and issuing, offering, renewing, rolling over, extending or selling any promissory notes.  On or about February 23, 1993, Towers announced to investors, through a letter from defendant Hoffenberg, that "all payments of principle [sic] and interest for your obligations are to be frozen and stopped" as a result of the Consent Preliminary Injunction, and that the company has been put up for sale or merger.  Plaintiff and the members of the Class are thus not receiving interest under the Notes, and may never recover the principal amounts they have invested.

ROLE OF THE INDIVIDUAL DEFENDANTS

42.    Defendant Hoffenberg is Chairman of the Board of Towers and the Chief Executive Officer of Towers Financial Corporation and the President of TCC and TFC Funding Corporation.  Hoffenberg directly owns 10% of Towers common stock and additionally owns or controls 61.4% of the stock through PBB, a corporation owned by the Hoffenberg Family Trust, of which he is the trustee.  Through PBB, the Hoffenberg Family Trust receives a percentage of Towers' gross revenues ostensibly pursuant to an agreement stemming from the 1986 sale of TFC and Towers Credit to Towers.  Hoffenberg founded Towers and has been intimately involved in its daily operations.  Hoffenberg participated in the drafting of the offering materials, including the offering memoranda and the annual reports, and signed messages to investors which are prominently featured in the annual reports.  Hoffenberg participates in the negotiation of contracts for Towers, and in negotiations and communications with state and federal regulatory authorities.  Hoffenberg

1 exercises control over Towers' bank accounts, including the escrow accounts established with
2 the proceeds of the Note. He further participates in the preparation of Towers' financial
3 statements, including determination of the amount of "excess profits" appropriated by Towers
4 from the offering proceeds. He reviews Towers' financial statements and verifies information
5 contained therein, and consults frequently with Towers' auditor, and was specifically consulted
6 with respect to Towers' revenue recognition policies. Hoffenberg has corresponded with
7 investors regarding the Notes, and his signature appeared on promissory notes at least through
8 1990.

9

10       43.     Defendant Brater is the Vice Chairman of the Board of Directors of
11 Towers and has served as the Chief Operating Officer of Towers during the class period. As
12 of July 1, 1991, Brater owned 10% of the common stock of Towers and further exercised
13 control over another 10% of the common stock held in the name of Sovereign Holdings, Ltd.
14 Mr. Brater has also been President of Eton Capital Corporation and Eton Securities
15 Corporation, a registered broker-dealer which in the past has marketed Towers securities.
16 Brater is intimately involved in the day-to-day operations of Towers and has extensive
17 knowledge of Towers' business and financial condition. Brater has responsibility for
18 marketing the Notes and supervises the regional wholesalers of the Notes and a network of
19 broker-dealers who earn commissions on Note sales. Brater has been responsible for broker-
20 dealer and investor relations, and for marketing accounts receivable services. Brater has
21 frequently corresponded with Towers' investors and has made representations to investors with
22 regard to Towers' financial condition.

23

24       44.     Defendant Chugerman is the Executive Vice President and Secretary
25 and a Member of the Board of Directors of Towers and President of Towers Leasing

1 Corporation. In May 1991, Towers issued 100,000 shares of common stock to Chugerman
2 connection with its collection business. Chugerman has intimate knowledge of Towers' da
3 to-day operations and has knowledge of Towers business, cash flow and financial conditio
4 and reviewed, ratified, approved, and/or acquiesced in the misleading offering materials
5 described herein.

6

7       45.     Defendant Ferro heads Towers' accounting department and prepares,
8 directly or indirectly, Towers' books and records and financial statements. Ferro is an
9 independent contractor and provides services through his one man accounting firm, Ferro &
10 Broderick, which has no offices other than at Towers' headquarters and in Ferro's residence.

11

12       46.     Defendant Rosoff is a Senior Vice President, Chief Legal Officer and
13 Assistant Secretary and Member of the Board of Directors of Towers Financial Corporation.
14 Rosoff participated in the drafting of the offering materials, has negotiated contracts and
15 agreements, has provided legal services and advice with respect to regulatory compliance and
16 has been pictured in the Towers annual reports, along with defendants Hoffenberg and Brater
17 Rosoff has also served as Vice President, General Counsel and a Director of TFC and TCC,
18 and has intimate knowledge of Towers' day-to-day operations.

19

20       47.     Defendants Barnes and Evans served on the Towers Advisory Board
21 until they joined the Board of Directors in 1990. In February 1991, Towers issued 100,000
22 shares of common stock each to Evans and Barnes in consideration of services they had
23 rendered to the company. Evans and Barnes each allowed their past political experience to be
24 featured in Towers offering materials to lend an aura of legitimacy and respectability to the
25 Towers operation. Evans has been listed in Towers offering materials as a former
26 co-chairman of the Republican National Committee, and a former senior member of the

1  United States House of Representatives. Prior to 1990, Evans was also described in offering
2  materials as a partner of the prominent law firm of Masatt Phelps Rothenberg & Evans.
3  Barnes has been described in the offering materials as the former Lieutenant Governor of the
4  State of Texas and the former Speaker of the House of Representatives of in the State of
5  Texas. Additionally, Barnes has received substantial fees for lobbying the Texas Securities
6  Board to permit the sale (and rollover) of Towers promissory notes in Texas ($400,000 in
7  1991), and has interceded with regulatory authorities of the State of Louisiana on Towers'
8  behalf. Evans, through his former law firm, has also provided legal services to Towers during
9  the class period. Barnes and Evans reviewed, ratified, approved and/or acquiesced in the
10 misleading offering materials described herein, and lent substantial assistance to the Towers
11 scheme.
12
13        48.    Defendant Basson, a certified public accountant, provided accounting
14 and auditing services to Towers, including the preparation of audited financial statements for
15 Towers and certain subsidiaries for the years 1986 through 1992. Basson failed to perform
16 the audits in accordance with Generally Accepted Auditing Standards ("GAAS") and
17 negligently and/or recklessly certified that the financial statements conformed with GAAP.
18
19        ROLE OF THE LAWYER DEFENDANTS
20        49.    Defendant Bronson, through the law firms of H. Bruce Bronson, Jr.,
21 Bronson & Migliaccio, and Gibney, Anthony & Flaherty, was retained to advise on legal
22 matters regarding the offerings. Bronson assisted in the preparation and drafting of the
23 offering materials, which contain the false and misleading statements alleged herein, and was
24 responsible for regulatory compliance, including negotiation and correspondence with
25 regulatory authorities. Each of the defendant law firms was identified in offering
26
27
28

1  memorandum as legal counsel to Towers (Law Offices of H. Bruce Bronson, Jr. -- 2/15/89
2  memorandum; Gibney, Anthony & Flaherty -- 2/20/90 and 10/1/90 memoranda, Bronson &
3  Migliaccio -- 10/15/91 and 3/23/92 memoranda).
4
5        FIRST CLAIM FOR RELIEF
6        [Section 12(1) of the Securities Act of 1933]
7
8        50.    Individual and Representative Plaintiff, on behalf of himself and other
9  Towers Note investors, realleges, as if fully set forth, each and every allegation contained in
10 Paragraphs 1 through 49 hereof, and further alleges, as follows, against all defendants:
11        51.    Investments in the Towers Promissory Notes, as described in the Factual
12 Allegations section of this Complaint, constitute securities (hereinafter "Towers Securities") as
13 described in Section 2 of the Securities Act of 1933 (15 U.S.C. § 77b) and for the purpose of
14 the registration and anti-fraud provisions of the Act.
15        52.    Defendants, severally and in concert, directly and indirectly, have
16 participated in a continuous course of conduct, throughout the Class Period, by the use of
17 mails, wires, and other means and instruments of communication, transportation and interstate
18 commerce, and offered for sale, sold and were the proximate cause or substantial and
19 necessary factors in the sale of the subject securities in violation of Section 5 of the Securities
20 Act [15 U.S.C. § 77(e)], in that no registration statement was in effect or had been filed with
21 respect to such securities, and the offer for sale and sale of such securities by defendants was
22 not exempt from the registration requirements of Section 5 by Sections 3 or 4 of the
23 Securities Act, 15 U.S.C. §§ 77(c) and 77(d).
24
25        53.    Individual and Representative Plaintiff and class members were and are
26 being induced to pay millions of dollars, to purchase the subject Towers Securities, as a direct
27
28

and proximate result of defendants' violations of Section 5, and plaintiff and the class members, accordingly, seek to recover a full amount of consideration paid for said securities, with interest thereon, upon tender of such securities, which tender is hereby made, or, in the alternative, seek damages sustained as a result of the sale of such securities, pursuant to Section 12(1) of the Securities Act, 15 U.S.C. § 77l(1).

54. This claim under Section 12(1) is asserted on behalf of a subclass of all investors who, like individual and representative plaintiff Dinsmore, invested within one (1) year of the filing of this Class Action Complaint.

## SECOND CLAIM FOR RELIEF

[Section 12(2) of the Securities Act of 1933]

55. Individual and Representative Plaintiff, on behalf of himself and all other Towers Notes investors, realleges as if fully set forth, each and every allegation contained in Paragraphs 1 through 54 hereof, and further alleges, as follows, against all defendants:

56. Defendants, severally and in concert, directly and indirectly, participated in a continuous course of conduct, throughout the Class Period, by use of the mails, wires, and other means and instruments of communication and transportation and interstate commerce, and offered for sale, sold, and were the proximate cause and substantial and necessary factors in the sale of the subject Towers Securities to plaintiffs by means of written promotional materials, oral communications, and violations of Section 12(2) of the Securities Acts, 15 U.S.C. § 77l(2).

57. In the course of their offer for sale and sale of said securities to plaintiffs, defendants have made untrue statements of material fact and omitted to state

-31-

Class Action Complaint

---

material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, at the time they offered for sale and sold said securities to plaintiffs.

58. Each of the defendants at various times have made or assisted the other defendants in making the untrue statements and omissions of material fact enumerated above in connection with the offer and sale of securities to plaintiffs. As a result of the material false representations and omissions of said defendant, plaintiffs were and are being induced to purchase the subject securities.

59. Plaintiffs have relied on the untrue statements of material facts above made by defendants in connection with the offer and sale of said securities to plaintiffs.

60. As a proximate result of the foregoing acts, omissions and representations, plaintiffs have been damaged in the amount of their lost investments. Plaintiffs, accordingly, seek to recover the full amount of said consideration for such securities, with interest thereon, upon the tender of such securities, which tender is hereby made, or for damages sustained as a result of the sale of said securities, pursuant to Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2).

## THIRD CLAIM FOR RELIEF

[Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 Thereunder]

61. Individual and Representative Plaintiff, on behalf of himself and all other Towers Note investors, realleges, as if fully set forth, each and every allegation contained in Paragraphs 1 through 60 hereof, and further alleges, as follows, against all defendants:

62. The Towers Securities, as described in the Factual Allegations section

-32-

Class Action Complaint

of this Complaint, are securities within the meaning of, and regulated by, the Securities Exchange Act of 1934, 15 U.S.C. § 78(c).

63.    Defendants, severally and in concert, directly and indirectly, participated, aided and abetted one another, and conspired with one another to participate and to aid and abet one another in a continuous course of conduct in connection with the purchase and sale of unregistered securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78(i)] and in contravention of Rule 10b-5 promulgated thereunder, continuing throughout the Class Period, and, by use of the mails and other means and instruments of transportation and communication and interstate commerce:

    a.    Employed manipulative and deceptive devices, contrivances, schemes, and artifices, to defraud plaintiffs;

    b.    Made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.    Employed acts, practices, and a course of business which operated or would operate as a fraud and deceit upon plaintiffs.

64.    The purchase of such securities by plaintiff and the class have been made in reliance upon the manipulative and deceptive devices, contrivances, schemes and artifices employed by defendants; in reliance on the integrity of the market and the regulatory process; and in reliance upon the untrue statements and omissions of material facts made by corporate, individual and broker-dealer defendants in connection with the offer and sale of said securities to plaintiffs. Defendants knew and knew that the devices, contrivances, schemes and artifices were fraudulent at the time they employed them, or employed them in

---

reckless disregard thereof, and employed them for the purpose and with the intent to deceive and defraud and oppress plaintiffs, or in reckless disregard of plaintiffs' interests and the truth.

Defendants have conspired with each other to market securities which were essentially worthless, and fraudulently promoted, as legitimate, sham investments which were not entitled to be placed on the market. Defendants also knew and know that the untrue statements and omissions of material fact that they made were false and misleading at the time they were made, or were made in reckless disregard thereof, and made them for the purpose of, and with the intent to, deceive, defraud and oppress plaintiffs or in reckless disregard of plaintiffs' interests and of the truth.

65.    As a direct and proximate result of the foregoing, plaintiffs were and are being induced by defendants to purchase said securities and sustained losses, and were damaged thereby in that sum plus additional sums in accrued and unpaid interest, according to proof.

## FOURTH CLAIM FOR RELIEF

### [Civil RICO, 18 U.S.C. § 1962(a)]

66.    Individual and representative plaintiff, on behalf of himself and all other Towers Note investors, realleges, as if fully set forth, each and every allegation contained in paragraphs 1 through 65 hereof, and further alleges, as follows, against Defendants Hoffenberg and Brater:

67.    Each of the Defendants is a "person" as defined in § 1961(3) of RICO.

68.    Towers Financial Corporation constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4). Towers engaged in activities which affect interstate and foreign commerce. Hoffenberg and Brater each invested a portion of the income or the

proceeds of income derived from the pattern of racketeering activity described above to establish and to operate Towers.

69. As more specifically alleged herein Defendants Hoffenberg and Eaton have received income derived, directly or indirectly, from a pattern of racketeering activity involving predicate acts of securities fraud under the 1933 Act, the 1934 Act, and state law, mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

70. For the purpose of executing and attempting to execute the Towers scheme, and participate in illegal activities, throughout the Class Period, the Defendants repeatedly caused to be made and made telephone calls and made other uses of interstate wire facilities to and from this district and elsewhere in repeated violation of 18 U.S.C. § 1343 (wire fraud). For the purpose of executing and attempting to execute the aforesaid scheme to defraud, Defendants also repeatedly caused letters, mailgrams and other matters and things to be delivered by the United States Postal Service to and from this district and elsewhere, in repeated violation of 18 U.S.C. § 1341 (mail fraud). These mailings included but were not limited to the mailing of letters, promotional material, brochures, and checks to Plaintiff Class members, to state regulatory authorities and to each other and other participants in the Towers scheme.

71. The hereinabove described acts constituting a pattern of racketeering activity occurred throughout the Class Period, and consisted of acts of racketeering activity as defined under 18 U.S.C. § 1961(1), and subject to criminal prosecution, as mail fraud, wire fraud or fraud in the sale of securities, or aided and abetted such racketeering activity in the manner of a co-conspirator. The acts were mail and wire fraud in that Defendants, as hereinabove alleged, devised and intended to devise a scheme or artifice to sell and distribute

obligations and securities and for the purpose of executing such scheme placed in the posti.. service and received such matters and things from the postal service, and caused to be transmitted by means of wire and telephone communications in interstate commerce writing signs, signals and sounds for the purpose of executing such scheme and artifice, so as to impose liability under the provisions of 18 U.S.C. §§ 1341 and 1343.

72. For the purpose of executing and attempting to execute the Towers scheme, the Defendants repeatedly caused to be made and made such telephone calls and other uses of interstate wire facilities to and from this district and elsewhere, in repeated violation of 18 U.S.C. § 1343 (wire fraud).

73. The use of the interstate wires included, but was not limited to, telephone conversations with Plaintiff Class members and among Defendants and between Defendants and third parties throughout the Class Period. Defendants and their agents and employees contacted many Class members by telephone prior to and throughout the course of their investments.

74. All such communications by wire were for the purpose of executing the Towers scheme.

75. For the purpose of executing and attempting to execute the Towers scheme, the Defendants also repeatedly caused letters and other matters and things to be delivered by the United States Postal Service to and from this district and elsewhere, in repeated violation of 18 U.S.C. § 1341 (mail fraud). These mailings included but are not limited to: mailing brochures, promotional materials, letters, invoices, confirmations and other materials to Class members throughout the Class Period.

76. These thousands of mailings and other communications, both written

and oral, by wire and post, failed to state important information regarding the securities and

contained material misrepresentations regarding the same, as more fully described in

Paragraphs 32 through 49 above.

77.     Each of the aforesaid violations by the Defendants of the mail fraud and

wire fraud statutes, and fraud in connection with the purchase and sale of securities,

constitutes an instance of "racketeering activity" as defined in 18 U.S.C. § 1961(1).

78.     Each of the above described acts were interrelated, part of a common

and continuous pattern of fraudulent schemes, perpetrated for the same or similar purposes,

involving the same or similarly situated participants and methods of commission, and had

similar results impacting similar victims, the members of the Plaintiff class. These acts thus

constituted a pattern within the meaning of the RICO Act, 18 U.S.C. § 1961(5). Each act

continued and threatens to continue, conceal, and compound the original concealment and

misrepresentation.    The racketeering activities and pattern engaged in by Defendants, and

other participants in the enterprises and/or associations in fact included, without limitation, the

mailing of false and misleading promotional documents and investment documentation and

correspondence to members of the Plaintiff class, the use of the wires to disseminate false and

misleading information to members of the Class, and the transfer of funds to the enterprise

and to each of the Defendants, all in furtherance of Defendants' common course of conduct.

79.     Plaintiffs have been injured in their business or property by reason of

Defendants' violations of 18 U.S.C. § 1962(c).

80.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble their

general and special compensatory damages, plus interest, costs and attorneys fees, by reason

of Defendants' violations of 18 U.S.C. § 1962(c).

---

# FIFTH CLAIM FOR RELIEF

[Civil RICO, 18 U.S.C. § 1962(c)]

81.     Individual and Representative Plaintiff, on behalf of himself and all

other Towers Note investors, realleges, as if fully set forth, each and every allegation

contained in Paragraphs 1 through 80 hereof, and further alleges, as follows, against the

Defendants Hoffenberg, the Hoffenberg Family Trust, Brater, Chugerman, Ferro, Rosoff,

Bronson, and Basson:

82.     Towers Financial Corporation constitutes an enterprise within the

meaning of 18 U.S.C. § 1961(4) (the "Towers Enterprise").

83.     The Defendants named in this claim for relief have conducted, and

participated directly and indirectly in the conduct of, the affairs of the Towers Enterprise

through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d).  This

pattern of racketeering activity consisted of repeated acts of mail fraud, violative of 18 U.S.C.

§ 1341, repeated acts of wire fraud, violative of 18 U.S.C. § 1343, repeated acts of fraud in

connection with the purchase and sale of the subject securities.  The mailings included, but

were not limited to, the mailings of letters, promotional materials, brochures, and checks to

plaintiff class members, and to the other defendants, and other participants in the Towers

scheme.  The use of the wires included, but was not limited to, telephone conversations with

plaintiff class members and among Defendants and third parties throughout the class period,

and faxing of correspondence and other documents.

84.     In addition to defendants' actions involving the representative plaintiffs

transactions as described in the Factual Allegations section of this Complaint, defendants

engaged and are engaging in similar acts with their other customers, the members of the

proposed class, throughout the Class Period, by misrepresenting the status and nature of the plaintiffs' investments, by making knowingly false representations concerning the profits to be derived from investments, and by selling or aiding and abetting sales of unregistered securities, by failing to disclose and misrepresenting material facts, and by soliciting funds or aiding and abetting the solicitation of funds from unsuitable individuals, in a planned effort to obtain money or property by means of false or fraudulent pretenses and representations constituting indictable acts under 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

85.    Defendants have participated in the conduct of the Towers Enterprise and conspired with each other by, among other things, offering the investments to the public without registration or qualification, making misrepresentations and omissions of material fact through standardized promotional materials and scripted sales presentations, and further promoting the sale of the Towers Securities through the techniques described herein.

86.    These acts all occurred after the enactment of RICO, and within ten years of one another.

87.    Each of these acts had similar purposes, involved the same or similarly-situated participants and methods of commission, and had similar results impacting similar victims (the members of the plaintiff class). These acts thus constituted a pattern of racketeering activity within the meaning of RICO.

88.    Through said pattern of racketeering activity, defendants, and each of them, conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs.

89.    As a direct and proximate result of defendants' RICO-violative activities, plaintiff and the class members have suffered substantial loss and injury to their

business and property. Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to treble thei general and special compensatory damages, plus interest, costs and attorneys' fees, by reaso of Defendants' violations of 18 U.S.C. § 1962(c).

## SIXTH CLAIM FOR RELIEF

[Civil RICO, 18 U.S.C. § 1962(d)]

90.    Individual and Representative Plaintiff, on behalf of himself and all other Towers Note investors, realleges, as if fully set forth, each and every allegation contained in Paragraphs 1 through 89 hereof, and further alleges, as follows, against all defendants except Towers:

91.    In violation of 18 U.S.C. § 1962(d), the defendants, and each of them, conspired to conduct, and to participate in the conduct of, the affairs of the aforesaid enterprise and conducted and participated, directly and indirectly, in the conduct of the affairs of such enterprise through a pattern of racketeering activity specifically defined as and consisting of repeated acts of mail fraud, violative of 18 U.S.C. § 1341, repeated acts of wire fraud, violative of 18 U.S.C. § 1343, repeated acts of fraud in connection with violations of the federal securities laws, which breaches also constitute mail and wire fraud, violative of 18 U.S.C. §§ 1341 and 1343.

92.    At all relevant times, these defendants knowingly agreed and conspired with each other to commit the predicate acts set forth herein, with knowledge that such acts were in furtherance of the violative conduct of the enterprise, and the scheme to engage in unlawful securities transactions.

93.    Plaintiff and the class members have been injured in their business or property by reason of the conspiracy to violate 18 U.S.C. § 1962(c), in that plaintiff and the

1  class members have lost their investments and incurred additional business related losses.

2  94.  Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to treble their

3  general and special compensatory damages, plus interest, costs and attorneys fees, by reason

4  of Defendants violations of 18 U.S.C. § 1962(d).

### SEVENTH CLAIM FOR RELIEF

### [Fraud and Deceit]

5  95.  Individual and Representative Plaintiff, on behalf of himself and all

6  other Towers Note investors, realleges, as if fully set forth, each and every allegation

10  contained in Paragraphs 1 through 94 hereof, and further alleges, as follows, against all

11  defendants:

12  96.  Each of the acts, practices, misrepresentations, omissions, violations,

13  and other wrongs complained of above, have been engaged in by defendants with malice and

14  with specific and deliberate intent to oppress, defraud and deceive plaintiffs.

16  97.  Defendants, and each of them, knew and know that the other defendants

17  and others identified herein were engaged in the fraudulent conduct as aforesaid, and that said

18  conduct has constituted a breach of their duties to investors and of fraud. Notwithstanding

19  this, said defendants, and each of them, has engaged in conduct as hereinbefore described

20  which rendered and continues to render substantial assistance to, aided and abetted, and

22  concealed the fraudulent Towers scheme.

23  98.  With knowledge of the unlawful purpose thereof, said defendants, and

24  each of them, have entered into an undisclosed agreement to accomplish the Towers scheme

25  and in their actions have assisted that scheme and its injurious results.

26  99.  As a proximate result of the conduct of defendants, and each of them,

-41-
Class Action Complaint

---

1  plaintiffs have invested in Towers Securities in actual and justifiable reliance on the

2  misrepresentations and omissions of material fact and on the integrity of the market and the

3  regulatory process, and plaintiffs have been injured as aforesaid.

4  100.  As a result, and because defendants have acted and continue to act

5  maliciously and oppressively, despicably, and in callous disregard of the rights and interests

7  of plaintiffs, plaintiffs are not only entitled to the damages set forth above, but also to

8  punitive damages, in a sum not presently known, for the sake of example and by way of

9  punishing defendants.

### EIGHTH CLAIM FOR RELIEF

### [Negligent Misrepresentation]

11  101.  Individual and representative plaintiff, on behalf of himself and all other

13  Towers Note investors, realleges, as if fully set forth, each and every allegation contained in

14  paragraphs 1 through 100 hereof, and further alleges, as follows, against the Lawyer

16  Defendants and Basson:

17  102.  In making the misrepresentations and omissions alleged above, the

18  defendants named in this claim for relief acted without any reasonable grounds for believing

19  the representations they made to be true.

20  103.  Plaintiff and the other members of the class were ignorant of the falsity

22  of these statements, and believed them to be true. In actual and justifiable reliance upon said

23  omissions and misrepresentations of material fact, and on the integrity of the market and the

24  regulatory process, plaintiff and other members of the class were induced to and did invest in

26  Towers Notes. Had plaintiff and the other members of the class known the true facts, they

27  would have taken no such action.

-42-
Class Action Complaint

each member of the class suffered damages.

104.   As a direct and proximate result of the foregoing conduct, plaintiffs and

### NINTH CLAIM FOR RELIEF

#### [Negligence]

105.   Individual and representative plaintiff, on behalf of himself and all other Towers Note investors, realleges, as if fully set forth, each and every allegation contained in paragraphs 1 through 104 hereof, and further alleges, as follows, against all defendants:

106.   Defendants and each of them owed a duty to plaintiff and other members of the class to use ordinary care to prevent plaintiff and the other members of the class being foreseeably injured as a result of their conduct. Defendants breached the duty through their conduct as set forth in paragraphs 32-49 above, and plaintiff and the other members of the class were directly and foreseeably injured as a result of the breach.

107.   As a direct and proximate result of the foregoing conduct, plaintiff and the members of the class suffered damages.

### TENTH CLAIM FOR RELIEF

#### [Conversion]

108.   Individual Representative Plaintiff, on behalf of himself and all other Towers Note investors, realleges, as if fully set forth, each and every allegation contained in Paragraphs 1 through 107 hereof, and further alleges, as follows, against all defendants:

109.   Plaintiff and the members of the class were the owners of the funds which constitute the proceeds of the offer and sale of Towers Promissory Notes. As set forth in detail herein, defendants actually and substantially interfered with plaintiffs and the class members' ownership of the funds and converted the funds it to their own use to pay

exorbitant salaries, fees and expenses or for other improper purposes as set forth herein, rat than utilizing the offering proceeds for the authorized purposes.

110.   As a proximate result of defendants' conversion, plaintiff and the class members have been damaged in the amount of their principal investments.

### ELEVENTH CLAIM FOR RELIEF

#### [False Advertising]

111.   Individual and Representative Plaintiff, on behalf of himself and all other Towers Note investors, realleges, as if fully set forth, each and every allegation contained in Paragraphs 1 through 110 hereof, and further alleges, as follows, against all defendant:

112.   The scripted telephone presentations, written promotional materials, and all other promotional efforts undertaken by defendants, constitute advertising devices, disseminated by defendants, which contained and contain statements concerning services which are untrue and/or misleading, and which are known, or by the exercise of reasonable care should have been known, to be untrue or misleading, by defendants, in violation of California Business and Professions Code §§ 17500, et seq. and the similar false advertising prohibitions of the other states in which the Towers scheme operated. Plaintiff accordingly is entitled to equitable and injunctive relief, on behalf of himself and all others similarly situated, and requests the following equitable and injunctive relief:

a.   That defendants, and each of them, be enjoined to cease and desist all promotional activities and practices described in the Factual Allegations section of this Class Action Complaint;

b.   That defendants, and each of them, be enjoined from promoting,

through the use of deceptive and misleading advertising devices, the Towers securities, as described herein; and

c. That defendants, and each of them, be ordered to disgorge, for the benefit of the class, their Towers profits and compensation and/or make restitution to the Class.

## TWELFTH CLAIM FOR RELIEF
### [Unfair Business Practices]

113. Individual and Representative Plaintiff, on behalf of himself and all other Towers Note investors, realleges, as if fully set forth, each and every allegation contained in Paragraphs 1 through 112 hereof, and further alleges, as follows, against all defendants:

114. The acts, omissions, misrepresentations, practices, and non-disclosures of defendants, and each of them, as alleged hereinabove, constituted and constitute unfair business practices within the meaning of California Business and Professions Code §§ 17200, et seq. and the similar unfair business practices prohibitions of the other states in which the Towers scheme operated. Plaintiffs are accordingly entitled to equitable relief in the form of restitution and disgorgement of all earnings, profits, compensation and benefits obtained by the defendants as a result of such unfair business practices, pursuant to California Business and Professions Code §§ 17200, et seq.

WHEREFORE, Individual and Representative Plaintiff requests of this Court the following relief, on behalf of himself and of all others similarly situated:

1. For an order certifying the proposed plaintiff class under Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) on a mandatory basis; or, in the alternative, under

23(b)(3) on a voluntary basis, according to proof, and certifying any necessary or appropriate subclasses under Federal Rules of Civil Procedure 23(c)(4)(B); and certifying the proposed defendant broker-dealer class under 23(b)(1) and/or 23(b)(3);

2. For relief in the nature of rescission of class members' purchases of the subject securities and recovery of the consideration by them paid to defendants and other amounts expended in connection therewith, plus interest thereon, at the contract or a legal rate from the date of each said purchase;

3. For an accounting of the disposition of the offering proceeds and of Towers' financial condition;

4. For compensatory damages for their lost principal investments, together with interest thereon at the contract or legal rate, plus additional general and incidental damages, according to proof;

5. For exemplary and punitive damages for defendant fraud, in an amount commensurate with each defendant's ability to pay, which will be shown at trial;

6. For treble damages pursuant to 18 U.S.C. § 1964(c) for defendants' civil RICO violations;

7. For disgorgement by defendants, and restitution to plaintiffs, of all earnings, profits, compensation and benefits obtained by defendants as a result of their false advertising and unfair business practices;

8. For injunctive relief, as requested above, and the prohibition of further offers or sales of securities in violation of applicable federal and state law;

9. For costs incurred herein, including attorneys' fees to the extent allowable by law; and

deem proper.

10.   For such other and further legal and equitable relief as this Court may

DATED: February 28, 1993

LIEFF, CABRASER & HEIMANN

By: _[signature]_
   KAREN E. KARPEN

Attorneys for Individual and Representative Plaintiff

-47-
Class Action Complaint

---

triable.

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all individual and class claims so triable.

DATED: February 28, 1993

LIEFF, CABRASER & HEIMANN

By: _[signature]_
   KAREN E. KARPEN

Attorneys for Individual and Representative Plaintiff

-48-
Class Action Complaint

EXHIBIT 21



1  Richard M. Heimann
2  Daniel C. Girard
3  Karen E. Karpen
   LIEFF, CABRASER & HEIMANN
4  Embarcadero Center West
   275 Battery Street, 30th Floor
5  San Francisco, California 94111
   Telephone: (415) 956-1000
6
7  Attorneys for Individual and
   Representative Plaintiff

8

9

10                IN THE UNITED STATES DISTRICT COURT

11           FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  ROBERT W. DINSMORE, TRUSTEE, on        )  Case No. 93 1164 SVW
13  behalf of himself and all others       )
    similarly situated,                    )  AFFIDAVIT OF SERVICE OF
14                                          )  SUMMONS, COMPLAINT AND
                     Plaintiffs,            )  RELATED MATERIALS ON
15                                          )  JOHN CHRISTENSON ON BEHALF
              v.                            )  OF MONTEREY BAY SECURITIES
16                                          )
    TOWERS FINANCIAL CORPORATION, et        )
17  al.,                                    )
18                                          )
                     Defendants.            )
19                                          )

20

21

22                        [See attachment]

23

24

25

26

27

28

                            -1-
                     Affidavit of Service

FILED

Apr 22    2 19 PM '93

CLERK U.S. ...
... OF CALIF.

LIEFF, CABRASER & HEIMANN
275 Battery Street, 30th Floor
San Francisco, California

ROBERT M. DINSMORE

(415) 956-1000

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

DINSMORE vs. TOWERS FINANCIAL CORP.

PROOF OF SERVICE
(Summons)

CASE NUMBER: 93-1164-SVW (GHKx)

DOCUMENTS SERVED:

SUMMONS;

COMPLAINT;

NOTICE TO COUNSEL;

NOTICE OF RIGHT TO CONSENT TO DISPOSITION OF A CIVIL CASE BY A U.S. MAGISTRATE and

NOTICE OF ASSIGNMENT TO U.S. MAGISTRATE JUDGE and

LITIGATION GUIDELINES.

DINSMORE vs. TOWERS FINANCIAL
CASE # 93 1164 SVW

---

1. At the time of service I was at least 18 years of age and not a party to this action, and I served copies of the *(specify documents):* SEE ATTACHED LIST

2. a. Party served *(specify name of party as shown on the documents served):* MONTEREY BAY SECURITIES

b. Person served: ☐ party in item 2a ☐ other *(specify name and title or relationship to the party named in item 2a):* John Christenson, Agent for Service

c. Address: 311 Bonita Drive, Aptos, California 95003

3. I served the party named in item 2
a. ☒ by personally delivering the copies (1) on *(date):* March 3, 1993 (2) at *(time):* 3:36 P.M.
b. ☐ by leaving the copies with or in the presence of *(name and title or relationship to person indicated in item 2b):*

(1) ☐ *(business)* a person at least 18 years of age apparently in charge at the office or usual place of business of the person served. I informed him or her of the general nature of the papers.
(2) ☐ *(home)* a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the person served. I informed him or her of the general nature of the papers.

(3) ☐ *(date):*
(4) ☐ *(time):*

(5) ☐ A declaration of diligence is attached. *(Substituted service on natural person, minor, conservatee, or candidate.)*

c. ☐ by mailing the copies to the person served, addressed as shown in item 2c, by first-class mail, postage prepaid,
(1) on *(date):*
(2) from *(city):*

(3) ☐ with two copies of the Notice and Acknowledgment of Receipt and a postage-paid return envelope addressed to me. *(Attach completed form.)*
(4) ☐ to an address outside California with return receipt requested. *(Attach completed form.)*

d. ☐ by other means *(specify other manner of service and authorizing code section):*

4. The "Notice to the Person Served" (on the summons) was completed as follows:
a. ☐ as an individual defendant.
b. ☐ as the person sued under the fictitious name of *(specify):*
c. ☒ on behalf of *(specify):* MONTEREY BAY SECURITIES
under: ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (individual)   ☐ other:
d. ☐ on behalf of *(specify):*

5. Person serving *(name, address and telephone No.):*
GERAIR RALIAN

a. ☐ Fee for service: $
b. ☐ Not a registered California process server.
c. ☒ Exempt from registration under B&P § 22350(b).
d. ☐ Registered California process server:
(1) ☐ Employee or independent contractor.
(2) ☐ Registration No.:
(3) ☐ County:

NETWORK ATTORNEY SERVICE
2440 MARIPOSA STREET
SAN FRANCISCO, CA 94110
L.A. COUNTY CERTIFICATE #2097

6. ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
7. ☐ I am a California sheriff, marshal, or constable and I certify that the foregoing is true and correct.

Date: March 3, 1993

PROOF OF SERVICE
(Summons)

DOCKET NO. 990

BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE TOWERS FINANCIAL CORP. NOTEHOLDERS' SECURITIES LITIGATION

BEFORE JOHN F. NANGLE, CHAIRMAN, MILTON POLLACK,[*] ROBERT R. MERHIGE, JR., JOHN F. GRADY AND BAREFOOT SANDERS, JUDGES OF THE PANEL

TRANSFER ORDER

This litigation presently consists of fourteen actions: twelve actions in the Southern District of New York and one action in the Eastern District of Michigan.[**] Before the Panel is a motion, pursuant to 28 U.S.C. §1407, for coordinated or consolidated pretrial proceedings of these fourteen actions in the following federal district: the consolidated Naxon District of New York and Eastern District of New York.[***] The Pennsylvania plaintiffs oppose the motion. If the Panel deems that coordinated or consolidated pretrial proceedings are appropriate and two other Michigan defendant and the Panel to separate and simultaneously transfer the Michigan action to the Southern District of New York by plaintiffs to Michigan in the Southern or consolidation ask the Panel to oppose the motion, the opposing Michigan defendant and two other Michigan.

On the basis of the papers filed and the hearing held, the Panel finds that the actions in this litigation involve common questions of fact and that centralization under Section 1407 in the Southern District of New York will best serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. These actions share questions of fact arising out of allegations concerning the offer and sale of Towers Financial Corp. notes between February 1988 and February 1993. Centralization under Section 1407 is thus necessary in order to eliminate duplication of discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.

The Michigan plaintiffs have asked the Panel to separate and simultaneously remand any claims against three Michigan defendants. We point out, however, that transfer under Section

---

[*] Judge Merhige took no part in the decision of this matter.

[**] All twelve New York actions have been consolidated before Judge Whitman Knapp. These actions are captioned In re Towers Financial Corporation Noteholders Litigation, S.D. New York, Master File No. 93 Civ. 0810 (WK).

---

1407 has the salutary effect of placing all actions in this docket before a single judge who can formulate a pretrial program that: 1) allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues; and 2) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties. In re Joseph F. Smith Patent Litigation, 407 F. Supp. 1403, 1404 (J.P.M.L. 1976). An in re such non-common claims to proceed with discovery on common issues, we are unwilling to overall benefit of the parties, we are unwilling to close security by the transferee judge, the transferee judge may, on further resolution of such actions and other appropriate. At the Panel finds that pretrial proceedings in any action of the Panel deems that pretrial proceedings in a just and expeditious resolution of all of the other by the transferee judge in the just and of any claims such a fashion appropriate. At any claim or actions of this same, as actions of all of the other by the transferee judge, the transferee judge may of before us, to make such a determination of this same. We are unwilling to be remanded at the just and with a minimum of delay. See Rule 14, R.P.J.P.M.L. 147 F.R.D. 589, 597-99 (1993).

We are persuaded that the Southern District of New York is the appropriate transferee forum for this docket. We note that i) the twelve New York actions have already been consolidated in the New York court by Judge Knapp before whom six other related Towers actions are pending, ii) Towers is headquartered in New York and key officers and employees work and reside there, and iii) that relevant documents and key witnesses are likely found there.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the actions listed on the attached Schedule A are transferred to the Southern District of New York and, with the consent of that court, are assigned to the Honorable Whitman Knapp for coordinated or consolidated pretrial proceedings with the actions pending in that district and listed on Schedule A.

FOR THE PANEL:

John F. Nangle
Chairman

MDL 994 — In re Towers Financial Corp. Noteholders Securities Litigation

**SCHEDULE A**

Eastern District of Michigan

General Retirement System of the City of Detroit, et al. v. Steven Hoffenberg, et al., C.A. No. 2:93-73209

Southern District of New York

Bernard Baron, et al. v. Steven Hoffenberg, et al., C.A. No. 1:93-810
Edward W. Murphy, Jr. v. Towers Financial Corp., et al., C.A. No. 1:93-961
Donna M. Ziegler v. Towers Financial Corp., et al., C.A. No. 1:93-987
Charlotte Riviera v. Towers Financial Corp., et al., C.A. No. 1:93-992
Anthony Izzo, Jr. v. Towers Financial Corp., et al., C.A. No. 1:93-1045
Bernard Baron, et al. v. Towers Financial Corp., et al., C.A. No. 1:93-1047
Timothy J. Casey, et al. v. Towers Financial Corp., et al., C.A. No. 1:93-1094
J.G. Lehman, et al. v. Towers Financial Corp., et al., C.A. No. 1:93-1095
Martin Penner v. Towers Financial Corp., et al., C.A. No. 1:93-1155
Robert W. Dinsmore v. Towers Financial Corp., et al., C.A. No. 1:93-449
Daniel Thom, et al. v. Towers Financial Corp., et al., C.A. No. 1:93-1303
Dr. John J. Siudmak et al. v. Towers Financial Corp., et al., C.A. No. 1:93-1343

Eastern District of Pennsylvania

Frederick P. Rothman, et al. v. Steven Hoffenberg, et al., C.A. No. 2:93-4508

CERTIFIED MAIL
P 046 573 446
Fold at line over top of envelope to the right of the return address

Proceedings include all events.
1:93cv1303  Thom, et al v. Twrs Financial Corp., et al    REF

3/4/93   1   COMPLAINT filed; Summons issued and Notice pursuant to 28 U.S.C. 636(c)/. FILING FEE $ 120.00 RECEIPT # 186784 (ed) [Entry date 03/05/93].

3/4/93   2   STATEMENT OF RELATEDNESS; 93 Civil 810 pending before the Hon. Whitman Knapp. (ed) [Entry date 03/05/93]

3/5/93   --   CASE REFERRED TO Judge Knapp (ed)

Docket as of March 8, 1993 12:07 pm                    Page 2

U.S. District Court
Southern District of New York - Civil Database (Foley Square)

CIVIL DOCKET FOR CASE #: 93-CV-1303

REF

Thom, et al v. Towe Financial Corp., et al          Filed: 03/04/93
Assigned to: Judge Unassigned                        Jury demand: Plaintiff
Demand: $0,000                                       Nature of Suit: 850
Lead Docket: None                                    Jurisdiction: Federal Question
Dkt\$ in other court: None

Cause: Securities Exchange Act of 1934

DANIEL THOM                    Edward S. Grossman
plaintiff                      [COR LD NTC]
                               Bernstein, Litowitz, Berger, &
                               Grossmann
                               1285 Avenue of the Americas
                               New York, NY 10019
                               (212) 554-1400

SHARON THOM                    Edward S. Grossman
plaintiff                      (see above)
                               [COR LD NTC]

v.

TOWERS FINANCIAL CORPORATION
defendant

ROSE SECURITIES CORPORATION
defendant

STEVEN HOFFENBERG
defendant

MITCHELL BRATER
defendant

ARTHUR J. FERRO
defendant

Docket as of March 8, 1993 12:07 pm                  Page 1

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NOTICE OF
ASSIGNMENT

93 CV 1303 WK

U.S. DISTRICT COURT
FILED
MAR 10 1993
S.D. OF N.Y.

Thom
- v -
Towe

JUDGE    Knop

Pursuant to the memorandum of the Case Processing Asst. the above entitled
action is assigned to the calendar of

The attorneys for the plaintiff are requested to serve a copy of the Notice of
Assignment on all defendants.

All future documents submitted in this action are to be presented in the Clerk's
Office for filing and shall bear the assigned Judge's initials after the docket number.

Dated:    3/10/93

JAMES M. PARKISON, CLERK

cc: Attorney of Record

Deputy Clerk

## MEMORANDUM

DATE: 3/10/93

TO: UNIT: Case Processing

FROM: Dorothy Guralnik, Case Processing

SUBJECT: ASSIGNMENT OF A CASE AS RELATED.

RE: 93 CV 1303    THOM  -v-  TOWER

The above action is assigned to Judge KNAPP
from the unassigned docket as related to    93 CV 810

The case processing clerk shall prepare and file an original Notice
of Assignment and mail copies to each attorney of record.

cc: Judge KNAPP
    File Clerks

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------X

DANIEL THOM and SHARON THOM,

           Plaintiffs,

   - against -          CIV. No.

TOWERS FINANCIAL CORPORATION, ROSE    CLASS ACTION
SECURITIES CORPORATION, STEVEN      COMPLAINT
HOFFENBERG, MITCHELL BRATER
and ARTHUR J. FERRO,

           Defendants.

-----------------------------X

Plaintiffs, by their attorneys, allege upon information and
belief, except as to paragraphs 5 and 34, which are alleged upon
knowledge, as follows:

### I.  JURISDICTION AND VENUE

1.  This Court has jurisdiction under Section 22(a) of the
Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77v, Section 27
of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C.
§ 78aa, and 28 U.S.C. § 1331. The Court has supplemental
jurisdiction under 28 U.S.C. § 1367 over the common law claim
alleged herein.

2.  The claims alleged herein arise under Section 12 of the
1933 Act, 15 U.S.C. § 77l, and Section 10(b) of the 1934 Act, 15
U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

3.  Many of the acts alleged herein occurred in this
District.  Towers Financial Corporation ("Towers" or the
"Company") maintains an office and does business in this
District.  Two of the three individually named defendants also
reside in this District.

93 CIV 1303

4. In connection with the acts and conduct alleged herein, defendants, directly or indirectly, used the mails and instrumentalities of interstate commerce.

## II. THE PARTIES

5. Plaintiffs Daniel Thom and Sharon Thom purchased notes issued by Tower during the class period. On June 26, 1992 they purchased $50,000 of 12% notes due June 26, 1993; on June 30, 1992 they purchased $55,000 of 12% notes due June 30, 1993; and on December 20, 1992 they purchased $80,000 of notes due March 18, 1993.

6. Defendant Towers Financial Corporation is a Delaware corporation with its principal place of business in New York, New York. Towers has two operating subsidiaries: Towers Credit ("TCC"), which is engaged in the purchase of commercial accounts receivable, and Towers Collection Services, Inc. ("TCS") which is engaged in the collection of past-due receivables for third parties on a contingency basis. Towers also conducts business operations, such as the purchase of certain receivables. In addition, Towers has five subsidiaries, incorporated in Delaware, that specialize in factoring healthcare receivables, Towers Healthcare Receivables Funding Corporation, and Towers Healthcare Receivables Funding Corporations II, III, IV and V (collectively the "THRFC Bond Funds"). By June 30, 1992, the THRFC Bond Funds had raised approximately $196 million through offerings of debt securities for the purpose of buying healthcare accounts

2

receivables. Investors in the THRFC Bond Funds, either owned outright, or had a perfected security interest in, all of such healthcare receivables.

7. Towers' common stock trades on over the counter market and is not listed on the National Association of Securities Dealer Automatic Quotation System or any exchange. Towers does not file periodic reports with the Commission under the provisions of the 1934 Act but does issue annual reports to shareholders.

8. On August 4, 1988, the Commission filed an injunctive action alleging violations of Section 5 of the 1933 Act, captioned _SEC v. Towers Credit Corporation, Towers Financial Corporation, Steven Hoffenberg, Prom Securities Corp. and Mitchell Brater_, 88 Civ. 5421 (SWK). A Final Consent Judgment of permanent injunctive and Order as to Towers Credit Corporation, Towers, and Hoffenberg was entered on November 16, 1988 and, as to Brater, on May 12, 1989 (the "injunction"). Towers, Hoffenberg, and Brater are bound by the injunction from violating Section 5 of the 1933 Act.

9. Defendant Steven Hoffenberg ("Hoffenberg") a/k/a Barry Cohen, age forty-eight, is the chief executive officer, president and chairman of the Board of Towers. Through the Hoffenberg Family Trust, of which Hoffenberg is the sole trustee, and Professional Business Brokers, Inc. ("PBB"), which is a corporation owned by the Hoffenberg Family Trust, Hoffenberg is

3

the controlling shareholder of Towers. Hoffenberg lives in New York, New York.

10. Defendant Mitchell Brater ("Brater"), Age fifty-one, is the vice chairman of the Board of Towers and has responsibility for marketing the Towers promissory notes (the "Notes") through a nationwide network of registered broker-dealers. Brater lives in New York, New York.

11. Defendant Arthur J. Ferro ("Ferro"), age fifty-one, heads Towers' accounting department, and prepares, directly or indirectly, Towers' books and records and financial statements. (Defendants Hoffenberg, Brater and Ferro are referred to collectively herein as the "Individual Defendants"). As an independent contractor, Ferro provides services through his one-man accounting firm, Ferro & Broderick, which has no offices other than Towers' headquarters, and in Ferro's residence in Valley Stream, New York. Ferro was once licensed as a CPA by the State of New York, but his registration statement is no longer active.

12. Hoffenberg, as chief executive officer, president and chairman of the Board of Towers, directed the actions of Towers, Brater and Ferro.

13. Each defendant herein is sued individually and as an aider and abettor, and the liability of each arises from the fact that each has engaged in all or part of the unlawful acts, plans, schemes, transactions and artifices to defraud as charged herein.

14. The Individual Defendants, by reason of their management position in Towers and/or their membership on Towers Board of Directors, were at all times controlling persons of Towers within the meaning of Section 15 of the 1933 Act and Section 20 of the 1934 Act. Because of their positions in the Company, the Individual Defendants had sufficient power and influence to cause Towers to engage in the unlawful acts and conduct alleged herein.

15. The Individual Defendants caused Towers to engage in the unlawful acts and conduct alleged herein.

16. Defendant Rose Securities Corporation ("Rose Securities") is a broker-dealer located in Carlsbad, California. Plaintiffs made each of their purchases of Tower notes through Rose Securities.

III.
CLASS ACTION ALLEGATIONS

A.    Plaintiff Class Allegations

17. Plaintiffs bring this action on their own behalf and as a class action under Rule 23 of the Federal Rules of civil procedure on behalf of a class (the "Class") consisting of all persons (other than defendants and the members of their immediate families, their heirs, successors and assigns) who purchased Towers' Notes within three years before the filing of this Complaint (the "Class Period"), and suffered damages as a result thereof.

18. Plaintiffs also sue on behalf of a subclass (the "subclass") of all persons who purchased Towers' Notes within one year of the filing of this complaint (the "Subclass Period") for purposes of the claim under Section 12 of the 1933 Act.

19. During the Class Period and the Subclass Period, as part of a single integrated offering that began in February 1989, the defendants fraudulently sold over $215,000,000 in Notes to over two thousand eight hundred investors.

20. Joinder of all Class and Subclass Members is impracticable. The number of class members and their addresses are unknown to plaintiffs but can be ascertained from the books and records of Towers or its agents.

21. Plaintiffs' claim are typical of the claims of the members of the Class and Subclass. Plaintiffs and the members of the Class and Subclass have sustained damages because of defendants' unlawful activities alleged herein. Plaintiffs have retained counsel competent and experienced in class and securities litigation and intend to prosecute this action vigorously. The interests of the Class and Subclass will be fairly and adequately protected by plaintiffs.

22. Common questions of law and fact exist as to all members of the Class and Subclass, and predominate over any questions solely affecting individual members of the Class and Subclass. Among the questions of law and fact common to the Class and Subclass are:

i) Whether defendants committed fraud in violation of federal securities

6

laws and the common law by preparing, causing to be prepared, disseminating, or aiding and abetting in the preparation or dissemination of materially false and misleading statements;

ii) whether defendants violated Section 12 of the 1933 Act and Section 10(b) of 1934 Act and Rule 10b-5 promulgated thereunder;

iii) whether the individual Defendants are controlling persons of Towers within the meaning of Section 15 of the 1933 Act and Section 20 of the 1934 Act; and

iv) whether plaintiffs and the Class have sustained damages and the appropriate measure thereof.

23. A class action is superior to other available methods for the fair and efficient adjudication of this action. Although damages suffered by each individual class member are relatively small, damages on a class-wide basis are significant. Given the expense and burden of prosecuting these claims individually a class action is superior for achieving a fair result for the Class. A class action also avoids the possibility of conflicting or inconsistent judgments in individual actions.

Defendant Class Allegations

24. The First and Second Claims for Relief are brought against a defendant class of broker-dealers pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1) and 23(b)(3). As to such claims, Ross Securities is sued both individually and on behalf of a defendant class consisting of all broker-dealers who, pursuant to the private placement memoranda, participated in the

7

offer and sale of Towers' Notes from March 1, 1990 through February 8, 1993 (the "Defendant Class").

25. The members of the Defendant Class are so numerous that joinder of all such class members is impracticable. Plaintiffs believe that there are more than sixty members of the Defendant Class. The Defendant class, including defendant Ross Securities, actively participated in marketing and the sale of Notes, and derived commissions and other compensation for such efforts.

26. There are questions of law and fact common to the Defendant Class which predominate over any questions affecting only individual members of such class, including, inter alia, whether the Notes were offered and sold without the required registration under the securities laws, and whether the offering materials disseminated with respect to the offer and sale of the Notes failed to disclose material facts or misrepresented material facts as alleged in this complaint.

27. The defenses of the representatives of the Defendant Class, on those claims asserted against such class, are typical of the defenses of all members of such class and defendant Ross Securities will fairly and adequately protect the interests of the members of such class as a whole.

28. The prosecution of separate actions by or against individual members of the Defendant Class would create a risk of:

a. Inconsistent or varying adjudications with respect to individual members of the Defendant Class which would establish incompatible standards of conduct for defendants or

8

---

of the Defendant Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

c. A defendant class action is superior to the other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a defendant class action.

IV. FACTUAL ALLEGATIONS

A. The Unregistered Offering and Sale of Securities

29. Beginning no later than February 1989, and continuing through the present, Towers, Hoffenberg and Exeter, in violation of the injunction, have been engaged in an unregistered offering and sale of securities, namely, over $215 million in Notes. No registration statement was or is in effect as to such securities and no exemption from registration was or is available.

30. Towers sold the Notes pursuant to five separate offering memoranda, which are part of a single integrated offering. Towers sold approximately $51 million in Notes pursuant to an offering memorandum dated February 15, 1989 (the "February 1989 offering memorandum"); approximately $49 million in Notes pursuant to an offering memorandum dated February 20, 1990 (the "February 1990 offering memorandum"); approximately $76

9

million in Notes pursuant to [illegible] October 1, 1990 (the "October 1990 offering memorandum"); and approximately $39 million in Notes pursuant to an offering memorandum dated March 23, 1992 (the "March 1992 offering memorandum"). The Notes were the same class of securities, sold for the same consideration and part of a single plan of financing.

11. Towers' sold the Notes pursuant to a purported exemption from registration under Section 4(2) of the 1933 Act (transactions by an issuer not involving a public offering) and Regulation D (exemption for limited offers and sales). The Notes are for terms of one or two years, with interest rates ranging from 12% to 14% per annum, and 14% to 16% per annum, respectively.

12. Brater, and other employees of Towers acting at Brater's direction, have solicited registered broker-dealers to market the Notes. Brater, or others acting at his direction, mailed over 25,000 offering memoranda to over 2,000 broker-dealers to potential investors. At least sixty broker-dealers in at least sixteen states sold the Notes to their customers. Some of these broker-dealers purchased Notes for themselves or family members.

33. The Notes have been offered and sold to thousands of persons and entities, who reside in at least 40 states. Many of the investors are unsophisticated, and are living on fixed

34. In making the purchases described above, plaintiffs relied on the Offering Documents, and on the Annual Reports issued by Defendants, including the 1991 Annual Report (issued in or around October 1991) and the 1992 Annual Report (issued in or around October 1992).

35. As set forth below, Towers has not distributed to the Notes investors certain accurate registration-type information material to an understanding of Towers, its business, and the Notes, as required by Securities Act Rule 502 [17 C.F.R. § 230.502] and Regulation S-K.

36. As of June 30, 1992, Towers had $198 million in Notes outstanding.

B.    **Misrepresentation By Towers Of Its Financial Condition**

37. Towers' Annual Reports for fiscal years 1988, 1989, 1990, 1991, and 1992, distributed to investors and potential investors, contained false and misleading financial statements which projected Towers as a financially successful and secure company, when, in fact, each year it was incurring greater losses. Through these false and misleading financial statements,



...their investments into two notes as described herein.

38. In the financial statements for fiscal years ended on June 30, 1988 ("FY 1988"), June 30, 1989 ("FY 1989"), June 30, 1990 ("FY 1990"), and June 30, 1991 ("FY 1991"), Towers grossly overstated its total assets (due to inflated accounts receivable), net income (due to inflated fee income) and shareholders' equity, in violation of generally accepted accounting principals ("GAAP"), as follows:

a. In FY 1988, Towers reported net income of $1.4 million when, in fact, Towers had incurred a loss of approximately $16 million; total assets of $76 million or less, approximately when, in fact, Towers had assets of $48 million or less, and shareholder equity of $6.5 million when, in fact, Towers had a deficit of approximately $35 million.

b. In FY 1989, Towers reported net income of $3.5 million when, in fact, Towers had incurred a loss of approximately $24 million; total assets of $122 million when, in fact, Towers had assets of $22 million or less, and shareholder equity of $10.3 million when, in fact, Towers had a deficit of approximately $35 million;

c. In FY 1990 Towers reported income of $3.9 million when, in fact, Towers had incurred a loss of approximately $36 million total assets of $195 million or less, approximately $13.4 million when, in fact, Towers had equity of $71 million, in fact, Towers had a deficit of approximately $71 million/ and shareholder

12

---

million when, in fact, Towers had incurred a loss of approximately $61 million total assets of $193 million, in fact, Towers had assets of $513 million when, in fact, Towers had a shareholder equity of approximately $250 million when, in fact, Towers had a deficit of approximately $20.1 million when, in fact, Towers had a deficit of approximately $130 million when, in fact, Towers had a deficit of approximately $130 million.

39. Hochberg knew or was reckless in not knowing, that Towers' financial statements were materially false and misleading, because, among other things, he had daily responsibility for Towers' operations and directly or indirectly in the preparation and review of Towers' financial statements.

40. Farro knew, or was reckless in not knowing, that Towers' financial statements were materially false and misleading, because, among other things, Farro prepared or oversaw the preparation of Towers' books and records and financial statements.

41. Breter knew, or was reckless in not knowing, that Towers' financial statements were materially false and misleading, because, among other things, Breter had knowledge of Towers' true financial condition.

c. Collection Receivables

42. TCS collected past-due accounts receivable ("collection receivables") for third-party clients on a contingency-fee basis. TCS pays no monies for these receivables and is obligated to return all collection receipts to its client.

13

TCS improperly recorded its income for its services at year-end, before performing significant collection activities and prior to cash collections. As a result of this improper recognition of fee income, Towers' fee income of $36 million was overstated by at least $10 million in FY 1989. For FY 1990, TCS improperly recognized $22 million in fee income, out of Towers' total reported fee income of $56 million. For FY 1991, TCS improperly recorded $56 million in fee income, out of Towers' total reported fee income of $97 million.

43. Towers also improperly recorded these collection receivables as Towers' own assets. These collection receivables did not belong to TCS, but rather to TCS's clients, which had entrusted these to TCS as their agent. TCS, therefore, could not properly record these collection receivables at any amount on its books and records. Moreover, TCS recorded these past-due accounts receivable at amounts grossly in excess of their value.

44. For FY 1989, Towers reported accounts receivable of $112 million, of which approximately $101 million were collection receivables. For FY 1990, Towers reported $177 million in accounts receivable of which approximately $142 million were collection receivables. For FY 1991, Towers reported $437 million in accounts receivable of which $246 million were collection receivables.

14

delinquent receivables for a price which constituted a deep discount to face value. Instead of properly recording these receivables at cost, Towers improperly recorded them at substantially above cost. Towers also improperly recorded significantly all income at the time the receivables were acquired, instead of properly recording no fee income until such time as the cost of the receivable was recaptured by cash collections.

F. **Federal Deposit Ins. Co. Loan Portfolios**

46. Towers has also inflated its accounts receivable and fee income by improperly recognizing income from loan portfolios originating from banks liquidated by the Federal Deposit Insurance Co. (the "FDIC loan portfolios"), and recording these FDIC loan portfolios at amounts grossly in excess of their cost.

47. In FY 1990, Towers bought various FDIC loan portfolios, with a face value of over $50 million, for less than $500,000. These FDIC loan portfolios contained nonperforming, distressed loans. In FY 1990, Towers improperly recorded fee income of $24 million from the FDIC loan portfolio, and also improperly recorded the portfolio as accounts receivable valued at $24 million. Towers had virtually no cash receipts from these FDIC portfolio in FY 1990.

48. In FY 1991, Towers purchased additional FDIC loan portfolios with a face value of $6 million for approximately

15

$10,000 in Towers' improperly-recognized $2 million in fee income, and recorded these distressed FDIC loan portfolios as accounts receivable valued at $6 million. As a result of the improper recording of the FDIC loan portfolios in FY 1990 and FY 1992, accounts receivable in FY 1991 were overstated by $13 million. In FY 1991, less than $1 million in cash receipts was collected on these receivables.

49. Towers falsely stated in its 1991 Annual Report that "income on RTC/FDIC loans is recognized as they are collected." In fact, Towers recorded fee income in much larger amounts than Towers ever collected in FY 1990 or FY 1991, as described in paragraphs 46 through 48.

V. Bank of America

50. In or around January 1991, Towers purchased a portfolio of credit-card balances from the Bank of America, with a face value of approximately $10 million for less than $200,000 (the "Bank of America portfolio"). Before selling the portfolio to Towers, Bank of America had charged off all of the balances as worthless after other private collection agencies had failed to collect on them. In FY 1991, Towers collected little or no amounts on the Bank of America portfolio.

51. Towers improperly recorded fee income of $4 million for the Bank of America portfolio in FY 1991, causing Towers' reported fee income in FY 1991 to be overstated by that amount. Towers also improperly recorded the Bank of America portfolio at

16

of the portfolio) of Towers' FY 1991 accounts receivable.

U. Southwestern Bell Portfolio

52. In or around June 30, 1988, TC purchased a portfolio of past-due accounts receivable from Southwestern Bell Yellow Pages, Inc. ("Southwestern Bell") with a face value of approximately $28 million, for less than $300,000 ("Southwestern Bell portfolio"). Before selling the portfolio to Towers, Southwestern Bell had charged off all of the balances as worthless after private collection agencies including Towers, had failed to collect on them. To date, TC has collected less than $1 million on the Southwestern Bell portfolio.

53. Towers improperly recorded fee income of $19 million for the Southwestern Bell portfolio in FY 1988, resulting in the overstatement of Towers' fee income in FY 1988 ($21 million) by that amount. Towers also improperly recorded the Southwestern Bell portfolio at $28 million (less the cost of the portfolio) of Towers' FY 1988 accounts receivable.

54. The improperly recorded fee income and accounts receivable, as set forth in paragraphs 37 through 53, resulted in material misstatements in Towers' financial statements for FY 1988 through FY 1991.

W. Investment in United Diversities

55. In its financial statements for FY 1989 through FY 1991, Towers had further inflated its assets by improperly

17

supplying funds/investments in United Diversified Corporation ("UDC"), which conducted business through its subsidiaries, Associated Life Insurance Co. ("Associated") and United Fire Insurance Co. ("United Fire").

56. Towers acquired a controlling interest in UDC in 1987 for $3 million, and Hoffenberg became chairman of the Boards of UDC, United Fire, and Associated.

57. Towers improperly recorded the purchase cost of $3 million, as an investment on its financial statements from FY 1989 through FY 1991. As set forth below, the UDC investment had become seriously impaired by FY 1989 and by at least FY 1991, posed a threat of liability beyond the cost of the original investment.

58. In July 1988, the Illinois Director of Insurance (the "Insurance Director") obtained an order placing UDC, Associated, and United Fire in conservation. On February 14, 1989, Hoffenberg agreed in a signed stipulation to the entry of an order liquidating Associated Life and United Fire. That liquidation order was based on Hoffenberg's agreement that both companies were insolvent. On March 3, 1989, when the liquidation order was entered, Hoffenberg lost all control of the companies, and any expectation of any return on the investment.

59. On or about June 27, 1991, Hoffenberg and others were charged by the Insurance Director with having used the insurance companies as an instrumentality of Towers, and, among other things, having transferred investments and cash belonging to the

18

companies into various Hoffenberg controlled brokerage accounts. These transfers of funds began in November 1987 and continued through July 1988. The civil action, captioned Schacht v. Hoffenberg et al., No. 91 C 4024 (N.D.Ill.) alleged that the defendants had cause UDC, Associated, and United Fire to suffer damages in excess of $4 million, become insolvent, and be placed in conservation and/or liquidation. The complaint sought, among other things, treble damages under RICO. Towers settled this and related actions in 1992, upon Towers' agreement to pay $3.5 million as part of the settlement.

60. It was materially false and misleading for Towers to continue to record its investment in the insurance companies at cost in the FY 1989, FY 1990, and FY 1991 financial statements without any reserve to reflect both the impairment of Towers' investment or the contingency of Towers' potential liability. Towers' assets were overstated by at least $3 million in each of those years as a result of Towers' failure to record an appropriate reserve.

61. Further, Towers did not accurately disclose to investors the liquidation and conservation proceedings against UDC, Associated, and United Fire, nor the filing of Schacht v. Hoffenberg against Towers.

I. Misrepresentations And Omissions In Towers' Offering Memoranda

Use of Proceeds

62. Towers represented in its offering memoranda that Towers planned to use the funds it raised by investors to buy

19

accounts receivable, defined as "Health Care Accounts Receivable purchased from hospitals, doctors, medical groups and other health care providers and Business Accounts Receivable purchased from manufacturers, wholesalers and service companies." Beginning with the October 1990 offering memorandum, the proposed activities were expanded to include FDIC loan portfolios.

63. The offering memoranda falsely stated that Towers typically would acquire accounts receivable for up to 95% of their face value, would earn a minimum 5% "factoring fee" for each such account receivable collected and would reinvest the proceeds of collection in additional accounts receivable. The offering memoranda further stated that Towers expected to compound its "factoring fee" up to six times per year from purchasing accounts receivable, collecting them and reinvesting the proceeds.

64. In fact, Towers bought few, if any, current accounts receivable with the offering proceeds, buying instead accounts receivable (or loan portfolios) at substantially less than 95% of face value that were largely uncollectible, such as those described above.

65. As of June, 1991, when Towers had $124 million in outstanding Notes, Towers owned virtually no accounts receivable. Accounts receivable reflected in Towers' consolidated financial statements for FY 1991, consisted mainly of the collection receivables described above, which Towers did not own, and certain receivables purchased and owned by three of the THRFC

20

Bond Funds. Any and all healthcare accounts receivable reflected on Towers' balance sheet dated June 30, 1991, were purchased with proceeds from these three THRFC Bond Funds, and not the Notes.

66. Instead of using investors' funds to purchase Accounts receivable, as represented in the offering memoranda, Towers, at the direction and control of Hoffenberg, used investors funds to pay, inter alia, interest on the Notes, to pay Towers' expenses, such as salaries (including exorbitant salaries to, Hoffenberg, Brater and Ferro) and attorneys' fees. In addition, because the collection and purchase receivables were of such poor quality, there was insufficient cash flow generated from collection on such receivables to meet Towers' financial needs and obligations. Thus, Towers resorted to such measures as failing to remit collection receipts due to its clients and diverting millions of dollars from THRFC Bond Funds to Towers, in violation of bond fund indenture covenants.

67. The offering memoranda falsely stated that the Notes were fully collateralized by accounts receivable purchased with the offering proceeds, and with a face value substantially in excess of the Notes. In fact, the Notes are severely under-collateralized because of the small face amount and low quality of accounts receivable purchased by Towers in the relevant years, as reflected by their cost and Towers' minimal collections on them such as the FDIC loan portfolios, Southwestern Bell receivables, and the Bank of America portfolio.

21

**Special Bank Accounts for Offering Proceeds**

68. Towers falsely stated in offering memoranda that it would keep offering proceeds in escrow bank accounts to the extent that the funds were not used to purchase accounts receivable or pay certain specified expenses. As of June 30, 1991, although Towers had purchased few accounts receivable with the $124 million in offering proceeds, Towers' bank accounts contained at most $5 million. As of June 30, 1992, when Towers was reporting outstanding promissory notes of $198 million (and additional debt issued by the special-purpose subsidiaries of $196 million), reported cash and cash equivalents was only $32 million.

69. The offering memoranda falsely and misleadingly described amounts that Towers could withdraw from escrow bank accounts to use for any corporate purpose. According to the offering memoranda, "excess profits amounts" could be withdrawn and used for any corporate purpose only if the face value of accounts receivable purchased with investors' funds (and proceeds from collections on these receivables) never exceeded the amount of Notes, yet Hoffenberg, or others at his direction and control routinely emptied the escrow bank accounts.

**Insurance Policy Covering Receivables**

70. The February 1989 offering memorandum misleadingly characterized the accounts receivable securing and backing the Notes offered therein as "insured." Towers represented that it had obtained in insurance policy "to insure the collectibility of

22

most of the accounts receivable which are either D & B listed or separately listed by the insurance company as additional insured companies."

71. Towers' insurance in effect at that time allowed Towers to recover only its purchase price on accounts receivable that were current at the time Towers purchased them (subject to other conditions being met). Therefore, the collectibility of collection receivables and other past-due receivables was not covered at all.

72. Other significant limitations not disclosed in the offering document are that the policy has a ceiling of $5 million; it protects only against insolvency of the debtor, and not disputed accounts (unless reduced to a judgment); and there is a dollar limitation per debtor.

**Beneficial Ownership of Towers**

73. The offering memoranda and annual reports distributed to investors failed to disclose Hoffenberg's ownership, either directly or indirectly, of a majority of Towers' common stock and the compensation paid to Towers' executive officers.

74. Hoffenberg knew, or was reckless in not knowing, that Towers' offering memoranda were materially false and misleading, because, among other things, he had knowledge of Towers' true financial condition and, directly or indirectly, developed the Note offering program.

75. Brater knew, or was reckless in not knowing, that Towers' offering memoranda were materially false and misleading,

23

because, among other things, he had knowledge of Towers' true financial condition and the nature of its business.

76. Farro knew, or was reckless in not knowing, that Towers' offering memoranda were materially false and misleading, because, among other things, he had knowledge of Towers' true financial condition.

J. **Trading By Hoffenberg**

77. Between January 1990 and April 1992, Hoffenberg's company, FBB, sold 208,960 shares of Towers common stock for $1,596,841, in nine transactions.

78. From January 2, 1990, through January 30, 1992, Towers common stock generally traded in a range between $7.50 and $9.50 per share, reaching a high of $11 per share (on January 10, 1990), and a low of $5.75 (on October 1, 1991).

79. At the time of his sales, Hoffenberg knew, or was reckless in not knowing, that he possessed material, nonpublic information about Towers' poor financial condition and misuse of investor proceeds.

80. Hoffenberg, while in possession of the material, nonpublic information described above, sold at least 208,960 shares of Towers common stock in breach of his fiduciary duty to Towers' shareholders, and realized profits of at least $1,596,841.

24

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Under Section 12(2) of the 1933 Act)

81. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 80 as if fully set forth herein.

82. Defendants sold securities by means of a prospectus which included untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

83. Plaintiffs and the Class did not know of such untruths and omissions and in the exercise of reasonable care could not have known of such untruths and omissions until February 9, 1993.

84. Plaintiffs hereby tender the securities.

85. Plaintiffs and the members of the Class are entitled to recover the consideration paid for the securities with interest thereon, upon the tender of the securities, or for damages.

### SECOND CLAIM FOR RELIEF
(Under Section 12(1) of the 1933 Act)

86. Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 80 as if fully set forth herein.

87. Defendants sold securities in violation of Section 5 of the 1933 Act, 15 U.S.C. Section 77e.

88. Plaintiffs hereby tender the securities.

89. As a result, plaintiffs and the members of the Class are entitled to recover the consideration paid for the securities

25

with interest thereon, upon the tender of the securities, or for damages.

THIRD CLAIM FOR RELIEF
(Under Section 10(b) of the 1934 Act
and Rule 10b-5 Promulgated Thereunder)

90. Plaintiffs repeat and reallege paragraph 1 through 80 as if fully set forth herein.

91. Defendants either directly issued or aided and abetted in the issuance of false and misleading statements and issued or permitted statements to be made which omitted to disclose material facts necessary to made the statements that were made not misleading.

92. Defendants engaged in acts, practices and a course of business which operated as a fraud or deceit upon plaintiff and the other members of the class.

93. Defendants directly violated and/or aided and abetted in the violations of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

94. The individual Defendants possessed direct knowledge of the falsity of the various statements issued during the Class Period by virtue of their direct participation in the preparation and dissemination of such statements.

95. The individual Defendants acted as controlling persons, as defined under Section 20(a) of the 1934 Act, during the Class Period. By virtue of their senior corporate status, they had the

26

power and influence and exercised the same to cause Tower to engage in the illegal conduct and practices complained of herein.

96. As a result, plaintiffs and other members of the Class have suffered damages in an amount to be proved at trial for which defendants are liable.

FOURTH CLAIM FOR RELIEF
(For Common Law Fraud)

97. Plaintiffs repeat and reallege paragraphs 1 through 80 as if fully set forth herein.

98. For the purpose of inducing plaintiffs and the members of the Class to purchase the Notes, and with intent to deceive them, defendants employed a scheme and conspiracy to defraud as a part of which defendants made and participated in the making of misrepresentations of fact to plaintiffs and the other members of the Class and concealed the true facts and omitted to state material facts.

99. Defendants acted wilfully and with conscious disregard of the rights of plaintiffs and the other members of the Class.

100. Plaintiffs and the other members of the Class believed the misrepresentations and omissions at the time they were made and were ignorant of the falsity.

101. Plaintiffs and the other members of the Class relied upon the misrepresentations and omissions and were induced to purchase the Notes by them. Had plaintiffs and the other members of the Class known the true facts, they would not have purchased the Notes.

27

102. As a result, defendants are liable to plaintiffs and the other members of the Class for compensatory and exemplary and punitive damages.

WHEREFORE, plaintiffs demand judgment against defendants as follows:

A.   Determining that the action is maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   Requiring the defendants to reimburse the Class and subclass for the consideration paid for the Notes, plus interest, upon tender of the Notes, or to pay the damages they sustained and award exemplary and punitive damages;

C.   Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees and experts' fees; and

D.   Awarding plaintiffs such other and further relief as the Court deems just.

Dated:   New York, New York
         March 4, 1992

BERNSTEIN LITOWITZ BERGER
& GROSSMANN

By: _Edward A. Grossmann_
    Edward A. Grossmann (6675)
    1285 Avenue of the Americas
    New York, New York 10019
    (212) 554-1400

    Attorneys for Plaintiffs

28

Plaintiffs demand trial by jury of all issues triable as of right by a jury.

JURY DEMAND

BERNSTEIN LITOWITZ BERGER
& GROSSMANN

By: _Edward A. Grossmann_
    Edward A. Grossmann (6675)
    1285 Avenue of the Americas
    New York, New York 10019
    (212) 554-1400

29



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

MARTIN GOLD, as Trustee of the
Martin Gold, Attorney-At-Law, P.C.
Defined Benefit Pension Plan
dated 12-10-87,

                              Plaintiff,

          - v. -

TOWERS FINANCIAL CORPORATION,
STEVEN HOFFENBERG,
MITCHELL BRATER and
ARTHUR J. FERRO,

                              Defendants.

- - - - - - - - - - - - - - - - - - - X                 93 Civ. 08110 (MK)

EDWARD W. MURPHY, JR. TRUSTEE
EDWARD W. MURPHY, JR. TRUST,

                              Plaintiff,

          - v. -

TOWERS FINANCIAL CORPORATION,
STEPHEN HOFFENBERG,
MITCHELL BRATER and
ARTHUR J. FERRO,

                              Defendants.

- - - - - - - - - - - - - - - - - - - X                 93 Civ. 0961 (MK)

DONA M. ZIEGLER AS TRUSTEE OF
DONA M. ZIEGLER DEFINED BENEFIT
PLAN, individually and on behalf
of all others similarly situated,

                              Plaintiff,

          - v. -

TOWERS FINANCIAL CORPORATION,
STEVEN HOFFENBERG,
MITCHELL BRATER, and
ARTHUR J. FERRO,

                              Defendants.

- - - - - - - - - - - - - - - - - - - X                 93 Civ. 0987 (MK)

MICROFILM

APR 08 1993

-3 00 PM

Stipulation

-2-

TIMOTHY J. CASEY and  
LEANNE G. CASEY, ... on  
behalf of themselves and all  
others similarly situated,  

    Plaintiffs,  

    v.  

TOWERS FINANCIAL CORPORATION,  
STEVEN HOFFENBERG,  
MITCHELL BRATER and  
ARTHUR J. FERRO,  

    Defendants.  

    93 Civ. 0992 (MK)

---

CHARLOTTE RIVERIDA,  

    Plaintiff,  

    v.  

TOWERS FINANCIAL CORPORATION,  
STEVEN HOFFENBERG,  
MITCHELL BRATER and  
ARTHUR J. FERRO,  

    Defendants.  

    93 Civ. 1045 (MK)

---

ANTHONY IZZO, JR., on behalf of  
himself and all others similarly  
situated,  

    Plaintiff,  

    v.  

TOWERS FINANCIAL CORPORATION,  
STEVEN HOFFENBERG,  
MITCHELL BRATER and  
ARTHUR J. FERRO,  

    Defendants.

---

BERNARD and STEPHANIE BATTEN,  

    Plaintiffs,  

    v.  

TOWERS FINANCIAL CORPORATION,  
STEVEN HOFFENBERG,  
MITCHELL BRATER and  
ARTHUR J. FERRO,  

    Defendants.  

    93 Civ. 1047 (MK)

-3-

... on  
behalf of themselves and all  
others similarly situated,  

    Plaintiffs,  

    v.  

TOWERS FINANCIAL CORPORATION,  
STEVEN HOFFENBERG,  
MITCHELL BRATER and  
ARTHUR J. FERRO,  

    Defendants.  

    93 Civ. 1094 (MK)

---

J.B. LIEBMAN and CAROL L.  
LIEBMAN, joint tenants, on  
behalf of themselves and all  
others similarly situated,  

    Plaintiffs,  

    v.  

TOWERS FINANCIAL CORPORATION,  
STEVEN HOFFENBERG,  
MITCHELL BRATER and  
ARTHUR J. FERRO,  

    Defendants.  

    93 Civ. 1095 (MK)

---

MARTIN PENNER,  

    Plaintiff,  

    v.  

TOWERS FINANCIAL CORPORATION,  
STEVEN HOFFENBERG,  
MITCHELL BRATER and  
ARTHUR J. FERRO,  

    Defendants.  

    93 Civ. 1155 (MK)

DANIEL THOM and SHARON THOM,

Plaintiffs,

v.

TOWERS FINANCIAL CORPORATION,
ROSE SECURITIES CORPORATION,
STEVEN HOFFENBERG,
MITCHELL BRATER, and
ARTHUR J. FERRO,

Defendants.

93 Civ. 1300 (WK)

DR. JOHN J. SIUDMAK;
THE JOHN J. SIUDMAK PROFIT SHARING
PLAN; STANLEY BRUSKIN; JOANNE KIRK;
TRUST; JOHN DAREK KIRK TRUST; JERRY
SIUDMAK; ROBERT KIRK TRUST; JEFFREY
GORELICK; individually and on
behalf of all others similarly
situated,

Plaintiffs,

v.

TOWERS FINANCIAL CORPORATION,
STEVEN HOFFENBERG,
MITCHELL BRATER, and
ARTHUR J. FERRO,

Defendants.

93 Civ. 1543 (WK)

## STIPULATION AND PRE-TRIAL ORDER NO. 1

IT IS HEREBY STIPULATED, AGREED AND ORDERED in each of the actions listed above as follows:

-4-

## CONSOLIDATION

1. The above-captioned actions are, until further order of this court, consolidated, pursuant to Fed. R. Civ. P. 42(a), for all purposes before the Honorable Whitman Knapp.

2. The action entitled Dinsmore v. Towers Financial Corporation, et al., Case No. 93-1164 SVW (C.D. Cal.) currently pending in the United States District Court for the Central District of California is hereby transferred to the United States District Court for the Southern District of New York before the Honorable Whitman Knapp, subject to the approval of the transferee court.

## MASTER DOCKET AND SEPARATE ACTION DOCKETS

3. The Clerk of the Court will maintain a master docket and case file under the following caption:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE TOWERS FINANCIAL CORPORATION
NOTEHOLDERS LITIGATION

Master File No.
93 Civ. 0810 (WK)

All orders, pleadings, motions and other documents will, when filed and docketed in the master case file, be deemed filed and docketed in each applicable constituent case.

4. All orders, pleadings, motions and other documents served or filed in this consolidated action will bear the caption of "In re Towers Financial Corporation Noteholders Litigation" (the

-5-

Consolidated Action") and the files of the action will be maintained under Master File No. 93 Civ. 0810 (WK). If the document is applicable to all of the constituent actions such caption shall also include the notation that the document is related to "All Cases" and be filed and docketed only in the master file. Documents intended to apply only to one or more, but not all, of the constituent cases shall indicate in their caption the specific case number of the case or cases to which they apply and extra copies of each document shall be provided to the Clerk to facilitate filing and docketing both in the master case file and in each of the specified individual case files.

NEWLY FILED OR TRANSFERRED ACTIONS

5. When a related case is hereafter filed in or transferred to this Court and assigned to the Honorable Whitman Knapp, the Clerk of the Court shall:

(a) Mail a copy of such order of relatedness or transfer to the members of the Executive Committee for plaintiffs (see ¶ 11) in this Consolidated Action;

(b) Place a copy of this Order in the separate file for such newly filed or transferred action; and

(c) Make an appropriate entry in the Master Docket.

6. The Executive Committee of plaintiffs' counsel, as defined hereafter, shall promptly mail a copy of this Order to the attorneys for the plaintiff(s) in the newly filed or transferred case. The attorneys for the plaintiff(s) in the newly filed or transferred case shall thereafter promptly serve a copy of this

-6-

Order upon any new defendants or their counsel in the newly filed or transferred case.

7. The Court requests the assistance of all counsel in calling to the attention of the Clerk of the Court the filing or transfer of any case which might properly be consolidated as part of this Consolidated Action.

8. For the purposes of this Order, a related action is any purported class action or direct action involving questions of law or fact common to this Consolidated Action, within the meaning of Fed. R. Civ. P. 42(a).

APPLICATION OF THIS ORDER TO SUBSEQUENTLY FILED CASES

9. This Order shall apply to each related case subsequently filed in or transferred to this Court, unless a party objecting to the consolidation of such a case or to any other provision of this Order shall, within twenty (20) days after the date upon which a copy of this Order is mailed to counsel for such party, file an application, with notice to the Executive Committees of plaintiffs' counsel and counsel for defendants in this Consolidated Action, for relief from this Order or any provision herein and this Court deems it appropriate to grant such application.

CONSOLIDATED AMENDED COMPLAINT

10. The Executive Committee of plaintiffs' counsel are directed to serve and file a Consolidated Amended Complaint within sixty (60) days from the date of entry of this Order. Until a Consolidated Amended Complaint is filed, the complaint in Martin

-7-

Gold v. Towers Financial Corporation, et al., 93 Civ. 0810 (MK) is designated as the operative complaint as to defendants Steven Hoffenberg, Mitchell Brater and Arthur J. Ferro. Until a Consolidated Amended Complaint is filed, the complaint in Dinsmore v. Towers Financial Corporation, et al., Case No. 93-1164 SVW (C.D. Cal.) is designated as the operative complaint as to all defendants other than Steven Hoffenberg, Mitchell Brater and Arthur J. Ferro.

RESPONSIVE PLEADINGS

11.   (a)   Defendants' responsive pleadings or motions shall await the filing of a Consolidated Amended Complaint and defendants shall not be required to answer, move or otherwise respond to the separate complaints filed in the captioned constituent actions or subsequently filed or transferred related actions.

(b)   Defendants shall answer, move, or otherwise respond to the Consolidated Amended Complaint within thirty (30) days after its service upon then unless said time is extended by stipulation among the parties. Defendants' response to the Consolidated Amended Complaint shall be deemed to be their response to any later filed complaint in any action which is thereafter consolidated with the Consolidated Action.

ORGANIZATION OF PLAINTIFFS' COUNSEL

12.   The organizational structure of plaintiffs' counsel established by this Order shall be applicable to the Consolidated Action and each later filed or transferred related action.

-8-

13.   The following law firms shall constitute Plaintiffs' Executive Committee: Stamell Tabacco & Schager, Milberg Weiss Bershad Specthrie & Lerach; Garwin Bronzaft/Gerstein; Lieff, Cabraser & Heimann.

14.   Plaintiffs' Executive Committee shall be responsible for coordinating and organizing plaintiffs in the conduct of this litigation and coordinating and communicating with defendants' counsel with respect to this litigation, and in particular, shall have the following responsibilities:

(a)   To initiate, brief and argue motions and prepare, serve and file opposing briefs in proceedings initiated by other parties;

(b)   To initiate and conduct discovery proceedings;

(c)   To act as spokespersons at pretrial conferences;

(d)   To negotiate with defense counsel with respect to settlement and other matters;

(e)   To call meetings of plaintiffs' counsel when appropriate;

(f)   To conduct all pre-trial, trial, and post-trial proceedings;

(g)   To consult with and employ experts;

(h)   To perform such other duties and undertake such other responsibilities as they deem necessary or desirable in connection with the prosecution of the Consolidated Action; and

-9-

(1)  To coordinate and communicate with plaintiffs'
and defendants' counsel, as the Court directs, with
respect to matters addressed in this para-
graph.

15.  The responsibilities and duties of the Plaintiffs'
Executive Committee shall be carried out by Plaintiffs' Executive
Committee as a whole.  The law firm of Stanell Tabacco & Schager
shall act as Chairperson of Plaintiffs' Executive Committee.

### COORDINATION AND SERVICE
### OF PLEADINGS AND OTHER PAPERS

16.  (a)  Defendants shall effect service of papers on
plaintiffs by serving a copy of same on Plaintiffs' Executive
Committee by overnight mail or hand delivery with copies thereof to
plaintiffs' remaining counsel, by regular mail.  Service of papers
on all plaintiffs shall be deemed complete when such papers are
served on Plaintiffs' Executive Committee.  Plaintiffs shall effect
service of papers on defendants by serving a copy of same on
defendants' counsel by overnight mail or hand delivery.

(b)  A consolidated service list will be prepared
and maintained by Plaintiffs' Executive Committee and counsel for
defendants.  A certificate of service shall be sufficient if it
indicates that service has been made upon all counsel designated on
the consolidated service list.  All parties are directed to notify
Plaintiffs' Executive Committee and counsel for defendants of any
changes required to be made in the consolidated service list.

-10-

(c)  Communication by the Court with any one of the
Members of Plaintiffs' Executive Committee shall be effective on
each of the members of Plaintiffs' Executive Committee.

Dated:  New York, New York
        March 31, 1993

STANELL TABACCO & SCHAGER

By: _____
    Jared B. Stanell (JS-5225)
    555 Madison Avenue
    New York, New York 10022
    (212) 752-9222

MILBERG WEISS BERSHAD SPECTHRIE
& LERACH

By: _____
    Robert P. Sugarman (RS-8001)
    One Pennsylvania Plaza
    New York, New York 10119
    (212) 594-5300

GARWIN, BRONZAFT, GERSTEIN & FISHER

By: _____
    Scott W. Fisher (SF-8756)
    1501 Broadway, Suite 1416
    New York, New York 10036
    (212) 398-0055

-11-

LIEFF, CABRASER & HEIMANN

By: 
Daniel Girard (DC-2011)
275 Battery Street, 30th Floor
San Francisco, California 94111
(415) 956-1000

Plaintiffs' Executive Committee

KAPLAN & KILSHEIMER
685 Third Avenue
New York, New York 10017
(212) 687-1980

MUCH SHELIST FREED DENENBERG
AMENT, P.C.
200 North LaSalle Street
Suite 2100
Chicago, Illinois 60601-1095
(312) 346-3100

WECHSLER SKIRNICK HARWOOD
HALEBIAN & FEFFER
555 Madison Avenue
New York, New York 10022
(212) 935-7400

POMERANTZ LEVY HAUDEK
BLOCK & GROSSMAN
100 Park Avenue
New York, New York 10017-5516
(212) 661-1100

BERNSTEIN LITOWITZ BERGER & GROSSMANN
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

BERMAN DeVALERIO & PEASE
One Liberty Square
Boston, Massachusetts 02109
(617) 542-8300

WOLF POPPER ROSS WOLF & JONES
845 Third Avenue
New York, New York 10022
(212) 759-4600

-12-

SO ORDERED:

Hon. Whitney Knapp
United States District Judge

LAWRENCE, WALNER & ASSOCIATES, LTD.
150 North Wacker Drive, Suite 2170
Chicago, Illinois 60606
(312) 236-0606

GILMAN & PASTOR
155 Federal Street, 11th Floor
Boston, MA 02110
(617) 742-1100

-11-

EXHIBIT 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x
                              :
In re TOWERS FINANCIAL CORPORATION :    Master File No.
NOTEHOLDERS LITIGATION        :
                              :    93 Civ. 0810 (MBM)
------------------------------x
                              :
This Document Relates To:     :
     All Cases                :
                              :
------------------------------x

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Richard M. Meyer, Esq.                  Daniel C. Girard, Esq.
MILBERG WEISS BERSHAD                    Karen E. Karpen, Esq.
 HYNES & LERACH                         LIEFF, CABRASER & HEIMANN
One Pennsylvania Plaza                   275 Battery Street, 30th Floor
New York, New York 10119                San Francisco, CA 94111
(212) 594-5300                          (415) 956-1000

Jared B. Stamell, Esq.                  Bertram Bronzaft, Esq.
Michelle Rago, Esq.                     Scott Fisher, Esq.
STAMELL, TABACCO & SCHAGER              GARWIN, BRONZAFT,
555 Madison Avenue                       GERSTEIN
New York, New York 10022                 & FISHER
(212) 752-9222                          1501 Broadway, Suite 1812
                                        New York, New York 10036
                                        (212) 398-0055

Plaintiffs' Executive Committee

NATURE OF THE CASE

1.    This is a class action on behalf of all persons
who invested in promissory notes ("Notes") issued by Towers
Financial Corporation ("Towers" or, the "Company") between
February 15, 1989 and February 9, 1993 (the "Class Period")
pursuant to five integrated offering memoranda ("offering
memoranda") dated February 15, 1989, February 20, 1990, October
1, 1990, October 15, 1991, and March 23, 1992.

2.    As set forth in ¶¶ 35 through 182 below, each of
the defendants participated in a conspiracy by which the
financial well being of Towers was repeatedly and materially
misrepresented to the investing public. The core of the
conspiracy centered on the nature of Towers' business and its
reported financial figures. Towers was projected as a vibrant
and diverse financial services company, whose primary businesses
were the purchase of commercial accounts receivable, the
collection of accounts receivable and the factoring of health
care receivables. Towers raised capital through a number of
investment vehicles, including a number of bond offerings (which
were investment-grade AA rated by Duff & Phelps) and through the
sale of nearly $215,000,000 in Notes to more than 2,800
investors. In its various public filings and offering brochures,
Towers announced strong financial growth in revenues and income.

3.    Despite the impressive numbers and growth
portrayed by Towers, it was anything but a dynamic growth
company. In reality, the revenue and income figures reported by

- 2 -

Towers in its annual reports and the offering memoranda relied upon by the Notes investors were materially false and misleading. The fraudulently prepared financial statements misstated Towers' assets, shareholder equity and net income by tens of millions of dollars. Instead of the thriving, diversified financial services company it claimed to be, Towers was merely a failing collection agency, staggering under huge debt, and unable to pay its expenses and the interest on its bonds and Notes without a constant infusion of new money.

4. As detailed herein, in order to meet their expenses and to make interest payments, Towers depended upon the continuing infusion of investors' funds, raised through successive Notes offerings. Thus, in effect, Towers was nothing more than a massive "Ponzi" scheme whereby new Notes were regularly sold to generate the money to pay the interest on earlier issued Notes and bonds.

5. In marketing the Notes to potential investors, Towers misstated and omitted material facts in its offering memoranda and financial statements. Towers misled the public as to the risks associated with investment in the Notes, and the intended use of the proceeds of the Notes. Moreover, the Notes and offering memoranda were never registered with the SEC, or with state regulatory authorities and the sales violated a prior injunction issued by the United States District Court for the Southern District of New York in 1988, enjoining certain

defendants from issuing unregistered securities in violation of Section 5 of the Securities Act of 1933.

6. Despite the pendency of a federal court injunction, defendants nevertheless launched a full-blown campaign to sell the Notes to thousands of unsuspecting investors, many of whom are widowed, retired or disabled, or living on fixed incomes, and they did so through more than 75. "Broker-Dealers" in over 20 states across the country. The Notes are virtually worthless, and tens of millions of dollars of investor funds remain unaccounted for.

7. This massive fraud was carried out under the personal direction of defendant Steven Hoffenberg, the officers and directors of Towers, and with the active participation of a number of law firms, accountants, an insurance company, a nationally recognized rating agency and the dozens of Broker-Dealers who assisted in perpetrating the fraud.

## JURISDICTION AND VENUE

8. Plaintiffs bring this action under Sections 12(1), 12(2) and 15 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77(1), 77l(2) and 77o]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)]; Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]; Section 20 of the Exchange Act [15 U.S.C. § 78t]; the Racketeer Influenced and Corrupt Organizations Act ("RICO") [18 U.S.C. §§ 1961-1968], and under the common law and applicable

Blue Sky Laws for claims of negligent misrepresentation, negligence, breach of fiduciary duty and fraud.

9. This Court has jurisdiction over this action under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under the provisions of the RICO statute 18 U.S.C. §§ 1964 and 1965. The Court has supplemental jurisdiction under 28 U.S.C. Section 1367 on the state law claims alleged herein.

10. Defendants Steven Hoffenberg; Mitchell Brater; Arthur Ferro; Charles Chugerman; Michael Rosoff; Thomas B. Evans, Jr.; Ben Barnes; Marvin E. Basson; American Credit Indemnity Co.; H. Bruce Bronson, Jr.; The Law Offices of H. Bruce Bronson, Jr.; Gibney Anthony & Flaherty; Bronson & Migliaccio; Squadron, Ellenoff, Plesent & Lehrer; Duff & Phelps; Monterey Bay Securities; First Affiliated Securities and the Broker-Dealer Defendant Class (collectively, "defendants"), directly and indirectly, made use of means or instrumentalities of transportation and communication in interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein. Many of the transactions, acts, practices and courses of business occurred within the jurisdiction of the United States District Court for the Southern District of New York, including the offer and sale of unregistered securities by means of materially false and misleading statements and omissions. In addition, many of the defendants transacted business, or resided in this District

- 5 -

during the Class Period. Moreover, many of the witnesses to the acts alleged herein reside in this District.

**THE PARTIES**

11. Plaintiffs Bernard and Stephanie Batten ("Battens") purchased a $40,000 two-year Towers' Note on April 2, 1991. On May 21, 1991, plaintiffs purchased a two-year $25,000 Note and on January 27, 1993, they purchased a two-year $40,000 Note. Plaintiffs also purchased a $90,000 one-year Note on September 30, 1992. The Batten's investment in such Notes, all issued by Towers, is now virtually worthless. Plaintiffs have been damaged as a result of defendants' wrongful and fraudulent acts by the loss of their investment.

12. Plaintiff Stanley Bruskin ("Bruskin"), is an individual and resides in Edison, New Jersey. On or about December 1992, plaintiff purchased a Towers' Note in the amount of $100,000. Bruskin's investment is now virtually worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

13. Plaintiffs Timothy J. Casey and Suzanne Casey ("Caseys") are residents of the state of Florida. On or about August 12, 1991, plaintiffs purchased a Towers' Note in the principal amount of $140,000. On or about July 22, 1992, plaintiffs purchased a Towers' Note in the amount of $190,000 from defendants. Plaintiffs' investment is now virtually worthless. Plaintiffs have been damaged as a result of

- 6 -

defendants' wrongful and fraudulent acts by the loss of their investment.

14. Plaintiff Robert Dinsmore ("Dinsmore"), Trustee of the Dinsmore Architects' PPSP, is an individual and a resident of Santa Monica, California. During the Class Period, Dinsmore invested $30,000 in Towers' Notes. The investment is now virtually worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

15. Plaintiff Ronald R. Evey ("Evey") is a resident of Santa Maria, California. During the Class Period, Evey purchased Towers' Notes in the aggregate amount of $25,000. Plaintiff's investments are virtually worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

16. Plaintiff Martin Gold ("Gold") is the Trustee of the Martin Gold Attorney at Law, P.C. Defined Benefit Pension Plan dated 12-10-87 (the "Plan"). On or about December 26, 1990, Gold purchased a Towers' Note in the amount of $30,000. On or about June 18, Gold purchased a Towers' Note in the amount of $20,000, and on or about December 26, 1992 Gold purchased a Note in the amount of $30,000. Gold's investments in the Notes are virtually worthless. Gold has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investments.

17. Plaintiff Jerry Gorelick ("Gorelick") is an individual residing in Boca Raton, Florida. In or about November 1992, plaintiff purchased a two-year Towers' Note in the amount of $50,000. Plaintiff's investment is now virtually worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

18. Plaintiff Anthony Izzo, Jr. ("Izzo"), is an individual and a resident of New York. On or about December 21, 1992, Izzo purchased a Towers' Note in the amount of $110,000. Izzo's investment in the Note is now virtually worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

19. Plaintiff Joanne Kirk Trust ("Joanne Kirk") purchased in or about August 1992 a two-year Towers' Note in the amount of $100,000. Plaintiff's investment is now virtually worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of her investment.

20. Plaintiff John Damen Kirk Trust ("John Kirk") purchased in or about August 1992 a two-year Towers' Note in the amount of $150,000. Plaintiff's investment is virtually worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

21. Plaintiff Shawn Robert Kirk Trust ("Shawn Kirk") purchased in or about August 1992 a two-year Towers' Note in the amount of $150,000. Plaintiff's investment is virtually

worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

22. Plaintiffs J.G. Liebman and Carl L. Liebman ("the Liebmans") are individuals and residents of Oklahoma. In or about April 1992, plaintiffs purchased a Towers' Note in the amount of $100,000. The Liebmans' investment in the Notes is virtually worthless. Plaintiffs have been damaged as a result of defendants' wrongful and fraudulent acts by the loss of their investment.

23. Plaintiffs Ernest S.J. Loh and Nina T. Loh ("Lohs") are residents of San Francisco, California. On or about October 5, 1992, the Lohs purchased a Towers' Note in the amount of $100,000. On or about January 3, 1993, the Lohs purchased a note in the amount of $100,000. The Lohs' investments in the Notes are now virtually worthless, and they have been damaged as a result of defendants' wrongful and fraudulent acts by the loss of their investments.

24. Plaintiff Edward W. Murphy, Jr. ("Murphy"), as Trustee of the Edward W. Murphy, Jr., Trust, purchased $12,500 in Towers' Notes. Murphy's investment in the Notes is virtually worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

25. Plaintiff Martin Penner ("Penner") is an individual and a resident of Illinois. On or about September 3, 1992, Penner purchased a two-year Note in the amount of $66,000. On December 20, 1992, Penner purchased a two-year Note in the

amount of $17,000. Penner's investment in the Notes is virtually worthless. Penner has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

26. Plaintiff Charlotte Riviera ("Riviera") is an individual and a resident of Bellevue, Washington. On or about August 26, 1991, Riviera purchased a Towers' Note in the principal amount of $100,000. On or about September 9, 1991, Riviera purchased another Towers' Note in the principal amount of $100,000. Riviera's investment in the Notes is now virtually worthless. Riviera has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of her investment.

27. Plaintiff Dr. John Siudmak ("Siudmak") is an individual and a resident of Cedar Grove, New Jersey. On or about February 15, 1990, Siudmak purchased a $150,000 two-year Towers' Note and renewed said purchase on February 15, 1992. Siudmak's investment is virtually worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

28. Plaintiff John J. Siudmak Profit Sharing Plan ("Siudmak Plan") purchased a two-year Towers' Note on or about June 2, 1991 in the amount of $150,000. Plaintiff's investment is virtually worthless. The Siudmak Plan has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of his investment.

29. Plaintiffs Daniel Thom and Sharon Thom ("Thoms") purchased several Towers' Notes. On or about June 26, 1992,

plaintiffs purchased a Towers' Note in the amount of $50,000. On or about June 30, 1992, plaintiffs purchased a Towers' Note in the amount of $55,000. On or about December 20, 1992, plaintiffs purchased a Towers' Note in the amount of $80,000. Plaintiffs' investments are virtually worthless. Plaintiffs have been damaged as a result of defendants' wrongful and fraudulent acts by the loss of their investments.

30. Plaintiff Dora M. Ziegler ("Ziegler"), Trustee of the Dora M. Ziegler Defined Benefit Plan, is an individual and a resident of Lake Forest, Illinois. On or about September 30, 1992, Ziegler purchased a two-year Towers' Note in the amount of $50,000. Ziegler's investment in the Note is virtually worthless. Plaintiff has been damaged as a result of defendants' wrongful and fraudulent acts by the loss of her investment.

31. Towers Financial Corporation is a Delaware corporation with its principal place of business in New York, New York. Towers has two subsidiaries: Towers Credit ("TC"), which is engaged in the purchase of commercial accounts receivable, and Towers Collection Services, Inc. ("TCS"), which is engaged in the collection of past-due receivables for third parties on a contingency basis. Towers also conducts business operations, such as the purchase of certain receivables. After the initial filing of this complaint, Towers filed for Bankruptcy on March 25, 1993, and is currently operating under protection of Chapter 11 of the Bankruptcy Code. But for Section 362 of the Code granting the automatic stay, Towers and its subsidiaries would be

- 11 -

named as defendants. Plaintiffs reserve the right to join Towers as a defendant at such time as they may be permitted to do so.

32. Towers has five subsidiaries, incorporated in Delaware that allegedly engaged in factoring healthcare receivables:

(a) Towers Healthcare Receivables Funding Corporation ("Bond Fund I") issued and has outstanding $45 million in Bonds pursuant to a private placement memorandum dated July 1990;

(b) Towers Healthcare Receivables Funding Corporation II ("Bond Fund II") issued $41.5 million in Bonds pursuant to a private placement memorandum dated November 1990;

(c) Towers Healthcare Receivables Funding Corporation III ("Bond Fund III") issued $42.5 million in Bonds pursuant to a private placement memorandum dated May 1991;

(d) Towers Healthcare Receivables Funding Corporation IV ("Bond Fund IV") issued $42.5 million in Bonds pursuant to a private placement memorandum dated December 1991;

(e) Towers Healthcare Receivables Funding Corporation V ("Bond Fund V") issued $27,950,000 pursuant to a private placement memorandum dated May 1992.

(f) Collectively, the selling documents issued by the subsidiaries are referred to as the "private placement memoranda" and the foregoing Bond Funds are sometimes described collectively as the "THRFC Bond Funds".

- 12 -

33. By June 30, 1992, the THRFC Bond Funds had raised approximately $196 million through offerings of debt securities for what was represented to be the purpose of buying healthcare accounts receivables. Defendants represented that investors in the THRFC Bond Funds either owned outright, or had a perfected security interest in, healthcare receivables. On March 25, 1993, the THRFC Bond Funds filed for bankruptcy, and are currently operating under the protection of Chapter 11 of the Bankruptcy Code. But for Section 362 of the Code granting the automatic stay, the THRFC Bond Funds would be named as defendants. Plaintiffs reserve their right to join the THRFC Bond Funds, as defendants at such time as they may be permitted to do so.

34. Towers Reinsurance Corporation ("Towers Reinsurance") is supposedly a foreign corporation engaged in insurance activities, but which has performed little or no insurance and/or reinsurance work and was, on information and belief, a sham corporation employed by the Individual Defendants (as defined herein) to secrete the proceeds of their fraudulent scheme.

35. Defendants Professional Business Brokers, Inc. ("PBB") and the Hoffenberg Family Trust are entities through which Steven Hoffenberg exercised control over the majority of Towers' common stock. Steven Hoffenberg is the president of PBB, which is owned by the Hoffenberg Family Trust, of which Steven Hoffenberg is the trustee. PBB owns in excess of 70% of Towers' outstanding stock.

36. Defendant Steven Hoffenberg ("Hoffenberg") a/k/a Barry Cohen, age forty-eight, was the Chief Executive Officer, President and Chairman of the Board of Towers and the President of TCC and TFC Funding Corporation.

37. Defendant Mitchell Brater ("Brater") was the Vice Chairman of the Board of Directors of Towers and served as the Chief Operating Officer of Towers during the Class Period. Among other activities, Brater supervised and coordinated the sale of Towers' Notes through a network of Broker-Dealers.

38. Defendant Arthur T. Ferro ("Ferro"), age fifty-one, headed Towers' accounting department, prepared Towers' financial statements and generally assisted Hoffenberg in orchestrating the Towers "Ponzi" scheme.

39. Defendant Charles H. Chugerman ("Chugerman") was the Executive Vice President and Secretary of Towers and a member of the Board of Directors of Towers. Chugerman also served as President of Towers Leasing Corporation.

40. Defendant Michael Rosoff ("Rosoff") was Senior Vice President, Chief Legal Officer, Assistant Secretary and a member of the Board of Directors of Towers.

41. Defendant Thomas B. Evans, Jr. ("Evans") served on the Advisory Board of Towers, and since 1990 was a member of the Board of Directors of Towers. Evans also provided legal and consulting services to Towers throughout the Class Period.

42. Defendant Ben Barnes ("Barnes") served on the Advisory Board of Towers, and since 1990 was a member of the

- 13 -

- 14 -

Board of Directors of Towers.  Barnes provided legal and
consulting services to Towers throughout the Class Period.

43.  Defendant Marvin E. Basson ("Basson") is a
certified public accountant and provided accounting and auditing
services, including the preparation of Towers' audited financial
statements for the years 1986 through 1992.

44.  Defendants Hoffenberg, PBB, Hoffenberg Family
Trust, Brater, Ferro, Chugerman, Rosoff, Evans and Barnes are
hereinafter referred to as the Individual Defendants.

45.  Towers Financial Corporation, the THRFC Bond
Funds, and Towers Reinsurance are hereinafter referred to as
Towers.

46.  Defendant Eton Securities Corp. ("Eton") was a
registered Broker-Dealer reportedly owned by defendant Brater.
Defendant Eton handled much of the retail sales activities
relating to the sale of Towers' Bonds and Notes.  During the
Class Period, Eton was paid over $1 million in "consulting fees"
by Towers.

47.  Defendant American Credit Indemnity Co. ("ACI") is
a New York corporation with its principal offices in Baltimore,
Maryland.  At all relevant times, ACI issued insurance policies
for the Notes.  However, by virtue of the limited scope of the
coverage and the exorbitant premiums paid, the policies were
illusory.  By knowingly or recklessly writing this illusory
insurance with the knowledge that it would be used by Towers as a

- 15 -

marketing device to sell the Notes, ACI actively and knowingly
assisted in the fraud engaged in by Towers.

48.  Defendant H. Bruce Bronson, Jr. ("Bronson") is an
attorney who, through defendants The Law Offices of H. Bruce
Bronson, Jr., and the law firms of Gibney Anthony & Flaherty and
Bronson & Migliaccio (collectively the "Bronson defendants"),
provided legal services and advice to Towers in connection with
the offering of the securities which are the subject of this
action.  The Bronson defendants actively participated in the
preparation and drafting of the offering materials, and provided
other advice and services in connection with the offer and sale
of the securities.

49.  Defendant Squadron, Ellenoff, Plesent & Lehrer
("Squadron, Ellenoff") is a New York law firm that served at all
relevant times as special legal counsel for Towers, and
defendants Hoffenberg and Brater.  Squadron, Ellenoff was
involved in many of Towers' activities, including the
representation of Towers before regulatory agencies.  Squadron,
Ellenoff knew or recklessly disregarded facts from which it
should have known that Towers and the defendants were engaged in
an ongoing and continuing fraud through which the Notes were sold
to investors.

50.  Defendant Duff & Phelps Credit Rating Co. ("D&P")
is a publisher of business and financial information and a rating
service which does business in New York.  During the Class
Period, D&P issued opinions, rating and/or endorsing Towers and

- 16 -

its secured and unsecured debt, including the Notes, and rated the Company as sound and financially secure. Such ratings and/or endorsements of Towers and of the Notes had no basis in fact when made, were recklessly negligent characterizations of the financial condition of Towers and the risk characteristics of its securities and constituted material misrepresentations of the true quality of the Company and its securities. During the Class Period, D&P received substantial payments from Towers for its rating services.

51. Defendant Monterey Bay Securities is a registered Broker-Dealer with the National Association of Securities Dealers ("NASD"), and a citizen of California. Defendant First Affiliated Securities Inc. is a registered Broker-Dealer with the NASD and a citizen of California. Defendants Monterey Bay Securities and First Affiliated Securities are sued individually and also as representatives of a defendant class pursuant to Rule 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure, consisting of all persons and entities who participated as sellers of various issues of Towers' Notes during the class period who thereby are alleged to have violated Sections 12(1) and 12(2) of the Securities Act, Section 10(b) of the Exchange Act, and applicable state Blue Sky statutes ("Defendant Class," "Defendant Broker-Dealer Class" or the "Broker-Dealers").

52. During the Class Period, Towers' common stock traded over the counter and was not listed on the National Association of Securities Dealers Automatic Quotation System or

any exchange. Though Towers was required to register its securities under the Exchange Act, it did not do so and failed to file periodic reports with the Commission under the provisions of the Exchange Act.

53. Hoffenberg, the Hoffenberg Family Trust, PBB, Brater, Rosoff, Chugerman, Evans and Barnes, by reason of their ownership, managerial and/or directorship positions in Towers, were at all times controlling persons of Towers within the meaning of 15 U.S.C. Sections 77o and 78t and had the power and the influence (and exercised the same) to cause Towers to engage in the unlawful acts and conduct alleged herein. By virtue of their positions in Towers, each of these defendant had access to adverse non-public information about the business and future prospects of Towers as alleged herein and acted to conceal that information from plaintiffs and the members of the class defined herein.

54. Hoffenberg, as Chief Executive Officer, President and Chairman of the Board of Towers, directed and controlled the actions and practices of Towers, Brater, Ferro and the TRRFC Bond Funds. Each defendant herein is sued individually and as an aider and abettor, and the liability of each arises from the fact that each has engaged in all or part of the unlawful acts, plans, schemes, transactions and artifices to defraud as charged herein.

## CONSPIRACY AND AIDING AND ABETTING ALLEGATIONS

55.    A conspiracy, common scheme, enterprise and course of conduct commenced, by express or tacit agreement, as early as in or about 1988 and, during its course, involved all of the defendants identified above.  The defendants continued the conspiracy, common scheme, enterprise and course of conduct until at least the end of the Class Period, as hereinafter defined.  The conspiracy, common scheme, enterprise and course of conduct was designed to and did (a) deceive the investing public, including the plaintiffs and other class members, regarding Towers and Towers' business, management, financial condition and future prospects; (b) allow worthless securities to be sold during the Class Period; (c) bring Towers' securities onto the market which were not entitled to be marketed; and (d) cause plaintiffs and other members of the class to purchase the Notes.  Defendants directed themselves toward these common goals by virtue of their mutual understanding and agreement.  Defendants accomplished their conspiracy, common scheme, enterprise and course of conduct by marketing, artificially inflating and maintaining the terms of the Notes throughout the Class Period; by concealing from plaintiffs, members of the class and other Towers' investors the true financial condition of Towers and the worthlessness of the Notes; and by maintaining, nurturing and advancing the Towers "Ponzi" scheme at the expense of plaintiffs, and the members of the Class.  Each of the named defendants herein knowingly and intentionally agreed to commit and committed

- 19 -

acts in furtherance of the conspiracy, which acts are more fully set forth below.

56.    Each of the named defendants herein aided and abetted and rendered substantial assistance in the accomplishment of the fraud complained of herein.  In taking the action, as particularized herein, to aid and abet and substantially assist and encourage the commission of the fraud complained of, all defendants acted with an awareness of the primary wrongdoing and realized that their conduct would substantially assist the accomplishment of that fraud.  Each was aware of his overall contribution to and furtherance of the conspiracy, common scheme, enterprise and course of conduct.  Defendants' acts of aiding and abetting included, _inter alia_, all of the acts that each of them is alleged to have committed in furtherance of the conspiracy, common scheme, enterprise and course of conduct complained of herein.

## CLASS ACTION ALLEGATIONS

57.    Plaintiffs bring this action on their own behalf and as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class (the "class") consisting of all persons (other than defendants and members of the defendant class, and the members of their immediate families, their heirs, successors and assigns) who purchased initially or reinvested in Towers' Notes at any time during the period from February 15, 1989 through February 9, 1993, and who have suffered damages as a result thereof.

- 20 -

58. Plaintiffs also sue on behalf of a number of subclasses consisting of all persons who: (a) purchased Towers' Notes from the defendants, (excluding Squadron, Ellenoff, the Bronson defendants, ACI and Duffs & Phelps), including the defendant class (collectively, the "selling defendants") on or after February 9, 1992 for purposes of the claim under Section 12(1) of the Securities Act (the "Section 12(1) Class"); (b) purchased Towers' Notes from the selling defendants on or after February 9, 1990 for purposes of the claim under Section 12(2) of the Securities Act (the "Section 12(2) Class"); and (c) purchased Towers' Notes from the selling defendants on or after February 9, 1991 (or earlier, depending upon the applicable state statute) for purposes of the claim under the applicable state Blue-Sky statute (the "Blue-Sky" Class)(collectively, "the Subclasses").

59. During the Class Period and the Subclasses Period, as part of a single integrated offering that began in February 1989, the defendants fraudulently and illegally sold over $215,000,000 in Notes to over 2,800 investors. Accordingly, the members of the class are so numerous that joinder of all Class and Subclass members is impracticable. The names and addresses of class members are appended to Towers' bankruptcy schedules, and additional class members may be identified by examining, the books and records of Towers and its agents.

60. Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses. Plaintiffs and the

members of the Class and Subclasses have sustained damages because of defendants' unlawful activities alleged herein.

61. Plaintiffs have retained counsel competent and experienced in class and securities litigation and intend to prosecute this action vigorously. The interests of the Class and Subclasses will be fairly and adequately protected by plaintiffs.

62. Plaintiffs have no interests contrary to or in, conflict with the interests of the other members of the Class or Subclasses.

63. Common questions of law and fact which exist and which predominate over any questions affecting individual members of the Class are:

(a) Whether defendants violated Sections 12 and 15 of the Securities Act, Sections 10(b) and 20(A) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, RICO and the common law;

(b) Whether defendants participated in and pursued the common course of conduct complained of;

(c) Whether the offering memoranda issued by Towers were materially false and misleading or omitted to state material facts concerning the business, finances and prospects of Towers;

(d) Whether the defendants acted reasonably in connection with the preparation and issuance of the offering memoranda;

(e) Whether the defendants acted willfully, recklessly or with gross negligence in omitting and misrepresenting material facts or in aiding and abetting the making of material misrepresentations or omissions; and

(f) The extent of damages sustained by the members of the Class and the Subclasses and the appropriate measure of damages.

64. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to seek redress for the wrongful conduct alleged. Plaintiffs envision no difficulty in the management of the action as a class action.

## THE DEFENDANT BROKER-DEALER CLASS ALLEGATIONS

65. Certain of the claims for relief are brought against a Defendant Class of Broker-Dealers pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1) and 23(b)(3). As to such claims, Monterey Bay Securities and First Affiliated Securities are sued both individually and as the representatives of a defendant class consisting of all Broker-Dealers who, pursuant to the offering memoranda, participated in the offer and sale of Towers' Notes from February 15, 1989 to the present.

66. The members of the Defendant Broker-Dealer Class are so numerous that joinder of all such class members is

- 23 -

impracticable. Plaintiffs are informed and believe that there are more than seventy-five members of the Defendant Class geographically dispersed across the nation.

67. There are questions of law and fact common to the Defendant Class which predominate over any questions affecting only individual members of such class, including, *inter alia*, whether the Notes were offered and sold without the required registration under the securities laws, and whether the offering materials disseminated with respect to the offer and sale of the Notes failed to disclose material facts or misrepresented material facts as alleged in this complaint.

68. The defenses of the representatives of the Defendant Class, on those claims asserted against such class, are typical of the defenses of all members of such class, and the named representatives of the Defendant Class will fairly and adequately protect the interests of the members of such class as a whole.

69. The prosecution of separate actions by or against individual members of the Defendant Class would create a risk of:

(a) inconsistent or varying adjudications with respect to individual members of the Defendant Class which would establish incompatible standards of conduct for plaintiffs; or

(b) adjudications with respect to individual members of the Defendant Class which would, as a practical matter, be dispositive of the interests of the other members not

- 24 -

parties to the adjudications or substantially impair or impede their ability to protect their interests.

(c) A defendant class action is superior to the other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a defendant class action.

## FACTUAL ALLEGATIONS

### The 1988 Injunction

70. On August 4, 1988, the SEC filed an injunctive action against several of the defendants herein, captioned SEC v. Towers Credit Corporation, Towers Financial Corporation, Steven Hoffenberg, Eton Securities Corp. and Mitchell Brater, 88 Civ. 5421 (SWK). The action alleged violations of Section 5 of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)], which prohibit the offering or sale of unregistered securities, among other things. A Final Consent Judgment of Permanent Injunction and Order as to Towers Credit Corporation ("Towers Credit"), Towers, and Hoffenberg was entered on November 16, 1988 and, as to Brater, on May 12, 1989 (the "Injunction"). Towers, Hoffenberg and Brater are bound by the Injunction from violating Section 5 of the Securities Act.

### The Unregistered Offering And Sale Of Securities

71. Beginning no later than February 1989, and continuing throughout the Class Period, Towers, Hoffenberg and Brater, in violation of the Injunction, engaged in the offering

and sale of unregistered securities, namely, over $215 million in Notes offered through the offering memoranda. No registration statement was or is in effect as to such securities and no exemption from registration was or is available.

72. Towers sold the Notes pursuant to five separate offering memoranda, which are part of a single integrated offering. Towers sold approximately $51 million in Notes pursuant to an offering memorandum dated February 15, 1989 (the "February 1989 OM"); approximately $49 million in Notes pursuant to an offering memorandum dated February 20, 1990 (the "February 1990 OM"); approximately $76 million in Notes pursuant to an offering memorandum dated October 1, 1990 (the "October 1990 OM"); and approximately $39 million in Notes pursuant to an offering memorandum dated October 15, 1991 (the "October 1991 OM"); and an uncertain amount pursuant to an offering memorandum dated March 23, 1992 (the "March 1992 OM"). The Notes were all the same class of securities, sold for the same consideration and constituted part of a single plan of financing.

73. Each of the five offering memoranda purports to raise funds for the purchase of accounts receivable. The first two memoranda state the proceeds will be used "to purchase health care and business receivables," and in addition, the last three state that the proceeds may also be used to buy loan packages purchased from the Federal Deposit Insurance Corporation ("FDIC") and the Resolution Trust Company ("RTC"). The offering materials state that receivables purchased with offering proceeds will

collateralize the Notes. For example, the February 15, 1989 memorandum states that the proceeds of the offering will be used "to purchase the Accounts Receivable which will collateralize the Promissory Notes" and to pay certain commissions. The same memorandum describes the Notes as "collateralized by Health Care Accounts Receivables purchased from hospitals, doctors, medical groups and other health care providers and Business Accounts Receivables purchased from manufacturers, wholesalers and service companies, that are insured by a major insurance company. . . ." Moreover, each of the offering memoranda states that the offering proceeds will be deposited in "special escrow accounts" at Chase Manhattan Bank, N.A.

74. Towers sold the Notes pursuant to a purported exemption from registration under Section 4(2) of the Securities 1933 Act (transactions by an issuer not involving a public offering) and Regulation D (exemption for limited offers and sales). These exemptions did not apply to these Notes. The Notes are for terms of one or two years, with interest rates ranging from 12% to 14% per annum, and 14% to 16% per annum, respectively. Although the Notes were purportedly sold in units of $50,000 or $100,000, Towers routinely sold the Notes in fractions of such units.

75. Brater, individually and through Econ Securities, Inc., together with other employees and agents of Towers acting at Brater's direction, solicited registered Broker-Dealers to market the Notes. Brater, or others acting at his direction,

- 27 -

mailed over 25,000 offering memoranda to over 2,000 Broker-Dealers for the purpose of having the Broker-Dealers offer the Notes to potential investors. More than seventy-five Broker-Dealers in at least twenty states sold the Notes to class members.

76. The Notes were offered and sold to thousands of persons and entities who reside in at least 40 states. Many of the investors are unsophisticated, and are living on fixed incomes. More than 35 of the investors are individual investors with net assets of less than $1 million at the time they purchased the Notes; or annual income of less than $200,000 in each of the two years prior to their purchase; or together with their spouse earned less than $300,000 in each of the two years prior to their purchase; or not-for-profit organizations, defined benefit plans and trusts with assets of under $5 million at the time of their investment.

77. As set forth below, Towers failed to distribute to the Notes' investors the information material to an understanding of Towers, its business, and the Notes, as required by Securities Act Rule 502 (17 C.F.R. § 230.502) and Regulation S-K.

78. As of June 30, 1992, Towers represented that it had $198 million in Notes outstanding.

**Misrepresentations By Towers Of Its Financial Condition**

79. Towers' Annual Reports for fiscal years 1988, 1989, 1990 and 1991, distributed to investors and potential investors, contained false and misleading financial statements

- 28 -

which projected Towers as a financially successful and secure company, when, in fact, each year it was incurring very substantial losses. Through these false and misleading financial statements, Towers deceived investors into investing in the Notes and rolling over their investments into new Notes as Notes matured.

80.    In the financial statements for fiscal years ended June 30, 1988 ("FY 1988"), June 30, 1989 ("FY 1989"), June 30, 1990 ("FY 1990"), and June 30, 1991 ("FY 1991"), Towers grossly overstated its total assets (due to inflated accounts receivable), net income (due to inflated fee income) and shareholders' equity, in violation of Generally Accepted Accounting Principles ("GAAP"), as follows:

(a)    In FY 1988, Towers reported net income of $1.4 million when, in fact, Towers had incurred a loss of approximately $16 million; total assets of $76 million when, in fact, Towers had assets of $48 million or less; and shareholder equity of $6.5 million when, in fact, Towers had a deficit of approximately $11 million;

(b)    In FY 1989, Towers reported net income of $3.5 million when, in fact, Towers had incurred a loss of approximately $24 million; total assets of $122 million when, in fact, Towers had assets of $21 million or less; and shareholder equity of $10.3 million when, in fact, Towers had a deficit of approximately $35 million;

- 29 -

(c)    In FY 1990, Towers reported net income of $3.9 million when, in fact, Towers had incurred a loss of approximately $36 million; total assets of $195 million when, in fact, Towers had assets of $29 million or less; and shareholder equity of $13.4 million when, in fact, Towers had a deficit of approximately $71 million;

(d)    In FY 1991, Towers reported net income of. $4.3 million when, in fact, Towers had incurred a loss of approximately $61 million; total assets of $513 million when, in fact, Towers had assets of $250 million or less; and shareholder equity of $20.1 million when, in fact, Towers had a deficit of approximately $130 million;

(e)    In FY 1992, Towers reported similar figures. It reported net income of $5.4 million, total assets of $684 million, and shareholders' equity of $25.5 million. Plaintiffs believe these figures are materially overstated just as the prior years' figures were.

81.    The Individual Defendants, Ferro, Basson, the Bronson defendants and Squadron, Ellenoff knew or were reckless in not knowing that Towers' financial statements were materially false and misleading, because, among other things, they had knowledge of and responsibility for Towers' operations and/or participated, directly or indirectly in the preparation and review of Towers' financial statements.

- 30 -

**Collection Receivables**

82. TCS collects past-due accounts receivable (the "collection receivables") for third-party clients on a contingency-fee basis. TCS pays no monies for these receivables and is obligated to return all collection receipts to its client, except for a percentage which constitutes TCS's fee, as agent. TCS improperly recorded fee income for its services at year end, before performing significant collection activities and prior to cash collections. As a result of this improper recognition of fee income, Towers' fee income of $36 million was overstated by at least $10 million in FY 1989. For FY 1990, TCS improperly recognized $22 million in fee income, out of Towers' total reported fee income of $56 million. For FY 1991, TCS improperly recorded $56 million in fee income, out of Towers' total reported fee income of $97 million.

83. Towers also improperly recorded these collection receivables as Towers' own assets. These collection receivables did not belong to TCS, but rather to TCS's clients, who had entrusted them to TCS as their agent. TCS, therefore, could not properly record these collection receivables at any amount on its books and records. Moreover, TCS recorded these past-due accounts receivable at amounts grossly in excess of their value.

84. For FY 1989, Towers reported accounts receivable of $112 million, of which approximately $101 million were collection receivables. For FY 1990, Towers reported $177 million in account receivable, of which approximately $142

- 31 -

million were collection receivables. For FY 1991, Towers reported $437 million in accounts receivable, of which $246 million were collection receivables.

**Purchase Receivables**

85. Towers engaged in the business of purchasing severely delinquent receivables for a price which constituted a deep discount to face value of the receivables. Instead of properly recording these receivables at cost, Towers improperly recorded them at substantially above cost. Towers also improperly recognized income at the time the receivables were acquired, instead of only recording income when such income was received.

**Federal Deposit Insurance Company Loan Portfolios**

86. Towers also inflated its accounts receivable and fee income by improperly recognizing income from loan portfolios originating from banks liquidated by the Federal Deposit Insurance Company (the "FDIC loan portfolios"), and recording these FDIC loan portfolios at amounts grossly in excess of their cost.

87. In FY 1990, Towers bought various FDIC loan portfolios, with a face value of over $50 million, for less than $500,000. These FDIC loan portfolio contained nonperforming, distressed loans. In FY 1990, Towers improperly recorded fee income of $24 million from the FDIC loan portfolios, and also improperly recorded the portfolios as accounts receivable valued

- 32 -

at $24 million. Towers had virtually no cash receipts from these FDIC portfolio in FY 1990.

88. In FY 1991, Towers purchased additional FDIC loan portfolio with a face value of $6 million for approximately $30,000. Towers improperly recognized $6 million in fee income and recorded these distressed FDIC loan portfolios as accounts receivable valued at $6 million. As a result of the improper, recording of the FDIC loan portfolios in FY 1990 and FY 1991, accounts receivable in FY 1991 were overstated by $13 million. In FY 1991, less than $1 million in cash receipts was collected on these receivables.

89. Towers falsely stated in its 1991 Annual Report that "income on RTC/FDIC loans is recognized as they are collected." In fact, Towers recorded fee income in much larger amounts than Towers ever collected in FY 1990 or FY 1991, as described in paragraphs 80(c)-(d).

Bank of America Portfolio

90. In or around January 1991, Towers purchased a portfolio of credit-card balances from the Bank of America, with a face value of approximately $10 million for less than $200,000 (the "Bank of America portfolio"). Before selling the portfolio to Towers, Bank of America had charged off all of the balances as worthless after other private collection agencies had failed to collect on them. In FY 1991, Towers collected little or no amounts on the Bank of America portfolio.

- 33 -

91. Towers improperly recorded fee income of $4 million for the Bank of America portfolio in FY 1991, causing Towers' reported fee income in FY 1991 to be overstated by this amount. Towers also improperly recorded the Bank of America portfolio at $4 million, causing an overstatement by $4 million (less the cost of the portfolio) of Towers' FY 1991 accounts receivable.

Southwestern Bell Portfolio

92. In or around June 30, 1988, TC purchased a portfolio of past-due accounts receivable from Southwestern Bell Yellow Pages, Inc. ("Southwestern Bell") with a face value of approximately $28 million, for less than $300,000 ("Southwestern Bell portfolio"). Before selling the portfolio to Towers, Southwestern Bell had charged off all of the balances as worthless after other private collection agencies, including Towers, had failed to collect on them. To date, TC has collected less than $1 million on the Southwestern Bell portfolio.

93. Towers improperly recorded fee income of $19 million for the Southwestern Bell portfolio in FY 1988, resulting in the overstatement of Towers' fee income in FY 1988 ($21 million) by that amount. Towers also improperly recorded the Southwestern Bell portfolio at $28 million, which resulted in an overstatement by $28 million (less the cost of the portfolio) of Towers' FY 1988 accounts receivable.

94. The improperly recorded fee income and accounts receivable, as set forth in paragraphs 92 through 93, resulted in

- 34 -

material misstatements in Towers' financial statements for FY 1988 through FY 1991.

Investment in United Diversified

95. In its financial statements for FY 1989 through FY 1991, Towers had further inflated its assets by improperly recording Towers' investment in United Diversified Corporation ("UDC"), which conducted business through its subsidiaries, Associated Life Insurance Co. ("Associated") and United Fire Insurance Co. ("United Fire").

96. Towers acquired a controlling interest in UDC in 1987 for $3 million, and Hoffenberg became Chairman of the Boards of UDC, United Fire and Associated.

97. Towers improperly recorded the purchase cost of $3 million as an investment on its financial statements from FY 1989 through FY 1991. As set forth below, the UDC investment had become seriously impaired by FY 1989 and by at least FY 1991, posed a threat of liability beyond the cost of the original investment.

98. In July 1988, the Illinois Director of Insurance (the "Insurance Director") obtained an order placing UDC, Associated and United Fire in conservation. On February 14, 1989, Hoffenberg agreed in a signed stipulation to the entry of an order liquidating Associated Life and United Fire. The liquidation order was based on Hoffenberg's agreement that both companies were insolvent. On March 3, 1989, when the liquidation

order was entered, Hoffenberg lost all control of the companies, and any expectation of any return on the investment.

99. On or about June 27, 1991, Hoffenberg and others were charged by the Insurance Director with having used the insurance companies as an instrumentality of Towers, and, among other things, having transferred investments and cash belonging from the companies into various Hoffenberg controlled brokerage accounts. These transfers of funds began in November 1987 and continued through July 1988. The civil action, entitled Schacht v. Hoffenberg, et al., No. 91 C 4024 (N.D. Ill.) alleged that the defendants had caused UDC, Associated and United Fire to suffer damages in excess of $4 million, become insolvent and be placed in conservation and/or liquidation. The complaint sought, among other things, treble damages under RICO. Towers settled this and related actions in 1992, upon Towers' agreement to pay $3.5 million as part of the settlement.

100. It was materially false and misleading for Towers to continue to record its investment in the insurance companies at cost in the FY 1989, FY 1990 and FY 1991 financial statements without any reserve to reflect both the impairment of the investment or the contingency of Towers' potential liability. Towers' assets were overstated by at least $3 million in each of those years as a result of Towers' failure to record an appropriate reserve.

101. Further, Towers did not disclose to investors the liquidation and conservation proceedings against UDC, Associated

and United Fire, nor the filing of <u>Schacht v. Hoffenberg</u> against Towers.

### <u>Misrepresentations And Omissions In Towers' Offering Memoranda</u>

#### <u>Use Of Proceeds</u>

102. Towers represented in its offering memoranda that Towers planned to use the funds it raised by investors to buy accounts receivable, defined as "Health Care Accounts Receivable purchased from hospitals, doctors, medical groups and other health care providers and Business Accounts Receivable purchased from manufacturers, wholesalers and service companies." Beginning with the October 1990 offering memorandum, the proposed activities were expanded to include FDIC loan portfolios.

103. The offering memoranda falsely stated that Towers typically would acquire accounts receivable for up to 95% of their face value, would earn a minimum 5% "factoring fee" for each such account receivable collected and would reinvest the proceeds of collection in additional accounts receivable. The offering memoranda further stated that Towers expected to compound its "factoring fee" up to six times per year from purchasing accounts receivable, collecting them and reinvesting the proceeds.

104. In fact, Towers bought few, if any, current accounts receivable with the offering proceeds, buying instead accounts receivable (or loan portfolios) at substantially less than 95% of face value that were largely uncollectible, such as those described above.

- 37 -

105. As of June 30, 1991, when Towers had $124 million in outstanding Notes, Towers owned virtually no accounts receivable. Accounts receivable reflected in Towers' consolidated financial statements for FY 1991 consisted mainly of the collection and other receivables described above, which Towers did not own, and certain receivables purchased and owned by three of the THRFC Bond Funds. Any and all healthcare accounts receivable reflected on Towers' balance sheet dated June 30, 1991 were purchased with proceeds from these three THRFC Bond Funds, and not the Notes.

106. Instead of using investors' funds to purchase accounts receivable, as represented in the offering memoranda, Towers, at the direction and control of the Individual Defendants Hoffenberg, used investors' funds to pay, <u>inter alia</u>, interest on the Notes, to pay Towers' expenses, such as salaries (including exorbitant salaries to Hoffenberg, Brater and Ferro) and attorneys' fees. In addition, because the collection and purchase receivables were of such poor quality, there was insufficient cash flow generated from collections on such receivables to meet Towers' financial needs and obligations. Thus, Towers resorted to such measures as failing to remit collection receipts due to its clients and diverting millions of dollars from THRFC Bond Funds to Towers, in violation of bond fund indenture covenants.

107. The offering memoranda falsely stated that the Notes were fully collateralized by accounts receivable purchased with the offering proceeds, and with a face value substantially

- 38 -

in excess of the Notes. In fact, the Notes were severely undercollateralized because of the small face amount and low quality of accounts receivable purchased by Towers in the relevant years, as reflected by their cost and Towers' minimal collections on them such as the FDIC loan portfolios, Southwestern Bell receivables, and the Bank of America portfolio.

Special Bank Accounts For Offering Proceeds

108. Towers falsely stated in offering memoranda that it would keep offering proceeds in escrow bank accounts to the extent that the funds were not used to purchase accounts receivable or pay certain specified expenses. As of June 30, 1991, although Towers had purchased few accounts receivable with the $124 million in offering proceeds, Towers' bank accounts contained at most $5 million. As of June 30, 1992, when Towers was reporting outstanding promissory Notes of $198 million (and additional debt issued by the special-purpose subsidiaries of $196 million), reported cash and cash equivalents were only $32 million.

109. The offering memoranda falsely and misleadingly described amounts that Towers could withdraw from escrow bank accounts to use for any corporate purpose. According to the offering memoranda, "excess profit amounts" could be withdrawn and used for any corporate purpose only if the face value of accounts receivable purchased with investors' funds (and proceeds from collections on these receivables) exceeded the amount of the Notes. The face value of accounts receivable purchased with

- 39 -

investors' funds (and proceeds from collections on these receivables) never exceeded the amount of Notes, yet Hoffenberg, or others at his direction and control, routinely emptied the escrow bank accounts.

Insurance Policy Covering Receivables

110. The February 1989 offering memorandum misleadingly characterized the accounts receivable securing and backing the Notes offered therein as "insured." Towers represented that it had obtained an insurance policy "to insure the collectibility of most of the Accounts Receivable which are either D & B listed or separately listed by the insurance company as additional insured companies."

111. Towers' insurance in effect at that time allowed Towers to recover only its purchase price on accounts receivable that were current at the time Towers purchased them (subject to other conditions being met). Therefore, the collectibility of collection receivables and other past-due receivables was not covered at all.

112. Other significant limitations not disclosed in the offering document were that the policy had a ceiling of $5 million; it protected only against insolvency of the debtor, and not disputed accounts (unless reduced to a judgment); and there was a dollar limitation per debtor.

Beneficial Ownership Of Towers

113. The offering memoranda and annual reports distributed to investors failed to disclose defendant

- 40 -

Hoffenberg's ownership, either directly or indirectly, of a majority of Towers' common stock and the compensation paid to Towers' executive officers.

114. The Individual Defendants, the Bronson defendants, and defendant Squadron, Ellenoff, knew, or were reckless in not knowing, that Towers' offering memoranda were materially false and misleading, because, among other things, they had knowledge of Towers' true financial condition and, directly or indirectly, developed the Note offering program.

**Trading By Hoffenberg**

115. From January 2, 1990 through January 30, 1992, Towers common stock generally traded in a range between $7.50 and $9.50 per share, reaching a high of $11 per share (on January 10, 1990), and a low of $5.75 (on October 1, 1991).

116. Hoffenberg, while in possession of the material, nonpublic information described above, sold at least 208,960 shares of Towers common stock in breach of his fiduciary duty to Towers' shareholders, and realized profits of at least $1,596,841.

- 41 -

117. At the time of his sales, Hoffenberg knew, or was reckless in not knowing, that he possessed material, nonpublic information about Towers' poor financial condition and misuse of investor proceeds.

**Role Of Bond Funds And Their Related
Party Transactions With Towers Which
Perpetuated And Prolonged The Ponzi Scheme**

118. The THRFC Bond Funds sold almost $200 million in securities pursuant to a claimed exemptions from registration. As of February 22, 1993, such subsidiaries owed $199,450,000 to 21 institutions that purchased the Bonds issued by the THRFC Bond Funds. The total amount purchased by each investor from one or more of the Bond Funds ranged from $500,000 to $85 million.

119. A key concept of each Bond Fund, as represented in the private placement memoranda, was that each Bond Fund would use the proceeds of the offering to purchase "Qualified Healthcare Receivables," as well as to pay certain fees to Towers and sales commissions. "Qualified Healthcare Receivables" were defined in the private placement memoranda as "health care accounts receivable of health care providers evidencing the right to collect payment for health care services previously rendered, the payment on which is to be made by an insurer with a rating of 'A' or better or a governmental entity (a 'Third Party Obligor') and which are purchased by Towers Financial Corporation pursuant to a contract approved by the issuer [the THRFC Bond Funds.]"

120. As expressed in standardized language in each Indenture for each issue of Bonds, such purchased receivables

- 42 -

would become "collateral" to secure repayment of the Bonds and Towers and each Bond Fund would maintain specified minimum ratios of such collateral to the outstanding amount of Bonds proceeds ("Collateral Coverage Ratio"). Specifically, Towers represented in the private placement memoranda that the Bonds would be secured by the healthcare receivables purchased from Towers and by bank accounts held by the Trustee, pursuant to the Trust indentures alleged below. The private placement memoranda further state that no further funds will be invested in healthcare receivables if the ratio of collateral to Bond proceeds is less than 180% (for bond Funds I and II) or 135% for Bond Funds III, IV and V for 31 days. All such funds become immediately available to pay principal on the Bonds, according to the private placement memoranda.

121. The offering memoranda describe Towers as the master servicer for the THRFC Bond Funds. As master servicer, Towers was to purchase qualified healthcare receivables from healthcare providers at a 5% discount, and initially advance 50% of the value of the receivables to the healthcare providers. Upon payment by third-party payors (such as insurance companies or Medicare), Towers was to keep a fee of 5% and remit the remaining 45% to the healthcare providers. According to the offering memoranda, the THRFC Bond Funds would buy the healthcare receivables from Towers on these same terms.

- 43 -

**Default Under The Indentures, And Acceleration Of Repayment Of Principal On The Bonds Cause "Going Concern" Exception**

122. Rather than using the proceeds from the sale of the Bonds to repurchase the required amounts of healthcare receivables and maintain the Collateral Coverage Ratios required under the Indentures for each of Bond Funds I through IV, Towers disregarded the supposedly separate corporate identity of the subsidiaries, commingled the money together with money raised through the Notes and diverted funds from the offerings and collection of receivables to keep the fraudulent Ponzi scheme going.

123. Specifically, at least $49 million of the bondholders' funds had not been invested in healthcare receivables, and had, instead, been diverted to Towers' own use.

124. Although the Towers' diversions of the Bond Fund proceeds to their fraudulent Ponzi scheme provided at least $49,000,000 to prolong the scheme, such diversions also caused, by June 30, 1992 at the latest, the following:

(a) Bond Fund I was in default and had triggered a Principal Amortization Event pursuant to Section 1005 of the Indenture dated July 1, 1990 by failing to meet the aforesaid 'required collateral coverage ratio' [1992 Annual Report, page 56];

(b) Bond Fund II was in default and had triggered a Principal Amortization Event pursuant to Section 1005 of the Indenture dated November 1, 1990 by failing to meet the 'required collateral coverage ratio' [1992 Annual Report, page 63-64];

- 44 -

(c)   Bond Fund III was in default and had
triggered a Principal Amortization Event
pursuant to Section 1005 of the Indenture
dated May 1, 1991 by failing to meet such
"required collateral coverage ratio" (1992
Annual Report, pages 71-72);

(d)   Bond Fund IV was in default and had triggered
a Principal Amortization Event pursuant to
Section 1005 of the Indenture dated
December 1, 1991 by failing to meet such
"required collateral coverage ratio" (1992
Annual Report, at pages 87-88 of the 1992
Annual Report, pages 87-88 [Bond Fund V
was not said, at pages 89-90 of the 1992
Annual Report, to be in default in the notes
to the financials for Fund V. However, the
Indenture therefor is dated May 1, 1992, and
Bond Fund V had, as of June 30, just begun
operations.)

125.   By reasons of such defaults and Principal
Amortization Events under such Indentures, the entire principal
amount outstanding under each Indenture was subject to being
declared to be due and payable, in full, by the Trustee [Section
502 of each Indenture).  Irrespective of any such declaration by
the Trustee, the entire principal amount of such Bonds was due
and payable, in full, at the latest, within eight months after
June 30, 1992 [Section 203(g) of each Indenture].

126.   By virtue of such accelerations:

(a)   Towers Bond Fund I Towers Bond Fund II,
Towers Bond Fund III and Towers Bond Fund IV,
had each ceased, as of June 30, 1992, to be a
going concern for accounting purposes in
that, among other things, it was unable to
meet its obligations when and as due;

(b)   As a result, Towers itself also ceased by
June 30, 1992 to be a going concern;

(c)   Each of the foregoing defaults was a material
adverse event required to be disclosed as

- 45 -

---

such by Towers as well as by Towers Bond
Funds I-IV; and

(d)   Based upon the true state of the financial
affairs of the Towers' Bond Funds and Towers
on a consolidated basis, Towers had no
creditworthiness and no financial ability to
offer and sell the Notes to plaintiffs and
other class members which Towers did, in
fact, offer and sell after June 30, 1992.

(e)   the assets of TEC and affiliates, including
accounts and notes receivables and equity in
real estate properties, were overstated; and

(f)   Goodwill of subsidiaries was overstated and
improperly amortized over a 40-year periods.

**THE ROLE OF THE INDIVIDUAL DEFENDANTS**

127.   The Individual Defendants were principals in and
substantially assisted and aided and abetted the fraud,
conspiracy, common course of conduct and scheme hereinabove
alleged.  By virtue of their positions as officers, directors
and/or substantial shareholders of Towers, the Individual
Defendants had access to confidential information and either knew
or, but for their recklessness, should have known all of the
omissions and misrepresentations of material fact hereinabove
alleged.

128.   The Individual Defendants, by reason of their
stock ownership, management positions and/or their membership on
Towers' Board of Directors during the Class Period, were
"controlling persons" of Towers within the meaning of Section 20
of the Exchange Act and Section 15 of the Securities Act and for
purposes of imposing respondeat superior liability under common

- 46 -

law. As is more fully set forth below, each of the Individual Defendants had the power and influence, and exercised the same, to cause Towers to engage in the wrongful and illegal practices complained of herein. In addition, each of the Individual Defendants acted as agent for one another and all of the acts alleged herein were done in the course and scope of said agency.

129. The Individual Defendants participated in the wrongful and illegal acts complained of herein in order to continue and prolong the illusion of Towers success and to inflate or maintain terms of the Notes, by concealing the adverse facts particularized in paragraphs 70-126 and for the purpose of

(i) protecting their executive and directorship positions and the substantial compensation and prestige they obtained hereby and

(ii) inflating the price and terms of the Notes in order to enhance the value of their holdings.

130. The Individual Defendants acted improperly with respect to Towers investors to whom they owed fiduciary obligations of the highest good faith and fair dealing. Their actions and failures to act included, but were not limited to the following:

(a) Created, or approved the creation of, and/or contributed to the operation and maintenance of the fraudulent Towers enterprise;

(b) Omitted to disclose to plaintiffs, members of the class and other Towers investors that Towers was nothing more than a "Ponzi" scheme;

- 47 -

(c) Reviewed, approved, adopted, distributed and/or failed to prevent the dissemination of the false and misleading annual reports, financial statements, offering memoranda, public filings and reports set forth in paragraphs 71 through 117 of this complaint;

(d) Failed to manage, conduct, supervise and direct the affairs of Towers in accordance with state and federal laws;

(e) Failed to exercise reasonable control and supervision over Towers' managers, employees and agents.

131. The Individual Defendants, and each of them, approved the matters set forth in the annual reports, financial statements and the offering memoranda referred to hereinabove by their attendance at Board of Directors meetings, where the annual reports were reviewed and represented to be accurate. The Individual Defendants failed, neglected and refused to advise investors of the inaccuracies contained in the financial statements, which conduct was due to their intent to defraud and deceive plaintiffs and was done with the intent to induce plaintiffs' reliance upon said financial reports in investing in the Towers' Notes.

132. Defendants issued the offering memoranda over a period of approximately three years as an integrated offering, with essentially the same type of securities being sold at the same prices for the same stated purposes.

- 48 -

133. In each of the offering memoranda and the annual reports, defendants falsely and fraudulently misrepresented Towers' financial condition, leading investors to believe that Towers had a positive stable financial situation when, in fact, it did not.

134. But for defendants' fraud and their fraudulent course of conduct, these Notes would not (and could not) have been marketed. A market existed in these Notes as a result of defendants' fraud and fraudulent course of conduct, and plaintiffs and the Class relied on the existence of this market in making their purchases of the Notes. If the financial information and other misrepresented facts had been properly disclosed, the offering memoranda would have disclosed that the Notes were worthless and were financially doomed investments and the Notes could never have been marketed.

135. By continuing the misrepresentations throughout the offering memoranda and annual reports, the Individual Defendants actively concealed from investors the truth about their investments. Thus, investors in each offering memoranda were misled not only by the annual reports issued subsequent to their purchase, but also by the subsequent offering memoranda into believing that Towers' financial condition continued to be stable or improving, when in fact it was not.

136. Defendant Hoffenberg was the Chief Executive Officer, President and Chairman of the Board of Towers and the President of TCC and TFC Funding Corporation. Hoffenberg

- 49 -

directly owns 10% of Towers' common stock and additionally owns or controls 61.4% of the stock through PBB, a corporation owned by the Hoffenberg Family Trust, of which he is the trustee. Through PBB, the Hoffenberg Family Trust received a percentage of Towers' gross revenues ostensibly pursuant to an agreement stemming from the 1986 sale of TFC and Towers Credit to Towers. Hoffenberg founded Towers and was intimately involved in its daily operations. Hoffenberg participated in the drafting of the offering materials, including the offering memoranda and the annual reports, and signed messages to investors which were prominently featured in the annual reports. Hoffenberg participated in the negotiation of contracts for Towers, and in negotiations and communications with state and federal regulatory authorities. Hoffenberg exercised control over Towers' bank accounts, including the escrow accounts established with the proceeds of the Note. He further participated in the preparation of Towers' financial statements, including determination of the amount of "excess profits" appropriated by Towers from the offering proceeds. He reviewed Towers' financial statements and verified information contained therein, and consulted frequently with Towers' auditor, and was specifically consulted with respect to Towers' revenue recognition policies. Hoffenberg corresponded with investors regarding the Notes, and his signature appeared on Notes at least through 1990.

137. Defendant Brater was the Vice Chairman of the Board of Directors of Towers and served as the Chief Operating

- 50 -

Officer of Towers during the Class Period. As of July 1, 1991, Brater owned 10% of the common stock of Towers and further exercised control over another 10% of the common stock held in the name of Sovereign Holdings, Ltd. Mr. Brater has also been President of Eton Capital Corporation and Eton Securities Corporation, a registered broker-dealer which in the past marketed Towers securities. Brater was intimately involved in the day-to-day operations of Towers and had extensive knowledge of Towers' business and financial condition. Brater had responsibility for marketing the Notes and supervised the regional wholesalers of the Notes and a network of Broker-Dealers who earned commissions on Note sales. Brater was responsible for broker-dealer and investor relations, and for marketing accounts receivable services. Brater frequently corresponded with Towers' investors and made representations to investors with regard to Towers' financial condition.

138. Defendant Ferro headed Towers' accounting department, and prepared, directly or indirectly, Towers' books and records and financial statements. As an independent contractor, Ferro provided services through his one-man accounting firm, Ferro & Broderick, which had no offices other than Towers' headquarters, and in Ferro's residence in Valley Stream, New York. Ferro was once licensed as a CPA by the State of New York, but his registration is no longer active.

139. Defendant Chugerman was the Executive Vice President and Secretary and a member of the Board of Directors of

Towers and President of Towers Leasing Corporation. In May 1991, Towers issued 100,000 shares of common stock to Chugerman in connection with its collection business. Chugerman has intimate knowledge of Towers' day-to-day operations and has knowledge of Towers' business, cash flow and financial condition, and reviewed, ratified, approved, and/or acquiesced in the misleading offering materials described herein.

140. Defendant Rosoff was a Senior Vice President, Chief Legal Officer and Assistant Secretary and Member of the Board of Directors of Towers Financial Corporation. Rosoff participated in the drafting of the offering materials, negotiated contracts and agreements, provided legal services and advice with respect to regulatory compliance and was pictured in the Towers' annual reports, along with defendants Hoffenberg and Brater. Rosoff also served as Vice President, General Counsel and a Director of TFC and TCC, and had intimate knowledge of Towers' day-to-day operations.

141. Defendant Evans served on the Advisory Board of Towers, and since 1990, was a member of the Board of Directors of Towers. In February 1991, Towers issued 100,000 shares to Evans in consideration of services he had rendered. Evans provided legal and consulting services to Towers during the Class Period through his former law firm - Manatt Phelps Rothenberg & Evans ("Manatt Phelps"). Additionally, Evans allowed his past political experience and affiliation with the prominent Manatt Phelps firm to be featured in Towers' offering materials to lend

an aura of legitimacy and respectability to the Towers operation. He was listed as former vice-chairman of the Republican National Committee and former senior member of the United States House of Representatives. Evans reviewed, ratified, approved and/or acquiesced in the misleading offering materials described herein, and lent substantial assistance to the Towers scheme.

142. Defendant Barnes served on the Advisory Board of Towers and, since 1990, was a member of the Board of Directors of Towers. In February 1991, Towers issued 100,000 shares to Barnes in consideration of services he had rendered to the Company. Barnes also provided consulting services to Towers throughout the Class Period and received substantial fees from lobbying the Texas Securities Board to permit the sale (and rollover) of Towers' Notes in Texas, and had interceded with regulatory authorities of the State of Louisiana on Towers' behalf. Barnes reviewed, ratified, approved and/or acquiesced in the misleading offering materials described herein, and lent substantial assistance to the Towers scheme.

143. Defendant Basson is a certified public accountant who was retained by Towers to provide accounting and auditing services, including the preparation of audited financial statements for the years 1986 through 1992. Defendant Basson performed such services with the knowledge and intent that the financial statements he prepared would be included in Towers' annual reports and Towers' offering materials and knew and intended that the above financial statements would be sent to

- 53 -

members of the plaintiff class, and would therefore be reviewed and relied upon by class members in making their investment decisions. By virtue of his relationship with Towers at all relevant times, defendant Basson had access to and knowledge of all information relating to the financial condition of Towers. Defendant Basson had actual knowledge of, or recklessly disregarded, the material misrepresentations and omissions alleged above, but nonetheless knowingly concealed, or recklessly failed to disclose, such misrepresentations and omissions to the plaintiffs and the other members of the class.

## THE ROLE OF ACI

144. Towers lulled investors into believing that investments in the Company's Notes were safe by, inter alia, claiming that it had insured through ACI the accounts receivable securing the notes, and by providing copies of the policies, and/or the cover pages thereof, to the Broker-Dealers for distribution to potential note investors.

145. For example, on page 10 of the February 15, 1989 offering memorandum, Towers represented that it:

has obtained an insurance policy (the "Insurance Policy") from American Credit Indemnity Company (rated A + VII by A.M. Best Co.), to insure the collectibility of most of the Accounts Receivable which are either D&B listed or separately listed by the insurance company as additional insured companies . . . . . The Insurance Policy is subject to certain other limitations set forth therein. . . .

- 54 -

The February 20, 1990 offering memorandum contains an almost identical representation.

146. The only statement not misleading in the above description is that Towers had obtained insurance, of some kind, from ACI relating to the accounts receivable. What Towers had obtained from ACI was credit insurance pursuant to several policies covering the period August 1, 1988 through December 31, 1992 (the "Insurance").

147. Contrary to the above description, the Insurance did not insure the collectibility of the accounts receivable securing the promissory notes but only protected Towers, in certain circumstances and for very limited amounts, from the risk of account debtors' insolvency.

148. By glibly passing off the severe restrictions of the Insurance as "certain other limitations," Towers concealed the above and other material facts concerning the Insurance, including the following:

a. In the event of a debtor's insolvency, Towers could collect on the Insurance in the amount of only the purchase prices, not the face value, of any accounts receivable owned by Towers and payable by the debtor, up to a specified maximum of gross coverage for that debtor. Moreover, such specified ceilings of coverage per debtor were very low.

b. The Insurance not only covered merely the purchase prices of accounts receivable, but it also covered only accounts receivable that were current at the time Towers

purchased them. Accounts receivable acquired by Towers that were past due at the time of acquisition were not covered by the Insurance.

c. The Insurance did not cover disputed accounts receivable, where the debtor refused to pay for a reason other than insolvency, unless Towers obtained a judgment against the debtor.

d. The Insurance covered only debtors rated by Dun & Bradstreet, and debtors identified specifically in the policies. If Towers acquired accounts receivable payable by debtors neither rated by Dun & Bradstreet nor expressly listed in the policies, those accounts were not covered by the Insurance.

e. The Insurance covered only accounts receivable that Towers purchased outright from others. Thus, most accounts that Towers purportedly purchased through its subsidiary Towers Collection Services, Inc. ("TCS") were not covered at all by the Insurance because they were not actually purchased by TCS, only contracted for collection by TCS on behalf of the accounts' owners.

f. The Insurance provided aggregate coverage for all accounts receivable of only $5 million, a far cry from the over $214 million that Towers raised through selling the promissory notes, which notes were purportedly secured by insured accounts receivable of equal value.

149. As early as August 12, 1988, in an internal ACI memorandum of that date, from S.L. Wilson, Regional Vice

president, to J.E. Simms, Executive Vice President, ACI acknowledged its awareness of a lawsuit by the SEC against Towers. Thus, ACI knew that the manner in which Towers conducted securities transactions warranted investigation.

150. ACI also knew or was reckless in not knowing, that Towers used the insurance solely as a promotional tool to sell its promissory notes. The limitations on the coverage ACI offered and the amount of the premium ACI collected, made the use of the coverage as a true risk management device unthinkable. The illusory nature of the ACI coverage and the misuse made of the coverage were readily apparent to ACI. ACI was aware of the statements made in the offering memorandum regarding the insurance and was aware that investors would rely on ACI's reputation and solvency in making Towers investments. Moreover, ACI received a document prepared in 1988 or 1989 by Towers entitled "Guaranteed, Insured Accounts Receivable Negotiated Banking Participations," purportedly a proposal for banking participations secured by accounts receivable. On page 3 of this document, Towers represented, in language virtually identical to that set forth in paragraph 145 above, that it had obtained insurance from ACI to insure the collectibility of most of such accounts receivable. Thus, ACI was on notice that Towers used the insurance as a selling point for its financial offerings. In a facsimile transmission dated July 7, 1992, Towers asked ACI for twenty ACI brochures, presumably for display to potential investors in the Towers promissory notes. Furthermore, ACI

- 57 -

fact, on at least one occasion, ACI was importuned by defendant Hoffenberg to continue its insurance for the purpose of facilitating the offering.

151. In spite of Towers' misrepresentations and omissions regarding the coverage afforded by the insurance, ACI made no attempt to stop Towers from making such misleading statements. On the contrary, ACI continued to provide the insurance to Towers, severely limited insurance that exposed ACI to little or no coverage risk while generating high premiums for the insurance company.

152. Towers, for its part, was all too willing to pay ACI premiums for insurance of dubious value, since the insurance enabled Towers to create the impression that investments in the promissory notes, supposedly secured by accounts receivable backed by ACI insurance, were safe.

153. Thus, ACI, in return for the high premiums that Towers paid, knowingly or recklessly furnished Towers with still another means to mislead investors and made no protest when Towers did so, and, in this way, benefitted from Towers' fraudulent scheme.

## THE ROLE OF THE BRONSON DEFENDANTS

154. The Bronson defendants served as special counsel to Towers for the purposes of preparing the offering memoranda pursuant to which Towers offered and sold the Notes, and out of their representation of Towers before various state regulatory agencies. In the course of this representation, the Bronson

- 58 -

defendants advised and assisted Towers in a number of transactions, including, inter alia, (1) the preparation of the February 1989 offering memorandum, pursuant to which Towers offered $100,000,000 in Notes bearing interest at the annual rates of 14% for 12-month Notes, and 16% for 24-month notes; (2) the preparation of the October 1991 offering memorandum pursuant to which Towers offered $100,000,000 in Notes bearing interest at the annual rates of 12% for 12-month notes and 14% for 24-month notes; (3) the preparation of the 1992 memorandum pursuant to which Towers offered $150,000,000 in 30-month notes, and 36-month notes; redeemable upon 90-days notice, bearing interest at 3.5%, over Chase Manhattan Bank, N.A.'s prime rate, adjustable monthly; (4) representing Towers before state and regulatory agencies.

155. In providing the counsel and assistance to Towers during the relevant period, the Bronson defendants purported to exercise due care to ascertain that the documents accurately disclosed all material facts. Yet in conducting their so-called investigation, the Bronson defendants knew, or were reckless in not knowing, that the various offering memoranda contained material misstatements and omissions of material facts. Among these material facts which the Bronson defendants failed to investigate and/or failed to disclose were: (1) failure to disclose that defendant Hoffenberg, Chairman of the Board and Chief Executive Officer of Towers as of the dates of the memoranda, had been convicted of a felony on March 31, 1971 in New York in the case People v. Steve Hoffenberg, a/k/a Barry

Cohen, No. 2023-70 (Sup. Ct. N.Y. County); (2) failure to disclose that defendant Hoffenberg was the beneficial owner of the majority of the common stock of Towers, controlling over 70% of the stock through his ownership and control of PBB, a corporation owned by defendant Hoffenberg Family Trust, of which Hoffenberg is the trustee; (3) the failure to disclose that defendant PBB was paid a percentage of Towers' gross profits, which amounted to approximately $824,000 in fiscal year 1990; (4) the failure to disclose the salary and other compensation paid to defendant Hoffenberg and Brater; (5) failure to disclose that Towers was actually operating at a loss and that the offering proceeds would be used to pay the interest on other Notes and to pay Towers' expenses, rather than to purchase healthcare and other receivables as represented; (6) the failure to disclose or describe accurately in the 1989 OM the regulatory action and litigation arising out of Towers' acquisition in 1989 of a controlling interest in United Diversified Corporation ("UDC"), the subsequent failure of UDC, its placement in conservatorship and the economic impact of UDC on Towers.

156. Not only did the Bronson defendants fail to make these disclosures in the various memoranda prepared by them, but they also failed to conduct reasonable investigations into certain representations made in the offering memoranda. The Bronson defendants failed to conduct a reasonable investigation in the following respects: (1) they failed to investigate reasonably, if at all, the accuracy of the representation made in

the 1989 memorandum that the accounts receivable securing the Notes were "insured," when in actuality the referenced insurance was of limited value to potential investors, (2) they failed to investigate reasonably, if at all, the accuracy of the representation in the memoranda that the proceeds from the sale of the Notes would be kept in a special escrow account, when such accounts were ordinary demand deposit accounts which could be and were drawn upon by Towers for its own use; (3) they failed to investigate reasonably, if at all, the accuracy of the representation in the offering memoranda that Towers would acquire accounts receivable for up to 95% of their face value, thus earning a minimum 5% factoring fee, and would reinvest the proceeds of the collection in additional accounts receivable, when in fact Towers bought few current accounts receivable with offering proceeds, but rather purchased accounts receivable at a discount for below 90% of the face value; (4) they failed to investigate reasonably, if at all, the accuracy of the representations in the memoranda that the Notes would be collateralized by accounts receivable purchased with the offering proceeds, while such notes were undercollateralized because of the poor quality of receivables purchased by Towers; and (5) finally, they failed to investigate reasonably, if at all, the representations made in the financial statements attached to the memoranda which totally overstated net income and accounts receivable in violation of GAAP.

- 61 -

157. The Bronson defendants also failed to reasonably investigate, if at all, the accuracy of the representations in the memoranda that, or to make any reasonable attempt to determining whether, the offerings of the Notes were exempt from registration with the Securities and Exchange Commission, when the exemptions claimed were actually not applicable.

158. Not only did the Bronson defendants fail to disclose or reasonably investigate material misstatements and omissions in the various memoranda they helped to prepare on behalf of Towers, but they additionally were involved in making misleading statements to state regulatory authorities that allowed Towers' fraudulent activities to continue to go undetected. For example, in response to an inquiry made by the Louisiana Deputy Commissioner for Securities regarding Towers' financial statements, the Bronson defendants responded by explaining how Towers' procedures complied with the American Institute of Certified Public Accountants audit guidelines, when in fact, the subsequent SEC inquiry found Bronson's response to be almost entirely false.

159. Another instance of the Bronson defendants' deliberately false communications on behalf of Towers with state regulators is a letter dated November 15, 1990, on Gibney, Anthony & Flaherty letterhead, in which Bronson responded to the very serious concerns raised by the Louisiana Deputy Commissioner of Securities regarding Towers' failure to disclose certain items in the private placement offering memorandum dated October 1,

- 62 -

1990. Towers, with such assistance from the Bronson defendants, was able to delay adverse action by the Deputy Commissioner of Securities until February 1993, when the Deputy Commissioner finally put an end to Towers' dealings in Louisiana by withdrawing the exemption on the Company's past offerings in that state and denying registration of the latest offering.

THE ROLE OF SQUADRON, ELLENOFF

160. Defendant Squadron, Ellenoff commenced its role as counsel to Towers and defendants Hoffenberg and Brater as early as 1988, and continued to serve in that capacity throughout the Class Period. In the course of such representation, Squadron, Ellenoff advised and assisted Towers and certain of the Individual defendants and represented them before various regulatory authorities.

161. Beginning with the SEC inquiry in 1988 regarding the illegal sale of unregistered securities by Towers and defendants Hoffenberg and Brater, and continuing through the subsequent SEC investigation which led to the filing of the SEC action in February 1993, alleging violations of the federal securities laws, defendant Squadron, Ellenoff made representations about Towers and its business practices before state and federal regulatory bodies. For example, Squadron, Ellenoff represented Towers and defendants Hoffenberg and Brater during the SEC investigation into the business affairs of Towers. As part of its representation, Squadron, Ellenoff affirmatively stated to the SEC, inter alia, that Towers' financial statements

- 63 -

were prepared in accordance with GAAP, and that its revenue was properly recognized and was based on appropriate collection rates. Such representations were patently false and misleading.

162. In making the above representations to the SEC, defendant Squadron, Ellenoff owed a duty to use reasonable care to insure that any statements made were true and correct. In exercising reasonable care, defendant Squadron, Ellenoff knew or should have known that their representations to the SEC were false. Specifically, defendant Squadron, Ellenoff had, or had access to documents and testimony later obtained by the SEC, which demonstrated that the representations made to the SEC regarding Towers' financial condition and accounting practices were materially false.

163. These affirmative and deliberate misrepresentations made by Squadron, Ellenoff provided substantial assistance needed by Towers and the Individual Defendants to continue and prolong the wrongdoing as alleged herein. Squadron, Ellenoff, through the acts of its partner, Ira Lee Sorkin, also allowed Towers to take on Squadron, Ellenoff's reputation in order to provide credibility to claims Towers made both to the SEC and to various state regulatory authorities to the effect that Towers was financially sound and that its financial statements were prepared in accordance with GAAP. As a result of Squadron, Ellenoff's actions, the SEC's effort to put an end to the sale of Notes was delayed. During such time, substantial amounts of the Notes were sold to plaintiffs and

- 64 -

other members of the Class. In this way, defendant Squadron, Ellenoff aided and abetted the wrongdoing of their client.

## THE ROLE OF DUFF & PHELPS

164. Defendant Duff & Phelps is a financial information company which provides rating services to corporations. During the Class Period, D&P was retained to rate the asset-backed debt securities being issued by Towers. As part of this service, D&P provided written opinions to Towers (which, as D & P knew, would be used by Towers in the sale of its securities) evaluating the securities offered and assigning rating designations to these securities. Despite Towers' serious cash-flow problems and staggering debt, rendering the Company incapable of meeting its expenses and interest payments due on its bonds and Notes, D&P rated Towers' bonds and its Notes favorably, thus asserting Towers' financial strength, stability and ability to honor its obligations.

165. For example, in a March 22, 1990 letter to Towers, D&P stated its opinion that Towers 'has the capability to act as servicer with respect to a securitized transaction involving the securitization of health care receivables." On January 16, 1991, D&P issued a letter to Towers stating that it had 'assigned a rating of 'BB' to Towers Financial Corp's. unsecured senior debt.' Additionally, on December 12, 1991, D&P issued a letter to Towers relating to its health care receivable subsidiaries, stating that ratings assigned to the bonds were being upgraded to

- 65 -

'AA+' from 'AA'. These D&P opinion letters were disseminated to investors through the defendant Broker-Dealers.

166. Thus, in rating Towers and the Notes, D&P had a duty to insure that it exercised due care in investigating the true financial condition of the Company, including its cash flow and the collectibility of the receivables.

167. During the Class Period, as defendant D&P knew, it was regarded in the securities industry, by corporations, government regulators, analysts, brokers, agents and investors as a reliable source of financial information. D&P also knew that its ratings were a necessary element in the successful marketing and sales of asset-backed securities such as the Notes. In fact, the Division of Investment Management of the SEC in May 1992 underscored the significance of rating agencies such as D&P in the marketing of asset-backed securities to the public, characterizing their role as 'integral' to such financings, and emphasizing the extensive due diligence' performed by rating

'In determining the rating, the rating agency reviews the relevant documentation regarding the transaction, including the R&S agreement, the prospectus or private placement memorandum, and any indenture. The rating agency also may conduct an on-site due diligence inspection of the sponsor and the servicer. Typically, the agency reviews the underwriting and servicing operations, particularly credit collection and delinquent receivable. This may entail tracking an application through the credit review and approval process and tracking collection on a delinquent receivable. The historical, current, and expected performance of the sponsor's portfolio (from which the pool will be taken) also may be discussed. In addition, the rating agency may review whether the sponsor has the capability to track the assets that will be pooled separately from the overall portfolio. Finally, an agency will review its own internal resources to obtain information about the sponsor, historical performance data

- 66 -

agencies in preparing rating evaluations, and how the public relies thereon in making their investment decisions.; As the Division stated, "The most important and time consuming role of the rating agencies is analyzing the credit risk of the financing." * . . . the rating agencies impose requirements that are intended to ensure the safety of a financing's assets." "Once a financing is rated, the rating agencies typically monitor its performance monthly or quarterly."

168. In performing its rating services for Towers, D&P purported to conduct a due-diligence investigation in the business affairs of Towers whereby it obtained or was reckless in not obtaining material information concerning the business affairs and true financial condition of Towers. In fact, in its opinion letters to Towers, D&P announced its intention of monitoring Towers on a continuing basis. Thus, in the March 22, 1990 letter, D&P stated "we require an annual review of Towers involving your servicing operations and financial condition." In the January 1991 letter, D&P informed Towers and the investing public that it would "continue to monitor the credit of Towers Financial on a continuing basis." Similarly, in the December 1991 letter, D&P said it would "continue to review the credit quality of the issue on a continuous basis."

on the type of assets being securitized, and other relevant information." SEC, Division of Investment Management, Protecting Investors: A Half Century of Investment Company Regulation 51-52 (1992, f.n. omitted).

169. Had they exercised reasonable care in conducting their due diligence investigation, defendant D&P would have learned <u>inter alia</u>, that in fact Towers was insolvent and that Towers had abrogated the terms of the indenture agreement with the bond trustee, Shawmut National Bank, a result of which was the genuine and material risk of default on the bonds. By acting with such knowledge, or recklessly disregarding such information, D&P misrepresented to the investing public the financial condition and strength of Towers and disseminated inaccurate and misleading information to plaintiffs and the other class members, as well as such information to Towers, which D&P knew would be relied upon by the Company in its promotional and solicitation activities directed toward plaintiffs. In fact, D&P expressly consented to the use of its name in disclosure documents, advertisements, and other sales materials used by defendants to market and sell the Notes. D&P knew or was reckless in not knowing information which indicated that the financial strength of the Company was far less than it had represented. D&P's ratings operated to misrepresent Towers' financial condition and the safety of its securities which plaintiffs relied upon in purchasing the Notes offered by Towers. As a result of their actions, D&P provided substantial assistance and contributed to the wrongdoing perpetrated by Towers and the defendants.

**THE ROLE PLAYED BY THE BROKER-DEALERS IN EFFECTUATING THE UNLAWFUL AND FRAUDULENT CONDUCT**

170. Defendants Monterey Bay Securities, First Dealer Class provided the members of the defendant Broker-Dealer Class provided the members of the defendant Broker-which enabled Towers to consummate its unregistered offering and sale of securities, as set forth above at ¶¶ 70-78. Because of their substantial contacts within the investment community, the Broker-Dealers were able to, and did, effect a wide distribution of the confidential offering memoranda to members of the public, including Class and Subclass members.

171. As stated above, Towers purportedly sold the Notes pursuant to a purported exemption from registration under Section 4(2) of the Securities Act (transactions by an issuer not involving a public offering) and Regulation D (exemption for limited offers and sales).

172. However, the offering of the Notes was in fact, a public offering, because the offering did not comply with Section 4(2). The Broker-Dealers contributed to the offering's non-compliance with Section 4(2), and thus the selling of unregistered securities by, inter alia, the following acts and omissions:

(a) Distributing the offering memoranda received by them from Towers to a large and indiscriminate number of offerees;

(b) Offering and selling the Notes to unsophisticated offerees through a "cold call" telemarketing campaign, many of whom were living on fixed incomes;

- 69 -

(c) Failing to appropriately screen potential investors;

(d) Failing to keep proper records of the exact number and identity of all offerees; and

(e) Failing to determine whether or not any of the offerees had prior relationships with Towers.

173. Because the offering of the Notes was a public offering and because the Broker-Dealers received substantial commissions from Towers based on the sale of the Notes, the Broker-Dealers were underwriters (as that term is defined in Section 2 of the Securities Act) in connection with the offering of the Notes.

174. The offering of the Notes also failed to comply with the Regulation D exemption, because it was not a limited offering and was sold to more than 35 non-accredited investors (investors with net assets of less than $1 million at the time of their purchase or annual income of less than $200,000 in each of the two years prior to their purchase or combined income with their spouse of less than $300,000 in each of the two years prior to their purchase or not-for-profit organizations, defined benefit plans and trust with assets of less than $5 million at the time of their investment). In furtherance of the non-compliance with the Regulation D exemption, the Broker-Dealers:

(a) Sold to non-accredited investors without taking action to determine the total number of non-accredited investors; and

(b) Caused the Notes to be offered and sold by means of general solicitation.

- 70 -

175. The Broker-Dealers were under a duty, at all relevant times, to investigate the propriety of the foregoing claimed exemptions from registration. Because of, *inter alia*, the massive solicitation, the size of the offering, the large number of Broker-Dealers involved and their presumed knowledge of the securities laws, the Broker-Dealers knew, or were reckless in not knowing that the offering did not comply with the claimed exemptions or was not likely to be in compliance therewith.

176. Regardless of the conduct engaged in, or the degree of knowledge attributable to the Broker-Dealers, the Broker-Dealers are strictly liable to plaintiffs, Class and Subclass members under Section 12(1) of the Securities Act, because of the sale of unregistered securities in violation of Section 5 of the Securities Act.

177. As set forth above, because the offering of the Notes was in reality a public offering, the Broker-Dealers were statutory underwriters and had all of the legal duties and responsibilities of underwriters with respect to an offering of securities. Prior to offering the Notes for sale and soliciting their customers to purchase the Notes, the Broker-Dealers had a duty to conduct a due diligence investigation with respect to the Notes and the offering.

178. Even a minimal investigation by any Broker-Dealer (far less than that which the law requires of underwriters) would have revealed that the offering memoranda and Towers' financial

- 71 -

statements contained the misrepresentations and omissions of material fact alleged herein.

179. The Broker-Dealers solicited sales of the Notes by means of the false and misleading offering memoranda and financial statements and by means of other written sales materials (including sales and marketing brochures and form prospecting letters) and oral statements to prospective purchasers.

180. The written and oral sales representations made by the Broker-Dealers contained the same misrepresentations and omissions as the offering memoranda, and these written and oral representations were in all material respects consistent with the offering memoranda. Further, any oral statements made by the Broker-Dealers were part of a uniform and standardized sales presentation, which was based upon written sales and marketing brochures, including sales materials which were distributed internally to Broker-Dealers only, for use in making oral representations to prospective purchasers.

181. The Broker-Dealers, in soliciting purchases of the Notes, were motivated by a desire to serve their own financial interests. The Broker-Dealers were paid substantial commissions on sales of the Notes and therefore, had every incentive to maximize the sales volume.

182. As a result of the foregoing, the Broker-Dealers have breached their fiduciary duties to plaintiffs and Class and

- 72 -

the Notes, to their detriment, and are liable therefor.

Subclass members, inducing plaintiffs and the Class to purchase

## CLAIMS FOR RELIEF

### COUNT I.

**For Violations Of Sections 12(2)
And 15 Of The Securities Act**

183. Plaintiffs repeat and reallege the allegation in paragraphs 1 through 182 as if fully set forth herein.

184. This Count is brought pursuant to Section 12(2) and 15 of the Securities Act, 15 U.S.C. §§ 77l(2), 77o, against the selling defendants on behalf of all Section 12(2) class members.

185. Defendants, severally and in concert, directly and indirectly participated in a continuous course of conduct, throughout the Section 12(2) Class Period, by the use of the mails, wires, and other means and instrumentalities of communication and transportation and interstate commerce, and offered for sale, sold and were the proximate cause and substantial and necessary factors in the sale of the Notes to the plaintiffs, by means of written promotional materials, oral communications, in violation of Sections 12(2) and 15 of the Securities Act.

186. The offering memoranda contained untrue statements of material facts, and omitted to state material facts necessary to make the statements made not misleading, in light of the circumstances under which they were made, as set forth above.

- 73 -

187. Plaintiffs and other members of the Section 12(2) Class purchased the Notes.

188. Plaintiffs, on behalf of themselves and all members of the Section 12(2) Class according seek to recover the full amount of the consideration paid for those securities, together with interest thereon upon tender of such securities, which tender is hereby made, or in the alternative, seek damages sustained as a result of the sale of such securities.

189. At the time of their purchases, plaintiffs and other members of the Section 12(2) Class were without knowledge of the facts concerning the wrongful conduct alleged herein and, due to defendants' concealment of those facts, were not given reason to suspect wrongdoing and inquire into those facts prior to February 9, 1993, at the earliest. Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts on which this Count is based to the time that plaintiffs filed this Complaint, and less than three years have elapsed since plaintiffs' purchases of the Notes. Thus, the claims in this Count have been asserted within the time provided by the appropriate statute of limitations.

### COUNT II.

**For Violations Of Sections 12(1)
And 15 Of The Securities Act**

190. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 189 as if fully set forth herein. This count is brought pursuant to Sections 12(1) and 15

- 74 -

of the Securities Act, 15 U.S.C. §§ 77l(1), 77o, against all
selling defendants on behalf of all Section 12(1) class members.

191. Defendants were sellers and offerors of securities
within the meaning of Section 12(1).

192. Defendants, directly, or indirectly made use of
means or instruments of transportation or communication in
interstate commerce or of the mails to sell and offer to sell
securities when no registration statement was filed or was in
effect as to such securities when no exemption from registration
was available.

193. By reason of these offers and sales of the notes,
the defendants sued in this claim have violated Section 5(a) and
(c), of the Securities Act, 15 U.S.C. §§ 77e(a) and (c), and they
and the Broker-Dealer Class have violated § 12(1) thereof, 15
U.S.C. § 77l(1).

194. Plaintiffs and other members of the Section 12(1)
Class purchased the Notes in the offering.

195. Plaintiffs, on behalf of themselves and all
members of the Section 12(1) Class, accordingly seek to recover
the full amount of consideration paid for said securities, with
interest thereon, upon tender of such securities, which tenders
are hereby made, or in the alternative, seek damages sustained as
a result of the sale of such securities.

- 75 -

# COUNT III.

## For Violations of Applicable State "Blue Sky" Laws

196. Plaintiffs reallege each and every allegation
contained in paragraphs 1 through 195 as fully set forth herein.
This count is brought pursuant to the applicable state "Blue-Sky"
laws (such as Ca. Corp. Code § 25503) against the selling
defendants on behalf of all Blue-Sky Class members.

197. Defendants were sellers and offerors of securities
within the meaning of the applicable statute.

198. Defendants, directly, or indirectly made use of
means or instruments of transportation or communication in
interstate commerce or of the mails to sell and offer to sell
securities when no registration statement was filed or was in
effect as to such securities when no exemption from registration
was available.

199. By reason of these offers and sales of the notes,
the selling defendants have violated Section 5(a) and (c), of the
Securities Act, 15 U.S.C. §§ 77e(a) and (c), and they have
violated the applicable state Blue-Sky statutes.

200. Plaintiffs and other members of the Blue-Sky Class
purchased the Notes in the offering.

201. Plaintiffs, on behalf of themselves and all
members of the Blue-Sky Class, accordingly seek to recover the
full amount of consideration paid for said securities, with
interest thereon, upon tender of such securities, which tenders

- 76 -

are hereby made, or in the alternative, seek damages sustained as a result of the sale of such securities.

**COUNT IV.**

**For Violations Of Section 10(b) Of
The Exchange Act And Rule 10b-5 Thereunder
And Section 20(a) Of The Exchange Act**

202. Plaintiffs realiege each and every allegation contained in paragraphs 1 through 201 as if fully set forth herein.

203. Count IV is brought against all defendants on behalf of all Class members who purchased Notes on or after February 9, 1990 ("Section 10(b) Class").

204. Throughout the Class Period, defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in and aided and abetted a continuous course of conduct to conceal adverse material information, as alleged herein, and particularized above. Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct as alleged herein which included the making of, or participation in, the making of untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the Notes, the intended use of investor proceeds, and the financial condition of Towers not misleading, in light of the circumstances under which they were made, and engaged in transactions, practices and courses of conduct which operated as

- 77 -

a comprehensive fraudulent Ponzi scheme upon the purchasers of the Notes during the Class Period.

205. As a result of the dissemination of the aforementioned materially false and misleading statements, the failure to disclose material facts, and defendants' other fraudulent conduct, defendants created an artificial market for the Notes. In ignorance of the falsity of defendants' statements, and defendants' fraud in creating the market for the Notes, plaintiffs and the members of the Section 10(b) Class purchased the Notes. Plaintiffs and the Class members relied upon the integrity of the process in bringing the offering to market and/or on the statements disseminated by defendants and were damaged thereby. But for defendants' fraud, the Notes would have been unmarketable.

206. Had plaintiffs and the members of the Class known of the materially adverse information not disclosed by defendants, they would not have purchased the Notes.

207. Each of the defendants knew or recklessly disregarded the material misrepresentations and omissions contained in the offering memoranda and the annual reports. Each of the defendants had knowledge of the wrongdoing perpetrated by other defendants and persons or acted so recklessly that knowledge of such wrongdoing may be imputed to each to them. The Individual Defendants, ACI, D&P, the Bronson defendants, Squadron, Ellenoff, and the Broker-Dealers are liable as control

- 78 -

persons under Section 20(a) of the Exchange Act (in the case of the Individual Defendants), and as aiders and abettors.

208. At the time of their purchases, plaintiffs and other members of the Section 10(b) Class were without knowledge of the facts concerning the wrongful conduct alleged herein and, due to defendants' concealment of those facts, were not given reason to suspect wrongdoing and inquire into those facts prior to February 9, 1993, at the earliest. Less than one year has elapsed from the time that plaintiffs discovered or reasonably could have discovered the facts on which this Count is based to the time that plaintiffs filed this Complaint, and less than three years have elapsed since plaintiffs' purchases of the Notes. Thus, the claims in this Count have been asserted within the time provided by the appropriate statute of limitations.

## COUNT V.

### For Violations Of RICO, 18 U.S.C. § 1962(a) And/Or (d)

209. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 208 as if fully set forth herein.

210. Count V is brought on behalf of all Class members against the defendants Hoffenberg and Brater.

211. Towers is an enterprise within the meaning of 18 U.S.C. § 1961(4), which was engaged in or whose activities affected interstate commerce.

212. As alleged above, defendants have engaged in a pattern of acts, including the issuance of the false and misleading offering memorandum and annual reports, constituting two or more acts of fraud in the sale of securities. Moreover, defendants used the mails in furtherance of their fraudulent activity. Such acts constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

213. Defendants derived substantial proceeds through this pattern of racketeering activity, and used or invested such proceeds in the operation of Towers, in violation of 18 U.S.C. § 1962(a).

214. The defendants knowingly conspired together to commit the wrongful acts alleged above in violation of 18 U.S.C. § 1962(d).

215. By virtue of the above, plaintiffs and all Class members have been injured by the loss of their investments and have otherwise been damaged in an amount to be determined. Accordingly, they are entitled to recover treble damages and their costs of suit, including reasonable attorneys fees, pursuant to 18 U.S.C. § 1964(c).

216. At the time of their purchases, plaintiffs and all other Class members were without knowledge of the facts concerning the wrongful conduct alleged herein and, due to defendants' concealment of the facts, were not given reason to suspect wrongdoing and inquire into those facts prior to February 9, 1993, at the earliest. The claims in this Count have

been asserted within the time provided by the appropriate statute of limitations and applicable discovery and/or tolling provisions.

### COUNT VI.
### For Violations Of Rico, 18 U.S.C. § 1962(c) And/Or (d)

217. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 216 as if fully set forth herein.

218. Count VI is brought on behalf of all Class members against defendants Hoffenberg, the Hoffenberg Family Trust, Brater, Chugerman, Ferro & Rossoff.

219. Towers engaged in the activities set forth above as an association in fact constituting an enterprise within the meaning of 18 U.S.C. § 1961(4), whose activities affected, directly or indirectly, interstate commerce.

220. In violation of 18 U.S.C. § 1962(c) and/or (d), defendants conducted or participated in the conduct of the affairs of an enterprise, through a pattern of racketeering activity, including the issuance of the false and misleading offering memorandum and annual reports.

### COUNT VII.
### For Negligent Misrepresentation

221. Plaintiffs on behalf of themselves and all other Towers' Notes investors, reallege, as if fully set forth, each

and every allegation contained in paragraphs 1 through 220 hereof, and further allege, as follows, against all defendants.

222. In making the misrepresentations and omissions alleged above, the defendants named in this claim for relief acted without any reasonable grounds for believing the representations they made to be true.

223. Plaintiffs and the other members of the class were ignorant of the falsity of these statements, and believed them to be true. In actual and justifiable reliance upon said omissions and misrepresentations of material fact, and on the integrity of the market and the regulatory process, plaintiffs and other members of the class were induced to and did invest in Towers Notes. Had plaintiffs and the other members of the class known the true facts, they would have taken no such action.

224. As a direct and proximate result of the foregoing conduct, plaintiffs and each member of the class suffered damages.

### COUNT VIII.
### For Negligence

225. Plaintiffs on behalf of themselves and all other Towers Note investors, reallege, as if fully set forth, each and every allegation contained in paragraphs 1 through 224 hereof, and further alleges, as follows, against all defendants.

226. Defendants and each of them owed a duty to plaintiffs and other members of the class to use ordinary care to prevent plaintiffs and the other members of the class being

foreseeably injured as a result of their conduct. Defendants breached the duty through their conduct as set forth in paragraphs 127-182 above, and plaintiffs and the other members of the class were directly and foreseeably injured as a result of the breach.

227. As a direct and proximate result of the foregoing conduct, plaintiffs and the members of the class suffered damages.

COUNT IX.

Breach of Fiduciary Duty

228. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 227 as if fully set forth herein.

229. This count is brought against all defendants, excluding the Bronson defendants, ACI and Duff & Phelps, on behalf of all class members.

230. Defendants, and each of them, by reason of their positions at and/or responsibilities to Towers, and as a result of their ability to control the business and corporate affairs of Towers, owed the purchasers of the Notes the fiduciary duties of fidelity, trust, loyalty, honesty and due care and were required to deal with and carry out their duties and responsibilities in a fair, just and equitable manner and to work in the best interest of the purchasers of the Notes so as to benefit such persons, and not in furtherance of their personal interests or at the expense of or in derogation of the best interests of the Notes.

- 83 -

231. The defendants, singly and in concert, engaged in the aforesaid conduct in breach of their fiduciary duties to the Towers' Notes purchasers.

232. As a direct and proximate result of defendants' conduct, plaintiffs and the members of the class suffered damages.

COUNT X.

For Common Law Fraud

233. Plaintiffs reallege each and every allegation contained in paragraphs 1 through 233 as if fully set forth herein.

234. This Count is asserted on behalf of all Class members against all defendants.

235. For the purpose of inducing investors, including plaintiffs and other Class members to purchase the Notes, and with the intent to deceive such investors, the defendants employed a scheme to defraud as a part of which the defendants made and participated in the making of material misrepresentations of fact and the omission of material facts.

236. Plaintiffs and other members of the Class were ignorant of the material misrepresentation and omissions described herein. In justifiable reliance on the misrepresentations and in ignorance of the true facts, plaintiffs and other Class members were induced to and did purchase the Notes. Had plaintiffs and other Class members known the true facts, they would have taken no such action. By reason thereof,

- 84 -

plaintiffs and other Class members have been damaged and demand compensatory, exemplary and punitive damages against each defendant.

WHEREFORE, plaintiffs seek this Court:

A.  To certify a Class and Subclasses under Rule 23 of the Federal Rules of Civil Procedure;

B.  To certify a defendant class of Broker-Dealers under Rule 23 of the Federal Rules of Civil Procedure;

C.  For compensatory damages in an amount not less than $215,000,000 or, in the alternative, for the remedy of rescission and rescissionary damages;

D.  For treble damages and attorneys' fees and costs pursuant to RICO;

E.  For punitive damages;

F.  For their costs, attorney fees and disbursements;

G.  For pre-judgment and post judgment interest at the maximum lawful rate; and

H.  For such other relief as is just and proper.

---

JURY DEMAND

Plaintiffs demand trial by jury of all issues.

Dated:  New York, New York
        June 7, 1993

MILBERG WEISS BERSHAD
HYNES & LERACH

By: _____
    Richard M. Meyer, Esq. (RM 6319)
    One Pennsylvania Plaza
    New York, New York 10119
    (212) 594-5300

STAMELL, TABACCO & SCHAGER

By: _____
    Jared B. Stamell, Esq.
    Michelle Rago, Esq.
    555 Madison Avenue
    New York, New York 10022
    (212) 752-9222

LIEFF, CABRASER & HEIMANN

By: _____
    Daniel C. Girard, Esq.
    Elizabeth E. Kaplan, Esq.
    275 Battery Street, 30th Floor
    San Francisco, CA 94111
    (415) 956-1000

GARWIN, BRONZAFT, GERSTEIN
& FISHER

By: _____
    Bertram Bronzaft, Esq.
    Scott Fisher, Esq.
    1501 Broadway, Suite 1812
    New York, New York 10036
    (212) 398-0055

Plaintiffs' Executive Committee

Mark Gaffney, Esq.
Robert N. Kaplan, Esq.
KAPLAN & KILSHEIMER
685 Third Avenue
New York, NY 10017
(212) 687-1980

Michael J. Freed, Esq.
MUCH SHELIST FREED
DENENBERG & AMENT, P.C.
200 North LaSalle Street
Suite 2100
Chicago, IL 60601-1095
(312) 346-3100

- 87 -

Robert A. Skirnick, Esq.
MEISELMAN, KENICK HARWOOD
HALEBIAN & PIFFER
555 Madison Avenue
New York, NY 10022
(212) 935-7400

Stanley M. Grossman, Esq.
POMERANTZ LEVY HAUDEK
BLOCK & GROSSMAN
100 Park Avenue
New York, NY 10017-5516
(212) 661-1100

Glen DeValerio, Esq.
BERMAN DeVALERIO & PEASE
One Liberty Square
Boston, MA 02109
(617) 542-8300

CHRISTOPHER LOVELL, P.C.
52 Duane Street
Federal Plaza, Suite 900
New York, NY 10007
(212) 608-1900

Stephen D. Oestreich, Esq.
WOLF POPPER ROSS WOLF & JONES
845 Third Avenue
New York, NY 10022
(212) 759-4600

LAWRENCE WALNER &
ASSOCIATES, LTD.
150 North Wacker Drive
Suite 1870
Chicago, IL 60606
(312) 201-1616

Edward A. Grossmann, Esq.
BERNSTEIN LITOWITZ BERGER
& GROSSMANN
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

- 88 -

GILMAN & PASTOR
155 Federal Street
Suite 1100
Boston, MA 02110
(617) 482-1110

Vance Opperman, Esq.
OPPERMAN HEINS & PAQUIN
2200 Washington Square
100 Washington Street
Suite 2200
Minneapolis, MN 55401
(612) 339-6900

THE ALEXANDER LAW FIRM
55 South Market Street
Suite 1080
San Jose, CA 95109-1330
(408) 289-1776

**EXHIBIT 38**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
                                    :
In re TOWERS FINANCIAL CORPORATION  :    Master File No.
NOTEHOLDERS LITIGATION              :
                                    :    93 Civ. 0810 (WK)
                                    :
------------------------------------x
                                    :
This Document Relates To:           :
                                    :
All Cases                           :
                                    :
------------------------------------x

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Richard M. Meyer, Esq.                    Daniel C. Girard, Esq.
MILBERG WEISS BERSHAD                     Karen B. Karpen, Esq.
HYNES & LERACH                            LIEFF, CABRASER & HEIMANN
One Pennsylvania Plaza                    275 Battery Street, 30th
New York, New York 10119                  San Francisco, CA 94111
(212) 594-5300                            (415) 956-1000

Jared B. Stamell, Esq.                    Bertram Bronzaft, Esq.
Michelle Pesso, Esq.                      Scott Fisher, Esq.
STAMELL, TABACCO & SCHAGER                GARWIN, BRONZAFT, GERSTEIN
555 Madison Avenue                        & FISHER
New York, New York 10022                  1501 Broadway, Suite 1812
(212) 752-9222                            New York, New York 10036
                                          (212) 398-0055

Plaintiffs' Executive Committee

PCG

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Consolidated Amended Class Action Complaint has been served by First Class Mail, postage prepaid, on all parties listed on the attached service list this 7th day of June, 1993.

Jay W. Kupietzky

---

## SERVICE LIST - TOWERS FINANCIAL

Jared B. Stamell, Esq.
Michelle Rago, Esq.
STAMELL, TABACCO & SCHAGER
555 Madison Avenue
New York, NY 10022
(212) 752-9222
FAX: (212) 371-4551

Richard M. Meyer, Esq.
MEINBERG WEISS BERSHAD
SPECTHRIE & LERACH
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300
FAX: (212) 868-1229

Bertram Bronzaft, Esq.
Scott J. Fisher, Esq.
GARWIN, BRONZAFT, GERSTEIN
& FISHER
1501 Broadway, Suite 1812
New York, NY 10036
(212) 398-0055
FAX: (212) 764-6620

Daniel C. Girard, Esq.
LIEFF, CABRASER & HEIMANN
Embarcadero Center West
275 Battery Street, 30th Fl.
San Francisco, CA 94111
(415) 956-1000
FAX: (415) 956-1008

Mark Gaffney, Esq.
Robert N. Kaplan, Esq.
KAPLAN & KILSHEIMER
685 Third Avenue
New York, NY 10017
(212) 687-1980
FAX: (212) 687-7714

- 1 -

Michael J. Freed, Esq.
MUCH SHELIST FREED DENENBERG
& AMENT, P.C.
200 North LaSalle Street
Suite 2100
Chicago, IL 60601-1095
(312) 346-3100
FAX (312) 346-1095

Robert A. Skirnick, Esq.
WECHSLER SKIRNICK HARWOOD
HALEDIAN & FEFFER
555 Madison Avenue
New York, NY 10022
(212) 935-7400
FAX: (212) 753-3630
        753-3639

Stanley M. Grossman, Esq.
POMERANTZ LEVY HAUDEK
BLOCK & GROSSMAN
100 Park Avenue
New York, NY 10017-5516
(212) 661-1100
FAX: (212) 661-8665

Glen DeValerio, Esq.
BERMAN DeVALERIO & PEASE
One Liberty Square
Boston, MA 02109
(617) 542-8300
FAX: (617) 542-1194

CHRISTOPHER LOVELL, P.C.
52 Duane Street
Federal Plaza, Suite 900
New York, NY 10007
(212) 608-1900
FAX: (212) 791-3607

Stephen D. Oestreich, Esq.
WOLF POPPER ROSS WOLF & JONES
845 Third Avenue
New York, NY 10022
(212) 759-4600
FAX: (212) 486-2093

LAWRENCE WALNER &
ASSOCIATES, LTD.
150 North Wacker Drive
Suite 1870
Chicago, IL 60606
(312) 201-1616
FAX: (312) 201-1538

Edward A. Grossmann, Esq.
BERNSTEIN LITOWITZ BERGER
& GROSSMANN
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400
FAX: (212) 554-1444

GILMAN & PASTOR
155 Federal Street
Suite 1400
Boston, MA 02110
(617) 482-1110
FAX: (617) 482-1711

Vance Opperman, Esq.
OPPERMAN HEINS & PAQUIN
2200 Washington Square
100 Washington Street South
Suite 2200
Minneapolis, MN 55401
(612) 339-9600
FAX: (612) 661-8665

THE ALEXANDER LAW FIRM
55 South Market Street
Suite 1000
San Jose, CA 95109
(408) 293-1776

**Plaintiff's Counsel**

Ira Lee Sorkin, Esq.
SQUADRON ELLENOFF PLESENT & LEHRER
551 Fifth Avenue
New York, New York

Counsel for Defendants Steven Hoffenberg, Hoffenberg Family Trust and Professional Business Brokers

10/23/98  17:22 FAX 415 856 1008          LIEFF CABRASER          @011

Lisa A. Cahill, Esq.
KAVANAUGH, PETERS, POWELL & OSNATO
415 Madison Avenue
New York, NY 10017

Counsel for Defendants Brater and Eton Securities

Robert K. Payson, Esq.
POTTER ANDERSON & CARROON
350 Delaware Trust Building
P.O. Box 951
Wilmington, DE 19899

Counsel for Defendant Evans

Arthur J. Ferro
ARTHUR J. FERRO
417 Fifth Avenue
New York, NY 10016

Michael Rosoff
417 Fifth Avenue
New York, NY 10016

Charles H. Chugerman
417 Fifth Avenue
New York, NY 10016

Ben Barnes
98 San Jacinto Blvd. Suite 200
Austin, TX 78701

Marvin E. Basson
24 Winding Lane
Upper Brookvill, NY 11545

Howard Wolitz, Esq.
Robert P. Mitrovich, Esq.
CHARLESTON, REVICH & WILLIAMS
1840 Century Park East, 3rd Floor
Los Angeles, CA 90067

Counsel for Defendants Bronson & Migliaccio and The Law Offices of
H. Bruce Bronson, Jr.

- 4 -

10/23/98  17:22 FAX 415 856 1008          LIEFF CABRASER          @012

Kurt C. Peterson, Esq.
CROSBY, HEAFEY, ROACH & MAY
700 South Flower Street, Suite 2200
Los Angeles, CA 90017

Counsel for Defendant Gibney, Anthony & Flaherty

MONTEREY BAY SECURITIES
7965 Soquer Drive
Aptus, CA 95003

AMERICAN CREDIT INDEMNITY CO.
One Pennsylvania Plaza, 4th Floor
New York, NY 10119

SQUADRON ELLENOFF PLESENT & LEHRER
551 Fifth Avenue
New York, NY 10176

DUFF & PHELPS CREDIT RATING CO.
55 E. Monroe St., Suite 3600
Chicago, IL  60603

FIRST AFFILIATED SECURITIES CORP.
4225 Executive Square, Suite 500
La Jolla, CA 92037

CORPORATION TRUST COMPANY
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Registered Agent - Towers Financial Corporation

- 5 -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -x
                                         :
In re TOWERS FINANCIAL                   :   Master File No.
CORPORATION NOTEHOLDERS                   :
LITIGATION                               :   93 Civ. 0810 (WK)
                                         :
- - - - - - - - - - - - - - - - - - - - -:
                                         :
This Document Relates To:                 :
     All Cases                           :
                                         :
- - - - - - - - - - - - - - - - - - - - -x

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

Richard M. Meyer                    Daniel C. Girard
Jay Kupietzky                       Anthony K. Lee
MILBERG WEISS BERSHAD               LIEFF, CABRASER & HEIMANN
  HYNES & LERACH                    Embarcadero Center West
One Pennsylvania Plaza              275 Battery Street, 30th Floor
New York, NY 10119                  San Francisco, CA 94111
(212) 594-5300                      (415) 956-1000

Jared B. Stamell                    Bruce E. Gerstein
Michelle Raso                       Bertram Bronzaft
STAMELL, TABACCO & SCHAGER          Jerald M. Stein
555 Madison Avenue                  GARWIN, BRONZAFT, GERSTEIN
New York, NY 10022                    & FISHER
(212) 752-9922                      1501 Broadway, Suite 1416
                                    New York, NY 10036
                                    (212) 398-0055

                    Plaintiffs' Executive Committee

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE CASE. . . . . . . . . . . . . . . . .  1

II.  JURISDICTION AND VENUE . . . . . . . . . . . . . .  1

III.  THE PARTIES . . . . . . . . . . . . . . . . . . .  2

  A.  Plaintiffs. . . . . . . . . . . . . . . . . . . .  2

  B.  Towers Financial Corporation and Affiliates in Bankruptcy. . . . . . . . . . . . . . . . . . . .  5

  C.  The Towers Defendants . . . . . . . . . . . . . .  6

  D.  The Professional Defendants . . . . . . . . . . .  9

  E.  The Broker-Dealer Defendants. . . . . . . . . . . 10

IV.  CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . 37

V.  BROKER-DEALER DEFENDANT CLASS ALLEGATIONS . . . . . 41

VI.  CONSPIRACY ALLEGATIONS . . . . . . . . . . . . . . 42

VII.  FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS . . . 43

  A.  The 1988 Injunction. . . . . . . . . . . . . . . 43

  B.  The Offer And Sale Of Unregistered Securities. . 44

  C.  Fraud In The Offer And Sale of Securities. . . . 46

  D.  The Role Of The Individual Defendants. . . . . . 48

  E.  The Offering Memoranda. . . . . . . . . . . . . . 56

  F.  The Annual Reports. . . . . . . . . . . . . . . . 59

  G.  Towers Accounting Practices. . . . . . . . . . . 61

    1.  Southwestern Bell Portfolio. . . . . . . . . 61

    2.  Federal Deposit Insurance Company Loan Portfolio. . . . . . . . . . . . . . . . . . 62

    3.  Bank Of America Portfolio. . . . . . . . . . 63

    4.  Investment In United Diversified. . . . . . . 63

    5.  Collection Receivables. . . . . . . . . . . . 65

-i-

  H.  The Role of American Credit Indemnity Company. . 67

  I.  The Role of the Bronson Defendants. . . . . . . . 78

  J.  The Role of Squadron Ellenoff. . . . . . . . . . 86

  K.  The Offer of Rescission . . . . . . . . . . . . . 88

  L.  The Role of Duff & Phelps. . . . . . . . . . . . 104

  M.  The Role Played by Richard A. Eisner & Company. . 112

    1.  Summary Of Allegations. . . . . . . . . . . . 112

    2.  The Healthcare Subsidiaries Were Mere Extensions Of Towers. . . . . . . . . . . . 118

    3.  The Purportedly Self-Contained System Created By The Indentures And The Servicing Agreement. . . 120

    4.  Specific Provisions and Requirements Of the Indentures And Servicing Agreements. . . . . 124

      (a)  The Required Characteristics Of Qualified Healthcare Receivables. . . . . . . . . . 124

      (b)  The Prohibition Against Advancing Funds Without Proper And Sufficient Collateral. 125

      (c)  The Prohibition Against Commingling Of Assets. . . . . . . . . . . . . . . . . . 125

      (d)  The Collateral Coverage Ratio. . . . . . 126

      (e)  The Requirement That Proceeds Of Receivables Be Deposited In The Lockbox Account. . . 127

    5.  The Systematic Breaches Of The Indentures And Servicing Agreements By Towers And THRFC I-V. 128

      (a)  Towers Impermissibly Sold A Large Number Of Receivables To The Healthcare Subsidiaries Which Were Not Qualified Healthcare Receivables. . . . . . . . . . . . . . . 128

        (i)  The Fictitious And Non-Healthcare Receivables. . . . . . . . . . . . . 129

        (ii) Towers Caused The Healthcare Subsidiaries To Exceed The Provider Concentration Limitation. . . . . . . 129

-ii-

(iii) Towers Caused The Healthcare Subsidiaries To Exceed The Aging Limitation. . . . . . . . . . . . 133

(b) The Healthcare Subsidiaries Are Caused To Impermissibly Advance Funds To Towers, Which Towers Misappropriated For Its Own Purposes. . . . . . . . . . . . . 135

(c) Towers And The Healthcare Subsidiaries Systematically Commingled Assets Throughout the Class Period. . . . . . . . . . . . . . 136

(d) The Healthcare Subsidiaries Did Not Maintain The Minimum Required Collateral Coverage Ratios. . . . . . . . . . . . . . . 137

(e) Towers Induced Obligors And Providers To Send Payments Directly to Towers Instead of the Lockbox Accounts. . . . . . . . . . . . 138

6. Eisner Intentionally Or Recklessly Disregard The Rampant And Blatant Violations Of The Indentures And Servicing Agreements Because Of Its Failure To Conduct A Proper Audit Pursuant To GAAS. . . . . 139

(a) The Basis Of Eisner's Knowledge Or Reckless Disregard Of The Indenture Violations, And The Resulting Failure Of The Healthcare Subsidiaries' Financial Statements. . . . . 139

(b) Eisner's Audit Grossly Violated GAAS. . . . . 140

7. The Violations of GAAP Permitted By Eisner. . . . 147

8. Eisner's Improper Acts Were A Proximate And Substantial Cause Of The Losses Suffered by Towers' Noteholders. . . . . . . . . . . . . 149

N. The Role Played by the Broker-Dealers in Effecting the Unlawful and Fraudulent Conduct. . . . . . 151

O. Effect of Defendants' Acts and Omissions on Price of Securities. . . . . . . . . . . . . . . 157

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . 158

COUNT I
For Violation Of Sections 12(1) of The Securities Act . 158

COUNT II
For Violation Of Sections 12(2) Of The Securities Act . 159

VIII.

Violations of Section 15 of the Securities Act Controlling Person Liability . . . . . . . . . . 161

COUNT IV
For Violations of Section 10(b) of the Exchange Act And Rule 10b-5(a), (b) and (c) Promulgated Thereunder . . . 161

COUNT V
Violation of Section 20 of the Exchange Act Controlling Person Liability . . . . . . . . . . . . . . . 165

COUNT VI
For Violations of Applicable "Blue Sky" Laws (Failure to Register or Qualify) . . . . . . . . . . . . 165

COUNT VII
For Violations of RICO, 18 U.S.C. § 1962(a) And/or (d) . 166

COUNT VIII
For Violations of RICO, 18 U.S.C. § 1962(c) And/or (d) . 168

COUNT IX
For Negligent Misrepresentation . . . . . . . . . 168

COUNT X
For Negligence . . . . . . . . . . . . . . . . . 169

COUNT XI
Breach of Fiduciary Duty . . . . . . . . . . . . 170

COUNT XII
For Common Law Fraud . . . . . . . . . . . . . . 171

IX. JURY DEMAND . . . . . . . . . . . . . . . . . . 172

## I.
## NATURE OF THE CASE

1. This is a class action brought on behalf of investors in certain unregistered securities issued by Towers Financial Corporation: promissory notes and Series 1991-A Asset Backed and Guaranteed Bonds ("Notes") sold to United States residents between February 15, 1989 and February 9, 1993 and to non-United States residents between February 1, 1991 and February 9, 1993.

2. The Note offerings, which raised approximately $245 million, formed the core of the largest Ponzi scheme in United States history. Although Towers Financial Corporation held itself out as a healthy and growing concern, it actually was a company failing on a massive scale and kept afloat only through the infusions of cash provided by the Note offerings.

3. As a result of Defendants' conduct alleged herein, investors were induced to purchase Notes and/or roll over or reinvest the principal of such investments in additional Note purchases when the Notes they had purchased matured. Unbeknownst to the investors, the source of the "interest" they received on their Notes was the principal paid by later Note investors. When the Towers Financial Corporation fraud collapsed in 1993, the worthlessness of the Note investments was revealed.

4. This action asserts claims under section 12(1) and (2) and section 15 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77l(1) and (2), and 77o; section 10(b) of the Securities

- 1 -

Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; section 20 of the Exchange Act, 15 U.S.C. § 78t; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; the applicable state "blue sky" statutes; and the common law for fraud, negligent misrepresentation, negligence, and breach of fiduciary duty.

5. This Court has jurisdiction over the federal claims herein under section 22(a) of the Securities Act, 15 U.S.C. § 77v(a); section 27 of the Exchange Act, 15 U.S.C. § 78aa; and under the provisions of the RICO statute 18 U.S.C. §§ 1964 and 1965. The Court has supplemental jurisdiction over the state law claims herein under 28 U.S.C. § 1367.

6. Many of the alleged transactions, acts, practices, and courses of business occurred in the Southern District of New York. In addition, many of the Defendants transacted business or resided in this District during the Class Period. Moreover, many of the witnesses to the alleged acts reside in this District.

## III.
## THE PARTIES

A. **Plaintiffs**.

7. Plaintiffs Bernard Batten and Stephanie Batten purchased a $40,000 Note on April 2, 1991; a $25,000 Note on May 21, 1991; a $90,000 Note on September 30, 1992; and a $40,000 Note on January 27, 1993.

8. Plaintiff Stanley Bruskin, a resident of New Jersey, purchased a $100,000 Note on or about December 1992.

- 2 -

9. Plaintiff Scott C. Davis, a Singapore resident and a Canadian citizen, purchased a $130,000 Note on April 30, 1991; a $20,000 Note on May 10, 1991; and a $152,646 Note and a $23,484 Note on June 1, 1992.

10. Plaintiff Robert W. Dinsmore, a resident of California, as Trustee of the Dinsmore Architects PPSP, purchased a $10,000 Note in December 1991 and a $20,000 Note in February 1992.

11. Plaintiff Ronald R. Evey, a resident of California, purchased a $12,500 Note in July 1989 and rolled over this investment into another $12,500 Note in July 1991; and purchased a $12,500 Note in December 1989 and rolled over this investment into another $12,500 Note in December 1991.

12. Plaintiff Martin Gold, as Trustee of the Martin Gold Attorney at Law, P.C. Defined Benefit Pension Plan dated December 10, 1987, purchased a $30,000 Note on or about December 26, 1990; a $20,000 Note on or about June 18, 1992; and a $30,000 Note on or about December 26, 1992.

13. Plaintiff Jo Frank Goodman, a resident of Michigan, purchased a $50,000 Note on or about February 23, 1992 and a $50,000 Note on or about April 20, 1992.

14. Plaintiff Jerry Gorelick, a resident of Florida, purchased a $50,000 Note in or about November 1992.

15. Plaintiff Anthony Izzo, Jr., a resident of New York, purchased a $110,000 Note on or about December 21, 1992.

16. Plaintiff Joanne Kirk Trust purchased a $100,000 Note in or about August 1992.

17. Plaintiff John Damen Kirk Trust purchased a $150,000 Note in or about August 1992.

18. Plaintiff Shawn Robert Kirk Trust purchased a $150,000 Note in or about August 1992.

19. Plaintiffs J.G. Leibman and Carol L. Leibman, residents of Oklahoma, purchased a $100,000 Note in or about April 1992.

20. Plaintiffs Ernest S.J. Loh and Nina T. Loh, residents of California, purchased a $100,000 Note on or about October 5, 1992 and a $100,000 Note on or about January 3, 1993.

21. Plaintiff Edward W. Murphy, Jr., as Trustee of the Edward W. Murphy, Jr., Trust, purchased $12,500 in Notes during the Class Period.

22. Plaintiff Martin Penner, a resident of Illinois, purchased a $66,000 Note on or about September 3, 1992 and a $17,000 Note on or about December 20, 1992.

23. Plaintiff Dr. John Siudmak, a resident of New Jersey, purchased a $150,000 Note on or about February 15, 1990 and, when the Note matured, rolled over his investment into another $150,000 Note on February 15, 1992.

24. Plaintiff John J. Siudmak Profit Sharing Plan purchased a $150,000 Note on or about June 2, 1991.

25. Plaintiffs Daniel Thom and Sharon Thom purchased a $50,000 Note on or about June 26, 1992; a $55,000 Note on or about June 30, 1992; and an $80,000 Note on or about December 20, 1992.

26.   Plaintiff Dora M. Ziegler, a resident of Illinois, as Trustee of the Dora M. Ziegler Defined Benefit Plan, purchased a $50,000 Note on or about September 30, 1992.

B.   **Towers Financial Corporation and Affiliates in Bankruptcy.**

27.   Towers Financial Corporation ("Towers") is a Delaware corporation headquartered in New York, New York which operated through subsidiaries such as Towers Credit Corporation, Towers Collection Services, Inc., Towers Healthcare Receivables Funding Corporation, Towers Healthcare Receivables Funding Corporation II, Towers Healthcare Receivables Funding Corporation III, Towers Healthcare Receivables Funding Corporation IV, and Towers Healthcare Receivables Funding Corporation V. Towers also conducted its own operations, including the purchase and collection of certain accounts receivable.

28.   Towers Credit Corporation ("Towers Credit") is a Towers subsidiary whose business was the purchase of commercial accounts receivable and collection of same for its own account.

29.   Towers Collection Services, Inc. ("Towers Collection") is a Towers subsidiary whose business was the collection of past-due accounts receivable for third parties on a contingency basis.

30.   Towers Healthcare Receivables Funding Corporation ("THRFC I"), Towers Healthcare Receivables Funding Corporation II ("THRFC II"), Towers Healthcare Receivables Funding Corporation III ("THRFC III"), Towers Healthcare Receivables Funding Corporation IV ("THRFC IV"), and Towers Healthcare Receivables

Funding Corporation V ("THRFC V") (collectively, the "Healthcare Subsidiaries") are five Towers subsidiaries, incorporated in Delaware, whose business was the factoring of healthcare accounts receivable and which offered and sold five issues of bonds to institutional investors in the total amount of approximately $196 million.

31.   In March 1993, Towers and its subsidiaries, including Towers Credit, Towers Collection, and the Healthcare Subsidiaries, filed for bankruptcy and are currently operating under the protection of chapter 11 of the Bankruptcy Code. But for the imposition of the automatic stay under section 362 of the Bankruptcy Code, Towers, Towers Credit, Towers Collection, and the Healthcare Subsidiaries would all be named as Defendants herein.

C.   **The Towers Defendants**

32.   Defendant Steven Hoffenberg ("Hoffenberg") a/k/a Barry Cohen, a resident of New York, New York, was Chief Executive Officer, President, and Chairman of the Board of Directors of Towers and President of Towers Credit and the Towers subsidiary TFC Funding Corporation.

33.   Defendants Professional Business Brokers, Inc. and the Hoffenberg Family Trust are entities through which Hoffenberg controlled the majority of Towers' common stock. Hoffenberg is the president of Professional Business Brokers, which owns over 70 percent of Towers' outstanding stock. Professional Business Brokers is owned by the Hoffenberg Family Trust, of which Hoffenberg is the trustee.

34. Defendant Mitchell Brater ("Brater"), a resident of Salem, New York, was Chief Operating Officer and Vice Chairman of the Board of Directors of Towers.

35. Defendant Arthur T. Ferro ("Ferro"), a resident of Valley Stream, New York, headed Towers' accounting department.

36. Defendant Charles R. Chugerman ("Chugerman"), a resident of New York, New York, was Executive Vice President, Secretary, and a member of the Board of Directors of Towers and President of the Towers subsidiary Towers Leasing Corporation.

37. Defendant Michael Rosoff ("Rosoff"), a resident of Chappaqua, New York, was Senior Vice President, Chief Legal Officer, Assistant Secretary, and a member of the Board of Directors of Towers.

38. Defendant Thomas B. Evans, Jr. ("Evans"), who maintains his offices in the District of Columbia, served on the Advisory Board of Towers and from 1990 was a member of the Board of Directors of Towers.

39. Defendant Ben Barnes ("Barnes"), a resident of Austin, Texas, served on the Advisory Board of Towers and from 1990 was a member of the Board of Directors of Towers.

40. Defendant Raymond Lewis ("Lewis"), a resident of New York, New York, was Vice President and a member of the Board of Directors of Towers.

41. Defendant Xavier Eboli ("Eboli"), a resident of Franklin Lakes, New Jersey, was a member of the Board of Directors of Towers and Vice President of Towers and President of

Towers Collection. During such employment, Eboli worked at Towers' offices in New York, New York.

42. Defendant Gregory Pattakos ("G. Pattakos"), a resident of Ponoma, New York, was Vice President, Secretary, and a member of the Board of Directors of Towers and President of Towers Collection.

43. Defendant Richard Levine ("Levine"), a resident of Plainview, New York, was Vice President of Towers, worked in Towers' accounting department, and was Chief Financial Officer of Towers from 1989 through 1991.

44. Defendant Anthony DiNicolas ("DiNicolas"), a resident of Chatham, New Jersey, was Senior Vice President of Towers and during such employment worked at Towers' offices in New York, New York.

45. Defendant David Franklin ("Franklin"), a resident of New York, New York, was Towers' Managing Director of Corporate Finance.

46. Defendant Nicholas T. Pattakos ("N. Pattakos"), a resident of Brooklyn, New York, was the Controller of Towers.

47. Defendant Marvin E. Basson ("Basson"), a resident of Upper Brookville, New York, is a certified public accountant who provided accounting and auditing services to Towers.

48. Defendant Eton Securities Corporation ("Eton Securities") is a securities broker-dealer owned by Defendant Brater. Through Eton Securities, Brater supervised and coordinated the sale of the Notes by other broker-dealers, as well as the sale of securities issued by the Healthcare

Subsidiaries. During the Class Period, Eton Securities received over $1 million in "consulting fees" from Towers.

49.    Defendants Hoffenberg, Professional Business Brokers, the Hoffenberg Family Trust, Brater, Ferro, Chugerman, Rosoff, Evans, Barnes, Lewis, Eboli, G. Pattakos, Levine, DiNicolas, Franklin, N. Pattakos, Basson, and Eton Securities are hereafter referred to as the "Towers Defendants."

D.    **The Professional Defendants.**

50.    Defendant American Credit Indemnity Co. ("ACI") is a credit insurance company incorporated in New York and headquartered in Baltimore, Maryland. During the Class Period, Towers maintained credit insurance policies issued by ACI that purportedly insured the consulting for the Notes. ACI authorized Towers to hold the insurance out to potential and actual investors as an indicium of the safety of the Notes as an investment.

51.    Defendant H. Bruce Bronson, Jr. ("Bronson") is an attorney who, through Defendant Law Offices of H. Bruce Bronson, Jr., and the law firms Defendant Gibney, Anthony & Flaherty and Defendant Bronson & Migliaccio (collectively, the "Bronson Defendants"), provided legal services and advice to Towers in connection with the Note offerings.

52.    Defendant Duff & Phelps Credit Rating Company ("Duff & Phelps") is a publisher of business and financial information and securities rating service which does business in New York. During the Class Period, Duff & Phelps issued opinions

rating or endorsing Towers and its debt offerings, including the Notes.

53.    Defendant Richard A. Eisner & Company ("Eisner") is a partnership of independent certified public accountants and management consultants. At all relevant times, Eisner was the certified public accountant and independent auditor for the Healthcare Subsidiaries.

54.    Defendant Squadron, Ellenoff, Plesent & Lehrer ("Squadron Ellenoff") is a law firm based in New York, New York that served as counsel to Towers and Defendants Hoffenberg and Brater. Squadron Ellenoff's activities on behalf of Towers included representing Towers before the Securities and Exchange Commission and other regulatory agencies.

55.    Defendants ACI, the Bronson Defendants, Duff & Phelps, Eisner, and Squadron Ellenoff are hereafter referred to as the "Professional Defendants."

E.    **The Broker-Dealer Defendants.**

56.    Defendant J.B. Bogart & Associates, Inc. ("Bogart") is a securities broker-dealer based in Manhattan Beach, California who offered and sold Towers Notes and received a total of approximately $741,678 in commissions from selling the Notes.

57.    Defendant Consolidated Financial Serv., Inc. ("Consolidated Financial") is a securities broker-dealer based in Hayward, California who offered and sold Towers Notes and received a total of approximately $53,925 in commissions from selling the Notes.

58. Defendant Dain Bosworth, Inc. ("Dain") is a securities broker-dealer based in Minneapolis, Minnesota who offered and sold Towers Notes and received a total of approximately $51,500 in commissions from selling the Notes.

59. Defendant David DeBazardinis is a securities broker-dealer based in Shreveport, Louisiana who offered and sold Towers Notes and received a total of approximately $2,433,817 in commissions from selling the Notes.

60. Defendant East-West Capital Management, Inc. ("East-West") is a securities broker-dealer based in Harper Woods, Michigan who offered and sold Towers Notes and received approximately $910,975 in commissions from selling the Notes.

61. Defendant First Affiliated Securities Inc. ("First Affiliated") is a securities broker-dealer based in La Jolla, California who offered and sold Towers Notes and received approximately $82,050 from selling the Notes.

62. Defendant Halpert & Company Inc. ("Halpert") is a securities broker-dealer based in Millburn, New Jersey who offered and sold Towers Notes and received approximately $353,232 in commissions from selling the Notes.

63. Defendant Martin Kaiden Company ("Kaiden") is a securities broker-dealer based in New York, New York who offered and sold Towers Notes and received a total of approximately $1,392,489 in commissions from selling the Notes.

64. Defendant Monterey Bay Securities ("Monterey Bay") is a securities broker-dealer based in Aptos, California who

offered and sold Towers Notes and received approximately $255,972 in commissions from selling the Notes.

65. Defendants Bogart, Consolidated Financial, Dain Bosworth, DeBazardinis, East-West, First Affiliated, Halpert, Kaiden, and Monterey Bay are sued individually and also as representatives of a Defendant Class pursuant to rule 23(a) and rule (b)(1) and (3) of the Federal Rules of Civil Procedure, consisting of all persons and entities who participated as sellers of Notes during the Class Period (the "Defendant Class" or "Broker-Dealer Defendant Class").

66. Defendant Class member Accuvest, Inc. is a securities broker-dealer based in Smithtown, New York who offered and sold Towers Notes and received a total of approximately $6,400 in commissions from selling the Notes.

67. Defendant Class member Alliance Financial Group, Inc. is a securities broker-dealer based in Fort Worth, Texas who offered and sold Towers Notes and received a total of approximately $33,450 in commissions from selling the Notes.

68. Defendant Class member Allison-Williams Company is a securities broker-dealer based in Minneapolis, Minnesota who offered and sold Towers Notes and received a total of approximately $416,125 in commissions from selling the Notes.

69. Defendant Class member American Discount Securities, Inc. is a securities broker-dealer based in Wichita, Kansas who offered and sold Towers Notes and received a total of approximately $5,000 in commissions from selling the Notes.

70. Defendant Class member American Heartland Investments, Inc. is a securities broker-dealer based in Salina, Kansas who offered and sold Towers Notes and received a total of approximately $11,000 in commissions from selling the Notes.

71. Defendant Class member American Investment Services, Inc. is a securities broker-dealer based in East Peoria, Illinois who offered and sold Towers Notes and received a total of approximately $16,556 in commissions from selling the Notes.

72. Defendant Class member American Investors Group, Inc. is a securities broker-dealer based in Minneapolis, Minnesota who offered and sold Towers Notes and received a total of approximately $15,625 in commissions from selling the Notes.

73. Defendant Class member American Municipal Securities, Inc. is a securities broker-dealer based in Tampa, Florida who offered and sold Towers Notes and received a total of approximately $28,000 in commissions from selling the Notes.

74. Defendant Class member American Preferred Securities is a securities broker-dealer based in Montgomeryville, Pennsylvania who offered and sold Towers Notes and received a total of approximately $67,400 in commissions from selling the Notes.

75. Defendant Class member Amerivest Financial Group, Inc. is a securities broker-dealer based in Marina Del Ray, California who offered and sold Towers Notes and received a total of approximately $3,200 in commissions from selling the Notes.

- 13 -

76. Defendant Class member Andover Securities is a securities broker-dealer based in Kansas City, Missouri who offered and sold Towers Notes and received a total of approximately $119,400 in commissions from selling the Notes.

77. Defendant Class member APS Financial Corporation is a securities broker-dealer based in Austin, Texas who offered and sold Towers Notes and received a total of approximately $15,300 in commissions from selling the Notes.

78. Defendant Class member Arundel Securities, Inc. is a securities broker-dealer based in Annapolis, Maryland who offered and sold Towers Notes and received a total of approximately $6,750 in commissions from selling the Notes.

79. Defendant Class member Barron Chase Securities, Inc. is a securities broker-dealer based in Boca Raton, Florida who offered and sold Towers Notes and received a total of approximately $7,000 in commissions from selling the Notes.

80. Defendant Class member Bench Securities is a securities broker-dealer based in Fort Lee, New Jersey who offered and sold Towers Notes and received a total of approximately $137,700 in commissions from selling the Notes.

81. Defendant Class member Berkowitz, Pierchaleki is a securities broker-dealer based in Pittsburgh, Pennsylvania who offered and sold Towers Notes and received a total of approximately $19,550 in commissions from selling the Notes.

82. Defendant Class member Berman & Stickel, Inc. is a securities broker-dealer based in Sausalito, California who

- 14 -

offered and sold Towers Notes and received a total of approximately $180,600 in commissions from selling the Notes.

83. Defendant Class member Blue Coral Capital is a securities broker-dealer based in Houston, Texas who offered and sold Towers Notes and received a total of approximately $74,429 in commissions from selling the Notes.

84. Defendant Class member BOE & Company, Inc. is a securities broker-dealer based in Aurora, Colorado who offered and sold Towers Notes and received a total of approximately $4,000 in commissions from selling the Notes.

85. Defendant Class member Das A. Borden & Associates is a securities broker-dealer based in Florence, Alabama who offered and sold Towers Notes and received a total of approximately $176,000 in commissions from selling the Notes.

86. Defendant Class member Boteo Tachkov is a securities broker-dealer based in Fort Lauderdale, Florida who offered and sold Towers Notes and received a total of approximately $3,800 in commissions from selling the Notes.

87. Defendant Class member Brennan Ross Securities is a securities broker-dealer based in Englewood, Colorado who offered and sold Towers Notes and received a total of approximately $2,000 in commissions from selling the Notes.

88. Defendant Class member Brent Capital Corp. is a securities broker-dealer based in Pittsford, New York who offered and sold Towers Notes and received a total of approximately $22,100 in commissions from selling the Notes.

89. Defendant Class member Brighton Securities is a securities broker-dealer based in Rochester, New York who offered and sold Towers Notes and received a total of approximately $179,405 in commissions from selling the Notes.

90. Defendant Class member Brown Church Securities, Inc. is a securities broker-dealer based in Wichita, Kansas who offered and sold Towers Notes and received a total of approximately $44,000 in commissions from selling the Notes.

91. Defendant Class member Burnside & Company is a securities broker-dealer based in Danville, Illinois who offered and sold Towers Notes and received a total of approximately $115,029 in commissions from selling the Notes.

92. Defendant Class member Capital Focus is a securities broker-dealer based in San Francisco, California who offered and sold Towers Notes and received a total of approximately $14,750 in commissions from selling the Notes.

93. Defendant Class member Capital Strategies, Ltd. is a securities broker-dealer based in Philadelphia, Pennsylvania who offered and sold Towers Notes and received a total of approximately $6,000 in commissions from selling the Notes.

94. Defendant Class member Certified Investments Corp. is a securities broker-dealer based in Saint Petersburg, Florida who offered and sold Towers Notes and received a total of approximately $63,450 in commissions from selling the Notes.

95. Defendant Class member Chapman Securities, Inc. is a securities broker-dealer based in Wichita, Kansas who offered

and sold Towers Notes and received a total of approximately $2,500 in commissions from selling the Notes.

96. Defendant Class member S.C. Coast Company, Inc. is a securities broker-dealer based in Tulsa, Oklahoma who offered and sold Towers Notes and received a total of approximately $8,500 in commissions from selling the Notes.

97. Defendant Class member Coastal Equities, Inc. is a securities broker-dealer based in Falmouth, Massachusetts who offered and sold Towers Notes and received a total of approximately $94,880 in commissions from selling the Notes.

98. Defendant Class member Cohig & Associates is a securities broker-dealer based in Englewood, Colorado who offered and sold Towers Notes and received a total of approximately $66,500 in commissions from selling the Notes.

99. Defendant Class member Commonwealth Equity Services, Inc. is a securities broker-dealer based in Waltham, Massachusetts who offered and sold Towers Notes and received a total of approximately $93,750 in commissions from selling the Notes.

100. Defendant Class member Consolidated Investment Serv., Inc. is a securities broker-dealer based in Littleton, Colorado who offered and sold Towers Notes and received a total of approximately $14,695 in commissions from selling the Notes.

101. Defendant Class member Cooper Investment Partners is a securities broker-dealer based in Chicago, Illinois who offered and sold Towers Notes and received a total of approximately $433,700 in commissions from selling the Notes.

102. Defendant Class member Coordinated Capital Securities is a securities broker-dealer based in Madison, Wisconsin who offered and sold Towers Notes and received a total of approximately $1,000 in commissions from selling the Notes.

103. Defendant Class member Cope Investment Corporation is a securities broker-dealer based in New Orleans, Louisiana who offered and sold Towers Notes and received a total of approximately $2,900 in commissions from selling the Notes.

104. Defendant Class member Corporate Benefit Securities, Inc. is a securities broker-dealer based in Laguna Niguel, California who offered and sold Towers Notes and received a total of approximately $105,400 in commissions from selling the Notes.

105. Defendant Class member Corporate Securities Group, Inc. is a securities broker-dealer based in Boca Raton, Florida who offered and sold Towers Notes and received a total of approximately $66,896 in commissions from selling the Notes.

106. Defendant Class member Covey & Company, Inc. is a securities broker-dealer based in Salt Lake City, Utah who offered and sold Towers Notes and received a total of approximately $11,450 in commissions from selling the Notes.

107. Defendant Class member Crane & Company Securities, Inc. is a securities broker-dealer based in Troy, Michigan who offered and sold Towers Notes and received a total of approximately $3,000 in commissions from selling the Notes.

108. Defendant Class member Crews & Associates, Inc. is a securities broker-dealer based in Little Rock, Arkansas who

offered and sold Towers Notes and received a total of approximately $8,200 in commissions from selling the Notes.

109. Defendant Class member Cullum & Sandow Securities, Inc. is a securities broker-dealer based in Dallas, Texas who offered and sold Towers Notes and received a total of approximately $46,500 in commissions from selling the Notes.

110. Defendant Class member Cumberland Brokerage Corporation is a securities broker-dealer based in Vineland, New Jersey who offered and sold Towers Notes and received a total of approximately $2,000 in commissions from selling the Notes.

111. Defendant Class member Cypress Capital Corp. is a securities broker-dealer based in Danville, California who offered and sold Towers Notes and received a total of approximately $25,350 in commissions from selling the Notes.

112. Defendant Class member Dean Lopnow is a securities broker-dealer based in Palatine, Illinois who offered and sold Towers Notes and received a total of approximately $22,100 in commissions from selling the Notes.

113. Defendant Class member Dominick Zaccoli is a securities broker-dealer based in Staten Island, New York who offered and sold Towers Notes and received a total of approximately $12,000 in commissions from selling the Notes.

114. Defendant Class member Donald & Company Securities, Inc. is a securities broker-dealer based in Tinton Falls, New Jersey who offered and sold Towers Notes and received a total of approximately $14,400 in commissions from selling the Notes.

115. Defendant Class member Dougherty, Dawkins, Strand & Bigelow, Inc. is a securities broker-dealer based in Minneapolis, Minnesota who offered and sold Towers Notes and received a total of approximately $22,000 in commissions from selling the Notes.

116. Defendant Class member F. Merle Nicholson is a securities broker-dealer based in Vista, California who offered and sold Towers Notes and received a total of approximately $2,500 in commissions from selling the Notes.

117. Defendant Class member F.J. Garber & Company is a securities broker-dealer based in Sioux City, Iowa who offered and sold Towers Notes and received a total of approximately $51,546 in commissions from selling the Notes.

118. Defendant Class member FAIC Securities is a securities broker-dealer based in Healdsburg, California who offered and sold Towers Notes and received a total of approximately $20,520 in commissions from selling the Notes.

119. Defendant Class member Falk & Associates, Inc. is a securities broker-dealer based in Englewood, New Jersey who offered and sold Towers Notes and received a total of approximately $9,600 in commissions from selling the Notes.

120. Defendant Class member Federated Securities, Inc. is a securities broker-dealer based in Huntington Station, New York who offered and sold Towers Notes and received a total of approximately $29,600 in commissions from selling the Notes.

121. Defendant Class member Financial Consultants, Inc. is a securities broker-dealer based in Kansas City, Missouri who

offered and sold Towers Notes and received a total of approximately $16,000 in commissions from selling the Notes.

122. Defendant Class member Financial Goal Securities, Inc. is a securities broker-dealer based in Palm Springs, California who offered and sold Towers Notes and received a total of approximately $350,130 in commissions from selling the Notes.

123. Defendant Class member Financial Information Centers Brokerage, Inc. is a securities broker-dealer based in Sarasota, Florida who offered and sold Towers Notes and received a total of approximately $81,200 in commissions from selling the Notes.

124. Defendant Class member First Associated Securities Group is a securities broker-dealer based in Chico, California who offered and sold Towers Notes and received a total of approximately $401,986 in commissions from selling the Notes.

125. Defendant Class member First California Associates is a securities broker-dealer based in Santa Clara, California who offered and sold Towers Notes and received a total of approximately $2,000 in commissions from selling the Notes.

126. Defendant Class member First Honolulu Securities, Inc. is a securities broker-dealer based in Honolulu, Hawaii who offered and sold Towers Notes and received a total of approximately $1,000 in commissions from selling the Notes.

127. Defendant Class member First Interregional Equity Corp. is a securities broker-dealer based in Short Hills, New Jersey who offered and sold Towers Notes and received a total of approximately $15,600 in commissions from selling the Notes.

- 21 -

128. Defendant Class member First Miami Securities, Inc. is a securities broker-dealer based in North Miami Beach, Florida who offered and sold Towers Notes and received a total of approximately $14,250 in commissions from selling the Notes.

129. Defendant Class member FSC Securities Corporation is a securities broker-dealer based in Marietta, Georgia who offered and sold Towers Notes and received a total of approximately $34,200 in commissions from selling the Notes.

130. Defendant Class member Geneva Securities, Inc. is a securities broker-dealer based in Schaumburg, Illinois who offered and sold Towers Notes and received a total of approximately $313,425 in commissions from selling the Notes.

131. Defendant Class member Gill & Associates, Inc. is a securities broker-dealer based in Denver, Colorado who offered and sold Towers Notes and received a total of approximately $86,476 in commissions from selling the Notes.

132. Defendant Class member Great Lakes Equities Company is a securities broker-dealer based in Farmington Hills, Michigan who offered and sold Towers Notes and received a total of approximately $2,450 in commissions from selling the Notes.

133. Defendant Class member Greenbrier Diversified, Inc. is a securities broker-dealer based in Beverly Hills, California who offered and sold Towers Notes and received a total of approximately $181,500 in commissions from selling the Notes.

134. Defendant Class member Harbor Investments, Inc. is a securities broker-dealer based in Madison, Wisconsin who

- 22 -

offered and sold Towers Notes and received a total of
approximately $76,275 in commissions from selling the Notes.

135. Defendant Class member Heidtke & Company, Inc. is
a securities broker-dealer based in Nashville, Tennessee who
offered and sold Towers Notes and received a total of
approximately $3,435 in commissions from selling the Notes.

136. Defendant Class member Houston Investment Group is
a securities broker-dealer based in Houston, Texas who offered
and sold Towers Notes and received a total of approximately
$29,325 in commissions from selling the Notes.

137. Defendant Class member Howe Barnes Investments,
Inc. is a securities broker-dealer based in Chicago, Illinois who
offered and sold Towers Notes and received a total of
approximately $15,600 in commissions from selling the Notes.

138. Defendant Class member Huntingdon Securities is a
securities broker-dealer based in Hermitage, Tennessee who
offered and sold Towers Notes and received a total of
approximately $44,000 in commissions from selling the Notes.

139. Defendant Class member IFP, Inc. is a securities
broker-dealer based in Dallas, Texas who offered and sold Towers
Notes and received a total of approximately $1,300 in commissions
from selling the Notes.

140. Defendant Class member Investment Brokers of
America is a securities broker-dealer based in Mill Valley,
California who offered and sold Towers Notes and received a total
of approximately $3,500 in commissions from selling the Notes.

141. Defendant Class member Investment Corporation of
Virginia is a securities broker-dealer based in Norfolk, Virginia
who offered and sold Towers Notes and received a total of
approximately $7,000 in commissions from selling the Notes.

142. Defendant Class member Investors Security Company
is a securities broker-dealer based in Suffolk, Virginia who
offered and sold Towers Notes and received a total of
approximately $13,000 in commissions from selling the Notes.

143. Defendant Class member J.E. Liss & Company is a
securities broker-dealer based in Milwaukee, Wisconsin who
offered and sold Towers Notes and received a total of
approximately $32,500 in commissions from selling the Notes.

144. Defendant Class member J.O. Davidson & Associates,
Inc. is a securities broker-dealer based in Wichita, Kansas who
offered and sold Towers Notes and received a total of
approximately $15,750 in commissions from selling the Notes.

145. Defendant Class member Jinco Leasing Corp. is a
securities broker-dealer based in Denver, Colorado who offered
and sold Towers Notes and received a total of approximately
$253,150 in commissions from selling the Notes.

146. Defendant Class member Joe Middlesworth (t/k/a
Pacific Inland Securities) is a securities broker-dealer based in
Stockton, California who offered and sold Towers Notes and
received a total of approximately $54,948 in commissions from
selling the Notes.

147. Defendant Class member JW Charles Securities, Inc.
is a securities broker-dealer based in Boca Raton, Florida who

offered and sold Towers Notes and received a total of approximately $20,300 in commissions from selling the Notes.

148. Defendant Class member Kelmoore Investment Company is a securities broker-dealer based in Paso Robles, California who offered and sold Towers Notes and received a total of approximately $8,500 in commissions from selling the Notes.

149. Defendant Class member John G. Kinnard & Company, Inc. is a securities broker-dealer based in Minneapolis, Minnesota who offered and sold Towers Notes and received a total of approximately $3,750 in commissions from selling the Notes.

150. Defendant Class member Kurz-Liebow & Company, Inc. is a securities broker-dealer based in New York, New York who offered and sold Towers Notes and received a total of approximately $445,113 in commissions from selling the Notes.

151. Defendant Class member LaSalle St. Securities, Inc. is a securities broker-dealer based in Chicago, Illinois who offered and sold Towers Notes and received a total of approximately $10,625 in commissions from selling the Notes.

152. Defendant Class member Lindsay Financial Corporation is a securities broker-dealer based in Los Angeles, California who offered and sold Towers Notes and received a total of approximately $1,100 in commissions from selling the Notes.

153. Defendant Class member Linsco/Private Ledger Corp. is a securities broker-dealer based in Boston, Massachusetts who offered and sold Towers Notes.

154. Defendant Class member M.E. Metzler Organization is a securities broker-dealer based in Saint Louis, Missouri who

offered and sold Towers Notes and received a total of approximately $84,408 in commissions from selling the Notes.

155. Defendant Class member Masterson Moreland Sauer Whisman, Inc. is a securities broker-dealer based in Houston, Texas who offered and sold Towers Notes and received a total of approximately $10,550 in commissions from selling the Notes.

156. Defendant Class member Maven Securities, Inc. is a securities broker-dealer based in Minneapolis, Minnesota who offered and sold Towers Notes and received a total of approximately $4,000 in commissions from selling the Notes.

157. Defendant Class member McCarley and Associates, Inc. is a securities broker-dealer based in Greenville, South Carolina who offered and sold Towers Notes and received a total of approximately $10,000 in commissions from selling the Notes.

158. Defendant Class member McClurg Capital Corporation is a securities broker-dealer based in San Francisco, California who offered and sold Towers Notes and received a total of approximately $5,000 in commissions from selling the Notes.

159. Defendant Class member McLaughlin, Piven, Vogel Securities, Inc. is a securities broker-dealer based in New York, New York who offered and sold Towers Notes and received a total of approximately $10,000 in commissions from selling the Notes.

160. Defendant Class member Monarch Financial Corporation of America is a securities broker-dealer based in New York, New York who offered and sold Towers Notes and received a total of approximately $2,000 in commissions from selling the Notes.

161. Defendant Class member Moneta Securities Corporation is a securities broker-dealer based in Commack, New York who offered and sold Towers Notes and received a total of approximately $111,375 in commissions from selling the Notes.

162. Defendant Class member Multi-Financial Securities Corporation, Inc. is a securities broker-dealer based in Englewood, Colorado who offered and sold Towers Notes and received a total of approximately $561,284 in commissions from selling the Notes.

163. Defendant Class member Multi-Bank Securities, Inc. is a securities broker-dealer based in Southfield, Michigan who offered and sold Towers Notes and received a total of approximately $237,500 in commissions from selling the Notes.

164. Defendant Class member Neidiger, Tucker, Bruner, Inc. is a securities broker-dealer based in Denver, Colorado who offered and sold Towers Notes and received a total of approximately $27,500 in commissions from selling the Notes.

165. Defendant Class member Outstanding Investments is a securities broker-dealer based in Grand Rapids, Michigan who offered and sold Towers Notes and received a total of approximately $16,450 in commissions from selling the Notes.

166. Defendant Class member Pacific Continental Securities Corporation is a securities broker-dealer based in Encino, California who offered and sold Towers Notes and received a total of approximately $1,500 in commissions from selling the Notes.

167. Defendant Class member Pacific West Securities, Inc. is a securities broker-dealer based in Renton, Washington who offered and sold Towers Notes and received a total of approximately $1,250 in commissions from selling the Notes.

168. Defendant Class member Palm Beach Financial, Inc. is a securities broker-dealer based in North Palm Beach, Florida who offered and sold Towers Notes and received a total of approximately $1,000 in commissions from selling the Notes.

169. Defendant Class member Park Avenue Securities, Inc. is a securities broker-dealer based in Oklahoma City, Oklahoma who offered and sold Towers Notes and received a total of approximately $38,500 in commissions from selling the Notes.

170. Defendant Class member Portfolio Management Consultants, Inc. is a securities broker-dealer based in Denver, Colorado who offered and sold Towers Notes and received a total of approximately $136,550 in commissions from selling the Notes.

171. Defendant Class member Princeton Equity Securities, Inc. is a securities broker-dealer based in Princeton, New Jersey who offered and sold Towers Notes and received a total of approximately $16,000 in commissions from selling the Notes.

172. Defendant Class member Protective Group Securities Corp. is a securities broker-dealer based in Eden Prairie, Minnesota who offered and sold Towers Notes and received a total of approximately $163,850 in commissions from selling the Notes.

173. Defendant Class member Quadrex Securities is a securities broker-dealer based in Queensway, Hong Kong who

offered and sold Towers Notes and received a total of approximately $25,000 in commissions from selling the Notes.

174. Defendant Class member Quest Securities, Inc. is a securities broker-dealer based in Fair Oaks, California who offered and sold Towers Notes and received a total of approximately $28,150 in commissions from selling the Notes.

175. Defendant Class member Questor Financial Securities is a securities broker-dealer based in Farmington Hills, Michigan who offered and sold Towers Notes and received a total of approximately $3,500 in commissions from selling the Notes.

176. Defendant Class member R.J. Steichen & Company is a securities broker-dealer based in Minneapolis, Minnesota who offered and sold Towers Notes and received a total of approximately $5,000 in commissions from selling the Notes.

177. Defendant Class member Republic Services, Inc. is a securities broker-dealer based in Chicago, Illinois who offered and sold Towers Notes and received a total of approximately $9,500 in commissions from selling the Notes.

178. Defendant Class member Republic Securities of America, Inc. is a securities broker-dealer based in Orlando, Florida who offered and sold Towers Notes and received a total of approximately $9,500 in commissions from selling the Notes.

179. Defendant Class member Resource Investment Partners is a securities broker-dealer based in Little Rock, Arkansas who offered and sold Towers Notes and received a total of approximately $1,050 in commissions from selling the Notes.

180. Defendant Class member Retirement Investment Group is a securities broker-dealer based in Houston, Texas who offered and sold Towers Notes and received a total of approximately $18,000 in commissions from selling the Notes.

181. Defendant Class member Rhodes Securities, Inc. is a securities broker-dealer based in Fort Worth, Texas who offered and sold Towers Notes and received a total of approximately $43,650 in commissions from selling the Notes.

182. Defendant Class member Richards Investment is a securities broker-dealer based in Salt Lake City, Utah who offered and sold Towers Notes and received a total of approximately $192,150 in commissions from selling the Notes.

183. Defendant Class member Rickel & Associates, Inc. is a securities broker-dealer based in Millburg, New Jersey who offered and sold Towers Notes and received a total of approximately $4,610 in commissions from selling the Notes.

184. Defendant Class member Rose Securities is a securities broker-dealer based in Carlsbad, California who offered and sold Towers Notes and received a total of approximately $541,413 in commissions from selling the Notes.

185. Defendant Class member S.G. Financial is a securities broker-dealer based in Sausalito, California who offered and sold Towers Notes and received a total of approximately $102,845 in commissions from selling the Notes.

186. Defendant Class member Santa Barbara Securities, Inc. is a securities broker-dealer based in Santa Barbara,

California who offered and sold Towers Notes and received a total of approximately $86,380 in commissions from selling the Notes.

187. Defendant Class member Schneider Securities, Inc. is a securities broker-dealer based in Denver, Colorado who offered and sold Towers Notes and received a total of approximately $26,000 in commissions from selling the Notes.

188. Defendant Class member Robert Scott Securities, Inc. is a securities broker-dealer based in Irvine, California who offered and sold Towers Notes and received a total of approximately $7,408 in commissions from selling the Notes.

189. Defendant Class member Securities Service Network, Inc. is a securities broker-dealer based in Knoxville, Tennessee who offered and sold Towers Notes and received a total of approximately $7,500 in commissions from selling the Notes.

190. Defendant Class member Sentra Securities Corp. is a securities broker-dealer based in Irvine, California who offered and sold Towers Notes and received a total of approximately $8,650 in commissions from selling the Notes.

191. Defendant Class member Seward, Groves, Richard & Wells, Inc. is a securities broker-dealer based in New York, New York who offered and sold Towers Notes and received a total of approximately $5,000 in commissions from selling the Notes.

192. Defendant Class member Shelter Rock Securities is a securities broker-dealer based in Jericho, New York who offered and sold Towers Notes and received a total of approximately $3,750 in commissions from selling the Notes.

193. Defendant Class member Sigma Financial Services, Inc. is a securities broker-dealer based in Ann Arbor, Michigan who offered and sold Towers Notes and received a total of approximately $3,600 in commissions from selling the Notes.

194. Defendant Class member Signal Securities, Inc. is a securities broker-dealer based in Fort Worth, Texas who offered and sold Towers Notes and received a total of approximately $239,310 in commissions from selling the Notes.

195. Defendant Class member Smith Benton & Hughes, Inc. is a securities broker-dealer based in Englewood, Colorado who offered and sold Towers Notes and received a total of approximately $27,390 in commissions from selling the Notes.

196. Defendant Class member Starboard Capital Corp. is a securities broker-dealer based in Williamsville, New York who offered and sold Towers Notes and received a total of approximately $1,000 in commissions from selling the Notes.

197. Defendant Class member Strategic Resource Management, Inc. is a securities broker-dealer based in Englewood, Colorado who offered and sold Towers Notes and received a total of approximately $2,595 in commissions from selling the Notes.

198. Defendant Class member Strategic Risk Management Inc. is a securities broker-dealer based in New York, New York who offered and sold Towers Notes and received a total of approximately $2,595 in commissions from selling the Notes.

199. Defendant Class member Summit Investment Corp. is a securities broker-dealer based in Minneapolis, Minnesota who

offered and sold Towers Notes and received a total of approximately $319,440 in commissions from selling the Notes.

200. Defendant Class member Sussex Financial Group is a securities broker-dealer based in Deerfield, Illinois who offered and sold Towers Notes and received a total of approximately $254,750 in commissions from selling the Notes.

201. Defendant Class member T.L. Smith Securities is a securities broker-dealer based in Fort Worth, Texas who offered and sold Towers Notes and received a total of approximately $49,188 in commissions from selling the Notes.

202. Defendant Class member Taggart Company Ltd. is a securities broker-dealer based in Beverly Hills, California who offered and sold Towers Notes and received a total of approximately $6,400 in commissions from selling the Notes.

203. Defendant Class member Tejas Securities, Inc. is a securities broker-dealer based in Houston, Texas who offered and sold Towers Notes and received a total of approximately $1,470 in commissions from selling the Notes.

204. Defendant Class member Texas Securities is a securities broker-dealer based in Fort Worth, Texas who offered and sold Towers Notes and received a total of approximately $290,400 in commissions from selling the Notes.

205. Defendant Class member Trading Desk, Inc. is a securities broker-dealer based in Englewood, Colorado who offered and sold Towers Notes and received a total of approximately $113,350 in commissions from selling the Notes.

206. Defendant Class member Thomas F. White & Company, Inc. is a securities broker-dealer based in San Francisco, California who offered and sold Towers Notes and received a total of approximately $199,133 in commissions from selling the Notes.

207. Defendant Class member Tierra Capital/Value Equity Group is a securities broker-dealer based in Roswell, New Mexico who offered and sold Towers Notes and received a total of approximately $6,350 in commissions from selling the Notes.

208. Defendant Class member Titan Value Equities is a securities broker-dealer based in Tustin, California who offered and sold Towers Notes and received a total of approximately $156,365 in commissions from selling the Notes.

209. Defendant Class member Toluca Pacific Securities Corp. is a securities broker-dealer based in Toluca Lake, California who offered and sold Towers Notes and received a total of approximately $70,580 in commissions from selling the Notes.

21C. Defendant Class member Torrey Pines Securities, Inc. is a securities broker-dealer based in Solana Beach, California who offered and sold Towers Notes and received a total of approximately $10,125 in commissions from selling the Notes.

211. Defendant Class member U.S. Securities, Inc. is a securities broker-dealer based in Hartford, Connecticut who offered and sold Towers Notes and received a total of approximately $19,250 in commissions from selling the Notes.

212. Defendant Class member U.S. Securities Corporation is a securities broker-dealer based in Reston, Virginia who

offered and sold Towers Notes and received a total of approximately $19,250 in commissions from selling the Notes.

213. Defendant Class member U.S. Securities International Corporation is a securities broker-dealer based in New York, New York who offered and sold Towers Notes and received a total of approximately $19,250 in commissions from selling the Notes.

214. Defendant Class member Underwood Associates is a securities broker-dealer based in Barrington, Illinois who offered and sold Towers Notes and received a total of approximately $6,950 in commissions from selling the Notes.

215. Defendant Class member Vautrain Nelson LeFevre, Endsley & Durham, Inc. is a securities broker-dealer based in Fort Worth, Texas who offered and sold Towers Notes and received a total of approximately $69,650 in commissions from selling the Notes.

216. Defendant Class member Vestcorp Securities, Inc. is a securities broker-dealer based in Irvine, California who offered and sold Towers Notes and received a total of approximately $2,520 in commissions from selling the Notes.

217. Defendant Class member Waldron & Company, Inc. is a securities broker-dealer based in San Rafael, California who offered and sold Towers Notes and received a total of approximately $10,300 in commissions from selling the Notes.

218. Defendant Class member Walnut Street Securities Inc. is a securities broker-dealer based in Saint Louis, Missouri

who offered and sold Towers Notes and received a total of approximately $13,100 in commissions from selling the Notes.

219. Defendant Class member Walter Lowman is a securities broker-dealer based in Larchmont, New York who offered and sold Towers Notes and received a total of approximately $10,000 in commissions from selling the Notes.

220. Defendant Class member Warwick Securities, Inc. is a securities broker-dealer based in Columbus, Ohio who offered and sold Towers Notes and received a total of approximately $70,550 in commissions from selling the Notes.

221. Defendant Class member Wedbush Morgan Securities, Inc. is a securities broker-dealer based in Los Angeles, California who offered and sold Towers Notes and received a total of approximately $51,592 in commissions from selling the Notes.

222. Defendant Class member West Coast Capital is a securities broker-dealer based in Camarillo, California who offered and sold Towers Notes and received a total of approximately $51,400 in commissions from selling the Notes.

223. Defendant Class member West Coast Securities is a securities broker-dealer based in Dallas, Texas who offered and sold Towers Notes and received a total of approximately $86,125 in commissions from selling the Notes.

224. Defendant Class member Wraxall Group is a securities broker-dealer based in South Hampton, Bermuda who offered and sold Towers Notes and received a total of approximately $8,787 in commissions from selling the Notes.

225. Defendant Class member Yankee Financial Group, Inc. is a securities broker-dealer based in Brightwaters, New York who offered and sold Towers Notes and received a total of approximately $36,650 in commissions from selling the Notes.

226. Defendant Class member Yeager Securities, Inc. is a securities broker-dealer based in Encino, California who offered and sold Towers Notes and received a total of approximately $545,860 in commissions from selling the Notes.

227. Defendants Bogart, Consolidated Financial, Dain Bosworth, deBardinsis, East-West, First Affiliated, Halpert, Kaiden, Monterey Bay, and the members of the Broker-Dealer Defendant Class are hereafter referred to as the "Broker-Dealer Defendants."

### IV.
### CLASS ACTION ALLEGATIONS

228. Plaintiffs bring this action on their own behalf and, under rule 23 of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons (excluding Defendants and members of the Defendant Class and the members of such persons' immediate families and their heirs, successors, and assigns) who purchased or reinvested in Notes at any time during the period from February 15, 1989 through February 9, 1993 (the "Class Period") and who have suffered damages as a result thereof (the "Class").

229. Plaintiffs bring this action also on behalf of the following subclasses for claims against the Towers Defendants and the Broker-Dealer Defendants (collectively, the "Selling Defendants") (with the exception of the subclass defined in

-37-

subparagraph (c), on whose behalf claims are asserted against all defendants.):

(a)   Class members who purchased Notes from the Selling Defendants on or after February 9, 1992 for purposes of the claim under section 12(1) of the Securities Act (the "Section 12(1) Subclass");

(b)   Class members who purchased Notes from the Selling Defendants on or after February 9, 1990 for purposes of the claim under section 12(2) of the Securities Act (the "Section 12(2) Subclass");

(c)   Class members who may assert claims against defendants under applicable state "Blue Sky" statutes (the "Blue Sky Subclass").

230. During the Class Period, Defendants sold approximately $245 million in Notes to over 3,500 investors. Accordingly, the members of the Plaintiff Class are so numerous that joinder of all of them is impracticable.

231. Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class. Plaintiffs and the members of the Class have sustained damages because of Defendants' unlawful activities alleged herein.

232. Plaintiffs have retained counsel competent and experienced in class and securities litigation and intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs.

-38-

233. Plaintiffs have no interests contrary to or in conflict with the interests of the other members of the Plaintiff Class.

234. Common questions of law and fact which exist and which predominate over any questions affecting individual members of the Plaintiff Class include:

(a) Whether Defendants violated sections 12 and 15 of the Securities Act, section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, section 20(a) of the Exchange Act, RICO, and the common law;

(b) Whether Defendants participated in and pursued the common course of conduct complained of;

(c) Whether, in connection with the offer and sale of the Notes, Defendants employed any device, scheme, or artifice to defraud;

(d) Whether, in connection with the offer and sale of the Notes, Defendants made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) Whether, in connection with the offer and sale of the Notes, Defendants engaged in any act, practice, or course of business which operated as a fraud upon any person;

(f) Whether Defendants acted reasonably in connection with the preparation and issuance of the offering memoranda pursuant to which the Notes were offered and sold;

(g) Whether Defendants acted willfully, recklessly, or with gross negligence in misrepresenting or omitting material facts as alleged; and

(f) The extent of damages sustained by the members of the Plaintiff Class and the appropriate measure of such damages.

235. The prosecution of separate actions by individual members of the Plaintiff Class would create a risk of:

(a) inconsistent or varying adjudications with respect to individual members of the Plaintiff Class which would establish incompatible standards of conduct for Defendants; or

(b) adjudications with respect to individual members of the Plaintiff Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(c) A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Plaintiff Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to seek redress for the wrongful conduct alleged. Plaintiffs envision no difficulty in the management of this action as a class action.

## V.

## BROKER-DEALER DEFENDANT CLASS ALLEGATIONS

236. Certain of the claims asserted herein are brought against a Defendant Class of securities broker-dealers pursuant to rule 23(a) and (b)(1) and (b)(3) of the Federal Rules of Civil Procedure. For such claims, Defendants Bogart, Consolidated Financial, Dain Bosworth, deBarardinis, East-West, First Affiliated, Halpert, Kaiden, and Monterey Bay are sued both individually and as the representatives of the Broker-Dealer Defendant Class, which consist of all securities broker-dealers who offered and sold any Notes from February 15, 1989 to the present.

237. The members of the Broker-Dealer Defendant Class are so numerous that joinder of all Defendant Class members is impracticable. Plaintiffs are informed and believe that there are at least 170 members of the Defendant Class.

238. Common questions of law and fact which exist and which predominate over any questions affecting individual members of the Defendant Class include:

(a) Whether the Notes were offered and sold without registration in violation of section 5 of the Securities Act of 1933; and

(b) Whether the offering materials disseminated in connection with the offer and sale of the Notes misrepresented or omitted material facts as alleged herein.

239. The defenses of the representatives of the Defendant Class, against those claims asserted against the Defendant Class, are typical of the defenses of all members of

- 41 -

such class, and the named representatives of the Defendant Class will fairly and adequately protect the interests of the members of the Defendant Class as a whole.

240. The prosecution of separate actions by or against individual members of the Defendant Class would create a risk of:

(a) inconsistent or varying adjudications with respect to individual members of the Defendant Class which would establish incompatible standards of conduct for Plaintiffs; or

(b) adjudications with respect to individual members of the Defendant Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(c) A Defendant class action is superior to the other available methods for the fair and efficient adjudication of this controversy. Plaintiffs envision no difficulty in the management of this action through certification of a Defendant Class.

## VI.

## CONSPIRACY ALLEGATIONS

241. A conspiracy, common scheme, enterprise, and course of conduct commenced, by express or tacit agreement, as early as in or about 1988 and, during its course, involved all Defendants identified above. Defendants continued the conspiracy, common scheme, enterprise, and course of conduct until at least the end of the Class Period, as defined herein. The conspiracy, common scheme, enterprise, and course of conduct was designed to and did (a) deceive the investing public,

- 42 -

including the Plaintiff and the other Plaintiff Class members, regarding Towers and Towers' business, management, financial condition, and future prospects; (b) allow worthless securities to be sold during the Class Period; (c) bring Towers' securities onto the market which were not entitled to be marketed; and (d) cause Plaintiffs and other members of the Plaintiff Class to purchase the Notes. Defendants directed themselves toward these common goals by virtue of their mutual understanding and agreement. Defendants accomplished their conspiracy, common scheme, enterprise, and course of conduct by marketing, artificially inflating, and maintaining the terms of the Notes throughout the Class Period; by concealing from Plaintiffs and the Plaintiff Class the true financial condition of Towers and the worthlessness of the Notes; and by maintaining and advancing the Towers Ponzi scheme at the expense of Plaintiffs and the Plaintiff Class. Each of the Defendants knowingly and intentionally agreed to commit and committed acts in furtherance of the conspiracy, which acts are more fully set forth below.

## VII.
## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.   The 1988 Injunction.

242. Towers began offering Notes to the public in or about 1986. These sales were not registered as required under section 5 of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (c). Moreover, the offering materials employed to effect the sales were grossly misleading. These initial Note sales attracted the attention and prompted serious concerns on the part

-43-

of the Securities and Exchange Commission ("SEC") and various state securities officials.

243. On August 4, 1988, the SEC sued Hoffenberg, Brater, and Eton Securities for offering and selling unregistered securities. A Final Consent Judgment of Permanent Injunction and Order (the "SEC Injunction") was entered on November 16, 1988 as to Hoffenberg and on May 12, 1989 as to Brater, prohibiting them from further violating section 5 of the Securities Act.

### B.   The Offer And Sale Of Unregistered Securities.

244. Beginning in about February 1989, Hoffenberg, Brater, and their confederates proceeded to sell over $245 million in Notes in violation of the Securities Act and in direct violation of the SEC Injunction.

245. The Notes were offered and sold to United States residents pursuant to five offering memoranda dated February 15, 1989, February 20, 1990, October 1, 1990, October 15, 1991, and March 23, 1992, respectively (the "Domestic Memoranda") and to non-United States residents pursuant to a so-called Explanatory Memorandum (collectively, the "Offering Memoranda").

246. The Notes offered to United States residents had maturity terms of one or two years and paid interest at annual rates ranging from 12 to 14 percent for one-year Notes and from 14 to 16 percent for two-year Notes. Although these Notes were purportedly for sale in units of $50,000 or $100,000, Towers routinely sold them in fractions of such units.

247. The Notes offered to non-United States residents had maturity terms ranging from one to seven years and paid

-44-

interest at annual rates ranging from 14 to 16% percent. Although these Notes were purportedly for sale in units of $100,000, Towers routinely sold them in fractions of such units.

248. Defendant Brater, individually and through Defendant Econ Securities, together with other employees and agents of Towers acting at Brater's direction, solicited securities broker-dealers to market the Notes and in connection with such solicitation caused over 25,000 copies of Domestic Offering Memoranda to be mailed to over 2,000 broker-dealers. Ultimately, approximately 170 broker-dealers across the United States sold the Notes to the Plaintiff Class.

249. The Notes were offered and sold to residents of at least 40 states. Many of these investors are unsophisticated and live on fixed incomes. The offer and sale of the Notes was effected through a general solicitation. Towers sold the Notes in the United States pursuant to a purported exemption from registration under section 4(2) of the Securities Act (transactions by an issuer not involving a public offering) and Regulation D (exemption for limited offers and sales). In fact, these exemptions did not apply to the Notes. Regulation D did not apply as more than 35 investors were, at the time of their investments in the Notes:

(a) Individual investors who had net assets of less than $1 million at the time they purchased the Notes, or annual income of less than $200,000 in each of the two years before their Notes purchases, or together with their spouse

earned less than $300,000 in each of the two years prior before their Notes purchases; or

(b) Not-for-profit organizations, defined benefit plans, or trusts which had assets of less $5 million at the time of their Note purchases.

C. **Fraud In The Offer And Sale of Securities.**

250. The Notes were sold through fraudulent means. In soliciting investments in the Notes, the Towers Defendants and the Broker Dealer Defendant Class disseminated the offering Memoranda, Towers "annual reports," and a variety of uniform and standardized written offering materials for the purpose of inducing investors to believe the Notes were sound, legitimate investment vehicles and Towers was a prosperous, dynamic and growing concern. In fact, Towers was a fraudulent enterprise which sustained itself through the infusion of cash raised through the fraudulent solicitation of investments from Noteholders and others.

251. Towers' business, the collection and financing of accounts receivable, was secondary in importance to Towers' primary objective, which was to provide a vehicle for the personal enrichment at any cost of Hoffenberg, Brater and other participants in the fraud. To sustain a steady flow of new cash, Towers contrived to create through various means an image of Towers and its investments which was entirely false. Throughout the Class Period, Towers lost substantial sums through mismanagement, the diversion of funds to the personal benefit of

Hoffenberg, Brater, and others, and the generally unprofitable character of Towers' business activity.

252. To prevent the discovery of the illegal scheme in which Defendants engaged, Towers made payments to investors which were denominated "interest" payments, when in fact those payments merely represented the return to investors of a portion of their principal or improperly diverted proceeds of offerings of other Towers securities, specifically, "Bonds" sold by Towers.

253. To mislead the public and law enforcement and regulatory agencies with jurisdiction over financial matters, the Towers Defendants committed perjury, falsified business records, distributed sham financial statements, misled state and federal officials, and otherwise engaged in a pattern of criminal conduct. Hoffenberg was the subject of grand jury indictments in the Northern District of Illinois and the Southern District of New York in April 1994, charging a variety of crimes, including criminal securities fraud in connection with the sale of the Notes.

254. The fraud Towers perpetuated on the Noteholders could not have been achieved without the active and culpable participation of accountants, lawyers and other persons and entities ostensibly independent from Towers. The allegations which follow detail the criminal conduct of the Towers Defendants, and, by way of illustration, some of the fraudulent practices in which Towers engaged, and the basis upon which the Noteholders claim the Towers Defendants, Professional Defendants,

-47-

and Broker-Dealer Defendants actively participated in the fraud perpetuated upon the Noteholders by Towers.

D. **The Role Of The Individual Defendants**.

255. Defendants Hoffenberg, Brater, Chugerman, Rosoff, Evans, Barnes, Lewis, Eboli, G. Pattakos, Levine, DiNicolas, Franklin, Basson, and N. Pattakos (the "Individual Defendants") participated in the fraud, conspiracy, common course of conduct and scheme hereinabove alleged.

256. The Individual Defendants, by reason of their stock ownership, management positions and/or their membership on Towers' Board of Directors during the Class Period, were "controlling persons" of Towers within the meaning of section 20 of the Exchange Act and section 15 of the Securities Act and for purposes of imposing *respondeat superior* liability under common law. Each of the Individual Defendants had the power and influence, and exercised the same, to cause Towers to engage in the wrongful and illegal practices complained of herein. In addition, each of the Individual Defendants acted as agent for one another and all of the acts alleged herein were done in the course and scope of said agency.

257. The individual Defendants participated in the wrongful and illegal acts complained of herein in order to continue and prolong the illusion of Towers' success and to inflate or maintain terms of the Notes, by concealing the adverse facts particularized in paragraphs 277-315 and for the purpose of (i) protecting their executive and directorship positions and the substantial compensation and prestige they obtained thereby and

-48-

(ii) inflating the price and terms of the Notes in order to enhance the value of the Towers stock they held.

258. But for the Defendants' fraudulent course of conduct, the Notes would not and could not have been marketed. A market existed in the Notes as a result of the Individual Defendants' fraud and fraudulent course of conduct, and Plaintiffs and the Plaintiff Class relied on the existence of this market in purchasing the Notes. If the financial information and other misrepresented facts had been properly disclosed, the Offering Memoranda would have disclosed that the Notes were worthless and could never have been marketed.

259. By continuing to issue Offering Memoranda and Annual Reports containing such misrepresentations, the Individual Defendants actively concealed from Note investors the truth about their investments. Thus, investors who purchased Notes pursuant to one Offering Memorandum continued to be misled by the Offering Memoranda and Annual Reports issued after their purchases into believing that Towers' financial condition was stable or improving, when it was not.

260. Defendant Hoffenberg was Chief Executive Officer, President, and Chairman of the Board of Directors of Towers and President of Towers Collection and TFC Funding Corporation. Hoffenberg directly owns 10 percent of Towers' common stock and additionally owns or controls 61.4 percent of the stock through Professional Business Brokers, a corporation owned by the Hoffenberg Family Trust, of which he is the trustee. Through Professional Business Brokers, the Hoffenberg Family Trust

- 49 -

received a percentage of Towers' gross revenues ostensibly pursuant to an agreement stemming from the 1986 sale of TFC Funding Corporation and Towers Credit to Towers.

261. Hoffenberg founded Towers and was intimately involved in its daily operations. Hoffenberg participated in the drafting of the offering material, including the Offering Memoranda and the Annual Reports, and signed messages to investors which were prominently featured in the Annual Reports.

262. Hoffenberg participated in the negotiation of contracts for Towers, and in negotiations and communications with state and federal regulatory authorities. Hoffenberg exercised control over Towers' bank accounts, including the escrow accounts established with the proceeds of the Note offerings and the special interest-bearing, lock-box accounts established with the proceeds of the foreign Note offerings. He further participated in the preparation of Towers' financial statements, including determination of the amount of "excess profits" appropriated by Towers from the offering proceeds. Hoffenberg directed and had complete knowledge of the scheme to defraud investors.

263. Defendant Brater was the Vice Chairman of the Board of Directors of Towers and served as the Chief Operating Officer of Towers during the Class Period. As of July 1, 1991, Brater owned 10 percent of the common stock of Towers and further exercised control over another 10 percent of the common stock held in the name of Sovereign Holdings, Ltd. Brater has also been President of Eton Capital Corporation which he owns with his wife Helen and Eton Securities Corporation, a registered broker-

- 50 -

dealer which in the past marketed Towers securities. Brater was intimately involved in the day-to-day operations of Towers and had extensive knowledge of Towers' business and financial condition. Brater had responsibility for marketing the Notes and supervised the regional wholesalers and a network of Broker-Dealers who earned commissions on Note sales. Brater was responsible for broker-dealer and investor relations, and for marketing accounts receivable services. Brater frequently corresponded with Towers' investors and made representations to investors with regard to Towers' financial condition. Defendant Brater was actively involved in and had complete knowledge of the scheme to defraud investors.

264. Defendant Ferro headed Towers' accounting department, and prepared, directly or indirectly, Towers' books and records and financial statements. As an independent contractor, Ferro provided services through his one-man accounting firm, Ferro & Broderick, which had no offices other than at Towers' headquarters and Ferro's residence in Valley Stream, New York. Ferro was once licensed as a certified public accountant by the State of New York, but his registration is no longer active. Ferro was actively involved in the scheme to defraud investors.

265. Defendant Chugerman was the Executive Vice President and Secretary and a member of the Board of Directors of Towers and President of Towers Leasing Corporation. In May 1991, Towers issued 100,000 shares of common stock to Chugerman in connection with its collection business. Chugerman has intimate

knowledge of Towers' day-to-day operations and has knowledge of Towers' business, cash flow and financial condition, and reviewed, ratified, approved, and/or acquiesced in the misleading offering materials described herein. Defendant Chugerman was actively involved in the scheme to defraud investors.

266. Defendant Rosoff was a Senior Vice President, Chief Legal Officer and Assistant Secretary and Member of the Board of Directors of Towers Financial Corporation. Rosoff participated in the drafting of the offering materials, negotiated contracts and agreements, provided legal services and advice with respect to regulatory compliance and was pictured in the Towers' annual reports, along with Defendants Hoffenberg and Brater. Rosoff also served as Vice President, General Counsel and a Director of TFC and TCC, and had intimate knowledge of Towers' day-to-day operations. Defendant Rosoff was actively involved in the scheme to defraud investors.

267. Defendant Lewis was the Vice President and a member of the Board of Directors of Towers. Lewis knew, or was reckless in not knowing, that Towers' financial statements were materially false and misleading because, among other things, Lewis had knowledge of Towers' true financial condition and was a director of Towers.

268. Defendant Eboli was a member of the Board of Directors of Towers and a Vice President of Towers and the President of Towers Collection. Eboli knew, or was reckless in not knowing, that Towers' financial statements were materially false and misleading because, among other things, Eboli had

knowledge of Towers' true financial condition, was a director of Towers and knew or was reckless in not knowing, since Eboli was in charge of the collections operation, that, contrary to Towers' representations, the 30/30 Rule had no basis because Towers was not collecting 30 percent of the receivables assigned to it.

269. Defendant G. Pattakos was a member of the Board of Directors, a Vice President and Secretary of Towers and President of Towers Collection. G. Pattakos knew, or was reckless in not knowing, that Towers' financial statements were materially false and misleading because, among other things, G. Pattakos had knowledge of Towers' true financial condition, was a director of Towers, and knew or was reckless in not knowing, since he was in charge of the collections operation, that Towers, contrary to its representations, was not collecting 30 percent of the receivables assigned to it.

270. Defendant Levine was a Vice President of Towers, worked in Towers' accounting department, in preparing Towers' financial statements and was Chief Financial Officer of Towers from 1989 through 1991. Levine knew, or was reckless in not knowing, that Towers' financial statements were materially false and misleading because among other things, Levine prepared and/or oversaw the preparation of Towers' books and records and its financial statements, reports and cash flow statements and had supervision of Towers' accounting department. Levine also knew that the funds raised from Towers' creditors were needed for and used to fund Towers' operating expenses.

-53-

271. Defendant DiNicolas was the Senior Vice President of Towers, developed the concept of the healthcare bonds and, during his employment by Towers, worked in Towers' New York City offices. DiNicolas knew, or was reckless in not knowing, that Towers' financial statements were materially false and misleading because, among other things, DiNicolas had knowledge of Towers' true financial condition, was a part of the inner circle at Towers and developed the bond offerings with outside counsel.

272. Defendant Franklin was the Managing Director, Corporate Finance of Towers. Franklin improperly received over $200,000 of due diligence and origination fees which belonged to Towers. Franklin knew, or was reckless in not knowing, that Towers' financial statements were materially false and misleading, because, among other things, Franklin had knowledge of Towers' true financial condition, and knew that Towers was misusing funds collected from its investors and paid to it by healthcare providers.

273. Defendant N. Pattakos was the Controller of Towers. N. Pattakos knew, or was reckless in not knowing, that Towers' financial statements were materially false and misleading, because among other things, N. Pattakos had knowledge of Towers' true financial condition and had knowledge of Towers' cash flow and the true amount of collections it was making.

274. Defendant Evans served on the Advisory Board of Towers, and since 1990, was a member of the Board of Directors of Towers. In February 1991, Towers issued 100,000 shares to Evans in consideration of services he had rendered. Evans provided

-54-

legal and consulting services to Towers during the Class Period through his former law firm, Manatt Phelps Rothenberg & Evans ("Manatt Phelps"). Additionally, Evans allowed his past political experience and affiliation with the prominent Manatt Phelps firm to be featured in Towers' offering materials to lend an aura of legitimacy and respectability to the Towers operation. He was listed as former co-chairman of the Republican National Committee and former senior member of the United States House of Representatives. Evans reviewed, ratified, approved and/or acquiesced in the misleading offering materials described herein and thereby participated in the Towers scheme.

275. Defendant Barnes served on the Advisory Board of Towers and, since 1990, was a member of the Board of Directors of Towers. In February 1991, Towers issued 100,000 shares to Barnes in consideration of services he had rendered to the Company. Barnes also provided consulting services to Towers throughout the Class Period and received substantial fees from lobbying the Texas Securities Board to permit the sale (and rollover) of Towers' Notes in Texas, and had interceded with regulatory authorities of the State of Louisiana on Towers' behalf. Barnes reviewed, ratified, approved and/or acquiesced in the misleading offering materials described herein and thereby participated in the Towers scheme.

276. Defendant Basson is a certified public accountant who was retained by Towers to provide accounting and auditing services, including the preparation of audited financial statements for the years 1986 through 1992. Defendant Basson

performed such services with the knowledge and intent that the financial statements he prepared would be included in Towers' annual reports and Towers' offering materials and knew and intended that the above financial statements would be sent to members of the Plaintiff class, and would therefore be reviewed and relied upon by class members in making their investment decisions. By virtue of his relationship with Towers at all relevant times, Defendant Basson had access to and knowledge of all information relating to the financial condition of Towers. Defendant Basson had actual knowledge of, or recklessly disregarded, the material misrepresentations and omissions alleged above, but nonetheless knowingly concealed, or recklessly failed to disclose, such misrepresentations and omissions to the Plaintiffs and the other members of the class.

F. The Offering Memoranda.

277. The Offering Memoranda represented that Towers would use the funds it raised from Note investors to buy certain types of current accounts receivable or loan portfolios for collection by Towers for its own account. The Offering Memoranda stated that Towers typically would acquire accounts receivable at a price of up to 95 percent of their face value, earn a minimum 5 percent "factoring fee" for each receivable collected, and reinvest the proceeds of collection in additional receivables. The Offering Memoranda further stated that Towers expected to compound its "factoring fee" up to six times per year through this purchase and collection of receivables and reinvestment of the collection proceeds in more receivables.

278. In fact, Towers bought few, if any, current accounts receivable with the Note proceeds, buying instead past-due, largely uncollectible accounts receivable or loan portfolios at prices substantially lower than 95 percent of the face value of the receivables or portfolios.

279. Instead of using Note investors' funds to purchase accounts receivable, Towers used the money to pay, among other things, interest on the Notes, Towers' expenses (including the compensation of defendants Hoffenberg, Brater, and Ferro), and professional fees. In addition, because the accounts receivable which Towers owned or had contracted to collect on behalf of others were of such poor quality, Towers' cash flow was insufficient to meet its needs and obligations. Thus, Towers resorted to such measures as retaining collection proceeds instead of remitting them to its clients and diverting millions of dollars from the Healthcare Subsidiaries to itself.

280. In addition, the Offering Memoranda stated that the Notes would be fully collateralized by accounts receivable purchased with the Note proceeds and having a total face value substantially in excess of the value of the Notes sold. In reality, the Notes were severely undercollateralized, if collateralized at all, because of the low face amount and quality of accounts receivable purchased by Towers.

281. The Domestic Memoranda, pursuant to which Notes were sold to United States residents, stated that Note proceeds would be deposited in "special escrow" accounts at Chase Manhattan Bank and would remain in such accounts to the extent

the funds were not used to purchase accounts receivable or pay certain specified expenses. The Explanatory Memorandum, pursuant to which Notes were sold to non-United States residents, stated that Towers would keep Note proceeds in special interest-bearing accounts and that proceeds from the collection of accounts receivable purchased with Note proceeds would be deposited under a "lock box" system which Towers had arranged with Chase Manhattan Bank.

282. As of June 30, 1991, however, although Towers had purchased few accounts receivable with the $124 million it had raised from selling Notes, Towers' bank accounts at Chase Manhattan Bank contained at most $5 million. As of June 30, 1992, when Towers was reporting Notes outstanding in the total amount of $198 million, its reported cash and cash equivalents amounted to only $32 million.

283. The Offering Memoranda described the terms purportedly governing Towers' ability to withdraw funds from the "special" accounts at Chase Manhattan Bank to use for its own purposes. According to the Offering Memoranda, "Excess Profit Amounts" could be withdrawn and used for any corporate purpose only if the face value of accounts receivable purchased with Note proceeds combined with the proceeds from the collection of these receivables exceeded the value of the Notes sold. Although the former never exceeded the latter, Defendant Hoffenberg routinely caused the "special" bank accounts to be emptied of Note proceeds. Despite being designated a "Special Escrow Account" in the Offering Memoranda, the accounts maintained by Towers with

Chase Manhattan Bank were simple checking accounts to which Towers had unfettered access.

284. To induce investors to believe the Notes were safe investments, Towers obtained a purported "credit insurance" policy from ACI which was touted in Towers 1989 and February 1990 Offering Memoranda. In fact, the ACI credit insurance served no risk-management function whatsoever, as illustrated by the fact Towers did not allocate much of the purported insurance protection to any accounts receivable. The ACI credit insurance was used solely as a marketing ploy to facilitate the sale of the Notes.

285. The Offering Memoranda and Annual Reports distributed to investors failed to disclose Defendant Hoffenberg's ownership, either directly or indirectly, of a majority of Towers' common stock and the compensation paid to Towers' executive officers.

F.    **The Annual Reports**

286. The promotional materials distributed to Plaintiffs and the Plaintiff Class included Towers' Annual Reports for fiscal years 1988, 1989, 1990 and 1991. Among other things, these Annual Reports contained false and misleading financial statements which falsely reported that Towers was a financially successful and growing company, when, in fact, each year it was incurring very substantial and increasing losses.

287. For fiscal year 1988, Towers reported net income of $1.4 million, when it had actually incurred a loss of approximately $29 million; total assets of $76 million, when it

-59-

actually had assets of no greater than $48 million; and shareholders' equity of $6.5 million (restated in 1990 as approximately $5.7 million), when it actually had a deficit of approximately $24.9 million.

288. For fiscal year 1989, Towers reported net income of $3.5 million, when it actually had incurred a loss of over $28 million; total assets of $122 million, when it actually had assets of no greater than $21 million; and shareholders' equity of $10.3 million (restated in 1990 as approximately $9.4 million), when it actually had a deficit of approximately $53 million.

289. For fiscal year 1990, Towers reported net income of $3.9 million, when it had actually incurred a loss of over approximately $49 million; total assets of $195 million, when it actually had assets of no greater than $29 million or less; and shareholders' equity of $13.4 million, when it actually had a deficit of over $101 million.

290. For fiscal year 1991, Towers reported net income of $4.3 million, when it actually had incurred a loss of over $47 million; total assets of $513 million, when it actually had assets of no greater than $250 million; and shareholders' equity of $20.1 million, when it actually had a deficit of over $130 million.

291. For fiscal year 1992, Towers reported net income of $5.4 million, when it actually had incurred a loss of over $95 million; and shareholders' equity of $25.5 million, when it had a deficit of over $242 million. Thus, by fiscal year 1992,

-60-

Towers was overstating its shareholders' equity by over $267 million, but the actual inaccuracy was even greater, because this figure does not include an allowance for doubtful accounts.

C. *Towers Accounting Practices.*

292. Among the bases for these false and misleading financial statements were figures generated by improper accounting procedures such as the following:

1. *Southwestern Bell Portfolio.*

253. On or around June 30, 1988, the Towers subsidiary Towers Collection paid less than $300,000 for a portfolio of past-due accounts receivable from Southwestern Bell Yellow Pages, Inc. ("Southwestern Bell") having a face value of approximately $28 million (the "Southwestern Bell portfolio"). Before selling the portfolio to Towers Collection, Southwestern Bell had charged off all of the balances as worthless after private collection agencies, including Towers, had failed to collect on them. To date, Towers Collection has collected less than $1 million on the Southwestern Bell portfolio.

294. For fiscal year 1988, Towers improperly recorded income of $19 million from collecting on the Southwestern Bell portfolio, resulting in the overstatement of Towers' income for fiscal year 1988 by that amount. Towers also improperly recorded the Southwestern Bell portfolio as valued at $28 million instead of valuing the portfolio at its acquisition cost, causing an overstatement of Towers' fiscal year 1988 accounts receivable by $28 million (less the cost of the portfolio).

2. *Federal Deposit Insurance Company Loan Portfolios.*

295. Towers also inflated the value of its accounts receivable and its income from collecting such receivables by recording loan portfolios originated from banks liquidated by the Federal Deposit Insurance Company ("FDIC loan portfolios") at values far above their acquisition costs and improperly recognizing income from collecting on the FDIC loan portfolios.

296. In fiscal year 1990, Towers paid less than $500,000 for various FDIC loan portfolios having a face value of over $50 million. These portfolios contained nonperforming, distressed loans. For fiscal year 1990, Towers improperly recorded the portfolios as accounts receivable having a value of $24 million and recorded income of $24 million from the portfolios. In fiscal year 1990, however, Towers had received virtually no cash proceeds from these FDIC loan portfolios.

297. In fiscal year 1991, Towers paid approximately $30,000 for additional distressed FDIC loan portfolios having a face value of $6 million. Towers improperly recorded the portfolios as accounts receivable having a value of $6 million and recorded income of $6 million from the portfolios.

298. As a result of Towers' improper recording of FDIC loan portfolios in fiscal years 1990 and 1991, accounts receivable for fiscal year 1991 were overstated by $13 million. In fiscal year 1991, Towers had collected less than $1 million on the FDIC loan portfolios.

299. Towers falsely stated in its 1991 Annual Report:

"Income on RTC/FDIC loans is recognized as they are collected."

In fact, Towers recorded income in much larger amounts than Towers ever collected in fiscal year 1990 or 1991, as described in paragraphs 287-291.

3. **Bank Of America Portfolio.**

300. In or around January 1991, Towers paid less than $200,000 for a portfolio of credit-card balances from Bank of America having a face value of approximately $16 million (the "Bank of America portfolio"). Before selling the portfolio to Towers, Bank of America had charged off all of the balances as worthless after other collection agencies had failed to collect on them. In fiscal year 1991, Towers collected little or no amounts on the Bank of America portfolio.

301. For fiscal year 1991, Towers improperly recorded income of $4 million from the Bank of America portfolio, causing Towers' reported income for fiscal year 1991 to be overstated by that amount. Towers also improperly recorded the Bank of America portfolio as accounts receivable valued at $4 million instead of valuing the portfolio at its acquisition cost, causing an overstatement of Towers' fiscal year 1991 accounts receivable by $4 million (less the cost of the portfolio).

4. **Investment In United Diversified.**

302. In its financial statements for fiscal year 1989 through fiscal year 1991, Towers further inflated its assets by improperly recording Towers' investment in United Diversified Corporation ("UDC"), which conducted business through its subsidiaries, Associated Life Insurance Company ("Associated Life") and United Fire Insurance Company ("United Fire").

303. Towers acquired a controlling interest in UDC in 1987 for $3 million, and Defendant Hoffenberg became Chairman of the Boards of Directors of UDC, United Fire, and Associated Life.

304. Towers improperly recorded the purchase cost of $3 million as an investment on its financial statements from fiscal year 1989 through fiscal year 1991. By fiscal year 1989, however, the UDC investment had become seriously impaired and by no later than fiscal year 1991 posed a threat of liability exceeding the purchase cost.

305. In July 1988, the Illinois Director of Insurance (the "Insurance Director") obtained an order placing UDC, United Fire, and Associated Life in conservation. On February 14, 1989, Hoffenberg agreed in a signed stipulation to the entry of an order liquidating Associated Life and United Fire. The liquidation order was based on Hoffenberg's agreement that both companies were insolvent. On March 3, 1989, when the liquidation order was entered, Hoffenberg lost all control of the companies, and Towers lost any expectation of a return on the investment.

306. On or about June 27, 1991, Hoffenberg and others were charged by the Insurance Director with having used the insurance companies as an instrumentality of Towers, and, among other things, with having transferred investments and cash of the other insurance companies into various Hoffenberg-controlled brokerage accounts. These transfers began in November 1987 and continued through July 1988. In the civil action Schacht v. Hoffenberg, No. 91-C-4024 (N.D. Ill.), the Insurance Director alleged that Defendants had caused UDC, Associated Life, and United Fire to suffer damages in

*excess of $4 million, become insolvent, and be placed in conservation and/or liquidation. The complaint sought, among other things, treble damages under RICO. Towers settled this and related actions in 1992 upon Towers' agreement to pay $3.5 million as part of the settlement.*

307. It was materially false and misleading for Towers to continue to record its investment in the insurance companies at cost in its financial statements for fiscal years 1989, 1990, and 1991 without any reserve to reflect both the impairment of the investment or the contingency of Towers' potential liability. Towers' assets were overstated by at least $3 million in each of those years as a result of Towers' failure to record an appropriate allowance for uncollectible accounts.

308. Furthermore, Towers did not disclose to potential or actual Note investors the liquidation and conservation proceedings against UDC, Associated Life, and United Fire or the filing of the action Schacht v. Hoffenberg against Hoffenberg and the other Defendants.

5. <u>Collection Receivables.</u>

309. The Towers subsidiary Towers Collection collected past-due accounts receivable for third parties ('collection receivables') for a fee contingent on collection. Towers Collection paid no money for collection receivables and was obligated to remit all collection proceeds to its clients, except for a certain percentage of the proceeds which Towers Collection retained as its fee.

310. Towers Collection improperly recorded fee income from collection receivables before performing any significant collection activities and collecting any proceeds. Because of this improper recognition of fee income, Towers' reported fee income for fiscal year 1989, $36 million, was overstated by at least $10 million. For fiscal year 1990, Towers reported total fee income of $56 million, of which $22 million was fee income improperly recognized by Towers Collection in the above manner. For fiscal year 1991, Towers reported total fee income of $97 million, of which $56 million was fee income improperly recognized by Towers Collection.

311. Towers' Annual Reports for fiscal years 1988, 1989, and 1990 state that Towers recognized its fees as 30 percent of the amount expected to be collected and that it expected to collect 30 percent of all collection receivables. This was the basis for Towers' accounting rule known as the "30/30 Rule."

312. In no year, however, had Towers collected even close to 30 percent of all of its collection receivables. As of June 30, 1993, for example, Towers had collected only 22 percent of the accounts receivable assigned to Towers for collection in 1988; only 18 percent of the accounts receivable assigned in 1989; 13 percent of the receivables assigned in 1990; 14 percent of the receivables assigned in 1991; and 11 percent of the receivables assigned in 1992.

313. The 30/30 Rule was invented by Defendant Hoffenberg and used by Defendants Ferro, Levine, and Basson in

preparing and auditing Towers' financial statements. From the beginning, Hoffenberg, Chugerman and Rosoff knew that the 30/30 Rule was invalid and could only be used to present fraudulent financial statements.

314. Towers also improperly recorded the collection receivables as Towers' own assets. The collection receivables were not owned by Towers Collection, however, but by Towers Collection's clients, who had assigned them to Towers Collection for collection on their behalf. Not only could Towers Collection not properly record the receivables as assets, but also Towers Collection recorded them at amounts substantially in excess of their value, resulting in an overstatement of Towers' assets of over $200 million by the end of fiscal year 1992.

315. For fiscal year 1989, Towers reported accounts receivable of $112 million, of which approximately $101 million consisted of collection receivables improperly recorded as owned by Towers. For fiscal year 1990, Towers reported accounts receivable of $177 million, of which approximately $142 million consisted of improperly recorded collection receivables. For fiscal year 1991, Towers reported accounts receivable of $437 million, of which $246 million consisted of improperly recorded collection receivables.

**H.    The Role of American Credit Indemnity Company.**

316. Towers facilitated the sale of Notes claiming that it had insured through ACI the accounts receivable securing the Notes.

- 67 -

317. For example, on page 10 of the February 15, 1989 offering memorandum, Towers represented that it:

> has obtained an insurance policy (the
> "Insurance Policy") from American Credit
> Indemnity Company (rated A+ VII by A.M. Best
> Co.), to insure the collectibility of most of
> the Accounts Receivable which are either D&B
> listed or separately listed by the insurance
> company as additional insured
> companies. . . The Insurance Policy is
> subject to certain other limitations set
> forth therein. . . .

The February 20, 1990 offering memorandum contains an almost identical representation.

318. In addition to making the above claims through its dissemination of the February 15, 1989 and February 20, 1990 offering memoranda, Towers also, for all five Note offerings that are the subject of this action, provided broker-dealers with promotional materials treating the ACI insurance as a reason the Notes were a safe investment. These promotional materials included not only copies of the credit insurance policies or the cover pages thereof for distribution by broker-dealers to potential Note investors, but also summaries of "selling points" which broker-dealers were to emphasize in their pitches to investors, including the ACI insurance.

319. The insurance that Towers had obtained from ACI was credit insurance pursuant to several policies covering the period August 1, 1988 through December 31, 1992. Towers' representations to Note investors regarding the insurance created the impression that the insurance insured the collectibility of at least most of the accounts receivable supposedly backing the Notes.

- 68 -

things:

320. Such an impression was false, since, among other things:

(a)    The insurance covered only debtors rated by Dun & Bradstreet, and debtors identified specifically in the policies. The vast majority of the accounts receivable purportedly backing the Notes were payable by debtors neither rated by Dun & Bradstreet nor expressly listed in the policies and were thus not covered by the insurance.

(b)    The insurance did not insure the **collectibility** of the accounts receivable that _were_ covered but only protected Towers in certain circumstances from the risk of account debtors' **insolvency**.

(c)    The insurance covered only the purchase prices of accounts receivable and only accounts receivable that were current at the time Towers purchased them. Accounts receivable acquired by Towers that were past due at the time of acquisition were not covered by the insurance.

(d)    The insurance did not cover disputed accounts receivable, where the debtor refused to pay for a reason other than insolvency, unless Towers obtained a judgment against the debtor.

(e)    The insurance covered only accounts receivable that Towers purchased outright from others. Thus, most receivables that Towers purportedly purchased through its subsidiary Towers Collection were not covered at all by the insurance because they actually had not been purchased by Towers

Collection, only contracted for collection by Towers Collection on behalf of the receivables' owners.

321. _From the beginning of ACI's dealings with Towers_ relevant here, ACI knew facts revealing Towers' use of ACI's insurance as a sales tool in marketing securities. Throughout its relationship with Towers ACI continued to learn more and more facts pointing to such misuse by Towers of the insurance. Nevertheless, ACI, knowing or disregarding these facts, sold and continued to sell Towers credit insurance, and, consistent with Towers' past conduct, which was known to ACI, Towers used the insurance to lure investors into buying the Notes.

322. Even before the Note offerings out of which this action arises, ACI had provided Towers with credit insurance which the company had used to market an earlier offering, by Towers' subsidiary Towers Credit Corporation, of securities very similar to the Notes here. The offering prospectus for the securities, Towers Credit Corporation Confidential Private Placement Memorandum for $50,000,000 of Twenty-Four Month Non-Recourse Promissory Notes Bearing Interest At The Rate of 10% Per Annum Payable Monthly Collateralized by Commercial Accounts Receivable Guaranteed By An Insurance Policy, dated October 17, 1986, states that the issuer's accounts receivable were insured by ACI and attaches the policy issued by ACI purportedly covering the receivables.

323. Before Towers made the first of the Note offerings that are the subject of this action, it renewed its credit insurance with ACI. Before purchasing the insurance from ACI,

however, Towers sought credit insurance from a competitor of ACI in or around 1988. In inquiring into the possibility of obtaining insurance from this competitor, Towers submitted the October 17, 1986 prospectus to the company.

324. Upon reviewing the prospectus -- noting the remarkably high rate of return, 18 percent, promised on the securities offered under the prospectus; the prospectus' description of the issuer's business as involving the acquisition of accounts receivable at discounts which were extraordinarily high by the standards of the credit insurance industry; and the use of ACI's name to promote the securities in the prospectus -- ACI's competitor declined to write credit insurance for Towers.

325. The competitor was concerned about the promised 18 percent rate of return in part because such a high rate of interest implied that the accounts receivable Towers claimed to factor would be of poor quality and present greater risk for an insurer. Furthermore, Towers' proposal, as described in the prospectus, to purchase accounts receivable at a remarkably high discount suggested that Towers' portfolio of receivables were, or would be, skewed toward riskier or marginal accounts receivable. As for the reference to ACI in the prospectus, the competitor was concerned about the possibility of Towers' similarly misusing its name to promote Towers' securities.

326. The fact that a competitor of ACI readily discerned the misuse to which Towers intended to put ACI's credit insurance and rejected Towers' business as presenting an unacceptable risk of exposing the insurer to suit by Towers'

investors if the investment failed shows that ACI's conduct in writing credit insurance for Towers was atypical and presented a marked departure from ordinary business practice for a credit insurer. ACI's conduct in the face of ACI's competitors' refusal to insure Towers indicates ACI had actual knowledge that its participation in the Towers Note offerings would mislead investors.

327. Furthermore, in an internal ACI memorandum of dated August 12, 1988, S.L. Wilson, Regional Vice President, wrote to J.E. Sims, Executive Vice President, regarding Towers' credit Corporation: "Towers has assured us that their lending banks are not concerned with the SEC lawsuit and that all problems with the SEC will be resolved very shortly." This memorandum further demonstrates that ACI had actual knowledge of facts which indicated ACI's participation as credit insurer in Towers' investment scheme presented an unacceptably high risk of misleading investors. The document was prepared in response to an inquiry within ACI as to possible troubles afflicting Towers. Indeed, the "SEC lawsuit" and "problems with the SEC" refer to the enforcement action brought by the SEC against Towers, Hoffenberg, and Brater for selling unregistered securities in violation of section 5 of the Securities Act, as described in paragraphs 242-243, which securities were offered pursuant to the very 1986 prospectus referring to ACI described above.

328. Nevertheless, in spite of its knowledge of facts indicating Towers' use of ACI's credit insurance to sell

securities illegally, ACI proceeded to write new insurance for Towers.

329. Also indicative of ACI's awareness that its involvement with Towers was unacceptable is a multi-page document from ACI's files which appears to be a printout of Wall Street Journal articles from a computer database search using the term "Steven Hoffenberg," which search appears to have been performed in 1988 by ACI or a person acting on ACI's behalf. The history of Towers and Hoffenberg as described in the articles -- e.g., the troubles with the SEC, a half-baked attempt to take over Pan Am Corporation -- paint a picture of an entity engaged in risky ventures and hence an entity that would have been a very high credit insurance risk. ACI was explicitly aware of the dangers of doing business with Towers.

330. Indeed, the very fact that ACI undertook this search at all indicates ACI's knowledge of possible problems arising out of dealings with Towers. The performance of an investigation of a credit insurance applicant as detailed as the investigation represented by the database search was an extraordinary undertaking by the standards of the credit insurance industry. That ACI saw fit to perform such an investigation shows that ACI harbored very serious concerns about the suitability of Towers as an insured.

331. In spite of the adverse facts known to it, ACI proceeded to issue credit insurance to Towers in the form of Policy No. D-238,578-7. Under this policy, Towers paid for $3.375 million of prepaid coverage, compared with approximately

-73-

$2.7 million of coverage allocated to specific accounts receivable. Prepaid coverage is coverage that, at the time of its purchase, is unallocated to any of an insured's accounts receivable and is bought in the anticipation that the insured will acquire accounts receivable in the near future to which the prepaid coverage will then be allocated. An insured buys prepaid coverage for the convenience of avoiding the piecemeal purchase of new insurance as new accounts receivable are acquired. In return for this convenience, however, the insured pays a higher premium, since the price of prepaid coverage is paid up front rather than during the policy term.

332. Towers' purchase of $3.375 million in prepaid coverage was unusually high, especially compared with the $2.7 million in allocated coverage that Towers bought at the same time. Such an anomaly might be accounted for had Towers later allocated the prepaid coverage to accounts receivable, but Towers never allocated any of its prepaid coverage under Policy No. D-238,578-7.

333. Effective January 1, 1989, Towers cancelled Policy No. D-238,578-7 and replaced it with Policy No. D-240,692-3. As under the cancelled policy, under Policy No. D-240,692-3, Towers again bought $3.375 million in prepaid coverage. Towers' non-allocation of its prepaid coverage resulted in the sending of a letter dated July 10, 1989 from C.L. Marks at ACI to Steve Hoffenberg at Towers in which ACI called to Towers' attention that much of Towers' prepaid coverage remained unused. Later, C.L. Marks sent Hoffenberg a letter dated December 13, 1989

-74-

stating that ACI periodically audits credit insurance policies providing for large amounts of prepaid coverage to the extent such coverage is not used; again calling to Towers' attention its non-allocation of much of its prepaid coverage; and reminding Towers of the July 10, 1989 letter. These letters indicate that ACI knew Towers' purchase and non-allocation of a large amount of prepaid coverage was cause for concern that Towers was not using ACI's insurance for the purposes for which it was intended.

334. Towers then allocated a portion of the $3,375 million in prepaid coverage it had bought. The company allocated only $1.666 million, however, leaving $1.709 million, or over half of the coverage, unallocated. Thus, ACI received substantial premiums, *i.e.*, the premiums for the prepaid coverage, without attendant coverage risk, since Towers' non-allocation of its prepaid coverage under Policy No. D-238,578-7 and Policy No. D-240,692-3 to any accounts receivable exposed ACI to no possibility of claims arising under such coverage.

335. Still another peculiarity readily apparent to ACI is found in the completed application form for credit insurance for 1990 that Towers submitted to ACI, on which Towers claims that its total gross sales for the previous policy period ending December 31, 1989, approximately one and a half years, amount to $180,000,000, while the receivables outstanding as of December 31, 1989 amount to $100,000,000. That the amount stated by Towers for outstanding receivables is over one half the total sales for the period was cause for alarm on the part of ACI. In Towers' original 1988 credit insurance application, Towers stated

that the longest terms of sale governing its receivables would be 90 days. This suggests that Towers would collect on its receivables, or the company's receivables would turn over, every 90 days or approximately 4 times a year. Thus, at any given point, assuming the company's receivables are randomly and evenly distributed throughout time, the amount of receivables outstanding will equal the company's total annual turnover volume divided by 4. Thus, dividing the $180,000,000 figure given by Towers for its total turnover for one and a half years by 6 (4 x 1.5 = 6) results in a figure of $30,000,000 for the expected amount of receivables outstanding at a given time. Towers, however, reported a figure of $100,000,000, more than *three* times the expected amount. Such a result alerted ACI to the possibility that the numbers given by Towers on the application were questionable or that Towers' accounts receivable were of a nature so atypical as to warrant further investigation.

336. Nevertheless, in spite of the above suspicious circumstances, ACI continued to write credit insurance for Towers' accounts receivable, as evidenced by ACI Policy No. A-245,199-2 and ACI Policy No. A-251,982-5.

337. ACI continued to ignore indications of Towers' misuse of ACI's insurance, including, among others, a facsimile transmission dated July 7, 1992 from Towers' Santa Monica sales office to ACI requesting twenty "ACI brochures." Since materials such as an insurer's brochures are used to promote the company and its insurance, and since Towers had no reason to promote ACI's credit insurance to other potential credit insurance

purchasers, the request meant that Towers was using the brochures to promote its Note offerings, a fact which was particularly obvious since the was request made not from Towers' New York City headquarters but from Towers' Santa Monica sales office.

338. Not only were the descriptions of ACI's credit insurance and its coverage of Towers' accounts receivable misleading, but so were the references to ACI in the promotional materials sent by Towers to broker-dealers for their use in marketing the Notes. These materials embody the dangers disregarded by ACI in ignoring the warning signals described above, for their descriptions of the credit insurance provided to Towers by ACI do not conform to the terms of the policies. In their summary descriptions of the insurance and their reference to ACI, the documents misleadingly suggest that the insurance protects Towers' accounts receivable to a far greater extent than it actually does.

339. Thus, ACI sold and continued to sell Towers credit insurance while knowing that Towers used ACI's credit insurance to promote the Notes or consciously disregarding the facts pointing to such misuse. Through such conduct, ACI directly or indirectly employed a manipulative device, artifice, or contrivance and engaged in a course of business that served as a deceit on the Note investors, in connection with Towers' offer and sale of the Notes.

I. The Role of the Bronson Defendants.

340. The Bronson Defendants served as special counsel to Towers for the purpose of preparing the offering memoranda pursuant to which Towers offered and sold the Notes, and out of their representation of Towers before various state regulatory agencies. In the course of this representation, the Bronson Defendants advised and assisted Towers in a number of transactions, including:

(a) preparation of the February 15, 1989 Domestic Memorandum, as to which "the Law Offices of H. Bruce Bronson, Jr." served as "Special Counsel";

(b) preparation of the February 20, 1990 Domestic Memorandum, as to which Gibney, Anthony & Flaherty served as "Special Counsel";

(c) preparation of the October 1, 1990 Domestic Memorandum, as to which Gibney, Anthony & Flaherty served as "Special Counsel";

(d) preparation of the October 15, 1991 Domestic Memorandum, as to which Bronson & Migliaccio served as "Special Counsel";

(e) preparation of the March 23, 1992 Domestic Memorandum, as to which Bronson & Migliaccio served as "Special Counsel"; and

(f) preparation of the Explanatory Memorandum used in offering the Notes overseas.

In short, Bronson, as either a sole practitioner or a member of Gibney, Anthony & Flaherty or Bronson & Migliaccio, is the lawyer

directly responsible for the preparation of the Offering Memoranda, which were used in connection with the largest Ponzi scheme in United States history. Moreover, Bronson assisted Defendant Brater in supervising Towers' compliance with the conditions of its claimed exemption from registration and therefore knew that, because of the manner in which Towers mass marketed the Notes through its wide network of broker-dealers, Towers' purported exemption from the registration requirement of section 5 of the Securities Act was without foundation. Finally, the Bronson Defendants represented Towers before various state agencies, in an effort to divert state regulators who developed suspicions as to the legitimacy of the Notes.

341. In providing the counsel and assistance to Towers during the relevant period, the Bronson Defendants purported to exercise due care to ascertain that the documents accurately disclosed all material facts. Yet in conducting their so-called investigation, the Bronson Defendants knew, or were reckless in not knowing, that the various offering memoranda contained material misstatements and omissions of material facts.

342. Towers had previously offered and sold unregistered Notes beginning in approximately 1986, resulting in an enforcement action by the SEC and leading to the SEC Injunction prohibiting Towers and Defendants Hoffenberg and Brater from again violating section 5 of the Securities Act, as described in paragraphs 242-243 above. Defendant H. Bruce Bronson, Jr., then with the law firm Ruffa & Hanover, served as outside counsel to Towers in connection with the preparation of

prospectuses and other documents pursuant to which Towers offered the Notes.

343. Through his participation in the previous Note offering, which led to the filing of an enforcement action against Towers, Hoffenberg, and Brater, Bronson and, through him, all the Bronson Defendants were aware of the fraudulent nature of the offering.

344. Bronson knew that the offering was an illegal offer and sale of unregistered securities, since, as he knew, Towers, through a wide network of approximately 170 broker-dealers indiscriminately mass marketed the Notes to the public without any attempt to restrict sales of the Notes to accredited investors or in any other respect, and thus there was no basis for any claimed exemption by Towers from the registration requirements of the Securities Act.

345. Through his involvement in the previous offering, Bronson also knew that the Notes were marketed using fraudulent means such as the use of false and misleading offering and promotional materials.

346. Thus, when the Bronson Defendants served as "Special Counsel" to Towers for the Note offerings that are the subject of this action, they knew through Bronson that Towers and its management had a history of engaging in the fraudulent offer and sale of securities and had a propensity to do so. Thus, they had no reasonable basis for a "good faith" belief that the Notes' marketing complied with section 5 and the parallel state exemption restrictions.

347. Indeed, such offerings were, and the Bronson Defendants knew they were, essentially identical to the Note offering in which Bronson had previously participated and during which participation he was aware of the fraudulent and illegal nature of the offering. For example, as in the earlier offering, these more recent offerings were conducted through an extensive network of broker-dealers -- approximately 170 of them -- and the Notes offered and sold indiscriminately with no attempt to restrict sales of the Notes to accredited investors or comply in any other respect with the conditions for exemption from the registration requirements of the Securities Act.

348. In addition, the nature of the securities offered -- promissory notes purportedly backed by accounts receivable -- was identical, and they were offered and sold using similarly misleading offering and promotional materials and other fraudulent devices.

349. Thus, in serving as "Special Counsel" to Towers for the Note offerings, the Bronson Defendants knew all they needed to know to conclude that Defendants, consistent with their track record, were once again fraudulently marketing unregistered securities.

350. Even if the Bronson Defendants were entitled to completely disregard such knowledge, which they were not, in serving as "Special Counsel" to Towers they completely failed to meet their duty to investigate the accuracy of the information provided to potential investors in connection with the offer of the Notes.

-81-

351. For example, the Bronson Defendants failed to reasonably investigate, if at all, the accuracy of the representations in the memoranda that the offerings of the Notes were exempt from registration with the Securities and Exchange Commission, when the exemptions claimed were actually not applicable.

352. Among other material facts which the Bronson Defendants failed to investigate and/or failed to disclose were:

(a)    failure to disclose that Defendant Hoffenberg, Chairman of the Board and Chief Executive Officer of Towers as of the dates of the Memoranda, had been convicted of a felony on March 31, 1971 in New York in the case People v. Steve Hoffenberg, a/k/a Barry Cohen, No. 2023-70 (Sup. Ct. N.Y. County);

(b)    failure to disclose that Defendant Hoffenberg was the beneficial owner of the majority of the common stock of Towers, controlling over 70 percent of the stock through his ownership and control of Professional Business Brokers, a corporation owned by Defendant Hoffenberg Family Trust, of which Hoffenberg is the trustee;

(c)    failure to disclose that Defendant Professional Business Brokers was paid a percentage of Towers' gross profits, which amounted to approximately $824,000 in fiscal year 1990;

(d)    failure to disclose the salary and other compensation paid to Defendants Hoffenberg and Bratter;

-82-

(e) failure to disclose that Towers was actually operating at a loss and that the offering proceeds would be used to pay the interest on other Notes and to pay Towers' expenses, rather than to purchase healthcare and other receivables as represented;

(f) failure to disclose or describe accurately the regulatory action and litigation arising out of Towers' acquisition in 1989 of a controlling interest in United Diversified Corporation ("UDC"), the subsequent failure of UDC, its placement in conservatorship and the economic impact of UDC on Towers; and

(g) failure to disclose each of the facts identified herein at paragraphs 340-356.

353. Not only did the Bronson Defendants fail to make these disclosures in the various Offering Memoranda prepared by them, but they also failed to conduct reasonable investigations into certain representations made in the Offering Memoranda. The Bronson Defendants failed to conduct a reasonable investigation in the following respects:

(a) they failed to investigate reasonably, if at all, the accuracy of the representations in the February 15, 1989 and February 20, 1990 Domestic Memoranda that the accounts receivable securing the Notes were "insured," when in actuality the referenced insurance was of limited value to potential investors;

(b) they failed to investigate reasonably, if at all, the accuracy of the representations in the Offering

- 83 -

Memoranda that the proceeds from the sale of the Notes to United States residents would be kept in a special escrow account and that the proceeds from the sale of the Notes to non-United States residents would be kept in a special interest bearing lock box account, when such accounts were ordinary demand deposit accounts which could be and were drawn upon by Towers for its own use;

(c) they failed to investigate reasonably, if at all, the accuracy of the representations in the Offering Memoranda that Towers would acquire accounts receivable for up to 95 percent of their face value, thus earning a minimum 5 percent factoring fee, and would reinvest the proceeds of the collection in additional accounts receivable, when in fact Towers bought few current accounts receivable with offering proceeds, but rather purchased accounts receivable at a discount far below 90 percent of the face value;

(d) they failed to investigate reasonably, if at all, the accuracy of the representations in the Offering Memoranda that the Notes would be collateralized by accounts receivable purchased with the offering proceeds, whereas in fact the Notes were undercollateralized because of the poor quality of receivables purchased by Towers; and

(e) finally, they failed to investigate reasonably, if at all, the representations made in the financial statements disseminated with the Offering Memoranda which totally overstated net income and accounts receivable in violation of Generally Accepted Accounting Principles.

- 84 -

354. Not only did the Bronson Defendants fail to disclose or reasonably investigate material misstatements and omissions in the various Offering Memoranda they helped to prepare on behalf of Towers, but they additionally were involved in making misleading statements to state regulatory authorities that allowed Towers' fraudulent activities to continue to go undetected. For example, in response to an inquiry made by the Louisiana Deputy Commissioner for Securities regarding Towers' financial statements, the Bronson Defendants responded by explaining how Towers' procedures complied with the American Institute of Certified Public Accountants audit guidelines, when in fact, the subsequent SEC inquiry revealed that Bronson's position had no foundation.

355. Another instance of the Bronson Defendants' deliberately false communications on behalf of Towers with state regulators is a letter dated November 15, 1990, on Gibney, Anthony & Flaherty letterhead, in which Bronson responded to the very serious concerns raised by the Louisiana Deputy Commissioner of Securities regarding Towers' failure to disclose certain items in the October 1, 1990 Domestic Memorandum. Towers, with such assistance from the Bronson Defendants, was able to delay adverse action by the Deputy Commissioner of Securities until February 1993, when the Deputy Commissioner finally put an end to Towers' dealings in Louisiana by withdrawing the exemption on Towers' past offerings in that state and denying registration of the latest offering.

356. A further example of the Bronson Defendants' misleading communications with state regulators is a letter dated February 23, 1989, on the letterhead of the Law Offices of H. Bruce Bronson, Jr., in which Bronson requested that the Alabama Securities Commission waive its previous disqualification of Towers for exemption of its securities from registration under the Alabama securities laws, which disqualification Bronson represented was based solely on the SEC injunction against Towers. The Alabama Securities Commission, however, noted, among other things, that Bronson's request on behalf of Towers omitted any mention of a previous Alabama action against Towers constituting an independent ground for disqualification and that Bronson's request provided no basis for waiver of the disqualification.

3.   **The Role of Squadron Ellenoff.**

357. Defendant Squadron Ellenoff began representing Towers and Defendants Hoffenberg, Brater, and others in 1988 and continued to serve in that capacity throughout the Class Period. In the course of such representation, Squadron Ellenoff advised and assisted Towers and certain of the Towers Defendants and represented them before various regulatory authorities. Squadron Ellenoff represented Towers in the SEC investigation which preceded the formal action against Towers for violating the registration provisions. In the course of its representation of Towers, Squadron Ellenoff received access to the confidential memorandum dated May 18, 1998 prepared by the accounting firm

Spicer & Oppenheim (the "Spicer & Oppenheim Memo") and commissioned by other attorneys retained by Towers.

358. The Spicer & Oppenheim Memo stated that the primary purpose of the accounting firm's engagement was to assist Towers' counsel by "identifying theoretical support for their [Towers'] income recognition policy, hereinafter referred to as the '30/30 Rule'."

359. The Spicer & Oppenheim Memo observed that Towers personnel, including Hoffenberg, gave the "appearance of cooperation" but failed to provide the information promised or did so on a delayed basis or in a format different from the one specified by the accountants.

360. Spicer & Oppenheim uncovered in 1988 many of the fraudulent practices which were confirmed by court-appointed trustee Jess Fardella and bankruptcy trustee Alan Cohen: "year end journal entries necessary to achieve certain targeted income levels," and "[d]espite the fact that there was no apparent support for these adjustments, such adjustments were recorded as of and for the year ended June 20, 1987."

361. A copy of the Spicer & Oppenheim Memo was provided to Squadron Ellenoff contemporaneously with the document's creation in May 1988. Despite the fact that virtually every aspect of the deception perpetrated by Towers was exposed in the Spicer & Oppenheim Memo, and that Squadron Ellenoff received and reviewed the document, Squadron Ellenoff went on to contrive through various means to sustain Towers' criminal course of conduct throughout the ensuing four years. Squadron Ellenoff's

activities included preparation and dissemination of a misleading "Offer of Rescission" circulated by Towers to Noteholders in or about December 1988; preparation and submission of false and misleading documents to the SEC; making misrepresentations to the SEC; and representing witnesses, including Hoffenberg, Brater, Ferro and others, who gave testimony before the SEC known to Squadron Ellenoff partner Ira Sorkin ("Sorkin") to have been misleading, evasive and perjurious, all in an effort to mislead, intimidate, and confuse SEC attorneys and investigators to forestall or prevent discovery of the fraudulent course of conduct in which Towers and its co-conspirators were engaged.

X. **The Offer of Rescission**

362. In response to an SEC civil complaint, which alleged that Towers had failed to register the Notes it sold between 1986 and 1988, Towers offered to rescind purchasers' Notes.

363. Squadron Ellenoff represented Towers before the SEC in relation to the civil complaint:

364. Squadron Ellenoff drafted the offer to rescind and knew its terms.

365. The offer of rescission provided Note purchasers a choice: the return of their investment (reduced by the amount of "interest payments" already received from Towers) along with simple interest at 5.41 percent or the alternative of holding the original Note investment until maturity at the interest initially offered, which was typically over 12 percent.

366. Predictably, in the absence of meaningful disclosure revealing the false premises upon which investors had committed their funds, Notes in the amount of only $445,000 of a total $37 million raised elected in favor of rescission.

367. Had Towers or Squadron Ellenoff disclosed the adverse facts revealed in the Spicer & Oppenheim Memo and known to Squadron Ellenoff, Notes investors would have rescinded their purchases and Towers' fraudulent scheme would have ended in 1988. Despite Squadron Ellenoff's superior access to information and its knowledge that investors were dependent upon it, as Towers' counsel, to insist upon disclosure of material adverse information required to make an informed decision in response to Towers' offer of rescission and despite its role as counsel requiring it to ensure the accuracy of the offer of rescission, Squadron Ellenoff elected not to require disclosure of the adverse facts known to it.

368. Squadron Ellenoff was motivated by the prospect of substantial attorneys' fees which Squadron Ellenoff anticipated it would and ultimately did obtain if Towers stayed in business.

369. Following the implementation of the offer of rescission, Squadron Ellenoff was actively involved in overseeing Towers' dealings with Noteholders, through the offices of Michell Brater and other Towers' counsel including the Bronson Defendants. Squadron Ellenoff partner Sorkin regularly received copies of documents which Towers sent investors, including documents Towers employed to solicit the "rollover" of investments by Noteholders. Such information was provided to

Squadron Ellenoff in connection with the ongoing inquiry of the SEC and the specific concern raised by the SEC periodically, including at meetings held in August 1990 at which the SEC specifically questioned whether Towers was involved in a fraud and whether Towers was offering its promissory notes to investors in violation of the federal securities laws.

370. On repeated occasions, Sorkin represented Hoffenberg and Brater and others before the SEC in the course of its continuing investigation. In the course of these depositions, Sorkin acquiesced in, ratified or failed to reveal the falsity of numerous statements made by Hoffenberg and others which Sorkin knew were untrue, incomplete or otherwise misleading. Hoffenberg's misrepresentations, false and evasive testimony extended to every aspect of Towers' business. These misrepresentations included false statements specifically applicable to the promissory notes and include the following false statements which were made in the presence of Sorkin and which he knew to be false:

(a) That Towers' promissory notes were collateralized by all types of various accounts receivable, commercial accounts, healthcare receivables, corporate accounts, FDIC receivables and RTC receivables. In fact, Towers' promissory notes were not collateralized at all.

(b) That Towers had the expectation it could compound a factoring fee up to six times per year, in other words, factor funds and recover them, then factor them out again

once every two months. In fact, Towers own records indicate it was incapable of factoring funds six times per year.

(c) That all investors who purchased Notes were accredited investors. In fact, unaccredited investors inevitably purchased Notes as the offering was made on a nationwide basis through dozens of marginal "broker-dealers" and Towers had no credible method of determining whether in fact the investors were accredited.

(d) That funds raised from Noteholders were placed in an escrow account at Chase Manhattan Bank. In fact, the funds were placed in a checking account. Towers had unrestricted access to the account which was in no sense an "escrow" account.

(e) That Towers calculated the "excess profits amount" i.e., the amount which Towers was entitled to withdraw from the escrow account with Chase Manhattan Bank on a periodic basis and that Towers had never withdrawn funds to a point where the "excess profits" remaining in the account were anything but "substantial." In fact, Towers withdrew funds from the escrow account despite the fact that Towers was operating at substantial losses throughout the period in which the note investments were made.

(f) That the proceeds from note offerings withdrawn from the Chase Manhattan escrow account under the "excess profits" definition were used to run Towers' business in the manner specified in Towers' offering documents distributed to Noteholders. In fact, the proceeds of Note offerings were

diverted by Towers to the personal use of Towers insiders, the operation of the Towers' Ponzi scheme and other improper purposes as alleged herein.

371. Squadron Ellenoff's further knowledge of the fraudulent course of conduct in which Towers was engaged is demonstrated by the firm awareness of Towers' fraudulent practice of repeatedly filing and withdrawing a registration statement under the Securities Exchange Act of 1934 on Form F-10, which was filed October 17, 1990. The Form 10 contained false, misleading and incomplete information. Squadron Ellenoff knew Towers' filing of the registration statement on Form F-10 was undertaken in bad faith in an effort to forestall the SEC from taking further action against Towers, and that in fact Towers had no intention of ever complying with the obligations of a "reporting company" under the Exchange Act, as Towers' financial reporting practices were inconsistent with recognized accounting standards, a fact which Squadron Ellenoff knew as a result of its access to and review of the Spicer & Oppenheim Memo.

372. On or about November 27, 1991, Squadron Ellenoff learned that Steven B. Enright, a "Certified Financial Planner" doing business under the name "Enright Financial Advisors" had informed a Towers' broker/dealer, Defendant Martin Kaiden Co., that he had been contacted by individuals who had identified themselves as investigators for the SEC. In a letter from Enright to Martin Kaiden Co., Enright described his contact with the SEC investigators, and acknowledged he knew Towers was the

subject of a continuing SEC investigation, a fact which Towers did not disclose in its offering memoranda.

373. Accordingly, Squadron Ellenoff was aware that the SEC investigation, as of November 1991, was active enough to cause SEC investigators to contact Towers Noteholders and broker/dealers; that the SEC suspected Towers was selling notes in violation of the Securities Act registration requirements and in violation of the SEC injunction; and that Towers was selling its Notes without disclosing the pendency of the investigation to Noteholders; all confirming information previously known to Squadron Ellenoff, to the effect that Towers continued to offer and sell the Notes in violation of the federal securities laws.

374. The lack of support for Towers' assertion that the "private offering exemption" enabled it to sell the Notes without registration is apparent from a memorandum Squadron Ellenoff received on or about December 9, 1991, from attorneys for Republic Securities, Inc., a Chicago brokerage firm which had offered notes to an unaccredited investor and strained to bring itself within the private offering exemption based on the broker's "reasonable belief" that the investor was accredited.

375. Towers' approach to compliance with the securities laws was further brought home to Squadron Ellenoff on February 19, 1992, when Hoffenberg referred to Sorkin a copy of a proposed declaration sent by a representative of the SEC to Noteholder Lavonne L. Moller of Lordsburg, New Mexico. According to information Mrs. Moller provided, she was an 82-year-old invalid who had purchased $40,000 in Towers promissory notes

through one Bud Falck of Multi-Financial Securities. Ms. Moller told the SEC she was not accredited under any definition at any time during the period in which she had been a note investor and that her only source of income was interest and dividends from investments and Social Security payments. In response, Bud Falck, Moller's broker, prepared a statement he attempted to enlist Moller to sign in which she was to have informed the SEC that "when you called and talked to me, I told you that I was not well and couldn't think clearly."

376. Falck further proposed to have Moller state that she was in fact accredited and had refused to disclose her assets to the SEC because she was "very private about my financial affairs and reluctant to tell someone whom I did not know over the telephone all about how much we have." Falck then transmitted the statement he drafted for Mrs. Moller with a note to Gerri Vignola of Towers expressing indignation at the SEC's attempt to investigate the circumstances of Mrs. Moller's investment: "I think it is unfair to harass an 82-year-old invalid who admits to being very confused and having great difficulty understanding or remembering things." Hoffenberg then forwarded Falck's letter and proposed statement for Mrs. Moller together with the declaration supplied her by the SEC to Squadron Ellenoff. Squadron Ellenoff did not find any aspect of Towers Note sales program amiss despite the fact a Towers broker had enlisted an 82-year-old invalid he considered "very confused" as an investor. Squadron Ellenoff continued to claim all Towers investors were "accredited" in all dealings with the SEC and to

belittle the SEC's attempt to confirm the accredited status of Towers investors.

377. By May 1992 the SEC investigation had progressed to the point where the SEC demanded documentation from Towers' accountants in an effort to substantiate Towers' accounting practices. In response to a letter from Dorothy Heyl of the New York Regional Office of the SEC dated April 28, 1992, Michael Rosoff wrote Sorkin a letter in which he identified categories of documents which he claimed Towers had or would produce to the SEC in response to its demands. In his letter, Rosoff explained that Basson had failed to retain copies of records substantiating much of the audit work he had purportedly done with respect to Towers' 1990 and 1991 audits. With the exception of Rosoff's lame explanation for Basson's failure to retain workpapers, Sorkin incorporated and adopted as his own Rosoff's representations in a responding letter to Heyl of the SEC.

378. Sorkin adopted and offered as his own Rosoff's representations. Among the factual representations and promises Sorkin made were the following:

(a) That Towers would produce a computer run evidencing accounts having a total approximate value of $251 million which was furnished by Basson.

(b) That Basson would produce computer runs utilized to test the validity of the 1990 income accrual, consisting of a list of 'randomly selected accounts receivable and the results of the collection activities undertaken with respect of the accounts during the 1991 fiscal year.'

(c) That Basson reviewed other computer listings of TFC accounts and performed confirmation tests of these entries but did not retain them.

(d) That Basson would produce a computer listing of 'randomly selected' accounts accepted by TCS for collection in the 1989 fiscal year.

(e) That the computer-generated information 'reflects the actual history of these accounts and was utilized by Mr. Basson to substantiate the continued application of the company's stated revenue recognition policy.'

379. In fact, Towers was in no position to produce the information Sorkin promised to the SEC as by and large it did not exist. Sorkin's representations that Towers, through Basson, could supply accounting records to substantiate the audits which Basson purported to have conducted of the financial statements were false. Sorkin either knew his statements to the SEC were false and misleading based on his prior contacts with Towers or adopted as his own the representations of Towers' insider Rosoff, without investigation, in which case he was reckless in doing so, in light of the facts known to Sorkin concerning Towers' accounting practices, reflected in the Spicer & Oppenheim Memo and confirmed by Sorkin's course of dealing with Towers and its managerial personnel.

380. On May 15, 1992, the SEC issued a subpoena duces tecum which made further information requests upon Towers.

381. In response, Rosoff sent Sorkin an 11-page memorandum dated June 5, 1992 which offered detailed explanations

of Towers' business practices with respect to the acquisition and valuation of collection receivables, including accounts purchased by Towers from the FDIC, Southwestern Bell Yellow Pages, Inc., Bank of America and others. Rosoff's memo claimed Towers engaged in a variety of business practices intended to ensure the purchase of high quality, collectable accounts receivable, including extensive due diligence and credit analysis, going so far as to contact the debtor prior to acceptance of each account receivable.

382. In a letter to the SEC dated June 11, 1992, Sorkin adopted verbatim Rosoff's representations as his own. Squadron Ellenoff's statements attesting to the legitimacy of Towers' accounting practices, the "myriad" due diligence procedures employed in the acquisition of accounts receivable and the testing purportedly undertaken with respect to purchases of specific receivables from the FDIC, Southwestern Bell Yellow Pages, Inc., Bank of America and other detailed business matters were false. Squadron Ellenoff knew its statements in the SEC in its June 11, 1992 letter were false. Squadron Ellenoff's representations were made on behalf of Towers which as Squadron Ellenoff knew, employed the services of three separate accounting firms to report on the financial condition of Towers and its affiliates, including a sole practitioner CPA who worked out of his home as its chief independent accountant, had previously stipulated to an injunction prohibiting it from offering securities in violation of the Securities Act, then raised over $100 million from several thousand additional investors

throughout the United States, had failed despite longstanding representations to the contrary to become a reporting company under the Exchange Act, had consistently failed to disclose the pendency of a longstanding SEC investigation in the course of its investment solicitations, whose senior officers and directors have given perjured testimony to the SEC in Sorkin's presence, had as its Board of Directors no credible independent presence, suggesting meaningful oversight over the corporation, and a consistent record of spawning litigation against it for violations of the securities laws and fraud.

383. On October 6, 1992, Sorkin attended a meeting at which representatives of the SEC informed him that the SEC would recommend initiation of a civil injunctive relief action against Towers, Hoffenberg, Ferro, Brater, and Basson for violation of section 5 of the Securities Act of 1933 with respect to all five Towers offerings (February 1989 through March 1992), violation of rule 10b-5 and section 17(a), for dissemination of false and misleading financial information and numerous misrepresentations and omissions of material fact, including the false representations concerning the ACI insurance policy, failure to disclose Towers' investment in United Diversified, and misrepresentations concerning the collateralization of the offerings. The SEC also expressed concern with the Towers' definition of "excess profits" and other conduct, including the possibility that Towers' accountant had fabricated work papers and failed to produce confirmations required under generally accepted accounting standards. The following day, October 9,

1992, Sorkin was informed in writing of the SEC's intent to formally recommend that a civil enforcement action be filed against Towers, Hoffenberg, Ferro and Brater.

384. Squadron Ellenoff then undertook to prepare a "Wells submission" on behalf of Towers. On November 6, 1992, Squadron Ellenoff made a Wells submission to the SEC on behalf of Towers in which Squadron Ellenoff opined that none of the claims asserted by the SEC against Towers "has any valid basis in fact or law." Squadron Ellenoff complained of the SEC's inability to grasp the subtleties of the accounting treatment adopted by Towers:

We further urge that from the inception of this investigation in which all proposed Defendants cooperated fully and produced approximately 100,000 documents to the staff...the [New York Regional Office] has failed not only to comprehend the nature of Towers' business, but that it also significantly misunderstands the accounting treatment utilized by Towers.

385. Squadron Ellenoff also claimed in its Wells submission that the Defendants had acted in "good faith and that any nondisclosure "was not material to the financial statements and annual reports."

GAAP'. (Emphasis in original.)

386. Squadron Ellenoff further stated that allegations Hoffenberg had sold Towers stock while in possession of material inside information "also have no basis in fact." Finally,

Squadron Ellenoff denied that Towers, Hoffenberg, and Brater had any reason to believe Towers Notes were sold to unaccredited investors in violation of the registration requirement under section 5 of the Securities Act of 1933.

387. In regards to the SEC's contention that the Offering Memoranda were misleading, Squadron Ellenoff opined that the scope of permissible collateral for the Notes was "fully and clearly disclosed in Towers' various offering memoranda" and stated there was "a substantial basis to believe" that investors did not rely on the quality of the collateral or the strengths of Towers' financial statements in investing. Squadron Ellenoff further represented:

This is not to suggest, however, that the notes were not adequately collateralized, or that the financial statements were not, in any respect, misleading. Any contention by the staff to the contrary is simply wrong.

Further factual representation made by Squadron Ellenoff was that the collateral arrangements were sufficient to enable Note investors to be made whole even if Towers ceased doing business.

388. With respect to the SEC's contention that Towers made false and misleading statements to investors relating to its financial condition in connection with the offering and sale of the promissory notes, Squadron Ellenoff stated that:

[s]imply put, the Staff's contentions are wrong. A simple analysis of the way in which Towers conducts its accounts receivable management and collection business and a comparison of the results of such analysis with the applicable accounting literature, inexorably leads to the conclusion that Towers' accounting methodologies comply, in all material respects, with the requirements of GAAP.

In fact, as Squadron Ellenoff knew, Towers' accounting methodology could not be reconciled with GAAP, as the Spicer & Oppenheim Memo had noted.

389. Throughout the initial Wells submission, Squadron Ellenoff makes representations which were false. For example, Squadron Ellenoff stated that the validity of the assumptions underlying the 30/30 Rule was "constantly tested." Squadron Ellenoff stated that "[y]ear in and year out, it is determined that Towers does, in fact, collect 30% (plus or minus one standard deviation) of the assigned accounts it accepts for collection." In fact, as Squadron Ellenoff knew, there was no basis in fact for the representation that Towers conducted tests of any kind to determine the validity of its 30/30 Rule.

390. After justifying Towers' disclosures or absence thereof relating to Towers' investment in an Illinois-based insurance company, United Diversified Corporation and subsequent litigation arising out of Towers' attempts to strip that company of its assets, Squadron Ellenoff belittled the SEC's contentions that Towers had improperly accounted for the purchase of receivables from the FDIC and Bank of America. Squadron Ellenoff opined that the SEC's contention that Towers had engaged in deceptive practices in its valuation of these portfolios "is clearly erroneous and supports the conclusion that the staff does not fully comprehend either the nature of Towers' business or its accounting methods."

391. Confronted with the SEC's skepticism as to the persuasiveness of the initial Wells submission, Squadron Ellenoff

-101-

prepared a "supplemental" Wells submission in which the opinion of one Sidney Davidson, a semi-retired professor of accounting was tendered in support of the propriety of Towers' 30/30 Rule. The SEC remained unimpressed, as much of Davidson's letter was simply circular logic based on the veracity of the representations of management. The SEC's investigation continued.

392. Further evidence of Sorkin's complicity in Towers' scheme was demonstrated through the efforts made by Sorkin on behalf of Towers to silence Nicholas Pattakos. Pattakos called the SEC in or about January 1993 and offered evidence with respect to Hoffenberg and the diversion of Towers' assets.

393. The SEC tried to contact Pattakos again only to be told by Sorkin that he represented Pattakos and to cease further attempts to enlist his cooperation.

394. On February 8, 1993, the SEC filed a civil complaint against Towers, Hoffenberg, Ferro, and Brater alleging violations of sections 17(a), 5(a) and 5(c) of the Securities Act of 1933 and section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

395. The SEC filed an amended complaint on March 3, 1993.

396. Squadron Ellenoff represented Towers in the suit until withdrawing as counsel.

397. In an affidavit dated May 12, 1993, Squadron Ellenoff partner Sorkin stated, among other things, that during the SEC investigation, the firm was unable to obtain answers to

-102-

certain questions because records were not sufficient or individuals could not recall certain transactions or events.

398. In the May 12, 1993 affidavit, Sorkin stated, among other things, that it would have been the "height of irresponsibility" and "unethical" to provide answers to the court that he could not personally verify as accurate and responsive.

399. In an affidavit dated May 13, 1993, Squadron Ellenoff associate Philip Raible ("Raible") stated that he spent an enormous amount of time at Towers' offices investigating the facts alleged by the SEC but that the books and records of Towers were not sufficiently detailed, complete, or up to date.

400. The statements by Squadron Ellenoff that it knew Towers' records were incomplete, inadequate, not sufficiently detailed, and not up to date shows that Squadron Ellenoff knew or was reckless in not knowing that the statements it made or participated in making to the SEC and the press were false.

401. By the false statements made to the SEC and others, Squadron Ellenoff intended to prevent or delay, and did delay, the SEC from stopping Towers and the Individual Defendants from selling Notes and encouraging the sale of the Notes.

402. Plaintiffs relied upon the integrity of the regulatory process and the truth of the representations made to the SEC by Squadron Ellenoff in purchasing their Notes.

403. The Notes that Plaintiffs purchased were without any value.

404. The Notes could not have been sold without the services of Squadron Ellenoff in perpetuating the fraudulent scheme.

**L.   The Role of Duff & Phelps.**

405. Defendant Duff & Phelps is a financial information company which provides rating services to corporations. During the Class Period, Duff & Phelps was retained to rate the asset-backed debt securities being issued by Towers. As part of this service, Duff & Phelps provided written opinions to Towers (which, as Duff & Phelps knew, would be used by Towers in the sale of its securities) evaluating the securities offered and assigning rating designations to these securities. Despite Towers' serious cash-flow problems and staggering debt, rendering the Company incapable of meeting its expenses and interest payments due on its bonds and Notes, Duff & Phelps rated Towers' bonds and its Notes favorably, thus asserting to the class members Towers' financial strength, stability and ability to honor its obligations.

406. For example, in a March 22, 1990 letter to Towers, Duff & Phelps stated its opinion that Towers "has the capability to act as servicer with respect to a securitized transaction involving the securitization of health care receivables." On January 16, 1991, Duff & Phelps issued a letter to Towers stating that it had "assigned a rating of 'BB' to Towers Financial Corp's unsecured senior debt." Additionally, on December 12, 1991, Duff & Phelps issued a letter to Towers relating to its health care receivable subsidiaries, stating that ratings

assigned to the bonds were being upgraded to 'AA-' from 'AA.' These Duff & Phelps opinion letters were disseminated to investors through the Broker-Dealer Defendants. Additionally, on July 6, 1990, Duff & Phelps issued a letter to the New York regional office of the SEC, in which Duff & Phelps reiterated its due diligence procedures regarding Towers, stating on one or more occasions that Duff & Phelps had better information than the authors of any negative press reports.

407. Duff & Phelps continued to meet with the Broker-Dealer Defendants and continued to volunteer false, inaccurate and overstated reports about Towers throughout the entire period that the Broker-Dealers were marketing notes to their customers, right up until the time that the SEC commenced its action against Towers.

408. Thus, for example, Mark Tuttle of Duff & Phelps told Broker-Dealers on several occasions that Duff & Phelps had arrived at its proposed ratings of Towers after spending substantial time on-site at Towers' offices, studying its organization and its capabilities as a servicer and collection agency and had been impressed with its computer and data systems and its operations. Tuttle also represented that Duff & Phelps would continue to review the receivables that comprised the collateral pool for the bonds and Notes. Tuttle also stated that the 1992 Financial Statements for the Health-Care Receivables Funding Corporations revealed that any operational problems were technical in nature and did not constitute a credit issue. He also said on numerous occasions that Duff & Phelps's rating was

based on the establishment of safeguards and the results of Duff & Phelps's on-site review of Towers. Finally, Tuttle and other employees of Duff & Phelps also represented that as part of its review of Towers, Duff & Phelps would receive monthly detailed financial reports on the quality of the receivables and that consequently the credit quality of Towers and of its securities was being monitored on a continuous basis.

409. Furthermore, in or about June 1990, as part of their effort to market and sell the Notes, certain members of the Broker-Dealer Class began to investigate Towers to further verify Towers' public pronouncements about its operations to better enable them to market the Notes. As part of this investigation, they contacted Towers for verification and corroboration regarding Towers' operational and financial background. Towers referred these Broker-Dealers to Duff & Phelps, stating that Duff & Phelps would provide additional information and corroboration regarding the creditworthiness of Towers and its Notes, and that Duff & Phelps could independently confirm the positive statements Towers had made in its public SEC filings and otherwise. The stated and understood premise of this reference was that, as rater of Towers and because of its intimate knowledge of Towers due to the months it had spent purportedly reviewing, analyzing and testing Towers' finances and operations, Duff & Phelps was in a unique position to provide comprehensive confirmation of Towers' financial statements from a purportedly unbiased source of the highest professional integrity.

410. Thus, in rating Towers and the Notes, Duff & Phelps had a duty to insure that it exercised due care in investigating the true financial condition of the Company, including its cash flow and the collectibility of the receivables.

411. During the Class Period, as Defendant Duff & Phelps knew, it was regarded in the securities industry, by corporations, government regulators, analysts, brokers, agents and investors as a reliable source of financial information. Duff & Phelps also knew that its ratings were a necessary element in the successful marketing and sales of asset-backed securities such as the Notes. In fact, the Division of Investment Management of the SEC in May 1992 underscored the significant of rating agencies such as Duff & Phelps in the marketing of asset-backed securities to the public, characterizing their extensive due diligence performed by rating agencies in preparing rating "integral" to such financings, and emphasizing the extensive due diligence performed by rating agencies in preparing rating

I"In determining the rating, the rating agency reviews the relevant documentation regarding the transaction, including the prospectus or private placement memorandum, P&S agreement, the indenture. The rating agency also may conduct an on-site due diligence inspection of the sponsor and the servicer. Typically, the servicer reviews the servicing operations, particularly the credit and collection processes. This may entail tracking an application through the credit review and approval process and tracking collection on a delinquent receivable. The historical, current, and expected performance of the sponsor's portfolio (from which the pool will be taken) also may be discussed. In addition, the rating agency may review whether the sponsor has the capability to track the assets that will be pooled separately from the overall portfolio. Finally an agency will review its own internal resources to obtain information about the sponsor, historical performance data on the type of assets being securitized, and other relevant information." SEC, Division of Investment Management, Protecting

(continued...)

evaluations, and how the public relies thereon in making their investment decisions. As the Division stated, "The most important and time consuming role of the rating agencies is analyzing the credit risk of the financing." * . . . the rating agencies impose requirements that are intended to ensure the safety of a financing's assets." "Once a financing is rated, the rating agencies typically monitor its performance monthly or quarterly."

412. Indeed, Duff & Phelps itself underscored the significance of its rating of the securities and the methods used by Duff & Phelps to rate Towers as a servicer, in a document entitled "Servicer Review Policy." This document which was made available to the public by Duff & Phelps stated that, prior to assigning a rating to a servicer of an asset-backed securitization, Duff & Phelps analysts:

(a) review and analyze the "servicer's historical performance in order to evaluate its past performance and to determine if there are any developing trends that may effect [sic] the servicer's performance in the future";

(b) consider prior experience of senior management;

(c) analyze the originations process and purchase criteria to which the servicer adheres;

(d) look for diligent tracking of documentation;

1 (...continued)
Investors, in Half a Century of Investment Company Regulation 51-52 (1992, f.n. omitted).

(e) review documentation of, ... ng other things,
collateral value and title and insurance;

(f) review servicing capabilities including
written procedures, cash management, customer service, collection
policies, computer systems, and reporting capabilities;

(g) review management's close supervision of cash
management operations including, among other things, "prompt
deposit of funds to appropriate accounts" and "the flow of
information between the servicer and the lock-box provider, the
accuracy and timeliness of information and the financial
condition, integrity and experience of information of lock-box provider";

(h) review the servicer's computer systems for
their ability to provide up-to-date data on all accounts
currently serviced;

(i) evaluate the servicer's capability for
producing reports at least monthly that accurately reflect their
performance of the assets, and are consistent with monthly
reporting requirements;

(j) consider management's "track record of
achievement in meeting stated goals" and its commitment; and

(k) discuss with management any "past litigation
or pending legal action involving the company or any principals
of the company. A legal search may be performed by Duff & Phelps
in order to obtain legal information about the parties."

413. In performing its rating services for Towers,
Duff & Phelps purported to conduct a due diligence investigation
in the business affairs of Towers whereby it obtained or was

-109-

reckless in not obtaining material information concerning the
business affairs and true financial condition of Towers. In
fact, in its opinion letters to Towers, Duff & Phelps announced
its intention of monitoring Towers on a continuing basis. Thus,
in the March 22, 1990 letter, Duff & Phelps stated "we require an
annual review of Towers involving your servicing operations and
financial condition." In the January 1991 letter, Duff & Phelps
informed Towers and the investing public that it would "continue
to monitor the credit of Towers Financial on a continuing basis."
Similarly, in the December 1991 letter, Duff & Phelps said it
would "continue to review the credit quality of the issue on a
continuous basis."

414. In conducting its due diligence investigation,
Defendant Duff & Phelps necessarily learned, inter alia:

(a) that, in fact, Towers had an extensive
history of fraud, securities law violations, consumer fraud
allegations, persistent allegations of past diversions of funds
from affiliates and subsidiaries, unpaid court judgments, prior
bankruptcies and other conduct inconsistent with a creditworthy
company, and that state and federal investigations and
prosecutions were then underway involving Hoffenberg, Towers,
and/or its affiliates;

(b) that Hoffenberg had previously caused at
least four companies he had led to seek bankruptcy protection and
that Moody's Investors' Service had declined on this basis to
issue a rating for one of the issues of securities when
approached to do so by Towers in 1991;

-110-

(c) that Towers as servicer had failed to submit to Duff & Phelps the detailed financial reports describing the receivables on a monthly basis as required to do so by the indenture agreement;

(d) that Towers, as servicer, was improperly purchasing from providers receivables which served as collateral for the bonds but were not owned by the providers free from any prior sale, lien, encumbrance or security interest, and, thus, not of adequate strength; and

(e) that in fact Towers was insolvent and that Towers had abrogated the terms of the indenture agreement with the bond trustee, Shawmut National Bank, a result of which was the genuine and material risk of default on the bonds.

415. Acting with such knowledge, or recklessly disregarding such information, Duff & Phelps misrepresented to the investing public the true financial condition and strength of Towers and disseminated inaccurate and misleading information to plaintiffs and the other class members, as well as furnishing statements to Towers, which Duff & Phelps knew would be used by the Company in its promotional and solicitation activities directed toward plaintiffs. In fact, Duff & Phelps expressly consented to the use of its name in disclosure documents, advertisements, and other sales materials used by Defendants to market and sell the Notes. Duff & Phelps knew or was reckless in not knowing information which indicated that the financial strength of the Company was far less than it had represented.

416. Thus, Duff & Phelps's ratings and material statements made to the Broker-Dealers and to potential investors operated to misrepresent Towers' financial condition and the safety of its securities which plaintiff relied upon in connection with their purchase of Notes offered by Towers. Indeed, Plaintiffs' damages could have been averted had Duff & Phelps identified the facts and circumstances that materially affected the likelihood that Towers would be able to properly perform its role as servicer of the Notes and that the Notes would be repaid. As a result of Duff & Phelps's knowing or reckless affirmative acts, Towers was able to sell the Notes on a monumental scale for years.

417. On May 3, 1993, Duff & Phelps Vice President Julie P. Schuecter (who had signed the letters assigning the "AA" ratings to certain of the asset-based securities issued by Towers) announced a new Duff & Phelps standard for rating asset-based transactions, explaining that: "Towers has brought to light a lot of the problems we were trying to address anyway in the industry," including the fact that the "bells and whistles implemented into the [Towers] transaction were not followed. The stuff that was supposed to happen, that we base ratings on and that investors take comfort on, didn't happen. Duff & Phelps believes that's a bigger problem than fraud."

N. The Role Played by Richard A. Eisner & Company.

1. Summary Of Allegations.

418. At all relevant times, Eisner was the certified public accountant and independent auditor for the Healthcare

Subsidiaries, which were five wholly owned subsidiaries of Towers, established by Towers as limited purpose corporations to purchase Qualified Healthcare Receivables (as that term is defined in paragraph ___) selected and serviced by Towers. These five subsidiaries were established by Towers and funded through the sale of bonds to the investing public, pursuant to private placement memoranda, as follows:

| Name | Date | Principal Amount Of Bonds Issued |
|---|---|---|
| Towers Healthcare Receivables Funding Corporation ("THRFC I") | March, 1990 | $45,000,000 |
| Towers Healthcare Receivables Funding Corporation II ("THRFC II") | November, 1990 | $41,500,000 |
| Towers Healthcare Receivables Funding Corporation III ("THRFC III") | May, 1991 | $42,500,000 |
| Towers Healthcare Receivables Funding Corporation IV ("THRFC IV") | December, 1991 | $42,500,000 |
| Towers Healthcare Receivables Funding Corporation V ("THRFC V") | May, 1992 | $27,950,000 |

419. The Healthcare Subsidiaries were limited purpose corporations, specifically established for, and prohibited from engaging in acts other than, the issuance of Bonds and the performance of their obligations under the applicable bond indentures (the "Indentures"). Moreover, pursuant to the Master Sale and Servicing Agreements (the "Servicing Agreements"), the terms of which essentially mirrored the terms of the Indentures, Towers was responsible for conducting all operations of the Healthcare Subsidiaries, including servicing and collection of all receivables. Since all five Indentures and Servicing Agreements are identical in all material respects, unless

-113-

otherwise noted, this complaint hereinafter refers to the THRFC V Indenture and Servicing Agreement as the "Indenture" and the "Servicing Agreement".

420. Eisner, as a consequence of information it was privy to in its role as auditor of the Healthcare Subsidiaries, knew or recklessly disregarded that the Healthcare Subsidiaries were mere "paper" entities with no identity or existence independent of Towers. Therefore, Eisner knew or recklessly disregarded that the consequences of employee malfeasance or indenture covenant violations by the Healthcare Subsidiaries would also be borne by Towers and its investors. Indeed, the Servicing Agreements, together with the Indentures, place much of the operational responsibilities and financial risk regarding the Healthcare Subsidiaries squarely on Towers. In addition, at all relevant times, Eisner knew or recklessly disregarded that Towers' officers, directors and employees were responsible for conducting, and did conduct, all or virtually all of the activities of the Healthcare Subsidiaries, including hiring Eisner to audit the financial statements of the Healthcare Subsidiaries. Eisner also knew that the Healthcare Subsidiaries account for almost 50 percent of Towers' total assets. Therefore, Eisner knew or recklessly disregarded that, in auditing the financial statements of the Healthcare Subsidiaries, (1) it was effectively working for Towers; and (2) the operations and financial condition of the entities it was auditing would (and did) have a material effect on Towers' operations and financial condition.

-114-

421. Eisner was engaged to audit the books and records of each of the Healthcare Subsidiaries and opine on various financial statements of THRFC I-V during the Class Period, including (1) the balance sheets, statements of operations and deficit, and cash flows (the "financial statements") of THRFC I-III for the fiscal year ended June 30, 1991 ("fiscal 1991"), (2) the financial statements of THRFC I-V for the fiscal year ended June 30, 1992 ("fiscal 1992"). During the Class Period, Eisner, in its role as independent certified public accountant, issued unqualified opinions that: (1) THRFC I-V's fiscal 1991 and 1992 financial statements were presented in conformity with Generally Accepted Accounting Principles ("GAAP"); and (2) Eisner conducted its audits in accordance with Generally Accepted Auditing Standards ("GAAS"). Eisner's unqualified opinions regarding THRFC I-V's fiscal 1991 and fiscal 1992 financial statements were subsumed under, and formed an integral basis for Defendant Basson's unqualified opinions regarding Towers' fiscal 1991 and 1992 financial statements. Moreover, Eisner's unqualified opinions regarding THRFC I-V's fiscal 1992 financial statements were included in and publicly disseminated with Tower's 1992 Annual Report, which in turn was disseminated together with certain Offering Memoranda for the Notes. Eisner had been engaged to and did in fact perform such services knowing or recklessly disregarding that the Healthcare Subsidiaries' financial statements audited by it, as well as Eisner's unqualified opinions, would be disseminated to and/or relied

upon, directly or indirectly, by investors in making investment decisions regarding Towers.

422. Eisner received substantial fees for its services on behalf of each of the five healthcare subsidiaries. Combined, THRFC I-V constituted one of Eisner's five largest clients. Therefore, Eisner had a substantial motive to turn a "blind eye" towards the fact that Towers caused the Healthcare Subsidiaries to repeatedly, blatantly and egregiously violate material covenants of the Indentures which caused the Healthcare Subsidiaries' financial statements audited by Eisner to contravene GAAP in several material respects.

423. Eisner was also engaged by late 1992 or early 1993 to assist and consult with Towers and Towers' lawyers in formulating their response to SEC inquiries regarding the propriety of Towers' overall financial reporting process. Furthermore, Eisner provided substantial assistance to Sidney Davidson (a Professor of Accounting at the University of Chicago, engaged to prepare an expert opinion on certain of Towers' accounting practices), in rendering his January 19, 1993 report to defendant Squadron Ellenoff which was filed with the SEC. Eisner's assistance included, inter alia, attendance at meetings and drafting accounting memoranda regarding the propriety of Towers' accounting practices.

424. Eisner is liable as a primary wrongdoer under Section 10(b) of the Exchange Act because it knowingly and/or recklessly participated in the comprehensive fraudulent scheme which enabled Towers to bring the Notes to market, as alleged

herein. Eisner participated in and furthered    is scheme by, inter alia, issuing opinions for fiscal 1991 and 1992 which were subsumed in and became an integral part of Marvin Basson's opinion letters stating that: (a) the Healthcare Subsidiaries' fiscal 1991 and 1992 financial statements conformed with GAAP and (b) Eisner's audit of such financial statements was conducted according to GAAS when Eisner knew or recklessly disregarded that (1) those financial statements contravened GAAP in numerous ways; and (2) Eisner ignored and/or recklessly failed to detect such violations of GAAP because it deliberately or recklessly failed to conduct an audit pursuant to GAAS. In addition, by permitting or turning a blind eye to the dissemination of their 1992 unqualified opinion regarding the Healthcare Subsidiaries' 1992 financial statements (which was subsumed in and became an integral part of Marvin Basson's opinion letter) as part of Towers' 1992 Annual Report, which Eisner knew or recklessly disregarded was being or would be used to market the Notes as of the date of publication of the opinion, Eisner further knowingly participated in the fraudulent scheme to create and perpetuate the market for Towers' securities, including the Notes.

425. Eisner knew or recklessly disregarded that without its clean opinion, it would have been virtually impossible to bring to market either Towers' Notes or Bonds.

426. Eisner also furthered and perpetuated the fraud alleged herein by periodically attesting and certifying to the Bond Indenture trustee, Shawmut, that the Healthcare Subsidiaries were maintaining the level of collateral required under the

-117-

Indenture to secure the payment of interest and principal on the bonds when Eisner knew or recklessly disregarded that Towers and/or the Healthcare Subsidiaries were (a) substantially overstating the value of the receivables held as collateral for the Bonds; and (b) diverting and misappropriating tens of millions of dollars of cash, purportedly earmarked for Bondholders, for their own purposes, in blatant violation of controlling provisions of the Indentures and Servicing Agreements. Eisner knew or recklessly disregarded that, without its periodic attestations that the Healthcare Subsidiaries were in compliance with the minimum collateral requirements of the Indentures and Servicing Agreement, which would have permitted the Trustee to declare a default and demand immediate repayment of the millions of dollars in outstanding Towers' Bonds, it would have been virtually impossible to market or sell Towers' securities, including the Notes.

2. **The Healthcare Subsidiaries Were Mere Extensions Of Towers.**

427. The Healthcare Subsidiaries were essentially passive "paper" entities, wholly-owned subsidiaries of Towers with no means to exist independent of Towers. They were created to serve as financial conduits, in order to facilitate Towers' efforts to raise capital.

428. Towers received substantial fees in connection with the creation and servicing of Healthcare Subsidiaries. Upon completion of the Bond offerings, for example, Towers would receive 1 percent of the Gross Offering Proceeds as a non-accountable organizational and offering expense allowance. Then,

-118-

as a fee for selecting Healthcare Receivables to be acquired by THRFC I-V, Towers was entitled to 2 percent of the Realized Value of each Purchased Account (i.e., 2 percent of the amount actually recovered), which fees Towers waived for fiscal 1992.

429. Consequently, in fulfilling its role as independent auditor, and in planning the scope of the audit pursuant to GAAS, Eisner should have given paramount importance to (1) the Healthcare Subsidiaries' compliance with the Indentures' covenants; and (2) Towers' compliance with the covenants of the Servicing Agreements (which essentially mirrored the requirements and limitations set forth in the Indentures).

430. Significantly, Eisner also knew or recklessly disregarded that the fiscal well-being and solvency of THRFC I-V had a direct and substantial impact on Towers' financial health and solvency for at least two reasons. First, Eisner knew that Towers had a substantial equity investment in THRFC I-V as owners of all the THRFC I-V stock. Second, Eisner knew or recklessly disregarded that THRFC I-V's assets constituted a significant percentage of Towers' total assets, amounting to $334,551,000 of Towers' $684,411,643 in total assets (or roughly 49 percent of total assets) at June 30, 1992.

431. Therefore, Eisner clearly knew or recklessly disregarded that a material breach in the Bond Indenture and related covenants which could cause the insolvency of the Healthcare Subsidiaries would have a two-fold effect: (a) it could render Towers' largest asset group virtually worthless; and (b) it could cause the acceleration of payment of both interest

-119-

140 sm

and principal on the Bonds, which payments Towers ultimately would be liable for under the terms of the Indentures and the Servicing Agreements in the event Towers breached those agreements.

432. In short, as Servicer pursuant to the Servicing Agreement, and as parent of the wholly-owned Healthcare Subsidiaries, Towers ultimately held fiscal responsibility for and bore the primary financial risks attendant to THRFC I-V's actions. Such upstream impact on Towers was wholly foreseeable to Eisner; it was clearly foreseeable (if not inevitable) that the insolvency of the Healthcare Subsidiaries would cause Towers to become insolvent and in fact it had just such an effect.

433. Despite the importance of THRFC I-V to Towers, however, THRFC I-V and Towers failed to comply with the terms of the Indentures and the Servicing Agreements, in furtherance of a massive and systematic fraud on all investors in Towers' securities including, _inter alia_, the Noteholders.

3. **The Purportedly Self-Contained System Created By The Indentures And The Servicing Agreements.**

434. The system created by the Indentures and the Servicing Agreements can be summarized as follows. Towers was to purchase only Qualified Healthcare Receivables, consisting of accounts receivable owing to various hospitals, nursing homes and other healthcare providers (the "Providers") by certain private insurance companies and governmental agencies (the "Third-Party Obligors"). Towers was to acquire the receivables from the Providers pursuant to Healthcare Purchase Contracts substantially in the form annexed to and included as part of the Indentures.

-120-

140 sm

Towers was then to sell those receivables to TNRFC I-V pursuant to the Servicing Agreement, which further required Towers to, among other things, make collections on the receivables, maintain the books and records, and provide certain reports to the bond Trustee. Proceeds from the collections were to be allocated, pursuant to express terms of the Indentures, to purchase new receivables, make periodic payments of interest (and ultimately principal) to the Bondholders, and to cover fees and expenses. The Bonds were to be secured by the receivables and the proceeds of such accounts receivable, which TNRFC I-V acquired from Towers under the Servicing Agreement.

435. In purchasing a receivable from a Provider, Towers was to pay the Provider a purchase price of 95 percent of the amount actually received by Towers from the Third Party Obligor with respect to the receivable. Indenture Ex. C ¶3. Towers was to pay this purchase price to the Provider in two installments: approximately 50 percent upon purchase, and the balance -- approximately 45 percent -- upon the earlier of collection or certain other events, but in no case later than 365 days after the date of the purchase. Indenture Ex. C ¶ 3. Towers, immediately after acquiring the Qualified Receivable, was to sell the receivable to the Healthcare Subsidiary under substantially the same payment terms. Servicing Agreement § 2.02. In each such transaction the money to fund the acquisition was to be provided by Shawmut from funds on deposit in the appropriate account maintained by it under the Indenture.

-121-

436. The Indenture and Servicing Agreement were supposed to create a "closed system", in which the bond proceeds would be designated for specifically enumerated uses, and the flow of funds carefully monitored in order to ensure that the funds necessary to service the bonds were not dissipated or misappropriated in any manner.

437. Pursuant to the Indenture and the Servicing Agreement, each Healthcare Subsidiary, upon receipt of a list of receivables to be purchased from Towers (as seller), was to submit to Shawmut an officer's certificate identifying the amount of money needed to purchase receivables. Upon receipt of the certificate, Shawmut was to transfer the requested amount of money from the appropriate Acquisition Account to a checking account. Towers, as Servicer, was authorized to draw on the funds in the checking account solely for the purpose of purchasing "Qualified Healthcare Receivables" and only upon sale of those receivables to TNRFC I-V. Indenture § 303(a), 303(d) and 304(b). However, in practice, Towers routinely drew monies prior to purchasing the receivables. For example, in the February 3, 1993 SEC deposition of Susan Keller, Vice President and trust administrator at Shawmut Bank - Connecticut (f/k/a Connecticut National Bank), the witness testified that when she received Towers' 1992 Annual Report, in December 1992, she became aware of the "$15,891,000 which consists of amounts advanced to the parent in advance of the application of those amounts to the purchase of health care receivables and fees paid to the parent during the year which were subsequently waived" and further, that

-122-

such advances were not allowed under the Indenture or Master Sale and Servicing Agreement. (Keller Tr. at 69-73).

438. Towers was also charged with effecting collection of the purchased receivables, as well as maintaining documents and establishing automated data systems to allow the receivables to be properly identified as a belonging to a particular Healthcare Subsidiary and tracked as to payments made. Servicing Agreement §§ 3.02, 3.03, 5.01 and 5.02.

439. Towers, as Servicer, would provide weekly or twice-weekly reports to Shawmut containing information necessary to justify the transfer of funds. Upon receipt of the requisite information, Shawmut was to transfer the funds in the Master Trust Accounts: (i) directly to Towers, as Servicer (to make the 45 percent deferred payments on collected receivables); (ii) to the Collection Account (for payment of expenses and transfer to the Interest Subaccount); and (iii) to the Acquisition Account (for purchase of new receivables). Servicing Agreement § 7.01(a); Indenture §§ 303(b), 306(b).

440. Towers was also required to provide monthly and annual Servicer Accounting Reports summarizing relevant information about each purchased receivable, including the date purchased, the identity of the Third Party Obligor and Healthcare Provider, the Stated Value (i.e., the amount Towers deemed to be due and payable), the history of payment (or nonpayment), and the aggregate Stated Value of receivables that remained uncollected after 90 days. Servicing Agreement §§ 3.03, 7.01(b), 7.02.

4. **Specific Provisions and Requirements Of the Indenture And Servicing Agreement.**

441. The Indentures contained various provisions designed to ensure that the Healthcare Subsidiaries generated, and retained, sufficient cash to service the Bonds.

(a) **The Required Characteristics Of Qualified Healthcare Receivables.**

442. The Indentures set forth a number of limitations on the quality and diversity of receivables that the Healthcare Subsidiaries could purchase from Towers and/or maintain (i.e., receivables which qualified as "Qualified Healthcare Providers"). For example:

(a) The Healthcare Subsidiaries could only purchase healthcare receivables, i.e., receivables owed to qualified healthcare Providers and backed by qualified Third-Party Obligors. Indenture § 101 "Healthcare Receivable."

(b) No more than 20 percent (15 percent in the case of THRFC I) of the aggregate receivables owned by any Healthcare Subsidiary, plus the net value of all cash and investments of that Healthcare Subsidiary pledged to Shawmut, could be purchased from any one Provider (the "Provider Concentration Limitation"). Indenture §1006(a).

(c) During any consecutive three-month period, the average stated value of any Healthcare Subsidiary's receivables that remained unpaid after 90 days could not exceed 10 percent of the average stated value of all of that Healthcare Subsidiary's receivables for an additional 30 days after receipt

of notice from the trustee to that effect (the "Aging Limitation"). Indenture § 101.

The purpose of these limitations was to ensure that the Healthcare Subsidiaries only purchased receivables with characteristics designed to enhance and maximize the collectibility of the receivables.

(b) **The Prohibition Against Advancing Funds Without Proper And Sufficient Collateral.**

443. THRFC I-V were expressly prohibited from advancing funds to any entity without receiving qualified accounts receivable as collateral. Specifically, section 907(b) of the Indenture provides:

The Issuer shall not:

(i) create, authorize, issue, incur or suffer to exist any indebtedness for borrowed money (other than the Bonds). . . .

This provision served to directly protect Bondholders (and indirectly other investors in Towers) by proscribing the use of the bond proceeds for purposes other than to purchase high quality receivables as collateral.

(c) **The Prohibition Against Commingling Of Assets.**

444. Furthermore, each Healthcare Subsidiary was prohibited from commingling assets with those of the other subsidiaries and/or with Towers' assets. Nor could a Healthcare Subsidiary assume any other Subsidiary's liabilities. Specifically, § 907(h) provides:

The Issuer will pay from its assets all obligations and indebtedness of any kind incurred by the Issuer and will not assume the liabilities of any other corporation. **The Issuer shall not commingle its assets**

-125-

**with those of any other corporation, including any Affiliate.** The Issuer will not purchase any securities of Towers Financial Corporation or any of its Affiliates.

(Emphasis added). This provision was designed to ensure that each Subsidiary retained its own assets, and that the assets of one Subsidiary were not used to bolster the assets of another Subsidiary (or of Towers).

(d) **The Collateral Coverage Ratio.**

445. Each Healthcare Subsidiary was required to maintain a collateral coverage ratio (the "Collateral Coverage Ratio"), such that the Stated Value of the Healthcare Subsidiaries' receivables, divided by: (i) the aggregate outstanding principal amount of the Bonds; less (ii) cash and investments held by the Trustee, cash in the Acquisition Account and operational fees paid, would equal or exceed 180 percent (or 135 percent in the case of THRFC IV and V). Indenture § 101. The Collateral Coverage Ratio was to be calculated quarterly, and at the end of each quarterly period each Healthcare Subsidiary was to file an officers' certificate with both Shawmut and the rating agency that rated the Bonds, Duff & Phelps, showing, among other things, that the Collateral Coverage Ratio was met. Indenture § 1005(a).

446. In order to assure the Trustee that the minimum collateral coverage ratio was being maintained, § 1005(b) of the Indenture required that each Healthcare Subsidiary obtain quarterly attestations from independent accountants of national standing, stating that the proper method of determining compliance with the collateral coverage ratio was used and that

-126-

the calculations were properly performed. From the inception of the Healthcare subsidiaries, through at least the end of fiscal year 1992, Eisner performed the critical role of providing attestations to the Trustee that each of the Healthcare Subsidiaries was in compliance with the minimum collateral coverage ratio.

(e) **The Requirement That Proceeds Of Receivables Be Deposited In The Lockbox Account.**

447. Moreover, as described above, the Indentures and Servicing Agreements required Towers (and, if Towers failed to do so, the Healthcare Subsidiaries) to instruct Third-Party Obligors to send all payments on receivables directly to the Lockbox Account established by Shawmut. The contents of the Lockbox Account were "swept" daily into the Master Trust Account from which funds could be withdrawn, only upon the submission by Towers of information certifying that the withdrawn funds would be used to purchase Qualified Healthcare Receivables.

448. The purpose of the Lockbox Account was to ensure that control of the funds of each Healthcare Subsidiary would be maintained by Shawmut and that funds (a) would not be improperly utilized by Towers or a Healthcare Subsidiary that did not have ownership of the funds; but (b) would be utilized to purchase the Qualified Healthcare Receivables.

449. In sum, the ultimate purpose and intent of the Indenture requirements described in paragraphs 434-448 above was to ensure that the receivables purchased by the Healthcare Subsidiaries were legitimate and readily collectible, and thus could generate sufficient revenues to service the bonds.

5. **The Systematic Breach Of The Indentures And Servicing Agreements By Towers And THRFC I-V.**

450. Despite express Indenture covenants delineating virtually every facet of THRFC I-V's rights, responsibilities and daily operations, Towers caused the Healthcare Subsidiaries to routinely and systematically violate numerous provisions of the Indentures, which violations ultimately and foreseeably caused the insolvencies and bankruptcies of THRFC I-V and Towers.

(a) **Towers Improperly Sold A Large Number Of Receivables To The Healthcare Subsidiaries Which Were Not Qualified Healthcare Receivables.**

451. Towers caused THRFC I-V to purchase and/or record as assets on their books receivables that failed to comply with the requirements contained in the Indentures because such receivables: (i) were non-existent, or non-healthcare accounts receivable such as the $19 million in FDIC Portfolio receivables transferred to the books and records of THRFC I-V in fiscal 1991, in order to maintain the appearance of compliance with the collateral coverage requirements; (ii) exceeded the limits on purchases of accounts receivable from any one Healthcare Provider (i.e., violated the Provider Concentration Limitation; or (iii) exceeded the limits on receivables over 90 days old (the Aging Limitation).

452. In addition, Towers improperly induced the Bond Trustee - Shawmut - to advance funds to Towers prior to Towers' purchase of Qualified Healthcare Receivables, in violation of the Bond Indenture and Master Sale and Servicing Agreement. (Keller Tr. at pp. 69-73).

-127-

-128-

**(1)  The Fictitious And Non-Healthcare Receivables.**

453. Recorded as assets on the books of the Healthcare Subsidiaries were numerous receivables which did not even exist. According to the trustee-in-bankruptcy in 1991, the Healthcare Subsidiaries recorded $5 million in fabricated healthcare receivables, with Towers selecting the names of purported obligors of many of the receivables out of the phone book. Obviously, such receivables did not meet the requirements of the Indenture, and could not generate funds necessary to service the Bonds.

454. Additionally, in 1991, Towers sold approximately 19 million in receivables to the Healthcare Subsidiaries which clearly were not even healthcare receivables; rather, they were receivables of the Federal Deposit Insurance Corporation ("FDIC"), which insures the deposits of its member banks. On their face, these FDIC receivables did not and could not constitute Qualified Healthcare Receivables, pursuant to § 101 of the Indenture.

**(ii)  Towers Caused The Healthcare Subsidiaries To Exceed The Provider Concentration Limitation.**

455. In 1992, and 1993, Towers caused THRFC I-V to violate the Indenture provisions governing the limits on healthcare receivables purchases from any single Provider by, inter alia, advancing an aggregate of over $120 million to North Detroit General Hospital, Ingleside Hospital, and Tustin Healthcare. In gross excess of the value of the outstanding accounts receivable the Providers had available to sell, of which

$43 million of the $120 million has yet to be repaid. (These "advances" also violated the Indenture provisions proscribing the use of Bond proceeds for purchases other than Qualified Healthcare Receivables. See paragraph 451 above.) In fact, each of these Providers was on the brink of becoming insolvent, if not already technically insolvent, at the time Towers improperly advanced the millions of dollars of Bondholders' money. For example, as noted in a May 24, 1992 PR Newswire release:

> North Detroit General Hospital (NDGH), reported as close to closing for the past few months and in a Chapter 11 situation since mid-1991, has received a heavy infusion of financial and managerial assistance, and taken a number of other positive steps to recoup its position as the primary healthcare delivery hospital in the north Detroit-Hamtramck area.
>
> Towers Financial of New York, a leading investment firm that provides financing to hundreds of hospitals nationwide, entered the NDGH situation in mid-February 1992. Towers also has advanced funds to NDGH to allow continued operation of the troubled but much-needed hospital during the recovery process.
>
> * * *
>
> Towers is in the process of developing a plan to revitalize the hospital and provide a fair return to employees, creditors and other parties which stand to lose everything if the hospital is closed. (Emphasis added)

Thus, despite the fact that North Detroit was in Chapter 11 proceedings in mid-1991 (thus, Towers and THRFC I-V were precluded by the express terms of the Indenture from acquiring its healthcare receivables), Towers advanced millions of dollars of THRFC I-V's funds, unsecured or undersecured, to North Detroit, beginning in February 1992.

456. In large part because of Towers' improper advances of over $120 million of Bondholders' Funds to insolvent or nearly insolvent hospitals, by the time the bankruptcy court appointed a trustee-in-bankruptcy for THRFC I-V and Towers, approximately $114 million in outstanding receivables remained uncollected.

457. Moreover, Towers and the Healthcare Subsidiaries admitted that the Subsidiaries had violated the Provider Concentration Limitation on at least nine occasions during fiscal 1992. Incredibly, Towers and the Healthcare Subsidiaries rationalized that while they violated the express terms of the Indenture on all nine occasions, six of these violations were "irrelevant because they did not violate the "less restrictive" description of the Provider Concentration Limitation purportedly contained in the Private Placement Memoranda for the Bonds. As stated in the Notes to THRFC I's 1992 Financial Statements, for example, which were audited by Defendant Eisner and included in Towers' 1992 Annual Report:

> The formula used to determine compliance with the covenant relating to receivables from any one provider is more restrictive in the Indenture than in the private placement memorandum delivered to investors in connection with the sale of the Bonds. The Company believes the formula in the private placement memorandum to be the intent of the parties. At June 10, 1992 the Company was not in compliance under the less restrictive formula with respect to one provider and is not in compliance under the more restrictive formula with respect to six providers.

458. Perhaps more incredibly, Towers and the Healthcare Subsidiaries made the above-quoted representation regarding the intent of the parties to the Indentures, with Eisner's blessing,

without even notifying the other party to the Indenture (Shawmut) that (1) the Subsidiaries had violated the Indentures in several material respects; or (2) the subsidiaries were applying a "less restrictive" Provider Concentration Limitation than the other provided for in the Indentures because it better represented the "intent of the parties".

459. Indeed, even if Towers' interpretation did represent the intent of the parties (which is belied by the fact that the Trustee declared an Event of Default upon being notified of the violations), neither Towers nor Eisner sought any written confirmation of such intent from the Trustee, or sought to obtain a waiver of the violations of the actual terms of the Indentures for the Trustee. In fact, under § 513 of the Indenture, the Trustee could not have granted such a waiver without amending the Indenture, which required the approval of holders of 50 percent of the outstanding Bonds.

460. In any event, Towers' (and Eisner's) purported reliance on the interpretation of the Indenture contained in the Private Placement Memorandum ("PPM"), as opposed to the terms of the Indenture is belied by the express representations in the PPM that the Indentures' provisions would govern over any descriptions of those provisions contained in the PPM:

> The following summaries describe certain provisions of the Indenture. The summaries do not purport to be complete and are subject to, and qualified in their entirety by reference to, the provisions of the Indenture.

E.g., THRFC V Bond PPM at 58.

(iii)  **Towers Caused The Healthcare Subsidiaries To Exceed The Aging Limitation.**

461. Moreover, by brazenly misapplying the rules for calculating the age of THRFC I-V's receivables, beginning at least in fiscal 1992, if not earlier, Towers caused the Subsidiaries to consistently violate the Indenture's requirement that no more than 10 percent of the Stated Value of any Subsidiary's receivables could be receivables that had remained unpaid for over 90 days (the Aging Limitation).

462. For example, the 1992 financial statements of THRFC I-V describe the Indenture provision which deems a principal Amortization Event if the amount of Defaulted Accounts which are unpaid after 90 days exceeds 10 percent of the average aggregate stated value of all healthcare receivables. It is then disclosed that "[m]anagement has considered it reasonable to treat unpaid claims, at the expiration of 90 days" -- Defaulted Accounts under the Indenture terms -- "as new claims on the assumption that they would have been paid except for insufficient documentation or some other nondisallowing reason .... "[m]anagement believes that, under this interpretation, the Company is in compliance with the 90 day provision described above."

463. This statement is significant because it implicitly admits that the Indenture covenants contradicted the Subsidiaries' "interpretation" of the aging provisions. Moreover, if the receivables lacked adequate documentation, then it was a breach of the Indenture to purchase them in the first

place. Without such documentation, Towers could not have properly completed the due diligence required before purchase and, at any rate, without proper documentation, the receivable would rightfully be deemed a Rejected Account under the Healthcare Purchase Contract, which requires the Provider to substitute the receivable with another qualified healthcare receivable.

464. Moreover, under the terms of the Healthcare Purchase Contract, ¶ 8(xiii), all such documents were required to be provided to Towers within 3 business day of Towers' purchase of such account, or such account would be a Rejected Account.

465. Finally, the Indenture requires the 90 day limitation to be 90 days from the billing date, not 90 days from the date the receivable was purchased by Towers. Indenture §101 (definition of Principal Amortization Event). Therefore, if Towers acquired a healthcare receivable 30 days after the debt was originally incurred by a patient in exchange for medical treatment received, pursuant to the Healthcare Purchase Contract, upon purchase by Towers, the receivable would be 31 days old, not 1 day old as Towers misrepresented. Consequently, Towers' "belief" that such accounts receivable would be paid except for some minor detail is wholly irrelevant; under the Indenture covenants, such accounts receivable constitute Defaulted Accounts and, since the Healthcare Subsidiary held in excess of the allowable limit on Defaulted Accounts after the requisite time period, the principal on the Bonds was immediately due and

payable. The Indenture in no way permits the Servicer to "refresh" over-aged receivables.

    (b) **The Healthcare Subsidiaries Are Caused To Impermissibly Advance Funds To Towers, Which Towers Misappropriated For Its Own Purposes.**

    466. Although Towers was obligated under the Indenture to maintain all advanced funds in segregated accounts apart from Towers' other funds because these monies were only permitted to be used for the purchase of Qualified Healthcare Accounts Receivables, such cash advances by THRFC I-V were routinely commingled with Towers other monies, and were also impermissibly used to pay whatever expenses Towers saw fit to pay, including maintaining Defendant Hoffenberg's lavish lifestyle of fancy offices, yachts, houses and limousines.

    467. The Notes to the Financial Statements of the Healthcare Subsidiaries, which were included in Towers' 1992 Annual Report, describe how THRFC I-V periodically advanced monies to Towers prior to Towers' purchase of healthcare receivables for the Healthcare Subsidiaries. Despite the fact that THRFC I-V purportedly "believe[d], and ha[d] been assured by the Parent [Towers], that all such advances would be applied in compliance with the Indenture", such transactions were expressly prohibited by the Indenture and constituted an Event of Default thereunder. Whether or not the Healthcare Subsidiaries believed that Towers would properly apply such advances to future purchases of receivables, the Indenture expressly prohibited such advances. Moreover, given that "The Company" and "The Parent" are comprised of the same personnel] (for example, the Board of

THRFC V was comprised of, inter alia, Brator, Rosoff, and Chugerman; each of whom was a Board Member of Towers], assurances from "The Parent" were meaningless doublespeak; since Towers and the Subsidiaries were one and the same, the Subsidiaries knew that Towers intended to misappropriate the funds advanced for its own uses to the detriment of Bondholders.

    468. By advancing funds to Healthcare Providers, THRFC I-V essentially acted as a revolving credit facility, rather than as a factoring business, by in essence making non-collateralized payments to Towers in return for only the promise of future healthcare receivables.

    (c) **Towers And The Healthcare Subsidiaries Systematically Commingled Assets Throughout the Class Period.**

    469. The 1992 Annual Report contains a separate opinion letter from Eisner and financial statements for each of the Healthcare Subsidiaries. The notes accompanying the financial statements, "an integral part of the financial statements", contain tacit, thinly-veiled admissions of wrongdoing on the part of THRFC I-V and, more importantly, Eisner.

    470. For example, the Notes to the financial statements of THRFC I, which are virtually identical to the financial statements of the other Healthcare Subsidiaries, expressly acknowledge that during fiscal 1992, Towers repurchased healthcare accounts receivable from THRFC I and sold them to its other subsidiaries:

    In an attempt to achieve equitable results among the five entities, [Towers] buys and sells receivables within this group.

1992 Annual Report at 54-55.

471. In like fashion, the Notes to the 1992 financial statements reveal that Towers also repurchased accounts receivable from THRFC II-V and resold them to, *inter alia*, THRFC I. Such repurchases and reshuffling of receivables were expressly prohibited by the Indentures. The impermissible transfers of accounts receivable each constitute a Principal Amortization Event under § 101 of the Indenture.

472. To mask this, Towers deliberately manipulated the books and records of THRFC I-V, according to the Trustee-in-bankruptcy, by maintaining two sets of records, one which accurately reflected Towers' advances to healthcare providers and one which showed falsely, that THRFC I-V were in compliance with the Indenture covenants.

(d) **The Healthcare Subsidiaries Did Not Maintain The Minimum Required Collateral Coverage Ratios.**

473. Furthermore, despite certifications and attestations to the contrary by the Healthcare Subsidiaries' officers and Eisner, the Subsidiaries consistently failed to maintain the minimum Collateral Coverage Ratios prescribed in the Indentures. They were able to report compliance with these ratios only by violating numerous Indenture provisions, including the following:

(a) by purchasing voluminous non-qualified healthcare receivables from Towers, including millions of dollars in receivables which either did not exist or were not even healthcare receivables, the Healthcare Subsidiaries substantially inflated the Stated Values of the collateral backing the Bonds;

(b) by shifting assets back and forth among the Healthcare Subsidiaries, Towers created the false impression that each subsidiary had sufficient collateral to back their bonds when, in reality, the aggregate value of the Subsidiaries' collateral was far less than the aggregate debt outstanding on the Subsidiaries' Bonds; and

(c) by advancing funds to Towers and other entities without obtaining the requisite collateral, the Healthcare Subsidiaries impermissibly depleted the cash available to service the Bonds.

474. Moreover, by inducing Third Party Obligors to submit their payments on receivables to Towers directly rather than the Lockbox Account established for the benefit of the Bondholders, and by keeping such payments for itself, Towers further depleted the cash available to service the Bonds.

(e) **Towers Induced Obligors And Providers To Send Payments Directly to Towers Instead Of the Lockbox Accounts.**

475. Towers also failed, in many instances, to deposit funds in the Lockbox Accounts, in contravention of the express terms of the Indentures. Despite express requirements to the contrary, Towers induced Third-Party Obligors and Providers to deliver accounts receivable proceeds directly to agents of Towers in order to enable Towers to divert millions of dollars in accounts receivable proceeds to uses unrelated to the purchase of healthcare receivables.

476. According to THRFC I-V bondholders complaint, Eisner knew of this practice as early as May 1991, as it

pertained to THRFC I, yet never disclosed such practices in the subsequent documents governing THRFC II-V, which documents continued the misrepresentation that payments by Third-Party Obligors would be made to the Lockbox Account. Apparently as a result of this practice, Towers was able to divert over $25 million in accounts receivable proceeds from the Lockbox Accounts to separate accounts, held by and for the benefit of Towers, at Chase Manhattan Bank, N.A. ("Chase"). Had Eisner properly disclosed the breaches by THRFC I, at a minimum, the breaches by THRFC II-V would never have occurred.

6. **Eisner Intentionally Or Recklessly Disregarded The Numerous And Blatant Breaches Of The Indentures And Servicing Agreements Because Of Its Failure To Conduct A Proper Audit Pursuant To GAAS.**

(a) **The Basis Of Eisner's Knowledge Or Reckless Disregard Of The Indenture Violations, And The Resulting Falsity Of The Healthcare Subsidiaries' Financial Statements.**

477. Upon information and belief, Eisner had actual knowledge of all or many of the numerous and blatant violations of the Indentures and Servicing Agreements described above, based upon (1) numerous meetings with principals, officers and/or directors of Towers (including, inter alia, Ross Greenberg, David Castle, Art Ferro, Charles Chugerman, Mitchell Brater, Michael Rosoff and Steven Hoffenberg); and (2) Eisner's review of the books and records of/on the Healthcare Subsidiaries or Towers.

478. Even if Eisner did not have actual knowledge of these transgressions, as detailed below, it clearly would have attained such knowledge if its audits of THRFC I-V's fiscal 1991 and 1992 financial statements had been conducted in accordance

with GAAS. Indeed, Eisner could fail to obtain, such knowledge only by conducting an audit which grossly and flagrantly contravened or disregarded even the most basic tenets of GAAS.

479. Moreover, Eisner obtained or should have obtained knowledge of many of these violations in preparing its quarterly attestations regarding the Healthcare Subsidiaries' compliance (or noncompliance) with their minimum required Collateral Coverage Ratios.

(b) **Eisner's Audit Grossly Violated GAAS.**

480. Eisner knowingly or recklessly violated GAAS in conducting its audits and THRFC I-V's fiscal 1991 and fiscal 1992 financial statements, as follows:

(a) Eisner failed to design an audit program which would adequately test the Healthcare Subsidiaries' compliance with material provisions of the Bond Indentures. See, e.g., Standard of Fieldwork No. 1 ("The work is to be adequately planned . . ."); S.O.F. No. 2 ("A sufficient understanding of the internal control structure is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed."); S.O.F. No. 3 ("Sufficient competent evidential matter is to be obtained . . . to afford a reasonable basis for an opinion . . ."). Indeed, since the Healthcare Subsidiaries were limited purpose corporations whose sole purpose was to issue the Bonds and perform their obligations under the Indentures, Eisner knew that monitoring compliance with the financial was of the utmost importance in determining whether the financial statements of the Healthcare Subsidiaries fairly and accurately

presented their financial position, results of operation and cash flow in accordance with GAAP;

(b) Eisner failed to adequately investigate the books and records of Towers, the Servicer to the Healthcare Subsidiaries, and failing to adequately monitor Towers' compliance with the Servicing Agreement (particularly because an Event of Default under the Servicing Agreement also constituted an Event of Default under the Bond Indentures), in violation of Standard of Field Work No. 2 and SAS 70;

(c) Eisner failed to adequately test the Healthcare Subsidiaries' compliance with material covenants of the Indenture, in violation of the standards of fieldwork set out in SAS; if Eisner had properly conducted such tests, it surely would have discovered that:

(1) Towers had caused the Healthcare Subsidiaries to purchase numerous receivables which did not meet the requirements for "Qualified Healthcare Receivables", set forth in the Indenture; indeed, any appropriate or adequate testing procedure would have revealed that the Healthcare Subsidiaries had on their books and records a significant number of receivables which (A) exceeded the Provider Concentration Limitation; (B) exceeded the Aging Limitation; (C) were not even Healthcare Receivables, but rather were receivables owed to insolvent banks taken over by the FDIC; and (D) in many cases, did not even exist. In fact, Eisner either ignored or failed to discover that Towers had completely fabricated the names of numerous people who supposedly owed debts purchased by the

-141-

Subsidiaries, picking random names out of the phone book. Eisner should have been alerted to the existence of these phony receivables not only by their sheer number, but by the fact that the last names of all of these purported Obligors began with a letter only in the range A-M, a statistical impossibility given the large number of names involved.

If Eisner had conducted even a cursory test to confirm the validity of the Healthcare Receivables pursuant to SAS 39, it surely would have discovered that a material portion of such receivables were not "Qualified Healthcare Receivables", as defined in the Indentures;

(2) Towers entered into numerous "side agreements" with Healthcare Providers containing terms which did not conform to the form Healthcare Receivable Contract annexed to the Indenture as Exhibit C;

(3) Towers had used bondholders' funds to advance or loan money to Healthcare Providers, when the Indenture expressly precludes expenditure of Bond proceeds for uses other than purchasing Qualified Healthcare Receivables;

(4) Towers and the Healthcare Subsidiaries impermissibly transferred receivables among the Healthcare Subsidiaries, in violation of Section 907(h) of the Indenture;

(5) Towers and the Healthcare Subsidiaries impermissibly diverted receivables proceeds "upstream" to Towers, in violation of the Indenture;

(6) Towers and the Healthcare Subsidiaries impermissibly "commingled" funds of the various Healthcare

-142-

Subsidiaries and Towers, in violation of Section 907(b) of the Indenture; and

(7) Towers impermissibly induced Third Party Obligors to make payments to Towers directly (or to Healthcare Providers, who either forwarded the checks to Towers or kept the proceeds for themselves) rather than sending their payments to the Lockbox Account, as required by the Indenture.

(d) Eisner failed to obtain competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for its opinion that the Healthcare Subsidiaries' financial statements complied with GAAP, as required by Standards of Field Work No. 3. For example:

(1) Eisner failed to confirm that the receivables on the books and records of the Healthcare Receivables were Qualified Healthcare Receivables. As defined in the Indenture; indeed even a cursory inspection or confirmation of an appropriate random sampling of the subsidiaries' receivables would have revealed not only that a material amount of receivables violated numerous Indenture requirements (e.g., the Provider Concentration Limitation and the Aging Limitation), but that many receivables were completely fictitious, with the names of healthcare patients selected from the phone book;

(2) Eisner failed to confirm that the Healthcare Subsidiaries' interpretation of certain requirements of the Indenture, which admittedly differed from the terms of the Indenture, in fact reflected, "the intent of the parties" to the Indenture. As described above, the Notes to the financial

-143-

statements included in Towers' 1992 Annual Report, which were audited by Eisner, state that "the formula used to determine compliance with the covenant relating to receivables from any one provider is more restrictive in the Indenture than in the Private Placement Memoranda delivered to investors in connection with the sale of the Bonds." Incredibly, Eisner simply accepted management's word that the parties to the Indenture -- i.e., the Healthcare Subsidiaries and the Trustee -- intended the Indenture to have the meaning set forth in the Private Placement Memorandum, rather than the meaning set forth in Indenture itself, without either (a) requesting that the Trustee confirm that it intended the agreement to have such meaning, or (b) requiring the Healthcare Subsidiaries to provide a waiver or some other assurance that the Trustee agreed with the subsidiaries' interpretation. Moreover, Eisner either ignored or recklessly disregarded the fact that the Private Placement Memoranda expressly provided that the information contained therein regarding the Indenture was subject to and qualified in its entirety by reference to the provisions of the Indenture;

(3) Eisner failed to confirm that advances made by the Healthcare Subsidiaries to Towers in advance of the application of those amounts to the purchase of healthcare receivables (itself, admittedly, a violation of the Indenture - see 1992 Annual Report at 55) would "be applied in compliance with the Indenture" (Id.); and

(4) Eisner failed to confirm that the Healthcare Subsidiaries' belief that "claims which were rejected

-144-

for insufficient documentation, or which were not paid as of the expiration of 90 days to be new claims upon resubmission to the healthcare provider'," was appropriate (i.e., the "freshening" of receivables) when the Servicing Agreement and/or GAAP expressly provide that the 90 day provision begins to run on the date the debt is incurred, not on the date that the debt is purchased by Towers.

(5) Eisner violated General Standard No. 3 which requires that due professional care must be exercised by the auditor in the performance of the examination and the preparation of the audit report.

(6) Eisner violated Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP, inasmuch as Eisner's reports inappropriately represented that THRFC I-V's audited financial statements for fiscal years 1991 and 1992, including the financial statements disseminated with the Offering Memoranda and Annual Reports complied with GAAP, when they violated GAAP for the reasons set forth in paragraphs 481(a)(g) below.

(7) Eisner violated SAS-58, which requires that the opinion letter represent that the audit complies with GAAS, and Eisner violated SAS-1, which governs the professional responsibilities of the independent auditor, by representing that it had conducted its audits of the Healthcare Subsidiaries pursuant to GAAS, when in fact Eisner's audits did not comply

z   1992 Annual Report at 56.

with GAAS in numerous material respects. Rule 202 of the Professional Code of Conduct requires all AICPA members to comply with GAAS.

(8) Eisner violated Standard of Reporting No. 3, which provides that the financial statements should be accompanied by informative disclosures. See also AU § 150.02.

(9) Eisner violated SAS No. 16 (and SAS No. 53, which superseded SAS No. 16 in April 1988), which states that it is the auditor's responsibility "to search for errors and irregularities that would have a material effect on the financial statements" and mandates that the auditor "plan and perform his examination with an attitude of professional skepticism, recognizing that the application of the auditing procedures may produce evidential matter indicating the possibility of errors and irregularities." Eisner failed to exercise due professional care since it did not plan and perform its examinations with an attitude of professional skepticism to detect the rampant errors and irregularities that would (and did) materially effect the financial statements of the Healthcare Subsidiaries.

(10) In light of the seriousness of the violations of the Indenture covenants, Eisner violated SAS-59 (The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern) by failing to make an enquiry into THRFC I-V's ability to continue as a going concern and by failing to adequately disclose, among other things, (A) the recoverability and classification of assets and (B) the amount and classification of liabilities. SAS-59 concludes that as part of

an examination, the auditor should evaluate conditions or events discovered during the engagement that raise questions about the appropriateness of the going concern concept. Such conditions or events may be identified at various points during the engagement, including the performance of analytical procedures, reading of responses received from the entity's legal counsel, and evaluating the entity's compliance with restrictions imposed by loan agreements. (GAAS Guide, § 9.65). The very existence of the Healthcare Subsidiaries and thus, Towers, was in jeopardy. In fact, the covenant violations ostensibly led to the bankruptcy petitions filed by THRC I-V and Towers.

7. The Violations of GAAP Permitted By Eisner.

481. By flagrantly failing to conduct its audits of the Healthcare Subsidiaries' financial statements, in accordance with GAAS, Eisner permitted the Healthcare Subsidiaries to issue financial statements which failed to present fairly the subsidiaries' financial position, operating results and cash flow in conformity with GAAP. The subsidiaries' financial statements contravened GAAP for the following reasons:

(a) The principle that losses should be accrued when assets are impaired or likely to be impaired in the future (FASB No. 5, ¶ 8) was violated in that the Healthcare Subsidiaries recorded the value of its receivables at values substantially higher than their actual worth, and failed to accrue losses necessary to write the receivables down to their realizable values;

(b) More importantly, FASB 5 requires that a loss contingency be accrued if (1) information available prior to the issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability incurred at the date of the financial statements and (2) the amount of loss can be reasonably estimated. This requirement was violated because Eisner was or should have been aware, had they conducted a proper audit, of the material Indenture violations and the foreseeable acceleration of the Bond principal and interest which in turn would cause significant losses to Towers. Under FASB 5, the Notes to the Financial Statements therefore required the THRC I-V, and thus Towers, to take a charge to income, since Eisner was or should have been aware, as a result of its audits, that the losses caused by the Indenture violations were both probable and reasonably estimable;

(c) Eisner was aware or should have been aware that the Healthcare Subsidiaries' Income Statements and Balance Sheets were materially overstated because they failed to reflect the loss contingencies resulting from the Indenture violations.

(d) Also, as a result of the material Indenture violations and the foreseeable acceleration of principal and interest payments, Eisner knew or was reckless in not knowing that the Healthcare Subsidiaries were in jeopardy of being able to operate as going concerns in the near and foreseeable future. Therefore, Eisner should have qualified its accountants' opinion to reflect this fact;

(e) The principle of adequacy and fairness of disclosure was violated. Information was not presented in a manner that would facilitate an understanding of, and avoid erroneous implications from, the financial statements (APB No. 4);

(f) The principle that the financial information presented should be complete was violated (APB No. 4); and

(g) The principle that methods of measuring and reporting should be adopted, which are most likely to aid readers in making the types of economic decisions for which they typically employ financial accounting data, was violated (SAS 3).

8. **Eisner's Improper Acts Were A Proximate And Substantial Cause Of The Losses Suffered By Towers' Noteholders.**

482. Eisner did not exercise due professional care in the performance of its examination of THRFC I-V's audited financial statements and review of interim financial statements, as alleged herein. Eisner knew it was required to adhere to standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. However, Eisner knowingly or recklessly failed to comply with these standards. Eisner, in issuing its several unqualified opinions, as alleged herein, knew or recklessly disregarded that, by doing so, it was engaged in gross departure from GAAS and permitted gross departures from GAAP, and consented to the public dissemination of its opinions with knowledge or reckless disregard for whether or not GAAS and GAAP had been complied with.

483. Despite knowledge or reckless disregard of (1) the defects in its audit, in contravention of GAAS, and (2) the resulting presentation of the Healthcare Subsidiaries' financial statements, in contravention of GAAP, in or about October 1991 and October 1992, Eisner issued unqualified opinions that (1) it conducted its audit pursuant to GAAS; and (2) the Healthcare Subsidiaries' financial statements conformed to GAAP.

484. Eisner knew or recklessly disregarded that such unqualified opinions substantially furthered and assisted the massive fraud being perpetrated by Towers and the Individual Defendants on purchasers of Towers securities. Eisner therefore knew or recklessly disregarded that, by issuing its false and misleading opinions, it was joining and substantially participating in the massive fraudulent scheme to market and sell Towers securities, including the Notes, which, but for Defendants' fraudulent schemes, representations and artifices as alleged throughout this Complaint, would have been unmarketable.

485. Eisner's false and misleading opinions were an integral part of the fraudulent scheme alleged throughout this Complaint. If Eisner had issued an adverse opinion regarding the Healthcare Subsidiaries' fiscal 1991 and 1992 financial statements (or at least a qualified opinion) in October 1991 and 1992, and/or disclosed that the numerous Indenture violations described above created a material question as to the Subsidiaries' ability to continue as a going concern (SAS No. 59), Towers would have been unable to market and sell any new securities, including the Notes, after October 1991.

486. Eisner's opinion was included in the 1992 Towers Annual Report. The Annual Report was used by Towers to market the Notes to investors; thus, as a result, Eisner's issuance of its false and misleading unqualified opinion letters was a direct and proximate cause of the losses suffered by Plaintiffs and other Class members who purchased their Notes after October 13, 1992. Eisner authorized, or provided apparent authority for Towers to use its 1992 opinion in marketing the Notes.

487. Similarly, from the inception of the Healthcare Subsidiaries through at least fiscal 1992, Eisner provided quarterly attestations that the Healthcare Subsidiaries had complied with the Minimum Collateral Coverage Ratios set forth in the Indentures, despite the fact that Eisner knew or recklessly disregarded that the Subsidiaries had not attained the requisite ratios because, as detailed at ¶¶ 445-446 below, Towers (1) significantly overstated the stated value of the subsidiaries' receivables; and (2) significantly depleted the Healthcare Subsidiaries' cash position, in violation of numerous Indenture provisions.

488. Eisner's false and misleading attestations were critical to perpetrating and furthering the false perception that Towers was a solvent and viable company, since § 501 of the Indenture provided that the Trustee could declare an Event of Default and demand full and immediate payment of the bond proceeds if the Healthcare Subsidiaries did not cure their noncompliance with the collateral coverage ratios within 60 days of the date the Trustee notified them of an Event of Default for

such noncompliance. Thus, but for Eisner's false attestations, the Trustee would have been notified by no later than the beginning of the Class Period of these material breaches of the Indenture. In fact, when the Trustee finally learned of these (and other) breaches of the Indenture, it declared an Event of Default, which foreseeably led to (1) a call on the Bonds; (2) the insolvency of the Healthcare Subsidiaries; and (3) ultimately, the insolvency of Towers.]

489. If Eisner had properly notified the Trustee that the Healthcare Subsidiaries had failed to comply with the Minimum Collateral Coverage Ratios, the truth regarding Towers' systematic Indenture violations and precarious financial condition would have come to light and thereafter Towers would have been unable to market and sell its securities, including the Notes. As a result, Eisner's false and misleading attestations were a direct and proximate cause of the losses suffered by Plaintiffs and other Class members.

490. Eisner's failure to detect and report Towers' commingling of the Healthcare Subsidiaries' assets with Towers' other assets enabled Towers to divert monies from the Healthcare Subsidiaries to make payments of "interest" to Noteholders. The diversion of funds from the Healthcare Subsidiaries to make periodic interest payments to Noteholders disguised the fact Towers had continuously incurred substantial operating losses and further misled Noteholders into believing Towers' financial statements were accurate and Towers' operations were sound and in accordance with the representations made by Towers in its

-151-

-152-

Offering Memoranda and Annual Reports. Eisner's failure to detect and disclose Towers' use of Healthcare Subsidiaries' assets to make interest payments to Noteholders was directly responsible for reinvestments and new investments by Noteholders throughout the Class Period, and a critical factor in Towers' concealment of its fraudulent scheme from regulatory authorities.

N. **The Role Played by the Broker-Dealers in Effecting the Unlawful and Fraudulent Conduct.**

491. Defendants Bogart, Consolidated Financial, Dain Bosworth, deBardalabin, East-West, First Affiliated, Halpert, Kaiden, Monterey Bay, and the members of the Defendant Broker-Dealer Class provided the essential link to the investing public which enabled Towers to consummate its unregistered offering and sale of securities, as set forth above. Because of their substantial contacts within the investment community, the Broker-Dealers were able to, and did, effect a wide distribution of the confidential offering memoranda to members of the public, including Class members.

492. As stated above, Towers purportedly sold the Notes pursuant to a purported exemption from registration under Section 4(2) of the Securities Act (transactions by an issuer not involving a public offering) and Regulation D (exemption for limited offers and sales).

493. However, the offering of the Notes was in fact, a public offering, because the offering did not comply with Section 4(2). The Broker-Dealers contributed to the offering's non-compliance with Section 4(2), and thus the selling of

unregistered securities by, _inter alia_, the following acts and omissions:

(a) Distributing the offering memoranda received by them from Towers to a large and indiscriminate number of offerees;

(b) Offering and selling the Notes to unsophisticated offerees through a "cold-call" telemarketing campaign, many of whom were living on fixed incomes;

(c) Failing to appropriately screen potential investors;

(d) Failing to keep proper records of the exact number and identity of all offerees; and

(e) Failing to determine whether or not any of the offerees had prior relationships with Towers.

494. Because the offering of the Notes was a public offering and because the Broker-Dealers received substantial commissions from Towers based on the sale of the Notes, the Broker-Dealers were underwriters (as that term is defined in Section 2 of the Securities Act) in connection with the offering of the Notes.

495. The offering of the Notes also failed to comply with the Regulation D exemption, because it was not a limited offering and was sold to more than 35 non-accredited investors (investors with net assets of less than $1 million at the time of their purchase or annual income of less than $200,000 in each of the two years prior to their purchase or combined income with their spouse of less than $300,000 in each of the two years prior

to their purchase or not-for-profit organizations, defined benefit plans and trust with assets of less than $5 million at the time of their investment). In furtherance of the non-compliance with the Regulation D exemption, the Broker-Dealers:

(a)   Sold to non-accredited investors without taking actions to determine the total number of non-accredited investors; and

(b)   Caused the Notes to be offered and sold by means of general solicitation.

496.   The Broker-Dealers were under a duty, at all relevant times, to investigate the propriety of the foregoing claimed exemptions from registration. Because of, *inter alia*, the massive solicitation, the size of the offering, the large number of Broker-Dealers involved and their presumed knowledge of the securities laws, the Broker-Dealers knew, or were reckless in not knowing that the offering did not comply with the claimed exemptions or was not likely to be in compliance therewith.

497.   Regardless of the conduct engaged in, or the degree of knowledge attributable to the Broker-Dealers, the Broker-Dealers are strictly liable to the Class and to Subclass members under Section 12(1) of the Securities Act, because of the sale of unregistered securities in violation of Section 5 of the Securities Act.

498.   As set forth above, because the offering of the Notes was in reality a public offering, the Broker-Dealers were statutory underwriters and had all of the legal duties and responsibilities of underwriters with respect to an offering of

securities. Prior to offering the Notes for sale and soliciting their customers to purchase the Notes, the Broker-Dealers had a duty to conduct a due diligence investigation with respect to the Notes and the offering.

499.   Adequate investigation by any Broker-Dealer would have revealed that the offering memoranda and Towers' financial statements contained the misrepresentations and omissions of material fact alleged herein.

500.   The Broker-Dealers solicited sales of the Notes by means of the false and misleading offering memoranda and financial statements and by means of other written sales materials (including sales and marketing brochures and form prospecting letters) and oral statements to prospective purchasers.

501.   The written and oral sales representations made by the Broker-Dealers contained the same misrepresentations and omissions as the offering memoranda, and these written and oral representations were in all material respects consistent with the offering memoranda. Further, any oral statements made by the Broker-Dealers were part of a uniform and standardized sales presentation, which was based upon written sales and marketing brochures, including sales materials which were distributed internally to Broker-Dealers only, for use in making oral representations to prospective purchasers.

502.   The Broker-Dealers, in soliciting purchases of the Notes, were motivated by a desire to serve their own financial interests. The Broker-Dealers were paid substantial commissions

on sales of the Notes and therefore, had every incentive to maximize the sales volume.

503. As a result of the foregoing, the Broker-Dealers have breached their duties to Plaintiffs and the Class and Subclass members, inducing Plaintiffs and the Class to purchase the Notes, to their detriment, and are liable therefor.

O. **Effect of Defendants' Acts and Omissions on Price of Securities.**

504. As a result of the aforesaid acts and practices, the omission to disclose that Towers was a Ponzi scheme, the dissemination of false and misleading reports, releases and statements and the lack of disclosure of the adverse facts concerning Towers' business and financial condition, as set forth above, the market price and/or terms of Towers Notes was artificially or maintained throughout the Class Period. In ignorance of Towers' business, management, financial condition, and future prospects, which were not disclosed by Defendants, the class members purchased essentially worthless Notes at artificially inflated prices or on terms artificially maintained. In doing so, the Plaintiffs and members of the class relied, inter alia, on the specific manipulative practices, artifices, omissions and misrepresentations of material fact alleged herein; on the integrity of the market; on the integrity of the registration, offering and marketing process and on the availability of the Notes in the marketplace as evidence that they were entitled to be marketed and were not fraudulently sold. In making their investment decisions, class members relied on the reputations of Defendants such as Duff & Phelps, Eisner, Act and

-157-

the Bronson Defendants. As a direct and proximate result thereof, Plaintiffs were damaged. Had Plaintiffs and the members of the class known of the material adverse information not disclosed by the Defendants, they would not have purchased the Notes.

**VIII.**
**CLAIMS FOR RELIEF**

**COUNT I**
**For Violation Of Sections 12(1) Of The Securities Act**
**(Against Selling Defendants)**

505. Plaintiffs incorporate by reference paragraphs 1 through 504 as if fully set forth herein and further allege, on behalf of the Section 12(1) Subclass, against the Selling Defendants (i.e., the Towers Defendants and the Broker-Dealer Defendants) as follows:

506. Defendants were sellers and offerors of securities within the meaning of section 12(1) of the Securities Act, 15 U.S.C. § 77l(1).

507. Defendants, directly, or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell and offer to sell securities when no registration statement was filed or was in effect as to such securities when no exemption from registration was available.

508. By reason of these offers and sales of the Notes, the Defendants sued violated section 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), and they and the Broker-Dealer Class have violated section 12(1) of the Securities Act, 15 U.S.C. § 77l(1).

-158-

509. Plaintiffs and other members of the Section 12(1) Subclass purchased the Notes in the offering.

510. Plaintiffs, on behalf of themselves and all members of the Section 12(1) Subclass, accordingly seek to recover the full amount of consideration paid for said securities, with interest thereon, upon tender of such securities, which tenders are hereby made, or in the alternative, seek damages sustained as a result of the sale of such securities.

511. This claim under section 12(1) is brought on behalf of Plaintiff Class members who purchased Notes from the Selling Defendants on or after February 9, 1992.

COUNT II
For Violation of Sections 12(2) Of The Securities Act
(Against Selling Defendants)

512. Plaintiffs incorporate by reference paragraphs 1 through 511 as if fully set forth herein and further allege, on behalf of the Section 12(2) Subclass, against the Selling Defendants as follows:

513. Defendants, severally and in concert, directly and indirectly participated in a continuous course of conduct, throughout the Section 12(2) Subclass Period, by the use of the mails, wires, and other means and instrumentalities of communication and transportation and interstate commerce, and offered for sale, sold and were the proximate cause and substantial and necessary factors in the sale of the Notes to the Plaintiffs, by means of written promotional materials, oral

communications, in violation of Section 12(2) of the Securities Act.

514. The domestic offering memoranda contained untrue statements of material facts, and omitted to state material facts necessary to make the statements made not misleading, in light of the circumstances under which they were made, as set forth above.

515. Plaintiffs and other members of the Section 12(2) Class purchased the Notes.

516. Plaintiffs, on behalf of themselves and all members of the Section 12(2) Class accordingly seek to recover the full amount of the consideration paid for those securities, together with interest thereon upon tender of such securities, which tender is hereby made, or in the alternative, seek damages sustained as a result of the sale of such securities.

517. At the time of their purchases, Plaintiffs and other members of the Section 12(2) Class were without knowledge of the facts concerning the wrongful conduct alleged herein and, due to Defendants' concealment of those facts, were not given reason to suspect wrongdoing and inquire into those facts prior to February 9, 1993, at the earliest. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts on which this Count is based to the time that Plaintiffs initially filed this Complaint, and less than three years have elapsed since Plaintiffs' purchases of the Notes. Thus, the claims in this Count have been asserted within the time provided by the statute of limitations.

## COUNT III
### Violations of Section 15 of the Securities Act
### Controlling Person Liability
### (Against the Individual Defendants)

518. Plaintiffs repeat and reallege each and every allegation contained in all paragraphs of the Complaint, both prior and subsequent, on behalf of the Section 12 Subclass, against the Individual Defendant, as if set forth fully herein.

519. The Defendants named in this Count are liable to plaintiffs and the other members of the Class as controlling persons under Section 15 of the Securities Act for all the unlawful acts set forth herein which constituted violations of Sections 12(1) and (2) of the Securities Act because each such defendant possessed, directly or indirectly, the power to influence and exercised the same, to direct the activities conducted by or attributable to the entities which they control.

520. By reason of the foregoing, plaintiffs are entitled to damages from these Defendants in an amount to be proven at trial and such other and further relief as the Court deems proper.

## COUNT IV
### For Violations of Section 10(b) of
### the Exchange Act And Rule 10b-5(a), (b) and (c)
### Promulgated Thereunder
### (Against All Defendants)

521. Plaintiffs incorporate by reference paragraphs 1 through 520 as if fully set forth herein and further allege, on behalf of the Class, against all defendants, as follows:

522. Commencing some time prior to the commencement of the issuance of the Notes and continuing throughout the Class Period, Defendants participated in the conception and/or implementation

-161-

of the fraudulent scheme alleged herein, i.e., to issue market and sell the Towers Notes by (i) engaging in devices, schemes and/or artifices to defraud; and (ii) engaging in acts, practices and a common course of business which operated as a fraud or deceit upon plaintiffs and all Class members in connection with their purchases of Towers Notes.

523. At all relevant times, the true nature of the Towers Notes and the risks associated with an investment in the Notes were fraudulently concealed from and/or misrepresented to plaintiffs and Class members by defendants, each of whom participated in, controlled, approved and/or acquiesced in the fraudulent acts, practices and courses of conduct complained of herein, including the making and/or dissemination of false and misleading statements to the investing public and/or state or federal governmental regulatory entities, as alleged herein.

524. Among these fraudulent acts, practices and courses of conduct were (i) the failure to disclose the true nature of the Ponzi scheme and finances of Towers and its subsidiaries (e.g., the Ponzi scheme detailed throughout the Complaint); (2) the failure to disclose the systematic and blatant violations of the controlling provisions of the Towers Bond Indentures, which foreseeably led the Trustee to declare a default on the Bonds, the resulting default on the Notes, and the collapse of the Ponzi scheme; (3) the making of false and/or deceptively incomplete statements to state and/or federal regulatory agencies or entities for the purpose and with the effect of improperly securing regulatory approval and/or exemptions from various

-162-

registration requirements; and/or (4) the failure to correct the false and misleading statements to investors and/or regulators.

525. Defendants knew or were reckless in not knowing that, but for the fraudulent scheme described herein, the Towers Notes would not have been marketable or sellable, i.e., Defendants fraudulently created a market for the Notes.

526. Similarly, Defendants knew or recklessly disregarded that, but for their fraudulent scheme, as alleged herein, including Defendants' false and misleading statements to state and/or federal regulators, Defendants could not have secured either (1) regulatory approval for the issuance of the Notes and/or (2) exemptions from the registration requirements of the SEC and/or the states in which the Notes were marketed and sold. As a result, Defendants' fraudulent scheme constituted a fraud on the regulatory process and/or the registration process.

527. Plaintiffs and the Class relied on the integrity of the market, the Offering Memoranda, the regulatory process and/or the registration process in deciding to purchase the Towers Notes insofar as they relied on the fact that (1) the Notes were entitled to be marketed; (2) the Offering Memoranda contained complete and accurate disclosures; (3) the Notes were properly entitled to regulatory approval; and/or (4) the Notes were properly entitled to an exemption from registration.

528. Defendants knew or recklessly disregarded that their acts would wrongfully enable the Notes to be successfully issued, marketed and sold, that plaintiffs and the Class would rely on the integrity of the market, the regulatory process and/or the

-163-

registration process for the Notes in deciding to purchase the Notes; that the Notes were not properly entitled to be issued, marketed or sold; and that plaintiffs and the Class would be damaged thereby.

529. Had plaintiffs and members of the Class known the material adverse information which was not disclosed by defendants to the investing public and/or regulators, they would not have purchased the Notes.

530. As a result of the wrongful conduct alleged herein, plaintiffs and members of the Class have suffered damages in an amount to be proven at trial.

531. By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) promulgated thereunder and plaintiffs are entitled to damages in an amount to be proven at trial.

532. Plaintiffs were not aware of any facts constituting the violations of Section 10(b) and Rule 10b-5 alleged herein -- i.e., that the Notes were not entitled to (1) be marketed or sold; (2) regulatory approval or (3) exceptions from registration until, at the very earliest, December 1992, when Shawmut sent Notices of Default to each of the Healthcare Subsidiaries, upon Shawmut's receipt of Towers' 1992 Annual Report which gave the first public notice of towers' and the Healthcare Subsidiaries' violations of the Indenture Covenants. Plaintiffs commenced this suit within one year of the date they became aware of the facts constituting the violations alleged herein and within three years of the date plaintiffs purchased their Notes. As a result, the

-164-

claims alleged in this Count were brought within the applicable statute of limitations.

COUNT V

Violation of Section 20 of the Exchange Act
Controlling Person Liability
(Against The Individual Defendants)

533. Plaintiffs repeat and reallege each and every allegation contained in all paragraphs of the Complaint, both prior and subsequent, on behalf of the Class, against the Individual Defendants, as if set forth fully herein.

534. The *Defendants named in this Count* are liable to *plaintiffs and the other members of the Class* as controlling persons under Section 20 of the Exchange Act for all the unlawful acts set forth herein which constituted violations of Section 10(b) of the Exchange Act because each such Defendant possessed, directly or indirectly, the power to influence and exercised the same, to direct the activities conducted by or attributable to the entities which they control in connection with the fraudulent plan and scheme alleged throughout this Complaint.

535. By reason of the foregoing, plaintiffs are entitled to damages from these Defendants in an amount to be proven at trial and such other and further relief as the Court deems proper.

COUNT VI

For Violations of Applicable "Blue Sky" Laws (Failure to Register or Qualify)

536. Plaintiffs incorporate by reference paragraphs 1 through 535 as though fully set forth herein and further allege, on behalf of the Blue Sky Sub-Class, against the Selling Defendants, as follows:

537. Defendants were sellers and offerors of securities within the meaning of the applicable statute.

538. Defendants, directly, or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell and offer to sell securities when no registration statement was filed or was in effect as to such securities when no exemption from registration was available.

539. By reason of these offers and sales of the Notes, the selling Defendants have violated section 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), and they have violated the applicable state Blue-Sky statutes.

540. Plaintiffs and other members of the Blue-Sky Class purchased the Notes in the offering.

541. Plaintiffs, on behalf of themselves and all members of the Blue-Sky Class, accordingly seek to recover the full amount of consideration paid for said securities, with interest thereon, upon tender of such securities, which tenders are hereby made, or in the alternative, seek damages sustained as a result of the sale of such securities.

COUNT VII

For Violations of RICO, 18 U.S.C. § 1962(a) And/or (d)

542. Plaintiffs incorporate by reference paragraphs 1 through 541 as if fully set forth herein and allege as follows:

543. Count V is brought on behalf of all Class members against Defendants Hoffenberg and Brater.

544. Towers is an enterprise within the meaning of 18 U.S.C. § 1961(4), which was engaged in or whose activities affected interstate commerce.

545. As alleged above, Defendants have engaged in a pattern of acts, including the issuance of the false and misleading offering memorandum and annual reports, constituting two or more acts of fraud in the sale of securities. Moreover, Defendants used the mails in furtherance of their fraudulent activity. Such acts constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

546. Defendants derived substantial proceeds through this pattern of racketeering activity, and used or invested such proceeds in the operation of Towers, in violation of 18 U.S.C. § 1962(a).

547. Defendants knowingly conspired together to commit the wrongful acts alleged above in violation of 18 U.S.C. § 1962(d).

548. By virtue of the above, Plaintiffs and all Class members have been injured by the loss of their investments and have otherwise been damaged in an amount to be determined. Accordingly, they are entitled to recover treble damages and their costs of suit, including reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c).

549. At the time of their purchases, Plaintiffs and all other Class members were without knowledge of the facts concerning the wrongful conduct alleged herein and, due to Defendants' concealment of the facts, were not given reason to

suspect wrongdoing and inquire into those facts prior to February 9, 1993, at the earliest. The claims in this Count have been asserted within the time provided by the appropriate statute of limitations and applicable discovery and/or tolling provisions.

### COUNT VIII

### For Violation of RICO, 18 U.S.C. § 1962(c) And/or (d)

550. Plaintiffs incorporate by reference paragraphs 1 through 549 as if fully set forth herein and allege as follows:

551. Count VI is brought on behalf of all Class members against Defendants Hoffenberg, the Hoffenberg Family Trust, Professional Business Brokers, Brater, Chugerman, Ferro, Rosoff, Lewis, Eboli, G. Fattakos, Levine, DiNicolas, Franklin, N. Fattakos, and Basson.

552. Towers engaged in the activities set forth above as an association in fact constituting an enterprise within the meaning of 18 U.S.C. § 1961(4), whose activities affected, directly or indirectly, interstate commerce.

553. In violation of 18 U.S.C. § 1962(c) and/or (d), Defendants conducted or participated in the conduct of the affairs of an enterprise, through a pattern of racketeering activity, including the issuance of the false and misleading Offering Memoranda and Annual Reports.

### COUNT IX

### For Negligent Misrepresentation

554. Plaintiffs incorporate by reference paragraphs 1 through 553 as if fully set forth herein and allege against all Defendants as follows:

555. In making the misrepresentations and omissions alleged above, Defendants acted without any reasonable grounds for believing the representations they made to be true.

556. Plaintiffs and the other members of the Plaintiff Class were ignorant of the falsity of these statements, and believed them to be true. In actual and justifiable reliance upon said omissions and misrepresentations of material fact, and on the integrity of the market and the regulatory process, Plaintiffs and other members of the class were induced to and did invest in Towers Notes. Had Plaintiffs and the other members of the class known the true facts, they would have taken no such action.

557. As a direct and proximate result of the foregoing conduct, Plaintiffs and each member of the Class suffered damages.

COUNT X
For Negligence

558. Plaintiffs incorporate by reference paragraphs 1 through 557 as if fully set forth herein and further allege against all Defendants as follows:

559. Defendants and each of them owed a duty to Plaintiffs and other members of the class to use ordinary care to prevent Plaintiffs and the other members of the class being foreseeably injured as a result of their conduct. Defendants breached the duty through their conduct as set forth above, and Plaintiffs and the other members of the Class were directly and foreseeably injured as a result of the breach.

560. As a direct and proximate result of the foregoing conduct, Plaintiffs and the members of the Plaintiff Class suffered damages.

COUNT XI
Breach of Fiduciary Duty

561. Plaintiffs incorporate by reference paragraphs 1 through 560 as if fully set forth herein and allege against all Defendants as follows:

562. This count is brought against all Defendants, excluding ACI, the Bronson Defendants, Duff & Phelps, and Squadron Ellenoff, on behalf of all class members.

563. Defendants, and each of them, by reason of their positions at and/or responsibilities to Towers, and as a result of their ability to control the business and corporate affairs of Towers, owed the purchasers of the Notes the fiduciary duties of fidelity, trust, loyalty, honesty and due care and were required to deal with and carry out their duties and responsibilities in a fair, just and equitable manner and to work in the best interest of the investors so as to benefit such persons, and not in furtherance of their personal interests or at the expense of or in derogation of the best interests of the investors.

564. The Defendants, singly and in concert, engaged in the aforesaid conduct in breach of their fiduciary duties to the Towers' Notes purchasers.

565. As a direct and proximate result of Defendants' conduct, Plaintiffs and the members of the class suffered damages.

COUNT XII
For Common Law Fraud

566. Plaintiffs incorporate by reference paragraphs 1 through 565 as if fully set forth herein and further allege against all Defendants as follows:

567. This Count is asserted on behalf of all Class members against all Defendants.

568. For the purpose of inducing investors, including Plaintiffs and other Class members to purchase the Notes, and with the intent to deceive such investors, the Defendants employed a scheme to defraud as a part of which the Defendants made and participated in the making of material misrepresentations of fact and the omission of material facts.

569. Plaintiffs and other members of the Class were ignorant of the material misrepresentation and omissions described herein. In justifiable reliance on the misrepresentations and in ignorance of the true facts, Plaintiffs and other Class members were induced to and did purchase the Notes. Had Plaintiffs and other Class members known the true facts, they would have taken no such action. By reason thereof, Plaintiffs and other Class members have been damaged and demand compensatory, exemplary and punitive damages against each Defendant.

WHEREFORE, Plaintiffs ask this Court:

A.  To certify a Class and Subclasses under rule 23 of the Federal Rules of Civil Procedure;

B.  To certify a Defendant Class of broker-dealers under rule 23 of the Federal Rules of Civil Procedure;

-171-

C.  For compensatory damages in an amount not less than $245,000,000 or, in the alternative, for the remedy of rescission and rescissionary damages;

D.  For treble damages and attorneys' fees and costs pursuant to RICO;

E.  For punitive damages;

F.  For their costs, attorney fees and disbursements;

G.  For pre-judgment and post judgment interest at the maximum lawful rate; and

H.  For such other relief as is just and proper.

II
JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Dated:  June 10, 1994

Respectfully submitted,

MILBERG, WEISS, BERSHAD, HYNES          LIEFF, CABRASER & HEIMANN
& LERACH

Richard M. Meyer (RM-2001)             Daniel C. Girard (DCG-2001)
One Pennsylvania Plaza                  Embarcadero Center West
New York, NY 10119                      275 Battery Street, 30th Floor
(212) 594-5300                          San Francisco, CA 94111
                                        (415) 956-1000

STRNELL, TABACCO & SCHAGER             GARWIN, BRONZAFT, GERSTEIN
                                        & FISHER

Jared B. Stamell (JS-5725)             Bruce E. Gerstein (BEG-2726)
555 Madison Avenue                      1501 Broadway, Suite 1416
Suite 600                               New York, NY 10036
New York, NY 10022                      (212) 398-0055
(212) 752-9222

Plaintiffs' Executive Committee

-172-