USDC SCAN INDEX SHEET

FINAL PART 2 OF 2.

MEG 6/26/00 9:56

3:96-CV-01023 BRADLEY V. HOFFENBERG

*350*

*EXH.*

96-CV-1023
#350

FINAL PART
2 OF 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re TOWERS FINANCIAL CORPORATION NOTEHOLDERS LITIGATION | Master File No. 93 Civ. 0810 (WK) |
| This Document Relates To: All Cases | PROOF OF SERVICE BY FEDERAL EXPRESS AND U.S. MAIL |

I hereby certify that I am not less than eighteen (18) years of age; that I am not a party to this action; and that on June 10, 1994, I served a true and correct copy of the following documents:

1. SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; and
2. PROOF OF SERVICE BY FEDERAL EXPRESS AND U.S. MAIL

by Federal Express to those indicated with two asterisks (**) and on all other parties in this action, listed on the attached service list, by United States first class mail.

[signature]
ANTHONY K. LEE

Martin F. Brecker
ANDERSON KILL OLICK & OSHINSKY, P.C.
666 Third Avenue
New York, NY 10017
Phone: (212)850-0700
FAX: (212)850-0733

Marvin Basson
24 Winding Lane
Upper Brookvill, NY 11545

William M. Boyd
BOYD VEIGEL, P.C.
P.O. Box 1179
McKinney, TX 75069
Phone: (214)542-0191
FAX: (214)542-4532

Richard C. Kraus
FARHAT, STORY & KRAUS
4572 S. Hagadorn Road
Suite Three
East Lansing, MI 48823
Phone: (517)351-3700
FAX: (517)332-4122

Arthur Ferro
54 West Maple Street
Valley Stream, NY 11580

Edward Gasthalter
HOFFMAN & POLLOK
260 Madison Avenue
New York, NY 10016
Phone: (212)679-2900
FAX: (212)679-1844

Paula Frome
KASE & DRUKER
1325 Franklin Avenue
Garden City, NY
Phone: (516)746-4300
FAX: (516)742-9416

** Frederic W. Yerman
KAYE, SCHOLER, FIERMAN, HAYS & HANDLER
425 Park Avenue, 12th Floor
New York, NY 10022
Phone: (212)836-8000
FAX: (212)836-8689

Philip S. Kaufman
** KRAMER, LEVIN, NAFTALIS, et al.
919 Third Avenue
New York, NY 10022
Phone: (212)715-9100
FAX: (212)688-2119

** Joseph E. Coughlin
LORD, BISSELL & BROOK
Suite 3200
115 South LaSalle Street
Chicago, IL 60603
Phone: (312)443-0700
FAX: (312)443-0570

MONTEREY BAY SECURITIES
7965 Soquel Drive
Aptos, CA 95003

** David H. Marion
David L. Grove
MONTGOMERY, McCRACKEN, WALKER & RHOADS
Three Parkway, 20th Floor
Philadelphia, PA 19102
Phone: (215)665-7200
FAX: (215)636-9373

Michael L. Kirby
POST KIRBY NOONAN & SWEAT
600 West Broadway
America Plaza, Suite 1100
San Diego, CA 92101-3355
Phone: (619)231-8666
FAX: (619)231-9593

Robert K. Payson
POTTER, ANDERSON & CARROON
350 Delaware Trust Building
P.O. Box 951
Wilmington, DE 19899
Phone: (302)658-6771
FAX: (302)658-1192

Charles S. Rudy
RAYMOND & PROKOP
2000 Town Center, Suite 2400
Southfield, MI 48075
Phone: (313)357-3010
FAX: (313)357-2720

** James P. Nunemaker, Jr.
RIVKIN, RADLER & KREMER
EAB Plaza
Uniondale, NY 11556
Phone: (516)357-3000
FAX: (516)357-3333

...old J. Rothlisberger
...wrence P. Sandor
... OFFICES OF ARNOLD J. ROTHLISBERGER
... Jamacha Road, Suite 200
... Cajon, CA 92019
Phone: (619)447-8588
FAX: (619)447-8586

** James A. Shanman
SHARFMAN, SHANMAN, PORET & SIVIGLIA
750 Lexington Avenue
New York, NY 10022
Phone: (212)935-7711
FAX: (212)935-5095

**Robert J. Jossen
SHEREFF, FRIEDMAN, HOFFMAN & GOODMAN
919 Third Avenue
New York, NY 10022
Phone: (212)758-9500
FAX: (212)319-5368

Douglas M. Kraus
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
919 Third Avenue, 43rd Floor
New York, NY 10022
Phone: (212)735-3000
FAX: (212)735-2000

Jasper A. Cragwall
WARNER, NORCROSS & JUDD
900 Old Kent Building
111 Lyon St., N.W.
Grand Rapids, MI 49503
Phone: (616)459-6121
FAX: (616)459-2170

** Mark E. Housman
Jeffery A. Sims
WILSON, ELSER, MOSKOWITZ, et al.
150 East 42nd Street
New York, NY 10017-5639
Phone: (212)490-3000
FAX: (212)490-3038

...ard J.M. Little
...sa A. Cahill
ZUCKERMAN, SPAEDER, GOLDSTEIN, et al.
1114 Avenue of the Americas
New York, NY 10036
Phone: (212)479-6500
FAX: (212)479-6512

Lisa A. Cahill
ZUCKERMAN, SPAEDER, GOLDSTEIN, et al.
1114 Avenue of the Americas
New York, NY 10036
Phone: (212)479-6500
FAX: (212)479-6512

Jill S. Abrams
ABBEY & ELLIS
212 East 39th Street
New York, NY 10016
Phone: (212)889-3700
FAX: (212)684-5191

Richard Alexander
THE ALEXANDER LAW FIRM
55 South Market Street
Suite 1080
San Jose, CA 95113
Phone: (408)289-1776
FAX: (408)287-1776

David Berger
Sherrie R. Savett
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Phone: (215)875-3000
FAX: (215)875-4604

Glen DeValerio
BERMAN, DeVALERIO & PEASE
One Liberty Square
Boston, MA 02109
Phone: (617)542-8300
FAX: (617)542-1194

Edward A. Grossmann
BERNSTEIN LITOWITZ BERGER & GROSSMAN
1285 Avenue of the Americas
33rd Floor
New York, NY 10019
Phone: (212)554-1400
FAX: (212)554-1444

Jonathan T. Walton, Jr.
John E. Berg
CLARK, KLEIN & BEAUMONT
1600 First Federal Building
1001 Woodward Avenue
Detroit, MI 48226-1962
Phone: (313)965-8300
FAX: (313)962-4348

Terrence A. Corrigan
Douglas Flaum
FRIED, FRANK, HARRIS, et al.
One New York Plaza
New York, NY 10004-1780
Phone: (212)820-8000
FAX: (212)747-1526

Bertram Bronzaft
Scott Fisher
GARWIN, BRONZAFT, GERSTEIN et al.
1501 Broadway, Suite 1416
New York, NY 10036
Phone: (212)398-0055
FAX: (212)764-6620

GILMAN & PASTOR
One Boston Place
28th Floor
Boston, MA 02108
Phone: (617)589-3750
FAX: (617)589-3749

Vance Opperman
SCHATZ, PAQUIN, LOCKRIDGE, et al.
100 Washington Street South
Suite 2200
Minneapolis, MN 55401
Phone: (612)339-6900
FAX: (612)339-0981

Mark Gaffney
Robert N. Kaplan
KAPLAN & KILSHEIMER
685 Third Avenue
26th Floor
New York, NY 10017
Phone: (212)687-1980
FAX: (212)687-7714

Daniel C. Girard
Karen E. Karpen
LIEFF, CABRASER & HEIMANN
Embarcadero Center West
275 Battery St., 30th Floor
San Francisco, CA 94111
Phone: (415)956-1000
FAX: (415)956-1008

CHRISTOPHER LOVELL, P.C.
52 Duane Street
Suite 900, Federal Plaza
New York, NY 10007
Phone: (212)608-1900
FAX: (212)791-3607

Richard M. Meyer
Jay Kupietzky
MILBERG, WEISS, BERSHAD, et al
One Pennsylvania Plaza
New York, NY 10119-0165
Phone: (212)594-5300
FAX: (212)868-1229

..hn D. Winter
..TTERSON, BELKNAP, WEBB & TYLER
.. Rockefeller Plaza
.. York, NY 10112
..one: (212)698-2500
FAX: (212)956-3153

Steven H. Cohen
Brian D. Roche
SACHNOFF & WEAVER, LTD
30 S. Wacker Drive
Chicago, IL 60606
Phone: (312)207-1000
FAX: (312)207-6400

Dorothy Heyl
SECURITIES AND EXCHANGE COMMISSION
Seven World Trade Center
13th Floor
New York, NY 10048-1102
Phone: (212)748-8035
FAX: (212)748-8045

..red B. Stamell
..ichelle Rago
STAMELL, TABACCO & SCHAGER
555 Madison Avenue, Suite 600
New York, NY 10022
Phone: (212)752-9222
FAX: (212)371-4551

Richard Bemporad
Jody R. Krisiloff
LOWEY DANNENBERG BEMPORAD & SELINGER
747 Third Avenue
New York, NY 10017
Phone: (212)759-1504
FAX: (212)593-0201

Michael J. Freed
MUCH, SHELIST, FREED, et al
200 North LaSalle Street
Suite 2100
Chicago, IL 60601
Phone: (312)346-3100
FAX: (312)621-1750

Stanley M. Grossman
POMERANTZ, LEVY, HAUDEK, et al.
100 Park Avenue
26th Floor
New York, NY 10017-5516
Phone: (212)661-1100
FAX: (212)661-8665

Alan R. Glickman
Peter Phillips
SCHULTE, ROTH & ZABEL
900 Third Avenue
New York, NY 10022
Phone: (212)758-0404
FAX: (212)593-5955

Douglas Schaffer
LAW OFFICES OF DOUGLAS SCHAFFER
1128 Fifteenth Street
Suite 500
Santa Monica, CA 90403
Phone: (310)451-7570
FAX: (310)451-2461

Charles R. Watkins
SUSMAN, SAUNDERS & BUEHLER
Two First National Plaza
Suite 620
Chicago, IL 60603
Phone: (312)346-3466
FAX: (312)346-2829

Curtis V. Trinko
LAW OFFICES OF CURTIS V. TRINKO
310 Madison Avenue
14th Floor
New York, NY 10017
Phone: (212)490-9550
FAX: (212)986-0158

Robert A. Skirnick
WECHSLER, SKIRNICK, HARWOOD, et al.
555 Madison Ave., 18th Floor
New York, NY 10022
Phone: (212)935-7400
FAX: (212)753-3630

Lawrence Walner
LAWRENCE WALNER & ASSOCIATES
150 North Wacker Dr.
Suite 1870
Chicago, IL 60606
Phone: (312)201-1616
FAX: (312)201-1538

Stephen D. Oestreich
WOLF, POPPER, ROSS, WOLF & JONES
845 Third Avenue
New York, NY 10022
Phone: (212)759-4600
FAX: (212)486-2093

IN RE TOWERS FINANCIAL CORPORATION NOTEHOLDERS LITIGATION
Master File No. 93 Civ. 0810 (WK)

**BROKER-DEALER SERVICE LIST**

Accuvest, Inc.
180 Main Street
Suite 231
Smithtown, NY 11787

Alliance Financial Group, Inc.
1600 West 7th Street
Suite 730
Fort Worth, TX 76102

Allison-Williams Co.
2700 Lincoln Centre
333 South 7th Street
Minneapolis, MN 55402-2426

American Discount Securities, Inc.
220 West Douglas
Suite 62
Wichita, KS 67202

American Heartland Investments, Inc.
219 South Santa Fe
Salina, KS 67402

American Heartland Investments, Inc.
P.O. Box 1303
Salina, KS 67402

American Investment Services, Inc.
100 North Main Street
Suite 300
East Peoria, IL 61611

American Investors Group, Inc.
600 S. Highway 169
Suite 700
Minneapolis, MN 55426

American Municipal Securities, Inc.
5810 West Cypress Street
Suite H
Tampa, FL 33607

American Preferred Securities
489 Bethelehem Pike, #500
Montgomeryville, PA 18936

Amerivest Financial Group, Inc.
14001 Palawan Way
Suite 111
Marina Del Ray, CA 90292

Andover Securities
11020 Ambassador Drive
Ambassador II, Suite 520
Kansas City, MO 64153-0676

APS Financial Corporation
1301 Capital of Texas Highway
Suite B-220
Austin, TX 78746

Arundel Securities, Inc.
79 West Street
Annapolis, MD 21401

Barron Chase Securities, Inc.
2255 Glades Road
One Boca Place, Suite 212E
Boca Raton, FL 33431

Bench Securities
Two Executive Drive
Fort Lee, NJ 07024

Pierchalski Berkowitz
Warner Center
Suite 500
Pittsburgh, PA 15222

Berman & Stickel, Inc.
300 Valley
Suite 305
Sausalito, CA 94965

Blue Coral Capital
9001 Gaylord
Suite #5
Houston, TX 77023

BOE & Company, Inc.
13791 East Rice Place
Suite 142
Aurora, CO 80015

Das A. Borden & Associates
Suite 500
First Federal Building
Florence, AL 35630

Boteo Tachkov
1 Los Olas Circle
Apt. 904
Ft. Lauderdale, FL 33316

Brennan Ross Securities
675 DIC Boulevard
Suite 180
Englewood, CO 80111

Brent Capital Corp.
29 Tobey Court
Pittsford, NY 14534

Brighton Securities
1703 Monroe Avenue
Rochester, NY 14618-1487

Brown Church Securities, Inc.
400 South Broadway
Wichita, KS 67202

Burnside & Company
111 N. Vermillion Street
P.O. Box 507
Danville, IL 61832-0507

Capital Focus
2657 Leavenworth
San Francisco, Ca 94133

Capital Strategies, Ltd.
5th & Chestnut Streets
Lafayette Building, Suite 615
Philadelphia, PA 19106

Certified Investments Corp.
6740 Crosswinds Drive N.
St. Petersburg, FL 33710

Chapman Securities, Inc.
150 North Main
Suite 700
Wichita, KS 67202

S.C. Coast Company, Inc.
320 South Boston Avenue
West Lobby
Tulsa, OK 74103

Coastal Equities, Inc.
15 Simpson Lane
Falmouth, MA 02540

Cohig & Associates
6300 South Syracuse Way
Suite 430
Englewood, CO 80111

Commonwealth Equity Services, Inc.
One University Park
Waltham, MA 02154

Consolidated Financial Serv., Inc.
22971 Sutro Street
Hayward, CA 94541

Consolidated Investment Serv., Inc.
5777 S. Rapp Street
Littleton, CO 8012

Coordinated Capital Securities
6033 Monona Drive
Madison, WI 53716

Corporate Benefit Securities, Inc.
28202 Cabot Road
Suite 110
Laguna Niguel, Ca 92677

Covey & Co., Inc.
115 South Main Street
Salt Lake City, UT 84111

Crews & Associates, Inc.
124 West Capital Avenue
2000 Union National Plaza
Little Rock, AR 72201

Cumberland Brokerage Corporation
614 Landis Avenue
Vineland, NJ 08360

Cypress Capital Corp.
315 Diablo Road
Suite 222
Danville, CA 94526

David D. deBarardinis
437 Ontario
Shreveport, LA 71106

Dominick Zaccoli
39 Harbour Court
Staten Island, NY

Dougherty, Dawkins, Strand
& Bigelow, Inc.
100 S. 5th St., Suite 2300
Minneapolis, MN 55402

Cooper Investment Partners
39 South LaSalle Street
Suite 313
Chicago, IL 60603-1604

Cope Investment Corporation
700 South Peters Street
Suite 213
New Orleans, LA 70130

Corporate Securities Group, Inc.
980 North Federal Highway
Suite 210
Boca Raton, FL 33432

Crane & Co. Securities, Inc.
1975 East Maple
Suite 1
Troy, MI 48083

Cullum & Sandow Securities, Inc.
1601 Elm Street
Suite 4343
Dallas, TX 75201

Cumberland Brokerage Corporation
P.O. Box 663
Vineland, NJ 08360

Dain Bosworth, Inc.
60 South 6th Street
Dain Bosworth Plaza
Minneapolis, MN 55402

Dean Lopnow
855 Sterling
Suite 100
Palatine, IL 60067

Donald & Co. Securities, Inc.
776 Shrewsberry Avenue
Tinton Falls, NJ 07724

East-West Capital Corporation
20542 Harper Avenue
Harper Woods, MI 48225

F. Merle Nicholson
550 W. Vista Way
Suite 105
Vista, CA 95735

FAIC Securities
1500 Lytton Springs Road
Suite A
Healdsburg, CA 95448

Federated Securities, Inc.
P.O. Box 214
Huntington Station, NY 11746

Financial Goal Securities, Inc.
255 North Ciello Road
Suite 300
Palm Springs, CA 92262

First Affiliated Securities
4225 Executive Square
Suite 500
La Jolla, CA 92037

First California Securities
2975 Bowers Avenue
Suite 304
Santa Clara, CA 95051

First Interregional Equity Corp.
830 Morris Turnpike
Short Hills, NJ 07078

FSC Securities Corporation
2300 Windy Ridge Parkway
Suite 1100
Marietta, GA 30067

Gill & Associates, Inc.
1800 Glenarm Place
Suite 400
Denver, CO 80202

Greenbrier Diversified, Inc.
8484 Wilshire Boulevard
Suite 500
Beverly Hills, CA 90211

F.J. Garber & Company
P.O. Box 235
Sioux City, IA 51102

Falk & Associates, Inc.
P.O. Box 263
Englewood, NJ 07631

Financial Consultants, Inc.
600 East 103rd Street
Kansas City, MO 64131

Financial Information Centers
Brokerage, Inc.
801 Sarasota Quay
Sarasota, FL 34236

First Associated Securities Group
430 Broadway
Chico, CA 95928

First Honolulu Securities, Inc.
900 Fort Street Mall
Suite 950
Honolulu, HI 96813

First Miami Securities, Inc.
20660 West Dixie Highway
North Miami Beach, FL 33180

Geneva Securities, Inc.
1827 Walden Office Square
Suite 550
Schaumburg, IL 60173

Great Lakes Equities Co.
3200 Northwestern Highway, #130
Farmington Hills, MI 48018

Halpert & Company, Inc.
284 Millburn Avenue
Millburn, NJ 07041

Harbor Investments, Inc.
One Odana Court
Madison, WI 53719

Houston Investment Corp.
1003 Wirt Road
Suite 302
Houston, TX 77055

Huntingdon Securities
4307 Central Pike
Hermitage, TN 73076

Investment Brokers of America
495 Miller Avenue
Mill Valley, CA 94941

Investors Security Co.
110 Bank Street
Suffolk, VA 23434

J.E. Liss & Company
424 E. Wisconsin Avenue
Milwaukee, WI 53202

Jinco Leasing Corp.
2865 S. Colorado Blvd., Suite 250
Denver, CO 80222

JW Charles Securities, Inc.
980 North Federal Way
Suite 210
Boca Raton, FL 33432

Kinnard (John G.) & Company, Inc.
1700 Northstar West
Minneapolis, MN 55402

LaSalle St. Securities, Inc.
250 S. Wacker Drive, 10th Floor
Chicago, IL 60606

Heidtke & Company, Inc.
Third National Bank Bldg.
P.O. Box 190666
Nashville, TN 37219

Howe Barnes Investments, Inc.
153 South LaSalle Street
Chicago, IL 60603

IFP, Inc.
2001 Bryan Tower
Suite 1540
Dallas, TX 75201

Investment Corporation of Virginia
999 Waterside Drive
Dominican Towers, 24th Floor
Norfolk, VA 23510

J.B. Bogart & Associates, Inc.
3208 Manhattan
Manhattan Beach, CA 90266

J.O. Davidson & Associates, Inc.
245 North Waco, Suite 525
Wichita, KS 67201

Joe Middlesworth
*(f/k/a Pacific Inland Securities)*
4138 Round Valley Circle
Stockton, CA 95207

Kelmoore Investment Co.
P.O. Box 3160
Paso Robles, CA 93447

Kurz-Liebow & Co., Inc.
70 West 40th Street
New York, NY 10018

Lindsay Financial Corporation
2029 Century Park East
Suite 320
Los Angeles, CA 90067

Linsco/Private Ledger Corp.
155 Federal Street, 14th Floor
Boston, MA 02110

Martin Kaiden Co.
310 Madison Avenue
Suite 1205
New York, NY 10017

Maven Securities, Inc.
90 South 7th Street
2850 Northwest Center
Minneapolis, MN 55402

McCarley and Associates, Inc.
P.O. Box 5677
Greenville, SC 29606

McLaughlin, Piven, Vogel
Securities Inc.
30 Wall Street
New York, NY 10005

Moneta Securities Corporation
340 Veterans Memorial Highway
Commack, NY 11725

Multi Financial Securities
Corporation
5350 S. Rosyln Street
Suite 310
Englewood, CO 80155

Neidiger, Tucker, Bruner, Inc.
1675 Larimer Street
Plaza Level - Suite 300
Denver, CO 80202

Pacific Continental Securities
Corporation
16830 Ventura Boulevard
Suite 321
Encino, CA 91436

M.E. Metzler Organization
111 Westport Plaza
St. Louis, MO 63146

Masterson Moreland Sauer
Whisman, Inc.
333 Clay, Suite 4000
Houston, TX 77002

McCarley and Associates, Inc.
242 S. Pleasantburg Drive
Greenville, SC 29607

McClurg Capital Corporation
235 Montgomery Street
Suite 600
San Francisco, CA 94104

Monarch Financial Corporation
of America
45 Rockefeller Plaza, 35th Floor
New York, NY 10111

Monterey Bay Securities
7965 Soquel Drive
Aptos, CA 95003

Multi-Bank Securities, Inc.
28411 Northwestern Hwy.
Suite 1350
Southfield, MI 48034

Outstanding Investments
2680 Horizons, SE F-1
Grand Rapids, MI 49506

Pacific West Securities, Inc.
2000 Benson Road
Suite 250
Renton, WA 98055

Palm Beach Financial, Inc.
618 U.S. Highway 1
2nd Floor
North Palm Beach, FL 33408

Portfolio Management Consultants, Inc.
555 17th Street, 14th Floor
Denver, CO 80202

Princeton Equity Securities, Inc.
P.O. Box 7104
Princeton, NJ 08543

Quadrex Securities
East Tower, Bond Centre
14th Floor
Queensway, Hong Kong

Questor Financial Services
33742 W. 12 Mile Road
Farmington Hills, MI 48331

Republic Securities, Inc.
208 South LaSalle Street
Suite 600
Chicago, IL 60604

Resource Investment Partners
P.O. Box 4994
10310 W. Markhom, #300
Little Rock, AR 72205

Rhodes Securities, Inc.
306 West 7th Street, Suite 505
Fort Worth, TX 76102

Rickel & Associates, Inc.
45 Essex Street
Millburg, NJ 07041

Park Avenue Securities, Inc.
9520 North May
Suite 390
Oklahoma City, OK 73120

Princeton Equity Securities, Inc.
621 Alexander Road
Princeton, NJ 08543

Protective Group Securities Corp.
Attn: Mike Flannagan
7901 Flying Cloud Drive
Eden Prairie, MN 55344

Quest Securities, Inc.
10940 Fair Oaks Boulevard
Suite 100
Fair Oaks, CA 95628

R.J. Steichen & Co.
801 Nicolet Mall
Suite 100
Minneapolis, MN 55402

Republic Securities of America, Inc.
600 East Colonial Drive
Suite 100
Orlando, FL 32803

Retirement Investment Group
1003 Wirt Road, Suite 302
Houston, TX 77055

Richards Investment
10 E.S. Temple Street
Kenneco Bldg.
Salt Lake City, UT 84133

Rose Securities
1935 Camino Vida Roble
Carlsbad, CA 92008

S.G. Financial
3020 Bridgeway, #252
Sausalito, CA 94965

Schneider Securities, Inc.
104 Broadway
Union Bank Building
Denver, CO 80203

Securities Service Network, Inc.
222 S. Peters Road
Knoxville, TN 37923

Seward, Groves, Richard & Wells, Inc.
40 Wall Street
New York, NY 10005

Sigma Financial Services, Inc.
4261 Park Road
Ann Arbor, MI 48103

Smith Benton & Hughes, Inc.
6535 South Dayton Street
Suite 3000
Engelwood, CO 80111

Strategic Resource Management, Inc.
5670 Greenwood Plaza Blvd.
Suite 110W
Engelwood, CO 80111

Summit Investment Corp.
900 Second Avenue, Suite 500
Minneapolis, MN 55402

T.L. Smith Securities
6300 Ridglea Place, Suite 500
Fort Worth, TX 76116

Tejas Securities, Inc.
7660 Woodway, Suite 500
Houston, TX 77063

Santa Barbara Securities, Inc.
200 East Carrillo Street
Suite 302
Santa Barbara, CA 93101

Scott (Robert) Securities, Inc.
19762 MacArthur Blvd., Suite 200
Irvine, CA 92715

Sentra Securities, Corp.
8001 Irvine Center Drive
Suite 710
Irvine, CA 92718

Shelter Rock Securities
500 No. Broadway
Jericho, NY 11753

Signal Securities, Inc.
700 Throckmorton Street
Fort Worth, TX 76102

Starboard Capital Corp.
36 Klein Road
Williamsville, NY 14221

Strategic Risk Management Inc.
20 Broad Street, 7th Floor
New York, NY 10005

Sussex Financial Group
111 Pfingsten Road, Suite 111
Deerfield, IL 60015

Taggart Company Ltd. (The)
9720 Wilshire Boulevard
Suite 205
Beverly Hills, CA 90212

Texas Securities
4200 S. Hulen, Suite 536
Houston, TX 76109

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re TOWERS FINANCIAL CORPORATION NOTEHOLDERS LITIGATION | ) | MDL No. 994 |
| | ) | Master File No. 93 Civ. 0810 (WK) |
| This Document Relates To: | ) | |
| All Cases. | ) | |

NOTICE OF SETTLEMENT CLASS CERTIFICATION AND PROPOSED SETTLEMENT

THIS NOTICE MAY AFFECT YOUR RIGHTS -- PLEASE READ IT CAREFULLY

TO: ALL PERSONS WHO PURCHASED INITIALLY OR REINVESTED IN TOWERS FINANCIAL CORPORATION PROMISSORY NOTES, SOLD TO UNITED STATES RESIDENTS, OR SERIES 1991-A ASSET BACKED AND GUARANTEED BONDS, SOLD TO NON-UNITED STATES RESIDENTS, DURING THE PERIOD FROM FEBRUARY 15, 1989 THROUGH FEBRUARY 9, 1993:

PLEASE TAKE NOTICE: that a Settlement Class has been certified in this litigation by the United States District Court for the Southern District of New York for purposes of the partial settlement described in this Notice; and that the partial settlement has been reached for the benefit of this Settlement Class between the Settlement Class Representatives and Defendant American Credit Indemnity Company for the aggregate sum of $1,250,000. The purpose of this Notice is to describe the Towers Financial Corporation Noteholders Litigation, the proposed settlement (which is subject to final Court approval), and your rights and responsibilities as a Settlement Class Member, and to provide you with an opportunity to comment in support of or in opposition to the proposed settlement.

THE LITIGATION

1. In the consolidated lawsuit In re Towers Financial Corporation Noteholders Litigation, MDL No. 994, Master File No. 93 Civ. 0810 (S.D.N.Y.) (the "Class Action"), which is pending in the United States District Court for the Southern District of New York, Plaintiffs have asserted claims, on behalf of themselves and all persons (excluding Defendants and members of the Defendant Class; their parents, subsidiaries, units, divisions, affiliates, and present and former directors and officers; the members of their immediate families; and their heirs, successors, and assigns) who purchased or reinvested in Towers Financial Corporation Promissory Notes, sold to United States residents, or Series 1991-A Asset Backed and Guaranteed Bonds, sold to non-United States residents (collectively, "Notes"), at any time during the period from February 15, 1989 through February 9, 1993 and suffered damages as a result thereof (the "Plaintiff Class"), against Defendants Professional Business Brokers, Inc.; the Hoffenberg Family Trust; Steven Hoffenberg a/k/a Barry Cohen; Mitchell Brater; Arthur T. Ferro; Charles H. Chugerman; Michael Rosoff; Thomas B. Evans, Jr.; Ben Barnes; Marvin E. Basson; H. Bruce Bronson, Jr.; the Law Offices of H. Bruce Bronson, Jr.; Gibney, Anthony & Flaherty; Bronson & Migliaccio; Squadron, Ellenoff, Plesent & Lehrer; American Credit Indemnity Company; Duff & Phelps Credit Rating Company; and J.B. Bogart & Associates, Consolidated Financial Serv., Inc., Dain Bosworth, Inc., David deBarardinis, East-West Capital Management, Inc., First Affiliated Securities Inc., Halpert & Company Inc., Martin Kaiden Company, and Monterey Bay Securities, as representatives of a Defendant class consisting of all broker-dealers who sold Notes. Plaintiffs have asserted claims for violations of the Securities Act of 1933; the Securities Exchange Act of 1934; the Racketeer Influenced and Corrupt Organizations Act; state blue sky laws; and the common law against fraud, negligent misrepresentation, negligence, and breach of fiduciary duty, arising out of the offer and sale of the Notes. Plaintiffs seek, for themselves and the Plaintiff Class, compensatory and punitive damages, including out-of-pocket losses, costs, interest, and attorneys' fees and expenses. Defendants deny all liability and wrongdoing whatsoever.

2. The Court has not yet ruled, one way or the other, on the merits of any of Plaintiffs' claims or on Plaintiffs' motion for certification of the Plaintiff Class for purposes of the continued prosecution and trial of the Class Action. On February 10, 1995, however, the Court granted preliminary approval of a proposed settlement by Plaintiffs of all claims asserted on behalf of the proposed Plaintiff Class against Defendant American Credit Indemnity Company ("ACI"). The following provisions of this Notice summarizing the proposed settlement are qualified in their entirety by reference to the settlement agreement, a complete copy of which is available for inspection and copying at the Office of the Clerk of the Court, United States Courthouse, 40 Foley Square, New York, New York 10007, during regular business hours.

SETTLEMENT CLASS CERTIFICATION

3. The Court has certified the Plaintiff Class for settlement purposes only and designated Plaintiffs Bernard Batten, Stephanie Batten, Stanley Bruskin, Scott C. Davis, Robert Dinsmore as Trustee of the Dinsmore Architects PPSP, Ronald R. Evey, Martin Gold as Trustee of the Martin Gold, Attorney at Law, P.C. Defined Benefit Pension Plan dated 12-10-87, Jo Frank Goodman, Jerry Gorelick, Anthony Izzo, Jr., Joanne Kirk Trust, John Damen Kirk Trust, Shawn Robert Kirk Trust, Ernest S.J. Loh, Nina T. Loh, Edward W. Murphy, Jr. as Trustee of the Edward W. Murphy, Jr. Trust, Martin Penner, Dr. John J. Siudmak, John J. Siudmak Profit Sharing Plan, and Dona M. Ziegler as Trustee of the Dona M. Ziegler Defined Benefit Plan and any other persons duly appointed as additional or successor representatives of the Plaintiff Class as Settlement Class Representatives for purposes of the settlement.

4. The Court has appointed as Settlement Class Counsel:

Girard & Green
160 Sansome Street, Suite 300
San Francisco, CA 94104

Milberg Weiss Bershad Hynes & Lerach
One Pennsylvania Plaza
New York, NY 10119

Lieff, Cabraser & Heimann
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Garwin, Bronzaft, Gerstein & Fisher
1501 Broadway, Suite 1416
New York, NY 10036

Stamell, Tabacco & Schager
555 Madison Avenue, Suite 600
New York, NY 10022

5. The appointments of the Settlement Class Representatives and Settlement Class Counsel are without prejudice to the appointment of class representatives and class counsel for purposes other than the proposed settlement described herein.

6. If the Court grants final approval of the proposed settlement, there will be no trial as to ACI, and the Settlement Class Members' claims against ACI, whether asserted or unasserted, known or unknown, will be compromised, released, discharged, and dismissed with prejudice in exchange for ACI's payment to the Settlement Class of $1,250,000.

PROPOSED SETTLEMENT WITH AMERICAN CREDIT INDEMNITY COMPANY

7. A proposed settlement has been reached with ACI. ACI continues to deny any and all liability to the Settlement Class Members or wrongdoing whatsoever relating to the claims asserted in, or the subject matter of, the Class Action. Notwithstanding such denial, ACI has entered into this proposed settlement to avoid the burden, expense, and uncertainty of continuing litigation.

(a) ACI has agreed to pay $1,250,000 (the "Settlement Payment") in settlement of the claims asserted against ACI by the Settlement Class Representatives on behalf of themselves and the Settlement Class.

(b) If the Court grants final approval of the settlement with ACI, ACI will deliver the Settlement Payment to Settlement Class Counsel for distribution to the Settlement Class. The Settlement Payment will be reduced by the award of costs to Settlement Class Counsel (see subparagraph (c) below) and then allocated and distributed among the Settlement Class Members on a pro rata basis according to the amounts of the Settlement Class Members' respective Note investments.

(c) In return for the Settlement Payment, any and all claims the Settlement Class Members have against ACI will be dismissed with prejudice and released, and Settlement Class Members will be barred from asserting any and all claims, relating to their Note investments or the activities alleged in or which are the subject of the Class Action, which were or, had the existence of such claims been known, could have been brought in the Class Action against ACI. All other lawsuits brought by Settlement Class Members against ACI relating to Settlement Class Members' Note investments will be permanently enjoined.

(d) The Court has not yet ruled, one way or the other, on the merits of the Settlement Class Representatives' claims against ACI.

(e) Settlement Class Counsel intend to apply for reimbursement from the Settlement Payment of a portion of the out-of-pocket costs they have advanced to date in prosecuting the Class Action, in the amount of $250,000. Settlement Class Counsel have not applied for an award of attorneys' fees from the Settlement Payment at this time. You will be notified of any application for attorneys' fees made by Settlement Class Counsel and will have the opportunity to be heard regarding such application.

RECOMMENDATION OF SETTLEMENT CLASS COUNSEL

8. Settlement Class Counsel, who have extensive experience in class actions and securities litigation, have conducted a thorough investigation and undertaken extensive discovery into the facts and circumstances relating to the claims asserted against ACI in the Class Action. Settlement Class Counsel have examined thousands of pages of documents relating to such claims and have retained an expert in ACI's line of business to assist them in their analysis of the claims. In addition, Settlement Class Counsel have analyzed the law relating to the claims against ACI. They have conducted extensive arm's-length negotiations with ACI's counsel. Settlement Class Counsel have considered such things as: (a) the benefits that the Settlement Class Members will receive from the settlement; and (b) the fact that the outcome of litigating the claims against ACI, including the amount of damages awarded, if any, is uncertain because, among other things, certain of the claims may be barred by the applicable statutes of limitations, and because ACI's alleged liability depends on the resolution of many sharply disputed issues of fact and other difficult issues relating both to liability and remedy, as well as other uncertainties and risks inherent in protracted litigation, including the likelihood that even if a judgment were rendered in favor of the Settlement Class, appeals will follow, and it is likely, therefore, that several years could elapse before Settlement Class Members receive any benefit. In light of the above, Settlement Class Counsel have recommended to this Court, and now recommend to the Settlement Class Members, the proposed settlement with

FINAL SETTLEMENT APPROVAL HEARING

9. The Court will hold a hearing commencing on November 16, 1995 at 10:00 a.m. in the courtroom of the Honorable Andrew J. Peck, United States Magistrate Judge for the Southern District of New York, located at the United States Courthouse, 40 Center Street, Room 519, New York, New York 10007, to determine whether the proposed settlement with ACI is fair, reasonable, and adequate. Although you may attend this hearing, you are not required to do so.

10. YOU DO NOT NEED TO APPEAR AT THE HEARING OR TAKE ANY OTHER ACTION IN SUPPORT OF THE SETTLEMENT OR SETTLEMENT CLASS CERTIFICATION. As a Settlement Class Member, you have the right to state your position for or against the proposed settlement. You have the right to appear in the Class Action through your own attorney. If you wish to submit written comments on the proposed settlement and/or Settlement Class Counsel's application for costs, you may do so provided that your letter, including any materials which you wish the Court to consider, is postmarked no later than October 6, 1995 and is sent to the Clerk of the Court, United States Courthouse, 40 Foley Square, New York, New York 10007; and copies must be sent simultaneously to the attorneys listed below:

Daniel C. Girard, Esq.
GIRARD & GREEN
160 Sansome Street, Suite 300
San Francisco, CA 94104

Settlement Class Counsel

David H. Marion, Esq.
MONTGOMERY McCRACKEN WALKER & RHOADS
Three Parkway, 20th Floor
Philadelphia, PA 19102

Counsel for American Credit Indemnity Company

You may be heard orally in support of or in opposition to the proposed settlement, provided that you mail a letter, postmarked no later than October 6, 1995, stating your intention to appear before the Court personally and indicating briefly the nature of the argument to be presented. Copies of such letter must be sent to the Clerk of the Court and the attorneys designated above.

11. If you do not object to the proposed settlement in the manner described above, you shall be deemed to have consented to the settlement and to have waived all objections and shall forever be foreclosed from making any such objections.

ELECTION BY SETTLEMENT CLASS MEMBERS AS TO THE PROPOSED SETTLEMENT WITH AMERICAN CREDIT INDEMNITY COMPANY

12. With regard to the proposed settlement with ACI, if you are included in the above definition of a Settlement Class Member, you have a choice as to whether or not to remain a Settlement Class Member. Either choice will have its consequences, which you should understand before making your decision.

13. If you want to be excluded from the Settlement Class with regard to the proposed settlement with ACI, you must notify Settlement Class Counsel in writing by mail postmarked no later than October 6, 1995 at the address listed in paragraph 10 above.

14. If you elect to exclude yourself from the Settlement Class with regard to the settlement with ACI, (1) you will not share in the money that will be paid to the Settlement Class as a result of the settlement with ACI; (2) you will not be bound by any decision in the Class Action regarding the claims against ACI, whether favorable or not; and (3) you may present any claims you may have against ACI by filing your own lawsuit, or you may seek to intervene in the Class Action.

15. If you want to remain a Settlement Class Member for purposes of the settlement with ACI, you are not required to do anything at this time. By remaining a Settlement Class Member, any claims against ACI for damages arising out of ACI's conduct as alleged in the Class Action will be determined in the Class Action and released by the proposed settlement and cannot be presented by you in any other lawsuit. As a Settlement Class Member, you have the right to share in the money that will be paid to *the Settlement Class as a result of the settlement with ACI.*

RIGHTS AND OBLIGATIONS OF CLASS MEMBERS

16. As a member of the Settlement Class as to the proposed settlement with ACI, if you do not exclude yourself from the settlement, you will be bound by all further orders and judgments of the Court affecting the Settlement Class, and your claims for damages against ACI as alleged in the Class Action will be determined in the Class Action. You will be entitled to notice of any further ruling affecting the Settlement Class. For this reason, as well as to facilitate your sharing in ACI's Settlement Payment, you are requested to notify the Settlement Class Counsel at the address listed in paragraph 18 below, of any corrections or changes to your name or address.

17. You need not hire or pay an attorney. Settlement Class Members will be represented by Settlement Class Counsel, who are proponents of the settlement. If you wish, however, you may retain and appear through your own attorney, at your expense. You may also seek to intervene individually in the Class Action, and you may advise the Court if at any time you think you are not being fairly and adequately represented by the Settlement Class Representatives or Settlement Class Counsel.

ADDITIONAL INFORMATION

18. Any questions you have concerning the matters contained in this Notice (and any corrections or changes to your name or address) should not be directed to the Court, but should be addressed in writing to the following Settlement Class Counsel:

Daniel C. Girard, Esq.
GIRARD & GREEN
160 Sansome Street, Suite 300
San Francisco, CA 94104

19. Complete copies of all pleadings and papers filed in the Class Action, including the complete text of the proposed settlement agreement with ACI, are available for inspection and copying at the Office of the Clerk of the Court, United States Courthouse, 40 Foley Square, New York, New York 10007, during regular business hours.

20. If the settlement with ACI is not approved by the Court, the settlement will be null and void, and the parties will be restored to their respective positions as they existed immediately prior to the settlement agreement. In any event, the case will continue against all other Defendants who are not parties to this settlement. The Court has not yet set a trial date, as discovery and other pretrial proceedings remain to be conducted.

DATED: August 14, 1995

CLERK, UNITED STATES DISTRICT COURT

PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE FOR INFORMATION.

EXHIBIT [illegible]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re TOWERS FINANCIAL CORPORATION NOTEHOLDERS LITIGATION | MDL No. 994<br>Master File No.<br>93 Civ. 0810 (WK) |
| This Document Relates To:<br>All Cases. | |

NOTICE OF SETTLEMENT CLASS CERTIFICATION, PROPOSED SETTLEMENTS; AND VOLUNTARY DISMISSAL OF CLAIMS

THIS NOTICE MAY AFFECT YOUR RIGHTS -- PLEASE READ IT CAREFULLY

TO: ALL PERSONS WHO PURCHASED INITIALLY OR REINVESTED IN TOWERS FINANCIAL CORPORATION PROMISSORY NOTES, SOLD TO UNITED STATES RESIDENTS, OR SERIES 1991-A ASSET BACKED AND GUARANTEED BONDS, SOLD TO NON-UNITED STATES RESIDENTS, DURING THE PERIOD FROM FEBRUARY 15, 1989 THROUGH FEBRUARY 9, 1993 ("SETTLEMENT CLASS"):

[illegible]ASE TAKE NOTICE: that (1) the Settlement Class, as further defined herein, has been certified in this litigation by the [illegible]d States District Court for the Southern District of New York for purposes of the partial settlements described in this Notice, [illegible] that the partial settlements have been reached for the benefit of this Settlement Class on terms described herein (a) among the Class Representatives, the Bank of Cape Verde, and Defendant Gibney, Anthony & Flaherty; and (b) among the Class Representatives, the Bank of Cape Verde, and Defendants H. Bruce Bronson, Jr., the Law Offices of H. Bruce Bronson, Jr. and the law firm of Bronson & Migliaccio; and (c) among the Class Representatives, certain other litigants referred to as the "Bondholders," and Defendant Richard A. Eisner & Company LLP; and (d) between the Class Representatives and the Administrative Trustee for the Towers Financial Corporation Administrative Trust for the allocation of disputed claims and associated recoveries; and (2) application has been made for leave to dismiss, without prejudice, claims asserted on behalf of Settlement Class members against broker-dealers who sold the Towers Financial Corporation Promissory Notes at issue in this litigation. The purpose of this Notice is to describe the Towers Financial Corporation Noteholders Litigation; the proposed partial settlements and the plan of allocation with the Administrative Trustee (which are subject to final Court approval); the voluntary dismissal of claims, and your rights and responsibilities as a Settlement Class Member, and to provide you with an opportunity to comment on the voluntary dismissal of claims, and in support of or in opposition to the proposed settlements or exclude yourself from them.

SUMMARY

1. Proposed settlements have been reached with certain defendants in the consolidated class action brought on behalf of Towers Noteholders. If approved, the settlements will result in a gross recovery to Noteholders of approximately $3,300,000 and a net recovery assuming an award of attorneys' fees and reimbursement of costs as requested by the attorneys for the class representatives in the class action of approximately $2,345,000. In addition, Noteholders may recover additional amounts under the terms of a sharing agreement with the Administrative Trustee of the Towers Financial Corporation Administrative Trust. You have [illegible]ight to exclude yourself from the settlements. If you do not exclude yourself from the settlements, you will share in the [illegible]ment proceeds and your claims against certain professionals (accountants and attorneys) who provided services to Towers or [illegible]iliates will be dismissed. You are not required to exclude yourself from the settlements to preserve your right to proceed with an individual claim against a seller of Towers Financial Corporation Promissory Notes. The attorneys for the class representatives in the class action have advised the Court that they intend to apply for reimbursement of costs in an amount not to exceed $250,000 and an award of attorneys' fees of approximately $1,550,000 in connection with the proposed settlements described in this Notice and in connection with an earlier settlement with American Credit Indemnity Company approved by this Court on December 18, 1995. Additional information on the application for reimbursement of costs and award of attorneys' fees appears at paragraph 30 of the Notice. The Court has also been advised by the attorneys for the class representatives that they propose to dismiss without prejudice the claims asserted by the class representatives on behalf of Settlement Class Members against the broker-dealers who sold the Towers Financial Corporation Notes at issue in this litigation. Important additional information about the dismissal of the claims of the class representatives against the broker-dealers, the implications for you of such dismissal and your rights in connection therewith appears at paragraph 42 of this Notice. This summary is qualified in its entirety by reference to this Notice, the Settlement Agreements described he[illegible]n, and all pleadings and papers filed in the class action and related proceedings, which may be inspected as provided at paragraph 30 of the Notice.

THE LITIGATION

2. In the consolidated lawsuit In re Towers Financial Corporation Noteholders Litigation, MDL No. 994, Master File No. 93 Civ. 0810 (WK) (S.D.N.Y.) (the "Class Action"), which is pending in the United States District Court for the Southern District of New York, Plaintiffs have asserted claims, on behalf of themselves and all persons (excluding Defendants and members of the Defendant Class and the members of such persons' immediate families and their heirs, successors, and assigns) who purchased or reinvested in Towers Financial Corporation Promissory Notes, sold to United States residents, or Series 1991-A Asset Backed and Guaranteed Bonds, sold to non-United States residents (collectively, "Notes"), at any time during the period from February 15, 1989 through February 9, 1993 and who suffered damages as a result thereof (the "Plaintiff Class"), against Defendants Professional Business Brokers, Inc.; the Hoffenberg Family Trust; Steven Hoffenberg a/k/a Barry Cohen; Mitchell Brater; Arthur T. Ferro; Charles H. Chugerman; Michael Rosoff; Thomas B. Evans, Jr.; Ben Barnes; Raymond Lewis; Xavier Eboli; Gregory Pattakos; Richard Levine; Anthony DiNicolas; David Franklin; Nicholas T. Pattakos; Marvin E. Basson; Eton Securities Corporation; H. Bruce Bronson, Jr.; the Law Offices of H. Bruce Bronson, Jr.; Gibney, Anthony & Flaherty; Bronson & Migliaccio; Squadron, Ellenoff, Plesent & Lehrer; American Credit Indemnity Company; Duff & Phelps Credit Rating Company; Richard A. Eisner & Company; and J.B. Bogart & Associates, Consolidated Financial Serv., Inc., Dain Bosworth, Inc., David deBarardinis, East-West Capital Management, Inc., First Affiliated Securities Inc., Halpert & Company Inc., Martin Kaiden Company, and Monterey Bay Securities, as representatives of a defendant class consisting of all broker-dealers who sold Notes. Plaintiffs have asserted claims for violations of the Securities Act of 1933; the Securities Exchange Act of 1934; the Racketeer Influenced and Corrupt Organizations Act; state blue sky laws; and common law claims of fraud, negligent misrepresentation, negligence, and breach of fiduciary duty, arising out of the offer and sale of the Notes. Plaintiffs seek, for themselves and the Plaintiff Class, compensatory and punitive damages, including out-of-pocket losses, costs, interest, and attorneys' fees and expenses. Defendants deny all liability and wrongdoing whatsoever. Defendants H. Bruce Bronson, Jr., the Law Offices of H. Bruce Bronson, Jr., Gibney, Anthony & Flaherty, and Bronson & Migliaccio are referred to collectively as the "Settling Attorney Defendants." Defendant Richard A. Eisner & Company LLP is referred to as "Eisner." Non-settling defendant Squadron, Ellenoff, Plesent & Lehrer is referred to as "Squadron Ellenoff."

3. Twenty-six purchasers of Towers bonds (the "Bondholders") have filed the lawsuit LaSalle National Bank v. Richard A. Eisner & Company, No. 93 Civ. 6514 (WK) (the "Bondholder Action"), in the United States District Court for the Southern District of New York. The Bondholders assert claims against Eisner and others arising out of the Bondholders' purchase of certain Bonds issued by the Towers Financial Corporation subsidiaries Towers Healthcare Receivables Funding Corporation, Towers Healthcare Receivables Funding Corporation II, Towers Healthcare Receivables Funding Corporation III, Towers Healthcare Receivables Funding Corporation IV, and Towers Healthcare Receivables Funding Corporation V (collectively, the "Healthcare Subsidiaries"). The Bondholders allege, among other things, that Eisner, as the certified public accountant and outside auditor of the Healthcare Subsidiaries, issued materially misleading opinions regarding the financial results of the Healthcare Subsidiaries on which the Bondholders relied in deciding to purchase the Bonds. Eisner has denied all liability in the Bondholder Action as well. The settlement with Eisner described herein will also settle the Bondholder Action.

4. On November 15, 1994, the Bank of Cape Verde (the "Bank") filed the lawsuit Bank of Cape Verde v. H. Bruce Bronson, et al., No. 94 Civ. 8299 (WK) (the "Bank Action"), in the United States District Court for the Southern District of New York. The Bank of Cape Verde asserts claims for breach of contract, breach of implied contract, breach of fiduciary duty, malpractice, and fraud against the Settling Attorney Defendants arising out of their issuance of five legal opinion letters addressed to the Bank of Cape Verde between 1989 and 1992, regarding the Bank of Cape Verde's extension of certain loans, and a rollover of those loans, to Towers Financial Corporation, its affiliates, and/or subsidiaries. The Settling Attorney Defendants deny all liability and wrongdoing whatsoever. The settlements with the Settling Attorney Defendants described herein will also settle the Bank Action.

5. In connection with the In re Towers Financial Corporation, et al., Case No. 93-B-41558 (PBA) bankruptcy proceedings, by an order, dated December 8, 1994 (the "Confirmation Order"), the Bankruptcy Court: (a) confirmed a joint plan of reorganization for the Towers Debtors (the "Plan"); and (b) approved the appointment of the Administrative Trustee, effective December 21, 1994, to administer the Towers Financial Corporation Administrative Trust created in connection with the Plan and the related Administrative Trust Agreement. Pursuant to Article IV of the Administrative Trust Agreement and section 5.3(B) of the Plan, the Administrative Trustee was authorized and empowered to prosecute any litigation and resolve all disputed claims on behalf of the Administrative Trust, including any claims previously brought or which could have been brought by the Chapter 11 Trustee on behalf of the Debtors' estates. The Administrative Trustee contends that the Administrative Trust has claims against the Settling Attorney Defendants, although the Administrative Trustee has not yet asserted such claims. The Settling Attorney Defendants deny that any such claims exist on the part of the Administrative Trustee and furthermore deny any liability or

wrongdoing in connection with those unasserted claims. The Administrative Trustee has also asserted claims against Eisner and Squadron Ellenoff. The Administrative Trustee and Plaintiffs have a dispute over who is entitled to pursue the Settling Attorney Defendants, Eisner and Squadron Ellenoff for damages and keep any resulting recoveries. Previously, under the Plan, an agreement between the Class Representatives and the Chapter 11 Trustee (the "Trustee Settlement") to cooperate in the assertion of claims and to share recoveries was endorsed, subject to the District Court's approval. The Trustee Settlement provides for cooperation between the Administrative Trustee and the Class.

6. The Court has not yet ruled, one way or the other, on the merits of any of Plaintiffs' claims against the Settling Attorney Defendants or Eisner, including motions to dismiss, or on Plaintiffs' motion for certification of the Plaintiff Class for purposes of the continued prosecution and trial of the Class Action. As of August 2, 1996, however, the Court granted preliminary approval of:

(a) proposed settlements by Plaintiffs of all claims asserted on behalf of the proposed Plaintiff Class in the Class Action against the Settling Attorney Defendants; and

(b) a proposed settlement by Plaintiffs on all claims asserted on behalf of the proposed Plaintiff Class in the Class Action against Eisner; and

(c) the Trustee Settlement.

The following provisions of this Notice summarizing the proposed settlements are qualified in their entirety by reference to the Settlement Agreements, complete copies of which are available for inspection and copying at the Office of the Clerk of the Court, United States Courthouse, 500 Pearl Street, Room 120, New York, New York 10007, during regular business hours.

## SETTLEMENT CLASS CERTIFICATION

7. The Court has certified the following Settlement Class (the "Settlement Class"), for purposes of the proposed settlements only: all persons (other than defendants and members of the defendant class in the Class Action, the members of their immediate families, their present or former officers and directors, and their heirs, successors and assigns) who purchased or reinvested in Notes at any time during the period from February 15, 1989 through February 9, 1993, or at any time thereafter pursuant to certain offerings and offering memoranda referred to in the Second Amended and Consolidated Class Action Complaint filed in this Class Action. The Court has designated Plaintiffs Bernard Batten, Stephanie Batten, Stanley Bruskin, Scott C. Davis, Robert Dinsmore as Trustee of the Dinsmore Architects PPSP, Ronald R. Evey, Martin Gold as Trustee of the Martin Gold, Attorney at Law, P.C. Defined Benefit Pension Plan dated 12-10-87, Joanne Kirk Trust, John Damen Kirk Trust, Shawn Robert Kirk Trust, Edward W. Murphy, Jr. as Trustee of the Edward W. Murphy, Jr. Trust, Martin Penner, Dr. John J. Siudmak, John J. Siudmak Profit Sharing Plan, and Dona M. Ziegler as Trustee of the Dona M. Ziegler Defined Benefit Plan, and any other persons duly appointed as additional or successor representatives of the Plaintiff Class, as Class Representatives for purposes of the settlements only.

8. For purposes of the settlements only, the Court has appointed as Settlement Class Counsel:

Daniel C. Girard
GIRARD & GREEN, P.C.
160 Sansome Street, Suite 200
San Francisco, CA 94104

MILBERG WEISS BERSHAD HYNES & LERACH LLP
One Pennsylvania Plaza
New York, NY 10119

LIEFF, CABRASER, HEIMANN & BERNSTEIN
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

GARWIN, BRONZAFT, GERSTEIN & FISHER
1501 Broadway, Suite 1416
New York, NY 10036

STAMELL & SCHAGER
One Liberty Plaza,
35th Floor
New York, NY 10022

9. The appointments of the Class Representatives and Settlement Class Counsel are without prejudice to the appointment of class representatives and class counsel for purposes other than the proposed settlements described herein.

10. If the Court grants final approval of the proposed settlements, there will be no trial as to the Settling Attorney Defendants or Eisner, and the Settlement Class members' claims against the Settling Attorney Defendants and Eisner, whether asserted or unasserted, known or unknown, will be compromised, released, discharged, and dismissed with prejudice in exchange for the following payments to be allocated among the Settlement Class, the Bank of Cape Verde, and the Administrative Trustee for distribution to the creditors of Towers as provided in the Plan, including Settlement Class members: (1) a total of $3,600,000 by Gibney, Anthony & Flaherty ("Gibney Defendants"), (2) a total of $500,000 by H. Bruce Bronson, Jr., the Law Offices of H. Bruce Bronson, and Bronson & Migliaccio (the "Bronson Defendants"), and (3) a total of $1,005,000 by Eisner.

11. If the Court grants final approval of the Trustee Settlement, resolving Plaintiffs' dispute with the Administrative Trustee over who is entitled to assert claims against and obtain recoveries from which Defendants, the Administrative Trustee and the Class Representatives will coordinate the prosecution of damage claims against Defendants, and any associated recoveries (including the proceeds of settlements with the Settling Attorney Defendants and Eisner) will be apportioned between the Class Representatives, on behalf of the Settlement Class, and the Administrative Trustee, on behalf of the Towers bankruptcy estates, in accordance with the terms of the Trustee Settlement.

## PROPOSED SETTLEMENTS WITH (1) GIBNEY, ANTHONY & FLAHERTY AND (2) H. BRUCE BRONSON, JR., THE LAW OFFICES OF H. BRUCE BRONSON, AND THE LAW FIRM OF BRONSON & MIGLIACCIO

12. Proposed settlements have been reached with the Settling Attorney Defendants. The Settling Attorney Defendants continue to deny any and all liability to the Settlement Class members or wrongdoing whatsoever relating to the claims asserted in, or the subject matter of, the Class Action. Notwithstanding such denial, the Settling Attorney Defendants have entered into these proposed settlements to avoid the burden, expense, and uncertainty of continuing litigation.

It has been agreed that the following amounts will be paid on behalf of the Settling Attorney Defendants by their respective insurance carriers:

(a) Gibney has agreed to pay a total of $3,600,000 ("Gibney Settlement Fund") and the Bronson Defendants have agreed to pay a total of $500,000 ("Bronson Settlement Fund") (collectively, the "Gross Attorney Settlement Fund") in settlement of (1) the claims asserted by the Class Representatives on behalf of themselves and the Settlement Class; (2) the claims asserted by the Bank of Cape Verde; and (3) the potential claims of the Administrative Trustee.

(b) The Gross Attorney Settlement Fund will be reduced by an allocation of $410,000 to the Bank pursuant to an agreement between the Class Representatives and the Bank (the "Bank Allocation Agreement") and any award of attorneys' fees, costs, and expenses to Settlement Class Counsel and other counsel for Plaintiffs and then distributed in accordance with the Trustee Settlement. See "Recommendation of Counsel" - "Bank Allocation Agreement".

(c) In return for the Gross Attorney Settlement Fund, any and all claims the Settlement Class members have against the Settling Attorney Defendants will be dismissed with prejudice and released, and Settlement Class members will be forever barred from asserting any and all claims, relating to their Note investments or the activities alleged in or which are the subject of the Class Action, which were or, had the existence of such claims been known, could have been brought in the Class Action against the Settling Attorney Defendants. All other lawsuits brought by Settlement Class members against the Settling Attorney Defendants relating to the Settlement Class members' Note investments will be permanently enjoined.

(d) The Court has not yet ruled, one way or the other, on the merits of the Class Representatives' claims against the Settling Attorney Defendants.

## PROPOSED SETTLEMENT WITH RICHARD A. EISNER & COMPANY

13. A proposed settlement has been reached with Eisner. Eisner continues to deny any and all liability to the Settlement Class members or wrongdoing whatsoever relating to the claims asserted in, or the subject matter of, the Class Action. Notwithstanding such denial, Eisner has entered into this proposed settlement to avoid the burden, expense, and inconvenience of continuing litigation.

(a) Eisner has agreed to pay a total of $6,000,000 in settlement of the claims asserted by the Bondholders in the Bondholder Action, of which amount $1,005,000, or 16.75 percent (the "Gross Eisner Settlement Fund"), will be allocated to settle (1) the claims asserted by the Class Representatives on behalf of themselves and the Settlement Class; and (2) the claims of the

Administrative Trustee.

(b) The Gross Eisner Settlement Fund will be reduced by any award of attorneys' fees, costs, and expenses to Settlement Class Counsel and other counsel for Plaintiffs (see "Application of Settlement Class Counsel for Reimbursement of Expenses and Award of Attorneys' Fees" below) and then distributed in accordance with the Trustee Settlement.

(c) In return for the Gross Eisner Settlement Fund, any and all claims the Settlement Class members have against Eisner will be dismissed with prejudice and released, and Settlement Class members will be barred from asserting any and all claims, relating to their Note investments or the activities alleged in or which are the subject of the Class Action, which were or, had the existence of such claims been known, could have been brought in the Class Action against Eisner. All other lawsuits brought by Settlement Class members against Eisner relating to the Settlement Class members' Note investments will be permanently enjoined.

(d) The Court has not yet ruled, one way or the other, on the merits of the Class Representatives' claims against Eisner.

PROPOSED SETTLEMENT WITH THE ADMINISTRATIVE TRUSTEE

14. A proposed settlement has also been reached with the Administrative Trustee of the Towers Financial Corporation Administrative Trust.

(a) In the Class Action, the Class Representatives have asserted damages claims against the principals, officers, directors, and certain accountants, attorneys, and other representatives and service providers of Towers Financial Corporation and its subsidiaries or affiliates (collectively, "Towers"). In the Bankruptcy Court, the Chapter 11 Trustee, on behalf of the Towers bankruptcy estates, and the Administrative Trustee have filed Adversary Proceedings No. 94-8055A and 96-8314A and others in connection with the proceedings styled In re Towers Financial Corporation, et al., Case No. 93-B-41558 (PBA), pending in the United States Bankruptcy Court for the Southern District of New York (the "Trustee Actions"). In the Trustee Actions, the Administrative Trustee has asserted similar and/or competing damages claims against some of the same Defendants, including Eisner and Squadron Ellenoff. A dispute existed between the Class Representatives and the Chapter 11 Trustee over who is entitled to assert claims against and obtain recoveries from which Defendants. To avoid lengthy and expensive litigation of this dispute, the Class Representatives and the Chapter 11 Trustee reached a proposed settlement of these issues, which is set out in the Trustee Settlement.

(b) As more fully set forth in the Trustee Settlement, a copy of which has been filed with the Court, the proposed settlement allocates responsibility between the Administrative Trustee and the Class Representatives for prosecuting claims against Defendants and provides that any recoveries, after payment of any court-approved attorneys' fees and costs, and other expenses, will be shared, divided, allocated, and distributed, as follows:

(1) Prosecution of Towers Defendant Group Claims. As between the Administrative Trustee and the Class Representatives, the Administrative Trustee shall be primarily responsible for prosecution of all claims which have been asserted or could be asserted in the Class Action or the Trustee Actions against any director, officer, or employee of Towers or any entity formed by Towers or against Steven Hoffenberg, the Hoffenberg Family Trust, Professional Business Brokers, Inc., Mitchell Brater, Arthur Ferro, Charles H. Chugerman, Michael Rosoff, Thomas B. Evans, Jr., Ben Barnes, or Marvin Basson (the "Towers Defendant Group"). Any recovery on any claim asserted against a member of the Towers Defendant Group shall be distributed to all Towers creditors, including Settlement Class members, pro rata in accordance with Towers' Plan.

(2) Prosecution of Joint Defendant Group Claims. Either the Administrative Trustee or the Class Representatives, or both, may prosecute claims which have been asserted or may be asserted in the Class Action or the Trustee Actions against any and accountants, accounting firms, attorneys, law firms, and other agents of Towers which rendered services to Towers (the "Joint Defendant Group"). Fifty percent (50%) of any recovery on any claim asserted against a member of the Joint Defendant Group shall be distributed to a class of creditors consisting exclusively of members of the Settlement Class; and fifty percent (50%) of such recovery shall be distributed to all Towers creditors, including Settlement Class members, pro rata pursuant to the Plan.

(3) Prosecution of Seller Defendant Group Claims. As between the Administrative Trustee and the Class Representatives, the Class Representatives shall be primarily responsible for prosecution of all claims which have been asserted or could be asserted in the Class Action or the Trustee Actions against Defendant American Credit Indemnity Company (with whom the Settlement Class entered into a settlement which was approved December 8, 1994) and all persons and entities who acted as broker-dealers in connection with the offer and sale of the Notes (the "Seller Defendant Group"). Any recovery on any claim asserted against a member of the Seller Defendant Group shall be distributed to a class of creditors consisting exclusively of Settlement Class members.

5

(c) The proposed settlement also provides that the Class Representatives' counsel ("Plaintiffs' Counsel") shall each be entitled to apply to this Court for reimbursement, from the aggregate recoveries on the above claims, of costs incurred by them in the prosecution of the claims, subject to this Court's approval as to the reasonableness of such costs. In addition, Plaintiffs' Counsel shall, subject to this Court's approval, be entitled to apply to the Court for reasonable compensation from the aggregate recoveries on the above claims as follows:

(1) With respect to the prosecution of claims against members of the Towers Defendant Group, Plaintiffs' Counsel shall be entitled to request an award of attorneys' fees based on the value, if any, that they contributed in achieving recoveries on claims against the Towers Defendant Group.

(2) With respect to the prosecution of claims against members of the Joint Defendant Group, Plaintiffs' Counsel shall be entitled to request an award of attorneys' fees not in excess of twenty-five percent (25%) of the gross amount recovered on any Joint Defendant Group claim, less any amount of fees awarded to the Administrative Trustee's counsel, such that the total fees paid to the Administrative Trustee's counsel and Plaintiffs' Counsel do not exceed twenty-five percent (25%) of the gross amount recovered on such claims.

(3) With respect to the prosecution of claims against members of the Seller Defendant Group, Plaintiffs' Counsel shall be entitled to request an award of attorneys' fees not in excess of thirty percent (30%) of the gross amount recovered on any Seller Defendant Group claim.

(d) The settlement further provides that the Administrative Trustee and his counsel and the Class Representatives and their counsel will actively cooperate and assist each other in the coordinated assertion of the claims of the Towers Noteholders and the Towers estates in order to maximize the shared recoveries.

(e) The proposed settlement agreement, if granted final approval, will finally resolve and compromise the dispute between the Class and the Administrative Trustee over who is entitled to pursue and benefit from damages claims arising from the offer and sale of the Notes and the conduct of Towers' business. The Court has not yet ruled, one way or the other, on these disputed issues. The proposed settlement relates only to the rights of the parties to pursue claims arising from the offer and sale of the Notes and the conduct of Towers' business and to the division of any recoveries on those claims. The settlement does not affect the merits of those claims; the validity of the claims and the amounts of any recoveries will be determined by the court before which these claims are brought.

15. On June 27, 1994, the Towers Bankruptcy Court approved the above Trustee Settlement. Partly as a result of developments in the Towers Chapter 11 cases, including the appointment of the Administrative Trustee in connection with the Plan of Reorganization, submission by the Plaintiffs of the Trustee Settlement to this Court for approval was deferred. The Administrative Trustee and the Class Representatives have considered the current status of proceedings in the Class Action and the Towers Chapter 11 cases and determined to submit the Trustee Settlement for Court approval at this time. If the Trustee Settlement is approved, recoveries obtained in connection with the prosecution of pending claims against professionals (including the Settling Attorney Defendants and Eisner) will be shared in accordance with its terms.

16. Accordingly, after deduction of any attorneys' fees, costs, and expenses awarded by the Court, fifty percent (50%) of the balance of the Gross Attorney Settlement Fund and the Gross Eisner Settlement Fund will be allocated to the Administrative Trustee for distribution among all Towers creditors, including the auditor class comprised of Noteholders. The other fifty percent (50%) of the balance of the Gross Attorney Settlement Fund and the Gross Eisner Settlement Fund will be allocated to a class of Towers creditors consisting solely of Settlement Class members, except that the Gross Attorney Settlement Fund is also subject to the Bank Allocation Agreement. See Recommendation of Settlement Class Counsel "Bank Allocation Agreement".

RECOMMENDATION OF SETTLEMENT CLASS COUNSEL

17. Settlement Class Counsel have recommended to this Court, and now recommend to the Settlement Class members, approval of the proposed settlements with the Settling Attorney Defendants, the proposed settlement with Eisner, the Trustee Settlement, and the Bank Allocation Agreement. The bases for Settlement Class Counsel's recommendation are set forth below.

Recent Adverse Court Decisions

18. Recent court decisions have adversely affected the ability of Settlement Class members to prevail upon their claims against the professionals, including the Settling Attorney Defendants and Eisner, who provided legal or accounting services to Towers

6

Financial Corporation or its affiliates. For example, in 1994, the United States Supreme Court ruled in Central Bank v. First Interstate Bank, 511 U.S. 164, 114 S. Ct. 1439 (1994), that there is no private right of action for aiding and abetting violations of Section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5, which was a claim commonly brought against professionals who rendered services to a securities issuer accused of securities fraud. The Settling Attorney Defendants and Eisner have moved to dismiss the claims against them in the Class Action: i.e., the Settling Attorney Defendants and Eisner have asked the Court to throw out the case against them. Magistrate Andrew J. Peck, to whom the Class Action has been assigned by District Judge Whitman Knapp for pretrial purposes, has recommended to Judge Knapp that the claims Noteholders have asserted against Squadron Ellenoff and Duff & Phelps Credit Rating Company be dismissed with prejudice. While Settlement Class Counsel continue to believe that Plaintiffs' claims against the Settling Attorney Defendants and Eisner are meritorious, Settlement Class Counsel also believe that decisions such as Central Bank and Magistrate Peck's decisions recommending dismissal of the claims asserted against Squadron Ellenoff and Duff & Phelps are a factor to consider in assessing the desirability of the settlements with the Settling Attorney Defendants and Eisner and the Trustee Settlement.

## The Proposed Settlements with the Settling Attorney Defendants

19. Settlement Class Counsel, who have extensive experience in class actions and securities litigation, have conducted a thorough investigation and undertaken extensive discovery into the facts and circumstances relating to the claims asserted against the Settling Attorney Defendants in the Class Action. Settlement Class Counsel have examined thousands of pages of documents relating to such claims. In addition, Settlement Class Counsel have analyzed the law relating to the claims against the Settling Attorney Defendants. They have conducted extensive arm's-length negotiations with the Settling Attorney Defendants' counsel. Settlement Class Counsel have considered such things as: (a) the benefits that the Settlement Class members will receive from the [illegible]ment; and (b) the fact that the outcome of litigating the claims against the Settling Attorney Defendants, including the amount [illegible]ages awarded, if any, is uncertain because, among other things, certain of the claims may be barred by the applicable statutes [illegible]ations, and because the Settling Attorney Defendants' alleged liability depends on the resolution of many sharply disputed [illegible] relating both to liability and remedy, as well as other uncertainties and risks inherent in protracted litigation, including the likelihood that even if a judgment were rendered in favor of the Settlement Class, appeals will follow, and it is likely, therefore, that several years could elapse before Settlement Class members receive any benefit.

20. Settlement Class Counsel have also considered the fact that Gibney and its insurer, the Home Insurance Company, have disputed and continue to dispute the extent and nature of insurance coverage which could be applicable to the claims of the Settlement Class, the Bank of Cape Verde, and the potential claims of the Administrative Trustee, and that the insurer has issued a reservation of rights concerning the extent and nature of available insurance. Gibney has made no representation as to the amount of insurance coverage they believe is available for purposes of resolution of the claims asserted in the Class Action, the Bank Action or any potential Trustee Action. To the extent that insurance is available, the Home Insurance Company has advised counsel for the Settlement Class, the Bank and the Administrative Trustee that the policy of professional liability insurance which may be available for resolution of claims asserted in the Class Action, the Bank Action, and related litigation has limits of $5,000,000, including both defense and indemnity obligations. As a result of the combined defense and indemnity limits, the amount which may be available for payment of indemnity has been and continues to be reduced by the costs incurred in defending the Class Action and the Bank Action, such that significantly less than $5,000,000 is potentially available for resolution of the claims in these actions.

21. With regard to the proposed settlement with the Bronson Defendants, Settlement Class Counsel note that the settlement payment, $500,000, is equal to the limits of the policy of insurance available for resolution of the claims in the Class Action and the Bank Action.

## The Bank Allocation Agreement

[illegible]. The Bank of Cape Verde (the "Bank") purchased $20 million in unsecured promissory notes from Towers. In the Bank [illegible], the Bank has alleged that in purchasing unsecured promissory notes, it relied on opinion letters signed by the Settling Attorney Defendants. If the Bank Action against the Settling Attorney Defendants were to proceed to trial independently of the Class Action, the Bank could obtain a judgment against one more of the Settling Attorney Defendants which potentially could exhaust the insurance coverage which forms the basis for the proposed settlements. In addition, in the opinion of Settlement Class Counsel, the Bank Action, which involves the delivery of written legal opinions to the Bank by the Settling Attorney Defendants, is not subject to certain defenses available to the Settling Attorney Defendants in the Class Action.

23. To maximize the potential recoveries and limit the risks of litigation, the Bank and the Class Representatives, through their respective counsel, entered into an agreement which provides for the division of recoveries obtained in connection with the prosecution of the claims against the Settling Attorney Defendants. Under the terms of the agreement, the Bank is entitled to an

allocation equal to twenty percent of that portion of the Gross Attorney Settlement Fund allocated to a class of Towers creditors consisting solely of Noteholders. As the Gross Attorney Settlement Fund totals $4,100,000, and under the Trustee Settlement, fifty percent (50%) of the Gross Attorney Settlement Fund, or $2,050,000 will be allocated to a class of creditors consisting solely of Noteholders, the Bank will receive an allocation of twenty percent (20%) of the amount allocated for distribution solely to Noteholders, or $410,000. A copy of the agreement between the Bank and the Class Representatives is attached to the Gibney and Bronson settlement agreements, which have been filed with the Court.

## The Proposed Settlement with Eisner

24. Settlement Class Counsel have also conducted a thorough investigation and undertaken extensive discovery into the facts and circumstances relating to the claims asserted against Eisner in the Class Action. Settlement Class Counsel have examined thousands of pages of documents relating to such claims. In addition, Settlement Class Counsel have analyzed the law relating to the claims against Eisner. Settlement Class Counsel have considered such things as: (a) the benefits that the Settlement Class members will receive from the settlement; and (b) the fact that the outcome of litigating the claims against Eisner, including the amount of damages awarded, if any, is uncertain because, among other things, certain of the claims may be barred by the applicable statutes of limitations, and because Eisner's alleged liability depends on the resolution of many sharply disputed issues relating both to liability and remedy, as well as other uncertainties and risks inherent in protracted litigation, including the likelihood that even if a judgment were rendered in favor of the Settlement Class, appeals will follow, and it is likely, therefore, that several years could elapse before Settlement Class members receive any benefit.

25. In concluding that the proposed settlement with Eisner, under which, of the $6,000,000 Eisner will pay to settle the Bondholders' claims, $1,005,000 will be allocated to settle the claims of the Settlement Class and the Administrative Trustee, is fair, reasonable, and adequate for the Settlement Class, Settlement Class Counsel have also considered the fact that if the Bondholder Action against Eisner were to proceed to trial independently of the Class Action, the Bondholders could obtain a judgment against Eisner which could potentially exhaust the insurance coverage which forms the basis for the proposed settlement. In addition, in the opinion of Settlement Class Counsel, the Bondholder Action, which involves Eisner's issuance of accounting opinions regarding the Healthcare Subsidiaries which issued the Bonds purchased by the Bondholders (but which did not issue the Notes purchased by the Settlement Class), is not subject to certain defenses available to Eisner in the Class Action.

## The Proposed Settlement with the Administrative Trustee

26. Settlement Class Counsel, who also have substantial experience in cooperatively prosecuting claims with bankruptcy trustees under agreements similar to the proposed settlement agreement with the Administrative Trustee, have familiarized themselves with the standing and entitlement issues to be resolved by the proposed Trustee Settlement and have analyzed the law relating to such issues. Settlement Class Counsel have also recognized that Noteholders will receive, pursuant to the Plan, as a creditor class pursuant to the Plan, approximately 45 to 55% of amounts distributed through the Administrative Trust (the actual percentage being a function of still pending claims and proceedings in the Towers Chapter 11 cases). If unresolved, the dispute with the Administrative Trustee over who, as between the Administrative Trustee and the Class, has the right to pursue claims and obtain recoveries, would complicate and lengthen the Class Action. They have recognized the mutual benefit to the Settlement Class members and the Administrative Trust (and creditors of Towers) of reaching a settlement providing for the cooperative prosecution of damages claims against Defendants and the equitable division of proceeds from these claims. Settlement Class Counsel have conducted extensive arm's-length negotiations with the Chapter 11 Trustee's counsel and the Administrative Trustee's counsel to reach and implement the proposed Trustee Settlement.

27. The following example illustrates why Settlement Class Counsel believe the Trustee Settlement to be desirable. One of the Defendants in the Class Action is the law firm of Squadron Ellenoff. As indicated above, Magistrate Peck, to whom the Class Action has been assigned by District Judge Whitman Knapp for pretrial purposes, has recommended to Judge Knapp that the claims they have asserted against Squadron Ellenoff be dismissed with prejudice, i.e., thrown out. While Settlement Class Counsel believe that the claims they have asserted against Squadron Ellenoff have merit, and have objected to Judge Peck's recommendation, there is no assurance whatsoever that the claims against Squadron Ellenoff will survive.

28. However, the Administrative Trustee has filed an adversary proceeding Raymond H. Wechsler, Administrative Trustee v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP, Adv. Pro. No. 96-18314A, in the Towers Chapter 11 cases in which the Administrative Trustee asserts claims against Squadron Ellenoff for attorney malpractice, breach of contract, and breach of fiduciary duty. While there have been no rulings of any kind in the Administrative Trustee's action against Squadron Ellenoff, and Settlement Class Counsel make no assurances that a recovery will be forthcoming in that action, the Administrative Trustee may be able to recover against Squadron Ellenoff, even if Squadron Ellenoff is dismissed from the Class Action.

29. By entering into the Trustee Settlement, in exchange for compromising on the Administrative Trustee's claim to a portion of the recoveries in the Class Action, including the recoveries from the Settling Attorney Defendants and Eisner, the Settlement Class acquires the reciprocal right to share in certain recoveries obtained by the Administrative Trustee including in respect of the action against Squadron Ellenoff. Accordingly, under the Trustee Settlement, even if Squadron Ellenoff is dismissed from the Class Action, the Settlement Class has the right to share in any recovery obtained by the Administrative Trustee in the Administrative Trustee's action against Squadron Ellenoff. While there can be no guarantee that the Trustee Settlement will result in the Settlement Class receiving greater recoveries than if the Trustee Settlement were not entered into, Settlement Class Counsel believe that the Trustee Settlement will substantially assist in maximizing the potential recovery of the Settlement Class.

## APPLICATION OF SETTLEMENT CLASS COUNSEL FOR REIMBURSEMENT OF EXPENSES AND AWARD OF ATTORNEYS' FEES

30. Settlement Class Counsel have undertaken to prosecute this action on behalf of Noteholders on an entirely contingent basis. Settlement Class Counsel intend to apply for reimbursement of costs and expenses and an award of attorneys' fees in connection with the proposed settlements with the Settling Attorney Defendants and Eisner and the settlement with American Credit Indemnity Company ("ACI") approved by this Court on December 18, 1995. Settlement Class Counsel will apply for reimbursement of costs and expenses in an amount not to exceed $250,000. Settlement Class Counsel were partially reimbursed from the proceeds of the ACI settlement for costs and expenses previously incurred in the prosecution of this litigation in the amount of $227,000. Settlement Class Counsel have received no other compensation for their services from the inception of this litigation in March 1993 to the present. Settlement Class Counsel will apply for an award of attorneys' fees, in accordance with the terms of the Trustee Settlement, of thirty percent (30%), or $375,000, of the gross amount recovered in connection with the ACI settlement (250,000) and twenty-five percent (25%), or $1,173,750 of the gross amount recovered in connection with the Gibney, Bronson and Eisner Settlements ($4,695,000). Settlement Class Counsel will not seek an award of attorneys' fees from any portion of the Gibney and Bronson settlements allocated to the Bank. In addition, the Administrative Trustee may seek to have attorneys fees and expenses not to exceed $50,000 connected with the Administrative Trustee's action against Eisner reimbursed or credited to the benefit of the Administrative Trust to the extent allowed under the Trustee Settlement or otherwise. Settlement Class Counsel's fee application will be reduced accordingly, such that the total fees paid to Settlement Class Counsel and reimbursed or credited in respect of the Administrative Trustee's counsel do not exceed twenty-five percent (25%) of the gross amount recovered in connection with the Gibney, Bronson and Eisner Settlements. In addition, Settlement Class Counsel intend to apply, on behalf of the Class Representations for an incentive award of $5,000 to each of the Class Representatives, payable from the Gross Recovery, in recognition of the services performed by the Class Representatives for the benefit of the Settlement Class.

## FINAL SETTLEMENT APPROVAL HEARING AND COMMENTS BY CLASS MEMBERS

31. The Court will hold a hearing commencing on October 15, 1996, at 9:30 a.m., in the courtroom of the Honorable Andrew J. Peck, United States Magistrate Judge for the Southern District of New York, located at the United States Courthouse, 500 Pearl Street, Courtroom 20D, New York, New York 10007, to determine whether the proposed settlements with the Settling Attorney Defendants and Eisner and the Trustee Settlement are fair, reasonable, and adequate. Although you may attend this hearing, you are not required to do so.

32. YOU DO NOT NEED TO APPEAR AT THE HEARING OR TAKE ANY OTHER ACTION IN SUPPORT OF THE SETTLEMENT OR SETTLEMENT CLASS CERTIFICATION. As a Settlement Class Member, you have the right to state your position for or against the proposed settlements. You have the right to appear in the Class Action through your own attorney. If you wish to submit written comments on the proposed settlements and/or Settlement Class Counsel's application for reimbursement of costs and an award of attorneys' fees, you may do so provided that your letter, including any materials which you wish the Court consider, is postmarked no later than September 24, 1996 and is sent to the Clerk of the Court, United States Courthouse, 500 Street, Room 120, New York, New York 10007. Copies must be sent simultaneously to the attorneys listed below:

Daniel C. Girard, Esq.
GIRARD & GREEN, P.C.
160 Sansome Street, Suite 300
San Francisco, CA 94104

Settlement Class Counsel

Richard Mancino, Esq.
WILLKIE FARR & GALLAGHER
One Citicorp Center
153 East 53rd Street
New York, NY 10022

Counsel for the Administrative Trustee

Mark E. Housman, Esq.
SILLER WILK LLP
747 Third Avenue
New York, NY 10017-2803

Counsel for Defendants
H. Bruce Bronson, Jr., the Law Offices of Bruce Bronson, and Bronson & Migliaccio

Robert I. Jossen
SHEREFF, FRIEDMAN, HOFFMAN & GOODMAN
919 Third Avenue
New York, NY 10022

Counsel for Defendant
Richard A. Eisner & Co. LLP

Christopher "Kip" Schwartz, Esq.
GRAHAM & JAMES LLP
2000 "M" Street, N.W., Suite 700
Washington, D.C. 20036

Counsel for the Bank of Cape Verde

James P. Nunemaker, Jr., Esq.
RIVKIN, RADLER & KREMER
EAB Plaza
Uniondale, NY 11556-0111

Counsel for Defendant Gibney, Anthony & Flaherty

33. You may be heard orally in support of or in opposition to the proposed settlements, provided that you mail a letter, postmarked no later than September 24, 1996, stating your intention to appear before the Court personally and indicating briefly the nature of the argument to be presented. Copies of such letter must be sent to the Clerk of the Court and the attorneys designated above.

34. If you do not object to the proposed settlements in the manner described above, you shall be deemed to have consented to the settlements and to have waived all objections and shall forever be foreclosed from making any such objections.

## OPTION OF EXCLUSION FROM THE SETTLEMENTS

35. If you are included in the above definition of the Settlement Class, you have a choice as to whether or not to remain a Settlement Class member for purposes of participating in each of the Gibney, Bronson and Eisner settlements and the Trustee Settlement. Your choice will have consequences, which you should understand before making your decision.

36. If you want to be excluded from the Settlement Class or from any of the Gibney, Bronson or Eisner settlements, you must notify Settlement Class Counsel in writing by mail postmarked no later than September 24, 1996 at the address listed in paragraph 32 above and specify from which of the proposed settlements you wish to be excluded. You may not exclude yourself from the Trustee Settlement and still participate in any of the Gibney, Bronson or Eisner settlements. To exclude yourself from the Trustee Settlement you must exclude yourself from the Settlement Class.

37. If you elect to exclude yourself from the Settlement Class or any proposed settlement, (1) you will not share in the money that will be paid to the Settlement Class as a result of the settlements from which you elected to exclude yourself; (2) you will not be bound by any decision in the Class Action regarding the claims against the Settling Attorney Defendants or Eisner or entitlement to claims asserted by the Administrative Trustee, whether favorable or not, to the extent you excluded yourself from the proposed settlements with any of the foregoing; and (3) you may present any claims you have preserved against the Settling Attorney Defendants or Eisner by filing your own lawsuit, or you may seek to intervene in the Class Action.

38. IF YOU WANT TO REMAIN A SETTLEMENT CLASS MEMBER AND PARTICIPATE IN EACH OF THE PROPOSED SETTLEMENTS, YOU ARE NOT REQUIRED TO DO ANYTHING AT THIS TIME. By remaining a Settlement Class member, all of your claims against the Settling Attorney Defendants and Eisner for damages arising out of their conduct as alleged in the Class Action will be determined in the Class Action and released by the proposed settlements and cannot be presented by you in any other lawsuit. Furthermore, any claims against the Administrative Trustee regarding entitlement to claims asserted by the Administrative Trustee against persons who harmed the Towers bankruptcy estates will be released by the Trustee Settlement and cannot be presented by you in any lawsuit. As a Settlement Class member, you have the right to share in the money that will be paid to the Settlement Class as a result of the settlements with the Settling Attorney Defendants and Eisner and any money obtained by the Administrative Trustee on claims against certain persons who harmed the Towers estates, all as more fully described in the Trustee Settlement.

## RIGHTS AND OBLIGATIONS OF CLASS MEMBERS

39. As a member of the Settlement Class, if you do not exclude yourself from the Settlement Class, you will be bound by all further orders and judgments of the Court affecting the Settlement Class, and your claims for damages against the Settling Attorney Defendants and Eisner as alleged in the Class Action will be determined in the Class Action. You will be entitled to notice of any further ruling affecting the Settlement Class. For this reason, as well as to enable you to share in the payments made by the Settling Attorney Defendants and Eisner, you are requested to notify Settlement Class Counsel at the address listed in paragraph 44 below, of any corrections or changes to your name or address.

40. You need not hire or pay an attorney. Settlement Class members will be represented by Settlement Class Counsel, who are proponents of the settlements. If you wish, however, you may retain and appear through your own attorney, at your expense. You may also seek to intervene individually in the Class Action, and you may advise the Court if at any time you think you are not being fairly and adequately represented by the Class Representatives or Settlement Class Counsel.

41. If you wish to preserve your right to pursue an arbitration or individual court action against a broker-dealer in connection with your investment in Towers Notes, you are not required to exclude yourself from the Settlement Class. You will be separately notified, if and when this action is certified for liability purposes as against one or more broker-dealer defendants, of your right to participate or exclude yourself.

## DISMISSAL WITHOUT PREJUDICE OF CLAIMS AGAINST BROKER-DEALER DEFENDANTS

The Class Representatives in the Class Action sued J.B. Bogart & Associates, Consolidated Financial Serv., Inc., Dain [illegible], Inc., David deBarardinis, East-West Capital Management, Inc., First Affiliated Securities Inc., Halpert & Company [illegible] Martin Kaiden Company, and Monterey Bay Securities, individually, and as representatives of a defendant class consisting of all broker-dealers who sold Notes (collectively, the "Broker-Dealer Defendants"). Settlement Class Counsel have advised the Court they propose to dismiss, without prejudice, all claims asserted against the Broker-Dealer Defendants, or in some cases, to pursue such claims on an individual basis. Settlement Class Counsel have advised the Court that, in light of the limited assets of the Broker-Dealer Defendants, they believe that pursuing such claims on behalf of the Plaintiff Class would not be cost-effective. Settlement Class Counsel have advised the Court that there are approximately 160 Broker-Dealer Defendants, virtually all of whom have very limited assets from which to satisfy an eventual judgment in the Class Action; that there appears to be no suitable representative of the proposed defendant class of Broker-Dealer Defendants, such that claims and defenses relating to each of the Broker-Dealer Defendants might need to be presented individually, which would result significant confusion, delay and expense, and potentially render a class action against the Broker-Dealer Defendants unmanageable; and that a substantial number of Class members have initiated individual arbitration proceedings against Broker-Dealer Defendants, indicating substantial interest on the part of Class members in individually controlling the prosecution of separate actions against Broker-Dealer Defendants. In light of the foregoing, Class Counsel intend to dismiss the claims of the Class Representatives against the Broker-Dealer Defendants, without prejudice, effective on October 15, 1996, meaning that your claims against the Broker-Dealer Defendants will not be presented in the Class Action.

43. If you wish to pursue a claim against a Broker-Dealer Defendant arising out of your Note investments, you may seek to do so by intervening in the Class Action or instituting a separate action or other proceeding through your own attorney. Settlement Class Counsel have advised the Court that they believe you will not be prevented by applicable statutes of limitations from pursuing your claims against the Towers Broker-Dealers responsible for soliciting your Note investments, provided you act immediately upon receipt of this Notice to assert such claim through your own attorney. If you have questions relating to the dismissal by the Cl[illegible] Representatives of the claims against the Broker-Dealer Defendants, or if you wish to receive a list of attorneys who may be [illegible] pursue claims against Note broker-dealers on a contingent basis, you may contact Settlement Class Counsel at the address [illegible]w. You may comment on the dismissal of the Class Representatives' claims against the Broker-Dealer Defendants by [illegible]g the procedures specified in paragraphs 32-33. This Notice should not be construed as an expression of opinion by the Court on the merits of any claim you may have against any of the Broker-Dealer Defendants or any defenses thereto.

## ADDITIONAL INFORMATION

44. Any questions you have concerning the matters contained in this Notice (and any corrections or changes to your name or address) should not be directed to the Court, but should be addressed in writing to the following Settlement Class Counsel:

Towers Financial Corporation Noteholders Litigation
c/o GIRARD & GREEN P.C.
160 Sansome Street, Suite 300
San Francisco, CA 94104

First-Class Mail
U.S.Postage
Paid
Gilardi & Co.

TOW2

81501-2036 43

Daniel C. Girard, Esq.
Eric H. Gibbs, Esq.
GIRARD & GREEN, P.C.
160 Sansome Street
Suite 300
San Francisco, CA 94104

45. Complete copies of all pleadings and papers filed in the Class Action, including the complete text of the settlement agreements embodying the proposed settlements with the Settling Attorney Defendants and Eisner and the Trustee Settlement, are available for inspection and copying at the Office of the Clerk of the Court, United States Courthouse, 500 Pearl Street, Room 120, New York, New York 10007, during regular business hours.

46. If any of the proposed settlements are not approved by the Court, the settlements will be null and void, and the parties will be restored to their respective positions as they existed immediately prior to the presentation of the settlement agreements to the Class. In any event, the actions will continue against all other Defendants who are not parties to these settlements, except the Broker-Dealer Defendants. The Court has not yet set a trial date, as further discovery and other pretrial proceedings remain to be conducted.

DATED: August 2, 1996

CLERK, UNITED STATES DISTRICT COURT

PLEASE DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE FOR INFORMATION.

**EXHIBIT  43**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

IN RE

TOWERS FINANCIAL CORPORATION

NOTEHOLDERS LITIGATION,

And Related Cases

------------------------------x

LEAD CASE:
93 Civ. 810 (WK)

Consolidated Cases:
93 Civ. 961, 0987, 0992, 1045, 1047, 1094, 1095, 1155, 1303, 1543, 1686 4449, 5844
94 Civ. 619, 721, 724, 725, 814

Related Cases:
93 Civ. 744, 855, 1080, 1927, 4692, 6514;
94 Civ. 1792, 2727

E 795/.002
547

October 15, 1996
9:35 a.m.

Before:

HON. ANDREW J. PECK

United States Magistrate Judge

APPEARANCES:

STAMMELL & SCHAFER,
Attorneys for plaintiff
JARED STAMELL

CLARK, HILL,
Attorneys for Detroit Retirement System
JOHN BERG

THE COURT: We are coming back roughly 40 days from now. The trigger point is going to be Duff & Phelps's submissions in 30 days of what its claim is. I want to give you a short but reasonable amount of time to be able to react to that, and have you all come back and tell me you have resolved the issue, or, if not, tell me and I will do it.

But assume you will all come back in 40 days, and tell me where that leaves us in terms of holidays, et cetera. Obviously your submission should be in advance of that, because what I will try to do at the next session is approval the settlements, if that's doable, and if you want your money at that session, you should get your submission in in advance of that. You should aim at 20 to 30 days, but if you think you need more, you will get more, but you just won't get your costs at that time until I digest what you have put in.

MR. GIRARD: Why don't we cover the broker dealers, if there are any questions on that, and we can set the dates for when we come back.

THE COURT: All right. Anyone want to say anything about the broker dealer settlement or non-settlement per se but dismissal?

(No response)

THE COURT: The person who stood up about that

issue before is either not here or has nothing to say.

MR. AARON: In favor of the dismissal of the broker dealers. I represent one of them.

THE COURT: All right: The court can rule on this independent of the other settlements that are going on. The following constitutes my report and recommendation. Under rule 25(e) of the Federal Rules of Civil Procedure, dismissal in any form requires Court approval and notice to the class.

In this case, notice to the class, at least of the intent of plaintiffs claim to dismiss, was given along with the notice of all the settlements. No objection was filed except for one person who objected under the hat of the member of the class, but who I am told at least by the papers submitted in reply by Mr. Girard, is actually a broker dealer as well, and the only objection there was that the Squadron dismissal is with prejudice, the dismissal as to the broker dealers should be with prejudice.

Whether the person who filed that objection really is a broker dealer or not, I don't need to determine, but it is certainly not an objection that is within the class's interest. There is good reason for the Squadron dismissal to be with prejudice. That was based on my review of the merits, and even as to Squadron, they are not dismissed with prejudice as this point because Judge Knapp

gave them leave which they accepted, to file a conspiracy-type complaint against Squadron, which will be the subject of further motions.

In any event, there is no parity between the situation as to Squadron and the situation as to the broker dealers, and the objection is not in the class's interest. The discontinuance of the class action here will not be of any harm to the members of the class. Many of them have already brought individual suits either at law or in arbitrations. If any of those who have waited based on their reliance on the class action and there is law to the effect that the class action tolls the statute of limitations and see, for example, in that regard the In Re Activision Securities litigation decision reported at 1986 Westlaw 15339 at page star 2-3. Northern District of California, October 20, 1986.

Neither the class representatives nor class counsel receive any consideration monetarily or otherwise in connection with the dismissal of the broker dealer defendants. See for example, plaintiff's brief at footnote 2 and Mr. Girard's affidavit at paragraph 49. The broker dealer defendants do not appear to have the economic viability for litigation against them as a class to be economically of benefit to the class and, in any event, the lack of a financially viable broker dealer defendant to

serve as a class representative of the defendant class raises severe questions as to whether a defendant class would be appropriate in this case.

The plaintiffs believe, and the court has no reason to doubt, that the cost of pursuing claims on a class action basis against the broker dealers will exceed any possible amount that could be recovered by the class. I note in that regard that the administrative trustee has sued the broker dealers or Note sale commissions as a voidable preference and related bankruptcy claims and that the broker dealers have generally been unable to pay all but even a small fraction. And I note, by the way, that the noteholder gets 50 percent under the trustee in reorganization's plan, so it is unlikely that the broker dealers would be able to pay the greater amount of damages that are being sought on a class action basis here.

As noted before, the class members have shown a great interest in controlling their own litigation. Plaintiff's believe that 30 percent of the class have suits of one sort or another, including arbitration, against the broker dealer, and that many did not sue against the broker dealer because their broker dealer is now out of business or not financially viable to support a claim.

We already saw in connection with the ACI litigation, where people opted out even of that settlement

in order to protect their claims against their broker dealer, but if we did have a class proceed against the broker dealers, there would be a significant level of opt outs involved. There is likely to not be any adequate class representative of the class of broker dealers because of the financial difficulties and other difficulties, so that in proceeding on a plaintiff class action based against each broker dealer separately would lead to litigation management problems, not insuperable on its own, but along with the financial viability does not make a class action superior to individual proceedings.

There has been very little activity in the In Re *Towers* and related actions against the broker dealer defendants. The broker dealers who were served answered the complaint. One broker dealer propounded written discovery. There has not been any motion practice on motions to dismiss or even discovery motions or anything else involving the broker dealer defendants or the broker dealer class.

Most importantly here, notice was given to the class members about the intent to dismiss without prejudice as to the broker dealer defendants. There was no objection from any class member, other than the one I referred to that the court overruled or disregards.

In conclusion I recommend to Judge Knapp that the court dismiss the plaintiff class claims against the broker

dealer defendants without prejudice to the right of individual plaintiffs to pursue individual claims against the respective broker dealers.

The only other point I want to place you with, Mr. Girard, is whether you believe that the existing notice to the class is sufficient or whether some additional notice should be given to them to tell them that what we were proposing has indeed happened and that their time to bring in individual action if they are going to do it, they really better not wait any longer.

MR. GIRARD: The only case I thought of is this is case in Ninth Circuit, the case of Diaz. We are well within the spirit of that case in light of what we have done and the reactions that I have elicited from people in conversations, indicating that the people who are going to pay attention to a notice have already paid attention and they have either hired an attorney a long time ago, determined their broker dealer was uncollectible, or have since after getting the notice gone out and done it. So I think it would be belt and suspenders to be renotifying them now that what we told them we are going to do has in fact happened.

THE COURT: What's your view as to whether you should send a form letter to those people who had communicated with you, asking for the names of counsel to

pursue matters or otherwise raising questions about the broker dealer issue?

MR. GIRARD: We have that record, and we can do that easily. It doesn't place a disproportional expense on the shoulders of the rest of the class. We will send out a form letter within a week advising people that the motion was granted and that they should proceed immediately with their claims.

The letter that we sent them advising them of the identities of the lawyers who could bring those claims included a statement that they should act promptly, but we'll reiterate that.

THE COURT: All right. That seems sufficient to the court, and so, accordingly, it is ordered that Mr. Girard's firm or co-counsel will send a letter to the class notifying them of my report and recommendation, but that letter should only be sent to those who have contacted plaintiffs' counsel with respect to the broker dealer issue.

Those are the people whose letters and responses are already a part of Mr. Girard's submission to the court. He knows who they are, and the court record will reflect that they are the ones whose letters are attachments to his reply affidavit in this matter.

As to the rest of the class, the court finds that the notice of the intent to move for dismissal is sufficient

to inform them that they need to take prompt action if they are going to pursue any individual claim against the broker dealers, and that the cost of sending additional notice would be disproportional to the benefit to the class. Accordingly, I recommend to Judge Knapp that the claims against the broker dealer defendants be dismissed without prejudice.

I will ask Mr. Girard to order this back little portion of the is transcript separately and if no objections are filed within 10 days, as I suspect none will, that he will forward this to Judge Knapp with an appropriate cover motion seeking approval. I suspect I might have had the right to enter this order without doing it on a report and recommend basis, but out of an excess of caution I will do it this way and let Judge Knapp do the final entry of an order.

With respect to that, I'd also advise the class members who are going to get your letters an extra 10 days.

Let's now decide when you are going to come back to further discuss the settlement bar order.

MR. GIRARD: I was looking at the 19th, since is that would --

THE COURT: With all due respect, and I know we are coming into Thanksgiving season, but on the assumption that I have got to make at this point that Duff & Phelps is

not going to do its pleading until Friday the 15th, and that you are all going to need a bit of time to react to it, research the viability of such claims, et cetera, as much I want to keep this on a fast track, I don't see holding a hearing before the first week of December or so as being of any use.

You know I run a rocket docket on non-Towers cases and Towers cases if that works, but feeling that gives you more time to work together is of more benefit than rushing in here with sloppy preparation, and that doesn't give you enough time to confer with each other: I am therefore looking at the week of December 9, just because I have got a trial on the week of December 2. Any preferences of day within that week?

MR. GIRARD: Could we have the 10th or the 11th?

THE COURT: All right. Let's do it Wednesday, December 11 at 9:30 a.m. I know you have heard all this before, but I just want to end repeating what I have said before. There is a limit to how much you can either play chicken on the settlement bar order or hope that somebody else is going to pick up the slack or litigate. There is a great risk that all of these settlements, or at least the ones affecting Bronson and Gibney, are going doing to go down the tubes because only of the settlement bar, and I recognize the needs for settling defendants to have global

EXHIBIT 41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re

TOWERS FINANCIAL CORPORATION NOTEHOLDERS LITIGATION

and Related Cases.

93 Civ. 0810 (WK) (AJP)

WHITMAN KNAPP, SENIOR DISTRICT JUDGE

Before us are Magistrate Judge Andrew J. Peck's October 15, 1996 and November 22, 1996 Report and Recommendations, as read into the record, respectively recommending dismissal without prejudice of the claims against the broker/dealer defendants and approval of the settlements reached between many of the parties in the Towers Noteholders Litigation.

No objections to the Report and Recommendations have been filed. Finding them to be eminently fair and reasonable, we affirm the Report and Recommendations in their entirety. Accordingly:

(1) the Eisner, Bronson, and related Bronson law firms, and Gibney Anthony & Flaherty settlements, including the revised bar orders incorporated therein, are approved;

(2) the Trustee settlement is approved;

(3) the plaintiff class claims against the broker/dealer class and broker/dealer defendants is dismissed without prejudice;

(4) plaintiffs' counsel shall be awarded $1,523,750 in counsel fees;

(5) the individual named plaintiffs are to receive an incentive award of $5,000 each, but only once as to each plaintiff class representative or related plaintiff class representative without regard to multiple capacities;

(6) the request for an award of out-of-pocket costs to counsel is denied without prejudice to renewal with further detail.

SO ORDERED.

New York, New York
December 11, 1996

WHITMAN KNAPP, SENIOR U.S.D.J.

DATED: October 1, 1990

CONFIDENTIAL PRIVATE OFFERING DOCUMENT

For: Accredited Investors Only

TOWERS FINANCIAL CORPORATION
$100,000,000 In Recourse Promissory Notes
Bearing Interest At The Rate Of 13% Per Annum
For 12-Month Promissory Notes
And 15% Per Annum For 24-Month Promissory Notes
Collateralized, Secured And Backed By
Healthcare Accounts Receivable Due From Major Insurance
Companies, Commercial Accounts
Receivable And Loans And Accounts Receivable
Purchased From Governmental Agencies

| | Subscription Price Payable Upon Subscription | Selling Commissions (1) | Proceeds to The Company |
|---|---|---|---|
| Per Unit (minimum offering is one Unit) ....... | $ 100,000 | $ 5,000(5%) | $ 95,000(95%) |
| Total 1,000 Units (maximum offering) ......... | $100,000,000 | $5,000,000(5%) | $95,000,000(95%) |

(1) Commissions of 5% per Unit will be paid from the offering for the purchase of 24-month promissory notes and an additional 5% per Unit will be paid one year from Sale and Acceptance. Commissions of 4% per Unit will be paid for the sale of 12-month promissory notes upon Sale and Acceptance. Commissions will only be paid to broker-dealers who are members of the National Association of Securities Dealers, Inc. Amounts allocated to commissions which are not paid will increase the proceeds to the Company.

This Offering Document Does Not Constitute an Offer to Any Person Other Than:

Name: ______________________ Offeree Number: 15178

TFC
TOWERS
FINANCIAL
CORPORATION

417 FIFTH AVENUE, NEW YORK, NY 10016 (212) 696-0505

Towers Financial Corporation,
Copyright 1990, All Rights Reserved

Towers Financial Corporation ("Towers" or the "Company") is offering for sale to Accredited Investors only, 12-month and 24-month Promissory Notes which are recourse to Towers, secured, collateralized and backed by (i) Healthcare Accounts Receivable purchased from hospitals, doctors, medical groups and other healthcare providers (the "Healthcare Receivables"); (ii) Business Accounts Receivable purchased from manufacturers, wholesalers and service companies (the "Business Accounts Receivable"); and/or (iii) receivables and loans purchased from the Federal Deposit Insurance Corporation ("FDIC") and/or Resolution Trust Company ("RTC") (the "FDIC and RTC Receivables"), or from secondary sources. The Healthcare Receivables will be receivables of, and payable by, major insurance companies, Blue Cross/Blue Shield, state governmental agencies, major unions, worker's compensation reimbursers, personal injury reimbursers, and all other third party reimbursers. The Business Accounts Receivable will be receivables of and payable by commercial businesses. The FDIC and RTC Receivables will be purchased at auction and, may be secured by assets. (The Healthcare Receivables, Business Accounts Receivable and FDIC and RTC Receivables are collectively referred to as the "Accounts Receivable".)

Investors will have the option upon maturity to reinvest the proceeds of the Promissory Notes, subject to the terms set forth herein as may be amended from time to time. The 12-month Promissory Notes will bear interest at the rate of 13% per annum and the 24-month Promissory Notes will bear interest at the rate of 15% per annum. Interest will be payable monthly or quarterly at the option of the investor.

Towers typically purchases Accounts Receivable for up to 95% of the face amount of such Accounts Receivable which is equivalent to a factoring fee of a minimum of 5% for each Account Receivable collected. Upon collection of each Account Receivable, the proceeds of collection will be reinvested in additional Accounts Receivable resulting in the compounding of the factoring fee with each new purchase. Towers expects to reinvest the collected funds in Accounts Receivable and compound its factoring fee up to six times per year, which is expected to provide sufficient funds for the payment of interest to the promissory noteholders. Towers may reinvest in the same healthcare provider or business entity or reinvest in a new or different healthcare provider or business entity in accordance with the terms of this offering. Towers will bid upon the purchase of FDIC and RTC loans and receivables offered periodically by the FDIC and RTC at auction. FDIC and RTC loans and receivables generally are non-performing loans and receivables which can be acquired for a substantial discount from their stated face value.

CAPITALIZED TERMS USED HEREIN SHALL HAVE THE MEANING SET FORTH AT GLOSSARY.

THIS SUMMARY IS CONFIDENTIAL AND MAY ONLY BE SHOWN TO ACCREDITED INVESTORS AS DEFINED HEREIN (SEE "TERMS OF THE INVESTMENT").

THE UNITS HAVE NOT BEEN REGISTERED WITH, OR APPROVED OR DISAPPROVED BY, THE SECURITIES AND EXCHANGE COMMISSION OR BY THE SECURITIES REGULATORY AUTHORITY OF ANY STATE. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

TOWERS SHALL MAKE AVAILABLE TO EACH INVESTOR OR HIS AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY UNITS, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM ANY PERSON AUTHORIZED TO ACT ON BEHALF OF TOWERS CONCERNING ANY ASPECT OF THE INVESTMENT AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT TOWERS HAS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

SALES OF THESE SECURITIES CAN BE CONSUMMATED ONLY BY TOWERS' ACCEPTANCE OF OFFERS TO PURCHASE SUCH SECURITIES WHICH ARE TENDERED TO TOWERS BY PROSPECTIVE INVESTORS. NO SOLICITATION OF ANY SUCH OFFER (INCLUDING ANY

SOLICITATION WHICH MAY BE CONSTRUED AS AN "OFFER" UNDER FEDERAL AND/OR STATE SECURITIES LAWS) IS AUTHORIZED WITHOUT THE PRIOR APPROVAL OF SUCH PROSPECTIVE INVESTOR BY TOWERS.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME (SEE "RISK FACTORS").

DESPITE THE INCLUSION OF THE LEGENDS BELOW, BROKER-DEALERS MUST CONFIRM WITH THE ISSUER THAT EITHER THE SECURITIES HAVE BEEN REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE SINCE THE INCLUSION OF A LEGEND BELOW DOES NOT ASSURE REGISTRATION OR EXEMPTION.

*FOR ALABAMA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR ALASKA RESIDENTS ONLY*: THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISION OF 3 AAC 08.500-3 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF AS 45.55.170.

THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

*FOR ARIZONA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED PURSUANT TO A.R.S. SECTION 44-1846 BUT THE FACT OF THE GRANTING OF SUCH EXEMPTION IS NOT TO BE DEEMED A FINDING BY THE ARIZONA CORPORATION COMMISSION THAT THIS OFFERING DOCUMENT IS TRUE OR ACCURATE, NOR DOES SUCH GRANT OF EXEMPTION MEAN THAT THE COMMISSION HAS PASSED UPON THE MERITS OF OR OTHERWISE APPROVED THE SECURITIES DESCRIBED HEREIN.

*FOR ARKANSAS RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-42-504(a)(14) OF THE ARKANSAS SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THE OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR CALIFORNIA RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE IF SUCH REGISTRATION IS REQUIRED.

*FOR COLORADO RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981, IF SUCH REGISTRATION IS REQUIRED.

*FOR CONNECTICUT RESIDENTS ONLY:* THE SECURITIES REFERRED TO IN THIS OFFERING DOCUMENT HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE CONNECTICUT UNIFORM SECURITIES ACT, AND, THEREFORE, THE SECURITIES CANNOT BE SOLD OR TRANSFERRED UNDER SUCH ACT UNLESS THEY ARE REGISTERED UNDER SUCH ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR FLORIDA RESIDENTS ONLY:* FLORIDA PURCHASERS ARE ADVISED THAT WHERE SALES ARE MADE TO FIVE OR MORE PERSONS PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES & INVESTOR PROTECTION ACT, SUCH SALES ARE VOIDABLE BY THE PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE COMPANY OR ANY AGENT OF THE COMPANY OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE PURCHASER, WHICHEVER OCCURS LATER. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT (RULE 3E500.005(5)(a)(12)).

*FOR GEORGIA RESIDENTS ONLY:* OFFEREES ARE HEREBY ADVISED THAT THE CONSENT DECREE ENTERED INTO BY TOWERS FINANCIAL CORPORATION ("TOWERS") DISCUSSED IN THE CONFIDENTIAL PRIVATE OFFERING DOCUMENT DATED OCTOBER 1, 1990, PROVIDES THAT TOWERS IS PERMANENTLY ENJOINED FROM VIOLATING THE SECURITIES LAWS AND THAT TOWERS IS SUBJECT TO AN ONGOING OBLIGATION NOT TO VIOLATE THE SECURITIES LAWS. UNLESS A WAIVER IS GRANTED BY THE STATE OF GEORGIA, THE CONSENT DECREE CONSTITUTES AN AUTOMATIC DISQUALIFICATION FROM THE USE OF PRIVATE OFFERING EXEMPTIONS IN THE STATE OF GEORGIA. TOWERS HAS APPLIED FOR SUCH A WAIVER AND THE GEORGIA SECURITIES COMMISSION HAS AGREED TO GRANT THE WAIVER PROVIDED THAT THIS NOTICE BE FURNISHED TO ALL GEORGIA OFFEREES.

*FOR IDAHO RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR ILLINOIS RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS, NOR HAS THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR INDIANA RESIDENTS ONLY:* THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 23-2-1-2 OF THE INDIANA CODE.

THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL OR STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.

*FOR LOUISIANA RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS OF LOUISIANA AND THEREFORE CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR MARYLAND RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, IF SUCH REGISTRATION IS REQUIRED.

*FOR MICHIGAN RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNIFORM SECURITIES ACT OF MICHIGAN AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. MINIMUM INVESTMENT IN MICHIGAN IS $50,000.

*FOR MINNESOTA RESIDENTS ONLY:* THESE SECURITIES REPRESENTED BY THIS OFFERING HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

*FOR MISSISSIPPI RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR MISSOURI RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR NEW JERSEY RESIDENTS ONLY:* THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING DOCU-

MENT. THE FILING OF THIS OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE OR THE SALE THEREOF BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR NEW MEXICO RESIDENTS ONLY:* THE SECURITIES DESCRIBED HEREIN ARE OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF NEW MEXICO. ACCORDINGLY, THE NEW MEXICO SECURITIES BUREAU HAS NOT REVIEWED THE OFFERING OF THESE SECURITIES AND HAS NOT APPROVED OR DISAPPROVED THIS OFFERING. THE NEW MEXICO SECURITIES BUREAU HAS NOT PASSED UPON THE VALUE OF THESE SECURITIES OR UPON THE ADEQUACY OR ACCURACY OF THE INFORMATION CONTAINED IN THIS OFFERING DOCUMENT.

*FOR NORTH CAROLINA RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR PENNSYLVANIA RESIDENTS ONLY:* PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, EACH PENNSYLVANIA RESIDENT WHO ACCEPTS THE OFFER MADE PURSUANT TO THE OFFERING DOCUMENT TO PURCHASE ANY UNITS SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE, WITHOUT INCURRING ANY LIABILITY TO THE COMPANY, ITS AFFILIATES OR ANY OTHER PERSON, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE COMPANY OF HIS WRITTEN BINDING CONTRACT OF PURCHASE (SUBSCRIPTION AGREEMENT). TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER SHOULD SEND A LETTER OR TELEGRAM INDICATING HIS INTENTION TO WITHDRAW TO THE COMPANY AT THE ADDRESS OF THE COMPANY SET FORTH IN THE OFFERING DOCUMENT. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF A SUBSCRIBER ELECTS TO SEND SUCH A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD A SUBSCRIBER MAKE THIS REQUEST ORALLY, HE SHOULD ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

IN ADDITION TO QUALIFYING AS AN ACCREDITED INVESTOR, THE RESIDENTS OF PENNSYLVANIA HEREBY AGREE THAT THEY WILL NOT SELL, TRANSFER OR SUBDIVIDE THE UNITS PURCHASED HEREIN UNTIL AT LEAST ONE (1) YEAR FROM THE DATE OF PURCHASE.

*FOR SOUTH CAROLINA RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSIONER REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR

DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR SOUTH DAKOTA RESIDENTS ONLY:* THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31A, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATIONS OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS OFFERING IS TRUE, COMPLETE, AND NOT MISLEADING; NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR TENNESSEE RESIDENTS ONLY:* THESE SECURITIES HAVE BEEN REGISTERED WITH THE STATE OF TENNESSEE. AS A CONDITION OF REGISTRATION, THE STATE OF TENNESSEE HAS IMPOSED MINIMUM SUITABILITY STANDARDS FOR TENNESSEE RESIDENTS. PURSUANT TO THOSE STANDARDS, EACH INVESTOR WHO IS A NATURAL PERSON MUST HAVE A NET WORTH OF AT LEAST $250,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES, AND MUST HAVE HAD A GROSS INCOME OF $65,000.00 DURING THE LAST TAX YEAR AND BE EXPECTED TO HAVE A GROSS INCOME OF $65,000.00 DURING THE CURRENT TAX YEAR, OR ALTERNATIVELY A NET WORTH OF AT LEAST $500,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS AND AUTOMOBILES. ADDITIONALLY, UNDER THIS SUITABILITY STANDARD, EACH NATURAL PERSON'S INVESTMENT MUST NOT EXCEED TEN PERCENT (10%) OF HIS NET WORTH.

THIS OFFERING IS MADE TO ACCREDITED INVESTORS AS DEFINED IN SECTION 501 (a) (1) OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933. SEE "TERMS OF INVESTMENT." THE ACCREDITED INVESTOR STANDARD IS GENERALLY MORE RESTRICTIVE THAN THE MINIMUM SUITABILITY REQUIREMENTS IMPOSED BY THE STATE OF TENNESSEE. THEREFORE, THE EFFECT OF REGISTRATION OF THE OFFERING IN TENNESSEE (AND THE MINIMUM SUITABILITY STANDARD) IS THAT THE OFFERING IS MADE ONLY TO ACCREDITED INVESTORS.

*FOR TEXAS RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS OF TEXAS AND THEREFORE CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR UTAH RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UTAH UNIFORM SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR VIRGINIA RESIDENTS ONLY:* THE VIRGINIA STATE CORPORATION COMMISSION DOES NOT PASS UPON THE ADEQUACY OF THIS OFFERING DOCUMENT OR UPON THE MERITS OF THIS OFFERING AND THE COMMISSION EXPRESSES NO OPINION AS TO THE QUALITY OF THIS SECURITY.

*FOR WASHINGTON RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND

RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSIONER REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

10001550

TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY | 1 |
| RISK FACTORS | 4 |
| DESCRIPTION OF THE PROMISSORY NOTES | 5 |
| TERMS OF THE INVESTMENT | 5 |
| Subscription Procedures | 6 |
| Acceptance | 6 |
| Restrictions on Transfer | 6 |
| USE OF PROCEEDS | 7 |
| FUNDING ACCOUNT | 7 |
| PROPOSED ACTIVITIES | 7 |
| Accounts Receivable as Collateral and Security | 7 |
| The Healthcare Industry | 8 |
| Description of Healthcare Accounts Receivable | 8 |
| Determination and Criteria of Eligibility for Healthcare Accounts Receivable | 9 |
| Description of Business Accounts Receivable | 9 |
| DESCRIPTION OF FDIC AND RTC LOANS AND RECEIVABLES | 10 |
| COMPENSATION TO TOWERS | 11 |
| COLLECTION OF ACCOUNTS RECEIVABLE | 11 |
| THE COMPANY | 11 |
| CONFLICTS OF INTEREST | 13 |
| ADDITIONAL INFORMATION | 14 |
| PLAN OF DISTRIBUTION | 14 |
| LEGAL MATTERS | 14 |
| PROMOTIONAL AND SALES LITERATURE | 14 |
| LITIGATION | 14 |
| GLOSSARY | 15 |

EXHIBITS

I. Subscription Documents
  A. Investor Questionnaire
  B. Subscription Agreement
II. Form of Promissory Note
III. Form of Security Agreement
IV. Annual Report of Towers

10001551

TOWERS FINANCIAL CORPORATION

SUMMARY

*This summary of certain provisions of this offering is intended only for quick reference and is not intended to be complete. This investment describes in detail numerous aspects of transactions which are material to Accredited Investors, including those summarized below, and this offering should be read in its entirety by prospective Accredited Investors.*

Certain capitalized terms used herein are defined in the Glossary.

**Description of the Promissory Notes and Terms of the Investment:** ...... An aggregate of one hundred million dollars ($100,000,000) of 12-month and 24-month Promissory Notes bearing interest at the rate of 13% and 15% per annum, respectively, payable monthly or quarterly (at the option of the Investor), collateralized, secured and backed by (i) Healthcare Accounts Receivable of major insurance companies, Blue Cross/Blue Shield, state governmental agencies, major unions, worker's compensation reimbursers, personal injury reimbursers, and all other third party reimbursers purchased from hospitals, doctors, medical groups and other healthcare providers (ii) Business Accounts Receivable purchased from manufacturers, wholesalers and service companies and (iii) receivables acquired from the FDIC and RTC (or from secondary sources), consisting of 1,000 Units at $100,000 each, is offered hereby to Accredited Investors only (see "Terms of the Investment" and "Description of the Promissory Notes"). Recommended minimum subscription is for one Unit; however, fractional Units may be accepted at the sole and absolute discretion of Towers and subject to federal and state law. This investment opportunity will terminate on the earlier of the date all units have been sold or January 31, 1991 (subject to extension at the sole discretion of Company) (the "Offering Termination Date"). There is no minimum number of units which are required to be subscribed for prior to investment of the Funds (see "Description of the Promissory Notes" and "Terms of the Investment").

**Proposed Activities:** .......... Towers will acquire (i) Healthcare Accounts Receivable from hospitals, doctors, medical groups, health maintenance organizations, rehabilitation centers and other healthcare providers which will be payable by major insurance companies, Blue Cross/Blue Shield, state governmental agencies, major unions, worker's compensation reimbursers, personal injury reimbursers, and all other third party reimbursers (ii) Business Accounts Receivable purchased from manufacturers, wholesalers and service companies; and (iii) loans and receivables purchased from the RTC and FDIC (or from secondary sources).

Towers acquires Healthcare and Business Accounts Receivable for up to 95% of such Accounts Receivable face value (a discount or factoring fee of a minimum of 5% for each Account Receivable collected). Upon collection of each Account Receivable, the proceeds of collection will be reinvested in additional Accounts Receivable thereby compounding

10001552

the discount or factoring fee with each new purchase of Accounts Receivable. Towers expects to reinvest the funds in Accounts Receivable and compound its factoring fee up to six times per year. Towers may reinvest in the same healthcare provider or business entity or reinvest in a new or different healthcare provider or business entity in accordance with the terms of this Offering and Towers' purchase contracts. Accordingly, Towers anticipates that the spread between its cost of funds (the interest payments to investors) and the factoring fee will be significant and provide adequate funds from which investors' interest payments may be made.

Generally, hospitals, doctors, dentists, and other healthcare providers do not manage their Accounts Receivable efficiently. Towers' Accounts Receivable factoring program is well received nationwide by healthcare providers because Towers offers the needed funding to these healthcare providers thereby bridging the time delay of slow paying insurance companies and state and government agencies. Towers' large staff of insurance collection experts provide the needed resources to accelerate the payment and collection of the Accounts Receivable.

As relates to the acquisition of Business Accounts Receivable, small businesses generally have limited credit with suppliers and often require additional funds for production of products prior to the receipt of proceeds from the sale of such products. Additionally, temporary or seasonal requirements for funds by small businesses are not uncommon. Therefore, small businesses utilize accounts receivable financing to meet cash flow needs.

As relates to receivables of the FDIC and RTC, Towers will purchase packages of asset backed loans and receivables at auction based upon Towers' analysis of the value of such packages. Also, Towers may purchase FDIC and RTC loans and receivables from secondary sources which have acquired such loans and receivables directly from the FDIC or RTC. Generally FDIC and RTC loans are non-performing and in the case of the RTC loans, such loans may be secured by assets, including real property.

The Accounts Receivable will be segregated from other assets of Towers and the books and records relating thereto will be available for inspection by Investors or their professional advisers (see "Proposed Activities"). The Promissory Notes are the recourse obligations of Towers and accordingly are backed by Towers' consolidated assets.

**Collateral:** .................. Payment upon the Promissory Notes will be secured by the Security Agreement and the filing of Uniform Commercial Code financing statements against Towers (as debtor) for those Accounts Receivable purchased with the Funds or the proceeds thereof. Towers will maintain Accounts Receivable in a face amount equal to or exceeding the amount of funds raised from investors.

**Funding Account:** ........... The Funds will be deposited in Chase Manhattan Bank, N.A. (the "Bank") in one or more interest bearing, special accounts (the "Funding Account"). Towers will direct the investment of the Funds as provided for herein. All proceeds of the Accounts Receivable will be deposited pursuant to a lock-box system in the Funding Account. The books and

10001553

records relating to the Funding Account are available for inspection and audit at the offices of the Company. Towers has the right at any time to receive payment of the Excess Profits Amount (as defined herein) from the Funding Account (see "Compensation to Towers").

**The Company:** ............... Towers is a publicly-traded corporation, organized pursuant to the laws of the State of Nevada, which, through certain of its wholly-owned subsidiaries or affiliates, has been engaged in various aspects of financing and or servicing of Accounts Receivable for the past 15 years. The Company maintains its corporate headquarters at 417 Fifth Avenue, New York, New York 10016, telephone number (212) 696-0505 (see "The Company").

Towers has been engaged in several offerings of securities in the past, including an offering for $56,500,000 of bonds issued on July 19, 1990 which received an "AA" rating by Duff & Phelps. Such bonds were issued by a special purpose subsidiary of Towers which is using the funds to acquire Accounts Receivables. Investors should note that the terms of this Offering differ substantially from the above-described offerings and that it is not anticipated that a rating will be sought for this offering.

**Distribution of Units:** ......... Towers is self-underwriting the offering of the Units and will offer and sell the Units to Accredited Investors only either (1) directly, in which case no commissions will be paid; or (2) through broker-dealers registered with the National Association of Securities Dealers, Inc., in which case the following commissions will be paid: 5% for the sale of 24-month Promissory Notes (an additional 5% per Unit will be paid one year from Sale and Acceptance of a 24-month Unit) and 4% for the sale of 12-month Promissory Notes (payable upon Sale and Acceptance of a 12-month Unit) (see "Plan of Distribution"). Commissions will only be paid upon acceptance by Towers of a fully executed subscription from a suitable Investor (see "Plan of Distribution"). There is no minimum number of Units which must be sold prior to investment of the Funds by Towers.

## RISK FACTORS

Acquisition of the Promissory Notes is speculative and subject to numerous and substantial risks. Therefore, purchase of the Units is suitable only for those persons who can afford to lose their entire investment. There will be no public market for the Units, and Federal and state securities laws impose substantial restrictions on the right of an Investor to sell or otherwise transfer his Units. Prospective Investors should carefully consider the risk factors relating to the proposed business of Towers, including, but not limited to, those certain risk factors discussed below, and should consult their own legal, financial and business advisers.

THE RISK FACTORS SET FORTH IN THIS SECTION ARE NOT INTENDED TO BE AN EXHAUSTIVE LIST OF THE RISKS RELATING TO AN INVESTMENT IN THE UNITS.

1. *Dependence on Management.* The Company's success is substantially dependent upon the ability of management (including the officers, directors and employees of its subsidiaries and affiliated companies) to provide financial and credit services as set forth herein. The loss of key personnel or an inability to attract and retain necessary replacement personnel could substantially and adversely affect the business of the Company and the Company's ability to service the program set forth herein (see "The Company").

2. *Severely Limited Liquidity of Units; Absence of Public Market.* The Units must be acquired by each purchaser for investment purposes only and not with a view to, or for resale in connection with any distribution. In reliance upon the exemption contained in Section 4(2) of the Securities Act of 1933, as amended (the "Federal Securities Act"), and regulations promulgated thereunder, the Units will not be registered under the Federal Securities Act, and Investors will have no right to require registration thereof. Furthermore, there is not currently (nor will there be) a public market for the Units. Accordingly, there can be no assurance that an Investor will be able to liquidate his investment quickly or on acceptable terms, if at all, if he should desire to do so (see "Description of the Promissory Notes" and "Terms of the Investment-Restrictions on Transfer").

3. *Availability of Exemptions from Registration.* The Units have not been registered under the Federal Securities Act or, in most cases, the securities laws of the jurisdictions in which they are proposed to be offered and sold, in reliance upon certain claimed exemptions therefrom. The claimed exemption from Federal registration is complex, and it is often difficult to determine that its terms have been fully complied with. In addition, exemptions from registration under state securities laws frequently depend upon the availability of exemption from Federal registration. If for any reason the Company is subject to civil liability, and/or the legal expense of defending the Company in any action or proceeding challenging the availability to the Company of such exemptions, the Company could have a material adverse effect upon its financial condition.

4. *Towers' Ability to Make Payments of Principal and/or Interest Upon the Promissory Notes.* The Promissory Notes are collateralized by Accounts Receivable. In the event the collateral is insufficient to satisfy the obligations of Towers to make payments of principal or interest on the Promissory Notes, then Towers will be liable upon the Promissory Notes to the extent of its consolidated assets. In the event such assets are insufficient to cover the payment of principal and/or interest on such Promissory Notes, an Investor could lose his or her investment, in part or in whole. Towers, however, has represented that the Promissory Notes will at all times be secured by Accounts Receivable with a face amount of at least 100% of the amount of proceeds raised in this offering.

5. *Ability to Purchase Qualified Accounts Receivable.* The success or failure of the Company's proposed business will depend, in part, upon its ability to purchase Accounts Receivable of sufficient quality at the discounts and upon the terms stated herein, so that the Company may earn a return sufficient to pay interest and principal on the Promissory Notes. The Company's ability to reinvest the funds a sufficient number of times during the year is the factor which will determine Towers' profitability and its ultimate ability to pay the principal and interest on the Promissory Notes.

6. *No Opportunity to Evaluate Collateral.* Although the criteria for acquiring the Accounts Receivable have been identified, Towers has not yet selected the specific Accounts Receivable to be purchased or the specific creditors whose accounts receivable will be purchased. Accordingly, Investors will not have the op-

portunity to evaluate the investment of the proceeds of this offering or the merit or creditworthiness of any particular debtor with respect to the Accounts Receivable, but must rely upon the ability of Towers based upon the criteria set forth herein to select the Accounts Receivable and to manage and operate Towers' business.

## DESCRIPTION OF THE PROMISSORY NOTES

An aggregate of one hundred million dollars ($100,000,000) of 12-month and 24-month Promissory Notes bearing interest at the rate of 13% and 15% per annum, respectively, with interest payable either monthly or quarterly at the option of the Investor, collateralized by: (i) Healthcare Accounts Receivable purchased from hospitals, doctors, medical groups and other healthcare providers (the "Healthcare Receivables"); (ii) Business Accounts Receivable purchased from manufacturers, wholesalers and service companies (the "Business Accounts Receivable"); and/or (iii) receivables and loans purchased from the Federal Deposit Insurance Corporation ("FDIC") and/or Resolution Trust Company ("RTC") or from secondary sources which have purchased loan or receivable packages from the FDIC or RTC (the "FDIC and RTC Receivables") consisting of 1,000 Units at $100,000 each, is offered hereby to Accredited Investors only.

Upon maturity, and subject to Federal and state laws and regulations, the proceeds of the Promissory Notes may be reinvested at the option of the Investors at the rates of interest as announced by Towers at that time. Such reinvestment is subject to Towers' discretion and upon the laws and regulations in effect at the time of such reinvestment. If upon maturity, the Promissory Notes are not redeemed for any reason, the terms of this offering shall continue to apply to the Promissory Notes and the holders thereof until such redemption occurs.

## TERMS OF THE INVESTMENT

Recommended minimum subscription is one Unit; however, fractional Units may be accepted at the sole discretion of Towers. The Offering will terminate on the earlier of the date all Units have been sold or January 31, 1991 subject to extension at the discretion of the Company (the "Offering Termination Date"). There is no minimum number of Units which must be subscribed prior to Investment of Funds.

This Offering is being made only to Accredited Investors (as defined in Section 501(a)(1)) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Act") which reads as follows:

"*Accredited Investor*" shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

This Offering has not been registered with the Securities and Exchange Commission. Further, this offering has not, as of the date hereof, been registered with any state and may only be offered in states which afford an exemption similar to the Federal exemption and/or provide a special exemption for Accredited or Institutional Investors. In addition, it should be noted that this Offering is being made pursuant to an exemption which requires that no specific information be furnished.

### Subscription Procedures

In order to subscribe for a Unit, each prospective Investor must complete, execute, acknowledge and return to Towers the Subscription Agreement in the form attached hereto as Exhibit I and a check for $100,000 per Unit acquired.

### Acceptance

Towers will review the Subscription Documents for completeness, due execution and investor suitability. Towers has the absolute right, at its sole discretion, to reject, in whole or in part, any subscription that is tendered or to waive any defect in any Subscription Documents. If Towers rejects a subscription, it will return the Subscription Documents, including the Investor's check, to the prospective Investor.

If Towers accepts a subscription ("Acceptance"), subscription funds will be deposited in the Funding Account and Towers will forward an executed Promissory Note in the form set forth in Exhibit II to the investor. Interest on the Promissory Note shall accrue from the date of Acceptance. The Company shall accept subscriptions from only Accredited Investors.

### Restrictions on Transfer

The Units offered hereby have not been registered under the Securities Act of 1933, as amended (the "Federal Securities Act"), nor pursuant to the provisions of the securities laws of any jurisdiction, and the Units are being offered, and will be sold, without benefit of registration under federal and state securities laws by reason of specific exemptions from registration provided thereby.

The availability of each such exemption is dependent, in part, upon the "investment intent" of each prospective Investor, and an exemption from registration would be unavailable if any one purchaser were purchasing a Unit with a view to the redistribution thereof. Accordingly, each prospective Investor when executing the Subscription Agreement will be required to acknowledge that the purchase is for investment, for his own sole account, and without any view towards the sale or other disposition thereof and to make certain representations and warranties to Towers.

Investors have not been granted the right to require the registration of their Units under either the Federal Securities Act or any state securities law and Towers will not register the Units in the future (see "Risk Factors").

If an Investor wishes to dispose of his Units, such disposition is circumscribed by the terms of the provisions of the Federal Securities Act and state securities laws.

## USE OF PROCEEDS

The proceeds of the offering will be used to purchase the Accounts Receivable which will collateralize the Promissory Notes and to pay the commissions of 5% for the sale of 24-month Promissory Notes (an additional 5% per Unit will be paid one year from Sale and Acceptance of 24-month Units) and 4% for the sale of 12-month Promissory Notes (payable upon Sale and Acceptance of 12-month Units). The Company will pay all other expenses of the offering, its costs of operations (including salaries and overhead). The Company will be entitled to direct the payment of the Excess Profits Amount to itself at its discretion.

## FUNDING ACCOUNT

A special interest-bearing account (the "Funding Account") has been established by Towers at Chase Manhattan Bank, N.A. (the "Bank") for the purpose of depositing (i) the proceeds of the offering as funds are received and accepted from Investors (the "Funds"); and (ii) the proceeds of Accounts Receivable as such Accounts Receivable are collected. Once the Funds are deposited, Towers may direct the investment of the Funds in Accounts Receivable or make such other disbursements of the Funds as provided in this document. The proceeds of the Accounts Receivable will be deposited pursuant to a lockbox system which Towers has arranged with the Bank. Any fees relating to the Funding Account will be paid by Towers. Towers reserves the right to utilize other major money center banks at its discretion.

## PROPOSED ACTIVITIES

Towers will use the Funds to acquire Healthcare and Business Accounts Receivable and receivables purchased from the FDIC and RTC or from secondary sources which have purchased from the FDIC and RTC. Presently, Towers, through its main New York City headquarters and its regional and branch offices, has identified substantial markets for the acquisition of suitable Accounts Receivable. Additionally, Accounts Receivable may be acquired from affiliates or subsidiaries of Towers (see "Conflicts of Interest").

Towers typically purchases Accounts Receivable for up to 95% of the face amount of the Account Receivable resulting in a minimum discount or factoring fee of 5% for each Account Receivable collected. Upon collection of each Account Receivable, the proceeds of collection will be reinvested in additional Accounts Receivable resulting in the compounding of the factoring fee with each new purchase. Towers expects to reinvest the collected funds in Accounts Receivable and compound the factoring fee up to six times a year, which is expected to provide sufficient funds for the payment of interest to the promissory noteholders. Towers may reinvest in the same healthcare provider or business entity or reinvest in a new or different healthcare provider or business entity in accordance with the terms of this Offering.

### Accounts Receivable as Collateral and Security

The Accounts Receivable will be security and collateral for the Promissory Notes pursuant to Uniform Commercial Code financing statement filings to be made against Towers relating to the Accounts Receivable. Such collateral will consist of Accounts Receivable with a face amount equal to or in excess of the Promissory Notes. In the case of Healthcare Accounts Receivable, since Towers generally only advances a portion of the stated value of Healthcare Receivables prior to collection, the unpaid balance of the purchase price of the Healthcare Receivables provides additional collateral.

Further, the Promissory Notes are the recourse obligations of Towers and Towers is liable for the stated value of the Promissory Notes to the extent of its consolidated assets.

### The Healthcare Industry

The healthcare industry in the United States has grown rapidly over recent years and is expected to continue to grow reflecting age and population trends. Billings, collection and insurance compliance for healthcare groups is extremely complex, time-consuming and labor intensive. Typically, hospitals, doctors, dentists and other healthcare professionals or groups do not efficiently manage their billing, collection and insurance operations and accordingly, cash flows are disrupted by the delay between the filing for payment of funds and the receipt of such funds. The Towers Healthcare Accounts Receivable funding program allows healthcare providers to bridge the time delays brought on by slow-paying insurance companies and state/federal governmental agencies and collect a greater portion of the funds to which such healthcare provider is entitled. For qualified healthcare providers, Towers provides (i) a thorough examination of claims submissions to ensure prompt payment and reduce incorrect third party provider deductions; (ii) the ability to reduce internal staffing; and (iii) use of sophisticated data processing equipment owned by Towers.

Accordingly, the ability of healthcare providers to sell or factor their accounts receivable is paramount to their financial stability and liquidity.

### Description of Healthcare Accounts Receivable

Generally, Healthcare Accounts Receivable are payable by the following: commercial insurance companies; Blue Cross/Blue Shield; government programs; self-pay; worker's compensation reimbursers; personal injury reimbursers and all other third party reimbursers.

The commercial insurance category covers the Healthcare Receivables for which payment will be received from either (i) a commercial insurance company or administrative services only contract ("ASO's"); or (ii) a Preferred Provider Organization ("PPO"). The commercial insurance company generally reimburses the Healthcare Provider for the Healthcare Provider's charges less any co-payment portion or deductibles.

The Blue Cross/Blue Shield category covers all Healthcare Receivables for which payment will be received from "Blue Cross/Blue Shield" entities. While Blue Cross/Blue Shield is a national entity, it is comprised of a series of state or multistate organizations which operate as individual entities. As a result, no "general" reimbursement method exists for the Healthcare Receivables that fall into this category. Each Healthcare Provider has its own arrangement with Blue Cross/Blue Shield whereby the Healthcare Provider may receive reimbursement for (i) the Healthcare Provider's standard fees and charges (ii) a negotiated rate; or (iii) the Healthcare Provider's cost of service.

The government program category, includes healthcare accounts receivable for which payment is received from either the federal government ("Medicare"), the state governments ("Medicaid") or other governmental entities (e.g. CHAMPUS). The receivables are paid at either a predetermined rate per diagnosis or a rate based on a formula associated with the cost of care. Medicare pays the average cost for each type of illness or injury. These various illness categories are called "Diagnosis Related Groups" or "DRGs." Medicare law requires Healthcare Providers to accept Medicare payment as payment in full, and prohibits Healthcare Providers from charging Medicare patients for anything other than the usual deductible and coinsurance amounts. Healthcare Providers can charge Medicare Patients for any "non-covered" items or services.

The self-pay category consists of accounts receivable for which payment will be received from either th individual patient or an individual guarantor on the patient's account.

proprietorships, municipalities, government agencies and nonprofit organizations for the purpose of acquiring capital equipment, computers, medical equipment, store fixtures, telephone equipment, office equipment, printing equipment, injection molding machines and optical equipment. TLC offers leases in a wide range of amounts and prides itself on offering individualized attention to all customers, both large and small. Upon receipt of all applications and credit information, credit decisions are generally made within 48 hours. In addition to offering standardized financing and operating leasing programs, Towers may offer specialized programs that are designed to meet the particular needs of individual customers.

Towers and its affiliates provide accounts receivable, credit and collection assistance to over 10,000 corporate clients and/or healthcare groups within the United States, including a large number of Fortune 1000 companies. Towers and its affiliates are servicing approximately $275,000,000 in outstanding debt for over $50,000 accounts. On a contractual basis, Towers and its affiliates handle past due accounts receivable and utilize their inhouse legal department to effectuate collection activity. All accounts are managed by Towers' staff attorneys. This professional approach minimizes loss of goodwill between the client and its debtor and accelerates the process of collecting past due accounts. Towers and its affiliates currently utilize a staff of approximately 400 full time collection personnel, including a staff of inhouse attorneys, paralegals, collectors, credit personnel, insurance adjusters and insurance regulatory administrators.

The senior officers, directors and advisory board members of Towers are set forth below:

| Name | Age | Position |
|---|---|---|
| Steven Hoffenberg | 45 | Chairman of the Board, President and Chief Executive Officer |
| Mitchell Brater | 49 | Vice Chairman of the Board and Chief Operating Officer |
| Charles H. Chugerman | 30 | Director, Executive Vice President and Secretary |
| Michael Rosoff | 40 | Director, Senior Vice President and Chief Legal Officer |
| Anthony DiNicholas | 40 | Senior Vice President |
| Richard M. Levine | 45 | Vice President and Chief Financial Officer |
| Raymond Lewis | 72 | Director and Vice President |
| Xavier Eboli | 50 | Director and Vice President |
| Thomas B. Evans, Jr. | 56 | Advisory Board Member |
| Ben Barnes | 50 | Advisory Board Member |
| Jay Fischer | 55 | Advisory Board Member |
| William D. Fugazy | 65 | Advisory Board Member |

Set forth below are the backgrounds of the senior officers, directors and advisory board members of Towers.

*Mr. Steven Hoffenberg*, has been Chairman of the Board and Chief Executive Officer of Towers since its inception. Mr. Hoffenberg has also been Chairman of the Board and Chief Executive Officer of each of the subsidiaries of Towers since they were formed.

*Mr. Mitchell Brater*, is a director and Vice Chairman of the Board and Chief Operating Officer of Towers. Mr. Brater graduated from Long Island University in 1963 with a B.S. degree in Accounting.

*Mr. Charles H. Chugerman*, is a director and Executive Vice President of Towers. Mr. Chugerman graduated from Bernard M. Baruch College with a B.B.A. degree in Business Administration.

*Mr. Michael Rosoff*, has been a Vice President and director of certain other subsidiaries of Towers since 1984. From 1980 to 1983, Mr. Rosoff was an Associate Attorney with the law firm of Meltzer, Lippe & Goldstein, P.C., which is located in Mineola, New York. Mr. Rosoff received his bachelors degree in economics from New York University in 1975 and graduated with a J.D. degree from Hofstra University Law School in 1976.

10001563

*Mr. Anthony DiNicholas*, is Senior Vice President of Towers. Mr. DiNicholas received a B.S. from Rutgers University in 1974. Prior to joining Towers in September 1989, Mr. DiNicholas was affiliated with the following major investment banking firms: Security Pacific (1987-1989); Smith Barney (1986-1987); and Union Planters (1985-1986).

*Mr. Richard M. Levine* is Vice President and Chief Financial Officer of Towers. From 1968 to 1986, Mr. Levine was Treasurer of Lincoln Center for the Performing Arts, and maintained a private accounting practice. Mr. Levine graduated from Baruch College of the City University of New York with a B.S. in Business Administration. He is a Certified Public Accountant.

*Mr. Raymond Lewis*, is a director and Vice President of Towers. For 25 years ending in 1979, Mr. Lewis served as the Chief Executive Officer and Executive Vice President of United Credit Corporation, an asset-based lending institution which is located in New York. Mr. Lewis graduated from St. John's University in 1940 with a B.A. degree in Business Administration.

*Mr. Xavier Eboli*, is a director and Vice President of Towers. Mr Eboli is also President of Towers Collection Service, Inc.

*Mr. Thomas B. Evans, Jr.* is an advisory board member of Towers. Mr. Evans is President of the Evans Group, Ltd., located in Washington, D.C. Mr. Evans is a former co-chairman of the Republic National Committee and a former senior member of the United States House of Representatives (United States Congress).

*Mr. Ben Barnes*, is an advisory board member. Mr. Barnes is President of Entrecorp of Austin, Texas and he was formerly chief operating officer of Barnes, Connolly Development Corporation. Mr. Barnes was formerly Lt. Governor of the State of Texas and the Speaker of the House of Representatives of the State of Texas.

*Mr. Jay Fischer*, is an advisory board member. Mr. Fisher is an attorney and partner at the New York City based law firm of Proskauer Rose Getz & Mendelsohn.

*Mr. William D. Fugazy*, is an advisory board member. Mr. Fugazy is chairman of the board of Fugazy International and was former president of Diners Club International.

Towers has recently closed upon its Promissory Note offering dated February 20, 1990 whereupon it raised $50,000,000. A special purpose subsidiary of Towers closed upon a $56,500,000 bond offering in July of 1990 which was rated "AA" by Duff & Phelps and offered to institutional investors only. The proceeds of the bond offering are being used to acquire Healthcare Accounts Receivable. Investors should note that the terms of this offering differ substantially from the above-described offerings and no rating will be sought for this offering.

## CONFLICTS OF INTEREST

Towers is acquiring Accounts Receivable for its own account and for the account of others and accordingly may have a conflict of interest in the purchasing and administering of Accounts Receivable. Various affiliates of Towers may be involved in acquiring, servicing, collecting or selling Accounts Receivable to Towers. Towers has represented that it will not cause an affiliate to charge any more for its services than it would charge a third party.

Further, Towers is sponsoring either directly or through affiliates, other accounts receivable programs. Accordingly, there may be a conflict as to the acquisition of accounts receivable and the servicing thereof.

10001564

## ADDITIONAL INFORMATION

Investors or their professional advisers will be provided with the opportunity to request additional information from Towers, which to the extent reasonably available, will either be furnished to such Investors or available at the Company's offices for review. Such information includes the following:

1. Certificate of Incorporation of Towers;
2. By-Laws of Towers;
3. Opinion of Counsel as to the legality of the securities; and
4. Receivables Purchase Contract.

## PLAN OF DISTRIBUTION

The Company is self-underwriting this offering of Promissory Notes on a best-efforts basis either (1) directly in which case no commissions will be paid; or (2) through broker-dealers registered with the National Association of Securities Dealers, Inc. in which case commissions of 5% will be paid for the sale of 24-month Promissory Notes (an additional 5% per Unit will be paid one year from Sale and Acceptance of 24-month Units) and 4% for the sale of 12-month Promissory Notes (payable upon Sale and Acceptance of 12-month Units).

## LEGAL MATTERS

Gibney, Anthony & Flaherty, 665 Fifth Avenue, New York, New York 10022, was retained as special counsel for the Company for the preparation of this document.

## PROMOTIONAL AND SALES LITERATURE

No offering literature or advertising in any form shall be employed in the offering of these Units except for this document and the exhibits hereto. No person has been authorized to make representations other than those contained in this document or the exhibits hereto and, if made, such representation must not be relied upon.

## LITIGATION

The Securities and Exchange Commission commenced a civil action against Towers captioned *Securities and Exchange Commission v. Towers Credit Corporation, et al.* (for purposes of this paragraph, "Towers" includes the other named parties to the litigation) for the sale of unregistered securities on August 4, 1988. The Commission alleged that the parties violated Sections 5(a) and 5(c) of the Securities Act of 1933, as amended. The parties entered into a consent decree on November 22, 1988. Towers, without admitting that it violated Section 5 in the past, has agreed not to violate Section 5 in the future. In addition, Towers provided investors in TCC's two prior note offerings the opportunity to accept or decline rescission of their investment, and forego the interest payment due under the offerings in exchange for money market interest, which rescission offer was completed on January 22, 1989, whereby $445,000 out of approximately $37,000,000 was accepted for rescission. Steven Hoffenberg and Mitchell Brater were named in this litigation and have also entered into similar consent decrees.

Towers is also subject to a consent order in the State of Alabama arising out of the same issues as the above described federal claims. The Alabama consent order provides that Towers and its affiliates shall not sell securities in Alabama in violation of the Alabama Securities Act.

In addition, the State of New Jersey has issued an Order of Denial of exemption against Towers Credit Corporation relating to its 1988 private offering of promissory notes due to the failure to file within 30 days of completion of offering. Towers is currently in the process of complying with requirements of New Jersey to remedy the denial, which includes the payment of a fine and an offering of rescission to New Jersey investors.

Furthermore, on June 11, 1990 Towers and Towers Credit Corporation entered into a Consent Order with the State of Nebraska and paid a fine with regard to the sale to three investors in the 1988 program. This Order was the result of Towers' previous counsel's failure to follow through on its responsibilities to make the proper state filings for the 1988 offering which such firm prepared and for which it made the necessary pre-blue sky filings.

Towers and a subsidiary of Towers has instituted litigation against the previous owners of United Diversified Corporation ("UDC") from whom it purchased 82% of UDC. Towers in this action is claiming rescission and damages, including a return of $2,500,000 it invested in UDC. In a separate action, due to the previous owners' failure to disclose material financial information, including misappropriation of $3,500,000 of UDC funds, Towers has blocked the former owners' access to the $3,500,000 pending the resolution of Towers' claims.

Towers is involved in various other lawsuits which Towers represents are either in the normal course of its business or are non-material either individually or collectively.

## GLOSSARY

"*Act*" means the Securities Act of 1933, as amended.

"*Accounts Receivable*" means Healthcare and Business Accounts Receivable of various third party companies which meet Towers' criteria for purchasing and the RTC and FDIC loans and receivables.

"*Accounts Receivable Management*" means the management of the recovery and collection of Accounts Receivable.

"*Bank*" means Chase Manhattan Bank, N.A.

"*Business Accounts Receivable*" means accounts receivable of third party business companies.

"*Excess Profits Amount*" means an amount equal to the amount by which (a)(i) the face value of the Accounts Receivable plus (ii) the Funds on deposit in the Funding Account exceeds (b)(i) the face amount of all issued Promissory Notes plus (ii) all accrued and unpaid interest due on such Promissory Notes.

"*Federal Securities Act*" means the Securities Act of 1933, as amended.

"*FDIC*" mean the Federal Deposit Insurance Corporation.

"*Funding Account*" means the interest-bearing account in which the Funds are deposited.

"*Funds*" means the monies received from Accredited Investors and the proceeds of the Accounts Receivable.

"*Healthcare Provider*" means a hospital, doctor, medical group, health maintenance organization, rehabilitation center and other healthcare providers.

"*Healthcare Accounts Receivable*" means accounts receivable from groups in the health-care industry.

"*Investor*" means any holder of a Promissory Note who is an Accredited Investor.

"*Notes*" means the 12-month and 24-month Promissory Notes.

"*Offering Termination Date*" shall mean the earlier of the date all of the Units have been sold or January 31, 1991.

"*Promissory Note*" means either a 12-month or 24-month promissory note issued by Towers to Accredited Investors pursuant to this Offering.

"*RTC*" means Resolution Trust Company.

"*Security Agreement*" means the agreement executed by Towers, the form of which is attached hereto as Exhibit III.

"*Stated Value*" means the agreed upon purchase price for the Account Receivable which is generally the face value of such Account Receivable.

"*Subscription Agreement*" means the subscription agreement attached hereto as Exhibit I(B).

"*Subscription Documents*" means the Subscription Agreement, the Investor Questionnaire and the Investor's check.

"*TCC*" means Towers Credit Corporation, a wholly-owned subsidiary of Towers.

"*TCS*" means Towers Collection Service, Inc., a wholly-owned subsidiary of Towers.

"*TLC*" means Towers Leasing Corporation, a wholly-owned subsidiary of Towers.

"*Towers*" means Towers Financial Corporation, a Nevada corporation which is publicly traded.

"*Unit*" means a Promissory Note for $100,000.

Subscription Documents

EXHIBIT I

INSTRUCTIONS TO SUBSCRIBERS

Accompanying the Offering Document, you will find (i) the Subscription Agreement with signature page in duplicate and (ii) Investor Questionnaire which you must complete in accordance with the following instructions.

1. *Investor Questionnaire.*

Please read, complete and sign the Investor Questionnaire.

2. *Subscription Agreement.*

(a) Please read, complete the Subscription Agreement and sign two copies of the signature page: and

(b) Have your signature notarized by a notary public on the acknowledgment forms accompanying the signature pages.

DO NOT SIGN THE SUBSCRIPTION AGREEMENT UNLESS YOU ARE CERTAIN YOU CAN MAKE ALL THE REPRESENTATIONS CONTAINED IN THE AGREEMENT.

3. *Purchaser Representative Questionnaire.*

If you used the services of a "purchaser representative," the purchaser representative questionnaire must be completed and which is available upon request.

4. *Payment.*

The subscription price is to be paid by check in the amount of $100,000 per Unit made payable to the order of "Towers Financial Corporation, Funding Account."

5. *Special Instructions for Trustees and Agents.*

Trustees, agents or other persons acting in a representative capacity are required to furnish with the completed Subscription Agreement (i) a copy of the trust agreement, power of attorney or other instrument granting the power and authority to subscribe, or (ii) an opinion of counsel as to such power and authority. In addition, such persons must indicate on the completed Subscription Agreement the name of the person or entity for whom he is acting as trustee or agent.

6. *Acceptance of Subscription.*

(a) Receipt of your subscription will be promptly acknowledged by the Company.

(b) Deliver completed Subscription Documents and payment for the Units to Towers Financial Corporation, 417 Fifth Avenue, New York, New York 10016. If your subscription is accepted, you will receive shortly thereafter (a) one copy of the Subscription Agreement executed by an officer of the Company and (b) original Promissory Note executed by the Company in the amount subscribed.

Investor Questionnaire

EXHIBIT I-A

10001570

TOWERS FINANCIAL CORPORATION

CONFIDENTIAL:
INVESTOR QUESTIONNAIRE

Private Offering of $100,000,000
of Recourse Promissory Notes of $100,000 each
For: Accredited Investors Only

The offering of secured recourse non-negotiable promissory notes (the "Promissory Notes") issued by Towers Financial Corporation, a Nevada corporation (the "Company"), as more fully described in the Offering Document, dated October 1, 1990, will be made to Accredited Investors only pursuant to Regulation D promulgated under the Securities Act of 1933, as amended (the "1933 Act").

The purpose of this questionnaire is to assist the Company in complying with the above requirements. You agree that the Company may present this questionnaire to such parties as it deems appropriate in order to be assured that the offer and sale of Promissory Notes to you will not result in violation of the exemption from registration under the 1933 Act, described above, or any applicable state securities laws; however, this document will otherwise be kept confidential by the Company.

If you are acting as agent for a corporation, partnership, trust or any other entity, any reference to the term "you" shall mean such corporation, partnership, trust or other entity.

Except as set forth herein, your answers to this questionnaire will, at all times, be kept strictly confidential.

If the answer to any question is "None" or "Not Applicable," please so state.

Please complete this questionnaire as fully as possible, and sign, date and deliver one copy thereof to Towers Financial Corporation, 417 Fifth Avenue, New York, New York 10016.

PLEASE PRINT

I. Please provide the following information if you are investing as an individual. (If you are purchasing on behalf of a corporation, partnership, trust, or any other entity, please complete part II below). In addition, please provide the same information for any joint tenant or tenant-in-common:

Name (1) ____________________ (2) ____________________

Date of Birth (1) ________ (2) ________ Marital Status (1) ________ (2) ________

Permanent Home Address (1) ____________________ (2) ____________________

____________________

__________ (Zip) __________ (Zip)

Home Telephone Number (1) ( ) ____________ (2) ( ) ____________

Social Security No. (1) ____________________ (2) ____________________

Citizenship (1) ____________________ (2) ____________________

10001571

Name of (Circle One and Complete)

Advisor/Broker-Dealer/Registered Investment Adviser

_______________

1 2 (if joint purchaser)

Names of Employer (1) ________ (2) ________

Nature of Business (1) ________ (2) ________

Position(s) (1) ________ (2) ________

General Duties (1) ________ (2) ________

Business Address (1) ________ (2) ________

Business Telephone Number (1) ( ) ________ (2) ( ) ________

Please describe your employment positions or occupations during the last five years (listing the inclusive dates of each) indicating any and all vocationally related experience in financial and business matters:

| Employment, Position or Occupation | Nature of Duties | From: | To: |
| --- | --- | --- | --- |
| (1) | | | |
| (2) | | | |

Are you acting for your own account? Yes(__) No(__)

If you are not acting for your own account, please complete the following:

(i) Capacity in which you are acting (Agent, Trustee or Otherwise):

_______________

(ii) Name, address and telephone number of persons you represent:

_______________

(iii) Please attach evidence of authority.

NOTE: ANY INDIVIDUALS REPRESENTED BY YOU MUST BE QUALIFIED AS "PURCHASERS" PURSUANT TO THE ACT AND SHOULD EACH COMPLETE A COPY OF THIS QUESTIONNAIRE.

II. Please complete the following if you are investing on behalf of a corporation, partnership, trust or other entity.

Name of corporation, partnership, trust or entity ________

Employer Identification No. ________

Business Activities ________

State and Year of Organization ________

Fiscal year ________

Business Address ________

________ (Zip) ________

Business Telephone Number ( ) ________

Authorized Person to Contact ________ (title) ________

III. PLEASE ANSWER THE FOLLOWING QUESTIONS.

**For Individuals only:**

1. At this time, is your individual net worth (or joint net worth with your spouse) in excess of $1,000,000?

Yes ( ) No ( )

2. Did your individual adjusted gross income (increased by any deduction for long term capital gains or depletion, any exclusion for interest and any losses of a partnership as reported on Schedule E on Form

1040) from all sources for each of the two taxable years preceding this date exceed $200,000 (or if jointly with spouse $300,000)?

Yes ( ) No ( )

3. If you have had income from all sources of $200,000 (or if jointly with spouse $300,000) for each of the past two taxable years, do you reasonably expect your income from all sources for the current taxable year to exceed $200,000 (or if jointly with spouse $300,000)?

Yes ( ) No ( )

4. *For Corporations, Charitable Organizations and Partnerships Only:*
If you are a 501(c)(3) organization, corporation, Massachusetts or similar business trust, or partnership, do you have total assets in excess of $5,000,000?

Yes ( ) No ( )

5. *For Trusts Only:*
If you are a trust (not formed for the specific purpose of acquiring the securities offered) and your investment herein is directed by a sophisticated person as described in Section 230.506(b)(2)(ii) are your total assets in excess of $5,000,000?

Yes ( ) No ( )

6. *For Banks, ERISA plans, SBICs, investment companies under the 1940 Act, etc.:*
Do you otherwise qualify as an accredited investor under the following definition:

Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefits of its employees if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

Yes ( ) No ( )

7. *For all Investors. Please complete the following questions and information requested:*
Are you aware that the proposed offering of Promissory Notes requires your capital investment to be maintained for the term of your Promissory Note (12-months or 24-months, as the case may be)?

Yes ( ) No ( )

8. Please indicate the general, business or professional education and the degrees received by you (or, if the purchaser is a corporation, partnership, trust or other entity, by the person completing this questionnaire on its behalf).

| College | Degree Received | Year |
|---|---|---|
| | | |
| | | |
| | | |

9. Investment Experience:
   (a) Frequency of investment in marketable securities:
   often ( ); occasionally ( ); seldom ( ); never ( ).
   (b) Frequency of investment in commodities futures:
   often ( ); occasionally ( ); seldom ( ); never ( ).
   (c) Frequency of investment in options:
   often ( ); occasionally ( ); seldom ( ); never ( ).
   (d) Frequency of investment in securities purchased on margin:
   often ( ); occasionally ( ); seldom ( ); never ( ).
   (e) Frequency of investment in illiquid securities:
   often ( ); occasionally ( ); seldom ( ); never ( ).

10. Indicate in the space provided below, any additional information which you think may be helpful in determining that your knowledge and experience in financial and business matters is sufficient to enable you to evaluate the merits and risks of investing in the securities offered pursuant to the Offering Document of which this forms a part.

______________________________
______________________________
______________________________
______________________________

I (we) acknowledge that the foregoing statements are true and accurate to the best of my (our) information and belief, and that I (we) will promptly notify the Company of any changes in the foregoing answers.

IN WITNESS WHEREOF, I (we) have executed this questionnaire this ____ date of ________, 19___.

______________________________
(Print Name of Joint Tenant or Tenant-in-Common, if applicable)

______________________________
(Print Name)

______________________________
(Signature of Joint Tenant or Tenant-in-Common, if applicable)

______________________________
(Signature)

*Please also complete and execute the following balance sheet or supply a substitute balance sheet as of a current date which should include an original signature of a duly authorized representative.*

BALANCE SHEET

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on Hand: | $ | | |
| Cash value of life insurance policies: | | | |
| Market value of listed securities: | | Margin Amount | $ |
| Market value of unlisted securities: | | | |
| Market value of real estate | | Encumbrances on Real Estate | |
| Residence: | | Residence: | |
| Other: | | Other: | |
| Accounts Receivable: | | Accounts Payable: (include all amounts due to others, including credit cards, debts and other unsecured debts) | |
| Automobiles: | | Automobile Loans: | |
| Other Assets: | | Other Debts: | |
| TOTAL ASSETS | $ | TOTAL LIABILITIES | $ |
| NET WORTH | $ | | |

I confirm that the above balance sheet is true, correct and accurate.

Signature

Subscription Agreement

EXHIBIT - IB

TOWERS FINANCIAL CORPORATION
SUBSCRIPTION AGREEMENT

To: Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016

Gentlemen:

1. *Subscription.*

I hereby subscribe to purchase the number of secured recourse non-negotiable promissory notes which are set forth in Article "11" of this Subscription Agreement (the "Promissory Notes") issued by TOWERS FINANCIAL CORPORATION, a Nevada corporation (the "Company"), as more fully described in the offering document, dated October 1, 1990 (the "Offering Document"), and I agree to pay for the Promissory Notes subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement. Each of the capitalized terms which are used in this Subscription Agreement shall have the same meaning as those terms have in the Offering Document.

2. *Purchase Price.*

The purchase price for each Promissory Note (the "Subscription Price") is $100,000 (subject to reduction at the sole discretion of the Company). I am herewith tendering payment for the subscribed for Promissory Notes by regular, bank or certified check payable to "Towers Financial Corporation, Funding Account" equal to $100,000 per Promissory Note (or such fraction thereof that is permitted by the Company).

3. *Offering.*

I understand that the offering will terminate on or before January 31, 1991 (subject to extension at the discretion of the Company). If my subscription is not accepted, all funds paid by me will be returned promptly to me without interest and without deduction of escrow costs. Upon receipt of such funds I will forthwith return the Offering Document and all other subscription documents to the Company. In the sole and absolute discretion of the Company, less than the full amount subscribed for by me may be accepted, whereupon the excess funds tendered by me will be promptly returned.

It is understood that this subscription is not binding unless and until it is accepted by the Company. I also understand and agree that my subscription to purchase Promissory Notes shall not be deemed binding upon the Company until the funds paid by me herewith are submitted to the Company, clear and are credited to the Funding Account.

4. *Representations and Warranties of the Undersigned.*

I acknowledge that I have received, read, understand, and am familiar with the Offering Document, including all attachments and exhibits thereto. I further acknowledge that, except as set forth in the Offering Document, no representations or warranties have been made to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Promissory Notes and/or the investment made thereby, and that I have not relied upon any information concerning the offering, written or oral, other than that contained in the Offering Document.

I further acknowledge that I have received, completed and returned to the Company, the Purchaser Questionnaire relating to my general ability to bear the risks of the investment being made hereby and my suitability as an Investor, and I hereby affirm the correctness of my answers in such questionnaire.

I further represent and warrant to the Company, Counsel to the Company, and their respective Affiliates, as follows:

(a) I can bear the economic risk of this investment and can afford a complete loss thereof; and I (i) have sufficient liquid assets to pay the full purchase price for each Promissory Note in the manner contemplated by the Offering Document; (ii) have adequate means of providing for my current needs and

possible personal contingencies, and have no present need for liquidity of my investment in the Promissory Notes; (iii) have a net worth presently of at least an amount indicated by me in Part III of my Investor Questionnaire delivered simultaneously herewith; and (iv) qualify as an "Accredited Investor" as defined in Regulation D which was promulgated under the 1933 Act as follows:

(1) Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

(b) I have been represented by such legal and tax counsel and others, each of whom has been personally selected by me, as I found necessary to consult concerning the purchase of the Promissory Notes, and such representation has included an examination of applicable documents and an analysis of all tax, financial, recording, and securities law aspects thereof. I, my counsel, my advisors, and such other persons with whom I have found it necessary or advisable to consult, have sufficient knowledge and experience in business and financial matters to evaluate the information set forth in the Offering Document, and the risks of the investment, and to make an informed investment decision with respect thereto.

(c) With respect to the tax aspects of my investment, I am relying solely upon the advice of my own personal tax advisors, and upon my own knowledge with respect thereto.

(d) Any and all information has been made available to me, my counsel and my advisors, prior to the date hereof. I have had the opportunity to ask questions of, and to receive answers from, the Com-

pany, and its representatives, concerning the terms and conditions of the offering and access to any information, documents, financial statements, records and books (i) relating to the Company, the purchase of the Promissory Notes and the offering, and (ii) necessary to verify the accuracy of any information furnished to me. All materials and information requested by either me, my counsel, my advisors or others representing me, including any information requested to verify any information furnished, have been made available and examined.

(e) I understand that the offering has not been registered under the Securities Act of 1933, as amended (the "1933 Act"), nor pursuant to the provisions of the securities or other laws of any other applicable jurisdictions, in reliance upon the exemption for private offerings contained in Section 4(2) of the 1933 Act, Regulation D promulgated thereunder and the laws of such jurisdictions. I am fully aware that the Promissory Notes subscribed for by me are to be sold to me in reliance upon such exemptions based upon my representations, warranties and agreements. I am fully aware of the restrictions on sale, transferability and assignment of the Promissory Notes, as more fully set forth in the Offering Document, and that I must bear the economic risk of my investment herein for an indefinite period of time because the offering has not been registered under the 1933 Act and, therefore, the Promissory Notes cannot be offered or sold unless the offering is subsequently registered under the 1933 Act or an exemption from such registration is available.

(f) My execution and delivery of this Subscription Agreement has been duly authorized by all necessary action. I will not pledge, transfer or assign this Subscription Agreement or the Promissory Notes which I acquire pursuant to this offering without complying with the procedures set forth in the Offering Document. I am making the investment hereunder for my own account and not for the account of others and for investment purposes only and not with a view to or for the transfer, assignment, resale or distribution thereof, in whole or in part. I have no present plans to enter into any such contract, undertaking, agreement or arrangement.

(g) I agree that I shall not cancel, terminate or revoke this Agreement or any other agreement executed by me with respect to the purchase of a Promissory Note, and that this Subscription Agreement shall survive my death or disability, except as pursuant to the laws of the applicable jurisdiction.

(h) I am aware that the purchase of a Promissory Note is a speculative investment involving a significant degree of risk and that there is no guarantee that I will realize any gain from my investment.

(i) The address set forth below is my true and correct residence, and I have no present intention of becoming a resident of any other state or jurisdiction prior to my purchase of the Promissory Note.

(j) I understand the meaning and legal consequences of the foregoing representations and warranties, which are true and correct as of the date hereof and will be true and correct as of the date of my purchase of the Promissory Note subscribed for herein. Each such representation and warranty shall survive such purchase.

5. *Indemnification.*

I hereby agree to indemnify and hold harmless the Company, Counsel, and their Affiliated persons from any and all damages, losses, costs and expenses (including attorneys' fees and disbursements) which they, or any of them, may incur by reason of my failure, or alleged failure, to fulfill any of the terms and conditions of this subscription or by reason of my breach of any of my representations and warranties contained herein.

6. *Blue Sky Representations.*

(a) *Residents of any State.* I have read the jurisdictional notice applicable to the State of my residence which appears in Article "10" of this Subscription Agreement.

(b) *Residents of Florida.* I hereby acknowledge that I have the right, pursuant to Section 517.061(11)(a)(5) of the Florida Securities Act, to withdraw my subscription and receive a full refund of all monies paid by me to the Company within three business days after the execution of this Subscription

Agreement or payment for the Promissory Notes has been made, whichever is later. Withdrawal will be without any further liability to me. To accomplish this I need only send a letter or telegram to the Company, indicating my intention to withdraw. I acknowledge that such letter or telegram should be sent or postmarked prior to the end of the aforementioned third business day. I have also been informed that it is prudent to send such letter by certified mail, return receipt requested, to ensure that it was received and also to evidence the time when it was mailed. I also understand that should I make this request orally (either in person or by telephone), I must request written confirmation that such request by me has been received.

(c) *Residents of Michigan.* I agree that I will not sell or transfer my Promissory Note(s) except in a transaction which is exempt under the Michigan Securities Act or pursuant to an effective Registration Statement under the Michigan Securities Act.

I acknowledge that I have received the Offering Document and am aware of the following:

(i) The intended use of the proceeds of this Offering;

(ii) The current financial condition of the Company;

(iii) The direct or indirect compensation which has been or will be received by the Company and its Affiliates from this Offering;

(iv) The securities being offered hereunder are Promissory Notes and the purchase price therefore is $100,000 per Promissory Note; and

(v) I or my representative may inspect the books and records of the Company which relate to the Funding Account and the purchase and collection of the Accounts Receivable.

(d) *Residents of Pennsylvania.* Pursuant to the Pennsylvania Securities Act, Section 207(m), each Pennsylvania resident may elect, within two business days of the date of execution, to withdraw from this Subscription Agreement and to receive a full refund of all funds paid on account of this subscription together with copies of the signature pages of the Agreement. Such withdrawal shall be without any further liability to any person. To accomplish this withdrawal, I need only to send a letter or telegram to the Company, indicating my intention to withdraw. Such letter or telegram must be sent or postmarked prior to the end of the aforementioned second business day. If I send a letter, I understand that it is prudent to send it by certified mail, return receipt requested, to ensure that it is received and also to evidence the time when it was mailed. Should I make this request orally, in person or by telephone to the Company, I understand that I must ask for written confirmation that my request has been received. I agree not to sell or transfer any of the Promissory Notes for a period of at least twelve months from the date of purchase.

(e) *Residents of Texas.* I agree that I will not sell or transfer my Promissory Notes except in a transaction which is exempt under the Texas Securities Act or pursuant to an effective Registration Statement under the Texas Securities Act.

7. *Acceptance by the Company.*

Except as set forth herein, this Subscription Agreement is irrevocable. It is subject to all of the terms and provisions contained in the Offering Document. It may be accepted, in whole or in part, by the Company executing this Agreement, and mailing a duplicate copy to the undersigned. The Company reserves the right in its sole discretion to reject this subscription in whole or in part.

8. *General Provisions.*

Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all of the terms and provisions hereof shall be construed in accordance with, and governed by the laws of the State of New York applicable to contracts fully to be performed therein, may not be modified or waived except in writing, and is subject to all of the terms and provisions contained in the Offering Document.

9. *Miscellaneous.*

(a) All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the undersigned at the address which is set forth below and to the Company at 417 Fifth Avenue, New York, New York 10016.

(b) This Agreement constitutes the entire Agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

(c) The Company, counsel, and their respective Affiliates shall not be liable for taking any action pursuant to this Agreement in the absence of gross negligence, misfeasance, malfeasance or fraud.

10. *Jurisdictional Notices and Representations.*

It should be noted that the inclusion of a notice under state securities laws below should not be construed to mean that the Promissory Notes have been cleared or are otherwise available for sale in that state. The Company will maintain a list, which will be available upon request, of those states in which offers and sales of Promissory Notes can be made.

DESPITE THE INCLUSION OF THE LEGENDS BELOW, BROKER-DEALERS MUST CONFIRM WITH THE ISSUER THAT EITHER THE SECURITIES HAVE BEEN REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE SINCE THE INCLUSION OF A LEGEND BELOW DOES NOT ASSURE REGISTRATION OR EXEMPTION.

IN ADDITION, SOME STATES' DEFINITION OF "ACCREDITED INVESTOR" DIFFERS FROM THE DEFINITION SET FORTH AT SECTION 4(a) OF THIS SUBSCRIPTION AGREEMENT. THEREFORE, IT IS IMPERATIVE THAT BROKER-DEALERS VERIFY THAT POTENTIAL INVESTORS QUALIFY AS "ACCREDITED INVESTORS" IN SUCH STATE.

*FOR ALABAMA RESIDENTS ONLY:* THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR ALASKA RESIDENTS ONLY:* THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISION OF 3 AAC 08.500-3 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THE OFFERING DOCUMENT SINCE THE OFFERING DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF AS 45.55.170.

THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

*FOR ARIZONA RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED PURSUANT TO A.R.S. SECTION 44-1846 BUT THE FACT OF THE GRANTING OF SUCH EXEMPTION IS NOT TO BE DEEMED A FINDING BY THE ARIZONA CORPORATION COMMISSION THAT THE OFFERING DOCUMENT IS TRUE OR ACCURATE, NOR DOES SUCH GRANT OR EXEMPTION MEAN THAT THE COMMISSION HAS PASSED UPON THE MERITS OF OR OTHERWISE APPROVED THE SECURITIES DESCRIBED HEREIN.

*FOR ARKANSAS RESIDENTS ONLY:* THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-42-504(a)(14) OF THE ARKANSAS SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THE OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR CALIFORNIA RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE, IF SUCH REGISTRATION IS REQUIRED.

*FOR COLORADO RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981, IF SUCH REGISTRATION IS REQUIRED.

*FOR CONNECTICUT RESIDENTS ONLY:* THE SECURITIES REFERRED TO IN THE OFFERING DOCUMENT HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE CONNECTICUT UNIFORM SECURITIES ACT, AND, THEREFORE, THE SECURITIES CANNOT BE SOLD OR TRANSFERRED UNDER SUCH ACT UNLESS THEY ARE REGISTERED UNDER SUCH ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR FLORIDA RESIDENTS ONLY:* FLORIDA PURCHASERS ARE ADVISED THAT WHERE SALES ARE MADE TO FIVE OR MORE PERSONS PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES & INVESTOR PROTECTION ACT, SUCH SALES ARE VOIDABLE BY THE PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE COMPANY OR ANY AGENT OF THE COMPANY OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE PURCHASER, WHICHEVER OCCURS LATER. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT (RULE 3E-500.005(5)(a)(12)).

*FOR GEORGIA RESIDENTS ONLY:* OFFEREES ARE HEREBY ADVISED THAT THE CONSENT DECREE ENTERED INTO BY TOWERS FINANCIAL CORPORATION ("TOWERS") DISCUSSED IN THE CONFIDENTIAL PRIVATE OFFERING DOCUMENT DATED OCTOBER 1, 1990, PROVIDES THAT TOWERS IS PERMANENTLY ENJOINED FROM VIOLATING THE SECURITIES LAWS AND THAT TOWERS IS SUBJECT TO AN ONGOING OBLIGATION NOT TO VIOLATE THE SECURITIES LAWS. UNLESS A WAIVER IS GRANTED BY THE STATE OF GEORGIA, THE CONSENT DECREE CONSTITUTES AN AUTOMATIC DISQUALIFICATION FROM THE USE OF PRIVATE OFFERING EXEMPTIONS IN THE STATE OF GEORGIA. TOWERS HAS APPLIED FOR SUCH A WAIVER AND THE GEORGIA SECURITIES COMMISSION HAS AGREED TO GRANT THE WAIVER PROVIDED THAT THIS NOTICE BE FURNISHED TO ALL GEORGIA OFFEREES.

*FOR IDAHO RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANS-

FERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR ILLINOIS RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS, NOR HAS THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR INDIANA RESIDENTS ONLY:* THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 23-2-1-2 OF THE INDIANA CODE. THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL OR STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.

*FOR LOUISIANA RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS OF LOUISIANA AND THEREFORE CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR MARYLAND RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, IF SUCH REGISTRATION IS REQUIRED.

*FOR MICHIGAN RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNIFORM SECURITIES ACT OF MICHIGAN AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. MINIMUM INVESTMENT IN MICHIGAN IS $50,000.

*FOR MINNESOTA RESIDENTS ONLY:* THESE SECURITIES REPRESENTED BY THIS OFFERING HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

*FOR MISSISSIPPI RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR MISSOURI RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR

STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR NEW JERSEY RESIDENTS ONLY:* THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THE OFFERING DOCUMENT. THE FILING OF THIS OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE OR THE SALE THEREOF BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR NEW MEXICO RESIDENTS ONLY:* THE SECURITIES DESCRIBED HEREIN ARE OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF NEW MEXICO. ACCORDINGLY, THE NEW MEXICO SECURITIES BUREAU HAS NOT REVIEWED THE OFFERING OF THESE SECURITIES AND HAS NOT APPROVED OR DISAPPROVED THIS OFFERING. THE NEW MEXICO SECURITIES BUREAU HAS NOT PASSED UPON THE VALUE OF THESE SECURITIES OR UPON THE ADEQUACY OR ACCURACY OF THE INFORMATION CONTAINED IN THE OFFERING DOCUMENT.

*FOR NORTH CAROLINA RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR PENNSYLVANIA RESIDENTS ONLY:* PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, EACH PENNSYLVANIA RESIDENT WHO ACCEPTS THE OFFER MADE PURSUANT TO THE OFFERING DOCUMENT TO PURCHASE ANY UNITS SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE, WITHOUT INCURRING ANY LIABILITY TO THE COMPANY, ITS AFFILIATES OR ANY OTHER PERSON, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE COMPANY OF HIS WRITTEN BINDING CONTRACT OF PURCHASE (SUBSCRIPTION AGREEMENT). TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER SHOULD SEND A LETTER OR TELEGRAM INDICATING HIS INTENTION TO WITHDRAW TO THE COMPANY AT THE ADDRESS OF THE COMPANY SET FORTH IN THE OFFERING DOCUMENT. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF A SUBSCRIBER ELECTS TO SEND SUCH A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD A SUBSCRIBER MAKE THIS REQUEST ORALLY, HE SHOULD ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR VIRGINIA RESIDENTS ONLY:* THE VIRGINIA STATE CORPORATION COMMISSION DOES NOT PASS UPON THE ADEQUACY OF THE OFFERING DOCUMENT OR UPON THE MERITS OF THIS OFFERING AND THE COMMISSION EXPRESSES NO OPINION AS TO THE QUALITY OF THIS SECURITY.

*FOR WASHINGTON RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSIONER REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

11. *Information Relating to My Investment.*

(a) Number of Promissory Notes (at a price of $100,000 per Promissory Note) ________

(b) Term of Promissory Notes ____12 months ____24 months

(c) Payment Tendered Herewith: ($100,000 times number of Promissory Notes) $ ________

(d) Additional Documents Required:

(i) Investor Questionnaire; and

(ii) Community Property Designation (if applicable) from Page __ of this Subscription Agreement.

10001887

TO BE COMPLETED BY ALL SUBSCRIBERS:

Residence Address to which information regarding this subscription should be mailed:

________________________
Street Address

________________________
City and State Zip

( )______________________
Telephone Number

________________________
Social Security Number or Employer Identification Number

________________________
Social Security Number or Employer Identification Number of Joint Tenant or Tenant-in-Common, if applicable

IN WITNESS WHEREOF, I (we) have executed this Subscription Agreement this ___ day of ________, 19__.

INDIVIDUAL:

________________________
Name (Please Print)

________________________
Signature

________________________
Name of Joint Tenant or Tenant-in-Common, if applicable.

Term of Promissory Notes:

________________________

Number of Promissory Notes Accepted:

________________________

ENTITIES:

________________________
Name of Entity (Please Print)

________________________
Signature and Title

[Corporate Seal (if applicable)]

ACCEPTED AND AGREED TO THIS ____ DAY OF ______, 1990.

TOWERS FINANCIAL CORPORATION

By:______________________
Mitchell Brater,
Vice Chairman and Chief Operating Officer

10001888

[INDIVIDUAL]

STATE OF ______ }
} SS.:
COUNTY OF ______ }

On __________, 19__, before me personally appeared ______________ and __________, known to me as the person(s) whose name(s) is (are) subscribed to the foregoing Subscription Agreement and acknowledged that (s)he (they) executed the same.

______________________
Notary Public

[CORPORATE]

STATE OF ______ }
} SS.:
COUNTY OF ______ }

On __________, 19__, before me personally appeared ______________, to me known and who, being by me duly sworn, did depose and say that (s)he is the ______________ of ______________, a ______________ corporation, the corporation which executed the foregoing Subscription Agreement, that (s)he knows the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by authority of the corporation; and that (s)he signed his (her) name thereto by like authority.

______________________
Notary Public

10001589

COMMUNITY PROPERTY DESIGNATION

If a subscriber is an individual who is legally domiciled or resident of the State of Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas or Washington, the following designation must also be completed:

A. The Promissory Notes are being purchased as Community Property in one or both names (both spouses must sign).

______________________ ______________________
SIGNATURE OF HUSBAND SIGNATURE OF WIFE

______________________ ______________________
Type or Print Name of Husband Type or Print Name of Wife

B. The Promissory Notes are being purchased as Separate Property (the Subscriber alone must sign the Separate Property Election, and the subscriber's spouse must sign the Separate Property Acknowledgement below).

SEPARATE PROPERTY ELECTION

The undersigned elects to treat this investment as (his) (her) separate property. In making this decision, I have consulted with independent counsel to determine that I have used my separate property or funds to purchase the Promissory Notes.

______________________
SIGNATURE OF SUBSCRIBER

______________________
Type or Print Name of Subscriber

SEPARATE PROPERTY ACKNOWLEDGEMENT

I hereby acknowledge that my spouse is making this investment with (his) (her) separate property and funds.

______________________
SIGNATURE OF SUBSCRIBER'S SPOUSE

______________________
Type or Print Name of Subscriber's Spouse

10001590

Form of Promissory Note

EXHIBIT II

TOWERS FINANCIAL CORPORATION
OCTOBER 1, 1990 PRIVATE OFFERING DOCUMENT
NON-NEGOTIABLE RECOURSE PROMISSORY NOTE

For value received, TOWERS FINANCIAL CORPORATION, a Nevada corporation (the "Maker"), promises to pay to the order of the person whose name and address are set forth at the end of this Note (the "Payee"), its successors and assigns, the principal sum which is indicated at the end of this Note, together with interest on the unpaid principal balance at the rate of interest which is set forth at the end of this Note, from the date of this Note (the date of this Note is set forth at the end of this Note) through and including the date of final payment hereunder.

Principal hereunder shall be due and payable in full on the date which is indicated at the end of this Note (the "Maturity Date").

Payment of principal and interest under this Note shall be made in lawful money of the United States of America to the Payee at the address which is set forth at the end of this Note or at such other location as shall be notified to the maker by the Payee. Interest shall be calculated on the basis of a year of 365 days for the actual number of days elapsed and shall be payable monthly (or quarterly) commencing with the interest payment which is due thirty (30) days from the date of this Note.

Notwithstanding anything to the contrary which is provided for herein, the rate of interest which is provided for hereunder shall not exceed the maximum legal rate of interest which is permitted pursuant to applicable law. If the rate of interest which is provided for in this Note shall be found to exceed the maximum legal rate of interest, the Maker shall be required to pay only the maximum legal rate of interest.

This Note has been issued pursuant to the Offering Document dated October 1, 1990 of the Maker, and this Note is subject to all of the terms, conditions, obligations and provisions which are set forth in the Offering Document.

The holder of this Note shall be entitled to all of the benefits provided for in the security agreement (the "Security Agreement") which was executed by the Maker in favor of the Payee and other similarly situated payees. Neither this reference to the Security Agreement nor any provision thereof shall affect or impair the obligations of the Maker which are provided for herein.

This Note is made and delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York. Any provision hereof which may prove unenforceable under any law shall not affect the validity of any other provision hereof. The Payee agrees that any action or proceeding to enforce this Note shall be brought in a court of competent jurisdiction located in the State and County of New York.

This Note may not be changed or terminated orally, but only by an agreement in writing and signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the __ day of _____, 19__.

TOWERS FINANCIAL CORPORATION

Date of Note: __________, 19__

By: ____________________
Mitchell Brater,
Vice Chairman and Chief Operating Officer

PAYEE:

____________________

Principal Amount of Note: $ __________

____________________
Print Name(s)

Period to Maturity: __________

____________________
Address

Maturity Date: __________

____________________
City, State and Zip Code

Rate of Interest: _____% per annum

This Promissory Note has not been registered under the Securities Act of 1933, as amended, and may not be sold or otherwise transferred in the absence of such registration or an exemption therefrom under such Act or state securities laws. Furthermore, this Promissory Note may be sold or otherwise transferred only in compliance with the conditions specified in the Offering Document of Maker, a complete and correct copy of which is available for inspection at the principal office of Maker and will be furnished without charge to the holder of this Promissory Note upon written request.

Security Agreement

EXHIBIT III

# SECURITY AGREEMENT

AGREEMENT made this ___ day of __________, 19__, by and among TOWERS FINANCIAL CORPORATION, a Nevada corporation having its principal place of business at 417 Fifth Avenue, New York, New York 10016 (hereinafter referred to as the "Debtor") and each of the persons whose names and addresses are set forth on Exhibit "A" which is annexed hereto (hereinafter referred to as the "Secured Party" or collectively the "Secured Parties").

1. *Background*

The Debtor, pursuant to its offering document, dated October 1, 1990 (hereinafter referred to as the "Offering Document"), has issued its recourse non-negotiable promissory notes (hereinafter referred to as the "Promissory Notes") to each of the Secured Parties in the amounts which are indicated on Exhibit "A" which is annexed hereto. Pursuant to the provisions of the Offering Document, the proceeds of the offering of the Promissory Notes are to be placed in the Funding Account, as defined in the Offering Document, and utilized for the purpose of purchasing and/or financing Accounts Receivable, as defined in the Offering Document. In order to induce the Secured Parties to enter into this transaction, the Debtor has agreed to grant the Secured Parties a security interest in the Funding Account, the Accounts Receivable and any proceeds therefrom in whatever form as security for repayment of the Promissory Notes pursuant to their respective terms.

2. *Definitions*

Each of the capitalized terms which is used herein shall have the same meaning which is set forth in the section of the Offering Document which is entitled "Glossary" unless the context of this Security Agreement requires otherwise.

3. *Security Interest*

To secure the payment when due of principal and interest under the Promissory Notes and the payment and performance by the Debtor of all obligations and liabilities of the Debtor to the Secured Parties pursuant to the Promissory Notes, the Debtor shall and hereby does, on and as of the date hereof, grant, convey, assign and transfer to Secured Party, a security interest in and to (i) the Accounts Receivable and all additions, replacements and attachments thereto, (ii) all other contracts calling for the purchase or financing of the Accounts Receivable, (iii) all proceeds which are derived by the Debtor from the collection or the attempted collection of any of the items referred to in "(i)" or "(ii)", and (iv) the Funding Account, exclusive of the Excess Profits Amount, as defined in the Offering Document (hereinafter referred to collectively, as the "Collateral").

4. *Default*

4.1 Event of Default. The term "Event of Default," as used herein, shall mean the occurrence and continuation of any one or more of the following events:

(a) The failure of the Debtor to promptly pay when due any of the amounts of interest or principal which are due and payable pursuant to any of the Promissory Notes, which failure continues for a period of thirty (30) days after the applicable Secured Party gives the Debtor written notice of such default;

(b) If the Debtor shall admit in writing its inability to pay, or fail to pay, its debts generally as they become due; or

(c) If, under the provisions of any law for the relief of debtors, any court of competent jurisdiction or custodian shall assume custody or control of the Debtor or of the whole or any substantial part of the Debtor's property without the consent of the Debtor.

4.2 Upon the happening of an Event of Default, the Promissory Notes shall become immediately due and payable and the applicable Secured Party shall have the rights which are set forth in Section 7 of this Security Agreement.

5. *Obligations of the Debtor*

5.1 If a Secured Party shall have required the Debtor to deliver to such Secured Party any or all of the Collateral and if the Debtor shall receive or become entitled to receive any rights, distributions or payments of any kind or description with respect to or on account of such Collateral, the Debtor agrees to accept same as agent for the Secured Party, to hold same in trust for the Secured Party, and to deliver same to the Secured Party in the form received, with the endorsement of the Debtor when necessary, to be held by the Secured Party as Collateral hereunder.

5.2 Until the Secured Parties are paid in full for the principal and interest of all indebtedness which is due to the Secured Parties pursuant to the terms of this Agreement and the Promissory Notes, the Debtor agrees that it will:

(a) take whatever actions are necessary to comply with all statutes and regulations governing its activities and operations; and

(b) promptly notify the Secured Parties of an Event of Default which is discovered by Debtor.

6. *Warranties of the Debtor*

6.1 The only office where the Debtor keeps, or will at any time prior to final release hereof, keep records concerning any part of the Collateral, which is "accounts" as that term is defined in the Uniform Commercial Code, is at the address of the Debtor which is shown at the beginning of this Agreement, which office is the principal place of business and the location of the chief executive office of the Debtor.

6.2 To induce the Secured Parties to enter into the transactions provided for herein, the Debtor represents and warrants to the Secured Parties that:

(a) The Debtor is duly authorized to execute and deliver this Agreement and the Promissory Notes and to perform all of its obligations under this Agreement, including the execution, delivery and performance of whatever additional documents are necessary or required in connection with the transactions which are contemplated herein;

(b) The execution and delivery by the Debtor of this Agreement and the Promissory Notes and the performance by the Debtor of its obligations under this Agreement and the Promissory Notes do not and will not conflict with any provision of law, or of the charter or by-laws, or of any other agreement affecting or binding upon the Debtor;

(c) This Agreement and the Promissory Notes, when duly executed and delivered in accordance with this Agreement, will be valid and binding obligations of the Debtor enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights and except to the extent that the availability of specific performance thereof may be limited by principles of equity; and

(d) The Debtor is a duly organized and validly existing corporation in good standing under the Nevada Business Corporation Law.

7. *Rights and Obligations of Secured Parties With Respect to the Collateral*

7.1 The Secured Parties hereby severally agree that, upon an Event of Default, each Secured Party shall be entitled to exercise his remedies hereunder and under the Uniform Commercial Code only in respect of that portion of the Collateral (determined according to the then present value thereof) which bears the same ratio to the total Collateral as that portion of the indebtedness with respect to any Promissory Note held by such Secured Party.

7.2 The proceeds of any sale or other disposition of the Collateral and all sums received or collected by the Secured Parties from or on account of the Collateral shall be applied by the Secured Parties in the manner set forth in Section 9-504 of the Uniform Commercial Code in effect at the time of such sale or other disposition of the Collateral.

7.3 A Secured Party may only transfer a Promissory Note held by him, subject to the terms of the Offering Document and the Securities Act of 1933, as amended, and state securities laws. Upon any such transfer, the transferee shall automatically become vested with all rights, powers and remedies hereunder of such Secured Party with respect to the Collateral.

7.4 Upon payment in full of all of his Promissory Note, a Secured Party will promptly thereafter release to the Debtor all of the Collateral.

8. *Miscellaneous*

8.1 *Headings*. The descriptive headings in this Security Agreement are for convenience of reference only, and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

8.2 *Waiver*. Except as otherwise specifically provided for hereunder, no party shall be deemed to have waived any of its rights hereunder or under any other agreement, instrument or paper signed by any of them with respect to the subject matter hereof, unless such waiver is in writing and signed by the party waiving such right. Except as otherwise specifically provided for hereunder, no delay or omission by any party in exercising any right with respect to the subject matter hereof shall operate as a waiver of such right or of any such other right. A waiver on any one occasion with respect to the subject matter hereof shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

8.3 *Rights Cumulative*. All rights and remedies with respect to the subject matter hereof, whether evidenced hereby or by any other agreement, instrument, or paper, will be cumulative, and may be exercised separately or concurrently.

8.4 *Entire Agreement*. The parties herein have not made any representations, warranties, or covenants not set forth with respect to this subject matter hereof, and this Security Agreement constitutes the entire agreement between them with respect to the subject matter hereof. All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Security Agreement and any such instrument which alone fully and completely expresses their agreement.

8.5 *Amendments*. This Security Agreement may not be changed, modified, extended, terminated, or discharged orally, but only by a written agreement which is signed by all of the parties to this Security Agreement.

8.6 *Further Instruments*. The parties agree to execute any and all such other and further instruments and documents and to take any and all such further actions reasonably required to effectuate this Security Agreement, and the intents and purposes hereof.

8.7 *Notices*. All notices or other communications required or permitted hereunder shall be in writing and shall be mailed by First Class, Registered or Certified Mail, Return Receipt Requested, postage prepaid, as follows:

To the Debtor:

Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016
Attn: Mitchell Brater, Vice Chairman
and Chief Operating Officer

To the Secured Parties:

All the addresses which are set forth
on Exhibit "A" to this Security Agreement

or in each case to such other address as shall have last been furnished by like notice. If mailing by Registered or Certified Mail is impossible due to an absence of postal service, notice shall be in writing and personally delivered to the aforesaid address. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be.

8.8 *New York Law*. This Security Agreement is made and delivered in the State of New York and shall be construed and enforced in accordance with the internal laws of the State of New York, without giving effect to the principles of conflicts of law. Any suit or proceeding to enforce the provisions of this Security Agreement shall be commenced in a court of competent jurisdiction in the State and County of New York.

8.9 *Successors and Assigns*. Subject to the restrictions which are contained in this Security Agreement, this Security Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

IN WITNESS WHEREOF, the Debtor has executed this Security Agreement as of the _____ day of __________, 19___.

TOWERS FINANCIAL CORPORATION

By: ___________________________
Mitchell Brater,
Vice Chairman and Chief Operating Officer

10001596

EXHIBIT A

| Names and Addresses of Secured Parties | Amount of Principal Obligation Pursuant to the Promissory Note |
| --- | --- |

All Investors whose investments have been used to purchase Accounts Receivable which are the subject of this Security Agreement.

10001597

Annual Report of Towers

EXHIBIT IV

10001S98

TOWERS FINANCIAL CORPORATION ANNUAL REPORT 1990

THE
TOWERS
FINANCIAL
CORPORATION
Automated Claims Management Systems
Healthcare Funding & Accounts Receivable Management
FDIC
Collection Services
RTC/FDIC Loan Portfolios

10001S99

Towers Financial Corporation is a diversified financial services company with more than 1,200 employees and independent agents nationwide. The company is a recognized leader in the business of: Healthcare Funding and Automated Claims Management Systems, Accounts Receivable Management, including Collection Services, and Accounts Receivable Purchasing and Factoring, servicing more than 850,000 accounts for nearly 10,000 commercial and healthcare clients.

**Consolidated Financial Highlights** (in thousands, except per share data)

| | 1990 | 1989 | 1988 |
|---|---|---|---|
| Gross Revenues | $291,565 | $182,982 | $140,029 |
| Total Assets | 195,562 | 122,573 | 76,187 |
| Shareholders' Equity | 13,422 | 9,419 | 5,683 |
| Net Income | 3,903 | 3,486 | 1,413 |
| Earnings Per Share | .87 | .78 | .32 |
| Average Common Shares Outstanding | 4,464 | 4,464 | 4,464 |

10001900

Steven Hoffenberg
Chairman & CEO

Mitchell Brater
Vice Chairman & COO

To Our Shareholders:

It has been a year of opportunity and significant growth. Our position of leadership in specifically identified segments of financial services, has been strengthened and continues as a primary focus. The solid financial performance of the past year provides abundant verification of our goals and direction.

We are in the third year of our strategic plan, devised to identify and aggressively compete in areas of the financial services industry that are germane to our experience and capabilities.

Our primary marketing thrust continues as a premier accounts receivable collection service to the more than 8 million companies within the universe of corporate America, and as a unique service responding to the funding and management needs of the burgeoning $660 billion healthcare industry.

Built upon years of intense resource development and growth, TFC has expanded into those financial environments in which our expertise can be applied directly, where our investment of time and resources can be justified by their long-term market potential... understanding that personnel within industries such as healthcare are in no position to maintain the training and technology needed to perform these functions.

TFC was one of the first to recognize and focus on these needs, hiring analysts with top-level experience at insurance companies and other intermediaries. Developing unique and proprietary software, TFC alone now trains healthcare facility staffs and takes over their claims and collection management in-house.

In this regard, TFC entered the bond market with Wall Street's first asset-backed healthcare receivables bond issue. TFC's first rated offering of two-year 1990 bonds rated 'AA' for $56,500,000, was 'self-underwritten' at substantial savings to TFC. It will provide added resources needed to pursue the vast potential within this receptive [illegible]

10001901

**Capability:**

The TFC financial services expansion program launched three years ago, and fully operational in 1989, has resulted in a regional support system that has no equal. It provides a national organizational structure that has allowed TFC to market its current and new services and those being planned, to more industries and localities than ever before...from coast-to-coast. It has permitted us to better service our expanded customer base with a more attentive, responsive approach to their needs.

TFC's experienced, extremely well-trained staff, whether in our national headquarters or in regional offices, provides TFC with a sound platform from which to launch, properly handle and exploit our imaginative programs.

**Opportunity: Healthcare**

The introduction of the powerful Towers Healthcare Receivable Funding Program and its Automated Claims Management Systems, with its unique and highly specialized software and hardware, has positioned TFC at the heart of an industry with annual revenues of more than $660 billion. It is a market TFC had identified and vigorously pursued, providing critically needed funding, receivable management and recovery expertise to healthcare providers across the country.

Using experienced TFC support personnel, processing capabilities and skilled techniques, the program has succeeded in bridging the reimbursement delays by third party reimbursers and governmental agencies, while it enhances the ability of providers to conduct their billing and reimbursement operations in a highly efficient manner. It is a TFC initiated system called "Accelerated Collection Recall" and it is inherent to TFC's proprietary software.

[illegible] the healthcare industry [illegible] ... [illegible] constructed to reflect the [illegible] ... [illegible] of each situation. With a [illegible] working knowledge of the [illegible] and claims requirements [illegible] of third-party reimbursers, [illegible] Claims Management [illegible] an integral part of many [illegible] billing and collection [illegible]. TFC has solidified [illegible] in the marketplace. [illegible] in this sector continues [illegible] from leading financial

institutions. [illegible] the [illegible] securitization of healthcare receivables [illegible] significant investment [illegible]

**Opportunity: RecoverCard℠**

The innovative [illegible] marketing concept, has been received [illegible] from coast-to-coast. [illegible] management [illegible] small and medium size businesses and professional firms [illegible] millions of [illegible] past due [illegible] work for their operation.

In addition to [illegible] TFC [illegible] recovery method [illegible] the RecoverCard program [illegible] members to [illegible] from their delinquent accounts

into needed merchandise, office equipment, travel, accommodations and services at meaningful discounts, or to simply withdraw their credits. It's an attractive and flexible program.

**New Opportunity: RTC/FDIC Loan Portfolios**

In its capacity as receiver and liquidator of hundreds of failed S&L banks, the FDIC (and the Resolution Trust Corporation) has amassed hundreds of billions of dollars worth of past due and delinquent loans, without the staff and resources to effectively realize their recovery. In this emerging market opportunity, Towers has entered into the business of purchasing loan portfolios from the Federal Deposit Insurance Company for a discount of their value. Utilizing existing capabilities and its national network, it is now recovering these loans on its own behalf, adding a new source of profitable business.

**Leadership:**

Building upon our strength and around our core businesses, investing in people and in the most advanced software collection capability, we stand at the threshold of what we believe will be a period of profound growth and profitability. As we continue to increase penetration of existing markets and establish solid positions in new ones, we will maintain our commitment to nurture the innovativeness that has consistently added value to the company and to your shares.

Sincerely,

Steven Hoffenberg
*Chairman of the Board and Chief Executive Officer*

Mitchell Brater
*Vice Chairman of the Board and Chief Operating Officer*

## OVERVIEW OF TOWERS FINANCIAL CORPORATION

For more than fifteen years, Towers Financial Corporation, through its wholly-owned subsidiaries and affiliates, has been engaged in various aspects of accounts receivable collection and management. TFC's success and the leadership position earned in the industry, derives from its ability to anticipate, build innovative programs with customers and re-define the accounts receivable collection, funding and management business.

Historically, TFC has been willing to invest in the development of systems and personnel fully capable of efficiently managing transactions on a large scale. Included is the development of specific systems and related software programs geared to a particular need and to the complex requirements of an industry such as healthcare — where knowledge and conformity to individual regulations varies with each type of third-party reimburser and with each provider.

The depth of understanding and the thoroughness of implementation [illegible] problem-solving has enabled TFC to take maximum advantage of existing markets while creating entirely new market opportunities. All of which are compatible with, and build upon the abilities, strategies and infrastructure devised for its core business.

Towers Financial Corporation is currently involved in these areas of business:

### Healthcare Funding Services

TFC pioneered asset-based financing for the healthcare industry with the introduction of the revolutionary Towers Healthcare Receivables Funding Program and its components — Automated Claims Management System and Accelerated Collection Recall System. It offers programs that provide funding, billing, claims and accounts receivable management and critical recovery benefits to healthcare providers in an industry that financially is in crisis. In so doing, TFC relies not upon the fiscal condition

[illegible]

### Collection Services

[illegible]

### FDIC RTC Loan Portfolios

[illegible]

### RecoverCard

[illegible]

their delinquent, past due accounts receivable. In a program that engages the full resources of TFC, RecoverCard member firms of any size, may use their accumulated account balances for the purchase of services or goods available through TFC and/or of their own choosing. This includes travel and accommodations, office equipment, car rentals, electronics, vendor indebtedness or other legitimate uses.

**Corporate Credit Service**

TFC is involved in the outright purchase of corporate accounts receivable or "factoring." TFC purchases accounts for a percentage of their face value and utilizes its extensive capability to collect on these receivables. The procedure affords TFC the opportunity to reinvest and profit from these funds.

**Leasing Services**

Towers provides lease financing to businesses, professional firms, government agencies, health-care providers and not-for-profit organizations, for acquisition of a wide variety of capital equipment they require in their operations.

**Organizational Strength**

A seasoned professional team—from top management people to the highly competent and motivated lawyers—from paralegals and experienced collectors to sales representatives—and to the full complement of office personnel. They all reflect the continuous investment by TFC in their maintenance as the best and brightest people in the field.

More than 1,200 people nationwide service and call on 850,000 accounts for over 10,000 commercial and health care clients. The remarkable record of repeat business generated by their attentive service and their considerable knowledge is a testimony to their personal dedication and to TFC's commitment to this extraordinary human resource.

Towers Financial Corporation, after 15 years, is recognized as one of the leading firms in accounts receivable collection, management and related financial services to corporate America, hospitals and healthcare providers. TFC manages and recovers accounts receivable (including purchasing and servicing) for more than 10,000 clients in the United States, including many of the Fortune 1000 companies. This involves managing outstanding debt of over $275 million for more than 850,000 accounts, nationwide. And this is but a portion of the approximately 8 million companies and additional thousands of healthcare firms in operation nationally. It is to this virtually limitless potential that TFC has directed its full attention.

## COLLECTION SERVICES

Over the years, TFC has brought to bear in the collections industry a heightened and consistent standard of excellence and professionalism. It results, to a large degree, from the years of investment made in the quality and caliber of TFC people, their effectiveness and their unequaled productivity...and from the framework of programs devised by TFC to realize these attributes.

### People, process and presence

The dynamic growth and enviable industry status achieved by TFC can be attributed to this valuable human resource and the systems and the comprehensive scope of a computer processing capability, unique to TFC.

### National network

Added to this state-of-the-art facility is TFC's fully operational national network of regional marketing and sales offices and staffs. It provides clients from coast-to-coast access to products and services that can be tailored to local market conditions...as well as providing access to the resources of the entire TFC organization.

### Collection is at the core

TFC's unparalleled ability to recover funds is paramount to its success and growth. TFC's investment in this area has had a compounding effect on existing businesses, as well as on its strength to successfully exploit new market opportunities. It is evident in TFC's approach to new business ventures, such as the RTC/FDIC Loan Portfolios and RecoverCard. It is perhaps, most evident in the commanding position TFC has earned in the healthcare industry.

### Performance

Success is evident in TFC's outstanding record in the substantial recovery of past due accounts and in the speed with which it is accomplished. In measuring performance, TFC's ability to gain repeat business and maintain good will between client and debtor stands as a validation of its processes and as a tribute to its professionals.

### The team

The TFC team includes attorneys, insurance claims analysts, collectors and paralegals with both the extensive experience in executing their specialized skills and in the particular industries they serve. This is equally true of the marketing specialists, accountants, programmers and sales representatives...assuring a continued level of cost-effective performance and added business. TFC has thus become closely identified with the industries in which they operate.

### Education, a continuing process

The knowledge, experience and proven capability of TFC professionals, have become the backbone of the training programs provided to customer billing and collection staffs...at their facilities or at TFC. Likewise, the educational process is ongoing at TFC for its personnel. Trends, procedures, techniques, government or insurer policy changes... all are continuously reviewed to maintain the TFC Team's skills...and their ability to deliver benefits and timely thinking to customers.

### The bottom line proof

The investment over the years, in state-of-the-art data processing, systems development and the uniform insistence on quality personnel...has resulted in an increase in the amount and the volume of accounts handled, the reserves they have generated and in significantly higher margins. Efficiencies that improve client services and cement relationships have proven to be in perfect accord with the goals of TFC and in its responsibility to its shareholders.





FACTORING SERVICES

TFC factoring services are fundamental compo- [illegible] development as a diversified [illegible] company. In tandem with [illegible] services, they are basic [illegible] growth and profitability. The [illegible] combination of services offered by TFC [illegible] providers is a "breakthrough" for [illegible]. TFC is firmly convinced of the vast potential [illegible] realized in this segment of [illegible] devoted a major share of its new [illegible] development activity on these growing [illegible] the resources carefully [illegible]. The following are key [illegible] in this regard.

THE TOWERS HEALTHCARE RECEIVABLE FUNDING PROGRAM & AUTOMATED CLAIMS MANAGEMENT SYSTEMS

Towers offers a unique financing opportunity for the nation's embattled healthcare providers. An innovative, first-time-ever program that provides them with significant added working capital and a predictable cash flow ... in combination with the expertise of Towers Senior Claims Analysts and the unique software of the Accelerated Collection Recall system. It is geared to speed collection recovery and to garner the fullest lawful reimbursement to hospitals, clinics, nursing homes, professional groups and other healthcare providers. It is a program designed to salvage a system that is in crisis.

The Crisis in US Healthcare Financing

The typical hospital, historically, has never earned quite enough on patient care to cover costs, and has usually relied on governmental programs and private philanthropy to stay in the black. Over the past years, this precarious mode of existence has been [illegible] the monumental efforts [illegible] and the best intentions of its trustees.

The growing rate of hospital [illegible] the fact that more [illegible] community healthcare facilities [illegible] small, rural and urban, [illegible] in danger of insolvency.

Major changes intensify problems

From the provider's viewpoint [illegible] of this worsening [illegible] by the federal government [illegible] cost controls and methods [illegible] based on what hospitals were supposed to spend, rather than what they actually spent. These federal mandates do not accommodate the need and high price of new technologies and drugs; shortages of nurses and staff; services for an aging population; the AIDS epidemic; and the higher costs of bad debt and charity care.

Previously, hospitals were paid retrospectively on a basis of costs and charges, and billings could be raised each year to recoup the previous year's losses and to ease cash flow. This situation no longer exists. The nation's healthcare facilities are caught in a severe economic dilemma.

The economic dilemma

Healthcare providers must address inflation and the costs of goods and services in an atmosphere of stringent cost controls. They must wait longer for repayment from third party reimbursers who have tightened a claims review procedure that grows increasingly more complex. And they bear an increasingly larger burden of shortfalls from Medicaid and Medicare reimbursements.

TOWERS HEALTHCARE FUNDING AND AUTOMATED CLAIMS MANAGEMENT SYSTEMS

**Costly borrowing, when available**
Borrowing has traditionally been the principal source of funds for healthcare institutions. But borrowing from banking resources has proven extremely difficult. Banks, themselves in crisis condition, have drastically cut back on capital available to healthcare providers. It reflects a changed banking regulatory environment which subjects hospitals and other providers to much closer financial scrutiny and to a subsequent downgrading of their credit ratings.

**Development of the Towers programs**
Dire predictions from knowledgeable industry sources and the pressing reality of their situation as recognized within the industry...led to the development of the Towers Healthcare Receivable Funding Program and its on-site components, Automated Claims Management and Accelerated Collection Recall systems. This landmark program offers healthcare providers a unique, affordable opportunity to restore higher levels of financial stability to their critically troubled institutions.

**The program**
In response to this growing need, TFC created a nationwide program that generates vital funding for healthcare providers with a need to bridge the delays brought on by slow-paying insurance carriers and state and federal governments...and by a need to gain control of an increasingly more complex reimbursement process...in addition to the undeniable imperative to collect a greater portion of the funds to which they are entitled.

The Towers Healthcare Receivable Funding Program is a breakthrough, a revolutionary new approach to cash flow management. It is a program which enables hospitals, clinics, doctors, nursing homes and other providers to conduct billing, collection, insurance filings and accurate reimbursement in a highly effective and professional manner.

**Automated Claims Management Systems**
TFC provides, on-site, to host healthcare administrators, a comprehensive and knowledgeable array of benefits, systems and supervisory acumen specifically geared to their operations

and to the complex universe of third-party reimbursers. Included is the training and acclimation of internal staff to this new methodology.

**Developed exclusively by TFC**
TFC's Automated Claims Management Systems and the Accelerated Collection Recall System are the most advanced software and processing technologies developed exclusively for the healthcare industry. They are systems capable of anticipating and managing the most complicated claims management requirements.

**True collection recall**
The industry's only true collection recall system (Accelerated Collection Recall) is capable of tracking the collection process step-by-step through any third-party reimbursement classification.

TFC's Automated Claims Management Systems train staff and stations expert claims analysts and insurance regulatory experts in provider billing and collection offices to supervise their claims management.

**The demands**
As the industry continues its expansion to meet the demands of a growing and rapidly aging population, the people and institutions who are addressing those medical needs will be hard-pressed to handle the complex, time-consuming, costly and labor-intensive tasks involved in the fiscal administration of those organizations.

Their first priority, understandably, must be the delivery of timely and fully updated healthcare services to the populations they serve.



A greater need

In the years ahead, healthcare professionals, from both the medical and managerial sides, expect to see this greater demand for services and an even higher degree of government intervention and [illegible] costs. The TFC programs address these needs head-on, ensuring the fiscal [illegible] of program participants.

Providing immediate payment

Qualified healthcare providers receive significant immediate payment for accounts receivable due from commercial insurance, Medicaid and Medicare. Following this initial funding the program pays the balance of the receivables (minus a service fee) upon collection.

Historically, only a few established firms with substantial assets or cash flow have been qualified to finance their accounts receivable. Most do not have the credit rating traditionally demanded. Now smaller operations may enjoy the same short-term financing as these few, enabling them to manage ongoing overhead expenses such as payroll, rent and taxes without borrowing or having to wait up to 90, 120 or sometimes 180 days for payment of their receivables.

Towers applies its expertise

A basic feature of the program is the elimination of crippling delays in payment from major insurance companies and government agencies, by building into the system an ability to generate 'clean' claims, plus a capability to edit processing and admittance procedures to prevent errors and delays, at the onset. After purchasing a hospital's receivables and providing immediate funding, TFC applies its extensive expertise in receivable management and collection in order to recover the funds due from third party reimbursers. As in many situations, TFC involvement includes the training of existing healthcare personnel and the exclusive use of the software capability of its Automated Claims Management Systems within the framework of the host healthcare provider.

Claims process monitoring

Because of its unique knowledge of the healthcare industry, its experience and organization, TFC's Automated Claims Management Systems is able to monitor each step of the process. And as a result of its focus and the extensive in-house systems put in place, the average payment cycle is dramatically reduced.

Other benefits

For healthcare providers, other related program benefits include a thorough examination of claims submissions to ensure quick payment and to reduce and eliminate third party deductions that are incorrect. Additionally, the program helps to reduce internal staffing costs through use of TFC's highly trained personnel and the state-of-the-art, multi-million dollar data processing ability, designed specifically to increase efficiency and create an additional audit control for all receivables generated each month.

In addition, TFC provides a substantial fund of working capital available through factoring, which can be used to reduce accounts payable, and as leverage in negotiating purchases and terms...to increase purchasing power and to improve delivery of services. The Automated Claims Management System offers on-site support, guidance and training for claims management staff involved in the collection of accounts receivable along with the establishment of appropriate in-house systems and controls to speed full reimbursement.

Additional client services

Beyond the specific program-related benefits, where TFC clients have access to a higher level of counseling/management direction...hospitals, clinics, medical groups, doctors, nursing homes and other providers, regardless of size or sophistication...are provided with the opportunity to apply the firm's expertise to a wide variety of problems and challenges. From organization of financial management controls, to underwriting of bonds and debentures, to providing cash flow, to assistance in ownership sale or restructuring, to financing assistance to improve firm's credit-worthiness, to direction on governmental and legislative issues, and to guidance on legal matters relating to healthcare and collection rights.

The restoration of financial stability

The Towers Healthcare Receivable Funding Program and the Automated Claims Management Systems are viewed by many leading healthcare professionals as a long awaited and necessary opportunity to restore financial stability to an overly regulated industry whose services are vital to the nation's well-being.

It is this growing recognition that has thrust TFC into the forefront of the industry, as it attempts to deal with the demands they will face in the coming years.

TFC

TOWERS FINANCIAL CORPORATION




## FDIC LOAN PORTFOLIO PACKAGES

TFC's entry in the purchase of FDIC loan portfolios is a prime example of the timely utilization of their unique combination of capabilities and services, and TFC's ability to take full advantage of emerging market opportunities.

### Hundreds of billions of dollars

The Federal Deposit Insurance Company, and the Resolution Trust Corporation, created by congressional legislation, serves in the capacity as receiver and liquidator of hundreds of failed savings and loan institutions and local banks. As a result, these federal agencies are overwhelmed with a mountain of past due and delinquent loans, worth hundreds of billions of dollars, and they lack the ability to effectively collect these outstanding loans.

### A range of collectible accounts

The outstanding loans included in the FDIC loan portfolios packages for any given region are provided with pertinent data about the debtor, whether a company or individual. Names, current addresses, phone numbers...are supplied ready to be processed by TFC personnel, anywhere in the United States.

### An opportunity for TFC

Towers has purchased a select number of these 'loan portfolio packages' of past due loans from the FDIC for a discount of their face value. The portfolio packages are compiled by locale, reflecting the failed institutions' individual marketing area and are compatible to TFC's own nationwide network. Using the systems and methodology developed for corporate clients, TFC utilizes its collection capabilities to recover these loans on its own behalf. TFC has identified this segment of business as a current and future profit center for the company and its shareholders.

## THE RECOVERCARD PROGRAM

A unique and sensible way for a company to put its past due debts to work. TFC's RecoverCard program enables a company to turn its tough receivables into usable and enjoyable assets.

**For business and professional firms**
The RecoverCard program was designed to improve the cash flow and the purchasing power of America's business and professional firms... for retailers, healthcare providers, dentists, doctors, clinics, publishers, manufacturers and service companies. The program utilizes proven recovery methods to enhance their ability to prosper in today's competitive environment.

**Maximum flexibility**
The RecoverCard program affords each of its members maximum flexibility in harnessing their firm's hidden revenue potential. Their bad checks, unpaid invoices and delinquent credit sales can be turned into the most demanded goods and services or dollars... travel, hotels, restaurants, sale trips, renting or leasing cars, updated office or technical equipment, office furnishings and services, desirable consumer products, perks, employee incentives, charitable contributions and even tuition for employees.

**It's not a credit card**
It's more like money in the bank. The RecoverCard has no interest rates or monthly payments, no credit checks, no minimums, no preset limits. RecoverCard guarantees any firm or company membership acceptance into both the Towers Recovery Program and the Mass Discount Buying Program...which couple an innovative mass buying service with Towers Collection's proven recovery expertise.

**Good fiscal sense, good times**
As members' unpaid accounts are turned over to Towers Collection, their RecoverCard Account Balances begin to build quickly. As it grows, their purchasing power increases. And just as quickly, hidden assets are accessible, ready to go to work. Whether it's a business trip, a new copier or fax machine, a dream vacation, payments to a vendor...RecoverCard transforms bad credit into good business and good times.

**Mass purchasing power**
RecoverCard members can take full advantage of the high volume economies of RecoverCard's mass buying program and maximize their purchasing power by selecting from quality merchandise offered through its membership.

**Mass Discount Buying Program Catalog**
A full color catalog, plus regular offerings of additional discounted merchandise, permits access to the most needed and wanted products, at the best possible prices. It's an advantage usually reserved for large corporations and buying consortiums. It is an added level of service provided by a TFC core capability.

10001918

As RecoverCard Account Balances grow, so do the options and opportunities. Pre-paid airfare, trainfare, travelers' checks, rent-a-cars, hotels, motels, restaurants...all paid for by a RecoverCard member's most troublesome past due accounts. The program goes beyond merchandise and travel. It provides easy access to computers, business machines, phones, faxes, copiers, printing, services, raw materials...almost anything. Members' Account Balances, which build as their dormant accounts are turned over to TFC, can directly pay MasterCard, Visa, American Express or Diners Club...or can be deposited to a company's bank account. It's a RecoverCard member's choice.

**An attractive program**
The response to the new RecoverCard program, targeted at the nation's millions of small and medium size firms, has been very strong. The positive reaction by the business and professional communities and the enthusiasm exhibited by TFC sales representatives have more than justified management's expectations.

## LEASING SERVICES

Towers Leasing Corporation, a TFC subsidiary, provides financing to credit-worthy companies, municipalities, government agencies, and other organizations for the purpose of leasing capital equipment such as computers, airplanes, medical equipment, telephone systems, printing presses, and a vast array of industrial machinery.

TFC arranges financing or operating leases for qualified clients, depending on the type of equipment involved, and the particular client need. Emphasis is placed on development of leasing programs that are based on reliable knowledge of residual values of equipment, sound economic fundamentals, and terms that are flexible and reasonable. TFC is currently reassessing its involvement in this area.

10001919

CORPORATE CREDIT SERVICES

TFC is engaged in the outright purchase of accounts receivable. Through this service, TFC purchases credit-worthy accounts receivable at a discount of their face value. TFC's effective collection process and its extraordinary recovery capabilities are used to close on the "purchased" receivables, thereby providing opportunities to reinvest its receivables portfolio at extremely favorable rates of return, over and over again.

Increase demand anticipated

The need for factoring increases each year, as cash flow demands grow for companies of all sizes and in all industries. With traditional payment schedules reaching 60, 90, 120 days or longer, companies cannot afford to wait in order to meet their own ongoing overhead expenses of payroll, rent, inventory and taxes.

Tightened bank borrowing

With tightened bank borrowing restrictions, limited credit extensions with suppliers, and the lack of available short-term borrowing funds to meet temporary cash flow needs, accounts receivable factoring provides a viable means of easing this financial pressure. TFC credit services are available to a broad spectrum of firms and industries including manufacturing, transportation, communications, wholesale and retail trade, finance, insurance and healthcare.

A healthy return of investment

TFC's corporate credit or factoring services continue to be important contributors to its business. The ability to realize substantial rates of repayment in the most efficient time-frame, utilizing its sophisticated collection expertise, ensures TFC a strong source of continued revenue and a healthy return of investment.

TFC
TOWERS
FINANCIAL
CORPORATION

TOWERS
FINANCIAL

## CONSOLIDATED BALANCE SHEET: ASSETS

| | As of June 30, 1990 | 1989 | 1988 |
|---|---|---|---|
| Current Assets: | | | |
| Cash and cash equivalents | $9,193,566 | $ 3,825,765 | $ 8,534,869 |
| Accounts receivable - net (note 3) | 177,155,446 | 112,331,892 | 61,270,590 |
| Other receivables (note 10) | 1,061,555 | 606,595 | 1,816,255 |
| Prepaid interest | 87,732 | 45,613 | - |
| Total current assets | 187,498,299 | 116,809,865 | 71,621,714 |
| Fixed Assets: | | | |
| Leasehold improvements | 357,812 | 295,300 | 69,985 |
| Furniture and equipment | 4,211,161 | 1,384,786 | 951,937 |
| | 4,568,973 | 1,680,086 | 1,021,922 |
| Less accumulated depreciation and amortization | (994,479) | (581,923) | (361,711) |
| | 3,574,494 | 1,098,163 | 660,211 |
| Investments (note 10) | 2,805,500 | 3,376,241 | 3,600,000 |
| Security deposits | 515,812 | 662,913 | 304,979 |
| Prepaid interest - Net of current portion | 709,851 | 375,323 | - |
| Note receivable officer (note 14) | - | 250,000 | - |
| Goodwill (note 2) | 458,414 | - | - |
| Total assets | $195,562,350 | $122,573,005 | $76,186,904 |

The accompanying notes are an integral part of the financial statements.

10001922

## CONSOLIDATED BALANCE SHEET: LIABILITIES & SHAREHOLDERS' EQUITY

| | As of June 30, 1990 | 1989 | 1988 |
|---|---|---|---|
| Current liabilities: | | | |
| Due to clients (note 4) | $64,880,237 | $52,501,911 | $31,606,396 |
| Accounts payable and accrued expenses | 7,185,666 | 1,860,188 | 2,338,679 |
| Current portion of long term debt (note 5) | 31,321,000 | 27,096,387 | 7,113,629 |
| Income taxes payable (note 8) | 13,725,633 | 6,584,201 | 2,385,750 |
| Total current liabilities | 117,112,536 | 88,042,687 | 43,444,454 |
| Long term liabilities: | | | |
| Notes payable (note 5) less current portion | 61,136,894 | 21,621,159 | 23,525,000 |
| Long term debt | 3,049,133 | 964,559 | 134,316 |
| Deferred income taxes (note 8) | 841,850 | 1,683,700 | 2,558,150 |
| Excess of fair value of assets acquired over cost (note 2) | - | 841,712 | 841,712 |
| Total long term liabilities | 65,027,877 | 25,111,130 | 27,059,37 |
| Total liabilities | 182,140,413 | 113,153,817 | 70,503,832 |
| Commitments and contingent liabilities (notes 2 and 11) | | | |
| Shareholders' equity | | | |
| Capital stock (.001 par value) | | | |
| Authorized - 10,000,000 shares; | | | |
| Issued and outstanding - 4,464,220 shares | 350,000 | 100,000 | 100,000 |
| Subscribed - 100,000 shares (note 14) | 100,000 | 250,000 | - |
| Capital stock issued, outstanding and subscribed - 4,564,220 (note 14) | 450,000 | 350,000 | 100,000 |
| Retained earnings | 12,971,937 | 9,069,188 | 5,583,072 |
| Total stockholders' equity | 13,421,937 | 9,419,188 | 5,683,072 |
| Total liabilities and stockholders' equity | $195,562,350 | $122,573,005 | $76,186,904 |

The accompanying notes are an integral part of the financial statements.

10001923

| | Fiscal year ended June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Gross Revenues | $291,565,160 | $182,982,043 | $140,028,892 |
| Purchases and cost of services | 82,390,872 | 69,551,712 | 54,294,965 |
| | 209,174,288 | 113,430,331 | 85,733,927 |
| Less recoverable reserve | 153,331,451 | 77,082,895 | 65,145,531 |
| Gross profit | 55,842,837 | 36,347,436 | 20,588,396 |
| Operating expenses | | | |
| Salaries and benefits | 14,012,973 | 9,487,151 | 5,660,552 |
| Selling | 7,558,382 | 4,552,053 | 2,635,698 |
| General and administrative | 14,701,687 | 8,498,538 | 7,063,718 |
| Interest on notes | 10,456,292 | 6,868,423 | 2,457,833 |
| | 46,729,334 | 29,406,165 | 17,817,801 |
| | 9,113,503 | 6,941,271 | 2,770,595 |
| Less: Loss on sale of securities | - | (128,169) | - |
| Add: Extraordinary item | 1,089,246 | - | 298,802 |
| Income before provision for taxes | 10,202,749 | 6,813,102 | 3,069,397 |
| Provision for income taxes (note 8) | 6,300,000 | 3,326,986 | 1,655,900 |
| Net income | $3,902,749 | $3,486,116 | $1,413,497 |
| Earnings per share | .87 | .78 | .32 |
| Average common shares outstanding | 4,464,220 | 4,464,220 | 4,464,220 |

The accompanying notes are an integral part of the financial statements.

10001924

CONSOLIDATED STATEMENT OF RETAINED EARNINGS

| | As of June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Balance - Beginning of year | $9,069,188 | $5,583,072 | $4,169,575 |
| Net Income | 3,902,749 | 3,486,116 | 1,413,497 |
| Balance - End of year | $12,971,937 | $9,069,188 | $5,583,072 |

The accompanying notes are an integral part of the financial statements.

10001925

## CONSOLIDATED STATEMENT OF CASH FLOWS
## INCREASE (DECREASE) IN CASH AND EQUIVALENTS

| | Years Ended June 30, 1990 | 1989 | 1988 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net earnings | $3,902,749 | $3,486,116 | $1,413,497 |
| Adjustments to reconcile net earnings to net cash provided by operating activities | | | |
| Bad debt - notes receivable | - | - | 30,500 |
| Depreciation and amortization | 412,556 | 220,908 | 188,389 |
| | 4,315,305 | 3,707,024 | 1,632,386 |
| Changes in assets and liabilities: | | | |
| Accounts receivable (net) | (64,823,554) | (51,061,302) | (16,951,028) |
| Other receivables | (454,960) | 1,209,660 | (1,526,733) |
| Prepaid interest | (42,119) | (45,613) | - |
| Other non current assets | (186,907) | (983,757) | (179,058) |
| Due to clients | 12,378,326 | 20,895,512 | (3,270,537) |
| Payable and accrued expenses | 5,325,478 | (478,491) | 1,572,844 |
| Accrued and deferred income taxes (net) | 6,299,582 | 3,324,001 | 1,655,900 |
| Net cash (used) for operating activities | (37,188,849) | (23,432,963) | (17,066,226) |
| Cash flows from investing activities: | | | |
| Capital expenditures, net of minor disposals | (2,883,887) | (658,860) | (522,138) |
| Acquisition/(disposition) of investments | 570,741 | 223,759 | (3,600,000) |
| Acquisition of goodwill | (1,300,126) | - | - |
| Net cash (used) in investing activities | (3,613,272) | (435,101) | (4,122,138) |
| Cash flows from financing activities: | | | |
| Increase in capital stock | 350,000 | - | - |
| Increase in capital stock subscribed | - | 250,000 | - |
| Increase in short term borrowings | 4,224,613 | 19,982,758 | 7,105,130 |
| Increase (decrease) in long term debt | 41,600,309 | (1,073,798) | 19,037,482 |
| Net cash provided by financing activities | 46,174,922 | 19,158,960 | 26,142,612 |
| Net increase (decrease) in | | | |
| Cash and cash equivalents | 5,367,801 | (4,709,104) | 4,954,248 |
| Cash and cash equivalents at beginning of year | 3,825,765 | 8,534,869 | 3,580,621 |
| Cash and cash equivalents at end of year | $9,193,566 | $3,825,765 | $8,534,869 |

The accompanying notes are an integral part of the financial statements.

## NOTES TO FINANCIAL STATEMENTS
For the Year Ended June 30, 1990

**1. Summary of significant accounting policies**

**Basis of presentation**

Towers Financial Corporation (formerly known as Transcon Adjustment Group Ltd., founded in 1973) is a diversified company operating in the acquisition and management of accounts receivable through Towers Financial Corporation and its wholly owned subsidiaries, Towers Credit Corporation, Towers Collection Service, Inc., Towers Leasing Corporation, TFC Funding Corporation, RecoverCard Corporation of America and Towers Healthcare Receivables Funding Corporation.

Towers Financial Corporation formed Towers Diversified Corporation, a wholly owned subsidiary, in October, 1987. (See Note 10).

Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation were acquired in July 1986, by Towers Financial Corporation, a publicly listed company. The financial statements for each subsidiary was independently audited and consolidated for presentation herein. The subsidiaries were incorporated as follows:

| | |
|---|---|
| Towers Credit Corporation | January 1984 |
| Towers Collection Service, Inc. | April 1980 |
| Towers Leasing Corporation | March 1985 |
| TFC Funding Corporation | November 1989 |
| RecoverCard Corporation of America | January 1990 |
| Towers Healthcare Receivables Funding Corporation | March 1990 |

The 1986 acquisitions took place for the benefit of becoming a publicly traded company.

**Operations and consolidations**

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries after elimination of material intercompany accounts and transactions.

**Statement of cash flows**

In 1987, the Company adopted Statement of Financial Accounting Standard No. 95, "Statement of Cash Flows", and is presenting a statement of cash flows in place of the statement of changes in financial position.

FAS 95 requires that the following supplemental disclosure to the statement of cash flows be provided in related disclosures. Cash paid for interest was $12,320,486 in 1990, $6,727,987 in 1989, and $2,264,696 in 1988. Cash paid for income taxes was none in 1989.

**Revenue Recognition**

The Company derives income from services rendered by its factoring and collection operations through receiving an irrevocable assignment of all claims accepted.

Gross revenue is recorded by the Towers Companies when accounts receivables are assigned.

Fees for collection services are recorded consistent with industry standards. The Company anticipates collecting 30% of accounts accepted and then records its fee of 30%.

**Property and equipment**

Property and equipment are stated at cost and are depreciated using the straight line method over the estimated useful lives of assets, ranging from 3 to 5 years.

Leasehold improvements are amortized over the term of the lease or the estimated life of the improvement, whichever is shorter. Maintenance and minor repairs are charged to operations as incurred.

**Accounting change**

The Company has changed its method of reporting for income tax returns (see note 8).

Capital leases
The Company has leases with RCA Services Company, for telephone equipment. The leases provide for monthly payments of $13,215.00 for ten years.

The Company has a lease with Mach 1, Corp Inc. for computer equipment. The lease provides for monthly payments of $3,698.00 for five years.

The Company has a lease with Atlantic Computer Corporation for computer equipment. The lease provides for monthly payments of $12,235.00 for seven years.

2. Acquisition
In July 1986, Towers Financial Corporation acquired Towers Credit Corporation, Towers Collections Service, Inc. and Towers Leasing Corporation from Professional Business Brokers Inc. (See note 15).

The agreement as amended provides that the Company pays five (5%) percent of its gross profits before expenses and before provision for taxes for a period of seven years commencing with July 1, 1988 to Professional Business Brokers Inc. The 1986 transaction took place for the benefit of becoming a publicly traded Company.

As of the statement date Professional Business Brokers has extended a portion of its fee for the current fiscal year. The Company is presently renegotiating the terms of its agreement with Professional Business Brokers. The final cost is still to be determined.

3. Accounts receivable
Recoverable reserves are amounts held in reserve against assigned and/or purchased accounts receivable and amounts written down from accounts accepted for collection. Accounts receivable accepted for collection are recorded at the gross amount and the Company sets up a recoverable reserve, based upon historical experience. (See note 1)

Purchased accounts receivable are written off when they are determined to be uncollectible. Losses sustained from purchased accounts receivable can be reimbursed by a credit insurance policy which has been obtained by the Company.

Management has elected to present accounts receivable, net of recoverable reserves, on the balance sheet. The details are as follows:

| June 30, | 1990 | 1989 | 1988 |
|---|---|---|---|
| Accounts Receivable | $354,995,882 | $189,680,514 | $108,133,395 |
| Less: Recoverable Reserves | (177,840,436) | (77,348,622) | (46,862,805) |
| Accounts Receivable-Net | $177,155,446 | $112,331,892 | $61,270,590 |

4. Payable to clients
Amounts due clients is the balance to be paid when the accounts accepted are collected and/or funded. The amount payable is the balance after Tower's fees and/or discounts, but subject to offset for monies due from clients to Towers.

5. Notes payable
Towers Financial Corporation and Towers Credit Corporation issued one and two year promissory notes for the acquisition of accounts receivable subject to an offering memorandum.

6. Long term debt.
See capital leases.

10001925

7. Operating leases
Rental expense charged to operations was $1,117,157.

8. Income taxes
The Company has filed all Federal Corporate Income tax returns through June 30, 1989.

Statement of Financial Accounting Standards No. 96, "Accounting for Income Taxes", was issued in December 1987 and is presently being revised and establishes financial accounting and reporting standards for the effects of income taxes which result from an enterprise's activities during the current and preceding years. The Company is not required to adopt this statement until its year ending June 30, 1990, although earlier adoption is permitted. When adopted, the Company is given the choice of reflecting the effect of the change in the year of adoption or of restating any number of years.

Accordingly the Company has elected to adopt Statement of Financial Accounting Standards No. 96 and has reflected the effect of the change in the year of adoption.

Deferred income taxes results from the phase in permitted by the Tax Reform Act of 1986.

9. Subsequent events
Towers Healthcare Receivables Funding Corporation (THRFC) was incorporated on March 27, 1990 as a wholly-owned subsidiary of the Company. Pursuant to a private placement memorandum dated July 19, 1990 THRFC raised $56,500,000 by the issuance of "AA" rated bonds at 10.20% interest per annum payable quarterly commencing October 15, 1990.

10. Litigation
The Securities and Exchange Commission commenced a civil action against Towers captioned Securities and Exchange Commission v. Towers Credit Corporation, et. al., (for purposes of this paragraph, "Towers" includes the other named parties to the litigation) for the sale of unregistered securities on August 4, 1988. The Commission alleged that the parties violated Sections 5(a) and 5(c) of the Securities Act of 1933, as amended. The parties entered into a consent decree on November 22, 1988. Towers, without admitting that it violated Section 5 in the past, has agreed not to violate Section 5 in the future. In addition, Towers provided investors in TCC's two prior note offerings the opportunity to accept or decline rescission of their investment, and forgo the interest payment due under the offerings in exchange for money market interest, which rescision offer was completed on January 22, 1989, whereby $547,431 out of approximately $37,000,000 was accepted for rescission. Steven Hoffenberg and Mitchell Brater, principals of Towers, were named in this litigation and have also entered into similar consent decrees.

Included in other receivables is $510,786, due from Marine Charter and Storage Ltd. The Company is presently litigating this claim and believes it will be fully victorious. The defendant has by court order posted a $500,000 bond to secure the Company's liens in this matter.

Towers and a subsidiary of Towers has instituted litigation against the previous owners of United Diversified Corporation ("UDC") from whom it purchased 82% of UDC. Towers in this action is claiming rescission and damages, including a return of $2,800,000 it invested in UDC. In a separate action, due to the previous owners

10001929

failure to disclose material financial information, including misappropriation of $3,500,000 of UDC funds. Towers has blocked the former owners access to the $3,500,000 pending the resolution of Towers' claims.

There is no other material litigation in which the Company is currently involved.

11. Commitments
See Note 2 relating to the acquisition of Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation.

12. Earning per share
There are presently 5,784 shares of Towers Financial Corporation set aside to satisfy the conversion agreement wherein the stockholders of O.G. Consulting, Inc. have the right to exchange fifty shares of O.G. Consulting, Inc. for one share of Towers Financial Corporation.

During the current fiscal year the number of shares of common stock issued and outstanding was reduced by 10,000 shares. This resulted from the cancellation of 30,000 shares as part of the settlement of claims reflected in extraordinary income and the issuance of 20,000 shares pursuant to the agreement referred to above.

The securities to Martin H. Meyerson and Kenneth J. Koock have not yet been issued (see note 14), and therefore the earnings per share have not been restated. The earnings per share if restated would be:

| 1990 | 1989 | 1983 |
|---|---|---|
| .86 | .76 | .31 |

13. Extraordinary income
Extraordinary income arose from settlement of claims.

14. Stock options
Pursuant to an agreement between Towers Financial Corporation and M.H. Meyerson and Company, and agreed to by Martin H. Meyerson and Kenneth J. Koock, Towers was to issue 100,000 shares of unissued Company stock during the fiscal year ended June 30, 1990. The Company intends to formally issue these shares as follows; Martin H. Meyerson 50,000 shares and Kenneth J. Koock 50,000 shares. (See note 12 relating to earnings per share.)

Mitchell Brater, Vice Chairman of the Board and Chief Operating Officer, exercised a stock option entitling him to 500,000 shares of Towers Financial Corporation. Payment of the optioned securities was made by a note with simple interest at 10 per cent per annum.

The principal was paid on January 3, 1990 and the interest was waived.

The Securities had not been issued in the two prior fiscal years, however, the earnings per share have been restated.

15. Related parties
Professional Business Brokers Inc. owns in excess of seventy percent of the Company's issued and outstanding stock. See note 2 for details of the transaction between the Company and Professional Business Brokers Inc.

10001930

We have audited the accompanying consolidated balance sheet of Towers Financial Corporation and subsidiaries as of June 30, 1990, 1989, and 1988 and the related consolidated statements of income, changes in shareholders' equity, retained earnings, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Towers Financial Corporation as of June 30, 1990, 1989, and 1988, and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles.

Sincerely,

Marvin E. Basson, CPA, P.C.
New York, New York
September 12, 1990

10001931

CORPORATE CREDIT SERVICES

TFC is engaged in the outright purchase of accounts receivable. Through this service, TFC purchases credit-worthy accounts receivable at a discount of their face value. TFC's effective collection process and its extraordinary recovery capabilities are used to close on the "purchased" receivables, thereby providing opportunities to reinvest its receivables portfolio at extremely favorable rates of return, over and over again.

ncrease demand anticipated

The need for factoring increases each year, as cash flow demands grow for companies of all sizes and in all industries. With traditional payment schedules reaching 60, 90, 120 days or longer, companies cannot afford to wait in order to meet their own ongoing overhead expenses of payroll, rent, inventory and taxes.

Tightened bank borrowing

With tightened bank borrowing restrictions, limited credit extensions with suppliers, and the lack of available short-term borrowing funds to meet temporary cash flow needs, accounts receivable factoring provides a viable means of easing this financial pressure. TFC credit services are available to a broad spectrum of firms and industries including manufacturing, transportation, communications, wholesale and retail trade, finance, insurance and healthcare.

A healthy return of investment

TFC's corporate credit or factoring services continue to be important contributors to its business. The ability to realize substantial rates of repayment in the most efficient time-frame, utilizing its sophisticated collection expertise, ensures TFC a strong source of continued revenue and a healthy return of investment.

EXHIBIT 46

TOWERS FINANCIAL CORPORATION ANNUAL REPORT 1990
Collection Services
Healthcare Funding & Accounts Receivable Management
RTC/FDIC Loan Portfolios
TOWERS FINANCIAL CORPORATION
FDIC

## ABOUT THE COMPANY

**Towers Financial Corporation is a diversified financial services company with more than 1,700 employees and independent agents nationwide. The company is a recognized leader in the business of Healthcare Funding and Automated Claims Management Systems, Accounts Receivable Management, including Collection Services, and Accounts Receivable Purchasing and Factoring, servicing more than 850,000 accounts for nearly 10,000 commercial and healthcare clients.**

Gross Revenues (Millions $)

Total Assets (Millions $)

Shareholders' Equity (Millions $)

Net Income (Millions $)

### Consolidated Financial Highlights (in thousands, except per share data)

| | 1990 | 1989 | 1988 |
|---|---|---|---|
| Gross Revenues | $291,565 | $182,982 | $140,029 |
| Total Assets | 195,562 | 122,573 | 76,187 |
| Shareholders' Equity | 13,422 | 9,419 | 5,683 |
| Net Income | 3,903 | 3,486 | 1,413 |
| Earnings Per Share | .87 | .78 | .32 |
| Average Common Shares Outstanding | 4,464 | 4,464 | 4,464 |

## LETTER TO SHAREHOLDERS:

Chairman & CEO

Vice Chairman & COO

To Our Shareholders:

It has been a year of opportunity and significant growth. Our position of leadership in specifically identified segments of financial services, has been strengthened and continues as a primary focus. The solid financial performance of the past year provides abundant verification of our goals and direction.

We are in the third year of our strategic plan, devised to identify and aggressively compete in areas of the financial services industry that are germane to our experience and capabilities.

Our primary marketing thrust continues as a premier accounts receivable collection service to the more than 8 million companies within the universe of corporate America, and as a unique service responding to the funding and management needs of the burgeoning $660 billion healthcare industry.

Built upon years of intense resource development and growth, TFC has expanded into those financial environments in which our expertise can be applied directly, where our investment of time and resources can be justified by their long-term market potential...understanding that personnel within industries such as healthcare are in no position to maintain the training and technology needed to perform these functions.

TFC was one of the first to recognize and focus on these needs, hiring analysts with top-level experience at insurance companies and other intermediaries. Developing unique and proprietary software, TFC alone now trains healthcare facility staffs and takes over their claims and collection management on-site.

In this regard, TFC entered the bond market with Wall Street's first asset-backed healthcare receivables bond issue. TFC's first rated offering of two-year 1990 bonds rated 'AA' for $56,500,000, was 'self-underwritten' at substantial savings to TFC. It will provide added resources needed to pursue the vast potential within this receptive market.

**Capability:**
The TFC financial services expansion program launched three years ago, and fully operational in 1989, has resulted in a regional support system that has no equal. It provides a national organizational structure that has allowed TFC to market its current and new services and those being planned, to more industries and localities than ever before...from coast-to-coast. It has permitted us to better service our expanded customer base with a more attentive, responsive approach to their needs.

TFC's experienced, extremely well-trained staff, whether in our national headquarters or in regional offices, provides TFC with a sound platform from which to launch, properly handle and exploit our imaginative programs.

**Opportunity: Healthcare**
The introduction of the powerful Towers Healthcare Receivable Funding Program and its Automated Claims Management Systems, with its unique and highly specialized software and hardware, has positioned TFC at the heart of an industry with annual revenues of more than $600 billion. It is a market TFC had identified and vigorously pursued, providing critically needed funding, receivable management and recovery expertise to healthcare providers across the country.

Using experienced TFC support personnel, processing capabilities and skilled techniques, the program has succeeded in bridging the reimbursement delays by third party reimbursers and governmental agencies, while it enhances the ability of providers to conduct their billing and reimbursement operations in a highly efficient manner. It is a TFC initiated system called "Accelerated Collection Recall" and it is inherent to TFC's proprietary software.

TFC delivers to the healthcare industry an incomparable combination of funding and vital services specifically constructed to reflect the individual characteristics of each situation. With a consummate up-to-date working knowledge of the processing, regulatory and claims requirements of the entire spectrum of third-party reimbursers, the TFC Automated Claims Management Systems have become an integral part of many healthcare providers' billing and collection offices. And in so doing, TFC has solidified its leadership position in the marketplace.

The growth opportunity in this sector continues to draw endorsements from leading financial institutions. The banking community views the securitization of healthcare receivables as a significant investment opportunity for the nineties.

**Opportunity: RecoverCard℠**
The innovative RecoverCard marketing concept, has been received with unusual enthusiasm from coast-to-coast. This unique accounts receivable management program offers small and medium size businesses and professional firms a means of putting past due and dormant accounts to work for their operations.

In addition to the proven TFC collection and recovery methods used for large corporations, the RecoverCard program permits customer members to transform their delinquent accounts

into needed merchandise, office equipment, travel, accommodations and services at meaningful discounts, or to simply withdraw their credits. It's an attractive and flexible program.

**New Opportunity:**
**RTC/FDIC Loan Portfolios**
In its capacity as receiver and liquidator of hundreds of failed S&L banks, the FDIC (and the Resolution Trust Corporation) has amassed hundreds of billions of dollars worth of past due and delinquent loans, without the staff and resources to effectively realize their recovery. In this emerging market opportunity, Towers has entered into the business of purchasing loan portfolios from the Federal Deposit Insurance Company for a discount of their value. Utilizing existing capabilities and its national network, it is now recovering these loans on its own behalf, adding a new source of profitable business.

**Leadership:**
Building upon our strength and around our core businesses, investing in people and in the most advanced software collection capability, we stand at the threshold of what we believe will be a period of profound growth and profitability. As we continue to increase penetration of existing markets and establish solid positions in new ones, we will maintain our commitment to nurture the innovativeness that has consistently added value to the company and to your shares.

Sincerely,

Steven Hoffenberg
*Chairman of the Board and Chief Executive Officer*

Mitchell Brater
*Vice Chairman of the Board and Chief Operating Officer*

## OVERVIEW OF TOWERS FINANCIAL CORPORATION

For more than fifteen years, Towers Financial Corporation, through its wholly-owned subsidiaries and affiliates, has been engaged in various aspects of accounts receivable collection and management. TFC's success and the leadership position earned in the industry derives from its ability to anticipate, build innovative programs with customers and re-define the accounts receivable collection, funding and management business.

Historically, TFC has been willing to invest in the development of systems and personnel fully capable of efficiently managing transactions on a large scale. Included is the development of specific systems and related software programs geared to a particular need and to the complex requirements of an industry such as healthcare where knowledge and conformity to individual regulations varies with each type of third-party reimburser and with each provider.

The depth of understanding and thoroughness of implementation invested in its customers' problem-solving has enabled TFC to take maximum advantage of existing markets while creating entirely new market opportunities. All of which are compatible with, and build upon, the abilities, strategies and inherent flexibility devised for its core business.

Towers Financial Corporation is currently involved in these areas of business:

### Healthcare Funding Services

TFC pioneered asset based financing for the healthcare industry with the introduction of the revolutionary Towers Healthcare Receivables Funding Program and its components — Automated Claims Management System and Accelerated Collection Recall System. TFC offers programs that provide funding, billing, claims and accounts receivable management and critical recovery benefits to healthcare providers in an industry that financially is in crisis. In so doing, TFC relies not upon the fiscal condition of the hospital or healthcare provider or the patient, but on the recognized status of the third party reimbursables, such as insurance companies, Blue Cross/Blue Shield, corporate programs, Medicare, Medicaid, HMO's and PPO's.

Hospitals and healthcare providers everywhere are experiencing great difficulty in meeting the challenging regulatory requirements and the [illegible] of available capital in the [illegible] an additional source of [illegible]. In a national banking environment [illegible] this huge potential of business is [illegible] towards TFC whose funding and [illegible] of this [illegible].

### Collection Services

[illegible] Collection Services, TFC's subsidiary, provides accounts receivable collection assistance to many of the nation's Fortune 1000 corporations and is the acknowledged leader in its field. At the core of this success is an unparalleled ability to recover funds in a timely, professional manner. It reflects the caliber of TFC personnel, its advanced computer capability and TFC's continuous program of training and education. It has led to the exclusive development and utilization of one of the finest [illegible] collection recall systems in the U.S.

### FDIC/RTC Loan Portfolios

TFC's strength and capability has proven ideally suited to take full advantage of this opportunity resulting from the federal government's takeover of banks and savings and loan institutions throughout the country. In the purchase of loan portfolios from FDIC at a discount of their face value, TFC is in a situation where it is uniquely able to realize the fullest return for both the government agency and for TFC shareholders. Employing the full range of services within its national network organization, TFC has begun to benefit from this new market.

### Recovery Card

TFC's new marketing concept offers a wide variety of business and professional firms [illegible] [illegible] methods of realizing the hidden assets of

their delinquent, past-due accounts receivable. In a program that engages the full resources of TFC, RecoverCard member firms of any size may use their accumulated account balances for the purchase of services or goods available through TFC and/or of their own choosing. This includes travel and accommodations, office equipment, car rentals, electronics, vendor indebtedness or other legitimate uses.

Corporate Credit Services

TFC is involved in the outright purchase of corporate accounts receivable or "factoring." TFC purchases accounts for a percentage of their face value and utilizes its extensive capability to collect on these receivables. The procedure affords TFC the opportunity to reinvest and profit from these funds.

Leasing Services

Towers provides lease financing to businesses, professional firms, government agencies, health care providers and not-for-profit organizations for acquisition of a wide variety of capital equipment they require in their operations.

Organizational Strength

A seasoned professional team—from top management people to the highly competent and motivated lawyers—from paralegals and experienced collectors to sales representatives, and to the full complement of office personnel. They all reflect the continuous investment by TFC in their maintenance of the best and brightest people in the field.

More than 1,200 people nationwide service and call on 850,000 accounts for over 10,000 commercial and healthcare clients. The remarkable record of repeat business generated by their attentive service and their considerable knowledge is a testimony to their personal dedication and to TFC's commitment to this extraordinary human resource.





Towers Financial Corporation, after 15 years, is recognized as one of the leading firms in accounts receivable collection, management and related financial services to corporate America, hospitals and healthcare providers. TFC manages and recovers accounts receivable (including purchasing and servicing) for more than 10,000 clients in the United States, including many of the Fortune 1000 companies. This involves managing outstanding debt of over $275 million for more than 850,000 accounts, nationwide. And this is but a portion of the approximately 8 million companies and additional thousands of healthcare firms in operation nationally. It is to this virtually limitless potential that TFC has directed its full attention.

## COLLECTION SERVICES

Over the years, TFC has brought to bear in the collections industry a heightened and consistent standard of excellence and professionalism. It results, to a large degree, from the years of investment made in the quality and caliber of TFC people, their effectiveness and their unequaled productivity...and from the framework of programs devised by TFC to realize these attributes.

### People, process and presence

The dynamic growth and enviable industry status achieved by TFC can be attributed to this valuable human resource and the systems and the comprehensive scope of a computer processing capability, unique to TFC.

### National network

Added to this state-of-the-art facility is TFC's fully operational national network of regional marketing and sales offices and staffs. It provides clients from coast-to-coast access to products and services that can be tailored to local market conditions...as well as providing access to the resources of the entire TFC organization.

### Collection is at the core

TFC's unparalleled ability to recover funds is paramount to its success and growth. TFC's investment in this area has had a compounding effect on existing businesses, as well as on its strength to successfully exploit new market opportunities. It is evident in TFC's approach to new business ventures, such as the RTC/FDIC Loan Portfolios and RecoverCard. It is perhaps, most evident in the commanding position TFC has earned in the healthcare industry.

### Performance

Success is evident in TFC's outstanding record in the substantial recovery of past due accounts and in the speed with which it is accomplished. In measuring performance, TFC's ability to gain repeat business and maintain good will between client and debtor stands as a validation of its processes and as a tribute to its professionals.

### The team

The TFC team includes attorneys, insurance claims analysts, collectors and paralegals with both the extensive experience in executing their specialized skills and in the particular industries they serve. This is equally true of the marketing specialists, accountants, programmers and sales representatives...assuring a continued level of cost-effective performance and added business. TFC has thus become closely identified with the industries in which they operate.

### Education, a continuing process

The knowledge, experience and proven capability of TFC professionals, have become the backbone of the training programs provided to customer billing and collection staffs...at their facilities or at TFC. Likewise, the educational process is ongoing at TFC for its personnel. Trends, procedures, techniques, government or insurer policy changes... all are continuously reviewed to maintain the TFC Team's skills...and their ability to deliver benefits and timely thinking to customers.

### The bottom line proof

The investment over the years, in state-of-the-art data processing, systems development and the uniform insistence on quality personnel...has resulted in an increase in the amount and the volume of accounts handled, the reserves they have generated and in significantly higher margins. Efficiencies that improve client services and cement relationships have proven to be in perfect accord with the goals of TFC and in its responsibility to its shareholders.








## FACTORING SERVICES

TFC factoring services are fundamental components of its strategic development as a diversified financial services company. In tandem with leadership in collection services, they are basic building blocks for growth and profitability. The unique combination of services offered by TFC to healthcare providers is a "breakthrough" for its industry. TFC is firmly convinced of the vast potential yet to be realized in this segment of business and has devoted a major share of its new business development activity on these growing opportunities...utilizing the resources carefully honed over the years. The following are key programs undertaken in this regard.

## THE TOWERS HEALTHCARE RECEIVABLE FUNDING PROGRAM & AUTOMATED CLAIMS MANAGEMENT SYSTEMS

Towers offers a unique financing opportunity for the nation's embattled healthcare providers. An innovative, first-time-ever program that provides them with significant added working capital and a predictable cash flow...in combination with the expertise of Towers Senior Claims Analysts and the unique software of the Accelerated Collection Recall system. It is geared to speed collection recovery and to garner the fullest lawful reimbursement to hospitals, clinics, nursing homes, professional groups and other healthcare providers. It is a program designed to salvage a system that is in crisis.

### The Crisis in US Healthcare Financing

The typical hospital, historically, has never earned quite enough on patient care to cover costs, and has usually relied on governmental programs and private philanthropy to stay in the black. Over the past years, this precarious mode of existence has been increasingly difficult to maintain, despite the monumental efforts of its administrators and the best intentions of its trustees.

The growing rate of hospital closings has dramatized the fact that more than half the community healthcare facilities, large and small, rural and urban, investor-owned and not-for-profit...are losing money on patient care and are in serious danger of insolvency.

### Major changes intensify problems

From the provider's viewpoint, a major cause of this worsening cash squeeze was the introduction by the federal government of stringent cost controls and methods of payment based on what hospitals were supposed to spend, rather than what they actually spent. These federal mandates do not accommodate the need and high price of new technologies and drugs; shortages of nurses and staff; services for an aging population; the AIDS epidemic; and the higher costs of bad debt and charity care.

Previously, hospitals were paid retrospectively on a basis of costs and charges, and billings could be raised each year to recoup the previous year's losses and to ease cash flow. This situation no longer exists. The nation's healthcare facilities are caught in a severe economic dilemma.

### The economic dilemma

Healthcare providers must address inflation and the costs of goods and services in an atmosphere of stringent cost controls. They must wait longer for repayment from third party reimbursers who have tightened a claims review procedure that grows increasingly more complex. And they bear an increasingly larger burden of shortfalls from Medicaid and Medicare reimbursements.

TOWERS
HEALTHCARE
FUNDING AND
AUTOMATED
CLAIMS
MANAGEMENT
SYSTEMS

**Costly borrowing, when available**
Borrowing has traditionally been the principal source of funds for healthcare institutions. But borrowing from banking resources has proven extremely difficult. Banks, themselves in crisis condition, have drastically cut back on capital available to healthcare providers. It reflects a changed banking regulatory environment which subjects hospitals and other providers to much closer financial scrutiny and to a subsequent downgrading of their credit ratings.

**Development of the Towers programs**
Dire predictions from knowledgeable industry sources and the pressing reality of their situation as recognized within the industry...led to the development of the Towers Healthcare Receivable Funding Program and its on-site components, Automated Claims Management and Accelerated Collection Recall systems. This landmark program offers healthcare providers a unique, affordable opportunity to restore higher levels of financial stability to their critically troubled institutions.

**The program**
In response to this growing need, TFC created a nationwide program that generates vital funding for healthcare providers with a need to bridge the delays brought on by slow-paying insurance carriers and state and federal governments...and by a need to gain control of an increasingly more complex reimbursement process... in addition to the undeniable imperative to collect a greater portion of the funds to which they are entitled.

The Towers Healthcare Receivable Funding Program is a breakthrough, a revolutionary new approach to cash flow management. It is a program which enables hospitals, clinics, doctors, nursing homes and other providers to conduct billing, collection, insurance filings and accurate reimbursement in a highly effective and professional manner.

**Automated Claims Management Systems**
TFC provides, on-site, to host healthcare administrators, a comprehensive and knowledgeable array of benefits, systems and supervisory acumen specifically geared to their operations

and to the complex universe of third-party reimbursers. Included is the training and acclimation of internal staff to this new methodology.

**Developed exclusively by TFC**
TFC's Automated Claims Management Systems and the Accelerated Collection Recall System are the most advanced software and processing technologies developed exclusively for the healthcare industry. They are systems capable of anticipating and managing the most complicated claims management requirements.

**True collection recall**
The industry's only true collection recall system (Accelerated Collection Recall) is capable of tracing the collection process step-by-step through any third-party reimbursement classification. TFC's Automated Claims Management Systems train staff and stations expert claims analysts and insurance regulatory experts in provider billing and collection offices to supervise their claims management.

**The demands**
As the industry continues its expansion to meet the demands of a growing and rapidly aging population, the people and institutions who are addressing those medical needs will be hard-pressed to handle the complex, time-consuming, costly and labor-intensive tasks involved in the fiscal administration of those organizations. Their first priority, understandably, must be the delivery of timely and fully updated healthcare services to the populations they serve.

[...]owing, when available
[...] has traditionally been the principal [...] of funds for healthcare institutions. But [...]owing from banking resources has proven [...]mely difficult. Banks, themselves in crisis [...], have drastically cut back on capital [...] to healthcare providers. It reflects a [...]ed banking regulatory environment which [...] hospitals and other providers to much [...] financial scrutiny and to a subsequent [...] of their credit ratings.

Development of the Towers programs
[...] from knowledgeable industry [...] and the pressing reality of their situation [...] recognized within the industry...led to the development of the Towers Healthcare [...]able Funding Program and its on-site components, Automated Claims Management and Accelerated Collection Recall systems. This [...] program offers healthcare providers a [...]rdable opportunity to restore higher [...] financial stability to their critically troubled institutions.

The program
In response to this growing need, TFC created a nationwide program that generates vital funding for healthcare providers with a need to bridge the delays brought on by slow-paying insurance carriers and state and federal governments...and by a need to gain control of an increasingly more complex reimbursement process. In addition to the undeniable imperative to collect a greater portion of the funds to which they are entitled.

*The Towers Healthcare Receivable Funding Program is a breakthrough, a revolutionary new approach to cash flow management. It is a* program which enables hospitals, clinics, doctors, nursing homes and other providers to conduct billing, collection, insurance filings and accurate reimbursement in a highly effective and professional manner.

Automated Claims Management Systems
TFC provides, on-site, to host healthcare administrators, a comprehensive and knowledgeable array of benefits, systems and supervisory acumen specifically geared to their operations

and to the complex universe of third-party reimbursers. Included is the training and acclimation of internal staff to this new methodology.

Developed exclusively by TFC
TFC's Automated Claims Management Systems and the Accelerated Collection Recall System are the most advanced software and processing technologies developed exclusively for the healthcare industry. They are systems capable of anticipating and managing the most complicated claims management requirements.

True collection recall
The industry's only true collection recall system (Accelerated Collection Recall) is capable of tracing the collection process step-by-step through any third-party reimbursement classification. TFC's Automated Claims Management Systems train staff and stations expert claims analysts and insurance regulatory experts in provider billing and collection offices to supervise their claims management.

The demands
As the industry continues its expansion to meet the demands of a growing and rapidly aging population, the people and institutions who are addressing those medical needs will be hard-pressed to handle the complex, time-consuming, costly and labor-intensive tasks involved in the fiscal administration of those organizations. Their first priority, understandably, must be the delivery of timely and fully updated healthcare services to the populations they serve.





### A greater need

In the years ahead, healthcare professionals, from both the medical and managerial sides, expect to see this greater demand for services and an even higher degree of government intervention and increases in operating costs. The TFC programs address these needs head-on, ensuring the fiscal stability and liquidity of program participants.

### Providing immediate payment

Qualified healthcare providers receive significant immediate payment for accounts receivable due from commercial insurance, Medicaid and Medicare. Following this initial funding the program pays the balance of the receivables (minus a service fee) upon collection.

Historically, only a few established firms with substantial assets or cash flow have been qualified to finance their accounts receivable. Most do not have the credit rating traditionally demanded. Now smaller operations may enjoy the same short-term financing as these few, enabling them to manage ongoing overhead expenses such as payroll, rent and taxes without borrowing or having to wait up to 90, 120 or sometimes 180 days for payment of their receivables.

### Towers applies its expertise

A basic feature of the program is the elimination of crippling delays in payment from major insurance companies and government agencies, by building into the system an ability to generate 'clean' claims, plus a capability to edit processing and admittance procedures to prevent errors and delays, at the onset. After purchasing a hospital's receivables and providing immediate funding, TFC applies its extensive expertise in receivable management and collection in order to recover the funds due from third party reimbursers. As in many situations, TFC involvement includes the training of existing healthcare personnel and the exclusive use of the software capability of its Automated Claims Management Systems within the framework of the host healthcare provider.

### Claims process monitoring

Because of its unique knowledge of the healthcare industry, its experience and organization, TFC's Automated Claims Management Systems is able to monitor each step of the process. And as a result of its focus and the extensive in-house systems put in place, the average payment cycle is dramatically reduced.

### Other benefits

For healthcare providers, other related program benefits include a thorough examination of claims submissions to ensure quick payment and to reduce and eliminate third party deductions that are incorrect. Additionally, the program helps to reduce internal staffing costs through use of TFC's highly trained personnel and the state-of-the-art, multi-million dollar data processing ability, designed specifically to increase efficiency and create an additional audit control for all receivables generated each month.

In addition, TFC provides a substantial fund of working capital available through factoring, which can be used to reduce accounts payable, and as leverage in negotiating purchases and terms...to increase purchasing power and to improve delivery of services. The Automated Claims Management System offers on-site support, guidance and training for claims management staff involved in the collection of accounts receivable along with the establishment of appropriate in-house systems and controls to speed full reimbursement.

### Additional client services

Beyond the specific program-related benefits, where TFC clients have access to a higher level of counseling/management direction...hospitals, clinics, medical groups, doctors, nursing homes and other providers, regardless of size or sophistication...are provided with the opportunity to apply the firm's expertise to a wide variety of problems and challenges. From organization of financial management controls, to underwriting of bonds and debentures, to providing cash flow, to assistance in ownership sale or restructuring, to financing assistance to improve firm's creditworthiness, to direction on governmental and legislative issues, and to guidance on legal matters relating to healthcare and collection rights.

### The restoration of financial stability

The Towers Healthcare Receivable Funding Program and the Automated Claims Management Systems are viewed by many leading healthcare professionals as a long awaited and necessary opportunity to restore financial stability to an overly regulated industry whose services are vital to the nation's well-being.

It is this growing recognition that has thrust TFC into the forefront of the industry, as it attempts to deal with the demands they will face in the coming years.

TFC
TOWERS FINANCIAL CORPORATION

## FDIC LOAN PORTFOLIO PACKAGES

TFC's entry in the purchase of FDIC loan portfolios is a prime example of the timely utilization of their unique combination of capabilities and services, and TFC's ability to take full advantage of emerging market opportunities.

### Hundreds of billions of dollars

The Federal Deposit Insurance Company, and the Resolution Trust Corporation, created by congressional legislation, serves in the capacity as receiver and liquidator of hundreds of failed savings and loan institutions and local banks. As a result, these federal agencies are overwhelmed with a mountain of past due and delinquent loans, worth hundreds of billions of dollars, and they lack the ability to effectively collect these outstanding loans.

### A range of collectible accounts

The outstanding loans included in the FDIC loan portfolios packages for any given region are provided with pertinent data about the debtor, whether a company or individual. Names, current addresses, phone numbers... are supplied ready to be processed by TFC personnel, anywhere in the United States.

### An opportunity for TFC

Towers has purchased a select number of these 'loan portfolio packages' of past due loans from the FDIC for a discount of their face value. The portfolio packages are compiled by locale, reflecting the failed institutions' individual marketing area and are compatible to TFC's own nationwide network. Using the systems and methodology developed for corporate clients, TFC utilizes its collection capabilities to recover these loans on its own behalf. TFC has identified this segment of business as a current and future profit center for the company and its shareholders.





## THE RECOVERCARD PROGRAM

A unique and sensible way for a company to put its past due debts to work. TFC's RecoverCard program enables a company to turn its tough receivables into usable, and enjoyable assets.

**For business and professional firms**
The RecoverCard program was designed to improve the cash flow and the purchasing power of America's business and professional firms... for retailers, healthcare providers, dentists, doctors, clinics, publishers, manufacturers and service companies. The program utilizes proven recovery methods to enhance their ability to prosper in today's competitive environment.

**Maximum flexibility**
The RecoverCard program affords each of its members maximum flexibility in harnessing their firm's hidden revenue potential. Their bad checks, unpaid invoices and delinquent credit sales can be turned into the most demanded goods and services or dollars...travel, hotels, restaurants, sales trips, renting or leasing cars, updated office or technical equipment, office furnishings and services, desirable consumer products, perks, employee incentives, charitable contributions and even tuition for employees.

**It's not a credit card**
It's more like money in the bank. The RecoverCard has no interest rates or monthly payments, no credit checks, no minimums, no preset limits. RecoverCard guarantees any firm or company membership acceptance into both the Towers Recovery Program and the Mass Discount Buying Program...which couple an innovative mass buying service with Towers Collection's proven recovery expertise.

**Good fiscal sense, good times**
As members' unpaid accounts are turned over to Towers Collection, their RecoverCard Account Balances begin to build quickly. As it grows, their purchasing power increases. And just as quickly, hidden assets are accessible, ready to go to work. Whether it's a business trip, a new copier or fax machine, a dream vacation, payments to a vendor...RecoverCard transforms bad credit into good business and good times.

**Mass purchasing power**
RecoverCard members can take full advantage of the high volume economies of RecoverCard's mass buying program and maximize their purchasing power by selecting from quality merchandise offered through its membership.

**Mass Discount Buying Program Catalog**
A full color catalog, plus regular offerings of additional discounted merchandise, permits access to the most needed and wanted products, at the best possible prices. It's an advantage usually reserved for large corporations and buying consortiums. It is an added level of service provided by a TFC core capability.

As RecoverCard Account Balances grow, so do the options and opportunities. Pre-paid airfare, trainfare, travelers' checks, rent-a-cars, hotels, motels, restaurants...all paid for by a RecoverCard member's most troublesome past due accounts. The program goes beyond merchandise and travel. It provides easy access to computers, business machines, phones, faxes, copiers, printing, services, raw materials...almost anything. Members' Account Balances, which build as their dormant accounts are turned over to TFC, can directly pay Mastercard, Visa, American Express or Diners Club...or can be deposited to a company's bank account. It's a RecoverCard member's choice.

**An attractive program**
The response to the new RecoverCard program, targeted at the nation's millions of small and medium size firms, has been very strong. The positive reaction by the business and professional communities and the enthusiasm exhibited by TFC sales representatives have more then justified management's expectations.

## LEASING SERVICES

Towers Leasing Corporation, a TFC subsidiary, provides financing to credit-worthy companies, municipalities, government agencies, and other organizations for the purpose of leasing capital equipment such as computers, airplanes, medical equipment, telephone systems, printing presses, and a vast array of industrial machinery.

TFC arranges financing or operating leases for qualified clients, depending on the type of equipment involved, and the particular client needs. Emphasis is placed on development of leasing programs that are based on reliable knowledge of residual values of equipment, sound economic fundamentals, and terms that are flexible and reasonable. TFC is currently reassessing its involvement in this area.

## CONSOLIDATED BALANCE SHEET: ASSETS

| | As of June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Current Assets: | | | |
| Cash and cash equivalents | $9,193,566 | $ 3,825,765 | $ 8,534,869 |
| Accounts receivable - net (note 3) | 177,155,446 | 112,331,892 | 61,270,590 |
| Other receivables (note 10) | 1,061,555 | 606,595 | 1,816,255 |
| Prepaid interest | 87,732 | 45,613 | - |
| Total current assets | 187,498,299 | 116,809,865 | 71,621,714 |
| Fixed Assets: | | | |
| Leasehold improvements | 357,812 | 295,300 | 69,985 |
| Furniture and equipment | 4,211,161 | 1,384,786 | 951,937 |
| | 4,568,973 | 1,680,086 | 1,021,922 |
| Less accumulated depreciation and amortization | (994,479) | (581,923) | (361,711) |
| | 3,574,494 | 1,098,163 | 660,211 |
| Investments (note 10) | 2,805,500 | 3,376,241 | 3,600,000 |
| Security deposits | 515,812 | 662,913 | 304,979 |
| Prepaid interest - Net of current portion | 709,831 | 375,823 | - |
| Note receivable officer (note 14) | - | 250,000 | - |
| Goodwill (note 2) | 458,414 | - | - |
| Total assets | $195,562,350 | $122,573,005 | $76,186,904 |

The accompanying notes are an integral part of the financial statements.

## CONSOLIDATED BALANCE SHEET: LIABILITIES & SHAREHOLDERS' EQUITY

| | As of June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Current liabilities: | | | |
| Due to clients (note 4) | $64,880,237 | $52,501,911 | $31,606,396 |
| Accounts payable and accrued expenses | 7,155,666 | 1,860,188 | 2,338,679 |
| Current portion of long term debt (note 5) | 31,321,000 | 27,096,387 | 7,113,629 |
| Income taxes payable (note 8) | 13,725,633 | 6,584,201 | 2,385,750 |
| Total current liabilities | 117,112,536 | 88,042,687 | 43,444,454 |
| Long term liabilities: | | | |
| Notes payable (note 5) less current portion | 61,136,894 | 21,621,159 | 23,525,000 |
| Long term debt | 3,049,133 | 964,559 | 134,516 |
| Deferred income taxes (note 8) | 841,850 | 1,683,700 | 2,558,150 |
| Excess of fair value of assets acquired over cost (note 2) | - | 841,712 | 841,712 |
| Total long term liabilities | 65,027,877 | 25,111,130 | 27,059,378 |
| Total liabilities | 182,140,413 | 113,153,817 | 70,503,832 |
| Commitments and contingent liabilities (notes 2 and 11) | | | |
| Shareholders' equity | | | |
| Capital stock (.001 par value) | | | |
| Authorized - 10,000,000 shares; | | | |
| Issued and outstanding- 4,464,220 shares | 350,000 | 100,000 | 100,000 |
| Subscribed - 100,000 shares (note 14) | 100,000 | 250,000 | - |
| Capital stock issued, outstanding and subscribed - 4,564,220 (note 14) | 450,000 | 350,000 | 100,000 |
| Retained earnings | 12,971,937 | 9,069,188 | 5,583,072 |
| Total stockholders' equity | 13,421,937 | 9,419,188 | 5,683,072 |
| Total liabilities and stockholders' equity | $195,562,350 | $122,573,005 | $76,186,904 |

The accompanying notes are an integral part of the financial statements.

## CONSOLIDATED STATEMENT OF INCOME

| | Fiscal year ended June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Gross Revenues | $291,565,160 | $182,982,043 | $140,028,892 |
| Purchases and cost of services | 82,390,872 | 69,551,712 | 54,294,965 |
| | 209,174,288 | 113,430,331 | 85,733,927 |
| Less recoverable reserve | 153,331,451 | 77,082,895 | 65,145,531 |
| Gross profit | 55,842,837 | 36,347,436 | 20,588,396 |
| Operating expenses | | | |
| Salaries and benefits | 14,012,973 | 9,487,151 | 5,660,552 |
| Selling | 7,558,382 | 4,552,053 | 2,633,698 |
| General and administrative | 14,701,687 | 8,498,538 | 7,065,718 |
| Interest on notes | 10,456,292 | 6,868,423 | 2,457,833 |
| | 46,729,334 | 29,406,165 | 17,817,801 |
| | 9,113,503 | 6,941,271 | 2,770,595 |
| Less: Loss on sale of securities | - | (128,169) | - |
| Add: Extraordinary item | 1,089,246 | - | 298,802 |
| Income before provision for taxes | 10,202,749 | 6,813,102 | 3,069,397 |
| Provision for income taxes (note 8) | 6,300,000 | 3,326,986 | 1,655,900 |
| Net income | $3,902,749 | $3,486,116 | $1,413,497 |
| Earnings per share | .87 | .78 | .32 |
| Average common shares outstanding | 4,464,220 | 4,464,220 | 4,464,220 |

The accompanying notes are an integral part of the financial statements.

## CONSOLIDATED STATEMENT OF RETAINED EARNINGS

| | As of June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Balance - Beginning of year | $9,069,188 | $5,583,072 | $4,169,575 |
| Net Income | 3,902,749 | 3,486,116 | 1,413,497 |
| Balance - End of year | $12,971,937 | $9,069,188 | $5,583,072 |

The accompanying notes are an integral part of the financial statements.

## CONSOLIDATED STATEMENT OF CASH FLOWS
## INCREASE (DECREASE) IN CASH AND EQUIVALENTS

| | Years Ended June 30, | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Cash flows from operating activities: | | | |
| Net earnings | $3,902,749 | $3,486,116 | $1,413,497 |
| Adjustments to reconcile net earnings to net cash provided by operating activities | | | |
| Bad debt - notes receivable | - | - | 30,500 |
| Depreciation and amortization | 412,556 | 220,908 | 188,389 |
| | 4,315,305 | 3,707,024 | 1,632,386 |
| Changes in assets and liabilities: | | | |
| Accounts receivable (net) | (64,823,554) | (51,061,302) | (16,951,028) |
| Other receivables | (454,960) | 1,209,660 | (1,526,733) |
| Prepaid interest | (42,119) | (45,613) | - |
| Other non current assets | (186,907) | (983,757) | (179,058) |
| Due to clients | 12,378,326 | 20,895,515 | (3,270,537) |
| Payable and accrued expenses | 5,325,478 | (478,491) | 1,572,844 |
| Accrued and deferred income taxes (net) | 6,299,582 | 3,324,001 | 1,655,900 |
| Net cash (used) for operating activities | (37,188,849) | (23,432,963) | (17,066,226) |
| Cash flows from investing activities: | | | |
| Capital expenditures, net of minor disposals | (2,888,887) | (658,860) | (522,138) |
| Acquisition/(disposition) of investments | 570,741 | 223,759 | (3,600,000) |
| Acquisition of goodwill | (1,300,126) | - | - |
| Net cash (used) in investing activities | (3,618,272) | (435,101) | (4,122,138) |
| Cash flows from financing activities: | | | |
| Increase in capital stock | 350,000 | - | - |
| Increase in capital stock subscribed | - | 250,000 | - |
| Increase in short term borrowings | 4,224,613 | 19,982,758 | 7,105,130 |
| Increase (decrease) in long term debt | 41,600,309 | (1,073,798) | 19,037,482 |
| Net cash provided by financing activities | 46,174,922 | 19,158,960 | 26,142,612 |
| Net increase (decrease) in | | | |
| Cash and cash equivalents | 5,367,801 | (4,709,104) | 4,954,248 |
| Cash and cash equivalents at beginning of year | 3,825,765 | 8,534,869 | 3,580,621 |
| Cash and cash equivalents at end of year | $9,193,566 | $3,825,765 | $8,534,869 |

The accompanying notes are an integral part of the financial statements.

## NOTES TO FINANCIAL STATEMENTS
For the Year Ended June 30, 1990

**1. Summary of significant accounting policies**

**Basis of presentation**

Towers Financial Corporation (formerly known as Transcon Adjustment Group Ltd., founded in 1975) is a diversified company operating in the acquisition and management of accounts receivable through Towers Financial Corporation and its wholly owned subsidiaries, Towers Credit Corporation, Towers Collection Service, Inc., Towers Leasing Corporation, TFC Funding Corporation, RecoverCard Corporation of America and Towers Healthcare Receivables Funding Corporation.

Towers Financial Corporation formed Towers Diversified Corporation, a wholly owned subsidiary, in October, 1987. (See Note 10).

Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation were acquired in July 1986, by Towers Financial Corporation, a publicly listed company. The financial statements for each subsidiary was independently audited and consolidated for presentation herein. The subsidiaries were incorporated as follows:

| | |
|---|---|
| Towers Credit Corporation | January 1984 |
| Towers Collection Service, Inc. | April 1980 |
| Towers Leasing Corporation | March 1985 |
| TFC Funding Corporation | November 1989 |
| RecoverCard Corporation of America | January 1990 |
| Towers Healthcare Receivables Funding Corporation | March 1990 |

The 1986 acquisitions took place for the benefit of becoming a publicly traded company.

**Operations and consolidations**

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries after elimination of material intercompany accounts and transactions.

**Statement of cash flows**

In 1987, the Company adopted Statement of Financial Accounting Standard No. 95, "Statement of Cash Flows", and is presenting a statement of cash flows in place of the statement of changes in financial position.

FAS 95 requires that the following supplemental disclosures to the statement of cash flows be provided in related disclosures. Cash paid for interest was $12,320,486 in 1990, $6,727,987 in 1989, and $2,264,696 in 1988. Cash paid for income taxes was none in 1989.

**Revenue Recognition**

The Company derives income from services rendered by its factoring and collection operations through receiving an irrevocable assignment of all claims accepted.

Gross revenue is recorded by the Towers Companies when accounts receivables are assigned.

Fees for collection services are recorded consistent with industry standards. The Company anticipates collecting 30% of accounts accepted and then records its fee of 30%.

**Property and equipment**

Property and equipment are stated at cost and are depreciated using the straight line method over the estimated useful lives of assets, ranging from 3 to 5 years.

Leasehold improvements are amortized over the term of the lease or the estimated life of the improvement, whichever is shorter. Maintenance and minor repairs are charged to operations as incurred.

**Accounting change**

The Company has changed its method of reporting for income tax returns (see note 8).

Capital leases
The Company has leases with RCA Services Company, for telephone equipment. The leases provide for monthly payments of $13,215.00 for ten years.

The Company has a lease with Mach 1, Corp Inc. for computer equipment. The lease provides for monthly payments of $3,698.00 for five years.

The Company has a lease with Atlantic Computer Corporation for computer equipment. The lease provides for monthly payments of $12,235.00 for seven years.

2. Acquisition
In July 1986, Towers Financial Corporation acquired Towers Credit Corporation, Towers Collections Service, Inc. and Towers Leasing Corporation from Professional Business Brokers Inc. (See note 15).

The agreement as amended provides that the Company pays five (5%) percent of its gross profits before expenses and before provision for taxes for a period of seven years commencing with July 1, 1988 to Professional Business Brokers Inc. The 1986 transaction took place for the benefit of becoming a publicly traded Company.

As of the statement date Professional Business Brokers has extended a portion of its fee for the current fiscal year. The Company is presently renegotiating the terms of its agreement with Professional Business Brokers. The final cost is still to be determined.

3. Accounts receivable
Recoverable reserves are amounts held in reserve against assigned and/or purchased accounts receivable and amounts written down from accounts accepted for collection. Accounts receivable accepted for collection are recorded at the gross amount and the Company sets up a recoverable reserve, based upon historical experience. (See note 1)

Purchased accounts receivable are written off when they are determined to be uncollectible. Losses sustained from purchased accounts receivable can be reimbursed by a credit insurance policy which has been obtained by the Company.

Management has elected to present accounts receivable, net of recoverable reserves, on the balance sheet. The details are as follows:

| June 30, | 1990 | 1989 | 1988 |
|---|---|---|---|
| Accounts Receivable | $354,995,882 | $189,680,514 | $108,133,395 |
| Less: Recoverable Reserves | (177,840,436) | (77,348,622) | (46,862,805) |
| Accounts Receivable-Net | $177,155,446 | $112,331,892 | $61,270,590 |

4. Payable to clients
Amounts due clients is the balance to be paid when the accounts accepted are collected and/or funded. The amount payable is the balance after Tower's fees and/or discounts, but subject to offset for monies due from clients to Towers.

5. Notes payable
Towers Financial Corporation and Towers Credit Corporation issued one and two year promissory notes for the acquisition of accounts receivable subject to an offering memorandum.

6. Long term debt.
See capital leases.

7. Operating leases
Rental expense charged to operations was $1,117,157.

8. Income taxes
The Company has filed all Federal Corporate Income tax returns through June 30, 1989.

Statement of Financial Accounting Standards No. 96, "Accounting for Income Taxes", was issued in December 1987 and is presently being revised and establishes financial accounting and reporting standards for the effects of income taxes which result from an enterprise's activities during the current and preceding years. The Company is not required to adopt this statement until its year ending June 30, 1990, although earlier adoption is permitted. When adopted, the Company is given the choice of reflecting the effect of the change in the year of adoption or of restating any number of years.

Accordingly the Company has elected to adopt Statement of Financial Accounting Standards No. 96 and has reflected the effect of the change in the year of adoption.

Deferred income taxes results from the phase in permitted by the Tax Reform Act of 1986.

9. Subsequent events
Towers Healthcare Receivables Funding Corporation (THRFC) was incorporated on March 27, 1990 as a wholly-owned subsidiary of the Company. Pursuant to a private placement memorandum dated July 19, 1990 THRFC raised $56,500,000 by the issuance of "AA" rated bonds at 10.20% interest per annum payable quarterly commencing October 15, 1990.

10. Litigation
The Securities and Exchange Commission commenced a civil action against Towers captioned Securities and Exchange Commission v. Towers Credit Corporation, et. al., (for purposes of this paragraph, "Towers" includes the other named parties to the litigation) for the sale of unregistered securities on August 4, 1988. The Commission alleged that the parties violated Sections 5(a) and 5(c) of the Securities Act of 1933, as amended. The parties entered into a consent decree on November 22, 1988. Towers, without admitting that it violated Section 5 in the past, has agreed not to violate Section 5 in the future. In addition, Towers provided investors in TCC's two prior note offerings the opportunity to accept or decline rescission of their investment, and forego the interest payment due under the offerings in exchange for money market interest, which rescission offer was completed on January 22, 1989, whereby $347,431 out of approximately $37,000,000 was accepted for rescission. Steven Hoffenberg and Mitchell Brater, principals of Towers, were named in this litigation and have also entered into similar consent decrees.

Included in other receivables is $510,786, due from Marine Charter and Storage Ltd. The Company is presently litigating this claim and believes it will be fully victorious. The defendant has by court order posted a $500,000 bond to secure the Company's liens in this matter.

Towers and a subsidiary of Towers has instituted litigation against the previous owners of United Diversified Corporation ("UDC") from whom it purchased 82% of UDC. Towers in this action is claiming rescission and damages, including a return of $2,800,000 it invested in UDC. In a separate action, due to the previous owners

failure to disclose material financial information, including misappropriation of $3,500,000 of UDC funds, Towers has blocked the former owners access to the $3,500,000 pending the resolution of Towers' claims.

There is no other material litigation in which the Company is currently involved.

**11. Commitments**

See Note 2 relating to the acquisition of Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation.

**12. Earning per share**

There are presently 5,784 shares of Towers Financial Corporation set aside to satisfy the conversion agreement wherein the stockholders of O.G. Consulting, Inc. have the right to exchange fifty shares of O.G. Consulting, Inc. for one share of Towers Financial Corporation.

During the current fiscal year the number of shares of common stock issued and outstanding was reduced by 10,000 shares. This resulted from the cancellation of 30,000 shares as part of the settlement of claims reflected in extraordinary income and the issuance of 20,000 shares pursuant to the agreement referred to above.

The securities to Martin H. Meyerson and Kenneth J. Koock have not yet been issued (see note 14), and therefore the earnings per share have not been restated. The earnings per share if restated would be:

| 1990 | 1989 | 1988 |
|---|---|---|
| .86 | .76 | .31 |

**13. Extraordinary income**

Extraordinary income arose from settlement of claims.

**14. Stock options**

Pursuant to an agreement between Towers Financial Corporation and M.H. Meyerson and Company, and agreed to by Martin H. Meyerson and Kenneth J. Koock, Towers was to issue 100,000 shares of unissued Company stock during the fiscal year ended June 30, 1990. The Company intends to formally issue these shares as follows: Martin H. Meyerson 50,000 shares and Kenneth J. Koock 50,000 shares. (See note 12 relating to earnings per share.)

Mitchell Brater, Vice Chairman of the Board and Chief Operating Officer, exercised a stock option entitling him to 500,000 shares of Towers Financial Corporation. Payment of the optioned securities was made by a note with simple interest at 10 per cent per annum.

The principal was paid on January 3, 1990 and the interest was waived.

The Securities had not been issued in the two prior fiscal years, however, the earnings per share have been restated.

**15. Related parties**

Professional Business Brokers Inc. owns in excess of seventy percent of the Company's issued and outstanding stock. See note 2 for details of the transaction between the Company and Professional Business Brokers Inc.

We have audited the accompanying consolidated balance sheet of Towers Financial Corporation and subsidiaries as of June 30, 1990, 1989, and 1988 and the related consolidated statements of income, changes in shareholders' equity, retained earnings, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Towers Financial Corporation as of June 30, 1990, 1989, and 1988, and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles.

Sincerely,

Marvin E. Basson, CPA, P.C.
New York, New York
September 12, 1990

# OFFICERS AND DIRECTORS

TFC
TOWERS FINANCIAL CORPORATION

**Annual Meeting of Shareholders**

The Annual Meeting of Stockholders of Towers Financial Corporation will be held on Tuesday, November 20, 1990 at 11:00am at Corporate Headquarters at 417 Fifth Avenue, New York, NY 10016.

**Board of Directors**

Steven Hoffenberg
Chairman of the Board, President and Chief Executive Officer
Towers Financial Corporation

Mitchell Brater
Vice Chairman of the Board and Chief Operating Officer
Towers Financial Corporation

Charles H. Chugerman
Executive Vice President, Secretary
Towers Financial Corporation and President
Towers Leasing Corporation

Michael Rosoff, Esq.
Senior Vice President, Chief Legal Officer and Assistant Secretary
Towers Financial Corporation

Xavier Eboh
Vice President
Towers Financial Corporation and President
Towers Collection Service, Inc.

Raymond Lewis
Vice President
Towers Financial Corporation

**Advisory Board**

The Honorable Thomas F. Evans, Jr., Esq.
President
The Evans Group, Ltd.
Washington, DC
Former Co-Chairman
Republican National Committee, and
Former Senior Member, United States
House of Representatives

William D. Fugazy
Chairman
Fugazy International
Former President
Diners Club International

The Honorable Ben Barnes
President, Entrecorp,
Austin, TX
Former Chief Operating Officer,
Barnes Connally Development Corporation
Former Lt. Governor, State of Texas
Former Speaker of the House of Representatives,
State of Texas

Jay Fischer, Esq.
Partner
Proskauer Rose Goetz & Mendelsohn

**Management**

Steven Hoffenberg
Chairman of the Board, President and Chief Executive Officer
Towers Financial Corporation

Mitchell Brater
Vice Chairman of the Board and Chief Operating Officer
Towers Financial Corporation

Charles H. Chugerman
Executive Vice President, Secretary
Towers Financial Corporation and President
Towers Leasing Corporation

Michael Rosoff, Esq.
Senior Vice President, Chief Legal Officer and Assistant Secretary
Towers Financial Corporation

Anthony DiNicolas
Senior Vice President
Towers Financial Corporation

Xavier Eboh
Vice President
Towers Financial Corporation and President
Towers Collection Service, Inc.

Richard Levine
Vice President and Chief Financial Officer
Towers Financial Corporation

Errol Margolin, Esq.
Vice President and General Counsel
Towers Financial Corporation

Raymond Lewis
Vice President
Towers Financial Corporation

Larry Lowy
Vice President-Sales
Towers Financial Corporation

Laura L. Cornell
Director of Sales Administration
Towers Financial Corporation

Eugene H. Sherman
Director of Branch Sales Administration
Towers Financial Corporation

**Outside Counsels**
Kutak Rock & Campbell
1650 Farnam Street, Omaha, NE 68102

Proskauer Rose Goetz & Mendelsohn
1585 Broadway, New York, NY 10036

**Transfer Agency and Registrar**
The Chase Manhattan Bank, N.A.
One New York Plaza, New York, NY 10081

417 Fifth Avenue
New York, NY 10016
(212) 696-0505
(800) 553-3322

EXHIBIT 47

DATED: October 15, 1991

# CONFIDENTIAL PRIVATE OFFERING DOCUMENT

For: Accredited Investors Only

## TOWERS FINANCIAL CORPORATION

**$100,000,000 In Recourse Promissory Notes**
**Bearing Interest At The Rate Of 12% Per Annum For 12-month Promissory Notes**
**And 14% Per Annum For 24-month And 36-month Promissory Notes**
**Collateralized, Secured And Backed By Accounts Receivable**
**Due From Major Insurance Companies, Commercial Accounts**
**Receivable And Loans And Accounts Receivables**
**Purchased From Governmental Agencies**

| | Subscription Price Payable Upon Subscription | Commissions (1) | Proceeds to The Company |
|---|---|---|---|
| Per Unit (minimum offering is one Unit) . . . . . . . . | $ 100.000 | $ 4.000(4%) | $ 96.000(96%) |
| Total 1.000 Units (maximum offering) . . . . . . . . . . . | $100,000.000 | $4.000.000(4%) | $96.000.000(96%) |

(1) Commissions of 4% per Unit will be paid from the proceeds of the offering for the purchase of 36-month Promissory Notes. The Company will pay an additional amount equal to 8% of the Subscription Price as follows: 4% will be paid one year from Sale and Acceptance and 4% will be paid on the second anniversary of Sale and Acceptance (12% in the aggregate). Commissions of 4% per Unit will be paid from the proceeds of the offering for the purchase of 24-month Promissory Notes and an additional amount equal to 4% of the Subscription Price will be paid by the Company one year from Sale and Acceptance (8% in the aggregate). Commissions of 4% per Unit will be paid from the proceeds of the offering for the sale of 12-month Promissory Notes upon Sale and Acceptance. Commissions will only be paid to broker-dealers who are members of the National Association of Securities Dealers, Inc. Amounts allocated to commissions which are not paid will increase the proceeds to the Company.

This Offering Document Does Not Constitute an Offer to Any Person Other Than:

Name: ______________ Offeree Number: 03442

TFC TOWERS FINANCIAL CORPORATION

417 FIFTH AVENUE, NEW YORK, NEW YORK 10016 (212) 696-0505

Towers Financial Corporation.
Copyright 1991. All Rights Reserved

EXHIBIT A
883

Towers Financial Corporation ("Towers" or the "Company") is offering for sale to Accredited Investors only, 12-month, 24-month and 36-month Promissory Notes which are recourse to Towers, secured, collateralized and backed by (i) Healthcare Accounts Receivable purchased from hospitals, doctors, medical groups and other healthcare providers (the "Healthcare Receivables"); (ii) Business Accounts Receivable purchased from manufacturers, wholesalers and service companies (the "Business Accounts Receivable"); and/or (iii) receivables and loans purchased from the Federal Deposit Insurance Corporation ("FDIC") and/or Resolution Trust Company ("RTC") or from secondary sources (the "FDIC and RTC Receivables"). Towers will maintain as collateral for this offering Accounts Receivable in a face amount equal to the amount raised by this Offering which is outstanding from time to time. The Healthcare Receivables will be receivables of, and payable by, major insurance companies such as Blue Cross/Blue Shield, state governmental agencies, major unions, private insurers, worker's compensation payors, personal injury payors, and all other third party reimbursers. The Business Accounts Receivable will be receivables of and payable by commercial businesses. The FDIC and RTC Receivables will be purchased at auction and, in some cases, may be secured by assets (the Healthcare Receivables, Business Accounts Receivable and FDIC and RTC Receivables are collectively referred to as the "Accounts Receivable").

Investors will have the option upon maturity to reinvest the proceeds of the Promissory Notes, subject to the terms set forth herein as may be amended from time to time and subject to federal and state securities laws and regulations. The 12-month Promissory Notes will bear interest at the rate of 12% per annum, and the 24-month and 36-month Promissory Notes will bear interest at the rate of 14% per annum. Interest will be payable monthly or quarterly at the option of the Investor.

CAPITALIZED TERMS USED HEREIN SHALL HAVE THE MEANING SET FORTH AT "GLOSSARY."

THIS DOCUMENT IS CONFIDENTIAL AND MAY ONLY BE SHOWN TO ACCREDITED INVESTORS AS DEFINED HEREIN (SEE "GLOSSARY").

THE UNITS HAVE NOT BEEN REGISTERED WITH, OR APPROVED OR DISAPPROVED BY, THE SECURITIES AND EXCHANGE COMMISSION OR BY THE SECURITIES REGULATORY AUTHORITY OF ANY STATE. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

TOWERS SHALL MAKE AVAILABLE TO EACH INVESTOR, OR HIS AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY UNITS, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM ANY PERSON AUTHORIZED TO ACT ON BEHALF OF TOWERS CONCERNING ANY ASPECT OF THE INVESTMENT AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT TOWERS HAS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

THIS OFFERING IS ACCOMPANIED BY THE COMPANY'S 1991 ANNUAL REPORT, INCLUDING AUDITED FINANCIAL STATEMENTS, WHICH IS BOUND UNDER SEPARATE COVER. IN THE EVENT PROSPECTIVE INVESTORS DO NOT RECEIVE A COPY OF THE 1991 ANNUAL AUDITED REPORT, NO OFFER IS MADE HEREBY. INVESTORS ARE REQUIRED TO ACKNOWLEDGE THE RECEIPT OF THE ANNUAL REPORT AS A CONDITION OF THE SUBSCRIPTION AGREEMENT.

SALES OF THESE SECURITIES CAN BE CONSUMMATED ONLY BY TOWERS' ACCEPTANCE OF OFFERS TO PURCHASE SUCH SECURITIES WHICH ARE TENDERED TO TOWERS BY PROSPECTIVE INVESTORS. NO SOLICITATION OF ANY SUCH OFFER (INCLUDING ANY SOLICITATION WHICH MAY BE CONSTRUED AS AN "OFFER" UNDER FEDERAL AND/OR STATE SECURITIES LAWS) IS AUTHORIZED WITHOUT THE PRIOR APPROVAL OF SUCH PROSPECTIVE INVESTOR BY TOWERS.

EXHIBIT A
884

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME (SEE "RISK FACTORS").**

DESPITE THE INCLUSION OF THE LEGENDS BELOW, BROKER-DEALERS MUST CONFIRM WITH THE ISSUER THAT EITHER THE SECURITIES HAVE BEEN REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE SINCE THE INCLUSION OF A LEGEND BELOW DOES NOT ASSURE REGISTRATION OR EXEMPTION.

*FOR ALABAMA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR ALASKA RESIDENTS ONLY*: THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISION OF 3 AAC 08.500-3 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF AS 45.55.170.

THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

*FOR ARIZONA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED PURSUANT TO A.R.S. SECTION 44-1846 BUT THE FACT OF THE GRANTING OF SUCH EXEMPTION IS NOT TO BE DEEMED A FINDING BY THE ARIZONA CORPORATION COMMISSION THAT THIS OFFERING DOCUMENT IS TRUE OR ACCURATE, NOR DOES SUCH GRANT OF EXEMPTION MEAN THAT THE COMMISSION HAS PASSED UPON THE MERITS OF OR OTHERWISE APPROVED THE SECURITIES DESCRIBED HEREIN.

*FOR ARKANSAS RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-42-504(a)(14) OF THE ARKANSAS SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THE OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR CALIFORNIA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE

EXHIBIT A

LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE, IF SUCH REGISTRATION IS REQUIRED.

*FOR COLORADO RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981, IF SUCH REGISTRATION IS REQUIRED.

*FOR CONNECTICUT RESIDENTS ONLY*: THE SECURITIES REFERRED TO IN THIS OFFERING DOCUMENT HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE CONNECTICUT UNIFORM SECURITIES ACT, AND, THEREFORE, THE SECURITIES CANNOT BE SOLD OR TRANSFERRED UNDER SUCH ACT UNLESS THEY ARE REGISTERED UNDER SUCH ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR FLORIDA RESIDENTS ONLY*: FLORIDA PURCHASERS ARE ADVISED THAT WHERE SALES ARE MADE TO FIVE OR MORE PERSONS PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES & INVESTOR PROTECTION ACT, SUCH SALES ARE VOIDABLE BY THE PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE COMPANY OR ANY AGENT OF THE COMPANY OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE PURCHASER, WHICHEVER OCCURS LATER. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT (RULE 3E500.005(5)(a)(12)).

*FOR GEORGIA RESIDENTS ONLY*: OFFEREES ARE HEREBY ADVISED THAT THE CONSENT DECREE ENTERED INTO BY TOWERS FINANCIAL CORPORATION ("TOWERS") DISCUSSED IN THE CONFIDENTIAL PRIVATE OFFERING DOCUMENT DATED OCTOBER 15, 1991, PROVIDES THAT TOWERS IS PERMANENTLY ENJOINED FROM VIOLATING THE SECURITIES LAWS AND THAT TOWERS IS SUBJECT TO AN ONGOING OBLIGATION NOT TO VIOLATE THE SECURITIES LAWS. UNLESS A WAIVER IS GRANTED BY THE STATE OF GEORGIA, THE CONSENT DECREE CONSTITUTES AN AUTOMATIC DISQUALIFICATION FROM THE USE OF PRIVATE OFFERING EXEMPTIONS IN THE STATE OF GEORGIA. TOWERS HAS APPLIED FOR SUCH A WAIVER AND THE GEORGIA SECURITIES COMMISSION HAS AGREED TO GRANT THE WAIVER PROVIDED THAT THIS NOTICE BE FURNISHED TO ALL GEORGIA OFFEREES.

*FOR IDAHO RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR ILLINOIS RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS, NOR HAS THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR INDIANA RESIDENTS ONLY*: THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 23-2-1-2 OF THE INDIANA CODE. THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL OR STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.

EXHIBIT A

*FOR LOUISIANA RESIDENTS ONLY*: THESE SECURITIES HAVE BEEN REGISTERED WITH THE SECURITIES COMMISSIONER OF THE STATE OF LOUISIANA. THE SECURITIES COMMISSIONER, BY ACCEPTING REGISTRATION, DOES NOT IN ANY WAY ENDORSE OR RECOMMEND THE PURCHASE OF ANY OF THESE SECURITIES.

*FOR MAINE RESIDENTS ONLY*: THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE BANK SUPERINTENDENT OF THE STATE OF MAINE UNDER SECTION 10502(2)(R) OF TITLE 32 OF THE MAINE REVISED STATUTES. THESE SECURITIES MAY BE DEEMED RESTRICTED SECURITIES AND AS SUCH THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS PURSUANT TO REGISTRATION UNDER STATE OR FEDERAL SECURITIES LAWS OR UNLESS AN EXEMPTION UNDER SUCH LAWS EXISTS.

*FOR MARYLAND RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, IF SUCH REGISTRATION IS REQUIRED.

*FOR MICHIGAN RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNIFORM SECURITIES ACT OF MICHIGAN AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. MINIMUM INVESTMENT IN MICHIGAN IS $50,000.

*FOR MINNESOTA RESIDENTS ONLY*: THESE SECURITIES REPRESENTED BY THIS OFFERING HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

*FOR MISSISSIPPI RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR MISSOURI RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1)

EXHIBIT A

YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR NEW HAMPSHIRE RESIDENTS ONLY*: NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE DIRECTOR OF THE OFFICE OF SECURITIES REGULATION THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE DIRECTOR OF THE OFFICE OF SECURITIES REGULATION HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

*FOR NEW JERSEY RESIDENTS ONLY*: THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING DOCUMENT. THE FILING OF THIS OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE OR THE SALE THEREOF BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR NEW MEXICO RESIDENTS ONLY*: THE SECURITIES DESCRIBED HEREIN ARE OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF NEW MEXICO. ACCORDINGLY, THE NEW MEXICO SECURITIES BUREAU HAS NOT REVIEWED THE OFFERING OF THESE SECURITIES AND HAS NOT APPROVED OR DISAPPROVED THIS OFFERING. THE NEW MEXICO SECURITIES BUREAU HAS NOT PASSED UPON THE VALUE OF THESE SECURITIES OR UPON THE ADEQUACY OR ACCURACY OF THE INFORMATION CONTAINED IN THIS OFFERING DOCUMENT.

*FOR NORTH CAROLINA RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR PENNSYLVANIA RESIDENTS ONLY*: PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, EACH PENNSYLVANIA RESIDENT WHO ACCEPTS THE OFFER MADE PURSUANT TO THE OFFERING DOCUMENT TO PURCHASE ANY UNITS SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE, WITHOUT INCURRING ANY LIABILITY TO THE COMPANY, ITS AFFILIATES OR ANY OTHER PERSON, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE COMPANY OF HIS WRITTEN BINDING CONTRACT OF PURCHASE (SUBSCRIPTION AGREEMENT). TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER SHOULD SEND A LETTER OR TELEGRAM INDICATING HIS INTENTION TO WITHDRAW TO THE COMPANY AT THE ADDRESS OF THE COMPANY SET

EXHIBIT

FORTH IN THE OFFERING DOCUMENT. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF A SUBSCRIBER ELECTS TO SEND SUCH A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD A SUBSCRIBER MAKE THIS REQUEST ORALLY, HE SHOULD ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

IN ADDITION TO QUALIFYING AS AN ACCREDITED INVESTOR, THE RESIDENTS OF PENNSYLVANIA HEREBY AGREE THAT THEY WILL WILL NOT SELL, TRANSFER OR SUBDIVIDE THE UNITS PURCHASED HEREIN UNTIL AT LEAST ONE (1) YEAR FROM THE DATE OF PURCHASE.

*FOR SOUTH CAROLINA RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR SOUTH DAKOTA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31A, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATIONS OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS OFFERING IS TRUE, COMPLETE, AND NOT MISLEADING; NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SOUTH DAKOTA RESIDENTS MUST REPRESENT THAT (I) THEY HAVE A NET WORTH OF AT LEAST $1,000,000 (EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES); (II) THEY WILL INVEST NOT LESS THAN $100,000; AND (III) THEIR INVESTMENT DOES NOT EXCEED 10% OF THEIR NET WORTH.

*FOR TENNESSEE RESIDENTS ONLY*: THESE SECURITIES HAVE BEEN REGISTERED WITH THE STATE OF TENNESSEE. AS A CONDITION OF REGISTRATION, THE STATE OF TENNESSEE HAS IMPOSED MINIMUM SUITABILITY STANDARDS FOR TENNESSEE RESIDENTS. PURSUANT TO THOSE STANDARDS, EACH INVESTOR WHO IS A NATURAL PERSON MUST HAVE A NET WORTH OF AT LEAST $250,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES, AND MUST HAVE HAD A GROSS INCOME OF $65,000.00 DURING THE LAST TAX YEAR AND BE EXPECTED TO HAVE A GROSS INCOME OF $65,000.00 DURING THE CURRENT TAX YEAR, OR ALTERNATIVELY A NET WORTH OF AT LAST $500,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS AND AUTOMOBILES. ADDITIONALLY, UNDER THIS SUITABILITY STANDARD, EACH NATURAL PERSON'S INVESTMENT MUST NOT EXCEED TEN PERCENT (10%) OF HIS NET WORTH.

THIS OFFERING IS MADE TO ACCREDITED INVESTORS AS DEFINED IN SECTION 501 (a) (1) OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933. SEE "TERMS

EXHIBIT A

OF THE INVESTMENT." THE ACCREDITED INVESTOR STANDARD IS GENERALLY MORE RESTRICTIVE THAN THE MINIMUM SUITABILITY REQUIREMENTS IMPOSED BY THE STATE OF TENNESSEE. THEREFORE, THE EFFECT OF REGISTRATION OF THE OFFERING IN TENNESSEE (AND THE MINIMUM SUITABILITY STANDARD) IS THAT THE OFFERING IS MADE ONLY TO ACCREDITED INVESTORS.

*FOR TEXAS RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS OF TEXAS AND THEREFORE CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR UTAH RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UTAH UNIFORM SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR VIRGINIA RESIDENTS ONLY*: THE VIRGINIA STATE CORPORATION COMMISSION DOES NOT PASS UPON THE ADEQUACY OF THIS OFFERING DOCUMENT OR UPON THE MERITS OF THIS OFFERING AND THE COMMISSION EXPRESSES NO OPINION AS TO THE QUALITY OF THIS SECURITY.

*FOR WASHINGTON RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

EXHIBIT A

## TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 1 |
| SUMMARY | 1 |
| RISK FACTORS | 5 |
| DESCRIPTION OF THE PROMISSORY NOTES | 6 |
| TERMS OF THE INVESTMENT | 7 |
| Subscription Procedures | 8 |
| Acceptance | 8 |
| Reinvestments | 8 |
| Restrictions on Transfer | 8 |
| USE OF PROCEEDS | 9 |
| FUNDING ACCOUNT | 9 |
| PROPOSED ACTIVITIES | 9 |
| Accounts Receivable as Collateral and Security | 9 |
| The Healthcare Industry | 10 |
| Description of Healthcare Accounts Receivable | 10 |
| Determination and Criteria of Eligibility for Healthcare Accounts Receivable | 11 |
| Description of Business Accounts Receivable | 11 |
| DESCRIPTION OF FDIC AND RTC LOANS AND RECEIVABLES | 13 |
| COMPENSATION TO TOWERS | 13 |
| COLLECTION OF ACCOUNTS RECEIVABLE | 13 |
| COLLATERAL COVERAGE | 13 |
| THE COMPANY | 13 |
| CONFLICTS OF INTEREST | 15 |
| ADDITIONAL INFORMATION | 15 |
| PLAN OF DISTRIBUTION | 16 |
| LEGAL MATTERS | 16 |
| PROMOTIONAL AND SALES LITERATURE | 16 |
| LITIGATION | 16 |
| GLOSSARY | 18 |

EXHIBITS

I. Subscription Documents
  A. Investor Questionnaire
  B. Subscription Agreement
II. Form of Promissory Note
III. Form of Security Agreement
IV. 1991 Annual Report of Towers, Including Audited Financial Statements [Furnished under separate cover]

EXHIBIT A

811

## TOWERS FINANCIAL CORPORATION

### INTRODUCTION

This Confidential Private Offering Document (the "Offering Document") is provided to furnish certain information in connection with the placement of Promissory Notes (the "Notes") issued by Towers Financial Corporation, as the Issuer. This Offering Document is submitted on a confidential basis to a limited number of prospective Accredited Investors for use solely in connection with their consideration of investing in the Notes. See "TERMS OF THE INVESTMENT." To the extent they deem necessary or advisable, prospective investors are urged to carry out independent investigations in order to determine their interest in investing in the Notes. This Offering Document may not be reproduced or used for any other purpose nor furnished to any other person.

Brief descriptions of the Notes, the security agreement and certain other documents are contained herein. Such descriptions do not purport to be comprehensive or definitive. All summaries herein of documents and agreements are qualified in their entirety by reference to such documents and agreements, drafts or forms of which may be obtained as described under "ADDITIONAL INFORMATION."

This Offering Document is accompanied by the Company's 1991 Annual Report which includes audited financial statements and which is bound under separate cover and incorporated herein by reference.

There are certain risks and other considerations relating to an investment in the Notes. Prospective investors should review the Section entitled "RISK FACTORS."

### SUMMARY

*The following summary is qualified in its entirety by reference to the detailed information appearing elsewhere in this Offering Document. Certain capitalized terms used in this Offering Document are defined in the "GLOSSARY."*

**Description of the Promissory Notes and Terms of the Investment:** ...... An aggregate of one hundred million dollars ($100,000,000), consisting of 1,000 units at $100,000 each of 12-month, 24-month and 36-month Promissory Notes, bearing interest at the rate of 12% per annum for 12-month Promissory Notes and 13% per annum for 24-month and 36-month Promissory Notes, payable monthly or quarterly (at the option of the Investor), is offered hereby to Accredited Investors only (see "TERMS OF THE INVESTMENT" and "DESCRIPTION OF THE PROMISSORY NOTES"). The Promissory Notes will be collateralized, secured and backed by (i) Healthcare Accounts Receivable of major insurance companies such as Blue Cross/Blue Shield, state governmental agencies, major unions, private insurance companies, worker's compensation payors, personal injury payors, and all other third party reimbursers purchased from hospitals, doctors, medical groups and other healthcare providers; (ii) Business Accounts Receivable purchased from manufacturers, wholesalers and service companies, including subsidiaries of the Company; and (iii) receivables acquired from the FDIC and RTC (or from secondary sources), in a face amount equal to the amount of the Offering. Recommended minimum subscription is for one Unit; however, fractional Units may be accepted at the sole and absolute discretion of Towers and subject to federal and state law. This investment opportunity will terminate on the earlier of the date all units have been sold or October 14, 1992 (the

EXHIBIT A

812

"Offering Termination Date"). There is no minimum number of units which are required to be subscribed for prior to investment of the Funds (see "DESCRIPTION OF THE PROMISSORY NOTES" and "TERMS OF THE INVESTMENT").

**Proposed Activities:** Towers will acquire (i) Healthcare Accounts Receivable from hospitals, doctors, medical groups, health maintenance organizations, rehabilitation centers and other healthcare providers which will be payable by major insurance companies such as Blue Cross/Blue Shield, state governmental agencies, major unions, private insurance companies, worker's compensation payors, personal injury payors, and all other third party reimbursers; (ii) Business Accounts Receivable purchased from manufacturers, wholesalers and service companies, including subsidiaries of the Company (the "Accounts Receivable"); and (iii) loans and receivables purchased from the RTC and FDIC (or from secondary sources).

Towers typically acquires Healthcare and Business Accounts Receivable for up to 95% of such Accounts Receivable face value (a discount or factoring fee of a minimum of 5% for each Account Receivable collected). The purchase terms for RTC and FDIC Accounts Receivable and loans vary on each acquisition.

Upon collection of each Account Receivable, the proceeds of collection (less the Excess Profits Amount) will be reinvested in additional Accounts Receivable thereby compounding the discount or factoring fee with each new purchase of Accounts Receivable. Towers expects to reinvest the funds in Accounts Receivable and compound its factoring fee up to six times per year. Towers may reinvest in the same healthcare provider or business entity or reinvest in a new or different healthcare provider or business entity in accordance with the terms of this Offering and Towers' purchase contracts. Accordingly, Towers anticipates that the spread between its cost of funds (the interest payments to investors) and the factoring fee will be significant and provide adequate funds from which investors' interest payments may be made.

Generally, hospitals, doctors, dentists, and other healthcare providers do not manage their Accounts Receivable efficiently. Towers' Accounts Receivable factoring program is well received nationwide by healthcare providers because Towers offers the needed funding to these healthcare providers thereby bridging the time delay of slow paying insurance companies and state and government agencies. Towers' large staff of insurance collection experts provide the needed resources to accelerate the payment and collection of the Accounts Receivable. Towers is currently servicing three pools of funds invested in wholly-owned special purpose subsidiaries of Towers pursuant to bond offerings. The funds from this Offering may be invested in conjunction with Towers' special purpose subsidiaries.

As relates to the acquisition of Business Accounts Receivable, small businesses generally have limited credit with suppliers and often require additional funds for production of products prior to the receipt of proceeds from the sale of such products. Additionally, temporary or seasonal requirements for funds by small businesses are not uncommon. Therefore,

2

EXHIBIT A

673

small businesses utilize accounts receivable financing to meet cash flow needs.

As relates to receivables of the FDIC and RTC, Towers will purchase packages of loans and receivables at auction based upon Towers' analysis of the value of such packages. Also, Towers may purchase FDIC and RTC loans and receivables from secondary sources which have acquired such loans and receivables directly from the FDIC or RTC. Generally FDIC and RTC loans are non-performing and in the case of the RTC loans, such loans may be secured by assets, including real property; however, such security is not expected. Due to the nature of the FDIC and RTC receivables, Towers expends substantial funds on labor and other costs associated with collecting these accounts which effectively increases the cost of these receivables. Towers will utilize no more than 20% of the aggregate offering proceeds to acquire FDIC and/or RTC loans and receivables.

The Accounts Receivable will be segregated from other assets of Towers and the computer records relating thereto will be available for inspection by Investors or their professional advisers (see "PROPOSED ACTIVITIES"). Towers reserves the right to pool Accounts Receivables with other offerings similar to this Offering. Each pool will be entitled to its pro rata share of Accounts Receivable acquired and the collateral will be shared pari passu.

The Promissory Notes are the recourse obligations of Towers and accordingly are backed by Towers' consolidated assets.

**Collateral:** Payment upon the Promissory Notes will be secured by the Security Agreement and the filing of Uniform Commercial Code ("UCC") financing statements against Towers (as debtor) for those Accounts Receivable purchased with the Funds or the proceeds thereof (see "PROPOSED ACTIVITIES - Accounts Receivable as Collateral and Security"). Towers will maintain Accounts Receivable in a minimum face amount equal to or exceeding the amount of funds caused from Investors.

**Funding Account:** The Funds will be deposited in Chase Manhattan Bank, N.A. (the "Bank") in one or more interest bearing, special accounts (the "Funding Account"). Towers will direct the investment of the Funds as provided for herein. All proceeds of the Accounts Receivable will be deposited pursuant to a lock-box system in the Funding Account. The books and records relating to the Funding Account are available for inspection and audit at the offices of the Company. Towers has the right at any time to receive payment of the Excess Profits Amount (as defined herein) from the Funding Account (see "COMPENSATION TO TOWERS").

**Use of Proceeds:** The proceeds of this Offering will be utilized to acquire Accounts Receivable, pay sales commissions of 4% of the Promissory Notes to NASD broker-dealers and pay the Excess Profits Amount.

**The Company:** Towers is a publicly-traded corporation, organized pursuant to the laws of the State of Delaware, which, through certain of its wholly-owned subsidiaries or affiliates, has been engaged in various aspects of financing and/or servicing of Accounts Receivable for the past 16 years. The Company

3

EXHIBIT A

674

maintains its corporate headquarters at 417 Fifth Avenue, New York, New York 10016, telephone number (212) 696-0505 (see "THE COMPANY").

Towers has been engaged in several offerings of securities in the past, including an offering for $56,500,000 of bonds issued on July 19, 1990; an offering for $41,500,000 of bonds issued on November 27, 1990 and an offering for $40,500,000 of bonds issued on May 23, 1991 with an additional $2,000,000 issued in July of 1991, all of which received an "AA" rating from Duff & Phelps. Such bonds were issued by special purpose subsidiaries of Towers which utilize the funds to acquire Accounts Receivable. Investors should note that the terms of this Offering differ substantially from the above-described offerings and that it is not anticipated that a rating will be sought for this Offering, or if sought, that such a rating would be issued.

**Distribution of Units:** ......... *Towers is self-underwriting the offering of the Units and will offer and sell* the Units to Accredited Investors only either (1) directly, in which case no commissions will be paid; or (2) through broker-dealers registered with the National Association of Securities Dealers, Inc., in which case the following commissions will be paid: 4% for the sale of 36-month Promissory Notes upon Sale and Acceptance, 4% on the anniversary date of Sale and Acceptance and 4% two years from Sale and Acceptance (an aggregate of 12%); 4% for the sale of 24-month Promissory Notes upon Sale and Acceptance and 4% one year from Sale and Acceptance (for an aggregate of 8%); and 4% for the sale of 12-month Promissory Notes payable upon Sale and Acceptance (for an aggregate of 4%) (see "PLAN OF DISTRIBUTION"). Commissions will only be paid upon acceptance by Towers of a fully-executed subscription from a Suitable Investor that is an Accredited Investor (see "PLAN OF DISTRIBUTION"). There is no minimum number of Units which must be sold prior to investment of the Funds by Towers.

EXHIBIT A

## RISK FACTORS

Acquisition of the Promissory Notes is speculative and subject to numerous and substantial risks. Therefore, purchase of the Units is suitable only for those persons who can afford to lose their entire investment. There will be no public market for the Units, and Federal and state securities laws impose substantial restrictions on the right of an Investor to sell or otherwise transfer his Units. Prospective Investors should carefully consider the risk factors relating to the proposed business of Towers, including, but not limited to, those certain risk factors discussed below, and should consult their own legal, financial and business advisers.

THE RISK FACTORS SET FORTH IN THIS SECTION ARE NOT INTENDED TO BE AN EXHAUSTIVE LIST OF THE RISKS RELATING TO AN INVESTMENT IN THE UNITS.

1. *Dependence on Management.* The Company's success is substantially dependent upon the ability of management (including the officers, directors and employees of its subsidiaries and affiliated companies) to provide financial and credit services and acquire Accounts Receivable as set forth herein. The loss of key personnel or an inability to attract and retain necessary replacement personnel could substantially and adversely affect the business of the Company and the Company's ability to service the program set forth herein (see "THE COMPANY").

2. *Severely Limited Liquidity of Units: Absence of Public Market.* The Units must be acquired by each purchaser for investment purposes only and not with a view to, or for resale in connection with any distribution. In reliance upon the exemption contained in Section 4(2) of the Securities Act of 1933, as amended (the "Federal Securities Act"), and regulations promulgated thereunder, the Units will not be registered under the Federal Securities Act, and Investors will have no right to require registration thereof. Furthermore, there is not currently (nor will there be) a public market for the Units. Accordingly, there can be no assurance that an Investor will be able to liquidate his investment quickly or on acceptable terms, if at all, if he should desire to do so (see "DESCRIPTION OF THE PROMISSORY NOTES" and "TERMS OF THE INVESTMENT—*Restrictions on Transfer*").

3. *Availability of Exemptions from Registration.* The Units have not been registered under the Federal Securities Act or, in most cases, the securities laws of the jurisdictions in which they are proposed to be offered and sold, in reliance upon certain claimed exemptions therefrom. The claimed exemption from Federal registration is complex, and it is often difficult to determine that its terms have been fully complied with. In addition, exemptions from registration under state securities laws frequently depend upon the availability of exemption from Federal registration. There may be a material adverse effect upon the Company's financial condition if for any reason the Company is subject to civil liability, and/or the legal expense of defending the Company in any action or proceeding challenging the availability of such exemptions.

4. *Towers' Ability to Make Payments of Principal and/or Interest Upon the Promissory Notes: Sufficiency of Collateral.* The Promissory Notes are collateralized by Accounts Receivable in a face amount equal to the aggregate amount invested in the Offering. In the event the collateral is insufficient to satisfy the obligations of Towers to make payments of principal and/or interest on the Promissory Notes, then Towers will be liable upon the Promissory Notes to the extent of its consolidated assets. In the event such assets are insufficient to cover the payment of principal and/or interest on such Promissory Notes, an Investor could lose his or her investment, in part or in whole. Although Towers has agreed that the Promissory Notes will at all times be secured by Accounts Receivable with a minimum face amount of at least 100% of the amount of proceeds raised in this Offering, it is a possibility that in a bankruptcy proceeding such collateral upon liquidation may prove to be insufficient to return to an investor the amount due him on the Promissory Note or that the bankruptcy court invalidates the investor's secured position on the collateral and the investor may be treated as an unsecured creditor having the same right to Towers' assets as all unsecured creditors.

5. *Ability to Purchase Qualified Accounts Receivable.* The success or failure of the Company's proposed business will depend, in part, upon its ability to purchase Accounts Receivable of sufficient quality at the discounts and upon the terms stated herein, so that the Company may earn a return sufficient to pay interest and principal on the Promissory Notes without incurring high losses for bad debts. The Company's ability to reinvest the funds a sufficient number of times during the year is a major factor which will determine Towers'

EXHIBIT A

profitability and its ultimate ability to pay the principal and interest on the Promissory Notes. The success or failure of any of Towers' businesses or subsidiaries may also affect its ability to repay its investors.

6. *Collectibility of Accounts Receivable.* Principal and interest payments to the Promissory Noteholders are expected to be made primarily from the collection of Accounts Receivable. In the event Business, Healthcare and FDIC and RTC Accounts Receivable cannot be collected or cannot be collected timely, the Company may not have sufficient funds to pay interest and principal on the Promissory Notes. Healthcare Accounts Receivable are acquired by the Company for its own account and for the accounts of certain of its special purpose subsidiaries pursuant to the terms of Healthcare Purchase Contracts entered into by the Company with Healthcare Providers.

All or a portion of acquired Healthcare Receivables may not be collectible due to possible breaches of representations and warranties made by Healthcare Providers. For example, the claim may be for amounts determined to be not properly payable by the Third Party Obligor, the claim may be improperly documented or the Third Party Obligor may offset payments due on such Healthcare Receivables against amounts owed by the respective Healthcare Provider to the Third Party Obligor. An example of a Third Party Obligor having an offset right is the right of a governmental entity under the Medicare or Medicaid program to offset prior overpayments discovered as the result of routine audits against current payment obligations to a given Healthcare Provider. If full payment of the value of a Healthcare Receivable is not received from Third Party Obligors due to a breach by a Healthcare Provider of its representations and warranties, the Healthcare Provider will be obligated to cure any defect with respect to such Healthcare Receivable or substitute one or more Healthcare Receivables. In the event the Healthcare Provider is financially unable to meet its obligations, the Company may generate insufficient funds to make full and timely payment of principal and interest solely from the Accounts Receivable, thereby requiring Towers to make payments of principal and interest from other sources of funds, if any.

A Healthcare Receivable may also be uncollectible for reasons that do not constitute a breach of a representation or warranty by a Healthcare Provider, such as the insolvency of a Third Party Obligor and accordingly, the Company may have no recourse against the Healthcare Provider. If an insolvency of a Third Party Obligor should occur, the Company may have insufficient funds to make full and timely payments of principal and interest on the Notes from the Accounts Receivable, thereby requiring the Company to make the payments from its general funds, if any.

As with Healthcare Receivables, Business Accounts Receivable and FDIC and RTC Accounts Receivable may be uncollectible for many reasons despite Towers' credit checking procedures and collection efforts. In the event a large number of Accounts Receivable become worthless or uncollectible, Towers may not have sufficient funds to repay investors the principal and interest on their Notes.

7. *No Opportunity to Evaluate Collateral.* Although the criteria for acquiring the Accounts Receivable have been identified, Towers has not yet selected the specific Accounts Receivable to be purchased or the specific creditors whose accounts receivable will be purchased. Accordingly, Investors will not have the opportunity to evaluate the investment of the proceeds of this Offering or the merit or creditworthiness of any particular debtor with respect to the Accounts Receivable, but must rely upon the ability of Towers based upon the criteria set forth herein to select the Accounts Receivable and to manage and operate Towers' business.

## DESCRIPTION OF THE PROMISSORY NOTES

An aggregate of one hundred million dollars ($100,000,000) of 12-month, 24-month and 36-month Promissory Notes (the "Units") bearing interest at the rate of 12% per annum for 12-month Units and 14% per annum for 24-month and 36-month Units with interest payable either monthly or quarterly at the option of the Investor, collateralized by: (i)Healthcare Accounts Receivable purchased from hospitals, doctors, medical groups and other healthcare providers (the "Healthcare Receivables"); (ii)Business Accounts Receivable purchased from manufacturers, wholesalers and service companies (the "Business Accounts Receivable"); and/or (iii)receivables and loans purchased from the Federal Deposit Insurance Corporation ("FDIC") and/or Resolution Trust Company ("RTC") or from secondary sources which have purchased

EXHIBIT A

loans or receivable packages from the FDIC or RTC (the "FDIC and RTC Receivables") consisting of 1,000 Units at $100,000 each, is offered hereby to Accredited Investors only.

Upon maturity, and subject to Federal and state laws and regulation, the proceeds of the Promissory Notes may be reinvested at the option of the Investors at the rates of interest as announced by Towers at that time. Such reinvestment is subject to Towers' discretion and the laws and regulations in effect at the time of such reinvestment. If upon maturity, the Promissory Notes are not redeemed for any reason, the terms of this Offering shall continue to apply to the Promissory Notes and the holders thereof until such redemption occurs.

Although the Promissory Notes are collateralized by Accounts Receivable, the ability to pay the interest on the Promissory Notes and pay the principal when due will be determined by Towers' overall financial condition.

## TERMS OF THE INVESTMENT

Recommended minimum subscription is one Unit; however, fractional Units may be accepted at the sole discretion of Towers. The Offering will terminate on the earlier of the date all Units have been sold or October 14, 1992 (the "Offering Termination Date"). There is no minimum number of Units which must be subscribed prior to Investment of Funds.

This Offering is being made only to Accredited Investors (as defined in Section 501(a)(1)) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Act") which reads as follows:

"*Accredited Investor*" shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefits of its employees if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of The Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

EXHIBIT A

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

*This Offering has not* been registered with the Securities and Exchange Commission. Further, this Offering has not, as of the date hereof, been registered with any state and *may only be offered* in states in which the securities have been registered or in states which afford an exemption similar to the Federal exemption and/or provide a special exemption for *Accredited or Institutional Investors.* In addition, it should be noted that this Offering is being made pursuant to an exemption which requires that no specific information be furnished to investors.

**Subscription Procedures**

*In order to subscribe for a Unit*, each prospective Investor must complete, execute, acknowledge and return to Towers the Subscription Agreement in the form attached hereto as Exhibit I.B. *and a check for $100,000* per Unit acquired.

**Acceptance**

Towers will review the Subscription Documents for completeness, due execution and investor suitability. Towers has the absolute *right, at its sole discretion, to reject*, in whole or in part, any subscription that is tendered or to waive any defect in any Subscription Documents. If Towers rejects a subscription, it will return the *Subscription Documents, including the Investor's check*, to the prospective Investor.

If Towers accepts a subscription ("*Acceptance*"), *subscription funds will* be deposited in the Funding Account and Towers will forward an executed Promissory Note in the form set forth in Exhibit II to the Investor. *Interest on the Promissory Note shall accrue from* the date of Acceptance. The Company shall accept subscriptions only from Accredited Investors.

**Reinvestments**

The Company may, in its discretion and pursuant to applicable securities laws, *permit investors from* past offerings to direct that the payment of the principal amount of the prior offering be credited toward an investment in the current Offering. *The Company reserves the right to pay such investors the interest rates* which they were receiving under their previous investment. Subscription procedures may be modified for such investors; provided, that such *investor remains an Accredited* Investor, as defined herein.

**Restrictions on Transfer**

*The Units offered hereby* have not been registered under the Securities Act of 1933, as amended (the "Federal Securities Act"), nor pursuant to the provisions of the securities laws of any jurisdiction, and the Units are being offered, and will be sold, without benefit of registration under federal and state securities laws by reason of specific exemptions from registration provided thereby.

The availability of each such exemption is dependent, in part, upon the "investment intent" of each prospective Investor, and an exemption from registration would be unavailable if any one purchaser were purchasing a Unit with a view to the redistribution thereof. *Accordingly, each prospective Investor when* executing the Subscription Agreement will be required to acknowledge that the purchase is for investment, for his own sole account, and without *any view towards the sale or other disposition* thereof and to make certain representations and warranties to Towers.

Investors have not been granted the right to require the registration of their Units under either the Federal Securities Act or *any state securities law and Towers will not* register the Units in the future (see "RISK FACTORS").

EXHIBIT A

819

If an Investor wishes to dispose of his Units, such disposition is circumscribed by the *terms of the provisions of the Federal Securities Act* and state securities laws.

## USE OF PROCEEDS

The proceeds of the Offering will *be used to purchase* the Accounts Receivable which will collateralize the Promissory Notes and to pay commissions of 4% for the 36-month, 24-month and 12-month *Promissory* Notes (see "*PLAN OF DISTRIBUTION*"). The Company will pay all other expenses of the Offering, and its costs of operations (including salaries and overhead). The Company will be *entitled to direct the payment of the Excess Profits Amount* to itself at its discretion; provided the required collateral coverage is maintained (see "COLLATERAL COVERAGE").

## FUNDING ACCOUNT

A special interest-bearing account (the "Funding Account") has been established by *Towers at Chase Manhattan Bank, N.A. (the "Bank")* for the purpose of depositing (i) the proceeds of the Offering as funds are received and accepted from Investors (the "Funds"); and (ii) the proceeds of *Accounts Receivable* as such *Accounts Receivable* are collected. Once the Funds are deposited, Towers may direct the investment of the Funds in Accounts Receivable or make such other disbursements *of the Funds as provided in this document.* The proceeds of the Accounts Receivable will be deposited pursuant to a lockbox system which Towers has arranged with the Bank. Any fees *relating to the Funding Account will* be paid by Towers. Towers reserves the right to utilize other major money center banks at its discretion.

## PROPOSED ACTIVITIES

Towers will use the Funds to acquire Healthcare and Business Accounts Receivable and receivables purchased from the FDIC and RTC or from secondary sources *which have purchased* from the FDIC and RTC. Presently, Towers, through its New York City headquarters and its regional and branch offices, has identified substantial markets for the acquisition of *suitable Accounts Receivable.* Additionally, Accounts Receivable may be acquired from affiliates or subsidiaries of Towers (see "CONFLICTS OF INTEREST").

Towers typically purchases Accounts Receivable for up to 95% of their face amount resulting in a minimum discount or factoring fee of 5% for each *Account Receivable collected.* Upon collection of each Account Receivable, the proceeds of collection will be reinvested in additional Accounts Receivable resulting in the compounding of the *factoring fee with each new purchase. Towers* expects to reinvest the collected funds in Accounts Receivable and compound the factoring fee up to six times a year; which is expected to provide sufficient *funds for the payment of* interest to the Promissory Noteholders. Towers may reinvest in the same Healthcare Provider or business entity or reinvest in a new or different Healthcare Provider or business entity *in accordance* with the terms of this Offering.

**Accounts Receivable as Collateral and Security**

The *Accounts Receivable will be* security and collateral for the Promissory Notes pursuant to Uniform Commercial Code financing statement filings to be made against Towers, as debtor, relating to the *Accounts Receivable. Such* collateral will consist of Accounts Receivable with a face amount equal to or in excess of the Promissory Notes. In the case of Healthcare Accounts Receivable, since *Towers sometimes only advances* a portion of the stated value of Healthcare Receivables prior to collection, the unpaid balance of the purchase price of the Healthcare Receivables may provide additional *collateral; however*, Towers will continue to remain obligated on the balance of the purchase price if the receivable is collected. For certain of the Healthcare Accounts Receivable, *UCC filings may not be* the proper mechanism to secure the investors. In such cases, the security interest is perfected by a pledge of such receivables.

Further, the Promissory Notes are the recourse obligations of Towers and Towers is liable for the stated value of the Promissory Notes *to the extent of its consolidated assets.*

Towers reserves the right to pool the security interest which will be granted to the Noteholders with other security interests granted to prior or future offerings. All such poolings will be on the pari passu (pro rata) basis.

EXHIBIT A

820

The healthcare industry in the United States has grown rapidly over recent years and is expected to continue to grow reflecting age and population trends. Billings, collection and *insurance compliance for* healthcare groups is extremely complex, time-consuming and labor intensive. Typically, hospitals, doctors, dentists and other healthcare professionals or groups do not efficiently manage their billing, collection and insurance operations and accordingly, cash flows are disrupted by the delay between the filing for payment of funds and the receipt of such funds. The Towers Healthcare Accounts Receivable funding program allows healthcare providers to bridge the time delays brought on by slow-paying insurance companies and state/federal governmental agencies, and collect a greater portion of the funds to which such healthcare provider is entitled. For qualified healthcare providers, Towers provides (i) a thorough examination of claims submissions to ensure prompt payment and reduce incorrect third party provider deductions; (ii) the ability to reduce *internal staffing; and (iii) use of sophisticated* data processing equipment owned by Towers.

Accordingly, the ability of Healthcare Providers to sell or factor their accounts receivable is paramount to their financial stability and liquidity.

***Description of Healthcare Accounts Receivable***

The Notes will be secured, in part, by the Healthcare Receivables generated by Healthcare Providers that from time to time enter into Healthcare Purchase Contracts with Towers. Generally, the Accounts Receivable of the Healthcare Providers can be separated into four categories based on the payor on the accounts: commercial insurance; Blue Cross; government programs; and self-pay.

The commercial insurance category covers the Healthcare Receivables for which payment will be received from either (i) a commercial insurance company (pursuant to health, personal injury, workmen's compensation and other insurance policies or administrative services only contracts ("ASOs")); (ii) a health maintenance organization ("HMO"); (iii) a preferred provider organization ("PPO"); or (iv) employers or unions who self-insure their employees or members. The commercial insurance company generally reimburses the Healthcare Provider for the Healthcare Provider's charges less any co-payment portion or deductibles. HMOs and PPOs generally have contractual arrangements with the individual Healthcare Providers *which set the fees and charges that the Healthcare Providers* may charge for their services.

The Blue Cross category covers all Healthcare Receivables for which payment will be received from "Blue Cross" entities. While Blue Cross is a national entity, it is comprised of a series of state or multistate organizations which operate as individual entities. As a result, no "general" reimbursement method exists for the Healthcare Receivables that fall into this category. Each Healthcare Provider which participates in the Blue Cross program has its own arrangement with Blue Cross whereby the Healthcare Provider may receive reimbursement for (i) the Healthcare Provider's standard fees and charges, (ii) a percentage of the Healthcare Provider's standard fees and charges, (iii) a negotiated rate or (iv) the Healthcare Provider's cost *of service. Healthcare Receivables representing payments to be received from "Blue Cross" entities will not* be acquired unless the Healthcare Provider is a participant in the Blue Cross program. (Collectively, companies in the commercial insurance category and the Blue Cross category, together with non-profit health insurance companies, are referred to as the "Insurers.")

*The government program category includes Healthcare Receivables for which payment is received from* either the federal government ("Medicare"), jointly from the state governments and the federal government ("Medicaid") or other governmental entities. The receivables are paid at either a predetermined rate per diagnosis or a rate based on a formula associated with the cost of care. Medicare law requires Healthcare Providers to accept Medicare payment as payment in full for "covered" items or services and prohibits Healthcare Providers from charging Medicare patients for anything other than the usual deductible and co-insurance amounts. Healthcare Providers can charge Medicare patients for any "noncovered" items or services. Claims against state workmen's compensation funds also fall into this category of accounts receivable.

The self-pay category consists of accounts receivable in excess of the Third Party Obligor's obligation for which payment will be received from either the individual patient or an individual guarantor on the patient's

EXHIBIT A

account. The Healthcare Provider charges its standard fees and charges and the accounts are usually outstanding for 120 to 180 days *from the date of first billing.*

The following representative list sets forth those insurance companies that are obligated to pay Towers pursuant to purchased claims from Healthcare Providers:

| | |
|---|---|
| Blue Cross/Blue Shield | Metropolitan Life Insurance Co. |
| General American Insurance Company | New York Life Insurance Co. |
| State Farm Insurance Company | National Association of Letter Carriers |
| Prudential Insurance Company | Allstate Insurance Co. |
| Travelers Insurance Company | Best Benefits |
| Aetna Insurance Company | Chubb Pacific Group |
| Mutual of Omaha | Cigna |
| Connecticut General Life Insurance Co. | Combined Insurance of America |
| Equitable Insurance Company | Continental Life |
| First Fund Insurance Co. | Fireman's Fund Insurance Co. |
| Liberty Mutual Insurance Co. | John Hancock Insurance Co. |
| Pacific Mutual Insurance Co. | Hartford Insurance Co. |

There currently are several financing sources which actively acquire accounts receivable from health*care groups of which Towers is one. Towers has 16 years of experience in healthcare accounts receivable* servicing and/or financing and through its professional collection team, trained insurance adjusters, insurance administrators, collectors, paralegals, claims examiners, claims billers, claims supervisors and attorneys can properly and efficiently acquire, service and collect Healthcare Receivables due from various insurance companies. Towers has generated, through its New York City headquarters and its regional and branch offices, a substantial backlog of Healthcare Receivables and accordingly, Towers will be able to quickly place the Funds.

**Determination and Criteria of Eligibility for Healthcare Accounts Receivable**

The Company will accept reimbursable Healthcare Accounts Receivable that have been verified with third party insurance carriers including unions, self insured groups, third party reimbursers and city and state agencies and documented in the patient account file. The Company will not purchase any direct federal reimbursed accounts, self-pay receivables or third party receivables located outside of the United States. It is the Healthcare Provider's responsibility to send eligible healthcare accounts receivable to Towers after a predetermined period of time from discharge depending upon the Healthcare Provider's window for final bill production and late charges. The Healthcare Provider will perform the pre-screening functions to ensure that appropriate verification has occurred. The Healthcare Provider is responsible for verifying the validity and propriety of *Healthcare Receivables by judgmentally selecting* Healthcare Receivables that meet certain criteria.

If the Healthcare Provider is unable to provide pre-screening verification, the servicer will arrange for verification with an independent service such as a third party administrator.

**Description of Business Accounts Receivable**

Towers actively acquires Accounts Receivable of qualified companies and may use a portion of the Funds for this purpose. Most large institutions do not extend substantial loans to businesses with annual sales volume of between $500,000 and $10,000,000 for the funding of accounts receivable. Historically, only established firms which have substantial assets or cash flow are able to readily finance their accounts receivable. Small businesses' accounts receivable are traditionally due 30 to 90 days after issuance and, in many instances, such companies cannot afford to wait until the due date of the accounts receivable in view of the fact

EXHIBIT A

that overhead expenses, such as payroll, rent and taxes must be paid on an ongoing basis. Generally, such small businesses have limited credit with their suppliers and often require additional funds for production prior to the sale of products. Short-term borrowing to meet temporary or seasonal cash flow interruptions is usually not available. Accordingly, many businesses utilize Accounts Receivable financing on a seasonal or ongoing basis to meet their cash flow needs.

Towers has created an accounts receivable purchasing program pursuant to which small, medium and large companies can sell their accounts receivable to Towers. In order to be eligible for purchase, the accounts must satisfy certain requirements imposed by Towers. Towers acquires Accounts Receivable for up to 95% of such Accounts Receivable stated value (a discount or factoring fee of a minimum of 5% for each Account Receivable collected). Upon payment of each Account Receivable Towers reinvests the funds and compounds its factoring fee with each purchase. Towers expects to reinvest the funds up to six times per year.

The following is a representative list of companies obligated to pay Towers on Business Accounts Receivable which have been previously acquired and which are likely to be acquired by Towers in the future:

| | |
|---|---|
| R.H. Macy and Company, Inc. | General Electric Company |
| RCA Corporation | Campbell Soup Company |
| Revlon Inc. | King Kullen Grocery Co. |
| Avon Products, Inc. | Westinghouse Electric Company |
| Burlington Northern Railroad Company, Inc. | Mitsubishi International Co. |
| | Pace Membership Warehouse |
| F.W. Woolworth Company | Simon and Schuster |
| J.C. Penny Company, Inc. | Lever Brothers Company |
| Jamesway Corporation | Esselte Pendaflex Corporation |
| Raytheon Co., Inc. | Saks Fifth Avenue |
| Caterpillar Inc. | Walt Disney Productions |

Towers requires as security for payment of acquired or financed Accounts Receivable first lien security interest in (or direct purchase of) the Accounts Receivable of the financed company which is evidenced by Uniform Commercial Code financing statements.

Towers reserves the right, in its sole discretion, to acquire Accounts Receivable which are not current or for a price above or below that stated herein under certain circumstances. Each purchase of Business Accounts Receivable will be documented by a written agreement between Towers and the seller and Towers will receive a bill of sale or purchase agreement for the Accounts Receivable which will give Towers title to and ownership of such account. The bill of sale and/or purchase agreement from the seller generally will contain *representations and warranties that the Accounts Receivable are valid and not in dispute and that in the* event of nonpayment, the bill of sale will provide that Towers and its assignees will have the right to offset the amount which is due to Towers from the unpaid Business Accounts Receivable against other payments which are due to the financed company on other Accounts Receivable of the financed company which are collected by Towers.

Towers generally only purchases Business Accounts Receivable of companies which are listed by a major rating agency; however, Towers reserves the right to purchase Accounts Receivable which are not so listed if in Towers' sole discretion such companies are comparable to listed companies. Towers may acquire Accounts Receivable from accounts in various industries, including, but not limited to, the following: manufacturing, transportation, communications, the wholesale and retail trade, finance, insurance and healthcare professionals.

Towers may purchase or finance Accounts Receivable from its affiliates and from companies in which it or its affiliates have a financial interest. Towers purchasing *from affiliates may include the acquisition of* receivables representing payments due Towers as collection fees for services performed in Accounts Receivable Management and factoring. These collection accounts will be valued at the amount of the collection fee due Towers for the purpose of this Offering. It should be noted that collection accounts may be obtained for

EXHIBIT A

823

no payment by Towers; however, substantial cost may be associated with collecting these Accounts Receivable.

## DESCRIPTION OF FDIC AND RTC LOANS AND RECEIVABLES

The Federal Deposit Insurance Corporation and the Resolution Trust Company (established by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA")) have the responsibility for liquidating assets of banks and savings and loan associations which are in receivership. It is estimated that billions of dollars of loans and receivables will be sold by the FDIC and the RTC over the next 24 months. These loans and receivables are *of various categories including performing*, non-performing, charge-offs and write-offs. Some of these loans and receivables are backed by assets while others are unsecured.

The FDIC and RTC packages loans and receivables for sale at auction through the regional offices of the FDIC and RTC. Towers will bid on suitable loan and receivable packages and if such bid is the highest bid, will acquire the loan and receivable packages. Towers will then utilize its collection abilities to collect upon the acquired loans and receivables. Since the loan receivable packages offered by the FDIC and RTC are offered at substantial discounts from face value, the successful collection upon a portion of these loans and receivables will produce a profit factor. Towers may also purchase FDIC and RTC originated loans and receivables from secondary sources which have acquired such receivables directly from the FDIC and RTC.

It should be noted that FDIC and RTC receivables are taken into account at face amount for purposes of this Offering even though they may be purchased for substantially less than the face amount.

The Company will utilize no more than 20% of the aggregate offering proceeds to acquire FDIC and/or RTC loans and/or accounts receivable.

## COMPENSATION TO TOWERS

Towers will be entitled to transfer or use for its own account an amount equal to the amount by which (a) (i) the face amount of the Accounts Receivable plus (ii) the Funds on deposit in the Funding Account exceeds (b) (i) the face amount of all issued Promissory Notes plus (ii) all accrued and unpaid interest due on such Promissory Notes (the "Excess Profits Amount"). Towers' profits are the assets of Towers and may be used for any corporate purpose as determined in the sole and absolute discretion of Towers.

Towers intends to utilize its subsidiaries and affiliates for the purpose of generating Accounts Receivable and collecting and servicing Accounts Receivable. Towers' affiliates and subsidiaries may charge a fee or make a profit on such services; however, it has been represented that such fees or profits will not exceed *those such affiliates and subsidiaries charge third parties and will be comparable to third party charges.*

## COLLECTION OF ACCOUNTS RECEIVABLE

Towers Collection Service, Inc. ("TCS"), a wholly-owned subsidiary of Towers, will be utilized to collect any Accounts Receivable which become past due at TCS's standard rates (see "CONFLICTS OF INTEREST" and "COMPENSATION TO TOWERS"). TCS is a major, full-service collection agency which has the ability to service all collections relating to this Offering (see "THE COMPANY").

## COLLATERAL COVERAGE

Towers will maintain as collateral for this Offering Accounts Receivable in the face amount of at least the amount of the aggregate offering less cash on hand in the Funding Account (see "PROPOSED ACTIVITIES—Accounts Receivable as Collateral and Security").

## THE COMPANY

Towers is a publicly-traded corporation organized pursuant to the laws of the State of Delaware which, directly and through its subsidiaries and their predecessors has, over the past 16 years, provided accounts

EXHIBIT A

824

receivable financing and management services for over 20,000 corporate and healthcare clients. Such services include the purchase and recovery of accounts receivable for Towers' own account (commonly known as factoring) and the collection of accounts receivable on a contractual basis for the account of others. Towers' corporate headquarters are located at 417 Fifth Avenue, New York, New York 10016.

As of June 30, 1991, Towers had a staff of approximately 600. In addition, Towers has an extensive network of independent contractors to supplement its in-house sales force with over 1,000 independent contractors who are paid on a commission-only basis for soliciting clients for Towers' services. Towers maintains a marketing staff of account executives and area managers plus regional managers. Towers employs area sales executives in most of the states. Towers and its subsidiaries lease approximately 100,000 gross square feet of office space in New York City. In addition, Towers has established regional branch offices and satellite operations which provide coverage to all major states in the United States.

Towers and its subsidiaries, Towers Credit Corporation ("TCC") and Towers Collection Service, Inc. ("TCS") (and certain other subsidiaries which are special-purpose subsidiaries) have engaged in either servicing or acquiring accounts receivable having an aggregate face value in excess of $1 billion.

The consolidated financial statements of Towers for the year ended June 30, 1991 are accompanying this Offering Document under separate cover.

Towers serviced in excess of $800,000,000 in outstanding debt for over 20,000 accounts during the fiscal year ended June 30, 1991. Towers utilizes an experienced staff of collection professionals, including trained insurance analysts, insurance claims experts, collectors, paralegals, claims examiners, claims billers, claims supervisors and attorneys. In addition, Towers' staff of computer programmers has specially designed computer software programs to support Towers' healthcare financing activities.

### Directors and Executive Officers

The directors and executive officers of Towers are listed below. Except as otherwise set forth in the description of their business experience below, each of the persons listed has held his position with Towers since October of 1985.

| Name | Age | Position and Offices Held With Towers |
|---|---|---|
| Steven Hoffenberg | 46 | Chairman of the Board, Chief Executive Officer and President |
| Mitchell Brater | 50 | Vice Chairman of the Board and Chief Operating Officer |
| Charles H. Chugerman | 32 | Director, Executive Vice President and Secretary |
| Michael Rosoff | 41 | Director, Senior Vice President Chief Legal Officer and Assistant Secretary |
| Thomas B. Evans, Jr. | 58 | Director |
| Ben Barnes | 53 | Director |
| Anthony DiNicholas | 41 | Senior Vice President |
| Xavier Eboli | 51 | Vice President |
| Richard Levine | 45 | Vice President |
| Raymond Lewis | 74 | Director and Vice President |

Towers' directors hold office until the next annual meeting of stockholders or until their successors have been duly elected and qualified. Towers' executive officers are elected annually by, and hold office at the pleasure of, the Board of Directors.

EXHIBIT A

*Steven Hoffenberg* has been the Chairman of the Board and President of TCC and Professional Business Brokers, Inc. (the prior owner of TCC and TCS) since their inception.

*Mitchell Brater* became Vice Chairman of the Board and Chief Operating Officer of Towers in November 1987. Mr. Brater has also been President of Eton Capital Corp. and Eton Securities Corp. ("Eton"), and Eton's predecessors for more than the past five years. Eton Capital Corp. is a financial services company.

*Michael Rosoff* became a Senior Vice President and Chief Legal Officer at Towers in 1989. He became a Vice President, an Assistant Secretary, General Counsel and a Director of Towers in 1986. Mr. Rosoff has also been a Vice President, General Counsel and a Director of TCS and TCC since 1984.

*Charles H. Chugerman* has been Vice President of TCC since 1985 and a Vice President of TCS since 1984.

*Thomas B. Evans, Jr.* became a Director of Towers in 1990. Mr. Evans has been the President of the Evans Group Ltd., a Washington, D.C.—based consulting firm, since 1989 and was a senior partner in the law firm of Manatt, Phelps, Rothenberg & Evans from 1985 to 1989. Mr. Evans currently serves as a Director of Zemex Corporation, a diversified minerals and materials firm. Mr. Evans served as Co-Chairman of the Republican National Committee from 1971 to 1973. He was a member of the United States House of Representatives from 1977 to 1983.

*Ben Barnes* became a Director of Towers in 1990. Mr. Barnes has been a business and government consultant since 1987 and is currently operating under the name of Entrecorp. Prior to that, Mr. Barnes was the Chief Executive Officer of Barnes-Connally Partnership, a real estate and oil and gas holding and development company, from 1981 to 1987. Mr. Barnes served as Lieutenant Governor for the State of Texas from 1969 to 1973 and as the Speaker of the House of Representatives of the State of Texas from 1965 to 1969. Mr. Barnes and Barnes-Connally Partnership filed voluntary petitions with the United States Bankruptcy Court in December 1987 and July 1987, respectively, under Chapter 7 of the United States Bankruptcy Code as a result of the severe economic dislocations in the Texas real estate and oil and gas industries during the mid 1980's.

*Anthony DiNicholas*, prior to joining Towers in 1989, was a Vice President at First Ohio Securities from April 1989 to September 1989, and a Vice President at Security Pacific National Bank from 1987 to 1989. From 1986 to 1987, Mr. DiNicholas was a Vice President at Smith Barney, Harris Upham & Co., Incorporated and from 1985 to 1987, Mr. DiNicholas was a securities broker with Bear, Stearns & Co., Inc.

*Xavier Eboli* has been a Director of Towers since 1988 and a Vice President of Towers since 1986. He has also been a Director of TCC since 1989 and a Director and President of TCS since 1985.

*Richard Levine* has been a Vice President of Towers since 1984.

*Raymond Lewis* has been a Vice President and Director of TCC since prior to 1984.

### CONFLICTS OF INTEREST

Towers is acquiring Accounts Receivable for its own account and for the account of others and accordingly may have a conflict of interest in the purchasing and administering of Accounts Receivable. Various affiliates of Towers may be involved in acquiring, servicing, collecting or selling Accounts Receivable to Towers. Towers has represented that it will not cause an affiliate to charge any more for its services than it would charge a third party.

Further, Towers is sponsoring either directly or through affiliates, other accounts receivable programs. Accordingly, there may be a conflict as to the acquisition of accounts receivable and the servicing thereof.

### ADDITIONAL INFORMATION

Investors or their professional advisers will be provided with the opportunity to request additional information from Towers, which to the extent reasonably available, will either be furnished to such Investors or available at the Company's offices for review. Such information includes the following:

1. Certificate of Incorporation of Towers:

EXHIBIT A

2. By-Laws of Towers; and
3. Opinion of Counsel as to the legality of the securities.

## PLAN OF DISTRIBUTION

The Company is self-underwriting this offering of Promissory Notes for sale on a best-efforts basis either (1) directly (in which case no commissions will be paid); or (2) through broker-dealers registered with the National Association of Securities Dealers, Inc. in which case commissions of: 4% for the sale of 36-month Promissory Notes upon Sale and Acceptance, 4% one year from Sale and Acceptance and 4% on the second anniversary of Sale and Acceptance (for an aggregate of 12%); 4% will be paid for the sale of 24-month Promissory Notes and an additional 4% per 24-month Unit will be paid one year from Sale and Acceptance (for an aggregate of 8%); and 4% for the sale of 12-month Promissory Notes payable upon Sale and Acceptance (for an aggregate of 4%).

## LEGAL MATTERS

Bronson & Migliaccio, New York, New York, was retained as special counsel for the Company for the preparation of this Offering Document.

## PROMOTIONAL AND SALES LITERATURE

No offering literature or advertising in any form shall be employed in the offering of these Units except for this document and the exhibits hereto. No person has been authorized to make representations other than those contained in this document or the exhibits hereto and, if made, such representation must not be relied upon.

## LITIGATION

On August 4, 1988, the Securities and Exchange Commission commenced a civil action in the United States District Court for the Southern District of New York (88 Civ. 5421) against the Company, TCC, Steven Hoffenberg, Mitchell Brater and Eton alleging that offers and sales of certain securities of TCC were made to the public by such persons without first having a registration statement on file and declared effective by the Securities and Exchange Commission. The Company, TCC and Steven Hoffenberg, without admitting or denying the Securities and Exchange Commission's allegations, consented to the entry of a judgment of permanent injunction on November 16, 1988 enjoining them from violating Sections 5(a) and 5(c) of the Securities Act of 1933, as amended. Mitchell Brater and Eton, without admitting or denying the Securities and Exchange Commission's allegations, consented to the entry of a judgment of similar permanent injunction on April 27, 1989. As a result of the same allegations as are discussed above, Eton, in its capacity as a registered broker-dealer, and Mitchell Brater, in his capacity as President of Eton, consented to the entry of an Order on May 13, 1989 by the Securities and Exchange Commission in an administrative proceeding separate from the civil action discussed above (i) prohibiting Eton from participating in any public and certain private offerings of securities for 60 days, (ii) prohibiting Mitchell Brater from any association with any broker, dealer, investment company, investment advisor or municipal securities dealer for 60 days and (iii) prohibiting Eton from participating in any public and certain private offerings of securities for three years unless Eton has retained independent counsel to provide a written opinion and certain other advice to Eton regarding compliance with Section 5, 3(b), 4(2) or 4(b) of the Securities Act of 1933, as amended, depending on the Section applicable to the particular offering.

On June 11, 1990, the State of Nebraska Department of Banking and Finance entered a Consent Order in an administrative proceeding against the Company and TCC after finding that the permanent injunction entered against the Company and TCC, as described above, disqualified the Company and TCC from using the private offering exemption from registration that is provided in the Nebraska Revised Statutes, for sales of certain promissory notes and, as a result, three of such sales in Nebraska were made in violation of the securities registration requirements of Nebraska law. The Consent Order imposed a $5,000 penalty and fine on the Company and TCC and required maintenance of a current registration or claim of an applicable exemption at all times offers and sales of their securities are made in Nebraska.

EXHIBIT A

827

On February 20, 1990, TCC consented to the entry of an Administrative Order against TCC by the Alabama Securities Commission following a determination by the Alabama Securities Commission that TCC sold its promissory notes to nonaccredited investors in violation of the terms of an exemption from registration of such sales with the Alabama Securities Commission. The Administrative Order directed TCC to cease and desist from any offer or sale of any security or from any other securities activities into, within, or from the State of Alabama in violation of the Alabama Securities Act.

On January 8, 1991, the Company consented to the entry of a Cease and Desist Order by the Commissioner of Securities for the State of Louisiana ordering the Company to cease and desist any activities which are in violation of the Louisiana Securities Act. The Louisiana Cease and Desist Order arose out of an investigation by the Louisiana Commissioner of Securities into whether certain promissory notes offered by the Company through Biedenharn Investment Group, Inc. were sold on behalf of the Company in a manner that did not comply with the requirements for an exemption from registration under Louisiana securities laws and regulations. In the Cease and Desist Order, the Louisiana Commissioner of Securities stated that "it appears that [the Company] is in violation of the Louisiana Securities Act, in that the [promissory notes] were not registered in the State of Louisiana." In consenting to the entry of the Cease and Desist Order, the Company neither admitted nor denied any liability.

In addition, on October 17, 1989, the New Jersey Bureau of Securities issued an order of denial of exemption against TCC relating to its 1988 private offering of promissory notes due to the failure to timely file a notice of exemption within 30 days of completion of the offering.

The Company instituted a lawsuit in 1989 against Ernest M. Solomon ("Solomon") and others seeking rescission and damages in connection with the sale by Solomon to the Company of approximately 83% of the common stock of United Diversified Corporation ("UDC") in 1987. The Company alleges that it was defrauded by the defendants as a result of certain misrepresentations made in connection with the Company's acquisition of the UDC common stock and actions taken by Solomon subsequent to his sale of the UDC common stock. In April, 1990, defendants counterclaimed for compensatory and punitive damages for fraud, and conversion by the Company, Steven Hoffenberg and others as a result of certain representations alleged to have been made in connection with the Company's acquisition of the UDC common stock and subsequent actions alleged to have been taken by Steven Hoffenberg, the Company and others (primarily, the alleged use of UDC assets for expenses not related to the business of UDC). The counterclaim also alleges violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), and seeks triple the amount of their actual damages, if any, as determined by the Court. The Company moved to dismiss those counts of the complaint based upon fraud, conversion and alleged RICO violations. On September 24, 1991, Magistrate Judge Edward A. Bobrick, to whom the Company's motion was directed, filed a report recommending that the District Court grant the Company's motion, and that those counts of the complaint seeking compensatory and punitive damages be dismissed. The Company believes that the remaining count contained in the counterclaim is without merit and that an adverse determination on this remaining count would not result in a damage award that would have a material adverse effect on the Company. *Towers Financial Corporation, et al. v. Ernest M. Solomon, et al.*, Case No. 89 C 0913 (N.D. Ill.)

On UDC's behalf, the Company is a claimant to certificates of deposit held by several banks in the principal amount of approximately $3.5 million plus interest, totalling approximately $4.1 million as of March 31, 1991. There are other claimants to the fund, including the Illinois Insurance Director and the Michigan Insurance Director in the latter's capacity as receiver of Cadillac Insurance Company, a company formerly controlled by Solomon. Pending further order by the United States District Court, the funds are being retained by the banks. *Cadillac Insurance Company v. The American National Bank of Schiller Park f/k/a First National Bank of Schiller Park, et al.*; Case No. 89 C 3267 (N.D. Ill.).

The Company is involved in additional litigation arising out of its acquisition of the UDC stock. In 1988, the Illinois Insurance Director instituted liquidation proceedings against United Fire Insurance Company and Associated Life Insurance Company, two wholly owned UDC subsidiaries. After initially contesting the liquidation proceedings, the subsidiaries acquiesced to the Director's liquidation petitions. The Director also placed UDC into a conservatorship and petitioned for liquidation of UDC. UDC is contesting that petition on the basis that UDC is not an insurance company and, therefore, is not subject to liquidation or conser-

EXHIBIT A

822

vatorship under the Illinois Insurance Code. That action is still pending. *People of the State of Illinois ex rel., John E. Washburn, etc. v. United Fire Insurance Company, et al.*; Case No. 88 CH 6942 (Cir. Ct. Cook Cty. 88 CH 6942).

The Company, through counsel, has had discussions with the California Department of Consumer Affairs regarding alleged violations by Towers Collection Services of California, Inc. (a wholly-owned subsidiary of the Company) of certain California laws and regulations applicable to collection agencies. Based on these discussions, it is expected that the California Department of Consumer Affairs will, in the near future, issue an "Accusation" alleging that the collection agency license of the Company's California subsidiary is subject to disciplinary action as a result of violations of various sections of the California Business and Professions Code between August 1989 and June 1990, including alleged violations of provisions that require (i) all persons engaged in conduct as a collection agency in California to hold a valid collection agency license for each location at which such conduct is engaged, (ii) a licensee to render a written statement of account and remittance of all money then due to each customer within 60 days after receipt of payment on any claim or account, (iii) a licensee to maintain accounts and records of transactions conducted in California at its address of record for a period of three years and (iv) faithful discharge of obligations regarding form attorney letters. It is also expected that simultaneously with the issuance of the Accusation, the Accusation will be dismissed with prejudice in exchange for entry of an Order against Towers' California subsidiary and the stipulation by the subsidiary that it is subject to the jurisdiction and requirements of the Bureau of Collection and Investigative Services of the Department of Consumer Affairs. Pursuant to the Order, it is expected that the collection agency license of Towers' California subsidiary will be placed on administrative probation for three years on the following terms and conditions: (i) the subsidiary must obey all laws and regulations related to licensed collection agencies and debt collection, (ii) the records required to be maintained by the California Collection Agency Act must be reviewed by an independent certified public accountant in New York, (iii) access to the records required to be maintained in California must be provided to the Bureau upon demand, (iv) the Bureau must be paid approximately $31,200 for the costs it incurred, (v) the subsidiary must notify the Bureau if it ceases California operations and (vi) in the event the terms of the administrative probation are violated, the Bureau may, after notice and hearing, impose whatever discipline is appropriate and authorized by law.

Towers is also involved in litigation stemming from settlement of a claim of F.H. Prince & Company against United Fire Insurance Company, a wholly-owned subsidiary of UDC, which claim arose prior to Towers' acquisition of UDC. Towers agreed to guarantee the settlement based upon the representations made by the seller of UDC which are the subject of the *Towers v. Solomon* litigation discussed above. In the Solomon litigation and in this litigation, Towers has asserted that the seller's representations made to Towers were untrue. Towers' defense in this litigation is that the Towers' guarantee is voidable because it was induced by the foregoing untrue representations and because F.H. Prince & Company provided no valuable consideration. Although the judge to whom the F.H. Prince & Company case was originally assigned indicated that the above-stated defense of Towers was deficient as pleaded, he stated that such a defense would be valid if adequately pleaded and accordingly he granted Towers time to replead. The case was subsequently assigned to another judge who disallowed Towers' defense with prejudice. This action has resulted in a judgment against Towers (which became final on May 8, 1991) of $767,986.86, plus attorneys' fees and court costs, which Towers is appealing based upon the above defenses and upon new facts that have come to light through discovery that show that Cadillac Insurance Company, a company formerly controlled by the seller, Ernest Solomon, which made representations to Towers, was insolvent in 1985 and 1986 prior to the acquisition. Towers has posted the requisite appeal bond. *F.H. Prince & Company v. Towers Financial Corporation*, 89L-15714 (Cir. Ct. of Cook County, IL).

## GLOSSARY

"*Act*" means the Securities Act of 1933, as amended.

"*Accounts Receivable*" means Healthcare and Business Accounts Receivable of various third party companies and RTC and FDIC loans and receivables which meet Towers' criteria for purchasing and which are acquired by Towers with the proceeds of this Offering.

EXHIBIT A

829

"*Accounts Receivable Management*" means the management of the recovery and collection of Accounts Receivable.

"*Bank*" means Chase Manhattan Bank, N.A.

"*Business Accounts Receivable*" means accounts receivable of third party business companies.

"*Company*" means Towers Financial Corporation, as the Issuer.

"*Excess Profits Amount*" means an amount equal to the amount by which (a)(i) the face value of the Accounts Receivable plus (ii) the Funds on deposit in the Funding Account exceeds (b)(i) the face amount of all issued Promissory Notes plus (ii) all accrued and unpaid interest due on such Promissory Notes.

"*Federal Securities Act*" means the Securities Act of 1933, as amended.

"*FDIC*" mean the Federal Deposit Insurance Corporation.

"*Funding Account*" means the interest-bearing account in which the Funds are deposited.

"*Funds*" means the monies received from Accredited Investors and the proceeds of the Accounts Receivable.

"*Healthcare Accounts Receivable*" means accounts receivable from groups in the health-care industry.

"*Healthcare Provider*" means a hospital, doctor, medical group, health maintenance organization, rehabilitation center and other healthcare providers.

"*Healthcare Purchase Contract*" means the agreement by which Towers acquires Healthcare Accounts Receivable from Healthcare Providers.

"*Investor*" means any holder of a Promissory Note who is an Accredited Investor.

"*Notes*" means the 12-month, 24-month and 36-month Promissory Notes.

"*Offering*" means this Confidential Private Offering Document.

"*Offering Termination Date*" shall mean the earlier of the date all of the Units have been sold or October 14, 1992.

"*Promissory Note*" means either a 12-month, 24-month or 36-month promissory note issued by Towers to Accredited Investors pursuant to this Offering.

"*RTC*" means Resolution Trust Company.

"*Security Agreement*" means the agreement executed by Towers, the form of which is attached hereto as Exhibit III.

"*Stated Value*" means the agreed upon purchase price for the Account Receivable which is generally the face value of such Account Receivable.

"*Subscription Agreement*" means the subscription agreement attached hereto as Exhibit I(B).

"*Subscription Documents*" means the Subscription Agreement, the Purchaser Questionnaire and the Investor's check.

"*TCC*" means Towers Credit Corporation, a wholly-owned subsidiary of Towers.

"*TCS*" means Towers Collection Service, Inc., a wholly-owned subsidiary of Towers.

"*Third Party Obligor*" means the debtor who is obligated to make payments on the healthcare, business, FDIC or RTC loans and receivables.

"*Towers*" means Towers Financial Corporation, a Delaware corporation which is publicly traded.

"*Unit*" means a Promissory Note for $100,000.

EXHIBIT A

830

**Subscription Documents**

EXHIBIT I

EXHIBIT A

## INSTRUCTIONS TO SUBSCRIBERS

Accompanying the Offering Document, you will find (i) the Subscription Agreement with signature page in duplicate and (ii) Investor Questionnaire which you must complete in accordance with the following instructions.

1. *Investor Questionnaire.*

Please read, complete and sign the Investor Questionnaire.

2. *Subscription Agreement.*

(a) Please read, complete the Subscription Agreement and sign two copies of the signature page; and

(b) Have your signatures notarized by a notary public on the acknowledgment forms accompanying the signature pages.

DO NOT SIGN THE SUBSCRIPTION AGREEMENT UNLESS YOU ARE CERTAIN YOU CAN MAKE ALL THE REPRESENTATIONS CONTAINED IN THE AGREEMENT.

3. *Purchaser Representative Questionnaire.*

If you used the services of a "purchaser representative," the purchaser representative questionnaire must be completed and which is available upon request.

4. *Payment.*

The subscription price is to be paid by check in the amount of $100,000 per Unit made payable to the order of "Towers Financial Corporation, Funding Account."

5. *Special Instructions for Trustees and Agents.*

Trustees, agents or other persons acting in a representative capacity are required to furnish with the completed Subscription Agreement (i) a copy of the trust agreement, power of attorney or other instrument granting the power and authority to subscribe, or (ii) an opinion of counsel as to such power and authority. In addition, such persons must indicate on the completed Subscription Agreement the name of the person or entity for whom he is acting as trustee or agent.

6. *Acceptance of Subscription.*

Deliver completed Subscription Documents and payment for the Units to Towers Financial Corporation, 417 Fifth Avenue, New York, New York 10016. If your subscription is accepted, you will receive shortly thereafter (a) one copy of the Subscription Agreement executed by an officer of the Company and (b) original Promissory Note executed by the Company in the amount subscribed.

EXHIBIT A

# Investor Questionnaire

EXHIBIT · IA

EXHIBIT A

TOWERS FINANCIAL CORPORATION

CONFIDENTIAL:
INVESTOR QUESTIONNAIRE

Private Offering of $100,000,000
of Recourse Promissory Notes of $100,000 each
For: Accredited Investors Only

The offering of secured recourse non-negotiable promissory notes (the "Promissory Notes") issued by Towers Financial Corporation, a Delaware corporation (the "Company"), as more fully described in the Offering Document, dated October 15, 1991, will be made to Accredited Investors only pursuant to Regulation D promulgated under the Securities Act of 1933, as amended (the "1933 Act").

The purpose of this questionnaire is to assist the Company in complying with the above requirements. You agree that the Company may present this questionnaire to such parties as it deems appropriate in order to be assured that the offer and sale of Promissory Notes to you will not result in violation of the exemption from registration under the 1933 Act, described above, or any applicable state securities laws; however, this document will otherwise be kept confidential by the Company.

If you are acting as agent for a corporation, partnership, trust or any other entity, any reference to the term "you" shall mean such corporation, partnership, trust or other entity.

Except as set forth herein, your answers to this questionnaire will, at all times, be kept strictly confidential.

If the answer to any question is "None" or "Not Applicable," please so state.

Please complete this questionnaire as fully as possible, and sign, date and deliver one copy thereof to Towers Financial Corporation, 417 Fifth Avenue, New York, New York 10016.

PLEASE PRINT

I. Please provide the following information if you are investing as an individual. (If you are purchasing on behalf of a corporation, partnership, trust, or any other entity, please complete part II below). In addition, please provide the same information for any joint tenant or tenant-in-common:

Name (1) ____________________ (2) ____________________

Date of Birth (1) __________ (2) __________ Marital Status (1) __________ (2) __________

Permanent Home Address (1) ____________________ (2) ____________________

____________________

(Zip) __________ (Zip) __________

Home Telephone Number (1) ( ) __________ (2) ( ) __________

Social Security No. (1) ____________________ (2) ____________________

Citizenship (1) ____________________ (2) ____________________

EXHIBIT A

Name of (Circle One and Complete)

Advisor/Broker-Dealer/Registered Investment Adviser

______________________

1 2 (if joint purchaser)

Names of Employer (1)__________ (2)__________

Nature of Business (1)__________ (2)__________

Position(s) (1)__________ (2)__________

General Duties (1)__________ (2)__________

Business Address (1)__________ (2)__________

Business Telephone Number (1) ( ) __________ (2) ( ) __________

Please describe your employment positions or occupations during the last five years (listing the inclusive dates of each) indicating any and all vocationally related experience in financial and business matters:

| Employment, Position or Occupation | Nature of Duties | From: | To: |
|---|---|---|---|
| (1) | | | |
| (2) | | | |

Are you acting for your own account? Yes(__) No(__)

If you are not acting for your own account, please complete the following:

(i) Capacity in which you are acting (agent, trustee or otherwise):

______________________

EXHIBIT A

(ii) Name, address and telephone number of persons you represent:

______________________

(iii) Please attach evidence of authority.

NOTE: ANY INDIVIDUALS REPRESENTED BY YOU MUST BE QUALIFIED AS "PURCHASERS" PURSUANT TO THE ACT AND SHOULD EACH COMPLETE A COPY OF THIS QUESTIONNAIRE.

II. Please complete the following if you are investing on behalf of a corporation, partnership, trust or other entity.

Name of corporation, partnership, trust, pension plan, or entity__________

Employer Identification No.__________

Business Activities __________

State and Year of Organization__________

Fiscal year __________

Business Address __________

__________ (Zip)__________

Business Telephone Number ( ) __________

Authorized Person to Contact __________ (title)__________

III. PLEASE ANSWER THE FOLLOWING QUESTIONS.

**For Individuals only:**

1. At this time, is your individual net worth (or joint net worth with your spouse) in excess of $1,000,000?

   Yes ( ) No ( )

2. Did your individual adjusted gross income (increased by any deduction for long term capital gains or depletion, any exclusion for interest and any losses of a partnership as reported on Schedule E on Form

EXHIBIT A

1040) from all sources for each of the two taxable years preceding this date exceed $200,000 (or if jointly with spouse $300,000)?

Yes ( ) No ( )

3. If you have had income from all sources of $200,000 (or if jointly with spouse $300,000) for each of the past two taxable years, do you reasonably expect your income from all sources for the current taxable year to exceed $200,000 (or if jointly with spouse $300,000)?

Yes ( ) No ( )

4. *For Corporations, Charitable Organizations and Partnerships Only:*
If you are a 501(c)(3) organization, corporation, Massachusetts or similar business trust, or partnership, do you have total assets in excess of $5,000,000?

Yes ( ) No ( )

5. *For Trusts Only:*
If you are a trust (not formed for the specific purpose of acquiring the securities offered) and your investment herein is directed by a sophisticated person as described in Section 230.506(b)(2)(ii) are your total assets in excess of $5,000,000?

Yes ( ) No ( )

6. *For Banks, ERISA plans, SBICs, investment companies under the 1940 Act; etc.*
Do you otherwise qualify as an accredited investor under the following definition:

Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefits of its employees *if such plan has total assets in excess of $5,000,000;* any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

Yes ( ) No ( )

7. *For all Investors. Please complete the following questions and information requested:*
Are you aware that the proposed offering of Promissory Notes requires your capital investment to be maintained for the term of your Promissory Note (12-months, 24-months or 36-months, as the case may be)?

Yes ( ) No ( )

8. Please indicate the general, business or professional education and the degrees received by you (or, if the purchaser is a corporation, partnership, trust or other entity, by the person completing this questionnaire on its behalf).

EXHIBIT A

837

| College | Degree Received | Year |
|---|---|---|
| | | |
| | | |
| | | |

9. Investment Experience:
(a) Frequency of investment in marketable securities:
often ( ); occasionally ( ); seldom ( ); never ( ).
(b) *Frequency of investment in commodities futures:*
often ( ); occasionally ( ); seldom ( ); never ( ).
(c) Frequency of investment in options:
often ( ); occasionally ( ); seldom ( ); never ( ).
(d) Frequency of investment in securities purchased on margin:
often ( ); occasionally ( ); seldom ( ); never ( ).
(e) *Frequency of investment in illiquid securities:*
often ( ); occasionally ( ); seldom ( ); never ( ).

10. Indicate in the space provided below, any additional information which you think may be helpful in determining that your knowledge and experience in financial and business matters is sufficient to enable you to evaluate the merits and risks of investing in the securities offered pursuant to the Offering Document of which this forms a part.

______________________________
______________________________
______________________________
______________________________

I (we) acknowledge that the foregoing statements are true and accurate to the best of my (our) information and belief, and that I (we) will promptly notify the Company of any changes in the foregoing answers.

IN WITNESS WHEREOF, I (we) have executed this questionnaire this ____ date of ________, 19__.

______________________________
(Print Name of Joint Tenant or Tenant-in-Common, if applicable)

______________________________
(Print Name)

______________________________
(Signature)

______________________________
(Signature of Joint Tenant

or______________________________
Tenant-in-Common, if applicable)
(Title, if Applicable)

Place of Execution:

______________________________

EXHIBIT A

838

*Please also complete and execute the following balance sheet or supply a substitute balance sheet as of a current date which should include an original signature of a duly authorized representative.*

**BALANCE SHEET**

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on hand: | $ ______ | | |
| Cash value of life insurance policies: | ______ | | |
| Market value of listed securities: | ______ | Margin Amount | $ ______ |
| Market value of unlisted securities: | ______ | | |
| Market value of real estate Residence: | ______ | Encumbrances on Real Estate Residence: | ______ |
| Other: | ______ | Other: | ______ |
| Accounts Receivable: | ______ | Accounts Payable: (include all amounts due to others, including credit cards, debts and other unsecured debts) | ______ |
| Automobiles: | ______ | Automobile Loans: | ______ |
| Other Assets: | ______ | Other Debts: | ______ |
| TOTAL ASSETS | $ ______ | TOTAL LIABILITIES | $ ______ |
| NET WORTH | $ ______ | | |

I confirm that the above balance sheet is true, correct and accurate.

______________________
Signature

EXHIBIT A

839

**Subscription Agreement**

EXHIBIT A

841

## TOWERS FINANCIAL CORPORATION
## SUBSCRIPTION AGREEMENT

To: Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016

Gentlemen:

1. *Subscription.*

I hereby subscribe to purchase the number of secured recourse non-negotiable promissory notes which are set forth in Article "11" of this Subscription Agreement (the "Promissory Notes") issued by TOWERS FINANCIAL CORPORATION, a Delaware corporation (the "Company"), as more fully described in the offering document, dated October 15, 1991 (the "Offering Document"), and I agree to pay for the Promissory Notes subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement. Each of the capitalized terms which are used in this Subscription Agreement shall have the same meaning as those terms have in the Offering Document.

2. *Purchase Price.*

The purchase price for each Promissory Note (the "Subscription Price") is $100,000 (subject to reduction at the sole discretion of the Company). I am herewith tendering payment for the subscribed for Promissory Notes by regular, bank or certified check payable to "Towers Financial Corporation, Funding Account" equal to $100,000 per Promissory Note (or such fraction thereof that is permitted by the Company).

3. *Offering.*

I understand that the offering will terminate on or before October 14, 1992. If my subscription is not accepted, all funds paid by me will be returned promptly to me without interest and without deduction of escrow costs. Upon receipt of such funds I will forthwith return the Offering Document and all other subscription documents to the Company. In the sole and absolute discretion of the Company, less than the full amount subscribed for by me may be accepted, whereupon the excess funds tendered by me will be promptly returned.

It is understood that this subscription is not binding unless and until it is accepted by the Company. I also understand and agree that my subscription to purchase Promissory Notes shall not be deemed binding upon the Company until the funds paid by me herewith are submitted to the Company, clear and are credited to the Funding Account.

4. *Representations and Warranties of the Undersigned.*

I acknowledge that I have received, read, understand, and am familiar with the Offering Document, including all attachments and exhibits thereto and the 1991 Annual Report of the Company including the Audited Financial Statements contained therein. I further acknowledge that, except as set forth in the Offering Document and the 1991 Annual Report, no representations or warranties have been made to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Promissory Notes and/or the investment made thereby, and that I have not relied upon any information concerning the offering, written or oral, other than that contained in the Offering Document.

I further acknowledge that I have received, completed and returned to the Company, the Purchaser Questionnaire relating to my general ability to bear the risks of the investment being made hereby and my suitability as an Investor, and I hereby affirm the correctness of my answers in such questionnaire.

I further represent and warrant to the Company, Counsel to the Company, and their respective Affiliates, as follows:

(a) I can bear the economic risk of this investment and can afford a complete loss thereof; and I (i) have sufficient liquid assets to pay the full purchase price for each Promissory Note in the manner contemplated by the Offering Document; (ii) have adequate means of providing for my current needs and possible personal contingencies, and have no present need for liquidity of my investment in the Promissory Notes; (iii) have a net worth presently of at least an amount indicated by me in Part III of my Investor Questionnaire delivered simultaneously herewith; and (iv) qualify as an "Accredited Investor" as defined in Regulation D which was promulgated under the 1933 Act as follows:

(1) Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefits of its employees if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

(b) I have been represented by such legal and tax counsel and others, each of whom has been personally selected by me, as I found necessary to consult concerning the purchase of the Promissory Notes, and such representation has included an examination of applicable documents and an analysis of all tax, financial, recording, and securities law aspects thereof. I, my counsel, my advisors, and such other persons with whom I have found it necessary or advisable to consult, have sufficient knowledge and experience in business and financial matters to evaluate the information set forth in the Offering Document, and the risks of the investment, and to make an informed investment decision with respect thereto.

(c) With respect to the tax aspects of my investment, I am relying solely upon the advice of my own personal tax advisors, and upon my own knowledge with respect thereto.

(d) Any and all information has been made available to me, my counsel and my advisors, prior to the date hereof. I have had the opportunity to ask questions of, and to receive answers from, the Compa-

EXHIBIT A

ny, and its representatives, concerning the terms and conditions of the offering and access to any information, documents, financial statements, records and books (i) relating to the Company, the purchase of the Promissory Notes and the offering, and (ii) necessary to verify the accuracy of any information furnished to me. All materials and information requested by either me, my counsel, my advisors or others representing me, including any information requested to verify any information furnished, have been made available and examined.

(e) I understand that the offering has not been registered under the Securities Act of 1933, as amended (the "1933 Act"), nor pursuant to the provisions of the securities or other laws of any other applicable jurisdictions, in reliance upon the exemption for private offerings contained in Section 4(2) of the 1933 Act, Regulation D promulgated thereunder and the laws of such jurisdictions. I am fully aware that the Promissory Notes subscribed for by me are to be sold to me in reliance upon such exemptions based upon my representations, warranties and agreements. I am fully aware of the restrictions on sale, transferability and assignment of the Promissory Notes, as more fully set forth in the Offering Document, and that I must bear the economic risk of my investment herein for an indefinite period of time because the offering has not been registered under the 1933 Act and, therefore, the Promissory Notes cannot be offered or sold unless the offering is subsequently registered under the 1933 Act or an exemption from such registration is available.

(f) My execution and delivery of this Subscription Agreement have been duly authorized by all necessary action. I will not pledge, transfer or assign this Subscription Agreement or the Promissory Notes which I acquire pursuant to this offering without complying with the procedures set forth in the Offering Document. I am making the investment hereunder for my own account and not for the account of others and for investment purposes only and not with a view to or for the transfer, assignment, resale or distribution thereof, in whole or in part. I have no present plans to enter into any such contract, undertaking, agreement or arrangement.

(g) I agree that I shall not cancel, terminate or revoke this Agreement or any other agreement executed by me with respect to the purchase of a Promissory Note, and that this Subscription Agreement shall survive my death or disability, except as pursuant to the laws of the applicable jurisdiction.

(h) I am aware that the purchase of a Promissory Note is a speculative investment involving a significant degree of risk and that there is no guarantee that I will realize any gain from my investment.

(i) The address set forth below is my true and correct residence, and I have no present intention of becoming a resident of any other state or jurisdiction prior to my purchase of the Promissory Note.

(j) I understand the meaning and legal consequences of the foregoing representations and warranties, which are true and correct as of the date hereof and will be true and correct as of the date of my purchase of the Promissory Note subscribed for herein. Each such representation and warranty shall survive such purchase.

5. *Indemnification.*

I hereby agree to indemnify and hold harmless the Company, Counsel, and their Affiliated persons from any and all damages, losses, costs and expenses (including attorneys' fees and disbursements) which they, or any of them, may incur by reason of my failure, or alleged failure, to fulfill any of the terms and conditions of this subscription or by reason of my breach of any of my representations and warranties contained herein.

6. *Blue Sky Representations.*

(a) *Residents of any State.* I have read the jurisdictional notice applicable to the State of my residence which appears in Article "10" of this Subscription Agreement.

(b) *Residents of Florida.* I hereby acknowledge that I have the right, pursuant to Section 517.061(11)(a)(5) of the Florida Securities Act, to withdraw my subscription and receive a full refund of all monies paid by me to the Company within three business days after the execution of this Subscription Agreement or payment for the Promissory Notes has been made, whichever is later. Withdrawal will be

EXHIBIT A

without any further liability to me. To accomplish this I need only send a letter or telegram to the Company, indicating my intention to withdraw. I acknowledge that such letter or telegram should be sent or postmarked prior to the end of the aforementioned third business day. I have also been informed that it is prudent to send such letter by certified mail, return receipt requested, to ensure that it was received and also to evidence the time when it was mailed. I also understand that should I make this request orally (either in person or by telephone), I must request written confirmation that such request by me has been received.

(c) *Residents of Michigan.* I agree that I will not sell or transfer my Promissory Note(s) except in a transaction which is exempt under the Michigan Securities Act or pursuant to an effective Registration Statement under the Michigan Securities Act.

I acknowledge that I have received the Offering Document and am aware of the following:

(i) The intended use of the proceeds of this Offering;

(ii) The current financial condition of the Company;

(iii) The direct or indirect compensation which has been or will be received by the Company and its Affiliates from this Offering;

(iv) The securities being offered hereunder are Promissory Notes and the purchase price therefore is $100,000 per Promissory Note; and

(v) I or my representative may inspect the books and records of the Company which relate to the Funding Account and the purchase and collection of the Accounts Receivable.

(d) *Residents of Pennsylvania.* Pursuant to the Pennsylvania Securities Act, Section 207(m), each Pennsylvania resident may elect, within two business days of the date of execution, to withdraw from this Subscription Agreement and to receive a full refund of all funds paid on account of this subscription together with copies of the signature pages of the Agreement without incurring any liability to the Company, its affiliates or to any other person. To accomplish this withdrawal, I need only to send a letter or telegram to the Company, indicating my intention to withdraw. Such letter or telegram must be sent or postmarked prior to the end of the aforementioned second business day. If I send a letter, I understand that it is prudent to send it by certified mail, return receipt requested, to ensure that it is received and also to evidence the time when it was mailed. Should I make this request orally, in person or by telephone to the Company, I understand that I must ask for written confirmation that my request has been received. I agree not to sell or transfer any of the Promissory Notes for a period of at least twelve months from the date of purchase.

(e) *Residents of Texas.* I agree that I will not sell or transfer my Promissory Notes except in a transaction which is exempt under the Texas Securities Act or pursuant to an effective Registration Statement under the Texas Securities Act.

7. *Acceptance by the Company.*

Except as set forth herein, this Subscription Agreement is irrevocable. It is subject to all of the terms and provisions contained in the Offering Document. It may be accepted, in whole or in part, by the Company executing this Agreement, and mailing a duplicate copy to the undersigned. The Company reserves the right in its sole discretion to reject this subscription in whole or in part.

8. *General Provisions.*

Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all of the terms and provisions hereof shall be construed in accordance with, and governed by the laws of the State of New York applicable to contracts fully to be performed therein, may not be modified or waived except in writing, and is subject to all of the terms and provisions contained in the Offering Document.

EXHIBIT A

9. *Miscellaneous.*

(a) All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the undersigned at the address which is set forth below and to the Company at 417 Fifth Avenue, New York, New York 10016.

(b) This Agreement constitutes the entire Agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

(c) The Company, counsel, and their respective Affiliates shall not be liable for taking any action pursuant to this Agreement in the absence of gross negligence, misfeasance, malfeasance or fraud.

10. *Jurisdictional Notices and Representations.*

It should be noted that the inclusion of a notice under state securities laws below should not be construed to mean that the Promissory Notes have been cleared or are otherwise available for sale in that state. The Company will maintain a list, which will be available upon request, of those states in which offers and sales of Promissory Notes can be made.

**DESPITE THE INCLUSION OF THE LEGENDS BELOW, BROKER-DEALERS MUST CONFIRM WITH THE ISSUER THAT EITHER THE SECURITIES HAVE BEEN REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE SINCE THE INCLUSION OF A LEGEND BELOW DOES NOT ASSURE REGISTRATION OR EXEMPTION.**

**IN ADDITION, SOME STATES' DEFINITION OF "ACCREDITED INVESTOR" DIFFERS FROM THE DEFINITION SET FORTH AT 4(a) OF THIS SUBSCRIPTION AGREEMENT. THEREFORE, IT IS IMPERATIVE THAT BROKER-DEALERS VERIFY THAT POTENTIAL INVESTORS QUALIFY AS "ACCREDITED INVESTORS" IN SUCH STATE.**

*FOR ALABAMA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR ALASKA RESIDENTS ONLY*: THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISION OF 3 AAC 08.500-3 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THE OFFERING DOCUMENT SINCE THE OFFERING DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF AS 45.55.170.

THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

*FOR ARIZONA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED PURSUANT TO A.R.S. SECTION 44-1846 BUT THE FACT OF THE GRANTING OF SUCH EXEMPTION IS NOT TO BE DEEMED A FINDING BY THE ARIZONA CORPORATION COMMISSION THAT THE OFFERING DOCUMENT IS TRUE OR ACCURATE, NOR DOES SUCH GRANT OF EXEMPTION MEAN THAT THE COMMISSION HAS PASSED UPON THE MERITS OF OR OTHERWISE APPROVED THE SECURITIES DESCRIBED HEREIN.

*FOR ARKANSAS RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-42-504(a)(14) OF THE ARKANSAS SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THE OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR CALIFORNIA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE, IF SUCH REGISTRATION IS REQUIRED.

*FOR COLORADO RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981, IF SUCH REGISTRATION IS REQUIRED.

*FOR CONNECTICUT RESIDENTS ONLY*: THE SECURITIES REFERRED TO IN THE OFFERING DOCUMENT HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE CONNECTICUT UNIFORM SECURITIES ACT, AND, THEREFORE, THE SECURITIES CANNOT BE SOLD OR TRANSFERRED UNDER SUCH ACT UNLESS THEY ARE REGISTERED UNDER SUCH ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR FLORIDA RESIDENTS ONLY*: FLORIDA PURCHASERS ARE ADVISED THAT WHERE SALES ARE MADE TO FIVE OR MORE PERSONS PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES & INVESTOR PROTECTION ACT, SUCH SALES ARE VOIDABLE BY THE PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE COMPANY OR ANY AGENT OF THE COMPANY OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE PURCHASER, WHICHEVER OCCURS LATER. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT (RULE 3E500.005(5)(a)(12)).

*FOR GEORGIA RESIDENTS ONLY*: OFFEREES ARE HEREBY ADVISED THAT THE CONSENT DECREE ENTERED INTO BY TOWERS FINANCIAL CORPORATION ("TOWERS") DISCUSSED IN THE CONFIDENTIAL PRIVATE OFFERING DOCUMENT DATED OCTOBER 15, 1991, PROVIDES THAT TOWERS IS PERMANENTLY ENJOINED FROM VIOLATING THE SECURITIES LAWS AND THAT TOWERS IS SUBJECT TO AN ONGOING OBLIGATION NOT TO VIOLATE THE SECURITIES LAWS. UNLESS A WAIVER IS GRANTED BY THE STATE OF GEORGIA, THE CONSENT DECREE CONSTITUTES AN AUTOMATIC DISQUALIFICATION FROM THE USE OF PRIVATE OFFERING EXEMPTIONS IN THE STATE OF GEORGIA. TOWERS HAS APPLIED FOR SUCH A WAIVER AND THE GEORGIA SECURITIES COMMISSION HAS AGREED TO GRANT THE WAIVER PROVIDED THAT THIS NOTICE BE FURNISHED TO ALL GEORGIA OFFEREES.

*FOR IDAHO RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANS-

FERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR ILLINOIS RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS, NOR HAS THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR INDIANA RESIDENTS ONLY*: THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 23-2-1-2 OF THE INDIANA CODE. THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL OR STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.

*FOR LOUISIANA RESIDENTS ONLY*: THESE SECURITIES HAVE BEEN REGISTERED WITH THE SECURITIES COMMISSIONER OF THE STATE OF LOUISIANA. THE SECURITIES COMMISSIONER, BY ACCEPTING REGISTRATION, DOES NOT IN ANY WAY ENDORSE OR RECOMMEND THE PURCHASE OF ANY OF THESE SECURITIES.

*MAINE RESIDENTS*: THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE BANK SUPERINTENDENT OR THE STATE OF MAINE UNDER SECTION 10502(2)(R) OF TITLE 32 OF THE MAINE REVISED STATUTES. THESE SECURITIES MAY BE DEEMED RESTRICTED SECURITIES AND AS SUCH THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS PURSUANT TO REGISTRATION UNDER STATE OR FEDERAL SECURITIES LAWS OR UNLESS AND EXEMPTION UNDER SUCH LAWS EXISTS.

*FOR MARYLAND RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, IF SUCH REGISTRATION IS REQUIRED.

*FOR MICHIGAN RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNIFORM SECURITIES ACT OF MICHIGAN AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. MINIMUM INVESTMENT IN MICHIGAN IS $50,000.

*FOR MINNESOTA RESIDENTS ONLY*: THESE SECURITIES REPRESENTED BY THIS OFFERING HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

*FOR MISSISSIPPI RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1)

YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR MISSOURI RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*NEW HAMPSHIRE RESIDENTS*: NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE DIRECTOR OF THE OFFICE OF SECURITIES REGULATION THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE DIRECTOR OF THE OFFICE OR SECURITIES REGULATION HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

*FOR NEW JERSEY RESIDENTS ONLY*: THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THE OFFERING DOCUMENT. THE FILING OF THIS OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE OR THE SALE THEREOF BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR NEW MEXICO RESIDENTS ONLY*: THE SECURITIES DESCRIBED HEREIN ARE OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF NEW MEXICO. ACCORDINGLY, THE NEW MEXICO SECURITIES BUREAU HAS NOT REVIEWED THE OFFERING OF THESE SECURITIES AND HAS NOT APPROVED OR DISAPPROVED THIS OFFERING. THE NEW MEXICO SECURITIES BUREAU HAS NOT PASSED UPON THE VALUE OF THESE SECURITIES OR UPON THE ADEQUACY OR ACCURACY OF THE INFORMATION CONTAINED IN THE OFFERING DOCUMENT.

*FOR NORTH CAROLINA RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE

SECURITIES LAWS. PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR PENNSYLVANIA RESIDENTS ONLY*: PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972. EACH PENNSYLVANIA RESIDENT WHO ACCEPTS THE OFFER MADE PURSUANT TO THE OFFERING DOCUMENT TO PURCHASE ANY UNITS SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE. WITHOUT INCURRING ANY LIABILITY TO THE COMPANY, ITS AFFILIATES OR ANY OTHER PERSON, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE COMPANY OF HIS WRITTEN BINDING CONTRACT OF PURCHASE (SUBSCRIPTION AGREEMENT). TO ACCOMPLISH THIS WITHDRAWAL A SUBSCRIBER SHOULD SEND A LETTER OR TELEGRAM INDICATING HIS INTENTION TO WITHDRAW TO THE COMPANY AT THE ADDRESS OF THE COMPANY SET FORTH IN THE OFFERING DOCUMENT. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF A SUBSCRIBER ELECTS TO SEND SUCH A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD A SUBSCRIBER MAKE THIS REQUEST ORALLY, HE SHOULD ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

IN ADDITION TO QUALIFYING AS AN ACCREDITED INVESTOR, THE RESIDENTS OF PENNSYLVANIA HEREBY AGREE THAT THEY WILL WILL NOT SELL TRANSFER OR SUBDIVIDE THE UNITS PURCHASED HEREIN UNTIL AT LEAST ONE (1) YEAR FROM THE DATE OF PURCHASE.

*FOR SOUTH CAROLINA RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933. AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR SOUTH DAKOTA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31A, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATIONS OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS OFFERING IS TRUE, COMPLETE, AND NOT MISLEADING; NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SOUTH DAKOTA RESIDENTS HEREBY REPRESENT THAT (I)THEY HAVE A NET WORTH OF AT LEAST $1,000,000 (EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES); (II)THEY WILL INVEST NOT LESS THAN $1,000,000; AND (III)THEIR INVESTMENT DOES NOT EXCEED 10% OF THEIR NET WORTH.

*FOR TENNESSEE RESIDENTS ONLY*: THESE SECURITIES HAVE BEEN REGISTERED WITH THE STATE OF TENNESSEE. AS A CONDITION OF REGISTRATION, THE STATE OF TENNES-

EXHIBIT A

849

SEE HAS IMPOSED MINIMUM SUITABILITY STANDARDS FOR TENNESSEE RESIDENTS. PURSUANT TO THOSE STANDARDS, EACH INVESTOR WHO IS A NATURAL PERSON MUST HAVE A NET WORTH OF AT LEAST $250,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES, AND MUST HAVE HAD A GROSS INCOME OF $65,000.00 DURING THE LAST TAX YEAR AND BE EXPECTED TO HAVE A GROSS INCOME OF $65,000.00 DURING THE CURRENT TAX YEAR, OR ALTERNATIVELY A NET WORTH OF AT LAST $500,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS AND AUTOMOBILES. ADDITIONALLY, UNDER THIS SUITABILITY STANDARD, EACH NATURAL PERSON'S INVESTMENT MUST NOT EXCEED TEN PERCENT (10%) OF HIS NET WORTH.

THIS OFFERING IS MADE TO ACCREDITED INVESTORS AS DEFINED IN SECTION 501 (a) (1) OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933. SEE OFFERING DOCUMENT AT "TERMS OF THE INVESTMENT." THE ACCREDITED INVESTOR STANDARD IS GENERALLY MORE RESTRICTIVE THAN THE MINIMUM SUITABILITY REQUIREMENTS IMPOSED BY THE STATE OF TENNESSEE. THEREFORE, THE EFFECT OF REGISTRATION OF THE OFFERING IN TENNESSEE (AND THE MINIMUM SUITABILITY STANDARD) IS THAT THE OFFERING IS MADE ONLY TO ACCREDITED INVESTORS.

*FOR TEXAS RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS OF TEXAS AND THEREFORE CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR UTAH RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UTAH UNIFORM SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR VIRGINIA RESIDENTS ONLY*: THE VIRGINIA STATE CORPORATION COMMISSION DOES NOT PASS UPON THE ADEQUACY OF THE OFFERING DOCUMENT OR UPON THE MERITS OF THIS OFFERING AND THE COMMISSION EXPRESSES NO OPINION AS TO THE QUALITY OF THIS SECURITY.

*FOR WASHINGTON RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

EXHIBIT A

850

11. *Information Relating to My Investment.*

(a) Number of Promissory Notes (at a price of $100,000 per Promissory Note) ______

(b) Term of Promissory Notes ____ 12 months; ____ 24 months; or ____ 36 months

(c) Payment Tendered Herewith: ($100,000 times number of Promissory Notes) $ ______

(d) Additional Documents Required:

(i) Investor Questionnaire; and

(ii) Community Property Designation (if applicable) from Page 14 of this Subscription Agreement.

**TO BE COMPLETED BY ALL SUBSCRIBERS:**

Residence Address to which information regarding this subscription should be mailed:

______
Street Address

______
City and State Zip

( )______
Telephone Number

______
Social Security Number or Employer Identification Number

______
Social Security Number or Employer Identification Number of Joint Tenant or Tenant-in-Common, if applicable

IN WITNESS WHEREOF, I (we) have executed this Subscription Agreement this ____ day of ______, 19__.

INDIVIDUAL:

______
Name (Please Print)

______
Signature

______
Name of Joint Tenant or Tenant-in-Common, if applicable.

Term of Promissory Notes:

______

Number of Promissory Notes Accepted:

______

ENTITIES:

______
Name of Entity (Please Print)

______
Signature and Title

[Corporate Seal (if applicable)]

ACCEPTED AND AGREED TO THIS ____ DAY OF ______, 19__.

TOWERS FINANCIAL CORPORATION

By:______
Mitchell Brater,
Vice Chairman and Chief Operating Officer

[INDIVIDUAL]

STATE OF
COUNTY OF } SS.:

On __________, 19___, before me personally appeared __________ and __________, known to me as the person(s) whose name(s) is (are) subscribed to the foregoing Subscription Agreement and acknowledged that (s)he (they) executed the same.

__________
Notary Public

[CORPORATE]

STATE OF
COUNTY OF } SS.:

On __________, 19___, before me personally appeared __________, to me known and who, being by me duly sworn, did depose and say that (s)he is the __________ of __________, a __________ corporation, the corporation which executed the foregoing Subscription Agreement, that (s)he knows the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by authority of the corporation; and that (s)he signed his (her) name thereto by like authority.

__________
Notary Public

EXHIBIT A

853

## COMMUNITY PROPERTY DESIGNATION

If a subscriber is an individual who is legally domiciled or resident of the State of Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas or Washington, the following designation must also be completed:

A. The Promissory Notes are being purchased as Community Property in one or both names (both spouses must sign).

__________
SIGNATURE OF HUSBAND

__________
SIGNATURE OF WIFE

__________
Type or Print Name of Husband

__________
Type or Print Name of Wife

B. The Promissory Notes are being purchased as Separate Property (the Subscriber alone must sign the Separate Property Election, and the subscriber's spouse must sign the Separate Property Acknowledgement below).

## SEPARATE PROPERTY ELECTION

The undersigned elects to treat this investment as (his) (her) separate property. In making this decision, I have consulted with independent counsel to determine that I have used my separate property or funds to purchase the Promissory Notes.

__________
SIGNATURE OF SUBSCRIBER

__________
Type or Print Name of Subscriber

## SEPARATE PROPERTY ACKNOWLEDGEMENT

I hereby acknowledge that my spouse is making this investment with (his) (her) separate property and funds.

__________
SIGNATURE OF SUBSCRIBER'S SPOUSE

__________
Type or Print Name of Subscriber's Spouse

EXHIBIT A

854

Form of Promissory Note

EXHIBIT II

EXHIBIT A

TOWERS FINANCIAL CORPORATION
OCTOBER 15, 1991 PRIVATE OFFERING DOCUMENT
NON-NEGOTIABLE RECOURSE PROMISSORY NOTE

For value received, TOWERS FINANCIAL CORPORATION, a Delaware corporation (the "Maker"), promises to pay to the order of the person whose name and address are set forth at the end of this Note (the "Payee"), its successors and assigns, the principal sum which is indicated at the end of this Note, together with interest on the unpaid principal balance at the rate of interest which is set forth at the end of this Note, from the date of this Note (the date of this Note is set forth at the end of this Note) through and including the date of final payment hereunder.

Principal hereunder shall be due and payable in full on the date which is indicated at the end of this Note (the "Maturity Date").

Payment of principal and interest under this Note shall be made in lawful money of the United States of America to the Payee at the address which is set forth at the end of this Note or at such other location as shall be notified to the maker by the Payee. Interest shall be calculated on the basis of a year of 365 days for the actual number of days elapsed and shall be payable monthly [or quarterly] commencing with the interest payment which is due thirty (30) days from the date of this Note.

Notwithstanding anything to the contrary which is provided for herein, the rate of interest which is provided for hereunder shall not exceed the maximum legal rate of interest which is permitted pursuant to applicable law. If the rate of interest which is provided for in this Note shall be found to exceed the maximum legal rate of interest, the Maker shall be required to pay only the maximum legal rate of interest.

This Note has been issued pursuant to the Offering Document dated October 15, 1991 of the Maker, and this Note is subject to all of the terms, conditions, obligations and provisions which are set forth in the Offering Document.

The holder of this Note shall be entitled to all of the benefits provided for in the security agreement (the "Security Agreement") which was executed by the Maker in favor of the Payee and other similarly situated payees. Neither this reference to the Security Agreement nor any provision thereof shall affect or impair the obligations of the Maker which are provided for herein.

This Note is made and delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York. Any provision hereof which may prove unenforceable under any law shall not affect the validity of any other provision hereof. The Payee agrees that any action or proceeding to enforce this Note shall be brought in a court of competent jurisdiction located in the State and County of New York.

This Note may not be changed or terminated orally, but only by an agreement in writing and signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the __ day of _____, 19__.

TOWERS FINANCIAL CORPORATION

Date of Note: __________, 19__

By: ____________________
Mitchell Brater,
Vice Chairman and Chief Operating Officer

PAYEE:

____________________

____________________
Print Name(s)

____________________
Address

____________________
City, State and Zip Code

Principal Amount of Note: $ __________

Period to Maturity: __________

Maturity Date: __________

Rate of Interest: _____% per annum

This Promissory Note has not been registered under the Securities Act of 1933, as amended, and may not be sold or otherwise transferred in the absence of such registration or an exemption therefrom under such Act or state securities laws. Furthermore, this Promissory Note may be sold or otherwise transferred only in compliance with the conditions specified in the Offering Document of Maker, a complete and correct copy of which is available for inspection at the principal office of Maker and will be furnished without charge to the holder of this Promissory Note upon written request.

EXHIBIT A

Form of Security Agreement

EXHIBIT III

# SECURITY AGREEMENT

AGREEMENT made this ___ day of ________, 19__ by and among TOWERS FINANCIAL CORPORATION, a Delaware corporation having its principal place of business at 417 Fifth Avenue, New York, New York 10016 (hereinafter referred to as the "Debtor") and each of the persons whose names and addresses are set forth on Exhibit "A" which is annexed hereto (hereinafter referred to as to the "Secured Parties").

1. *Background*

The Debtor, pursuant to its offering document, dated October 15, 1991, (hereinafter referred to as the "Offering Document"), has issued its recourse non-negotiable Promissory Notes (hereinafter referred to as the "Promissory Notes") to each of the Secured Parties in the amounts which are indicated on Exhibit "A" which is annexed hereto. Pursuant to the provisions of the Offering Document, the proceeds of the Offering of the Promissory Notes are to be placed in the Funding Account, as defined in the Offering Document, and utilized for the purpose of purchasing and/or financing Accounts Receivable, as defined in the Offering Document. In order to induce the Secured Parties to enter into this transaction, the Debtor has agreed to grant the Secured Parties a security interest in the Funding Account, the Accounts Receivable and any proceeds therefrom in whatever form as security for repayment of the Promissory Notes pursuant to their respective terms.

2. *Definitions*

Each of the capitalized terms which is used herein shall have the same meaning which is set forth in the section of the Offering Document which is entitled "Glossary" unless the context of this Security Agreement requires otherwise.

3. *Security Interest*

To secure the payment when due of principal and interest under the Promissory Notes and the payment and performance by the Debtor of all obligations and liabilities of the Debtor to the Secured Parties pursuant to the Promissory Notes, the Debtor shall and hereby does, on and as of the date hereof, grant, convey, assign and transfer to Secured Party, a security interest in and to (i) the Accounts Receivable and all additions, replacements and attachments thereto; (ii) all other contracts calling for the purchase or financing of the Accounts Receivable; (iii) all proceeds which are derived by the Debtor from the collection or the attempted collection of any of the items referred to in (i) or (ii) above; and (iv) the Funding Account, exclusive of the Excess Profits Amount, as defined in the Offering Document (hereinafter referred to collectively as the "Collateral").

4. *Default*

4.1 *Event of Default.* The term "Event of Default" as used herein, shall mean the occurrence and continuation of any one or more of the following events:

(a) The failure of the Debtor to promptly pay when due any of the amounts of interest or principal which are due and payable pursuant to any of the Promissory Notes, which failure continues for a period of thirty (30) days after the applicable Secured Party gives the Debtor written notice of such default;

(b) If the Debtor shall admit in writing its inability to pay, or fails to pay, its debts generally as they become due; or

(c) If, under the provisions of any law for the relief of debtors, any court of competent jurisdiction or custodian shall assume custody or control of the Debtor's property without the consent of the Debtor.

4.2 Upon the happening of an Event of Default, the Promissory Notes shall become immediately due and payable and the applicable Secured Party shall have the rights which are set forth in Section 7 of this Security Agreement.

5. *Obligations of the Debtor*

5.1 If a Secured Party shall have required the Debtor to deliver to such Secured Party any or all of the Collateral and if the Debtor shall receive or become entitled to receive any rights, distributions or payments

EXHIBIT 4

of any kind or description with respect to or on account of such Collateral, the Debtor agrees to accept same as agent for the Secured Party, to hold same in trust for the Secured Party, and to deliver same to the Secured Party in the form received, with the endorsement of the Debtor when necessary, to be held by the Secured Party as Collateral hereunder.

5.2 Until the Secured Parties are paid in full for the principal and interest of all indebtedness which is due to the Secured Parties pursuant to the terms of this Agreement and the Promissory Notes, the Debtor agrees that it will:

(a) take whatever actions are necessary to comply with all statutes and regulations governing its activities and operations; and

(b) promptly notify the Secured Parties of an Event of Default which is discovered by Debtor.

6. *Warranties of the Debtor*

6.1 The only office where the Debtor keeps, or will at any time prior to final release hereof, keep records concerning any part of the Collateral, which is "accounts" as that term is defined in the Uniform Commercial Code, is at the address of the Debtor which is shown at the beginning of this Agreement, which office is the principal place of business and the location of the chief executive officer of the Debtor.

6.2 To induce the Secured Parties to enter into the transactions provided for herein, the Debtor represents and warrants to the Secured Parties that:

(a) The Debtor is duly authorized to execute and deliver this Agreement and the Promissory Notes and to perform all of its obligations under this Agreement, including the execution, delivery and performance of whatever additional documents are necessary or required in connection with the transactions which are contemplated herein;

(b) The execution and deliver by the Debtor of this Agreement and the Promissory Notes and the performance by the Debtor of its obligations under this Agreement and the Promissory Notes do not and will not conflict with any provision of law, or of the charter or by-laws, or of any other agreement affecting or binding upon the Debtor;

(c) This Agreement and the Promissory Notes, when duly executed and delivered in accordance with this Agreement, will be valid and binding upon the Debtor enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights and except to the extent that the availability of specific performance thereof may be limited by principles of equity; and

(d) The Debtor is a duly organized and validly existing corporation in good standing under the Delaware Corporation Law.

7. *Rights and Obligations of Secured Parties With Respect to the Collateral*

7.1 The Secured Parties hereby severally agree that, upon an Event of Default, each Secured Party shall be entitled to exercise his remedies hereunder and under the Uniform Commercial Code only in respect of that portion of the Collateral (determined according to the then present value thereof) which bears the same ratio to the total Collateral as that portion of the indebtedness with respect to any Promissory Note held by such Secured Party.

7.2 The proceeds of any sale or other disposition of the Collateral and all sums received or collected by the Secured Parties from or on account of the Collateral shall be applied by the Secured Parties in the manner set forth in Section 9-504 of the Uniform Commercial Code in effect at the time of such sale or other disposition of the Collateral.

7.3 A Secured Party may only transfer a Promissory Note held by him, subject to the terms of the Offering Document and the Securities Act of 1933, as amended, and state securities laws. Upon any such transfer, the transferee shall automatically become vested with all rights, powers and remedies hereunder of such Secured Party with respect to the Collateral.

EXHIBIT A

859

7.4 Upon payment in full of all of his Promissory Note, a Secured Party will promptly thereafter release to the Debtor all of the Collateral.

8. *Pooling*

The Debtor, in its discretion, may pool the Collateral with offerings which are similar to the current offering. In the event such a pooling occurs, the Secured Parties of the current offering and the secured parties of the other offerings will share the Collateral on a pari passu (pro rata) basis for all purposes.

9. *Miscellaneous*

9.1 *Headings*. The descriptive headings in this Security Agreement are for convenience of reference only, and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

9.2 *Waiver*. Except as otherwise specifically provided for hereunder, no party shall be deemed to have waived any of its rights hereunder or under any other agreement, instrument or paper signed by any of them with respect to the subject matter hereof, unless such waiver is in writing and signed by the party waiving such right. Except as otherwise specifically provided for hereunder, no delay or omission by any party in exercising any right with respect to the subject matter hereof shall operate as a waiver of such right or of any such other right. A waiver on any one occasion with respect to the subject matter hereof shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

9.3 *Rights Cumulative*. All rights and remedies with respect to the subject matter hereof, whether evidenced hereby or by any other agreement, instrument, or paper, will be cumulative, and may be exercised separately or concurrently.

9.4 *Entire Agreement*. The parties herein have not made any representations, warranties, or covenants not set forth with respect to the subject matter hereof. All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Security Agreement and any such instrument which alone fully and completely expresses their agreement.

9.5 *Amendments*. This Security Agreement may not be changed, modified, extended, terminated, or discharged orally, but only by a written agreement which is signed by all of the parties to this Security Agreement.

9.6 *Further Instruments*. The parties agree to execute any and all such other and further instruments and documents and to take any and all such further actions reasonably required to effectuate this Security Agreement.

9.7 *Notices*. All notices or other communications required or permitted hereunder shall be in writing and shall be mailed by First Class, Registered or Certified Mail, Return Receipt Requested, postage prepaid as follows:

To the Debtor:

Towers Financial Corporation
417 Fifth Avenue
New York, NY 10016
Attn: Mitchell Brater, Vice Chairman
and Chief Operating Officer

To the Secured Parties:

All the addresses which are set forth
on Exhibit "A" to this Security Agreement

or in each case to such other address as shall have last been furnished by like notice. If mailing by Registered or Certified Mail is impossible due to an absence of postal service, notice shall be in writing and personally delivered to the aforesaid address. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be.

EXHIBIT A

860

9.8 *New York Law*. This Security Agreement is made and delivered in the State of New York and shall be construed and enforced in accordance with the internal laws of the State of New York, without giving effect to the principals of conflicts of law. Any suit or proceeding to enforce the provisions of this Security Agreement shall be commenced in a court of competent jurisdiction in the State and County of New York.

9.9 *Successors and Assigns*. Subject to the restrictions which are contained in this Security Agreement, this Security Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

IN WITNESS WHEREOF, the Debtor has executed this Security Agreement as of the date first above written.

TOWERS FINANCIAL CORPORATION

By:__________________________
Mitchell Brater,
Vice Chairman and Chief Operating Officer

EXHIBIT A

661

EXHIBIT A

| Names and Addresses Of Secured Parties | Amount of Principal Obligations Pursuant to the Promissory Note |
|---|---|

All Investors whose investments have been used to purchase Accounts Receivable which are the subject of this Security agreement.

EXHIBIT A

662



1991 Annual Report of Towers
[Furnished under separate cover]
EXHIBIT IV
EXHIBIT A
TFC
TOWERS
FINANCIAL
CORPORATION
417 FIFTH AVENUE, NEW YORK, NEW YORK 10016 (212) 696-0505
EXHIBIT A

EXHIBIT 48



TFC
TOWERS FINANCIAL CORPORATION

# TOWERS FINANCIAL CORPORATION

# 1991 ANNUAL REPORT

# ABOUT THE COMPANY

Towers Financial Corporation is a diversified financial services company with more than 1,500 employees and independent agents nationwide. The company is a recognized leader in the collection, factoring and management of accounts receivable, with major lines of business in:

- *computerized business office management systems for hospitals, nursing homes, clinics and doctors, including billing, collections and factoring of accounts receivable;*
- *physicians' private practice office systems, including billing, collections and factoring of accounts receivable;*
- *healthcare factoring and financing of accounts receivable;*
- *corporate accounts receivable factoring;*
- *accounts receivable collection;*
- *acquiring RTC/FDIC and banking industry accounts receivable loan portfolios;*
- *property and casualty insurance and reinsurance.*

Towers Financial Corporation's dramatic growth over the past three years is best demonstrated through the amount of accounts receivable under contract annually, which has grown from $182 million in 1989 to more than $800 million in 1991. The company currently operates at a level above $1 billion annually.

# CONSOLIDATED FINANCIAL HIGHLIGHTS

(In thousands, except per share data)

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| Accounts Receivable Under Contract | $800,200 | $291,565 | $182,982 |
| Total Assets | 513,623 | 195,562 | 121,731 |
| Shareholders' Equity | 20,078 | 13,422 | 9,419 |
| Net Income | 4,256 | 3,903 | 3,486 |
| Earnings Per Share | .91 | .86 | .78 |
| Average Common Shares Outstanding | 5,000 | 4,600 | 4,500 |

$514 million
$196 million
$122 million
1989 1990 1991
Total Assets
$4.3 million
$3.9 million
$3.5 million
1989 1990 1991
Net Income
$20.1 million
$13.4 million
$ 9.4 million
1989 1990 1991
Shareholders' Equity
$1.5 billion
$800 million
$292 million
$183 million
1989 1990 1991 1992
(Est.)
Accounts Receivable Under Contract

Towers Financial Corporation enters the 1992 fiscal year in a position of unprecedented financial strength and industry leadership. During the past year, we continued our impressive record of business growth, innovation and financial performance, transacting more than $800 million of accounts receivable. We are currently operating at a level of more than $1 billion annually.

By focusing on our four market segments where we hold distinct business, technological and marketing advantages, TFC has established a leadership position in several important and growing sectors of the financial services industry. These four segments include accounts receivable collection; factoring of medical accounts receivable and business office management systems for the healthcare industry; acquiring RTC/FDIC and banking industry accounts receivable loan portfolios; and the underwriting and policy issuance of primary insurance and reinsurance.

We are continuing to follow our long-term plan of identifying under-served market niches, applying our unique expertise and resources, and building momentum to attain a meaningful market share in selected businesses.

TFC's track record of more than 15 years in accounts receivable management and related businesses provides clear evidence of our seriousness of purpose, our determination to compete aggressively and our ability to succeed.

**A commanding position in healthcare**
One of our most exciting areas of opportunity continues to be in the healthcare business we pioneered in 1989, when we created the first nationwide healthcare accounts receivable medical factoring system: the Healthcare Factoring and Business Office Management System. This landmark development in healthcare financing — an industry of more than $660 billion — provided hospitals, nursing homes, clinics and related facilities across the country with opportunities to generate a valuable source of working capital that had never been available to them.

In this market segment, TFC also provides computerized business office operations, which manage the total billing, processing, auditing and collection needs of healthcare providers. These services are distinguished by the added value of our accounts receivable claims management programs and unique Accelerated Claims Recovery System, a strong competitive advantage for TFC against more limited collection or factoring firms.

We believe TFC has the potential to develop and retain a major share of accounts receivable factoring management services in this market segment. The financial pressures now being exerted on this industry are enormous. As a result of changes in government programs and insurance company practices, and due to the ongoing need for upgraded equipment and facilities, healthcare providers have a nearly insatiable need for working capital. We have targeted the service-sensitive segment of this market, in order to utilize our expertise and our technology to assist client business offices in upgrading their billing systems and accounts receivable claims procedures, including much needed collection support.

We believe that TFC will enhance its reputation as one of America's healthcare factoring leaders, as our programs enjoy a relatively high rate of growth, as we continue to benefit from our early entrance into this market and from our innovative business office management programs and services.

**Securitizing healthcare receivables**
Our healthcare programs were enhanced by the issuance of innovative double-A-rated healthcare receivables-backed securities which significantly increase the healthcare industry's access to capital.

The first asset-backed securities of their kind, these offerings use accounts receivable from a variety of healthcare institutions as collateral for medium-term notes and long-term bonds. Accounts receivable used in the program are generally reimbursable by third-party payers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans. The securities have been rated double-A. To date, rated and non-rated debt issues valued at more than $300 million have been successfully placed.

**Reaching out to private practitioners**
Our experience in meeting the special needs of the U.S. healthcare industry is enabling TFC to

reach out to a new industry segment: America's 350,000 doctors — and other healthcare professionals — in private or group practice.

Scheduled for introduction in 1992, the new Towers Private Practice Office System will allow private practitioners to spend their time and energy delivering vital medical services instead of collecting bills, processing accounts receivable claims and worrying about their cash flow. Our turnkey solution to doctors' office administration covers their billing, collection, funding and accounts receivable claims management needs. It will be the first nationwide program of its kind, serving an industry with reported revenues of up to $200 billion annually.

**Acquiring RTC/FDIC and bank accounts receivable loan portfolios**
TFC is continuing to expand our program of acquiring performing and non-performing portfolios of accounts receivable loans originally

issued by banks or savings and loan institutions. These portfolios are acquired from the Federal Deposit Insurance Company (FDIC) or Resolution Trust Corporation (RTC) in their role as receiver or liquidator of failed banks, and from other institutions participating in an active primary and secondary market for these portfolios.

Each RTC/FDIC portfolio is made up of different types of accounts receivable loans with different characteristics. In general, they consist of loans evidenced by promissory notes and secured by one of these two types of collateral: real property such as homes, office buildings, warehouses, factories, farms and undeveloped land; or personal property such as cars, trucks, *machinery, inventories, mobile homes*, credit card accounts and unsecured loans.

TFC had significant experience in collecting these types of accounts receivable loans on behalf of our financial institution clients for many years. In addition, we purchase non-performing loans from the portfolios of healthy, solvent banks seeking to lower their credit risk exposure.

Acquiring and collecting these loans on our *own behalf is a logical extension of our existing* services, and we believe it will continue to be a significant business opportunity for TFC due to the continuing crisis among U.S. financial institutions.

**Re-entering the insurance business**

TFC took the initial steps this year to re-enter the property-and-casualty insurance industry in

a carefully controlled manner. Reinsurance enables us to share premiums and losses with *primary insurers*, diversify our exposures, and join TFC with the world's most prominent insurance entities on a partnership basis. Towers Insurance Group will eventually provide coverages on both a primary-risk and reinsurance basis through domestic and offshore companies.

In the coming year, we will continue to pursue TFC's strategic plan by capitalizing on our expertise and resources to build market share in its major business segments, in which TFC is currently handling in excess of $1 billion of accounts receivable annually.

We also are continuing to evaluate new opportunities consistent with our core businesses. We intend to take advantage of these situations as they arise, and to maintain the controlled investment of financial, managerial and staff resources in ways which add value to the Company and to your shares.

Steven Hoffenberg
Chairman & CEO

Towers Financial Corporation, through wholly owned subsidiaries and affiliates, has been engaged in the management of accounts receivable for more than 15 years. During that time, TFC has emerged as an industry leader in its core business and has pioneered new businesses which extend and redefine the traditional boundaries of the accounts receivable industry.

In part, TFC's success derives from our proprietary large-scale computerized systems and nationwide network of highly skilled *professionals. Our expertise and unmatched* resources enable us to process accounts receivable on a scale and with a professionalism unequalled in this business.

Complementing these unique resources is a distinctive market vision enabling us to anticipate and meet market opportunities. As TFC has grown in size and stature over the last two decades, we have repeatedly applied our expertise to new industries and areas of service compatible with our core business. To support and enhance our continued growth, TFC became a publicly traded company in 1986.

In its role as one of America's leading collectors of past due business debt, TFC is currently engaged in these principal lines of business:

**Accounts receivable collection services**

TFC's unprecedented success in the collection of past due accounts reflects the high calibre of our personnel and quality of our systems. Our continuous program of training and education, our exclusive computerized Accelerated Claims Recovery System (ACRS), and our ability to maintain good will with our customers' debtors while rapidly recovering their obligations have enabled us to build continuing customer relationships and build a solid platform of profitability and growth.

**Corporate accounts receivable factoring**
In addition to collecting accounts receivable, TFC is an active participant in providing asset-based financing services to our commercial customers. Through the outright purchase or factoring of receivables, TFC purchases past due and current accounts at a discount to their face value and applies our exceptional collections capabilities on our own behalf. By recovering these accounts, TFC benefits from the opportunity to reinvest and profit from these funds.

**Healthcare factoring of medical accounts receivable and computerized business office management systems**
To meet the specialized needs of hospitals, nursing homes, clinics and other healthcare providers, TFC created a revolutionary, nationwide approach to the factoring of their reimbursable medical accounts receivable which provided a new source of working capital for this industry of more than $660 billion. Instead of relying on the fiscal condition of the healthcare provider to qualify for asset-based financing — which would limit the availability of credit to a small number of institutions — it uses the credit quality of third-party reimbursers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans. The medical factoring program is delivered with TFC's expert accounts receivable computerized business office management services, which together speed the recovery of funds to the healthcare institution.

**Acquiring RTC/FDIC and banking industry accounts receivable loan portfolios**
TFC has long served as a factoring resource for the banking industry, through purchase of non-performing loans from their portfolios. The federal takeover of failed banks and thrift institutions throughout the United States created a unique opportunity for TFC to capitalize on its existing knowledge of this business. We have moved swiftly to capture this opportunity by purchasing accounts receivable loan portfolios at a discount to their face values. TFC's unique skills and capabilities have proven ideal for realizing the fullest values in these accounts receivable portfolios.

**Towers Private Practice Office System (1992)**
Building on our expertise in healthcare factoring, TFC is planning to introduce next year an integrated factoring and office system for doctors and other healthcare professionals in private and group practice. The Towers Private Practice Office System will offer doctors a turnkey solution to billing, collection, factoring and accounts receivable computerized claims management. It covers all payment classes including self-pay obligations as well as reimbursable payments. The first nationwide program of its kind, it will serve an industry with reported revenues of up to $200 billion annually.

**Insurance/reinsurance**
The newest business segment of TFC is property and casualty insurance and reinsurance. The Towers Insurance Group was formed in 1991 with the eventual goal of providing coverage on a primary-risk and reinsurance basis through domestic and offshore companies. Our activities currently include primary insurance and reinsurance, which will enable us to diversify our initial exposures and benefit from the experience and financial depth of the leading worldwide insurance firms with whom we join on a partnership basis.



# ACCOUNTS RECEIVABLE COLLECTION SERVICES

The core business of Towers Financial Corporation is assisting our customers in collecting past due accounts receivable. We are a national leader in this field with a proven track record in providing these services to *more than 20,000 business and healthcare* organizations throughout the United States, including many of the Fortune 1000 corporations. Since fiscal 1988, we have managed approximately $1.5 billion in accounts receivable. As of year-end fiscal 1991, more than $800 million of accounts receivable were under management. Currently, TFC is operating at more than $1 billion annually, covering all of its business lines.

**Recovering America's business debts**

The importance of regular, predictable cash flow to a business cannot be overemphasized. When customer accounts become past due, a company is left with cash flow problems which can have *a serious impact on its ability to manage* overhead, pay vendors, reduce debt and fund its business operations.

TFC offers customers an unparalleled opportunity to recover past due funds in a speedy, thorough and professional manner. We also provide a full array of related financing, factoring and management services to speed the flow of capital back into our customers' businesses.

With approximately 8 million companies doing business in the United States, our opportunities for growth are virtually boundless. TFC is an industry leader in building the accounts receivable systems, training the people and developing the nationwide presence required to capitalize on these opportunities and expand our business in a controlled, efficient manner.

**The "Towers System"**

TFC has developed a unique business system which places us at the forefront of this growing field. We call it the Towers System, and attribute its success to our intensive focus on the "three Ps" of accounts receivable management: *people, process* and *presence.*

***People*** At the heart of TFC's success stands a unique team of highly trained and motivated professionals. Our nationwide network includes attorneys, healthcare claims analysts, account executives, collectors and paralegals with extensive experience in the industries they serve. We continually educate and train these professionals to maintain their skills and keep them informed of current trends, procedures, techniques and government or insurer policy changes.

***Process*** Our state-of-the-art, nationwide data processing equipment, and proprietary tracking and collection software, are unmatched by any competitor serving the industry. We are always

**Factoring: A Time-Honored Financial Management Technique**

The factoring of accounts receivable is a time-tested, dependable technique for managing cash *flow and assuring financial stability.* Today, corporate factoring is a $75 billion industry serving large and middle-market companies in a wide variety of industries.

Factoring enables companies that are not highly capitalized to regain control over their cash flow. Many firms can no longer afford to wait the full 60, 90 or 120 days — or even longer — *that their customers now routinely delay* payment of invoices. By factoring their receivables, these companies benefit from affordable financing to meet their ongoing overhead expenses of payroll, rent, inventory, taxes and other regular business costs.

TFC was first to extend this "big company" concept to healthcare organizations by creating *the first nationwide medical factoring resource* for hospitals, nursing homes, clinics and related facilities in this industry of more than $660 billion. These institutions, which desperately need cash flow to meet their operating requirements, might not otherwise have qualified for asset-based financing by relying instead on the fiscal condition of third-party reimbursers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans.

In addition to our programs for healthcare providers, TFC provides factoring services to all types of manufacturing, transportation, communications, finance, insurance and wholesale and distribution companies.

investing in our processing systems and upgrading our capabilities to increase the volume of accounts receivable we can handle, without significantly increasing our personnel [illegible]ts or other expenses. TFC's systems currently possess the capacity to collect, factor and manage more than $3 billion in accounts receivable annually.

***Presence*** To deliver these services, TFC has developed an extensive marketing and sales presence in major markets throughout the United States. This national presence enables us to customize our products and services to the needs of individual markets, and to provide our customers with greater access and a higher level of service.

**Experience and professionalism**
TFC's rapid growth in accounts receivable collection stems largely from our success at marketing our services on the basis of our experience and our collection practices. We assign each collection account to one of our staff of practicing attorneys and collectors, who actively pursue collection with the help of paralegals, credit analysts and investigators (skip tracers).

Our policy is to hire people for our collection staff who have at least five years of relevant experience. Each new member of the collection staff undergoes an in-house training program and has strict guidelines to follow with respect to the collection process. The collection staff undertakes a comprehensive review of each new collection account; debtors are contacted and dealt with on the basis of this review. Our proprietary accounts receivable computer systems allow us to track all accounts quickly for any client, to track our contacts with each debtor, and to track each debtor's payment and credit histories.

**The highest standards of performance**
Over the past 15 years, TFC has unceasingly worked to raise the standards of professionalism, effectiveness and profitability in the industry. The impact of these efforts is best reflected in a number of meaningful performance measures.

A clear indication of the quality of our performance is our proven ability to recover accounts which are substantially past due. Another is the significant amount of repeat business we generate. Not only the speed of our collections but our professional approach — which strives to maintain good will between customer and debtor — has resulted in repeat business and referrals from thousands of satisfied customers.

Of course, perhaps the best measure of our success is found on our bottom line, which mirrors the consistent growth to TFC's current level of more than $1 billion of accounts receivables annually. Over the last two decades, we have clearly demonstrated that by enhancing our services and improving our operational efficiencies for TFC customers, we also fulfill our financial responsibilities to shareholders.

# HEALTHCARE FACTORING OF ACCOUNTS RECEIVABLE AND COMPUTERIZED BUSINESS OFFICE MANAGEMENT SYSTEMS

Towers Financial Corporation's breakthrough Healthcare Factoring Program was launched nationwide in 1989 to help hospitals, clinics, nursing homes, professional groups and other healthcare providers overcome the significant cash flow problems caused by slow-paying health insurers and other third-party payers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans.

The first nationwide program of its kind, the Healthcare Factoring Program was introduced to address this industry crisis. The program has received wide praise by healthcare administrators seeking a more professional and effective means of generating and managing their vital cash flow requirements. It has also been praised by community leaders who are grateful for this opportunity to restore economic stability to these important institutions.

TFC is a recognized leader in helping U.S. healthcare institutions solve their funding problems through innovative, receivables-based financing approaches. We continue to build on our core strengths in asset-based financing and healthcare factoring to develop new approaches and serve new segments of this vitally important industry of more than $660 billion.

**An industry in crisis**

The typical hospital has never earned quite enough on patient care to cover costs. Historically, it has relied on government programs and private philanthropy to stay in the black. But in recent years, this precarious mode of existence has been increasingly difficult to maintain.

The growing rate of hospital closings has dramatized the fact that more than half of all community healthcare facilities — large and small, urban and rural, investor-owned and not-for-profit — are losing money on patient care.

Under the federal government's Diagnosis-Related Groups (DRG) program, America's healthcare facilities are caught in an economic squeeze. They must address inflation in an environment of stringent cost controls. They must wait for repayment from third-party payors who have tightened claims review. And they must bear an increasing burden of the shortfalls from Medicaid and Medicare reimbursements.

**An innovative funding solution**

Typically, borrowing has become a major source of funding for today's healthcare institution. But borrowing at a reasonable cost can be difficult for hospitals in today's age of lending cutbacks, the S&L crisis and the banking industry's "credit crunch." Further complicating hospitals' funding problems are cutbacks in corporate giving, the current recession, and changes in the tax law which discourage private charitable donations.

Furthermore, hospitals face growing scrutiny by their lending sources. Many healthcare institutions are not profit-oriented; in fact, they

need to operate at a loss or near-loss to qualify for public funding. A significant number of institutions have seen their credit ratings downgraded and access to credit curtailed.

In response to this growing cash flow crunch, TFC created a unique factoring solution especially designed for healthcare institutions. It assists them in bridging delays brought on by slow-paying insurers and government agencies, and in collecting a greater portion of the funds to which they are entitled.

**Predictable cash flow**

The Healthcare Factoring Program provides accounts receivable medical factoring to hospitals, clinics, nursing homes, professional groups and other healthcare providers, together with TFC's specialized expertise and proprietary computerized business office systems to speed the full recovery of third-party reimbursable claims and self-pay accounts receivable.

Qualified institutions receive *same day factoring* of submitted bills from third-party reimbursers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans.

By financing their medical accounts receivable, healthcare providers receive benefits previously available only to a limited number of the highest investment-grade U.S. hospitals with substantial assets or cash flow. With a more prompt, more predictable cash flow, they can not only manage ongoing overhead expenses such as payroll, rent and taxes, but also negotiate substantially better prices from vendors. This increased purchasing power is often used to purchase life-saving medical equipment, for facilities renovation, and to upgrade an institution's staffing levels.

**Computerized business office claims management systems**

After factoring receivables, TFC applies its extensive expertise in collection and management to recover funds due from self-pay accounts, and from third-party reimbursers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans. Our advanced software and processing systems enable us to automate the collection process and accelerate the recovery of claims.

TFC reviews and operates each step of the accounts receivable claims process. We thoroughly examine each claims submission to eliminate errors and facilitate faster payment. We provide support and guidance for the business office claims management staff, and assist in establishing appropriate in-house systems and controls for billing, collection and accounts receivable filing and reimbursement. As a result of these efforts and our familiarity with healthcare payment procedures, we are

**Securitization: Harnessing the power of the capital markets**

TFC has been making financial history in the past year with the first successful issuance of double-A-rated asset-backed securities secured by third-party healthcare accounts receivable. Similar to recent offerings by major banks of securities backed by credit card receivables, these offerings tap the nation's enormous financial markets in support of TFC's unique Healthcare Funding Program. They mark a significant improvement in the capital access of America's vital healthcare industry.

These innovative securities "pass through" income from accounts receivable purchased by TFC from hospitals, nursing homes and other healthcare providers nationwide to outside investors who receive a fixed rate of interest. In effect, they are a vehicle to obtain long-term financing for accounts receivable which are short-term obligations.

A series of rated and non-rated issues of medium-term notes and long-term bonds totalling more than $300 million have already been successfully placed.

often able to reduce the payment cycle substantially, and to raise reimbursement levels to what these providers are entitled to.

**Restoring financial stability**

In addition to these direct benefits of the Healthcare Factoring Program, customers gain access to TFC's financial and management expertise. Our staff is fully knowledgeable in a broad range of business office management issues facing healthcare professionals today such as financial organization and controls, the underwriting of bonds and debentures, the sale or restructuring of ownership, credit enhancements, governmental and legislative issues, group insurance and benefits programs, and legal guidance on matters relating to healthcare and collection rights.

As a result of this program, a vitally important $660 billion industry now has access to a form of asset-based accounts receivable factoring which has been available to commercial corporations for more than three decades. Many healthcare professionals view the program as a breakthrough opportunity to restore financial stability to an overly regulated industry whose services are fundamental to the nation's well-being. At TFC, we view it as a prime example of our opportunistic business philosophy — taking advantage of our business strengths to foresee, measure and plan for emerging market needs.

**Towers Private Practice Office System (1992)**

Our proven expertise in meeting the financial needs of hospitals, nursing homes and other healthcare institutions is enabling TFC to expand our services to America's healthcare community. Beginning in 1992, the Towers Private Practice Office System will offer an integrated factoring and office system to doctors and other healthcare professionals in private or group practice — a complete solution to their billing, collection, factoring and accounts receivable management needs.

**Complementing doctors' professional skills**

American doctors begin their professional lives with the finest medical education in the world — but with little if any formal training in the business and financial disciplines necessary to manage a private practice. Many are unprepared for the realities of collecting bills, processing third-party and self-pay claims and maintaining a regular cash flow. Those who possess the required business skills frequently lack sufficient time to put them to use while building a business and meeting their other professional obligations.

**A turnkey solution**

In response to this recognized need, TFC has created the Towers Private Practice Office System. This unique nationwide service will offer effective administration of private doctors' business offices, including complete accounts receivable management and factoring services. The program will include:

- Accounts receivable claims billing;
- Accounts receivable claims collection;
- Accounts receivable claims factoring at the time of confirmed billing by third-party payers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans; and
- Complete private practice accounts receivable claims management.

This program will cover all classes of payment owed to the practice, including the self-pay portion of consumer debt as well as accounts receivable claims from third-party reimbursers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans. It will be the first nationwide program of its kind, serving a national market with reported revenues of up to $200 billion annually.



# ACQUIRING RTC/FDIC AND BANKING INDUSTRY ACCOUNTS RECEIVABLE LOAN PORTFOLIOS

Towers Financial Corporation has traditionally served as a factoring resource for banks and other financial institutions seeking to dispose of non-performing loans. By purchasing these debts, TFC has enabled these solvent banks to keep their portfolio credit risk within reasonable limits.

A growing part of this business segment is the purchase of accounts receivable asset packages from the Federal Deposit Insurance Company (FDIC), Resolution Trust Corporation (RTC) and other institutions. These portfolios include loans from banks and thrift institutions nationwide which have failed and been placed in receivership by these federal agencies.

**Keeping America's promises**

America's current financial crisis is generally considered the most serious since the Great Depression, when thousands of Americans lost their life's savings. "Many have called it the worst financial crisis this nation has ever faced," recently reported the RTC, "and, once all is said and done, it may well be in terms of dollars spent, its impact on the federal budget deficit and its far-reaching financial and emotional impact on every citizen in this country."

As the federal agencies responsible for fulfilling the promise of federal deposit insurance, the FDIC and RTC have assumed the assets and liabilities of failed banks and thrifts throughout the United States. Between them, they have acquired hundreds of billions of dollars worth of diverse assets including shopping centers, office buildings, junk bonds, single-family mortgages, consumer and commercial loans and miscellaneous other holdings.

To maximize the return to taxpayers, the FDIC and RTC have chosen to sell many assets to third parties with specialized expertise who can manage them more efficiently and realize greater values. Accounts receivable are pooled into packages sharing common characteristics such as similar geographic marketplaces and similar management and marketing needs, thereby making it easier for purchasers to manage them.

**Purchasing selected portfolios**

TFC has purchased selected packages of past due accounts receivable loans which show a close fit with our distinctive expertise and geographic coverage. These packages generally consist of past due and delinquent consumer, commercial, real estate and other accounts receivable loans which are available at a significant discount to their face value.

Using the systems and methodology developed for our corporate and healthcare customers, TFC applies its unique collections capabilities on our own behalf. By realizing greater values for these assets than could be accomplished by government agencies acting on their own, TFC is able to substantially increase the return to our shareholders.

The continued availability and steady growth of assets held by banks and the FDIC and RTC have made this business segment an important profit center for TFC and, we anticipate, a source of steady growth for years to come.

## OTHER SERVICES

Towers Financial Corporation also offers a wide range of high-quality asset-based financing, primary insurance and reinsurance, and related financial services to our customers.

### Corporate credit services

In tandem with our collection services, Towers Financial Corporation offers an exceptional program for the financing and outright factoring and purchasing of accounts receivable for corporate customers.

Through these funding programs, TFC purchases and factors accounts receivable at a discount of their face value. Our highly effective collections capability enables us to recover these funds. Customers benefit from payment of accounts receivable and more predictable cash flow, while TFC is able to reinvest its portfolio at an extremely favorable rate of return.

National economic and business trends — including nationwide and regional recessions, the credit crunch, the tightening of bank borrowing restrictions and stricter credit terms being offered by many companies — point to continuing growth in this sector of the business.

Despite the rapid success achieved to date, TFC has only begun to tap the enormous potential of these funding services. We believe our innovative, industry-based approach — exemplified by our highly acclaimed medical factoring program — will give us a competitive advantage as we move forward in this business. We are currently applying a major share of our new business development activities toward identifying and penetrating significant market opportunities in the financing and collection of accounts receivable.

### Insurance/reinsurance

Management of TFC has identified the property-and-casualty insurance business as the next logical step in the company's growth and diversification. The first phase of implementing this decision was undertaken in 1991 with the formation of Towers International Reinsurance Corporation as the first company of the Towers Insurance Group. The Group provides coverages on both a primary-risk and reinsurance basis through domestic and offshore companies.

Rather than dealing directly with the insured public and facing large, concentrated exposures, reinsurers share premiums and losses with the primary insurers who originate the coverages. By entering the insurance industry as a reinsurer, Towers is able to join with the world's most prominent insurance entities on a partnership basis. We share in their experience and financial depth through this partnership arrangement.

The worldwide insurance industry is currently in the midst of deep-seated change and global restructuring. Profound changes in the world economy and sources of production, the evolution of the European common market as 1992 approaches, and the formation of cross-border insurance alliances in response to these trends create opportunities for new entrants with new ideas.

Management of TFC intends to expand operations geographically and in selected business niches to establish Towers Insurance Group in major European business centers and other world markets. With a global presence and TFC's proven ability to respond to changing market conditions, we anticipate these operations will grow to become an important source of revenues and earnings for TFC.

## CONSOLIDATED BALANCE SHEET: ASSETS

| | As Of June 30, | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Accounts Receivable (Note 3) | $437,416,432 | $177,155,446 | $112,331,892 |
| Investments (Note 4) | 2,805,500 | 2,805,500 | 3,376,241 |
| Cash and Cash Equivalents | 63,473,291 | 9,193,566 | 3,825,765 |
| Other Receivables | 1,173,831 | 1,061,555 | 130,354 |
| Note Receivable - Officer | – | – | 250,000 |
| Property and Equipment - Net | 3,258,278 | 3,574,494 | 1,098,163 |
| Security Deposits | 569,846 | 515,812 | 662,913 |
| Prepaid Interest and Expenses | 4,499,700 | 797,563 | 421,436 |
| Excess of Cost Over Fair Value of Assets Acquired From Majority Shareholder (Notes 1, 2 and 12) | 425,911 | 458,414 | |
| Excess of Fair Value of Assets Acquired From Majority Shareholder Over Cost (Notes 2 and 12) | | | (365,471) |
| Total Assets | $513,622,789 | $195,562,350 | $121,731,293 |

The accompanying notes are an integral part of the financial statements.

## CONSOLIDATED BALANCE SHEET: LIABILITIES & SHAREHOLDERS' EQUITY

| | As Of June 30, | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Due To Clients | $191,188,759 | $64,880,237 | $52,501,911 |
| Notes Payable (Note 5) | 286,595,677 | 92,178,894 | 48,599,658 |
| Loan Payable (Notes 6 and 7) | 2,888,966 | 3,328,133 | 1,082,447 |
| Accounts Payable and Accrued Expenses | 6,461,689 | 7,185,666 | 1,860,188 |
| Deferred Income | 4,442,011 | | |
| Income Taxes Payable (Note 8) | 1,967,510 | 13,725,633 | 6,584,201 |
| Deferred Income Taxes Payable (Note 8) | – | 841,850 | 1,683,700 |
| Total Liabilities | 493,544,612 | 182,140,413 | 112,312,105 |
| Stockholders' Equity: | | | |
| Common Stock $.001 Par Value 100,000,000 Shares Authorized Shares Issued and Outstanding 5,000,000 in 1991, 4,600,000 in 1990 and 4,500,000 in 1989 | 5,000 | 4,600 | 4,500 |
| Additional Paid In Capital | 2,845,000 | 445,400 | 345,500 |
| Retained Earnings | 17,228,177 | 12,971,937 | 9,069,188 |
| Total Stockholders' Equity | 20,078,177 | 13,421,937 | 9,419,188 |
| Total Liabilities and Stockholders' Equity | $513,622,789 | $195,562,350 | $121,731,293 |

The accompanying notes are an integral part of the financial statements.

## CONSOLIDATED STATEMENT OF INCOME

| | Fiscal Year Ended June 30, | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Gross Revenues | $97,449,134 | $74,442,718 | $53,269,068 |
| Operating Expenses | | | |
| Interest on Notes | 27,381,087 | 10,456,292 | 6,868,423 |
| Salaries and Benefits | 22,386,024 | 14,012,973 | 9,487,151 |
| Selling | 11,180,184 | 7,558,382 | 4,552,053 |
| General and Administrative | 31,159,399 | 32,212,322 | 25,548,339 |
| | 92,106,694 | 64,239,969 | 46,455,966 |
| Income Before Provision for Income Taxes | 5,342,440 | 10,202,749 | 6,813,102 |
| Provision for Income Taxes (Note 8) | 1,086,200 | 6,300,000 | 3,326,986 |
| Net Income | $4,256,240 | $3,902,749 | $3,486,116 |
| Earnings Per Share (Note 10) | $0.91 | $0.86 | $0.78 |

The accompanying notes are an integral part of the financial statements.

## CONSOLIDATED STATEMENT OF RETAINED EARNINGS

| | As of June 30, | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Balance - Beginning of Year | $12,971,937 | $9,069,188 | $5,583,072 |
| Net Income | 4,256,240 | 3,902,749 | 3,486,116 |
| Balance - End of Year | $17,228,177 | $12,971,937 | $9,069,188 |

The accompanying notes are an integral part of the financial statements.

## CONSOLIDATED STATEMENT OF CASH FLOWS

| | Year Ended June 30, | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| **Cash Flows From Operating Activities:** | | | |
| Net Earnings: | $4,256,240 | $3,902,749 | $3,486,116 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided By Operating Activities: | | | |
| Depreciation and Amortization | 1,401,655 | 412,556 | 220,908 |
| Accounts Payable, Accrued Expenses and Other | (1,620,933) | 5,303,359 | (543,604) |
| Deferred Income Taxes and Taxes Payable | (12,599,973) | 22,119 | 65,113 |
| Deferred Income | 4,442,011 | - | - |
| Prepaid Interest and Expenses | (3,702,137) | 6,299,582 | 3,324,001 |
| Payables Due to Clients | 126,308,522 | 12,378,326 | 20,895,515 |
| Net Cash Provided By Operating Activities | 118,485,385 | 28,318,691 | 27,448,049 |
| **Cash Flows From Investing Activities:** | | | |
| Finance Receivables Acquired | (415,429,644) | (151,436,279) | (80,787,549) |
| Finance Receivables Principal Collected | 155,168,658 | 86,612,725 | 29,726,247 |
| Purchase Property and Equipment | (322,290) | (2,888,887) | (658,860) |
| Proceeds From Disposition/Acquisition of Fixed Assets and Investments | - | 570,741 | 223,759 |
| Installment Payment for Acquisition of Stock in Subsidiaries | - | (823,885) | (260,000) |
| Other | (439,167) | (1,160,227) | 690,290 |
| Net Cash (Used) in Investing Activities | (261,022,443) | (69,125,812) | (51,066,113) |
| **Cash Flows From Financing Activities:** | | | |
| Proceeds From Notes Payable | 194,416,783 | 45,824,922 | 18,908,960 |
| Proceeds From Collection of Note Receivable - Officer | - | 250,000 | - |
| Proceeds From Stock Subscription | 2,400,000 | 100,000 | - |
| Net Cash Provided By Financing Activities | 196,816,783 | 46,174,922 | 18,908,960 |
| Net Increase (Decrease) in Cash and Cash Equivalents | 54,279,725 | 5,367,801 | (4,709,104) |
| Cash and Cash Equivalents - Beginning of Fiscal Year | 9,193,566 | 3,825,765 | 8,534,869 |
| Cash and Cash Equivalents - End of Fiscal Year | $63,473,291 | $9,193,566 | $3,825,765 |

The accompanying notes are an integral part of the financial statements.

## NOTES TO FINANCIAL STATEMENTS

For the Year Ended June 30, 1991

### 1. Summary of Significant Accounting Policies:

**Basis of Presentation**

Towers Financial Corporation (formerly known as O.G. Consulting Corp., incorporated in 1983) is a diversified company operating in the acquisition and management of accounts receivable directly and through its wholly owned subsidiaries, Towers Credit Corporation, Towers Collection Service, Inc., Towers Leasing Corporation, TFC Funding Corporation, Towers Healthcare Receivable Funding Corporation, Towers Healthcare Receivable Funding Corporation II, Towers Healthcare Receivable Funding Corporation III and Towers International Reinsurance Corporation.

Towers Financial Corporation formed Towers Diversified Corporation, a wholly owned subsidiary, in October 1987 to acquire United Diversified Corporation. (See Note 4.)

Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation were acquired by Towers Financial Corporation in July 1986. The financial statements for each subsidiary were independently audited and have been consolidated for presentation herein. Each of the consolidated subsidiaries is wholly-owned by Towers Financial Corporation. The subsidiaries were incorporated as follows:

Towers Collection Service, Inc. (April 1980)

Towers Credit Corporation (October 1982)

Towers Leasing Corporation (March 1985)

TFC Funding Corporation (November 1989)

Towers Healthcare Receivables Funding Corporation (March 1990)

Towers Healthcare Receivables Funding Corporation II (November 1990)

Towers Healthcare Receivables Funding Corporation III (May 1991)

Towers International Reinsurance Corporation (April 1991)

Towers Collection Service, Inc. succeeded to the business of Transcon Adjustment Group Ltd., which was founded in 1975. Senior Management have been in control of the Company since 1975.

**Operations and Consolidations**

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries (except for United Diversified Corporation, see Note 4) after elimination of material intercompany accounts and transactions.

**Statement of Cash Flows**

In 1987, the Company adopted Statement of Financial Accounting Standard No. 95, "Statement of Cash Flows", and is presenting a statement of cash flows using the indirect method in accordance with AICPA Audit Guide—Audits of Financial Companies, in place of the statement of changes in financial position.

FAS 95 requires that the following supplemental disclosures to the statement of cash flows be provided in related disclosures. Cash paid for interest was $29,079,335 in 1991, $12,320,486 in 1990 and $6,727,987 in 1989. Cash paid for income taxes was $11,761,250 in 1991, none in 1990 and 1989.

**Revenue Recognition**
The consolidated statement of income reflects a recasting of the Company's revenue and costs when compared with the previously published financial statements. However, the recasting has no effect on reported net income.

Previously, the Company had included in gross revenue the face value of accounts receivable which were either acquired by the Company's factoring subsidiary or were irrevocably assigned to the Company's collection subsidiary. In computing gross profit the Company deducted the projected amounts for payments due to clients, the costs of collection and the uncollectible portions of the receivables.

As a result of the recasting of the figures, the Company now reflects in gross income only that portion of the receivables that the Company reasonably expects it will retain. The costs of collection previously deducted in arriving at gross profit are now reflected as part of general and administrative expenses and the projected amounts due to client no longer enter into the calculation.

The factoring operation consists of purchasing, from healthcare providers, receivables owed by major insurance companies, Medicare, Medicaid, Blue Cross/Blue Shield, workmen's compensation, health maintenance organizations, unions and corporate payors of healthcare, and commercial accounts receivable (goods sold and delivered and work, labor and services purchased from companies extending credit to other companies). The fees for the factoring operation are recognized on the purchase of the receivable.

The Company's fees for its collection services are recorded on the assignment of the account to the Company at a contingent fee rate. Actual fees vary with the nature and volume of service performed and are dependent on contract terms. Income on RTC/FDIC loans is recognized as they are collected.

**Property and Equipment**
Property and equipment are stated at cost and are depreciated using the straight-line method over the estimated useful lives of assets, ranging from three to five years.

Leasehold improvements are amortized over the terms of the lease or the estimated life of the improvement, whichever is shorter. Maintenance and minor repairs are charged to operations as incurred.

**Goodwill**
The Company intends to amortize goodwill over 40 years in accordance with APB 16.

**Accounting Change**
The Company has changed its method of reporting income taxes. (See Note 8.)

**Cash and Cash Equivalents**
The Company treats all assets that qualify as cash equivalents under FAS Statement 95 as cash equivalents.

**Capital Leases**
The Company has leases with GE Capital Corporation (RCA Services Company) for telephone equipment. The leases provide for monthly payments of $13,522 for 10 years, ending in fiscal year 1998.

The Company has a lease with BLT Leasing Company for computer equipment. The lease provides for monthly payments of $4,002 for five years, ending in fiscal year 1993.

The Company has a lease with Atlantic Computer Corporation for computer equipment. The lease provides for monthly payments of $13,244 for seven years, ending in fiscal year 1997.

**2. Acquisition**
The Company acquired 80% of the common stock of Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation from Professional Business Brokers, Inc. July 1986. (See Note 12.)

In fiscal year 1987, the Company acquired the remaining 20% of the common stock of these corporations from Professional Business Brokers, Inc. Professional Business Brokers, Inc. waived the difference between the amount paid and the amount owed with respect to the fiscal year ended June 30, 1988 and has agreed to defer the payment of such difference with respect to the fiscal years ended June 30, 1990 and 1989. The Company is presently revising the terms of its agreement with Professional Business Brokers, Inc. The final cost is still to be determined.

**3. Accounts Receivable**
Accounts receivable consists of the following major categories of receivables:

| | As of June 30 | | |
|---|---|---|---|
| | 1991 | 1990 | 1989 |
| Collection & Commerical Accounts | $268,306,775 | $163,769,335 | $112,331,892 |
| Healthcare Accounts | 169,109,657 | 13,386,111 | |
| | $437,416,432 | $177,155,446 | $112,331,892 |

**4. Investments**
The Company acquired an 82% interest in United Diversified Corporation ("UDC"), an insurance holding company, in 1987. Within six months of the acquisition, UDC was placed into receivership by the Illinois Insurance Director, and the Company thereupon ceased to have access to information concerning the financial condition of UDC. The Company's investment in UDC, $2,805,500, is presented at cost. The Illinois Insurance Director has instituted a legal action to take possession of all assets of UDC. Management believes that the Illinois Insurance Director will not prevail and that the Company will ultimately be determined to be entitled to all assets of UDC, in which case the Company would experience no loss on this investment. Conversely, if the Illinois Insurance Director does prevail, the Company would sustain a total loss of this investment subject to possible recovery in a currently pending counterclaim for recoupment and damages.

**5. Notes Payable**

The Company's factoring and portfolio acquisition businesses require substantial capital to fund the portion of the purchase price payable upon acquisition of the receivables. The amount of capital required is dependent on the volume of business the Company generates and how quickly the receivables can be collected, thereby providing funds for further purchases. The Company has funded its factoring and portfolio acquisition capital requirements primarily through the sale of debt in the capital markets.

**6. Long-Term Debt**

The Company's long-term debt includes a bank loan with a remaining principal balance of $1,357,834 of which $1,202,459 is categorized as long-term. The loan is secured by equipment, bears interest at 11.25% per annum and matures in October 1996. The remaining long-term debt consists of the long-term portion of the Company's capital lease obligations to GE Capital Corporation (RCA Services Company), Atlantic Computer Corporation and BLT Leasing Company which long-term portion aggregates $1,319,239. (See Note 7.)

**7. Leases**

The Company leases all office space utilized by the Company and substantial portions of its equipment. The Company's corporate headquarters in New York City occupy approximately 100,000 gross square feet for which the company pays $2,531,954 annually (subject to adjustment for increases or decreases in the landlord's taxes and costs of providing certain building services) pursuant to subleases which expire in 1996. The Company's regional sales offices are all leased for one or two years or are rented on a month-to-month tenancy with annual rental payments aggregating $288,111.

The following is an analysis of the Company's capital leases:

| | Balance As of June 30, 1991 | 1990 | 1989 |
|---|---|---|---|
| Equipment | $1,327,989 | $1,327,989 | $828,549 |
| Less: Accumulated Depreciation | 474,804 | 307,225 | 166,733 |
| | $ 853,185 | $1,020,764 | $661,816 |

The following is a schedule by years of future lease payments under capital leases:

| Year Ending June 30 | |
|---|---|
| 1992 | $ 369,239 |
| 1993 | 329,212 |
| 1994 | 321,205 |
| 1995 | 321,205 |
| 1996 | 321,205 |
| Later Years | 276,070 |
| Total Payments | $1,938,136 |

The Company's operating leases all expire during the year ending June 30, 1992 and the future rental payments required under those leases aggregate $566,736 for the next fiscal year.

**8. Income Taxes**

Statement of Financial Accounting Standards No. 96, "Accounting for Income Taxes", was issued in December 1987 and is presently being revised. It establishes financial accounting and reporting standards for the effects of income taxes which result from an enterprise's activities during the current and preceding years. The Company was not required to adopt this statement until its year ending June 30, 1990, although earlier adoption is permitted. When adopted, the Company is given the choice of reflecting the effect of the change in the year of adoption or of restating any number of years.

Accordingly, the Company has elected to adopt Statement of Financial Accounting Standards No. 96 for the current fiscal year. Since the Company had not previously recognized any deferred tax assets, the financial statements were not affected.

Deferred income taxes resulted from the previous use of the cash method of accounting for tax purposes, and are decreasing pursuant to the phase-in permitted by the Tax Reform Act of 1986.

Towers Financial Corporation's income tax rate for 1991, 1990 and 1989 (computed by applying the U. S. federal income tax rate of 34% to income before income taxes) differs from the actual effective income tax rate as a result of the following:

| | 1991 | 1990 | 1989 |
|---|---|---|---|
| Tax at Statutory Rate | 34.000% | 34.000% | 34.000% |
| Plus: State and Local Taxes, Net of Federal Benefit | 6.671 | 4.512 | 13.166 |
| Plus: Nondeductible Penalties | (21.150) | 23.540 | 01.666 |
| | 19.521% | 62.052% | 48.832% |

**9. Stock Options**

During the fiscal year ended June 30, 1991 stock options were exercised resulting in the issuance of an additional four hundred thousand shares of common stock.

**10. Earnings Per Share**

The earnings per share are based on a weighted average common shares outstanding of 4,695,342 in 1991, 4,529,315 in 1990 and 4,500,000 in 1989.

**11. Commitments**

See Note 2 relating to the acquisition of Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation.

**12. Related Parties**

Professional Business Brokers, Inc. owns in excess of 70% of the Company's issued and outstanding stock. See Note 2 for details of the transaction between the company and Professional Business Brokers, Inc.

## COMPUTERIZED ACCOUNTS RECEIVABLE BUSINESS OFFICE CLAIMS MANAGEMENT SYSTEMS

By financing their medical accounts receivable, healthcare providers receive benefits previously available only to the highest investment-grade U.S. hospitals. With a more prompt, more predictable cash flow, they can not only manage ongoing overhead expenses, but also negotiate substantially better prices from vendors. Money saved can be used to purchase life-saving medical equipment, renovate facilities, and upgrade staffing levels.

After factoring receivables, TFC applies its expertise in collection and management to recover funds due from self-pay accounts, and from third-party reimbursers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans.

Our advanced software and processing systems enable us to automate the collection process and accelerate the recovery of claims. TFC reviews and monitors each step of the accounts receivable claims process. We thoroughly examine each claims submission to eliminate errors and facilitate faster payment. We provide support and guidance for the business office claims management staff, and assist in establishing appropriate in-house systems and controls for billing, collection.

# INDEPENDENT AUDITOR'S REPORT

We have audited the accompanying consolidated balance sheet of Towers Financial Corporation and subsidiaries as of June 30, 1991, 1990 and 1989 and the related consolidated statements of income, retained earnings and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We did not audit the financial statements of Towers Healthcare Receivables Funding Corporation, Towers Healthcare Receivables Funding Corporation II, Towers Healthcare Receivables Funding Corporation III, and Towers International Reinsurance Corporation, wholly owned subsidiaries, which statements reflect total assets as of June 30, 1991 and total revenues for the year then ended as follows:

| | ASSETS | TOTAL REVENUES |
|---|---|---|
| THRFC | $92,527,000 | $8,499,000 |
| THRFC II | $79,277,000 | $4,711,000 |
| THRFC III | $47,824,000 | $302,000 |
| TIRC | $10,237,000 | $12,000 |

Those statements were audited by other auditors whose reports have been furnished to us, and our opinion, insofar as it relates to the amounts included for those companies is based solely on the reports of the other auditors.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit and the reports of the other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audit and the reports of the other auditors, the financial statements referred to above present fairly, in all material respects, the financial position of Towers Financial Corporation as of June 30, 1991, 1990 and 1989, and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles.

Sincerely,

Marvin E. Basson, CPA, P.C.
New York, New York
October 9, 1991

# OFFICERS AND DIRECTORS

**Board of Directors**

Steven Hoffenberg
Chairman of the Board,
President and
Chief Executive Officer
Towers Financial Corporation

Mitchell Brater
Vice Chairman of the Board
Towers Financial Corporation

Charles H. Chugerman
Executive Vice President
and Secretary
Towers Financial Corporation
and President
Towers Leasing Corporation

Michael Rosoff, Esq.
Senior Vice President,
Chief Legal Officer and
Assistant Secretary
Towers Financial Corporation

Raymond Lewis
Vice President
Towers Financial Corporation

The Honorable Ben Barnes
President
Entrecorp
Austin, Texas
Former Chief Operating Officer,
Barnes Connolly
Development Corporation
Former Lt. Governor,
State of Texas
Former Speaker of the
House of Representatives,
State of Texas

The Honorable
Thomas B. Evans, Jr. Esq.
President
The Evans Group, Ltd.
Washington, DC
Former Co-Chairman,
Republican National
Committee and
Former Senior Member,
United States
House of Representatives

**Management**

Steven Hoffenberg
Chairman of the Board,
President and
Chief Executive Officer
Towers Financial Corporation

Mitchell Brater
Vice Chairman of the Board
Towers Financial Corporation

Charles H. Chugerman
Executive Vice President
and Secretary
Towers Financial Corporation
and President
Towers Leasing Corporation

Michael Rosoff, Esq.
Senior Vice President,
Chief Legal Officer and
Assistant Secretary
Towers Financial Corporation

Anthony DiNicolas
Senior Vice President
Towers Financial Corporation

Xavier Eboli
Vice President
Towers Financial Corporation
and President
Towers Collection Service, Inc.

Richard Levine
Vice President
Towers Financial Corporation

Raymond Lewis
Vice President
Towers Financial Corporation

Lauri L. Cornell
Director of Sales
Administration
Towers Financial Corporation

Richard Barbuto, Esq.
General Counsel
Towers Financial Corporation

Jack Tillem, Esq.
General Counsel
Towers Collection Service, Inc

Alan Litchy, Esq.
Assistant General Counsel
Towers Collection Service, Inc

Joseph Hughes
Vice President Sales
Towers Financial Corporation

Alpha Nickelberry
Vice President Sales
Towers Financial Corporation

Stuart Dann
Vice President Sales
Towers Financial Corporation

Joseph Turano
Director
Human Resources
Towers Financial Corporation

**Outside Counsels**

Kutak Rock & Campbell
1650 Farnam Street, Omaha, NE 68102

Proskauer Rose Goetz & Mendelsohn
1585 Broadway, New York, NY 10036

**Transfer Agency and Registrar**

Mellon Financial Services
85 Challenger Road
Overpeck Centre
Ridgefield Park, NJ 07660

**Annual Meeting of Shareholders**

The Annual Meeting of Shareholders of Towers Financial Corporation will be held on Tuesday, November 25, 1991 at 10:00 am at Corporate Headquarters at 417 Fifth Avenue, New York, NY 10016.

*DATED: March 23, 1992*

# CONFIDENTIAL PRIVATE OFFERING DOCUMENT

For: Accredited Investors Only

TOWERS FINANCIAL CORPORATION

*$150,000,000* In Thirty-Month, Full Recourse Promissory Notes Redeemable Upon 90 Days Written Notice By The Investor Bearing Interest At 3.5% Over Chase Manhattan Bank, N.A.'s Prime Rate of Interest, Adjustable Monthly Collateralized, Secured And Backed By Accounts Receivable Due From Major Insurance Companies, Commercial Accounts Receivable And Loans And Accounts Receivable Purchased From Governmental Agencies

| | Subscription Price Payable Upon Subscription | Maximum Commissions(1) | Proceeds to The Company |
|---|---|---|---|
| Per Unit (minimum offering is one Unit) .......... | $ 100,000 | $ 10,000(10%) | $ 90,000(90%) |
| Total 1,500 Units (maximum offering) ........... | $150,000,000 | $15,000,000(10%) | $135,000,000(90%) |

(1) Commissions of up to 1% per quarter of the outstanding principal amount of the Promissory Notes may be paid to broker-dealers who are members of the National Association of Securities Dealers, Inc. Accordingly, the maximum compensation to broker-dealers will be 10% of the offering; promissory notes that are retired prior to their maturity will bear proportionately lower commissions. Amounts allocated to commissions which are paid will increase the proceeds to the Company.

This Offering Document Does Not Constitute an Offer to Any Person Other Than:

Name: ____________________

Offeree Number: 14409

417 FIFTH AVENUE, NEW YORK, NEW YORK 10016 (212) 696-0505

Towers Financial Corporation, Copyright 1992, All Rights Reserved

KR 0090

Towers Financial Corporation ("Towers" or the "Company") is offering for sale to Accredited Investors only, thirty-month promissory notes (the "Promissory Notes" or "Notes") redeemable upon 90 days written notice to Towers by the investor, which Notes are recourse to Towers, secured, collateralized and backed by all types of (i) Healthcare Accounts Receivable purchased and/or financed from hospitals, doctors, medical groups and other healthcare providers (the "Healthcare Receivables"); (ii) Business Accounts Receivable (which category includes Collection Accounts Receivable) purchased and/or financed from manufacturers, wholesalers and service companies including subsidiaries of Towers (the "Business Accounts Receivable"); and/or (iii) receivables and loans purchased from the Federal Deposit Insurance Corporation ("FDIC") and/or Resolution Trust Company ("RTC") (the "FDIC and RTC Receivables"), or from secondary sources. Towers will maintain as collateral for this offering Accounts Receivable in a face amount equal to the amount raised by this Offering which is outstanding from time to time. The Healthcare Receivables will be receivables of, and payable by, major insurance companies such as Blue Cross/Blue Shield, state governmental agencies, major unions, private insurers, worker's compensation payors, personal injury payors, self-payors and co-payors and all other first and third party reimbursers. The Business Accounts Receivable will be receivables of and payable by commercial businesses. The FDIC and RTC Receivables will be purchased at auction (or from secondary sources) and, in some cases, may be secured by assets (the Healthcare Receivables, Business Accounts Receivable and FDIC and RTC Receivables are collectively referred to as the "Accounts Receivable").

CAPITALIZED TERMS USED HEREIN SHALL HAVE THE MEANING SET FORTH AT "GLOSSARY."

THIS DOCUMENT IS CONFIDENTIAL AND MAY ONLY BE SHOWN TO ACCREDITED INVESTORS AS DEFINED HEREIN (SEE "GLOSSARY").

THE UNITS HAVE NOT BEEN REGISTERED WITH, OR APPROVED OR DISAPPROVED BY, THE SECURITIES AND EXCHANGE COMMISSION OR BY THE SECURITIES REGULATORY AUTHORITY OF ANY STATE. NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

TOWERS SHALL MAKE AVAILABLE TO EACH INVESTOR OR HIS AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY UNITS, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM ANY PERSON AUTHORIZED TO ACT ON BEHALF OF TOWERS *CONCERNING ANY ASPECT OF THE INVESTMENT AND TO OBTAIN ANY ADDITIONAL INFORMA*TION, TO THE EXTENT TOWERS HAS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

THIS OFFERING IS ACCOMPANIED BY THE COMPANY'S 1991 ANNUAL AUDITED REPORT WHICH IS BOUND UNDER SEPARATE COVER. IN THE EVENT PROSPECTIVE INVESTORS DO NOT RECEIVE A COPY OF THE 1991 ANNUAL AUDITED REPORT, NO OFFER IS MADE HEREBY. INVESTORS *ARE REQUIRED TO ACKNOWLEDGE THE RECEIPT OF THE ANNUAL REPORT AS A CONDI*TION OF THE SUBSCRIPTION AGREEMENT.

SALES OF THESE SECURITIES CAN BE CONSUMMATED ONLY BY TOWERS' ACCEPTANCE OF OFFERS TO PURCHASE SUCH SECURITIES WHICH ARE TENDERED TO TOWERS BY PROSPECTIVE INVESTORS. NO SOLICITATION OF ANY SUCH OFFER (INCLUDING ANY SOLICITATION WHICH MAY BE CONSTRUED AS AN "OFFER" UNDER FEDERAL AND/OR STATE SECURITIES LAWS) IS AUTHORIZED WITHOUT THE PRIOR APPROVAL OF SUCH PROSPECTIVE INVESTOR BY TOWERS.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE

KR 0091

REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME (SEE "RISK FACTORS").

DESPITE THE INCLUSION OF THE LEGENDS BELOW, BROKER-DEALERS MUST CONFIRM WITH THE ISSUER THAT EITHER THE SECURITIES HAVE BEEN REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE SINCE THE INCLUSION OF A LEGEND BELOW DOES NOT ASSURE REGISTRATION OR EXEMPTION FROM REGISTRATION.

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR ALABAMA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR ALASKA RESIDENTS ONLY*: THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISION OF 3 AAC 08.500-3 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THIS DOCUMENT SINCE THE DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF AS 45.55.170.

THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

*FOR ARIZONA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED PURSUANT TO A.R.S. SECTION 44-1846 BUT THE FACT OF THE GRANTING OF SUCH EXEMPTION IS NOT TO BE DEEMED A FINDING BY THE ARIZONA CORPORATION COMMISSION THAT THIS OFFERING DOCUMENT IS TRUE OR ACCURATE, NOR DOES SUCH GRANT OF EXEMPTION MEAN THAT THE COMMISSION HAS PASSED UPON THE MERITS OF OR OTHERWISE APPROVED THE SECURITIES DESCRIBED HEREIN.

*FOR ARKANSAS RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-42-504(a)(14) OF THE ARKANSAS SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THE OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR CALIFORNIA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE

OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE, IF SUCH REGISTRATION IS REQUIRED.

*FOR COLORADO RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981, IF SUCH REGISTRATION IS REQUIRED.

*FOR CONNECTICUT RESIDENTS ONLY*: THE SECURITIES REFERRED TO IN THIS OFFERING DOCUMENT HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE CONNECTICUT UNIFORM SECURITIES ACT, AND, THEREFORE, THE SECURITIES CANNOT BE SOLD OR TRANSFERRED UNDER SUCH ACT UNLESS THEY ARE REGISTERED UNDER SUCH ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR FLORIDA RESIDENTS ONLY*: FLORIDA PURCHASERS ARE ADVISED THAT WHERE SALES ARE MADE TO FIVE OR MORE PERSONS PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES & INVESTOR PROTECTION ACT, SUCH SALES ARE VOIDABLE BY THE PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE COMPANY OR ANY AGENT OF THE COMPANY OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE PURCHASER, WHICHEVER OCCURS LATER. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT (RULE 3E500.005(5)(a)(12)).

*FOR GEORGIA RESIDENTS ONLY*: OFFEREES ARE HEREBY ADVISED THAT THE CONSENT DECREE ENTERED INTO BY TOWERS FINANCIAL CORPORATION ("TOWERS") DISCUSSED IN THE CONFIDENTIAL PRIVATE OFFERING DOCUMENT DATED MARCH 23, 1992, PROVIDES THAT TOWERS IS PERMANENTLY ENJOINED FROM VIOLATING THE SECURITIES LAWS AND THAT TOWERS IS SUBJECT TO AN ONGOING OBLIGATION NOT TO VIOLATE THE SECURITIES LAWS. UNLESS A WAIVER IS GRANTED BY THE STATE OF GEORGIA, THE CONSENT DECREE CONSTITUTES AN AUTOMATIC DISQUALIFICATION FROM THE USE OF PRIVATE OFFERING EXEMPTIONS IN THE STATE OF GEORGIA. TOWERS HAS APPLIED FOR SUCH A WAIVER AND THE GEORGIA SECURITIES COMMISSION HAS AGREED TO GRANT THE WAIVER PROVIDED THAT THIS NOTICE BE FURNISHED TO ALL GEORGIA OFFEREES.

*FOR IDAHO RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR ILLINOIS RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS, NOR HAS THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR INDIANA RESIDENTS ONLY*: THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 23-2-1-2 OF THE INDIANA CODE. THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL OR STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.

*FOR LOUISIANA RESIDENTS ONLY*: THESE SECURITIES HAVE BEEN REGISTERED WITH THE SECURITIES COMMISSIONER OF THE STATE OF LOUISIANA. THE SECURITIES COMMISSIONER, BY

ACCEPTING REGISTRATION, DOES NOT IN ANY WAY ENDORSE OR RECOMMEND THE PURCHASE OF ANY OF THESE SECURITIES.

*FOR MAINE RESIDENTS ONLY:* THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE BANK SUPERINTENDENT OF THE STATE OF MAINE UNDER SECTION 10502(2)(R) OF TITLE 32 OF THE MAINE REVISED STATUTES. THESE SECURITIES MAY BE DEEMED RESTRICTED SECURITIES AND AS SUCH THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS PURSUANT TO REGISTRATION UNDER STATE OR FEDERAL SECURITIES LAWS OR UNLESS AN EXEMPTION UNDER SUCH LAWS EXISTS.

*FOR MARYLAND RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, IF SUCH REGISTRATION IS REQUIRED.

*FOR MICHIGAN RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNIFORM SECURITIES ACT OF MICHIGAN AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. MINIMUM INVESTMENT IN MICHIGAN IS $50,000.

*FOR MINNESOTA RESIDENTS ONLY:* THESE SECURITIES REPRESENTED BY THIS OFFERING HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

*FOR MISSISSIPPI RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR MISSOURI RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR NEW HAMPSHIRE RESIDENTS ONLY:* NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED

IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE DIRECTOR OF THE OFFICE OF SECURITIES REGULATION THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE DIRECTOR OF THE OFFICE OF SECURITIES REGULATION HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

*FOR NEW JERSEY RESIDENTS ONLY:* THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING DOCUMENT. THE FILING OF THIS OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE OR THE SALE THEREOF BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR NEW MEXICO RESIDENTS ONLY:* THE SECURITIES DESCRIBED HEREIN ARE OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF NEW MEXICO. ACCORDINGLY, THE NEW MEXICO SECURITIES BUREAU HAS NOT REVIEWED THE OFFERING OF THESE SECURITIES AND HAS NOT APPROVED OR DISAPPROVED THIS OFFERING. THE NEW MEXICO SECURITIES BUREAU HAS NOT PASSED UPON THE VALUE OF THESE SECURITIES OR UPON THE ADEQUACY OR ACCURACY OF THE INFORMATION CONTAINED IN THIS OFFERING DOCUMENT.

*FOR NORTH CAROLINA RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR PENNSYLVANIA RESIDENTS ONLY:* PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, EACH PENNSYLVANIA RESIDENT WHO ACCEPTS THE OFFER MADE PURSUANT TO THE OFFERING DOCUMENT TO PURCHASE ANY UNITS SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE, WITHOUT INCURRING ANY LIABILITY TO THE COMPANY, ITS AFFILIATES OR ANY OTHER PERSON, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE COMPANY OF HIS WRITTEN BINDING CONTRACT OF PURCHASE (SUBSCRIPTION AGREEMENT). TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER SHOULD SEND A LETTER OR TELEGRAM INDICATING HIS INTENTION TO WITHDRAW TO THE COMPANY AT THE ADDRESS OF THE COMPANY SET FORTH IN THE OFFERING DOCUMENT. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF A SUBSCRIBER ELECTS TO SEND SUCH A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD A SUBSCRIBER MAKE THIS REQUEST ORALLY, HE SHOULD ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

IN ADDITION TO QUALIFYING AS AN ACCREDITED INVESTOR, THE RESIDENTS OF PENNSYLVANIA HEREBY AGREE THAT THEY WILL NOT SELL, TRANSFER OR SUBDIVIDE THE UNITS PURCHASED HEREIN UNTIL AT LEAST ONE (1) YEAR FROM THE DATE OF PURCHASE.

*FOR SOUTH CAROLINA RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR SOUTH DAKOTA RESIDENTS ONLY:* THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31A, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATIONS OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS OFFERING IS TRUE, COMPLETE, AND NOT MISLEADING; NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SOUTH DAKOTA RESIDENTS HEREBY REPRESENT THAT (I) THEY HAVE A NET WORTH OF AT LEAST $1,000,000 (EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES); (II) THEY WILL INVEST NOT LESS THAN $100,000; AND (III) THEIR INVESTMENT DOES NOT EXCEED 10% OF THEIR NET WORTH.

*FOR TENNESSEE RESIDENTS ONLY:* THESE SECURITIES HAVE BEEN REGISTERED WITH THE STATE OF TENNESSEE. AS A CONDITION OF REGISTRATION, THE STATE OF TENNESSEE HAS IMPOSED MINIMUM SUITABILITY STANDARDS FOR TENNESSEE RESIDENTS. PURSUANT TO THOSE STANDARDS, EACH INVESTOR WHO IS A NATURAL PERSON MUST HAVE A NET WORTH OF AT LEAST $250,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES, AND MUST HAVE HAD A GROSS INCOME OF $65,000.00 DURING THE LAST TAX YEAR AND BE EXPECTED TO HAVE A GROSS INCOME OF $65,000.00 DURING THE CURRENT TAX YEAR, OR ALTERNATIVELY A NET WORTH OF AT LAST $500,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS AND AUTOMOBILES. ADDITIONALLY, UNDER THIS SUITABILITY STANDARD, EACH NATURAL PERSON'S INVESTMENT MUST NOT EXCEED TEN PERCENT (10%) OF HIS NET WORTH.

THIS OFFERING IS MADE TO ACCREDITED INVESTORS AS DEFINED IN SECTION 501(a) (1) OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. SEE "TERMS OF INVESTMENT." THE ACCREDITED INVESTOR STANDARD IS GENERALLY MORE RESTRICTIVE THAN THE MINIMUM SUITABILITY REQUIREMENTS IMPOSED BY THE STATE OF TENNESSEE. THEREFORE, THE EFFECT OF REGISTRATION OF THE OFFERING IN TENNESSEE (AND THE MINIMUM SUITABILITY STANDARD) IS THAT THE OFFERING IS MADE ONLY TO ACCREDITED INVESTORS.

*FOR TEXAS RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS OF TEXAS AND THEREFORE CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR UTAH RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UTAH UNIFORM SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR VIRGINIA RESIDENTS ONLY:* THE VIRGINIA STATE CORPORATION COMMISSION DOES NOT PASS UPON THE ADEQUACY OF THIS OFFERING DOCUMENT OR UPON THE MERITS OF THIS OFFERING AND THE COMMISSION EXPRESSES NO OPINION AS TO THE QUALITY OF THIS SECURITY.

*FOR WASHINGTON RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

TABLE OF CONTENTS

| Heading | Page |
|---|---|
| SUMMARY | 1 |
| RISK FACTORS | 5 |
| DESCRIPTION OF THE PROMISSORY NOTES | 6 |
| TERMS OF THE INVESTMENT | 7 |
| Subscription Procedures | 8 |
| Acceptance | 8 |
| Restrictions on Transfer | 8 |
| USE OF PROCEEDS | 8 |
| FUNDING ACCOUNT | 9 |
| PROPOSED ACTIVITIES | 9 |
| Accounts Receivable as Collateral and Other Security | 9 |
| The Healthcare Industry | 9 |
| Description of Healthcare Accounts Receivable | 10 |
| Determination and Criteria of Eligibility for Healthcare Accounts Receivable | 11 |
| Description of Business Accounts Receivable | 11 |
| Description of FDIC and RTC Loans and Receivables | 12 |
| COMPENSATION TO TOWERS | 13 |
| COLLECTION OF ACCOUNTS RECEIVABLE | 13 |
| COLLATERAL COVERAGE | 13 |
| THE COMPANY | 13 |
| CONFLICTS OF INTEREST | 15 |
| ADDITIONAL INFORMATION | 15 |
| PLAN OF DISTRIBUTION | 15 |
| LEGAL MATTERS | 16 |
| PROMOTIONAL AND SALES LITERATURE | 16 |
| LITIGATION | 16 |
| GLOSSARY | 18 |

EXHIBITS

I. Subscription Documents
   A. Investor Questionnaire
   B. Subscription Agreement
II. Form of Promissory Note
III. Form of Security Agreement
IV. Form of Written Notice
V. Annual Report of Towers (Furnished under separate cover)

TOWERS FINANCIAL CORPORATION
Thirty-Month Promissory Notes Redeemable
Upon 90 Days Written Notice By The Investor

INTRODUCTION

This Confidential Private Offering Document (the "Offering Document") is provided to furnish certain information in connection with the placement of Promissory Notes (the "Promissory Notes" or "Notes") issued by Towers Financial Corporation, as the Issuer. This Offering Document is submitted on a confidential basis to a limited number of prospective Accredited Investors for use solely in connection with their consideration of investing in the Notes. See "TERMS OF THE INVESTMENT." To the extent they deem necessary or advisable, prospective investors are urged to carry out independent investigations in order to determine their interest in investing in the Notes. This Offering Document may not be reproduced or used for any other purpose nor furnished to any other person.

Brief descriptions of the Notes, the security agreement and certain other documents are contained herein. Such descriptions do not purport to be comprehensive or definitive. All summaries herein of documents and agreements are qualified in their entirety by reference to such documents and agreements, drafts or forms of which may be obtained as described under "ADDITIONAL INFORMATION."

This Offering Document is accompanied by the Company's 1991 Annual Report which is bound under separate cover and incorporated by reference.

There are certain risks and other considerations relating to an investment in the Notes. Prospective investors should review the Section entitled "RISK FACTORS."

SUMMARY

*The following summary is qualified in its entirety by reference to the detailed information appearing elsewhere in this Offering Document. Certain capitalized terms used in this Offering Document are defined in the "GLOSSARY."*

**Description of the Promissory Notes and Terms of the Investment:** ...... An aggregate of one hundred fifty million dollars ($150,000,000) consisting of 1,500 units at $100,000 each of thirty-month Promissory Notes which are redeemable upon 90 days written notice to Towers by the investor, bearing interest at the rate of 3.5% over Chase Manhattan Bank, N.A.'s prime rate of interest (adjustable to the rate in effect at the beginning of each month), payable monthly, collateralized, secured and backed by all types of (i) Healthcare Accounts Receivable of major insurance companies such as Blue Cross/Blue Shield, state governmental agencies, major unions, private insurance companies, worker's compensation payors, personal injury payors, self-payors, co-payors and all other first and third party reimbursers purchased and/or financed from hospitals, doctors, medical groups and other healthcare providers; (ii) Business Accounts Receivable (which category includes Collection Accounts Receivable) purchased and/or financed from manufacturers, wholesalers and service companies, including subsidiaries of the Company; and (iii) receivables acquired from the FDIC and RTC (or from secondary sources), in a face amount equal to the amount of the Offering, is offered hereby to Accredited Investors only (see "TERMS OF THE INVESTMENT" and "DESCRIPTION OF THE PROMISSORY NOTES"). Recommended minimum subscription is

for one Unit; however, fractional Units may be accepted at the sole and absolute discretion of Towers and subject to federal and state law. This investment opportunity will terminate on the earlier of the date all units have been sold or February 28, 1993 (the "Offering Termination Date"). There is no minimum number of units which are required to be subscribed for prior to investment of the Funds (see "DESCRIPTION OF THE PROMISSORY NOTES" and "TERMS OF THE INVESTMENT").

**Prepayment Feature:** Investors may elect to redeem the principal of their Promissory Notes upon 90 days prior written notice to Towers. Towers does not intend to maintain reserves or a sinking fund for the payment upon maturity of the Promissory Notes; however, Towers expects in the normal course of its business to have sufficient funds to retire maturing Promissory Notes as they are due or redeemed.

**Proposed Activities:** Towers will acquire and/or finance (i) Healthcare Accounts Receivable from hospitals, doctors, medical groups, health maintenance organizations, rehabilitation centers and other healthcare providers which will be payable by major insurance companies such as Blue Cross/Blue Shield, state governmental agencies, major unions, private insurance companies, worker's compensation payors, personal injury payors, self-payors and co-payors and all other first and third party reimbursers; (ii) Business Accounts Receivable (which category includes Collection Accounts Receivable) from manufacturers, wholesalers and service companies, including subsidiaries of the Company (the "Accounts Receivable"); and (iii) loans and receivables from the RTC and FDIC (or from secondary sources).

Towers typically acquires and/or finances Healthcare and Business Accounts Receivable for up to 95% of such Accounts Receivable face value (a discount or factoring fee of a minimum of 5% for each Account Receivable collected). The purchase terms for RTC and FDIC Accounts Receivable and loans vary on each acquisition or financing. The purchase and/or financing of Accounts Receivable from affiliates of Towers may include amounts allocated for administration, collection, handling and labor. Towers reserves the right to acquire any and all types of Accounts Receivable without restriction.

Upon collection of each Account Receivable, the proceeds of collection (less the Excess Profits Amount) will be reinvested in additional Accounts Receivable thereby compounding the discount or factoring fee with each new purchase or financing of Accounts Receivable. Towers expects to reinvest the funds in purchasing or financing Accounts Receivable and compound its factoring or financing fee up to six times per year. Towers may reinvest in the same healthcare providers or business entities or in new or different healthcare providers or business entities in accordance with the terms of this Offering and Towers' purchase and/or financing contracts. Accordingly, Towers anticipates that the spread between its cost of funds (the interest payments to investors) and the factoring or financing fees will be significant and provide adequate funds from which investors' interest payments may be made.

Generally, hospitals, doctors, dentists, and other healthcare providers do not manage their Accounts Receivable efficiently. Towers' Accounts Receivable factoring and financing programs are well received nationwide by healthcare

providers because Towers offers the needed funding to these healthcare providers thereby bridging the time delay of slow paying payors including insurance companies, state and government agencies, self-payors and co-payors. Towers' large staff of healthcare collection experts provide the needed resources to accelerate the payment and collection of the Accounts Receivable. Towers is currently servicing four pools of funds invested in wholly-owned special purpose subsidiaries of Towers pursuant to bond offerings rated "AA+" or "AA" by Duff & Phelps and pools of funds from prior offerings similar to this offering. The funds of this Offering may be invested in conjunction with Towers' special purpose subsidiaries or other pools of funds from loans or other Promissory Note programs.

As relates to the acquisition and/or financing of Business Accounts Receivable, small businesses generally have limited credit with suppliers and often require additional funds for production of products prior to the receipt of proceeds from the sale of such products. Additionally, temporary or seasonal requirements for funds by small businesses are not uncommon. Therefore, small businesses utilize accounts receivable financing to meet cash flow needs. Towers also acquires and/or finances collection accounts which are part of the category Business Accounts Receivable. Such collection accounts are usually generated by the collection subsidiary and/or divisions of Towers. In acquiring and/or financing such collection accounts, the costs of administration, overhead, collection, handling and labor are taken into account.

As relates to receivables of the FDIC and RTC, Towers will purchase packages of loans and receivables at auction based upon Towers' analysis of the value of such packages. Also, Towers may purchase FDIC and RTC loans and receivables from secondary sources which have acquired such loans and receivables directly from the FDIC or RTC. Generally FDIC and RTC loans are non-performing and in the case of the RTC loans, such loans may be secured by assets, including real property; however, such security is not expected. Due to the nature of the FDIC and RTC receivables, Towers expends substantial funds on labor and other overhead costs associated with collecting these accounts which effectively increases the cost of these receivables (see "COMPENSATION TO TOWERS").

Towers reserves the right to pool Accounts Receivable with other offerings similar to this Offering or with Offerings in which the Promissory Notes have longer maturities. Each pool will be entitled to its pro rata share of Accounts Receivable acquired.

The Promissory Notes are the full recourse obligations of Towers and accordingly are backed by Towers' consolidated assets.

**Collateral:** Payment upon the Promissory Notes will be secured by the Security Agreement and the filing of UCC-1 Financing Statements ("UCC") against Towers (as debtor) for those Accounts Receivable purchased or financed with the Funds or the proceeds thereof. It should be noted that due to the nature of some of the receivables, UCC filings may be insufficient to perfect a security interest. In such cases, Towers may utilize other methods to secure the Offering such as pledges of receivables (see "PROPOSED ACTIVITIES—Accounts Receivable as Collateral and Other Security"). Towers will maintain Ac-

counts Receivable in a minimum face amount equal to or exceeding the amount of funds raised from Investors.

**Funding Account:** .......... The Funds will be deposited in Chase Manhattan Bank, N.A. (the "Bank") in one or more interest bearing, special accounts (the "Funding Account(s)"). Towers will direct the investment of the Funds as provided for herein. All proceeds of the Accounts Receivable will be deposited pursuant to a lock-box system in Funding Account(s) maintained by Towers or its wholly-owned subsidiaries. The books and records relating to the Funding Accounts are available for inspection and audit at the offices of the Company. Towers has the right at any time to receive payment of the Excess Profits Amount (as defined herein) from the Funding Account (see "COMPENSATION TO TOWERS").

**Use of Proceeds:** ............ The proceeds of this Offering will be utilized to acquire and/or finance Accounts Receivable, pay commissions to NASD broker-dealers and pay the Excess Profits Amount once sufficient funds are invested (see "USE OF PROCEEDS").

**The Company:** .............. Towers is a publicly-traded corporation, organized pursuant to the laws of the State of Delaware, which, through certain of its wholly-owned subsidiaries or affiliates, has been engaged in various aspects of financing and/or servicing of Accounts Receivable for the past 16 years. The Company maintains its corporate headquarters at 417 Fifth Avenue, New York, New York 10016, telephone number (212) 696-0505 (see "THE COMPANY").

Towers has been engaged in several offerings of securities in the past, including an offering for $56,500,000 of bonds issued on July 19, 1990; an offering for $41,500,000 of bonds issued on November 27, 1990, an offering for $40,500,000 of bonds issued on May 23, 1991 and an additional $2,000,000 was raised in July of 1991 and an Offering for $41,500,000 of bonds issued on December 18, 1991 and $1,000,000 of bonds issued on February 27, 1992, all of which have "AA+" or "AA" ratings from Duff & Phelps. Such bonds were issued by special purpose subsidiaries of Towers which utilize the funds to acquire Accounts Receivables. Towers has also engaged in Promissory Note Offerings in the past and is currently offering 12-month, 24-month and 36-month Promissory Notes pursuant to a Confidential Offering Document, dated October 15, 1991, which offering terminates on September 30, 1992. Investors should note that the terms of this offering differ substantially from the above-described offerings and that it is not anticipated that a rating will be sought for this offering, or if sought, that such a rating would be issued.

**Distribution of Units:** ......... Towers is self-underwriting the offering of the Units and will offer and sell the Units to Accredited Investors only either (1) directly, in which case no commissions will be paid; or (2) through broker-dealers registered with the National Association of Securities Dealers, Inc., in which case the following commissions will be paid: 1% per quarter of the outstanding principal amount of Promissory Notes for the term of the Notes (see "PLAN OF DISTRIBUTION"). Commissions will only be paid upon acceptance by Towers of a fully-executed subscription from a Suitable Investor that is an Accredited Investor (see "PLAN OF DISTRIBUTION"). There is no minimum number of Units which must be sold prior to investment of the Funds by Towers. Commissions may be limited by state securities laws.

## RISK FACTORS

Acquisition of the Promissory Notes is speculative and subject to numerous and substantial risks. Therefore, purchase of the Units is suitable only for those persons who can afford to lose their entire investment. There will be no public market for the Units, and Federal and state securities laws impose substantial restrictions on the right of an Investor to sell or otherwise transfer his Units. Prospective Investors should carefully consider the risk factors relating to the proposed business of Towers, including, but not limited to, those certain risk factors discussed below, and should consult their own legal, financial and business advisers.

THE RISK FACTORS SET FORTH IN THIS SECTION ARE NOT INTENDED TO BE AN EXHAUSTIVE LIST OF THE RISKS RELATING TO AN INVESTMENT IN THE UNITS.

1. *Dependence on Management.* The Company's success is substantially dependent upon the ability of management (including the officers, directors and employees of its subsidiaries and affiliated companies) to provide financial and credit services and acquire Accounts Receivable as set forth herein. The loss of key personnel or an inability to attract and retain necessary replacement personnel could substantially and adversely affect the business of the Company and the Company's ability to service the program set forth herein (see "THE COMPANY").

2. *Severely Limited Liquidity of Units: Absence of Public Market.* The Units must be acquired by each purchaser for investment purposes only and not with a view to, or for resale in connection with any distribution. In reliance upon the exemption contained in Section 4(2) of the Securities Act of 1933, as amended (the "Federal Securities Act"), and regulations promulgated thereunder, the Units will not be registered under the Federal Securities Act, and Investors will have no right to require registration thereof. Furthermore, there is not currently (nor will there be) a public market for the Units. Accordingly, there can be no assurance that an Investor will be able to liquidate his investment quickly or on acceptable terms, if at all, if he should desire to do so (see "DESCRIPTION OF THE PROMISSORY NOTES" and "TERMS OF THE INVESTMENT—Restrictions on Transfer").

3. *Availability of Exemptions from Registration.* The Units have not been registered under the Federal Securities Act or, in most cases, the securities laws of the jurisdictions in which they are proposed to be offered and sold, in reliance upon certain claimed exemptions therefrom. The claimed exemption from Federal registration is complex, and it is often difficult to determine that its terms have been fully complied with. In addition, exemptions from registration under state securities laws frequently depend upon the availability of exemption from Federal registration. If for any reason the Company is subject to civil liability, and/or the legal expense of defending the Company in any action or proceeding challenging the availability to the Company of such exemptions, the Company could have a material adverse effect upon its financial condition.

4. *Towers' Ability to Make Payments of Principal and/or Interest Upon the Promissory Notes: Sufficiency of Collateral.* The Promissory Notes are collateralized by Accounts Receivable in a face amount equal to the aggregate amount invested in the Offering. In the event the collateral is insufficient to satisfy the obligations of Towers to make payments of principal and/or interest on the Promissory Notes, then Towers will be liable upon the Promissory Notes to the extent of its consolidated assets. In the event such assets are insufficient to cover the payment of principal and/or interest on such Promissory Notes, an Investor could lose his or her investment, in part or in whole. Although Towers has agreed that the Promissory Notes will at all times be secured by Accounts Receivable with a minimum face amount of at least 100% of the amount of proceeds raised in this Offering, it is a possibility that in a bankruptcy proceeding such collateral upon liquidation may prove to be insufficient to return to an investor the amount due him on the Promissory Note or that the bankruptcy court invalidates the investor's secured position on the collateral and the investor may be treated as an unsecured creditor having the same right to Towers' assets as all unsecured creditors. It should be further noted that Towers does not intend to maintain reserves or a sinking fund for the payment upon maturity of the Promissory Notes; however, Towers expects in the normal course of business to have sufficient funds to retire maturing Promissory Notes as they become due. In the event Towers does not have sufficient funds to retire the Promissory Notes, investors may be delayed in receiving payments of their principal and/or accrued interest.

5. *Ability to Purchase Qualified Accounts Receivable.* The success or failure of the Company's proposed business will depend, in part, upon its ability to purchase and/or finance Accounts Receivable of sufficient quality at the discounts and upon the terms stated herein, so that the Company may earn a return sufficient to pay interest and

principal on the Promissory Notes without incurring high losses for bad debts. The Company's ability to reinvest the funds a sufficient number of times during the year is a major factor which will determine Towers' profitability and its ultimate ability to pay the principal and interest on the Promissory Notes. The success or failure of any of Towers' businesses or subsidiaries may also affect its ability to repay its investors.

6. *Collectibility of Accounts Receivable.* Principal and interest payments to the Promissory Noteholders are expected to be made primarily from the collection of Accounts Receivable. In the event Business, Healthcare and FDIC and RTC Accounts Receivable cannot be collected or cannot be collected timely, the Company may not have sufficient funds to pay interest and principal on the Promissory Notes. Healthcare Accounts Receivable are acquired or financed by the Company for its own account and for the accounts of certain of its special purpose subsidiaries pursuant to the terms of Healthcare Purchase Contracts entered into by the Company with Healthcare Providers.

All or a portion of acquired and/or financed Healthcare Receivables may not be collectible due to possible breaches of representations and warranties made by Healthcare Providers. For example, the claim may be for amounts determined to be not properly payable by the first or third party obligor, the claim may be improperly documented or the first or third party obligor may offset payments due on such Healthcare Receivables against amounts owed by the respective Healthcare Provider to the first or third party obligor. An example of a first or third party obligor having an offset right is the right of a Governmental Entity under the Medicare or Medicaid program to offset prior overpayments discovered as the result of routine audits against current payment obligations to a given Healthcare Provider. If full payment of the value of a Healthcare Receivable is not received from first or third party obligors due to a breach by a Healthcare Provider of its representations and warranties, the Healthcare Provider will be obligated to cure any defect with respect to such Healthcare Receivable or substitute one or more Healthcare Receivables. In the event the Healthcare Provider is financially unable to meet its obligations, the Company may generate sufficient funds to make full and timely payment of principal and interest solely from the Accounts Receivable, thereby requiring Towers to make payments of principal and interest from other sources of funds, if any.

A Healthcare Receivable may also be uncollectible for reasons that do not constitute a breach of a representation or warranty by a Healthcare Provider, such as the insolvency of a first or third party obligor and accordingly, the Company may have no recourse against the Healthcare Provider. If an insolvency of a first or third party obligor should occur, the Company may have insufficient funds to make full and timely payments of principal and interest on the Notes from the Accounts Receivable, thereby requiring the Company to make the payments from its general funds, if any.

As with Healthcare Receivables, Business Accounts Receivable and FDIC and RTC Accounts Receivable may be uncollectible for many reasons despite Towers' credit checking procedures and collection efforts. In the event a large number of Accounts Receivable become worthless or uncollectible, Towers may not have sufficient funds to repay investors the principal and interest on their Notes.

7. *No Opportunity to Evaluate Collateral.* Although the criteria for acquiring and/or financing the Accounts Receivable have been identified, Towers has not yet selected the specific Accounts Receivable to be purchased or the specific creditors whose accounts receivable will be purchased. Accordingly, Investors will not have the opportunity to evaluate the investment of the proceeds of this Offering or the merit or credit worthiness of any particular debtor with respect to the Accounts Receivable, but must rely upon the ability of Towers based upon the criteria set forth herein to select the Accounts Receivable and to manage and operate Towers' business.

## DESCRIPTION OF THE PROMISSORY NOTES

An aggregate of one hundred fifty million dollars ($150,000,000) of thirty-month Promissory Notes redeemable upon 90 days written notice to Towers by the Investor (the "Units") bearing interest at the rate of 3.5% over Chase Manhattan Bank, N.A.'s prime rate of interest as is in effect on the first of each month with interest payable monthly, collateralized by: (i) Healthcare Accounts Receivable purchased and/or financed from hospitals, doctors, medical groups and other healthcare providers (the "Healthcare Receivables"); (ii) Business Accounts Receivable purchased and/or financed from manufacturers, wholesalers and service companies or subsidiaries of Towers (which category includes Collection Accounts Receivable) (the "Business Accounts Receivable"); and/or (iii) receivables and loans purchased from the Federal Deposit Insurance Corporation ("FDIC") and/or Resolution Trust Company

("RTC") or from secondary sources which have purchased loans or receivable packages from the FDIC or RTC (the "FDIC and RTC Receivables") consisting of 1,500 Units at $100,000 each, is offered hereby to Accredited Investors only.

Upon maturity, and subject to Federal and state laws and regulation, the proceeds of the Promissory Notes may be reinvested at the option of the Investors at the rates of interest as announced by Towers at that time. Such reinvestment is subject to Towers' discretion and upon the laws and regulations in effect at the time of such reinvestment. If upon maturity, the Promissory Notes are not redeemed for any reason, the terms of this Offering shall continue to apply to the Promissory Notes and the holders thereof until such redemption occurs.

Although the Promissory Notes are collateralized by Accounts Receivable, the ability to pay the interest on the Promissory Notes and pay the principal when due will be greatly determined by Towers' overall financial condition.

## TERMS OF THE INVESTMENT

Recommended minimum subscription is one Unit; however, fractional Units may be accepted at the sole discretion of Towers. The Offering will terminate on the earlier of the date all Units have been sold or February 28, 1993 (the "Offering Termination Date"). There is no minimum number of Units which must be subscribed prior to Investment of Funds.

This Offering is being made only to Accredited Investors (as defined in Section 501(a)(1)) of Regulation D promulgated under the Securities Act of 1933, as amended (the "Act") which reads as follows:

"*Accredited Investor*" shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

(1) Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefits of its employees if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of The Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

This Offering has not been registered with the Securities and Exchange Commission. Further, as of the date hereof, this Offering has not been registered with any state and may only be offered in states in which the securities have been registered or in states which afford an exemption similar to the Federal exemption and/or provide a special exemption for Accredited or Institutional Investors. In addition, it should be noted that this Offering is being made pursuant to an exemption which requires that no specific information be furnished.

**Subscription Procedures**

In order to subscribe for a Unit, each prospective Investor must complete, execute, acknowledge and return to Towers the Subscription Agreement in the form attached hereto as Exhibit I.B. and a check for $100,000 per Unit acquired.

**Acceptance**

Towers will review the Subscription Documents for completeness, due execution and investor suitability. Towers has the absolute right, at its sole discretion, to reject, in whole or in part, any subscription that is tendered or to waive any defect in any Subscription Documents. If Towers rejects a subscription, it will return the Subscription Documents, including the Investor's check, to the prospective Investor.

If Towers accepts a subscription ("Acceptance"), subscription funds will be deposited in the Funding Account and Towers will forward an executed Promissory Note in the form set forth in Exhibit II to the Investor. Interest on the Promissory Note shall accrue from the date of Acceptance. The Company shall accept subscriptions only from Accredited Investors.

**Restrictions on Transfer**

The Units offered hereby have not been registered under the Securities Act of 1933, as amended (the "Federal Securities Act"), nor pursuant to the provisions of the securities laws of any jurisdiction, and the Units are being offered, and will be sold, without benefit of registration under federal and state securities laws by reason of specific exemptions from registration provided thereby.

The availability of each such exemption is dependent, in part, upon the "investment intent" of each prospective Investor, and an exemption from registration would be unavailable if any one purchaser were purchasing a Unit with a view to the redistribution thereof. Accordingly, each prospective Investor when executing the Subscription Agreement will be required to acknowledge that the purchase is for investment, for his own sole account, and without any view towards the sale or other disposition thereof and to make certain representations and warranties to Towers.

Investors have not been granted the right to require the registration of their Units under either the Federal Securities Act or any state securities law and Towers will not register the Units in the future (see "RISK FACTORS").

If an Investor wishes to dispose of his Units, such disposition is circumscribed by the terms of the provisions of the Federal Securities Act and state securities laws.

## USE OF PROCEEDS

The proceeds of the Offering will be used to purchase and/or finance the Accounts Receivable which will collateralize the Promissory Notes and to pay commissions of 1% per quarter of the principal amount outstanding on the Promissory Notes (see "PLAN OF DISTRIBUTION" for additional commissions which may be payable by the Company to a maximum of 10%). The Company will pay all other expenses of the Offering. The Company will be entitled to utilize the Excess Profits Amount for any corporate purpose at its discretion; provided the required collateral coverage is maintained (see "COLLATERAL COVERAGE").

## FUNDING ACCOUNT

A special interest-bearing account has been established by Towers at Chase Manhattan Bank, N.A. (the "Bank") for the purpose of depositing the proceeds of the Offering as funds are received and accepted from Investors (the "Funds"). The proceeds of Accounts Receivable as such Accounts Receivable are collected will be deposited in one or more funding accounts maintained by Towers and its subsidiaries (collectively the "Funding Account(s)"). Once the Funds are deposited, Towers may direct the investment of the Funds in Accounts Receivable or make such other disbursements of the Funds as provided in this document. The proceeds of the Accounts Receivable will be deposited pursuant to a lockbox system which Towers has arranged with the Bank. Any fees relating to the Funding Account will be paid by Towers. Towers reserves the right to utilize other major money center banks at its discretion.

## PROPOSED ACTIVITIES

Towers will use the Funds to acquire and/or finance Healthcare and Business Accounts Receivable and receivables purchased from the FDIC and RTC or from secondary sources which have purchased from the FDIC and RTC. Presently, Towers, through its New York City headquarters and its regional and branch offices, has identified substantial markets for the acquisition of suitable Accounts Receivable. Additionally, Accounts Receivable may be acquired or financed from affiliates or subsidiaries of Towers (see "CONFLICTS OF INTEREST").

Towers typically purchases and/or finances Accounts Receivable for up to 95% of their face amount resulting in a minimum discount, factoring fee or financing fee of 5% for each Account Receivable collected. It should be noted, however, that Towers may acquire Accounts Receivable for any percentage of face amount of Accounts Receivable without limitation. Upon collection of each Account Receivable, the proceeds of collection will be reinvested in additional Accounts Receivable resulting in the compounding of the factoring and/or financing fee with each new purchase. Towers expects to reinvest the collected funds in Accounts Receivable and compound the factoring and/or financing fee up to six times a year; which is expected to provide sufficient funds for the payment of interest to the Promissory Noteholders. Towers may reinvest in the same Healthcare Providers or business entities or reinvest in new or different Healthcare Providers or business entities in accordance with the terms of this Offering. Towers may acquire receivables in other countries such as Canada and/or the United Kingdom.

**Accounts Receivable as Collateral and Security**

The Accounts Receivable will be security and collateral for the Promissory Notes pursuant to Uniform Commercial Code financing statement filings to be made against Towers, as debtor, relating to the Accounts Receivable. Such collateral will consist of Accounts Receivable purchased or financed with a face amount equal to or in excess of the Promissory Notes. For certain of the Healthcare Accounts Receivable, UCC filings may not be the proper mechanism to secure the investors. In such cases, the security interest is perfected by a pledge of such receivables.

Further, the Promissory Notes are the recourse obligations of Towers and Towers is liable for the stated value of the Promissory Notes to the extent of its consolidated assets.

Towers reserves the right to pool the security interest which will be granted to the Noteholders with other security interests granted to prior or future offerings or loans made to Towers.

**The Healthcare Industry**

The healthcare industry in the United States has grown rapidly over recent years and is expected to continue to grow reflecting age and population trends. Billings, collection and insurance compliance for healthcare groups are extremely complex, time-consuming and labor intensive. Typically, hospitals, doctors, dentists and other healthcare professionals or groups do not efficiently manage their billing, collection and insurance operations and accordingly, cash flows are disrupted by the delay between the filing for payment of funds and the receipt of such funds. The Towers Healthcare Accounts Receivable funding program allows healthcare providers to bridge the time delays brought on by slow-paying insurance companies and state/federal governmental agencies, and collect a greater portion of the funds to which such healthcare provider is entitled. For qualified healthcare providers, Towers provides (i) a thorough examination of claims submissions to ensure prompt payment and reduce incorrect third party provid-

er deductions; (ii) the ability to reduce internal staffing; and (iii) use of sophisticated data processing equipment owned by Towers.

Accordingly, the ability of Healthcare Providers to sell, factor or finance their accounts receivable is paramount to their financial stability and liquidity.

**Description of Healthcare Accounts Receivable**

The Notes will be secured, in part, by the Healthcare Receivables generated by Healthcare Providers that from time to time enter into healthcare purchase and/or financing contracts with Towers. Generally, the Accounts Receivable of the Healthcare Providers can be separated into the following categories based on the payor on the accounts: commercial insurance; Blue Cross; government programs; and self-pay.

The commercial insurance category covers the Healthcare Receivables for which payment will be received from either (i) a commercial insurance company (pursuant to health, personal injury, workmen's compensation and other insurance policies or administrative services only contracts ("ASOs")); (ii) a health maintenance organization ("HMO"); (iii) a preferred provider organization ("PPO"); or (iv) employers or unions who self-insure their employees or members. The commercial insurance company generally reimburses the Healthcare Provider for the Healthcare Provider's charges less any co-payment portion or deductibles. HMOs and PPOs generally have contractual arrangements with the individual Healthcare Providers which set the fees and charges that the Healthcare Providers may charge for their services.

The Blue Cross category covers all Healthcare Receivables for which payment will be received from "Blue Cross" entities. While Blue Cross is a national entity, it is comprised of a series of state or multistate organizations which operate as individual entities. Each Healthcare Provider which participates in the Blue Cross program has its own arrangement with Blue Cross whereby the Healthcare Provider may receive reimbursement for (i) the Healthcare Provider's standard fees and charges, (ii) a percentage of the Healthcare Provider's standard fees and charges, (iii) a negotiated rate or (iv) the Healthcare Provider's cost of service. Healthcare Receivables representing payments to be received from "Blue Cross" entities will not be acquired unless the Healthcare Provider is a participant in the Blue Cross program. (Collectively, companies in the commercial insurance category and the Blue Cross category, together with non-profit health insurance companies, are referred to as the "Insurers.")

The government program category includes Healthcare Receivables for which payment is received from either the federal government ("Medicare"), jointly from the state governments and the federal government ("Medicaid") or other governmental entities. The receivables are paid at either a predetermined rate per diagnosis or a rate based on a formula associated with the cost of care. Medicare law requires Healthcare Providers to accept Medicare payment as payment in full for "covered" items or services and prohibits Healthcare Providers from charging Medicare patients for anything other than the usual deductible and co-insurance amounts. Healthcare Providers can charge Medicare patients for any "noncovered" items or services. Claims against state workmen's compensation funds also fall into this category of accounts receivables.

The self-pay category consists of accounts receivable (i) of individuals for medical services provided, or (ii) of individuals for amounts in excess of the first or third party obligor's obligation ("co-pay") for which payment will be received from either the individual patient or an individual guarantor on the patient's account. The Healthcare Provider charges its standard fees and charges and the accounts are usually outstanding for 120 to 180 days from the date of first billing.

The following representative list sets forth those insurance companies that are obligated to pay Towers pursuant to purchased claims from Healthcare providers:

| | |
|---|---|
| Blue Cross/Blue Shield | Metropolitan Life Insurance Co. |
| General American Insurance Company | New York Life Insurance Co. |
| State Farm Insurance Company | National Association of Letter Carriers |
| Prudential Insurance Company | Allstate Insurance Co. |
| Travelers Insurance Company | Best Benefits |
| Aetna Insurance Company | Chubb Pacific Group |
| Mutual of Omaha | Cigna |
| Connecticut General Life Insurance Co. | Combined Insurance of America |
| Equitable Insurance Company | Continental Life |
| First Fund Insurance Co. | Fireman's Fund Insurance Co. |
| Liberty Mutual Insurance Co. | John Hancock Insurance Co. |
| Pacific Mutual Insurance Co. | Hartford Insurance Co. |

There currently are several financing sources which actively acquire accounts receivable from healthcare groups of which Towers is one of the leaders. Towers has 16 years of experience in healthcare accounts receivable servicing and/or financing and through its professional collection team, trained insurance adjusters, insurance administrators, collectors, paralegals, claims examiners, claims billers, claims supervisors and attorneys can properly and efficiently acquire, service and collect Healthcare Receivables due from various insurance companies. Towers has generated, through its New York City headquarters and its regional and branch offices, a substantial backlog of Healthcare Receivables and accordingly, Towers will be able to quickly place the Funds.

**Determination and Criteria of Eligibility for Healthcare Accounts Receivable**

The Company will accept reimbursable Healthcare Accounts Receivable that have been verified with first and third party insurance carriers including unions, self insured groups, first and third party reimbursers and city and state agencies and documented in the patient account file. The Company may purchase or finance direct government reimbursed accounts, or first or third party receivables located in Canada, the United Kingdom or elsewhere at the Company's discretion. It is the Healthcare Provider's responsibility to send eligible healthcare accounts receivable to Towers after a predetermined period of time from discharge depending upon the Healthcare Provider's window for final bill production and late charges. The Healthcare Provider will perform the pre-screening functions to ensure that appropriate verification has occurred. The Healthcare Provider is responsible for verifying the validity and propriety of the Stated Value of the Healthcare Receivables by judgmentally selecting Healthcare Receivables that meet certain criteria.

**Description of Business Accounts Receivable**

Towers actively acquires or finances Accounts Receivable of qualified companies and may use a portion of the Funds for this purpose. Most large institutions do not extend substantial loans to businesses with annual sales volume of between $500,000 and $10,000,000 for the funding of accounts receivable. Historically, only established firms which have substantial assets or cash flow are able to readily finance their accounts receivable. Small businesses' accounts receivable are traditionally due 30 to 90 days after issuance and, in many instances, such companies cannot afford to wait until the due date of the accounts receivable in view of the fact that overhead expenses, such as payroll, rent and taxes must be paid on an ongoing basis. Generally, such small businesses have limited credit with their suppliers and often require additional funds for production prior to the sale of products. Short-term borrowing to meet temporary or seasonal cash flow interruptions is usually not available. Accordingly, many businesses utilize Accounts Receivable financing on a seasonal or ongoing basis to meet their cash flow needs.

Towers has created an accounts receivable purchasing and/or financing program pursuant to which small, medium and large companies can sell or finance their accounts receivable to Towers. In order to be eligible for purchase and/or finance, the accounts must satisfy certain requirements imposed by Towers. Towers acquires or finances Accounts Receivable for up to 95% of such Accounts Receivable stated value (a discount, factoring or financing fee

of a minimum of 5% for each Account Receivable collected). Upon payment of each Account Receivable Towers' reinvests the funds and compounds its fees with each purchase. Towers expects to reinvest the funds up to six times per year.

The following is a representative list of companies obligated to pay Towers on Business Accounts Receivable which have been previously acquired and which are likely to be acquired by Towers in the future:

| | |
|---|---|
| RCA Corporation | General Electric Company |
| Revlon Inc. | Campbell Soup Company |
| Avon Products, Inc. | King Kullen Grocery Co. |
| Burlington Northern Railroad Company, Inc. | Mitsubishi International Co. |
| | Pace Membership Warehouse |
| F.W. Woolworth Company | Simon and Schuster |
| J.C. Penny Company, Inc. | Lever Brothers Company |
| Walmart | Esselte Pendaflex Corporation |
| Raytheon Co., Inc. | Walt Disney Productions |
| Caterpillar Inc. | K-Mart |

Towers requires as security for payment of acquired or financed Accounts Receivable first lien security interest in (or direct purchase of) the Accounts Receivable of the financed company which is evidenced by a Uniform Commercial Code filing, if available.

Towers reserves the right, in its sole discretion, to acquire and/or finance Accounts Receivable which are not current or for a price above or below that stated herein under certain circumstances. The purchase or financing of Business Accounts Receivable will be documented by written agreements between Towers and the seller or financing party and in a purchase Towers will receive a bill of sale or purchase agreement for the Accounts Receivable which will give Towers title to and ownership of such account. The bill of sale and/or purchase agreement from the seller generally will contain representations and warranties that the Accounts Receivable are valid and not in dispute and that in the event of nonpayment, the bill of sale will provide that Towers and its assignees will have the right to offset the amount which is due to Towers from the unpaid Business Accounts Receivable against other payments which are due to the financed company on other Accounts Receivable of the financed company which are collected by Towers. Similar provisions are utilized for financings.

Towers generally only purchases or finances Business Accounts Receivable of companies which are listed by a major rating agency; however, Towers reserves the right to purchase or finance Accounts Receivable which are not so listed if in Towers' sole discretion such companies or consumer Accounts Receivable are comparable to listed companies. Towers may accept Accounts Receivable from accounts in various industries, including, but not limited to, the following: manufacturing, transportation, communications, the wholesale and retail trade, finance, insurance and healthcare professionals.

Towers may purchase or finance Accounts Receivable from its affiliates and from companies in which it or its affiliates have a financial interest. Towers purchasing from affiliates may include the acquisition of receivables representing payments due Towers as collection fees for services performed in Accounts Receivable Management and factoring. These collection accounts will be valued at the amount of the collection fee due Towers for the purpose of this Offering. It should be noted that collection accounts may be obtained for no payment by Towers; however, substantial cost may be associated with collecting these Accounts Receivable.

**Description of FDIC and RTC Loans and Receivables**

The Federal Deposit Insurance Corporation and the Resolution Trust Company (established by the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA")) have the responsibility for liquidating assets of banks and savings and loan associations which are in receivership. It is estimated that billions of dollars of loans and receivables will be sold by the FDIC and the RTC over the next 24 months. These loans and receivables are of various categories including performing, non-performing, charge-offs and write-offs. Some of these loans and receivables are backed by assets while others are unsecured.

The FDIC and RTC packages Loans and Receivables for sale at auction through the regional offices of the FDIC and RTC. Towers will bid on suitable loan and receivable packages and if such bid is the highest bid, will acquire the loan and receivables packages. Towers will then utilize its collection abilities to collect upon the acquired loans and receivables. Since the loan receivable packages offered by the FDIC and RTC are offered at substantial discounts from face value, the successful collection upon a portion of these loans and receivables will produce a profit factor. Towers may also purchase FDIC and RTC originated loans and receivables from secondary sources which have acquired such receivables directly from the FDIC and RTC.

It should be noted that FDIC and RTC Receivables are taken into account at face amount for purposes of this Offering even though they may be purchased for substantially less than the face amount.

## COMPENSATION TO TOWERS

Towers will be entitled to transfer or use for its own account an amount equal to the amount by which (a) (i) the face amount of the Accounts Receivable plus (ii) the Funds on deposit in the Funding Account exceeds (b) (i) the face amount of all issued Promissory Notes plus (ii) all accrued and unpaid interest due on such Promissory Notes (the "Excess Profits Amount"). Towers' Excess Profits Amounts are the assets of Towers and may be used for any corporate purpose as determined in the sole and absolute discretion of Towers.

Towers intends to utilize its subsidiaries and affiliates for the purpose of generating Accounts Receivable and collecting and servicing Accounts Receivable. Towers' affiliates and subsidiaries may charge a fee or make a profit on such services; however, it has been represented that such fees or profits will not exceed those such affiliates and subsidiaries charge third parties and will be comparable to third party company charges. It should also be noted that a portion of the costs of Accounts Receivable may be a reimbursement of Towers or its subsidiaries costs (including administrative, overhead, labor and fixed costs).

## COLLECTION OF ACCOUNTS RECEIVABLE

Towers Collection Service, Inc. ("TCS"), a wholly-owned subsidiary of Towers, will be utilized to collect any Accounts Receivable which become past due at TCS's standard rates (see "CONFLICTS OF INTEREST" and "COMPENSATION TO TOWERS"). TCS is a major, full-service collection agency which has the ability to service all collections relating to this Offering (see "THE COMPANY").

## COLLATERAL COVERAGE

Towers will maintain as collateral for this Offering Accounts Receivable in the face amount of at least the amount of the aggregate offering less cash on hand in the Funding Account(s) (see "PROPOSED ACTIVITIES—Accounts Receivable as Collateral and Security").

## THE COMPANY

Towers is a publicly-traded corporation organized pursuant to the laws of the State of Delaware which, directly and through its subsidiaries and their predecessors has, over the past 16 years, provided account receivable financing and management services for over 23,000 corporate and healthcare clients. Such services include the purchase and recovery of accounts receivable for Towers' own account (commonly known as factoring or financing) and the collection of accounts receivable on a contractual basis for the account of others. Towers' corporate headquarters are located at 417 Fifth Avenue, New York, New York 10016.

As of February 28, 1992, Towers had a staff of approximately 700 full time employees. In addition, Towers has an extensive network of independent contractors to supplement its in-house sales force. As of February 28, 1992, Towers had contracts with over 1,000 independent contractors who are paid on a commission-only basis for soliciting clients for Towers' services. Towers maintains a marketing staff of account executives and area managers plus regional managers. Towers employs area sales executives in most of the states. Towers and its subsidiaries lease approximately 100,000 gross square feet of office space in New York City. In addition, Towers has established regional branch offices and satellite operations which provide coverage to all major states in the United States.

Towers and its subsidiaries, Towers Credit Corporation ("TCC") and Towers Collection Service, Inc. ("TCS") (and certain other subsidiaries which are special-purpose subsidiaries), have engaged in either servicing or acquiring accounts receivable having an aggregate face value in excess of $1 billion.

The consolidated financial statements of Towers for the year ended June 30, 1991 are accompanying this Offering Document under separate cover.

Towers serviced in excess of $800,000,000 in outstanding debt for over 23,000 accounts during the fiscal year ended June 30, 1991. Towers utilizes an experienced staff of collection professionals, including trained insurance analysts, medical insurance claims analysts, collectors, paralegals, claims examiners, claims billers, claims supervisors and attorneys. In addition, Towers' staff of computer programmers has specially designed computer software programs to support Towers' healthcare financing activities.

### Directors and Executive Officers

The directors and executive officers of Towers are listed below. Except as otherwise set forth in the description of their business experience below, each of the persons listed has held his position with Towers since October of 1985.

| Name | Age | Positions and Offices Held With Towers |
|---|---|---|
| Steven Hoffenberg | 47 | Chairman of the Board, Chief Executive Officer and President |
| Mitchell Brater | 50 | Vice Chairman of the Board and Chief Operating Officer |
| Michael Rosoff | 41 | Director, Senior Vice President, Chief Legal Officer and Assistant Secretary |
| Charles H. Chugerman | 32 | Director, Vice President and Secretary |
| Thomas B. Evans, Jr. | 58 | Director |
| Ben Barnes | 53 | Director |
| Anthony DiNicolas | 41 | Senior Vice President |
| Xavier Eboli | 51 | Vice President |
| Richard Levine | 45 | Vice President |
| Raymond Lewis | 74 | Director and Vice President |

Towers' directors hold office until the next annual meeting of stockholders or until their successors have been duly elected and qualified. Towers' executive officers are elected annually by, and hold office at the pleasure of, the Board of Directors.

*Steven Hoffenberg* has been the Chairman of the Board, CEO and President of Towers, TCC and Professional Business Brokers, Inc. (the prior owner of TCC and TCS) since their inception.

*Mitchell Brater* became Vice Chairman of the Board and Chief Operation Officer of Towers in November 1987. Mr. Brater has also been President of Eton Capital Corp. and Eton Securities Corp. ("Eton"), and Eton's predecessors for more than the past five years. Eton Capital Corp. is a financial services company.

*Michael Rosoff* became a Senior Vice President and Chief Legal Officer at Towers in 1989. He became a Vice President, an Assistant Secretary, General Counsel and a Director of Towers in 1986. Mr. Rosoff has also been a Vice President, General Counsel and a Director of TCS and TCC since 1984.

*Charles H. Chugerman* has been President of TLC since 1985 and a Vice President of TCS since 1984.

*The Honorable Thomas B. Evans, Jr.* became a Director of Towers in 1990. Mr. Evans has been the President of the Evans Group Ltd., a Washington, D.C.-based consulting firm, since 1989 and was a senior partner in the law firm of Manatt, Phelps, Rothenberg & Evans from 1985 to 1989. Mr. Evans currently serves as a Director of Zemex Corporation, a diversified minerals and materials firm. Mr. Evans served as Co-Chairman of the Republican National Committee from 1971 to 1973. He was a member of the United States House of Representatives from 1977 to 1983.

*The Honorable Ben Barnes* became a Director of Towers in 1990. Mr. Barnes has been a business and government consultant since 1987 and is currently operating under the name of Entrecorp. Prior to that, Mr. Barnes was the Chief Executive Officer of Barnes-Connally Partnership, a real estate and oil and gas holding and development company, from 1981 to 1987. Mr. Barnes served as Lieutenant Governor for the State of Texas from 1969 to 1973 and as the Speaker of the House of Representatives of the State of Texas from 1965 to 1969. Mr. Barnes and Barnes-Connally Partnership filed voluntary petitions with the United States Bankruptcy Court in December 1987 and July 1987, respectively, under Chapter 7 of the United States Bankruptcy Code as a result of the severe economic dislocations in the Texas real estate and oil and gas industries during the mid 1980's.

*Anthony DiNicolas*, prior to joining Towers in 1989, was a Vice President at First Ohio Securities from April 1989 to September 1989, and a Vice President at Security Pacific National Bank from 1987 to 1989. From 1986 to 1987, Mr. DiNicolas was a Vice President at Smith Barney, Harris Upham & Co., Incorporated and from 1985 to 1987, Mr. DiNicolas was a securities broker with Bear, Stearns & Co., Inc.

*Xavier Eboli* has been a Director of Towers since 1988 and a Vice President of Towers since 1986. He has also been a Director of TCC since 1989 and a Director and President of TCS since 1985.

*Richard Levine* has been in his current position with Towers since 1984.

*Raymond Lewis* has been a Vice President and Director of TCC since prior to 1984.

## CONFLICTS OF INTEREST

Towers is acquiring and/or financing Accounts Receivable for its own account and for the account of others and accordingly may have a conflict of interest in the purchasing and administering of Accounts Receivable. Various affiliates of Towers may be involved in acquiring, servicing, collecting or selling Accounts Receivable to Towers. Towers has represented that it will not cause an affiliate to charge any more for its services than it would charge a third party.

Further, Towers is sponsoring either directly or through affiliates, other accounts receivable programs. Accordingly, there may be a conflict as to the acquisition of accounts receivable and the servicing thereof.

## ADDITIONAL INFORMATION

Investors or their professional advisers will be provided with the opportunity to request additional information from Towers, which to the extent reasonably available, will either be furnished to such Investors or available at the Company's offices for review. Such information includes the following:

1. Certificate of Incorporation of Towers;
2. By-Laws of Towers; and
3. Opinion of Counsel as to the legality of the securities.

## PLAN OF DISTRIBUTION

The Company is self-underwriting this offering of Promissory Notes for sale on a best-efforts basis either (1) directly (in which case no commissions will be paid); or (2) through broker-dealers registered with the National Association of Securities Dealers, Inc. in which case commissions of: 1% per quarter of the outstanding principal amount of Promissory Notes will be paid, subject to restrictions imposed by state securities laws, for a maximum aggregate of 10% if the Promissory Notes are held by the investors to maturity.

## LEGAL MATTERS

Bronson & Migliaccio, New York, New York, was retained as special counsel for the Company for the preparation of this Offering Document.

## PROMOTIONAL AND SALES LITERATURE

No offering literature or advertising in any form shall be employed in the offering of these Units except for this document and the exhibits hereto. No person has been authorized to make representations other than those contained in this document or the exhibits hereto and, if made, such representation must not be relied upon.

## LITIGATION

On August 4, 1988, the Securities and Exchange Commission commenced a civil action in the United States District Court for the Southern District of New York (88 Civ. 5421) against the Company, TCC, Steven Hoffenberg, Mitchell Brater and Eton alleging that offers and sales of certain securities of TCC were made to the public by such persons without first having a registration statement on file and declared effective by the Securities and Exchange Commission. The Company, TCC and Steven Hoffenberg, without admitting or denying the Securities and Exchange Commission's allegations, consented to the entry of a judgment of permanent injunction on November 16, 1988 enjoining them from violating Sections 5(a) and 5(c) of the Securities Act of 1933, as amended. Mitchell Brater and Eton, without admitting or denying the Securities and Exchange Commission's allegations, consented to the entry of a judgment of similar permanent injunction on April 27, 1989. As a result of the same allegations as are discussed above, Eton, in its capacity as a registered broker-dealer, and Mitchell Brater, in his capacity as President of Eton, consented to the entry of an Order on May 13, 1989 by the Securities and Exchange Commission in an administrative proceeding separate from the civil action discussed above (i) prohibiting Eton from participating in any public and certain private offerings of securities for 60 days, (ii) prohibiting Mitchell Brater from any association with any broker, dealer, investment company, investment advisor or municipal securities dealer for 60 days and (iii) prohibiting Eton from participating in any public and certain private offerings of securities for three years unless Eton has retained independent counsel to provide a written opinion and certain other advice to Eton regarding compliance with Section 5, 3(b), 4(2) or 4(b) of the Securities Act of 1933, as amended, depending on the Section applicable to the particular offering.

On October 17, 1989, the New Jersey Bureau of Securities issued an order of denial of exemption against TCC relating to its 1988 private offering of promissory notes due to the failure to timely file a notice of exemption within 30 days of completion of the offering.

On February 20, 1990, TCC consented to the entry of an Administrative Order against TCC by the Alabama Securities Commission following a determination by the Alabama Securities Commission that TCC sold its promissory notes to nonaccredited investors in violation of the terms of an exemption from registration of such sales with the Alabama Securities Commission. The Administrative Order directed TCC to cease and desist from any offer or sale of any security or from any other securities activities into, within, or from the State of Alabama in violation of the Alabama Securities Act.

On June 11, 1990, the State of Nebraska Department of Banking and Finance entered a Consent Order in an administrative proceeding against the Company and TCC after finding that the permanent injunction entered against the Company and TCC, as described above, disqualified the Company and TCC from using the private offering exemption from registration that is provided in the Nebraska Revised Statutes, for sales of certain promissory notes and, as a result, three of such sales in Nebraska were made in violation of the securities registration requirements of Nebraska law. The Consent Order imposed a $5,000 penalty and fine on the Company and TCC and required maintenance of a current registration or claim of an applicable exemption at all times offers and sales of their securities are made in Nebraska.

On January 8, 1991, the Company consented to the entry of a Cease and Desist Order by the Commissioner of Securities for the State of Louisiana ordering the Company to cease and desist any activities which are in violation of the Louisiana Securities Act. The Louisiana Cease and Desist Order arose out of an investigation by the Louisiana

Commissioner of Securities into whether certain promissory notes offered by the Company through Biedenharn Investment Group, Inc. were sold on behalf of the Company in a manner that did not comply with the requirements for an exemption from registration under Louisiana securities laws and regulations. In the Cease and Desist Order, the Louisiana Commissioner of Securities stated that "it appears that [the Company] is in violation of the Louisiana Securities Act, in that the [promissory notes] were not registered in the State of Louisiana." In consenting to the entry of the Cease and Desist Order, the Company neither admitted nor denied any liability.

Certain of the foregoing federal and state orders will, if not waived, disqualify the Company from future use of the Uniform Limited Offering Exemption from registration of offers and sales of securities under the various states' securities laws. If the Company were disqualified from the future use of the Uniform Limited Offering Exemption, it would be required to register its future securities offerings in certain states or would be required to rely on other exemptions from registration, which could result in an increase in the Company's cost of raising capital. Company management believes that any such increase in the cost of raising capital would not be material, particularly in light of the Company's success in raising nearly $100 million in debt through two subsidiaries without registration of such securities in reliance upon other exemptions from registration.

The Company instituted a lawsuit in 1989 against Ernest M. Solomon ("Solomon") and others seeking rescission and damages in connection with the sale by Solomon to the Company of approximately 83% of the common stock of United Diversified Corporation ("UDC") in 1987. The Company alleges that it was defrauded by the defendants as a result of certain misrepresentations made in connection with the Company's acquisition of the UDC common stock and actions taken by Solomon subsequent to his sale of the UDC common stock. In April 1990, the defendants counterclaimed for compensatory damages in the amount of $15 million and punitive damages in an amount not less than $30 million for fraud and conversion by the Company, Steven Hoffenberg and others as a result of certain representations alleged to have been made in connection with the Company's acquisition of the UDC common stock and subsequent actions alleged to have been taken by Steven Hoffenberg, the Company and others (primarily, the alleged use of UDC assets for expenses not related to the business of UDC). That portion of the counterclaim which alleged violations of the Racketeer Influence and Corrupt Organizations Act ("RICO") and sought triple damages was dismissed by the court. Both proceedings are pending before the United States District Court in the Northern District of Illinois. The Company's management believes that the counterclaim is without merit and that an adverse determination on matters other than damages would not result in a damage award which would have a material adverse effect on the Company. *Towers Financial Corporation, et al. v. Ernest M. Solomon, et al.*, Case No. 89 C 0913 (N.D. Ill.).

The Company has reached an agreement in principle to settle the following three actions with the Illinois Director of Insurance which are expected to be formally settled within a reasonable period of time:

1. On UDC's behalf, the Company is a claimant to certificates of deposit held by several banks in the principal amount of approximately $3.5 million plus interest, totalling approximately $4.1 million as of March 31, 1991. There are other claimants to the fund, including the Illinois Insurance Director and the Michigan Insurance Director in the latter's capacity as receiver of Cadillac Insurance Company, a company formerly controlled by Solomon. Pending further order by the United States District Court, the funds are being retained by the banks. *Cadillac Insurance Company v. The American National Bank of Schiller Park f/k/a First National Bank of Schiller Park, et al.*; Case No. 89 C 3267 (N.D. Ill.).

2. The Company is involved in additional litigation arising out of its acquisition of the UDC stock. In 1988, the Illinois Insurance Director instituted liquidation proceedings against United Fire Insurance Company and Associated Life Insurance Company, two wholly owned UDC subsidiaries. After initially contesting the liquidation proceedings, the subsidiaries acquiesced to the Director's liquidation petitions. The Director also placed UDC into a conservatorship and petitioned for liquidation of UDC. UDC is contesting that petition on the basis that UDC is not an insurance company and, therefore, is not subject to liquidation or conservatorship under the Illinois Insurance Code. That action is still pending. In the UDC liquidation action, the Director has filed a petition to compel Mr. Hoffenberg to turn over to the Director certain assets allegedly belonging to UDC and the insurance companies totalling $2.9 million. Mr. Hoffenberg has denied the material allegations of the Petition and has alleged that all documents and property properly belonging to the purported conservator were turned over. In this and the other proceedings, Mr. Hoffenberg may be entitled to indemnification by the Company pursuant to its Bylaws and appli-

cable Delaware Law. *People of the State of Illinois ex rel., John E. Washburn, etc. v. United Fire Insurance Company, et al.*; Case No. 88 CH 6942 (Cir. Ct. Cook Cty. 88 CH 6942).

3. Towers and its wholly-owned subsidiary Towers Diversified Corporation ("TDC") is involved in litigation brought by the Acting Director of Insurance of the State of Illinois (the "Director"), in his capacity as Conservator of UDC and as liquidator of Associated Life Insurance Company ("ALI") and United Fire Insurance Company ("UFI"). This litigation involves the same facts and similar claims as the litigation *Towers v. Solomon* discussed in the Confidential Private Offering Document of Towers dated October 15, 1991, under Litigation on page 17. This is a monetary action for damages against Towers and certain individuals who were directors of UDC, ALI and UFI based on claims of fraud, conversion breach of fiduciary duty, negligence, breach of contract and RICO. Towers has answered the complaint denying all of the claims and Towers has interposed certain counterclaims for recoupment and damages based upon the Director's providing of false and misleading financial information to Towers and the Director's making of false and misleading representations and omissions to Towers as to the financial condition of UDC, UFI and ALI prior to TDC's acquisition of UDC. Towers' chief legal officer and local counsel have engaged in extensive negotiations with counsel for the Director and expect to settle this matter on terms satisfactory to Towers. *James W. Schact, Acting Director of Insurance of the State of Illinois, in his capacity as Conservator of United Diversified Corporation, as liquidator of United Fire Insurance Company v. Steven Hoffenberg, Mitchell Brater, Charles H. Chugerman, Michael Rosoff and Towers Diversified Corporation*, case No. 91C4024 (E.D. Ill.).

Towers is also involved in litigation stemming from settlement of a claim of F.H. Prince & Company against United Fire Insurance Company, a wholly-owned subsidiary of UDC, which claim arose prior to Towers' acquisition of UDC. Towers agreed to guarantee the settlement based upon the representations made by the seller of UDC which are the subject of the *Towers v. Solomon* litigation discussed above. In the Solomon litigation and in this litigation, Towers has asserted that the seller's representations made to Towers were untrue. Towers' defense in this litigation is that the Towers' guarantee is voidable because it was induced by the foregoing untrue representations and because F.H. Prince & Company provided no valuable consideration. Although the judge to whom the F.H. Prince & Company case was originally assigned indicated that the above-stated defense of Towers was deficient as pleased, he stated that such a defense would be valid if adequately pleaded and accordingly he granted Towers time to re-plead. The case was subsequently assigned to another judge who disallowed Towers' defense with prejudice. This action has resulted in a judgment against Towers (which became final on May 8, 1991) of $767,986.86, plus attorneys' fees and court costs, which Towers is appealing based upon the above defenses and upon new facts that have come to light through discovery that show that Cadillac Insurance Company, a company formerly controlled by the seller, Ernest Solomon, which made representations to Towers, was insolvent in 1985 and 1986 prior to the acquisition. Towers has posted the requisite appeal bond. *F.H. Prince & Company v. Towers Financial Corporation*, 89L-15714 (Civ. Ct. of Cook County, IL).

## GLOSSARY

"*Act*" means the Securities Act of 1933, as amended.

"*Accounts Receivable*" means Healthcare and Business Accounts Receivable, including consumer Accounts Receivable of various first and third party companies and RTC and FDIC loans and receivables which meet Towers' criteria for purchasing and which are acquired by Towers with the proceeds of this Offering. Towers reserves the right to acquire any and all types of Accounts Receivable without restriction.

"*Accounts Receivable Management*" means the management of the recovery and collection of Accounts Receivable.

"*Bank*" means Chase Manhattan Bank, N.A.

"*Business Accounts Receivable*" means accounts receivable of first or third party business companies.

"*Company*" means Towers Financial Corporation, as the Issuer.

"*Excess Profits Amount*" means an amount equal to the amount by which (a)(i) the face amount of the Accounts Receivable plus (ii) the Funds on deposit in the Funding Account exceeds (b)(i) the face amount of all issued Promissory Notes plus (ii) all accrued and unpaid interest due on such Promissory Notes.

"*FDIC*" mean the Federal Deposit Insurance Corporation.

"*Federal Securities Act*" means the Securities Act of 1933, as amended.

"*Funding Accounts*" means the interest-bearing accounts in which the Funds are deposited.

"*Funds*" means the monies received from Accredited Investors and the proceeds of the Accounts Receivable.

"*Healthcare Accounts Receivable*" means accounts receivable from groups in the health-care industry.

"*Healthcare Provider*" means a hospital, doctor, medical group, health maintenance organization, rehabilitation center and other healthcare providers.

"*Healthcare Purchase Contract*" means the agreement by which Towers acquires or finances Healthcare Accounts Receivable from Healthcare Providers.

"*Investor*" means any holder of a Promissory Note who is an Accredited Investor.

"*Notes*" means the thirty-month Promissory Notes.

"*Offering*" means this Private Confidential Offering Document.

"*Offering Termination Date*" shall mean the earlier of the date all of the Units have been sold or February 28, 1993.

"*Promissory Note*" means the thirty-month promissory note issued by Towers to Accredited Investors pursuant to this Offering.

"*RTC*" means Resolution Trust Company.

"*Security Agreement*" means the agreement executed by Towers, the form of which is attached hereto as Exhibit III.

"*Subscription Agreement*" means the subscription agreement attached hereto as Exhibit I(B).

"*Subscription Documents*" means the Subscription Agreement, the Purchaser Questionnaire and the Investor's check.

"*TCC*" means Towers Credit Corporation, a wholly-owned subsidiary of Towers.

"*TCS*" means Towers Collection Service, Inc., a wholly-owned subsidiary of Towers.

"*TLC*" means Towers Leasing Corporation, a wholly-owned subsidiary of Towers.

"*Towers*" means Towers Financial Corporation, a Delaware corporation which is publicly traded.

"*Unit*" means a Promissory Note for $100,000.



Subscription Documents

EXHIBIT I

## INSTRUCTIONS TO SUBSCRIBERS

Accompanying the Offering Document, you will find (i) the Subscription Agreement with signature page in duplicate and (ii) Investor Questionnaire which you must complete in accordance with the following instructions.

1. *Investor Questionnaire.*

Please read, complete and sign the Investor Questionnaire.

2. *Subscription Agreement.*

(a) Please read, complete the Subscription Agreement and sign two copies of the signature page; and

(b) Have your signatures notarized by a notary public on the acknowledgment forms accompanying the signature pages.

DO NOT SIGN THE SUBSCRIPTION AGREEMENT UNLESS YOU ARE CERTAIN YOU CAN MAKE ALL THE REPRESENTATIONS CONTAINED IN THE AGREEMENT.

3. *Purchaser Representative Questionnaire.*

If you used the services of a "purchaser representative," the purchaser representative questionnaire must be completed and which is available upon request.

4. *Payment.*

The subscription price is to be paid by check in the amount of $100,000 per Unit made payable to the order of "Towers Financial Corporation, Funding Account."

5. *Special Instructions for Trustees and Agents.*

Trustees, agents or other persons acting in a representative capacity are required to furnish with the completed Subscription Agreement (i) a copy of the trust agreement, power of attorney or other instrument granting the power and authority to subscribe, or (ii) an opinion of counsel as to such power and authority. In addition, such persons must indicate on the completed Subscription Agreement the name of the person or entity for whom he is acting as trustee or agent.

6. *Acceptance of Subscription.*

Deliver completed Subscription Documents and payment for the Units to Towers Financial Corporation, 417 Fifth Avenue, New York, New York 10016. If your subscription is accepted, you will receive shortly thereafter (a) one copy of the Subscription Agreement executed by an officer of the Company and (b) original Promissory Note executed by the Company in the amount subscribed.

Investor Questionnaire

EXHIBIT A

TOWERS FINANCIAL CORPORATION

CONFIDENTIAL:
INVESTOR QUESTIONNAIRE

Private Offering of $150,000,000
of Recourse Promissory Notes of $100,000 each
For: Accredited Investors Only

The offering of secured recourse non-negotiable promissory notes (the "Promissory Notes") issued by Towers Financial Corporation, a Delaware corporation (the "Company"), as more fully described in the Offering Document, dated March 23, 1992, will be made to Accredited Investors only pursuant to Regulation D promulgated under the Securities Act of 1933, as amended (the "1933 Act").

The purpose of this questionnaire is to assist the Company in complying with the above requirements. You agree that the Company may present this questionnaire to such parties as it deems appropriate in order to be assured that the offer and sale of Promissory Notes to you will not result in violation of the exemption from registration under the 1933 Act, described above, or any applicable state securities laws; however, this document will otherwise be kept confidential by the Company.

If you are acting as agent for a corporation, partnership, trust or any other entity, any reference to the term "you" shall mean such corporation, partnership, trust or other entity.

Except as set forth herein, your answers to this questionnaire will, at all times, be kept strictly confidential.

If the answer to any question is "None" or "Not Applicable," please so state.

Please complete this questionnaire as fully as possible, and sign, date and deliver one copy thereof to Towers Financial Corporation, 417 Fifth Avenue, New York, New York 10016.

PLEASE PRINT

1. Please provide the following information if you are investing as an individual. (If you are purchasing on behalf of a corporation, partnership, trust, or any other entity, please complete part II below). In addition, please provide the same information for any joint tenant or tenant-in-common:

Name (1) ____________ (2) ____________

Date of Birth (1) ______ (2) ______ Marital Status (1) ______ (2) ______

Permanent Home Address (1) ____________ (2) ____________

____________

(Zip) ____________ (Zip) ____________

Home Telephone Number (1) ( ) ____________ (2) ( ) ____________

Social Securities No. (1) ____________ (2) ____________

Citizenship (1) ____________ (2) ____________

Name of (Circle One and Complete)

Advisor/Broker-Dealer/Registered Investment Adviser

______________________________

1 2 (if joint purchaser)

Names of Employer (1) ______ (2) ______

Nature of Business (1) ______ (2) ______

Position(s) (1) ______ (2) ______

General Duties (1) ______ (2) ______

Business Address (1) ______ (2) ______

Business Telephone Number (1) (   ) ______ (2) (   ) ______

Please describe your employment positions or occupations during the last five years (listing the inclusive dates of each) indicating any and all vocationally related experience in financial and business matters:

| Employment, Position or Occupation | Nature of Duties | From: | To: |
|---|---|---|---|
| (1) | | | |
| (2) | | | |

Are you acting for your own account? Yes(__) No(__)

If you are not acting for your own account, please complete the following:

(i) Capacity in which you are acting (agent, trustee or otherwise):

______________________________

(ii) Name, address and telephone number of persons you represent:

______________________________

(iii) Please attach evidence of authority.

NOTE: ANY INDIVIDUALS REPRESENTED BY YOU MUST BE QUALIFIED AS "PURCHASERS" PURSUANT TO THE ACT AND SHOULD EACH COMPLETE A COPY OF THIS QUESTIONNAIRE.

II. PLEASE COMPLETE THE FOLLOWING IF YOU ARE INVESTING ON BEHALF OF A CORPORATION, PARTNERSHIP, TRUST OR OTHER ENTITY.

Name of corporation, partnership, trust, pension plan, or entity ______

Employer Identification No. ______

Business Activities ______

State and Year of Organization ______

Fiscal year ______

Business Address ______

______ (Zip) ______

Business Telephone Number (   ) ______

Authorized Person to Contact ______ (title) ______

III. PLEASE ANSWER THE FOLLOWING QUESTIONS.

**For Individuals only:**

1. At this time, is your individual net worth (or joint net worth with your spouse) in excess of $1,000,000?

Yes (  ) No (  )

2. Did your individual adjusted gross income (increased by any deduction for long term capital gains or depletion, any exclusion for interest and any losses of a partnership as reported on Schedule E on Form 1040) from all

sources for each of the two taxable years preceding this date exceed $200,000 (or if jointly with spouse $300,000)?

Yes ( ) No ( )

3. If you have had income from all sources of $200,000 (or if jointly with spouse $300,000) for each of the past two taxable years, do you reasonably expect your income from all sources for the current taxable year to exceed $200,000 (or if jointly with spouse $300,000)?

Yes ( ) No ( )

4. *For Corporations, Charitable Organizations and Partnerships Only:*

If you are a 501(c)(3) organization, corporation, Massachusetts or similar business trust, or partnership, do you have total assets in excess of $5,000,000?

Yes ( ) No ( )

5. *For Trusts Only:*

If you are a trust (not formed for the specific purpose of acquiring the securities offered) and your investment herein is directed by a sophisticated person as described in Section 230.506(b)(2)(ii) are your total assets in excess of $5,000,000?

Yes ( ) No ( )

6. *For Banks, ERISA plans, SBICs, investment companies under the 1940 Act, etc.*

Do you otherwise qualify as an accredited investor under the following definition:

Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefits of its employees if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

Yes ( ) No ( )

7. *For all Investors. Please complete the following questions and information requested:*

Are you aware that the proposed offering of thirty-month Promissory Notes may be redeemed upon 90 days written notice?

Yes ( ) No ( )

8. Please indicate the general, business or professional education and the degrees received by you (or, if the purchaser is a corporation, partnership, trust or other entity, by the person completing this questionnaire on its behalf).

| College | Degree Received | Year |
|---|---|---|
| | | |
| | | |
| | | |

9. Investment Experience:

(a) Frequency of investment in marketable securities:

often ( ); occasionally ( ); seldom ( ); never ( ).

(b) Frequency of investment in commodities futures:

often ( ); occasionally ( ); seldom ( ); never ( ).

(c) Frequency of investment in options:

often ( ); occasionally ( ); seldom ( ); never ( ).

(d) Frequency of investment in securities purchased on margin:

often ( ); occasionally ( ); seldom ( ); never ( ).

(e) Frequency of investment in illiquid securities:

often ( ); occasionally ( ); seldom ( ); never ( ).

10. Indicate in the space provided below, any additional information which you think may be helpful in determining that your knowledge and experience in financial and business matters is sufficient to enable you to evaluate the merits and risks of investing in the securities offered pursuant to the Offering Document of which this forms a part.

______________________________

______________________________

I (we) acknowledge that the foregoing statements are true and accurate to the best of my (our) information and belief, and that I (we) will promptly notify the Company of any changes in the foregoing answers.

IN WITNESS WHEREOF, I (we) have executed this questionnaire this _____ date of _________, 19___.

______________________________
(Print Name of Joint Tenant or Tenant-in-Common, if applicable)

______________________________
(Print Name)

______________________________
(Signature)

______________________________
(Signature of Joint Tenant or Tenant-in-Common, if applicable)
(Title, if Applicable)

Place of Execution:

______________________________

*Please also complete and execute the following balance sheet or supply a substitute balance sheet as of a current date which should include an original signature of a duly authorized representative.*

BALANCE SHEET

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on hand: | $______ | | |
| Cash value of life insurance policies: | ______ | | |
| Market value of listed securities: | ______ | Margin Amount | $______ |
| Market value of unlisted securities: | ______ | | |
| Market value of real estate Residence: | ______ | Encumbrances on Real Estate Residence: | ______ |
| Other: | ______ | Other: | ______ |
| Accounts Receivable: | ______ | Accounts Payable: (include all amounts due to others, including credit cards, debts and other unsecured debts) | ______ |
| Automobiles: | ______ | Automobile Loans: | ______ |
| Other Assets: | ______ | Other Debts: | ______ |
| TOTAL ASSETS | $______ | TOTAL LIABILITIES | $______ |
| NET WORTH | $______ | | |

I confirm that the above balance sheet is true, correct and accurate.

______________________
Signature

KR 0126

Subscription Agreement

E H I B I T · I B

KR 0127

TOWERS FINANCIAL CORPORATION
SUBSCRIPTION AGREEMENT

To: Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016

Gentlemen:

1. *Subscription.*

I hereby subscribe to purchase the secured recourse non-negotiable promissory note which is set forth in Article "11" of this Subscription Agreement (the "Promissory Notes") issued by TOWERS FINANCIAL CORPORATION, a Delaware corporation (the "Company"), as more fully described in the offering document, dated March 23, 1992 (the "Offering Document"), and I agree to pay for the Promissory Notes subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement. Each of the capitalized terms which are used in this Subscription Agreement shall have the same meaning as those terms have in the Offering Document.

2. *Purchase Price.*

The purchase price for each Promissory Note (the "Subscription Price") is $100,000 (subject to reduction at the sole discretion of the Company). I am herewith tendering payment for the subscribed Promissory Notes by regular, bank or certified check payable to "Towers Financial Corporation, Funding Account" equal to $100,000 per Promissory Note (or such fraction thereof that is permitted by the Company).

3. *Offering.*

I understand that the offering will terminate on or before February 28, 1993. If my subscription is not accepted, all funds paid by me will be returned promptly to me without interest and without deduction of escrow costs. Upon receipt of such funds I will forthwith return the Offering Document and all other subscription documents to the Company. In the sole and absolute discretion of the Company, less than the full amount subscribed for by me may be accepted, whereupon the excess funds tendered by me will be promptly returned.

It is understood that this subscription is not binding unless and until it is accepted by the Company. I also understand and agree that my subscription to purchase Promissory Notes shall not be deemed binding upon the Company until the funds paid by me herewith are submitted to the Company, clear and are credited to the Funding Account.

4. *Representations and Warranties of the Undersigned.*

I acknowledge that I have received, read, understand, and am familiar with the Offering Document, including all attachments and exhibits thereto and the 1991 Annual Report of the Company. I further acknowledge that, except as set forth in the Offering Document and the 1991 Annual Report, no representations or warranties have been made to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Promissory Notes and/or the investment made thereby, and that I have not relied upon any information concerning the offering, written or oral, other than that contained in the Offering Document.

I further acknowledge that I have received, completed and returned to the Company, the Purchaser Questionnaire relating to my general ability to bear the risks of the investment being made hereby and my suitability as an Investor, and I hereby affirm the correctness of my answers in such questionnaire.

I further represent and warrant to the Company, Counsel to the Company, and their respective Affiliates, as follows:

(a) I can bear the economic risk of this investment and can afford a complete loss thereof; and I (i) have sufficient liquid assets to pay the full purchase price for each Promissory Note in the manner contemplated by the Offering Document; (ii) have adequate means of providing for my current needs and possible personal contingencies, and have no present need for liquidity of my investment in the Promissory Notes; (iii) have a net worth presently of at least an amount indicated by me in Part III of my Investor Questionnaire delivered simultaneously herewith; and (iv) qualify as an "Accredited Investor" as defined in Regulation D which was promulgated under the 1933 Act as follows:

(1) Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefits of its employees if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

(b) I have been represented by such legal and tax counsel and others, each of whom has been personally selected by me, as I found necessary to consult concerning the purchase of the Promissory Notes, and such representation has included an examination of applicable documents and an analysis of all tax, financial, recording, and securities law aspects thereof. I, my counsel, my advisors, and such other persons with whom I have found it necessary or advisable to consult, have sufficient knowledge and experience in business and financial matters to evaluate the information set forth in the Offering Document, and the risks of the investment, and to make an informed investment decision with respect thereto.

(c) With respect to the tax aspects of my investment, I am relying solely upon the advice of my own personal tax advisors, and upon my own knowledge with respect thereto.

(d) Any and all information has been made available to me, my counsel and my advisors, prior to the date hereof. I have had the opportunity to ask questions of, and to receive answers from, the Company, and its representatives, concerning the terms and conditions of the offering and access to any information, documents, financial statements, records and books (i) relating to the Company, the purchase of the Promissory Notes and the offering, and (ii) necessary to verify the accuracy of any information furnished to me. All materials and in-

formation requested by either me, my counsel, my advisors or others representing me, including any information requested to verify any information furnished, have been made available and examined.

(e) I understand that the offering has not been registered under the Securities Act of 1933, as amended (the "*1933 Act*"), *nor pursuant to the provisions of the securities or other laws of any other applicable jurisdictions*, in reliance upon the exemption for private offerings contained in Section 4(2) of the 1933 Act, Regulation D promulgated thereunder and the laws of such jurisdictions. I am fully aware that the Promissory Notes subscribed for by me are to be sold to me in reliance upon such exemptions based upon my representations, warranties and agreements. I am fully aware of the restrictions on sale, transferability and assignment of the Promissory Notes, as more fully set forth in the Offering Document, and that I must bear the economic risk of *my investment herein for an indefinite period of time because the offering has not been registered under the* 1933 Act and, therefore, the Promissory Notes cannot be offered or sold unless the offering is subsequently registered under the 1933 Act or an exemption from such registration is available.

(f) My execution and delivery of this Subscription Agreement have been duly authorized by all necessary action. I will not pledge, transfer or assign this Subscription Agreement or the Promissory Notes which I acquire pursuant to this offering without complying with the procedures set forth in the Offering Document. I am making the investment hereunder for my own account and not for the account of others and for investment purposes only and not with a view to or for the transfer, assignment, resale or distribution thereof, in whole or in part. I have no present plans to enter into any such contract, undertaking, agreement or arrangement.

(g) I agree that I shall not cancel, terminate or revoke this Agreement or any other agreement executed by me with respect to the purchase of a Promissory Note, and that this Subscription Agreement shall survive my death or disability, except as pursuant to the laws of the applicable jurisdiction.

(h) I am aware that the purchase of a Promissory Note is a speculative investment involving a significant degree of risk and that there is no guarantee that I will realize any gain from my investment.

(i) The address set forth below is my true and correct residence, and I have no present intention of becoming a resident of any other state or jurisdiction prior to my purchase of the Promissory Note.

(j) *I understand the meaning and legal consequences of the foregoing representations and warranties,* which are true and correct as of the date hereof and will be true and correct as of the date of my purchase of the Promissory Note subscribed for herein. Each such representation and warranty shall survive such purchase.

5. *Indemnification.*

I hereby agree to indemnify and hold harmless the Company, Counsel, and their Affiliated persons from any *and all damages, losses, costs and expenses (including attorneys' fees and disbursements) which they, or any of* them, may incur by reason of my failure, or alleged failure, to fulfill any of the terms and conditions of this subscription or by reason of my breach of any of my representations and warranties contained herein.

6. *Blue Sky Representations.*

(a) *Residents of any State.* I have read the jurisdictional notice applicable to the State of my residence *which appears in Article "10" of this Subscription Agreement.*

(b) *Residents of Florida.* I hereby acknowledge that I have the right, pursuant to Section 517.061(11)(a)(5) of the Florida Securities Act, to withdraw my subscription and receive a full refund of all monies paid by me to the Company within three business days after the execution of this Subscription Agreement or payment for the Promissory Notes has been made, whichever is later. Withdrawal will be without any further liability to me. To accomplish this I need only send a letter or telegram to the Company, indicating my intention to withdraw. I acknowledge that such letter or telegram should be sent or postmarked prior to the end of the aforementioned third business day. I have also been informed that it is prudent to send such letter by certified mail, return receipt requested, to ensure that it was received and also to evidence the time when it was mailed. I also understand that should I make this request orally (either in person or by telephone), I must request written confirmation that such request by me has been received.

(c) *Residents of Michigan.* I agree that I will not sell or transfer my Promissory Note(s) except in a transaction which is exempt under the Michigan Securities Act or pursuant to an effective Registration Statement under the Michigan Securities Act.

I acknowledge that I have received the Offering Document and am aware of the following:

(i) The intended use of the proceeds of this Offering;

(ii) The current financial condition of the Company;

(iii) The direct or indirect compensation which has been or will be received by the Company and its Affiliates from this Offering;

(iv) The securities being offered hereunder are Promissory Notes and the purchase price therefore is $100,000 per Promissory Note; and

(v) I or my representative may inspect the books and records of the Company which relate to the Funding Account and the purchase and collection of the Accounts Receivable.

(d) *Residents of Pennsylvania.* Pursuant to the Pennsylvania Securities Act, Section 207(m), each Pennsylvania resident may elect, within two business days of the date of execution, to withdraw from this Subscription Agreement and to receive a full refund of all funds paid on account of this subscription together with copies of the signature pages of the Agreement. Such withdrawal shall be without any further liability to any person. To accomplish this withdrawal, I need only to send a letter or telegram to the Company, indicating my intention to withdraw. Such letter or telegram must be sent or postmarked prior to the end of the aforementioned second business day. If I send a letter, I understand that it is prudent to send it by certified mail, return receipt requested, to ensure that it is received and also to evidence the time when it was mailed. Should I make this request orally, in person or by telephone to the Company, I understand that I must ask for written confirmation that my request has been received. I agree not to sell or transfer any of the Promissory Notes for a period of at least twelve months from the date of purchase.

(e) *Residents of Texas.* I agree that I will not sell or transfer my Promissory Notes except in a transaction which is exempt under the Texas Securities Act or pursuant to an effective Registration Statement under the Texas Securities Act.

7. *Acceptance by the Company.*

Except as set forth herein, this Subscription Agreement is irrevocable. It is subject to all of the terms and provisions contained in the Offering Document. It may be accepted, in whole or in part, by the Company executing this Agreement, and mailing a duplicate copy to the undersigned. The Company reserves the right in its sole discretion to reject this subscription in whole or in part.

8. *General Provisions.*

Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all of the terms and provisions hereof shall be construed in accordance with, and governed by the laws of the State of New York applicable to contracts fully to be performed therein, may not be modified or waived except in writing, and is subject to all of the terms and provisions contained in the Offering Document.

9. *Miscellaneous.*

(a) All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the undersigned at the address which is set forth below and to the Company at 417 Fifth Avenue, New York, New York 10016.

(b) This Agreement constitutes the entire Agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

(c) The Company, counsel, and their respective Affiliates shall not be liable for taking any action pursuant to this Agreement in the absence of gross negligence, misfeasance, malfeasance or fraud.

10. *Jurisdictional Notices and Representations.*

It should be noted that the inclusion of a notice under state securities laws below should not be construed to mean that the Promissory Notes have been cleared or are otherwise available for sale in that state. The Company will maintain a list, which will be available upon request, of those states in which offers and sales of Promissory Notes can be made.

**DESPITE THE INCLUSION OF THE LEGENDS BELOW, BROKER-DEALERS MUST CONFIRM WITH THE ISSUER THAT EITHER THE SECURITIES HAVE BEEN REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE SINCE THE INCLUSION OF A LEGEND BELOW DOES NOT ASSURE REGISTRATION OR EXEMPTION.**

**IN ADDITION, SOME STATES' DEFINITION OF "ACCREDITED INVESTOR" DIFFERS FROM THE DEFINITION SET FORTH AT 4(a) OF THIS SUBSCRIPTION AGREEMENT. THEREFORE, IT IS IMPERATIVE THAT BROKER-DEALERS VERIFY THAT POTENTIAL INVESTORS QUALIFY AS "ACCREDITED INVESTORS" IN SUCH STATE.**

*FOR ALABAMA RESIDENTS ONLY:* THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR ALASKA RESIDENTS ONLY:* THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISION OF 3 AAC 08.500-3 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THE OFFERING DOCUMENT SINCE THE OFFERING DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF AS 45.55.170.

THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

*FOR ARIZONA RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED PURSUANT TO A.R.S. SECTION 44-1846 BUT THE FACT OF THE GRANTING OF SUCH EXEMPTION IS NOT TO BE DEEMED A FINDING BY THE ARIZONA CORPORATION COMMISSION THAT THE OFFERING DOCUMENT IS TRUE OR ACCURATE, NOR DOES SUCH GRANT OR EXEMPTION MEAN THAT THE COMMISSION HAS PASSED UPON THE MERITS OF OR OTHERWISE APPROVED THE SECURITIES DESCRIBED HEREIN.

*FOR ARKANSAS RESIDENTS ONLY:* THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-42-504(a)(14) OF THE ARKANSAS SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THE OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR CALIFORNIA RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE BY REA-

SON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE, IF SUCH REGISTRATION IS REQUIRED.

*FOR COLORADO RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981, IF SUCH REGISTRATION IS REQUIRED.

*FOR CONNECTICUT RESIDENTS ONLY:* THE SECURITIES REFERRED TO IN THE OFFERING DOCUMENT HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE CONNECTICUT UNIFORM SECURITIES ACT, AND, THEREFORE, THE SECURITIES CANNOT BE SOLD OR TRANSFERRED UNDER SUCH ACT UNLESS THEY ARE REGISTERED UNDER SUCH ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR FLORIDA RESIDENTS ONLY:* FLORIDA PURCHASERS ARE ADVISED THAT WHERE SALES ARE MADE TO FIVE OR MORE PERSONS PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES & INVESTOR PROTECTION ACT, SUCH SALES ARE VOIDABLE BY THE PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE COMPANY OR ANY AGENT OF THE COMPANY OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE PURCHASER, WHICHEVER OCCURS LATER. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT (RULE 3E500.005(5)(a)(12)).

*FOR GEORGIA RESIDENTS ONLY:* OFFEREES ARE HEREBY ADVISED THAT THE CONSENT DECREE ENTERED INTO BY TOWERS FINANCIAL CORPORATION ("TOWERS") DISCUSSED IN THE CONFIDENTIAL PRIVATE OFFERING DOCUMENT DATED MARCH 23, 1992, PROVIDES THAT TOWERS IS PERMANENTLY ENJOINED FROM VIOLATING THE SECURITIES LAWS AND THAT TOWERS IS SUBJECT TO AN ONGOING OBLIGATION NOT TO VIOLATE THE SECURITIES LAWS. UNLESS A WAIVER IS GRANTED BY THE STATE OF GEORGIA, THE CONSENT DECREE CONSTITUTES AN AUTOMATIC DISQUALIFICATION FROM THE USE OF PRIVATE OFFERING EXEMPTIONS IN THE STATE OF GEORGIA. TOWERS HAS APPLIED FOR SUCH A WAIVER AND THE GEORGIA SECURITIES COMMISSION HAS AGREED TO GRANT THE WAIVER PROVIDED THAT THIS NOTICE BE FURNISHED TO ALL GEORGIA OFFEREES.

*FOR IDAHO RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR ILLINOIS RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS, NOR HAS THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR INDIANA RESIDENTS ONLY:* THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 23-2-1-2 OF THE INDIANA CODE. THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL OR STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.

KR 0133

*FOR LOUISIANA RESIDENTS ONLY:* THESE SECURITIES HAVE BEEN REGISTERED WITH THE SECURITIES COMMISSIONER OF THE STATE OF LOUISIANA. THE SECURITIES COMMISSIONER, BY ACCEPTING REGISTRATION, DOES NOT IN ANY WAY ENDORSE OR RECOMMEND THE PURCHASE OF ANY OF THESE SECURITIES.

*MAINE RESIDENTS:* THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE BANK SUPERINTENDENT OR THE STATE OF MAINE UNDER SECTION 10502(2) (R) OF TITLE 32 OF THE MAINE REVISED STATUTES. THESE SECURITIES MAY BE DEEMED RESTRICTED SECURITIES AND AS SUCH THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS PURSUANT TO REGISTRATION UNDER STATE OR FEDERAL SECURITIES LAWS OR UNLESS AN EXEMPTION UNDER SUCH LAWS EXISTS.

*FOR MARYLAND RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, IF SUCH REGISTRATION IS REQUIRED.

*FOR MICHIGAN RESIDENTS ONLY:* THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNIFORM SECURITIES ACT OF MICHIGAN AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. MINIMUM INVESTMENT IN MICHIGAN IS $50,000.

*FOR MINNESOTA RESIDENTS ONLY:* THESE SECURITIES REPRESENTED BY THIS OFFERING HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

*FOR MISSISSIPPI RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR MISSOURI RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*NEW HAMPSHIRE RESIDENTS:* NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE

KR 0134

FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE DIRECTOR OF THE OFFICE OF SECURITIES REGULATION THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE DIRECTOR OF THE OFFICE OR SECURITIES REGULATION HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

*FOR NEW JERSEY RESIDENTS ONLY:* THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THE OFFERING DOCUMENT. THE FILING OF THIS OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE OR THE SALE THEREOF BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR NEW MEXICO RESIDENTS ONLY:* THE SECURITIES DESCRIBED HEREIN ARE OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF NEW MEXICO. ACCORDINGLY, THE NEW MEXICO SECURITIES BUREAU HAS NOT REVIEWED THE OFFERING OF THESE SECURITIES AND HAS NOT APPROVED OR DISAPPROVED THIS OFFERING. THE NEW MEXICO SECURITIES BUREAU HAS NOT PASSED UPON THE VALUE OF THESE SECURITIES OR UPON THE ADEQUACY OR ACCURACY OF THE INFORMATION CONTAINED IN THE OFFERING DOCUMENT.

*FOR NORTH CAROLINA RESIDENTS ONLY:* IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR PENNSYLVANIA RESIDENTS ONLY:* PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, EACH PENNSYLVANIA RESIDENT WHO ACCEPTS THE OFFER MADE PURSUANT TO THE OFFERING DOCUMENT TO PURCHASE ANY UNITS SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE, WITHOUT INCURRING ANY LIABILITY TO THE COMPANY, ITS AFFILIATES OR ANY OTHER PERSON, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE COMPANY OF HIS WRITTEN BINDING CONTRACT OF PURCHASE (SUBSCRIPTION AGREEMENT). TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER SHOULD SEND A LETTER OR TELEGRAM INDICATING HIS INTENTION TO WITHDRAW TO THE COMPANY AT THE ADDRESS OF THE COMPANY SET FORTH IN THE OFFERING DOCUMENT. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF A SUBSCRIBER ELECTS TO SEND SUCH A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD A SUBSCRIBER MAKE THIS REQUEST ORALLY, HE SHOULD ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

The Trading Desk, Inc.
7009 S. Potomac, Suite 100
Engelwood, CO 80112

Thomas F. White & Co., Inc.
1 Second Street, 5th Floor
San Francisco, CA 94105

Titan Value Equities
17852 Seventeenth Street
Suite 102
Tustin, CA 92680

Torrey Pines Securities, Inc.
140 Marine View Drive
Suite 110
Solana Beach, CA 92075

U.S. Securities Corporation
11911 Freedom Drive
Suite 500
Reston, VA 22090

Underwood Associates
27 Ridge Road
P.O. Box 661 - 27 Ridge Road
Barrington, IL 60011

Vautrain Nelson LeFevre,
Endsley & Durham, Inc.
8851 Hwy. 80W, #110
Ft. Worth, TX 76116

Waldron & Company, Inc.
1050 Northgate Drive
San Rafael, CA 94903

Walter Lowman
8 Woody Lane
Larchmont, NY 10538

The Wraxall Group
Seymour Hall, #1
Seymour Farm Road
S. Hampton, Bermuda

Tierra Capital/
Value Equity Group
One McKay Place
P.O. Box 1816
Roswell, NM 88202-1816

Toluca Pacific Securities Corp.
3500 West Olive, Suite 1190
Toluca Lake, CA 91505

U.S. Securities, Inc.
15 Lewis Street, Suite 212
Hartford, CT 06103

U.S. Securities International, Corporation
120 Broadway, 27th Floor
New York, NY 10271

Vautrain Nelson LeFevre,
Endsley & Durham, Inc.
6300 Ridglea Place, Suite 500
Ft. Worth, TX 76116

Vestcorp Securities, Inc.
17701 Mitchell North
Irvine, CA 92714

Walnut Street Securities Inc.
1801 Park 270 Drive - Suite 220
P.O. Box 46902
St. Louis, MO 63146

Warwick Securities, Inc.
134 North Wood Blvd.
Columbus, OH 43235

Wedbrush Morgan Securities, Inc.
1000 Wilshire Boulevard
Los Angeles, CA 90017

West Coast Securities
10670 N. Central, Suite 200
Dallas, TX 75231

Yeager Securities, Inc.
16633 Ventura Blvd, Suite 1220
Encino, CA 91436

West Coast Capital
123 Vientos Road
Camarillo, CA 93010

Yankee Financial Group, Inc.
P.O. Box 0330
Brightwaters, NY 11718

IN ADDITION TO QUALIFYING AS AN ACCREDITED INVESTOR, THE RESIDENTS OF PENNSYLVANIA HEREBY AGREE THAT THEY WILL NOT SELL, TRANSFER OR SUBDIVIDE THE UNITS PURCHASED HEREIN UNTIL AT LEAST ONE (1) YEAR FROM THE DATE OF PURCHASE.

*FOR SOUTH CAROLINA RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR SOUTH DAKOTA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31A, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATIONS OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS OFFERING IS TRUE, COMPLETE, AND NOT MISLEADING; NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SOUTH DAKOTA RESIDENTS HEREBY REPRESENT THAT (I) THEY HAVE A NET WORTH OF AT LEAST $1,000,000 (EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES); (II) THEY WILL INVEST NOT LESS THAN $1,000,000; AND (III) THEIR INVESTMENT DOES NOT EXCEED 10% OF THEIR NET WORTH.

*FOR TENNESSEE RESIDENTS ONLY*: THESE SECURITIES HAVE BEEN REGISTERED WITH THE STATE OF TENNESSEE. AS A CONDITION OF REGISTRATION, THE STATE OF TENNESSEE HAS IMPOSED MINIMUM SUITABILITY STANDARDS FOR TENNESSEE RESIDENTS. PURSUANT TO THOSE STANDARDS, EACH INVESTOR WHO IS A NATURAL PERSON MUST HAVE A NET WORTH OF AT LEAST $250,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES, AND MUST HAVE HAD A GROSS INCOME OF $65,000.00 DURING THE LAST TAX YEAR AND BE EXPECTED TO HAVE A GROSS INCOME OF $65,000.00 DURING THE CURRENT TAX YEAR, OR ALTERNATIVELY A NET WORTH OF AT LAST $500,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS AND AUTOMOBILES. ADDITIONALLY, UNDER THIS SUITABILITY STANDARD, EACH NATURAL PERSON'S INVESTMENT MUST NOT EXCEED TEN PERCENT (10%) OF HIS NET WORTH.

THIS OFFERING IS MADE TO ACCREDITED INVESTORS AS DEFINED IN SECTION 501 (a) (1) OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933. SEE OFFERING DOCUMENT AT "TERMS OF INVESTMENT." THE ACCREDITED INVESTOR STANDARD IS GENERALLY MORE RESTRICTIVE THAN THE MINIMUM SUITABILITY REQUIREMENTS IMPOSED BY THE STATE OF TENNESSEE. THEREFORE, THE EFFECT OF REGISTRATION OF THE OFFERING IN TENNESSEE (AND THE MINIMUM SUITABILITY STANDARD) IS THAT THE OFFERING IS MADE ONLY TO ACCREDITED INVESTORS.

*FOR TEXAS RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS OF TEXAS AND THEREFORE CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR UTAH RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UTAH UNIFORM SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR VIRGINIA RESIDENTS ONLY*: THE VIRGINIA STATE CORPORATION COMMISSION DOES NOT PASS UPON THE ADEQUACY OF THE OFFERING DOCUMENT OR UPON THE MERITS OF THIS OFFERING AND THE COMMISSION EXPRESSES NO OPINION AS TO THE QUALITY OF THIS SECURITY.

*FOR WASHINGTON RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

11. *Information Relating to My Investment.*

(a) Amount of Promissory Notes and amount of payment tendered herewith (at a price of $100,000 per Promissory Note) ____________

(b) Additional Documents Required:

(i) Investor Questionnaire; and

(ii) Community Property Designation (if applicable) from Page ___ of this Subscription Agreement.

TO BE COMPLETED BY ALL SUBSCRIBERS:

Residence Address to which information regarding this subscription should be mailed:

______________________
Street Address

______________________ City and State Zip

( ) ______________________ Telephone Number

______________________ Social Security Number or Employer Identification Number

______________________ Social Security Number or Employer Identification Number of Joint Tenant or Tenant-in-Common, if applicable

IN WITNESS WHEREOF, I (we) have executed this Subscription Agreement this ____ day of __________, 19___.

INDIVIDUAL:

______________________
Name (Please Print)

______________________
Signature

______________________
Name of Joint Tenant or Tenant-in-Common, if applicable.

ENTITIES:

______________________
Name of Entity (Please Print)

______________________
Signature and Title

[Corporate Seal (if applicable)]

ACCEPTED AND AGREED TO THIS _____ DAY OF _________, 19___.

TOWERS FINANCIAL CORPORATION

By: ______________________
Mitchell Brater,
Vice Chairman and Chief Operating Officer

Term of Promissory Notes:

______________________

Number of Promissory Notes Accepted:

______________________

[INDIVIDUAL]

STATE OF
} SS.:
COUNTY OF

On __________, 19___, before me personally appeared ______________ and __________, known to me as the person(s) whose name(s) is (are) subscribed to the foregoing Subscription Agreement and acknowledged that (s)he (they) executed the same.

______________________
Notary Public

[CORPORATE]

STATE OF
} SS.:
COUNTY OF

On __________, 19___, before me personally appeared ______________, to me known and who, being by me duly sworn, did depose and say that (s)he is the ______________ of ______________________, a ________________ corporation, the corporation which executed the foregoing Subscription Agreement, that (s)he knows the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by authority of the corporation; and that (s)he signed his (her) name thereto by like authority.

______________________
Notary Public

## COMMUNITY PROPERTY DESIGNATION

If a subscriber is an individual who is legally domiciled or resident of the State of Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas or Washington, the following designation must also be completed:

A. The Promissory Notes are being purchased as Community Property in one or both names (both spouses must sign).

SIGNATURE OF HUSBAND

Type or Print Name of Husband

SIGNATURE OF WIFE

Type or Print Name of Wife

B. The Promissory Notes are being purchased as Separate Property (the Subscriber alone must sign the Separate Property Election, and the subscriber's spouse must sign the Separate Property Acknowledgement below).

## SEPARATE PROPERTY ELECTION

The undersigned elects to treat this investment as (his) (her) separate property. In making this decision, I have consulted with independent counsel to determine that I have used my separate property or funds to purchase the Promissory Notes.

SIGNATURE OF SUBSCRIBER

Type or Print Name of Subscriber

## SEPARATE PROPERTY ACKNOWLEDGEMENT

I hereby acknowledge that my spouse is making this investment with (his) (her) separate property and funds.

SIGNATURE OF SUBSCRIBER'S SPOUSE

Type or Print Name of Subscriber's Spouse

KR 0140

Form of Promissory Note

EXHIBIT - II

KR 0141

TOWERS FINANCIAL CORPORATION
MARCH 23, 1992 PRIVATE OFFERING DOCUMENT
NON-NEGOTIABLE FULL RECOURSE PROMISSORY NOTE

For value received, TOWERS FINANCIAL CORPORATION, a Delaware corporation (the "Maker"), promises to pay to the order of the person whose name and address are set forth at the end of this Note (the "Payee"), its successors and assigns, the principal sum which is indicated at the end of this Note, adjustable monthly, together with interest on the unpaid principal balance at the rate of interest which is set forth at the end of this Note, from the date of this Note (the date of this Note is set forth at the end of this Note) through and including the date of final payment hereunder.

Principal hereunder shall be due and payable in full on the date which is indicated at the end of this Note (the "Maturity Date"); provided that this Note will be redeemable upon 90 days written notice by Payee to Maker.

Payment of principal and interest under this Note shall be made in lawful money of the United States of America to the Payee at the address which is set forth at the end of this Note or at such other location as shall be notified to the maker by the Payee. Interest shall be calculated on the basis of a year of 365 days for the actual number of days elapsed and shall be payable monthly commencing with the interest payment which is due 30 days from the date of this Note.

Notwithstanding anything to the contrary which is provided for herein, the rate of interest which is provided for hereunder shall not exceed the maximum legal rate of interest which is permitted pursuant to applicable law. If the rate of interest which is provided for in this Note shall be found to exceed the maximum legal rate of interest, the Maker shall be required to pay only the maximum legal rate of interest.

This Note has been issued pursuant to the Offering Document dated March 23, 1992 of the Maker, and this Note ...bject to all of the terms, conditions, obligations and provisions which are set forth in the Offering Document.

The holder of this Note shall be entitled to all of the benefits provided for in the security agreement (the "Securi...y Agreement") which was executed by the Maker in favor of the Payee and other similarly situated payees. Neither this reference to the Security Agreement nor any provision thereof shall affect or impair the obligations of the Maker which are provided for herein.

This Note is made and delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York. Any provision hereof which may prove unenforceable under any law shall not affect the validity of any other provision hereof. The Payee agrees that any action or proceeding to enforce this Note shall be brought in a court of competent jurisdiction located in the State and County of New York.

This Note may not be changed or terminated orally, but only by an agreement in writing and signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the __ day of ______, 19__.

TOWERS FINANCIAL CORPORATION

Date of Note: __________, 19__

By: ______________________
Mitchell Brater,
Vice Chairman and Chief Operating Officer

PAYEE:

______________________

Principal Amount of Note: $ __________

______________________
Print Name(s)

Maturity Date: __________

______________________
...ddress

Rate of Interest: 3.5% per annum over the prime rate of interest of Chase Manhattan Bank, N.A. as in effect at the time of issuance, and adjustable on the first day of each month thereafter.

______________________
City, State and Zip Code

This Promissory Note has not been registered under the Securities Act of 1933, as amended, and may not be sold or otherwise transferred in the absence of such registration or an exemption therefrom under such Act or state securities laws. Furthermore, this Promissory Note may be sold or otherwise transferred only in compliance with the conditions specified in the Offering Document of Maker, a complete and correct copy of which is available for inspection at the principal office of Maker and will be furnished without charge to the holder of this Promissory Note upon written request.

EXHIBIT III

Form of Security Agreement

SECURITY AGREEMENT

AGREEMENT made this ___ day of _____, 1992 by and among TOWERS FINANCIAL CORPORATION, a Delaware corporation having its principal place of business at 417 Fifth Avenue, New York, New York 10016 (hereinafter referred to as the "Debtor") and each of the persons set forth on Exhibit "A" which is annexed hereto (hereinafter referred to as to the "Secured Parties").

1. *Background*

The Debtor, pursuant to its offering document, dated March 23, 1992, (hereinafter referred to as the "Offering Document"), has issued its recourse non-negotiable Promissory Notes (hereinafter referred to as the "Promissory Notes") to each of the Secured Parties in the amounts set forth in such Promissory Notes. Pursuant to the provisions of the Offering Document, the proceeds of the Offering of the Promissory Notes are to be placed in the Funding Account(s), as defined in the Offering Document, and utilized for the purpose of purchasing and/or financing Accounts Receivable, as defined in the Offering Document. In order to induce the Secured Parties to enter into this transaction, the Debtor has agreed to grant the Secured Parties a security interest in the Funding Accounts, the Accounts Receivable and any proceeds therefrom in whatever form as security for repayment of the Promissory Notes pursuant to their respective terms.

2. *Definitions*

Each of the capitalized terms which is used herein shall have the same meaning which is set forth in the section of the Offering Document which is entitled "Glossary" unless the context of this Security Agreement requires other-

3. *Security Interest*

To secure the payment when due of principal and interest under the Promissory Notes and the payment and performance by the Debtor of all obligations and liabilities of the Debtor to the Secured Parties pursuant to the Promissory Notes, the Debtor shall and hereby does, on and as of the date hereof, grant, convey, assign and transfer to Secured Party, a security interest in and to (i) the Accounts Receivable and all additions, replacements and attachments thereto, (ii) all other contracts calling for the purchase or financing of the Accounts Receivable, (iii) all proceeds which are derived by the Debtor from the collection or the attempted collection of any of the items referred to in "(i)" or "(ii)" and (iv) the Funding Account(s), exclusive of the Excess Profits Amount, as defined in the Offering Document (hereinafter referred to collectively as the "Collateral").

4. *Default*

4.1 *Event of Default*. The term "Event of Default" as used herein, shall mean the occurrence and continuation of any one or more of the following events:

(a) The failure of the Debtor to promptly pay when due any of the amounts of interest or principal which are due and payable pursuant to any of the Promissory Notes, which failure continues for a period of thirty (30) days after the applicable Secured Party gives the Debtor written notice of such default;

(b) If the Debtor shall admit in writing its inability to pay, or fail to pay, its debts generally as they become due; or

(c) If, under the provisions of any law for the relief of debtors, any court of competent jurisdiction or custodian shall assume custody or control of the Debtor's property without the consent of the Debtor.

4.2 Upon the happening of an Event of Default, the Promissory Notes shall become immediately due and payable and the applicable Secured Party shall have the rights which are set forth in Section 7 of this Security Agreement.

5. *Obligations of the Debtor*

5.1 If a Secured Party shall have required the Debtor to deliver to such Secured Party any or all of the Collateral and if the Debtor shall receive or become entitled to receive any rights, distributions or payments of any kind or

description with respect to or on account of such Collateral, the Debtor agrees to accept same as agent for the Secured Party, to hold same in trust for the Secured Party, and to deliver same to the Secured Party in the form received, with the endorsement of the Debtor when necessary, to be held by the Secured Party as Collateral hereunder.

5.2 Until the Secured Parties are paid in full for the principal and interest of all indebtedness which is due to the Secured Parties pursuant to the terms of this Agreement and the Promissory Notes, the Debtor agrees that it will:

(a) take whatever actions are necessary to comply with all statutes and regulations governing its activities and operations; and

(b) promptly notify the Secured Parties of an Event of Default which is discovered by Debtor.

6. *Warranties of the Debtor*

6.1 The only office where the Debtor keeps, or will at any time prior to final release hereof, keep records concerning any part of the Collateral, which is "accounts" as that term is defined in the Uniform Commercial Code, is at the address of the Debtor which is shown at the beginning of this Agreement, which office is the principal place of business and the location of the chief executive officer of the Debtor.

6.2 To induce the Secured Parties to enter into the transactions provided for herein, the Debtor represents and warrants to the Secured Parties that:

(a) The Debtor is duly authorized to execute and deliver this Agreement and the Promissory Notes and to perform all of its obligations under this Agreement, including the execution, delivery and performance of whatever additional documents are necessary or required in connection with the transactions which are contemplated herein;

(b) The execution and delivery by the Debtor of this Agreement and the Promissory Notes and the performance by the Debtor of its obligations under this Agreement and the Promissory Notes do not and will not conflict with any provision of law, or of the charter or by-laws, or of any other agreement affecting or binding upon the Debtor;

(c) This Agreement and the Promissory Notes, when duly executed and delivered in accordance with this Agreement, will be valid and binding upon the Debtor enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights and except to the extent that the availability of specific performance thereof may be limited by principles of equity; and

(d) The Debtor is a duly organized and validly existing corporation in good standing under the Delaware General Corporation Law.

7. *Rights and Obligations of Secured Parties With Respect to the Collateral*

7.1 The Secured Parties hereby severally agree that, upon an Event of Default, each Secured Party shall be entitled to exercise his remedies hereunder and under the Uniform Commercial Code only in respect of that portion of the Collateral (determined according to the then present value thereof) which bears the same ratio to the total Collateral as that portion of the indebtedness with respect to any Promissory Note held by such Secured Party.

7.2 The proceeds of any sale or other disposition of the Collateral and all sums received or collected by the Secured Parties from or on account of the Collateral shall be applied by the Secured Parties in the manner set forth in Section 9-504 of the Uniform Commercial Code in effect at the time of such sale or other disposition of the Collateral.

7.3 A Secured Party may only transfer a Promissory Note held by him, subject to the terms of the Offering Document and the Securities Act of 1933, as amended, and state securities laws. Upon any such transfer, the transferee shall automatically become vested with all rights, powers and remedies hereunder of such Secured Party with respect to the Collateral.

7.4 Upon payment if full of all of his Promissory Note, a Secured Party will promptly thereafter release to the Debtor all of the Collateral.

8. *Pooling*

The Debtor, in its discretion, may pool the Collateral with other of its offerings and other loans made to Debtor. In the event such a pooling occurs, the Secured Parties of the current offering and the secured parties of the other offerings will share the Collateral on a pari passu (pro rata) basis for all purposes.

9. *Miscellaneous*

9.1 *Headings.* The descriptive headings in this Security Agreement are for convenience of reference only, and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

9.2 *Waiver.* Except as otherwise specifically provided for hereunder, no party shall be deemed to have waived any of its rights hereunder or under any other agreement, instrument or paper signed by any of them with respect to the subject matter hereof, unless such waiver is in writing and signed by the party waiving such right. Except as otherwise specifically provided for hereunder, no delay or omission by any party in exercising any right with respect to the subject matter hereof shall operate as a waiver of such right or of any such other right. A waiver on any one occasion with respect to the subject matter hereof shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

9.3 *Rights Cumulative.* All rights and remedies with respect to the subject matter hereof, whether evidenced hereby or by any other agreement, instrument, or paper, will be cumulative, and may be exercised separately or concurrently.

9.4 *Entire Agreement.* The parties herein have not made any representations, warranties, or covenants not set with respect to the subject matter hereof. All understandings and agreements heretofore had between the parties with respect to the subject matter hereof are merged in this Security Agreement and any such instrument which one fully and completely expresses their agreement.

9.5 *Amendments.* This Security Agreement may not be changed, modified, extended, terminated, or discharged orally, but only by a written agreement which is signed by all of the parties to this Security Agreement.

9.6 *Further Instruments.* The parties agree to execute any and all such other and further instruments and documents and to take any and all such further actions reasonably required to effectuate this Security Agreement.

9.7 *Notices.* All notices or other communications required or permitted hereunder shall be in writing and shall be mailed by First Class, Registered or Certified Mail, Return Receipt Requested, postage prepaid as follows:

To the Debtor:

Towers Financial Corporation
417 Fifth Avenue
New York, NY 10016
Attn: Mitchell Brater, Vice Chairman
and Chief Operating Officer

To the Secured Parties:

All the addresses which are set forth
on Exhibit "A" to this Security Agreement or
are provided in the Promissory Notes or Subscription Documents.

or in each case to such other address as shall have last been furnished by like notice. If mailing by Registered or Certified Mail is impossible due to an absence of postal service, notice shall be in writing and personally delivered to aforesaid address. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be.

9.8 *New York Law.* This Security Agreement is made and delivered in the State of New York and shall be construed and enforced in accordance with the internal laws of the State of New York, without giving effect to the principals of conflicts of law. Any suit or proceeding to enforce the provisions of this Security Agreement shall be commenced in a court of competent jurisdiction in the State and County of New York.

9.9 *Successors and Assigns.* Subject to the restrictions which are contained in this Security Agreement, this Security Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns.

IN WITNESS WHEREOF, the Debtor has executed this Security Agreement as of the date first above written.

TOWERS FINANCIAL CORPORATION

By: ____________________________
Mitchell Brater,
Vice Chairman and Chief Operating Officer

Form of Written Notice

EXHIBIT - IV

To: Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016

Re: Thirty-Month Recourse Promissory Note

Gentlemen:

Pursuant to the terms of the thirty-month recourse Promissory Note in the principal amount of $__________ issued to me by Towers Financial Corporation ("Towers") in connection with the Confidential Private Offering Document, dated March 23, 1992, I hereby make demand payment which payment, Towers shall make to me within 90 days from the date hereof.

Date:______________________

______________________
(Signature)

______________________
(Print Name)

______________________
(Address)

______________________
(Telephone Number)

Annual Report of Towers
[Furnished under separate cover]

EXHIBIT V

KR 0150

TFC
TOWERS
FINANCIAL
CORPORATION

417 FIFTH AVENUE, NEW YORK, NEW YORK 10016 (212) 696-0505

KR 0151





1 9 9 2

# TOWERS FINANCIAL CORPORATION

ANNUAL REPORT

## ABOUT THE COMPANY

Towers Financial Corporation — a diversified financial services company with more than 2,000 employees and independent agents nationwide — has fundamentally changed healthcare financing in the U.S. with its creation of the *first nationwide medical accounts receivable financing and factoring program.*

In addition, the company is a recognized leader in the collection, *factoring and management of accounts receivable for all industries.* Although many of the company's 23,000 clients include America's Fortune 1,000 companies, the Towers systems are also designed to help small and mid-sized *customers.*

In the healthcare arena, Towers' innovative financial programs have allowed healthcare providers to keep their doors open to serve their communities, despite the dual pressures of federal "cost-cutting" regulations and the unwillingness of banks and other traditional money sources to provide needed capital. Meanwhile, nearly half of the hospital executives surveyed recently believe their own institutions are at risk of failure within the next several years.

TFC's medical receivables factoring and financing program has been successful exactly because it addresses this critical need. Moreover, it does so with simplicity and efficiency, solving working *capital problems for its clients.*

Towers is one of the country's largest financial institutions with tailored accounts receivable programs for smaller healthcare providers and businesses. The company's major lines of business include:

- Computerized business office accounts receivable management systems for hospitals, nursing homes, clinics and doctors, including billing, collections and factoring *of accounts receivable;*
- Healthcare factoring and financing of accounts receivable;
- Corporate accounts receivable factoring and financing;
- Accounts receivable collection;
- Acquiring RTC/FDIC and banking industry accounts receivable loan portfolios;
- Property and casualty reinsurance.

*Towers Financial Corporation's* rapid and sustained growth is best demonstrated through the amount of accounts receivable under contract annually, which has grown from almost $183 million in 1989 to more than $1.45 billion in 1992.

## TABLE OF CONTENTS

2 To Our Shareholders

6 Company Overview

10 Accounts Receivable Collection Services

18 Healthcare Factoring of Accounts Receivable and Computerized Accounts Receivable Business Office Management Systems

26 Acquiring RTC/FDIC and Banking Industry Accounts Receivable Loan Portfolios

28 Other Services

30 Financial Statements

# CONSOLIDATED FINANCIAL HIGHLIGHTS

*(In thousands, except per share data)*

| | 1992 | 1991 | 1990 |
|---|---|---|---|
| Accounts Receivable Under Contract | $1,450,000 | 800,200 | 291,565 |
| Total Assets | $684,442 | 513,623 | 195,562 |
| Shareholders' Equity | $25,481 | 20,078 | 13,422 |
| Net Income | $5,403 | 4,256 | 3,903 |
| Per Share | $1.08 | .91 | .86 |
| Average Common Shares Outstanding | 5,000 | 5,000 | 4,600 |

ACCOUNTS RECEIVABLE UNDER CONTRACT

$183 million — '89
$292 million — '90
$800 million — '91
$1 billion, 450 million — '92 (est)
$2 billion — '93 (est)

# SHAREHOLDERS

Towers Financial Corporation enters the 1993 fiscal year in a position of continued financial strength and industry leadership, built largely on our astounding success as the national leader in providing accounts receivable management and factoring services to hospitals, clinics, nursing homes and other healthcare providers which are otherwise shut off from traditional working capital sources. The company's annual accounts receivable under contract is now more than $1.45 billion. We project accounts receivable under contract to reach $2 billion this year.

By providing unmatched technical resources in its key market segments, TFC has established a leadership position in major sector the financial services industry, led off by the factoring and financing of medical accounts receivable. Other important industry segments for TFC include: accounts receivable collection; business office accounts receivable management systems for the healthcare industry; acquiring RTC/FDIC and banking industry accounts receivable loan portfolios; and the underwriting and issuance of reinsurance.

## AN INNOVATOR IN HEALTHCARE

In 1986, we saw a looming crisis in healthcare financing in the United States. Because of that year's tax reform act, donations to non-profit and not-for-profit healthcare institutions were being cut back. By [illegible], a growing S&L crisis meant that healthcare providers were being shut off from their lifeblood of capital. By their nature, most small hospitals, clinics and nursing homes are unprofitable, making it nearly impossible for them to secure credit lines from commercial banks.

[illegible] wouldn't have mattered anyway. Even if they could have loaned money, banks were in no position to help with healthcare providers' fundamental problem: [illegible] lack of financial and management systems [illegible] manage medical receivables.

What was needed was a total system of computer hardware and specialized software, claims analysis, management disciplines, and experience. That's where we made the difference.

In 1989, Towers stepped in to help solve a growing crisis in the U.S. healthcare system by developing the first nationwide healthcare accounts receivable medical factoring system: the Healthcare Factoring and Business Office Accounts Receivable Management System. This landmark development in financing provided this $900-billion industry access to badly needed working capital just as a combination of federal "cost-cutting" regulations and a growing banking crisis was placing hospitals, nursing homes, clinics and other providers in great jeopardy.

Not only did TFC help solve healthcare providers' long- and short-term cash-flow problems, but TFC also developed computerized medical accounts receivable office operations which manage the total billing, processing, auditing and collection needs of healthcare providers. These services are distinguished by the added value of our accounts receivable claims management programs and unmatched Accelerated Claims Recovery System, a strong competitive advantage for TFC against more limited collection or factoring firms.

Since their inception, TFC's healthcare accounts receivable factoring and collections programs have enjoyed a high rate of growth. Consequently, to capitalize on its position as the creator of this market category, as well as its place as a continuing leader, the company has been reinvesting a large portion of its proceeds so that it might continue to improve the vast systems needed to retain market leadership.

TFC's healthcare programs have been enhanced by the issuance of innovative double-A-rated healthcare receivables-backed securities, which significantly increase the industry's access to much-needed capital.

Another Towers innovation, the first asset-backed securities of their kind, these offerings use accounts receivable from many healthcare providers as collateral for medium-term notes and long-term bonds.

TFC also is continuing to expand our successful program of acquiring performing and non-performing portfolios of accounts receivable loans originally issued by banks or savings and loan institutions. These portfolios are acquired from the Federal Deposit Insurance Corporation (FDIC) or the Resolution Trust Corporation (RTC) in their role as receiver or liquidator of failed banks. They are acquired from other institutions participating in an active primary and secondary market for these portfolios.



...n addition, the company purchases non-performing loans from the ...rtfolios of healthy, solvent banks ...eking to lower their credit risk exposure.

Our experience has shown that ...cquiring and collecting such loans ...s a natural outgrowth of our exist...ng business — one in which we've ...nvested so much in terms of personnel and systems. Because of the continuing crisis among U.S. finan...tutions, we believe it will ...e to be a significant growth ...rea for TFC.

...ally, TFC took additional steps ...st year to establish itself as a serious contender in the property reinsurance industry through Towers Insurance Group. Reinsurance enables us to share premiums and losses with primary insurers, diversify our exposure, and join TFC with the world's most prominent insurance entities.

In the next 12 months, we will continue to implement TFC's long-term strategic plan. This plan has been the foundation on which the company's tremendous growth has been built, and on which we will build for the future.

Steven Hoffenberg
Chairman of the Board,
President & CEO

Mitchell Brater
Vice Chairman of the Board

COMPANY
OVERVIEW

Over the past 18 years, Towers Financial Corporation, through wholly owned subsidiaries and affiliates, has become a recognized national leader in the management of accounts receivable.

In recent years, TFC has revolutionized healthcare accounts receivable funding in the U.S. and has — in no small measure — helped keep our healthcare system afloat by helping providers keep their doors open in the face of mounting financial pressure. In the process, Towers has become a national leader in providing accounts receivable management and factoring services to hospitals, clinics and nursing homes, helping this vital sector of the U.S. economy solve the problem of a lack of working capital, and increase their ability to collect and manage their medical accounts receivab...

In large measure, TFC's success derives from our proprietary, large-scale, computerized systems, in tandem with our nationwide network of highly skilled professionals. These resources enable us to process accounts receivable on an unequaled scale.

As TFC has grown in size and stature, we have consistently applied our expertise to new industries and areas of service compatible with our core busine...

'o support and enhance our continued growth, TFC became a publicly traded company in 1986. In its role as one of America's leading collectors of past-due business debt, TFC is currently engaged in five principal lines of business:

### HEALTHCARE FACTORING AND FINANCING OF MEDICAL ACCOUNTS RECEIVABLE AND COMPUTERIZED ACCOUNTS RECEIVABLE BUSINESS OFFICE MANAGEMENT SYSTEMS

To meet the specialized needs of hospitals, nursing homes, clinics and other healthcare providers, and to provide a new source of working capital for this industry of more than $900 billion, TFC has developed a unique approach to the factoring of medical accounts receivable. Instead of relying on the fiscal condition of the healthcare provider to qualify for asset-based financing — which would limit the availability of credit to a small number of institutions — it uses the credit quality of third-party reimbursers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans. The medical accounts receivable factoring program is processed with TFC's expert accounts receivable computerized business office management services. This greatly speeds healthcare providers' recovery of funds.

A large part of TFC's success in factoring and financing of medical accounts receivable is derived from the company's multi-million-dollar investment in proprietary hardware and software used to manage its state-of-the-art systems. Because of its size, strength and competitive cost structure, working with TFC has been especially beneficial to small and middle-sized healthcare providers — the very market segment most often ignored by traditional funding sources.

TFC's healthcare financing assists millions of patients through working capital that allows healthcare providers to stay in business. In addition, hundreds of thousands of healthcare employees stay employed due to working capital financing of the healthcare providers.

### ACCOUNTS RECEIVABLE COLLECTION SERVICES

TFC's unparalleled success in collecting past-due accounts is the result of our policy of finding only the best available people for our collections departments, putting these men and women through the best training program in the industry, and equipping them with the most sophisticated collection system available — our proprietary Accelerated Claims Recovery System (ACRS). That, combined with our ability to maintain goodwill with our customers' debtors while rapidly recovering their obligations, is the foundation upon which we've built our success.

The human factor is evident everywhere in the Towers system. TFC's highly trained professionals spend time on site in client offices, both managing the systems for them and helping their own staffs learn TFC's unsurpassed methodology for collection management.

### CORPORATE ACCOUNTS RECEIVABLE FACTORING

Through either the purchase or factoring of receivables, TFC factors past-due and current accounts at a discount.

### ACQUIRING RTC/FDIC AND BANKING INDUSTRY ACCOUNTS RECEIVABLE LOAN PORTFOLIOS

Almost since its inception, TFC has served as a factoring resource for the banking industry, through purchase of non-performing loans from their portfolios. This remains a highly profitable business sector for us, as the federal takeover of failed banks and thrift institutions



...created an opportunity to leverage our existing knowledge and experience. TFC has moved swiftly to capture this opportunity by purchasing accounts receivable loan portfolios at a discount, allowing us to realize the fullest possible values in these portfolios.

### Insurance/ Reinsurance

Since the Towers Insurance Group was formed in 1991, specializing in property and casualty reinsurance, we have made great progress toward our goal of providing coverage on a reinsurance basis through domestic and offshore companies. Our reinsurance activities enable us to diversify our initial exposures and benefit from the experience and financial depth of the leading worldwide insurance firms with whom we participate in sharing risk.

# ACCOUNTS RECEIVABLE COLLECTION SERVICES

From the company's establishment, the core business of Towers Financial Corporation has been helping our customers collect past-due accounts. TFC is a recognized leader in this field with a proven track record, and with a client base consisting of more than 23,000 business and healthcare organizations — including many from the Fortune 1,000 — throughout the United States. Since fiscal 1989, we have serviced over $3 billion in accounts receivable. As of year-end 1992, more than $1.45 billion of accounts receivable were serviced.

### Recovering America's Business Debts

Nothing is more important to a business operation than predictable cash flow. More than sales volume itself, the regularity of cash flow affects its ability to manage overhead, pay vendors, reduce debt and fund day-to-day expenses.

TFC is a company dedicated to helping companies maintain their cash flow. To do this, we provide a complete range of accounts receivable se- ·es, including:

·ers Advantage Collection ·r Writing Program — providing demand letter writing services ·t the lowest fixed cost in the industry. The Towers Advantage Collection Letter Writing Program, unlike any other service of its kind, involves no up-front fees. Instead, fees are paid out of first recoveries received either by Towers or the client, after collection.

·owers Intensive Collection ·m — which provides a full range of appropriate collection practices. The Towers Intensive Collection Program also requires no up-front fees, with payment made from collected funds.

Supported by a significant investment in computer hardware, plus the finest proprietary software systems available, the Towers data-processing system can manage 50 million accounts, representing more than $6 billion annually.

**DEBT RECOVERY TRENDS**
*Source U.S. Department of Commerce*

*The chances for debt recovery, and the amount ultimately recovered, drop off sharply over time*

EXPERIENCE AND PROFESSIONALISM

TFC's rapid and sustained growth i accounts receivable collection is an outgrowth of our success for clients — both large and small. We assign each collection account to one of our staff collectors, who actively pursues collection with the help of lawyers, paralegals, credit analysts and investigators (skip tracers).



Our collection staff comes to us with at least five years of relevant experience. In addition, all staff members undergo a rigorous, in-house training program and work within strict guidelines during the collection process. The collection staff undertakes a comprehensive review of each new collection account; debtors are contacted and dealt with on the basis of this review. Our proprietary accounts receivable computer systems allow us to track all accounts quickly for any client, to track our contacts with each debtor, and to track each debtor's payment and credit history.

## MEDICAL FACTORING SERVICES: A MAJOR GROWTH AREA

TFC's innovative approach has solved the problem of finding working capital for hospitals, nursing homes, clinics and related facilities, which were shut off from traditional funding sources. These institutions, which desperately need cash flow to meet their operating requirements, might not otherwise have qualified for asset-based financing other than by relying on the fiscal condition of third-party reimbursers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans.

In addition to our programs for healthcare providers, TFC provides factoring services to all types of manufacturing, transportation,



communications, finance, insurance, and wholesale and distribution companies.

Factoring enables companies that are not highly capitalized to regain control over their cash flow. Many firms — especially cash-sensitive small and mid-sized companies — can no longer afford to wait the full 60, 90, 120 days or longer that customers now routinely delay payment of invoices. By factoring their receivables, these companies benefit from affordable financing to meet the continuing overhead expenses of payroll, rent, inventory, taxes and other regular business costs. Towers' factoring systems are specifically designed for small and mid-sized companies, those most often neglected by the banking community.

The best measure of our success can be found in our growth. Over the last 18 years, we have clearly demonstrated that by enhancing our services and improving our operational efficiencies for our customers, we will have fulfilled our financial responsibilities to our shareholders, and will continue to do so.

**TFC'S STRENGTH AT WORK FOR ITS CLIENTS**

- Towers is an approved government contractor on the federal, state and municipal levels.
- Towers can manage and service the total accounts receivable needs of its clients, as it is doing for business and medical organizations now.
- Towers' multi-million-dollar investment in its internal capabilities has provided a capacity to service more than 50 million accounts annually.
- Towers serves 23,000 clients in industry, health care, banking, education and government.
- Towers maintains a large legal department, staffed with thoroughly knowledgeable, full-time, in-house collection lawyers, paralegals and collectors.
- Towers maintains one of the largest accounts receivable collection service centers in the country, with 700 people in the headquarters site alone.
- Towers offers the lowest fixed-cost, contingency-based, immediate-results, letter writing program available.
- Towers also offers contingent based intensive collection programs, providing a full range of appropriate recovery procedure
- Towers' programs are the most comprehensive, yet flexible, programs available.

- Towers is one of the few publicly owned accounts receivable collec-.on institutions. We have more than 2,000 employees and indepen-dent contractors nationwide.
- Towers charges no up-front or advance costs for any of our programs. Towers is paid only when recoveries are made.
- Towers is almost alone in its under-standing of how to lend its clients money against accounts receivable, ·urchase accounts receivable outright.
- Towers is a recognized leader in the accounts receivable collection industry, with nationwide presence and capabilities.
- Towers has accounts receivable of more than $1.45 billion under con-tract annually, and is projecting to raise the level of serviced accounts receivable in 1993 up to $2 billion annually. This continued growth will place Towers into the leading position of managing accounts receivable for corporate industry and health care in America.

In today's business climate, lending institu-tions often require more security and assurance than in the past. For example, a trucking company's assets — its fleet and service contracts — might not satisfy a credit source. Similarly, a shopping cen-ter seeking a line of credit might find its land asset and store leases insufficient collateral. In 1992, TFC is initiating a new service which guarantees our clients' credit obligations.

As a co-signer on notes of obligation, TFC is helping customers to:

- Lease equipment;
- Obtain mortgage financing;
- Purchase needed supplies;
- Enter into leases for real estate;
- Secure private loans or bank loans;
- Acquire existing businesses for growth or diversification;
- Secure partnership notes;
- Renovate existing space or build new space to suit their needs; and
- Settle litigation.

## OF ACCOUNTS RECEIVABLE AND COMPUTERIZED ACCOUNTS RECEIVABLE BUSINESS OFFICE MANAGEMENT SYSTEMS

In 1986, TFC recognized a looming crisis in the healthcare industry. Hospitals, clinics, nursing homes, professional groups and other healthcare providers were facing significant cash-flow problems caused by slow-paying health insur-ers and other third-party payers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans.

TFC's Healthcare Accounts Receivable Factoring Program, the first nationwide program of its kind, was introduced to address this industry crisis. Since its inception, the program has received wide praise from healthcare administra-tors seeking a more professional and effective means of generating and managing their vital cash-flow requirements. It also has been praised by community leaders who are grateful for the opportunity the program affords to restore econom-ic stability to these important healthcare providers.

## AN INDUSTRY IN NEED OF HELP — NOW

It's certainly not news that most hospitals don't earn enough on patient care to cover costs. Historically, they rely on government programs and private philanthropy to stay in the black. But in recent years, this precarious mode of existence has been increasingly difficult to maintain.

The growing rate of hospital closings dramatized the fact that more than half of all community healthcare facilities are losing money on patient care.

Under the federal government's Diagnosis-Related Groups (DRG) program, America's healthcare facilities are caught in an economic squeeze. They must address inflation in an environment of stringent cost controls. They must wait for payment from third-party payers who have strict claims review requirements. And they must bear an increasing burden of the shortfalls from Medicaid and Medicare reimbursements.

## AN INNOVATIVE FUNDING SOLUTION

Borrowing has become a major source of funding for healthcare institutions. But borrowing at a reasonable cost can be difficult for hospitals now, in light of lending cutbacks and the S&L crisis, and compounded by a general credit crunch.

Complicating the picture further are cutbacks in corporate contributions, the current recession, and changes in the 1986 tax law which discourage private charitable donations.

Furthermore, hospitals face growing scrutiny by their lending sources.

**TFC has been making financial history with the first successful issuance of double-A-rated asset-backed securities secured by third-party healthcare accounts receivable. Similar to offerings by major banks of securities backed by credit card receivables, these offerings tap the nation's enormous financial markets in support of TFC's unique Healthcare Funding Program.**

**These securities "pass through" income from accounts receivable purchased by TFC from hospitals, nursing homes and other healthcare providers nationwide to outside investors who receive a fixed rate of interest. In effect, they are a vehicle to obtain long-term financing for accounts receivable which are short-term obligations.**

**A series of rated and non-rated issues of medium-term notes and long-term bonds totaling more than $500 million has already been successfully placed.**

Many healthcare institutions are not profit-oriented; in fact, they need to operate at a loss or near-loss to qualify for public funding. A significant number of institutions have seen their credit ratings downgraded and access to credit curtailed.

In response to this growing cash-flow crunch, TFC created a unique accounts receivable factoring solution especially designed for healthcare providers. It assists them in bridging delays brought on by slow-paying insurers and government agencies, and in collecting a greater portion of the funds to which they are entitled.

And by developing systems with small and medium-sized healthcare institutions in mind, TFC can provide a level of service and commitment unmatched by traditional capital sources.

## PREDICTABLE CASH FLOW

The Healthcare Accounts Receivable Factoring Program provides medical accounts receivable factoring to hospitals, clinics, nursing homes, professional groups and other healthcare providers, together with TFC's specialized expertise and proprietary computerized business office medical accounts receivable systems to speed the full recovery of third-party reimbursable accounts and self-pay accounts receivable.

Qualified institutions receive same-day factoring of submitted accounts from third-party reimbursers such as Medicare, Medicaid, commercial insurers, Blue Cross/Blue Shield and corporate or union health plans.

and accounts receivable filing and reimbursement. As a result of these efforts and our familiarity with healthcare payment procedures, we are often able to reduce the payment cycle substantially, and to raise reimbursement levels to what these providers are entitled to.

## RESTORING FINANCIAL ABILITY

In addition to these direct benefits of the Healthcare Accounts Receivable Factoring Program, customers gain access to TFC's financial and management expertise. Our staff is fully knowledgeable in a broad range of business office management issues facing healthcare professionals today, such as financial organization and controls, the underwriting of bonds and debentures, the sale or restructuring of ownership, credit enhancements, governmental and legislative issues, group insurance and benefits programs, and legal guidance on matters relating to healthcare and collection rights.

As a result of this program, this vitally important $900-billion industry now has access to a form of asset-based accounts receivable factoring which has been available to commercial corporations for more than three decades. At TFC, we view it as a prime example of our opportunistic business philosophy — taking advantage of our strengths to capitalize on market needs.

THE CRISIS IN U.S. HEALTHCARE FINANCING

NUMBER OF CLOSINGS
HOSPITAL CLOSINGS
Source: American Hospital Association

YEAR END PERCENT
NEW PATIENT REVENUE MARGINS
Source: AHA National Hospital Panel Survey

PERCENTAGE OF GNP
NATIONAL HEALTH CARE COSTS
Source: U.S. Department of Commerce





...hoestring economics is nothing ...ew to most of the nation's health-care providers. But over the past decade, the precarious existence that most hospitals lead has only gotten worse, and it's become hard-er for many to stay afloat to serve their communities.

The growing rate of hospital closings has dramatized the fact that more ... half of all community health-... facilities — large and small, urban and rural, investor-owned and not-for-profit — can't survive on patient-generated revenue, and ... in danger of closing their doors.

...om the provider's viewpoint, a ...jor cause of this worsening ...sh squeeze was the federal gov-ernment's introduction, in 1983, of Diagnosis-Related Groups. This system applied stringent cost controls on top of payment meth-ods based on what the government ...ated hospitals were supposed ...pend, rather than on what their actual costs are.

But these federal directives didn't anticipate the high price of new life-saving technology, today's nursing shortage, more service use because of an aging population and AIDS, or the skyrocketing costs of charity care. When hospi-tals were paid retrospectively on the basis of costs or charges, billings could be raised each year to recoup the losses of the previ-ous year, and to ease cash-flow demands. But that financial flexi-bility no longer exists, and health-care providers of all types are feel-ing the squeeze.

Under the DRG formula and subse-quent legislation, the nation's healthcare facilities are caught in an economic dilemma. They must address inflation in the cost of goods and services in an era of stringent controls. They must wait longer for repayment from third-party providers. And they must bear a larger burden from Medicare and Medicaid reim-bursement shortfalls. Borrowing has become the principal source of funds for healthcare institutions. But borrowing has become harder, with shrinking margins causing closer scrutiny by financial institutions.

Meanwhile, 48% of hospital execu-tives surveyed in a Touche-Ross study believe their own hospitals to be at risk of failure within the next several years. And the National Committee for Quality Health Care, a blue-ribbon panel of leading industry executives, warned that "Our nation's health-care system is approaching critical condition," and that unless current trends are changed, the entire sys-tem's solvency will be jeopardized.

These are cold facts. They are also the catalysts that have led to the development of TFC's accounts receivable factoring and collection programs — an opportunity for healthcare providers to work toward restoring their institutions' financial stability.

# ACQUIRING RTC/FDIC AND BANKING INDUSTRY ACCOUNTS RECEIVABLE LOAN PORTFOLIOS

A major part of TFC's business has been as a factoring resource for banks and other financial institu-tions seeking to dispose of non-performing loans. By purchasing these debts, TFC has enabled these solvent banks to keep their portfolio credit risk within reason-able limits.

A growing part of this business seg-ment is the purchase of accounts receivable asset packages from the Federal Deposit Insurance Corporation (FDIC), the Resolution Trust Corporation (RTC) and other institutions. These portfolios include loans from banks and thrift institutions nationwide that have failed and been placed in receivership by these federal agencies.

## THE DREAM — KEPT ALIVE

America's current financial crisis is generally considered the most seri-ous since the Great Depression, when thousands of Americans lost their life's savings. Many have called it the worst financial crisis this nation has ever faced. It may well be, in terms of dollars spent, its impact on the federal budget deficit, and its far-reaching finan-cial and emotional impact on every citizen in this country.

As the federal agencies responsible for fulfilling the promise of federal deposit insurance, the FDIC and RTC have assumed the assets and liabilities of failed banks and [illegible]troughout the United [illegible]s. Between them, they have acquired hundreds of billions of dollars worth of diverse assets, including shopping centers, office buildings, junk bonds, single-family mortgages, consumer and commercial loans, and miscellaneous other holdings.

To maximize the return to taxpayers, the FDIC and RTC have chosen to sell many assets to third parties with specialized expertise who can [illegible]age them more efficiently and realize greater values. Accounts receivable are pooled into packages sharing common characteristics, such as similar geographic marketplaces and similar management and marketing needs, thereby making it easier for purchasers to manage them.

## PURCHASING FDIC AND RTC PORTFOLIOS

TFC continues to purchase very select packages of past-due accounts receivable loans. These packages generally consist of past-due and delinquent consumer, commercial, real estate and other accounts receivable loans which are available at a significant discount to their face value.

Then, for our own account, TFC applies the same sophisticated collections capabilities and methodology developed for our corporate and healthcare customers.

By realizing greater values for these assets than could be accomplished by government agencies acting on their own, TFC is able to substantially increase the return to our shareholders.

# OTHER SERVICES

We also offer a wide range of high-quality asset-based financing, reinsurance, and related financial services to our customers.

## CORPORATE CREDIT SERVICES

In tandem with our collection services, Towers Financial Corporation offers an exceptional program for the financing and outright factoring and purchasing of accounts receivable for corporate customers.

Through these funding programs, TFC purchases and factors accounts receivable at a discount of their face value. Our highly effective collections capability enables us to recove[r] these funds. Customers benefit fro[m] accelerated payment of accounts receivable and more predictable cas[h] flow, while TFC is able to reinve[st] portfolio at an extremely favorable rate of return.

## GROWING MARKET DEMAND

National economic and business trends — including nationwide and regional recessions, the credit crunch, the tightening of bank borrowing restrictions and stricter credi[t] terms being offered by many compa[n]ies — point to continuing growth in this sector of the business.

Despite the rapid success achieved to date, TFC has just begun to tap the enormous potential of these funding services. We believe our innovative, industry-based approach — exemplified by our highly acclaimed medical factoring program — will give us a competitive advantage as we move forward in this …ess. We are currently applying … r share of our new business development activities toward identifying and penetrating significant market opportunities in the financing and collection of accounts receivable.

## REINSURANCE

Management of TFC has identified the property and casualty insurance business as the next logical step in the company's growth and diversification. The first phase of imple… …ng this decision was undertaken in 1991 with the formation of Towers International Reinsurance Corporation as the first company of the Towers Insurance Group.

The Group provides coverages for primary-risk and reinsurance from domestic and offshore companies. Rather than dealing directly with the insured public and facing large, concentrated exposures, reinsurers share premiums and losses with the primary insurers who originate the coverages. By entering the insurance industry as a reinsurer, Towers is able to join with the world's most prominent insurance entities on a quota share basis. We share in their experience and financial depth through sharing or assumption arrangements.

The worldwide insurance industry is currently in the midst of deep-seated change and global restructuring. Profound changes in the world economy and sources of production, the evolution of the European common market, and the formation of cross-border insurance alliances in response to these trends create opportunities for new entrants with a basic approach to sound underwriting.

Management of TFC intends to expand operations geographically and in selected business niches to establish Towers Insurance Group in major European business centers and other world markets. With a global presence and TFC's proven ability to respond to changing market conditions, we anticipate these operations will grow to become an important source of revenues and earnings for TFC.

# CONSOLIDATED BALANCE SHEET: ASSETS

| | As of June 30, 1992 | 1991 | 1990 |
|---|---|---|---|
| Accounts Receivable (Note 3) | $624,747,547 | $437,416,432 | $177,155,446 |
| Investments (Note 4) | - | 2,805,500 | 2,805,500 |
| Cash and Cash Equivalents | 32,487,055 | 63,473,291 | 9,193,566 |
| Other Receivables | 1,858,909 | 1,173,831 | 1,061,555 |
| Note Receivable-Officer (Note 1) | 448,900 | — | — |
| Property and Equipment—Net (Note 1) | 17,215,214 | 3,258,278 | 3,574,494 |
| Security Deposits | 474,776 | 569,846 | 515,812 |
| Prepaid Interest and Expenses | 5,267,634 | 4,499,700 | 797,563 |
| Excess of Cost Over Fair Value of Assets Acquired From Majority Shareholder (Notes 1, 2 and 11) | 1,941,608 | 425,911 | 458,414 |
| Total Assets | $684,441,643 | $513,622,789 | $195,562,350 |

The accompanying notes are an integral part of the financial statements.

## BALANCE SHEET: LIABILITIES AND [S]HAREHOLDERS' EQUITY

| | As of June 30, 1992 | 1991 | 1990 |
|---|---|---|---|
| Due to Clients | $240,953,678 | $191,188,759 | $64,880,237 |
| Notes Payable (Note 5) | 394,214,500 | 286,595,677 | 92,178,894 |
| Loans Payable (Notes 6 and 7) | 2,959,048 | 2,888,966 | 3,328,133 |
| Accounts Payable and Accrued Expenses | 8,070,812 | 6,461,689 | 7,185,666 |
| Deferred Income | 7,245,103 | 4,442,011 | — |
| …e Taxes Payable (Note 8) | — | 1,967,510 | 13,725,633 |
| …erred Income Taxes Payable (Note 8) | 5,517,500 | — | 841,850 |
| Total Liabilities | 658,960,641 | 493,544,612 | 182,140,413 |
| …ockholders' Equity: | | | |
| Common Stock $.001 Par Value 100,000,000 Shares Authorized Shares Issued and Outstanding 5,000,000 in 1992, 5,000,000 in 1991 and 4,600,000 in 1990 | 5,000 | 5,000 | 4,600 |
| A…ditional Paid In Capital | 2,845,000 | 2,845,000 | 445,400 |
| …tained Earnings | 22,631,002 | 17,228,177 | 12,971,937 |
| Total Stockholders' Equity | 25,481,002 | 20,078,177 | 13,421,937 |
| Total Liabilities and Stockholders' Equity | $684,441,643 | $513,622,789 | $195,562,350 |

…e accompanying notes are an integral part of the financial statements.

## CONSOLIDATED STATEMENT OF INCOME

| | Fiscal Year Ended June 30, 1992 | 1991 | 1990 |
|---|---|---|---|
| Gross Revenues | $114,732,616 | $97,449,134 | $74,442,718 |
| Operating Expenses | | | |
| Interest on Notes | 42,386,886 | 27,381,087 | 10,456,292 |
| Salaries and Benefits | 23,485,682 | 22,386,024 | 14,012,973 |
| Selling | 10,626,404 | 11,180,184 | 7,558,382 |
| General and Administrative | 30,411,451 | 31,159,399 | 32,212,322 |
| | 106,910,423 | 92,106,694 | 64,239,969 |
| Income Before Provision for Income Taxes, Extraordinary Item and Cumulative Effect of a Change in Accounting Principle | 7,822,193 | 5,342,440 | 10,202,74[illegible] |
| Provision for Income Taxes (Note 8) | 2,635,775 | 1,086,200 | 6,300,000 |
| Income Before Extraordinary Item and Cumulative Effect of a Change in Accounting Principle | 5,186,418 | 4,256,240 | 3,902,749 |
| Extraordinary Item (Net of Income Taxes) (Note 4) | (3,780,000) | — | — |
| Cumulative Effect on Prior Years of Changing to Capitalization of Software Costs (Net of Income Taxes) (Note 1) | 3,996,407 | — | — |
| Net Income | $5,402,825 | $4,256,240 | $3,902,749 |
| Earnings Per Share (Note 9) | $1.08 | $0.91 | $0.86 |

The accompanying notes are an integral part of the financial statements.

# CONSOLIDATED STATEMENT OF RETAINED EARNINGS

| | As of June 30, 1992 | 1991 | 1990 |
|---|---|---|---|
| Balance-Beginning of Year | $17,228,177 | $12,971,937 | $9,069,188 |
| Net Income | 5,402,825 | 4,256,240 | 3,902,749 |
| Balance-End of Year | $22,631,002 | $17,228,177 | $12,971,937 |

The accompanying notes are an integral part of the financial statements.

# STATEMENT OF CASH FLOWS

| | Year Ended June 30, 1992 | 1991 | 1990 |
|---|---|---|---|
| Net Earnings: | $5,402,825 | $4,256,240 | $3,902,749 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided By Operating Activities: | | | |
| Depreciation and Amortization | 3,571,075 | 1,401,655 | 412,556 |
| Accounts Payable, Accrued Expenses and Other | (4,516,557) | (1,620,933) | 5,303,359 |
| Deferred Income Taxes and Taxes Payable | 3,549,990 | (12,599,973) | 22,119 |
| Deferred Income | 2,803,092 | 4,442,011 | |
| Prepaid Interest and Expenses | (767,934) | (3,702,137) | 6,299,582 |
| Payables Due to Clients | 49,764,919 | 126,308,522 | 12,378,326 |
| Net Cash Provided By Operating Activities | 59,807,410 | 118,485,385 | 28,318,691 |
| Finance Receivables Acquired | (703,364,136) | (415,429,644) | (151,436,279) |
| Finance Receivables Principal Collected | 516,033,021 | 155,168,658 | 86,612,725 |
| Purchase Property and Equipment | (13,956,936) | (322,290) | (2,888,887) |
| Proceeds From Disposition/Acquisition of Fixed Assets and Investments | – | – | 570,741 |
| Installment Payment for Acquisition of Stock in Subsidiaries | – | – | (823,885) |
| Other | 2,875,582 | (439,167) | (1,160,227) |
| Net Cash (Used) in Investing Activities | (198,412,469) | (261,022,443) | (69,125,812) |

The accompanying notes are an integral part of the financial statements.

| | YEAR ENDED JUNE 30 | | |
|---|---|---|---|
| | 1992 | 1991 | 1990 |
| Proceeds From Notes Payable | 107,618,823 | 194,416,783 | 45,824,922 |
| Proceeds From Collection of Note Receivable - Officer | | | 250,000 |
| Proceeds From Stock Subscription | — | 2,400,000 | 100,000 |
| Net Cash Provided By Financing Activities | 107,618,823 | 196,816,783 | 46,174,922 |
| Net Increase (Decrease) in Cash and Cash Equivalents | (30,986,236) | 54,279,725 | 5,367,801 |
| Cash and Cash Equivalents - Beginning of Fiscal Year | 63,473,921 | 9,193,566 | 3,825,765 |
| Cash and Cash Equivalents - End of Fiscal Year | $32,487,055 | $63,473,291 | $9,193,566 |

The accompanying notes are an integral part of the financial statements.

# FINANCIAL STATEMENTS

Towers Financial Corporation is the successor to the initial business of Transcon Adjustment Group, Ltd., incorporated in 1975. Senior management has been in control of the Company since that date.

The Company is a diversified financial services company operating in the acquisition and management of accounts receivable directly and through its wholly owned subsidiaries, Towers Credit Corporation, Towers Collection Service, Inc., Towers Leasing Corporation, TFC Funding Corporation, Towers Healthcare Receivables Funding Corporation, Towers Healthcare Receivables Funding Corporation II, Towers Healthcare Receivables Funding Corporation III, Towers Healthcare Receivables Funding Corporation IV and Towers Healthcare Receivables Funding Corporation V.

The Company operates in the insurance industry through Towers International Reinsurance Corporation.

Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation were acquired by Towers Financial Corporation in July 1986. The financial Statements for each subsidiary were independently audited and have been consolidated for presentation herein. Each of the consolidated subsidiaries is wholly owned by Towers Financial Corporation. The subsidiaries were incorporated as follows:

Towers Collection Service, Inc. (April 1980)
Towers Credit Corporation (October 1982)
Towers Leasing Corporation (March 1985)
TFC Funding Corporation (November 1989)
Towers Healthcare Receivables Funding Corporation (March 1990)
Towers Healthcare Receivables Funding Corporation II (November 1990)
Towers Healthcare Receivables Funding Corporation III (May 1991)
Towers Healthcare Receivables Funding Corporation IV (December 1991)
Towers Healthcare Receivables Funding Corporation V (May 1992)
Towers International Reinsurance Corporation (April 1991)

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries after elimination of material intercompany accounts and transactions.

The financial statements of Towers Healthcare Receivables Funding Corporation, Towers Healthcare Receivables Funding Corporation II, Towers Healthcare Receivables Funding Corporation III, Towers Healthcare Receivables Funding Corporation IV and Towers Healthcare Receivables Funding Corporation V were independently audited by the accounting firm of Richard A. Eisner & Co. The audited financial statements of each of these wholly owned subsidiaries are annexed to the Company's audited consolidated financial statements.

The financial statements of Towers International Reinsurance Corporation were independently audited by the accounting firm of Price, Waterhouse & Co. The audited financial statements of this wholly owned subsidiary are annexed to the Company's audited consolidated financial statements.

In 1987, the Company adopted Statement of Financial Accounting Standard No. 95, "Statement of Cash

Flows", and is presenting a statement of cash flows using the indirect method in accordance with AICPA Audit Guide - Audits of Financial Companies, in place of the statement of changes in financial position.

[F]AS 95 requires that the following supplemental disclosures to the statement of cash flows be provided in related disclosures. Cash paid for interest was $41,687,422 in 1992, $29,079,335 in 1991 and $12,320,486 in 1990. Cash paid for income taxes [illegible]683,379 in 1992, $13,761,250 in 1991 and [illegible] 1990.

[T]he Company's factoring businesses consist of purchasing healthcare accounts receivable from health care providers which are either payable by third parties, such as commercial insurance carriers, Blue Cross/Blue Shield organizations, the federal Medicare program, state Medicaid programs, health maintenance organizations (HMOs), workmen's compensation carriers, union health insurance plans or self-insured corporate payors, or are payable by the patient itself, and commercial accounts receivable purchased from businesses which extend credit to other businesses or consumers. The company recognizes certain fees generated by its factoring businesses on the purchase of the receivable. See the accompanying financial statements of the Company's five wholly owned, special purpose subsidiaries.

[T]he Company's accounts receivable management and collection business receives total control of assigned [ac]counts. Based upon an extensive analysis and due [dilige]nce examination of accounts offered to the [Com]pany, which takes place prior to the acceptance of irrevocably assigned accounts, the Company determines to accept only those accounts which the Company believes to be collectible. The company then records its fee upon acceptance of the irrevocably assigned account. The Company's fee is determined based upon the Company's contractual rights and its historical experiences.

Income on portfolios purchased from the Federal Deposit Insurance Corporation and the Resolution Trust Corporation (or from third parties who originally purchased such portfolios from either the FDIC or the RTC) is recognized on collection.

The note receivable from an officer consists of a demand bridge loan to the Company's Chief Legal Officer bearing interest at 6% per annum and collateralized by a second mortgage on his home.

Property and equipment are stated at cost and are depreciated using the straight-line method over the estimated useful lives of assets, ranging from three to five years.

Leasehold improvements are amortized over the terms of the lease or the estimated life of the improvement, whichever is shorter. Maintenance and minor repairs are charged to operations as incurred.

The Company intends to amortize goodwill over 40 years in accordance with APB 16.

The Company treats all assets that qualify as cash equivalents under FAS Statement 95 as cash equivalents.

The Company has leases with GE Capital Corporation (RCA Services Company) for telephone equipment. The leases provide for monthly payments of $13,522 for 10 years, ending in fiscal year 1998.

The Company has a lease with BLT Leasing Company for computer equipment. The lease provides for monthly payments of $4,002 for five years, ending in fiscal year 1993.

The Company has a lease with Atlantic Computer Corporation for computer equipment. The lease provides for monthly payments of $13,244 for seven years, ending in fiscal year 1997.

The Company has leases with First Funding, Inc. for computer and telephone equipment. The leases provide for monthly payments totaling $5,031 for five years, ending in fiscal year 1997.

In the course of developing and implementing its healthcare finance and accounts receivable management and collection businesses, the Company designed and created numerous unique and proprietary software programs, including systems for automating the billing of healthcare claims and the Accelerated Claims Recovery Systems" (ACRS"). For all fiscal years ending on June 30, 1991 or before, the Company had expensed the costs associated with the development of the programs as such costs were incurred. The implementation of these programs will have a impact on future revenue.

Accordingly, for the fiscal year ended June 30, 1992, the Company adopted a policy of capitalizing certain software development costs. Management believes that this policy better matches revenues and expenses. The effect of the change increased income in 1992 before extraordinary item by approximately $4,679,000 (or $.94 per share). The pro forma effect of this change for 1991 and 1990 is as follows:

| | JUNE 30, 1991 | JUNE 30, 1990 |
|---|---|---|
| Net Earnings as shown | $4,256,240 | $3,902,749 |
| Effect of Change | 2,183,520 | 908,909 |
| Net Earnings After Change | $6,439,760 | $4,811,658 |
| Net Earnings per share as shown | $0.91 | $0.86 |
| Effect of Change per share | 0.46 | 0.20 |
| Net Earnings per Share After Change | $1.37 | $1.06 |

The Company acquired 80% of the common stock of Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation from Professional Business Brokers, Inc. July 1986. (See Note 11.)

In fiscal year 1987, the Company acquired the remaining 20% of the common stock of these corporations from Professional Business Brokers, Inc. Professional Business Brokers, Inc. waived the difference between the amount paid and the amount owed with respect to the fiscal year ended June 30, 1988 and has agreed to defer the payment of such difference with respect to the fiscal years ended June 30, 1991, 1990 and 1989. The Company is presently revising the terms of its agreement with Professional Business Brokers, Inc. The final cost is presently being negotiated. These negotiations will be concluded shortly.

Accounts receivable consist of several categories, including: Healthcare, Commercial and FDIC.

Healthcare Accounts are accounts generated by hospitals, nursing homes, clinics and other healthcare providers which are payable by third party payors, such as commercial insurers, Blue Cross/Blue Shield organizations, the federal Medicare program, state Medicaid programs, health maintenance organizations (HMOs), CHAMPUS/CHAMPVA, large self-insured plans or are self-pay. The Company purchases these receivables. For purposes of its financial statements, the Company recognizes the purchased receivable as an asset at the time it acquires the purchased receivable, and records as a liability the balance to be paid to the seller upon collection. The terms and conditions pursuant to which the Company's five wholly owned special purpose corporate subsidiaries engage in this business segment differ, in certain regards, from those applicable to the Company; see the financial statements of these five subsidiaries which are appended to and made a part of these financial statements.

Commercial accounts are accounts which are purchased by the Company in its commercial factoring business, accounts which are assigned and totally controlled by the Company in its collection business and portfolios acquired either directly from either the Federal Deposit Insurance Corporation (FDIC) or the Resolution Trust Corporation (RTC) in their capacities as receiver or liquidator of failed savings and loan associations and banks, or from third parties who had purchased such portfolios from either the FDIC or the RTC.

In its commercial accounts receivable business, the Company either purchases accounts receivable from commercial entities in a variety of industries, including manufacturing, service, wholesale and transportation businesses, or it receives total control over receivables by an irrevocable assignment of accounts receivable from its customer. The Company records accounts as an asset when it acquires full control of the receivable, and records as a liability any balance due to the seller upon collection.

Where the Company received an irrevocable assignment of accounts receivable from its customer, the Company obtained complete control of the account. Before accepting such an assignment, the Company performed an extensive analysis and due diligence examination of the offered receivables. Only after the Company had satisfied itself that the offered receivables were collectible would the Company accept them. In addition to this analysis and due diligence examination in prior years (but not in fiscal year ending June 30, 1992), the Company had determined, based upon historical experiences, to record as an asset only 30% of the value of receivables assigned to it and accepted. The Company recorded as a liability the amounts which would be due to the transferors of the receivables. Although the Company received total control over the entire receivable, the Company did not record as an asset the remaining 70% of the value of assigned receivables. For example, for each $100 of accounts which were assigned to the Company for collection and control was vested in the Company, the Company would record as an asset $30. The remaining $70 was treated as a reserve for doubtful accounts. The Company's collection efforts were focused on both the $30 recorded as an asset and the $70 reserved for doubtful accounts in order to collect both categories.

In fiscal year ending June 30, 1992 the Company recorded as an asset only that portion of the assigned accounts which represented the amount of its estimated fee income from the controlled collection accounts receivable portfolio. In prior years the Company recorded the total receivable estimated to be collected and a liability for the difference between the total receivable and the fee. If 1991 and 1990 were presented in the same format with the method used in 1992 the Accounts Receivable would have been $384,610,473 in 1991 and $112,275,209 in 1990 and Due to Clients would have been $138,382,800 in 1991 and zero in 1990. All other purchased accounts receivable are included in these amounts.

In many instances, certain accounts which are initially assigned to the doubtful accounts reserve are subsequently determined to be collectible. In such event, the Company adjusts its initial determination and includes such accounts as assets.

FDIC and RTC portfolios consist of groups of charged-off and/or delinquent loans generated by failed banks and savings and loan associations. The Company also acquires certain portfolios from non-failed banks. Due to the fact that this category represents a relatively new industry, and the fact that the Company accordingly has not developed the same historical experiences in this category as it has in its other businesses, the Company records these portfolios as an asset at their cost. Cost includes the amounts paid to the seller of the portfolios as well as the Company's due diligence examination costs and allocated overhead expenses.

The Company acquired an 82% interest in United Diversified Corporation ("UDC"), an insurance holding company, in 1987. Within six months of the acquisition, UDC was placed into receivership by the Illinois Insurance Director, and the Company thereupon ceased to have access to information concerning the financial condition of UDC. In 1992 the Company settled certain litigation arising out of this acquisition. As part of such settlement, the Illinois Insurance Director was given control of UDC. As a result of this decision, the Company incurred an extraordinary loss of $3,780,000, net of income tax benefit of $2,520,000 (or $.76 loss per share).

The Company's businesses require substantial capital. The amount of capital required is dependent on the volume of business the Company generates. The Company has funded capital requirements primarily through the sale of notes and bonds in the capital markets.

Notes Payable consists of the following:

| | |
|---|---|
| Healthcare Notes | $195,821,463 |
| Other Notes | 198,393,037 |
| | $394,214,500 |

The Healthcare Notes consist of notes issued under five different indentures. They bear interest at fixed rates ranging from 7.8% to 10.2%. The notes mature on various dates between November 15, 1993 and May 15, 1997. Amortization begins on various dates between March 15, 1993 and November 15, 1996. Amortization is determined by collection of Healthcare Receivables over a nine month period. The notes are collateralized by the assets of the respective subsidiaries which issued them. Such assets which consist principally of Healthcare Receivables, aggregate approximately $334,551,000. The other notes are secured by the assets of the Company, bear interest in a range from 12 to 14% and mature at various dates through June 30, 1994. These notes are collateralized by the total assets of the Company.

The Company's long-term debt includes a bank loan with a remaining principal balance of $1,162,911 of which $951,193 is categorized as long-term. The loan is secured by equipment, bears interest at 11.25% per annum and matures in October 1996. The remaining long-term debt consists of the long-term portion of the Company's capital lease obligations to GE Capital Corporation (RCA Services Company), Atlantic Computer Corporation and First Funding, Inc., which long-term portion aggregated $1,209,728 (See Notes 1 and 7).

[illegible] Company leases all office space utilized by the Company and substantial portions of its equipment. The Company's corporate headquarters in New York City occupy approximately 120,000 gross square feet for which the company pays $3,329,290 annually (subject to adjustment for increases or decreases in the landlord's taxes and costs of providing certain building services) pursuant to subleases which expire in 1996. The Company's regional sales offices are all leased for one or two years or are rented on a month-to-month tenancy with annual rental payments aggregating $281,462.

The following is an analysis of the Company's capital leases:

| | Balance As of June 30, | | |
|---|---|---|---|
| | 1992 | 1991 | 1990 |
| Equipment | $1,546,444 | $1,327,989 | $1,327,989 |
| Less: | | | |
| Accumulated Depreciation | 626,813 | 474,804 | 307,225 |
| | $919,631 | $853,185 | $1,020,764 |

The following is a schedule by years of future lease payments under capital leases:

| Year Ending June 30 | |
|---|---|
| 1993 | $389,584 |
| 1994 | 381,577 |
| 1995 | 381,577 |
| 1996 | 381,577 |
| 1997 | 326,380 |
| Total Payments | $1,860,695 |

Statement of Financial Accounting Standards No. 96, "Accounting for Income Taxes", was issued in December 1987 and is presently being revised. It establishes financial accounting and reporting standards for the effects of income taxes which result from an enterprise's activities during the current and preceding years. When adopted, the Company had the choice of reflecting the effect of the change in the year of adoption or of restating any number of years.

Accordingly, the Company elected to adopt Statement of Financial Accounting Standards No. 96 for the year ending June 30, 1990. Since the Company had not previously recognized any deferred tax assets, the financial statements were not affected.

Deferred income tax in a prior year resulted from the previous use of the cash method of accounting for tax purposes, and decreased pursuant to the phase-in permitted by the Tax Reform Act of 1986. Deferred income tax in the current year represents income taxes at enacted statutory rates on temporary differences which primarily result from software development costs expensed for tax and capitalized for book purposes.

Towers Financial Corporation's income tax rate for 1992, 1991 and 1990 (computed by applying the U.S. federal income tax rate of 34% to income before



income taxes) differs from the actual effective income tax rate as a result of the following:

| | 1992 | 1991 | 1990 |
|---|---|---|---|
| Tax at Statutory Rate | 34.000% | 34.000% | 34.000% |
| Plus: State and Local Taxes, Net of Federal Benefit | 4.500 | 6.671 | 4.512 |
| Plus: Benefits of Adjustments of State and Local Tax | (5.711) | — | — |
| Plus: Nondeductible Penalties | — | (21.150) | 23.540 |
| | 37.789% | 19.521% | 62.052% |

The earnings per share are based on a weighted average common shares outstanding of 5,000,000 in 1992, 4,695,342 in 1991 and 4,529,315 in 1990.

| | 1992 | 1991 | 1990 |
|---|---|---|---|
| Income Before Extraordinary Item and Cumulative Effect of a Change of Accounting Principle and Provision For Income Taxes | $1.04 | $0.91 | $0.86 |
| Extraordinary Item (Net of Income Taxes) | (0.76) | — | — |
| Cumulative Effect of Prior Years of Changing to Capitalization of Software Costs (Net of Income Taxes) | 0.80 | — | — |
| Net Income | $1.08 | $0.91 | $0.86 |

See Note 2 relating to the acquisition of Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation.

Professional Business Broker, Inc. (PBB) presently owns in excess of 60% of the Company's outstanding common stock. PBB is owned by the Hoffenberg Family Trust, a revocable trust established by Steven Hoffenberg, the Company's Chairman of the Board and Chief Executive Officer. Due to the nature of the trust instrument creating the Hoffenberg Family Trust, Mr. Hoffenberg may be considered the beneficial owner of PBB, and hence the beneficial owner of PBB's interest in the Company. See Note 2 for details of the Company's transaction with PBB.

In addition, Mr. Hoffenberg and Mr. Brater have acquired equity interests in certain companies. In all cases, opportunities pursued by such other companies are first presented to the Board of the Company for consideration, and are only pursued by such other companies after the Company's Board of Directors has determined not to pursue them.

Towers Healthcare Receivables Funding Corporation V raised $4,950,000 by the issuance of additional "AA" rated bonds on July 31, 1992.

The Company is not currently involved in any litigation of a material nature.

# INDEPENDENT AUDITOR'S REPORT

We have audited the accompanying consolidated balance sheets of Towers Financial Corporation and subsidiaries as of June 30, 1992, 1991 and 1990 and the related consolidated statements of income, retained earnings and cash flows for the years then ended. The financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We did not audit the financial statements of Towers Healthcare Receivables Funding Corporation, Towers Healthcare Receivables Funding Corporation II, Towers Healthcare Receivables Funding Corporation III, Towers Healthcare Receivables Funding Corporation IV, Towers Healthcare Receivables Funding Corporation V and Towers International Reinsurance Corporation, wholly owned subsidiaries, which statements reflect total assets as of June 30, 1992 and total revenues for the year then ended as follows:

| | | |
|---|---|---|
| THRFC | 90,454,000 | 5,283,000 |
| THRFC II | 67,922,000 | 6,379,000 |
| THRFC III | 76,022,000 | 12,156,000 |
| THRFC IV | 71,339,000 | 4,540,000 |
| THRFC V | 28,814,000 | 235,000 |
| TIRC | 20,272,786 | 25,947 |

Those statements were audited by other auditors whose reports have been furnished to us, and our opinion, insofar as it relates to the amounts included for those companies is based solely on the reports of the other auditors.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit and the reports of the other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audit and the reports of the other auditors, the financial statements referred to above present fairly, in all material respects, the financial position of Towers Financial Corporation as of June 30, 1992, 1991 and 1990, and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles.

As discussed in Note 1 to the financial statements, the Company capitalized software development costs that were expensed in prior years.

Marvin E. Basson, CPA, P.C.
New York, New York
November 24, 1992

Price Waterhouse Centre
Collymore Rock
P.O. Box 634C
St. Michael Barbados W.I.

Tel (809) 436 7000
Fax (809) 436 7057
Fax (809) 429 3747

*Price Waterhouse*

September 30, 1992

Auditors' Report

To the Shareholder of
Towers International Reinsurance Corporation

We have audited the balance sheet of Towers International Reinsurance Corporation as at June 30, 1992 and the statements of income and retained earnings and changes in financial position for the year then ended. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform an audit to obtain reasonable assurance that the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

In our opinion, these financial statements present fairly, in all material respects, the financial position of the company as at June 30, 1992 and the results of its operations and the changes in its financial position for the year then ended in accordance with generally accepted accounting principles.

Price Waterhouse

Chartered Accountants

REINSURANCE
CORPORATION
ALANCE SHEET

| (AMOUNTS EXPRESSED IN UNITED STATES DOLLARS) | JUNE 30 1992 | 1991 |
|---|---|---|
| Cash | $10,155,536 | $10,228,322 |
| Premiums receivable | 30,528 | |
| Interest receivable | 86,722 | 8,882 |
| Amount due from ultimate parent company (Note 3) | 10,000,000 | |
| | $20,272,786 | $10,237,204 |
| Accounts payable and accrued liabilities | $12,159 | $14,181 |
| Unearned premium reserve | 8,769 | |
| Amounts due to parent and affiliated companies (Note 4) | 154,276 | 224,988 |
| | 175,204 | 239,169 |
| Share capital (Note 5) | 20,000,000 | 125,000 |
| Subscription for shares to be issued | | 9,875,000 |
| Retained earnings (deficit) | 97,582 | (1,965) |
| | 20,097,582 | 9,998,035 |
| | $20,272,786 | $10,237,204 |

The accompanying notes are an integral part of the financial statements.

INTERNATIONAL
REINSURANCE
CORPORATION
STATEMENT OF INCOME
AND RETAINED EARNINGS

| (AMOUNTS EXPRESSED IN UNITED STATES DOLLARS) | YEAR ENDED JUNE 30 1992 | PERIOD ... INCORPORA... ON JUNE 5, ... TO JUN... |
|---|---|---|
| Underwriting income | | |
| Gross premiums written | $34,716 | $ |
| Unearned premiums | (8,769) | |
| Premiums earned | 25,947 | |
| Underwriting expenses | | |
| Commissions | 4,188 | |
| Net underwriting income | 21,759 | |
| Other income (expenses) | | |
| Interest income | 97,969 | 12,2 |
| General and administrative expenses | (20,181) | (14,18 |
| | 77,788 | (1,96 |
| Net income (loss) for the year | 99,547 | (1,96 |
| Deficit, beginning of year | (1,965) | |
| Retained earnings (deficit), end of year | $97,582 | $(1,96 |

The accompanying notes are an integral part of the financial stateme...

Case 3:96-cv-01023-L-JFS Document 350-1 Filed 06/23/00 PageID.2874 Page 204 of 344

TOWERS INTERNATIONAL
REINSURANCE
CORPORATION
# STATEMENT OF CHANGES IN FINANCIAL POSITION

| (AMOUNTS EXPRESSED IN UNITED STATES DOLLARS) | YEAR ENDED JUNE 30 1992 | PERIOD FROM INCORPORATION ON JUNE 5, 1991 TO JUNE 30 1991 |
|---|---|---|
| Cash provided by (used in) operating activities | | |
| Net income (loss) for the year | $99,547 | $(1,965) |
| Changes in non-cash assets and liabilities | | |
| Premiums receivable | (30,528) | – |
| Interest receivable | (77,840) | (8,882) |
| Amount due from ultimate payment company | (10,000,000) | – |
| Accounts payable and accrued liabilities | (2,022) | 14,181 |
| Unearned premium reserve | 8,769 | – |
| Amounts due to parent and affiliated companies | (70,712) | 224,988 |
| | (10,072,786) | 228,322 |
| Cash provided by financing activities | | |
| Proceeds from issue of shares | 10,000,000 | 10,000,000 |
| Cash (decrease) increase for the year | (72,786) | 10,228,322 |
| Cash, beginning of year | 10,228,322 | – |
| Cash, end of year | $10,155,536 | $10,228,322 |

The accompanying notes are an integral part of the financial statements.

TOWERS INTERNATIONAL
REINSURANCE
CORPORATION
# NOTES TO THE FINANCIAL STATEMENTS

(amounts expressed in United States dollars)

The company was incorporated under the laws of Barbados on June 5, 1991 and is licensed under the Exempt Insurance Act of 1983. It is a wholly owned subsidiary of Towers Group Inc., and its ultimate parent company is Towers Financial Corporation of New York, USA.

The principal activity of the company is the reinsurance of property and casualty, accident and health and group life risks.

Premiums are recognized on a pro-rata basis over the period coverage is effective. Unearned premiums are those portions of premiums written which relate to coverage provided subsequent to the balance sheet date.

Loss reserves, which include provision for outstanding losses and losses incurred but not reported, are estimated by management and may differ significantly from actual loss development. Adjustments to estimates are reflected in income for the year in which they are identified. Loss reserves have been estimated as nil at June 30, 1992.

Transactions in foreign currencies are translated into United States dollars at exchange rates ruling at the date of the transactions. Amounts receivable and payable in foreign currencies at the balance sheet date are translated into United States dollars at exchange rates prevailing at that date and the resulting gain or loss is included in income for the year.

This comprises a promissory note repayable on demand and bearing interest at the rate of 3% per annum. Interest income earned for the year on this note amounted to $84,657 (1991 – nil).

These amounts are unsecured, interest free and have no fixed repayment terms.

The company is authorised to issue an unlimited number of common shares without nominal or par value. At June 30, 1992 20,000,000 shares were issued and outstanding. During the year 125,000 shares originally held by Towers Financial Corporation were transferred to Towers Group Inc. In addition a further 19,875,000 shares were issued to Towers Group Inc.

The company is exempt from all withholding taxes on income, profits or capital gains in Barbados as a result of its licence under the Barbados Exempt Insurance Act of 1983. The exemptions have been guaranteed by the Government of Barbados for a period of fifteen years expiring on June 30, 2006.

Richard A. Eisner & Company
*Certified Public Accountants*

REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

Board of Directors
Towers Healthcare Receivables
Funding Corporation
New York, New York

We have audited the accompanying balance sheets of Towers Healthcare Receivables Funding Corporation as at June 30, 1992 and June 30, 1991, and the related statements of operations and deficit, and cash flows for the year ended June 30, 1992 and for the period from July 16, 1990 (inception) to June 30, 1991. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements enumerated above present fairly, in all material respects, the financial position of Towers Healthcare Receivables Funding Corporation at June 30, 1992 and June 30, 1991, and the results of its operations and its cash flows for the year ended June 30, 1992 and for the period from July 16, 1990 (inception) to June 30, 1991 in conformity with generally accepted accounting principles.

As discussed in notes to financial statements, the Company is a party to an indenture which imposes certain operating restrictions. See Notes B, C and D for further information with respect to such restrictions.

Richard A. Eisner & Company
CERTIFIED PUBLIC ACCOUNTANTS

New York, New York
October 23, 1992

HEALTHCARE
RECEIVABLES FUNDING
CORPORATION
BALANCE SHEETS

| | June 30 1992 | 19 |
|---|---|---|
| Purchased healthcare receivables (Notes C and D) | $85,868,000 | $81,481,0 |
| Cash and cash equivalents (Note D) | 3,737,000 | 6,905,0 |
| Due from affiliates (Note B) | 503,000 | 2,643,0 |
| Prepaid origination fees (Note B) | — | 889,0 |
| Deferred financing costs (Note A[4]) | 337,000 | 592,0 |
| Interest receivable | 9,000 | 17,0 |
| TOTAL | $90,454,000 | $92,527,0 |
| Bonds payable (Notes B and D) | $46,321,000 | $56,500,0 |
| Due to Parent (Notes B and D) | 41,671,000 | 32,841,0 |
| Due to affiliates | 738,000 | |
| Deferred income (Note A[2]) | 1,895,000 | 2,209,0 |
| Interest payable | 962,000 | 1,217,0 |
| Other liabilities | 88,000 | 50,0 |
| Total liabilities | 91,675,000 | 92,817,0 |
| Common stock, no par value; 200 shares authorized, issued and outstanding | 1,130,000 | 1,130,0 |
| (Deficit) | (2,351,000) | (1,420,0 |
| Total capital deficiency | (1,221,000) | (290,0 |
| TOTAL | $90,454,000 | $92,527,0 |

The accompanying notes are an integral part of the financial statem

Case 3:96-cv-01023-L-JFS Document 350-1 Filed 06/23/00 PageID.2876 Page 206 of 344

## TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION
## [illegible]ATEMENTS OF [illegible]PERATIONS AND DEFICIT

| | YEAR ENDED JUNE 30, 1992 | PERIOD FROM JULY 16, 1990 (INCEPTION) TO JUNE 30, 1991 |
|---|---|---|
| Fees (Note A[2]) | $4,872,000 | $6,723,000 |
| Interest | 411,000 | 1,776,000 |
| Total revenues | 5,283,000 | 8,499,000 |
| [illegible]terest | 5,405,000 | 5,475,000 |
| Origination fees (Note B) | — | 2,689,000 |
| [illegible]ervice fees (Note B) | — | 1,095,000 |
| Amortization | 705,000 | 538,000 |
| [illegible]ther operating expenses | 104,000 | 122,000 |
| Total expenses | 6,214,000 | 9,919,000 |
| NET (LOSS) | (931,000) | (1,420,000) |
| (Deficit) - beginning of period | (1,420,000) | — |
| (DEFICIT) - END OF PERIOD | $(2,351,000) | $(1,420,000) |

The accompanying notes are an integral part of the financial statements.

## TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION
## STATEMENTS OF CASH FLOWS

| | YEAR ENDED JUNE 30, 1992 | PERIOD FR[illegible] JULY 16, 19[illegible] (INCEPTION) [illegible] JUNE 30, 19[illegible] |
|---|---|---|
| Net (loss) | $(931,000) | $(1,420,0[illegible] |
| Adjustments to reconcile net (loss) to net cash provided by (used in) operating activities: | | |
| Amortization | 705,000 | 538,0[illegible] |
| Changes in cash from changes in: | | |
| Interest receivable | 8,000 | (17,0[illegible] |
| Prepaid origination fees | 889,000 | (889,0[illegible] |
| Due to Parent | (1,660,000) | 1,660,0[illegible] |
| Due to affiliates | [illegible]235,000 | |
| Interest payable | (255,000) | 1,217,0[illegible] |
| Other liabilities | 38,000 | 50,0[illegible] |
| Net cash provided by (used in) operating activities | (971,000) | 1,139,0[illegible] |

The accompanying notes are an integral part of the financial statem[illegible]

| | YEAR ENDED JUNE 30, 1992 | PERIOD FROM JULY 16, 1990 (INCEPTION) TO JUNE 30, 1991 |
|---|---|---|
| Purchases of healthcare receivables | (72,467,000) | (138,829,000) |
| Collection of healthcare receivables | 94,147,000 | 90,738,000 |
| Other advances to Parent | (15,891,000) | – |
| Due from affiliates | 2,643,000 | (2,643,000) |
| Net cash provided by (used in) investing activities | 8,432,000 | (50,734,000) |
| Proceeds from issuance of bonds | – | 56,500,000 |
| Repayment of bonds | (10,179,000) | – |
| Proceeds from issuance of common stock | – | 1,130,000 |
| Payment of financing costs | (450,000) | (1,130,000) |
| Net cash provided by (used in) financing activities | (10,629,000) | 56,500,000 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (3,168,000) | 6,905,000 |
| Cash and cash equivalents - beginning of year | 6,905,000 | – |
| CASH AND CASH EQUIVALENTS - END OF YEAR | 3,737,000 | 6,905,000 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | 5,660,000 | 4,258,000 |

The accompanying notes are an integral part of the financial statements.

# TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION NOTES TO FINANCIAL STATEMENTS

Towers Healthcare Receivables Funding Corporation (the "Company"), a Delaware corporation, is a wholly owned subsidiary of Towers Financial Corporation (the "Parent"). The Company purchases, from the Parent, healthcare receivables of hospitals and other providers of healthcare services. The obligors of the healthcare receivables purchased are primarily insurance companies and governmental agencies ("third party obligor").

The Company is one of five subsidiaries of the Parent in the business of purchasing healthcare receivables. The Parent controls which healthcare receivables are purchased by each of the five subsidiaries and may also purchase certain healthcare receivables for its own account. Further, the income and expenses of the subsidiaries may vary at the discretion of the Parent as described in Note B.

The Company earns a fee of 5% of the collected amount of the healthcare receivables and pays an origination fee of 2% to the Parent (see Note B). Such fees are recognized as income and expense over the estimated average life of such healthcare receivables.

The Company assumes the credit risk of the third party obligor, the healthcare provider is charged-back for any collection deficiencies. The Company also assumes the risk of loss if the provider or the Parent does not pay the Company the amount of such deficiencies or replace the uncollected receivables with an equivalent amount of collectible receivables. Provisions for credit losses will be established in the event that default by a third party obligor or a healthcare provider appears probable. Through June 30, 1992 no credit losses have been incurred.

Costs of $1,580,000 incurred in connection with the issuance of bonds, of which $565,000 was paid to the Parent, are being amortized over the life of the bonds.

For purposes of the statements of cash flows, the Company considers debt instruments which it believes to be highly liquid and which have a maturity of three months or less to be cash equivalents.

Pursuant to a Master Sale and Servicing Agreement (the "Agreement"), as compensation for its services in originating, servicing, administering, and collecting the purchased healthcare receivables, the Parent receives fees from the Company. Subsequent to June 30, 1992 the Parent agreed to waive all such fees for the year ended June 30, 1992.

The amount due to Parent at June 30, 1991 of $32,841,000 consisted of a liability for purchased healthcare receivables of $31,181,000 and other liabilities of $1,660,000. The amount due to Parent at June 30, 1992 of $41,671,000 consists of amounts due to Parent for purchased healthcare receivables of $57,562,000 less $15,891,000 which consists of amounts advanced to Parent in advance of the application of those amounts to the purchase of healthcare receivables and fees paid to the Parent during the year which were subsequently waived (see Note D[2]).

The Parent manages the Company and four other subsidiaries, all of which are in the same business. In an attempt to achieve equitable results among the five entities, the Parent buys and sells receivables within this group. During the year ended June 30, 1992 the Parent repurchased certain healthcare receivables from the Company and sold them to its other sub-

sidiaries. The Parent also repurchased receivables from its other subsidiaries which were then sold to the Company.

Prior to December 31, 1991 cash balances on hand in one of the Company's operating bank accounts were automatically transferred to an interest-bearing account of another subsidiary of the Parent. These funds (including interest income) are classified as due from affiliate on the accompanying balance sheet.

[illegible] the terms of the Company's bond indenture [illegible]D) the assets of the Company may not be available to pay creditors of the Parent.

Healthcare receivables are carried at stated value which is an amount evaluated by the Parent to be due and payable by a third party obligor. Amounts collected from the third party obligors may be below stated value. In such circumstances the healthcare provider is required to substitute healthcare receivables in an amount equal to the difference between stated value and collected amounts. Upon purchase of a healthcare receivable, a percentage of stated value is advanced to the Parent by the Company for payment to the healthcare provider and the balance due is paid upon ultimate collection from the third party obligor.

Pursuant to the terms of the Agreement, the Company is required to pay to the Parent the balance due prior to collection from the third party obligor if i) the third party obligor is unable to pay for reasons not relating to the receivable or the healthcare provider (see Note A[3]) or ii) 365 days elapse from the purchase date as defined. See Note D[2] for management's method for aging healthcare receivables.

Purchased healthcare receivables amount to $11,323,000 from one provider. Two other subsidiaries of the Parent have receivables aggregating $21,909,000 from the same provider. The Company and the two other subsidiaries have collateral in addition to the receivables, with an appraised value in excess of $40,000,000.

On July 19, 1990 the Company issued $56,500,000 of its Healthcare Receivable-Backed Bonds (the "Bonds") pursuant to an indenture between the Company and Connecticut National Bank, as Trustee (the "Indenture"). Interest on the Bonds was payable quarterly at 10.20% per annum. Effective July 15, 1992 the Bonds bear interest at 8.375% per annum. The Bonds were originally scheduled to mature on July 15, 1992. Holders of an aggregate of $45,000,000 in Bonds elected to extend their maturity date to November 15, 1993, with principal amortization to begin on March 15, 1993 in amounts determined by collection of healthcare receivables. The bond holders who did not elect to extend were repaid their principal balances in varying monthly amounts from November 15, 1991 through July 15, 1992, with $1,321,000 remaining unpaid at June 30, 1992.

The Company's cash, cash equivalents and healthcare receivables collateralize the Bonds.

The Indenture indicates that monies are to be transferred by the Company to the Parent only for the purpose of purchasing healthcare receivables; from time to time the Company advances amounts to the Parent in advance of application of those amounts to the purchase of healthcare receivables (see Note B). The Company believes, and has been assured by the Parent, that all such advances will be applied in compliance with the Indenture.

The Indenture requires the Company to maintain a certain level of collateral coverage. The level of collateral coverage is measured by comparing the stated value of outstanding purchased healthcare receivables to the aggregate principal amount of Bonds outstanding reduced by cash and cash equivalents. The Indenture also places certain restrictions on the amount of receivables that may be purchased from any one healthcare provider. For purposes of determining compliance with this restriction and the required collateral coverage, the Company considers the other advances to Parent described in Note B to be cash equivalents. The formula used to determine compliance with the covenant relating to receivables from any one provider is more restrictive in the Indenture than in the private placement memorandum delivered to investors in connection with the sale of the Bonds. The Company believes the formula in the private placement memorandum to be the intent of the parties. At June 30, 1992 the Company is not in compliance under the less restrictive formula with respect to one provider and is not in compliance under the more restrictive formula with respect to six providers.

The Indenture also calls for an acceleration of loan principal repayment in the event that during any consecutive three-month period, the aggregate stated value of outstanding purchased healthcare receivables which are not Defaulted Accounts, as defined, and which are unpaid after 90 days exceeds 10% of the average aggregate stated value of all healthcare receivables. For purposes of this provision the Company considers claims which were rejected for insufficient documentation, or which were not paid as of the expiration of 90 days to be new claims upon resubmission to the healthcare provider. Based on its collection experience relating to healthcare receivables, and the provisions of applicable state laws relating to the payment obligations of third party obligors, management has considered it reasonable to treat unpaid claims, at the expiration of 90 days, new claims on the assumption that they would have been paid except for insufficient documentation or some other nondisallowing reason. Due to the natu[re] of healthcare receivables and the collection experience previously noted, management believes that, under this interpretation, the Company is in compli[ance] with the 90 day provision described above.

The Company files a consolidated federal income tax return with the Parent. Pursuant to a tax-sharing agreement, the benefit of the Company's losses aggregating approximately $2,300,000 through June 30, 1992 utilized by the Parent will be passed on to the Company to offset future taxable income, if an[y]

Richard A. Eisner & Company
*Certified Public Accountants*

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

Board of Directors
Towers Healthcare Receivables
Funding Corporation-II
New York, New York

We have audited the accompanying balance sheets of Towers Healthcare Receivables Funding Corporation-II as at June 30, 1992 and June 30, 1991, and the related statements of operations and retained earnings, and cash flows for the year ended June 30, 1992 and for the period from November 2, 1990 (inception) to June 30, 1991. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally [acc]epted auditing standards. Those standards require that we plan [an]d perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements enumerated above present fairly, in all material respects, the financial position of Towers Healthcare Receivables Funding Corporation-II at June 30, 1992 and June 30, 1991, and the results of its operations and its cash flows for the year ended June 30, 1992 and for the period from November 2, 1990 (inception) to June 30, 1991 in conformity with generally accepted accounting principles.

As discussed in notes to financial statements, the Company is a party to an indenture which imposes certain operating restrictions. See Notes B, C and D for further information with respect to such restrictions.

Richard A. Eisner & Company
CERTIFIED PUBLIC ACCOUNTANTS

[N]ew York, New York
October 23, 1992

575 Madison Avenue, New York, N.Y. 10022-2597 Telephone (212) 355-1700, Fax (212) 355-2414
Member of Summit International Associates Inc.
New York, NY · Melville, NY · Cambridge, MA · Millburn, NJ

# RECEIVABLES FUNDING CORPORATION-II
## BALANCE SHEETS

| | June 30, 1992 | 19[91] |
|---|---|---|
| Purchased healthcare receivables (Notes C and D) | $59,798,000 | $68,536,00[0] |
| Cash and cash equivalents (Note D) | 3,660,000 | 6,413,00[0] |
| Due from affiliate (Note B) | 3,469,000 | 2,792,00[0] |
| Prepaid origination fees (Note B) | 601,000 | 692,00[0] |
| Deferred financing costs (Note A[4]) | 389,000 | 666,00[0] |
| Interest receivable | 5,000 | 21,00[0] |
| TOTAL | $67,922,000 | $79,120,00[0] |
| Bonds payable (Notes B and D) | $41,500,000 | $41,500,00[0] |
| Due to Parent (Notes B and D) | 23,796,000 | 34,725,000 |
| Deferred income (Note A[2]) | 1,504,000 | 1,733,000 |
| Due to affiliate | — | 16,000 |
| Interest payable | 169,000 | 169,000 |
| Other liabilities | 65,000 | 89,000 |
| Total liabilities | 67,034,000 | 78,232,000 |
| Shareholder's Equity (Note E) | | |
| Common stock, no par value; 1,000 shares authorized, 1 share issued and outstanding | 830,000 | 830,000 |
| Retained earnings | 58,000 | 58,000 |
| Total shareholder's equity | 888,000 | 888,000 |
| TOTAL | $67,922,000 | $79,120,000 |

The accompanying notes are an integral part of the financial statement[s].

## RECEIVABLES FUNDING CORPORATION-II
## STATEMENTS OF OPERATIONS AND RETAINED EARNINGS

| | YEAR ENDED JUNE 30, 1992 | PERIOD FROM NOV. 2, 1990 (INCEPTION) TO JUNE 30, 1991 |
|---|---|---|
| Fees (Note A[2]) | $6,114,000 | $3,808,000 |
| Interest | 265,000 | 903,000 |
| Total revenues | 6,379,000 | 4,711,000 |
| Interest | 4,046,000 | 2,394,000 |
| Origination fees (Note B) | 571,000 | 1,523,000 |
| Service fees (Note B) | 1,374,000 | 440,000 |
| Amortization | 277,000 | 165,000 |
| Other operating expenses | 111,000 | 92,000 |
| Total expenses | 6,379,000 | 4,614,000 |
| Income before provision for income taxes | – | 97,000 |
| Provision for income taxes (Note E) | – | 39,000 |
| NET INCOME | – | 58,000 |
| Retained earnings - beginning of period | 58,000 | – |
| RETAINED EARNINGS - END OF PERIOD | $58,000 | $58,000 |

The accompanying notes are an integral part of the financial statements.

## RECEIVABLES FUNDING CORPORATION-II
## STATEMENTS OF CASH FLOWS

| | YEAR ENDED JUNE 30, 1992 | PERIOD FROM NOV. 2, 1990 (INCEPTION) TO JUNE 30, 1991 |
|---|---|---|
| Net income | – | $58,000 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | |
| Amortization | $277,000 | 164,000 |
| Changes in cash from changes in: | | |
| Due from Parent | 157,000 | (157,000) |
| Due to Parent | 1,245,000 | – |
| Interest receivable | 16,000 | (21,000) |
| Prepaid origination fees | 91,000 | (692,000) |
| Interest payable | – | 169,000 |
| Other liabilities | (24,000) | 89,000 |
| Net cash provided by (used in) operating activities | 1,762,000 | (390,000) |
| Purchases of healthcare receivables | (133,163,000) | (71,756,000) |
| Collection of healthcare receivables | 129,341,000 | 39,835,000 |
| Due from affiliates, net | (693,000) | (2,776,000) |
| Net cash (used in) investing activities | (4,515,000) | (34,697,000) |

The accompanying notes are an integral part of the financial statements.

| | YEAR ENDED JUNE 30, 1992 | PERIOD FROM NOV. 2, 1990 (INCEPTION) TO JUNE 30, 1991 |
|---|---|---|
| Proceeds from issuance of bonds | — | 41,500,000 |
| Proceeds from issuance of common stock | — | 830,000 |
| Payment of financing costs | — | (830,000) |
| Net cash provided by financing activities | — | 41,500,000 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS - JUNE 30, 1991 | (2,753,000) | 6,413,000 |
| Cash and cash equivalents, beginning of year | 6,413,000 | — |
| CASH AND CASH EQUIVALENTS, END OF YEAR | $3,660,000 | $6,413,000 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for interest | $4,046,000 | $2,225,000 |

The accompanying notes are an integral part of the financial statements.

# RECEIVABLES FUNDING CORPORATION-II NOTES TO FINANCIAL STATEMENTS

Towers Healthcare Receivables Funding Corporation-II (the "Company"), a Delaware corporation, is a wholly owned subsidiary of Towers Financial Corporation (the "Parent"). The Company purchases, from the Parent, healthcare receivables of hospitals and other providers of healthcare services. The obligors of the healthcare receivables purchased are primarily insurance companies and governmental agencies ("third party obligor").

The Company is one of five subsidiaries of the Parent in the business of purchasing healthcare receivables. The Parent controls which healthcare receivables are purchased by each of the five subsidiaries and may also purchase certain healthcare receivables for its own account. Further, the income and expenses of the subsidiaries may vary at the discretion of the Parent as described in Note B.

The Company earns a fee of 5% of the collected amount of the healthcare receivables and pays an origination fee of 2% to the Parent (see Note B). Such fees are recognized as income and expense over the estimated average life of such healthcare receivables.

The Company assumes the credit risk of the third party obligor; the healthcare provider is charged-back for any collection deficiencies. The Company also assumes the risk of loss if the provider or the Parent does not pay the Company the amount of such deficiencies or replace the uncollected receivables with an equivalent amount of collectible receivables. Provisions for credit losses will be established in the event that default by a third party obligor or a healthcare provider appears probable. Through June 30, 1992 no credit losses have been incurred.

Costs of $830,000 incurred in connection with the issuance of bonds of which $415,000 was paid to the Parent, are being amortized over the life of the bonds.

For purposes of the statements of cash flows, the Company considers debt instruments which it believes to be highly liquid and which have a maturity of three months or less to be cash equivalents.

Pursuant to a Master Sale and Servicing Agreement (the "Agreement"), as compensation for its servic[es] in originating, servicing, administering, and colle[cting] the purchased healthcare receivables, the Par[ent] receives fees from the Company. Subsequent to J[une] 30, 1992 the Parent agreed to waive $1,853,000 in origination fees for the year ended June 30, 1992.

The amount due to Parent at June 30, 1991 of $34,725,000 consisted of a liability for purchased healthcare receivables of $34,882,000 less other receivables of $157,000. The amount due to Parent at June 30, 1992 of $23,796,000 consists of amoun[ts] due to Parent for purchased healthcare receivables of $22,551,000 and other liabilities of $1,245,000 (see Note D[2]).

The Parent manages the Company and four other su[b]sidiaries, all of which are in the same business. In a[n] attempt to achieve equitable results among the five entities, the Parent buys and sells receivables withi[n] this group. During the year ended June 30, 1992 th[e] Parent repurchased certain healthcare receivables from the Company and sold them to its other subsidiaries. The Parent also repurchased receivables from its other subsidiaries which were then sold to the Company.

Prior to December 31, 1991 cash balances on hand [in] one of the Company's operating bank accounts w[ere] automatically transferred to an interest-bearing

account of another subsidiary of the Parent. These funds (including interest income) are classified as due from affiliate on the accompanying balance sheet.

Under the terms of the Company's Bond Indenture (Note D) the assets of the Company may not be made available to pay creditors of the Parent.

Healthcare receivables are carried at stated value which [illegible] amount evaluated by the Parent to be due and [illegible]e by a third party obligor. Amounts collected [illegible] the third party obligors may be below stated value. In such circumstances the healthcare provider is required to substitute healthcare receivables in an [illegible]mount equal to the difference between stated value [illegible]d collected amounts. Upon purchase of a healthcare receivable, a percentage of stated value is advanced to the Parent by the Company for payment to the healthcare provider and the balance due is [illegible]id upon ultimate collection from the third party [illegible]ligor.

[illegible]uant to the terms of the Agreement, the Company [illegible]equired to pay to the Parent the balance due prior [illegible] collection from the third party obligor if i) the [illegible]ird party obligor is unable to pay for reasons not relating to the receivable or the healthcare provider (see Note A[3]) or ii) 365 days elapse from the purchase date as defined. See Note D[2] for management's method for aging healthcare receivables.

[illegible]vember 27, 1990 the Company issued [illegible]1,500,000 of its Healthcare Receivable-Backed Bonds (the "Bonds") pursuant to an indenture between the Company and Connecticut National [illegible]nk, as Trustee (the "Indenture"). Interest on the [illegible]onds is payable quarterly, at 9.75% per annum. The Bonds are scheduled to mature on November 15, 1993 and call for principal amortization to begin on May 15, 1993 in amounts determined based on the collection of healthcare receivables.

The Company's cash, cash equivalents and healthcare receivables collateralize the Bonds.

The Indenture indicates that monies are to be transferred by the Company to the parent only for the purpose of purchasing healthcare receivables; from time to time the Company advances amounts to the Parent in advance of application of those amounts to the purchase of healthcare receivables. The Company believes, and has been assured by the Parent, that all such advances are applied in compliance with the Indenture.

The Indenture requires the Company to maintain a certain level of collateral coverage. The level of collateral coverage is measured by comparing the stated value of outstanding purchased healthcare receivables to the aggregate principal amount of Bonds outstanding reduced by cash and cash equivalents. As of June 30, 1992, the Company is not in compliance with this requirement. Management has taken the necessary action to cure the noncompliance and is of the opinion that such noncompliance has been cured subsequent to year end. The Indenture also places certain restrictions on the amount of receivables that may be purchased from any one healthcare provider. For purposes of determining compliance with this restriction and the required collateral coverage, the Company considers other advances to the Parent, if any, and receivables from other affiliates to be cash equivalents. The formula used to determine compliance with the covenant relating to receivables from any one provider is more restrictive in the Indenture than in the private placement memorandum delivered to investors in connection with the

sale of the Bonds. The Company believes the formula in the private placement memorandum to be the intent of the parties. At June 30, 1992 the Company is in compliance under the less restrictive formula and is not in compliance under the more restrictive formula with respect to one provider.

The Indenture also calls for an acceleration of loan principal repayment in the event that during any consecutive three-month period, the aggregate stated value of outstanding purchased healthcare receivables which are not Defaulted Accounts, as defined, and which are unpaid after 90 days exceeds 10% of the average aggregate stated value of all healthcare receivables. For purposes of this provision the Company considers claims which were rejected for insufficient documentation, or which were not paid as of the expiration of 90 days to be new claims upon resubmission to the healthcare provider. Based on its collection experience relating to healthcare receivables, and the provisions of applicable state laws relating to the payment obligations of third party obligors, management has considered it reasonable to treat unpaid claims, at the expiration of 90 days, as new claims on the assumption that they would have been paid except for insufficient documentation or some other nondisallowing reason. Due to the nature of healthcare receivables and the collection experience previously noted, management believes that, under this interpretation, the Company is in compliance with the 90 day provision described above.

The Company files a consolidated federal income tax return with the Parent. Pursuant to a tax-sharing agreement, the benefit of any losses of the Company utilized by the Parent will be passed on to the Company to offset future taxable income, if any.

Richard A. Eisner & Company
*Certified Public Accountants*

# REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

Board of Directors
Towers Healthcare Receivables
Funding Corporation-III
New York, New York

We have audited the accompanying balance sheets of Towers Healthcare Receivables Funding Corporation-III as at June 30, 1992 and June 30, 1991, and the related statements of operations and retained earnings, and cash flows for the year ended June 30, 1992 and for the period from May 16, 1991 (inception) to June 30, 1991. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements enumerated above present fairly, in all material respects, the financial position of Towers Healthcare Receivables Funding Corporation-III at June 30, 1992 and June 30, 1991, and the results of its operations and its cash flows for the year ended June 30, 1992 and for the period from May 16, 1991 (inception) to June 30, 1991 in conformity with generally accepted accounting principles.

As discussed in notes to financial statements, the Company is a party to an indenture which imposes certain operating restrictions. See Notes B, C and D for further information with respect to such restrictions.

CERTIFIED PUBLIC ACCOUNTANTS

New York, New York
October 23, 1992

575 Madison Avenue, New York, N.Y. 10022-2597 Telephone (212) 355-1700 Fax (212) 355-2414
Member of Summit International Associates, Inc.
New York, NY · Melville, NY · Cambridge, MA · Millburn, NJ

# RECEIVABLES FUNDING CORPORATION-III BALANCE SHEETS

| | June 30, 1992 | 1991 |
|---|---|---|
| Purchased healthcare receivables (Notes C and D) | $68,097,000 | $11,428,000 |
| Cash and cash equivalents (Note D) | 3,094,000 | 34,423,000 |
| Due from affiliate (Note B) | 3,629,000 | 810,000 |
| Deferred financing costs (Note A[4]) | 538,000 | 782,000 |
| Prepaid origination fees (Note B) | 658,000 | 200,000 |
| Interest receivable | 6,000 | 181,000 |
| TOTAL | $76,022,000 | $47,824,000 |
| Bonds payable (Notes B and D) | $42,500,000 | $40,500,000 |
| Due to Parent (Notes B and D) | 28,611,000 | 5,797,000 |
| Deferred income (Note A[2]) | 1,644,000 | 500,000 |
| Interest payable | 505,000 | 391,000 |
| Other liabilities | 795,000 | 63,000 |
| Total liabilities | 74,055,000 | 47,251,000 |
| Common stock, no par value; 1,000 shares authorized, 1 share issued and outstanding | 850,000 | 810,000 |
| Retained earnings (deficit) | 1,117,000 | (237,000) |
| Total shareholder's equity | 1,967,000 | 573,000 |
| TOTAL | $76,022,000 | $47,824,000 |

The accompanying notes are an integral part of the financial statements.

RECEIVABLES FUNDING CORPORATION-III
STATEMENTS OF OPERATIONS AND RETAINED EARNINGS

| | YEAR ENDED JUNE 30, 1992 | PERIOD FROM MAY 16, 1991 (INCEPTION) TO JUNE 30, 1991 |
|---|---|---|
| Fees (Note A[2]) | $11,348,000 | $85,000 |
| Interest | 808,000 | 217,000 |
| Total revenues | 12,156,000 | 302,000 |
| [illegible] | 3,953,000 | 391,000 |
| Origination fees (Note B) | 4,524,000 | 35,000 |
| Service fees (Note B) | 1,145,000 | 19,000 |
| Amortization | 284,000 | 28,000 |
| Other operating expenses | 150,000 | 66,000 |
| Total expenses | 10,056,000 | 539,000 |
| Income (loss) before provision for income taxes | 2,100,000 | (237,000) |
| Provision for income taxes (Note E) | (746,000) | – |
| NET INCOME (LOSS) | 1,354,000 | (237,000) |
| (Deficit) - beginning of period | (237,000) | – |
| RETAINED EARNINGS (DEFICIT) - END OF PERIOD | $1,117,000 | $(237,000) |

The accompanying notes are an integral part of the financial statements.

[illegible] HEALTHCARE RECEIVABLES FUNDING CORPORATION-III
STATEMENTS OF CASH FLOWS

| | YEAR ENDED JUNE 30, 1992 | PERIOD FROM MAY 16, 1991 (INCEPTION) TO JUNE 30, 1991 |
|---|---|---|
| Net income (loss) | $1,354,000 | $(237,000) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | |
| Amortization | 284,000 | 28,000 |
| Changes in cash from changes in: | | |
| Prepaid origination fees | (458,000) | (200,000) |
| Interest receivable | 175,000 | (181,000) |
| Due to Parent | (19,000) | 19,000 |
| Interest payable | 134,000 | 391,000 |
| Other liabilities | 732,000 | 63,000 |
| Net cash provided by (used in) operating activities | 2,182,000 | (117,000) |
| [illegible] | | |
| Purchases of healthcare receivables | (224,131,000) | (5,528,000) |
| Collection of healthcare receivables | 194,731,000 | 378,000 |
| Other advances to Parent | (3,292,000) | – |
| Due from affiliate | (2,819,000) | (810,000) |
| Net cash (used in) investing activities | (35,511,000) | (5,960,000) |

The accompanying notes are an integral part of the financial statements.

| | YEAR ENDED JUNE 30, 1992 | PERIOD FROM MAY 16, 1991 (INCEPTION) TO JUNE 30, 1991 |
|---|---|---|
| Proceeds from issuance of bonds | 2,000,000 | 40,500,000 |
| Proceeds from issuance of common stock | 40,000 | 810,000 |
| Payment of financing costs | (40,000) | (810,000) |
| [illegible] cash provided by financing activities | 2,000,000 | 40,500,000 |
| [illegible] INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (31,329,000) | 34,423,000 |
| Cash and cash equivalents, beginning of year | 34,423,000 | — |
| CASH AND CASH EQUIVALENTS, END OF YEAR | $3,094,000 | $34,423,000 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the year for: | | |
| Interest | $3,839,000 | |
| Income taxes | 1,000 | |

The accompanying notes are an integral part of the financial statements.

# RECEIVABLES FUNDING CORPORATION-III NOTES TO FINANCIAL STATEMENTS

Towers Healthcare Receivables Funding Corporation III (the "Company"), a Delaware corporation, is a wholly owned subsidiary of Towers Financial Corporation (the "Parent"). The Company purchases, from the Parent, healthcare receivables of hospitals and other providers of healthcare services. The obligors of the healthcare receivables purchased are primarily insurance companies and governmental agencies ("third party obligor").

The Company is one of five subsidiaries of the Parent in the business of purchasing healthcare receivables. The Parent controls which healthcare receivables are purchased by each of the five subsidiaries and may also purchase certain healthcare receivables for its own account. Further, the income and expenses of the subsidiaries may vary at the discretion of the Parent as described in Note B.

The Company earns a fee of 5% of the collected amount of the healthcare receivables and pays an origination fee of 2% to the Parent (see Note B). Such fees are recognized as income and expense over the estimated average life of such healthcare receivables.

The Company assumes the credit risk of the third party obligor; the healthcare provider is charged-back for any collection deficiencies. The Company also assumes the risk of loss if the provider or the Parent does not pay the Company the amount of such deficiencies or replace the uncollected receivables with an equivalent amount of collectible receivables. Provisions for credit losses will be established in the event that default by a third party obligor or a healthcare provider appears probable. Through June 30, 1992 no credit losses have been incurred.

Costs of $850,000 incurred in connection with the issuance of bonds, of which $405,000 was paid to the Parent, are being amortized over the life of the bonds.

For purposes of the statements of cash flows, the Company considers debt instruments which it believes to be highly liquid and which have a maturity of three months or less to be cash equivalents.

Pursuant to a Master Sale and Servicing Agreement (the "Agreement"), as compensation for its services in originating, servicing, administering, and collecting the purchased healthcare receivables, the Parent receives fees from the Company.

The amount due to Parent at June 30, 1991 of $5,797,000 consisted of a liability for purchased healthcare receivables of $5,778,000 and other liabilities of $19,000. The amount due to Parent at June 30, 1992 of $28,611,000 consists of amounts due to Parent for purchased healthcare receivables of $31,902,000 less $3,291,000 of amounts advanced to Parent in advance of the application of those amounts to the purchase of healthcare receivables (see Note D[2]).

The Parent manages the Company and four other subsidiaries, all of which are in the same business. In an attempt to achieve equitable results among the five entities, the Parent buys and sells receivables within this group. During the year ended June 30, 1992 the Parent repurchased certain healthcare receivables from the Company and sold them to its other subsidiaries. The Parent also repurchased receivables from its other subsidiaries which were then sold to the Company.

Case 3:96-cv-01023-L-JFS Document 350-1 Filed 06/23/00 PageID.2886 Page 216 of 344

Prior to December 31, 1991 cash balances on hand in one of the Company's operating bank accounts were automatically transferred to an interest-bearing account of another subsidiary of the Parent. These funds (including interest income) are classified as due from affiliate on the accompanying balance sheet.

Under the terms of the Company's Bond Indenture (Note D) the assets of the Company may not be made available to pay creditors of the Parent.

[illegible] receivables are carried at stated value which [illegible] amount evaluated by the Parent to be due and payable by a third party obligor. Amounts collected from the third party obligors may be below stated [illegible]. In such circumstances the healthcare provider [illegible] required to substitute healthcare receivables in an amount equal to the difference between stated value and collected amounts. Upon purchase of a healthcare receivable, a percentage of stated value is advanced to the Parent by the Company for payment to the healthcare provider and the balance due is paid upon ultimate collection from the third party obligor.

Pursuant to the terms of the Agreement, the Company [illegible] required to pay to the Parent the balance due prior to collection from the third party obligor if i) the third party obligor is unable to pay for reasons not relating to the receivable or the healthcare provider (see Note A[3]) or ii) 365 days elapse from the purchase date as defined. See Note D[2] for management's method for aging healthcare receivables.

In May and July 1991 the Company issued $42,500,000 [illegible] Healthcare Receivable-Backed Bonds (the "Bonds") pursuant to an indenture between the Company and Connecticut National Bank, as Trustee (the "Indenture"). Interest on the Bonds is payable quarterly, at 9.15% per annum. The Bonds are scheduled to mature on May 16, 1994 and call for principal amortization to begin on November 15, 1993 in amounts determined by collections of healthcare receivables.

The Company's cash, cash equivalents and healthcare receivables collateralize the Bonds.

The Indenture indicates that monies are to be transferred by the Company to the Parent only for the purpose of purchasing healthcare receivables; from time to time the Company advances amounts to the Parent in advance of application of those amounts to the purchase of healthcare receivables (see Note B). The Company believes, and has been assured by the Parent, that all such advances will be applied in compliance with the Indenture.

The Indenture requires the Company to maintain a certain level of collateral coverage. The level of collateral coverage is measured by comparing the stated value of outstanding purchased healthcare receivables to the aggregate principal amount of Bonds outstanding reduced by cash and cash equivalents. The Indenture also places certain restrictions on the amount of receivables that may be purchased from any one healthcare provider. For purposes of determining compliance with this restriction and the required collateral coverage, the Company considers other advances to the Parent described in Note B and receivables from other affiliates to be cash equivalents. The formula used to determine compliance with the covenant relating to receivables from any one provider is more restrictive in the Indenture than in the private placement memorandum delivered to investors in connection with the sale of the Bonds. The Company believes the formula in the private placement memorandum to be the intent of the parties. At June 30, 1992 the Company is in compliance under the less restrictive formula and is not in compliance under the more restrictive formula with respect to one provider.

The Indenture also calls for an acceleration of loan principal repayment in the event that during any consecutive three-month period, the aggregate stated value of outstanding purchased healthcare receivables which are not Defaulted Accounts, as defined, and which are unpaid after 90 days exceeds 10% of the average aggregate stated value of all healthcare receivables. For purposes of this provision the Company considers claims which were rejected for insufficient documentation, or which were not paid as of the expiration of 90 days to be new claims upon resubmission to the healthcare provider. Based on its collection experience relating to healthcare receivables, and the provisions of applicable state laws relating to the payment obligations of third party obligors, management has considered it reasonable to treat unpaid claims, at the expiration of 90 days, as new claims on the assumption that they would have been paid except for insufficient documentation or some other nondisallowing reason. Due to the nature of healthcare receivables and the collection experience previously noted, management believes that, under this interpretation, the Company is in compliance with the 90 day provision described above.

The Company files a consolidated federal income tax return with the Parent. Taxes have been provided for as if the Company were filing a separate tax return. Pursuant to a tax-sharing agreement, the benefit of the Company's prior year losses utilized by the Parent has been passed on to the Company to offset current taxable income.

Richard A. Eisner & Company
*Certified Public Accountants*

REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

Board of Directors
Towers Healthcare Receivables
Funding Corporation-IV
New York, New York

We have audited the accompanying balance sheet of Towers Healthcare Receivables Funding Corporation-IV as at June 30, 1992, and the related statements of income and retained earnings, and cash flows for the period from November 18, 1991 (inception) to June 30, 1992. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements enumerated above present fairly, in all material respects, the financial position of Towers Healthcare Receivables Funding Corporation-IV at June 30, 1992, and the results of its operations and its cash flows for the period from November 18, 1991 (inception) to June 30, 1992 in conformity with generally accepted accounting principles.

As discussed in notes to financial statements, the Company is a party to an indenture which imposes certain operating restrictions. See Notes B, C and D for further information with respect to such restrictions.

Richard A. Eisner & Company
CERTIFIED PUBLIC ACCOUNTANTS

New York, New York
October 23, 1992

[illegible]
Member of Summit International Associates, Inc.
New York, NY · Melville, NY · Cambridge, MA · Millburn, NJ

# TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION-IV
## BALANCE SHEET

AS AT JUNE 30, 1992

| | | |
|---|---|---|
| Purchased healthcare receivables (Notes C and D) | | $67,153,000 |
| Cash and cash equivalents (Note D) | | 2,935,000 |
| Deferred financing costs (Note A[4]) | | 703,000 |
| Prepaid origination fees (Note B) | | 544,000 |
| Interest receivable | | 4,000 |
| TOTAL | | $71,339,000 |
| Liabilities: | | |
| Bonds payable (Notes B and D) | | $42,500,000 |
| Due to Parent (Notes B and D) | | 26,014,000 |
| Deferred income (Note A[2]) | | 1,359,000 |
| Interest payable | | 139,000 |
| Other liabilities | | 230,000 |
| Total liabilities | | 70,242,000 |
| [illegible] | | |
| Common stock, no par value; 1,000 shares authorized, 1 share issued and outstanding | $850,000 | |
| Retained earnings | 247,000 | 1,097,000 |
| TOTAL | | $71,339,000 |

[illegible]

# TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION-IV STATEMENT OF INCOME AND RETAINED EARNINGS

| | | For the Period from November 18, 1991 (Inception) to June 30, 1992 |
|---|---|---|
| Fees (Note A[2]) | | $4,165,000 |
| Interest | | 375,000 |
| Total revenues | | 4,540,000 |
| Interest | $1,769,000 | |
| Origination fees (Note B) | 1,663,000 | |
| Service fees (Note B) | 407,000 | |
| Amortization | 147,000 | |
| Other operating expenses | 127,000 | |
| Total expenses | | 4,113,000 |
| Income before provision for income taxes | | 427,000 |
| Provision for income taxes (Note E) | | 180,000 |
| NET INCOME AND RETAINED EARNINGS | | $247,000 |

The accompanying notes are an integral part of the financial statements.

# TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION-IV STATEMENT OF CASH FLOWS

| | For the Period from November 18, 1991 (Inception) to June 30, 1992 |
|---|---|
| Net income | $247,000 |
| Adjustments to reconcile net income to net cash provided by operating activities: | |
| Amortization | 147,000 |
| Changes in cash from changes in: | |
| Prepaid origination fees | ($44,000) |
| Interest receivable | (4,000) |
| Interest payable | 339,000 |
| Other liabilities | 230,000 |
| Net cash provided by operating activities | 215,000 |
| Purchases of healthcare receivables | (101,166,000) |
| Collection of healthcare receivables | 62,943,000 |
| Other advances to Parent | (1,557,000) |
| Net cash (used in) investing activities | (39,780,000) |

The accompanying notes are an integral part of the financial statements.



| | FOR THE PERIOD FROM NOVEMBER 18, 1991 (INCEPTION) TO JUNE 30, 1992 |
|---|---|
| Proceeds from issuance of bonds | 42,500,000 |
| Proceeds from issuance of common stock | 850,000 |
| Payment of financing costs | (850,000) |
| [illegible] cash provided by financing activities | 42,500,000 |
| [illegible] AND CASH EQUIVALENTS- JUNE 30, 1992 | $2,935,000 |
| Supplemental disclosure of cash flow information: | |
| Cash paid during the year for interest | $1,630,000 |

[illegible]e accompanying notes are an integral part of the financial statements.

# TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION-IV NOTES TO FINANCIAL STATEMENTS

Towers Healthcare Receivables Funding Corporation IV (the "Company"), a Delaware corporation, is a wholly owned subsidiary of Towers Financial Corporation (the "Parent"). The Company purchases, from the Parent, healthcare receivables of hospitals and other providers of healthcare services. The obligors of the healthcare receivables purchased are primarily insurance companies and governmental agencies ("third party obligor").

The Company is one of five subsidiaries of the Parent in the business of purchasing healthcare receivables. The Parent controls which healthcare receivables are purchased by each of the five subsidiaries and may also purchase certain healthcare receivables for its own account. Further, the income and expenses of the subsidiaries may vary at the discretion of the Parent as described in Note B.

The Company earns a fee of 5% of the collected amount of the healthcare receivables and pays an origination fee of 2% to the Parent (see Note B). Such fees are recognized as income and expense over the estimated average life of such healthcare receivables.

The Company assumes the credit risk of the third party obligor; the healthcare provider is charged-back for any collection deficiencies. The Company also assumes the risk of loss if the provider or the Parent does not pay the Company the amount of such deficiencies or replace the uncollected receivables with an equivalent amount of collectible receivables. Provisions for credit losses will be established in the event that default by a third party obligor or a healthcare provider appears probable. Through June 30, 1992 no credit losses have been incurred.

Costs of $830,000 incurred in connection with the issuance of bonds, of which $415,000 was paid to the Parent, are being amortized over the life of the bonds.

For purposes of the statement of cash flows, the Company considers debt instruments which it believes to be highly liquid and which have a maturity of three months or less to be cash equivalents.

Pursuant to a Master Sale and Servicing Agreement (the "Agreement"), as compensation for its services in originating, servicing, administering, and collecting the purchased healthcare receivables, the Parent receives fees from the Company.

The amount due to Parent at June 30, 1992 of $26,014,000 consists of amounts due to Parent for purchased healthcare receivables of $27,571,000 less $1,557,000 of amounts advanced to Parent in advance of the application of those amounts to the purchase of healthcare receivables (see Note D[2]).

The Parent manages the Company and four other subsidiaries, all of which are in the same business. In an attempt to achieve equitable results among the five entities, the Parent buys and sells receivables within this group. During the year ended June 30, 1992 the Parent repurchased certain healthcare receivables from the Company and sold them to its other subsidiaries. The Parent also repurchased receivables from its other subsidiaries which were then sold to the Company.

Under the terms of the Company's Bond Indenture (Note D) the assets of the Company may not be made available to pay creditors of the Parent.

Healthcare receivables are carried at stated value which is an amount evaluated by the Parent to be due and payable by a third party obligor. Amounts collected from the third party obligors may be below stated value. In such circumstances the healthcare provider is required to substitute healthcare receivables in an amount equal to the difference between stated value and collected amounts. Upon purchase of a healthcare receivable, a percentage of stated value is advanced to the Parent by the Company for payment to the healthcare provider and the balance due is paid upon ultimate collection from the third party obligor.

Pursuant to the terms of the Agreement, the Company is required to pay to the Parent the balance due prior to collection from the third party obligor if i) the third party obligor is unable to pay for reasons not relating to the receivable or the healthcare provider (see Note A[3]) or ii) 365 days elapse from the purchase date as defined. See Note D[2] for management's method for aging healthcare receivables.

Purchased healthcare receivables amount to $18,108,000 from one provider. Two other subsidiaries of the Parent have receivables aggregating $15,124,000 from the same provider. The Company and the two other subsidiaries have collateral in addition to the receivables, with an appraised value in excess of $40,000,000.

On December 18, 1991 the Company issued $41,500,000 of its Healthcare Receivable-Backed Bonds (the "Bonds") pursuant to an indenture between the Company and Connecticut National Bank, as Trustee (the "Indenture"). $39,000,000 of the Bonds are scheduled to mature on December 15, 1994 and $3,500,000 of the Bonds are scheduled to mature on December 16, 1996 and call for principal amortization to begin on July 15, 1994 and July 15, 1996, respectively, in amounts determined by collection of healthcare receivables. Interest on the Bonds is payable quarterly at 7.8% per annum and 8.65% per annum, respectively.

The Company's cash, cash equivalents and healthcare receivables collateralize the Bonds.

The Indenture indicates that monies are to be transferred by the Company to the Parent only for the purpose of purchasing healthcare receivables; from time to time the Company advances amounts to the Parent in advance of application of these amounts to the purchase of healthcare receivables (see Note B). The Company believes, and has been assured by the Parent, that all such advances will be applied in compliance with the Indenture.

The Indenture requires the Company to maintain a certain level of collateral coverage. The level of collateral coverage is measured by comparing the stated value of outstanding purchased healthcare receivables to the aggregate principal amount of Bonds outstanding reduced by cash and cash equivalents. The Indenture also places certain restrictions on the amount of receivables that may be purchased from any one healthcare provider. For purposes of determining compliance with this restriction and the required collateral coverage, the Company considers

the other advances to the Parent described in Note B to be cash equivalents. As of June 30, 1992, the Company is not in compliance with the latter restriction with respect to one provider.

The Indenture also calls for an acceleration of loan principal repayment in the event that during any consecutive three-month period, the aggregate stated value of outstanding purchased healthcare receivables which are not Defaulted Accounts, as defined, and which are unpaid after 90 days exceeds 10% of the average aggregate stated value of all healthcare receivables. For purposes of this provision the Company considers claims which were rejected for insufficient documentation, or which were not paid as of the expiration of 90 days to be new claims upon resubmission to the healthcare provider. Based on its collection experience relating to healthcare receivables, and the provisions of applicable state laws relating to the payment obligations of third party obligors, management has considered it reasonable to treat unpaid claims, at the expiration of 90 days, as new claims on the assumption that they would have been paid except for insufficient documentation or some other nondisallowing reason. Due to the nature of healthcare receivables and the collection experience previously noted, management believes that, under this interpretation, the Company is in compliance with the 90 day provision described above.

(Note E) - Income Taxes:

The Company files a consolidated federal income tax return with the Parent. Taxes have been provided for as if the Company were filing a separate tax return. Pursuant to a tax-sharing agreement, the benefit of any losses of the Company utilized by the Parent will be passed on to the Company to offset prior or future taxable income, if any.

Richard A. Eisner & Company

# REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

Board of Directors
Towers Healthcare Receivables
Funding Corporation-V
New York, New York

We have audited the accompanying balance sheet of Towers Healthcare Receivables Funding Corporation-V as at June 30, 1992, and the related statements of operations and deficit, and cash flows for the period from April 23, 1992 (inception) to June 30, 1992. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally [illegible]cepted auditing standards. Those standards require that we plan [illegible]d perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements enumerated above present fairly, in all material respects, the financial position of Towers Healthcare Receivables Funding Corporation-V at June 30, 1992, and the results of its operations and its cash flows for the period from April 23, 1992 (inception) to June 30, 1992 in conformity with generally accepted accounting principles.

As discussed in notes to financial statements, the Company is a party to an indenture which imposes certain operating restrictions. See Notes B, C and D for further information with respect to such restrictions.

[signature]
CERTIFIED PUBLIC ACCOUNTANTS

[illegible]w York, New York
[illegible]tober 23, 1992

81

# TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION-V BALANCE SHEET

Assets

Liabilities

Shareholder's Equity (Note A)

82

Case 3:96-cv-01023-L-JFS Document 350-1 Filed 06/23/00 PageID.2892 Page 222 of 344

## RECEIVABLES FUNDING CORPORATION-V
## [S]TATEMENT OF [O]PERATIONS AND DEFICIT

| | | FOR THE PERIOD FROM APRIL 23, 1992 (INCEPTION) TO JUNE 30, 1992 |
|---|---|---|
| [F]ees (Note A[2]) | | $135,000 |
| Interest | | 100,000 |
| Total revenues | | 235,000 |
| [In]terest | $288,000 | |
| Origination fees (Note B) | 54,000 | |
| [S]ervice fees (Note B) | 47,000 | |
| Amortization | 14,000 | |
| Other operating expenses | 67,000 | |
| [T]otal expenses | | 470,000 |
| [N]ET LOSS (DEFICIT AT JUNE 30, 1992) | | $(235,000) |

The accompanying notes are an integral part of the financial statements.

## TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION-V
## STATEMENT OF CASH FLOWS

| | FOR THE PERIOD FROM APRIL 23, 1992 (INCEPTION) TO JUNE 30, 1992 |
|---|---|
| Net loss | $(235,000) |
| Adjustments to reconcile net loss to net cash (used in) operating activities: | |
| Amortization | 14,000 |
| Changes in cash from changes in: | |
| Prepaid origination fees | (351,000) |
| Interest receivable | (49,000) |
| Interest payable | 300,000 |
| Other liabilities | 52,000 |
| Net cash (used in) operating activities | (269,000) |
| Purchases of healthcare receivables | (12,800,000) |
| Collection of healthcare receivables | 722,000 |
| Other advances to Parent | (1,505,000) |
| Net cash (used in) investing activities | (13,583,000) |

The accompanying notes are an integral part of the financial statements.

| | FOR THE PERIOD FROM APRIL 23, 1992 (INCEPTION) TO JUNE 30, 1992 |
|---|---|
| Proceeds from issuance of bonds | 23,000,000 |
| Proceeds from issuance of common stock | 460,000 |
| Payment of financing costs | (460,000) |
| [Ca]sh provided by financing activities | 23,000,000 |
| [CASH] AND CASH EQUIVALENTS - JUNE 30, 1992 | $9,148,000 |
| Supplemental disclosure of cash flow information: | |
| Cash paid during the year for interest | — |

[The] accompanying notes are an integral part of the financial statements.

# TOWERS HEALTHCARE RECEIVABLES FUNDING CORPORATION-V NOTES TO FINANCIAL STATEMENTS

Towers Healthcare Receivables Funding Corporation-V (the "Company"), a Delaware corporation, is a wholly owned subsidiary of Towers Financial Corporation (the "Parent"). The Company purchases, from the Parent, healthcare receivables of hospitals and other providers of healthcare services. The obligors of the healthcare receivables purchased are primarily insurance companies and governmental agencies ("third party obligor").

The Company is one of five subsidiaries of the Parent in the business of purchasing healthcare receivables. The Parent controls which healthcare receivables are purchased by each of the five subsidiaries and may also purchase certain healthcare receivables for its own account. Further, the income and expenses of the subsidiaries may vary at the discretion of the Parent as described in Note B.

The Company earns a fee of 5% of the collected amount of the healthcare receivables and pays an origination fee of 2% to the Parent (see Note B). Such fees are recognized as income and expense over the estimated average life of such healthcare receivables.

The Company assumes the credit risk of the third party obligor; the healthcare provider is charged-back for any collection deficiencies. The Company also assumes the risk of loss if the provider or the Parent does not pay the Company the amount of such deficiencies or replace the uncollected receivables with an equivalent amount of collectible receivables. Provisions for credit losses will be established in the event that default by a third party obligor or a healthcare provider appears probable. Through June 30, 1992 no credit losses have been incurred.

Costs of $400,000 incurred in connection with the issuance of bonds, of which $200,000 was paid to the Parent, are being amortized over the life of the bonds.

For purposes of the statement of cash flows, the Company considers debt instruments which it believes to be highly liquid and which have a maturity of three months or less to be cash equivalents.

Pursuant to a Master Sale and Servicing Agreement (the "Agreement"), as compensation for its services in originating, servicing, administering, and collecting the purchased healthcare receivables, the Parent receives fees from the Company.

The amount due to Parent at June 30, 1992 of $4,394,000 consists of amounts due to Parent for purchased healthcare receivables of $5,899,000 less $1,505,000 of amounts advanced to Parent in advance of the application of those amounts to the purchase of healthcare receivables (see Note D[2]).

The Parent manages the Company and four other subsidiaries, all of which are in the same business. In an attempt to achieve equitable results among the five entities, the Parent buys and sells receivables within this group. During the year ended June 30, 1992 the Parent repurchased certain healthcare receivables from the Company and sold them to its other subsidiaries. The Parent also repurchased receivables from its other subsidiaries which were then sold to the Company.

[illegible] the terms of the Company's Bond Indenture [illegible] Note D) the assets of the Company may not be [illegible] available to pay creditors of the Parent.

(Note C) - Purchased Healthcare Receivables:

[illegible]

(Note D) - Bonds Payable:

[1] Terms:

On May 5, 1992 the Company issued $25,000,000 of its Healthcare Receivable Backed Bonds (the "Bonds") (increased to $27,950,000 in July 1992) pursuant to an indenture between the Company and Connecticut National Bank as Trustee (the "Indenture"). The Bonds are scheduled to mature on May 15, 1997 and call for principal amortization to begin on November 15, 1996 in amounts determined by collection of healthcare receivables. Interest on the Bonds is payable quarterly at 8.57% per annum.

The Company's cash, cash equivalents and healthcare receivables collateralize the Bonds.

[2] Covenants and restrictions:

The Indenture indicates that monies are to be transferred by the Company to the Parent only for the purpose of purchasing healthcare receivables from time to time the Company advances amounts to the Parent in advance of application of those amounts to the purchase of healthcare receivables (see Note B). The Company believes, and has been assured by the Parent, that all such advances will be applied in compliance with the Indenture.

The Indenture requires the Company to maintain a certain level of collateral coverage. The level of collateral coverage is measured by comparing the [illegible] amount of Bonds outstanding reduced by cash and cash equivalents. The Indenture also places certain restrictions on the amount of receivables that may be purchased from [illegible] the other advances to the Parent described in Note B to be cash equivalents.

The Indenture also calls for an acceleration of loan [illegible] 10% of [illegible]

(Note E) - Income Taxes:

[illegible]

# OFFICERS AND DIRECTORS

**...ard of Directors**

...ven Hoffenberg
Chairman of the Board,
...resident and Chief Executive Officer
...owers Financial Corporation

...itchell Brater
Vice Chairman of the Board
Towers Financial Corporation

... Chugerman
... Vice President and Secretary
...ancial Corporation
...ident
...owers Collection Service, Inc.

...hael Rosoff, Esq.
...enior Vice President,
Chief Legal Officer and Assistant Secretary
...owers Financial Corporation

...ymond Lewis
Vice President
Towers Financial Corporation

...Honorable Ben Barnes
...ident
...ntercorp
..., Texas
...r Chief Operating Officer,
...ames Connally
...Development Corporation
Former Lt. Governor, State of Texas
Former Speaker of the ...
...ouse of Representatives, State of Texas

**Management**

Steven Hoffenberg
Chairman of the Board,
President and Chief Executive Officer
Towers Financial Corporation

Mitchell Brater
Vice Chairman of the Board
Towers Financial Corporation

Charles H. Chugerman
Executive Vice President and Secretary
Towers Financial Corporation
and President
Towers Collection Service, Inc.

Michael Rosoff, Esq.
Senior Vice President,
Chief Legal Officer and Assistant Secretary
Towers Financial Corporation

Richard Levine
Vice President
Towers Financial Corporation

Raymond Lewis
Vice President
Towers Financial Corporation

Richard Barbuto, Esq.
General Counsel
Towers Financial Corporation

Jack Tillem, Esq.
General Counsel
Towers Collection Service, Inc.

Alan Linuchy, Esq.
Assistant General Counsel
Towers Collection Service, Inc.

Joseph Hughes
Vice President Sales
Towers Financial Corporation

Alpha Nickelberry
Vice President Sales
Towers Financial Corporation

Stuart Dunn
Vice President Sales
Towers Financial Corporation

Joseph Turano
Director Human Resources
Towers Financial Corporation

David Franklin
Managing Director
Corporate Finance
Towers Financial Corporation

Richard Dombroff
Managing Director
Healthcare
Towers Financial Corporation

Steven Silver
Managing Director
Healthcare
Towers Financial Corporation

**Outside Counsels**

Shea & Gould
1251 Avenue of the Americas
New York, New York 10020

Lord Day & Lord, Barrett Smith
1675 Broadway
New York, New York 10019

**Transfer Agency and Registrar**

Mellon Financial Services
85 Challenger Road
Overpeck Centre
Ridgefield Park, NJ 07660

TFC
TOWERS
FINANCIAL
CORPORATION

417 FIFTH AVENUE
NEW YORK, NY 10016
212 696-0505

EXHIBIT 51

## $100,000,000

# Towers Financial Corporation

## Subscription Documents

417 FIFTH AVENUE, NEW YORK, NY 10016 (212) 696-0505 TOLL-FREE: (800) 553-3322

### INSTRUCTIONS TO SUBSCRIBERS

Accompanying the Offering Document, you will find (i) the Subscription Agreement with signature page in duplicate and (ii) Investor Questionnaire which you must complete in accordance with the following instructions.

1. *Investor Questionnaire.*

Please read, complete and sign the Investor Questionnaire.

2. *Subscription Agreement.*

(a) Please read, complete the Subscription Agreement and sign two copies of the signature page; and

(b) Have your signature notarized by a notary public on the acknowledgment forms accompanying the signature pages.

DO NOT SIGN THE SUBSCRIPTION AGREEMENT UNLESS YOU ARE CERTAIN YOU CAN MAKE ALL THE REPRESENTATIONS CONTAINED IN THE AGREEMENT.

3. *Purchaser Representative Questionnaire.*

If you used the services of a "purchaser representative," the purchaser representative questionnaire must be completed and which is available upon request.

4. *Payment.*

The subscription price is to be paid by check in the amount of $100,000 per Unit made payable to the order of "Towers Financial Corporation, Funding Account."

5. *Special Instructions for Trustees and Agents.*

Trustees, agents or other persons acting in a representative capacity are required to furnish with the completed Subscription Agreement (i) a copy of the trust agreement, power of attorney or other instrument granting the power and authority to subscribe, or (ii) an opinion of counsel as to such power and authority. In addition, such persons must indicate on the completed Subscription Agreement the name of the person or entity for whom he is acting as trustee or agent.

6. *Acceptance of Subscription.*

(a) Receipt of your subscription will be promptly acknowledged by the Company.

(b) Deliver completed Subscription Documents and payment for the Units to Towers Financial Corporation, 417 Fifth Avenue, New York, New York 10016. If your subscription is accepted, you will receive shortly thereafter (a) one copy of the Subscription Agreement executed by an officer of the Company and (b) original Promissory Note executed by the Company in the amount subscribed.

# Investor Questionnaire

TOWERS FINANCIAL CORPORATION

CONFIDENTIAL:
INVESTOR QUESTIONNAIRE

*Private Offering of $100,000,000*
of Recourse Promissory Notes of $100,000 each
For: Accredited Investors Only

The offering of secured recourse non-negotiable promissory notes (the "Promissory Notes") issued by Towers Financial Corporation, a Nevada corporation (the "Company"), as more fully described in the Offering Document, dated October 1, 1990, will be made to Accredited Investors only pursuant to Regulation D promulgated under the Securities Act of 1933, as amended (the "1933 Act").

The purpose of this questionnaire is to assist the Company in complying with the above requirements. You agree that the Company may present this questionnaire to such parties as it deems appropriate in order to be assured that the offer and sale of Promissory Notes to you will not result in violation of the exemption from registration under the 1933 Act, described above, or any applicable state securities laws; however, this document will otherwise be kept confidential by the Company.

If you are acting as agent for a corporation, partnership, trust or any other entity, any reference to the term "you" shall mean such corporation, partnership, trust or other entity.

*Except as set forth herein, your answers to this questionnaire will, at all times, be kept strictly confidential.*

If the answer to any question is "None" or "Not Applicable," please so state.

Please complete this questionnaire as fully as possible, and sign, date and deliver one copy thereof to Towers Financial Corporation, 417 Fifth Avenue, New York, New York 10016.

PLEASE PRINT

1. Please provide the following information if you are investing as an individual. (If you are purchasing on behalf of a corporation, partnership, trust, or any other entity, please complete part II below). In addition, please provide the same information for any joint tenant or tenant-in-common:

Name (1) ________________ (2) ________________

Date of Birth (1) ________ (2) ________ Marital Status (1) ________ (2) ________

Permanent Home Address (1) ________________ (2) ________________

________________ (Zip) ________________ (Zip)

Home Telephone Number (1) ( ) ________________ (2) ( ) ________________

Social Security No. (1) ________________ (2) ________________

Citizenship (1) ________________ (2) ________________

Name of (Circle One and Complete)

Advisor/Broker-Dealer/Registered Investment Adviser

______________________________

1    2    (if joint purchaser)

Names of Employer (1) ____________ (2) ____________

Nature of Business (1) ____________ (2) ____________

Position(s) (1) ____________ (2) ____________

General Duties (1) ____________ (2) ____________

Business Address (1) ____________ (2) ____________

Business Telephone Number (1) ( ) ____________ (2) ( ) ____________

Please describe your employment positions or occupations during the last five years (listing the inclusive dates of each) indicating any and all vocationally related experience in financial and business matters:

| Employment, Position or Occupation | Nature of Duties | From: | To: |
|---|---|---|---|
| (1) | | | |
| (2) | | | |

Are you acting for your own account? Yes( ) No( )

If you are not acting for your own account, please complete the following:

(i) Capacity in which you are acting (Agent, Trustee or Otherwise):

______________________________

(ii) Name, address and telephone number of persons you represent:

______________________________

(iii) Please attach evidence of authority.

NOTE: ANY INDIVIDUALS REPRESENTED BY YOU MUST BE QUALIFIED AS "PURCHASERS" PURSUANT TO THE ACT AND SHOULD EACH COMPLETE A COPY OF THIS QUESTIONNAIRE.

II. Please complete the following if you are investing on behalf of a corporation, partnership, trust or other entity.

Name of corporation, partnership, trust or entity ____________

Employer Identification No. ____________

Business Activities ____________

State and Year of Organization ____________

Fiscal year ____________

Business Address ____________

____________ (Zip) ____________

Business Telephone Number ( ) ____________

Authorized Person to Contact ____________ (title) ____________

III. PLEASE ANSWER THE FOLLOWING QUESTIONS.

**For Individuals only:**

1. At this time, is your individual net worth (or joint net worth with your spouse) in excess of $1,000,000?

   Yes ( ) No ( )

2. Did your individual adjusted gross income (increased by any deduction for long term capital gains or depletion, any exclusion for interest and any losses of a partnership as reported on Schedule E on Form

1040) from all sources for each of the two taxable years preceding this date exceed $200,000 (or if jointly with spouse $300,000)?

Yes ( ) No ( )

3. If you have had income from all sources of $200,000 (or if jointly with spouse $300,000) for each of the past two taxable years, do you reasonably expect your income from all sources for the current taxable year to exceed $200,000 (or if jointly with spouse $300,000)?

Yes ( ) No ( )

4. *For Corporations, Charitable Organizations and Partnerships Only:*
If you are a 501(c)(3) organization, corporation, Massachusetts or similar business trust, or partnership, do you have total assets in excess of $5,000,000?

Yes ( ) No ( )

5. *For Trusts Only:*
If you are a trust (not formed for the specific purpose of acquiring the securities offered) and your investment herein is directed by a sophisticated person as described in Section 230.506(b)(2)(ii) are your total assets in excess of $5,000,000?

Yes ( ) No ( )

6. *For Banks, ERISA plans, SBICs, investment companies under the 1940 Act, etc.:*
Do you otherwise qualify as an accredited investor under the following definition:

Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefits of its employees if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

Yes ( ) No ( )

7. *For all Investors. Please complete the following questions and information requested:*
Are you aware that the proposed offering of Promissory Notes requires your capital investment to be maintained for the term of your Promissory Note (12-months or 24-months, as the case may be)?

Yes ( ) No ( )

8. Please indicate the general, business or professional education and the degrees received by you (or, if the purchaser is a corporation, partnership, trust or other entity, by the person completing this questionnaire on its behalf).

| College | Degree Received | Year |
|---|---|---|
| | | |
| | | |
| | | |

9. Investment Experience:

(a) Frequency of investment in marketable securities:
often ( ); occasionally ( ); seldom ( ); never ( ).

(b) Frequency of investment in commodities futures:
often ( ); occasionally ( ); seldom ( ); never ( ).

(c) Frequency of investment in options:
often ( ); occasionally ( ); seldom ( ); never ( ).

(d) Frequency of investment in securities purchased on margin:
often ( ); occasionally ( ); seldom ( ); never ( ).

(e) Frequency of investment in illiquid securities:
often ( ); occasionally ( ); seldom ( ); never ( ).

10. Indicate in the space provided below, any additional information which you think may be helpful in determining that your knowledge and experience in financial and business matters is sufficient to enable you to evaluate the merits and risks of investing in the securities offered pursuant to the Offering Document of which this forms a part.

I (we) acknowledge that the foregoing statements are true and accurate to the best of my (our) information and belief, and that I (we) will promptly notify the Company of any changes in the foregoing answers.

IN WITNESS WHEREOF, I (we) have executed this questionnaire this ____ date of ________, 19__.

(Print Name of Joint Tenant or Tenant-in-Common, if applicable)

(Print Name)

(Signature of Joint Tenant or Tenant-in-Common, if applicable)

(Signature)

*Please also complete and execute the following balance sheet or supply a substitute balance sheet as of a current date which should include an original signature of a duly authorized representative.*

BALANCE SHEET

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on Hand: | $______ | | |
| Cash value of life insurance policies: | ______ | | |
| Market value of listed securities: | ______ | Margin Amount | $______ |
| Market value of unlisted securities: | ______ | | |
| Market value of real estate Residence: | ______ | Encumbrances on Real Estate Residence: | ______ |
| Other: | ______ | Other: | ______ |
| Accounts Receivable: | ______ | Accounts Payable: (include all amounts due to others, including credit cards, debts and other unsecured debts) | ______ |
| Automobiles: | ______ | Automobile Loans: | ______ |
| Other Assets: | ______ | Other Debts: | ______ |
| TOTAL ASSETS | $______ | TOTAL LIABILITIES | $______ |
| NET WORTH | $______ | | |

I confirm that the above balance sheet is true, correct and accurate.

______________________
Signature

**Subscription Agreement**

**TOWERS FINANCIAL CORPORATION**
**SUBSCRIPTION AGREEMENT**

To: Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016

Gentlemen:

1. *Subscription.*

I hereby subscribe to purchase the number of secured recourse non-negotiable promissory notes which are set forth in Article "11" of this Subscription Agreement (the "Promissory Notes") issued by TOWERS FINANCIAL CORPORATION, a Nevada corporation (the "Company"), as more fully described in the offering document, dated October 1, 1990 (the "Offering Document"), and I agree to pay for the Promissory Notes subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement. Each of the capitalized terms which are used in this Subscription Agreement shall have the same meaning as those terms have in the Offering Document.

2. *Purchase Price.*

The purchase price for each Promissory Note (the "Subscription Price") is $100,000 (subject to reduction at the sole discretion of the Company). I am herewith tendering payment for the subscribed for Promissory Notes by regular, bank or certified check payable to "Towers Financial Corporation, Funding Account" equal to $100,000 per Promissory Note (or such fraction thereof that is permitted by the Company).

3. *Offering.*

I understand that the offering will terminate on or before January 31, 1991 (subject to extension at the discretion of the Company). If my subscription is not accepted, all funds paid by me will be returned promptly to me without interest and without deduction of escrow costs. Upon receipt of such funds I will forthwith return the Offering Document and all other subscription documents to the Company. In the sole and absolute discretion of the Company, less than the full amount subscribed for by me may be accepted, whereupon the excess funds tendered by me will be promptly returned.

It is understood that this subscription is not binding unless and until it is accepted by the Company. I also understand and agree that my subscription to purchase Promissory Notes shall not be deemed binding upon the Company until the funds paid by me herewith are submitted to the Company, clear and are credited to the Funding Account.

4. *Representations and Warranties of the Undersigned.*

I acknowledge that I have received, read, understand, and am familiar with the Offering Document, including all attachments and exhibits thereto. I further acknowledge that, except as set forth in the Offering Document, no representations or warranties have been made to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Promissory Notes and/or the investment made thereby, and that I have not relied upon any information concerning the offering, written or oral, other than that contained in the Offering Document.

I further acknowledge that I have received, completed and returned to the Company, the Purchaser Questionnaire relating to my general ability to bear the risks of the investment being made hereby and my suitability as an Investor, and I hereby affirm the correctness of my answers in such questionnaire.

I further represent and warrant to the Company, Counsel to the Company, and their respective Affiliates, as follows:

(a) I can bear the economic risk of this investment and can afford a complete loss thereof; and I (i) have sufficient liquid assets to pay the full purchase price for each Promissory Note in the manner contemplated by the Offering Document; (ii) have adequate means of providing for my current needs and possible personal contingencies, and have no present need for liquidity of my investment in the Promissory Notes; (iii) have a net worth presently of at least an amount indicated by me in Part III of my Investor Questionnaire delivered simultaneously herewith; and (iv) qualify as an "Accredited Investor" as defined in Regulation D which was promulgated under the 1933 Act as follows:

(1) Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

(b) I have been represented by such legal and tax counsel and others, each of whom has been personally selected by me, as I found necessary to consult concerning the purchase of the Promissory Notes, and such representation has included an examination of applicable documents and an analysis of all tax, financial, recording, and securities law aspects thereof. I, my counsel, my advisors, and such other persons with whom I have found it necessary or advisable to consult, have sufficient knowledge and experience in business and financial matters to evaluate the information set forth in the Offering Document, and the risks of the investment, and to make an informed investment decision with respect thereto.

(c) With respect to the tax aspects of my investment, I am relying solely upon the advice of my own personal tax advisors, and upon my own knowledge with respect thereto.

(d) Any and all information has been made available to me, my counsel and my advisors, prior to the date hereof. I have had the opportunity to ask questions of, and to receive answers from, the Com-

pany, and its representatives, concerning the terms and conditions of the offering and access to any information, documents, financial statements, records and books (i) relating to the Company, the purchase of the Promissory Notes and the offering, and (ii) necessary to verify the accuracy of any information furnished to me. All materials and information requested by either me, my counsel, my advisors or others representing me, including any information requested to verify any information furnished, have been made available and examined.

(e) I understand that the offering has not been registered under the Securities Act of 1933, as amended (the "1933 Act"), nor pursuant to the provisions of the securities or other laws of any other applicable jurisdictions, in reliance upon the exemption for private offerings contained in Section 4(2) of the 1933 Act, Regulation D promulgated thereunder and the laws of such jurisdictions. I am fully aware that the Promissory Notes subscribed for by me are to be sold to me in reliance upon such exemptions based upon my representations, warranties and agreements. I am fully aware of the restrictions on sale, transferability and assignment of the Promissory Notes, as more fully set forth in the Offering Document, and that I must bear the economic risk of my investment herein for an indefinite period of time because the offering has not been registered under the 1933 Act and, therefore, the Promissory Notes cannot be offered or sold unless the offering is subsequently registered under the 1933 Act or an exemption from such registration is available.

(f) My execution and delivery of this Subscription Agreement has been duly authorized by all necessary action. I will not pledge, transfer or assign this Subscription Agreement or the Promissory Notes which I acquire pursuant to this offering without complying with the procedures set forth in the Offering Document. I am making the investment hereunder for my own account and not for the account of others and for investment purposes only and not with a view to or for the transfer, assignment, resale or distribution thereof, in whole or in part. I have no present plans to enter into any such contract, undertaking, agreement or arrangement.

(g) I agree that I shall not cancel, terminate or revoke this Agreement or any other agreement executed by me with respect to the purchase of a Promissory Note, and that this Subscription Agreement shall survive my death or disability, except as pursuant to the laws of the applicable jurisdiction.

(h) I am aware that the purchase of a Promissory Note is a speculative investment involving a significant degree of risk and that there is no guarantee that I will realize any gain from my investment.

(i) The address set forth below is my true and correct residence, and I have no present intention of becoming a resident of any other state or jurisdiction prior to my purchase of the Promissory Note.

(j) I understand the meaning and legal consequences of the foregoing representations and warranties, which are true and correct as of the date hereof and will be true and correct as of the date of my purchase of the Promissory Note subscribed for herein. Each such representation and warranty shall survive such purchase.

5. *Indemnification.*

I hereby agree to indemnify and hold harmless the Company, Counsel, and their Affiliated persons from any and all damages, losses, costs and expenses (including attorneys' fees and disbursements) which they, or any of them, may incur by reason of my failure, or alleged failure, to fulfill any of the terms and conditions of this subscription or by reason of my breach of any of my representations and warranties contained herein.

6. *Blue Sky Representations.*

(a) *Residents of any State.* I have read the jurisdictional notice applicable to the State of my residence which appears in Article "10" of this Subscription Agreement.

(b) *Residents of Florida.* I hereby acknowledge that I have the right, pursuant to Section 517.061(11)(a)(5) of the Florida Securities Act, to withdraw my subscription and receive a full refund of all monies paid by me to the Company within three business days after the execution of this Subscription

Agreement or payment for the Promissory Notes has been made, whichever is later. Withdrawal will be without any further liability to me. To accomplish this I need only send a letter or telegram to the Company, indicating my intention to withdraw. I acknowledge that such letter or telegram should be sent or postmarked prior to the end of the aforementioned third business day. I have also been informed that it is prudent to send such letter by certified mail, return receipt requested, to ensure that it was received and also to evidence the time when it was mailed. I also understand that should I make this request orally (either in person or by telephone), I must request written confirmation that such request by me has been received.

(c) *Residents of Michigan.* I agree that I will not sell or transfer my Promissory Note(s) except in a transaction which is exempt under the Michigan Securities Act or pursuant to an effective Registration Statement under the Michigan Securities Act.

I acknowledge that I have received the Offering Document and am aware of the following:

(i) The intended use of the proceeds of this Offering;

(ii) The current financial condition of the Company;

(iii) The direct or indirect compensation which has been or will be received by the Company and its Affiliates from this Offering;

(iv) The securities being offered hereunder are Promissory Notes and the purchase price therefore is $100,000 per Promissory Note; and

(v) I or my representative may inspect the books and records of the Company which relate to the Funding Account and the purchase and collection of the Accounts Receivable.

(d) *Residents of Pennsylvania.* Pursuant to the Pennsylvania Securities Act, Section 207(m), each Pennsylvania resident may elect, within two business days of the date of execution, to withdraw from this Subscription Agreement and to receive a full refund of all funds paid on account of this subscription together with copies of the signature pages of the Agreement. Such withdrawal shall be without any further liability to any person. To accomplish this withdrawal, I need only to send a letter or telegram to the Company, indicating my intention to withdraw. Such letter or telegram must be sent or postmarked prior to the end of the aforementioned second business day. If I send a letter, I understand that it is prudent to send it by certified mail, return receipt requested, to ensure that it is received and also to evidence the time when it was mailed. Should I make this request orally, in person or by telephone to the Company, I understand that I must ask for written confirmation that my request has been received. I agree not to sell or transfer any of the Promissory Notes for a period of at least twelve months from the date of purchase.

(e) *Residents of Texas.* I agree that I will not sell or transfer my Promissory Notes except in a transaction which is exempt under the Texas Securities Act or pursuant to an effective Registration Statement under the Texas Securities Act.

7. *Acceptance by the Company.*

Except as set forth herein, this Subscription Agreement is irrevocable. It is subject to all of the terms and provisions contained in the Offering Document. It may be accepted, in whole or in part, by the Company executing this Agreement, and mailing a duplicate copy to the undersigned. The Company reserves the right in its sole discretion to reject this subscription in whole or in part.

8. *General Provisions.*

Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all of the terms and provisions hereof shall be construed in accordance with, and governed by the laws of the State of New York applicable to contracts fully to be performed therein, may not be modified or waived except in writing, and is subject to all of the terms and provisions contained in the Offering Document.

9. *Miscellaneous.*

(a) All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the undersigned at the address which is set forth below and to the Company at 417 Fifth Avenue, New York, New York 10016.

(b) This Agreement constitutes the entire Agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

(c) The Company, counsel, and their respective Affiliates shall not be liable for taking any action pursuant to this Agreement in the absence of gross negligence, misfeasance, malfeasance or fraud.

10. *Jurisdictional Notices and Representations.*

It should be noted that the inclusion of a notice under state securities laws below should not be construed to mean that the Promissory Notes have been cleared or are otherwise available for sale in that state. The Company will maintain a list, which will be available upon request, of those states in which offers and sales of Promissory Notes can be made.

**DESPITE THE INCLUSION OF THE LEGENDS BELOW, BROKER-DEALERS MUST CONFIRM WITH THE ISSUER THAT EITHER THE SECURITIES HAVE BEEN REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE SINCE THE INCLUSION OF A LEGEND BELOW DOES NOT ASSURE REGISTRATION OR EXEMPTION.**

**IN ADDITION, SOME STATES' DEFINITION OF "ACCREDITED INVESTOR" DIFFERS FROM THE DEFINITION SET FORTH AT SECTION 4(a) OF THIS SUBSCRIPTION AGREEMENT. THEREFORE, IT IS IMPERATIVE THAT BROKER-DEALERS VERIFY THAT POTENTIAL INVESTORS QUALIFY AS "ACCREDITED INVESTORS" IN SUCH STATE.**

*FOR ALABAMA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR ALASKA RESIDENTS ONLY*: THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISION OF 3 AAC 08.500-3 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THE OFFERING DOCUMENT SINCE THE OFFERING DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF AS 45.55.170.

THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

*FOR ARIZONA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED PURSUANT TO A.R.S. SECTION 44-1846 BUT THE FACT OF THE GRANTING OF SUCH EXEMPTION IS NOT TO BE DEEMED A FINDING BY THE ARIZONA CORPORATION COMMISSION THAT THE OFFERING DOCUMENT IS TRUE OR ACCURATE, NOR DOES SUCH GRANT OR EXEMPTION MEAN THAT THE COMMISSION HAS PASSED UPON THE MERITS OF OR OTHERWISE APPROVED THE SECURITIES DESCRIBED HEREIN.

*FOR ARKANSAS RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-42-504(a)(14) OF THE ARKANSAS SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THE OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR CALIFORNIA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE, IF SUCH REGISTRATION IS REQUIRED.

*FOR COLORADO RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981, IF SUCH REGISTRATION IS REQUIRED.

*FOR CONNECTICUT RESIDENTS ONLY*: THE SECURITIES REFERRED TO IN THE OFFERING DOCUMENT HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE CONNECTICUT UNIFORM SECURITIES ACT, AND, THEREFORE, THE SECURITIES CANNOT BE SOLD OR TRANSFERRED UNDER SUCH ACT UNLESS THEY ARE REGISTERED UNDER SUCH ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR FLORIDA RESIDENTS ONLY*: FLORIDA PURCHASERS ARE ADVISED THAT WHERE SALES ARE MADE TO FIVE OR MORE PERSONS PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES & INVESTOR PROTECTION ACT, SUCH SALES ARE VOIDABLE BY THE PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE COMPANY OR ANY AGENT OF THE COMPANY OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE PURCHASER, WHICHEVER OCCURS LATER. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT (RULE 3E500.005(5)(a)(12)).

*FOR GEORGIA RESIDENTS ONLY*: OFFEREES ARE HEREBY ADVISED THAT THE CONSENT DECREE ENTERED INTO BY TOWERS FINANCIAL CORPORATION ("TOWERS") DISCUSSED IN THE CONFIDENTIAL PRIVATE OFFERING DOCUMENT DATED OCTOBER 1, 1990, PROVIDES THAT TOWERS IS PERMANENTLY ENJOINED FROM VIOLATING THE SECURITIES LAWS AND THAT TOWERS IS SUBJECT TO AN ONGOING OBLIGATION NOT TO VIOLATE THE SECURITIES LAWS. UNLESS A WAIVER IS GRANTED BY THE STATE OF GEORGIA, THE CONSENT DECREE CONSTITUTES AN AUTOMATIC DISQUALIFICATION FROM THE USE OF PRIVATE OFFERING EXEMPTIONS IN THE STATE OF GEORGIA. TOWERS HAS APPLIED FOR SUCH A WAIVER AND THE GEORGIA SECURITIES COMMISSION HAS AGREED TO GRANT THE WAIVER PROVIDED THAT THIS NOTICE BE FURNISHED TO ALL GEORGIA OFFEREES.

*FOR IDAHO RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANS-

FERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR ILLINOIS RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS, NOR HAS THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR INDIANA RESIDENTS ONLY*: THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 23-2-1-2 OF THE INDIANA CODE. THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL OR STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.

*FOR LOUISIANA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS OF LOUISIANA AND THEREFORE CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR MARYLAND RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, IF SUCH REGISTRATION IS REQUIRED.

*FOR MICHIGAN RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNIFORM SECURITIES ACT OF MICHIGAN AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. MINIMUM INVESTMENT IN MICHIGAN IS $50,000.

*FOR MINNESOTA RESIDENTS ONLY*: THESE SECURITIES REPRESENTED BY THIS OFFERING HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

*FOR MISSISSIPPI RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR MISSOURI RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR

STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR NEW JERSEY RESIDENTS ONLY*: THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THE OFFERING DOCUMENT. THE FILING OF THIS OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE OR THE SALE THEREOF BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR NEW MEXICO RESIDENTS ONLY*: THE SECURITIES DESCRIBED HEREIN ARE OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF NEW MEXICO. ACCORDINGLY, THE NEW MEXICO SECURITIES BUREAU HAS NOT REVIEWED THE OFFERING OF THESE SECURITIES AND HAS NOT APPROVED OR DISAPPROVED THIS OFFERING. THE NEW MEXICO SECURITIES BUREAU HAS NOT PASSED UPON THE VALUE OF THESE SECURITIES OR UPON THE ADEQUACY OR ACCURACY OF THE INFORMATION CONTAINED IN THE OFFERING DOCUMENT.

*FOR NORTH CAROLINA RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR PENNSYLVANIA RESIDENTS ONLY*: PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, EACH PENNSYLVANIA RESIDENT WHO ACCEPTS THE OFFER MADE PURSUANT TO THE OFFERING DOCUMENT TO PURCHASE ANY UNITS SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE, WITHOUT INCURRING ANY LIABILITY TO THE COMPANY, ITS AFFILIATES OR ANY OTHER PERSON, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE COMPANY OF HIS WRITTEN BINDING CONTRACT OF PURCHASE (SUBSCRIPTION AGREEMENT). TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER SHOULD SEND A LETTER OR TELEGRAM INDICATING HIS INTENTION TO WITHDRAW TO THE COMPANY AT THE ADDRESS OF THE COMPANY SET FORTH IN THE OFFERING DOCUMENT. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF A SUBSCRIBER ELECTS TO SEND SUCH A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD A SUBSCRIBER MAKE THIS REQUEST ORALLY, HE SHOULD ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

IN ADDITION TO QUALIFYING AS AN ACCREDITED INVESTOR, THE RESIDENTS OF PENNSYLVANIA HEREBY AGREE THAT THEY WILL WILL NOT SELL, TRANSFER OR SUBDIVIDE THE UNITS PURCHASED HEREIN UNTIL AT LEAST ONE (1) YEAR FROM THE DATE OF PURCHASE.

*FOR SOUTH CAROLINA RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSIONER REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR SOUTH DAKOTA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31A, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATIONS OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS OFFERING IS TRUE, COMPLETE, AND NOT MISLEADING; NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR TENNESSEE RESIDENTS ONLY*: THESE SECURITIES HAVE BEEN REGISTERED WITH THE STATE OF TENNESSEE. AS A CONDITION OF REGISTRATION, THE STATE OF TENNESSEE HAS IMPOSED MINIMUM SUITABILITY STANDARDS FOR TENNESSEE RESIDENTS. PURSUANT TO THOSE STANDARDS, EACH INVESTOR WHO IS A NATURAL PERSON MUST HAVE A NET WORTH OF AT LEAST $250,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES, AND MUST HAVE HAD A GROSS INCOME OF $65,000.00 DURING THE LAST TAX YEAR AND BE EXPECTED TO HAVE A GROSS INCOME OF $65,000.00 DURING THE CURRENT TAX YEAR, OR ALTERNATIVELY A NET WORTH OF AT LEAST $500,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS AND AUTOMOBILES. ADDITIONALLY, UNDER THIS SUITABILITY STANDARD, EACH NATURAL PERSON'S INVESTMENT MUST NOT EXCEED TEN PERCENT (10%) OF HIS NET WORTH.

THIS OFFERING IS MADE TO ACCREDITED INVESTORS AS DEFINED IN SECTION 501 (a) (1) OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933. SEE OFFERING DOCUMENT AT "TERMS OF INVESTMENT." THE ACCREDITED INVESTOR STANDARD IS GENERALLY MORE RESTRICTIVE THAN THE MINIMUM SUITABILITY REQUIREMENTS IMPOSED BY THE STATE OF TENNESSEE. THEREFORE, THE EFFECT OF REGISTRATION OF THE OFFERING IN TENNESSEE (AND THE MINIMUM SUITABILITY STANDARD) IS THAT THE OFFERING IS MADE ONLY TO ACCREDITED INVESTORS.

*FOR TEXAS RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS OF TEXAS AND THEREFORE CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR UTAH RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UTAH UNIFORM SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR

TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR VIRGINIA RESIDENTS ONLY*: THE VIRGINIA STATE CORPORATION COMMISSION DOES NOT PASS UPON THE ADEQUACY OF THE OFFERING DOCUMENT OR UPON THE MERITS OF THIS OFFERING AND THE COMMISSION EXPRESSES NO OPINION AS TO THE QUALITY OF THIS SECURITY.

*FOR WASHINGTON RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSIONER REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

11. *Information Relating to My Investment.*

(a) Number of Promissory Notes
(at a price of $100,000 per Promissory Note) __________

(b) Term of Promissory Notes ____12 months ____24 months

(c) Payment Tendered Herewith: ($100,000 times number of Promissory Notes) $ __________

(d) Additional Documents Required:

(i) Investor Questionnaire; and

(ii) Community Property Designation (if applicable) from Page ___ of this Subscription Agreement.

TO BE COMPLETED BY ALL SUBSCRIBERS:

Residence Address to which information regarding this subscription should be mailed:

Paul E. Meier, Trustee
Street Address

13677 River Valley Court Chesterfield, MO 6301
City and State Zip

(314) 576 1574
Telephone Number

37 0960892
Social Security Number or Employer Identification Number

37 0960892
Social Security Number or Employer Identification Number of Joint Tenant or Tenant-in-Common, if applicable

IN WITNESS WHEREOF, I (we) have executed this Subscription Agreement this 26th day of September, 19 91.

INDIVIDUAL:

Paul E. Meier, Trustee
Name (Please Print)

Paul E. Meier Trustee
Signature

Name of Joint Tenant or Tenant-in-Common, if applicable.

ENTITIES:

Name of Entity (Please Print)

Signature and Title

[Corporate Seal (if applicable)]

ACCEPTED AND AGREED TO THIS 11 DAY OF October, ~~1990~~ 1991

TOWERS FINANCIAL CORPORATION

By: [signature]
Mitchell Brater,
Vice Chairman and Chief Operating Officer

Term of Promissory Notes:
24 months

Number of Promissory Notes Accepted:
1 3 ,15

[INDIVIDUAL]

STATE OF Missouri }
COUNTY OF St. Louis } SS.:

On 26th, 1991, before me personally appeared Paul E. Meier and ________, known to me as the person(s) whose name(s) is (are) subscribed to the foregoing Subscription Agreement and acknowledged that (s)he (they) executed the same.

[signature]
Notary Public

MILTON E. METZLER
NOTARY PUBLIC STATE OF MISSOURI
ST. LOUIS COUNTY
MY COMMISSION EXP. JUNE 6,1992

[CORPORATE]

STATE OF }
COUNTY OF } SS.:

On ________, 19___, before me personally appeared ____________, to me known and who, being by me duly sworn, did depose and say that (s)he is the ____________ of ____________, a ____________ corporation, the corporation which executed the foregoing Subscription Agreement, that (s)he knows the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by authority of the corporation; and that (s)he signed his (her) name thereto by like authority.

Notary Public

TOW ERS FINANCIAL CORPORATION
OCTOBER . 1990 PRIVATE OFFERING DOCUMENT
NON-NEGO ABLE RECOURSE PROMISSORY NOTE

For value received, TOWERS F. IANCIAL CORPORATION, a Nevada corporation (the "Maker"), promises to pay to the order of the p on whose name and address are set forth at the end of this Note (the "Payee"), its successors and assigns, he principal sum which is indicated at the end of this Note, together with interest on the unpaid principal lance at the rate of interest which is set forth at the end of this Note, from the date of this Note (the date of is Note is set forth at the end of this Note) through and including the date of final payment hereunder.

Principal hereunder shall be du and payable in full on the date which is indicated at the end of this Note (the "Maturity Date").

Payment of principal and interes under this Note shall be made in lawful money of the United States of America to the Payee at the address w ch is set forth at the end of this Note or at such other location as shall be notified to the maker by the Payee. Interest shall be calculated on the basis of a year of 365 days for the actual number of days elapsed and sl ll be payable monthly [or quarterly] commencing with the interest payment which is due thirty (30) day: from the date of this Note.

Notwithstanding anything to the ontrary which is provided for herein, the rate of interest which is provided for hereunder shall not exceed h maximum legal rate of interest which is permitted pursuant to applicable law. If the rate of interest wl i is provided for in this Note shall be found to exceed the maximum legal rate of interest, the Maker shal : required to pay only the maximum legal rate of interest.

This Note has been issued pursua to the Offering Document dated October 1, 1990 of the Maker, and this Note is subject to all of the terms, nditions, obligations and provisions which are set forth in the Offering Document.

The holder of this Note shall be titled to all of the benefits provided for in the security agreement (the "Security Agreement") which was ex uted by the Maker in favor of the Payee and other similarly situated payees. Neit er this reference to the S curity Agreement nor any provision thereof shall affect or impair the obligations of the Maker which are p ovided for herein.

This Note is made and delivered i the State of New York and shall be governed by, and construed in accordance with, the laws of the Stat of New York. Any provision hereof which may prove unenforceable under any law shall not affect the vali y of any other provision hereof. The Payee agrees that any action or proceeding to enforce this Note shall brought in a court of competent jurisdiction located in the State and County of New York.

This Note may not be changed or erminated orally, but only by an agreement in writing and signed by the party against whom enforcement r any waiver, change, modification or discharge is sought.

IN WITNESS WHEREOF, the und igned has executed this Note as of the 1 day of Oct , 19 91

TOWERS FINANCIAL CORPORATION

Date of Note: September 30 19 9

By: [signature]
Mitchell Brater
Vice Chairman and Chief Operating Officer

PAYEE:

Paul E. Meier, TTEE

Principal Amount of Note: $ 100,000.00

Paul E. Meier, TTEE
Print Name(s)

Period to Maturity: 24 Months

13677 River Valley Court
Address

Maturity Date: September 30, 1993

Chesterfield, MO 63017
City, State and Zip Code

Rate of Interest: 15 % per annum

This Promissory Note has not been re stered under the Securities Act of 1933, as amended, and may not be sold or otherwise transferred in the absence of such registra n or an exemption therefrom under such Act or state securities laws. Furthermore, this Promissory Note may be sold or otherwise ransferred only in compliance with the conditions specified in the Offering Document of Maker, a complete and correct copy of h ch is available for inspection at the principal office of Maker and will be furnished without charge to the holder of this Pror issory Note upon written request.

## $100,000,000

# Towers Financial Corporation

## Subscription Documents

417 FIFTH AVENUE, NEW YORK, NEW YORK 10016 (212) 696-0505

### *INSTRUCTIONS TO SUBSCRIBERS*

Accompanying the Offering Document, you will find (i) the Subscription Agreement with signature page in duplicate and (ii) Investor Questionnaire which you must complete in accordance with the following instructions.

1. *Investor Questionnaire.*

Please read, complete and sign the Investor Questionnaire.

2. *Subscription Agreement.*

(a) Please read, complete the Subscription Agreement and sign two copies of the signature page; and

(b) Have your signatures notarized by a notary public on the acknowledgment forms accompanying the signature pages.

DO NOT SIGN THE SUBSCRIPTION AGREEMENT UNLESS YOU ARE CERTAIN YOU CAN MAKE ALL THE REPRESENTATIONS CONTAINED IN THE AGREEMENT.

3. *Purchaser Representative Questionnaire.*

If you used the services of a "purchaser representative," the purchaser representative questionnaire must be completed and which is available upon request.

4. *Payment.*

The subscription price is to be paid by check in the amount of $100,000 per Unit made payable to the order of "Towers Financial Corporation, Funding Account."

5. *Special Instructions for Trustees and Agents.*

Trustees, agents or other persons acting in a representative capacity are required to furnish with the completed Subscription Agreement (i) a copy of the trust agreement, power of attorney or other instrument granting the power and authority to subscribe, or (ii) an opinion of counsel as to such power and authority. In addition, such persons must indicate on the completed Subscription Agreement the name of the person or entity for whom he is acting as trustee or agent.

6. *Acceptance of Subscription.*

Deliver completed Subscription Documents and payment for the Units to Towers Financial Corporation, 417 Fifth Avenue, New York, New York 10016. If your subscription is accepted, you will receive shortly thereafter (a) one copy of the Subscription Agreement executed by an officer of the Company and (b) original *Promissory Note executed by the Company in the amount subscribed.*

# Investor Questionnaire

TOWERS FINANCIAL CORPORATION

**CONFIDENTIAL:**
**INVESTOR QUESTIONNAIRE**

Private Offering of $100,000,000
of Recourse Promissory Notes of $100,000 each
For: Accredited Investors Only

The offering of secured recourse non-negotiable promissory notes (the "Promissory Notes") issued by Towers Financial Corporation, a Delaware corporation (the "Company"), as more fully described in the Offering Document, dated October 15, 1991, will be made to Accredited Investors only pursuant to Regulation D promulgated under the Securities Act of 1933, as amended (the "1933 Act").

The purpose of this questionnaire is to assist the Company in complying with the above requirements. You agree that the Company may present this questionnaire to such parties as it deems appropriate in order to be assured that the offer and sale of Promissory Notes to you will not result in violation of the exemption from registration under the 1933 Act, described above, or any applicable state securities laws; however, this document will otherwise be kept confidential by the Company.

If you are acting as agent for a corporation, partnership, trust or any other entity, any reference to the term "you" shall mean such corporation, partnership, trust or other entity.

Except as set forth herein, your answers to this questionnaire will, at all times, be kept strictly confidential.

If the answer to any question is "None" or "Not Applicable," please so state.

Please complete this questionnaire as fully as possible, and sign, date and deliver one copy thereof to Towers Financial Corporation, 417 Fifth Avenue, New York, New York 10016.

**PLEASE PRINT**

1. Please provide the following information if you are investing as an individual. (If you are purchasing on behalf of a corporation, partnership, trust, or any other entity, please complete part II below). In addition, please provide the same information for any joint tenant or tenant-in-common:

Name (1) ______________________ (2) ______________________

Date of Birth (1) __________ (2) __________ Marital Status (1) __________ (2) __________

Permanent Home Address (1) ______________________ (2) ______________________

______________________ ______________________

______________ (Zip) ______________ (Zip)

Home Telephone Number (1) (  ) ______________ (2) (  ) ______________

Social Security No. (1) ______________________ (2) ______________________

Citizenship (1) ______________________ (2) ______________________

Name of (Circle One and Complete)

Advisor/Broker-Dealer/Registered Investment Adviser

______________________________

1 2 (if joint purchaser)

Names of Employer (1) __________ (2) __________

Nature of Business (1) __________ (2) __________

Position(s) (1) __________ (2) __________

General Duties (1) __________ (2) __________

Business Address (1) __________ (2) __________

Business Telephone Number (1) (  ) __________ (2) (  ) __________

Please describe your employment positions or occupations during the last five years (listing the inclusive dates of each) indicating any and all vocationally related experience in financial and business matters:

| Employment, Position or Occupation | Nature of Duties | From: | To: |
|---|---|---|---|
| (1) | | | |
| (2) | | | |

Are you acting for your own account? Yes(__) No(__)

If you are not acting for your own account, please complete the following:

(i) Capacity in which you are acting (agent, trustee or otherwise):

______________________________

(ii) Name, address and telephone number of persons you represent:

______________________________

(iii) Please attach evidence of authority.

NOTE: ANY INDIVIDUALS REPRESENTED BY YOU MUST BE QUALIFIED AS "PURCHASERS" PURSUANT TO THE ACT AND SHOULD EACH COMPLETE A COPY OF THIS QUESTIONNAIRE.

II. Please complete the following if you are investing on behalf of a corporation, partnership, trust or other entity.

Name of corporation, partnership, trust, pension plan, or entity __________

Employer Identification No. __________

Business Activities __________

State and Year of Organization __________

Fiscal year __________

Business Address __________

__________ (Zip) __________

Business Telephone Number (  ) __________

Authorized Person to Contact __________ (title) __________

III. PLEASE ANSWER THE FOLLOWING QUESTIONS.

**For Individuals only:**

1. At this time, is your individual net worth (or joint net worth with your spouse) in excess of $1,000,000?

Yes (  ) No (  )

2. Did your individual adjusted gross income (increased by any deduction for long term capital gains or depletion, any exclusion for interest and any losses of a partnership as reported on Schedule E on Form

1040) from all sources for each of the two taxable years preceding this date exceed $200,000 (or if jointly with spouse $300,000)?

Yes ( ) No ( )

3. If you have had income from all sources of $200,000 (or if jointly with spouse $300,000) for each of the past two taxable years, do you reasonably expect your income from all sources for the current taxable year to exceed $200,000 (or if jointly with spouse $300,000)?

Yes ( ) No ( )

4. *For Corporations, Charitable Organizations and Partnerships Only*:
If you are a 501(c)(3) organization, corporation, Massachusetts or similar business trust, or partnership, do you have total assets in excess of $5,000,000?

Yes ( ) No ( )

5. *For Trusts Only*:
If you are a trust (not formed for the specific purpose of acquiring the securities offered) and your investment herein is directed by a sophisticated person as described in Section 230.506(b)(2)(ii) are your total assets in excess of $5,000,000?

Yes ( ) No ( )

6. *For Banks, ERISA plans, SBICs, investment companies under the 1940 Act, etc.*
Do you otherwise qualify as an accredited investor under the following definition:

Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefits of its employees if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

Yes ( ) No ( )

7. *For all Investors. Please complete the following questions and information requested*:
Are you aware that the proposed offering of Promissory Notes requires your capital investment to be maintained for the term of your Promissory Note (12-months, 24-months or 36-months, as the case may be)?

Yes ( ) No ( )

8. Please indicate the general, business or professional education and the degrees received by you (or, if the purchaser is a corporation, partnership, trust or other entity, by the person completing this questionnaire on its behalf).

| College | Degree Received | Year |
|---|---|---|
| | | |
| | | |
| | | |

9. Investment Experience:

(a) Frequency of investment in marketable securities:
often ( ); occasionally ( ); seldom ( ); never ( ).

(b) Frequency of investment in commodities futures:
often ( ); occasionally ( ); seldom ( ); never ( ).

(c) Frequency of investment in options:
often ( ); occasionally ( ); seldom ( ); never ( ).

(d) Frequency of investment in securities purchased on margin:
often ( ); occasionally ( ); seldom ( ); never ( ).

(e) Frequency of investment in illiquid securities:
often ( ); occasionally ( ); seldom ( ); never ( ).

10. Indicate in the space provided below, any additional information which you think may be helpful in determining that your knowledge and experience in financial and business matters is sufficient to enable you to evaluate the merits and risks of investing in the securities offered pursuant to the Offering Document of which this forms a part.

______________________________

______________________________

______________________________

______________________________

I (we) acknowledge that the foregoing statements are true and accurate to the best of my (our) information and belief, and that I (we) will promptly notify the Company of any changes in the foregoing answers.

IN WITNESS WHEREOF, I (we) have executed this questionnaire this ____ date of ________, 19__.

______________________________
(Print Name of Joint Tenant or Tenant-in-Common, if applicable)

______________________________
(Print Name)

______________________________
(Signature)

______________________________
(Signature of Joint Tenant

or______________________________
Tenant-in-Common, if applicable)
(Title, if Applicable)

Place of Execution:

______________________________

*Please also complete and execute the following balance sheet or supply a substitute balance sheet as of a current date which should include an original signature of a duly authorized representative.*

BALANCE SHEET

| Assets | | Liabilities | |
|---|---|---|---|
| Cash on hand: | $______ | | |
| Cash value of life insurance policies: | ______ | | |
| Market value of listed securities: | ______ | Margin Amount | $______ |
| Market value of unlisted securities: | ______ | | |
| Market value of real estate | | Encumbrances on Real Estate | |
| Residence: | ______ | Residence: | ______ |
| Other: | ______ | Other: | ______ |
| Accounts Receivable: | ______ | Accounts Payable: (include all amounts due to others, including credit cards, debts and other unsecured debts) | ______ |
| Automobiles: | ______ | Automobile Loans: | ______ |
| Other Assets: | ______ | Other Debts: | ______ |
| TOTAL ASSETS | $______ | TOTAL LIABILITIES | $______ |
| NET WORTH | $______ | | |

I confirm that the above balance sheet is true, correct and accurate.

______________________
Signature

Subscription Agreement

# TOWERS FINANCIAL CORPORATION
## SUBSCRIPTION AGREEMENT

To: Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016

Gentlemen:

1. *Subscription.*

I hereby subscribe to purchase the number of secured recourse non-negotiable promissory notes which are set forth in Article "11" of this Subscription Agreement (the "Promissory Notes") issued by TOWERS FINANCIAL CORPORATION, a Delaware corporation (the "Company"), as more fully described in the offering document, dated October 15, 1991 (the "Offering Document"), and I agree to pay for the Promissory Notes subscribed for by me in the manner which is described in Article "2" of this Subscription Agreement. Each of the capitalized terms which are used in this Subscription Agreement shall have the same meaning as those terms have in the Offering Document.

2. *Purchase Price.*

The purchase price for each Promissory Note (the "Subscription Price") is $100,000 (subject to reduction at the sole discretion of the Company). I am herewith tendering payment for the subscribed for Promissory Notes by regular, bank or certified check payable to "Towers Financial Corporation, Funding Account" equal to $100,000 per Promissory Note (or such fraction thereof that is permitted by the Company).

3. *Offering.*

I understand that the offering will terminate on or before October 14, 1992. If my subscription is not accepted, all funds paid by me will be returned promptly to me without interest and without deduction of escrow costs. Upon receipt of such funds I will forthwith return the Offering Document and all other subscription documents to the Company. In the sole and absolute discretion of the Company, less than the full amount subscribed for by me may be accepted, whereupon the excess funds tendered by me will be promptly returned.

It is understood that this subscription is not binding unless and until it is accepted by the Company. I also understand and agree that my subscription to purchase Promissory Notes shall not be deemed binding upon the Company until the funds paid by me herewith are submitted to the Company, clear and are credited to the Funding Account.

4. *Representations and Warranties of the Undersigned.*

I acknowledge that I have received, read, understand, and am familiar with the Offering Document, including all attachments and exhibits thereto and the 1991 Annual Report of the Company including the Audited Financial Statements contained therein. I further acknowledge that, except as set forth in the Offering Document and the 1991 Annual Report, no representations or warranties have been made to me, or to my advisors, by the Company, or by any person acting on behalf of the Company, with respect to the sale of the Promissory Notes and/or the investment made thereby, and that I have not relied upon any information concerning the offering, written or oral, other than that contained in the Offering Document.

I further acknowledge that I have received, completed and returned to the Company, the Purchaser Questionnaire relating to my general ability to bear the risks of the investment being made hereby and my suitability as an Investor, and I hereby affirm the correctness of my answers in such questionnaire.

I further represent and warrant to the Company, Counsel to the Company, and their respective Affiliates, as follows:

(a) I can bear the economic risk of this investment and can afford a complete loss thereof; and I (i) have sufficient liquid assets to pay the full purchase price for each Promissory Note in the manner contemplated by the Offering Document; (ii) have adequate means of providing for my current needs and possible personal contingencies, and have no present need for liquidity of my investment in the Promissory Notes; (iii) have a net worth presently of at least an amount indicated by me in Part III of my Investor Questionnaire delivered simultaneously herewith; and (iv) qualify as an "Accredited Investor" as defined in Regulation D which was promulgated under the 1933 Act as follows:

(1) Any Bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; *any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934;* any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefits of its employees if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(2) Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Section 230.506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are accredited investors.

(b) I have been represented by such legal and tax counsel and others, each of whom has been personally selected by me, as I found necessary to consult concerning the purchase of the Promissory Notes, and such representation has included an examination of applicable documents and an analysis of all tax, financial, recording, and securities law aspects thereof. I, my counsel, my advisors, and such other persons with whom I have found it necessary or advisable to consult, have sufficient knowledge and experience *in business and financial matters to evaluate the information set forth in the Offering Document,* and the risks of the investment, and to make an informed investment decision with respect thereto.

(c) With respect to the tax aspects of my investment, I am relying solely upon the advice of my own personal tax advisors, and upon my own knowledge with respect thereto.

(d) Any and all information has been made available to me, my counsel and my advisors, prior to the date hereof. I have had the opportunity to ask questions of, and to receive answers from, the Compa-

ny, and its representatives, concerning the terms and conditions of the offering and access to any information, documents, financial statements, records and books (i) relating to the Company, the purchase of the Promissory Notes and the offering, and (ii) necessary to verify the accuracy of any information furnished to me. All materials and information requested by either me, my counsel, my advisors or others representing me, including any information requested to verify any information furnished, have been made available and examined.

(e) I understand that the offering has not been registered under the Securities Act of 1933, as amended (the "1933 Act"), nor pursuant to the provisions of the securities or other laws of any other applicable jurisdictions, in reliance upon the exemption for private offerings contained in Section 4(2) of the 1933 Act, Regulation D promulgated thereunder and the laws of such jurisdictions. I am fully aware that the Promissory Notes subscribed for by me are to be sold to me in reliance upon such exemptions based upon my representations, warranties and agreements. I am fully aware of the restrictions on sale, transferability and assignment of the Promissory Notes, as more fully set forth in the Offering Document, and that I must bear the economic risk of my investment herein for an indefinite period of time because the offering has not been registered under the 1933 Act and, therefore, the Promissory Notes cannot be offered or sold unless the offering is subsequently registered under the 1933 Act or an exemption from such registration is available.

(f) My execution and delivery of this Subscription Agreement have been duly authorized by all necessary action. I will not pledge, transfer or assign this Subscription Agreement or the Promissory Notes which I acquire pursuant to this offering without complying with the procedures set forth in the Offering Document. I am making the investment hereunder for my own account and not for the account of others and for investment purposes only and not with a view to or for the transfer, assignment, resale or distribution thereof, in whole or in part. I have no present plans to enter into any such contract, undertaking, agreement or arrangement.

(g) I agree that I shall not cancel, terminate or revoke this Agreement or any other agreement executed by me with respect to the purchase of a Promissory Note, and that this Subscription Agreement shall survive my death or disability, except as pursuant to the laws of the applicable jurisdiction.

(h) I am aware that the purchase of a Promissory Note is a speculative investment involving a significant degree of risk and that there is no guarantee that I will realize any gain from my investment.

(i) The address set forth below is my true and correct residence, and I have no present intention of becoming a resident of any other state or jurisdiction prior to my purchase of the Promissory Note.

(j) I understand the meaning and legal consequences of the foregoing representations and warranties, which are true and correct as of the date hereof and will be true and correct as of the date of my purchase of the Promissory Note subscribed for herein. Each such representation and warranty shall survive such purchase.

5. *Indemnification.*

I hereby agree to indemnify and hold harmless the Company, Counsel, and their Affiliated persons from any and all damages, losses, costs and expenses (including attorneys' fees and disbursements) which they, or any of them, may incur by reason of my failure, or alleged failure, to fulfill any of the terms and conditions of this subscription or by reason of my breach of any of my representations and warranties contained herein.

6. *Blue Sky Representations.*

(a) *Residents of any State.* I have read the jurisdictional notice applicable to the State of my residence which appears in Article "10" of this Subscription Agreement.

(b) *Residents of Florida.* I hereby acknowledge that I have the right, pursuant to Section 517.061(11)(a)(5) of the Florida Securities Act, to withdraw my subscription and receive a full refund of all monies paid by me to the Company within three business days after the execution of this Subscription Agreement or payment for the Promissory Notes has been made, whichever is later. Withdrawal will be

without any further liability to me. To accomplish this I need only send a letter or telegram to the Company, indicating my intention to withdraw. I acknowledge that such letter or telegram should be sent or postmarked prior to the end of the aforementioned third business day. I have also been informed that it is prudent to send such letter by certified mail, return receipt requested, to ensure that it was received and also to evidence the time when it was mailed. I also understand that should I make this request orally (either in person or by telephone), I must request written confirmation that such request by me has been received.

(c) *Residents of Michigan.* I agree that I will not sell or transfer my Promissory Note(s) except in a transaction which is exempt under the Michigan Securities Act or pursuant to an effective Registration Statement under the Michigan Securities Act.

I acknowledge that I have received the Offering Document and am aware of the following:

(i) The intended use of the proceeds of this Offering;

(ii) The current financial condition of the Company;

(iii) The direct or indirect compensation which has been or will be received by the Company and its Affiliates from this Offering;

(iv) The securities being offered hereunder are Promissory Notes and the purchase price therefore is $100,000 per Promissory Note; and

(v) I or my representative may inspect the books and records of the Company which relate to the Funding Account and the purchase and collection of the Accounts Receivable.

(d) *Residents of Pennsylvania.* Pursuant to the Pennsylvania Securities Act, Section 207(m), each Pennsylvania resident may elect, within two business days of the date of execution, to withdraw from this Subscription Agreement and to receive a full refund of all funds paid on account of this subscription together with copies of the signature pages of the Agreement without incurring any liability to the Company, its affiliates or to any other person. To accomplish this withdrawal, I need only to send a letter or telegram to the Company, indicating my intention to withdraw. Such letter or telegram must be sent or postmarked prior to the end of the aforementioned second business day. If I send a letter, I understand that it is prudent to send it by certified mail, return receipt requested, to ensure that it is received and also to evidence the time when it was mailed. Should I make this request orally, in person or by telephone to the Company, I understand that I must ask for written confirmation that my request has been received. I agree not to sell or transfer any of the Promissory Notes for a period of at least twelve months from the date of purchase.

(e) *Residents of Texas.* I agree that I will not sell or transfer my Promissory Notes except in a transaction which is exempt under the Texas Securities Act or pursuant to an effective Registration Statement under the Texas Securities Act.

7. *Acceptance by the Company.*

Except as set forth herein, this Subscription Agreement is irrevocable. It is subject to all of the terms and provisions contained in the Offering Document. It may be accepted, in whole or in part, by the Company executing this Agreement, and mailing a duplicate copy to the undersigned. The Company reserves the right in its sole discretion to reject this subscription in whole or in part.

8. *General Provisions.*

Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all of the terms and provisions hereof shall be construed in accordance with, and governed by the laws of the State of New York applicable to contracts fully to be performed therein, may not be modified or waived except in writing, and is subject to all of the terms and provisions contained in the Offering Document.

9. *Miscellaneous.*

(a) All notices or other communications given or made hereunder shall be in writing and shall be delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the undersigned at the address which is set forth below and to the Company at 417 Fifth Avenue, New York, New York 10016.

(b) This Agreement constitutes the entire Agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

(c) The Company, counsel, and their respective Affiliates shall not be liable for taking any action pursuant to this Agreement in the absence of gross negligence, misfeasance, malfeasance or fraud.

10. *Jurisdictional Notices and Representations.*

It should be noted that the inclusion of a notice under state securities laws below should not be construed to mean that the Promissory Notes have been cleared or are otherwise available for sale in that state. The Company will maintain a list, which will be available upon request, of those states in which offers and sales of Promissory Notes can be made.

DESPITE THE INCLUSION OF THE LEGENDS BELOW, BROKER-DEALERS MUST CONFIRM WITH THE ISSUER THAT EITHER THE SECURITIES HAVE BEEN REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE SINCE THE INCLUSION OF A LEGEND BELOW DOES NOT ASSURE REGISTRATION OR EXEMPTION.

IN ADDITION, SOME STATES' DEFINITION OF "ACCREDITED INVESTOR" DIFFERS FROM THE DEFINITION SET FORTH AT 4(a) OF THIS SUBSCRIPTION AGREEMENT. THEREFORE, IT IS IMPERATIVE THAT BROKER-DEALERS VERIFY THAT POTENTIAL INVESTORS QUALIFY AS "ACCREDITED INVESTORS" IN SUCH STATE.

*FOR ALABAMA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER THE ALABAMA SECURITIES ACT. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ALABAMA SECURITIES COMMISSION. THE COMMISSION DOES NOT RECOMMEND OR ENDORSE THE PURCHASE OF ANY SECURITIES, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR ALASKA RESIDENTS ONLY*: THE SECURITIES OFFERED HAVE BEEN REGISTERED WITH THE ADMINISTRATOR OF SECURITIES OF THE STATE OF ALASKA UNDER PROVISION OF 3 AAC 08.500-3 AAC 08.506. THE INVESTOR IS ADVISED THAT THE ADMINISTRATOR HAS MADE ONLY A CURSORY REVIEW OF THE REGISTRATION STATEMENT AND HAS NOT REVIEWED THE OFFERING DOCUMENT SINCE THE OFFERING DOCUMENT IS NOT REQUIRED TO BE FILED WITH THE ADMINISTRATOR. THE FACT OF REGISTRATION DOES NOT MEAN THAT THE ADMINISTRATOR HAS PASSED IN ANY WAY UPON THE MERITS, RECOMMENDED OR APPROVED THE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A VIOLATION OF AS 45.55.170.

THE INVESTOR MUST RELY ON THE INVESTOR'S OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED, IN MAKING AN INVESTMENT DECISION ON THESE SECURITIES.

*FOR ARIZONA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED PURSUANT TO A.R.S. SECTION 44-1846 BUT THE FACT OF THE GRANTING OF SUCH EXEMPTION IS NOT TO BE DEEMED A FINDING BY THE ARIZONA CORPORATION COMMISSION THAT THE OFFERING DOCUMENT IS TRUE OR ACCURATE, NOR DOES SUCH GRANT OF EXEMPTION MEAN THAT THE COMMISSION HAS PASSED UPON THE MERITS OF OR OTHERWISE APPROVED THE SECURITIES DESCRIBED HEREIN.

*FOR ARKANSAS RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 23-42-504(a)(14) OF THE ARKANSAS SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. A REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS NOT BEEN FILED WITH THE ARKANSAS SECURITIES DEPARTMENT OR WITH THE SECURITIES AND EXCHANGE COMMISSION. NEITHER THE DEPARTMENT NOR THE COMMISSION HAS PASSED UPON THE VALUE OF THESE SECURITIES, MADE ANY RECOMMENDATIONS AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THE OFFERING, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR CALIFORNIA RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE CALIFORNIA CORPORATIONS CODE, IF SUCH REGISTRATION IS REQUIRED.

*FOR COLORADO RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981 BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE COLORADO SECURITIES ACT OF 1981, IF SUCH REGISTRATION IS REQUIRED.

*FOR CONNECTICUT RESIDENTS ONLY*: THE SECURITIES REFERRED TO IN THE OFFERING DOCUMENT HAVE NOT BEEN REGISTERED UNDER SECTION 36-485 OF THE CONNECTICUT UNIFORM SECURITIES ACT, AND, THEREFORE, THE SECURITIES CANNOT BE SOLD OR TRANSFERRED UNDER SUCH ACT UNLESS THEY ARE REGISTERED UNDER SUCH ACT OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR FLORIDA RESIDENTS ONLY*: FLORIDA PURCHASERS ARE ADVISED THAT WHERE SALES ARE MADE TO FIVE OR MORE PERSONS PURSUANT TO SECTION 517.061(11)(a)(5) OF THE FLORIDA SECURITIES & INVESTOR PROTECTION ACT, SUCH SALES ARE VOIDABLE BY THE PURCHASER EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE COMPANY OR ANY AGENT OF THE COMPANY OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE PURCHASER, WHICHEVER OCCURS LATER. THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT (RULE 3E500.005(5)(a)(12)).

*FOR GEORGIA RESIDENTS ONLY*: OFFEREES ARE HEREBY ADVISED THAT THE CONSENT DECREE ENTERED INTO BY TOWERS FINANCIAL CORPORATION ("TOWERS") DISCUSSED IN THE CONFIDENTIAL PRIVATE OFFERING DOCUMENT DATED OCTOBER 15, 1991, PROVIDES THAT TOWERS IS PERMANENTLY ENJOINED FROM VIOLATING THE SECURITIES LAWS AND THAT TOWERS IS SUBJECT TO AN ONGOING OBLIGATION NOT TO VIOLATE THE SECURITIES LAWS. UNLESS A WAIVER IS GRANTED BY THE STATE OF GEORGIA, THE CONSENT DECREE CONSTITUTES AN AUTOMATIC DISQUALIFICATION FROM THE USE OF PRIVATE OFFERING EXEMPTIONS IN THE STATE OF GEORGIA. TOWERS HAS APPLIED FOR SUCH A WAIVER AND THE GEORGIA SECURITIES COMMISSION HAS AGREED TO GRANT THE WAIVER PROVIDED THAT THIS NOTICE BE FURNISHED TO ALL GEORGIA OFFEREES.

*FOR IDAHO RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE IDAHO SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANS-

FERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR ILLINOIS RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS, NOR HAS THE SECRETARY OF STATE OF ILLINOIS OR THE STATE OF ILLINOIS PASSED UPON THE ACCURACY OR ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

*FOR INDIANA RESIDENTS ONLY*: THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 23-2-1-2 OF THE INDIANA CODE. THE SECURITIES MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH THE REGISTRATION OR QUALIFICATION PROVISIONS OF APPLICABLE FEDERAL OR STATE SECURITIES LAWS OR APPLICABLE EXEMPTIONS THEREFROM.

*FOR LOUISIANA RESIDENTS ONLY*: THESE SECURITIES HAVE BEEN REGISTERED WITH THE SECURITIES COMMISSIONER OF THE STATE OF LOUISIANA. THE SECURITIES COMMISSIONER, BY ACCEPTING REGISTRATION, DOES NOT IN ANY WAY ENDORSE OR RECOMMEND THE PURCHASE OF ANY OF THESE SECURITIES.

*MAINE RESIDENTS*: THESE SECURITIES ARE BEING SOLD PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE BANK SUPERINTENDENT OR THE STATE OF MAINE UNDER SECTION 10502(2)(R) OF TITLE 32 OF THE MAINE REVISED STATUTES. THESE SECURITIES MAY BE DEEMED RESTRICTED SECURITIES AND AS SUCH THE HOLDER MAY NOT BE ABLE TO RESELL THE SECURITIES UNLESS PURSUANT TO REGISTRATION UNDER STATE OR FEDERAL SECURITIES LAWS OR UNLESS AND EXEMPTION UNDER SUCH LAWS EXISTS.

*FOR MARYLAND RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, BY REASON OF SPECIFIC EXEMPTIONS THEREUNDER RELATING TO THE LIMITED AVAILABILITY OF THE OFFERING. THESE SECURITIES CANNOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF TO ANY PERSON OR ENTITY UNLESS SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE MARYLAND SECURITIES ACT, IF SUCH REGISTRATION IS REQUIRED.

*FOR MICHIGAN RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNIFORM SECURITIES ACT OF MICHIGAN AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. MINIMUM INVESTMENT IN MICHIGAN IS $50,000.

*FOR MINNESOTA RESIDENTS ONLY*: THESE SECURITIES REPRESENTED BY THIS OFFERING HAVE NOT BEEN REGISTERED UNDER CHAPTER 80A OF THE MINNESOTA SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO REGISTRATION, OR AN EXEMPTION THEREFROM.

*FOR MISSISSIPPI RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1)

YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR MISSOURI RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY GENERALLY NOT BE TRANSFERRED OR RESOLD FOR A PERIOD OF ONE (1) YEAR. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*NEW HAMPSHIRE RESIDENTS*: NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE DIRECTOR OF THE OFFICE OF SECURITIES REGULATION THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE DIRECTOR OF THE OFFICE OR SECURITIES REGULATION HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

*FOR NEW JERSEY RESIDENTS ONLY*: THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY HAS NOT PASSED ON OR ENDORSED THE MERITS OF THE OFFERING DOCUMENT. THE FILING OF THIS OFFERING WITH THE BUREAU OF SECURITIES DOES NOT CONSTITUTE APPROVAL OF THE ISSUE OR THE SALE THEREOF BY THE BUREAU OF SECURITIES OR THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

*FOR NEW MEXICO RESIDENTS ONLY*: THE SECURITIES DESCRIBED HEREIN ARE OFFERED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF NEW MEXICO. ACCORDINGLY, THE NEW MEXICO SECURITIES BUREAU HAS NOT REVIEWED THE OFFERING OF THESE SECURITIES AND HAS NOT APPROVED OR DISAPPROVED THIS OFFERING. THE NEW MEXICO SECURITIES BUREAU HAS NOT PASSED UPON THE VALUE OF THESE SECURITIES OR UPON THE ADEQUACY OR ACCURACY OF THE INFORMATION CONTAINED IN THE OFFERING DOCUMENT.

*FOR NORTH CAROLINA RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE

SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR PENNSYLVANIA RESIDENTS ONLY*: PURSUANT TO SECTION 207(m) OF THE PENNSYLVANIA SECURITIES ACT OF 1972, EACH PENNSYLVANIA RESIDENT WHO ACCEPTS THE OFFER MADE PURSUANT TO THE OFFERING DOCUMENT TO PURCHASE ANY UNITS SHALL HAVE THE RIGHT TO WITHDRAW HIS ACCEPTANCE, WITHOUT INCURRING ANY LIABILITY TO THE COMPANY, ITS AFFILIATES OR ANY OTHER PERSON, WITHIN TWO (2) BUSINESS DAYS FROM THE DATE OF RECEIPT BY THE COMPANY OF HIS WRITTEN BINDING CONTRACT OF PURCHASE (SUBSCRIPTION AGREEMENT). TO ACCOMPLISH THIS WITHDRAWAL, A SUBSCRIBER SHOULD SEND A LETTER OR TELEGRAM INDICATING HIS INTENTION TO WITHDRAW TO THE COMPANY AT THE ADDRESS OF THE COMPANY SET FORTH IN THE OFFERING DOCUMENT. SUCH LETTER OR TELEGRAM SHOULD BE SENT AND POSTMARKED PRIOR TO THE END OF THE AFOREMENTIONED SECOND BUSINESS DAY. IF A SUBSCRIBER ELECTS TO SEND SUCH A LETTER, IT IS PRUDENT TO SEND IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ENSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME WHEN IT WAS MAILED. SHOULD A SUBSCRIBER MAKE THIS REQUEST ORALLY, HE SHOULD ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

IN ADDITION TO QUALIFYING AS AN ACCREDITED INVESTOR, THE RESIDENTS OF PENNSYLVANIA HEREBY AGREE THAT THEY WILL WILL NOT SELL, TRANSFER OR SUBDIVIDE THE UNITS PURCHASED HEREIN UNTIL AT LEAST ONE (1) YEAR FROM THE DATE OF PURCHASE.

*FOR SOUTH CAROLINA RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

*FOR SOUTH DAKOTA RESIDENTS ONLY*: THESE SECURITIES ARE OFFERED FOR SALE IN THE STATE OF SOUTH DAKOTA PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SOUTH DAKOTA BLUE SKY LAW, CHAPTER 47-31A, WITH THE DIRECTOR OF THE DIVISION OF SECURITIES OF THE DEPARTMENT OF COMMERCE AND REGULATIONS OF THE STATE OF SOUTH DAKOTA. THE EXEMPTION DOES NOT CONSTITUTE A FINDING THAT THIS OFFERING IS TRUE, COMPLETE, AND NOT MISLEADING; NOR HAS THE DIRECTOR OF THE DIVISION OF SECURITIES PASSED IN ANY WAY UPON THE MERITS OF, RECOMMENDED, OR GIVEN APPROVAL TO THESE SECURITIES. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SOUTH DAKOTA RESIDENTS HEREBY REPRESENT THAT (I)THEY HAVE A NET WORTH OF AT LEAST $1,000,000 (EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES); (II)THEY WILL INVEST NOT LESS THAN $1,000,000; AND (III)THEIR INVESTMENT DOES NOT EXCEED 10% OF THEIR NET WORTH.

*FOR TENNESSEE RESIDENTS ONLY*: THESE SECURITIES HAVE BEEN REGISTERED WITH THE STATE OF TENNESSEE. AS A CONDITION OF REGISTRATION, THE STATE OF TENNES-

SEE HAS IMPOSED MINIMUM SUITABILITY STANDARDS FOR TENNESSEE RESIDENTS. PURSUANT TO THOSE STANDARDS, EACH INVESTOR WHO IS A NATURAL PERSON MUST HAVE A NET WORTH OF AT LEAST $250,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS, AND AUTOMOBILES, AND MUST HAVE HAD A GROSS INCOME OF $65,000.00 DURING THE LAST TAX YEAR AND BE EXPECTED TO HAVE A GROSS INCOME OF $65,000.00 DURING THE CURRENT TAX YEAR, OR ALTERNATIVELY A NET WORTH OF AT LAST $500,000.00 EXCLUSIVE OF HOME, HOME FURNISHINGS AND AUTOMOBILES. ADDITIONALLY, UNDER THIS SUITABILITY STANDARD, EACH NATURAL PERSON'S INVESTMENT MUST NOT EXCEED TEN PERCENT (10%) OF HIS NET WORTH.

THIS OFFERING IS MADE TO ACCREDITED INVESTORS AS DEFINED IN SECTION 501 (a) (1) OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933. SEE OFFERING DOCUMENT AT "TERMS OF THE INVESTMENT." THE ACCREDITED INVESTOR STANDARD IS GENERALLY MORE RESTRICTIVE THAN THE MINIMUM SUITABILITY REQUIREMENTS IMPOSED BY THE STATE OF TENNESSEE. THEREFORE, THE EFFECT OF REGISTRATION OF THE OFFERING IN TENNESSEE (AND THE MINIMUM SUITABILITY STANDARD) IS THAT THE OFFERING IS MADE ONLY TO ACCREDITED INVESTORS.

*FOR TEXAS RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER APPLICABLE SECURITIES LAWS OF TEXAS AND THEREFORE CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR UTAH RESIDENTS ONLY*: THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UTAH UNIFORM SECURITIES ACT AND, THEREFORE, CANNOT BE RESOLD OR TRANSFERRED UNLESS THEY ARE SO REGISTERED OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.

*FOR VIRGINIA RESIDENTS ONLY*: THE VIRGINIA STATE CORPORATION COMMISSION DOES NOT PASS UPON THE ADEQUACY OF THE OFFERING DOCUMENT OR UPON THE MERITS OF THIS OFFERING AND THE COMMISSION EXPRESSES NO OPINION AS TO THE QUALITY OF THIS SECURITY.

*FOR WASHINGTON RESIDENTS ONLY*: IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE OFFERING DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**TO BE COMPLETED BY ALL SUBSCRIBERS:**

Residence Address to which information regarding this subscription should be mailed:

5737 W. Ohio Avenue
Street Address

Lakewood CO 80226
City and State Zip

(303) 988 0085
Telephone Number

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
Social Security Number or Employer Identification Number

———
Social Security Number or Employer Identification Number of Joint Tenant or Tenant-in-Common, if applicable

*IN WITNESS WHEREOF, I (we) have executed this Subscription Agreement this* 15th *day of* June, 1992.

INDIVIDUAL:

Steven H. Johnson
Name (Please Print)

[signature]
Signature

Name of Joint Tenant or Tenant-in-Common, if applicable.

ENTITIES:

Name of Entity (Please Print)

Signature and Title

[Corporate Seal (if applicable)]

ACCEPTED AND AGREED TO THIS 29 DAY OF June, 1992.

TOWERS FINANCIAL CORPORATION

By: [signature]
Mitchell Bratch
Vice Chairman and Chief Operating Officer

Term of Promissory Notes:

24 m.

Number of Promissory Notes Accepted:

$50,000

**[INDIVIDUAL]**

STATE OF Colorado } SS.:
COUNTY OF Denver }

On June 15, 1992, before me personally appeared Steven H. Johnson and ________, known to me as the person(s) whose name(s) is (are) subscribed to the foregoing Subscription Agreement and acknowledged that (s)he (they) executed the same.

[signature]
Notary Public

My commission expires: 4/30/94

**[CORPORATE]**

STATE OF } SS.:
COUNTY OF }

On ________, 19___, before me personally appeared ________, to me known and who, being by me duly sworn, did depose and say that (s)he is the ________ of ________, a ________ corporation, the corporation which executed the foregoing Subscription Agreement, that (s)he knows the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by authority of the corporation; and that (s)he signed his (her) name thereto by like authority.

Notary Public

**TOWERS FINANCIAL CORPORATION**
**OCTOBER 15, 1991 PRIVATE OFFERING DOCUMENT**
**NON-NEGOTIABLE RECOURSE PROMISSORY NOTE**

For value received, TOWERS FINANCIAL CORPORATION, a Delaware corporation (the "Maker"), promises to pay to the order of the person whose name and address are set forth at the end of this Note (the "Payee"), its successors and assigns, the principal sum which is indicated at the end of this Note, together with interest on the unpaid principal balance at the rate of interest which is set forth at the end of this Note, from the date of this Note (the date of this Note is set forth at the end of this Note) through and including the date of final payment hereunder.

Principal hereunder shall be due and payable in full on the date which is indicated at the end of this Note (the "Maturity Date").

Payment of principal and interest under this Note shall be made in lawful money of the United States of America to the Payee at the address which is set forth at the end of this Note or at such other location as shall be notified to the maker by the Payee. Interest shall be calculated on the basis of a year of 365 days for the actual number of days elapsed and shall be payable monthly [or quarterly] commencing with the interest payment which is due thirty (30) days from the date of this Note.

Notwithstanding anything to the contrary which is provided for herein, the rate of interest which is provided for hereunder shall not exceed the maximum legal rate of interest which is permitted pursuant to applicable law. If the rate of interest which is provided for in this Note shall be found to exceed the maximum legal rate of interest, the Maker shall be required to pay only the maximum legal rate of interest.

This Note has been issued pursuant to the Offering Document dated October 15, 1991 of the Maker, and this Note is subject to all of the terms, conditions, obligations and provisions which are set forth in the Offering Document.

The holder of this Note shall be entitled to all of the benefits provided for in the security agreement (the "Security Agreement") which was executed by the Maker in favor of the Payee and other similarly situated payees. Neither this reference to the Security Agreement nor any provision thereof shall affect or impair the obligations of the Maker which are provided for herein.

This Note is made and delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York. Any provision hereof which may prove unenforceable under any law shall not affect the validity of any other provision hereof. The Payee agrees that any action or proceeding to enforce this Note shall be brought in a court of competent jurisdiction located in the State and County of New York.

This Note may not be changed or terminated orally, but only by an agreement in writing and signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the 29 day of June, 19 92

TOWERS FINANCIAL CORPORATION

By: [signature]
Mitchell Brater,
Vice Chairman and Chief Operating Officer

Date of Note: June 23, 1992

PAYEE:

Steven H. Johnson

Steven H. Johnson
Print Name(s)

9737 W. Ohio Avenue
Address

Lakewood, CO 80226
City, State and Zip Code

Principal Amount of Note: $50,000.00

Period to Maturity: 24 Months

Maturity Date: June 23, 1994

Rate of Interest: 14 % per annum

This Promissory Note has not been registered under the Securities Act of 1933, as amended, and may not be sold or otherwise transferred in the absence of such registration or an exemption therefrom under such Act or state securities laws. Furthermore, this Promissory Note may be sold or otherwise transferred only in compliance with the conditions specified in the Offering Document of Maker, a complete and correct copy of which is available for inspection at the principal office of Maker and will be furnished without charge to the holder of this Promissory Note upon written request.

**TO BE COMPLETED BY ALL SUBSCRIBERS:**

Residence Address to which information regarding this subscription should be mailed:

Paul E. Meier
Street Address

13677 River Valley Court, Chesterfield, MO 63017
City and State Zip

( )
Telephone Number

43-1500-376
Social Security Number or Employer Identification Number

Social Security Number or Employer Identification Number of Joint Tenant or Tenant-in-Common, if applicable

IN WITNESS WHEREOF, I (we) have executed this Subscription Agreement this 25 day of March, 19 92.

INDIVIDUAL:

Paul E. Meier, Trustee
Name (Please Print)

Paul E Meier Trustee
Signature

Name of Joint Tenant or Tenant-in-Common, if applicable.

ENTITIES:

Name of Entity (Please Print)

Signature and Title

[Corporate Seal (if applicable)]

ACCEPTED AND AGREED TO THIS 3 DAY OF April, 1992.

TOWERS FINANCIAL CORPORATION

By: [signature]
Mitchell Brater
Vice Chairman and Chief Operating Officer

Term of Promissory Notes:
36 month

Number of Promissory Notes Accepted:
1/13, m

[INDIVIDUAL]

STATE OF Missouri }
} SS.:
COUNTY OF St Louis }

On March 26 1992, before me personally appeared Paul E. Meier and he, known to me as the person(s) whose name(s) is (are) subscribed to the foregoing Subscription Agreement and acknowledged that (s)he (they) executed the same.

[signature]
Notary Public

[notary stamp: NOTARY PUBLIC STATE OF MISSOURI, ST. LOUIS COUNTY]

[CORPORATE]

STATE OF }
} SS.:
COUNTY OF }

On ________, 19__, before me personally appeared ____________, to me known and who, being by me duly sworn, did depose and say that (s)he is the ____________ of ____________, a ____________ corporation, the corporation which executed the foregoing Subscription Agreement, that (s)he knows the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by authority of the corporation; and that (s)he signed his (her) name thereto by like authority.

Notary Public

**TOWERS FINANCIAL CORPORATION**
**OCTOBER 15, 1991 PRIVATE OFFERING DOCUMENT**
**NON-NEGOTIABLE RECOURSE PROMISSORY NOTE**

For value received, TOWERS FINANCIAL CORPORATION, a Delaware corporation (the "Maker"), promises to pay to the order of the person whose name and address are set forth at the end of this Note (the "Payee"), its successors and assigns, the principal sum which is indicated at the end of this Note, together with interest on the unpaid principal balance at the rate of interest which is set forth at the end of this Note, from the date of this Note (the date of this Note is set forth at the end of this Note) through and including the date of final payment hereunder.

Principal hereunder shall be due and payable in full on the date which is indicated at the end of this Note (the "Maturity Date").

Payment of principal and interest under this Note shall be made in lawful money of the United States of America to the Payee at the address which is set forth at the end of this Note or at such other location as shall be notified to the maker by the Payee. Interest shall be calculated on the basis of a year of 365 days for the actual number of days elapsed and shall be payable monthly [or quarterly] commencing with the interest payment which is due thirty (30) days from the date of this Note.

Notwithstanding anything to the contrary which is provided for herein, the rate of interest which is provided for hereunder shall not exceed the maximum legal rate of interest which is permitted pursuant to applicable law. If the rate of interest which is provided for in this Note shall be found to exceed the maximum legal rate of interest, the Maker shall be required to pay only the maximum legal rate of interest.

This Note has been issued pursuant to the Offering Document dated October 15, 1991 of the Maker, and this Note is subject to all of the terms, conditions, obligations and provisions which are set forth in the Offering Document.

The holder of this Note shall be entitled to all of the benefits provided for in the security agreement (the "Security Agreement") which was executed by the Maker in favor of the Payee and other similarly situated payees. Neither this reference to the Security Agreement nor any provision thereof shall affect or impair the obligations of the Maker which are provided for herein.

This Note is made and delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York. Any provision hereof which may prove unenforceable under any law shall not affect the validity of any other provision hereof. The Payee agrees that any action or proceeding to enforce this Note shall be brought in a court of competent jurisdiction located in the State and County of New York.

This Note may not be changed or terminated orally, but only by an agreement in writing and signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the 3 day of April, 1992.

TOWERS FINANCIAL CORPORATION

By: [signature]
Mitchell Brater,
Vice Chairman and Chief Operating Officer

Date of Note: March 26, 19 92

PAYEE:
Paul E. Meier Trust
Paul E. Meier, TTEE
Paul E. Meier Trust
Paul E. Meier, TTEE
Print Name(s)

13177 River Valley Court
Address

Chesterfield, MO 63017
City, State and Zip Code

Principal Amount of Note: $100,000.00

Period to Maturity: 36 Months

Maturity Date: March 26, 1995

Rate of Interest: 14 % per annum

This Promissory Note has not been registered under the Securities Act of 1933, as amended, and may not be sold or otherwise transferred in the absence of such registration or an exemption therefrom under such Act or state securities laws. Furthermore, this Promissory Note may be sold or otherwise transferred only in compliance with the conditions specified in the Offering Document of Maker, a complete and correct copy of which is available for inspection at the principal office of Maker and will be furnished without charge to the holder of this Promissory Note upon written request.

TO BE COMPLETED BY ALL SUBSCRIBERS:

Residence Address to which information regarding this subscription should be mailed:

Paul E. Meier
Street Address

13677 River Valley Court, Chesterfield, MO 63017
City and State Zip

( )
Telephone Number

43-1500-375
Social Security Number or Employer Identification Number

Social Security Number or Employer Identification Number of Joint Tenant or Tenant-in-Common, if applicable

IN WITNESS WHEREOF, I (we) have executed this Subscription Agreement this 25 day of March 19 92.

INDIVIDUAL:

Paul E. Meier, Trustee
Name (Please Print)

Paul E. Meier Trustee
Signature

Name of Joint Tenant or Tenant-in-Common, if applicable.

ENTITIES:

Name of Entity (Please Print)

Signature and Title

[Corporate Seal (if applicable)]

ACCEPTED AND AGREED TO THIS 3 DAY OF April, 1992.

TOWERS FINANCIAL CORPORATION

By: [signature]
Mitchell Brater
Vice Chairman and Chief Operating Officer

Term of Promissory Notes:
36 month

Number of Promissory Notes Accepted:
7/13, 2V

[INDIVIDUAL]

STATE OF Missouri }
COUNTY OF St Louis } SS.:

On March 26 1992, before me personally appeared Paul E. Meier and he, known to me as the person(s) whose name(s) is (are) subscribed to the foregoing Subscription Agreement and acknowledged that (s)he (they) executed the same.

[signature]
Notary Public

[stamp: NOTARY PUBLIC STATE OF MISSOURI, ST. LOUIS COUNTY, MY COMMISSION EXP. ... 1993]

[CORPORATE]

STATE OF }
COUNTY OF } SS.:

On ________, 19___, before me personally appeared ____________, to me known and who, being by me duly sworn, did depose and say that (s)he is the ____________ of ____________, a ____________ corporation, the corporation which executed the foregoing Subscription Agreement, that (s)he knows the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by authority of the corporation; and that (s)he signed his (her) name thereto by like authority.

Notary Public

TOWERS FINANCIAL CORPORATION
OCTOBER 15, 1991 PRIVATE OFFERING DOCUMENT
NON-NEGOTIABLE RECOURSE PROMISSORY NOTE

For value received, TOWERS FINANCIAL CORPORATION, a Delaware corporation (the "Maker"), promises to pay to the order of the person whose name and address are set forth at the end of this Note (the "Payee"), its successors and assigns, the principal sum which is indicated at the end of this Note, together with interest on the unpaid principal balance at the rate of interest which is set forth at the end of this Note, from the date of this Note (the date of this Note is set forth at the end of this Note) through and including the date of final payment hereunder.

Principal hereunder shall be due and payable in full on the date which is indicated at the end of this Note (the "Maturity Date").

Payment of principal and interest under this Note shall be made in lawful money of the United States of America to the Payee at the address which is set forth at the end of this Note or at such other location as shall be notified to the maker by the Payee. Interest shall be calculated on the basis of a year of 365 days for the actual number of days elapsed and shall be payable monthly [or quarterly] commencing with the interest payment which is due thirty (30) days from the date of this Note.

Notwithstanding anything to the contrary which is provided for herein, the rate of interest which is provided for hereunder shall not exceed the maximum legal rate of interest which is permitted pursuant to applicable law. If the rate of interest which is provided for in this Note shall be found to exceed the maximum legal rate of interest, the Maker shall be required to pay only the maximum legal rate of interest.

This Note has been issued pursuant to the Offering Document dated October 15, 1991 of the Maker, and this Note is subject to all of the terms, conditions, obligations and provisions which are set forth in the Offering Document.

The holder of this Note shall be entitled to all of the benefits provided for in the security agreement (the "Security Agreement") which was executed by the Maker in favor of the Payee and other similarly situated payees. Neither this reference to the Security Agreement nor any provision thereof shall affect or impair the obligations of the Maker which are provided for herein.

This Note is made and delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York. Any provision hereof which may prove unenforceable under any law shall not affect the validity of any other provision hereof. The Payee agrees that any action or proceeding to enforce this Note shall be brought in a court of competent jurisdiction located in the State and County of New York.

This Note may not be changed or terminated orally, but only by an agreement in writing and signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the 8 day of May, 1992

TOWERS FINANCIAL CORPORATION

By: ____________________
Mitchell Brater,
Vice Chairman and Chief Operating Officer

Date of Note: March 26, 1992

PAYEE:
Edward J. & Catherine W. Meier Irrevocable Insurance Tr.
Paul E. Meier, TTEE
Edward J. & Catherine W. Meier Irrevocable Insurance Tr.
Paul E. Meier, TTEE
Print Name(s)

13667 River Valley Ct.
Address

Chesterfield, MO 63017
City, State and Zip Code

Principal Amount of Note: $ 100,000.00

Period to Maturity: 36 Months

Maturity Date: March 26, 1995

Rate of Interest: 14 % per annum

This Promissory Note has not been registered under the Securities Act of 1933, as amended, and may not be sold or otherwise transferred in the absence of such registration or an exemption therefrom under such Act or state securities laws. Furthermore, this Promissory Note may be sold or otherwise transferred only in compliance with the conditions specified in the Offering Document of Maker, a complete and correct copy of which is available for inspection at the principal office of Maker and will be furnished without charge to the holder of this Promissory Note upon written request.

TO BE COMPLETED BY ALL SUBSCRIBERS:

Residence Address to which information regarding this subscription should be mailed:
Paul E. Meier, Trustee
13067 River Valley Court
Street Address

Chesterfield, Missouri 63017
City and State Zip

(314) 576-1574
Telephone Number

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
Social Security Number or Employer Identification Number

Social Security Number or Employer Identification Number of Joint Tenant or Tenant-in-Common, if applicable

IN WITNESS WHEREOF, I (we) have executed this Subscription Agreement this 17 day of August, 1992.

INDIVIDUAL:
Edward J. Meier Revocable Living Trust, Paul E. Meier, Trustee
Name (Please Print)

Paul E. Meier Trustee
Signature

Name of Joint Tenant or Tenant-in-Common, if applicable.

ENTITIES:

Name of Entity (Please Print)

Signature and Title

[Corporate Seal (if applicable)]

ACCEPTED AND AGREED TO THIS 4 DAY OF Sept., 19 93

TOWERS FINANCIAL CORPORATION

By: [signature]
Mitchell Brater
Vice Chairman and Chief Operating Officer

Term of Promissory Notes:
3 Years ; 36 MO.

Number of Promissory Notes Accepted:
7100,200

[INDIVIDUAL]

STATE OF Missouri }
COUNTY OF St. Louis } SS.:

On 8/17, 1992, before me personally appeared Paul E. Meier and Trustee, known to me as the person(s) whose name(s) is (are) subscribed to the foregoing Subscription Agreement and acknowledged that (s)he (they) executed the same.

[signature]
Notary Public

MILTON E METZLER
NOTARY PUBLIC STATE OF MISSOURI
ST. LOUIS COUNTY
MY COMMISSION EXP. JUNE 6,1996

[CORPORATE]

STATE OF }
COUNTY OF } SS.:

On ______, 19__, before me personally appeared ________, to me known and who, being by me duly sworn, did depose and say that (s)he is the ________ of ________, a ________ corporation, the corporation which executed the foregoing Subscription Agreement, that (s)he knows the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by authority of the corporation; and that (s)he signed his (her) name thereto by like authority.

Notary Public

TOWERS FINANCIAL CORPORATION
OCTOBER 15, 1991 PRIVATE OFFERING DOCUMENT
NON-NEGOTIABLE RECOURSE PROMISSORY NOTE

For value received, TOWERS FINANCIAL CORPORATION, a Delaware corporation (the "Maker"), promises to pay to the order of the person whose name and address are set forth at the end of this Note (the "Payee"), its successors and assigns, the principal sum which is indicated at the end of this Note, together with interest on the unpaid principal balance at the rate of interest which is set forth at the end of this Note, from the date of this Note (the date of this Note is set forth at the end of this Note) through and including the date of final payment hereunder.

Principal hereunder shall be due and payable in full on the date which is indicated at the end of this Note (the "Maturity Date").

Payment of principal and interest under this Note shall be made in lawful money of the United States of America to the Payee at the address which is set forth at the end of this Note or at such other location as shall be notified to the maker by the Payee. Interest shall be calculated on the basis of a year of 365 days for the actual number of days elapsed and shall be payable monthly [or quarterly] commencing with the interest payment which is due thirty (30) days from the date of this Note.

Notwithstanding anything to the contrary which is provided for herein, the rate of interest which is provided for hereunder shall not exceed the maximum legal rate of interest which is permitted pursuant to applicable law. If the rate of interest which is provided for in this Note shall be found to exceed the maximum legal rate of interest, the Maker shall be required to pay only the maximum legal rate of interest.

This Note has been issued pursuant to the Offering Document dated October 15, 1991 of the Maker, and this Note is subject to all of the terms, conditions, obligations and provisions which are set forth in the Offering Document.

The holder of this Note shall be entitled to all of the benefits provided for in the security agreement (the "Security Agreement") which was executed by the Maker in favor of the Payee and other similarly situated payees. Neither this reference to the Security Agreement nor any provision thereof shall affect or impair the obligations of the Maker which are provided for herein.

This Note is made and delivered in the State of New York and shall be governed by, and construed in accordance with, the laws of the State of New York. Any provision hereof which may prove unenforceable under any law shall not affect the validity of any other provision hereof. The Payee agrees that any action or proceeding to enforce this Note shall be brought in a court of competent jurisdiction located in the State and County of New York.

This Note may not be changed or terminated orally, but only by an agreement in writing and signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.

IN WITNESS WHEREOF, the undersigned has executed this Note as of the 4 day of Sept., 19 92

TOWERS FINANCIAL CORPORATION

By: [signature]
Mitchell Brater
Vice Chairman and Chief Operating Officer

Date of Note: Sept. 21, 19 92

PAYEE:
Edward J. Meier Revocable Living Trust
Paul E. Meier, TTEE
Edward J. Meier Revocable Living Trust
Paul E. Meier, TTEE
Print Name(s)

13667 River Valley Court
Address

Chesterfield, MO 63017
City, State and Zip Code

Principal Amount of Note: $100,000.00

Period to Maturity: 36 Months

Maturity Date: September 21, 1995

Rate of Interest: 15 % per annum

This Promissory Note has not been registered under the Securities Act of 1933, as amended, and may not be sold or otherwise transferred in the absence of such registration or an exemption therefrom under such Act or state securities laws. Furthermore, this Promissory Note may be sold or otherwise transferred only in compliance with the conditions specified in the Offering Document of Maker, a complete and correct copy of which is available for inspection at the principal office of Maker and will be furnished without charge to the holder of this Promissory Note upon written request.

5142

# TOWERS FINANCIAL CORPORATION

417 FIFTH AVENUE
NEW YORK, NY 10016
212-696-0505

## BROKER-DEALER AGREEMENT

AGREEMENT made as of the date which is set forth at the end of this Agreement, by and between the broker-dealer whose name, address, and state of incorporation is set forth at the end of this Agreement (hereinafter referred to as the "Broker-Dealer"), and TOWERS FINANCIAL CORPORATION, a Delaware corporation, having its principal place of business at 417 Fifth Avenue, New York, New York 10016 (hereinafter referred to as the "Company").

The Company is engaged in offering to Accredited Investors only one hundred fifty million dollars ($150,000,000) of thirty-month, full recourse Promissory Notes bearing interest at 3.5% over the prime rate of interest of Chase Manhattan Bank, N.A., adjustable monthly and backed by collateralized business accounts receivable and health care accounts receivable due from major insurance companies and governmental agencies, in 1,500 Units of $ 100,000 per Unit. The offering of the Promissory Notes is being made, on a "best efforts" basis, with no minimum sales requirement. As used in this Agreement, "Offering Document" refers to the confidential Private Offering Document dated March 23, 1992, distributed by the Company in connection with the offering of Promissory Notes issued by the Company, including the exhibits thereto, unless the Offering Document or exhibits have been supplemented or amended, in which event the term shall refer, from and after the time of the supplements or amendments to such Offering Documents and supplements. The Company desires to offer and sell the Promissory Notes to Accredited Investors only pursuant to a non-public offering under the provisions of Section 4 ( 2 ) of the Securities Act of 1933, as amended (hereinafter referred to as the "Act") and Rule 506 (herein referred to as "Rule 506") of Regulation D (herein referred to as "Regulation D").

The subscribers for Promissory Notes (hereinafter referred to as the "Accredited Investors") will be required to enter into a Subscription Agreement, a copy of which is attached to the Offering Document as an Exhibit thereto (hereinafter referred to as the "Subscription Agreement"). Each subscriber whose Subscription Agreement is accepted by the Company will be issued a Promissory Note in the manner which is provided for in the Subscription Agreement.

The Company and the Broker-Dealer hereby agree to the placement by the Broker-Dealer of the Units under the following terms and conditions:

*Section 1.* Appointment as Non-Exclusive Broker-Dealer. The Broker-Dealer is hereby appointed, subject to the provisions of this Agreement, to act as a nonexclusive broker-dealer for the sale of the Promissory Notes.

*Section 2.* Representation and Warranties of Broker-Dealer. The Broker-Dealer hereby covenants, represents and warrants to and for the benefit of the Company that:

(a) The Broker-Dealer is registered as a broker-dealer under the Securities Exchange Act of 1934, as amended, and is a member in good standing of the National Association of Securities Dealers, Inc. (hereinafter referred to as the "NASD"). The Broker-Dealer will notify the Company in writing of any change in its status as described in this subsection (a).

(b) The Broker-Dealer will aid in the placement of the Promissory Notes on a "best efforts" nonexclusive basis through the distribution, subject to applicable securities laws and regulations, of the Offering Document and subscription documents relating to the offering to potential Accredited Investors and their purchaser representatives (as such terms are defined in Regulation D) and through the processing of such Accredited Investors and their purchaser representatives. The Broker-Dealer agrees to utilize only the Offering Document and such offering materials which are provided by the Company or which have been previously approved by the Company in writing in connection with the offering and sale of the Promissory Notes. Specifically, the Broker-Dealer acknowledges that from time to time the Company may, in its sole discretion, provide the Broker-Dealer or its representatives with certain information not contained in the Offering Document in connection with the Broker-Dealer's "due diligence" examination. The Broker-Dealer agrees that no reference to any such material, which is not described or contained in the Offering Document or any amendment thereto, will be disclosed to any potential Investor or appear in any analysis, report or literature prepared by the Broker-Dealer or its representative, except with the prior written consent of the Company. Neither the Broker-Dealer nor its representatives are authorized to circulate any such information or to make any representations other than those contained in the Offering Document, and any such information will be furnished to the Broker-Dealer or its representatives only upon the condition that the same is for their information only; and such persons will upon request of the Company execute all such agreements and documents as the Company may reasonably request in connection with the matters contained in this Section, which agreements and documents may be filed by the Company with the Securities and Exchange Commission or any state securities agency.

(c) The Broker-Dealer will at all times comply with all applicable Federal, state, local and common laws and all applicable rules, regulations and orders of any court, government or unit or agency thereof, and of the NASD.

(d) The Broker-Dealer will offer placement services only in those states where both of the following are applicable:

(1) The Broker-Dealer is licensed as a broker-dealer; and

(2) The Company has advised the Broker-Dealer in writing that either: (A) the Company has obtained "blue sky" clearance, (B) an exemption exists from "registration" requirements; (C) the Company has registered, or (D) there are no "filing" requirements;

Such placement services by the Broker-Dealer will be offered only in amounts within the maximum amount of securities for which such clearance or exemption exists.

(e) The Broker-Dealer will diligently make inquiries of all prospective Accredited Investors and their purchaser representatives to ascertain: (i) whether a purchase of Promissory Notes is suitable for the prospective Accredited Investors, (ii) whether the prospective Accredited Investors are qualified purchasers under Regulation D and any applicable "blue sky" requirements, and (iii) whether the prospective investors are Accredited Investors under Regulation D.

000409

(f) The Broker-Dealer will keep a log of investors to whom Offering Documents are furnished and such log will contain the name, address, telephone number, and nature of the pre-existing relationship that Broker-Dealer has with the potential investor. Copies of such log will be periodically (but not less frequently than weekly) delivered to the Company.

(g) The Broker-Dealer will not "generally solicit sales" as is prohibited by Regulation D, and the Broker-Dealer will only sell to Accredited Investors with whom the Broker-Dealer has a pre-existing relationship.

(h) The Broker-Dealer will obtain fully completed and duly executed documents as required by the Offering Document and promptly transmit same to the Company or its designee.

(i) There is no action, suit, litigation or proceeding before or by any court or governmental agency pending or threatened against, or involving the property or business of the Broker-Dealer which might result in any material adverse change of the condition (financial or otherwise), business or prospects of the Broker-Dealer.

(j) This Agreement has been duly and validly authorized, executed and delivered by and on behalf of the Broker-Dealer and constitutes the valid and binding agreement of the Broker-Dealer enforceable in accordance with its terms subject to any applicable bankruptcy, insolvency, moratorium, reorganization or other laws affecting the enforceability of creditor's rights generally, from time to time in effect and except as the indemnification provisions of Section 6 hereof may be limited under the Federal securities laws.

(k) If the Broker-Dealer is a corporation, the Broker-Dealer has the corporate power and authority to execute, deliver and perform this Agreement and has taken all action required by law, its Certificate of Incorporation, its By-Laws, or otherwise to authorize the execution, delivery and performance of this Agreement and the execution, delivery and performance of this Agreement does not violate the provisions of the Certificate of Incorporation or By-Laws of the Broker-Dealer or any law or any agreement to which the Broker-Dealer is a party or by which the Broker-Dealer and/or its assets are bound, or any order, rule or regulation applicable to the Broker-Dealer of any court or any governmental body or administrative agency having jurisdiction over the Broker-Dealer as described in the Offering Document.

*Section 3.* <u>Representations and Warranties of The Company</u>. The Company hereby covenants, represents and warrants to and for the benefit of the Broker-Dealer that:

(a) The Company will at all times comply with all applicable rules, regulations and orders of any court, government or unit or agency thereof, and the NASD.

(b) There is no action, suit, litigation or proceeding before or by any court or governmental agency pending or threatened against, or affecting or involving the property of business of the Company or its Affiliates, which might result in any material adverse change of the condition (financial or otherwise), business or prospects of the Company or its Affiliates except as may be disclosed in the offering.

(c) This Agreement has been duly and validly authorized, executed and delivered by and on behalf of the Company and constitutes the valid and binding agreement of the Company enforceable in accordance with its terms subject to any applicable bankruptcy, insolvency, moratorium, reorganization or other laws affecting the enforceability of creditor's rights generally, from time to time in effect and except as the indemnification provisions of Section 6 hereof may be limited under the Federal securities laws.

000410

(d) The Company has the corporate power and authority to execute, deli... and perform this Agreement and has taken all action required by law, its Certificate of Incorporation, its By-Laws, or otherwise to authorize the execution, delivery and performance of this Agreement and the execution, delivery and performance of this Agreement does not violate the provisions of the Certificate of Incorporation or By-Laws of the Company or any law or any agreement to which the Company is a party or by which the Company and / or its assets are bound, or any order, rule or regulation applicable to the Company of any court or any governmental body or administrative agency having jurisdiction over the Company, as described in the Offering Document.

*Section 4.* Limitations. Broker-Dealer as a condition of this Agreement hereby agrees that it will not make offers and sales to any "institutional investors" without prior written approval of the Company. Institutional investors for purposes of this Agreement has the definition provided in applicable state "blue sky" laws and as is generally defined in the securities industry.

*Section 5.* Compensation. The Broker-Dealer shall receive as its compensation for acting as the sales agent hereunder the following compensation:

(a) For each Promissory Note which is sold by the Broker-Dealer, a commission of 1% per quarter of the ...tstanding principal amount of the Promissory Notes may be paid to broker-dealers who are members of the ...ational Association of Securities Dealers, Inc. Accordingly, the maximum compensation to broker-dealers will be 10% of the offering however promissory notes that are retired prior to their maturity will bear proportionately lower commissions.

(b) The Commission which is referred to in Paragraph (a) of this Section 4- shall be paid to the Broker-Dealer upon satisfaction of the following:

(i) The Company is in receipt of all required subscription documents from the applicable Investor;

(ii) The applicable Investor has had his subscription for Promissory Notes accepted by the Company; and

(iii) The Accredited Investor's payment for his Promissory Notes has cleared such Accredited Investor's bank.

(c) Payments of compensation to the Broker-Dealer pursuant to this Agreement shall only be made to the extent permitted under applicable Federal and state securities laws.

(d) Under no circumstances may any portion of the purchase price which is received from a subscriber of the securities be withheld by the Broker-Dealer toward payment of any compensation which is due to the Broker-Dealer.

(e) The Broker-Dealer acknowledges that the Company shall have the right, in its sole and absolute discretion, to reject any Investor which is secured by, or through, the Broker-Dealer, in which case, no compensation shall be due to the Broker-Dealer with respect to said rejected Investor.

000411

*Section 6.* Conditions of Performance. The Company acknowledges that the obligations of the Broker-Dealer are limited to a "best efforts" basis, and that there is no obligation or undertaking, expressed or implied, that the Broker-Dealer is making a commitment to purchase or sell a minimum number of Promissory Notes. In addition, the duties and obligations of the parties which are provided for in this Agreement shall be subject to: (A) the accuracy, between the date hereof and the date of completion of the sale of the Promissory Notes, of the representations and warranties which are made by the parties herein; (B) the performance by the parties of all their duties and obligations hereunder, and (C) compliance by the parties with all aspects of Rule 506 and Regulation D which are required to be complied with by the parties hereunder in order that the offering of the Promissory Notes be exempt from the registration requirements of the Act under the provisions of Rule 506 and Regulation D.

*Section 7.* Indemnification. The Company agrees to indemnify and hold harmless the Broker-Dealer and its employees, agents, officers, directors and each person, if any, who controls the Broker-Dealer within the meaning of Section 15 of the Act, from and against any losses, claims, damages or liabilities, joint or several, to which it may become subject, under said Act or otherwise (including any legal or other reasonable expenses incurred in connection therewith), insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon (i) any violation of the Act by the Company; ( ii ) any violation by the Company of the blue sky laws of any state in which the Promissory Notes shall be offered or sold; or (iii) any violation of the covenants, representations or warranties of the Company which are contained in this Agreement.

The Broker-Dealer agrees to indemnify and hold harmless the Company, as well as its employees, agents, officers, directors, legal counsel and each person, if any, who controls either the Company, within the meaning of Section 15 of said Act, from and against any losses, claims, damages or liabilities, joint or several, to which any of them may become subject, under said Act or otherwise (including any legal or other reasonable expenses incurred in connection therewith) insofar as such losses, claims, damages or liabilities (or such actions in respect thereof) arise out of or are based upon (i) a failure by the Broker-Dealer to comply with the applicable laws, rules and regulations governing qualification and conduct of broker-dealers under Federal and/or state securities laws; (ii) any other violation of said Act by the Broker-Dealer; ( iii ) any violation by the Broker-Dealer of the blue sky laws of any state in which the Promissory Notes shall be offered or sold; or (iv) any violation of the covenants, representations or warranties of the Broker-Dealer which are contained in this Agreement.

The indemnifying party shall reimburse the indemnified party for legal or other reasonable expenses incurred by such indemnified party in connection with investigating or defending any such action or claim or in connection with its participation as a third-party witness in any action or administrative proceeding, which is commenced or threatened. In no case shall the indemnified party be liable under this indemnity provision unless such party is notified in writing of the nature of the claim within a reasonable time of its assertion.

In case any such action (other than an administrative action by the Securities and Exchange Commission, any state securities or blue sky authority or any self-regulatory organization to which the indemnified party belongs ) shall be brought against an indemnified party, the indemnifying party will be entitled to participate therein.

*Section 8* Termination of Agreement. This Agreement shall automatically terminate upon the

000412

closing of the Offering of Promissory Notes issued by the Company. Prior to such time, either party shall have the right, by giving notice as provided in Section 15 of this Agreement, to terminate this Agreement (i) immediately with respect to a material breach of the provision of this Agreement; (ii) upon not less than thirty (30) days written notice for any reason at any time; and (iii) for breach of Section 3 of this Agreement at Company's option. In the event of such termination, all of the obligations of the parties hereto which are required to be performed pursuant to this Agreement shall be performed with respect to any sales which are made pursuant to this Agreement.

This Agreement shall also automatically terminate in the event that the Broker-Dealer's right to sell securities is revoked by an applicable governmental agency; provided if such revocation is partial or limited the Agreement will be terminated only to the extent necessary for compliance with such regulatory action.

Except as set forth above, upon the termination of this Agreement, for any reason, the Company's obligation to the Broker-Dealer shall cease, with the exception of the obligation of the Company to pay to the Broker-Dealer the amount of any compensation which is due to the Broker-Dealer (as provided for in Section 4 of the Agreement) for sales made prior to the date of termination. Notwithstanding anything to the contrary herein contained, Section 6 of this Agreement shall survive termination.

*Section 9.* Independent Contractors. It is understood and agreed that the Broker-Dealer's relationship with the Company is that of an independent contractor and that nothing herein shall be construed as creating a relationship of partners, joint venture, or employer and employees, between the Broker-Dealer and the Company or its Affiliates. The Broker-Dealer is not authorized to make any placement of the Promissory Notes to any person unless and until that person complies with the qualifications standard contained in the Offering Document, particularly those contained in paragraph (b)(2)-(ii) of Rule 506 of Regulation D, nor is the Broker-Dealer authorized to deliver an Offering Document or any other information or documents, or make any representations to any person concerning the Offering except as provided in this Agreement. No additional material, documents, or information may be delivered to any person unless expressly authorized in writing by the Company.

*Section 10.* Assignment. No rights or interests of the Broker-Dealer arising hereunder may be assigned by the Broker-Dealer except with the prior written consent of the Company; provided, however, that the Broker-Dealer shall have the right to assign any payments which are due to it hereunder; provided further, however, that in the event of any such assignments, that the Broker-Dealer continues to be obligated to perform its obligations hereunder; and provided further, however, that such assignment is permitted pursuant to applicable Federal and state securities laws. Nothing contained herein shall be construed as limiting the liability of the Broker-Dealer under this Agreement and the Company expressly reserves the right to proceed against either the Broker-Dealer or its assignee of the terms of this Agreement. Subject to these limitations, this Agreement shall inure to the benefit of and be binding upon the Broker-Dealer, the Company and their respective successors and assigns. This Agreement is intended to be and is for the sole and exclusive benefit of the parties hereto, and their respective successors and assigns and controlling persons, officers, and directors, and for the benefit of no other person or corporation; and, except as provided in Section 6 of this Agreement, nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person or corporation, other than the parties hereto, their respective successors and assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement of any provisions herein contained. No Investor shall be construed to be a successor or assignee of any party hereto by reason of the purchase of a Promissory Note.

000413

*Section 11.* Waiver. Except as otherwise specifically provided for hereunder, no party shall be deemed to have waived any of its rights hereunder or under any other agreement, instrument or paper signed by any of them with respect to the subject matter hereof, unless such waiver is in writing and signed by the party waiving said right. Except as otherwise specifically provided for hereunder, no delay or omission by any party in exercising any right with respect to the subject matter hereof shall operate as a waiver of such right or any such other right. A waiver on any one occasion with respect to the subject matter hereof shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

*Section 12.* Rights Cumulative. All rights and remedies with respect to the subject matter hereof, whether evidenced hereby or by any other agreement, instrument, or paper, will be cumulative, and may be exercised separately or concurrently.

*Section 13.* Entire Agreement. The parties have not made any representations, warranties, or covenants not set forth herein with respect to the subject matter hereof, and this Agreement constitutes the entire Agreement between them with respect to the subject matter.

*Section 14.* Amendments. This Agreement may not be changed, modified, extended, terminated, or discharged orally, but only by a written agreement which is signed by all of the parties to this Agreement.

*Section 15.* Further Instruments. The parties agree to execute any and all such other and further instruments and documents, and to take any and all such further actions reasonably required to effectuate this Agreement and the intent and purpose hereof.

*Section 16.* Notice. All notices or other communications required or permitted hereunder shall be in writing and shall be mailed by First Class, Registered or Certified Mail, Return Receipt Requested, postage prepaid, as follows:

To the Company: Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016
Att: Mitchell Brater, Vice Chairman and Chief Operating Officer

To the Broker/Dealer: To the Principal
at the address shown on the last page hereof.

or in each case to such other address as shall have last been furnished by like notice. If mailing by Registered or Certified Mail is impossible due to an absence of postal service, notice shall be in writing and personally delivered to the aforesaid address. Each notice or communication shall be deemed to have been given as of the date so mailed or delivered, as the case may be.

*Section 17.* Jurisdiction and Venue. This Agreement was negotiated in New York, New York, and the parties agree that with respect to any legal or equitable action, suit, or other proceeding arising under, or in any way connected with, this Agreement, the parties hereto consent to the in personal jurisdiction of the Federal and State courts in New York, New York, waive any forum non convenience and any venue objections they might otherwise have, and agree to accept service of process upon them by certified mail, return receipt requested.

000414

*Section 18.* New York Law. This Agreement shall be construed and enforced in accordance with the internal laws of the State of New York, without giving effect to the principle of conflicts of law.

*Section 19.* Successors and Assigns. Subject to the restrictions which are contained in Section 9 of this Agreement, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, personal representatives, successors and assigns. In addition, the Broker-Dealer specifically agrees that the representation, warranties, indemnifications, and agreements which have been made by the Broker-Dealer pursuant to this Agreement shall inure to the benefit of the Company.

*Section 20.* Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all together shall constitute one and the same Agreement.

*Section 21.* Captions. The descriptive headings in this Agreement are for convenience of reference only and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

*Section 22.* Further Dealings. Any dealing by or between the parties after the date of expiration or prior termination of this Agreement shall not constitute a renewal of this Agreement or the creation of a new agreement, but shall nevertheless be controlled by the terms hereof.

000415

*WITNESS WHEREOF*, the parties to this Agreement have set their hands or caused these presents to be signed by their authorized officers, as of the ____ day of ________ 19__

CRD NO.________

TOWERS FINANCIAL CORPORATION

By: ________

Mitchell Brater - Vice Chairman
and Chief Operating Officer

________
Name of Broker-Dealer ( Please Print )

________
Address

________
City, State, Zip

________
Signature/Title

________
Telephone Number

000416

EXHIBIT 53

TOWERS FINANCIAL CORPORATION

BROKER GUIDE

For Additional Information Contact:

(212) 696-0505
or
(800) 553-3322

* The following information is for Broker/Dealer informational purposes only. An offer to sell or a solicitation to buy can only be made by the Private Placement Memorandum.

## Towers Financial Corporation
## Investment Summary

| | | |
|---|---|---|
| Issuer | - | Towers Financial Corporation. A publicly traded, multi-million dollar company that through affiliates has been in the financial services industry for the past 14 years. |
| Rate | - | 16% for 2 years or 14% for 1 year, payable either monthly or quarterly at the investors option. |
| Term | - | Either 1 or 2 years, at the investor's option. |
| Size | - | $ 100 million, consisting of 2,000 units of $50,000 each with fractional units offered at Towers' discretion. |
| Security | - | Insured, fully collateralized Health Care accounts receivable due from major insurance companies and governmental agencies, also business accounts recivable from Dun & Bradstreet rated companies or other companies specifically covered by the insurance policy. |
| Insurance Policy | - | Issued by American Credit Indemnity Company, which is rated A + VII by A.M. Best Company. |
| Escrow Account | - | The funds will be deposited in Chase Manhattan Bank. |
| Costs | - | The costs of the insurance policy, the escrow account and all operational costs will be paid by Towers. |
| Investor Suitability | - | Accredited investors as defined in section 501(a)(1) of Regulation D of the Securities Act of 1933. |
| Commissions | - | 4% per unit on 1 year investment and 5% for the 2 year note with an additional 5% payable one year from the sale and acceptance of the 2 year note. |
| Distributor | - | Towers is self-underwriting the notes. Towers will pay the above commissions on units sold through NASD member firms. For additional assistance contact : |

Towers Financial Corporation
(212) 696-0505
or
(800) 553-3322

## Towers Financial Corporation Note Highlights

Issued by Towers Financial Corporation a multi-million dollar, publicly traded company headquartered in New York, with offices throughout the United States.

The Note is fully recourse to Towers and is backed by insured, fully collateralized health care accounts receivable due from major insurance companies and governmental agencies.

Towers, through it's subsidiaries and affiliates, has been involved in the financing and/or servicing of accounts receivable for over 14 years.

The receivables are due from such well known insurance companies as : New York Life, Prudential, Blue Cross/Blue Shield, Metropolitan, Travelers etc.

As an additional degree of safety, Towers has obtained an insurance policy from American Credit Indemnity, ( which is A + VII rated by A.M. Best), to insure the collectabilty of most of the Accounts Receivable.

Towers is offering the investor 12 and 24 month Promissory Notes bearing interest at 14% and 16% respectively, with interest payable either monthly or quarterly at the investor's option.

The total note offering is $100 million comprised of 2,000 units at $50,000 per unit. Fractional units may be available at Towers' discretion.

Towers will use the proceeds of the offering to purchase health care industry receivables. Generally, small hospitals, doctors, dentists and other health care providers do not manage their Accounts Receivable efficiently. Towers' Accounts Receivable factoring program offers the needed funding to these health care providers bridging the time delay of slow paying insurance companies and governmental agencies. Towers' large staff of insurance collection experts provide the needed resources to accelerate the payment and collection of the Accounts Receivable.

Towers charges a factoring fee of up to 15% of the face value of Accounts Receivable for each Account Receivable purchased. Upon payment of the Receivable, Towers will reinvest the proceeds in additional Accounts Receivable and thereby compound it's factoring fee with each new purchase. Towers expects to reinvest the funds in Accounts Receivable and compound it's factoring fee up to 6 times per year. This process of reinvesting the funds and compounding the factoring fees enables Towers to pay the high rates of interest provided for in the offering.

## Additional Details on the Towers Investment

**Towers Financial Corporation** - Publicly owned and traded stock

Offices at:

417 Fifth Avenue
New York, New York 10016

Towers operates in the financial services industry specializing in the fields of equipment leasing, equipment financing, collection services, credit factoring and other forms of asset based lending.

Towers, through it's subsidiaries, has been engaged in various aspects of financing and/or servicing of Accounts Receivable for over 14 years.

Towers has over 7000 corporate clients including many Fortune 1000 companies.

Towers has over 1200 individuals working on their behalf in offices located throughout the United States.

Officers, Directors and Advisory Board Members -

Steven Hoffenberg - Chairman of the Board and CEO of the company and President of it's predecessor companies for the past 14 years.

Mitchell Brater - Vice Chairman of the Board and COO

Michael Rosoff - Vice President and Chief Legal Officer

Raymond Lewis - Vice President - For 25 years ending 1979 Mr. Lewis was CEO of United Credit Corporation, an asset based lender based in New York.

Charles Chugerman - Vice President

Gregory Pattakos - Vice President and Secretary

Thomas B. Evans, Jr. - Advisory Board - Former cohairman of the Republican National Committee and former senior member of the U.S. House of Representatives.

Ben Barnes - Advisory Board - Former Lt. Governor and Speaker of the House in Texas.

Arthur C. Bass - Advisory Board - Former chairman Midway Airlines and former President of Federal Express Inc.

**American Credit Indemnity** - Issuer of the Insurance Policy

An A + VII rated by A.M. Best, the insurance industries rating institution

American Credit Indemnity has issued credit insurance since 1893

**Partial list of Accounts Receivable** -

| | |
|---|---|
| Blue Cross/Blue Shield | Liberty Mutual Insurance Co. |
| State Farm Insurance Co. | Metropolitan Life Insurance Co. |
| Prudential Insurance Co. | New York Life Insurance Co. |
| Travelers Insurance Co. | Allstate Insurance Co. |
| Aetna Insurance Co. | Cigna |
| Mutual of Omaha | Continental Life |
| Equitable Insurance Co. | Firemans Fund Insurance Co. |
| John Hancock Insurance Co. | Hartford Insurance Co. |

## Commonly Asked Questions about the Towers Financial Corporation Note

**Is my investment liquid ?**

Under Regulation D of the Securities Act of 1933 the units must be acquired for investment purposes, if an investor wishes to dispose of his units, such disposition is circumscribed by the terms of the provisions of the Federal Securities Act and state securities laws.

**Will Towers be able to purchase enough receivables for the program ?**

There were more than $532 BILLION worth of health care industry receivables in 1988. Towers program could purchase approximately $600 million worth of receivables, or a little more than 1% of all health care industry receivables outstanding.

**What do I receive to verify ownership ?**

When your subscription is accepted, you will receive a copy of your subscription agreement executed on behalf of the company and the company's non-negotiable Promissory Note executed by Steven Hoffenberg as Chairman and CEO of Towers.

**When do I receive my first check ?**

The investor receives the first interest payment approximately 30 days after clearance of funds and the acceptance of the subscription documents. Approximately 90 days if quarterly payments are elected.

**How is my investment treated for Federal income tax purposes ?**

The interest from the notes is classified as portfolio income, therefore the income is classified as ordinary income for I.R.S. purposes. This is not passive income.

**What are the other receivables mentioned in the memorandum ?**

These are due from corporate America and carry the same safety factors as the health care receivables. A representative list would include RCA Corporation, General Electric Co., Westinghouse and many other household names.

**Why would a health care institution sell its receivables to Towers ?**

Many health care professionals do not have the funds to hire top line individuals to process the paperwork required by the insurance industry. If this paperwork is not properly completed it can delay payment by many months. By selling these receivables to Towers, these organizations will receive approximately 50% of the value up front. Towers staff of professionals take care of the paperwork properly and Towers is paid directly from the insurance companies. Towers then pays the remaining 35% due to the health care organization. ( Remember, Towers charges a discount of approximately 15% for each receivable purchased.)

**What if the health care organization over-bills the insurance company ?**

Towers has each organization guarantee the fact that all receivables are correct, if they are not, Towers has the right of offset against

the organization's other assets. On top of this remember that Towers only pays 50% of the receivables value up front. the other 35% of the value can be used to offset any errors in billing.

Does Towers have any track record in selling programs to the public ?
Yes. Towers has issued approximately $37 million worth of similar notes over the last 2 1/2 years. Not a single investors payment has been missed and Towers has fully established it's credibility. (Towers also has an international note offering and a banking participation offering.)

How can Towers pay these high rates of return ?
Towers receives approximately 15% from each receivable purchased. Each receivable is paid within approximately 75 days. Towers expects to reinvest the funds in receivables thereby compounding the receivable fees.

How does Towers acquire receivables ?
Towers has over 1200 individuals working on their behalf located throughout the United States. These individuals contact various institutions to offer Towers' expert services.

30001979

# TOWERS FINANCIAL CORPORATION
# PRIVATE PLACEMENT NOTE OFFERING

## TOWERS FINANCIAL: OVERVIEW

TOWERS Financial Corporation is an eighteen year old publicly traded company. TOWERS is the largest accounts receivable financing company in America's health care industry.
On a national scale, TOWERS is the second largest commercial recovery firm in the United States, boasting 1991 revenues of over $1 BILLION.

## INVESTMENT BENEFITS

| | |
|---|---|
| **Promissory Notes** | TOWERS issues full recourse Promissory Notes that are available to Accredited Investors only. |
| **Fixed Maturities** | 12 Months @ 12%<br>24 Months @ 14% |
| **High Yields** | 30 Months @ 14% |
| **Fixed Income** | Interest payments are made on a MONTHLY basis. |
| **Tax Consequences** | Interest income is fully taxable and is 1099 income. |
| **Investment Sizes** | Unit sizes are $100,000 per, however fractional units are available. |
| **Liquidity** | A special 30 month Note can be purchased that offers investors 90 Day redemption privileges. The rate of interest is 3.5% over the current Prime Rate at Chase Manhattan Bank. |

## HIGHLIGHTS

* TOWERS has raised over $400 million through these Note Offerings since 1986.
* TOWERS has never failed to make an interest payment or a redemption of principal to any of its four-thousand plus clients.
* TOWERS is classified as an Investment Grade Servicer of commercial paper by Duff & Phelps.
* TOWERS has completed five rated institutional offerings, all five of which were rated AA or AA+ by the agency of Duff & Phelps.

## INFORMATION

For further information, please call Steve Block or Wayne Wagner at (800) 999-1658.

**BROKER-DEALER USE ONLY**

# TOWERS FINANCIAL CORPORATION
# PRIVATE PLACEMENT NOTE OFFERING

## BENEFITS

* **TOWERS FINANCIAL:** TOWERS is an eighteen year old public company. TOWERS is the DOMINANT and LARGEST health care factoring firm in the United States. TOWERS is the second largest commercial recovery firm in the country.
* **MATURITIES:** One, Two, and Three years.
* **HIGH YIELD:** 12% for a One year note. 14% for either a Two or Three year note.
* **INTEREST:** Interest payments are dispersed MONTHLY.
* **NO LOAD:** There are absolutely NO FEES to the investor. TOWERS pays for all costs of the offering. 100% of your client's money goes to work right away.
* **COLLATERAL:** TOWERS secures all notes by a specific UCC-1 full recourse collateralized lien against the creditor's receivables.
* **DEBTORS:** The underlying debtors who guarantee payment on the invoices are either A or A+ insurance companies (health care), Federal and/or State agencies (Medicare, Medicaid, Blue Cross etc.) or Dunn & Bradstreet rated 1 and 2 (commercial).
* **INSURANCE:** The company is insured by American Credit Indemnity against the underlying debtor being unable to perform due to either bankruptcy or insolvency.
* **PERFORMANCE:** TOWERS has NEVER failed to make an interest payment or a principal redemption on over $400 million of note liabilities during a six year period.

The answers to LIQUIDITY lie in TOWERS' 30 month Promissory Note, priced at 3.5% over Chase's Prime Rate. Your client can come out of the program in 90 DAYS with NO PENALTIES.

Offering is suitable for Accredited Investors ONLY.

This summary to be used by Brokers only, not for solicitation.

# TFC Towers Financial Corporation

1821 WILSHIRE BOULEVARD, SUITE 650, SANTA MONICA, CA 90403
800-999-1658 213-315-9326 FAX: 213-823-2293

**Towers Financial Institutional Offering #5**

* AA rating by Duff & Phelps
* 100% Health Care Receivables
* Trustee: Connecticut National Bank
* 3 Year pays 7.85%
  5 Year pays 8.85%
* Interest paid quarterly
* 1% commission to Broker-Dealer

Should you have any questions, please call either Steve Block or Wayne Wagner at (800) 999-1658.

CORPORATE HEADQUARTERS:
417 FIFTH AVENUE, NEW YORK, NY 10016
212-696-0505 800-553-3322 FAX: 212-889-8412

# TOWERS FINANCIAL CORPORATION PRIVATE PLACEMENT NOTE OFFERING

## BENEFITS

* **TOWERS FINANCIAL:** TOWERS is an eighteen year old public company. TOWERS is the DOMINANT and LARGEST health care factoring firm in the United States. TOWERS is the second largest commercial recovery firm in the country.

* **MATURITIES:** One, Two, and Three years.

* **HIGH YIELD:** 12% for a One year note. 14% for either a Two or Three year note.

* **INTEREST:** Interest payments are dispersed MONTHLY.

* **NO LOAD:** There are absolutely NO FEES to the investor. TOWERS pays for all costs of the offering. 100% of your client's money goes to work right away.

* **COLLATERAL:** TOWERS secures all notes by a specific UCC-1 full recourse collateralized lien against the creditor's receivables.

* **DEBTORS:** The underlying debtors who guarantee payment on the invoices are either A or A+ insurance companies (health care), Federal and/or State agencies (Medicare, Medicaid, Blue Cross etc.) or Dunn & Bradstreet rated 1 and 2 (commercial).

* **INSURANCE:** The company is insured by American Credit Indemnity against the underlying debtor being unable to perform due to either bankruptcy or insolvency.

* **PERFORMANCE:** TOWERS has NEVER failed to make an interest payment or a principal redemption on over $400 million of note liabilities during a six year period.

The answers to LIQUIDITY lie in TOWERS' 30 month Promissory Note, priced at 3.5% over Chase's Prime Rate. Your client can come out of the program in 90 DAYS with NO PENALTIES.

Offering is suitable for Accredited Investors ONLY.

This summary to be used by Brokers only, not for solicitation.

# TOWERS FINANCIAL CORPORATION
# PRIVATE PLACEMENT NOTE OFFERING

## TOWERS FINANCIAL: OVERVIEW

TOWERS Financial Corporation is an eighteen year old publicly traded company. TOWERS is the largest accounts receivable financing company in America's health care industry.
On a national scale, TOWERS is the second largest commercial recovery firm in the United States, boasting 1991 revenues of over $1 BILLION.

## INVESTMENT BENEFITS

| | |
|---|---|
| Promissory Notes | TOWERS issues full recourse Promissory Notes that are available to Accredited Investors only. |
| Fixed Maturities | 12 Months @ 12%<br>24 Months @ 14% |
| High Yields | 30 Months @ 14% |
| Fixed Income | Interest payments are made on a MONTHLY basis. |
| Tax Consequences | Interest income is fully taxable and is 1099 income. |
| Investment Sizes | Unit sizes are $100,000 per, however fractional units are available. |
| Liquidity | A special 30 month Note can be purchased that offers investors 90 Day redemption privileges. The rate of interest is 3.5% over the current Prime Rate at Chase Manhattan Bank. |

## HIGHLIGHTS

* TOWERS has raised over $400 million through these Note Offerings since 1986.
* TOWERS has never failed to make an interest payment or a redemption of principal to any of its four-thousand plus clients.
* TOWERS is classified as an Investment Grade Servicer of commercial paper by Duff & Phelps.
* TOWERS has completed five rated institutional offerings, all five of which were rated AA or AA+ by the agency of Duff & Phelps.

## INFORMATION

For further information, please call Steve Block or Wayne Wagner at (800) 999-1658.

**BROKER-DEALER USE ONLY**

TFC Towers Financial Corporation

1821 WILSHIRE BOULEVARD, SUITE 650, SANTA MONICA, CA 90403
800-999-1658 310-315-9326 FAX: 310-828-2293

**TOWERS FINANCIAL PRIVATE PLACEMENT NOTE OFFERING**

**BENEFITS**

* TOWERS FINANCIAL: Is an eighteen year old national public company. Towers is the second largest commercial recovery firm in the United States. Towers is the dominant and largest health care factoring firm in the United States.

* SHORT TERM: One, two, and three year maturities.

* HIGH YIELD: 12% for one year note.
14% for either two or three year note.

* INTEREST PAYMENTS: Interest is paid monthly beginning thirty-four days from date of subscription.

* NO LOAD: There are absolutely no fees to the investor. Towers pays for all costs of the Offering.

* MARKET RISK: None - This security is not traded, therefore there is no market risk or fluctuation of interest or principal.

* COLLATERAL: Towers secures all notes by a specific UCC-1 full recourse collateralized lien against the debtor's assets.

* DEBTORS: The underlying debtors who guarantee payment on the invoices are A+ insurance companies (health care), Federal and State agencies (Medicare and Medicaid) or Dunn & Bradstreet rated 1 and 2 (commercial).

* INSURANCE: The note offering is insured against the underlying debtor being unable to perform due to either bankruptcy, insolvency, or default.

* PAST PERFORMANCE: Towers has never failed to make an interest payment or principal redemption on over $400 million of note liabilities during a six year period.

CORPORATE HEADQUARTERS:
417 FIFTH AVENUE, NEW YORK, NY 10016
800-553-3322

EXHIBIT 5[illegible]



# Accounts Receivable Collection Services

## Towers Financial Corporation

**Contents**

Our Credentials .......... 1
Why Towers? .......... 4
Collection Programs .......... 6
Q & A .......... 10
Getting Started .......... 12

### A Profile of *Towers Financial Corporation*

Towers Financial Corporation, a publicly traded accounts receivable collection institution, *is a recognized leader in the recovery of accounts receivable assets.* Through its nationwide network of 1,500 employees and independent agents, Towers provides a full range of accounts receivable management and accounts receivable *financing* and funding. Included among those services are:

- *collection of past due accounts receivable;*
- accounts receivable factoring and financing;
- accounts receivable *billing, credit approvals* and collection;
- health care receivable financing and factoring; and
- other related services, including *acquisition of RTC / FDIC* and banking industry accounts receivable.

*Towers Financial Corporation* (through its licensed collection subsidiaries, Towers Collection Service, Inc., Towers Collection Service of California, Inc., as well as *management-related affiliates in the collections industry*) can assist virtually every business and health care provider that extends credit to customers. These include manufacturers, wholesalers, distributors, *retailers, service companies,* health care providers, educational facilities, banking institutions and broadcasting and publishing companies.

*With more than $100 million* invested in its collections infrastructure, Towers has the capacity to manage 50 million accounts annually, representing more than $6 billion in *receivables per year.* Even the most challenging assignments from America's largest companies can't strain our collection resources.

Towers' stature in the accounts receivable collections industry is best reflected in the amount of accounts receivable under contract — more than $1.5 billion annually. With more than $600 million in assets and an in-house legal department, Towers is well prepared to stand by its promise to get you paid.

# Towers Financial Corporation

## Our Credentials in Accounts Receivable Collection Services

*The Towers system is backed by a nationwide network and a $100 million collections infrastructure.*

### Recovering America's Business, Health Care and Consumer Debt

Towers' core business is helping our customers collect their past due accounts receivable. We are a national leader in this business, with a reputation earned by delivering an exceptionally high level of service and bottom line results to more than 23,000 client customers throughout the United States — from the small shops on Main Street to the large companies well known on Wall Street.

Over the past two decades, Towers has continued to seek higher levels of professionalism and effectiveness from its personnel and systems. Our goal is to improve Towers' ability to maintain good will with our customers' debtors, while recovering their accounts receivable as rapidly as possible. This continuing emphasis on quality, combined with our pioneering new services, has extended and redefined the traditional boundaries of the accounts receivable business.

America is a credit-based society. And in order to conduct business in this country, nearly every American organization must extend credit in some form. Even "cash and carry" businesses that accept checks or credit cards at point of sale are extending credit to their customers.

The price most American organizations pay to grant credit is, at best, the 30- to 60- day delay in payment for goods or services delivered. At worst, it is the time and unpleasantness involved in collection of past due receivables, or even the loss of payment altogether.

Regular, predictable cash flow is the lifeblood of any business. When customer accounts become past due, a company is often left with cash flow problems that can have a significant impact on its ability to maintain overhead, to pay suppliers and personnel, and to keep its own credit in good standing. Because *of this potential for disruption* and financial loss, accounts receivable management is a critical business function which

*Towers continually trains its staff to keep them current on accounts receivable trends, procedures and regulations.*

requires expertise, diplomacy, persistence and results.

Unfortunately, most businesses — regardless of size or industry — do not have the ability to collect past due accounts receivable in an effective manner. They are often too busy dealing with management of healthy accounts to spend time chasing problem accounts. "Why throw good money after bad?" is often the rationalization for not pursuing past due receivables with the attention they deserve.

Towers has the ability to recover past due funds in an efficient, thorough and professional manner. We also provide a full range of related financing, factoring and management services to speed the flow of capital back into our customers' businesses.

### Clients Benefit From the Towers System

Based on many years' experience in our business, Towers has developed a unique accounts receivable management system which has placed us at the forefront of the industry. The success of the Towers System can be attributed to an intensive focus on the "three Ps" of our business: *people, process* and *presence*.

***People*** At the heart of the Towers system stands a team of highly trained and motivated professionals. Our nationwide network includes attorneys, claims analysts, account executives, collectors and paralegals with extensive experience in the industries they serve. We continually educate, train and monitor

*The chances for debt recovery, and the amount ultimately recovered, drop off sharply over time.*

these professionals to maintain their skills and keep them informed of trends, procedures and techniques, as well as government or health care policy changes.

***Process*** Our state-of-the-art, nationwide data processing equipment, systems and proprietary software are unmatched by any competitor serving the industry. We continually invest in these assets, and work to upgrade Towers' claims processing capabilities, in order to provide low-cost, effective results for our customers. Our systems currently have the capacity to collect, factor and manage 50 million accounts, representing more than $6 billion in accounts receivable annually. Even the largest customers' needs can't strain our $100 million collections infrastructure.



...ence to deliver on our ...mitment to client service, ...ers has developed an exten... national presence in major ...rkets throughout the United ...ates. This national network ...ables us to customize products ...nd services to meet the needs ...f individual markets, and to ...provide our customers with greater access and a higher level of service.

## Providing Experience and Professionalism

Towers understands that good ...e are the key to success in ...nts receivable manage... toward that end, our ...is to hire individuals for our collection staff who have at ...ast five years of relevant expe...ence. Each new member of the collection account team under...goes rigorous in-house training, ongoing education and frequent monitoring to ensure their adher...ence to Towers' strict guidelines involving the collection process.

Our collection account team, consisting of practicing attorneys, collectors, paralegals, credit ana...lysts and investigators (skip tracers), undertakes a comprehen...sive review of each new collection account and contacts debtors on the basis of this review. Towers' proprietary software systems enable us to track all accounts ...y for any client, to track our ...s with each debtor, and to ...ach debtor's payment and credit histories.

## Applying the Highest Performance Standards

Since its founding, Towers has worked diligently to raise the standards of professionalism and effectiveness of a service which has been viewed historically as a "dirty business," often by those who stood the most to gain from its proper application. Starting with an appreciation of its eco...nomic function, and building on a belief that the rules of capitalism entitle businesses to be paid in a timely manner, Towers has helped to establish accounts receivable management as a legitimate and necessary discipline.

Evidence of Towers' industry leadership is plentiful. One indi...cation of our performance is our proven ability to recover accounts which are substantially past due. Another is the signifi...cant amount of repeat business we generate. The effectiveness and speed of our collections, combined with our professional manner — designed to maintain good will between customer and debtor — has resulted in repeat business and referrals from thou...sands of satisfied customers. This is a reputation we intend to enhance in the years ahead.

Towers has pioneered new approaches to cash flow management for health care providers.

***"The advantage to the client in using a third-party servicer is that debt collection agencies generally deliver more effective service, at less cost, than in-house personnel. Most important, debt collection agencies, when they do their jobs properly, are more likely to collect from debtors, because they are not part of the original adversarial collection picture."***

Analysis by
SHEARSON LEHMAN

3 4

# Why Towers?

## A Proven Track Record of Success

[illegible] Towers' state-of-the-art data [illegible] systems can manage mo[illegible] [illegible] accounts, representing more than $6 billion annually.

## Our Approach to Collections

Towers is a company dedicated to the accounts receivable busi...ness. As such, we provide a complete range of accounts receivable services, including:

- **The Towers Advantage Collection Letter Writing Program** — which provides demand letter writing services available at one of the lowest fixed costs in the industry. The Towers Advantage Collection Letter Writing Program, unlike any other service of its kind, involves *no up-front fees*. Instead, fees are paid out of first recov...eries received either by Towers or the client, after collection.
- The Towers Intensive Collection Program — which provides a full range of appro...priate collection tactics. The Towers Intensive Program also involves *no up-front fees*, with payment taken out of collected funds.

For example, if a client selects Towers to collect one past due account of $10,000, the program charge (whether a flat fee for the Towers Advantage Collection Letter Writing Program, or a per...centage for the Towers Intensive Collection Program) is taken out of whatever portion of the $10,000 debt that Towers, or the client, receives. If we collect nothing, you pay nothing.

In other words, Towers pro...vides clients with a risk-free opportunity to collect any size past due account for as little as 10 or 20 dollars.

Philosophically, we approach our business with an understanding and appreciation of the fact that the collection of past due accounts is both an art and a science. The sci...entific, or quantifiable aspect of our business involves the physical systems and management disci...plines necessary to deliver results in an orderly, efficient manner. The artistic, and more subjective aspect of our business involves the inter...personal skills and judgment that are developed only through con...tinuous training and years of

practical experience. With this in mind, Towers continually strives to improve the quality of its systems and its people.

In addition to this appreciation for the dynamics of the accounts receivable business, Towers takes very seriously its responsibility as an "agent" for our clients. We recognize that when we contact our clients' past due accounts — either through the written or spoken word — our actions will be viewed as a direct reflection of the professionalism of our clients. As a result, we never violate our ...nts' trust ...aking any action that might ...ish their reputation or inadvertently jeopardize the good will they may wish to maintain with a past due debtor. In short, we operate according to the belief that most businesses are built on long-term relationships.

The specific methods that we use to collect past due accounts depend on the specific program selected by a client (see "Collection Programs" section), and on the individual circumstances involved in each situation — based on information and direction provided by a client.

Collection methods applied in the Towers Advantage Collection Letter Writing ...gram are well documented ...ients before any action is ..., and guidelines are then followed exactly as presented in this brochure.

Methods applied in collections under the Towers Intensive Collection Program can vary considerably. All of our collection activities are conducted in accordance with applicable federal and state laws and regulations. Nevertheless, *all* of these efforts can involve:

- numerous written and verbal communications from collectors and/or attorneys assigned to the case;
- attempts to have debtors sign promissory notes or other formal payment agreements which will reinforce our client's ability to collect their debts;
- ongoing communication with clients regarding the status of all accounts;
- immediate access to account information through Towers' on-line computer capability;

- specific and well-reasoned direction regarding the most appropriate actions to take, based on the behavior of the debtor account; and
- close supervision over the account by Towers' own staff attorneys, and access to these individuals for any information regarding accounts.

### Selecting the Best

If a company accepts the premise that an experienced, reliable third party can produce better collection results than it can alone, then the most critical decision it must make is which agency is best suited to handle its past due accounts.

Selection of a collection agency is no easy task. Large credit reporting firms, with legitimate credentials in that specialized field, often provide accounts receivable collection to their clients as a secondary service. And those clients often mistakenly assume that they are receiving the best level of service the industry has to offer.

Selection is also made difficult by the large number of collection agencies of varying size, experience and expertise, claiming to be better, quicker or cheaper than their competitors. Out of frustration, many companies will make an arbitrary agency selection and stick with their decision for years — simply because there is no assurance that they can improve their situation.

Towers' credentials in the accounts receivable collection business are based on documented evidence. We think we're the best at what we do, and have thousands of satisfied clients who agree.

If you're serious about benefiting from the full potential of accounts receivable collection, then you have nothing to lose and much to gain by using Towers.

## Compare Towers to the Competition

| | Towers | Competitic |
|---|---|---|
| **Features:** | | |
| • One of the largest collection institutions in America | ☑ | ☐ |
| • No up-front fees for collections | ☑ | ☐ |
| • No long-term contracts required | ☑ | ☐ |
| • No annual minimum placement of accounts receivable | ☑ | ☐ |
| **Experience:** | | |
| • Experience based on more than 23,000 clients | ☑ | ☐ |
| • Senior collectors with a minimum of five years collection experience | ☑ | ☐ |
| • In-house legal department with full-time lawyers, paralegals and collectors | ☑ | ☐ |
| **Services:** | | |
| • Ability to purchase your current and past due accounts | ☑ | ☐ |
| • Ability to finance accounts receivable | ☑ | ☐ |
| • Same day contact of debtors once contracts are received | ☑ | ☐ |
| • Status reports — case by case — over the phone | ☑ | ☐ |
| • Ability to manage and service total accounts receivable needs | ☑ | ☐ |
| • Tape-to-tape computer hookup capability | ☑ | ☐ |
| • Fax and overnight express pickups from debtors | ☑ | ☐ |
| **Resources:** | | |
| • Completely computerized recovery department | ☑ | ☐ |
| • Access to a nationwide network of lawyers and paralegals | ☑ | ☐ |
| • $100 million collection infrastructure in place | ☑ | ☐ |
| • Capacity to manage 50 million accounts representing $6 billion in receivables annually | ☑ | ☐ |

## Why Towers Collection Service?

- Towers offers the lowest fixed-cost, *contingency-based*, immediate-results, letter-writing program available.
- Towers also offers *contingency-based*, intensive collection programs providing a full range of appropriate recovery procedures.
- Towers charges no up-front or advance costs for any of our programs. Towers is paid only when recoveries are made.
- Towers' programs are the most comprehensive, yet flexible, programs available.
- Towers is almost alone in its understanding of how to lend its clients money against accounts receivable, or to purchase accounts receivable outright.
- Towers is a recognized leader in the accounts receivable collection industry, with a nationwide presence and capability.
- Towers serves 23,000 clients in industry, health care, banking, education and government.
- Towers is an approved government contractor on the federal, state and municipal levels.
- Towers has accounts receivable of more than $1.5 billion under contract, and more than $600 million in assets.
- Towers is one of the few publicly owned accounts receivable collection institutions. We have more than 1,500 employees and independent contractors nationwide.
- Towers maintains a large legal department, staffed with thoroughly knowledgeable full-time, in-house collection lawyers, paralegals and collectors.
- Towers maintains one of the largest accounts receivable collection service centers in the country, with 700 people in the headquarters site alone.
- Towers can manage and service the total accounts receivable needs of our clients, as it is doing for businesses and medical organizations now.
- Towers' $100 million investment in its internal capabilities has provided a capacity to service more than 50 million accounts annually.

## Collections Programs

### A Broad Range Of Program Options

Towers provides the broadest range of accounts receivable collection programs available anywhere. Because we understand that the "art" of accounts receivable collection often involves application of the least degree of persuasion necessary to generate payment, Towers has designed a graduated system of collection options which can be:

- tailored to meet the complexity or seriousness of each situation, and
- applied in incremental steps, in order to be paid quickly, while still maintaining the good will of past due debtors.

To provide this high degree of flexibility and customization, Towers has created two distinct programs, featuring various collection strategies with a large selection of product services to fill any client/customer requirement.

# The Towers Advantage Collection Letter Writing Program

The Towers Advantage Collection Letter Writing Program is the most effective and lowest priced, fixed-cost, contingency-based demand letter writing program available anywhere. It was created by Towers as a means of applying various combinations of written and telephone contact, in order to generate payment and prevent an account from becoming a serious collection problem.

The Towers Advantage Collection Letter Writing Program is intended for all types of outstanding debt.

One of the most innovative features of the Towers Advantage Collection Letter Writing Program is its fixed-price payment options, which enable customers to either:

- pay the program fee up front, without any billing or processing charges; or
- pay the program fee from the first collections of program results, which will include a charge of 10% of the program fee to cover billing and processing.

When a Towers client selects [illegible] the Towers Advantage [illegible]ion Letter Writing Program options to collect a past-due account, they may either pay the program's flat fee (for example, $10) up front, or have $11 ($10 + 10%) taken from the collected funds. In either case, the Towers Advantage Collection Letter Writing Program delivers a combination of low cost and quick results that cannot be matched by any other collection agency.

Here is the full range of the Towers Advantage Collection Letter Writing Program options available:

## Program 1

Program 1 provides delivery of four (4) separate collection letters from Towers to an account debtor. These communications, presented on Towers letterhead, let debtors know that you're serious about collection.

## Program 2

Program 2 also provides delivery of four (4) separate collection letters from Towers to an account debtor. These letters, however, are presented on stationery from Towers' legal department. Although no reference to litigation is made at this stage, account debtors understand how serious the non-payment problem is.

## Program 3

Program 3 provides delivery of four (4) separate collection letters on Towers letterhead to an account debtor. In addition to these written communications, an account debtor will receive telephone calls from a trained Towers customer service representative, who will request payment for the amount due. This additional step, always conducted in a professional manner, serves to reinforce your intention to collect from the account debtor.

## Program 4

Program 4 provides delivery of four (4) separate collection letters on Towers letterhead to an account debtor. In addition, an account debtor will receive telephone calls from one of Towers' highly trained, professional collectors. These collectors have years of experience in handling objections to payment, and in persuading account debtors to meet their obligations.

## Program 5

Program 5 provides delivery of four (4) separate collection letters from Towers' legal department to an account debtor. In addition, and supporting the written communications, an account debtor will receive telephone calls from a collector in Towers' legal department, who is trained to present account debtors with a serious (but non-threatening) argument for payment.

## Program 6

Program 6 provides delivery of four (4) separate collection letters from Towers' legal department to an account debtor. In addition, an account debtor will receive ongoing telephone calls from a collector in Towers' legal department. This persistent approach frequently convinces an account debtor of the seriousness of the matter, and brings about an understanding that immediate payment is necessary.

## Program 7

Program 7 provides delivery of four (4) separate collection letters from Towers' legal department to an account debtor. An account debtor will also receive ongoing telephone calls from a collector in Towers' legal department. In addition, at the end of 30 days, the client receives a detailed written status report explaining the results of the collection calls to the account debtor.

*Towers' expertise also includes acquisition of RTC/FDIC and banking industry accounts receivable.*

## Program 8

Program 8 provides delivery of four (4) separate collection letters from Towers' legal department to an account debtor. In addition, an account debtor will receive ongoing telephone calls from one of Towers' most experienced collectors in Towers' legal department. Senior collectors will attempt to negotiate with an account debtor in order for Towers' client to receive payment. In this highly personalized program, senior collectors provide a detailed explanation of the progress made over each 30-day period.

## Program 9

Program 9 involves development of a customized account collection approach, within a fixed price arrangement. These programs are designed to address specialized client needs and concerns, and may be as simple or as complex as those needs dictate.

The Towers Advantage Collection Letter Writing programs are generally conducted over 30 to 60 days, depending on applicable federal and state laws, to which *all* Towers collection programs are subject. Towers will pursue debtors until it recovers its fees, which will come out of first proceeds received by Towers or the client.

## The Towers Intensive Collection Program

The longer an account receivable is left uncollected, the more difficult it becomes to obtain payment. In addition, long-standing receivables often become, and are eventually written off, as bad debt. Towers believes that these write-offs are often unnecessary, and should always be viewed only as a last resort.

For delinquent accounts, Towers has structured an intensive collection program designed to recover all or a significant portion of these debts.

As with our fixed-price Towers Advantage Collection Letter Writing Program, and unlike most other collection agencies, *there are no up-front fees or retainers involved in the Towers Intensive Collection Program.* For these difficult collection efforts, we work strictly on a contingency basis, which means we will get results or we don't get paid.

The Towers Intensive Collection Program provides whatever collection resources are necessary to collect your past due accounts quickly and amicably. Debtors receive numerous written and verbal communications from our legal department requesting payment. Towers clients are kept informed of developments regarding all accounts.

Because of the complexities involved in collecting different types of debtor accounts, two separate fee structures exist for the Towers Intensive Collection Program:

**BUSINESS AND COMMERCIAL DEBT**

For collection of past due accounts involving commercial debts (business-to-business transactions), the following fees are applied, after collection:

| Fee | Age of Account |
|---|---|
| 5% | Up to 90 days old |
| 10% | More than 90 and less than 120 days old |
| 25/20% | For each collection, 25% of the first $2,000 collected, and 20% of the excess of $2,000 collected for debts more than 120 days old |
| 40 to 50% Plus costs | Upon your written authorization, accounts will be assigned to attorneys of your choice for litigation. This fee will apply to all collections made after receipt of your written authorization. |

**CONSUMER, RETAIL AND INDIVIDUAL DEBT**

For collection of past due accounts involving consumer debts (retail transactions), the following fees are applied, after collection:

| Fee | Age of Account |
|---|---|
| 10% | Up to 90 days old |
| 20% | More than 90 and less than 120 days old |
| 33 1/3% | More than 120 days old |
| 50% Plus costs | Upon your written authorization, accounts will be assigned to attorneys of your choice for litigation. This fee will apply to all collections made after receipt of your written authorization. |

## Frequently Asked Questions

We are often asked similar questions regarding the collections business, our methods and capabilities. However, if you have a question or concern that is not addressed here, a Towers representative will be happy to provide an in-depth response.

**Isn't it more effective to handle the collections process internally?**

Most companies do, in fact, have individuals who handle past due accounts. And at some companies this task is managed in a fairly professional manner, and positive results can be gained.

Depending on the seriousness of the situation, the average number of past due accounts, and the ability of internal staff to manage this sensitive area, it often makes more sense to assign collection of past due debts to a qualified institution.

Experienced recovery specialists, familiar with standard objections and stall tactics from debtors, are usually more effective than an internal bookkeeper or accounting staff member who may be too busy or less motivated to get results.

In addition, the involvement of a third party in the collection process often sends a clear signal to the debtor regarding the seriousness of the matter, and therefore can serve as a more effective catalyst for prompt payment.

**Should we use our inside legal counsel or outside law firm to collect debts?**

There are two reasons why it can be unwise to use your own legal resources. First, many collections do not require the time or expertise of a lawyer, and in some cases, the use of an attorney can slow down the process or send an inappropriate message to the debtor.

Second, when it becomes necessary to use legal resources, it makes little sense to involve a lawyer who is not a collection

law specialist. At Towers, our lawyers are used only when it is appropriate and necessary. And because our lawyers are full-time collection law specialists, you do not pay for their learning curve. Nor do you risk losing your claim in court as a result of their inexperience or a lack of knowledge regarding state and federal laws involving collection or harassment.

In addition, Towers' staff of attorneys, paralegals and collectors have the capacity to present a case both factually and legally, so that if litigation becomes necessary, there is no wasted time waiting for the case to be prepared.

**Are there hidden costs or contingency fees in any of Towers' collection programs?**

No. All fees for the Towers Advantage Collection Letter Writing Program are stated up front, with two ways for customers to pay. With the Towers Intensive Collection Program, payment is made as a percentage of what is collected from the debtor, according to the schedules presented in this brochure.

**How can I be sure that Towers can deliver on its claims?**

We recognize that some agencies have a poor track record when it comes to delivering on their promises. However, we encourage prospective clients to scrutinize our credentials before doing business with us.

Towers is a publicly traded company with an obligation to its shareholders, employees and customers to maintain the highest standards of professionalism and effectiveness. We hold all necessary licenses to do business. Our personnel are bonded, and our results are well documented.

In short, we will not risk our hard-earned reputation by failing to deliver on our promises. Towers seeks long-time relationships built on trust and performance.

**What if I'm currently satisfied with another collection company?**

Towers does *not* require clients to sign exclusive contracts or make any long-term commitments, so there is no need to interrupt your current arrangements. We do suggest, however, that it makes good business sense to compare your current level of service against Towers' capabilities by assigning us a number of past due accounts for collection — either on one of the Towers Advantage Collection Letter Writing Program options, or on the Towers Intensive Collection Program basis.

Some clients who formerly used large credit reporting services or small to medium-sized collection agencies for collections, often find there is a world of difference between a company that handles collections as a secondary business (or that lacks experience and resources), and a firm that's dedicated to delivering the highest quality collection service.

Why pay more for less?

**What if litigation is necessary?**

If, after all other appropriate means of collection have been attempted, and if Towers' legal analysts believe the account has merit, Towers will (with a lawyer of your choice) assist in your litigation. If you wish, Towers will help you choose competent legal counsel and will, if you choose, manage the litigation process for you. In addition to the collection fees outlined in the Towers Intensive Collection Program schedule, clients are responsible for court costs and attorney fees.

It is important to remember that Towers will not recommend legal action for a client unless the potential economic benefits of litigation far outweigh the time and expense involved. In addition, and as a result of Towers' depth of experience in collections litigation, these cases are always handled in the most expeditious and cost-effective manner possible.

**How many past due accounts can Towers handle for a client at one time?**

There is no limit to the number of accounts Towers can simultaneously handle for a client. For many of our larger clients we may manage thousands of their past due accounts on an ongoing basis; for our smaller clients we manage fewer, based on their individual needs. Our proprietary tracking and reporting systems, collections procedures and highly trained staff enable us to deliver consistent levels of service and bottom-line performance — whether we're handling one or ten thousand past due accounts for a particular client.

Our collection capacity exceeds 50 million accounts annually, representing more than $6 billion in receivables per year.

# Working With Towers

Our Service Goals:
Simplicity,
Clear Communication
and Results

*Accounts receivable management requires expertise, diplomacy, persistence and results. Towers demonstrates all of these capabilities.*

## Getting Started

At Towers, we think the difficulty involved in dealing with debtor accounts should not be compounded by difficulty in dealing with a collection agency. Toward that end, we make doing business with Towers very easy.

To begin an assignment, a client need only:

1. Select one of the nine Towers Advantage Collection Letter Writing Program options, or the Towers Intensive Collection Program.
2. Fill out the appropriate account agreement(s).
3. Attach to each agreement any statements, invoices and correspondence which might help Towers to collect the past due debt.
4. Submit the agreement and documentation to Towers.

Before proceeding with your account, you'll be contacted by a Towers professional, who will clarify basic information, and let you know how and when the collection effort will be conducted. No litigation or any other legal action will take place without your knowledge and written permission.

All money recovered by Towers will be remitted to you after deduction of any fees. Money which you receive directly from those debtors whose accounts we have been assigned is subject to our stated fee schedule.

You may stop the collection process before the debt has been paid, or before Towers deems the account uncollectable. You will, however, still be liable to Towers for the fees applicable to such account. Towers may use any funds collected to offset any open fees due Towers for an account submitted to Towers.

If you have questions or concerns regarding the account application process, or any aspect of our collection procedures, ask your Towers representative, or call our executive office toll-free at 800-553-3322. Within New York State, call 212-696-0505.

Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016

Tel: (212) 696-0505
(800) 553-3322

TFC
TOWERS
FINANCIAL
CORPORATION

EXHIBIT 57



The Receivables Funding Program
A Unique Financing Opportunity for Health Care Providers
Towers Financial Corporation

Case 3:96-cv-01023-L-JFS Document 350-1 Filed 06/23/00 PageID.2956 Page 286 of 344

## The Crisis in U.S. Health Care Financing

Hospital Closings

Source: American Hospital Association

New Patient Revenue Margins

Source: AHA National Hospital Panel Survey

National Health Care Costs

Source: U.S. Department of Commerce

Shoestring economics is nothing new to most of the nation's health care providers. The typical hospital has never earned quite enough on patient care to cover costs, and has historically relied on government programs and private philanthropy to stay in the black. But over the past few years, this precarious mode of existence has been increasingly difficult to maintain.

The growing rate of hospital closings has dramatized the fact that more than half of all community health care facilities—large and small, urban and rural, investor-owned and not-for-profit—are losing money on patient care, and are in danger of insolvency.

From the provider's viewpoint, a major cause of this worsening cash squeeze was the federal government's introduction of Diagnosis-Related Groups in 1983, which featured stringent cost controls and a prospective method of payment based on what hospitals are supposed to spend, rather than what they actually spent.

Unfortunately, these federal mandates to hold the line on spending were not designed to accommodate the need or high price of new technology and drugs; shortages of nurses and other qualified staff; greater intensity of services due to an aging population and the AIDS epidemic; or skyrocketing costs of bad debts and charity care. When hospitals were paid retrospectively on the basis of costs or charges, billings could be raised each year to recoup the losses of the previous year, and to ease cash flow demands. But that financial flexibility no longer exists, and health care providers of all types are feeling the squeeze.

Under the DRG formula and subsequent legislation in 1985, the nation's health care facilities are caught in an economic dilemma. They must address inflation in the cost of goods and services in an environment of stringent cost controls. They must wait longer for repayment from third-party providers who have tightened claims review. And they must bear an increasingly larger burden of the shortfalls from Medicaid and Medicare reimbursements.

Borrowing has become the principal source of funds for today's health care institution. But borrowing at a reasonable cost has proven extremely difficult as shrinking patient margins have subjected hospitals to closer scrutiny by the financial community and traditional lending sources, and as many have seen their credit rating downgraded.

Where is the nation's health care industry headed? A recent Touche Ross survey of hospital executives found that 48% believe their own hospitals to be at risk of failure within the next five years. And the National Committee for Quality Health Care, a blue-ribbon panel of leading industry executives, warned that "Our nation's health care system is approaching critical condition," and reported that unless current trends are changed, the solvency of the entire system will be jeopardized. These are hard-nosed facts, strong words and dire predictions from knowledgeable sources. They are also the catalysts that have led to the development of The Receivables Funding Program—a unique opportunity for health care providers to help restore higher levels of financial stability.

# The Receivables Funding Program

In response to the growing U.S. health care economic crisis, Towers Financial Corporation has developed a nationwide program that generates necessary funding for health care providers with a need to:

- [illegible] the time delays brought [illegible] slow-paying insurance [illegible]panies and state/federal government agencies, and
- collect a greater portion of the funds to which they are entitled.

The Receivables Funding Program is a revolutionary new approach to cash flow management which enables hospitals, clinics, doctors, dentists and other health care providers to conduct billing, collection and insurance filing/reimbursement operations in a highly effective and profesional manner.

As the health care industry continues its expansion to meet the demands of a growing and [illegible] aging population, the peo[illegible] institutions that address [illegible] medical needs will be hard-pressed to handle the complex, time-consuming and labor intensive tasks involved in the financial administration of those organizations.

In the years ahead, health care professionals—from both the medical and managerial sides of the business—can expect to see greater demand for services, an even higher degree of governmental intervention, and continued increases in operating costs. The Receivables Funding Program addresses these three trends head-on, ensuring the financial stability and liquidity of Program participants.

The Receivables Funding Program gives qualified health care providers up to 50% *immediate payment* for accounts receivable due from commercial insurance, Medicaid, Medicare and private parties. Following this initial funding, the Program pays the balance of receivables (minus the factoring fee) upon collection—which TFC usually completes within 60 days.

Historically, only established firms with substantial assets or cash flow have been qualified to finance their accounts receivable; now smaller businesses may enjoy the same short-term financing capability—enabling them to manage ongoing overhead expenses such as payroll, rent and taxes without borrowing or having to wait up to 90, 120 or sometimes 180 days for payment of their receivables.

Another major feature of the Receivables Funding Program is the elimination of crippling delays in payments from major insurance companies and government agencies. After purchasing a hospital's receivables and providing immediate funding, Towers Financial then applies its extensive expertise in receivables management and collection in order to recover the funds due from third-party providers.

Because of its knowledge of the health care industry and its experience and organization, Towers Financial is able to review and monitor each step of the claims process. And as a result of its focus and extensive in-house systems, the average payment cycle for Towers Financial is less than 60 days.

For health care providers, other related Program benefits include:

- thorough examination of claims submissions, in order to ensure quick payment, and to reduce and eliminate third-party provider deductions that are incorrect;
- elimination of internal staffing costs through use of TFC's highly trained personnel;
- application of a state-of-the-art, multi-million dollar data processing capability, designed specifically to increase collection efficiency and to create an additional audit control for all accounts receivable generated each month;
- a substantial credit line available through factoring, which can be used for various purposes, including bridge financing for fundraising or bond offerings;





support and guidance for internal claims management staff, involving collection of accounts receivable, establishment of appropriate in-house systems and controls, etc.

In addition to the specific Program-related benefits, TFC's Receivables Funding clients have access to an extremely high level of counseling and management ...ion. Hospitals, clinics, medical groups, doctors, dentists and other health care providers—regardless of size or sophistication—are provided with the opportunity to apply the firm's expertise to a wide variety of problems and challenges, including:

- organization of financial management controls,
- underwriting of bonds and debentures to provide cash flow,
- assistance in selling or restructuring ownership,
- financing assistance to increase creditworthiness,
- direction on governmental and legislative issues,
- structuring of group insurance and benefits programs,
- guidance on legal matters relating to health care and collection rights.

The Receivables Funding Program is viewed by many leading health care professionals as a long-awaited opportunity to restore financial stability to an overly regulated industry whose services are vital to the nation's well-being. Towers Financial Corporation invites you to explore the potential benefits and application of this program within your own organization.

HP LaserJet 3100
Printer/Fax/Copier/Scanner

SEND CONFIRMATION REPORT for
Law Offices Timothy C. Karen
619 259 6817
Oct-14-98 8:47AM

| Job | Start Time | Usage | Phone Number or ID | Type | Pages | Mode | Status |
|---|---|---|---|---|---|---|---|
| 928 | 10/14 8:31AM | 15'55" | 702 565 5663 | Send | 10/10 | EC 96 | Completed |

Total 15'55" Pages Sent: 10 Pages Printed: 0

## Frequently Asked Questions

## Questions & Answers

▸ **What types of receivables does the Program purchase?**

TFC will purchase any credit-worthy accounts. For health care providers, most insurance carriers and government agencies qualify, as well as many private party receivables, payable by institutional third parties, such [illegible]ions and major [illegible]orations.

▸ **How much will the Program pay for the accounts?**

Depending on the age, size and creditworthiness of the debtor, TFC will provide immediate cash payment for up to 50% of the total of the face value of the accounts. Following this initial funding, the Program pays the balance of receivables (minus the factoring fee) upon collection—which TFC usually completes within 60 days.

▸ **How quickly does the health care provider receive payment, after the Program purchases the accounts?**

Within 48 hours of finalization of purchase agreement.

▸ **What sort of account is ineligible for purchase of the Program?**

Bankruptcies, insolvencies and disputed claims are ineligible.

▸ **May the health care provider select which accounts it chooses to sell?**

Yes. The provider may sell as few or as many as it wishes.

▸ **May the provider borrow against its receivables?**

No. TFC is a purchase-only factor.

▸ **What sort of commissions or fees are involved in the program?**

For collecting and servicing the account, TFC charges a factoring fee of up to 15% of the face value of the accounts receivable for each account receivable.

▸ **What are the Program requirements, in terms of provider credentials?**

The Program generally limits its purchases to companies with an acceptable rating from Dun & Bradstreet or A.M. Best Co.

▸ **What sort of collection guarantees does the Program involve?**

The Program's purchase agreement has a number of specific requirements, most notably, a warranty that the accounts receivable are valid and not in dispute.

▸ **What is the capitalization source for purchase of the receivables by the Program?**

The Program is backed by $100 million in recourse promissory notes purchased by a number of the country's most prominent banks and institutional investors. In addition, a leading investment bank has agreed to manage a private placement of debt instruments up to $500 million, for the purchase of health care receivables.

▸ **What is the Program's total funding capacity?**

The Program's financial resources, combined with TFC's recent investment in expansion of its data processing facilities and physical plant provides the Program with the capacity to manage and collect over a billion dollars of health care receivables at any one time.

▸ **Is this Program acceptable to federal and state regulators?**

Yes. In fact, the Health & Human Resources Agency recently endorsed the purchase of receivables as a viable means for health care providers to improve cash flow and lessen insolvency risk.

▸ **Why should a health care institution consider Towers Financial Corporation over the other companies involved in purchase of receivables?**

TFC is recognized as the leader in its field, due to its unmatched ability to identify, originate, manage and collect health care receivables. The company has more than 15 years of experience in managing and servicing health care, as well as commercial accounts.

## Program Worksheet

This worksheet is intended to serve as a tool for health care providers considering The Receivables Funding Program as a potential means of increasing cash flow and expediting the payment of outstanding accounts.

The worksheet questions are [illegible]ned to provide health care [illegible]essionals with an overview [illegible]heir current receivables situation, and as an objective basis for determining the applicability of the Program to their particular situation. This worksheet is not an application for Program participation.

If you have any questions, or would like assistance in completing or evaluating the results of the worksheet, please feel free to contact Towers Financial Corporation.

Total accounts receivable currently outstanding ________

Rough breakdown of receivables:

____% private insurance ____% Medicare
____% private patient ____% personal injury
____% workman's comp ____% Medicaid
____% other

Approximate number of insurance companies billed________

Approximately annual bad debt write-off $________

Accounts receivable aging:

____% 30 days or less ____% 90 to 120 days
____% 31 to 60 days ____% over 120 days
____% 61 to 90 days

Number of accounts receivable against which judgements or liens have been filed ________

Estimated total face value of accounts receivable eligible for purchase by Program. $________

Estimated value of accounts eligible for Program purchase over the next year $________

Current cash flow requirements $________

## About Towers Financial Corporation

The Receivables Funding Progrma was developed and underwritten by Towers Financial Corporation, a publicly owned company with more than 15 years of experience in the field of accounts receivable servicing and financing. Through its professional collection team—consisting of trained insurance adjusters, insurance administrators, collectors, paralegals, claims examiners, claims supervisors and attorneys—TFC is well equipped to acquire, service and collect health care accounts receivable in a highly efficient and ethical manner.

TFC's impressive human resource capability in the health care industry is matched by its extensive data processing systems and proprietary tracking and collection programs. The company's leadership role in the accounts receivable business extends into a number of other major industries—providing assistance to more than 9,000 clients in the United States, including many FORTUNE 1000 companies. TFC currently services outstanding debt for more than 500,000 accounts.

Towers Financial Corporation is also well-known as a diversified financial services company, with more than 1,200 employees and independent agents operating within a national network of branch offices in nearly every state. In addition to its accounts receivable factoring and financing activities, TFC and its affiliated companies supply clients with many other forms of asset based funding, including:

- corporate financing,
- inventory financing,
- machinery and equipment leasing,
- financing of corporate buy-outs.

In 1988, the company entered the European marketplace, with introduction of mortgage backed business asset bonds. Additional activity in the overseas markets is planned.

The company's headquarters are located in New York City on three contiguous floors occupying approximately 100,000 square feet at a prestigious midtown location. Over the past four years, TFC's financial strength has grown steadily, with gross revenues reaching more than $180 million and total assets of more than $110 million in 1989.

To learn more about The Receivables Funding Program, write or call TFC's manager and health care facilities financing at:

Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016
Tel (212) 695-0505
(800) 553-3322
Fax (212) 779-7969

There is no obligation or cost inolved in the initial consultation.

Towers Financial Corporation
417 Fifth Avenue
New York, New York 10016
Tel: (212) 696-0505
(800) 553-3322
Fax (212) 779-7769

TFC
Towers
Financial
Corporation

EXHIBIT 58





TOWERS' HEALTHCARE FUNDING AND AUTOMATED CLAIMS MANAGEMENT SYSTEMS

## TOWERS' HEALTHCARE FUNDING AND AUTOMATED CLAIMS MANAGEMENT SYSTEMS

Towers Financial Corporation's Healthcare Funding Program provides an accounts receivable line of credit against third party reimbursable receivables. Towers' funds are an excellent source of immediately available additional working capital...funds which can be used not only to pay bills, but also to negotiate substantially better prices with vendors.

The savings, as much as 10% to 15%, resulting from this increased purchasing power, from the additional working capital provided by Towers accounts receivable line of credit, will more than offset the program's modest cost.



## 1. Same Day Funding Means A More Predictable Cash Flow

Towers' Healthcare Funding Program provides same day funding for submitted bills. Towers will pay up to one half of a third party receivables reimbursable value on the very same day that each claim is billed. The second half of the receivable, less Towers' modest fee, is forwarded when Towers collects the account. Because of Towers' demonstrated expertise in automated claims management, including billing and collecting, turn-around time on all outstanding receivables is greatly reduced.

## 2. Financial Classifications For Reimbursable Claims Management

Towers' Healthcare Funding Program addresses claims processing and collection for each and every type of reimbursable accounts receivable classification including but not limited to Blue Cross and Blue Shield, in its role as a carrier and intermediary, for government payment programs, all private insurance carriers, nationwide Medicare, state by state Medicaid programs including Medi-Cal in the state of California, workers compensation, HMO and preferred provider organizations, unions, and corporate employee coverage for self-administered healthcare plans. All third party reimbursable classifications are included.

## 3. Towers Automated Claims Management Systems

Towers is able to provide, through some of the best data processing companies in America, a full data processing system which includes both state-of-the-art hardware and software. The automated claims management system utilizes this up to the minute computerized technology to bill and administer all types of third party reimbursable accounts receivable. In addition, Towers provides this technology, including both hardware and software, to participants in its programs at no extra charge. The savings that result from this no-cost upgrade of computer capability and billing programs, is substantial.

## 4. Verification & Pre-certification

Towers will review and correct any defects within the Healthcare providers present systems of admitting patients for treatment.

## 5. Billing Processing Edits And Claims Review For Preparation Of UB 82 And HCFA 1500

Towers will review and correct any defect in processing of UB 82 and HCFA 1500. This system will include training of staff and the stationing of expert claims analysts in the back office to supervise and manage the entire claims reimbursement system. Included in this program is the establishment of appropriate in-house systems and controls and the installation of edit systems that will address billing errors to ensure the initial production of a clean claim.






THE TOWERS HEALTHCARE RECEIVABLES FUNDING PROGRAM

## 6. Insurance Expertise

Towers provides insurance regulatory expertise to stop inordinate delays in payments by insurance carriers. Most states have laws which govern the speed with which insurance carriers must reimburse hospitals and other healthcare providers. In a majority of states, insurance companies must pay claims within thirty (30) days, Towers' program assures that these deadlines are adhered to.

## 7. Electronic Claims Transfer

Included in the Towers claims management systems, electronic claims submission systems can be installed for each reimbursable classification of accounts receivable that the payor can accept. This program will accelerate the recovery process and curtail manual billing errors.

## 8. Collection Recall System

Towers will install a collection recall system that will trace reimbursements for Blue Cross/Blue Shield, all insurance carriers, Medicaid and Medicare, plus any and all third party payors. The healthcare provider will have a system that will track, pinpoint, and follow-up each claim that has been submitted for reimbursement. Collection will be handled by the recall software that operates under Towers' staff supervision. This specialized software was developed by Towers specifically to cut-back the time delay in reimbursement. The healthcare provider will be capable of knowing the on-going status of their claims that are moving through the third party payor's systems. This collection recall system is an important breakthrough in monitoring and collecting reimbursable accounts receivable of all classifications.

## 9. Re-billing Of Rejected Claims

Towers will address the need to re-bill rejected claims in order to re-submit a clean claim as soon as possible to qualify for reimbursement. Thereafter, the claims will be monitored by Towers Collection Recall System.

TFC TOWERS FINANCIAL CORPORATION





## 10. Claims Denied For Medical Reasons

Towers addresses the problem of collecting claims that have been denied for medical reasons. Our expertise in understanding the rules and regulations governing the rights of a third party payor to deny a claim for medical reasons will assist the healthcare provider in receiving lawful reimbursement.

## 11. FTE Staff Savings And Supervising Claims Analysts

Towers' supervising claims analysts are available for assignment in the healthcare provider's back office, enabling existing staff training in handling claims processing. Towers claims analysts are experts in the proper billing and collection of third party receivables and are fully trained to handle any claims problems. This support staff will provide an expert level of management that will assist in the collection of third party reimbursable receivables, solve billing problems, and save the cost of FTE's with the benefit of the Towers healthcare funding and support program. Towers' support staff will not only enhance and increase prompt collection of receivables, but their expertise in claims processing will yield a higher percentage of reimbursement of third party receivables, resulting in greater revenues to healthcare providers.

## 12. Attending & Referring Physician Support

Towers also provides a funding program for attending and referring physicians, to assist them in meeting the financial needs of operating their private practices. The captial, technology and savings which the Towers' program provides to hosptials will also be made available to attending physicians. Doctors will find these to be a substantial benefit to their practices, reducing office overhead, increasing cash flow and allowing more time for patient care and practice enhancement. The bottom line being fewer headaches and greater net income.

## 13. No Impairment Of Banking Relationships

The Towers Healthcare Funding Program will provide substantially greater financing which will be in addition to, and not a replacement of, current banking relationships. Towers values accounts receivable for their actual reimbursable amount and provides working captial to greatly enhance cash flow. Traditionally, banks do not have the flexibility to provide financing accommodations against that net worth. In addition, banks are extremely negative to hospitals which do not generate profits, and show operating losses. Towers' Healthcare Funding Program is not affected by the profit or loss of a hospital.



## 14. Most Importantly, Better Service

The most important benefit of Towers' Healthcare Funding and Automated Claims Management Systems is that it allows healthcare providers to offer added and improved services to patients. Greater working capital facilitates payment of outstanding bills, and increases purchasing power. This financing in turn enables hospitals to attract and hire more and better physicians, purchase or upgrade equipment, and increase out-patient services. Towers' Automated Claims Management System provides state-of-the-art computerized technology to bill, monitor, and administer third party reimbursable accounts receivables. This upgraded data processing capability allows providers to, in return, receive the highest level of accounts receivable reimbursement possible. Towers listens and reacts to providers' individual needs and furnishes a flexible program that is of major benefit to hospitals, nursing homes, medical groups, and other health care providers.

TFC
TOWERS
FINANCIAL
CORPORATION

TFC
TOWERS
FINANCIAL
CORPORATION
417 FIFTH AVENUE, NEW YORK, NY 10016 (212) 696-0505 TOLL-FREE: (800) 553-3322

# ASSET FINANCE & LEASING DIGEST

A EUROMONEY PUBLICATION

RAIL FINANCE STEAMS AHEAD

Taking cover in a disaster

Finding finance for farmers

Country study: Austria

No. 187 JUNE 1992

# Towering over US healthcare

Occupying a prominent position in US healthcare factoring is Towers Financial Corporation. Nathaniel Gilbert investigates this novel company.

Towers Financial Corporation (Towers), although not known outside the healthcare industry, occupies the dominant position in one of the most specialised niches of finance. It is the largest accounts receivable factor in America's healthcare industry, holding more than $1 billion in receivables, primarily from hospitals, nursing homes, clinics and related facilities. Towers recently enhanced its position by creating double A-rated securities using receivables from a variety of healthcare institutions — the first securities of their kind. This year it is also offering a medical private practice office system that can operate doctors' billing, collection, funding and accounts receivable claims management. This will be the first nationwide service of its kind.

The driving force behind Towers is an intense 46-year-old workaholic, Steven Hoffenberg, whose entrepreneurial instincts, unambiguous directives and 14-hour working day set the pace for the more than 1,500 employees and independent representatives.

Encouraged by the success of his healthcare collections, Hoffenberg is now launching a collection system virtually any business can use, with nine options starting as low as $10 per account debtor.

Towers, founded by Hoffenberg 16 years ago, had assets of $514 million

receivables under management at the end of 1991 (corporate factoring is a $75 billion industry in the US). Towers' gross revenues last year were $97.4 million, which yielded a net income of $4.2 million — $0.91 per share. Hoffenberg says that the company is still in its development phase, and it spends a large amount of money on training its staff and developing and deploying its advanced proprietary computer software programs. The company's programs are backed by $500 million in promissory notes, and it spent $27.3 million to service interest on notes in 1991.

Hoffenberg says that shoestring economics is nothing new to most healthcare providers. "The typical hospital has never earned enough on patient care to cover costs, and has historically relied on government programmes and private philanthropy to stay out of trouble. But over the past five years, this precarious mode of existence has been increasingly difficult to maintain. The growing rate of hospital closings" — now approaching two a week — "has dramatised the fact that more than half of all community health facilities are in danger of insolvency."

Towers' Receivables Funding Programme brings two important factors into this dismal situation: money to bridge the time delays brought on by

state/federal government agencies; and the ability to collect a greater portion of the funds owed to the healthcare provider. Towers' system is simple: it immediately provides as much as 70 per cent of accounts receivables due from commercial insurance, Medicaid, Medicare, union insurance and other high grade sources. The balance, minus a finding fee, usually between five and 15 per cent, is paid upon collection, usually within 60 days.

After purchasing a hospital's receivables and providing the initial stage funds, Towers uses its experience, expertise and reputation to recover the funds due to the healthcare provider. This includes investigation and settlement of any disputed claims, as well as training and support for the internal claims management staff of the provider. In addition to the specific programme-related benefits, Towers makes its staff available to its clients for consultations on financial management controls, underwriting of bonds and debentures, assistance in selling or restructuring ownership, creditworthiness improvement programmes, structuring of group insurance and benefit programmes, and guidance on legal matters.

## Third party restrictions

One of the strictures on buying of health provider's receivables has been the Congressional mandate against government agencies paying anyone but the provider. The Social Security Act of 1966, which established Medicare (for the elderly and disabled) and Medicaid (for the poor), expressly forbade assignment of these accounts to third parties. Richard Barbuto, vice president and general counsel of Towers' notes that federal laws and courts have not prohibited providers from assigning receivables from these agencies to lenders as collateral.

While various courts have ruled on the issue of whether an assignee of Medicare and Medicaid receivables can proceed against the government directly, government manuals say that a provider's cheque can be deposited to an account which also can be drawn on by a lender. Specifically, section 3060.7 of the Medicare Carriers Manual and section 3488.2 of the Medicare Intermediary Manual says: "The law does not . . . preclude a lender from having a security interest in non-possessory, ie it is an enforceable right to the provider's . . . Medicare payments after they have reached the hands of the provider . . . and does not call for the Medicare

This provision makes life exciting at Towers because it demands considerable vigilance that needy providers do not remove payments from these two-door accounts before Towers does. Passing payments within reach of beleaguered administrators can sometimes cause them to twitch. But Barbuto says his claims sustain in the courts.

The risk-reward factor also goes into high gear when Towers funds healthcare facilities of municipalities and states that are in difficulty. Although funded by the federal government, Medicaid is managed by states; and Towers has to make careful calls as to whether a slow paying state has created an opportunity or a crisis.

*The driving force behind Towers: Steven Hoffenberg*

## Growing importance of scheme

Looking over the healthcare horizon, Hoffenberg says he is building a resource that is as important to providers as autoclaves and tanked oxygen. "Funding problems have escalated as corporate and private charitable contributions have shrunk, and the credit crunch has limited borrowing. A significant number of institutions have seen their credit ratings downgraded and access to credit curtailed." The recession has also produced an increase in overdue receivables, and it has made collections even more difficult.

To take up the slack, Towers' computers are directly hooked onto many of its healthcare facilities on a real time interactive basis, and does electronic claims transfer to some insurers. "Time is money," Hoffenberg says simply, "and the faster we go on-line, the faster we can put money in their hands. Qualified institutions receive same day factoring."

The importance of intimacy and immediacy is attested to by another authority in their field. Joseph Privitera, associate administrator and chief financial officer of Yonkers

# Is your money tied up in a showroom?

The APAK WHOLESALE FINANCE SYSTEM is day sensitive and offers cost-effective unit plan management with flexible scheme profiling

The APAK Wholesale Finance System provides day to day control, management and accounting for dealer funding of merchandise. Features include interest free periods, stock locator, base rate linked interest charges, and a comprehensive suite of management reports

The APAK Wholesale Finance computer system is available as a bureau facility or for in-house use. Optional modules for the system and bespoke development ensure that the system is tailored to meet specific requirements at reasonable cost.

For further information please contact Juliet Allen:

APAK SYSTEMS LTD.

APAK HOUSE, BADMINTON COURT

## FEATURES

County, New York State, says that as hospitals continue the trend toward more out-patient services and charges, outsourcing the billing and collection of these patients is far easier than trying to adapt traditional procedures for in-patients. He reports the volume of out-patients increased 25 per cent while the number of in-patients decreased slightly during the past year. However, the ratio between in-patient and out-patient revenue remained relatively constant.

"Before outsourcing, the situation was a sort of Pareto's Law in reverse: 80 per cent of the patient accounting department's time and effort was spent handling accounts that generated only 20 per cent of the hospital's revenue. On the other hand, the majority of the healthcare administrator's time and resources generally is focused on the area bringing in the most revenue: in-patient receivables," according to Privitera.

Even accounts receivables of mental patients, rigorously protected by privacy laws in most states, can be factored because it is not necessary to know the name of the patient. Hoffenberg says that case codes and the Diagnosis-Related Groups (DRGs) which have specific claim payments, not patients' names and diagnoses, are the key to providing factoring.

Intimacy also helps Towers help its clients present their bills to insurers in better form. In situations where it acts

*"Community health facilities are in danger of insolvency"*

as an outsource, its claims management system involves review of each claim submission to eliminate errors and facilitate faster payment. As a result of providing appropriate in-house controls for billing, collection and accounts receivable filing and reimbursement, Towers assures prospects it is able to reduce the payment cycle and raise reimbursement levels.

"One of the biggest benefits of utilising a systemised accounts receivable financing system is the elimination of the bare spots in income patterns. Any business, and that includes healthcare providers can operate more efficiently and effectively when it has a predictable cash flow," Hoffenberg explains.

How does Hoffenberg feel about the hue and cry for socialised medicine — or at least some of its aspects — to get healthcare off the backs of employers and extend it to millions not now covered? "It doesn't change our role. If we use the Canadian model, it essentially means extending Medicare and Medicaid coverage, not the nature of healthcare providers — and more claims means more receivables and more collectibles. We have the capability to handle as many as 50 million accounts worth $6 billion, and I'm doing everything I can to gear up for the healthcare millenium." ■

*A three-day training course from the Euromoney Asset Finance & Leasing Division sponsored by*

ASSET FINANCE & LEASING DIGEST

# INTERNATIONAL TAXATION & ASSET FINANCING

July 8-10, 1992
Forte Crest St James's Hotel
London, UK

For further details please contact:
Caroline Carter in London on +44 71 779 8793
Fax: +44 71 779 8795

09.15 Lecture One
TAX TRADING IN ASSET FINANCE
*By Colin Sach, Partner, New Boston Partners, London, UK*

11.00 Lecture Two
TAX RISKS: THE BANKER'S PERSPECTIVE
*By Stephen E. Hubble, Head of European Structured Finance, Paribas Capital Markets Group, London, UK*

12.00 OPEN FORUM
*By Colin Sach and Stephen Hubble*

14.00 Lecture Three
SOURCES OF TAX LEVERAGE
*By Simon Hall, Partner, Freshfields, London, UK*

15.30 Lecture Four
CROSSBORDER FINANCING STRUCTURES
*By Stephen Hoyle, Partner and Murray Clayson, Freshfields, London, UK*

17.30 Group Case Study: Introduction

09.00 Lecture Five
THE IMPORTANCE OF TAX NEUTRALITY
*By Stephen Hoyle and David Taylor, Partners, Freshfields, London, UK*

11.00 Lecture Six
VALUE ADDED TAX AND WITHHOLDING TAXES
*By Michael Conlon and Murray Clayson, Freshfields, London, UK*

14.00 Lecture Seven
CROSSBORDER LEASING TRANSACTIONS INVOLVING US PARTIES
*By Michael Simonson, Partner, Simpson Thacher & Bartlett, New York, USA*

16.00 Lecture Eight
FOCUS ON US FSCs
*By Michael Simonson, Partner, Simpson Thacher & Bartlett, New York, USA*

09.00 Lecture Nine
DOCUMENTING THE TRANSACTION
*By Michael Simonson, Partner, Simpson Thacher & Bartlett, New York, USA and David Taylor, Partner, Freshfields, London, UK*

11.00 Lecture Ten
TAX-BASED CASH-FLOWS
*By Chris Richards, Director, Morgan Grenfell International, London, UK*

14.00 Lecture Eleven
CASE STUDIES REVIEWED
An assessment of the group case study results.
*Michael Simonson, Simpson Thacher & Bartlett, New York, USA
Stephen Hoyle, Freshfields, London, UK
Colin Sach, Partner, New Boston Partners, London, UK*

15.30 School Concludes

THIS ANNOUNCEMENT APPEARS AS
A MATTER OF RECORD ONLY

DECEMBER 18, 1991

# $41,500,000

**TOWERS HEALTHCARE RECEIVABLES
FUNDING CORPORATION - IV
THREE AND FIVE YEAR
1991B BONDS - RATED AA
BACKED BY HEALTHCARE RECEIVABLES
INTEREST RATE - THREE YEAR 7.45%
FIVE YEAR 8.25%**

(Issuer)

**TOWERS FINANCIAL CORPORATION**

(Servicer)

TFC TOWERS FINANCIAL CORPORATION

417 FIFTH AVENUE, NEW YORK, NY 10016 (212) 696-0505

THIS ANNOUNCEMENT APPEARS AS
A MATTER OF RECORD ONLY

MAY 23, 1991

# $40,500,000

**TOWERS HEALTHCARE RECEIVABLES
FUNDING CORPORATION - III
THREE-YEAR 1991 BONDS - RATED AA
BACKED BY HEALTHCARE RECEIVABLES
INTEREST RATE - 9.15%**

(Issuer)

**TOWERS FINANCIAL CORPORATION**

(Servicer)

TFC TOWERS FINANCIAL CORPORATION

417 FIFTH AVENUE, NEW YORK, NY 10016 (212) 696-0505



THIS ANNOUNCEMENT APPEARS AS
A MATTER OF RECORD ONLY

November 27, 1990

**$41,500,000**

TOWERS HEALTHCARE RECEIVABLES
FUNDING CORPORATION - II
THREE-YEAR 1990 BONDS - RATED AA
BACKED BY HEALTHCARE RECEIVABLES
INTEREST RATE - 9.75%
(Issuer)

TOWERS FINANCIAL CORPORATION
(Servicer)

TFC
TOWERS
FINANCIAL
CORPORATION

417 FIFTH AVENUE, NEW YORK, NY 10016 (212) 696-0505

---

THIS ANNOUNCEMENT APPEARS AS
A MATTER OF RECORD ONLY

July 19, 1990

**$56,500,000**

TOWERS HEALTHCARE RECEIVABLES
FUNDING CORPORATION
TWO-YEAR 1990 BONDS - RATED AA
BACKED BY HEALTHCARE RECEIVABLES
INTEREST RATE - 10.20%
(Issuer)

TOWERS FINANCIAL CORPORATION
(Servicer)

TFC
TOWERS
FINANCIAL
CORPORATION

417 FIFTH AVENUE, NEW YORK, NY 10016 (212) 696-0505



# Squeezed for cash, Albany Med sells its billings

ARTIST'S VIEW How Albany Medical Center will look after new construction, expected to add monthly costs of $1.2 million by 1992. In inset is Thomas Fitzpatrick, the medical center's chief financial officer.

## Hospital in the red may net as much as $160 million

By James Dunn
Business writer

Albany Medical Center, caught in a squeeze for readily available funding, is about to get a cash infusion -- possibly as much as $160 million -- by selling a portion of its billings to a New York City financial services company.

An agreement with Towers Financial Services Co. made in August is expected to provide quick access to money that the hospital needs for its day-to-day operations.

The hospital operated about $13 million in the red last year and is facing continuing pressures on keeping rising medical costs under control.

In addition, the costs of funding for construction of new facilities, including a new power plant and a seven-story patient tower, will add to the annual budget starting in 1992. Though the cost is funded through the state Medical Care Facilities Finance Agency, the monthly carrying costs on the debt will run $1.2 million a month.

For hospitals under pressure to meet payroll expenses, pay bills or reduce debt, selling accounts receivable provides a new source of low cost, readily available cash.

"As hospitals run into cash flow problems, this could happen a lot," said Carolyn Scanlon, executive vice president of the Hospital Association of New York State. "They are looking to enhance their cash position."

Under the agreement, Towers will buy the medical center's third party receivables — such as bills owed from Medicare, Medicaid and insurance companies — at a discounted rate. Towers will pay the medical center a first installment as soon as the bills are turned over. The balance, less a service charge, will be paid when Towers collects on the bill.

For example, the hospital could sell Towers an account worth $100 for $92. When the finance company collects the full amount, the difference is its profit. By doing this, the hospital improves its cash flow, but at a cost of 8 percent.

Receivables represent the amount due, but not yet collected, for services already rendered by the hospital. The sale of receivables for a specified upfront payment is known in the collections industry as "factoring."

The concept of factoring is not new. The garment industry relies on firms such as Towers to keep cash flowing while awaiting payments from its customers — namely department stores.

But the agreement is unique for a hospital in New York state and is one of the first of its kind in the nation.

Medical center officials have not yet determined how much of the $160 million in annual receivables they will sell to Towers in financial transactions known as factoring.

Towers launched its hospital factoring service 18 months ago. It has been courting the medical center for the last six months.

See HOSPITAL / F 4

# HOSPITAL

Continued from F-1

"All hospitals are faced with bottom-line problems and liquidity problems," said Thomas Fitzpatrick, the hospital's chief financial officer.

But Fitzpatrick, along with several other financial experts in the health care industry, cautioned that a sell-off of billings in exchange for quick cash is not a panacea.

They warned that such transactions may be only quick fixes and that there is a danger of delaying long-term solutions to long-term financial problems.

For instance, Fitzpatrick pointed out a major reason for entering into the Towers agreement is that the medical center does not have the cash to update its own antiquated and overloaded billing system.

"I would have rather fixed our own systems," he acknowledged. "In the long haul, that would have been better."

"We need capital to put in a modern, state-of-the-art billing system and we are unable to generate the capital to replace the old billing systems," he said.

The cost of a new billing system would be about $2 million. "In lieu of that," he said, "we look to Towers to offload some of our billing systems."

He declined to specify what Towers' fee would be, but said it was a combination of an interest charge and a service fee.

Some health care finance experts also warn that the medical center may be paying too high a price for an increased cash flow.

"There might be a better alternative to improving cash flow, such as a line of credit," said Dan Rode, director of technical services for the Healthcare Financial Management Association — a 28,000-member professional association based in Westchester, Ill.

The hospital's unsecured lines of credit with Key Bank of Eastern New York and Norstar Bank of Upstate NY total $10 million. Fitzpatrick said the hospital reached its credit limit a year ago.

He agreed that transactions with Towers are short-term fixes of long-term problems.

Towers officials did not respond to several phone calls.

"Any organization has to be very careful about a receivables-funding program," said Fitzpatrick. "It's tough to wean yourself off of it."

But the medical center's cash-flow problems are among a growing industry phenomenon, experts say, and by selling the receivables the hospital is at least heading in the right direction.

"These types of programs are useful to hospitals," said Robert Wool, director of program development for the Greater New York Hospital Association, which represents New York City hospitals.

"Hospitals in New York state are in a tough financial strait," he said. "Hospitals are in a tough cash position. The big reason hospitals go into this is cash flow. Payors taking too long of a time to pay. This way, it cleans up the hospital's books."

Fitzpatrick said the hospital "would not do this transaction if it was merely a financial transaction. But it has an operations effect."

While the hospital's annual receivables total $160 million, Fitzpatrick said, "only a portion" of that amount is in the receivables account at any one time. On a monthly average, the hospital has about $13.3 million in receivables.

In 1989, the hospital collected $15.9 million from Medicare, $20.7 million from Blue Cross and $13 million from Medicaid.

As a group, New York hospitals last year lost about $78.4 million on revenues of $15 billion.

Albany Medical Center had total revenues of $203.06 million last year and expenses of $156.56 million. The hospital employs more than 4,000 people.

By selling their receivables, hospitals can gain flexibility in managing debt, analysts say.

"Accelerating cash flow has become necessary for hospitals hardest hit by changes in Medicare's periodic interim payment program," Mel Spiegel, vice president of Premier Hospital Alliance of Westchester, Ill., wrote in a recent issue of *Healthcare Financial Management*, a trade magazine. Premier pioneered the restructuring of accounts receivable in the hospital industry.

Because many hospitals are in a financial bind, Rode of the Healthcare Financial Management Association, said many are discounting their receivables by as much as 20 percent.

Companies like Towers will do well in the hospital industry, he said, especially for collecting bills from Medicare.

"The beauty of Medicare receivables is you know what you will get," he said. "You can sell Medicare at a better discount than for Medicaid. The steadier the stream of money coming from a third party the better able you are to judge the discount."

Vicki Zeldin, spokeswoman for the state Health Department, said, "Five years ago operations such as Towers Financial were unheard of. It's a fairly new concept."

The health department does not have a position about the use of factoring. "We don't regulate how they collect their money," Zeldin said.

Recycled Paper

Global Finance

SEPTEMBER 1992

# THE WORLD'S SAFEST BANKS

## GLOBAL FINANCE'S RANKING OF THE 250 LARGEST BANKS BY CREDIT QUALITY

One form of foreign participation in Russian privatization might be direct investment. Another could be purchases of blocks of shares at auction.

trolling interests in concerns to managers and workers, with the distribution of the remaining government-held equity in Russian enterprises targeted for the public.

Once company privatization plans are in place, workers and management can choose between two options for becoming shareholders. The first allows them to buy shares of preferred stock equal to 25% of the face value of their company and 15% of common stock, giving them a total equity stake of 40%. The remaining interest held by the state, through the GKI, will consist of voting shares totaling 20% of company equity and nonvoting preferred totaling 40%. The second option allows workers and managers to buy 51% of the total common voting shares at a price equal to 1.7 times the book value of the company. Under both options, the blocks remaining in state hands, 60% and 49%, respectively, will be disseminated to the public at large through auctions or stock vouchers. All private citizens will receive vouchers, which can then be exchanged for shares in the new joint stock companies.

"The idea is to create widespread public ownership" of private companies, says Ravitch. He envisions that the voucher program will ultimately provide the springboard for the establishment of pooled investment funds in Russia. As the privatization process unfolds, he says, the institutions that would manage these funds could collect the vouchers and invest in the resulting shares on behalf of private citizens.

Although the vouchers will be distributed to citizens free of charge, company managers and workers will have to pay for much of their equity stakes, regardless of which ownership option they choose. Option 1, giving this group *a 40% ownership position, will be* the easiest to finance. Some shares will be distributed for free, but the bulk of the equity will be sold to managers and workers at a discount to book value. Under option 2, providing for a 51% ownership stake, vouchers (which managers and workers will receive like everyone else) can be used to acquire 15% of the company, leaving 36% that will have to be financed. "This will be okay for the smaller companies, but the larger ones will be forced to look to newly formed private funds or to Russian commercial banks [to finance their acquisition]," says Crowley of Goldman Sachs.

Foreign participation in Russian privatizations could evolve in several forms. Banks or other institutions could provide loans to company workers and managers, with the shares they buy with those borrowed funds used as collateral.

Foreigners, particularly those who already have relationships with Russian companies, might step up to make more direct investments themselves, says Crowley. RJR Nabisco's recent announcement of its $20 million investment in a St Petersburg cigarette company—already private—is a sign of things to come. Foreign involvement might also take the form of purchases of substantial blocks of shares at the time of privatization through the tender, or auction, process.

But accounting procedures must first evolve. Before January 1, Russia had "a budget economy in which the state assigned prices to goods and told companies what to produce and in what quantities," Crowley explains. "Accounting based on these historical costs had no real value." As a result, it's hard to look currently at a financial statement of *that time and relate it to reality.*

*—By Katherine Wells*

*United States*

## HEALTH CARE COMPANIES REDISCOVER SECURITIZATION

The US asset-backed market, which already packages mortgages, automobile loans, credit card outstandings, and corporate trade receivables, is poised for an expansion into the health care receivables sector. After languishing in recent years, activity in this area is once again on the rise. There are at least seven private debt deals currently in various stages of structuring that will be completed before the year is out, and some bankers predict the emergence of the first public health care receivables offering in about six months' time.

And there is new international interest brewing in this securitized product as well. London's Granada Worldwide Investments is looking to sell securities backed by the receivables of US health care companies through a vehicle being set up for the firm by Citicorp Securities Markets.

The securitization of health care receivables has in fact long been viewed as an emerging growth area for the asset-backed market because it offers an attractive funding

Copyright © Global Finance 1992.

## With bank lending drying up, securitizing receivables should provide an alternative source of working capital for health care companies.

alternative for health care companies, which often find capital difficult to come by. As banks have shied away from lending to them, working capital has virtually dried up for all but the soundest health care concerns. Soaring health care costs have sharply increased outstanding accounts receivable; and restrictive reimbursement schedules implemented by government-funded health plans in 1987 have stretched out collection periods.

To alleviate the cash crunch, hospitals have often turned to factoring companies for advance funding on their receivables. But factors typically purchase these receivables at deep discounts to their face value. Securitization offers a better deal for these providers because they can net more in proceeds from their receivables. And in the late 1980s, a number of institutions such as Healthcare International and Universal Health Services set up their own programs or participated in multiseller conduits that pooled receivables from various parties.

Health care receivables typically have 30-day average lives and bear no interest. Institutions sell the receivables into a trust at a slight discount to their full value to create a yield component on the securities. As the receivables in the trust pay off, new receivables are purchased to replace them.

Following the seminal efforts, however, the idea of securitizing health care receivables languished. Asset finance professionals focused on higher-profile consumer asset deals. Health care receivables deals were too complicated and time-consuming to merit serious consideration. But now, as consumer receivables deals are harder to come by, bankers profess a renewed interest in the health care business. Among other developments, bankers say, improved methods of processing data and an influx of start-up servicing operations will facilitate securitization to the extent these assets can be collected and monitored more efficiently.

For the most part, the factoring companies themselves—in particular, New York-based Towers Financial—have taken the lead in exploring securitization. Since 1986, Towers, by far the largest servicer and factor of health care receivables in the United States, has securitized about $650 million of its portfolio in the private placement market, $200 million of which has been rated. Market participants estimate that there are about $500 billion of securitizable health care receivables.

So far, though, only about $1.3 billion of health care receivables have been packaged into either multiseller conduits or stand-alone private placement transactions. The conduit allows providers to reduce their debt-to-equity ratios and boost their straight borrowing potential, and the stand-alone private placement provides lower rates than those attainable through other sources.

Noteworthy among recent developments is the trend toward selling health care deals in the medium-term securities market. Liquidity support from banks is becoming a scarce commodity, making securitized commercial paper programs, which need that liquidity support, less workable. In addition, now that fixed rates are historically low, issuers can fix their borrowing costs further out the maturity spectrum.

The handful of deals that have been placed already in the term market as well as those currently in the works are mostly $40–50 million in size. For instance, Barclays de Zoete Wedd structured a $50 million privately placed term deal for Universal Health that is expected to close this month. The company wound down a commercial paper program it set up in 1989 because banks no longer wanted to participate. Similarly, Paracelsus Healthcare, a Pasadena-based organization, plans to complement its $40 million commercial paper program with a yet unsized private term deal in the next few months, also via BZW.

In late August, Prudential Securities placed a $40 million issue of three-year notes for National Premier Financial Services. The deal was backed by receivables pooled from a consortium of 21 hospitals and was the first triple-A-rated deal to use health care receivables as collateral. This financing replaced a small commercial paper program

NOT EASY
**Steven Hoffenberg of Towers Financial says securitization of health care receivables has not yet taken off because servicing the claims is complex.**

Copyright : Global Finance 1992

## Unlike credit card or auto loan receivables, health care receivables are not homogeneous. That's been an obstacle to securitization.

structured and marketed by Merrill Lynch in 1990.

"Securitized health care receivables not only provide hospitals with an opportunity to tap the capital markets but also with the ability to issue triple-A securities," says Sunasir Sen, vice president at Prudential Securities. He adds that because of the fragmented nature of the health care market, conduit programs that pool receivables from a group of distinct hospitals are becoming increasingly popular.

On the international front, Citicorp Securities was recently awarded a mandate to create a multiseller conduit for Granada. It will buy receivables from US health care companies and then sell them into a trust financed in the term market. Due to close later this year, the program will be about $100 million in size and will be the first conduit of its kind to use master trust technology, which offers greater issuing flexibility.

Among other new entrants in the field is AdvaCare, which went public early this year. The company, based in Horsham, Pennsylvania, provides accounts receivable and reimbursement management for hospitals and physicians. In concert with its initial public offering, the company set up a separate funding corporation with Prudential Insurance of America. The funding corporation is financed with an initial $40 million secured note held by Prudential. AdvaCare's funding arm can offer advances of up to 72% of the value of the receivables it purchases. Eventually, AdvaCare will expand into issuing securitized notes as well as creating a commercial paper program. The company is also examining the idea of a separate program for its physician clients, according to Gregory Campbell, chairman and CEO.

While the potential market is apparently huge, a few obstacles have impeded its development. Unlike credit card or auto loan receivables, health care receivables are not homogeneous. Medicare receivables, for instance, are different from private insurance receivables. Medicare receipts tend to be simpler to work with because of strict reimbursement schedules. However, government-funded plans such as Medicare also have the right of offset. If Medicare determines that monies are due but unpaid from the hospital, it can withhold payments in the current year, which could affect a prospective securitization.

Another consideration is the antiassignment provision applying to Medicare and Medicaid contracts under a 1972 amendment to the Social Security Act. This rule, designed to curb abuses involving inflated claims, prohibits parties other than the health care providers themselves from receiving reimbursement for Medicare- and Medicaid-related services. Payments from the government would have to pass through the provider to the trust, which adds an element of risk, says Ronald Joelson, managing director of structured finance at Prudential Insurance. "The problem is not the government, but what if the hospital goes under?" he says. The risk of bankruptcy, among other things, "is why you are seeing yield spreads typically north of 200 basis points over treasuries."

The need for accurate servicing has given rise to several companies, such as COS Technologies and Wellmark, that offer hospitals accounts receivable monitoring, collection, and servicing operations. Indeed, the new generation of health care securitizations could involve these new servicing operations, which buy accounts receivable from hospitals as well.

"The attempts to bring greater systematization to the claims processing provider will help more of these deals get done," notes Cathy Kaplan, partner at law firm Brown & Wood. Deals done through blind polls in which the servicer is also buying the receivables will help "unify the credit" of these transactions, she says.

But servicing is a tough job. "In this particular product, you have to be an expert in servicing the claims or you can lose all your money," says Steven Hoffenberg, CEO and founder of Towers Financial, which has been in this business for 20 years. "Everyone thinks it's easy, but it is not like opening a McDonald's. The reason this product has not taken off yet is because of the complexity of the servicing."

For this business to grow beyond the few specialists, he says, "there has to be an evolution of standardized billing practices and a repair of the claims processing systems, which are in total disarray."

In fact, says Larry Rufrano, vice president at Citicorp Securities Markets, uniform data processing standards could become the norm in a few years because of an initiative sponsored by the Work Group on Electronic Data Interchange. The group, spearheaded by the Travelers Insurance and the Blue Cross and Blue Shield Association in Chicago, proposed last July replacing the processing of five billion paper claims with electronic data. This blueprint, if adopted, could streamline the securitization process. —*By Michael Gold*

Copyright © Global Finance 1992.

Global Finance
SEPTEMBER 1992
THE WORLD'S SAFEST BANKS
GLOBAL FINANCE'S RANKING OF THE 250 LARGEST BANKS BY CREDIT QUALITY

> One form of foreign participation in Russian privatization might be direct investment. Another could be purchases of blocks of shares at auction.

historical costs had no real value." As a result, it's hard to look currently at a financial statement of that time and relate it to reality.

—By Katherine Wells

Copyright © Global Finance 1992

*United States*

## HEALTH CARE COMPANIES REDISCOVER SECURITIZATION

The US asset-backed market, which already packages mortgages, automobile loans, credit card outstandings, and corporate trade receivables, is poised for an expansion into the health care receivables sector. After languishing in recent years, activity in this area is once again on the rise.

> With bank lending drying up, securitizing receivables should provide an alternative source of working capital for health care companies.

NOT EASY

Copyright © Global Finance 1992

> Unlike credit card or auto loan receivables, health care receivables are not homogeneous. That's been an obstacle to securitization.

—By Michael Gold

Copyright © Global Finance 1992

**EXHIBIT  63**

91 18 4374
RECD S.E.C.
JUL 19 1991
0-19419

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

Form 10

GENERAL FORM FOR REGISTRATION OF SECURITIES

Pursuant to Section 12(b) or (g) of
The Securities Exchange Act of 1934

TOWERS FINANCIAL CORPORATION
(Exact name of registrant as specified in its charter)

| Delaware<br>(State or other jurisdiction of incorporation or organization) | 13-3440065<br>(I.R.S. Employer Identification No.) |
|---|---|
| 417 Fifth Avenue, New York, NY<br>(Address of principal executive offices) | 10016<br>(zip code) |

Registrant's telephone number, including area code:
(212) 696-0505

Securities to be registered pursuant to Section 12(b) of the Act:

| Title of each class to be so registered | Name of each exchange on which each class is to be registered |
|---|---|
| Not applicable | Not applicable |

Securities to be registered pursuant to Section 12(g) of the Act:

Common Stock, par value $.001 per share
(Title of Class)

PROCESSED BY
DISCLOSURE INCORPORATED

3407t/7408o

Item 1. Business

Towers Financial Corporation (the "Company"), directly and through its subsidiaries and their predecessors, has, over the past 15 years, provided account receivable financing and management services for over 10,000 corporate and healthcare clients. Such services include the purchase and recovery of accounts receivable for the Company's own account (commonly know as factoring) and the collection of accounts receivable on a contractual basis for the account of others. In addition, the Company purchases portfolios of receivables on a bid or negotiated basis and collects such receivables for its own account. The Company is one of the larger firms in the United States providing commercial accounts receivable collection services and during the past 12 months has been a leader in purchasing and servicing healthcare receivables.

The Company conducts its business directly and through two of its consolidated subsidiaries, Towers Credit Corporation ("TCC") and Towers Collection Service, Inc. ("TCS"). These entities were acquired by the Company in 1986 from Professional Business Brokers, Inc., a company controlled by the Chairman of the Company. See Item 7 "Certain Relationships and Related Transactions." Prior to the acquisition of these entities by the Company, TCC had been engaged in the business of factoring commercial accounts receivable since 1982 and TCS had been in the business of collecting commercial accounts receivable on behalf of others since 1980 and, as successor to Transcon Adjustment Group, Ltd., since 1975. Towers Financial Corporation was incorporated as a Nevada corporation in 1983 under the name O.G. Consulting Corp. It changed its name to Towers Financial Corporation in 1986 in connection with its acquisition of TCC and TCS. Immediately prior to its change of name and its acquisition of TCC and TCS, O.G. Consulting Corp. was not actively engaged in business. O.G. Consulting Corp. was, however, a publicly traded corporation, and the acquisition of TCC and TCS by O.G. Consulting Corp. indirectly resulted in the equity interests in TCC and TCS becoming publicly traded through the public trading of their corporate parent's common stock.

On February 21, 1991, Towers Financial Corporation merged into a previously inactive subsidiary incorporated under the laws of the State of Delaware. The name of the subsidiary was Towers Financial Corporation, and the effect of the merger was to change the Company's state of incorporation from Nevada to Delaware in order to take

advantage of the increased certainty associated with the more developed state of Delaware corporate law.

The following is a brief description of the material aspects of the Company's factoring, collection and portfolio acquisition businesses which constitute all the material businesses in which the Company is engaged.

Factoring and Portfolio Acquisitions

Through its factoring activities, the Company purchases accounts receivable from its clients at a discount and then attempts to collect the full face value of such receivables. The Company manages the risk of noncollectability of the receivables differently depending on whether such receivables are healthcare related or arise from other commercial transactions, as discussed below.

The profitability of this business is dependent on, among other things, how quickly the receivables are collected by the Company and the purchase price of the accounts. The Company utilizes an experienced staff of full- and part-time collection professionals (approximately 4% are employed on a part-time basis), including trained insurance analysts, insurance claims experts, collectors, paralegals, claims examiners, claims billers, claims supervisors and attorneys. The Company's staff of collection professionals is employed directly by TFC Management Inc., a wholly owned subsidiary of Professional Business Brokers, Inc., and is employed by the Company on a subcontracted basis. See "Personnel" below and Item 7, "Certain Relationships and Related Transactions." In addition, the Company's staff of computer programmers has specially designed computer software programs to support the Company's collection and factoring activities.

Healthcare Receivables. The Company believes that one of its primary opportunities for future growth is in providing account receivable claims management and factoring/financing services to the healthcare industry. This belief is supported by the financial pressures being exerted on healthcare providers as a result of changes in government programs and insurance company practices and the resulting need for working capital. Further, the Company believes that there is an opportunity to develop and retain a significant share of the market for account receivable management services in the healthcare industry.

The Company has targeted the service-sensitive segment of the healthcare account receivable market. The Company offers potential clients not only the funding of their

accounts receivable through their purchase by the Company at a discount price, but also offers the following additional services among others to the healthcare providers:

— upgrades of the healthcare providers' computer hardware and software systems to accomodate the Company's software for billing and administering healthcare receivables at no cost to the healthcare providers,

— an analysis of the healthcare providers' existing systems of admitting patients for treatment and recommendations for improvement,

— a review and correction of any defects in preparation or processing of standard insurance and Medicare and Medicaid forms,

— stationing of the Company's expert claims analysts in the business office to supervise and manage the healthcare providers' claims reimbursement system,

— advice to healthcare providers by the Company's in-house insurance regulatory experts on elimination of insurance payment delays,

— installation of a collection recall system that will trace reimbursements for any and all third-party obligors on the healthcare receivables and

— assistance to the healthcare provider in the rehabilitation of claims to cure defects causing initial rejection by the third-party obligor.

By providing the foregoing services in addition to the purchase of healthcare receivables, the Company seeks to distinguish itself from other current and potential competitors for the factoring of healthcare receivables.

The Company typically purchases eligible healthcare receivables for 95% of their reimbursable value (the "Reimbursable Value"). The Reimbursable Value of a healthcare receivable is the amount due to the healthcare provider from third-party obligors. The third-party obligors are those insurance companies and government programs (such as Medicare and Medicaid) which are contractually obligated to pay all or a portion of a healthcare receivable. The "Reimbursable Value" of a particular healthcare receivable does not include the portion of the receivable which is the patient's sole obligation.

Typically, the Company will advance to the healthcare provider 50% of each healthcare receivable's initially estimated Reimbursable Value, upon the purchase of the healthcare receivable. The remainder of the purchase price is paid to the provider promptly upon Towers' recovery of the Reimbursable Value, subject to the terms of the agreement between the Company and the healthcare provider. The initial estimate of the Reimbursable Value is typically based upon the standard reimbursement rates for the type of injury or sickness and the region of the country involved. In the case of Medicare or Medicaid receivables, it is typically made on the basis of the applicable flat fee reimbursement schedule established for the relevant Diagnostic Related Group ("DRG"). The final Reimbursable Value, which establishes the exact purchase price, is, in most cases, determined by the amount which is actually paid by the third-party obligor except in those cases in which the third-party obligor fails to pay because of a financial inability to pay. If the Reimbursable Value of an account initially estimated at the time such account is purchased turns out to be either more or less than the actual Reimbursable Value, the purchase price is adjusted accordingly.

Healthcare receivables are purchased by Towers pursuant to a written agreement with the healthcare provider. The written purchase agreement contains representations and warranties regarding the healthcare receivables, including a representation that the healthcare receivables are due and payable by third-party insurers or governmental programs. The primary risk of nonpayment which is not covered by a representation or warranty is the financial inability of the third-party insurer or governmental program to pay the amounts owing on the receivable. The risk of nonpayment in such event is assumed by the Company as the purchaser of the receivables. The Company perfects a security interest in the healthcare receivables or in the seller's right to receive payment thereon to safeguard the Company's rights in the event of a bankruptcy of a healthcare provider. See Exhibit C to the Indentures included as Exhibits 4(b) and 4(b) to this Registration Statement for the Company's typical form of a purchase agreement relating to healthcare receivables.

In the event that a healthcare receivable is not paid for a reason that involves a breach of the seller's representations and warranties regarding the healthcare receivable, the Company has the right to require the healthcare provider to replace the receivable with other receivables having an equal Reimbursable Value, or to offset the portion of the purchase price advanced by the Company, and the fee due to the Company, against other payments that

may be due to the healthcare provider as a result of other healthcare receivables purchased by the Company. This protection is particularly significant in the context of Medicare and Medicaid receivables since government regulations require that such healthcare receivables be paid solely to the healthcare provider.

In order to protect itself from the financial inability of a third-party obligor to pay, the Company will generally require that the third-party obligors which are insurance companies have a rating by a nationally recognized rating agency of "A" or better. The following is a representative list of some of the insurance companies that are obligated to make payments directly to the Company pursuant to healthcare receivables purchased by the Company from healthcare providers:

| | |
|---|---|
| Blue Cross/Blue Shield | Pacific Mutual Insurance Co. |
| General American Insurance Company | Metropolitan Life Insurance Co. |
| State Farm Insurance Company | New York Life Insurance Co. |
| Prudential Insurance Company | National Association of Letter Carriers |
| Travelers Insurance Company | Allstate Insurance Co. |
| Aetna Insurance Company | Best Benefits |
| Mutual of Omaha | Chubb Pacific Group |
| Connecticut General Life Insurance Co. | Cigna |
| Equitable Insurance Company | Combined Insurance of America |
| First Fund Insurance Co. | Continental Life |
| Liberty Mutual Insurance Co. | Firemans Fund Insurance Co. |
| | John Hancock Insurance Co. |
| | Hartford Insurance Co. |

The Company also purchases healthcare receivables due from Medicare, the various state Medicaid programs, major unions, workers' compensation reimbursers and other thirdparty reimbursers.

Commercial Receivables. The Company markets its commercial accounts receivables factoring business to companies who, due to their need for working capital, cannot afford to wait for their receivables to be collected. Through the sale of their receivables to the Company, such companies are able to generate the working capital they need either on a temporary, seasonal or ongoing basis. The Company believes that its flexibility in addressing the particular needs of its clients in terms of timing and volume of purchases and the broader spectrum of potential clients it is willing to accept distinguish it from many of its competitors.

Commercial accounts receivable are typically purchased by the Company at discounts ranging from 5% to 10% from their face value. An initial payment of up to 75% of the face value of the purchased accounts is usually made to the seller at the time the accounts receivable are purchased. The remainder of the purchase price is paid to the seller promptly after the accounts receivable are recovered. If less than the face value of a purchased account is recovered for reasons that involve a breach of the seller's representations and warranties, the purchase price is reduced to a percent of the amount recovered.

Commercial accounts receivable are purchased by the Company pursuant to a written purchase agreement with the seller. The purchase agreement contains representations and warranties regarding the receivables including a representation that the accounts receivable are valid and not in dispute, and usually provides that in the event of nonpayment of a receivable by the debtor for a reason that involves a breach of any of the representations or warranties, the Company will have certain rights against the seller. The primary risk of nonpayment which is not covered by a representation or warranty is the financial inability of the debtor to pay the amounts owing on the receivable. The risk of nonpayment in such event is assumed by the Company. The Company also perfects a security interest in the receivables. See Exhibit 28(a) to this Registration Statement for the Company's typical form of a commercial accounts receivable purchase agreement.

Portfolio Acquisition and Collection. During the fiscal year ended June 30, 1990, the Company began actively pursuing opportunities to purchase loan portfolios generated by financial institutions currently in financial difficulties. A large number of such loan portfolios are held by the Federal Deposit Insurance Corporation in its role as a receiver or liquidator of failed banks and savings and loan institutions. Each loan portfolio has a different composition and different characteristics. The composition of a loan portfolio is generally determined by the seller based on its desire to maximize the price it receives for all loans among the various portfolios. For example, some loan portfolios may consist of a large number of small consumer loans which are unsecured or are secured by non-real estate assets, while other portfolios may consist of loans primarily secured by real estate and yet other portfolios may consist of a mixture of such loans and other types of loans. Some portfolios may contain significant numbers of past-due, nonperforming loans. The purchase price paid for such loan portfolios by the Company is determined based on the

composition of the particular portfolio, the amounts the Company believes it can collect on such portfolios and the risks associated with the collection of such amounts.

The Company has purchased portfolios of loans from various regional offices of the FDIC and from third parties which had purchased the portfolios directly from the FDIC. Purchases by the Company from the FDIC require payment of the purchase price upon the purchase of the loan portfolio. The purchase prices paid by the Company on portfolios acquired from the FDIC have ranged from 5% to 50% of the aggregate outstanding principal amount of the loans in such portfolios at the time of purchase. Purchases by the Company from third parties are usually structured to require the Company to make an initial down payment which is equal to a percentage of the face value of the portfolios at the time of purchase (which percentage is typically between 1% and 2%), plus a percentage (ranging from 10% to 50%) of the amounts which are ultimately recovered from such portfolios in excess of the initial down payment. Except for limited representations and warranties provided by the sellers of the loan portfolios, the Company acquires the loan portfolios without recourse against the sellers, and, accordingly, the risk of noncollectibility is, for the most part, assumed by the Company.

The purchased portfolios consist, for the most part, of loans evidenced by promissory notes and secured by one of two types of collateral: personal property (e.g., automobiles, trucks, office and industrial machinery and equipment, inventories, securities, livestock, art, coins, mobile homes, healthcare equipment, airplanes and boats) and real property (e.g., personal residences, office buildings, warehouses, factories, farms and undeveloped land). The value of such collateral may range from nominal to substantial and is often not able to be established prior to acquisition of the portfolios with the level of certainty that lenders typically require before making a loan.

Prior to purchasing any specified portfolio, the Company is afforded an opportunity to inspect the available files on the loans which comprise the portfolio. The Company's pre-acquisition inspection of the loan files involves a preliminary review of the lender's collection experiences, the debtor's credit history, appraisals of collateral securing the loans, and financial statements to the extent such information is available. In many cases the loan files may not be current and substantial uncertainties may exist regarding the collectibility of the various loans in the portfolio. The purchase price of the loan portfolios will be reflective of the results of the Company's preacquisition review of the loan files. Following the acquisition of a

loan portfolio, the Company through its in-house lawyers and other collection professionals takes an active role in foreclosing upon, and selling, the collateral associated with such portfolio or restructuring the loans in order to bring them current.

Upon the acquisition of a portfolio, the Company assumes the risk that it will be unable to recover an amount equal to its purchase price plus its carrying costs, collection costs and expected profit on such accounts. The extent of such risk is dependent on a number of factors, including the Company's ability to locate the debtors, the debtors' financial condition, the possibility that a debtor may file for protection under applicable bankruptcy laws, the Company's ability to locate the collateral, if any, for the loan and to obtain possession of such collateral, the value of such collateral and the length of time it takes to realize the ultimate recovery either through collection procedures or through a resale of the loans following a restructuring that brings them current.

The Company believes that the collection of loans purchased from the FDIC (directly or indirectly) is a logical adjunct to its existing accounts receivable management and collection business. The Company has for the past decade collected similar loans on behalf of its bank clientele, and it is anticipated that this will become a significant part of the Company's future activities based on the amount of loans available for purchase.

In the fiscal year ended June 30, 1990, the Company purchased portfolios of loans from the FDIC and third parties which had purchased the portfolios directly from the FDIC, having an aggregate face value of $111,654,000. The total number of loans in portfolios acquired by the Company during the fiscal year ended June 30, 1990 was 7,395 and the total purchase price for such portfolios paid in such year was $5,635,000, or approximately $762 per loan. The maturities of the portfolio loans upon acquisition by the Company ranged from one to 20 years and 54% of the loans had maturities of one to two years from the date of acquisition. The Company generally will negotiate extensions of the maturities of defaulted loans in connection with its attempts to bring the loans current. The Company will recognize income on these portfolios when collections are received based on the difference between the Company's purchase price, including payments contingent on the amounts collected, and the amount recovered on such portfolios.

Collection Services

The Company, through its subsidiary, Towers Collection Services, Inc., is involved in commercial accounts receivable collection activities. The Company's marketing of its collection services focuses on its experience as well as its practice of assigning each collection account to one of its staff of practicing attorneys who actively pursue collection with the help of paralegals, credit analysts, investigators (skip tracers) and collectors. The Company's policy is to hire people for its collection staff who have at least five years of relevant experience. Each new member of the collection staff undergoes an in-house training program and has strict guidelines to follow with respect to the collection process. The collection staff undertakes a comprehensive review of each new collection account and on the basis of such review will contact and deal with the respective debtors. The Company's proprietary computer systems allow it to track all accounts quickly for any client and to track the contacts with and payment and credit histories of the various debtors.

Unlike its factoring business, the Company's collection services are undertaken pursuant to a written agreement with the client that provides for a collection fee of 10% to 50% of the amount recovered on each receivable. The amount of the fee charged depends upon the extent of the services required, which may include litigation on behalf of the client, and the type and amount of the receivable being collected. The collected funds are paid or credited to the client when received by the Company. The collection agreement also provides that the submission of accounts for collection is irrevocable except upon full payment of the collection fee that would be due if the account were collected in full.

The Company has collected accounts receivable over the past five years for clients in the manufacturing, wholesale, distribution, retail, transportation, communications, service, finance and insurance industries.

In the fiscal years ended June 30, 1990, 1989 and 1988 TCS was engaged to recover $291,565,160, $182,982,043 and $140,028,892 of accounts receivable, respectively. These amounts represent the Reimbursable Value of healthcare receivables accepted for collection plus the face amount of all other accounts receivable accepted for collection. Included in these amounts for the fiscal years ended June 30, 1990, 1989 and 1988 are $151,335,736, $80,787,549 and $60,686,677 of accounts receivable and healthcare receivables

that were purchased by the Company in its factoring and portfolio acquisition businesses and were placed with TCS for collection. In the fiscal years ended June 30, 1990, 1989 and 1988, accounts receivable management services (primarily consisting of collection, monitoring, data processing and information retrieval services) represented 48.0%, 55.7% and 56.6%, respectively, of the Company's consolidated revenues.

Franchising

The Company has granted Towers Franchise Corporation (the "Franchisor") a license to serve as the Franchisor of businesses (the "Franchisees") engaged in marketing of accounts receivable collection, management, financing, funding and factoring services and related services and products to be provided by the Company (the "Services"). Pursuant to the franchise agreement between the Franchisor and the Franchisees, the Franchisees will be permitted to market the Services in the Franchisees' respective territories. The primary market for the Services is expected to be businesses, hospitals, healthcare providers and extenders of credit. The Company will pay the Franchisor a fee and the Franchisor will pay each Franchisee an origination fee, which origination fees will vary in amount (currently anticipated to range from 0.53125% to 4.5% with respect to payments from the Company to the Franchisor and from 0.5% to 4.0% with respect to payments from the Franchisor to Franchisees) based on the fees charged by the Company to the clients who are referred to the Company by the Franchisee or who are located in the Franchisee's territory. The franchises will be sold to Franchisees for an initial franchise fee of $50,000 payable to the Franchisor. Each Franchisee will be required to make a monthly contribution to the Franchisor's advertising fund in an amount ranging from 2% to 4% of the origination fees earned by such Franchisee.

In the process of marketing the Services, the Franchisees will be required to utilize the systems developed by the Company and the Franchisor for marketing the Services as well as certain trademarks, trade names, service marks, copyrights and logotypes owned by the Company.

The Company currently anticipates that the Franchisees will replace the Company's regional sales offices over the next one to two years. The current managers of the Company's regional sales offices are expected to be given the right to acquire the franchises for territories currently covered by the regional sales offices prior to such franchises being offered to third parties.

The Franchisor is owned by two employees of the Company who are neither executive officers nor directors of the Company.

Other Business

The Company is continually evaluating new business opportunities which are consistent with its core businesses. Management intends to take advantage of those opportunities that it believes are appropriate for the Company subject to the availability of financial resources and personnel.

Through the fiscal year ended June 30, 1988, the Company provided equipment lease financing to corporations, partnerships and individuals that met its internal underwriting and credit standards. Revenues from the Company's equipment leasing business represented 1.6% of the Company's consolidated revenues in the fiscal year ended June 30, 1988. No new equipment lease financings have been entered into by the Company subsequent to June 30, 1988.

Offices

The Company's headquarters are located at 417 Fifth Avenue, New York, New York where the Company leases approximately 100,000 gross square feet. The Company currently maintains sales offices in the following metropolitan areas: Los Angeles, California; Denver, Colorado; Washington, DC; Ft. Lauderdale, Florida; Atlanta, Georgia; Chicago, Illinois; Boston, Massachusetts; St. Louis, Missouri; Memphis, Tennessee; Dallas, Texas; and Houston, Texas. The Company anticipates that these regional sales offices will, over the next two years, be transferred to persons who purchase franchises for the territories covered by these offices.

Competition

Although the Company anticipates increased competition in the healthcare receivables factoring and servicing business, the Company currently believes that its primary competition comes from traditional lenders to healthcare providers who may provide lines of credit but limited or no additional services at a lower cost to the healthcare providers. In addition, the Company encounters competition from other providers of account receivable management services who do not provide a factoring capability.

Apart from the healthcare receivables and factoring business discussed above, the commercial factoring business

is highly competitive with over 250 firms competing for this business either on a local, regional or national basis. There are numerous commercial factors who have longer business histories, more established positions in the industry and stronger financial resources than the Company. The Company believes that its data processing capabilities and its proprietory automatic account tracking and collection programs make its commercial factoring business competitive in the industry.

The commercial accounts receivable collection business is also highly competitive with over 12,000 firms competing for this business either on a local, regional or national basis. Among competitors of the Company in this business are firms that have more experience, broader name recognition and stronger financial resources than the Company. The Company believes its competitive position in the industry is strong due to its experienced personnel and advanced computer systems which allow it to manage all accounts effectively for any client and to manage the various debtors professionally.

Personnel

As of March 31, 1991, the Company had a staff of 450. Approximately 4% of the Company's staff is employed on a part-time basis. In addition, the Company has an extensive network of independent contractors to supplement its in-house sales force. As of June 30, 1990, the Company had contracts with over 1,000 independent contractors who are paid on a commission-only basis for soliciting clients for the Company's services. The independent contractors are not required to devote any specific amount of time to the Company's business. No employees are represented by a collective bargaining unit and the Company generally considers relations with its employees to be good. The Company's staff is employed directly by TFC Management, Inc., a wholly owned subsidiary of Professional Business Brokers, Inc. (see Item 7, "Certain Relationships and Related Transactions"), and are employed by the Company on a subcontracted basis.

Financing Practices

The Company's factoring and portfolio acquisition businesses require substantial capital to fund the portion of the purchase price of receivables payable upon acquisition of the receivables. The amount of capital required is dependent on the volume of business the Company generates and how quickly the receivables can be collected thereby providing

funds for further purchases. The Company has funded its factoring and portfolio acquisition capital requirements primarily through the sale of debt in the capital markets. The Company intends to continue to rely primarily on this source of funding for its ongoing capital requirements because it believes that such debt provides a less expensive and more reliable source of funding than direct bank financing.

The following table provides certain information concerning certain outstanding debt of the Company and its subsidiaries as of December 31, 1990:

| Name of Issue | Type of Issue | Amount Outstanding | Original Maturity | Per Annum Interest Rates | Collateral |
|---|---|---|---|---|---|
| Various Bank Lines | Commercial Loans | $ 798,000 | (1) | 16% and 18% (2) | Commercial Accounts Receivable acquired with the proceeds of the loans |
| Insured Over-Collateralized Class A Bonds | Foreign Placement-Capital Markets | $ 1,108,457 | (3) | (3) | Healthcare Accounts Receivable acquired with the proceeds of the Notes |
| Recourse Promissory Notes-1989 | Private Placement-Capital Markets | $44,377,600 | (1) | 14% and 16% (2) | Healthcare and Business Accounts Receivable acquired with the proceeds of the Notes |
| Recourse Promissory Notes-1990 | Private Placement-Capital Markets | $49,983,800 | (1) | 13% and 18% (2) | Healthcare and Business Accounts Receivable acquired with the proceeds of the Notes |
| Recourse Promissory Notes-1990/1991 | Private Placement-Capital Markets | $11,681,500 | (1) | 13% and 15% (2) | Healthcare and Business Accounts Receivable acquired with the proceeds of the Notes |
| Promissory Notes-Bank of Cape Verde | Commercial Loan | $15,000,000 | 2 years | 15% and 18% (4) | Healthcare and Business Accounts Receivable acquired with the proceeds of the Notes |
| Healthcare Receivable-Backed Bonds (5) | Private Placement-Capital Markets | $56,500,000 | July 15, 1992 (5) | 10.2% (5) | Healthcare Accounts Receivable acquired with the proceeds of the Bonds |
| Healthcare Receivable-Backed Bonds--Series 1990A | Private Placement-Capital Markets | $41,500,000 | December 15 1993 (6) | 9.75% | Healthcare Accounts Receivable acquired with the proceeds of the Bonds |

---

(1) Investors elected maturities of either one or two years. At maturity, the Company has, in the past, given purchasers of the Insured Over-Collateralized Class A Bonds, the Recourse Promissory Notes - 1989, the Recourse Promissory Notes - 1990 and the Recourse Promissory Notes-1990/1991 the ability to reinvest the principal amount of such instruments through the purchase of the promissory notes then being offered by the Company at the interest rate in effect at the time the investor initially invested.

(2) The one-year debt carried the lower of the two interest rates. The two-year debt carried the higher of the two interest rates. In addition, as the result of reinvestments by holders of previously issued debt at the interest rate in effect at the time the investor initially invested, $9,105,000 in principal amount of the Recourse Promissory Notes-1989, $12,317,500 in principal amount of the Recourse Promissory Notes-1990 and $4,970,000 in principal amount of Recourse Promissory Notes-1990/1991 bore interest at rates in excess of those levels shown in the table but, in no event, more than 18% per annum.

(3) Interest rates were privately negotiated between the Company and the investors and ranged from 11% to 15% per annum. Original maturities ranged from one to five years.

(4) The first $3,000,000 bears interest at 18% per annum and the remainder bears interest at 15% per annum.

(5) These Bonds were issued by Towers Healthcare Receivables Funding Corporation, a wholly owned subsidiary of the Company, and are secured by healthcare accounts receivable acquired by Towers Healthcare Receivables Funding Corporation from the Company with the proceeds of the Bonds. The maturity of the Bonds is subject to extension at the option of the Bondholder to November 15, 1993 at 200 basis points over the interest rate on two-year Treasury Notes immediately preceding November 15, 1991.

(6) These Bonds were issued by Towers Healthcare Receivables Funding Corporation-II, a wholly owned subsidiary of the Company, and are secured by healthcare accounts receivable acquired by Towers Healthcare Receivable Funding Corporation-II from the Company with the proceeds of the Bonds.

The more recent debt has lower interest rates which the Company believes is attributable to various factors, including an increasing acceptance of its debt by the capital markets, a generally lower overall interest rate environment and the fact that certain of the more recent debt issuances by its subsidiaries have been assigned investment-grade ratings by a nationally recognized securities rating agency.

The Company is not directly liable on the debt of either Towers Healthcare Receivables Funding Corporation or Towers Healthcare Receivables Funding Corporation-II but does act as the servicer of the accounts receivable owned by the issuing subsidiary.

The proceeds from the sale of the debt issued by Towers Healthcare Receivables Funding Corporation and Towers Healthcare Receivables Funding Corporation-II (the "Bond Issuers"), after payment of sales commissions of 1% of the offering proceeds, payment of a nonaccountable organizational and offering expense allowance of 1% of the offering proceeds and deposit of an amount into a reserve account equal to 3% of the offering proceeds, were available for the purchase of healthcare accounts receivable from the Company. The purchase price for the healthcare accounts receivables is required to be 95% of the sum of the amounts actually received by the respective Bond Issuer from third-party obligors (e.g., insurance companies, the United States government, pursuant to the Medicare program, and the various states, pursuant to their Medicaid programs) and patients with respect to such healthcare accounts receivable plus all unpaid amounts due and owing from third-party obligors but not paid by the date the deferred portion of the purchase price is due pursuant to clauses (ii) and (iii) below for reasons that do not constitute a breach of representations and warranties made by the Company in connection with the purchase of such healthcare accounts receivable by the respective Bond Issuer (the "Collected Value"). The purchase price will be paid as follows: upon acquisition, the respective Bond Issuer will pay to the Company an amount equal to 50% of the stated value of each healthcare account receivable. The remaining portion of the purchase price will be paid by the respective Bond Issuer to the Company upon the earliest of (i) three business days following receipt by the respective Bond Issuer of payment with respect to such healthcare account receivable, (ii) 30 days after the respective Bond Issuer receives notice that the third party obligor will not pay the amount owed for reasons that would not constitute a breach of a representation or warranty by the Company in the applicable master sale and servicing agreement or (iii) 365 days after the healthcare account receivable is purchased by the respective Bond Issuer.

Proceeds from the collection of the healthcare accounts receivable are used for payment of interest on the Bond Issuers' debt, payment of the deferred portion of the purchase price of the healthcare accounts receivable, payment of a monthly servicing fee of 1/12 of 2% of the stated value of outstanding healthcare accounts receivable on a monthly basis, payment of trustee and other administrative fees and expenses, reinvestment in healthcare accounts receivable (to the extent of approximately 50% of the stated value of such healthcare account receivable) and, upon commencement of the principal amortization of the Bond Issuer's debt, payment of principal of such debt. Certain proceeds from the collection of the healthcare accounts receivable which remain after the foregoing payments may be released to the Company for general corporate purposes. Pending investment or reinvestment in healthcare accounts receivables, the Bond Issuers are required to invest available funds in short-term debt of issuers whose short-term credit ratings are in one of the two highest short-term credit rating categories then available from Standard & Poor's Corporation, Moody's Investors Service or Duff & Phelps Credit Rating Co.

Regulation

The Company and its subsidiary, TCS, are required by a number of states to be licensed to carry on collection activities. The laws under which such licenses are granted generally provide for annual license renewals, as well as denials, suspensions or revocations for improper action or other disabilities. In addition, in connection with their collection activities, the Company and TCS are subject to the Federal Trade Commission Act which forbids the use of any deceptive representation or deceptive means to collect debts or to obtain information concerning debtors.

Item 2. Financial Information

Selected Consolidated Financial Data

The financial data presented below are derived from the Company's consolidated financial statements and related notes which have been audited by Marvin E. Basson, CPA, P.C. The following table should be read in conjunction with the Company's audited consolidated financial statements and related notes and is qualified in its entirety by reference thereto.

(Dollars in thousands except earnings per share)

| | Fiscal Year Ended June 30, | | | | | Six Months Ended December 31, | |
|---|---|---|---|---|---|---|---|
| | 1990 | 1989 | 1988 | 1987 | 1986 | 1990 | 1989 |
| Income Statement Data | | | | | | | |
| Gross Revenues | $ 74,443 | $ 53,269 | $ 43,575 | $25,481 | $15,942 | $ 41,429 | $ 22,613 |
| Operating Expenses | 64,240 | 46,455 | 40,506 | 18,821 | 14,181 | 38,027 | 18,897 |
| Income Before | | | | | | | |
| Provision for Taxes | 10,203 | 6,813 | 3,069 | 6,660 | 1,761 | 3,403 | 3,716 |
| Provision for Income Taxes | 6,300 | 3,327 | 1,656 | 2,390 | 898 | 1,438 | 1,821 |
| Net Income | 3,902 | 3,486 | 1,413 | 4,270 | 863 | 1,965 | 1,895 |
| Average Common | | | | | | | |
| Shares Outstanding | 4,470 | 4,500 | 4,500 | 4,250 | 4,000 | 4,500 | 4,500 |
| Earnings Per Share | .86 | .78 | .31 | 1.00 | .21 | .43 | .42 |
| Balance Sheet Data (at end of year) | | | | | | | |
| Total Assets | 195,562 | 121,731 | 75,595 | 48,673 | 10,031 | 281,945 | 133,166 |
| Total Liabilities | 182,141 | 112,312 | 69,662 | 44,154 | 9,781 | 266,558 | 121,010 |
| Shareholders' Equity | 13,421 | 9,419 | 5,933 | 4,519 | 250 | 15,387 | 12,155 |

Management's Discussion and Analysis of Financial Condition and Results of Operations

The Company records revenues upon acquisition of accounts receivable acquired by the Company in its factoring business ("Factored Accounts") and accounts receivable assigned to the Company in its collection business ("Collection Accounts"). The amount of revenue recorded with respect to Factored Accounts is a stated percentage of the total accounts purchased. The amount of revenue recorded with respect to Collection Accounts is the amount that the Company expects to retain after it pays over to the client the amount due to the client. The Company records revenues upon collection of accounts purchased by the Company in its portfolio acquisition business ("Purchased Accounts"). The amount of revenue recorded with respect to Purchased Accounts is the amount that the Company receives, less amounts due to the seller with respect to such accounts. Generally, the amounts due to clients with respect to Collection Accounts is a percentage of the amount collected. Amounts due to clients upon collection of Factored Accounts are generally less than for Collection Accounts because at least 50% of the purchase price of the Factored Accounts is paid upon the purchase of such accounts. Amounts due to clients with respect to Purchased Accounts are generally fairly low.

19

Fiscal Year Ended June 30, 1990 Compared With Fiscal Year Ended June 30, 1989 and Fiscal Year Ended June 30, 1989 Compared With Fiscal Year Ended June 30, 1988

Revenues from Collection Accounts represented 48.0% of Gross Revenues for the fiscal year ended June 30, 1990, 55.7% of Gross Revenues for the fiscal year ended June 30, 1989 and 56.6% of Gross Revenues for the fiscal year ended June 30, 1988. In addition, revenues from Collection Accounts have represented 22.5%, 25.2% and 34.6% of the Company's Gross Profit for the fiscal years ended June 30, 1990, 1989 and 1988. These declines are attributable to the growth of the Company's factoring business at a faster rate than the growth of its collections business. This faster rate of growth is reflective of the Company's determination to allocate more of its financial, managerial and staff resources to the factoring business due to the Company's belief that this business will, during the next couple of years, be more profitable to the Company than its collection business.

A significant part of the growth in the Company's factoring business in recent periods has been related to the Company's purchases of healthcare receivables. The Company's business has grown in this area primarily as the result of its having few effective competitors due to the recent introduction of these financing mechanisms to the healthcare industry. This absence of effective competitors is expected to disappear during the next several years as competitors introduce their own services into this industry.

The Company's expenditures for salaries and benefits are dependent, in large part, upon employment levels, which, in turn, are primarily dependent on the volume of accounts assigned to the Company for collection and the volume of accounts acquired by the Company in its factoring business. Benefits as a percent of total "salaries and benefits" has increased to approximately 12% for the fiscal year ended June 30, 1990 from approximately 8% for the fiscal years ended June 30, 1989 and 1988 as the result of increases in the quality of fringe benefits provided to the employees. The Company believes that the relatively low levels of inflation experienced in recent years has had a favorable impact on the level of "salaries and benefits."

3407t/7408o

20

The Company's selling expenses are primarily commissions payable to independent contractors for submission of accounts for collection or for purchase by the Company. As a percentage of the face value of accounts received for collection and accounts purchased, selling expenses have stayed in the range of 2.0% to 2.5% for each of the three fiscal years ended June 30, 1990, 1989 and 1988.

The Company's general and administrative expenses consist of (i) telephone expense, (ii) postage and supplies expense, (iii) occupancy costs (including rent, depreciation of furniture and fixtures and amortization of leasehold improvements), (iv) commissions paid to brokers for sale of the Company's debt, (v) costs of collection and (vi) other operating costs. Telephone expense was $1,353,714, $1,072,387 and $632,174 for the fiscal years ended June 30, 1990, 1989 and 1988. These increases are primarily related to the Company's increased business activity. Over the past three years the Company has invested over $630,000 in acquiring a sophisticated telephone system which permits the monitoring of telephone traffic and the ability to efficiently switch calls and lines to the most cost effective provider. Postage and supplies expense increased 53% in the fiscal year ended June 30, 1990 over the prior fiscal year primarily reflecting the Company's increased business activity and a distribution of literature regarding the Company's healthcare receivable factoring and servicing activities. Occupancy costs increased 38% in the fiscal year ended June 30, 1990 over the level for the fiscal year ended June 30, 1989 and 94% in the fiscal year ended June 30, 1989 over the level for the fiscal year ended June 30, 1988. These increases were due primarily to new and/or revised leases for corporate headquarters and regional sales offices and the addition of leasehold improvements. It is estimated that occupancy costs could be decreased by approximately $250,000 to $300,000 per year if the regional sales offices are transferred to franchisees as described in Item 1-"Business." Commissions paid to brokers for the sale of the Company's debt was $4,655,652, $1,627,850 and $2,119,461 for the fiscal years ended June 30, 1990, 1989 and 1988. This expense is directly related to the amount of debt the Company sells and the commission rate for the sale of that debt. Costs of collection were $17,510,635, $17,049,801 and $22,688,569 for the fiscal years ended June 30, 1990, 1989 and 1988, respectively. Other operating costs increased 59% in the fiscal year ended June 30, 1990 over the level for the fiscal year ended June 30, 1989 and 55% in the fiscal year ended June 30, 1989 over the level for the fiscal year ended June 30, 1988 primarily as a result of the Company's

3407t/7408o

increased business activity. Proceeds from the settlement of a lawsuit were received during the fiscal year ended June 30, 1990, increasing pretax earnings by approximately $.24 per share.

The Company's provision for income taxes has equaled 61.7%, 48.8% and 53.9% of "income before provision for taxes" for each of the years ended June 30, 1990, 1989 and 1988. Included in the Company's calculation of income taxes for the year ended June 30, 1990 was an add back of approximately $5.4 million for interest and penalties on taxes determined to be due in prior years. For further detail concerning the Company's provision, see Note 8 to the Company's financial statements. The Company elected to adopt Statement of Financial Accounting Standards No. 96 "Accounting for Income Taxes" and reflect the entire impact of the change in the consolidated Statement of Income for the year ended June 30, 1990. The Company's effective tax rate, however, has remained relatively stable over the last three years as a result of relatively few changes in statutory rates.

<u>Six Months Ended December 31, 1990 Compared With Six Months Ended December 31, 1989</u>

The same trends and considerations that affected the fiscal year financial statements also affected the financial statements for the six months ended December 31, 1990 as compared to the six months ended December 31, 1989.

The substantial increases in gross revenues and interest expense during the six months ended December 31, 1990 over the six months ended December 31, 1989 was due primarily to the issuance of Healthcare Receivable-Backed Bonds by two special-purpose subsidiaries of the Company during the six months ended December 31, 1990 and the use of those proceeds to purchase healthcare accounts receivable.

The general and administrative expenses of the Company for the six months ended December 31, 1989, June 30, 1990 and December 31, 1990 were $7,075,163, $25,137,159 and $12,086,138, respectively. The significant period-to-period changes in general and administrative expenses, in large part, reflect changes in costs of collection, which in turn are heavily influenced by changes in the composition of the Company's portfolio of accounts receivable. As noted above, increased acquisitions of Collection Accounts result in increased amounts due to clients as collections are received on such accounts.

The Company's provision for income taxes is lower for the six months ended December 31, 1990 than the comparative period in 1989 due to a determination by the Company to allocate a significant portion of its revenues to states other than New York, in recognition of where the income was generated. Such states generally have lower income tax rates than does the State of New York.

<u>Liquidity</u>. The Company's liquidity needs are primarily dependent on the rate of growth of its capital-intensive businesses (namely, factoring), the price it pays for Factoring Accounts, the speed at which it is able to collect receivables and the interest rate on its debt.

Trends in the Company's business which, if continued, are likely to increase its needs for liquidity are (i) the growth of the Company's factoring business, primarily in the healthcare industry, and (ii) an increase in the price the Company pays for Factored Accounts. Increased competition in the factoring of healthcare accounts receivable is anticipated. As a result, the initial installment of the purchase price which the Company pays for such accounts receivable is likely to increase, thereby increasing its liquidity needs, all else being equal. In addition, the Company has entered into an agreement with PBS pursuant to which the Company is required to make payments of up to $1.2 million per year over the next eight years. See Item 7--"Certain Relationships and Related Transactions."

Trends in the Company's business which, if continued, are likely to reduce its needs for liquidity are (i) the reduction in the number of days it takes for the Company to collect funds on receivables which it has purchased or which have been assigned to it for collection ("recovery time") and (ii) the reduced interest takes the Company is paying on its outstanding debt. The average interest rate on the Company's outstanding debt has fallen from approximately 16% per annum as of March 31, 1990 to approximately 12% per annum as of March 31, 1991. See Item 1--"Business--Financing Practices." The Company's recovery time is generally enhanced by its continual refining of its computer software and systems and the experience of its collections professionals. Downturns in business cycles can, however, adversely affect collection speed. Although the Company does not keep statistics relating to collection speed, management believes that the Company collects accounts receivable more quickly than it did several years ago before its collections services were computerized.

23

In the past, the Company has managed its liquidity needs to the extent not funded from operations through the sale of its debt, or debt of its subsidiaries, in the capital markets. During the fiscal year ended June 30, 1990, the Company generated over $45.8 million from the issuance of debt and approximately $4.3 million from operating revenues. During the six months ended December 31, 1990, the Company generated approximately $128.6 million from the issuance of debt and approximately $41.4 million from operating revenues. Although the Company expects to be able to continue to fund its liquidity needs through the issuance of its debt and, to a lesser extent, from operating revenues, the Company believes that other sources of funding, including bank financing and equity funding, may be available if it is unable to fund its liquidity needs as it has in the past. There is no assurance that the Company's liquidity requirements will not grow beyond its liquidity funding capabilities or that it will be able to continue funding its current liquidity requirements. Significant increases in interest rates or a reduction in the market's acceptance of the debt of the Company and its subsidiaries could have a material adverse impact on the Company's liquidity. A loss of liquidity would result in a reduced rate of growth in the Company's capital intensive businesses (namely, factoring and portfolio acquisitions) and perhaps even a decline in such business activities. A loss of liquidity would force the Company to focus its business activities on less capital-intensive aspects of its business. If the Company experiences a loss of liquidity, it can be expected that the business activities on which the Company would focus would be less profitable for the Company than the more capital-intensive businesses. See also Item 1, "Business" and Item 10, "Recent Sales of Unregistered Securities."

Item 3. Properties

The Company's executive, administrative and operational offices are located at 417 Fifth Avenue, New York, New York, where the Company subleases approximately 100,000 gross square feet. The subleases for such space provide for annual rental payments of approximately $1,820,000 (subject to adjustment for increases or decreases in the landlord's taxes and costs of providing certain building services) and expire in 1996. Approximately 82% of the Company's employees are located in its New York office. The Company currently maintains sales offices in the following metropolitan areas: Los Angeles, California; Denver, Colorado; Washington, DC; Ft. Lauderdale, Florida; Atlanta, Georgia; Chicago, Illinois; Boston, Massachusetts; St. Louis, Missouri; Memphis, Tennessee; Dallas, Texas; and Houston, Texas. The Company

24

anticipates that these regional sales offices will, over the next two years, be transferred to persons who purchase franchises for the territories covered by these offices.

The sales offices occupy leased space in each of the metropolitan areas in which they are located. The lease for space in the Los Angeles, California metropolitan area requires annual payments of approximately $134,000 through October 31, 1995. With one exception, the leases for all other regional sales offices have expired, and the Company is occupying those offices on month-to-month tenancies. Except for the Los Angeles, California office, the annual rental payments for the regional sales offices do not currently exceed $30,000 for any one office, and the annual lease payments for all regional sales offices aggregate approximately $265,000.

Item 4. Security Ownership of Certain Beneficial Owners and Management

The following table sets forth certain information with respect to the beneficial ownership (determined in accordance with Securities and Exchange Commission Rule 13d-3 under the Securities Exchange Act of 1934) of the Company's common stock by each person known to the Company to beneficially own more than 5% of the Company's outstanding common stock, by each director of the Company and by all officers and directors as a group.

| Name and Address of Beneficial Owner | Number of Shares: Voting Control | Number of Shares: Investment Control | Percent of Class |
|---|---|---|---|
| Professional Business Brokers, Inc.(1) | 3,410,520 | | 68.21% |
| 417 Fifth Avenue | | 3,210,520 | 64.21% |
| New York, New York | | | |
| Sovereign Holdings, Ltd., as voting trustee(2) | 500,000 | | 10.00% |
| 417 Fifth Avenue | | | |
| New York, New York | | | |
| Mitchell Brater(2) | | 500,000 | 10.00% |
| 417 Fifth Avenue | | | |
| New York, New York | | | |

25

| | | | |
|---|---|---|---|
| Steven Hoffenberg<br>417 Fifth Avenue<br>New York, New York | 3,910,520 (3) | 3,210,520 (4) | 78.21%<br>64.21% |
| Thomas B. Evans, Jr.(5)<br>Suite 810<br>1010 Wisconsin Avenue<br>Washington, D.C. | 100,000 | 100,000 | 2.00% |
| Ben Barnes(5)<br>Suite 1630<br>600 Congress Avenue<br>Austin, Texas | 100,000 | 100,000 | 2.00% |
| Michael Rosoff<br>417 Fifth Avenue<br>New York, New York | -0- | -0- | -0-% |
| Raymond Lewis<br>417 Fifth Avenue<br>New York, New York | -0- | -0- | -0-% |
| Charles H. Chugerman(5)<br>417 Fifth Avenue<br>New York, New York | -0- | 100,000 | -0-<br>2.00% |
| All officers and directors as a group (11 persons)(6) | 4,110,520 | 4,110,520 | 82.21% |

---

(1) Steven Hoffenberg, Chairman of the Board, Chief Executive Officer and President of the Company, is also the President of Professional Business Brokers, Inc. All of the outstanding capital stock of Professional Business Brokers, Inc. is owned by The Hoffenberg Family Trust. Mr. Hoffenberg is the trustee of The Hoffenberg Family Trust. Included in this total are 200,000 shares with respect to which Professional Business Brokers, Inc. has an irrevocable proxy but no investment control.

(2) These shares are held in the name of Sovereign Holdings, Ltd. pursuant to a Voting Trust Agreement dated December 20, 1989, wherein Sovereign Holdings, Ltd. and its successors in trust have the sole voting power over these shares until December 20, 2004. Mr. Brater is entitled to receive all dividends, if any, declared with respect to these shares and may transfer his interest in the voting trust at any time, subject to applicable law. Sovereign Holdings,

26

Ltd. is a wholly owned subsidiary of Professional Business Brokers, Inc. (see footnote (1) above), and its President is Steven Hoffenberg.

(3) This reflects a combination of the shares over which Professional Business Brokers, Inc. and Sovereign Holdings, Ltd. have voting control. See footnotes (1) and (2).

(4) This reflects the shares over which Professional Business Brokers, Inc. has investment control. See footnote (1).

(5) These shares were issued to Messrs. Evans, Barnes and Chugerman during 1991 in consideration for services previously rendered to the Company. Mr. Chugerman has given an irrevocable proxy to Professional Business Brokers, Inc. with respect to his 100,000 shares.

(6) Included in this total are 100,000 shares issued in 1991 to Mr. DiNicolas, a Senior Vice President of the Company, pursuant to an option granted in 1991 for an aggregate purchase price of $100. The option was granted in consideration for services rendered by Mr. DiNicolas in connection with the structuring and assistance in the marketing of the Healthcare Receivable-Backed Bonds offered by two subsidiaries of the Company. See Item 6--"Executive Compensation." Mr. DiNicolas has given an irrevocable proxy to Professional Business Brokers, Inc. with respect to his 100,000 shares.

Item 5. Directors and Executive Officers

The directors and executive officers of the Company are listed below. Except as otherwise set forth in the description of their business experience below, each of the persons listed has held his position with the Company for at least the last five years.

| Name | Age | Positions and Offices Held With the Company |
|---|---|---|
| Steven Hoffenberg | 46 | Chairman of the Board, Chief Executive Officer and President |
| Mitchell Brater | 49 | Vice Chairman of the Board and Chief Operating Officer |
| Michael Rosoff | 41 | Director, Senior Vice President, Chief Legal Officer and Assistant Secretary |

| | | |
|---|---|---|
| Charles H. Chugerman | 32 | Director, Vice President and Secretary |
| Thomas B. Evans, Jr. | 58 | Director |
| Ben Barnes | 53 | Director |
| Anthony DiNicolas | 41 | Senior Vice President |
| Xavier Eboli | 51 | Vice President |
| Richard Levine | 45 | Vice President-Finance and Chief Financial Officer |
| Raymond Lewis | 74 | Director and Vice President |

The Company's directors hold office until the next annual meeting of stockholders or until their successors have been duly elected and qualified. The Company's executive officers are elected annually by, and hold office at the pleasure of, the Board of Directors.

Steven Hoffenberg has been the Chairman of the Board and President of TCC and Professional Business Brokers, Inc. since their inception.

Mitchell Brater became Vice Chairman of the Board and Chief Operating Officer of the Company in November 1987. Mr. Brater has also been President of Eton Capital Corp. and Eton Securities Corp. ("Eton"), and Eton's predecessors for more than the past five years. Eton Capital Corp. is a financial services company. Eton is a registered securities broker-dealer. Mr. Brater currently devotes his full time to the Company's business.

Michael Rosoff became a Senior Vice President and Chief Legal Officer at the Company in 1989. He became a Vice President, an Assistant Secretary, General Counsel and a Director of the Company in 1986. Mr. Rosoff has also been a Vice President, General Counsel and a Director of TCS and TCC since 1984.

Charles H. Chugerman has been President of TLC since 1985 and a Vice President of TCS since 1984.

Thomas B. Evans Jr. became a Director of the Company in 1990. Mr. Evans has been the President of the Evans Group, Ltd., a Washington, D.C.-based consulting firm, since 1989 and was a senior partner in the law firm of Manatt, Phelps, Rothenberg & Evans from 1985 to 1989. Mr. Evans currently

serves as a Director of Zemex Corporation, a diversified minerals and materials firm. Mr. Evans served as Co-Chairman of the Republican National Committee from 1971 to 1973. He was a member of the United States House of Representatives from 1977 to 1983.

Ben Barnes became a Director of the Company in 1990. Mr. Barnes has been a business and government consultant since 1987 and is currently operating under the name of Entrecorp. Prior to that, Mr. Barnes was the Chief Executive Officer of Barnes-Connally Partnership, a real estate and oil and gas holding and development company, from 1981 to 1987. Mr. Barnes served as Lieutenant Governor for the State of Texas from 1969 to 1973 and as the Speaker of the House of Representatives of the State of Texas from 1965 to 1969. Mr. Barnes and Barnes-Connally Partnership filed voluntary petitions with the United States Bankruptcy Court in December 1987 and July 1987, respectively, under Chapter 7 of the United States Bankruptcy Code as a result of the severe economic dislocations in the Texas real estate and oil and gas industries during the mid-1980's.

Anthony DiNicolas, prior to joining the Company in 1989, was a Vice President at First Ohio Securities from April 1989 to September 1989, a Vice President at Security Pacific National Bank from 1987 to 1989. From 1986 to 1987, Mr. DiNicholas was a Vice President at Smith Barney, Harris Upham, Inc. and from 1985 to 1987, Mr. DiNicholas was a securities broker with Bear Stearns & Co. Inc.

Xavier Eboli has been a Director of the Company since 1988 and a Vice President of the Company since 1986. He has also been a Director of TCC since 1989 and a Director and President of TCS since 1985.

Richard Levine has been in his current position with the Company since 1984 except for eight months during 1989 when he served as a Vice President of the Company.

Raymond Lewis has been a Vice President and Director of TCC since prior to 1984.

On August 4, 1988, the Securities and Exchange Commission commenced a civil action in the United States District Court for the Southern District of New York (88 Civ. 5421) against the Company, TCC, Steven Hoffenberg, Mitchell Brater and Eton alleging that offers and sales of certain securities of TCC were made to the public by such persons without first having a registration statement on file and declared effective by the Securities and Exchange

Commission. The Company, TCC and Steven Hoffenberg, without admitting or denying the Securities and Exchange Commission's allegations, consented to the entry of a judgment of permanent injunction on November 16, 1988 enjoining them from violating Sections 5(a) and 5(c) of the Securities Act of 1933, as amended. Mitchell Brater and Eton, without admitting or denying the Securities and Exchange Commission's allegations, consented to the entry of a judgment of similar permanent injunction on April 27, 1989. As a result of the same allegations as are discussed above, Eton, in its capacity as a registered broker-dealer, and Mitchell Brater, in his capacity as President of Eton, consented to the entry of an Order on May 13, 1989 by the Securities and Exchange Commission in an administrative proceeding separate from the civil action discussed above (i) prohibiting Eton from participating in any public and certain private offerings of securities for 60 days, (ii) prohibiting Mitchell Brater from any association with any broker, dealer, investment company, investment advisor or municipal securities dealer for 60 days and (iii) prohibiting Eton from participating in any public and certain private offerings of securities for three years unless Eton has retained independent counsel to provide a written opinion and certain other advice to Eton regarding compliance with Section 5, 3(b), 4(2) or 4(b) of the Securities Act of 1933, as amended, depending on the Section applicable to the particular offering.

On June 11, 1990, the State of Nebraska Department of Banking and Finance entered a Consent Order in an administrative proceeding against the Company and TCC after finding that the permanent injunction entered against the Company and TCC, as described above, disqualified the Company and TCC from using the private offering exemption from registration that is provided in the Nebraska Revised Statutes, for sales of certain promissory notes and, as a result, three of such sales in Nebraska were made in violation of the securities registration requirements of Nebraska law. The Consent Order imposed a $5,000 penalty and fine on the Company and TCC and required maintenance of a current registration or claim of an applicable exemption at all times offers and sales of their securities are made in Nebraska.

On February 20, 1990, TCC consented to the entry of an Administrative Order against TCC by the Alabama Securities Commission following a determination by the Alabama Securities Commission that TCC sold its promissory notes to nonaccredited investors in violation of the terms of an exemption from registration of such sales with the Alabama Securities Commission. The Administrative Order directed TCC

to cease and desist from any offer or sale of any security or from any other securities activities into, within, or from the State of Alabama in violation of the Alabama Securities Act.

On January 8, 1991, the Company consented to the entry of a Cease and Desist Order by the Commissioner of Securities for the State of Louisiana ordering the company to cease and desist any activities which are in violation of the Louisiana Securities Act. The Louisiana Cease and Desist Order arose out of an investigation by the Louisiana Commissioner of Securities into whether certain promissory notes offered by the Company through Biedenharn Investment Group, Inc. were sold on behalf of the Company in a manner that did not comply with the requirements for an exemption from registration under Louisiana securities laws and regulations. In the Cease and Desist Order, the Louisiana Commissioner of Securities stated that "it appears that [the Company] is in violation of the Louisiana Securities Act, in that the [promissory notes] were not registered in the State of Louisiana." In consenting to the entry of the Cease and Desist Order, the Company neither admitted nor denied any liability.

In addition, on October 17, 1989, the New Jersey Bureau of Securities issued an order of denial of exemption against TCC relating to its 1988 private offering of promissory notes due to the failure to timely file a notice of exemption within 30 days of completion of the offering.

Certain of the foregoing federal and state orders will, if not waived, disqualify the Company from future use of the Uniform Limited Offering Exemption from registration of offers and sales of securities under the various states' securities laws. If the Company were disqualified from the future use of the Uniform Limited Offering Exemption, it would be required to register its future securities offerings in certain states or would be required to rely on other exemptions from registration, which could result in an increase in the Company's cost of raising capital. Company management believes that any such increase in the cost of raising capital would not be material, particularly in light of the Company's success in raising nearly $100 million in debt through two subsidiaries without registration of such securities in reliance upon other exemptions from registration.

Item 6. Executive Compensation

The following table sets forth all cash compensation, including bonuses and deferred compensation paid by the

Company for the fiscal year ended June 30, 1990 to (i) each of the Company's five most highly compensated executive officers whose cash compensation exceeded $60,000 and (ii) all executive officers of the Company as a group:

| Name of Individual or Number in Group | Capacities in Which Served | Cash Compensation |
|---|---|---|
| Steven Hoffenberg (1) | Chairman of the Board, | $100,000 |
| | Chief Executive Officer and President | |
| Mitchell Brater | Vice Chairman of the Board and Chief Operating Officer | $ (2) |
| Michael Rosoff | Director, Senior Vice President, Chief Legal Officer and Assistant Secretary | $100,000 |
| Charles Chugerman (3) | Director, Vice President and Secretary | $150,000 |
| Anthony DiNicolas (4) | Senior Vice President | $160,000 |
| Executive Officers as a group (10 persons) | | $928,000 |

---

(1) See Item 7, "Certain Relationships and Related Transactions."

(2) During the Company's fiscal year ended June 30, 1990, the Company paid $385,000 to Eton Capital Corp. for services rendered to the Company by Mr. Brater. Mr. Brater is the President and sole shareholder of Eton Capital Corp. In addition, during that same year, the Company forgave the interest on a $250,000 promissory note which Mr. Brater had given the Company in consideration for the issuance to him of 500,000 shares of the Company's capital stock.

(3) In May 1991, the Company issued 100,000 shares of the Company's common stock to Mr. Chugerman in consideration for services previously rendered to the Company in connection with its collection business. On the date the stock was issued (May 8, 1991), the bid price for the Company's common stock was reported by the National Quotation Bureau, Inc. at 8.

(4) Mr. DiNicolas' employment agreement provided that upon $100 million being raised for the Company from institutional offerings arising from Mr. DiNicolas' efforts, the Company would grant Mr. DiNicolas an option to acquire 100,000 shares of the Company's common stock for $1.00 per share. The Company subsequently agreed to modify the employment agreement to reduce the $100 million requirement to $98 million and to reduce the exercise price to an amount equal to the par value of the Company's common stock, namely $.001 per share. The Company granted Mr. DiNicolas the option under the modified terms in January 1991, and Mr. DiNicolas exercised the option in March 1991. On the date the option was granted (January 4, 1991), the bid price for the Company's common stock was reported by the National Quotation Bureau, Inc. at $10.00. On the date the option was exercised (March 27, 1991), the bid price for the Company's common stock was reported by the National Quotation Bureau, Inc. at $8.00.

Item 7. Certain Relationships and Related Transactions

In 1986, Professional Business Brokers, Inc. ("PBB") sold 80% of the common stock of TCS, TCC and Towers Leasing Corporation ("TLC") to the Company in exchange for the Company's agreement to pay PBB for a period of five years from July 9, 1986 and amount equal to the aggregate of (i) 3% of the gross value of all claims booked by TCS during such period, (ii) 3% of the gross sales and revenues of TCC during such period, and (iii) 3% of the gross leases and sales revenues of TLC during such period. During the Company's 1987 fiscal year, the agreement was orally modified to give the Company 100% of the common stock of TCS, TCC and TLC in exchange for the Company's agreement to pay to PBB for a period of seven years from July 1, 1987 an amount equal to 5% of the Company's gross profits before operating expenses, extraordinary items and income taxes. Although the term "gross profits" was not expressly defined in the Company's written agreement with PBB, the Company and PBB interpreted that term to refer to "gross profits" as shown on the Company's prior financial statements which were prepared on a different basis than the financial statements set forth in Item 13. Note 3 to the financial statements provides details concerning the amounts which were required to be paid during the Company's 1990, 1989 and 1988 fiscal years. PBB subsequently waived a portion of the payments to which it was entitled during the 1988 fiscal year in exchange for the Company's agreement to change the period of time covered by the agreement to seven years from July 1, 1988. During the 1990, 1989 and 1988 fiscal years, the Company paid PBB $823,885, $260,000 and $216,241, respectively, pursuant to

this agreement. On August , 1991, a new agreement was entered into between the Company and PBB in order to fix the amount of payments required to be made by the Company to PBB, thereby providing more certainty to the Company as to its ultimate obligations to PBB in this respect. The new agreement provides for the Company to pay to PBB an amount each year through June 30, 1998 equal to 1.5% of the Company's gross revenues for such year, as set forth on its consolidated statement of income, but in no event more than $1,200,000 per year. In addition, pursuant to the new agreement, the Company has agreed to issue to PBB an option to acquire 400,000 shares of its common stock each year through June 30, 1996 (for an aggregate of 2,000,000 shares) at a price of $1.00 per share. Each option will expire 10 years after its issuance. On August , 1991, the bid price for the Company's common stock was reported by the National Quotation Bureau, Inc. at $ .

If the Company had paid PBB the full amount required under the prior agreement for fiscal years 1988 through 1990 and had the amount required to be paid for fiscal years 1991 through 1995 grown at a rate of 10% each year, the Company would have owed PBB an aggregate of $24,389,870 under the prior agreement. Under the new agreement, the Company will be required to pay PBB a maximum of $15,238,934 plus issue stock worth $14,000,000, assuming issuance of the full 2,000,000 shares with an $8 per share market value minus the $1 per share purchase price.

All of the outstanding capital stock of PBB is owned by The Hoffenberg Family Trust. Mr. Hoffenberg is the trustee of The Hoffenberg Family Trust.

The Company has entered into an agreement with TFC Management, Inc. for the provision of certain payroll services to the Company, its subsidiaries and Professional Business Brokers, Inc. The purpose of such an arrangement is to provide a central payroll administration operation for the several different corporations parties to the agreement. In addition to advancing to TFC Management, Inc. the full payroll costs (including wage and salary expenses and payroll taxes), the Company, commencing October 1, 1990, pays TFC Management, Inc. $6,000 per month to cover general and administrative expenses and overhead, a portion of which may be deemed to be profit to TFC Management, Inc. TFC Management, Inc. is 100% owned by Professional Business Brokers, Inc. All of the outstanding capital stock of Professional Business Brokers, Inc. is owned by The Hoffenberg Family Trust. Steven Hoffenberg is the trustee of The Hoffenberg Family Trust. During the fiscal year ended June 30, 1990, the Company paid TFC Management, Inc. no

amounts in excess of the full payroll costs (including wage and salary expenses and payroll taxes).

The establishment of the terms of the agreements between the Company and PBB and the Company and TFC Management, Inc. involves conflicts of interest inasmuch as Steven Hoffenberg is a director and officer and is either directly or indirectly the controlling shareholder of each of the three companies. The Company did not actively consider entering into a payroll services agreement, such as the one it entered into with TFC Management, Inc., with an unaffiliated third party due to the desire to retain indirect control over the performance of such services. Inasmuch as no attempt was made to negotiate these agreements on an arm's-length basis, there is no assurance that the terms of such agreements are reflective of terms which would have resulted from arm's-length negotiations. In addition, PBB is engaged in other businesses and from time to time may take advantage of business opportunities that are complementary with or related to the business activities in which the Company is engaged. PBB has advised the Company that PBB will not engage in businesses that are in competition with the Company's business activities nor will it take advantage of business opportunities that belong to the Company unless those opportunities are first determined by Company management to be inconsistent with the Company's then-current business plan. Although no additional transactions between the Company and PBB are currently being negotiated, it is contemplated that PBB may, in the future, request the Company to provide financing for healthcare-related businesses it may acquire. Any such financing is expected to be on terms comparable to those the Company would provide to third parties under similar circumstances although, since such transactions, if consummated, would not be negotiated on an arm's-length basis, there is no assurance that the terms will be comparable to terms which would have resulted from arm's-length negotiations.

Mitchell Brater, Vice Chairman of the Board and Chief Operating Officer of the Company since November 1987, is the sole shareholder and President of Eton. Since October 1986 Eton has been the distributor, either exclusively or with other broker-dealers, of approximately $37,000,000 of the Company's or its subsidiaries' debt securities. Eton has received, for its own account, approximately $1,450,472 in commissions from such transactions. Eton did not receive any commissions from the Company or its subsidiaries during the fiscal years ended 1989 or 1990. On January 6, 1987, Mitchell Brater exercised a stock option to purchase 500,000 shares of the Company's Common Stock at $.50 per share and paid for such shares by delivering a $250,000 promissory note

to the Company the principal amount of which was paid in full on January 3, 1990. The Company forgave the interest on that promissory note which had been accruing at 10% per annum and amounted to approximately $74,800 as of January 3, 1990. The shares issued to Mr. Brater are subject to the Voting Trust Agreement described in footnote 2 to the table of beneficial ownership set forth in "Item 4. Security Ownership of Certain Beneficial Owners and Management."

Item 8. Legal Proceedings

The Company instituted a lawsuit in 1989 against Ernest M. Solomon ("Solomon") and others seeking rescission and damages in connection with the sale by Solomon to the Company of approximately 83% of the common stock of United Diversified Corporation ("UDC") in 1987. The Company alleges that it was defrauded by the defendants as a result of certain misrepresentations made in connection with the Company's acquisition of the UDC common stock and actions taken by Solomon subsequent to his sale of the UDC common stock. In April 1990, the defendants counterclaimed for compensatory damages in the amount of $15 million and punitive damages in an amount not less than $30 million for fraud and conversion by the Company, Steven Hoffenberg and others as a result of certain representations alleged to have been made in connection with the Company's acquisition of the UDC common stock and subsequent actions alleged to have been taken by Steven Hoffenberg, the Company and others (primarily, the alleged use of UDC assets for expenses not related to the business of UDC). The counterclaim also alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and seeks triple the amount of their actual damages, if any, as determined by the court. Both proceedings are pending before the United States District Court in the Northern District of Illinois. The Company's management believes that the counterclaim is without merit and that an adverse determination on matters other than damages would not result in a damage award which would have a material adverse effect on the Company. Towers Financial Corporation, et al. v. Ernest M. Solomon, et al., Case No. 89 C 0913 (N.D. Ill.)

On UDC's behalf, the Company is a claimant to certificates of deposit held by several banks in the principal amount of approximately $3.5 million plus interest, totalling approximately $4.1 million as of March 31, 1991. There are other claimants to the fund, including the Illinois Insurance Director and the Michigan Insurance Director in the latter's capacity as receiver of Cadillac Insurance Company, a company formerly controlled by Solomon. Pending further order by the United States District Court, the funds are

being retained by the banks. Cadillac Insurance Company v. The American National Bank of Schiller Park f/k/a/ First National Bank of Schiller Park, et al.; Case No. 89 C 3267.(N.D. Ill.).

The Company is involved in additional litigation arising out of its acquisition of the UDC stock. In 1988, the Illinois Insurance Director instituted liquidation proceedings against United Fire Insurance Company and Associated Life Insurance Company, two wholly owned UDC subsidiaries. After initially contesting the liquidation proceedings, the subsidiaries acquiesced to the Director's liquidation petitions. The Director also placed UDC into a conservatorship and petitioned for liquidation of UDC. UDC is contesting that petition on the basis that UDC is not an insurance company and, therefore, is not subject to liquidation or conservatorship under the Illinois Insurance Code. That action is still pending. In the UDC liquidation action, the Director has filed a petition to compel Mr. Hoffenberg to turn over to the Director certain assets allegedly belonging to UDC and the insurance companies totalling $2.9 million. Mr. Hoffenberg has denied the material allegations of the Petition and has alleged that all documents and property properly belonging to the purported conservator were turned over. In this and the other proceedings, Mr. Hoffenberg may be entitled to indemnification by the Company pursuant to its Bylaws and applicable Delaware Law. (See Item 12--"Indemnification of Directors and Officers.") People of the State of Illinois ex rel., John E. Washburn, etc. v. United Fire Insurance Company, et al.; Case No. 88 CH 6942 (Cir. Ct. Cook Cty. 88 CH 6942).

The Company, though counsel, has had discussion with the California Department of Consumer Affairs regarding alleged violations by Towers Collection Services of California, Inc. (a wholly-owned subsidiary of the Company) of certain California laws and regulations applicable to collection agencies. Based on these discussions, it is expected that the California Department of Consumer Affairs will, in the near future, issue an "Accusation" alleging that the collection agency license of the Company's California subsidiary is subject to disciplinary action as a result of violations of various sections of the California Business and Professions Code between August 1989 and June 1990, including alleged violations of provisions that require (i) all persons engaged in conduct as a collection agency in California to hold a valid collection agency license for each location at which such conduct is engaged, (ii) a licensee to render a written statement of account and remittance of all money then

due to each customer within 60 days after receipt of payment on any claim or account, (iii) a licensee to maintain accounts and records of transactions conducted in California at its address of record for a period of three years and (iv) faithful discharge of obligations regarding form attorney letters. It is also expected that simultaneously with the issuance of the Accusation, the Accusation will be dismissed with prejudice in exchange for entry of an Order against Towers' California subsidiary and the stipulation by the subsidiary that it is subject to the jurisdiction and requirements of the Bureau of Collection and Investigative Services of the Department of Consumer Affairs. Pursuant to the Order, it is expected that the collection agency license of Towers California subsidiary will be placed on administrative probation for three years on the following terms and conditions: (i) the subsidiary must obey all laws and regulations related to licensed collection agencies and debt collection, (ii) the records required to be maintained by the California Collection Agency Act must be reviewed by an independent certified public accountant in New York, (iii) access to the records required to be maintained in California must be provided to the Bureau upon demand, (iv) the Bureau must be paid approximately $31,200 for the costs it incurred, (v) the subsidiary must notify the Bureau if it ceases California operations and (vi) in the event the terms of the administrative probation are violated, the Bureau may, after notice and hearing, impose whatever discipline is appropriate and authorized by law.

Item 9. Market Price of and Dividends on the Registrant's Common Equity and Related Stockholder Matters

The Company's common stock is traded on the over-the-counter market, and the bid and actual prices thereof are reported by the National Quotation Bureau, Inc. in the "pink sheets." The following table shows the quarterly range of high and low bid prices for the Company's common stock, as reported by the National Quotation Bureau, Inc., during the periods indicated, and represents interdealer prices, which do not include retail mark-ups, markdowns, or any commission to the broker-dealer, and may not necessarily represent actual transactions. Due to the limited trading market for the Company's common stock and the absence of information concerning the Company on file with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended, the stock prices in the following table may not be representative of the prices which may prevail in a more active trading market with greater access to information of the type required to be provided by companies with securities registered under the Securities Exchange Act of 1934, as amended.

| | High | Low |
|---|---|---|
| July-September 1988 | $ 5.50 | $4.00 |
| October-December 1988 | $ 3.75 | $3.00 |
| January-March 1989 | $ 5.62 | $4.50 |
| April-June 1989 | $ 5.50 | $4.00 |
| July-September 1989 | $ 5.38 | $4.69 |
| October-December 1989 | $ 9.00 | $4.75 |
| January-March 1990 | $10.25 | $8.50 |
| April-June 1990 | $ 9.50 | $7.50 |
| July-September 1990 | $10.00 | $8.00 |
| September-December 1990 | $ 8.25 | $7.00 |
| January-March 1991 | $8.00 | $7.50 |

As of October 8, 1990, the Company's common stock was held of record (as that term is defined in Securities and Exchange Commission Rule 12g5-1 under the Securities Exchange Act of 1934, as amended) by approximately 73 persons. As of that same date, the Company estimates that its common stock was beneficially owned (as that term is defined in Securities and Exchange Commission Rule 13d-3 under the Securities Exchange Act of 1934, as amended) by approximately 580 persons.

The Company has paid no dividends since its inception. The Company currently anticipates that all of its earnings will be retained for use in the operation and expansion of its business and does not intend to pay any cash dividends on its common stock in the forseeable future. Any future determination as to the payment of cash dividends will depend upon the earnings and financial position of the Company and such other factors as the Board of Directors may deem appropriate.

As described in Item 7, "Certain Relationships and Related Transactions", the Company has agreed to issue to PBB an option to acquire 400,000 shares of the Company's common stock each year through June 30, 1996 (for an aggregate of 2,000,000 shares) at a price of $1.00 per share. As of December 31, 1990, 3,810,520 shares of the Company's common stock were owned by persons who are deemed "affiliates" of the Company for purposes of Rule 144 and, subsequent to December 31, 1987, the Company had issued 300,000 shares of its common stock to nonaffiliates in transactions not involving a public offering.

Item 10. Recent Sales of Unregistered Securities

Healthcare Receivables-Backed Bonds—Series 1990A. On November 27, 1990, a wholly owned subsidiary of the Company, Towers Healthcare Receivables Funding Corporation-II, issued $41,500,000 of Healthcare Receivable-Backed Bonds—Series 1990A at par. The Bonds were rated "AA" by Duff & Phelps Credit Rating Co. and were sold by selected NASD member brokerage firms to institutional investors pursuant to the exemption from registration under the Act, as amended (the "Act"), set forth in Section 4(2) thereof.

Recourse Promissory Notes-1990/1991. The Company is currently offering up to $100,000,000 of its Recourse Promissory Notes at par pursuant to a Confidential Private Offering Document dated October 1, 1990. As of March 31, 1991, $19,145,000 of Notes have been issued pursuant to this offering. The Notes are unrated and are being offered by the Company and selected NASD member brokerage firms to institutional investors pursuant to the exemption from registration under the Act set forth in Section 4(2) thereof.

Healthcare Receivable-Backed Bonds. On July 19, 1990, a wholly owned subsidiary of the Company, Towers Healthcare Receivables Funding Corporation, issued $56,500,000 of Healthcare Receivable-Backed Bonds at par. The Bonds were rated "AA" by Duff & Phelps Credit Rating Co. and were sold by selected NASD member brokerage firms to institutional investors pursuant to the exemption from registration under the Act set forth in Section 4(2) thereof.

Recourse Promissory Notes-1990. The Company has issued through September 30, 1990 an aggregate of $49,983,800 of its Recourse Promissory Notes at par pursuant to a Confidential Private Offering Document dated February 20, 1990. The Notes are unrated and were sold by the Company and selected NASD member brokerage firms to institutional investors pursuant to the exemption from registration under the Act set forth in Section 4(2) thereof.

Insured Over-Collateralized Guaranteed Class A Bonds. The Company has issued an aggregate of $1,200,000 of its Insured Over-Collateralized Guaranteed Class A Bonds at par pursuant to an Offering Circular dated July 1, 1989. The Bonds are unrated and are being sold to nonresidents of the United States by the Company. Inasmuch as the Bonds are being offered and sold to nonresidents of the United States, the Company has not registered the offer and sale of the Bonds under the Act due to the inapplicability of the Act to such offers and sales.

Recourse Promissory Notes-1989. The Company has issued through February 15, 1990 an aggregate of $50,000,000 of its Recourse Promissory Notes at par pursuant to a Confidential Private Offering Document dated February 15, 1989. The Notes were unrated and were sold by the Company and selected NASD member brokerage firms to "accredited investors," as that term is defined in Rule 501 under the Act, pursuant to the exemption from registration under the Act set forth in Section 4(2) thereof.

Secured Recourse Non-Negotiable Promissory Notes-1988. A wholly owned subsidiary of the Company, Towers Credit Corporation, has issued through August 4, 1988 an aggregate of $22,000,000 of its Secured Recourse Non-Negotiable Promissory Notes at par pursuant to a Confidential Private Placement Memorandum dated January 20, 1988. The Notes were unrated and were sold by selected NASD member brokerage firms. Although the Company believed that the offer and sale of the Notes was exempt from registration under the Act pursuant to Section 4(2) thereof, the Securities and Exchange Commission alleged that certain requirements for the exemption were not met. The Company and certain of its officers and directors consented to the entry of an injunctive order and agreed to offer rescission to the Note purchasers in order to resolve the allegations made by the Securities and Exchange Commission. Holders of $445,000 in principal amount of the Notes accepted the offer of rescission.

Common Stock. In October 1990, the Company issued 50,000 shares of common stock each to Martin H. Meyerson and Kenneth J. Koock in consideration for financial consulting services rendered to the Company by Messrs. Meyerson and Koock. In February 1991, the Company issued 100,000 shares of common stock each to Thomas Evans and Ben Barnes primarily in consideration for services rendered by Messrs. Evans and Barnes as Directors of the Company. In March 1991, the Company issued 100,000 shares of common stock to Mr. DiNicolas pursuant to the exercise by Mr. DiNicolas of an option to acquire such stock, which option was granted in January 1991, as described under Item 6 -- "Executive Compensation." In May 1991, the Company issued 100,000 shares of common stock to Charles Chugerman in consideration for services rendered by Mr. Chugerman as a Vice President of the Company. All of these shares were issued by the Company pursuant to the exemption from registration under the Act set forth in Section 4(2) thereof.

41

Item 11. Description of Registrant's Securities To Be Registered

The authorized capital stock of the Company consists of 100,000,000 shares of common stock, par value $.001 per share. As of March 31, 1991, there were 4,900,000 shares of common stock outstanding.

Holders of shares of common stock are entitled to one vote per share in all matters to be voted on by stockholders, and are entitled to dividends and other distributions as and when declared by the Board of Directors out of assets legally available therefor. The vote of the holders of a majority of shares of common stock is required for the stockholders to take any corporate action. Upon the liquidation, dissolution or winding up of the Company, the holders of common stock are entitled to share pro rata in the distribution of all of the Company's assets, subject to the existing claims of creditors. The holders of common stock have no preemptive or preferential rights to purchase shares of common stock, and they are not entitled to the benefits of any sinking fund provisions. Shares of common stock are no subject to any redemption provisions, and are not convertible into any other security or other property of the Company. All outstanding shares of common stock are fully paid and nonassessable.

The transfer agent and registrar for the Company's common stock is The Chase Manhattan Bank, N.A.

Item 12. Indemnification of Directors and Officers

The Company's Bylaws provide as follows:

> The Corporation shall indemnify each of its Directors and officers, whether or not then in office (and his or her executor, administrator and heirs), against all reasonable expenses, including attorneys' fees, judgements and fines, actually and necessarily incurred by him or her in connection with the defense of any litigation to which he or she may have been made a party because he or she is or was a Director or officer of the Corporation. He or she shall have no right to reimbursement, however, in relation to any matter to which he or she has been adjudged liable to the Corporation for gross negligence or culpable misconduct in the performance of his or her duties. The right to indemnify for expenses shall also apply to the expenses of suits which are compromised if the court having jurisdiction of the matter shall

42

> approve such settlement. The foregoing right of indemnification shall be in addition to all other rights to which such Director or officer may be entitled, pursuant to the Delaware General Corporation Law.

The Company maintains a directors and officers insurance policy with National Union Fire Insurance Company of Pittsburgh, Pennsylvania.

Item 13. Financial Statements and Supplementary Data

**MARVIN E. BASSON**
CERTIFIED PUBLIC ACCOUNTANT
[illegible] WINDING LANE
UPPER BROOKVILLE, N.Y. 11545
(516) [illegible]

We have audited the accompanying consolidated balance sheet of Towers Financial Corporation and subsidiaries as of June 30, 1990, 1989 and 1988 and the related consolidated statements of income, changes in shareholders' equity, retained earnings, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Towers Financial Corporation as of June 30, 1990, 1989 and 1988, and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles.

As discussed in Note 1 to the consolidated financial statements, the Company changed its method of recording gross revenues.

Sincerely,

Marvin E. Basson, CPA, P.C.
New York, New York
May 7, 1991

CONSOLIDATED BALANCE SHEET:

| Assets | As of June 30, 1990 | 1989 | 1988 |
|---|---|---|---|
| Accounts Receivable (Note 3) | $177,155,446 | $112,331,892 | $61,270,590 |
| Investments (Note 4) | 2,805,500 | 3,376,241 | 3,600,000 |
| Cash and Cash Equivalents | 9,193,566 | 3,825,765 | 8,534,869 |
| Other Receivables | 1,061,555 | 130,354 | 1,600,014 |
| Note Receivable - Officer | - | 250,000 | 250,000 |
| Property and Equipment - Net | 3,574,494 | 1,098,163 | 660,211 |
| Security Deposits | 515,812 | 662,913 | 304,979 |
| Prepaid Interest | 797,563 | 421,436 | - |
| Excess of Cost over Fair Value of Assets Acquired From Majority Shareholder (Notes 1, 2 and 12) | 458,414 | | |
| Excess of Fair Value of Assets Acquired From Majority Stockholder over Cost (Notes 2 and 12) | - | (365,471) | (625,471) |
| Total Assets | $195,562,350 | $121,731,293 | $ 75,595,192 |
| **Liabilities** | | | |
| Due to Clients | $ 64,880,237 | $ 52,501,911 | $ 31,606,396 |
| Notes Payable (Note 5) | 92,178,894 | 48,599,658 | 30,605,000 |
| Loan Payable (Notes 6 and 7) | 3,328,133 | 1,082,447 | 168,145 |
| Accounts Payable and Accrued Expenses | 7,185,666 | 1,860,188 | 2,338,679 |
| Income Taxes Payable (Note 8) | 13,725,633 | 6,584,201 | 2,385,750 |
| Deferred Income Taxes Payable (Note 8) | 841,850 | 1,683,700 | 2,558,150 |
| Total Liabilities | 182,140,413 | 112,312,105 | 69,662,120 |
| **Stockholders' Equity** | | | |
| Common Stock, $.001 Par Value: 100,000,000 Shares Authorized: Shares Issued and Outstanding: 4,600,000 in 1990, 4,500,000 in 1989 and 1988 | 4,600 | 4,500 | 4,500 |
| Additional Paid in Capital | 445,400 | 345,500 | 345,500 |
| Retained Earnings | 12,971,937 | 9,069,188 | 5,583,072 |
| Total Stockholders' Equity | 13,421,937 | 9,419,188 | 5,933,072 |
| Total Liabilities and Stockholders' Equity | $195,562,350 | $121,731,293 | $75,595,192 |

3407t/7408o

45

CONSOLIDATED STATEMENT OF INCOME

| | Fiscal Year Ended June 30, 1990 | 1989 | 1988 |
|---|---|---|---|
| Gross Revenues | $74,442,718 | $53,269,068 | $43,575,767 |
| Operating Expenses | | | |
| Interest on Notes | 10,456,292 | 6,868,423 | 2,457,833 |
| Salaries and Benefits | 14,012,973 | 9,487,151 | 5,660,552 |
| Selling | 7,558,382 | 4,552,053 | 2,633,698 |
| General and Administrative | 32,212,322 | 25,548,339 | 29,754,287 |
| | 64,239,969 | 46,455,966 | 40,506,370 |
| Income Before Provision for Income Taxes | 10,202,749 | 6,813,102 | 3,069,397 |
| Provision for Income Taxes (Note 8) | 6,300,000 | 3,326,986 | 1,655,900 |
| Net Income | $ 3,902,749 | $ 3,486,116 | $ 1,413,497 |
| Earnings per Share (Note 10) | $ 0.86 | $ 0.78 | $ 0.31 |

3407t/7408a

46

Towers Financial Corporation
Consolidated Statement of Cash Flows
Year Ended June 30,

| | 1990 | 1989 | 1988 |
|---|---|---|---|
| Cash Flows From Operating Activities: | | | |
| Net Earnings: | $ 3,902,749 | $ 3,486,116 | $ 1,413,497 |
| Adjustments to Reconcile Net Earnings to Net Cash Provided by Operating Activities: | | | |
| Depreciation and Amortization | 412,556 | 220,908 | 218,889 |
| Accounts Payable, Accrued Expenses and Other | 5,325,478 | (478,491) | 1,572,844 |
| Deferred Income Taxes and Income Taxes Payable | 6,299,582 | 3,324,001 | 1,655,900 |
| Payables Due to Clients | 12,378,326 | 20,895,515 | (3,270,537) |
| Net Cash Provided by Operating Activities | 28,318,691 | 27,448,049 | 1,590,593 |
| Cash Flows From Investing Activities | | | |
| Finance Receivables Acquired | (151,436,279) | (80,787,549) | (60,686,677) |
| Finance Receivables Principal Collected | 86,612,725 | 29,726,247 | 43,735,649 |
| Purchase Property and Equipment | ( 2,888,887) | ( 658,860) | ( 522,138) |
| Proceeds From Disposition/Acquisition of Fixed Assets and Investment | 570,741 | 223,759 | ( 3,600,000) |
| Installment Payment for Acquisition of Stock in Subsidiaries | ( 823,885) | (260,000) | (246,241) |
| Other | ( 1,160,227) | 690,290 | ( 1,459,550) |
| Net Cash (Used) in Investing Activities | ( 69,125,812) | (51,066,113) | (22,778,957) |
| Cash Flows From Financing Activities | | | |
| Proceeds From Notes Payable | 45,824,922 | 18,908,960 | 26,142,612 |
| Proceeds From Collection of Note Receivable - Officer | 250,000 | - | - |
| Proceeds From Stock Subscription | 100,000 | - | - |
| Net Cash Provided by Financing Activities | 46,174,922 | 18,908,960 | 26,142,612 |
| Net Increase (Decrease) in Cash and Cash Equivalents | 5,367,801 | ( 4,709,104) | 4,954,248 |
| Cash and Cash Equivalents - Beginning of Fiscal Year | 3,825,765 | 8,534,869 | 3,580,621 |
| Cash and Cash Equivalents - End of Fiscal Year | $ 9,193,566 | $ 3,825,765 | $ 8,534,869 |

3407t/7408a

Towers Financial Corporation
Consolidated Statement of Changes in Stockholders' Equity

| | Common Stock and Additional Paid In Capital | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|
| Balance at 6/30/87 | $ 350,000 | $ 4,169,575 | $ 4,519,575 |
| Net Income | | 1,413,497 | 1,413,497 |
| Balance at 6/30/88 | 350,000 | 5,583,072 | 5,933,072 |
| Net Income | | 3,486,116 | 3,486,116 |
| Balance at 6/30/89 | 350,000 | 9,069,188 | 9,419,188 |
| Issuance of Common Stock | 100,000 | | 100,000 |
| Net Income | | 3,902,749 | 3,902,749 |
| Balance at 6/30/90 | $ 450,000 | $12,971,937 | $13,421,937 |

**NOTES TO FINANCIAL STATEMENTS**
For the Year Ended June 30, 1990

1. Summary of Significant Accounting Policies.

Basis of Presentation

Towers Financial Corporation (formerly known as O. G. Consulting Corp., incorporated in 1983) is a diversified company operating in the acquisition and management of accounts receivable directly and through its wholly owned subsidiaries, Towers Credit Corporation, Towers Collection Service, Inc., Towers Leasing Corporation, TFC Funding Corporation and Towers Healthcare Receivables Funding Corporation.

Towers Financial Corporation formed Towers Diversified Corporation, a wholly owned subsidiary, in October 1987 to acquire United Diversified Corporation. (See Note 4.)

Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation were acquired by Towers Financial Corporation in July 1986. The financial statements for each subsidiary were independently audited and have been consolidated for presentation herein. Each of the consolidated subsidiaries is wholly-owned by Towers Financial Corporation. The subsidiaries were incorporated as follows:

| | |
|---|---|
| Towers Credit Corporation | October 1982 |
| Towers Collection Service, Inc. | April 1980 |
| Towers Leasing Corporation | March 1985 |
| TFC Funding Corporation | November 1989 |
| Towers Healthcare Receivables Funding Corporation | March 1990 |

Towers Collection Service, Inc. succeeded to the business of Transcon Adjustment Group Ltd., which was founded in 1975.

Operations and Consolidations

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries (except for United Diversified Corporation, see Note 4) after elimination of material intercompany accounts and transactions.

Statement of Cash Flows

In 1987, the Company adopted Statement of Financial Accounting Standard No. 95, "Statement of Cash Flows," and is

presenting a statement of cash flows using the indirect method in accordance with AICPA Audit Guide--Audits of Financial Companies, in place of the statement of changes in financial position.

FAS 95 requires that the following supplemental disclosures to the statement of cash flows be provided in related disclosures. Cash paid for interest was $12,320,486 in 1990, $6,727,987 in 1989 and $2,264,696 in 1988. Cash paid for income taxes was none in 1990, 1989 and 1988.

Revenue Recognition

The consolidated statement of income reflects a recasting of the Company's revenue and costs when compared with the previously published financial statements. However, the recasting has no effect on reported net income.

Previously, the Company had included in gross revenue the face value of accounts receivable which were either acquired by the Company's factoring subsidiary or were irrevocably assigned to the Company's collection subsidiary. In computing gross profit the Company deducted the projected amounts for payments due to clients, the costs of collection and the uncollectible portions of the receivables.

As a result of the recasting of the figures, the Company now reflects in gross income only that portion of the receivables that the Company reasonably expects it will retain. The costs of collection previously deducted in arriving at gross profit are now reflected as part of general and adminstratvie expenses and the projected amounts due to client no longer enter into the calculation.

The factoring operation consists of purchasing, from healthcare providers, receivables owed by major insurance companies, Medicare, Medicaid, Blue Cross/Blue Shield, workmen's compensation, health maintenance organizations, unions and corporate payors of healthcare, and commercial accounts receivable (goods sold and delivered and work, labor and services purchased from companies extending credit to other companies). The fees for the factoring operation are recognized on the purchase of the receivable.

The Company's fees for its collection services are recorded on the assignment of the account to the Company at a contingent fee rate. Actual Fees vary with the nature and volume of service performed and are dependent on contract terms.

Income on RTC/FDIC loans is recognized as they are collected.

Property and Equipment

Property and equipment are stated at cost and are depreciated using the straight-line method over the estimated useful lives of assets, ranging from three to five years.

Leasehold improvements are amortized over the term of the lease or the estimated life of the improvement, whichever is shorter. Maintenance and minor repairs are charged to operations as incurred.

Goodwill

The Company intends to amortize goodwill over 40 years in accordance with APB 16.

Accounting Change

The Company has changed its method of reporting income taxes. (See Note 8.)

Cash and Cash Equivalents

The Company treats all assets that qualify as cash equivalents under FAS Statement 95 as cash equivalents.

Capital Leases

The Company has leases with GE Capital Corporation (RCA Services Company) for telephone equipment. The leases provide for monthly payments of $13,522.69 for 10 years, ending in fiscal year 1998.

The Company has a lease with BLT Leasing Company for computer equipment. The lease provides for monthly payments of $4,002.87 for five years, ending in fiscal year 1993.

The Company has a lease with Atlantic Computer Corporation for computer equipment. The lease provides for monthly payments of $13,244.39 for seven years, ending in fiscal year 1997.

2. Acquisition.

The Company acquired 80% of the common stock of Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation from Professional Business Brokers, Inc. in July 1986. (See Note 12.)

In fiscal year 1987, the Company acquired the remaining 20% of the common stock of these corporations from Professional Business Brokers, Inc. In consideration for the common stock and the waiver by Professional Business Brokers, Inc. of a portion of the amounts due to Professional Business Brokers, Inc. in prior years, the Company and Professional Business Brokers, Inc. have agreed that the Company will pay 5% of its gross profits before expenses and before provision for taxes for a period of seven years, commencing July 1, 1988, to Professional Business Brokers, Inc.

The following table identifies the amounts owed and paid to Professional Business Brokers, Inc. by the Company for the three years ended June 30, 1990:

| Fiscal Year Ended June 30 | Amount Owed | Amount Paid |
|---|---|---|
| 1990 | $2,792,142 | $823,885 |
| 1989 | 1,817,372 | 260,000 |
| 1988 | 1,029,420 | 246,241 |

Professional Business Brokers, Inc. waived the difference between the amount paid and the amount owed with respect to the fiscal year ended June 30, 1988 and has agreed to defer the payment of such difference with respect to the fiscal years ended June 30, 1990 and 1989. The Company is presently revising the terms of its agreement with Professional Business Brokers, Inc. The final cost is still to be determined.

3. Accounts Receivable.

Accounts receivable consists of the following major categories of receivables:

| | As of June 30 | | |
|---|---|---|---|
| | 1990 | 1989 | 1988 |
| Collection and Commercial Accounts | $163,769,335 | $112,331,892 | $61,270,590 |
| Healthcare Accounts | 13,386,111 | | |
| | $177,155,446 | $112,331,892 | $61,270,590 |

4. Investments.

The Company acquired an 82% interest in United Diversified Corporation ("UDC"), an insurance holding company, in 1987. Within six months of the acquisition, UDC was placed into receivership by the Illinois Insurance

Director, and the Company thereupon ceased to have access to information concerning the financial condition of UDC. The Company's investment in UDC, $2,805,500, is presented at cost. The Illinois Insurance Director has instituted a legal action to take possession of all assets of UDC. Management believes that the Illinois Insurance Director will not prevail and that the Company will ultimately be determined to be entitled to all assets of UDC, in which case the Company would experience no loss on this investment. Conversely, if the Illinois Insurance Director does prevail, the Company would sustain a total loss of this investment subject to possible recovery in a currently pending action for rescission of its acquisition of UDC.

5. Notes Payable

The Company's factoring and portfolio acquisition businesses require substantial capital to fund the portion of the purchase price payable upon acquisition of the receivables. The amount of capital required is dependent on the volume of business the Company generates and how quickly the receivables can be collected, thereby providing funds for further purchases. The Company has funded its factoring and portfolio acquisition capital requirements primarily through the sale of debt in the capital markets.

The following table provides certain information concerning certain outstanding debt of the Company and its subsidiaries as of June 30, 1990:

| Name of Issue | Type of Issue | Outstanding | Maturity | Per Annum Interest Rates | Collateral |
|---|---|---|---|---|---|
| Secured Recourse Nonnegoitable Promissory Notes--1988 | Private Placement-- Capital Markets | $12,735,000 | 2 years | 18% | Commercial Accounts Receivable acquired with the proceeds of the Notes |
| Various Bank Lines | Commercial Loans | $ 1,365,000 | (A) | 16% and 18% (B) | Commercial Accounts Receivable acquired with the proceeds of the loans |
| Insured Over-Collarteralized Class A Bonds | Foreign Placement-- Capital Markets | $ 1,193,094 | (C) | (C) | Healthcare Accounts Receivable acquired with the proceeds of the Notes |
| Recourse Promissory Notes-1989 | Private Placement-- Capital Markets | $50,682,600 | (A) | 14% and 16% (B) | Healthcare and Business Accounts Receivable acquired with the proceeds of the Notes |
| Recourse Promissory Notes-1990 | Private Placement-- Capital Markets | $16,203,200 | (A) | 13% and 15% (B) | Healthcare and Business Accounts Receivable acquired with the proceeds of the Notes |
| Promissory Notes-Bank of Cape Verde | Commercial Loan | $10,000,000 | 2 years | 15% and 18% (D) | Healthcare and Business Accounts Receivable acquired with the proceeds oth the Notes. |

(A) Investors elected maturities of either one or two years. At maturity, this Company, has, in the past, given purchasers of the Secured Recourse Non-Negotiable Promissory Notes, the Insured Over-Collateralized Class A Bonds, the Recourse Promissory Notes-1989 and the Recourse Promissory Notes-1990 the ability to reinvest the proceeds through the purchase of the promissory notes then being offered by the Company at the interest rate in effect at the time the investor initially invested.

(B) The one-year debt carried the lower of the two interest rates. The two-year debt carried the higher of the two interest rates.

(C) Interest rates were privately negotiated between the Company and the investors and ranged from 11% to 15% per annum. Original maturities ranged from one to five years.

(D) The first $3,000,000 bears interest at 18% per annum, and the remainder bears interest at 15% per annum.

6. Long-Term Debt.

The Company's long-term debt includes a bank loan with a remaining principal balance of $1,513,209 of which $1,357,834 is categorized as long-term. The loan is secured by equipment, bears interest at 11.25% per annum and matures in October 1996. The remaining long-term debt consists of the long-term portion of the Company's capital lease obligations to GE Capital Corporation (RCA Services Company), Atlantic Computer Corporation and BLT Leasing Company which long-term portion aggregates $1,599,813. See Note 7.

7. Leases.

The Company leases all office space utilized by the Company and substantial portions of its equipment. The Company's corporate headquarters in New York City occupy approximately 100,000 gross square feet for which the Company pays $1,820,875 annually (subject to adjustment for increases or decreases in the landlord's taxes and costs of providing certain building services) pursuant to subleases which expire in 1996. The Company's regional sales offices are all leased for one or two years or are rented on a month-to-month tenancy with annual rental payments aggregating $265,525.

The following is an analysis of the Company's capital leases:

| | Balance | | |
|---|---|---|---|
| | June 30, 1990 | June 30, 1989 | June 30, 1988 |
| Equipment | $1,327,989 | $828,549 | $357,950 |
| Less: Accumulated Depreciation | 307,225 | 166,733 | 90,249 |
| | $1,020,764 | $661,816 | $367,701 |

The following is a schedule by years of future lease payments under capital leases:

| Year Ending June 30 | |
|---|---|
| 1991 | $ 369,239 |
| 1992 | 369,239 |
| 1993 | 329,212 |
| 1994 | 321,205 |
| 1995 | 321,205 |
| 1996 | 321,205 |
| Later Years | 276,070 |
| Total payments | $2,307,375 |

55

| | |
|---|---|
| Less: Amount representing estimated executory costs (such as taxes, maintenance and insurance), including profit thereon, included in total minimum lease payments | $ 396,302 |
| Net lease payments | $1,911,073 |
| Less: Amount representing interest | $ 797,563 |
| Present value of net lease payments | $1,113,510 |

The Company's operating leases all expire during the year ending June 30, 1992 and the future rental payments required under those leases aggregate $566,736 for each of the next two fiscal years.

8. Income Taxes.

Statement of Financial Accounting Standards No. 96, "Accounting for Income Taxes," was issued in December 1987 and is presently being revised and establishes financial accounting and reporting standards for the effects of income taxes which result from an enterprise's activities during the current and preceding years. The Company was not required to adopt this statement until its year ending June 30, 1990, although earlier adoption is permitted. When adopted, the Company is given the choice of reflecting the effect of the change in the year of adoption or of restating any number of years.

Accordingly, the Company has elected to adopt Statement of Financial Accounting Standards No. 96 for the current fiscal year. Since the Company had not previously recognized any deferred tax assets, the financial statements were not affected.

Deferred income taxes resulted from the previous use of the cash method of accounting for tax purposes, and are decreasing pursuant to the phase-in permitted by the Tax Reform Act of 1986.

Towers Financial Corporation's Income Tax Rate for 1990, 1989 and 1988 (computed by applying the U.S. federal income tax rate of 34% to income before income taxes) differs from the actual effective income tax rate as a result of the following:

56

| | 1990 | 1989 | 1988 |
|---|---|---|---|
| Tax at Statutory Rate | 34.000% | 34.000% | 34.000% |
| Plus: State and Local Taxes, Net of Federal Benefit | 4.512 | 13.166 | 16.636 |
| Plus: Nondeductible Interest and Penalties | 23.540 | 01.666 | 03.313 |
| | 62.052% | 48.832% | 53.949% |

9. Stock Options

On August 7, 1987, the Company granted Martin H. Meyerson and Kenneth J. Koock a right to purchase 50,000 shares each of the Company's common stock, at a price of $1 per share, in consideration for certain investment banking services rendered to the Company. These options were fully exercised during the year ended June 30, 1990.

10. Earnings Per Share

The earnings per share are based on a weighted average common shares outstanding of 4,529,315 in 1990, and 4,500,000 in 1989 and 1988.

11. Commitments.

See Note 2 relating to the acquisition of Towers Credit Corporation, Towers Collection Service, Inc. and Towers Leasing Corporation.

12. Related Parties.

Professional Business Brokers, Inc. owns in excess of 70% of the Company's issued and outstanding stock. See Note 2 for details of the transaction between the Company and Professional Business Brokers, Inc.

13. Subsequent Events.

On July 17, 1990, Towers Healthcare Receivables Funding Corporation, a wholly owned subsidiary of the Company, issued $56.5 million of debt maturing on July 15, 1992 (subject to extension at the option of each debt holder to November 15, 1993) bearing interest at 10.2% per annum (and interest, during any extended maturity period, at 200 basis points over the interest rate on two-year U.S. Treasury Notes immediately

preceding November 15, 1991). The debt was privately placed with institutional investors and is secured by healthcare accounts receivable sold to Towers Healthcare Receivables Funding Corporation by the Company, the purchase price of which was paid with the proceeds of the debt issue.

The Company is not liable on the debt of Towers Healthcare Receivables Funding Corporation, but does act as the servicer of the accounts receivable owned by the issuing subsidiary. The healthcare accounts receivable securing the debt of Towers Healthcare Receivables Funding Corporation are not available to creditors of the Company or other subsidiaries of the Company.

UNAUDITED CONSOLIDATED BALANCE SHEET:

| Assets | As of December 31, 1990 | 1989 |
|---|---|---|
| Accounts Receivable | $203,213,086 | $118,551,693 |
| Investments | 2,805,500 | 3,376,659 |
| Cash and Cash Equivalents | 68,730,276 | 6,211,300 |
| Other Receivables | 1,488,702 | 152,885 |
| Note Receivable - Officer | | 250,000 |
| Prepaid Interest | 1,142,021 | 430,550 |
| Property and Equipment-Net | 3,636,114 | 3,228,123 |
| Security Deposits | 487,176 | 452,176 |
| Excess of Cost over Fair Value of Assets Acquired from Majority Stockholder | 442,162 | |
| Excess of Fair Value of Assets Acquired From Majority Shareholder Over Cost | | (328,677) |
| Total Assets | $281,945,037 | $132,324,709 |
| **Liabilities** | | |
| Due to Clients | $ 31,451,332 | $ 42,514,669 |
| Bonds and Notes Payable (Note 3) | 220,949,357 | 64,183,243 |
| Loans Payable | 3,178,366 | 2,618,654 |
| Accounts Payable and Accrued Expenses | 8,409,685 | 1,607,392 |
| Income Taxes Payable | 2,569,258 | 8,402,686 |
| Deferred Income Taxes Payable | | 1,683,700 |
| Total Liabilities | $266,557,998 | $121,010,344 |
| **Stockholders' Equity** | | |
| Common Stock, $.001 Par Value; 100,000,000 Shares Authorized; Shares Issued and Outstanding: 4,600,000 in 1990 and 4,500,000 in 1989 | 4,600 | 4,500 |
| Additional Paid in Capital | 445,400 | 345,500 |
| Retained Earnings | 14,937,039 | 10,964,365 |
| Total Stockholders' Equity | 15,387,039 | 11,314,365 |
| Total Liabilities and Stockholders' Equity | $281,945,037 | $132,324,709 |

UNAUDITED CONSOLIDATED STATEMENT OF INCOME

| | Six Months Ended December 31, 1990 | 1989 |
|---|---|---|
| Gross Revenues | $41,429,391 | $22,612,913 |
| Operating Expenses | | |
| Interest on Notes | 12,368,617 | 4,590,210 |
| Salaries and Benefits | 9,183,052 | 6,134,267 |
| Selling | 4,388,810 | 1,097,296 |
| General and Administrative | 12,086,138 | 7,075,163 |
| | $38,026,617 | $18,896,936 |
| Income Before Provision For Income Taxes | $3,402,774 | $3,715,977 |
| Provision for Income Taxes | 1,437,672 | 1,820,800 |
| Net Income | $ 1,965,102 | $ 1,895,177 |
| Earnings Per Share | $ 0.43 | $ 0.42 |

3407t/7408a

CONSOLIDATED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY

| | Common Stock and Additional Paid In Capital | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|
| Balance at June 30, 1989 | $ 350,000 | $ 9,069,188 | $ 9,419,188 |
| Net Income | | 1,895,177 | 1,895,177 |
| Balance at December 31, 1989 | $350,000 | $10,964,365 | $11,314,365 |
| Balance at June 30, 1990 | $450,000 | $12,971,937 | $13,421,937 |
| Net Income | | 1,965,102 | 1,965,102 |
| Balance at December 31, 1990 | $ 450,000 | $14,937,039 | $15,387,039 |

3407t/7408a

Notes to Financial Statements
for the Six Months Ended December 31, 1990

1. The consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries (except for United Diversified Corporation).

These financial statements should be read in conjunction with the consolidated financial statements included in the Company's 1990 Annual Report to shareholders and Form 10.

The information furnished herein reflects all adjustments, which consists only of normal recurring accruals, which are, in the opinion of management, necessary to reflect a fair statement of the results for the interim period.

2. Earnings per share are based on a weighted average common shares outstanding of 4,600,000 in 1990 and 4,500,000 in 1989.

3. On November 27, 1990, Towers Healthcare Receivables Funding Corporation-II, a wholly owned subsidiary of the Company, issued $41.5 million of debt maturing on December 15, 1993, bearing interest at 9.75% per annum. The debt was privately placed with institutional investors and is secured by healthcare accounts receivable acquired by Towers Healthcare Receivables Funding Corporation-II from the Company with the proceeds of the debt issue.

The Company is not liable on the debt of Towers Healthcare Receivables Funding Corporation-II, but does act as the servicer of the accounts receivable owned by Towers Healthcare Receivables Funding Corporation-II.

Item 14. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure. None.

Item 15. Financial Statements and Exhibits

a. Financial Statements filed as part of the Registration Statement:

Consolidated Balance Sheets as of June 30, 1988, 1989 and 1990.

Consolidated Statements of Income for the fiscal years ended June 30, 1988, 1989 and 1990.

Consolidated Statements of Retained Earnings as of June 30, 1988, 1989 and 1990.

Consolidated Statements of Cash Flows, Increase (Decrease) in Cash and Equivalents for the fiscal years ended June 30, 1988, 1989 and 1990.

Notes to Financial Statements.

Unaudited Consolidated Balance Sheet as of December 31, 1990

Unaudited Consolidated Statement of Income as of December 31, 1990

Unaudited Consolidated Statement of Retained Earnings as of December 31, 1990

Statement of Changes in Stockholders' Equity

b. Exhibits

(3) Articles of Incorporation and Bylaws.

(4) (a) Form of Promissory Note and Form of Security Agreement for Recourse Promissory Notes (1990);

(b) Trust Indenture, dated as of July 1, 1990, by and between Towers Healthcare Receivables Funding Corporation and The Connecticut National Bank relating to the Healthcare Receivables Backed Bonds;

(c) Form of Non-Negotiable Recourse Promissory Note and Form of Security Agreement for Recourse Promissory Notes (1989).

(d) Trust Indenture, dated as of November 1, 1990, by and between Towers Healthcare Receivables Funding Corporation--II and the Connecticut National Bank relating to the Healthcare Receivables Backed Bonds--Series 1990A.

(e) Form of Promissory Note and Form of Security Agreement for Recourse Promissory Notes (1990/1991).

(9) Voting Trust Agreement between Mitchell Brater and Sovereign Holdings, Ltd., dated December 20, 1989.

(10) (a) Sublease Agreements between Towers Financial Corporation and Associated Dry Goods Corporation with respect to space at 417 Fifth Avenue, New York, New York;

(b) Agreements between Towers Financial Corporation and Professional Business Brokers, Inc. dated July 9, 1986 and [ ], 1991;*

(c) Payroll Services Agreement among TFC Management, Inc., Towers Leasing Corporation, Towers Credit Corporation, Towers Collection Services, Inc., and Towers Financial Corporation dated [ ], 1991.*

(d) Stock Option granted by Towers Financial Corporation to Mr. Anthony DiNicolas dated January 4, 1991.

(22) List of Subsidiaries of the Company is incorporated by reference to Footnote 1 of Notes to Financial Statements.

(28) (a) Form of commercial accounts receivable purchase agreement.

(b) Form of purchase contract for acquisition of a loan portfolio.

(c) Form of Franchise Agreement.*

*To be filed by amendment.

SIGNATURES

Pursuant to the requirements of Section 12 of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized.

TOWERS FINANCIAL CORPORATION

By ______________________
Mitchell Brater
Vice Chairman of the Board
and Chief Operating Officer

Date: July 17, 1991

65

# EXHIBIT INDEX

| EXHIBIT NUMBER | |
|---|---|
| 3 | Articles of Incorporation and Bylaws. |
| 4(a) | Form of Promissory Note and Form of Security Agreement for Recourse Promissory Notes (1990); |
| 4(b) | Trust Indenture, dated as of July 1, 1990, by and between Towers Healthcare Receivables Funding Corporation and The Connecticut National Bank relating to the Healthcare Receivables Backed Bonds; |
| 4(c) | Form of Non-Negotiable Recourse Promissory Note and Form of Security Agreement for Recourse Promissory Notes (1989). |
| 4(d) | Trust Indenture, dated as of November 1, 1990, by and between Towers Healthcare Receivables Funding Corporation--II and the Connecticut National Bank relating to the Healthcare Receivables Backed Bonds--Series 1990A. |
| 4(e) | Form of Promissory Note and Form of Security Agreement for Recourse Promissory Notes (1990/1991). |
| 9 | Voting Trust Agreement between Mitchell Brater and Sovereign Holdings, Ltd., dated December 20, 1989. |

66

| | |
|---|---|
| 10(a) | Sublease Agreements between Towers Financial Corporation and Associated Dry Goods Corporation with respect to space at 417 Fifth Avenue, New York, New York; |
| 10(d) | Stock Option granted by Towers Financial Corporation to Mr. Anthony DiNicolas dated January 4, 1991. |
| 22 | List of Subsidiaries of the Company is incorporated by reference to Footnote 1 of Notes to Financial Statements. |
| 28(a) | Form of commercial accounts receivable purchase agreement. |
| 28(b) | Form of purchase contract for acquisition of a loan portfolio. |